# In the United States Court of Federal Claims

No. 01-249-C

(Filed June 2, 2004)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * | ) | Breach of contract; standard contract for disposal of spent nuclear fuel; motion for summary judgment; RCFC 56; contractual mechanism for defining and implementing a contractual term; duty of good faith and fair dealing; prevention doctrine; Restatement (Second) Contracts § 225; scope of relief available for ongoing partial breaches; Restatement (Second) Judgments § 26 |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant. | ) | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | |

Peter K. Shea, Office of the General Counsel, Tennessee Valley Authority, Knoxville, Tennessee, for plaintiff. With him on the briefs were Maureen H. Dunn, General Counsel, and Edwin W. Small, Assistant General Counsel.

Harold D. Lester Jr., Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Robert D. McCallum Jr. and David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This action is one of a series of cases pending before the Court involving contracts between the federal government and the operators of the nation's nuclear electric utilities for the

disposal of spent nuclear fuel.[1] Plaintiff, the Tennessee Valley Authority ("TVA"), challenges the alleged failure of the Department of Energy ("DOE") to perform under a contract for the disposal of spent nuclear fuel ("SNF") and related materials generated at two nuclear power plants owned and operated by TVA – its Browns Ferry and Sequoyah nuclear plants. As damages, TVA seeks its costs incurred in building on-site dry storage facilities for the spent fuel that it otherwise would have transferred to DOE under the contract. Before the Court are cross-motions for summary judgment styled as follows: (1) defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater than Class C Radioactive Waste Arguments, filed on November 28, 2001 ("Def.'s GTCC Mot."), (2) defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance, filed on December 3, 2001 ("Def.'s Rate Mot."), and (3) plaintiff's Motion for Summary Judgment, filed on October 23, 2002 ("Pl.'s Mot."). The arguments presented in the parties' motions for summary judgment have been fully briefed,[2] and a hearing on the motions was conducted on April 2, 2004.

At the hearing, the government's counsel withdrew its GTCC motion on the ground that it is premature, and accordingly that motion is denied without prejudice. For the reasons set forth below, the Court denies the government's rate motion because it lacks any legal basis on the undisputed facts of this case. TVA's motion is granted in part insofar as liability for breach of contract is concerned, *i.e.*, DOE is liable for its breach of its standard contract with TVA by failing to accept, transport, and dispose of spent nuclear fuel from TVA's two nuclear plants, but TVA's motion otherwise is denied.

This Opinion and Order also addresses the issue of the scope of the relief available to TVA in light of the unusual nature of the ongoing partial breaches of contract in this case. This issue was raised by plaintiff in its cross-motion and was addressed during the hearing on April 2, 2004.[3] The Court orders that this case should proceed to trial on damages in a timely fashion, to address TVA's damages accrued between the government's initial alleged breach in 1998 and the conclusion of TVA's fiscal year ending September 30, 2004.

---

[1]This case is one of more than sixty cases filed in this Court based on alleged breaches of a standard contract entered into by the Department of Energy and the operators of the nation's nuclear power plants.

[2]Prior to the hearing, as requested by the Court, defendant submitted a supplemental brief on February 27, 2004 ("Def.'s Supp. Br."), and plaintiff submitted a responsive supplemental brief on March 18, 2004 ("Pl.'s Supp. Br.").

[3]Plaintiff submitted a supplemental brief addressing the issue on April 16, 2004 ("Pl.'s Scope Br."). The government referred to arguments it presented on this issue via a motion *in limine* filed in another spent nuclear fuel case, *Indiana Michigan Power Co. v. United States*, No. 98-486C ("Def.'s Scope Br.").

## BACKGROUND

The general factual background of the contracts and the surrounding circumstances underlying this and the other spent nuclear fuel cases have been recounted by this Court and the Courts of Appeals for the Federal and D.C. Circuits on a number of occasions. *See Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337-40 (Fed. Cir. 2000); *Northern States Power Co. v. United States*, 224 F.3d 1361, 1364 (Fed. Cir. 2000) ("*Northern States II*"); *Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 756-58 (D.C. Cir. 1997) ("*Northern States I*"); *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1273-74 (D.C. Cir. 1996) ("*Indiana Michigan I*"); *Commonwealth Edison Co. v. Dep't of Energy*, 877 F.2d 1042, 1043-45 (D.C. Cir. 1989) ("*Commonwealth Edison I*"); *Indiana Michigan Power Co. v. United States*, __ Fed. Cl. __, 2004 WL 1161880 at *2-3 (May 21, 2004) ("*Indiana Michigan III*"); *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 90-94 (2003) ("*Indiana Michigan II*"); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 654-55 (2003) ("*Commonwealth Edison II*"); *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 300 (2003). As a consequence, the following recitation is limited to those facts necessary for an analysis of the pending motions.

In January 1983, Congress enacted the Nuclear Waste Policy Act ("NWPA"), Pub. L. No. 97-425, Title III, § 302, 96 Stat. 2257 (Jan. 7, 1983) (codified at 42 U.S.C. § 10222), authorizing DOE "to enter into contracts with any person who generates or holds title to high-level radioactive waste ["HLW"], or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel" in exchange for the payment of an initial amount and then recurring fees. 42 U.S.C. § 10222(a)(1). Congress mandated that the country's nuclear plant operators, primarily electrical utilities, enter into such contracts with DOE as a prerequisite to obtaining renewal of their operating licenses. 42 U.S.C. § 10222(b). *See also Maine Yankee*, 225 F.3d at 1337 ("The [NWPA] effectively made entry into such contracts mandatory for the utilities."). "The Act required that all such contracts 'shall provide that' [DOE] will dispose of the waste [or spent fuel] 'beginning not later than January 31, 1998.'" *Id.* (quoting 42 U.S.C. § 10222(a)(5)(B)). In furtherance of the NWPA, DOE promulgated a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste ("Standard Contract"), which Contract was codified at 10 C.F.R. § 961.11. The Standard Contract established the terms under which the government would "accept title to, transport, and dispose of . . . spent fuel and waste . . . [i]n exchange for . . . fees specified in the contract." 10 C.F.R. § 961.2. Although DOE was to begin collection of waste in 1998, no collection began at that time, and no collection has occurred to date. DOE announced in 1995 that it does not anticipate making any such collection prior to 2010. Def.'s Proposed Findings of Uncontroverted Fact ("PFUF") ¶ 132; 60 Fed. Reg. 21,793, 21,794 (May 3, 1995).

The Standard Contract did not establish a specific rate or schedule for the collection of SNF. Rather, it established a process by which a rate would be established for each utility. *See Indiana Michigan II*, 57 Fed. Cl. at 97; *Commonwealth Edison II*, 56 Fed. Cl. at 662-663. Under the contractual process, first, the utilities, including TVA, would submit to DOE proposed

Delivery Commitment Schedules ("DCSs") for DOE's review and approval. Standard Contract Art. V.B., App. C. Such DCSs were to specify the amount of SNF the utility "wishe[d] to deliver to DOE beginning sixty three (63) months thereafter." *Id*., Art. V.B.1.

The amount of waste covered by such DCSs was to be based upon allocations established by DOE and published in two types of documents – Annual Capacity Reports ("ACRs") and Annual Priority Rankings ("APRs"). ACRs were to "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." *Id*., Art. IV.B.5.(b). APRs were to address the "receipt of SNF and/or HLW" and were to be "based on the age of SNF and/or HLW as calculated from the date of discharge of such material." *Id.,* Art IV.B.5.(a).[4] ACRs were issued in 1991 and 1992, and DOE published a consolidated ACR/APR in 1995, establishing allotments and priorities for all of the utilities for the initial ten-year period of collection (*i.e.,* 1998-2007). Def.'s Rate App. at 234-242. DOE has not published an ACR or an APR since then and has indicated that it does not intend to designate allocations for 2008 or 2009. Pl.'s App. at 197 (letter from David K. Zabransky to John B. Carden, III (Aug. 14, 2002)).

The 1995 ACR/APR was based on a projected "ramped-up" maximum total annual collection level of 900 metric tons of uranium ("MTU") of SNF for an aggregate of 8,200 MTU over 10 years. Def.'s Rate App. at 224, 233, 239. Previously issued schedules had used a higher annual maximum collection level of 3,000 MTU of SNF. Def.'s Rate App. at 201-202.[5] The

[4]In general, oldest SNF was intended to have the highest priority. *Id*., Art. IV.B.5.(a).

[5]The reduction in acceptance levels in 1995 was engendered by amendments to the NWPA enacted in 1987 that capped DOE's ability to accept SNF at 10,000 MTU prior to opening a permanent repository. *See* 42 U.S.C. § 10168(d)(3); *Commonwealth Edison II*, 56 Fed. Cl. at 666. The 1987 amendments authorized DOE to construct "one monitored retrievable storage facility" that was expected to be constructed more quickly than a permanent storage facility and that would serve to augment any eventual permanent facility. 42 U.S.C. § 10162(b). However, DOE could not begin construction of this secondary storage facility until it had obtained a license for a permanent facility. 42 U.S.C. § 10168(d)(1). DOE has identified a site in Nevada, known as Yucca Mountain, for the location of the permanent repository, but it remains uncertain when construction of either facility will begin. As matters now stand,

> [t]he President approved the Yucca site formally in late July 2002. *See* Approval of Yucca Mountain Site, Pub. L. No. 107-200 (2000). The next milestone in the process is submitting DOE's application to begin construction. The Department will submit its license application to [the Nuclear Regulatory Commission] by December 2004. *See* 10 C.F.R. Part 2, Appendix D; *see also* 10 C.F.R. § 2.1023(b).

utilities were instructed to base their DCS submission on the "reduced" allocations designated in the 1995 schedules. Pl.'s App. at 85 (letter from M. Detmer to David H. Marks (Mar. 4, 1992)).

Once a utility's allocation had been determined, the Standard Contract describes the process for approval of a given utility's proposed DCS as follows:

> 1. . . . DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the [utility] in writing of the reasons for such disapproval and request a revised schedule from the [utility], to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.
>
> 2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the [utility] in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the [utility], the parties shall promptly seek to negotiate [a] mutually acceptable schedule(s). [The utility] shall have the right to adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

Standard Contract Art. V.B. Subsequent to the establishment of a DCS, each utility was to provide DOE with a Final Delivery Schedule ("FDS") for the waste covered by such DCS not less than twelve months prior to the date for the first delivery. *Id*., Art. V.C. DOE was then to approve or disapprove such FDS, with a procedure for comment, revision, and negotiation similar to that set forth for a disapproved DCS in the event of disapproval of a utility's proposed final schedule. *Id*.

Within this framework, TVA and DOE entered into the Standard Contract in June of 1983, executing Contract No. DE-CR01-83NE44420 ("TVA Contract"). Pl.'s App. at 34. The TVA Contract encompasses SNF and waste produced at four power plants – (1) Browns Ferry, which is located on the northern shore of Wheeler Lake in Limestone County, Alabama, (2) Sequoyah, which is located on the western shore of Chickamauga Lake in Hamilton County, Tennessee, (3) Watts Bar, which is located on the western bank of the Tennessee River in Rhea County, Tennessee, and (4) Bellefonte, which is located on the western bank of the Tennessee River in Jackson County, Alabama. Pl.'s App. at 35-43. By this action, however, TVA seeks damages related only to the Browns Ferry and Sequoyah plants. Compl. ¶ 8.

---

*Indiana Michigan III*, ___ Fed. Cl. at ___, 2004 WL 1161880 at *4.

TVA submitted DCS proposals for the collection of SNF from Browns Ferry and Sequoyah for each year between 2002 and 2007, with the first DCS submission made in 1997. *See* Pl.'s Mot. at 11; *see also* Def.'s Rate App. at 454-468; Def.'s Supp. Rate App. at 190. In response to each submission, DOE sent TVA a letter containing the following paragraph:

> The Department is not able at this time to approve your DCS submittal. Consequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days.

Def.'s Rate App. at 456, 459, 462, 465, 468. There is no evidence that DOE has provided such "further notice" to date, and no final delivery schedule for any of TVA's SNF has been established. Additionally, TVA states that it has paid "over $589 million" in fees to DOE under the contract and "continues to make quarterly contract payments totaling over $40 million annually." Pl.'s Mot. at 13.

The rate of DOE's projected acceptance of spent nuclear fuel and waste has proved to be a major issue in other SNF cases. Plaintiffs in SNF cases have argued that use of DOE's "reduced" acceptance level in its 1995 ACR resulted in significant decreases in the utilities' designated allotments. *See Indiana Michigan II*, 57 Fed. Cl. at 99; *Commonwealth Edison II*, 56 Fed. Cl. at 666. TVA, however, has made no such allegation with respect to the contractual claim it is currently pursuing. Instead, for purposes of its motion, TVA accepts DOE's reduced ACR. With the rate-of-acceptance issue eliminated, this case has a different focal point than other such cases. TVA's claim is premised upon the allegation that it "was forced to construct dry storage facilities for SNF only because DOE did not perform at all; had DOE even performed in accordance with its 1995 ACR's reduced acceptance rates for the period 1998-2007, the SNF storage facilities being constructed by TVA would have been unnecessary." Pl.'s Mot. at 16.

Specifically, TVA avers that "[a]s a result of DOE's breach, TVA's Browns Ferry and Sequoyah Nuclear Plants will not have sufficient capacity to store SNF through 2010 or later. Accordingly, TVA will have to construct additional capacity and procure appropriate containers to store SNF until such time as DOE fulfills its contractual commitments." Compl. ¶ 8. TVA's original plan was to transfer its SNF to DOE pursuant to the TVA Contract, but when DOE announced that it would not collect any SNF prior to 2010, TVA alleges that it had no option other than to begin construction of on-site long-term storage facilities at Browns Ferry and Sequoyah. Pl.'s Mot. at 1, 28-29. TVA avers that it has incurred costs at both of these sites in connection with the construction of dry storage casks in which SNF may be lagered for an extended period of time. *Id.*, at 16. The construction of such casks was allegedly required by the circumstance that the wet storage capacity available with the Browns Ferry and Sequoyah reactors is insufficient to store the spent fuel produced through the reactors' regular operations. Without sufficient wet storage space, the spent fuel must be removed and stored elsewhere. Construction of the dry storage facility at Sequoyah was "virtually complete" at the time of the hearing in April 2004, and the facility at Brown's Ferry was "at least 60 percent done" and scheduled to enter service in 2005. Hr'g Tr. at 37.

## DISCUSSION

### A. Standard of Decision

Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250. A fact is "material" if it would affect the outcome of the case. *Id.* at 248. In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In considering cross-motions for summary judgment, a court must evaluate each motion on its own merits and resolve any reasonable inferences against the party whose motion is being considered. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Both motions must be denied if genuine disputes exist over material facts. *Id.* A claimant's motion for summary judgment may be granted only if admissible evidence has been adduced to support each required element of the claimant's case. *Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 243-44 (2003).

### B. The Government's Rate-of-Acceptance Motion

The government's motion for summary judgment as to the rate of acceptance is a now-standard motion that the Department of Justice has submitted in numerous SNF cases and is, in large part, not pertinent to the specific issues of this case. In its motion, the government discusses the contractual obligations it argues are owed to two other classes of plaintiffs in the various SNF cases – those utilities whose DCSs were approved by DOE and those utilities that failed to submit any DCS. *See* Def.'s Rate Mot. at 18-22. With regard to those utilities that did not submit a DCS, the government argues that such utilities have "no basis upon which to seek damages for DOE's 'failure' to accept [their] SNF" because such utilities would not have been entitled to collection of any SNF due to their own inaction. *Id.* at 21-22. As for those utilities for which DOE did approve a DCS, the government argues that these "utilities' claims for damages should be measured against these approved DCSs." *Id.* at 21.[6]

Only the government's reply brief touches upon the factual scenario in this case - one in which the plaintiff had submitted DCS proposals on which the government refused to act. In this third factual setting, the government argues that "the Court's determination of the appropriate

[6]Given DOE's use of a "reduced" acceptance level in relation to the DCSs that it did approve, this argument has been viewed in other SNF cases to be an attempt by the government to limit its liability. *See Indiana Michigan II*, 57 Fed. Cl. at 99; *Commonwealth Edison II*, 56 Fed. Cl. at 665.

benchmark by which to measure damages must be limited, at most, to the DCSs that the utility submitted for approval within the parameters of the DCS Instructions." Def.'s Rate Reply at 48. For its part, and unusually for these cases, TVA does not disagree that DOE's previously promulgated schedules are a proper basis for its asserted damages. *See* Pl.'s Mot. at 16 ("TVA's damages are the same regardless of which schedule is employed as the benchmark."). TVA's counsel summarized this position as follows -

> [W]e do have a very definite rate for DOE. We can definitize [*sic*] this contract here because we can turn and look and see exactly what DOE said and exactly what DOE allocated to TVA under the contract, and TVA stepped up and said, Yes, sir, we'll take it.

Hr'g Tr. at 31:8-12. TVA avers that the Court should treat its DCS submissions as though they had been approved by the government and asserts that DOE acted in bad faith by refusing to accept or deny such submissions. Pl.'s Mot. at 21-24.

The TVA Contract establishes a definite and detailed procedure that the parties agreed to employ to determine the applicable rate of acceptance. *See supra*, at 3-5. The government has characterized this procedure as an "agreement to agree," Def.'s Rate Reply at 25, 48, and argues that acceptance schedules derived through the prescribed negotiation procedure "become commitments that define the parties' schedule obligations for those years of SNF acceptance to which the approved DCSs apply." *Id*. at 26 n.17. It relies on the fact that no such commitment has been agreed to by the parties in this case. TVA asserts that the lack of approved DCSs should not bar its recovery.[7]

---

[7]The Court in *Commonwealth Edison II* disagreed with the government's position on this point, explaining that the DCS submission-and-approval "mechanism does not create a contractually binding obligation for either party." 56 Fed. Cl. at 663. "Even if the process defined in Article V of the Standard Contract could, if followed and completed in good faith, create a contractual obligation, the third step in the process was not completed because plaintiff did not submit and defendant did not approve a FDS for any year." *Id.* at 666. In *Commonwealth Edison II*, however, the *plaintiff* was challenging the binding nature of its approved DCSs, arguing that the government had "attempt[ed] to limit its damages through the DCS process." *Id.* at 665. Similarly, in *Indiana Michigan II*, this Court held that the schedule set forth in the relevant DCSs was not binding. 57 Fed. Cl. at 97-98. In that instance, the Court again based its conclusion on the fact that DOE had used an "artificially low acceptance rate" to decrease the "limit of the [g]overnment's liability to plaintiff for breach." *Id.* at 99. In this case, however, TVA has accepted the rates established by defendant for the first ten years of SNF acceptance as an adequate basis for determining its damages. In light of the parties' concurrence on this point, the Court accepts only for the purposes of this case that the DCS process creates a binding "benchmark" for addressing breaches of the Standard Contract.

Rather, TVA argues, DOE's unilateral decision neither to approve nor to reject TVA's DCS submissions was either a breach of the government's implied duty of good faith and fair dealing or an active step designed to prevent TVA from enjoying the benefits of the contract. *See* Pl.'s Mot. at 21-24. Specifically, TVA argues that "even though TVA submitted DCS forms in accordance with DOE's allocations to TVA [as set forth in the 1995 ACR/APR] for the period 2002-2007 and even though approval in such instances necessarily would be pro forma, DOE refused to approve TVA's DCS submittals." Pl.'s Mot. at 11. TVA avers that "by improperly suspending the approval process, DOE made it impossible for TVA to obtain an approved DCS." *Id*. at 15-16. According to TVA, the government should not be allowed to use the lack of an approved DCS as a shield to protect itself from liability when the very lack of such approval was caused wholly by the government's own inaction. For its part, the government argues that it was justified in declining to act on TVA's DCS submissions because "it certainly would not constitute a lack of good faith for DOE to decline to create commitments that it knew it could not satisfy." Def.'s Rate Reply at 48.

"[I]n every contract there exists an implied covenant of good faith and fair dealing." 13 Richard A. Lord, *A Treatise on the Law of Contracts* § 38:15 at 437 (4th ed. 2000) (hereafter "*Williston on Contracts*"). *See also Restatement (Second) Contracts* § 205 (1981); *Southern California Edison Co. v. United States*, 58 Fed. Cl. 313, 324 (2003); *Commonwealth Edison II*, 56 Fed. Cl. at 665; *Asco-Falcon II Shipping Co. v. United States*, 32 Fed. Cl. 595, 604 (1994). Proving a breach of this covenant in a government contract is frequently difficult because of the presumption that a government employee performs his or her duties in good faith. *See generally* John W. Whelan, *Understanding Federal Government Contracts* 68-70 (1993). "'[S]ince good faith is presumed unless bad faith is shown, the government is prevented only from engaging in actions motivated by a specific intent to harm plaintiff'. . . . Thus, in order to state a claim premised on a violation of the obligation of good faith and fair dealing, plaintiffs must allege facts which if proved would constitute malice or an intent to injure." *Asco-Falcon*, 32 Fed. Cl. at 604 (quoting *Torncello v. United States*, 681 F.2d 756, 771 (Ct. Cl. 1982)). *See also Torncello*, 681 F.2d at 770 (The government "is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary.").

Correlatively, when one party to a contract interferes with the fulfillment of a condition by the other party, the interfering party may not then use the lack of fulfillment of that condition to the detriment of the injured party. *See* 9 Arthur Corbin, *Corbin on Contracts* § 947 (2002).[8]

---

[8]The government has argued at length that the terms of the Standard Contract should be interpreted according to the principles used to interpret regulations, *i.e.*, granting a degree of deference to the agency's interpretation and application of its own regulations, rather than those used to interpret the terms of a contract, *i.e.*, not granting deference to interpretations rendered by the party who drafted the contract. *See, e.g.,* Def.'s Rate Mot. at 7-10; Def.'s Rate Reply at 4-19. For purposes of the currently pending motions, the Court need not resolve this issue. Whatever the standard, no deference is due when DOE's position is inconsistent with the clear and unambiguous language of the Standard Contract. *See Commonwealth Edison II*, 56 Fed. Cl. at

In other words, the occurrence of a necessary condition "may be excused by prevention or hindrance of its occurrence through a breach of the duty of good faith and fair dealing." *Restatement (Second) Contracts* § 225 cmt. b. A party that alleges

> prevention or hindrance by the other party must prove that the condition on which his rights depended would have occurred or been performed but for the prevention or hindrance. Those terms presuppose a relation of cause and effect. If his performance would not have been rendered anyway, he has not been harmed by the alleged prevention or hindrance. The existence of this causal relation is a question of fact, one that may at times be difficult of determination.

9 *Corbin on Contracts* § 947 at 724-725. Furthermore, under the prevention doctrine, "[t]he government must avoid actions that unreasonably cause delay or hindrance to contract performance." *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed. Cir. 1993). The determination of whether the government's actions in causing a delay were reasonable must be considered in light of the relevant circumstances. *See Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 70 (2001) ("[T]o hold that the [agency] breached the implied duty not to hinder, the Court must determine whether, in the surrounding circumstances of the contract, the length of the suspension [of the contract] was unreasonable.").

Here, TVA has averred that prior to DOE's decision in 1997 to stop acting on DCS submissions, approval was "pro forma" and that DOE had approved every proper application up until that point. Pl.'s Mot. at 11, 23; Hr'g Tr. at 30. Moreover, DOE has refused to take action on TVA's DCSs, thereby depriving TVA of any benefit under the contract while continuing to assess and collect millions of dollars in fees annually. For its part, the government argues that it was not reasonable for DOE to create new binding contractual obligations by approving DCSs once it became obvious that DOE "would be unable to accept any SNF because it did not have any location at which it lawfully could place the SNF." Def.'s Rate Reply at 48.

Nothing in the Standard Contract conditions DOE's performance on the existence of a repository in which DOE might place spent nuclear fuel. In *Indiana Michigan I*, the D.C. Circuit examined the Standard Contract and the NWPA providing for such contract and concluded that

---

661. *See also Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 356 (2000) (declining to give deference to agency's interpretation when such interpretation was "inconsistent with the text" of the regulation at issue). Importantly for consideration of TVA's allegations of a breach of good faith, the government has presented no "interpretation" of the Standard Contract that would explain DOE's inaction in light of the requirement of Article V that DOE "shall approve or disapprove" the utilities' DCS submissions. *See generally Southern California Edison*, 58 Fed. Cl. at 322 (quoting *Black's Law Dictionary* 1233 (5th ed. 1979) ("[T]he term 'shall' is a word of command, and one which has always or which must be given a compulsory meaning; as denoting obligation . . . . It has the invariable significance of excluding the idea of discretion.")).

DOE's obligations under 42 U.S.C. § 10222(a)(5) subparagraph (A) ("take title to") and subparagraph B ("will dispose of") were independent and that the disposal obligation was not affected by the absence of a repository. *See* 88 F.3d at 1276-77. *See also Northern States I,* 128 F.3d at 756-57; *Commonwealth Edison II*, 56 Fed. Cl. at 664. As the D.C. Circuit put it, "that Congress contemplated [a repository] would be available [by January 31, 1998] does not mean that Congress conditioned DOE's obligation to begin acceptance of SNF on the availability of a facility." *Indiana Michigan I*, 88 F.3d at 1277. *See also Commonwealth Edison II*, 56 Fed. Cl. at 664 (quoting *Northern States I*, 128 F.3d at 760 ("[T]he NWPA directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility.")). Thus, DOE's proffered excuse for short-circuiting the acceptance process by not acting on TVA's DCSs has no legal validity because the Standard Contract does not tie DOE's obligation to accept SNF to the existence of a repository.

In short, DOE's motion for partial summary judgment on rate of acceptance lacks merit in this case, and the rate issue the government raises does not give rise to a genuine dispute of material fact in TVA's circumstances. For purposes of this case, TVA accepts DOE's 1995 reduced rate, and DOE is remitted only to a legally unavailing excuse that it has no repository or interim storage facility available to it. The government's rate motion must be denied as legally insufficient.

### C. The Government's GTCC Motion

In its additional motion for partial summary judgment, the government asks the Court to rule that DOE is not "obligated to accept and dispose of Greater Than Class C radioactive waste ('GTCC waste') under the terms of the Standard Contract." Def.'s GTCC Mot. at 1. The government asserts that GTCC waste[9] is not covered by the Standard Contract and, accordingly, DOE does not have an obligation to accept or dispose of such waste. *Id.* at 18. For its part, TVA explains that it "is not currently claiming damages based on DOE's failure to accept GTCC waste." Pl.'s Mot. at 32. TVA made no claim respecting GTCC waste in its Complaint and has made no argument that the scope of the SNF contract it entered into in 1983 encompassed disposal of such waste. Indeed, it is not apparent that TVA has produced any GTCC waste that is subject to disposal in light of the fact that its power plants remain in operation.

The government has subsequently conceded that in this case its pre-emptive challenge to a potential assertion of a claim related to the acceptance of GTCC waste is premature. Hr'g Tr. at 25-28. Consequently, there is no "concrete" dispute between the parties "because it is not known at this point whether plaintiff will request defendant to accept and dispose of GTCC waste as HLW pursuant to the Standard Contract or whether defendant will reject that possible

---

[9]GTCC waste is a category of radioactive material that is produced as a secondary result of the operation of a nuclear reactor. Such waste "comes from metal components in the reactor that absorb neutrons during the reactor's operation and become irradiated." *Id*. at 5. As such, GTCC waste is not typically generated for disposal until a reactor is shut down.

future request." *Commonwealth Edison II*, 56 Fed. Cl. at 659. However, it is foreseeable that at some point TVA will produce GTCC waste and assert a claim that disposal of such waste is encompassed by the TVA Contract. At that time, both TVA and the government may reassert their positions regarding whether the Standard Contract covers disposal of GTCC waste. Accordingly, the government's GTCC Waste Motion is denied without prejudice.

**D. TVA's Motion**

*1. TVA's claim of breach.*

In its cross-motion for summary judgment, TVA asks the Court to determine that "DOE breached its 1983 standardized contract with TVA by not beginning to accept, transport, and dispose of SNF from domestic civilian nuclear reactors by January 31, 1998, and by not continuing performance thereafter at a reasonable rate." Pl.'s Mot. at 1. As discussed *supra*, DOE has breached the contract through its unilateral failure to act upon TVA's DCS submissions. The contract specifically provides that DOE "shall" either accept or reject such submissions and also provides that the parties shall engage in negotiations in the event they cannot reach an agreement as to an appropriate schedule for DOE's acceptance, transport, and disposal of TVA's SNF. Standard Contract Art. V.B. It is not contested that the government has failed either to accept or reject TVA's submissions and that it has also refused to engage in meaningful negotiations related to such submissions. Because there is no dispute as to the facts surrounding DOE's inaction on TVA's DCS submissions, and because the TVA Contract specifically requires DOE's performance, the Court grants TVA's request for summary judgment insofar as DOE breached its obligation to act on TVA's DCSs in good faith and ultimately to accept, transport, and dispose of TVA's SNF. Such breach provides a basis for TVA's claims of damages.

The government's complete failure to collect SNF from the various utilities under the Standard Contract has been extensively litigated. The Federal Circuit in *Maine Yankee* concluded that, with respect to the plaintiffs in that case, "[t]he government does not, and could not, deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998." 225 F.3d at 1343. Similarly, in this case it is beyond dispute that DOE has collected no SNF or HLW from TVA. It bears noting, however, that TVA was not entitled to have its SNF removed beginning in January 1998. Rather, the earliest that any of TVA's SNF would have been collected by DOE was sixty-three months after TVA's submission of its first proposed DCS. *See* Standard Contract Art. V.B.1. TVA submitted its first proposed DCS, for the collection of 58.7 MTU from the Sequoyah plant, in April of 1997. Def.'s Rate App. at 454-55. Consequently, the earliest scheduled pickup of TVA's SNF would have occurred in July 2002, putting aside the possibility of adjusting a final schedule by two months under Article B.2.

Nonetheless, DOE notified all of the utilities in 1995 that it would not begin collection of SNF on time, which position was born out by its refusal to act upon proposed DCSs beginning in

1997. When it became obvious to TVA that DOE would not perform under the contract, TVA was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance. "Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." *Restatement (Second) Contracts* § 350 cmt. b. *See also Robinson v. United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002) ("[R]easonable efforts in the form of affirmative steps are required to mitigate damages.") (citing *Restatement (Second) Contracts* § 350). TVA's construction of dry storage facilities for spent nuclear fuel at its Browns Ferry and Sequoyah nuclear plans must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial, ongoing breach.[10] Accordingly, to the extent that TVA is able to show at trial that it has incurred damages as a result of DOE's failure to act upon the proposed DCSs and its failure to collect SNF, TVA may recover those damages.

*2. TVA's claimed damages.*

In addition to seeking a ruling that DOE has breached the contract, TVA requests that the Court grant summary judgment awarding damages incurred "in constructing SNF dry storage facilities at TVA's Sequoyah and Browns Ferry Nuclear Plants which, except for DOE's breach, would have been unnecessary." Pl.'s Mot. at 1. In support of its request for damages, TVA has provided a Declaration from Thomas Hayslett, TVA's Manager, Nuclear Fuel Supply ("Hayslett Decl."). In his Declaration, Mr. Hayslett states that "TVA would have had sufficient storage space for SNF in its reactor pools at TVA's Sequoyah and Browns Ferry Nuclear Plants until 2013 had DOE begun acceptance operations no later than January 31, 1998 in accordance with DOE's 1991, 1992, or 1995 ACRs." Hayslett Decl. at 3. His declaration sets out TVA's spent fuel inventory and capacity at the two plants over time based on a scenario in which DOE collected no waste and one in which DOE collected waste according to the schedules based on DOE's reduced 900 MTU annual cap. *Id.,* Ex. 2. This report shows that, without any waste removal by DOE, Sequoyah and Browns Ferry are expected to exceed the installed capacity of their wet storage facilities, less full core reserve,[11] at some point during 2006. *Id.* By contrast,

---

[10]Notably, "the intent of the NWPA and the parties [to the Standard Contract] was to avoid the construction by utilities of additional at-reactor storage [after January 31, 1998]." *Commonwealth Edison II*, 56 Fed. Cl. at 667. DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, *i.e.*, the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants throughout the United States.

[11]"Commercial nuclear power plants reserve space in their spent fuel pools in the event they must offload fuel from a reactor unexpectedly. This may occur during an emergency to effect repairs or to prevent core damage. The extra capacity in a pool maintained for this purpose is known as full core offload capability or full core reserve." *Indiana Michigan III*, __ Fed. Cl. at __, 2004 WL 1161880 at *16.

with DOE collecting from TVA 414 MTU by 2007 and 908 MTU by 2020, Hayslett's report shows that Browns Ferry and Sequoyah would exceed their wet storage capacity, less full core reserve, at some point during 2013. *Id.* TVA has alleged that it has incurred $24,590,966.81 in damages measured by construction costs for the dry storage facilities as of the close of its fiscal year 2003, *i.e.,* September 30, 2003. Pl.'s Scope Br. at 3 n.1.

The government has presented no evidence that would controvert Mr. Hayslett's declaration. However, to date, the government has had no opportunity to conduct discovery related to TVA's alleged damages. *See* Hr'g Tr. at 45-46. Discovery on issues of liability was conducted on a consolidated basis in and for the early-filed SNF cases, of which this was one. *See* Order of Sept. 26, 2001 (Judge Weinstein, now Sypolt). Discovery on damages issues, which are of necessity specific to each individual plaintiff utility, was suspended during the coordinated discovery period. *See* Order of Jan. 31, 2003 at 3 (Judge Sypolt) ("The manner and scope of the government's discovery, should its pending motions for summary judgment be denied, on schedule or acceptance rate or other issues, and whether or not this discovery will be coordinated to any extent with the discovery in other SNF cases, has yet to be determined.").[12] Moreover, subsequent to the coordinated discovery period, all proceedings in this case were stayed by order of the Chief Judge of this Court from April 16, 2003, until January 30, 2004, pending consideration of a renewed motion by the government to consolidate the SNF cases. *See Yankee Atomic Elec. Co. v. United States*, No. 98-126 (Order of Jan. 30, 2004 ) (Chief Judge Damich).

"Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact . . . , but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule . . . that the claims and defenses have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986). A party that has not had the opportunity to obtain evidence in support of its opposition to a motion for summary judgment should not have that inability held against it. *See generally* RCFC 56(f); *Theisen Vending Co. v. United States*, 58 Fed. Cl. 194, 197-99 (2003). Because the government has had no opportunity to conduct discovery specifically related to TVA's allegations of damages, the Court cannot determine that no genuine dispute of material fact exists as to the amount of those damages or that TVA is entitled to those damages as a matter of law. TVA's motion for summary judgment must, accordingly, be denied insofar as it requests an award of damages, and an appropriate factual record as to TVA's damages must be developed through discovery and then trial. The parties shall conduct discovery related to TVA's damages and present their evidence at trial, according to the framework set forth in the following section of this opinion as to the appropriate scope of relief to be considered in this case.

---

[12]In this case, proceedings related to pending summary judgment motions were also suspended during this period. *See* Order of Dec. 26, 2001 (Judge Bruggink).

### E. Scope of Claims for Redress of Partial, Ongoing Breach

Although, as discussed *supra*, disputes of material fact preclude a determination of the amount of TVA's damages, no such barrier exists to the Court's defining the scope of TVA's claims for redress of the government's partial, ongoing breaches of the TVA Contract. In its cross-motion, TVA requests that the Court "provide in the judgment that TVA is not precluded from bringing a future action for damages incurred after [the close of TVA's fiscal year that precedes trial]." Pl.'s Mot. at 31; *see also* Pl.'s Scope Br. at 6-7 (repeating request that the Court allow TVA to provide proof of its damages "through TVA's most recently closed fiscal year with TVA retaining the right to bring additional actions for subsequent damages incurred"). The government elected not to address the scope of TVA's claims for redress in its initial briefing. However, the government's counsel did present arguments on the issue at the hearing, Hr'g Tr. at 9-12, 46-47, and additionally made reference to the government's motion *in limine* submitted in an indirectly related case, *Indiana Michigan III*, seeking to exclude evidence of future damages from that trial.

The government has argued that performance and breach under the Standard Contract should be analyzed in a framework similar to an installment contract in which a plaintiff may recover for partial-breach damages as they are incurred, subsequently bringing additional suits for further damages over time. *See* Hr'g Tr. at 9-12, 46-47 (citing *San Carlos Irrigation and Drainage Dist. v. United States*, 23 Cl. Ct. 276 (1991)); Def.'s Scope Br. at 6-7 (same). The government states its position as follows:

> The only damages that the Court need consider are those that [plaintiff] has incurred based upon the actual partial breach of the Standard Contract upon which [plaintiff's] complaint is based: the Department of Energy's failure to begin accepting spent nuclear fuel and/or high-level radioactive waste on January 31, 1998. Those damages are minimal, and the Court can review those incurred costs to determine whether they were actually caused by the Department of Energy's partial breach. *To the extent that additional partial breaches occur in the future, [plaintiff] can attempt to resolve any claims arising from those partial breaches without litigation as they arise or, alternatively, may maintain another suit based upon those partial breaches.* However, it may not recover damages at this time for partial breaches that may occur in the future.

Def.'s Scope Br. at 8-9 (emphasis added).

For its part, TVA asserts that "the [g]overnment here is not committing a series of recurring partial breaches, each of which results in discrete damages; instead, all TVA's damages spring from the [g]overnment's conceded twelve-year continuing delay from 1998 through 2010 rather than being discretely linked to individual failures to pick up SNF in a given year." Pl.'s Scope Br. at 4.

*1. Preservation of claims for ongoing harm caused by the government's partial breach.*

Because the Court has held that the government has breached the TVA Contract, this case is on course to proceed to trial on damages. *See supra*, at 12-14. *See also Maine Yankee*, 225 F.3d at 1343. At the conclusion of such trial, the Court will enter a final judgment in favor of either plaintiff or defendant.[13] As a general rule, "[w]hen a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see [*Restatement (Second) Judgments*] §§ 18, 19 [1982]), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Restatement (Second) Judgments* § 24(1). *See Young Eng'rs, Inc. v. International Trade Comm'n*, 721 F.2d 1305, 1314-15 (Fed. Cir. 1983) (adopting merger and bar rules and exceptions from the *Restatement (Second) Judgments*). Under this general rule of claim preclusion upon a final judgment, future claims by TVA based upon the same contract and the same failure to collect SNF by DOE would typically be forestalled.

However, TVA's right to pursue damages in the future may be preserved by one or more exceptions to the general rule, explicated in *Restatement (Second) Judgments* § 26(1) as follows:

> When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:
>
> (a) The parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein; or
> (b) The court in the first action has expressly reserved the plaintiff's right to maintain the second action; or
> . . .
> (e) For reasons of substantive policy in a case involving a continuing or recurrent wrong, the plaintiff is given an option to sue once for the total harm, both past and prospective, or to sue from time to time for the damages incurred to the date of suit, and chooses the latter course.

TVA has suggested that the Court may treat the government's position with regard to a plaintiff's ability to maintain another suit based upon DOE's recurring partial breaches, together with the government's representations at the hearing in this case that the Court should not consider future damages at this point, as an agreement, as envisioned by Paragraph 26(1)(a) of the *Restatement*, that TVA may split its claim. Pl.'s Scope Br. at 2-3, 5-6. Alternatively, TVA argues that "the

---

[13]The Court agrees with the parties' position that a final judgment issued pursuant to Rule 54(b) on some but not all claims would not be appropriate in the circumstances of this case. *See* Pl.'s Scope Br. at 4 n.2; Hr'g Tr. at 47, 51-52.

damages issues arising from the failure by the Department of Energy (DOE) to dispose of spent nuclear fuel (SNF) under the Standard Contract present a unique legal setting" that justifies the Court's issuing an order, pursuant to either Paragraph 26(1)(b) or 26(1)(e), preserving TVA's right to maintain future actions. *Id.* at 2.

The Court agrees with TVA's second argument.[14] TVA's claim for a partial breach of the TVA Contract is a limited claim that, by its nature, does not embrace all of TVA's rights and claims for redress with respect to the ongoing TVA Contract. "For a partial breach the injured party can maintain action at once[,] but he is not permitted to stop further performance by the wrongdoer and get damages for the anticipated future non-performance, as well as for the past non-performance constituting the partial breach." 9 *Corbin on Contracts* § 946 at 719. "A claim for damages for partial breach is one for damages based on only part of the injured party's remaining rights to performance." *Restatement (Second) Contracts* § 236(2). Any consideration of future damages in this case would require a high degree of speculation and uncertainty both as to whether such damages even would be incurred as well as what their quantum might be. *See generally Indiana Michigan III*, ___ Fed. Cl. at ___, ___, 2004 WL 1161880 at *13, 23-27. TVA's claim is necessarily solely a claim for partial breach – a claim for total breach would abort the contract, thereby obviating DOE's obligation to collect TVA's SNF and HLW in the future and most likely resulting in the forfeiture of TVA's operating licenses pursuant to 42 U.S.C. § 10222(b). As such, TVA's current claim for damages cannot be viewed as encompassing future damages, and the Court declines to treat it as such.

Accordingly, the Court hereby adopts the exceptions to the rules of merger and bar set out in *Restatement (Second) Judgments* § 26(1)(b) and (e).[15] The Court holds that at trial, the scope of TVA's claims for redress of the partial ongoing breach shall be limited to damages incurred by TVA between the date of DOE's breach and the end of TVA's most recently closed fiscal year

---

[14]Notwithstanding the government's expressed position in its Scope Brief and at the hearing in this case, the Court is hesitant to imply an agreement or acquiescence on the government's behalf as to TVA's right to maintain future actions.

[15]In the circumstances of this case, there appears to be no meaningful difference in practical effect and application between Paragraphs 26(1)(b) ("The court in the first action has expressly reserved the plaintiff's right to maintain the second action.") and 26(1)(e) ("For reasons of substantive policy in a case involving a continuing or recurrent wrong, the plaintiff is given an option . . . to sue from time to time for the damages incurred to the date of suit, and chooses th[at] course."). TVA has urged the Court to allow it "to sue from time to time" based upon definitively incurred, non-speculative damages, and the Court has been guided by the experience in *Indiana Michigan III* to "reserve[]" and "give[]" that option. *Restatement (Second) Judgments* § 26(1)(b), (e).

prior to the date of trial.[16] Further, TVA shall retain the right to bring subsequent actions for damages it sustains after the period encompassed by such trial. Because discovery in this case related to TVA's damages previously was postponed, *see supra*, at 14; Hr'g Tr. at 45-47, the parties shall conduct discovery and otherwise prepare for trial accordingly.

*2. Statute of Limitations*

In light of the holding that TVA may bring subsequent suits for damages in the future, the statute of limitations applicable to such future claims must be addressed. "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Section 2501 is "jurisdictional in nature and, as an express limitation on the waiver of sovereign immunity, may not be waived." *Hart v. United States*, 910 F.2d 815, 818-19 (Fed. Cir. 1990). *See also Ware v. United States*, 57 Fed. Cl. 782, 787 (2003). "[A] claim 'first accrues' when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988); *see also Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). "Generally, '[i]n the case of a breach of a contract, a cause of action accrues when the breach occurs.'" *Alder Terrace*, 161 F.3d at 1377 (quoting *Manufacturers Aircraft Ass'n v. United States*, 77 Ct. Cl. 481, 523 (1933)). However, "a claim does not accrue until the claimant has suffered damages," even if those damages, once suffered, may not be calculated with precision. *Alder Terrace*, 161 F.3d at 1377 (citing *Terteling v. United States*, 167 Ct.Cl. 331, 334 F.2d 250, 254 (Ct. Cl. 1964) ("It is too well established to require citation of authority that a claim does not accrue until the claimant has suffered damages."); *Alder v. United States*, 785 F.2d 1004 (Fed. Cir. 1986)). TVA's future claims for its future damages should, therefore, be considered to accrue for purposes of the statute of limitations at the time such damages are incurred. Accordingly, TVA must bring any future actions for damages related to DOE's breach of the Standard Contract within six years of TVA's incurring such damages.[17]

---

[16]TVA has stated that its fiscal year ends on September 30. Hr'g Tr. at 55. In view of the ongoing nature of TVA's alleged damages and the Court's determination that TVA may bring subsequent suits for damages incurred in the future, adoption of the end of the plaintiff's regular fiscal year as a cutoff date will make presentation and analysis of evidence more convenient and efficient for the parties and the Court without inflicting prejudice on either party. The trial in this case will likely occur after September 30, 2004, and before September 30, 2005. Therefore, September 30, 2004, shall be the cutoff date for damages in this case. In the event the trial occurs after September 30, 2005, that date shall be the cutoff.

[17]The question whether this Court should retain jurisdiction to hear claims for future damages attendant to the partial, ongoing breach of the TVA contract, notwithstanding any entry of final judgment in this case, is reserved for further consideration. *Cf. Indiana Michigan III*, __ Fed. Cl. at ___, 2004 WL 1161880 at *27.

## CONCLUSION

For the reasons stated, Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance is DENIED; Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater than Class C Radioactive Waste Arguments is DENIED without prejudice; and Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part, as follows:

(1) the government breached the TVA Contract and is and shall be liable for any damages that TVA may show it has incurred due to that breach;

(2) genuine disputes of material fact exist as to the damages incurred by TVA due to the government's breach;

(3) the scope of TVA's claims for redress of partial, ongoing breach of the TVA Contract by the government shall be limited to damages incurred by TVA between the initial date of the government's breach and the end of TVA's most recently concluded fiscal year; and

(4) in accord with *Restatement (Second) of Judgments* § 26(1)(b) and (e), TVA shall retain the right to bring subsequent actions on claims for damages incurred after the period encompassed by item (3) above, regardless of any final judgment entered by the Court following trial on the merits in this case.

On or before July 2, 2004, the parties shall submit a joint status report setting forth a proposed schedule for further proceedings in this case, including a schedule for any remaining discovery that is needed as well as those items encompassed by RCFC App. A ¶ 12 (final sentence) respecting preparations for trial.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge