IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-488 C<br>(Judge Braden) |

AMENDED COMPLAINT

Pursuant to the Court's Memorandum Opinion and Order dated July 30, 2004, Plaintiff, Sacramento Municipal Utility District ("SMUD"), through its undersigned counsel, files this Amended Complaint against Defendant, the United States, and states as follows:

NATURE OF THIS ACTION

1. This is an action for breach of contract and taking of property without just compensation. Plaintiff SMUD bases its claims upon a written contract with the United States, known as the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract") whereby the government agreed to dispose of spent nuclear fuel ("SNF") produced by SMUD in exchange for agreed payments fixed in the Standard Contract at particular amounts. SMUD paid these fixed payments to the government on time and in full with the result that, as with any such commercial transaction, SMUD obtained the

contract right to the government's performance of its contract obligations. The government breached the Standard Contract when it demonstrated, by its conduct and statements, that it did not intend to perform its contractual duty to dispose of the SNF in a timely manner, and then announced that it does not intend to fulfill its contract obligations prior to, at the earliest, the year 2010, and perhaps much later -- far longer than any reasonable time within which to begin performance. The government's failure to perform breached both the express terms of the Standard Contract and the implied contract of good faith and fair dealing. The government has caused SMUD to incur the substantial sums it has paid and will pay to store SNF during years when the government was obligated to store that SNF at its own cost. The government has also failed to tender to SMUD the just compensation due SMUD for the government's taking of SMUD's property rights in the Standard Contract. The government has also failed to tender to SMUD the just compensation due SMUD for the fact that the government, by forcing SMUD to store SNF on real property that SMUD would otherwise put to productive economic uses, has taken the real property on which SMUD must store the SNF.

2. For relief, SMUD seeks (i) damages to compensate SMUD for the injury the government caused to SMUD; (ii) an amount equal to the amount by which the government has benefited itself by unilaterally extending, by many years, the time that it will have the use of SMUD's money; (iii) just compensation for the government's taking of SMUD's contract rights; and (iv) just compensation for the temporary taking of SMUD's real property used for continued storage of SNF. SMUD also seeks such other and further relief as the Court may deem just

and appropriate. Moreover, SMUD preserves, retains and asserts all of its rights to the government's performance pursuant to the Standard Contract.

JURISDICTION

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

PARTIES

4. Plaintiff SMUD is a municipal utility district established under the laws of California, which operates community-owned electricity generating facilities. These facilities formerly comprised among others the Rancho Seco Nuclear Generating Station Unit 1, a nuclear-powered plant situated near Sacramento, California ("Rancho Seco"). Rancho Seco was SMUD's only nuclear-powered plant. SMUD permanently shut down Rancho Seco on June 7, 1989.

5. Defendant United States is a sovereign entity that is bound to honor the terms of its duly executed commercial contracts, and is subject to the requirements of applicable law, including the Fifth Amendment to the Constitution of the United States.

6. The United States Department of Energy ("DOE") is a cabinet-level department in the Executive Branch authorized to make contracts for the disposition of SNF and to dispose of the SNF generated by utilities such as SMUD. DOE is the successor to the United States Energy Research and Development Administration ("ERDA"), which was an independent

agency in the Executive Branch. ERDA was the successor to the United States Atomic Energy Commission ("AEC"), which was an independent agency in the Executive Branch.

<u>SUMMARY OF SMUD'S CLAIMS</u>

7. This action involves a written Standard Contract between SMUD and DOE. Pursuant to the Standard Contract the government, acting through DOE and as a commercial enterprise, agreed to sell to SMUD, and SMUD agreed to purchase, services for the disposal of spent nuclear fuel used by SMUD in the operation of Rancho Seco. The Standard Contract expressed as determinable and fixed payments the prices that the government agreed to charge and SMUD agreed to pay for those SNF disposal services. The amount of those payments was measured, for the most part, by the amount of electricity generated by SMUD at Rancho Seco and sold to customers.

8. In timely fashion continuing throughout the period of performance of the Standard Contract, SMUD paid whatever was the appropriate specified fixed price in return for the government's promise of future SNF disposal services, all in accordance with the terms of the Standard Contract between the parties. When Rancho Seco ceased generating electricity in 1989, SMUD's obligation to make further payments to DOE pursuant to the Standard Contract came to an end. SMUD has fully performed all of its obligations under the Standard Contract. The total of SMUD’s payments, net of minor adjustments, amounts to nearly $40 million.

9. Many years after full performance of the Standard Contract by SMUD, and after SMUD had permanently shut down Rancho Seco, the government by its conduct and by its statements demonstrated that it intended to keep all of SMUD's payments and the interest the government had earned thereon, but would refuse to dispose of SMUD's SNF in a timely manner as the Standard Contract required.

10. Thus, years after SMUD fully performed its obligations under the Standard Contract and after SMUD permanently shut down its only nuclear-powered plant, the government breached the Standard Contract but refused to tender back to SMUD any of the almost $40 million SMUD paid to purchase the government's SNF disposal services, or any of the interest the government has earned on SMUD's payments. The government is therefore liable to SMUD for return of the amounts by which it has benefited and for damages.

11. SMUD is entitled to recover the monies that it has expended, and will be required to expend, to maintain the safe storage of SNF during the period when the government should have performed its contractual duty to store that SNF.

12. The government by its failure to perform has taken the vested contract rights SMUD earned that obligate the government to dispose of SMUD's SNF. SMUD earned these rights when it paid in full the bargained-for agreed fixed payments specified in the Standard Contract. The Fifth Amendment thus mandates that the government pay SMUD just compensation for this taking.

13. The government's breach has forced SMUD to dedicate real property to serve as an SNF storage site, rather than convert that property to other economically beneficial uses. The

Fifth Amendment thus mandates that the government pay SMUD just compensation for this taking.

14. The government has stated that SMUD's Standard Contract is not subject to the Contract Disputes Act, 41 U.S.C. §§ 601-612 ("CDA"). The Standard Contract expressly preserves SMUD’s rights to obtain all remedies available at law, in addition to any other remedies expressed in the Standard Contract. The Standard Contract provides no procedures for resolving the breach and takings claims presented here. Accordingly, no administrative procedures apply to this case, in which SMUD asserts claims for damages and other compensation for breach of contract, and for just compensation as mandated by the Fifth Amendment.

## STATEMENT OF FACTS

### Nature of the Government's Services Under the Contract Involved Here

15. SNF is composed in significant part of toxic uranium and toxic byproducts such as plutonium and other highly radioactive substances. SNF remains radioactive after it is removed from a nuclear reactor and must be isolated in safe disposal facilities for thousands of years.

16. Congressional policy has been for many years, and is today, that the government’s responsibility to protect future generations from the hazards of SNF is better discharged by a strategy of final disposal in government-owned, government-controlled sites than by reliance on storage in utility-controlled sites such as power generating facilities.

17. In 1982, Congress enacted the Nuclear Waste Policy Act ("NWPA"), codifying the Federal Government's long-standing commitment to accept responsibility and provide for the timely disposition of SNF produced by utilities. *See* 42 U.S.C. § 10101 *et seq*.

18. Pursuant to Section 302 of the NWPA, the government in 1983 developed the Standard Contract, using "notice and comment" procedures to allow utilities to present their positions in response to the draft contract proposals. The Standard Contract governs the payment of fees into the Nuclear Waste Fund and the provision of services by the government, acting through DOE, required under the NWPA. *See* 10 C.F.R. Part 961.11.

19. Pursuant to these "notice and comment" procedures, the government stated that the Standard Contract is not subject to the Contract Disputes Act, 41 U.S.C. §§ 601-612 ("CDA"). Accordingly, no administrative procedures apply to this case.

20. The Standard Contract provides that "[t]he services to be provided by [the government] under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW [high level radioactive waste] from the civilian nuclear power reactors . . . has been disposed of." Standard Contract Art. II.

21. The Standard Contract provides that the government must dispose of SNF beginning on January 31, 1998. The Standard Contract provided that "[n]otwithstanding the age of the SNF and/or HLW, priority [for government acceptance of SNF] may be accorded any SNF and/or HLW removed from a civilian nuclear reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." Standard Contract Art.

VI.B.1(b). SMUD's only reactor, the Rancho Seco reactor, has been permanently shut down since 1989.

22. The Standard Contract provides that "[u]pon payment of all applicable fees, interest and penalties on unpaid or underpaid amounts, the Purchaser shall have no further financial obligation to DOE for the disposal of the accepted SNF and/or HLW." Standard Contract Art. VIII.D. SMUD has paid all applicable fees under the contract.

SMUD's Contract With the Government

23. SMUD entered into the Standard Contract at issue here on June 14, 1983. Pursuant to the Standard Contract, SMUD agreed to pay fees to the government for SNF disposal services. The total amount of SMUD's fee was determined by a two-part calculation: the first part was a "one-time fee" based on the number of kilograms of SNF that SMUD used to generate electricity prior to April 7, 1983, and the second part was a fee of 1.0 mill per kilowatt-hour for electricity generated and sold on or after April 7, 1983. Standard Contract Art. VIII.A.

24. The mutual intent of the parties at the time of contract formation was that DOE would remove SNF and HLW from utilities, including SMUD, on a reasonable schedule so as to prevent utilities from having to build additional at-reactor storage and to reduce the backlog of SNF located at reactors to promote the timely decommissioning of those reactors.

25. An acceptance rate of 3000 tons of SNF per year – a rate that exceeds the industry-wide annual spent fuel discharge rate of 2000 tons – is necessary to achieve the objectives of the

Standard Contract. In addition, DOE has planned since 1983 to perform at least at the 3000 ton rate.

26. From 1983 to the present day, DOE has calculated program costs and the fees paid by utilities based on a program to remove waste at the 3000 ton rate.

27. SMUD paid the fees as required by the Standard Contract. In return for the payment of fees by SMUD, the Standard Contract obligated the government, acting through DOE, to commence disposing of SNF by January 31, 1998 in accordance with the priority to be accorded to utilities such as SMUD whose reactors had been permanently shut down and to allow SMUD to timely decommission its reactor.

28. The government deposited the fees it received from utilities, including SMUD, into the Nuclear Waste Fund, which was to be the source of funds to cover the government's costs for disposing of SMUD's SNF. 42 U.S.C. §§ 10131(b)(4) and 10222.

29. The Nuclear Waste Fund was established by Congress as a separate fund in the Treasury of the United States. The Nuclear Waste Fund receives the fees paid to the government by utilities pursuant to the Standard Contract. The Treasury is authorized to invest the funds in the Nuclear Waste Fund in interest-bearing government securities. The interest earned on such investments is deposited in the Nuclear Waste Fund. Collectively, the utilities have paid in excess of $10 billion into the Waste Fund.

30. SMUD has paid a net amount, after minor adjustments, of nearly $40 million into the Nuclear Waste Fund.

31. By fully performing all of its obligations expressed in the Standard Contract, SMUD's contractual rights became vested in SMUD, and the government's contractual obligations expressed in the Standard Contract became wholly unconditional.

## THE GOVERNMENT'S BREACH OF ITS OBLIGATIONS

32. This action arises out of the government's failure to begin disposing of SNF by January 31, 1998, as required by the Standard Contract.

33. Because of the government's failure to make progress in the late 1980s and early 1990s in preparing disposal facilities, many states and utilities, including SMUD, became concerned about the government's ability to meet its contractual obligations to utilities under the Standard Contracts.

34. Starting in the late 1980s and early 1990s, the government began announcing that it would not be able to start accepting SNF from utilities until 2010 at the earliest.

35. After the government began announcing its inability to accept SNF until 2010, the government has forecast an increasingly restrictive annual SNF disposal capacity for its storage program, and has asserted increasingly elongated schedules for disposal of SNF. In addition, the government's forecasts disregarded the priority for shut-down plants such as SMUD's Rancho Seco plant.

36. Instead, the government wrongfully instructed SMUD and other utilities to submit delivery commitment schedules in accordance with the announced unduly restrictive annual disposal

capacity amounts. But for the government's wrongful instructions, SMUD would not have submitted schedules reflecting the government's unduly restrictive capacity amounts.

37. SMUD became so concerned about the government's failure to make progress that in 1992, SMUD's board of directors voted to authorize the construction of a "dry storage" facility, or Independent Spent Fuel Storage Installation ("ISFSI").

38. In 1993, several utilities and states wrote DOE to demand assurances from the government that DOE would honor its contractual obligations.

39. In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21,793 (1995) ("Final Interpretation"). DOE asserted that it did not have an unconditional statutory or contractual obligation to accept SNF beginning January 31, 1998, in the absence of a repository or interim storage facility constructed under the NWPA. *Id*.

40. Several states and utilities responded to DOE's Final Interpretation by filing a petition for review of DOE's final decision in the United States Court of Appeals for the District of Columbia Circuit, pursuant to the NWPA.

41. On July 23, 1996, in *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), the U.S. Court of Appeals for the District of Columbia Circuit ruled on that petition and held that the NWPA imposed on the government an obligation to begin disposing of SNF by January 31, 1998, conditioned only on fulfillment by the utilities' of their obligation to pay fees into the Nuclear Waste Fund. The Court of Appeals remanded the matter to the government for proceedings consistent with the opinion.

42. In December, 1996, notwithstanding the D.C. Circuit's unequivocal ruling in *Indiana Michigan* that the government had an unconditional obligation to commence acceptance of SNF by January 31, 1998, the government, acting through DOE, announced that it would not begin to dispose of SNF by the statutory deadline. The government suggested that its delay was "unavoidable" and thus might be excusable under Article IX of the Standard Contract. The government invited contractors to submit comments on its position concerning the delay.

43. On January 31, 1997, Northern States Power Company and other utilities, not including SMUD explicitly, filed a petition with the D.C. Circuit for a writ of mandamus to compel the government to comply with the mandate in *Indiana Michigan* and to honor the government's unconditional obligations under the NWPA and Standard Contract.

44. On June 3, 1997, during the pendency of this petition for mandamus, the government issued a letter response to the comments submitted by utility parties to Standard Contracts. In this response, the government announced that it had "preliminarily determined" that its delay was unavoidable. Attached to the response was a document dated June 3, 1997, titled "Contracting Officer's Preliminary Determination that the Department of Energy's Delay in Beginning Spent Fuel Disposal Was Unavoidable." This Preliminary Determination described the government's difficulties in preparing a permanent deep geologic disposal site in which to store SNF. The government asserted that its failure to construct a deep geologic disposal site excused the government from any obligation to provide a financial remedy to utility Standard Contract parties for the delay because the delay was allegedly "unavoidable."

45. In *Northern States Power Co. v. United States*, 128 F.3d 754 (D.C. Cir. 1997), the D.C. Circuit rejected the government's assertions in the June 3 letter response and Preliminary Determination. The court reaffirmed its ruling in *Indiana Michigan* both that the NWPA required the government to bind itself unconditionally in the Standard Contract to begin disposing of utilities' SNF by January 31, 1998, and that the government had in fact bound itself. The Court of Appeals held that "[t]he contractual obligations created consistently with the statutory contemplation leave no room for [the government] to argue that it does not have a clear duty to take the SNF from the owners and generators by the deadline imposed by Congress." The Court issued a writ of mandamus "to correct [the government's] misapprehension of *Indiana Michigan*." The Court stated that "we preclude [the government] from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim."

46. The ruling of the D.C. Circuit in *Northern States Power* estops the government from arguing here that its liability for breach of SMUD's Standard Contract is excused on the grounds that the breach was unavoidable or that the government's performance of SMUD's Standard Contract was impossible.

47. The D.C. Circuit reaffirmed this ruling in an order issued May 5, 1998, in *Northern States Power Co. v. United States*, Nos. 97-1064, 97-1065, 97-1370, 97-1398, 98-1069, and 98-1070 (D.C. Cir. May 5, 1998). While denying the petitioners their requested injunctive relief (an order compelling the government to accept SNF), the D.C. Circuit stated that "[o]ur

decision in *Northern States* barred the DOE from interpreting the [Standard] Contract as imposing only a conditional disposal obligation."

48. The declaratory and mandatory relief sought by the petitioning utilities in *Northern States* was separate and apart from any and all rights that such utilities have to seek monetary relief for the government's breach of its obligations pursuant to its Standard Contracts. The petitioning utilities in *Northern States* expressly reserved their right to seek monetary remedies against the government in a court of appropriate jurisdiction.

49. Despite the D.C. Circuit's second unequivocal ruling in *Northern States* that the government had an unconditional obligation to commence acceptance of SNF by January 31, 1998, the government failed to honor its contractual obligations and refused to begin accepting SNF by the contractual and statutory deadline. The government has stated that it will not begin to dispose of SNF until 2010, *at the earliest.*

50. The United States Court of Appeals for the Federal Circuit has held that the government's failure to commence the removal of SNF in 1998 constitutes a breach of the Standard Contract. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000).

51. Because of the government's failure to make progress and its other conduct and statements demonstrating that it would fail timely to perform its obligations expressed in its Standard Contract with SMUD, SMUD contracted for the design, licensing and construction of stainless steel casks and canisters to encase the SNF and be stored in the concrete bunkers of the ISFSI.

52. SMUD's efforts to design, license and construct a transportable dry storage system was a first-of-a-kind project in the nuclear industry. As a result, there was considerable uncertainty and difficulty in completing the project, including the bankruptcy of key vendors.

53. From 1992 through 2002, SMUD reevaluated whether to continue with the dry storage project or leave its SNF in the wet pool many different times.

54. If the government had given assurances that it was going to meet its obligations under the Standard Contract, SMUD would have left its SNF in the wet pool for pick up by DOE.

55. However, as a result of the government's breach and the minimum 12-year delay during which SMUD will have to store SNF, SMUD decided each time to continue with the dry storage project.

56. But for the storage of SNF at the ISFSI, SMUD would be able to completely decommission its entire Rancho Seco site, remove all nuclear materials, and devote the entire site to non-nuclear uses.

57. SMUD completed the transfer of its SNF from the wet pool to dry canisters in August 2002. The canisters, in turn, were loaded into the concrete bunker or ISFSI.

58. SMUD's claims in this action are for amounts related to the government's failure to make timely performance. SMUD insists the government meet its obligation to dispose of SMUD's SNF. If the government further repudiates its obligations, and demonstrates an intention permanently to refuse to dispose of SMUD's SNF, SMUD reserves all rights to assert new and separate claims founded upon such action.

## ALTERNATIVE CLAIMS FOR RELIEF

### Count I: Breach of Contract: Damages

59. Paragraphs 1 through 58 are incorporated herein by reference as if set forth in full.

60. The government's failure to make progress, and its announcements that it would refuse to begin disposal of SNF by January 31, 1998, and that it will not begin to dispose of SNF until 2010, *at the earliest*, and the government's failure to begin disposing of SNF on January 31, 1998, and the government's implementation of an artificially-low acceptance rate and its manipulation of the delivery commitment schedule process, were breaches by the government of its unconditional express obligations under its Standard Contract with SMUD.

61. The government's failure to make progress, and its announcements that it would refuse to begin disposal of SNF by January 31, 1998, and that it will not begin to dispose of SNF until 2010, *at the earliest*, and the government's failure to begin disposing of SNF on January 31, 1998, and the government's implementation of an artificially-low acceptance rate and its manipulation of the delivery commitment schedule process, were also breaches of the government's implied obligation of good faith and fair dealing, an obligation which the government undertakes in every contract it enters into, including the Standard Contract.

62. As a direct and proximate result of the government's breach of its Standard Contract with SMUD, SMUD has suffered and can recover damages in amounts to be determined at trial.

**Count II: Breach of Contract: Return of Benefits Received by the Government**

63. Paragraphs 1 through 58 are incorporated herein by reference as if set forth in full.

64. The government's failure to make progress, and its announcements that it would refuse to begin disposal of SNF by January 31, 1998, and that it will not begin to dispose of SNF until 2010, *at the earliest*, and the government's failure to begin disposing of SNF on January 31, 1998, and the government's implementation of an artificially-low acceptance rate and its manipulation of the delivery commitment schedule process, were breaches by the government of its unconditional express obligations under its Standard Contract with SMUD.

65. The government's failure to make progress, and its announcements that it would refuse to begin disposal of SNF by January 31, 1998, and that it will not begin to dispose of SNF until 2010, *at the earliest*, and the government's failure to begin disposing of SNF on January 31, 1998, and the government's implementation of an artificially-low acceptance rate and its manipulation of the delivery commitment schedule process, were also breaches of the government's implied obligation of good faith and fair dealing, an obligation which the government undertakes in every contract it enters into, including the Standard Contract.

66. Under the Standard Contract, and in return for the government's promises, SMUD paid the government sums of money well in advance of the date on which the government was to begin performance.

67. The Standard Contract between SMUD and the government entitled the government to retain SMUD's advance payments only on the condition that the government made progress on meeting its obligations and began performance by January 31, 1998.

68. By unilaterally extending the date on which it will begin acceptance of SNF, the government has unilaterally arrogated to itself the use of SMUD's money for this additional period of time. The government has thus benefited itself at SMUD's expense.

69. The government's breaches of its Standard Contract with SMUD entitle SMUD to recover an amount equal to the amount by which the government has benefited itself.

**Count III: Illegal Exaction (Removed)**

**Count IV: Taking Without Just Compensation: Vested Contract Rights**

70. Paragraphs 1 through 58 are incorporated herein by reference as if set forth in full.

71. SMUD, by its timely payment of all of its monetary obligations under the Standard Contract, obtained a vested contract right to demand that the government dispose of SMUD's SNF in a timely manner at an acceptance rate consistent with the parties' intentions.

72. The acceptance rate that satisfies the parties' intentions, and the rate upon which DOE has determined the adequacy of the utilities' payments under the Standard Contract, is 3000 tons of SNF per year.

73. DOE was obligated to continue accepting SNF from SMUD until all of SMUD's SNF had been disposed of.

74. The government has contended, however, that its obligation to accept and dispose of SMUD's SNF in a timely manner at a rate consistent with the parties' intentions was statutorily limited by the 1987 Amendments of the NWPA, 42 U.S.C. § 10168(d). In an

effort to reduce its obligations to SMUD and other utilities, the government has asserted that, in the 1987 Amendments to the NWPA, Congress "specifically limit[ed] DOE's authority to accept more than a total of 10,000 MTU of SNF and/or HLW in any DOE facility prior to the operation of a repository."

75. Relying on the 1987 Amendments to the NWPA, the government has sought to limit SMUD's recovery of damages by imposing an artificially-low rate of acceptance for SNF and HLW.

76. If successful, the government's efforts would constitute a substantial reduction in its contract obligations, which would otherwise be to accept 3,000 tons of SNF and HLW per year and require DOE to continue picking up SMUD's SNF and HLW until such time as it has been fully disposed of. This would result in a taking of SMUD's vested contract rights and a diminution of SMUD's contract remedies.

77. The economic impact on SMUD of the government's efforts has been substantial. SMUD has been forced to construct a dry storage system at significant expense and to dedicate its real property as an interim storage center for SNF. The government's efforts have also interfered with SMUD's reasonable investment backed expectations.

78. The government's failure to make progress, and its announcement that it would refuse to begin disposal of SNF beginning on January 31, 1998, and that it will not begin to dispose of SNF until 2010, *at the earliest*, and the government's failure to begin disposing of SNF on January 31, 1998, took SMUD's vested contract rights, expressed in the Standard Contract, to demand that the government timely dispose of SMUD's SNF.

79. The government's failure to make progress, and its announcement that it would refuse to begin disposal of SNF beginning on January 31, 1998, and that it will not begin to dispose of SNF until 2010, *at the earliest*, and the government's failure to begin disposing of SNF on January 31, 1998, also took SMUD's vested contract rights, implied in the Standard Contract, to demand that the government deal with SMUD fairly and in good faith and to dispose of SMUD’s SNF.

80. The government owes SMUD just compensation for these takings of SMUD's vested contract rights. This just compensation includes an amount equal to all amounts paid by SMUD to the government pursuant to the Standard Contract, plus interest, plus the costs of constructing a dry storage system with interest, plus such other amounts with interest as may be appropriate to justly compensate SMUD for the value of the contract rights the government has taken.

**Count V: Taking Without Just Compensation: Real Property**

81. Paragraphs 1 through 58 are incorporated herein by reference as if set forth in full.

82. The government's failure to make progress, and its announcement that it would refuse to begin disposal of SNF beginning on January 31, 1998, and that it will not begin to dispose of SNF until 2010, *at the earliest*, and the government's failure to begin disposing of SNF on January 31, 1998, forced SMUD to devote economically valuable real property to the storage of SNF in the ISFSI. The government has taken this real property by denying SMUD its rights as owner of this property to put it to other valuable economic uses.

83. The government owes SMUD just compensation for this taking of SMUD's real property.

## PRAYER FOR RELIEF

WHEREFORE, SMUD respectfully requests that the Court enter judgment in its favor and against defendant, granting SMUD the following relief:

(a) an amount equal to the amount by which the government has benefited itself;

(b) damages for breach of contract, including breach of the duty of good faith and fair dealing;

(c) just compensation for the taking of SMUD's vested contract rights;

(d) just compensation for the taking of SMUD's real property; and

(e) interest and such costs, expenses, and attorneys' fees as are available under applicable law, and such other relief as the Court deems just and proper.

Dated: August 30, 2004

Respectfully submitted:

s/ Howard Cayne by s/ Timothy R. Macdonald
Howard Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5556
Counsel of Record for
Plaintiff Sacramento Municipal Utility District

Of Counsel:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Amended Complaint to be filed electronically through the Court of Federal Claims Case Management / Electronic Case Filing System on August 30, 2004. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Harold D. Lester, Jr.
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/ Timothy R. Macdonald