No. 98-488C
(Judge Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

# SACRAMENTO MUNICIPAL UTILITY DISTRICT'S REPLY TO DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO FILE PROPOSED LIABILITY ORDER

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

Howard Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

October 29, 2004

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

**TABLE OF CONTENTS**

Page

ARGUMENT.....2

I. THE GOVERNMENT ACKNOWLEDGES THAT IT BREACHED SMUD'S CONTRACT AND SUBSTANTIAL PRECEDENT SUPPORTS THE ISSUANCE OF A LIABILITY ORDER IN THIS CASE. .....2

II. THE DCSs WERE NON-BINDING PLANNING DOCUMENTS WHICH DID NOT DEFINE DOE'S OBLIGATIONS AND THE OLDEST FUEL FIRST PRINCIPLE WAS SUBJECT TO EXCEPTIONS.....6

III. MITIGATION DAMAGES ARE NOT PRECLUDED. .....10

CONCLUSION.....13

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
339 F.3d 1341 (Fed. Cir. 2003) ........ 10

*Chain Belt Co. v. United States*,
115 F. Supp. 701 (Ct. Cl. 1953) ........ 10

*Commonwealth Edison Co. v. United States*,
56 Fed. Cl. 652 (2003) ........ 7

*Commonwealth Edison Co. v. United States*,
No. 98-621 (J. Hewitt, Aug. 1, 2001) ........ 4

*Connecticut Yankee Atomic Power Co. v. United States*,
No. 98-154 (Fed. Cir., Aug. 31, 2000) ........ 4

*Florida Power & Light Co. v. United States*,
No. 98-483 (J. Wilson, Jan. 11, 2002) ........ 4

*Home Sav. of Am., F.S.B. v. United States*,
57 Fed. Cl. 694 (2003) ........ 10

*Hughes Communications Galaxy, Inc. v. United States*,
271 F.3d 1060 (Fed. Cir. 2001) ........ 10

*Indiana Michigan Power Co. v. Dept. of Energy*,
88 F.3d 1272 (D.C. Cir. 1996) ........ 5

*Indiana Michigan Power Co. v. United States*,
57 Fed. Cl. at 88 (2003) ........ 7, 8

*Indiana Michigan Power Co. v. United States*,
60 Fed. Cl. 639 (2004) ........ 10, 13

*Indiana Michigan Power Co. v. United States*,
No. 98-486 (J. Hodges, Jan. 17, 2003) ........ 4

*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000) ........ 3

*Maine Yankee Atomic Power Co. v. United States*,
No. 98-474 (Fed. Cir. July 31, 2001) ........ 4

*Northern States Power Co. v. Dept. of Energy*,
128 F.3d 754 (D.C. Cir. 1997) .......... 5

*Northern States Power Co. v. United States*,
224 F.3d 1361 (Fed. Cir. 2000) .......... 3, 4

*Northern States Power Co. v. United States*,
No. 98-484 (J. Wiese, July 31, 2001) .......... 4

*Power Authority of the State of New York v. United States*,
No. 00-703(C), slip. op. at 1 (Fed. Cl. Sept. 30, 2004) .......... 4

*Robinson v. United States*,
305 F.3d 1330 (Fed. Cir. 2002) .......... 10

*Southern Nuclear Operating Co. v. United States*,
No. 98-614 (J. Merow, April 7, 2004) .......... 4

*Tennessee Valley Authority v. United States*,
60 Fed. Cl. 665 (2004) .......... 4, 8, 13

*Wisconsin Electric Power Co. v. United States*,
No. 00-697 (J. Merow, Oct. 8, 2004) .......... 4

*Yankee Atomic Elec. Co. v. United States*,
No. 98-126 (Fed. Cir. Aug. 31, 2000) .......... 4

*Yankee Atomic Elec. Co. v. United States*,
No. 98-126C, 2004 WL 1535688, at *6 (Fed. Cl. June 28, 2004) .......... 5, 12, 13

*Yankee Atomic Electric Co. v. United States*,
No. 98-126C, slip op. at 2 (Fed. Cl. June 28, 2004) .......... 8, 9

**REGULATIONS**

59 Fed. Reg. 27,007 (May 25, 1994) .......... 10

60 Fed. Reg. 21,793 (May 3, 1995) .......... 10

62 Fed. Reg. 1095 (Jan. 8, 1997) .......... 11

# INDEX TO APPENDIX

Document Page

Portions of Standard Contract....................1

Liability Orders....................12

*Yankee Atomic Electric Co. v. United States*, No. 98-126C, slip op. at 2 (Fed. Cl. June 28, 2004)....................30

*Yankee Atomic Electric Co. v. United States*, No. 98-126C, slip op. at 2 (Fed. Cl. June 28, 2004)....................49

Portions of Report to Congress on the Reassessment of the Civilian Radioactive Waste Management Program....................52

Portions of Deposition Transcript of James Shetler....................56

Portions of Deposition Transcript of S. David Freeman....................59

Portions of Deposition Transcript of Dan Keuter....................61

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 98-488 C<br><br>(Judge Braden) |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S REPLY TO DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO FILE PROPOSED LIABILITY ORDER**

Plaintiff Sacramento Municipal Utility District ("SMUD") submits the following Reply to Defendant's Supplemental Response on liability ("Supplemental Response" or "Resp."). SMUD respectfully requests that the Court enter an order holding the government liable for breach of SMUD's spent nuclear fuel ("SNF") contract. There is no question that SMUD had a Contract with the Department of Energy ("DOE") for the disposal of its SNF ("Contract"), that SMUD paid all fees required by the Contract, and that DOE, by its own admission, has not performed under the Contract to date. Accordingly, a liability order is appropriate.

Most of the government's Supplemental Response is devoted to a different issue: the temporal scope of the government's liability and SMUD's damages. The government argues that no liability and no damages should accrue prior to January 31, 2001, which would eliminate most of SMUD's damages. The government's arguments are, however, contrary to substantial precedent and the contractual language. The temporal scope of SMUD's damages raises factual issues and should be determined at trial.

## ARGUMENT

### I. THE GOVERNMENT ACKNOWLEDGES THAT IT BREACHED SMUD'S CONTRACT AND SUBSTANTIAL PRECEDENT SUPPORTS THE ISSUANCE OF A LIABILITY ORDER IN THIS CASE.

The government acknowledges in its Supplemental Response that it breached SMUD's Contract by failing to accept and dispose of SMUD's SNF in a timely fashion. *See* Resp. at 4 (conceding that DOE "failed to satisfy a performance obligation to accept *SMUD's* SNF"), 7 (arguing that "DOE's first obligation to accept SMUD's SNF and HLW began in 2001"). The government, however, seeks to limit its liability for breach of contract to the period commencing January 31, 2001. *Id.* at 7-8, 10. Even this date is almost four years past, and the government acknowledges that, as in the *Yankee* cases, "because the date for DOE to begin acceptance of these plaintiffs-appellees' SNF had already passed, DOE had already committed its partial breach." *Id.* at 5. The same is true here, and the Court should enter an order of liability for breach of contract in this case even under the theory set forth in the Supplemental Response.

The remaining arguments in the Supplemental Response relate to damages. In an effort to minimize SMUD's damages, the government argues that the government's "breach" occurred on January 31, 2001, rather than the date specified in the Contract for the start of services – January 31, 1998. *See, e.g., id.* at 7 (arguing that "the first breach that would have caused an injury to SMUD would not have occurred until at least 2001"), 10 (arguing that "the Government's liability should be established no earlier than January 31, 2001"). There is no support for the government's attempt to eviscerate its obligations under the Contract.

The language of SMUD's SNF Contract demonstrates that DOE was obligated to begin disposal services by January 31, 1998. SMUD's Contract states that the services to be provided by DOE shall begin "not later than January 31, 1998 and shall continue until such time as all

SNF and/or HLW from the civilian nuclear power reactor[] . . . has been disposed of." Contract, Art. II (see attached Plaintiff's Appendix at 2, hereinafter referred to as "Pl. App."). The government does not even address this unambiguous language in its brief. Numerous judges of this Court, the Federal Circuit, and the D.C. Circuit, however, have concluded that the 1998 date represented a binding and unconditional obligation.[1]

The Federal Circuit previously held that the government's failure to begin accepting SNF on January 1, 1998, constituted a breach of contract. *See Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1343 (Fed. Cir. 2000); *Northern States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000). The government attempts to minimize the Federal Circuit's holdings by arguing that they were based on the unique facts of those cases. The Federal Circuit's opinions, however, do not support the government's new theory. The Federal Circuit itself stated that:

> Yankee's claim against the government is far broader than one for improper delays by the Department in performing its contractual obligations. Yankee contends that the government breached a critical and central obligation of the contract – that it begin disposal of nuclear waste by January 1, 1998. Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that *all the contracts must contain this explicit requirement. The breach involved all the utilities that had signed the contract – the entire nuclear electric industry.*

*Maine Yankee*, 225 F.3d at 1341-42 (emphasis added). In *Northern States*, the Federal Circuit held that "[a]s the Act required, the contract (article II) obligated the Department to take title to,

[1] Setting aside the question of whether DOE would have accepted any of SMUD's SNF before 2001 if it was performing under the Contract, *see infra* pp. 6-9, DOE beginning to provide services by the 1998 date and accepting SNF industry-wide would have provided real and concrete benefits to SMUD, including allowing SMUD to make planning decisions for storage of SNF with the knowledge that DOE was accepting fuel, allowing SMUD to seek exchanges or swaps of acceptance slots with another utility, and allowing SMUD to pursue the possibility of priority for shutdown reactors, all as provided by the Contract. *See* Art. V(D), (E), & VI(B)(1)(b) (Pl. App. at 8, 9, 11). DOE's breach prevented all of these from happening.

transport, and dispose of nuclear waste beginning 'not later than January 31, 1998.'" 224 F.3d at 1364. SMUD's Contract contains the same requirement.

Other judges of this Court have recognized this precedent, and liability orders have been entered in numerous other SNF cases. *See Wisconsin Electric Power Co. v. United States*, No. 00-697 (J. Merow, Oct. 8, 2004); *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004); *Southern Nuclear Operating Co. v. United States*, No. 98-614 (J. Merow, April 7, 2004); *Indiana Michigan Power Co. v. United States*, No. 98-486 (J. Hodges, Jan. 17, 2003); *Florida Power & Light Co. v. United States*, No. 98-483 (J. Wilson, Jan. 11, 2002); *Commonwealth Edison Co. v. United States*, No. 98-621 (J. Hewitt, Aug. 1, 2001); *Northern States Power Co. v. United States*, No. 98-484 (J. Wiese, July 31, 2001); *Maine Yankee Atomic Power Co. v. United States*, No. 98-474 (Fed. Cir. July 31, 2001); *Connecticut Yankee Atomic Power Co. v. United States*, No. 98-154 (Fed. Cir. Aug. 31, 2000); *Yankee Atomic Elec. Co. v. United States*, No. 98-126 (Fed. Cir. Aug. 31, 2000) (collectively Pl. App. at 12-29).

None of these decisions have hinged on whether the utility had an approved "Delivery Commitment Schedule" in 1998, as the Supplemental Response acknowledges. *See* Resp. at 7 n.3 (acknowledging that "several published decisions from this Court have rejected the contention that the delivery commitment schedule ("DCS") procedure creates contractual commitments that establish an overall schedule and rate of acceptance").[2] In addition, in the *Yankee* cases, Judge Merow recently explained that the government's partial breach may have

[2] The government's citation to the *Power Authority of the State of New York* case is misleading. Resp. at 7 n.3. In that case, the government has raised a question about the standing of that particular plaintiff to bring an action for damages because the utility has sold its nuclear power plant. No such argument has been or could be made here. *See Power Authority of the State of New York v. United States*, No. 00-703(C), slip. op. at 1 (Fed. Cl. Sept. 30, 2004).

even pre-dated the 1998 date: "DOE had an obligation to take actions necessary to be ready to commence performance starting at the end of 1998. Failure to do so may have commenced an earlier partial breach." *Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 1535688, at *6 (Fed. Cl. June 28, 2004).

The decisions of this Court and the Federal Circuit are consistent with those of the D.C. Circuit, which held that "DOE's duty . . . to dispose of the SNF is conditioned on the payment of fees by the owner and is triggered, *at the latest*, by the arrival of January 31, 1998." *Indiana Michigan Power Co. v. Dept. of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (emphasis added). In a subsequent decision, the D.C. Circuit further explained that "DOE's duty to take the materials by the 1998 deadline is . . . an integral part of the Standard Contract, which provides that the Department 'shall begin' disposing of the SNF by January 31, 1998." *Northern States Power Co. v. Dept. of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997); *see also id.* at 758 ("DOE's duty to act could hardly be more clear.").

Finally, the government conceded in prior briefing in this case that its obligation was to begin performance on January 31, 1998, acknowledging that "DOE's inability to begin the services to be provided by the Standard Contract *by January 31, 1998* constituted a partial breach of the Standard Contract." Defendant's Response to the Court's August 1, 2001 Order, at 3 (Aug. 17, 2001) (Dckt. #60) (emphasis added). At a hearing before Judge Sypolt on the coordinated discovery on September 20, 2001, government counsel again stated that "we are not contesting that the government is liable for breaches of contract as a result of the Department of Energy's delay in beginning acceptance of spent nuclear fuel and high level radioactive waste *by January 31, 1998*." *See* Transcript of Sept. 20, 2001 Hearing, at 6 (previously attached as Ex. A

to SMUD's Renewed Motion for a Status Conference (Nov. 17, 2003) (Dckt. #216)) (emphasis added).

While the government may have developed a new liability theory, the facts and language of the Contract remain the same. DOE's failure to provide the services required by the Contract constitutes a breach of contract for which the government is liable. The Court should enter an order so finding. The scope of this liability, and SMUD's resulting damages, should be determined at trial.

## II. THE DCSs WERE NON-BINDING PLANNING DOCUMENTS WHICH DID NOT DEFINE DOE'S OBLIGATIONS AND THE OLDEST FUEL FIRST PRINCIPLE WAS SUBJECT TO EXCEPTIONS.

The government attempts to limit its liability to SMUD in advance of trial by asserting that its obligation was defined by so-called Delivery Commitment Schedules or DCSs. Contrary to the government's assertions, it is *not* an "undisputed fact that DOE had no obligation under the Standard Contract to accept SMUD's SNF and/or HLW until January 31, 2001 [the date set forth in SMUD's DCSs], at the earliest." Resp. at 3, 7 n.3. Rather, the effect of these DCSs has been vigorously disputed by SMUD, and the government's DCS theory has been rejected by every judge of this Court who has considered it.

As SMUD has previously explained, there is no factual or legal support for the government's assertion that the DCSs somehow limited its commitment to SMUD. *See* Plaintiff's Cross-Motion for Partial Summary Judgment on the Acceptance Rate, at 58-70 (Dec. 16, 2002) (Dckt. # 162) (consolidating evidence). SMUD will not repeat those arguments here, but notes that the evidence from the government's own witnesses demonstrates that the

Annual Capacity Reports ("ACR")[3] and DCS process were not intended to be binding on either party and that the government manipulated this process to limit its potential liability. *See id*.

In *Commonwealth Edison*, after painstaking review of the DCS and ACR process, Judge Hewitt rejected the very same argument the government offers here. Judge Hewitt explained that

> This mechanism does not create a contractually binding obligation for either party. The ACRs are, according to the Standard Contract terms, for 'planning purposes' only. The court finds that there is no evidence that the exchange of DCSs was intended to create a contract between the parties.

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 663 (2003). In addition, Judge Hewitt "agree[d] that DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of defendant's duty of good faith and fair dealing." *Id.* at 665; *see also id.* at 666 (noting that "[d]efendant eventually conceded at oral argument that the ACRs were for planning purposes" and that "[t]he parties could not have expected that planning documents would create binding contractual obligations").

Likewise, in *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. at 88, 98 (2003), Judge Hodges rejected the assertion that the DCSs provide the limit of the Government's liability. Judge Hodges explained that

> The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate. The Department of Energy did not consider these forms to be binding . . . . The Contract contemplated that DOE would use these reports for planning purposes only. The Capacity Reports disclaimed any other purpose, specifically stating that they were not binding on either party.

---

[3] The Contract required DOE to issue an Annual Capacity Report "for planning purposes." Art. IV(B)(5)(b) (Pl. App. at 6). DOE improperly tied the submission of DCSs to SNF receipt allocations set forth in the 1991 ACR, where DOE had unilaterally reduced the annual industry-wide acceptance rate from a total of 3,000 metric tons to 900 metric tons. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 663 (2003).

*Id.*; *see also id.* (noting that "the Government used an artificially small quantity of waste to limit its liability").

Finally, Judge Merow has noted that "[t]he government's argument that it was obligated to pick-up only a minimum amount of fuel, or only fuel for which there was an approved delivery commitment[,] has been rejected." *Yankee Atomic Electric Co. v. United States*, No. 98-126C, slip op. at 2 (Fed. Cl. June 28, 2004) ("Order on Motion in Limine") (Pl. App. at 31).[4]

The government also asserts incorrectly that it is "undisputed" that, as a result of the "oldest fuel first" allocation for SNF under the Contract (Art. VI(B)(1)(a)), "the first DOE approved allocation to which SMUD could potentially be entitled under the Standard Contract was in 2001." Resp. at 4. As with its DCS argument, this statement ignores the language of the Contract and prior rulings in other SNF cases.

The Contract creates several exceptions to the "oldest fuel first" priority. For example, the Contract provides for "exchanges" of DCSs, Art. V(E), "emergency deliveries," Art. V(D), and the possibility of "priority" acceptance for SNF from shutdown plants like Rancho Seco, the plant at issue in this case. *See* Art. VI(B)(1)(b) (Pl. App. at 11) ("Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down

[4] The government also overstates the holding in *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 669, 671 (2004). In that case the utility agreed, only for purposes of the motion before the court, to accept DOE's reduced rate and promulgated schedule because, even at the artificially low rate, there was no issue about causation.

permanently for whatever reason."). All of these contractual provisions raise factual issues about the acceptance queue that may be presented at trial.[5]

In the *Yankee* cases, the government sought to exclude evidence related to potential exchanges and sought partial summary judgment claiming that there would have been no priority for shutdown reactors under the Contract. Judge Merow rejected both of the government's arguments. With respect to exchanges, the court concluded that the exchange of acceptance allocations was "supported by deposition testimony" and noted that "[a] plant owner would have the economic incentive to buy an earlier swap allocation at a price less than the cost to store the fuel." *Yankee Atomic* Order on Motion in Limine, slip. op. at 7, 9 (Pl. App. at 36, 38). In a separate opinion on the shutdown priority, the court held that "[g]ranting priority to shutdown reactors was one of the contractual tools available to DOE to meet this goal" of avoiding additional on-site storage costs after 1998. *Yankee Atomic Electric Co. v. United States*, No. 98-126(C), slip. op. at 2 (Fed. Cl. June 28, 2004) (Pl. App. at 50). These decisions – which the government does not acknowledge – refute the suggestion in the Supplemental Response that the acceptance queue is "undisputed."[6]

---

[5] The government's citation of testimony from SMUD witnesses misses the mark. None of the SMUD witnesses testified that DOE had no legal obligations under the Contract until 2001. A reading of the quotations reveals that most of the questions related to whether SMUD had "allocations" in the Annual Capacity Reports, the very documents that DOE's own witnesses confess were manipulated in an effort to limit DOE's liability. *See supra* pp. 6-8. In addition, having an acceptance "allocation" in a given year would not necessarily determine the actual pick up schedule. As noted above, there were explicit exceptions for exchanges, emergency deliveries, and a possible priority for shutdown reactors. *See* Art. V(D), (E), & VI(B)(1)(b) (Pl. App. at 8, 9, 11).

[6] The government also misstates the analysis of Eileen Supko. As a conservative basis for her opinion, Ms. Supko used the oldest fuel first methodology to determine an initial SNF acceptance allocation. *See* Gov. App. at 4. She nevertheless repeatedly cautioned that the exchange and shutdown priority provisions could affect the actual final acceptance queue. *Id.* at 4, 6. Although the government omits this fact from its brief, Ms. Supko explained throughout her report that "while the Standard Contract priority ranking is based on an [oldest fuel first] methodology, the Standard Contract contains additional provisions that might affect the acceptance of spent nuclear fuel. The Standard Contract, Article V.E, 'Exchanges', allows Standard Contract holders the right to exchange delivery commitment schedules with other Standard Contract holders. . . . In addition, the Standard Contract, Article

Footnote continued on next page

## III. MITIGATION DAMAGES ARE NOT PRECLUDED.

The last two pages of the Supplemental Response assert that SMUD is precluded as a matter of law from recovering any damages incurred prior to DOE's breach of contract. This argument, like the others in the Supplemental Response, is premature and relates to the magnitude of SMUD's damages, not whether DOE breached the contract. Moreover, it is wrong as a matter of black letter law.

It is a basic principle of contract law that, when faced with an impending breach, the non-breaching party is entitled – indeed, required – to try to avoid further losses through mitigation or by engaging in substitute transactions. *See Robinson v. United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002) (noting "reasonable efforts in the form of affirmative steps are required to mitigate damages"). So long as the mitigation or substitute transaction was reasonable at the time it was entered into, the non-breaching party may recover these costs. *See Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953); *see also Home Sav. of Am., F.S.B. v. United States*, 57 Fed. Cl. 694, 722-23 (2003). This follows from the even more fundamental principle that sufficient damages should be awarded for a breach of contract "to place the injured party in as good a position as he or she would have been had the breaching party fully performed." *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001); *accord Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003).

Here, the government began announcing in the late 1980s and early 1990s that it was unlikely to begin performance in 1998. *See, e.g.*, 60 Fed. Reg. 21,793 (May 3, 1995); 59 Fed. Reg. 27,007 (May 25, 1994); *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 649

---

Footnote continued from previous page
VI.B.1(b) allows DOE to grant priority for any spent fuel removed from a nuclear power plant that has reached the end of its useful life or has been permanently shutdown for any reason." *Id.* at 4.

n.22 (2004) ("Defendant made statements in 1987 and 1989 suggesting that DOE might not meet the 1998 deadline."). For example, in 1989 the government announced that acceptance at the SNF repository would be delayed until at least 2010, a twelve-year delay from the 1998 start date. *See* Report to Congress on the Reassessment of the Civilian Radioactive Waste Management Program, at vii (Nov. 29, 1989) (Pl. App. at 54) ("This schedule shows a significant slip for the expected start of repository operations – from the year 2003 to approximately 2010.").

As a result of the government's announced delay, SMUD, like many utilities, began making alternative plans for the long-term storage of its spent fuel.[7] SMUD ultimately decided to design and build its own dry storage system for its SNF – the same decision made by nearly all utilities, as well as the government's own departments, such as the U.S. Navy. *See* 62 Fed. Reg. 1095 (Jan. 8, 1997). Current and former SMUD officials have testified that they began pursuing a dry storage system in the 1990s and did so as a direct result of the government's expected twelve-year delay in performance. *See* Deposition of James Shetler, at 161; Deposition of S. David Freeman, at 42-43; Deposition of Dan Keuter, at 193 (Pl. App. at 56-63).

SMUD Assistant General Manager, Jim Shetler, explained that:

> It was clear at that time [the early 1990s] that DOE wasn't going to be coming to take the fuel in 1998 in accordance with the original schedule. So the issue is now how do we put this facility in the safest mode that will still facilitate getting the fuel in DOE's hands but also reduce the costs for SMUD and at least potentially DOE, depending on how they ended up taking the fuel.

---

[7] For temporary storage, spent fuel is typically maintained in a large pool of water or "wet pool" at the reactor site. Because of the government's long delay in performance, utilities have been developing alternative storage systems – primarily "dry storage" in special metal or concrete casks or containers – that will provide safer and more efficient storage during the long period of the government's delay.

Deposition of James Shetler, at 161 (Pl. App. at 58). General Manager S. David Freeman similarly testified that "[w]e entered into a contract with a cask manufacturer, if I can describe them that way . . . . All driven by the fact that the federal government had taken our money, hadn't come to take our [nuclear] trash, and was telling us that they weren't going to come at least until 2010, which put us in a horrible financial situation of having to spend a bunch of money which really was owed to us by the government." Deposition of S. David Freeman, at 42-43 (Pl. App. at 60); *see also* Deposition of Dan Keuter, at 193 (Pl. App. at 63) ("[I]f the Department of Energy was going to come in and accept the fuel with us not having to build any casks, to me, that would have been cheaper. At the time, it was clear that the DOE wasn't going to accept it in 1998. Everything indicated at the time that it was going to be at least 2010, if not longer, and that has proven out correct.").

Under similar circumstances, Judge Merow recently rejected the government's proposed *per se* bar on the recovery of pre-breach damages in several SNF cases. *See Yankee Atomic*, 2004 WL 1535688, at *7. As Judge Merow explained,

> Plaintiffs proffer that logic and exigencies and basic contract principles dictated that they start dealing with this failure [by DOE to meet the 1998 date]. To limit damages as defendant's suggest would reduce the court's analysis to expenditures only from [January] 31, 1998 on. The court declines to do so. Consider the ramifications of defendant's position. Should plaintiffs have waited until [January] 31, 1998 and then decided what to do with their nuclear waste? The court thinks not, and accordingly, will not preclude evidence and argument in this regard.

*Id.* at *6. Judge Lettow made a similar observation in his *Tennessee Valley Authority* decision:

> When it became obvious to TVA that DOE would not perform under the contract, TVA was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance. "Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to

> take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise."

*Tennessee Valley Authority*, 60 Fed. Cl. at 674 (quoting Restatement (Second) Contracts § 350 cmt. b (1981)).[8]

The government now takes the position in this case that SMUD should have waited until 2001 to see if the government arrived to remove its waste. Such a position is untenable. The government's breach was apparent in the early 1990s, and SMUD took appropriate action to limit its damages and maintain safe long-term storage of its nuclear waste until DOE eventually performs under the Contract. The government's arguments to the contrary raise factual issues that should be determined at trial.

## CONCLUSION

DOE had an obligation, as the Contract explicitly provides, to begin disposal services by January 31, 1998. DOE's failure to provide such services constituted a breach of contract. SMUD properly planned to mitigate its damages from the breach and to procure substitute, albeit temporary, performance. DOE's breach of this obligation is beyond dispute and DOE is liable for damages that resulted to SMUD. The Court should so recognize and enter an order establishing DOE's liability in this case, with the temporal scope of such liability to be determined at trial.

[8] To the extent that the court in *Indiana Michigan* concluded otherwise, 60 Fed. Cl. at 647-48, such discussion was dicta and was made only after a full trial on the merits. After conducting a several week trial, the court in that case concluded as a factual matter that the plaintiff had failed to prove that its past costs were due to the government's breach. See *Yankee Atomic*, 2004 WL 1535688, at *7. "Indiana Michigan also noted that other SNF cases differ in that dry storage facilities were built because of the breach, and some are no longer operating." Id. at *7 n.9.

DATED this 29th day of October, 2004.

Respectfully submitted,

s/ Howard Cayne by s/ Timothy R. Macdonald
Howard Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899
Counsel of Record for
Plaintiff Sacramento Municipal Utility District

Of Counsel:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Reply to Defendant's Supplemental Response to Plaintiff's Motion for Leave to File Proposed Liability Order to be filed electronically through the Court of Federal Claims Case Management/ Electronic Case Filing System on October 29, 2004. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Harold D. Lester, Jr.
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/ Timothy R. Macdonald