Rec'd 1/27/2003

# In the United States Court of Federal Claims

* * * * * * *

INDIANA MICHIGAN POWER CO., *

Plaintiff, * No. 98-486C

v. * Filed: January 17, 2003

UNITED STATES OF AMERICA, *

Defendant. *

* * * * * * *

## ORDER

Whether styled as a motion for summary judgment or a motion for the Government to acknowledge liability, it seems clear that decisions by the Federal Circuit establish liability against the United States. Therefore, we direct that the Clerk enter judgment for plaintiff on the issue of liability. The parties should advise the court by telephone conference call or status report within the next two weeks whether we should enter a schedule for further discovery or other deadlines acceptable to the parties. We are available to meet with counsel on the record or otherwise, at their request.

Robert H. Hodges, Jr.
Judge

# In the United States Court of Federal Claims

No. 98-483C

(Filed: January 11, 2002)

JAN 2 8 2002

| | |
|---|---|
| FLORIDA POWER & LIGHT CO., | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

**ORDER**

Pending is plaintiff's motion for summary judgment on liability. Based on *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) and *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000), the motion is **GRANTED**.

In light of Judge Weinstein's January 4, 2002 order lifting the suspension of discovery, plaintiff's responses to the Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater Than Class C Radioactive Waste Arguments, Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance, and Defendant's Motion to Dismiss Count III of Plaintiff's First Amended Complaint shall be filed no more than 45 days after the close of discovery. While this case is in the discovery phase, plaintiff is directed to address any discovery requests to Judge Weinstein.

SARAH L. WILSON
Judge

# In the United States Court of Federal Claims

No. 98-621 C

(Filed: August 1, 2001)

| | |
|---|---|
| COMMONWEALTH EDISON CO., | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

## ORDER

On July 16, 2001, the court requested that defendant show cause why a liability order should not be entered in this case. Defendant's response acknowledged a partial breach of contract. Accordingly, plaintiff's Motion for Partial Summary Judgment is GRANTED on the issue of liability alone, pursuant to Rule 56(c) of the United States Court of Federal Claims. Further proceedings in this case will address the amount of damages to be awarded.

IT IS SO ORDERED.

EMILY C. HEWITT
Judge

[redacted]

Rec'd 8/7/01

# In the United States Court of Federal Claims

No. 98-484 C
Filed: July 31, 2001

| | |
|---|---|
| NORTHERN STATES POWER COMPANY, | ) |
| Plaintiff | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

ORDER

GRANTING PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

and

DEEMING PLAINTIFF'S PROPOSED LIABILITY ORDER MOOT

On the basis of defendant's response of July 27, 2001, to the Order to Show Cause that was entered by the court on July 19, 2001, plaintiff's Renewed Motion for Summary Judgment, filed December 27, 2000, is granted.

As a result of that holding, further action with respect to plaintiff's proposed liability order (filed by leave of court on July 10, 2001), is rendered unnecessary and the proposed order is therefore deemed moot.

John P. Wiese
John P. Wiese
Judge

# In the United States Court of Federal Claims

No. 98-126C
(Filed June 28, 2004)

******************************
YANKEE ATOMIC *
ELECTRIC COMPANY, *
Plaintiff, *
*
v. *
*
THE UNITED STATES, *
Defendant. *
******************************

**ORDER**[1/]

Before the court are several motions *in limine.*

Motion *in limine* to preclude the testimony of Frank Graves

Asserting it is speculative, defendant seeks to preclude the introduction of the damages theory, model and opinion of Frank C. Graves, one of plaintiffs' expert witnesses ("Graves"). Graves has a bachelors degree in mathematics and a masters degree from the MIT Sloan School of Management. According to his report, Graves has nineteen years of experience in assisting utilities in the design and implementation of long-range planning, investment and operating policies, capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, design and pricing of new services, and financial simulation and valuation techniques. (Appendix to defendant's Motion, pp. 1-32 and Appendix to plaintiffs' Opposition, pp. 1-47).

When the capacity of a DOE storage facility is eventually approved, by appropriate regulatory action, the contract between DOE and the various utilities contains a procedure to establish a time and quantity schedule for SNF pickup based

[1/] This should also be deemed applicable in *Connecticut Yankee v. United States,* No. 98-154 C and *Maine Yankee v. United States*, No. 98-474 C.

on DOE-issued delivery commitments including exchanges thereof. Graves propounds what he describes as a reasonable estimate of how the contract's exchange provision would have affected the timing of the removal of SNF from plaintiffs' facilities under reasonable rates of acceptance. Graves' report creates an economy that would have existed had defendant commenced performance in a so-called "but for world." "But for" defendant's contract breach, basic economic principles of supply and demand would have created a market for exchanges based on an individual utility's cost to store its SNF until its pickup commitment, and a price at which another utility was willing to exchange its earlier pickup date. If storage costs were greater than an earlier pickup price, an exchange could occur. In that market, Graves opines, Yankee Atomic would have purchased/swapped for earlier acceptance slots for $11.8 million dollars and have all its spent fuel picked up by January 1999.[2] Using the same economic model, Graves opines that Connecticut Yankee and Maine Yankee (both of which had remaining storage space) would have exchanged their early allocation slots for later times, netting $7.8 million and $9.1 million, resulting in removal of their SNF by August 2001 and June 2002 respectively. Precisely how much SNF DOE would have removed each year or in what order, will not be proffered according to plaintiffs. Rather, Graves apparently will testify that regardless of the precise acceptance schedule, applying reasonable rates, Yankee's pool would have been cleared in 1999, Connecticut Yankee's in 2001, and Maine Yankee in 2002.

The government's argument that it was obliged to pick-up only a minimum amount of fuel, or only fuel for which there was an approved delivery commitment has been rejected. *Commonwealth Edison Co. v. United States*, 56 Fed. Cl 652, 663 (2003) explained that to date the delivery commitment "mechanism does not create a contractually binding obligation for either party." "Even if the process . . . could, if followed and completed in good faith, create a contractual obligation, the third step in the process was not completed because plaintiff did not submit and defendant did not approve a [final delivery schedule] for any year." *Id.*, at 666. In *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 97-98 (2003), the court also found the delivery commitment schedules were not controlling and were used by DOE

---

[2] The government also assails Graves' reliance on the so called priority for shut-down reactors. The government's position is the Standard Contract provides only that priority **may** be given to shut-down reactors, not that priority **must** be given to shut-down reactors. Absent that priority, Graves' opinion crumbles the government argues. Priority for shut-down reactors is the subject of defendant's motion for partial summary judgment.

as an attempt to keep acceptance rates low to decrease the "limit of the [g]overnment's liability to plaintiff for breach."*I d.* at 99. The Standard Contract did not set a specific rate of spent fuel acceptance, or a date by which the government was required to complete accepting the fuels; therefore, as the court stated in its June 26, 2003 Order in the instant case, in the unlikely event an award of damages to plaintiffs, or any one of them, requires the development of a pick-up schedule for all SNF and/or HLW from all utilities under the Standard Contract, the court reserves its option of invoking the primary jurisdiction doctrine by initiating the matter by means of the call procedure of 28 U.S.C. § 2507(a).[3]

Plaintiffs also point out that Graves' opinion is only part of their damage case. Plaintiffs will also present evidence of their reliance damages – actual expenses. Plaintiffs' position that it could have purchased earlier pickups is an alternative position.

Standards for motions *in limine*

RCFC 16 motions *in limine* ". . . prevent a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters. Such a motion enables a court to rule in advance on the admissibility of documentary or testimonial evidence and thus expedite and render efficient a subsequent trial." *Norman v. United States*, 56 Fed. Cl. 255, 267 (2003)(citation omitted).

Expert testimony "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As the Supreme Court has observed, "[t]his condition goes primarily to relevance." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "The Rule's basic standard of relevance is thus a liberal one." *Daubert*, 509 U.S. at 587.

[3] *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003) held that damages for the government's breach of contract were based on a 3,000-ton annual rate of acceptance commencing in January, 1998.

Fed. R. Evid. 702(1) provides that an expert witness with "scientific, technical, or other specialized knowledge may testify if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Accordingly, in its "gatekeeper" function, the court excludes expert testimony that it finds to be irrelevant or not based upon the application of the particular facts of the case to reliable methodologies or theories. *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003), *citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92. *See also Fed. R. Evid. 104.* The inquiry is "whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology can properly be applied to the facts at issue." *Daubert*, 509 U.S. at 592-93. This inquiry is necessarily "'a flexible one,'"based on the uniqueness of the circumstances present. *Id., citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a [court] to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). If the relevancy of evidence is dependent upon disputed facts, evidence may be admitted "upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Fed. R. Evid. 104(b).

Defendant argues Graves' damages theory and underlying model are too speculative to support a damage award and fail the reasonable certainty standard. The Standard Contract provides that once DOE approved a utility's delivery commitment, that utility could exchange or sell it, subject to DOE's unilateral right, in advance and "in its sole discretion," to approve the exchange. Graves' assumption that DOE would not only have begun pickup, but have approved the delivery slot exchanges he hypothesizes, thus allowing for utilities to barter among themselves, is flawed defendant asserts. In the twenty-one years since the Standard Contract was promulgated, no contract holder has ever submitted an exchange request to DOE. Accordingly, there being no "real world" experience to test the market theories upon which Graves relies, his analysis is asserted to be speculative and based on assumptions that are incorrect or inconsistent with plaintiffs' data.

Under the Standard Contract, after the capacity of a DOE storage facility is established and the delivery procedure is commenced, a utility may seek approval of an exchange six months prior to a delivery commitment date. The DOE has thirty

days to provide written reasons for any disapproval. Although the government has discretion to approve or disapprove requested exchanges, discretion may not be exercised arbitrarily or capriciously. *Reservation Ranch v. United States*, 39 Fed. Cl. 696, 714-15 (1997), *aff'd*, 217 F.3d 850 (1999). *See also Hayes v. United States*, 43 Fed. Cl. 735, 740 (1999). Accordingly, DOE's right to approve the exchanges on which Graves opinion rests, does not render his opinion inadmissible on that basis. Good faith action may be presumed. Defendant also points out that in 1992 Yankee Atomic analyzed the possibility of exchanging its allocations, an analysis that showed significant savings, yet Yankee Atomic did not pursue any exchanges then, and therefore, would not pursue that avenue in Graves' hypothetical world. Graves can be cross-examined in this area. DOE's other objections related to transportation issues, such as cask availability and geographic locations of proposed swaps as well as any impact that "Greater-Than-Class C" low-level radioactive waste ("GTCC")(which the defendant asserts it has no contractual obligation to pick up) would have on exchange market prices, can also be explored in cross-examination. Defendant alleges the continued presence of GTCC on plaintiffs' property after pickup of the SNF would eliminate or reduce plaintiffs' damages. As the court stated in its June 26, 2003 Opinion, to the extent it is necessary to resolve the GTCC policy issue in order to determine damages, evidence on this issue is appropriate.

Standards for the fact of damages and the amount of damages:

Analogizing to *Winstar* cases that have rejected expectation damages because of the failure to identify specific investment opportunities that the thrifts would have followed in the "but for world," defendant likewise urges the rejection of Graves' analysis and opinion for lack of "real world" experience. The court rejects the government's assertion that Graves' opinion should not be introduced at trial because it does not identify which utilities would trade or sell to plaintiffs. Proof of damages need not always specify transactions that would have occurred but for the breach. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1329 (2002)(affirming damage award for agreement for lender to provide loans to make HUD housing more energy efficient without evidence of which loans would have been made); *Ace-Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1333 (2000) (approving damages for breach of transcription contract without evidence of specific proceedings the reporters would have handled but for the breach); *Locke v. United States*, 283 F.2d 521, 524-25 (Ct. Cl. 1960)(approving damages for breach of a typewriter repair contract without evidence of specific machines plaintiff would have repaired.). If there is a reasonable

probability of damages, the amount of which is uncertain, the court makes a "fair and reasonable approximation of the damages." *Ace-Federal Reporters,* 226 F.3d at 1333, *quoting Locke v. United States*, 283 F.2d at 524. Such damages may rest on "reasonable inferences based upon the evidence." *Energy Capital Corp.*, 302 F.3d at 1329, *citing Locke*, 283 F.2d at 524 (" . . . we may act upon probable and inferential as well as direct and positive proof."). *See also California Federal Bank v. United States,* 245 F.3d 1342, 1350 (Fed. Cir. 2001)(If the fact of damages proximately caused by the breach is clear, there must be some basis on which a reasonable estimate of the profit may be made.). If the jury method of ascertaining damages is applied, the court must determine (1) clear proof of injury; (2) there is no more reliable method to calculate damages; and (3) there is sufficient evidence from which to make a fair and reasonable approximation of damages. *Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002). "In estimating damages, the Court of Claims occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties." *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1357 (Fed. Cir. 2001) citing *Specialty Assembling& Packing Co. v. United States,* 355 F.2d 554, 572 (Ct. Cl. 1966), citing *United States v. Smith,* 94 U.S. 214, 219, 12 Ct. Cl. 119, 24 L.Ed. 115 (1876). Accusations that Graves' proof is speculative will not preclude the introduction of the evidence. *Id.* Whether the exchanges Graves describes "could have" or "would have" occurred can be explored at trial.

Defendant's objection that Graves does not rely upon any "real world" exchanges for his economic theories is strikingly similar to the objections rejected in *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002). At issue in *Energy Capital* was a contract between HUD and the plaintiff under which plaintiff would extend energy efficiency loans to HUD property owners. 302 F.3d 1316-18. Following HUD's breach of that agreement, the question became whether, and to what extent plaintiff would have profited from those loans – loans which could not have been made without the consent of HUD, the holders of the first mortgages and the underlying fee owners. Responding to the government's assertion that the resulting damage award was speculative because there was no testimony that the first mortgagees would have consented to the energy loans, the Federal Circuit characterized the government's argument as an attack on the sufficiency of the evidence. 302 F.3d 1329. The Federal Circuit counseled that the trial court made reasonable inferences from evidence which included incentives to the first mortgagees

to consent to the thwarted loans, and deferred to the trial court's broad discretion to weigh that evidence.

Similarly, the government here argues DOE has not consented to any exchanges, nor been requested to do so. The court will await the close of evidence to make its findings and will not exclude Graves' opinion on the grounds the government urges. See also *Ace Federal Reporters*, 226 F.3d at 1333 (noting that if a reasonable probability of damages is established, damages may be fairly and reasonably approximated.).

Defendant's contract breach is established. That breach prevented the very market the government assails as speculative – the lack of real- market data on the sale of allocation slots for the storage of spent nuclear fuel. By partially breaching the contract, defendant cannot exclude Graves' opinion on the grounds that there is no market data. There is no market data because the government's breach thwarted this possibility.

Graves relies on facts in record - not mere speculation

In constructing his economic model -- a "should have been world" if DOE had commenced performance, Graves assumes (1) certain storage costs; (2) a rate of acceptance by DOE; and (3) certain fuel would be classified as "must move" – fuel that needed to be removed to eliminate continuing storage costs – for example, SNF held by a shutdown utility for more than five years (the necessary cooling time for SNF prior to acceptance) or SNF that exceeded available storage space. From this theoretical supply and demand, "swap" prices would have developed Graves opines, with an ascertainable market price arising naturally (and scientifically) from the economic tenants of supply and demand. As noted, under the Standard Contract, initial allocations, or slots, for pick-up are based on "Oldest Fuel First." However, under the contract, subject to DOE approval, slots could be exchanged among plant owners. Graves creates a model economy or market for these acceptance slots based on economic engines. A plant owner would have the economic incentive to buy an earlier swap allocation at a price less than the cost to store the fuel. Conversely, a plant owner would be motivated to sell a swap allocation and accept a later place in the queue if the exchange price was greater than its storage costs.

Defendant objects to various factual assumptions Graves makes. Many of those objections go to facts that are in dispute, the rate (or a reasonable rate) of acceptance, storage costs in the "but for or the "breach world." Defendant's objections are to the application of facts to Graves' economic principles and methodology. As the Federal Circuit counseled in *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed. Cir. 2003), the court does not winnow expert testimony because of factual disputes. Rather the court scrutinizes the methodology used.

> Defendants confuse the requirement for sufficient facts and data with the necessity for a reliable foundation in principles and method, and end up complaining that [the expert's testimony] was not based on 'reliable facts'. . . . When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of the facts underlying one expert's testimony . . .
>
> > When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data'i s not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

317 F.3d at 1392, citing Advisory Committee note to Rule 702.

Defendant may by cross-examination and presentation of a competing theory, explore the facts it disputes. *Cf. Litton Sys., Inc. v. Honeywell, Inc.*, 87 F.3d 1559 (Fed. Cir. 1996), *vacated, and remanded,* 520 U. S. 111 (1997). Graves' opinion will be subjected to scrutiny at trial; it will not be excluded pre-trial.

Expectation damages in the *Winstar* cases cited by defendants (decided on summary judgment not by a motion *in limine*) were not based on experience but solely on projections and assumptions that may not have been supported by the evidence. In contrast, without prejudging the evidence, here, at least some of the costs have been incurred, SNF quantities are ascertainable, and both parties have projections of acceptance rate, delivery schedules, and quantities. Specifically, Graves relies upon the expert witness report of John W. Bartlett, former Director of the Office of Civilian