Radioactive Waste Management, to determine how the government should have and did structure its spent fuel acceptance program, an opinion supported by DOE publications. SNF inventory, projected discharge data, and storage costs were obtained from James P. Malone of NAC International; SNF storage capacity was taken from a DOE publication. Transportation data was obtained from the expert witness report of Ivan F. Stuart of NAC International. Appendix, p. 4. Pool capacities, inventories, and reactor discharge rates for all the spent fuel facilities in the United States were obtained from DOE publications and from Mr. Malone. Annual aggregate acceptance amounts used were found to be reasonable by Dr. Bartlett and supported by the opinion of Ivan Stuart, and also contained in a DOE planning document titled, "Civilian Radioactive Waste Management System Requirements Document," dated January 1999. *Id.* pp. 7-8. While the government may present contrary evidence, plaintiffs' position is not fiction. Approval of exchanges is supported by deposition testimony. Id. p. 13-14. Factors used in reaching Graves' conclusions are "real world" figures. While many of the facts are in dispute and many facts are subject to extrapolation or projection, many of the underlying figures represent costs that have been incurred and facts and opinions of others, while perhaps disputed, exist independently. *See* Graves' Opinion, Exhibit 1, List of Data and Documents considered in Forming Opinions, Defendant's Motion, Appendix, pp. 22-23. Accordingly, Graves' opinion is not based on "unsupported speculation." *Energy Capital*, 302 F.3d at 1329.

Importantly, both ramp-up and acceptance rates, along with storage costs are not created by Graves out of whole cloth. Graves relies upon the rates set forth in the 1999 Civilian Radioactive Waste Requirements document for a centralized interim storage facility that was never developed. The government argues that the same document contains different rates that apply to the planning of "overall system level requirements." And while both eventually reach a steady-state rate of 3,000 MTU per year, the ramp-up rates for planning the system level requirements are significantly lower in the first three years than the ramp-up rates upon which Graves relies. According to the government, with the system-wide ramp-up rates, Yankee Atomic would not have been able to purchase sufficient allocations in year one of Graves' model. Graves relies upon the expert report of Dr. John Bartlett, who admitted in his deposition that the rate he chose was "illustrative of reasonable performance." From this the government argues that, as the assumptions change, so does Graves' opinion, which makes it too speculative. Again, this criticism goes to the weight of the opinion, not its preclusion at this pre-trial stage. As the court found in its June 26, 2003 Order, DOE was to commence pickup at a reasonable rate no later than January 31, 1998.

Plaintiffs proffer that Graves' ramp-up rate is supported by (1) DOE's own planning documents; (2) the opinion of Dr. Bartlett; (3) the amount of "must move fuel;" and (4) the opinion of Ivan Stuart. The government's cited cases where expert opinion was not supported by any evidence are not convincing. The government does not suggest any other rate would be reasonable. That plaintiffs' damages could vary with changes in acceptance rate does not preclude the introduction of Graves' opinion.

Likewise, the government's criticism concerning storage costs (a factor in Graves' economic methodology) is fair game for cross-examination. "Fair and reasonable" approximation, not an exact calculation (which would of course be impossible in this situation) is all that is needed. Of course, the court is not ruling here on a request for future damages, a motion addressed separately. That plaintiffs' damages could vary depending upon rates of acceptance does not make plaintiffs' damages speculative or otherwise unrecoverable. Graves' estimate of how the exchange provision would have affected the timing of the removal of plaintiffs' spent fuel will not be precluded at this stage. The government's cites *Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part and remanded in part*, 301 F.3d 1328 (2004) as supporting its argument that a damage award may not be based on speculative assumptions. Here, cited disagreements with storage costs go to the amount, not the existence of damages. *Castle* followed trial and damages were rejected because assumptions, such as the credit quality of the bank's loan portfolio, were contrary to the evidence. Its analysis and applicability as to the existence of damages vice the amount of damages are better suited for trial.

Without prejudging the weight to be accorded Graves' report, his testimony may be presented. Graves' report purports to be grounded in fundamental economic principles of market supply and demand and cost avoidance applied to data that the court will not find to be insufficient at this pretrial stage.

Although there are numerous SNF cases pending in this court, apparently only these three plaintiffs rely on a damage theory based upon exchanges. Defendant complains that any damages assessed in this case would not be binding in subsequent damage assessments in other cases that may utilize a differing acceptance schedule on which damages can be based. However, damages are unique to each utility, and may well not depend upon any overall schedule for their determination.

The parties disagree on whether the fact of damage from the government's partial breach is established, and/or whether Graves' opinion can be categorized as

addressing the fact of damage, the amount of damage, or something in between. Plaintiffs allege the fact of damage is established and refer to government's expert, R. Larry Johnson's February 19, 2004 report that concludes plaintiffs are entitled to very substantial damages in every factual scenario he examined except scenario 1. Pltfs' App. A133. Scenario 1 is based on the 1995 acceptance rates which the court rejected as controlling in its June 26, 2003 Order denying the government's motion for partial summary judgment on the rate of spent fuel acceptance. As a result, plaintiffs state, damages are certain; therefore, the court must hear the evidence to reach a reasonable approximation of the amount of damages. In that calculation, Graves' opinion will be offered to show when DOE would have completed removing plaintiffs' fuel absent the DOE's breach, a constituent fact contributing to the estimation of the amount of damages – to which the government offers no alternative model.

In its Reply the government says that while this court has determined a contract breach, issues as to causation and damages remain and Graves' opinion does not establish either causation or injury in fact. His opinion will be offered as the only evidence that plaintiffs suffered any damages – for which reasonable certainty is required. The government also asserts Graves' opinion is the only causation testimony plaintiffs plan on presenting, and Graves does not establish the amount of damages (for which a reasonable approximation standard applies); rather Graves' opinion supplies a factual predicate (causation) for the opinion of Mr. Wise who then quantifies damages, according to the government. As such, the government asserts that Graves' causation opinion must be reasonably certain. As Graves' opinion is not based on reasonable certainty, the government asserts, the opinion should be precluded. Again, such scrutiny awaits trial; Graves' testimony will not be precluded at this stage. Whether Graves' opinion goes to the fact of damage, the amount of damages, or a combination thereof, will be explored at trial. The arguments defendant makes about his opinion can be explored in *voir dire*, cross-examination and argument. It bears emphasis, however, that while the court has ruled that the government breached the contract, plaintiffs must still establish that the breach caused damages and the amount of those damages. Whether plaintiffs are able to prove either the existence or the amount of damages awaits trial.

Motion *in limine* to preclude the testimony of Dr. Bartlett

Defendant also moves to preclude the expert report of Dr. John W. Bartlett, former Director of DOE's Office of Civilian Radioactive Waste Management ("OCRWM"). Dr. Bartlett was the Director of OCRWM from 1990 until 1993. This office had and has the responsibility to develop and manage the federal system for the disposal of all spent nuclear fuel ("SNF") and high-level radioactive waste.

In sum, Dr. Bartlett makes three points. First, absent the breach, the DOE would have ramped-up to 3,000 MTU per year. Supporting that proffer is, not only his own experience and knowledge, but Graves' opinion and government documents, including the 1985 Mission Plan, which utilized the 3,000 MTU rate. Second, Dr. Bartlett's opinion that exchanges would have been an important part of the "but for world," is based on his own knowledge and experience in the "real world," and supported by his discussions with utilities while he was Director, as well as DOE publications. Thirdly, Dr. Bartlett's opinion is that utilities would be encouraged to organize deliveries efficiently and less expensively by "campaigning."[4/]

Defendant asserts Dr. Bartlett's opinion does not meet the threshold of Fed. R. Evid. 702 because he is not qualified to render an opinion as to the "proper pace and schedule" for DOE's acceptance of SNF and the viability of exchanges or transportation campaigns. Defendant complains that Dr. Bartlett lacks experience and knowledge of how an exchange system would have operated; he fails to identify an acceptance or ramp-up rate; he has virtually no knowledge of the Standard Contract and no specialized knowledge or experience as to DOE's responsibilities thereunder, and during his tenure as Director of OCRWM, his involvement with the Standard Contract was "absolutely minimal." Defendant also asserts Dr. Bartlett lacks experience with "acceptance campaigns" or exchanges and largely relies on the opinion of Ivan Stuart, another of plaintiff's experts. Defendant also complains Dr. Bartless was unable to project whether or how many exchanges would be submitted for approval, thus his opinion is pure conjecture.

In addition to questioning his qualifications, defendant also assails Dr. Bartlett's methodology, asserting it is unreliable and incoherent. His exchange theory is based on expectation and belief formed during his tenure as OCRWM Director and review

[4/]Plaintiffs explain that a transportation "campaign" is the acceptance and transportation of a substantial amount of spent fuel or radioactive waste from a site during each visit in contrast to acceptance of a small amount from a particular location. In other words, it is more cost efficient to pick up a substantial amount of SNF from one site than small amounts from several.

of documents first given to him by plaintiffs' attorneys. His conclusion that acceptance campaigns are a good idea is baseless according to the government.

Finally, defendant posits that Dr. Bartlett's opinion is simply not helpful to the court as the trier-of-fact; it fails to account for many variables, and is inconsistent with what is required by the Standard Contract as opposed to what might be a good idea.

Plaintiffs' counter that defendant's position is diametrically opposed to its prior motion to exclude Dr. Bartlett from testifying because of the possible application of the lifetime ban under 18 U.S.C. § 207. Defendant now argues Dr. Bartlett's opinion is not based on scientific principles; defendant's prior motion to exclude Dr. Bartlett's testimony was on the grounds he relies on scientific, technical, or other specialized knowledge obtained while Director of OCRWM. The court held in its December 30, 2002 Order that there was not a sufficient showing that Dr. Bartlett's service as Director of OCRWM involved the "particular matter" now before the court, and if so whether that involvement was sufficiently personal and substantial so as to call for the permanent testimonial bar of the Ethics in Government Act, 18 U.S.C. § 207(a)(1). Accordingly, the court ordered that Dr. Bartlett may serve as an expert witness in this litigation consistent with the Federal Rules of Evidence, subject to the qualifications contained in that Order. Plaintiffs also represent that Dr. Bartlett may testify as a fact witness.

Without prejudging his acceptance as an expert in this case for all purposes that may be advanced, it is noted that plaintiffs present Dr. Bartlett's experience and personal knowledge not only from his three years as director of DOE's SNF program, but from his experience commencing in 1957 with the design of the Navy's first nuclear-powered surface ship and his doctorate degree from Rensselaer Polytechnic Institute where he studied and taught courses in nuclear engineering and the nuclear fuel cycle. In 1968, Dr. Bartlett was a Fulbright professor of Nuclear Engineering in Istanbul, Turkey, where he taught atomic physics, reactor engineering and reactor design. Dr. Bartlett worked for the contractor to the Atomic Energy Commission Division of Waste Management and Transportation where he developed the program plan for a complete system for nuclear waste management. Plaintiffs represent that he was on the ground floor of designing and planning this country's spent nuclear fuel and high-level waste disposal plan.

In 1974 Dr. Bartlett led the Nuclear Waste Management Planning Office's preparation of a five volume compilation of technologies in nuclear waste management. With a consulting firm starting in 1978, Dr. Bartlett's work included providing technical support to the Nuclear Regulatory Commission's promulgation of regulations pursuant to the Nuclear Waste Policy Act. He provided peer review of DOE's 1985 plans for the spent fuel program.

In October of 1989, he was nominated by President Bush to be the director of DOE's spent fuel disposal program; he was confirmed by the Senate in 1990. As Director he communicated with CEOs of leading utilities which included discussions about exchanges. After leaving DOE in 1993, Dr. Bartlett consulted in the field of radioactive waste disposal program planning, including the logistics of an attempted spent fuel repository in Australia. His work included transportation logistics. A 3,000 rate he assumes is a rate that was adopted in *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003).

For the reasons stated above, defendant's objections or disagreements with Dr. Bartlett's facts, assumptions, and reasoning can be explored in cross-examination subject to the qualifications and conditions contained in the court's December 30, 2002 Order. Whether factual or expert testimony, or a combination thereof, the court will not preclude plaintiffs from offering Dr. Bartlett's opinion; it cannot be said at this stage, he lacks specialized knowledge, skill or experience related to the matters about which he intends to offer expert testimony in this case, that his methodology is flawed or that all his assumptions are speculative. Fed. R. Evid. 702. Given the uniqueness of the facts in this case, lack of specific experience with government-run industry-wide disposal of SNF will not, in and of itself, preclude expert testimony. Dr. Bartlett will not be offering legal opinions as to the meaning of provisions of the Standard Contract, according to plaintiffs. Dr. Bartlett will assist the court regarding the Standard Contract. *Restatement (Second) of Contracts* § 204 (1981)(The court must supply missing contract terms that are reasonable under the circumstances). His opinion as to the operation of a functional disposal program may assist the court in resolving issues of reasonable contract administration. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003)(stating that "[c]ourts should read contract provision to 'effectuate [its] spirit and purpose.'").

<u>Motion to Exclude the Testimony of Kenneth W. Blair</u>

Plaintiffs assert they needed to build and load an Independent Spent Fuel Storage Installation ("ISFSI") because of defendant's breach. Plaintiffs move to exclude testimony from Kenneth W. Blair, defendant's scheduling expert, whose "Summary of Opinion" states that "contractor delays to the fuel preparation activities," not DOE's inaction, resulted in an eleven-month delay in completion of transfer of fuel to plaintiffs' ISFSI. This position may be used to support defendant's argument that it is not liable for costs arising from contractor delays, plaintiffs assert.

In its August 29, 2003 Order, the court stated that, to the extent defendant asserts that a portion of plaintiffs' damages are attributable to contractor delays, defendant – as the breaching party – must demonstrate that plaintiffs' remedial actions were not commercially reasonable in that regard. According to plaintiffs, Blair has no opinion on the commercial reasonableness of plaintiffs' actions and cite deposition testimony to that effect. While they do assert that the building and loading of the ISFSI was due to the government's breach, plaintiffs do not dispute that certain activities took longer than originally anticipated. Plaintiffs do not allege that DOE activities or inaction caused delays in completion of their ISFSIs.

Additionally, plaintiffs seek to exclude Blair's testimony that plaintiffs are responsible for any delays associated with its ISFSI project, by virtue of the fact that plaintiffs hired NAC as its contractor. This, plaintiffs assert is an inadmissible legal conclusion offered by Blair, a civil engineer not a lawyer. Any probative value is outweighed by the unnecessary time that would be used in allowing Blair to testify, particularly given his inability to opine as to the commercial reasonableness of plaintiffs' remedial acts, and thus his opinion is properly excludable under Fed. R. Evid. 402 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, . . . or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

Plaintiffs contend Blair's testimony is inherently unreliable because he admitted his opinions are incomplete and subject to amendment pending review of additional documents, and because he cannot state with a minimal degree of certainty that he is the primary author of his report, which he acknowledges was co-authored with his colleague Kelly Heuer. Plaintiffs complain that Blair's expert report also fails to contain the basis and reasons for his opinion as required by Fed. R. Civ. P. 26(a)(2), the court's November 8, 2001 Order respecting expert witness disclosures, and Fed. R. Evid. 702 which requires an expert to explain how experience led to the conclusion

reached. Plaintiffs also state that Blair believes he discarded preliminary sketches, notes of conversations and drafts of his opinion in violation of the court's November 8, 2001 Order requiring "[a]ll material considered by a testifying expert (including that rejected) or material generated by the expert in formulating opinions should be produced . . . . This would include any communications from persons, including counsel, addressing or commenting on the substance of the testimony to be presented."

In opposition, defendant represents that it is not taking the position that plaintiffs attempted to mitigate damages by building ISFSIs. Rather, defendant asserts that factors other than need for spent fuel storage motivated plaintiffs to shift to dry storage. Defendant does note, that the ISFSIs were failed mitigation attempts because their costs exceed those of wet storage. In short, delays in the ISFSI projects extended the period during which the Yankees are claiming both wet and dry storage costs. Evidence in that regard is, defendant's counter, consistent with this court's order of December 24, 2003 that "[p]laintiff cannot complain in that its decision to move to dry storage was, at least in part, premised on saving costs. If this saving did not occur, through no fault of the government, additional damages over the cost of assumed continued wet storage should remain plaintiff's responsibility." Defendant also points out that Blair's opinion is, to some extent, subject to modification because the ISFSI project is currently under construction. Finally, defendant asserts that Blair's opinion is no less credible because he wrote his report in collaboration with colleagues, and plaintiffs have been provided with all drafts of his report; what was discarded were notes of phone calls with follow-up issues that were thrown away when resolved.

In Reply, plaintiffs cite to Blair's testimony that further documents that the court declined to order produced in its Orders of August 29, 2003 and December 24, 2003 "are required" in order to complete the analysis upon which his opinions are based. Appendix 3 to Blair's report states "[a]ny remaining existing documents are required in order to complete the schedule delay analysis." Pltf's Motion, p. 039. Plaintiffs also reassert the court's insistence that the touchstone for judging plaintiffs' conduct in responding to the government's breach is reasonableness.

In general, for the reasons expressed with respect to the denial of the motion to preclude the testimony of Frank Graves, this motion to preclude Blair's testimony shall also be denied. The issues as to the relevance of contract delay to damages claimed can best be handled on a trial record. The points raised by plaintiffs can better be

addressed by *voir dire* before any evidence is presented or by cross-examination thereafter.

Motion to Exclude testimony from Daniel Fischel

Plaintiffs seek to exclude the testimony of Daniel R. Fischel ("Fischel"). Fischel is the Director, Chairman and President of Lexecon, Inc., a consulting firm that specialized in the application of economics to a variety of legal and regulatory issues. He is also the Lee and Brena Freeman Professor of Law and Business at the University of Chicago Law School. His credentials are contained in his expert report. His Summary of Conclusions responds to Graves' opinion that "had DOE commenced acceptance of spent fuel by January 31, 1998 with a reasonable aggregate acceptance rate, it should and would have completed removal of spent fuel from Plaintiffs' facility by January 1999;" and "in order to achieve removal by this date, Plaintiff would need to swap removal slots with other Purchasers" at certain costs. Pltfs' Motion, App., p. 02. Based on those conclusions, another of plaintiffs' experts, Dr. Kenneth T. Wise opines that damages of Yankee Atomic are $70.6 million in the minimum in the "Breach World," not including the $11.8 million Yankee Atomic would have allegedly spent for the allocation slots in the "Non-Breach World."

Based on his review and analysis, Fischel reached two conclusions: (1) claimed damages do not result from DOE's failure to commence disposing of SNF and HLW by January 31, 1998 (the "Causation Opinion" according to plaintiffs); and (2) claimed damages are dependent upon assumptions about future events, assume a particular schedule, assume DOE would pick-up GTCC and "failed" waste, and assume exchanges would minimize aggregate at-reactor storage costs (the "Speculativeness Opinion") according to plaintiffs. Plaintiffs complain that Fischel's opinion is not based on DOE's failure to continue acceptance of spent fuel at a reasonable rate until such acceptance is completed and that Fischel's underlying assumption is that the breach was the failure of DOE to commence removal by December 31, 1998, a legal conclusion already rejected by this court in its Order of June 26, 2003 which adopted in part the ruling in *Commonwealth Edison Co. v. United States*, 56 Fed. C. 652, 664 (2003)(rejecting the argument that DOE was only required to begin acceptance and had no obligation to continue acceptance at a reasonable rate.).

Plaintiffs complain Fischel's Speculative Opinion is not useful to the court because he was unable to define "speculative" in deposition, yet used it in different contexts, and argue he uses an unknown and unidentified methodology. After a

teleconference with the court, Fischel admitted his methodology is unnamed. Plaintiffs also assert that Fischel criticizes Graves' expert opinion because the latter assumes future events, yet was unable to identify any such future events and admitted he had no expertise to do so. Fischel's criticism of the opinions of Dr. Bartlett and Graves for failing to take into account program, loading, and societal costs is assertedly unfounded and Fischel was unable to evaluate whether or not those issues have any bearing on those opinions. Plaintiffs complain that Fischel rendered legal opinions as to the acceptance schedules that are asserted to be consistent with the terms of the Standard Contract and as to whether purchasers could exchange allocations that had not been projected, requested and approved, and opines on efficiencies of exchanges under the Standard Contract vice exchanges in Graves' Opinion, all testimony that is either a legal opinion or would not be helpful to the court. In sum, plaintiffs posit that Fischel's report is more advocacy than expertise and should be excluded from the witness box.

Defendant disagrees and asserts plaintiffs misunderstand Fischel's opinion. Defendant asserts that in Fischel's opinion the damage claims proffered by plaintiffs are not based on an analysis of damages arising from the government's failure to commence removal in 1998. Rather, Fischel critiques plaintiffs' damage claims because they are founded upon the "speculative and implausible" assumptions that the government would have completed removal by a certain date. Fischel criticizes plaintiffs' damage theory because it is "not linked to a failure to start but rather is linked on a series of speculative and implausible assumptions relating to the time of removal independent of the time of commencement." This, according to Fischel, is a "fundamental disconnect, a lack of causal connection between the alleged breach and the claimed damage." As a result of this "disconnect," it is asserted plaintiffs' experts have failed to measure damages from both the failure to commence removal in 1998 and acceptance thereafter. Defendant calls plaintiffs' objections about Fischel's methodology and implausible assumptions confusing and counters that Fischel's critical analysis of plaintiffs' experts will aid the court in its examination of this matter.

Fischel is not offering legal opinions defendant insists. Even if his opinions are legal, as defendant points out, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704. Fischel's opinions regarding the assumption made by plaintiffs experts are based upon his expertise in economics and

damages. Defendant claims that his opinions will aid the court in examining other expert testimony; that it is not inadmissable. Fed. R. Evid. 702.

Similar to the results reached with respect to the proposed testimony of Frank Graves, it is concluded that Fischel's proposed testimony cannot be rejected by an *in limine* motion. Fischel's inability to name his methodology does not render it inadmissable. Questions of reliability of that analysis can be explored at trial. As for objections about Fischel's inability to quantify impact of future events, Fischel testified in deposition that ". . . predicting the future is difficult, and therefore a damage claim which is premised upon predictions about the future is speculative for that reason." Def. Op., p. 10. Fischel's point is that one cannot quantify how future events may affect future costs. Furthermore, the failure of Fischel to quantify societal and private costs he complains are missing from Graves' analysis does not warrant the pre-trial exclusion of Fischel's opinion. Other criticism of Fischel's analysis and his subsidiary opinions can be explored in cross-examination and argument.

Accordingly, it is **ORDERED** that:

(1) Defendant's motions to preclude the testimony of Frank Graves and John W. Bartlett shall be **DENIED**;

(2) Plaintiffs' motions to preclude the testimony of Kenneth W. Blair and Daniel Fischel shall be **DENIED.**

s/ James F. Merow
James F. Merow
Senior Judge