# In the United States Court of Federal Claims

No. 98-126 C
(Filed June 28, 2004)

*******************************

| | |
|---|---|
| YANKEE ATOMIC | * |
| ELECTRIC COMPANY, | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| Defendant. | * |

*******************************

## ORDER[1]

This matter is before the court on defendant's Motion for Partial Summary Judgment Regarding Priority for Shutdown Reactors. Plaintiffs filed their Opposition and Appendix; defendant filed its Reply. Having reviewed these materials, the court deems oral argument unnecessary.

Acknowledging that a breach of contract has already been determined, with the upcoming trial to be focused on damages, defendant asserts that once the government commences performance, the Standard Contract does not require priority be given to shutdown reactors. As the three plaintiffs in the cases now before the court have shutdown reactors, and at least one of their damages model assumes such a priority, defendant asks the court to conclude, as a matter of law, that such a priority is **not** required under the Standard Contract, and plaintiffs are not entitled to recover damages based upon such a priority.

According to defendant, the Standard Contract is clear; no expert testimony is necessary or appropriate; and, on its face, there is no priority for shutdown reactors. While the government **may**, in its discretion, grant such priority, it is not required under the Standard Contract. Defendant also asserts that, in fact DOE has refused to

---

[1] This should also be deemed applicable in *Connecticut Yankee v. United States*, No. 98-154 and *Maine Yankee v. United States*, No. 98-474.

grant priority to shutdown reactors, citing deposition testimony of various individuals. The court notes that in one of the cited depositions, it was DOE's policy not to grant priority to shutdown reactors at that time, but it is always possible that DOE may grant priority in the future. *See* deposition of Tomas Pollog, p. 205, ll, 9-16, cited in defendant's Motion at p. 7.

Plaintiffs complain that defendant's motion does not seek judgment in the government's favor "'upon all or any part of a claim or counterclaim,'" and thus is not an appropriate summary judgment motion under RCFC 56(a). Addressing the merits, plaintiffs contend defendant's motion misconstrues or misunderstands their position on the priority issue. Plaintiffs embrace the discretionary "may" language. Plaintiffs state that construing the entire contract, giving meaning to all of its parts, and its purpose and spirit, priority to shutdown reactors was an option and would have been extended in the "but for world" had the defendant not breached. Citing the court's June 26, 2003 Order which adopted, in part, the reasoning of *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) that the Standard Contract procedure has not dictated a controlling waste acceptance schedule, plaintiffs suggest that discretion is inherent in the Standard Contract. Plaintiffs proffer evidence and their responses to interrogatories and contend that a significant purpose of the Standard Contract and of the underlying statute, the Nuclear Waste Policy Act, was to enable utilities to avoid incurring additional on-site storage costs after 1998. Granting priority to shutdown reactors was one of the contractual tools available to DOE to meet this goal, citing *Roedler v. DOE*, 255 F.3d 1347, 1352 (Fed. Cir. 2001)(construing the Standard Contract and instructing that "[for] determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose.").

Plaintiffs also complain that the deposition testimony cited by defendant was in the context of the "breach world" – when DOE had given up on having a repository by 1998. Plaintiffs proffer that in the "non-breach" world addressed by plaintiffs' experts, if DOE had begun accepting fuel in 1998 at a 3,000 MTU rate (or at that rate following a reasonable ramp-up ) such a priority could be given. The government commissioned studies to investigate acceptance scenarios that would be the most reasonable and cost-efficient which included extending priority for shut-down reactors.

The parties agree that the Standard Contract, not a model of clarity, provides both that DOE "shall," except as provided elsewhere, accept oldest fuel first, and DOE "may" grant priority to shutdown reactors. "[A]cceptance priority **shall** be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." Standard Contract, Art. VI.B.1(a)(emphasis added). "Notwithstanding the age of the SNF and/or HLW, **priority may be accorded** any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." Standard Contract, Art. VI.B.1.(b)(emphasis added). Discretionary priority to shutdown plants is, in a sense, inconsistent with mandatory priority to oldest fuel first. The court needs to hear evidence to interpret this ambiguity, or, in the context of good faith contract administration, to construe and harmonize these and other terms in the Standard Contract. *Commonwealth Edison Co. v. United States,* 56 Fed. Cl. 652, 662 (2003)(concluding an acceptance rate term was missing from the Standard Contract construed to "'effectuate the spirit and purpose of the entire contract such that an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous or achieves a weird and whimsical result.'")(citations omitted).

In its Reply, defendant contends that DOE had sole discretion to determine whether or not priority may be (or would be) granted removal of SNF and/or HLW from shutdown reactors, and, as a matter of law, damages may not be awarded based on a priority dependant upon DOE's discretion. Assuming discretion for the purposes of ruling on this motion, discretion to approve or reject must be exercised reasonably and rationally. *Reservation Ranch v. United States*, 39 Fed. Cl. 696, 714-15 (1997), *aff'd*, 217 F.3d 850 (1999). *See also Hayes v. United States*, 43 Fed. Cl. 735, 740 (1999). Accordingly, it cannot be said as a matter of law that plaintiffs may not recover otherwise proven damages that assume priority for shutdown reactors. This must be determined on the basis of a factual record.

Accordingly, defendant's motion is **DENIED,** in that the need for ventilation of factual issues precludes resolution of this priority issue on summary judgment.

s/ James F. Merow
James F. Merow
Senior Judge

# REASSESSMENT OF THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM

**Report to the Congress by the Secretary of Energy**

**November 29, 1989**

# FOREWORD

In the Report of the House Committee on Appropriations (House Report No. 101-96) on the Energy and Water Development Appropriation Act, 1990 (P.L. 101-101), the Committee directed the Department of Energy (DOE) ". . . to submit a report within 60 days of enactment . . . which describes in detail how the Department plans to respond to the Committee's . . . concerns dealing with endemic schedule slips, problems in management structure, and lack of integrated contractor efforts."

This report has been prepared in response to the above-mentioned Congressional directive. It is based on a comprehensive review that the Secretary of Energy has recently completed of the Civilian Radioactive Waste Management Program. The Secretary's review has led to the development of a three-point action plan for restructuring the program. This plan is explained in this report.

## EXECUTIVE SUMMARY

The success of the Civilian Radioactive Waste Management Program of the U.S. Department of Energy (DOE) is critical to U.S. ability to manage and dispose of nuclear waste safely--and to the reestablishment of confidence in the nuclear energy option in the United States. The program must conform with all applicable standards and, in fact, set the example for a national policy on the safe disposal of radioactive waste.

The Secretary of Energy has recently completed an extensive review of the Civilian Radioactive Waste Management Program and concluded that it cannot be effectively executed in its current form. In response to Congressional concerns about schedule slips, management structure, and contractor efforts in the program, this report describes the results of that review and outlines actions the Secretary has taken and will take in the near future to restructure the program in order to get it moving forward again.

An important underlying premise of these Secretarial actions is that the program and supporting activities have a sound scientific basis. The intent is to develop and follow a solid, integrated plan based on a realistic assessment of the current situation.

Several months ago, the Secretary directed that a comprehensive review of the schedule for repository-related activities be performed. For the first time since the passage of the Nuclear Waste Policy Act, the program has put together a schedule based on a realistic assessment of activity durations and past experience. This schedule shows a significant slip for the expected start of repository operations--from the year 2003 to approximately 2010. In developing the revised schedule, the DOE was mindful that certain activities, such as the issuance of environmental permits by the State of Nevada and the Nuclear Regulatory Commission review of the license application, are outside the DOE's control.

One new emphasis of the program's efforts will be on completing an integrated array of near-term milestones directed at the scientific investigation of the potential site at Yucca Mountain in Nevada. Since a licensed geologic repository is a first-of-a-kind undertaking, the later dates in the schedule should be viewed as reasonable targets that represent the current estimate of activity durations. The DOE, however, pledges its best efforts toward meeting the near-term and later milestones consistent with its goals of safety and scientific excellence.

To promote the DOE's ability to achieve such milestones and goals, the Secretary is announcing the initiation of a three-point action plan. This plan centers on a



PA-163161

restructuring of the Office of Civilian Radioactive Waste Management, initiatives to gain access to the Yucca Mountain site to continue the scientific investigations needed to evaluate the site's suitability for a repository, and an initiative for establishing integrated monitored retrievable storage (MRS) with a target for spent-fuel acceptance in 1998. The major elements of this plan are outlined below.

Management structure

1. Appointment of new Director: The Secretary has proposed a candidate for a new Director of the Office of Civilian Radioactive Waste Management to the White House for appointment by the President. The program has been managed by acting Directors for over two years. The new Director will have the freedom to propose program changes in addition to those discussed in this report.

2. Direct-line reporting: Direct-line reporting by the Manager of the Yucca Mountain Project to the Office of Civilian Waste Management at Headquarters has been established. This allows for a direct line of authority and accountability between the Headquarters and field elements of the program for the first time.

3. Independent management review: The Secretary has directed that an independent review be performed to assess the effectiveness of the program organizational structure and processes. The review will include an examination of management structure and systems. The results of this review will be incorporated into the program restructuring beginning in January 1990.

4. Contractor support: Several reviews have been initiated to examine the program's current use of contractors to streamline and, where possible, consolidate contracts. In some areas, the number of contractors has already been reduced. As a result of schedule adjustments, some contractor work will be deferred, while other work may be accelerated. Because of uncertainties resulting from the revised program focus, there is a need to reassess options for contractor support. This is expected to be completed in the next few months.

5. Management controls: Formal, more rigorous program and project management controls are being implemented to enhance those previously in place. This includes the development or revision of technical, schedule, and cost baselines subject to formal change-control procedures.

6. Nuclear Waste Negotiator: The Secretary is working in close cooperation with the White House to facilitate the appointment of the Nuclear Waste Negotiator as provided for in the Nuclear Waste Policy Amendments Act. The Negotiator could provide valuable assistance in promoting progress in the repository and MRS programs.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--oOo--

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, Plaintiff, | ) | |
| vs. | ) | Case No. 98-488C |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

--oOo--

FRIDAY, SEPTEMBER 10, 2004

8:27 A.M.

COPY

--oOo--

DEPOSITION OF

JAMES SHETLER

VOLUME 2 (PAGES 259-450)

--oOo--

Louise Hatzenbehler
Certified Shorthand Reporter
License No. 12312

Q. Do you recall if you had any role in drafting this document for Mr. Freeman?
A. You know, I don't specifically remember whether I did or didn't.
Q. Let me ask you this question -- and I'm talking in total generalities now -- as a general proposition, when a general manager's signature is on a document and individuals are referenced in the body, is it generally those individuals referenced in the body that would have drafted the document for the general manager?
A. Not necessarily. They may have been involved in reviewing it, or they may just have been added as people to contact.
Q. So it's a case-by-case basis?
A. Case-by-case basis.
Q. And you have no specific recollection one way or the other what sort of involvement you would have had in drafting this?
A. I don't recall specifically, yeah.
Q. If I can refer you down to the fourth paragraph, it says "As recognized," and it says:

"...DOE may grant priority to remove spent fuel from a civilian nuclear reactor that has been shut down permanently for whatever reason."



When you were discussing earlier your discussions with DOE and the potential for getting priority, is that consistent with this document -- or is this document consistent with your recollection that this would have the time frame in which you were asking for priority?
A. This is consistent -- in the early '90s that would have been consistent with what we were asking for, yes.
Q. Do you recall in addition to this document any specific meetings you would have had with DOE staff with respect to priority?
A. Again, I think we talked about that earlier. I don't recall any specific meetings.
Q. I want to refer you down -- I guess it's three sentences. It says:

"We would like to take this opportunity to encourage you to grant priority to shutdown reactors for two major reasons. First, the NRC 10 CFR 50 license cannot be terminated until the fuel is removed from site."

Now, do you know, does this sentence assume that spent fuel is not separately licensed under Part 71, 72?



A. That would be my assumption.
Q. Is it also true that if, in fact, the spent nuclear fuel was separately licensed, that SMUD could terminate its Part 50 license?
A. Yes. If it's separately licensed in a Part 72 storage facility, then yes, the Part 50 license could be separately released.
Q. Was that one of the reasons you decided to separately license the facility, the spent fuel facility -- was to facilitate getting rid of the Part 50 license?
A. That certainly is part of it, but also when you're looking at storage facilities, one of the options you have is a Part 72 license.
Q. What were the reasons that SMUD considered -- or what was the basis for pursuing a separate license for the ISFSI?
A. I think it was in part to allow -- it would certainly facilitate decommissioning. The other issue is that it would under the license requirements -- my recollection at the time is for a storage facility, you needed to go through a Part 72 application.
Q. So in other words, you couldn't have a stand-alone ISFSI under a Part 50?
A. I'd have to go back and look at the license



again -- or the 10 CFR. It's been awhile since I've done that. I can't remember whether you could have a storage facility as part of your 50 license or whether you needed to go Part 72 separate. I'd need to go back and look at that.
Q. And, of course, would you need a separate license for transportation?
A. Yes.
Q. A Part 50 license wouldn't cover transportation?
A. A Part 50 license does not cover transportation, that's correct.
Q. Going back as far as you can recall, when did Rancho Seco first make the decision or the planning to pursue dry storage as an option for its spent nuclear fuel?
A. Did you say when?
Q. When?
MR. NESLIN: Object to the question as previously asked and answered. You've asked him a series of questions on a couple of occasions now, Josh.
Q. BY MR. GARDNER: You may answer the question.
A. I believe I testified earlier it was sometime in the early '90s.
Q. And you don't recall anything more specific

than the early '90s?
A. '90, '91, '92 time frame, in that range.
Q. And can you go through with me the logic behind that decision?
A. As I mentioned earlier in prior testimony, in looking at where we were in that time period we were clearly a shutdown nuclear plant. We clearly had direction from our electorate and our board, that we wanted to be out of the nuclear business as soon as we could. And so the issue was how to decrease that nuclear footprint.
Part of that was decommissioning. Part of it was disposal of the fuel. It was clear at that time that DOE wasn't going to be coming to take the fuel in 1998 in accordance with the original schedule. So the issue is now how do we put this facility in the safest mode that will still facilitate getting the fuel in DOE's hands but also reduce the costs for SMUD and at least potentially DOE, depending on how they ended up taking the fuel.
Q. So is it your testimony that in your initial discussions in decision-making, that you assumed DOE would not be performing under the original schedule?
A. Under the 1998 requirement?
Q. Yes.



A. Yeah, it was pretty obvious to us in the early '90s that DOE was not going to be performing under the 1998 take requirement.
(Defendant's Exhibit No. 9 was marked for identification.)
Q. BY MR. GARDNER: I'll warn you now, this document is massive.
A. Are you going to make me read it?
Q. I will not make you read the whole thing, but we are going to go into it in a lot of detail. Having said that, this is Exhibit 9. And what I suggest we do is, to the extent you can identify the document without reading the whole thing, that would be fantastic. And then I will direct you to certain parts of the document that I want to ask you about.
A. Well, it would appear to be a copy of the Rancho Seco Proposed Decommissioning Plan.
Q. Okay. And would you have seen this document before?
A. Yes, I would have seen the document before.
Q. Would you have had any responsibilities with respect to the generation of this document?
A. I would probably not have been involved in the actual generation of the document, but I would have been involved in the review of the document.



Q. And would you have been responsible for reviewing the entirety of this document or portions of the document? Do you recall?
A. I don't recall specifically. There's a lot of data in here that I probably would not have tried to verify or review, but the general write-up of the document, yes, I would have looked at.
Q. Can you tell me if you know what the purpose of a proposed decommissioning plan is?
A. It's to lay out to the commission what our proposal is for decommissioning the facility.
Q. And when you refer to the commission, are you referring to the Nuclear Regulatory Commission?
A. Yes, I am.
Q. And for the duration of this deposition, I'll refer to them as the "NRC" so we're clear about that.
A. All right.
Q. Is it your understanding that this document was submitted to the NRC?
A. There was a document submitted to the NRC. I guess I don't know whether this document is the one that was or not.
Q. And do you recall, whether it was this document or another document, when your proposed decommissioning plan would have been submitted to the NRC?



A. Again, earlier I think I said it was probably sometime -- my recollection was the '92 time frame.
Q. If I suggested to you it was May 1991, would you disagree with that?
A. It's in the realm of that time frame that I'm trying to remember, so it's possible it could have been May '91 rather than '92, yeah.
Q. Do you recall at this 1991, 1992 time frame, did the NRC require the filing of a decommissioning plan within a certain period of time after plant shutdown?
A. It's been awhile since I looked at the 10 CFR, but my recollection is yeah, I believe there was a time period requirement.
Q. And do you recall if it was two years?
A. I don't recall specifically. It was on the order of a couple years, but I don't recall specifically.
Q. In the 1991 and 1992 time frame did NRC regulations require NRC approval of a decommissioning plan before SMUD could engage in any decommissioning activities?
A. My recollection at that time period was yes, they did require approval.
Q. Do you recall if the NRC ever approved of SMUD's decommissioning plan?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SACRAMENTO MUNICIPAL UTILITY )
DISTRICT, )
Plaintiff, )
)
vs. ) No. 98-488 C
) (Judge Braden)
THE UNITED STATES, )
)
Defendant. )
)

**CONDENSED TRANSCRIPT**

DEPOSITION OF SIMON DAVID FREEMAN

LOS ANGELES, CALIFORNIA

FRIDAY, JULY 16, 2004

Reported by: LorRae D. Nelson, CSR No. 7384

MIRANDA COURT REPORTERS, INC.

3717 E. Thousand Oaks Boulevard
Suite 200
Westlake Village, California 91362

800-564-1494

Fax: 805-830-1186
Web Site & E-Mail:
www.

When I became general manager, I felt like that we had to think this through from scratch.

Q. That being said, were you aware, whether or not you recall this particular document, that SMUD prior to you starting there, had been exploring different options of disposing of its spent nuclear fuel?

A. I guess my testimony is that I wasn't aware of any specific options they had explored. But if they had, they were talking to themselves, because I wasn't going to put any weight on anything that those fellows that couldn't get their act together had done. I am trying to be candid with you.

Q. No, I appreciate that. The only reason I ask is when you started there, wasn't one of your responsibilities to come up with a plan or options for the Board to consider regarding the spent nuclear fuel?

A. Yes, sirree, and we did in due time but not the next day or the day after that. We had other items of more urgent priority such as keeping the lights on.

Q. During your service with SMUD until 1994, did SMUD come up with a plan to address the disposition of its spent nuclear fuel?

A. I think we did.

Q. Do you recall what that plan was or what the ultimate decision was regarding a plan?



A. Yeah. We were going to take the spent fuel out of the wet pool and place it in dry transportable casks.

Q. Now, who at SMUD ultimately made that decision to go that route?

A. Well, I believe it was my recommendation, concurred in by the Board of Directors, just as with any other issue.

Q. And just in an overall description, what steps were taken to move forward with the dry storage option which you just described?

MR. MACDONALD: Objection, vague as to what steps were taken. Over a course of eight or ten years?

MR. DAMELIN: I am only asking -- let me rephrase it.

BY MR. DAMELIN:

Q. During the time that you were the SMUD general manager, what steps were taken?

A. We entered into a contract with a cask manufacturer, if I can describe them that way. It was for a fair sum of money to start designing and building the casks. I mean, that was the specific step that I recall we took to implement the decision to go in that direction. All driven by the fact that the federal government had taken our money, hadn't come to take our trash, and was telling us that they weren't going to come



at least until 2010, which put us in a horrible financial situation of having to spend a bunch of money which really was owed to us by the government.

But the government kept turning down our requests to pay for all this extra work so we just did what a prudent utility would do. We took steps as fast as we could to mitigate the damages that were being inflicted upon us.

Q. So, you viewed the steps that were being taken by SMUD regarding the fuel disposition options you were pursuing as mitigation?

A. Yes, because if we had sat back and said well, you folks are obligated to take the trash and you are not here and we are just going to sit back and wait. I have a legal background. I figure, first of all, we didn't -- the money was so big it would impact our rates, but second of all, you were refusing to pay so -- I know the federal government is capable of litigating till the cows come home, which you are doing.

And we had an obligation to try to make those damages as small as possible, both to protect our own cash flow because you wouldn't pay for it, and also because that's what you would claim we should have done in the lawsuit, which is what we did and it wasn't easy.

Q. Regarding the government's obligation to pick



up SMUD spent nuclear fuel, when you were general manager during that period of time, what did you understand the date on which the government should have at least started to pick up the spent nuclear fuel from Rancho Seco?

A. Well, my recollection is more the date when you, the government, in plain English told us that it would be 2010 before you would pick it up. That was the date that sticks in my mind.

The date that you were obligated to pick it up, you know, was not the date that was driving what I was doing. It was the fact that you were saying you are not going to pick it up on time and it's going to be 2010.

Q. And what date are you referring to when you say that, that there is a particular date that you were focusing on?

A. Statements by the government contemporaneously -- and even before I got there. Listen, I've been in this field most of my life and kind of followed things, and this was a major blunder and breach on behalf of the government. We -- utilities were paying big money into a fund to take our trash away and you were saying we got your money, buddy, but we ain't going to pick up your trash, at least until 2010.

And believe me, I believed you when you said that because it was obvious that you were making no

IN THE UNTED STATES COURT OF FEDERAL CLAIMS

SACRAMENTO MUNICIPAL UTILITY DISTRICT PLAINTIFF

VERSUS NO. 98-488 C

THE UNITED STATES DEFENDANT

*****************************************************

DEPOSITION OF DAN R. KEUTER

******************************************************

APPEARANCES NOTED HEREIN

TAKEN AT INSTANCE OF: DEFENDANT
DATE: JULY 16, 2004
PLACE: ENTERGY
1340 ECHELON PARKWAY
JACKSON, MISSISSIPPI 39213
TIME: 8:00 a.m.

COPY

REPORTED BY: AMANDA MAGEE WOOTTON
CSR #1238

---

WOOTTON REPORTING
338 INDIAN GATE CIRCLE
RIDGELAND, MISSISSIPPI 39157
(601) 898-9990

services to evaluate the various options associated with removal of the nuclear fuel from the spent fuel pool at Rancho Seco.
Now, again, as of February 7th, 1990, had you already come to the conclusion that dry storage was the most economical means of disposal of spent nuclear fuel?
A No.
Q So then why was Sal Levy then, if you know, only looking at options associated with removing nuclear fuel from the spent fuel pool?
A Pardon me?
Q This language here says you or Mr. Boggs, I guess, with you CC'ed, asking you to evaluate the various options associated with removal of the nuclear fuel from the spent fuel pool at Rancho Seco.
A Yes.
Q Okay. Why did you only have him look at options for removal of the nuclear fuel from --
MR. NESLIN: Objection. Lacking foundation. It's simply a statement in the letter.



MR. GARDNER: (Continuing.)
Q Did you have any discussions with Mr. Boggs with respect to the hiring of Sal Levy to conduct any sort of evaluations?
A I don't recall any.
Q Was it your understanding that as of February 7th, 1990, you had made the determination that dry storage was the best alternative for Rancho Seco?
MR. NESLIN: Objection. Asked and answered.
You may answer it again.
A I don't -- I can't imagine that I would recommend dry cask storage without fully evaluating dual cask.
MR. GARDNER: (Continuing.)
Q Okay. Was it your understanding that Sal Levy was hired to do an evaluation of dual cask storage?
A I don't recall. Dual cask storage would have been part of dry cask storage.
Q Sure. And do you recall generally, maybe not even with regard to Sal Levy, that a study was done evaluating the cost and benefits of dual purpose cask system?



A No.
Q You don't recall any studies being done?
A No.
Q If you don't recall any studies being done, how did you -- because you said you ultimately reached the conclusion that you thought that dual purpose casks would be the best option for Rancho Seco, correct?
A Yes.
Q How did you reach that conclusion without any sort of --
A Well, the conclusion is what we're trying to do is, you know, get to decommission which included disassembly of spent fuel pool. If we had to maintain the spent fuel pool, because eventually you have to go back to the spent fuel pool to transfer from a storage cask to a transfer cask, it didn't make sense, common sense to go to dry cask storage if you had to maintain the pool in the first place. So that's how I came to that conclusion.
Q I see. And you made that conclusion without reference to any sort of economic analysis?



A No. What we're trying to do is disassemble the spent fuel pool. You don't need economic analysis to say that if you still have to maintain the spent fuel pool because you only have a storage cask and you're eventually going to have to transfer to the other, then, I guess my thinking at the time was it didn't make sense.
Q But yet you --
A Because you wouldn't accomplish what you were trying to accomplish.
Q Sure. Sorry to interrupt you. But when you were doing this, you did have to make assumptions as to how long a wet pool would potentially have to operate, correct?
A Yes.
Q And when you were making those kind of assumptions, where did you get those kind of assumptions from? Was that from a report issued or was that from --
A I guess you don't need an analysis to have common sense. If you have to maintain -- if your object is to get rid of the spent fuel pool, it doesn't make sense to go into dry cask storage and still maintain the spent fuel pool.

I guess you don't need an economic analysis to determine that.

Q But, of course, though, I thought it was your testimony earlier that if you thought that the Department of Energy was going to begin pickup, say, roughly in 1998, it wouldn't have made economic sense to go to dry storage. Did you not say that?

A Yes.

Q Okay. You did say that. So then didn't you have to make certain assumptions as to the length of operation of a wet pool versus dry storage?

A If -- if -- if the Department of Energy was going to come in and accept the fuel with us not having to build any casks, to me, that would have been cheaper. At the time, it was clear that the DOE wasn't going to accept it in 1998. Everything indicated at the time that it was going to be at least 2010, if not longer, and that has proven out correct. All I'm saying is that, you know, if -- if we could have been assured that they would have started taking it in 1998, and we would then have to build dry casks or dual casks or any kind of



casks, that would have been probably the cheapest thing. But that just wasn't considered an option because it was the belief of not only myself but the industry that that wasn't going to happen.

Q Sure. And again, your notion that it would have been cheaper to stay wet had there been performance in '98, does that assume a certain duration of time before which DOE would accept all of SMUD spent fuel?

A Yes, it was discussions at the time. I don't remember the specific queues, where we were in the queues, but my impression was that it was five to ten years. And it was going to take five to ten years to complete -- if we got into dismantlement anyway. But if we got past that, you know, it didn't make sense.

Q I see. But now in your economic analysis, then, I think we were touching on this before, if the spent nuclear fuel had to stay in the wet pool, the latest discharges had to stay there for five years, correct?

A Correct.

Q And it is 1994 is the earliest the latest fuel could be put into dry storage,



correct, or taken out of the pool, correct?

A Yes.

Q And you said five to ten years potentially for a queue. You also said you thought --

A But the queue would have started in 1998.

Q Okay.

A So first -- you know, I don't know. Remember -- I mean, when I say the queue, they would have accepted all of the spent fuel. So if it was five years, they could have accepted all of the fuel by the five years that we would have had to have it in storage.

Q Oh. Maybe I've been misunderstanding you this entire time. Is it your statement, then, that you thought this five-year period meant that all the spent nuclear fuel from Rancho Seco would be picked up by 1998?

A No.

Q Okay. You thought it would be -- 1998 plus five?

A All of it would have been picked up by 1998 plus five to ten.

Q Okay.



A I don't remember exactly where they were. I remember it was in that kind of range.

Q Sure. If you were to assume plus ten rather than plus five, so you're talking about 2008 --

A Okay.

Q -- would it still be your opinion that it would have been more cost-effective to stay wet than dry?

A If I could have been assured of that, yeah.

Q Okay. So --

A But I don't have a basis. I don't have an analysis. We didn't evaluate that because it wasn't an option.

Q I see. So is it your testimony that SMUD never conducted any analyses --

MR. NESLIN: Objection to the form of the question. You can continue.

MR. GARDNER: I haven't finished.

MR. GARDNER: (Continuing.)

Q Is it your testimony that SMUD never conducted any analyses assuming performance by