# In the United States Court of Federal Claims

No. 98-488C
Filed: January 19, 2005
**TO BE PUBLISHED**

| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, Plaintiff, v. THE UNITED STATES, Defendant. | Breach of Contract; Nuclear Waste Policy Act, 42 U.S.C. § 10101 *et seq*. Standing; Summary Judgment; RCFC 56(c); 10 C.F.R. § 961.11. |

**Howard N. Cayne,** Arnold & Porter, LLP, Washington, D.C.; **David S. Neslin** and **Timothy R. Macdonald**, Arnold & Porter, LLP, Denver, Colorado, counsel for plaintiff.

**Russell Alan Shultis**, United States Department of Justice, Civil Division, Commercial Litigation Branch, counsel for defendant.

## MEMORANDUM OPINION REGARDING STANDING AND GRANTING PLAINTIFF'S JULY 18, 2001 MOTION REGARDING LIABILITY

**BRADEN, *Judge***

## FACTUAL BACKGROUND[1]

[1] The facts discussed herein are derived from Plaintiff's July 18, 2001 Motion for Leave to File Proposed Liability Order ("Pl. Motion"); Defendant's August 17, 2001 Response to the Court's August 1, 2001 Order requiring the Government to Show Cause ("Gov't Resp."); Plaintiff's August 24, 2001 Reply to Gov't Resp. ("Pl. Reply"); Plaintiff's August 30, 2004 Amended Complaint ("Amended Compl."); Defendant's October 15, 2004 Supplemental Response ("Gov't Supp. Resp."); Defendant's October 15, 2004 Answer to Plaintiff's August 30, 2004 Amended Complaint ("Gov't Answer"); and Plaintiff's October 29, 2004 Reply to Defendant's Supplemental Response ("Pl. Supp. Reply").

**A. Statutory And Regulatory Requirements Regarding The Federal Government's Assumption Of The Legal Duty To Accept, Transport, And Dispose Of Spent Nuclear Fuel And/Or High Level Radioactive Waste From Domestic Utilities.**

In 1982, Congress enacted the Nuclear Waste Policy Act, 42 U.S.C. § 10101 *et seq.* ("NWPA"), pursuant to which the federal government assumed the legal duty to "provide for the permanent disposal" of spent nuclear fuel[2] and/or high-level radioactive waste[3] from utilities across the country by providing for the long-term storage of such material. *See* 42 U.S.C. § 10131(a)(4) ("Congress finds that – . . . the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment[.]"); *see also* 42 U.S.C. § 10131(b)(2) ("[T]o establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel[.]"). Congress imposed the cost of acceptance and disposal on SNF and HLW "generators" and "owners." *See* 42 U.S.C. § 10131(a)(4) ("Congress finds that – . . . while the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment, the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel.").

The Department of Energy ("DOE") was required to enter into contracts with the generators and owners of SNF and HLW by June 30, 1983 that required DOE to accept, transport and dispose of such SNF and HLW. *See* 42 U.S.C. § 10222(b)(2) ("No [SNF or HLW] may be disposed of by the Secretary . . . unless the generator or owner of such [SNF or HLW] has entered into a contract with the Secretary under this section by not later than – June 30, 1983[.]"). And, DOE established a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste that set the fee amounts to be paid by utilities into the Nuclear Waste Fund to fund acceptance and disposal of SNF (hereinafter the "DOE Standard Contract"). *See* 42 U.S.C. § 10222(a)(1) ("[T]he

---

[2] Spent nuclear fuel ("SNF") was defined by Congress as fuel that "has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing." 42 U.S.C. § 10101(23). SNF contains toxic uranium and toxic byproducts, such as plutonium. *See* Amended Compl. at ¶ 15; *see also* Gov't Answer at ¶ 15. Moreover, SNF "remains radioactive after it is removed from a nuclear reactor and must be isolated in safe disposal facilities for thousands of years." *See id.*

[3] High-level radioactive waste ("HLW") was defined by Congress as "highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing . . . and other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation." 42 U.S.C. § 10101(12).

Secretary is authorized to enter into contracts with any person[4] who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel. Such contracts shall provide for payment to the Secretary of fees pursuant to paragraphs (2) and (3) sufficient to offset expenditures described in subsection (d) of this section."); *see also* 10 C.F.R. § 961.11 (setting forth "the text of the standard contract for disposal of spent nuclear fuel and/or high-level radioactive waste[.]"). The DOE Standard Contract provided, in return for the payment of fees from a utility,[5] that DOE would commence disposal of SNF no later than January 31, 1998 and continue such services until disposal of all SNF and HLW was completed. *See* 42 U.S.C. § 10222(5)(B) ("[I]n return for payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter."); *see also* 10 C.F.R. § 961.11 at Art. II ("The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors . . . has been disposed of."). In addition, Congress required that utilities must either agree to the DOE Standard Contract or forfeit their license to operate. *See* 42 U.S.C. § 10222(b)(1)(A) (prohibiting the Nuclear Regulatory Commission from renewing or issuing an operator's license unless such operator "has entered into a contract with the Secretary" or who "is [not] actively and in good faith negotiating with the Secretary for a contract.").

The priority of SNF and/or HLW acceptance was to be determined by the material's age, calculated as of the date of discharge from a nuclear power reactor. *See* 10 C.F.R. § 961.11 at Art. VI(B)(1) ("[A]cceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor."). DOE's acceptance of SNF and/or HLW was to be prioritized, pursuant to Delivery Commitment Schedules ("DCSs") submitted by each utility and approved by DOE. *See* 10 C.F.R. § 961.11 at Art. V ("After DOE has issued its proposed acceptance priority ranking . . . the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning 63 months thereafter."). The DOE Standard Contract further provided that DOE first would accept the oldest SNF and/or HLW. *See* 10 C.F.R. § 961.11 at Art. VI (B) ("DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V."). A utility, however, had the right to exchange approved DCSs with any other utilities that may hold a priority ranking for pickup of SNF and/or HLW, subject to DOE's approval. *See* 10 C.F.R. § 961.11 at Art. V(E) ("Purchaser

---

[4] When a "person [or entity] who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin" enters into the DOE Standard Contract, the DOE Standard Contract provides that the person or entity will be referred to in the Contract as the "Purchaser." 10 C.F.R. § 961.11.

[5] "Utility" or "utilities" refers to an entity or entities that generate or hold title to high-level radioactive waste, or spent nuclear fuel, of domestic origin, and have entered into a DOE Standard Contract.

shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges."). The DOE Standard Contract also provided that DOE may grant priority for removal of SNF and/or HLW from nuclear reactors that are no longer operating and accept emergency deliveries prior to the date of acceptance. *See* 10 C.F.R. § 961.11 at Art. V(D) ("Emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon prior written approval by DOE."); *see also* 10 C.F.R. § 961.11 Art. VI(B) ("[P]riority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.").

**B. The Sacramento Municipal Utility District Entered Into A Department Of Energy Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste On June 14, 1983.**

Sacramento Municipal Utility District ("SMUD") is a municipal utility district established under the laws of California. *See* Pl. Supp. Reply Appendix at 1. SMUD operated the former Rancho Seco Nuclear Generating Station Unit 1 ("Rancho Seco"), a nuclear-powered plant located in Sacramento County, California. *See* Amended Compl. at ¶ 4; *see also* Gov't Supp. Resp. Appendix at 20 (Rancho Seco ISFSI Decommissioning Plan). SMUD and DOE entered into the DOE Standard Contract on June 14, 1983. *See* Pl. Supp. Reply Appendix at 1. SMUD has paid all applicable fees required by the DOE Standard Contract. *See* Amended Compl. at ¶ 22; *see also* Gov't Answer at ¶ 22.

On June 7, 1989, SMUD permanently shut down Rancho Seco as a result of a public referendum on June 6, 1989. *See* Gov't Supp. Resp. Appendix at 19 (Proposed Rancho Seco ISFSI Decommissioning Plan). At that time, SMUD's SNF was stored in a "wet pool." *See, e.g.*, Pl. Supp. Reply Appendix at 59-60 (July 16, 2004 Dep. of Simon David Freeman, SMUD General Manager); *id.* at 61-63 (July 16, 2004 Dep. of Dan. R Keuter, Chief Nuclear Officer at Rancho Seco from mid-1989-September 1991). In 1991, SMUD began the process of constructing an Independent Fuel Storage Installation ("ISFSI") or dry storage facility at Rancho Seco where SNF would be stored until removed by DOE. *See id.*; *see also* Gov't Supp. Resp. Appendix at 19 (Rancho Seco ISFSI Decommissioning Plan). SMUD contracted for the design, licensing, and construction of stainless steel casks and canisters to encase the SNF at the ISFSI. *See* Pl. Supp. Reply Appendix at 56-58 (Sept. 10, 2004 Dep. of James Shetler, SMUD Asst. General Manager); *id.* at 59-60 (July 16, 2004 Dep. of Simon David Freeman, SMUD General Manager) *id.* at 61-63 (July 16, 2004 Dep. of Dan. R Keuter, Chief Nuclear Officer at Rancho Seco from mid-1989 through September 1991).

On May 25, 1994, DOE announced that it would not be in a position to commence collecting SNF from utilities until 2010, at the earliest. *See* Office of Civilian Radioactive Waste Management: Waste Acceptance Issues, 59 FED. REG. 27,007 (May 25, 1994) ("The Department currently projects

that the earliest possible date for acceptance of waste for disposal at a repository is 2010.");[6] *see also* 60 FED. REG. 21,793 (May 3, 1995) (same). Because a federal repository was not ready for use, DOE argues that it was unable to collect SNF on January 31, 1998, as provided in the DOE Standard Contract. *See* Govt. Resp. at 2. To date DOE has not collected SNF from SMUD's storage site. *See* Amended Compl. at ¶ 48.

Pursuant to the terms of the DOE Standard Contract, SMUD paid approximately $40 million into the Nuclear Waste Fund for these services, as of January 31, 1998. *See* Amended Compl. at ¶¶ 8, 30; *see also* Gov't Answer at ¶¶ 8, 30. In August 2002, SMUD completed the transfer of all of SMUD's SNF from the "wet pool" into the dry canisters that were loaded into the ISFSI. *See* Amended Compl. at ¶ 57.

## PROCEDURAL HISTORY

On June 9, 1998, SMUD filed a Complaint in the United States Court of Federal Claims alleging claims for: breach of contract (Counts I and II); an illegal exaction (Count III); and violation of the Just Compensation Clause of the Fifth Amendment of the United States Constitution (Counts IV and V). The case was assigned to the Honorable Robert J. Yock.

On January 23, 2001, the Government filed a Motion to Reassign the SNF-Related Cases to a Single Judge. On May 21, 2001, then-Chief Judge Baskir designated Judge Wiese as the Managing Judge of all pending spent nuclear fuel cases for the purpose of meeting with the parties to consider whether consolidation, joint handling of discovery, or other pre-trial dispositives were in order. On June 14, 2001, Judge Wiese convened a hearing, at which the parties were directed to file a Joint Order with the assigned judge in their individual cases regarding the merits of proposed consolidation and/or joint handling of discovery in light of decisions of the United States Court of Appeals for the Federal Circuit in: *Maine Yankee Atomic Co.* v. *United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) (holding that DOE's "breach involved all the utilities that had signed the contract – the entire nuclear electric industry.") and *Northern States Power Co.* v. *United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000) (holding that "the unavoidable delays provision deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998.").

On July 10, 2001, the Government filed in each spent nuclear fuel case a Joint Motion for an Order Coordinating Discovery. On July 18, 2001, SMUD filed a Motion for Leave to File a Proposed Liability Order with Judge Yock. *See* Pl. Motion at 1-2. On August 1, 2001, Judge Yock

---

[6] There were, however, earlier public reports by DOE about the possibility of a delay in acceptance and disposal of SNF and/or HLW. *See* Report to the Congress by the Secretary of Energy on Reassessment of the Civilian Radioactive Waste Management Program (Nov. 29, 1989) ("This schedule shows a significant slip for the expected start of repository operations – from the year 2003 to approximately 2010.").

granted SMUD's motion and ordered the Government to show cause why a liability order should not be entered on August 17, 2001. Judge Yock also issued an Order lifting any stays entered in the case and designated Judge Diane Gilbert Sypolt nee Weinstein to preside over the discovery phase of the proceeding. On August 17, 2001, the Government filed a Response. On August 24, 2001, SMUD filed a Reply.

On September 26, 2001, Judge Sypolt issued an Order granting the Government's Joint Motion for an Order Coordinating Discovery in all spent nuclear fuel cases. On November 27, 2001, the Government moved to dismiss Count IV (Taking Without Just Compensation: Vested Contract Rights) and Count V (Taking Without Just Compensation: Real Property) for failure to state a claim. On December 13, 2001, the Government moved to dismiss Count III (Illegal Exaction). On December 16, 2002, SMUD responded, indicating that it did not oppose the Government's Motion to Dismiss Count III, but argued that the Fifth Amendment claims asserted in Counts IV and V were viable. On January 31, 2003, the Government filed a Reply. On April 17, 2003, the case was reassigned to Judge Emily C. Hewitt.

On August 15, 2003, the case was reassigned to the undersigned judge. On December 15, 2003 and February 25, 2004, the court convened status conferences with the parties. On March 23, 2004, the court entered a Scheduling Order. On July 15, 2004, the court convened another status conference and on July 28, 2004, entered an Amended Scheduling Order. On July 30, 2004, the court issued a Memorandum Opinion and Order denying defendant's November 27, 2001 Motion to Dismiss Counts IV and V, granting defendant's Motion to Dismiss Count III, and granting plaintiff thirty days to Amend the Complaint. *See Sacramento Municipal Utility District* v. *United States*, 61 Fed. Cl. 438, 443 (2004). On August 30, 2004, SMUD filed an Amended Complaint. On September 23, 2004, the court granted the Government's request to file a supplemental brief on the issue of liability. On October 15, 2004, the Government filed a Supplemental Response to SMUD's Motion for Leave to File a Proposed Liability Order, under seal. On October 29, 2004, SMUD filed a Reply.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000). The Tucker Act, however, is only a "jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Testan*, 424 U.S. 392, 398 (1976). Therefore, in order to pursue a substantive right, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under

the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit."); *Kahn* v. *United States,* 201 F.3d 1375, 1377 (Fed. Cir. 2000) (quoting *James* v. *Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) ("The plaintiff 'must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.'").

In this case, SMUD properly has pled a contractual relationship with the Government. *See Trauma Service Group* v. *United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To show jurisdiction . . . [Plaintiff] must show that either an express or implied-in-fact contract underlies its claim."). Therefore, the court has determined that it has jurisdiction to adjudicate SMUD's claims in this case.

**B. Standing.**

The lower federal courts have been advised to "decide standing questions at the outset of a case. That order of decision (first jurisdiction then the merits) helps better to restrict the use of the federal courts to those adversarial disputes that Article III defines as the federal judiciary's business." *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 111 (1998) (Breyer, J. concurring). Plaintiff, the party invoking federal jurisdiction, has the burden of proof and persuasion to satisfy the constitutional requirements of Article III standing. *See FEW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the party seeking to exercise jurisdiction by clearly alleging facts sufficient to establish jurisdiction).

On August 17, 2001, the Government acknowledged "that DOE's inability to begin the services to be provided by the [DOE] Standard Contract by January 31, 1998 constituted a partial breach of the [DOE] Standard Contract." *See* Gov't Resp. at 3. The Government, however, also stated that, as other pending spent nuclear fuels cases progress, including the present case, other standing or related legal defects may be identified and clarified. *Id.* at 4. To date, the Government has not made an effort to challenge SMUD's standing. Nevertheless, since standing is a component of jurisdiction that the court has authority to raise *sua sponte*, the issue will be addressed. *See Folden* v. *United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) ("Subject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte*."); *Pandrol USA, LP* v. *Airboss Ry. Products, Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003) ("It is well-established that any party, and even the court *sua sponte,* can raise the issue of standing for the first time at any stage of the litigation, including on appeal.").

First, to establish standing on a contract claim, plaintiff is required to be in privity of contract with the United States. *See e.g.*, *Anderson* v. *United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003) ("To have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States."); *Castle* v. *United States*, 301 F.3d 1328, 1339 (Fed. Cir. 2002) (holding that

only direct parties to the contract have standing to allege breach of contract claims based upon the contract); *Cienega Gardens* v. *United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) ("The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity."); *Erickson Air Crane Co.* v. *United States*, 731 F.2d 810, 813 (Fed. Cir. 1987) ("The government consents to be sued only by those with whom it has privity of contract[.]"). As a signator and intended beneficiary of the June 14, 1983 DOE Standard Contract, SMUD has established privity.

In light of the court's opinion in *Sacramento Municipal Utility District* v. *United States*, 61 Fed. Cl. 438 (2004) and plaintiff's August 30, 2004 Amended Complaint, the court also will address SMUD's standing to pursue claims under the Takings Clause of the Fifth Amendment of the United States Constitution. In such an action, plaintiff must have a valid property interest at the time of the alleged taking. *See Cienega Gardens* v. *United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) ("For any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken, even for regulatory takings."); *see also Wyatt* v. *United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001) (holding that "the existence of a valid property interest is necessary in all takings claims."). It is well established that the owner of real property has standing to assert a Fifth Amendment takings claim. Contract rights, however, also are recognized property that a party to which may assert a Fifth Amendment claim. *See Cienega Gardens*, 331 F.3d at 1328-31 (holding that plaintiffs may have a property interest in vested contractual rights); *see also Lynch* v. *United States*, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States."); *United States Trust Co. of N.Y.* v. *New Jersey*, 431 U.S. 1, 19 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."). There is no evidence in the record that SMUD either sold or assigned SMUD's contractual rights under the DOE Standard Contract entered on June 14, 1983 or sold the Rancho Seco property, which is the subject of same. The court, therefore, has determined that SMUD has standing to bring this action to pursue a claim based on the takings clause.

### C. Standard Of Review.

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *American Pelagic Fishing Co.* v. *United States*, 379 F.3d 1363, 1370-71 (Fed. Cir. 2004) ("Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."). In the United States Court of Federal Claims, summary judgment, albeit "interlocutory in nature, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." RCFC 56(c); *see also Winstar Corp.* v. *United States*, 518 U.S. 839, 910 (1996) (affirming grant of partial summary judgment on contract liability and remanding the determination of the appropriate measure or amount of damages, if any.). Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the

substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id*. Therefore, there is no issue for the court to adjudicate unless the nonmoving party puts forth evidence sufficient for a jury to return a verdict for that party; but "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted).

The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing' – that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."). A summary judgment may be made without supporting affidavits and rely "solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id*. at 324. Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Laboratories*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial."). A dispute over a material fact is "genuine" where a reasonable jury could find for the non-movant. *See Anderson*, 477 U.S. at 248.

A trial court is required to resolve all doubt over factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). And, all reasonable inferences and presumptions must be resolved in favor of the non-moving party. *See Anderson*, 477 U.S. at 255; *Caterpillar Inc.* v. *Deere & Co.*, 224 F.3d 1374, 1379 (Fed. Cir. 2000) ("When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."); *Gasser Chair Co., Inc.* v. *Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) (requiring the trial court to view the evidence in a light most favorable to the non-moving party and to draw all reasonable inferences in favor of the non-moving party).

## D. Resolution Of Plaintiff's Motion For Entry Of An Order That The Government Is Liable For Breach Of SMUD's June 14, 1983 DOE Standard Contract.

### 1. As A Matter Of Law, The United States Court Of Appeals For The Federal Circuit Has Settled The Issue Of Whether The Government Breached The DOE Standard Contract.

SMUD argues that, consistent with the decisions of our appellate court in *Maine Yankee Atomic Co.* v. *United States*, 225 F.3d 1336 (Fed. Cir. 2000) and *Northern States Power*

*Co.* v. *United States*, 224 F.3d 1361 (Fed. Cir. 2000), issuance of a liability order in this case is required.[7]

The United States Court of Appeals for the Federal Circuit has settled the legal issue of whether the Government's failure to begin accepting nuclear waste by January 31, 1998, constituted a breach of contract. *See Maine Yankee Atomic Co.*, 225 F.3d at 1342, 1343 (holding that "[t]he government does not, and could not deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998. . . . Accordingly, DOE has breached the contract."); *see also id.* at 1342 (holding that the Government's breach concerned "all the utilities that had signed the [standard] contract – the entire nuclear electric industry.").

Subsequently, in *Northern States Power Co.* v. *United States*, 224 F.3d 1361 (Fed. Cir. 2000), the United States Court of Appeals for the Federal Circuit addressed similar arguments and again held that the unavoidable delays provisions of the DOE Standard Contract did not bar a suit

[7] The United States Court of Federal Claims has issued a number of opinions and orders in cases asserting the Government's liability based on this precedent. *See, e.g., Wisconsin Electric Power Co.* v. *United States*, No. 00-697 (Fed. Cl. Oct. 8, 2004) (granting plaintiff's motion for partial summary judgment on liability but "any specific item(s) of damages claimed remains open for resolution[.]"); *Tennessee Valley Authority* v. *United States*, 60 Fed. Cl. 665, 674-75, 679 (2004) (granting plaintiff's motion for summary judgment, in part, and holding that the Government breached the TVA Contract, but if TVA is able to show damages incurred as a result of DOE's failure to collect SNF and failure to act upon proposed DCSs, TVA may recover those damages); *Southern Nuclear Operating Co.* v. *United States*, No. 98-614 (Fed. Cl. April 17, 2004) (granting plaintiff's motion for summary judgment on contract liability "to the extent that defendant's failure by January 31, 1998, to commence disposal of SNF and/or HLW covered by the Standard Contract executed with APC and GPC shall comprise a partial breach of these contracts for which defendant is liable."); *Indiana Michigan Power Co.* v. *United States*, No. 98-486 (Fed. Cl. Jan. 17, 2003) (entering judgment for plaintiffs on the issue of liability based on Federal Circuit decisions that clearly establish liability against the United States); *Florida Power & Light Co.* v. *United States*, No. 98-483 (Fed. Cl. Jan. 11, 2002) (granting plaintiff's motion for summary judgment on liability based on *Maine Yankee* and *Northern States Power*); *Commonwealth Edison Co.* v. *United States*, No. 98-621 (Fed. Cl. Aug. 1, 2001) (granting plaintiff's motion for partial summary judgment on the issue of liability following the Government's acknowledgment of a partial breach of the DOE Standard Contract); *Northern States Power Co.* v. *United States*, No. 98-484 (Fed. Cl. July 31, 2001) (granting plaintiff's renewed motion for summary judgment on the issue of liability based on defendant's response); *but see Power Authority of the State of New York*, No. 00-703 (Fed. Cl. Sept. 30, 2004) (denying plaintiff's motion for summary judgment on liability, because plaintiff's actual injury depends on whether DOE failed to meet any obligation to accept plaintiff's SNF prior to the date of plaintiff's sale of the facilities.).

for damages caused by the Government's "failure to begin performance at all by the statutory and contractual deadline of January 31, 1998." *Id*. at 1367.[8]

In this case, SMUD's June 14, 1983 DOE Standard Contract included a requirement that the Government must begin disposing of nuclear waste from utilities by January 31, 1998. *See* Pl. Supp. Reply Appendix at 2. This requirement is not conditioned on the occurrence of some other event. *See Northern States Power Co.*, 128 F.3d at 757 (citing *Indiana Michigan Power Co.* v. *Dept. of Energy*, 88 F.3d 1272, 1273 (D.C. Cir. 1996)) ("We held [in *Indiana Michigan*] that DOE's obligation to meet the 1998 deadline is 'without qualification or condition,' and identified DOE's duty to 'perform its part of the contractual bargain.'").

The Government concedes that SMUD has paid all of the fees required under the DOE Standard Contract. *See* Gov't Answer at ¶ 22. The Government also does not dispute that DOE has not begun disposal of any SNF, including any of SMUD's SNF. *See* Office of Civilian Radioactive Waste Management: Waste Acceptance Issues, 59 FED. REG. 27,007 (May 25, 1994) ("The Department currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010."); *see also Maine Yankee Atomic Power Co.*, 225 F.3d at 1343 ("The Government does not, and could not deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998."); *Winstar Corp.* v. *United States*, 64 F.3d 1531, 1545 (Fed. Cir. 1995), *aff'd* 518 U.S. 839 (1996) ("Failure to perform a contractual duty when it is due is a breach of the contract."); *Trauma Service Group* v. *United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("A breach of contract is a failure to perform a contractual duty when it is due."); RESTATEMENT (SECOND) OF CONTRACTS § 235(2) ("When performance of a duty under a contract is due any non-performance is a breach."). In addition, on August 17, 2001, in the Government's

---

[8] The United States Court of Appeals for the D.C. Circuit also has addressed DOE's duty to dispose of SNF under the DOE Standard Contract in *Indiana Michigan Power Co.* v. *Dept. of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), wherein it held that duty to dispose of SNF was "conditioned on the payment of fees by the owner and is triggered, at the latest, by the arrival of January 31, 1998." *Id.* at 1276. Subsequently, in *Northern States Power Co.* v. *Dept. of Energy*, 128 F.3d 754 (D.C. Cir. 1997), that appellate court also clarified that "DOE's duty to take the materials by the 1998 deadline is . . . an integral part of the Standard Contract, which provides that the Department 'shall begin' disposing of the SNF by January 31, 1998." *Id*. at 758.

Congress required that "contracts entered into under this section shall provide that – . . . in return for payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the HLW or SNF[.]" 42 U.S.C. § 10222. Therefore, after the utility was obligated to pay the set fees, DOE assumed the duty to begin accepting SNF by January 31, 1998. *See Indiana Michigan Power Co.*, 88 F.3d at 1276 ("Under the plain language of the statute, the utilities anticipated paying fees 'in return for [which] the Secretary' had a commensurate duty. [The Secretary] was to begin disposing of the high-level radioactive waste or SNF by a day certain.").

response to Judge Yock's Order to Show Cause in this case, the Government admitted that "DOE's inability to begin the services to be provided by the Standard Contract by January 31, 1998 constituted a partial breach of the Standard Contract." *See* Govt. Resp. at 3. Accordingly, the court has determined that the Government breached the DOE Standard Contract with SMUD on January 31, 1998.

**2. As A Matter Of Law, The Date Of The Government's Breach Of SMUD's June 14, 1983 DOE Standard Contract Is Not Determined By The Delivery Commitment Schedules.**

The Government argues that *Maine Yankee Atomic Power Co.* and *Northern States Power Co.* are not binding, because the plaintiffs in those cases all had Delivery Commitment Schedules requiring DOE to begin acceptance of SNF by January 31, 1998 or January 31, 1999. *See* Govt. Supp. Resp. at 5. DOE's ACR and SMUD's DCSs were issued and approved on March 10, 1993, after the DOE had publicly stated that it would not begin collection of any SNF and/or HLW by the statutory and contractual deadline of January 31, 1998. *See* Report to the Congress by the Secretary of Energy on Reassessment of the Civilian Radioactive Waste Management Program (Nov. 29, 1989) ("This schedule shows a significant slip for the expected start of repository operations – from the year 2003 to approximately 2010."); *Indiana Michigan Power Co.* v. *United States*, 60 Fed. Cl. 639, 649 n.22 (2004) ("Defendant made statements in 1987 and 1989 suggesting that DOE might not meet the 1998 deadline."). Nevertheless, the Government asserts the earliest the DOE Standard Contract with SMUD was breached was January 31, 2001, the date of DOE's first approved scheduled acceptance of SMUD's SNF and/or HLW as set forth in the DCSs that SMUD submitted and were approved by DOE.[9] *See* Govt. Supp. Resp. at 7.

The DOE Standard Contract required that an Annual Capacity Report ("ACR") be issued "for planning purposes." 10 C.F.R. § 961.11 at Art. IV(B)(5)(b) ("Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes."). According to the DOE Standard Contract, the ACR set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking for the disposal of SNF and/or HLW. *See* 10 C.F.R. § 961.11 at Art. IV(B)(5)(b) ("The report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility."). The DOE Standard Contract also required DOE to issue an annual acceptance priority ranking ("APR"), based on the age of the

---

[9] Some of the plaintiffs in *Maine Yankee Atomic Power Co.* and *Northern States Power Co.* had submitted DCSs establishing January 31, 1998 or January 31, 1999 as the deadline for DOE to begin accepting nuclear waste from the utilities. *See* Gov't Supp. Resp. at 5. The Government, however, did not argue in those cases that the date of acceptance set out in an approved DCS established the date of the breach. Instead, the Government conceded that the DOE's "inability to *begin*" acceptance of SNF and/or HLW by January 31, 1998 constituted a breach of the DOE Standard Contract. *See* Gov't Resp. at 3.

SNF and/or HLW, with the oldest fuel having the highest priority. *See* 10 C.F.R. § 961.11 at Art. IV(B)(5)(a) ("Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. . . . The oldest fuel will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.")

After the DOE issued the ACR and APR, utilities submitted DCSs that identified "all SNF and/or HLW the Purchaser *wishes* to deliver to DOE beginning sixty-three (63) months thereafter." *See* 10 C.F.R. § 961.11 at Art. V(B)(1) (emphasis added) ("After the DOE has issued its proposed acceptance priority ranking . . . the Purchaser shall submit to DOE the [DCSs] which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter."). The DCSs required approval by DOE. *Id*. at Art. (V)(B)(1) ("DOE shall approve or disapprove such schedules within three (3) months after receipt."). In the event of disapproval of a DCS, the parties could seek to negotiate a mutually acceptable schedule. *Id*. at Art. (V)(B)(2) (stating that if revised schedule(s) are not approved by DOE, DOE "shall submit its proposed schedule. . . . If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s)."). Final delivery schedules were to be submitted and approved by DOE for delivery of SNF and/or HLW covered by an approved DCS. *See* 10 C.F.R. § 961.11 at Art. (V)(C) ("The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five days (45) days after receipt.").

The Government argues that the DOE-approved DCSs were binding contractual commitments on the parties, specifying the first year in which DOE was obligated to begin acceptance of a contract holder's SNF and the amount of SNF that DOE was to dispose of in a given year. *See* Govt. Supp. Resp. at 7. The Government does not reveal whether it considers the DCSs to be a term of the DOE Standard Contract or the subject of a separate contract. As a matter of law, the integration clause in the DOE Standard Contract precludes the DCSs from being considered as a contractual term. Moreover, the DOE Standard Contract provided that the ACRs were the basis for DCS submission and therefore were only "for planning purposes." *See* 10 C.F.R. § 961.11 at Art. IV(B)(5)(b); *see also Commonwealth Edison Co.* v. *United States*, 56 Fed. Cl. 652, 666 (2003) (noting that "[d]efendant eventually conceded at oral argument that the ACRs were for planning purposes" and that "[t]he parties could not have expected that planning documents would create

binding contractual obligations.").[10] Therefore, the DCSs imposed no legal obligation on either party to the DOE Standard Contract.

Second, the Government cannot assert that the DCSs were a separate agreement amending the DOE Standard Contract without evidence of separate consideration to support the acceptance of new terms. An agreement constitutes a contract only if it meets three requirements: "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Cal. Fed. Bank* v. *United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001) (quoting *Massie* v. *United States*, 166 F.3d 1184, 1888 (Fed. Cir. 1999)). The record contains no evidence that separate consideration was offered by the Government to support an independent contract modifying the DOE Standard Contract. *See* Pl. Cross Motion for Partial S.J. on Acceptance Rate Appendix II at 1640.2 (DOE Instructions For Completing Delivery Commitment Schedule NWPA-830C) ("The process described herein assumes that the FWMS will be able to accept the Purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.").

For these reasons, the court has determined that the Government was obligated under the June 14, 1983 DOE Standard Contract to begin accepting SNF and/or HLW from utilities no later than January 31, 1998, at which time the DOE Standard Contract was breached.

**3. As A Matter Of Law, SMUD's Submission Of Delivery Commitment Schedules Also Does Not Alter The Date Of The Government's Breach Of SMUD's June 14, 1983 DOE Standard Contract.**

The Government also argues that SMUD's DCSs did not require the acceptance of SNF until the beginning of 2001.[11] Therefore, the Government claims that SMUD interpreted the DOE

---

[10] Moreover, the mechanism in the DOE Standard Contract for the submission, review and approval of DCSs also included an additional step that involved final delivery schedules. *See* 10 C.F.R. § 961.11 at Art. V(C) ("Final delivery schedule(s) . . . for delivery of SNF and/or HLW covered by an approved delivery commitment schedule shall be furnished to DOE by Purchaser."). Although the Government argues that the approved DCSs establish the date of liability, the DCS process as set out in Article V of the DOE Standard Contract was not completed since final delivery schedules were not issued. *See Maine Yankee Atomic Power Co.*, 225 F.3d at 1342 ("At present there are no schedules containing specific dates for disposing of the waste of particular companies. It is uncertain when they will be adopted and to what extent, if any, they will, or could effectively reflect the Department's breach of the contract.").

[11] According to DOE's instructions for completing delivery commitment schedules, DOE would not consider DCSs from utilities for SNF acceptance any earlier than the date set out in the ACR. *See* Pl. Cross Motion for Partial S.J. on Acceptance Rate Appendix II at 1640.2 (DOE Instructions For Completing Delivery Commitment Schedule NWPA-830C) ("[O]nly DCSs

Standard Contract as requiring DOE to begin accepting SMUD's SNF in 2001. *See* Gov't Supp. Resp. at 12. As a matter of law, what SMUD thought about the DOE Standard Contract is irrelevant since the DOE Standard Contract has an integration clause "the agreement is completely integrated." *See McAbee Construction, Inc.* v. *United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (party challenging attestation to the document's finality and completeness carries an extremely heavy burden). The parol evidence precludes consideration of post-execution evidence. *See Barron Bancshares, Inc.* v. *United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) ("The [parol evidence rule] thus renders inadmissible evidence introduced to modify, supplement, or interpret the terms of an integrated agreement."); *see also McAbee Construction, Inc.*, 97 F.3d at 1435 (citing *Hughes Communications Galaxy, Inc.* v. *United States*, 998 F.2d 953, 958 (Fed. Cir. 1993) ("If the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'"); C. *Sanchez and Son, Inc.* v. *United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof").

Therefore, as a matter of law, the Government's contractual obligation to begin disposing of SNF and/or HLW from utilities no later than January 31, 1998 is established in the DOE Standard Contract. SMUD's submission of DCSs does not alter the contractual obligation of DOE to begin accepting SNF and/or HLW from utilities no later than January 31, 1998 or DOE's failure to begin such services.

**4. As A Matter Of Law, The Date Of The Government's Breach Of SMUD's June 14, 1983 DOE Standard Contract Is Not Determined By The "Oldest Fuel First Principles" In The DOE Standard Contract.**

In the alternative, the Government argues that DOE was not obligated to accept SNF from SMUD prior to January 31, 2001, based on the "oldest fuel first principles," set forth in SMUD's June 14, 1983 DOE Standard Contract. *See* Govt. Supp. Resp. at 8.

The DOE Standard Contract provides that "acceptance priority [for SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11 at Art. VI(B)(1). In addition, the DOE Standard Contract provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph (B)(1)(b) of Article VI. *Id*. at Art. V(B), (D); VI(B)(1)(b).

---

submitted by Purchasers with an allocation in the delivery year will be considered for approval (*e.g.*, in order for a Purchaser to have a DCS considered for approval for delivery in 1998, the Purchaser must have an allocation in 1998.")).

There are three specific exceptions to the "oldest fuel first principles." First, Article V(E) provides for exchanges of DCSs. *See* 10 C.F.R. § 961.11 at Art. V(E).[12] Second, Article V(D) allows for emergency deliveries. *See id.* at Art. V(D).[13] Third, priority acceptance from permanently shut down nuclear power plants is contemplated in Article VI(B)(1)(b). *See id.* at Art. VI(B)(1)(b).[14] Although SMUD may have used one of these exceptions to obtain an earlier SNF acceptance date than in SMUD's approved DCS, as a matter of law, the "oldest fuel first principles" do not change DOE's contractual obligation to begin accepting SNF and/or HLW from all utilities with a DOE Standard Contract by January 31, 1998. *See Indiana Michigan Power Co.*, 88 F.3d at 1273 (holding "that DOE's obligation to meet the 1998 deadline is 'without qualification or condition,' and identified DOE's duty to 'perform its part of the contractual bargain.'"). Whether SMUD was entitled to have some or all SNF and/or HLW accepted for delivery by DOE before 2001 based on the "oldest fuel first principles" or approved DCSs is yet to be determined, but does not change the fact that DOE had a contractual obligation to *begin* collection of SNF and/or HLW from utilities by January 31, 1998. Therefore, DOE's failure to begin collection of SNF and/or HLW by January 31, 1998, as required by statute and the June 14, 1983 DOE Standard Contract was a breach thereof.

## CONCLUSION

For the reasons discussed herein, SMUD's July 18, 2001 Motion for Entry of an Order holding that the Government is liable for a breach of SMUD's June 14, 1983 DOE Standard Contract is granted. Whether damages, if any, were caused by the January 31, 1998 breach has not been adjudicated.

**IT IS SO ORDERED.**

s/**SUSAN G. BRADEN**
**Judge**

---

[12] Article V(E) provides that "[p]urchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges." 10 C.F.R. § 961.11 at Art. V(E).

[13] Article V(D) provides that "[e]mergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon written approval by DOE." 10 C.F.R. § 961.11 at Art. V(D).

[14] Article VI(B)(1)(b) provides that "[n]otwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." 10 C.F.R. § 961.11 at Art. VI(B)(1)(b).