No. 98-488C
(Judge Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

SACRAMENTO MUNICIPAL UTILITY DISTRICT'S
MEMORANDUM OF CONTENTIONS OF FACT AND LAW

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

Howard Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

February 17, 2004

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION AND SUMMARY OF ARGUMENT ....................1

II. STATEMENT OF FACTS ....................6

A. The Beginning Of DOE's SNF Program – 1983 Through 1986. ....................6

B. DOE Announces Likely Delay In Repository Operations – 1987 Through 1988. ....................9

C. SMUD Closes Its Reactor And Evaluates Its Options In Light Of DOE's Announcements Of Delay – 1989 Through 1991. ....................11

D. SMUD Pursues The Design Of Dry Storage Canisters With DOE Support / DOE Announces Additional Delay – 1991 Through 1994. ....................13

E. SMUD Proceeds With Development Of On-Site Dry Storage / DOE Declares It Has No Obligation – 1995 Through 1997. ....................23

F. SMUD Continues To Reevaluate Its Dry Storage Project / DOE Encourages Utilities To Develop Dry Storage – 1998 Through 2000. ....................30

G. SMUD Completes The Fuel Transfer / DOE Experiences Further Setbacks To Its SNF Program – 2001 Through 2004. ....................33

III. ARGUMENT ....................34

A. The Government Has Breached Its Obligations Under The Contract And SMUD Should Be Awarded Its Resulting Damages. ....................34

B. Had The Government Properly Performed, It Would Have Picked Up All SNF From SMUD By 2006 At The Latest. ....................36

1. The Government Would Have Performed at a 3,000-Ton Receipt Rate. ....................36

a. A 3,000-Ton Receipt Rate Is Necessary to Satisfy the Intent of the Parties. ....................37

b. The Receipt Rate Would Equal the Annual Capacity of DOE's Disposal Facilities, Which Is 3,000 Tons. ....................40

2. At an Annual Receipt Rate of 3,000 Tons, DOE Would Have Picked Up All of SMUD's SNF by 2006 At the Latest and Likely Several Years Sooner. ....................41

C. Expectation Damages Are Appropriate In This Case Because SMUD's Costs Were Reasonably Foreseeable, Were Caused By The Government's Breach, And Are Reasonably Certain. ....44

1. The Need for Additional Storage Was A Reasonably Foreseeable Consequence of a Breach of the Contract. ....44

2. As A Direct Result of DOE's Impending Breach, SMUD Developed and Implemented Its Dry Storage System. ....47

a. The Government's Breach of Contract Caused SMUD to Decide in the Early 1990s to Develop Dry Storage. ....48

b. The Government's Breach of Contract Also Caused SMUD to Decide in the Mid-to-Late-1990s to Continue With Its Dry Storage Project. ....51

3. The Costs SMUD Incurred Have Been Established With Reasonable Certainty. ....53

D. SMUD's Dry Storage Costs Are Also Recoverable As Cost Of Mitigation Or Alternative Performance. ....55

E. Offsets To Damages Claim. ....59

F. Breach Of Good Faith And Fair Dealing. ....60

IV. CONCLUSION ....63

# TABLE OF AUTHORITIES

**Pages**

**CASES**

*Alabama Power Co. v. United States*,
307 F.3d 1300, 1302 (11th Cir. 2002) .......... 6, 41, 63

*Augustine Medical, Inc. v. Progressive Dynamics, Inc.*,
194 F.3d 1367, 1374 (Fed. Cir. 1999).......... 39

*Bluebonnet Savings Bank F.S.B. v. United States*,
266 F.3d 1348, 1355 (Fed. Cir. 2001).......... 35, 44, 46, 47

*Boston Edison Company v. United States*,
Opinion and Order dated Feb. 15, 2005, at 20 .......... 47, 62

*Cal. Fed. Bank v. United States*,
Nos. 03-5070, 03-5082, 2005, WL 95171, at *3 (Fed. Cir. Jan. 19, 2005) .......... 47, 48

*Centex Corp. v. United States*,
395 F.3d 1283, slip op. at 37 (Fed. Cir. Jan 19, 2005).......... 61

*Chain Belt Co. v. United States*,
115 F. Supp. 701, 714 (Ct. Cl. 1953).......... 56, 57

*Cienega Gardens v. United States*,
38 Fed. Cl. 64, 79 (1997) .......... 56

*Coast Fed. Bank, F.S.B. v. United States*,
48 Fed. Cl. 402, 408 (2000) .......... 44

*Commonwealth Edison Co. v. United States*,
56 Fed. Cl. 652, 667 (2003) .......... 7, 19, 46, 62

*David Nassif Assocs. v. United States*,
557 F.2d 249, 259-60, 263 (Ct. Cl. 1977).......... 36

*David Nassif Assocs. v. United States*,
644 F.2d 4, 7-9 (Ct. Cl. 1981).......... 36

*Energy Capital Corp. v. United States*,
302 F.3d 1314, 1320 (Fed. Cir. 2002).......... 44

*Essex Electro Eng'rs, Inc. v. Danzig*,
224 F.3d 1283, 1291 (Fed. Cir. 2000).......... 61

*Estate of Berg v. United States*,
687 F.2d 377, 379 (Cl. Ct. 1982) .......... 34

*Glendale Fed. Bank, F.S.B. v. United States*,
378 F.3d 1308, 1313 (Fed. Cir. 2004)........................................................................ 53

*Home Sav. Of Am., F.S.B. v. United States*,
57 Fed. Cl. 694, 726 (2003) .................................................................... 44, 53, 55, 56

*Hughes Communications Galaxy, Inc. v. United States*,
271 F.3d 1060, 1066 (Fed. Cir. 2002)..................................................... 34, 44, 46, 47, 55, 56

*In re Cambridge Biotech Corp.*,
186 F.3d 1356, 1375 (Fed. Cir. 1999)........................................................................ 39

*In re Kellett Aircraft Corp.*,
186 F.2d 197, 198 (3d Cir. 1950)............................................................................... 56

*Indiana Michigan Power Co. v. United States*,
57 Fed. Cl. 88, 99 (2003) .......................................................................................... 7

*Indiana Michigan Power Company v. Department of Energy*,
88 F.3d 1274 (D.C. Cir. 1996) .............................................................. 10, 19, 24, 41

*Indiana Michigan Power v. United States*,
60 Fed. Cl. 639, 648 (2004) ...................................................................................... 58

*Koby v. United States*,
53 Fed. Cl. 493, 497 (2002) ...................................................................................... 56

*Locke v. United States*,
283 F.2d 521, 526 (Ct. Cl. 1960) ........................................................................ 44, 53

*Massachusetts Bay Transp. Auth. v. United States*,
129 F.3d 1226, 1232 (Fed. Cir. 1997)........................................................................ 34

*McAbee Constr. Inc. v. United States*,
97 F.3d 1431, 1434 (Fed. Cir. 1996)........................................................................... 39

*Northern Helex Co. v. United States*,
524 F.2d 707, 718 (Ct. Cl. 1975) .............................................................................. 56

*Northern States Power Co. v. United States*,
128 F.3d 754, 757 (D.C. Cir. 1997) ........................................................................... 25

*Robinson v. United States*,
305 F.3d 1330, 1334 (Fed. Cir. 2002)........................................................................ 57

*Rumsfeld v. Freedom NY, Inc.*,
329 F.3d 1320, 1330 (Fed. Cir. 2003)........................................................................ 61

*San Carlos Irrigation & Drainage Dist. v. United States*,
111 F.3d 1557, 1562-63 (Fed. Cir. 1997) .......... 34, 47

*Tennessee Valley Authority v. United States*,
60 Fed. Cl. 665, 674 n.10 (2004) .......... 46, 57, 58

*Unihealth v. U. S. Healthcare, Inc.*,
14 F. Supp. 2d 623, 627 (D.N.J. 1998) .......... 36

*Yankee Atomic Elec. Co. v. United States*,
No. 98-126C, 2004 WL 1535688, at *7 (Fed. Cl. June 28, 2004) .......... 7, 46, 58, 61

## STATUTES

42 U.S.C. § 10131 .......... 6, 45

42 U.S.C. § 10138 .......... 10

42 U.S.C. § 10165 .......... 10

42 U.S.C. § 10168 .......... 10, 41

42 U.S.C. § 10172 .......... 10

42 U.S.C. § 10221 .......... 8

Nuclear Waste Policy Act of 1982,
Pub. L. No. 97-245, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270) .......... 6

U.C.C. § 2-712 (1997) .......... 55

## OTHER AUTHORITIES

10 C.F.R. Part 71 .......... 13

10 C.F.R. Part 72 .......... 13

48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983) .......... 43, 46

48 Fed. Reg. 5458, 5458 (Feb. 4, 1983) .......... 10

59 Fed. Reg. 27,007, 27,008 (May 25, 1994) .......... 10, 19, 20

60 Fed. Reg. 21,793, 21,794 (May 3, 1995) .......... 10, 23, 51

62 Fed. Reg. 1095 (Jan. 8, 1997) .......... 29

8 Williston on Contracts § 19:40 (4th ed.) .......... 41

H.R. Rep. No. 101-536 (1991)........................................................................................ 14, 16

H.R. Rep. No. 97-795, pt. 1, at 38 (1982)........................................................................... 10

Restatement (Second) Contracts § 350 ........................................................................... 57

Restatement (Second) of Contracts § 204 (1981) ............................................................ 36, 39

Restatement (Second) of Contracts § 205 (1981) ............................................................... 61

Restatement (Second) of Contracts § 33 (1981) ................................................................. 36

Restatement (Second) of Contracts § 347 (1981) ...................................................... 34, 44, 55, 56

Restatement (Second) of Contracts § 351, (1981) .............................................................. 44

Restatement (Second) of Contracts § 352 (1981) ............................................................... 44

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 98-488 C |
| THE UNITED STATES OF AMERICA, | ) | (Judge Braden) |
| Defendant. | ) | |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

This Court has already held that the Department of Energy ("DOE") breached its Contract with Plaintiff Sacramento Municipal Utility District ("SMUD"), ruling that "the Government was obligated under the June 14, 1983 DOE Standard Contract to begin accepting SNF and/or HLW from utilities no later than January 31, 1998," and that the government's failure to begin such services constituted a breach of contract. Memorandum Opinion dated Jan. 19, 2005 at 14 ("Memorandum Opinion"). Accordingly, the remaining issue for resolution at trial is the amount of damages caused by the government's breach.[1]

The DOE's inability to begin disposal services as required by the Contract was apparent long before the January 31, 1998 start date. As early as 1987, the DOE began announcing delays

[1] Sacramento Municipal Utility District's Amended Complaint also includes Fifth Amendment Takings claims. *See* Amended Complaint, Counts IV & V (Aug. 30, 2004). On July 30, 2004, this Court denied the government's motion to dismiss the Takings claims, and subsequently deferred those claims for resolution after the present trial. *See* Supplemental Scheduling Order dated Sept. 23, 2004 at 1. Thus, the upcoming trial has been limited to SMUD's damages arising from the breach of contract.

in the expected opening of the repository. *See* 1987 OCRWM Draft Mission Plan Amendment at 6 (Pl. Ex. 118). In a 1989 report to Congress on the status of the program, DOE announced a "significant slip for the expected start of repository operations—from the year 2003 to approximately 2010." *See* Report to the Congress by the Secretary of Energy on Reassessment of the Civilian Radioactive Waste Management Program ("1989 Reassessment") (Nov. 29, 1989) (Pl. Ex. 169). The 1989 Reassessment confirmed that there would be at least a 12-year delay in DOE's ability to begin the disposal of spent nuclear fuel and high-level radioactive waste (collectively "SNF" or "fuel"). DOE recently acknowledged that there would be further delay in the opening of the repository, now estimating a start date of 2012, with additional delay likely. *See* Doug Abrahms, *Yucca Mountain Opening Pushed Back 2 Years*, 2005 WL 62548304, Gannett News Serv. (Feb. 8, 2005).

If SMUD had done nothing to address the consequences of DOE's long-announced delays, SMUD could have left all of its SNF – 493 assemblies – in indefinite storage in its wet pool at the reactor site.[2] In that case, SMUD would have been entitled to recover the resulting increased decommissioning costs and the costs of at least an additional 14 years of wet pool storage costs resulting from DOE's 1998 to 2012 delay. These damages likely would be significantly more than the damages sought here.[3]

---

[2] Having utilities maintain their fuel in the pool until DOE disposal was the very premise of the NWPA and the Contract. *See* Draft OCRWM Mission Plan (Dec. 20, 1983) (Pl. Exs. 58, 59). DOE decidedly did not want and did not intend for there to be mini on-site storage facilities at nuclear reactors across the country. *See id.*; Memorandum from Williamson re: Mission Plan Strategy (Sept. 15, 1983) (Pl. Ex. 50). Under the Contract, the plan was for utilities to store SNF in their wet pool after discharge from the reactor core, DOE would bring transport casks for accepting the fuel, utilities would load the "bare" fuel into the transport casks, and DOE would transport the casks to the repository.

[3] Most of SMUD's estimates for the annual cost of wet pool storage range from $6 million to $12 million per year. Thus, the minimum 14-year delay would have resulted in wet pool damages of between $84 million and $168 million. In addition, SMUD would have been entitled to recover the increased costs to decommission the facility as a result of the DOE's delay, a cost that would have been many tens of millions of dollars. If the start date of the

Footnote continued on next page

SMUD, however, did not simply leave its SNF in the wet pool while awaiting eventual DOE performance and incurring higher storage and decommissioning costs. Instead, SMUD sought to minimize its losses resulting from DOE's indefinite delay. Starting in 1992, SMUD pursued the design, licensing, and fabrication of its own on-site storage facility, referred to as an Independent Spent Fuel Storage Installation or ISFSI, for the long term dry storage of its spent fuel.[4]

Because SMUD's dry storage project experienced significant regulatory and technical hurdles – including the bankruptcy of its primary vendor in 1997 – SMUD reevaluated its storage options many times between 1992 and 2001. After each reevaluation, SMUD decided to continue pursuing an on-site dry storage facility because of the then-announced certain breach by DOE. Following the 1997 bankruptcy of its vendor, SMUD entered into a new contract with a different vendor to complete the dry storage project. SMUD completed the project and loaded all of its fuel into the dry storage facility in late 2002.[5]

At any point prior to 2002, SMUD could have left its SNF in the pool and likely incurred greater costs and greater damages as a result of the 14-year delay in DOE performance. DOE, however, supported SMUD's move to an on-site storage facility, both by contributing $2 million

---

Footnote continued from previous page
repository is actually 2015, as most experts believe – including the government's own expert in the *Yankee* cases, then SMUD's wet pool and decommissioning damages would be even higher.

[4] Because a dry storage facility is a passive system, it requires fewer personnel for oversight, monitoring, and security. SMUD's estimates for the annual cost of operating and maintaining such a facility generally have ranged from $1.5 million to $4.5 million per year. Thus, there is a significant savings in annual operating costs between wet and dry storage.

[5] The development of the dry storage facility consisted of, among other things, the design, licensing, and fabrication of twenty-one dual-purpose canisters, twenty-two Horizontal Storage Modules, a dual-purpose transport cask, a new road, a transport trailer, a sophisticated security apparatus and security boundary, development of canister and cask loading procedures, extensive training for fuel loading and transfer, and modifications to the site and facility.

toward the project through a Cooperative Agreement and by encouraging the industry to develop canister-based dual-purpose storage systems like that procured by SMUD. Indeed, after announcing delays in 1993 and 1994, the government explicitly considered providing utilities with dry storage canisters to alleviate the burden caused by DOE's delay.

Today, more than 25 utilities at 43 reactor sites have or are developing on-site dry storage facilities similar to those at SMUD. Even the United States Navy, whose SNF is to be delivered to the repository as well, has chosen to store its spent fuel in a system similar to that at SMUD. DOE documents and officials have publicly recognized the benefits of the dual-purpose dry storage systems as the best alternative to cope with DOE's extended delay, and they are planning to incorporate such systems into their permanent repository for SNF.

SMUD's costs related to the development of its on-site storage facility totaled $78,558,212 between 1992 and 2003.[6] As described more fully in Section III.D., *infra*, SMUD has agreed to offsets to these costs totaling $1,954,810. Thus, SMUD's damages claim in this case totals $76,603,412. These costs were reasonably foreseeable, were caused by the government's failure to perform under the Contract, and have been established with reasonable certainty. SMUD is therefore entitled to recover this amount as damages in this case.

Set forth below in Table 1 is a chart showing SMUD's costs in millions by year:

---

[6] By agreement of the parties and order of this Court, the damages trial will involve SMUD's costs through 2003. The parties agreed, and the Court entered an Order, that allows SMUD to bring future actions against the government for costs incurred after 2003.

**SMUD's Costs for On-Site Storage Development**

| Line | Order | Work Order Description | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | Total Claim |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |
| 1 | 465031 | General Support Spent Fuel | $ - | $ - | $ (23,367) | $ 25,486 | $ 7,284 | $ 110,106 | $ 20,869 | $ 146,483 | $ (64,715) | $ - | $ - | $ - | **$ 222,146** |
| 2 | 4000371 | General Support Spent Fuel | - | - | - | - | - | - | - | - | 271,536 | 562,656 | 698,301 | (360) | **1,532,133** |
| 3 | 701547 | Spent Fuel Offload & Storage | - | - | 194,646 | 633,494 | 254,624 | 201,714 | 147,041 | 309,776 | 31,393 | 366 | - | - | **1,773,054** |
| 4 | 4000372 | Spent Fuel Offload & Storage | - | - | - | - | - | - | - | - | 46,925 | 1,992,111 | 1,787,254 | - | **3,826,290** |
| 5 | 4000114 | Fuel Offload & Storage | - | - | - | - | - | - | - | 2,645 | 7,004 | 273 | - | - | **9,922** |
| 6 | 4002862 | Nuclear Fuel Storage | - | - | - | - | - | - | - | - | - | - | 604,328 | 616,344 | **1,220,672** |
| 7 | 604025 | Construct ISFSI | 84,630 | 239,078 | 829,234 | 1,152,472 | 391,602 | 231,306 | 106,483 | 108,978 | 2,049 | 689 | - | - | **3,146,521** |
| 8 | 604026 | Spent Fuel Disposition | 531,430 | 1,242,191 | 1,654,969 | 7,623,850 | 628,954 | 3,116,577 | 896,011 | 11,435,529 | 14,031,074 | 11,519,049 | 6,848,288 | (152) | **59,527,770** |
| 9 | 701804 | Site Improvement/Fuel | - | - | 45,779 | 401,902 | 1,499,991 | 203,984 | 160,913 | 528,107 | 346,895 | 106,300 | 34,366 | 65,462 | **3,393,699** |
| 10 | 702035 | Gantry Crane Refurbishment | - | - | - | - | - | 7,095 | - | - | - | - | - | - | **7,095** |
| 11 | 702036 | Gantry Crane Upgrade | - | - | - | 567,723 | 111,404 | (18,393) | - | - | - | - | - | - | **660,734** |
| 12 | 702468 | Computer Project - ISFSI Security | - | - | - | - | 180 | 33,995 | 22,101 | 208,314 | 21,876 | 230,909 | 492,547 | 65,089 | **1,075,011** |
| 13 | 705184 | Fuel Off-load Training | - | - | - | - | - | - | - | 459,712 | 1,039,408 | 299,542 | 5,354 | - | **1,804,016** |
| 14 | 701843 | DOE/SMUD Demonstration Project | - | - | 1,431 | 3,646 | 4,469 | 61 | 3,978 | - | - | - | - | - | **13,585** |
| 15 | 702459 | DOE/SMUD Demonstration Project | - | - | - | 318 | 52,226 | 25,741 | 24,866 | - | - | - | - | - | **103,151** |
| 16 | 4002100 | Warranty Modifications - Lifting Lugs | - | - | - | - | - | - | - | - | - | 2,922 | - | - | **2,922** |
| 17 | 4002281 | Warranty Modifications - Cask/Can Interface | - | - | - | - | - | - | - | - | - | 2,978 | - | - | **2,978** |
| 18 | 604028 | Cask Impact Limiter Drop Test | - | 86,123 | 123,754 | 5,704 | - | - | - | - | - | - | - | - | **215,581** |
| 19 | 703088 | Vectra-SMUD In Kind Support | - | - | - | - | - | 20,932 | - | - | - | - | - | - | **20,932** |
| | | | | | | | | | | | | | | | |
| **Annual Totals** | | | **$ 616,060** | **$ 1,567,392** | **$ 2,826,446** | **$ 10,414,595** | **$ 2,950,734** | **$ 3,933,118** | **$ 1,382,262** | **$ 13,199,544** | **$ 15,733,445** | **$ 14,717,795** | **$ 10,470,438** | **$ 746,383** | **$ 78,558,212** |

## II. STATEMENT OF FACTS

### A. The Beginning Of DOE's SNF Program – 1983 Through 1986.

On January 7, 1983, President Reagan signed into law the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270). The NWPA required that the government provide for the safe, permanent disposal of spent nuclear fuel. In the NWPA, Congress expressly acknowledged that "[a] national problem had been created by the accumulation of spent nuclear fuel from nuclear reactors." 42 U.S.C. § 10131(a)(2). Congress recognized that "[f]ederal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate." *Id.* § 10131(a)(3). Thus, one of the key purposes of the NWPA was to impose upon the government a firm schedule and deadline by which the government would assume responsibility for the disposal of commercially-generated SNF – and that date was January 31, 1998. *See id.* at § 10131(b)(1).

On June 14, 1983, SMUD, as the owner of the Rancho Seco nuclear power plant in Sacramento County, entered into a Contract with DOE for the disposal of its SNF. *See generally* Contract for the Disposal of Spent Nuclear Fuel No. DE-CR01-83NE44415.000 between DOE & SMUD (June 14, 1983) (Pl. Ex. 44). As this Court previously held, SMUD's Contract created an unconditional obligation for the DOE to begin taking SNF no later than January 31, 1998, and to continue to do so until all wastes have been disposed of. Contract Art. II. *See* Memorandum Opinion at 14; *Alabama Power Co. v. United States,* 307 F.3d 1300, 1302 (11th Cir. 2002) ("The NWPA thus established a quid pro quo; the Government would provide a valuable service and utilities would pay money for this service."). In fulfillment of its obligations under the Contract, SMUD paid DOE all fees required under the Contract, amounting to more than $40 million

dollars. Gov't Answer at ¶ 22. All told, the contracting utilities have paid DOE fees, including interest, amounting to more than $19 billion.

Because of the short time period in which the Contract was put together, DOE recognized that it contained "numerous omissions, inconsistencies, ambiguities and contradictions," *see* ACR Issues Status Report (Dec. 31, 1991) (Pl. Ex. 237), including the absence of a specific acceptance rate. Nonetheless, DOE interpreted both the NWPA and the Contract to require the DOE to accept SNF at a rate and schedule that was sufficient to avoid the need for additional at-reactor storage after January 31, 1998 and to reduce the backlog of fuel accumulated prior to that date so that utilities could decommission their reactors in a timely manner. *See generally* SMUD's Cross-Motion for Partial Summary Judgment on the Acceptance Rate, dated December 16, 2002 ("SMUD Rate Brief").

DOE documents and officials have confirmed that the designed acceptance rate for the repository is 3,000 tons today and has been 3,000 tons since the outset of the program. *See* L. Barrett Dep. at 49-60, 117-122 (Apr. 22, 2002); Yankee Trial, pp. 4168-69 (Aug. 5, 2004) (D. Zabransky); Yankee Trial, pp. 4021-23 (Aug. 4, 2004) (T. Pollog). Furthermore, the undisputed evidence demonstrates that DOE intended to operate the program with an acceptance rate of 3,000 tons in order to achieve the objectives described above. *See, e.g., Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 1535688, at *7 (Fed. Cl. June 28, 2004); *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003) (recognizing that the record contains "uniform support" for the conclusion that "DOE believed that acceptance of SNF and/or HLW at a steady state rate of 3,000 tons annually was necessary to prevent additional on-site storage after 1998 and to begin to eliminate the accumulated backlog of SNF and/or HLW on-site"); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 667 (2003); *see also*

Memorandum Opinion & Order (Braden, J.) dated July 30, 2004, at 5 n.3 (noting that the 10,000-ton limit in the 1987 Amendments "is a reduction in DOE's original obligation to dispose of up to 3,000 tons of SNF per year, as of January 31, 1998, until all the SNF has been disposed").

From the outset of the program, DOE also assured the utilities that, if repository operations were delayed, DOE still would carry out the purposes of the NWPA and the Contract by taking other necessary steps to help utilities avoid additional onsite storage costs after 1998. For example, shortly after the Contracts were signed in 1983, DOE wrote: "The main plan is to have an operating geological repository in 1998 . . . . If by 1994 it is known that the first repository will be delayed, then . . . to be able to accept fuel in 1998 . . . . DOE will take title to the spent fuel, have it placed in dry storage casks and pay a rental fee to the utility to store the casks onsite at the reactor." Memorandum from Williamson re: Mission Plan Strategy (Sept. 15, 1983) (Pl. Ex. 50); *see also, e.g.,* 1984 Draft Mission Plan, Vol. II, at 9-6 (Pl. Ex. 69) (noting that, "if the Department fails to meet the schedule shown in Table 9-2 [3,000-ton rate after a five year ramp-up], then the additional storage capacity needed to accommodate the delay in schedule will be provided by the Department, possibly at reactor sites"); Memorandum from T. Overcast to E. Moore (Apr. 26, 1984) (Pl. Ex. 70) ("Rosselli stated that DOE 'plans to provide the capability to accept waste *at the reactor site* in accordance with the waste acceptance schedule so that utilities will not be required to continue adding additional storage capacity beyond 1998.") (emphasis added).

In 1985, as required by the NWPA, DOE published and submitted to Congress a Mission Plan that provided utilities and other stakeholders with information "sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this [Act]." 42 U.S.C. § 10221(a).

The Mission Plan outlined two plans for SNF acceptance by DOE. 1985 Mission Plan (Pl. Ex. 91). The "authorized system" had the opening of the repository in 1998, with an acceptance rate of 3,000 tons after the fifth year of operation. *Id.* at 26-27. The "improved performance plan" had a Monitored Retrievable Storage ("MRS") facility opening in 1996, accepting 2,200 tons before 1998 and 3,000 tons per year starting in 1998, and the repository opening in 1998. *Id.*

DOE believed that an MRS could serve as a staging ground for optimizing and increasing the shipment of waste to the repository.[7] *Id.* at 282-84. DOE made clear that a potential MRS would not be a substitute for the opening of the repository, but rather an enhancement to the system that would allow DOE to accept more waste and do so starting in 1996. *Id.* DOE recognized that if it delayed opening the repository and MRS, utilities would be forced to add dry storage facilities at reactor sites to accommodate the delay. *Id.* at 19. Nonetheless, DOE reassured utilities that "DOE is committed to accept waste from the signatories of the Standard Contract on a firm schedule beginning no later than January 31, 1998." *Id.* at 97.

### B. DOE Announces Likely Delay In Repository Operations – 1987 Through 1988.

In 1987, in its published Mission Plan Amendment, DOE announced a five-year delay in the proposed opening of the repository. *See* OCRWM Mission Plan Amendment at 6 (June 1987) (Pl. Ex. 118); Draft Mission Plan Amendment at 5 (Jan. 1987) (Pl. Ex. 109). To accept waste despite the delay, the DOE proposed opening an MRS facility in 1998 with repository operation commencing in 2003. *Id.* at 12-13; *see also* Monitored Retrievable Storage

[7] The idea of the MRS facility was that it could be designed more quickly than a repository because it was an above-ground, temporary storage facility, not unlike the facility that SMUD ended up building.

Submission to Congress at 1 (Mar. 1987) (Pl. Ex. 113). As noted in the 1985 Mission Plan, however, the MRS was never intended to be a substitute for the repository.[8]

In December 1987, Congress passed the Nuclear Waste Policy Amendments Act, Pub. L. 100-120, 101 Stat. 1329-1401, 1329-121 ("1987 Amendments"). The 1987 Amendments provided that the DOE was to consider only Yucca Mountain in Nevada as a repository site. 42 U.S.C. § 10172(a). In addition, to prevent an MRS from becoming a substitute for the repository, Congress adopted stringent linkages that tied the opening of any MRS to the opening of the repository. *See id.* at §§ 10165(b), 10168(d)(1), 10168(d)(2). The 1987 Amendments also established an MRS capacity limit of 10,000 tons until a repository had opened and an MRS capacity limit of 15,000 tons thereafter. *Id.* § 10138(d)(3).

The linkages in the 1987 Amendments had the effect of insuring that an MRS could only begin operations if a repository was close behind. DOE witnesses and DOE documents confirmed that as a result of the linkages, it was impossible to have an MRS operating more than three years before a repository. *See* R. Milner Dep. at 20-21 (May 7, 2002); L. Barrett Dep. at 775 (Apr. 26, 2002); Report of the Monitored Retrievable Storage Review Commission at 19 (Nov. 1989) (Pl. Ex. 169). The 1987 Amendments did not relieve DOE of any obligations imposed by its Contract with SMUD or obligations under the NWPA.

---

[8] DOE has acknowledged that "[w]hen the Act was passed, the Department anticipated that a geologic repository would be in operation and prepared to begin acceptance of spent nuclear fuel by January 31, 1998." DOE's Notice of Inquiry, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994) ("Notice of Inquiry"). *See also Indiana Michigan Power Co. v. United States*, 88 F.3d 1272, 1277 (D.C. Cir. 1996) (noting ". . . Congress anticipated the existence of a repository by 1998"); DOE's Final Interpretation of Nuclear Acceptance Issues, 60 Fed. Reg. 21,793, 21,794 (May 3, 1995) ("Final Interpretation") ("[T]he Act originally envisioned that a geologic repository would be in operation, and DOE would be prepared to begin acceptance of SNF by January 31, 1998.") (Pl. Ex. 410); DOE's 1983 Notice of Proposed Rulemaking, 48 Fed. Reg. 5458, 5458 (Feb. 4, 1983) (noting the NWPA "directs DOE to begin repository operations no later than January 31, 1998"); H.R. Rep. No. 97-795, pt. 1, at 38 (1982) (explaining that the "Secretary must begin repository operations no later than January 1998").

In June 1988, DOE issued another Draft Mission Plan Amendment. The Amendment projected that waste acceptance would begin at a repository in 2003. *See* Draft 1988 Mission Plan Amendment at 15 (Pl. Ex. 143). DOE recognized, however, that, given the statutory linkages between the MRS and the repository, it was unlikely that DOE would begin accepting SNF in 1998, as required by the Contract. *Id.*; *see also* 1988 Annual Capacity Report ("ACR") at 5 (Pl. Ex. 142) (projecting that DOE would begin acceptance of waste in 2003 and would ramp up to 3,000 tons by 2008).

### C. SMUD Closes Its Reactor And Evaluates Its Options In Light Of DOE's Announcements Of Delay – 1989 Through 1991.

Although SMUD's Rancho Seco reactor was licensed to operate through 2008, on June 6, 1989, the residents of Sacramento voted by public referendum to prematurely and permanently shut down Rancho Seco. In accordance with the results of the referendum, the SMUD Board of Directors decided to shut down the plant immediately.

That same year, in November 1989, DOE published a "Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program." (Pl. Ex. 169). This 1989 Reassessment was the result of a comprehensive review of the repository schedule directed by the Secretary of Energy, and it announced that the expected start of repository operations would be delayed from 2003 to 2010. *Id.* at vii. It also stated that any possibility of accepting waste at an MRS in 1998 would require Congress to change the law and abolish the statutory linkages between an MRS and the repository. *Id.* at ix-x, 17. Given the government's own pronouncements of delay, it was evident that DOE was highly unlikely to be able to perform as obligated under the Contract.

In March 1990, faced with the likelihood of a delay in SNF disposal until at least 2010, and possibly longer, SMUD commissioned a study by an outside nuclear expert regarding fifteen different options for fuel storage at Rancho Seco. *See* S. Levy Inc., Rancho Seco Nuclear Generation Station Nuclear Fuel Storage Options (Mar. 31, 1990) (the "Levy Report" or "Report") (Pl. Ex. 176). One option considered was to continue to store the SNF in SMUD's spent fuel pool, which was termed the "most certain" approach because it would entail simply leaving the fuel in the pool until DOE eventually picked it up. *Id.* at ii, 51. The Report explained that:

> [T]he schedule for DOE pickup is currently highly uncertain with the earliest conceivable pickup date being in 1998 and a much more likely pickup date well after 2010. As long as the fuel is in the fuel pool, the costs associated with security, cooling and monitoring will continue; and furthermore, options for plant decommissioning and other uses of the site will be limited or precluded.

*Id.* at 59.[9]

The Levy Report ultimately recommended that SMUD pursue development of an onsite interim storage facility, based on a "dual-purpose" dry storage system, that would allow for the storage of the fuel onsite until the DOE came to dispose of the fuel, at which time the fuel would be ready and licensed for transport. *Id.* at 62. One benefit of such a system was that "[s]torage in transportable casks offers the best opportunity for early offsite shipment, possibly as early as 1998, to an interim DOE storage facility." *Id.* at ii. Recognizing DOE's own discussions about taking title of SNF or providing storage at utility sites if a repository were unavailable by 1998,

---

[9] The Levy Report used the following cost estimates (in 1990 dollars) for ongoing wet pool storage costs: maintenance and monitoring costs of $2 million to $3 million per year, capital costs of $1 million, and 1-2 years extra schedule at the time of shipment to DOE. Levy Report at 58. For dual-purpose transportable casks, Levy estimated maintenance and monitoring costs of $1.5 million to $2 million per year, capital costs of $21 to $31 million, and dismantling costs of $.2 to $.5 million. *Id.* The Report noted, however, that "[b]ecause of the short time available, Levy was unable to always carry out definitive evaluations and SMUD needs to apply appropriate and cautious judgment in the application of some of the results contained in this report." *Id.* at 1.

*see supra*, pp. 8-9, the Report noted that "[a]nother possibility is interim acceptance by DOE by 1998 of the spent fuel in transportable storage casks at the Rancho Seco site." *Id.* at ii; *see also id.* at 39.[10]

Levy recognized that a dual-purpose system had never been developed before and would require licensing and approval by the Nuclear Regulatory Commission ("NRC") under both 10 C.F.R. Part 71 (transportation) and 10 C.F.R. Part 72 (storage). *Id.* at 46. The Report also encouraged SMUD to enter into negotiations with DOE for a demonstration project that would help achieve DOE buy-in on the project. *Id.* at 33.

### D. SMUD Pursues The Design Of Dry Storage Canisters With DOE Support / DOE Announces Additional Delay – 1991 Through 1994.

In 1991, SMUD began negotiations with DOE for a demonstration project and began developing potential specifications for a dry storage system. In October 1991, at a public meeting of the SMUD Board of Directors, SMUD staff gave a presentation on the proposed decommissioning plan,[11] the demonstration project, and the fuel storage options at Rancho Seco. Transcript of Public Hearing, at 3-4 (Oct. 3, 1991). Staff explained that a dual-purpose dry storage system could reduce long-term annual operating costs by $8 million and allow SMUD to continue with decommissioning without the SNF in the pool. *Id.* at 22, 66. SMUD staff member

[10] The Report recognized DOE's pronouncements of delay, noting that "[o]riginally, the Department of Energy (DOE) had planned to accept spent fuel by 1998. Recently, DOE has delayed the repository date to 2010 and there is a good chance that further schedule slippages may occur." *Id.* at 3. The Report also concluded that, in light of the uncertainties in the program and DOE's transportation fleet, "the only way to be prepared for DOE success in establishing a site by 1998 is to proceed toward storage in transportable casks." *Id.* at 65. Recognizing that "[t]he most uncertain element remains the probability that DOE can select a site and make it ready to receive dual-purpose casks by 1998," the Levy Report recommended that SMUD pursue a dual-purpose storage system. *Id.*

[11] SMUD's initial decommissioning plan was to stabilize the existing facilities at the Rancho Seco plant until 2008 to allow adequate decommissioning funds to accumulate. Thereafter, active decommissioning would have commenced. Subsequently, in the mid to late 1990's, SMUD transitioned to "incremental decommissioning" under which it would decommission particular segments of the plant as they became available.

Rita Bowser explained that the repository was delayed by at least 12 years, and that although DOE was pursuing an MRS, such a facility would require congressional action to de-link it from the repository. *Id.* at 62. Members of the Board expressed their view that it was unrealistic to believe that DOE would accept SNF from utilities in a timely fashion. *Id.* at 62-71. Similar to DOE's own proposals in 1983 and 1984, *see supra*, pp. 8-9, Assistant General Manager Jim Shetler also discussed the possibility of requiring DOE to take ownership and responsibility for the SNF at SMUD's site. *Id.* at 70.

SMUD's pursuit of dry storage was closely coupled with the potential "demonstration project" involving DOE. The program was spurred in part by Fiscal Year 1991 appropriations in which Congress directed DOE to pursue a cooperative research and demonstration program to demonstrate dual-purpose casks. In approving that appropriation, Congress agreed with the NRC "that radiation exposure and other handling risks should be minimized in the entire process from original removal of the fuel from the reactor pool through its ultimate disposal. Development of dual-purpose casks can help to reduce these handling risks and thereby enhance public health and safety." H.R. Rep. No. 101-536 (1991).

SMUD began meeting monthly with DOE in 1991 regarding the demonstration project and shared its technical specifications for the dry storage casks with DOE. DOE provided comments to SMUD on the technical specifications and stayed in close contact with SMUD regarding the project. In December 1991, SMUD issued a Solicitation for Dual Purpose Casks and Request for Proposal, seeking proposals from vendors for casks that could be used for an on-site dry storage facility. DOE again received and reviewed SMUD's Request for Proposal and had meetings with SMUD about the proposal.

Given DOE's acknowledgements of significant delay in the program, DOE believed that the development and licensing of dual-purpose casks could be beneficial to it and the nuclear industry and was supportive of SMUD's development of an interim dry storage facility. In 1992, SMUD's Assistant General Manager, Jim Shelter, explained that "[w]e feel we need to keep DOE involved in this program to gain their buy-in of the dual-purpose system for ultimate acceptance of the fuel by DOE. . . .[12] The DOE acknowledges that there are benefits to our approach and is interested in seeing it become successful." Memorandum from J. Shelter to D. Freeman and L. Fassler at 1 (June 11, 1992) (memo misdated June 11, 1991) (Pl. Ex. 208). Mr. Shetler further explained that SMUD was focused on getting the fuel into dry storage because it could produce cost savings of approximately $6 million per year. *Id.*

After nearly three years of meetings and negotiations regarding the details of a demonstration project, SMUD and DOE officially signed a Cooperative Agreement in late 1994. *See* Letter from S. Redeker to DOE with Cooperative Agreement attached (Dec. 19, 1994) (Pl. Ex. 381). Under the Cooperative Agreement, DOE would provide $2 million in funding for one dual-purpose cask and SMUD would provide DOE with Monthly Reports regarding the status of the project and detailed Quarterly Financial Reports regarding the ongoing costs. *Id.* at 88-90. The Cooperative Agreement recognized that DOE would share in and benefit from the licensing experience for the transportable storage system, noting that "[i]t is especially important to identify license-related requirements for maintaining the capability to ship loaded spent fuel after long-term spent fuel storage." *Id.* at 4.

[12] DOE had previously taken the position that a dual-purpose cask or canister could be subject to delayed acceptance at the federal repository. *See, e.g.*, Letter from D. Zabransky to A. Brownstein (Apr. 1, 1991) (Pl. Ex. 201).

The Cooperative Agreement created Joint Oversight and Technical Management Committees to administer the project and DOE's members included DOE officials Jeff Williams, Dave Langstaff, Leroy Stewart, and Mikal McKinnon. *Id.* at 85-87. The Joint Committees, including the DOE officials, were responsible for "approval of the DOE and SMUD Technical Project Plans," "concurrence with any proposed changes to this Project Management Plan; the DOE and SMUD Technical Project Plans; or major milestones," "concurrence of each year's proposed budgets and any changes to the budgets," and "review of overall general progress, conduct of technical reviews, and determination of approaches to improve or solve technical problems or recommendations of work-around solutions." *Id.* at 87.

Thus, DOE had the opportunity to review every aspect of SMUD's dry storage project and received monthly and quarterly information on it. DOE also had audit and termination rights under the Cooperative Agreement, *id.* at 15-16, 55-59, neither of which DOE exercised during the term of the Agreement. DOE ultimately paid SMUD $2 million toward the purchase of one dual-purpose cask that, because of fabrication difficulties and the bankruptcy of SMUD's vendor, was never completed.[13]

Following the issuance of its Request for Proposal in late 1991, SMUD received five bids from different storage vendors for the cask and canister portion of the storage facility, ranging from approximately $12 million to $72 million. At that time, no company had a cask or canister that was licensed for both storage *and* transport of SNF – the so-called "dual-purpose" system.[14]

[13] The Cooperative Agreement was terminated by mutual agreement of the parties in April 2000. *See* Letter from DOE to S. Redeker (Apr. 28, 2000) (Pl. Ex. 648).

[14] Because SMUD was a shutdown utility, SMUD, as well as DOE, believed that a "dual-purpose" system was the most economical and rational choice because it would reduce radiation exposure and handling risks and allow SMUD to decommission the fuel pool. *See* H.R. Rep. No. 101-536 (1991); Letter from L. Barrett to J. Shetler (Sept. 2, 1993) (Pl. Ex. 320). Maintaining the wet pool for the extended storage period would have dramatically

Footnote continued on next page

As a result, there was a large disparity in the bids and considerable uncertainty in how much the project would cost. SMUD ultimately selected the low bidder – Pacific Nuclear.

In July 1992, SMUD staff sought authorization from the SMUD Board of Directors to negotiate a contract with Pacific Nuclear for the design and development of the dry casks and canisters. In seeking this authorization, SMUD staff explained that 2010 was "the proposed opening of the Federal Geologic Repository." *See* Board Agenda Item Staffing Summary Sheet, at 2 (July 7, 1992) (Pl. Ex. 261). In addition, SMUD estimated that the conversion to a dry storage facility could save SMUD approximately $33 million between 1998 and 2010. The contract price for the canisters, cask, and storage modules was estimated at $12.4 million, plus applicable taxes, escalation, and a 15% contingency. *Id.* In addition, SMUD would have its own costs for design and engineering, the costs of other necessary equipment (*e.g.*, security systems, ISFSI pad), and the costs for transferring SNF to dry storage (*e.g.*, training, procedure development, tool fabrication).

The Board approved negotiations of a contract with Pacific Nuclear and subsequently, in September 1992, approved the signing of a contract on the negotiated terms. In seeking approval of the contract, SMUD staff explained that "[t]he District solicited proposals for the spent nuclear fuel dry cask system as a more economic alternative than long term storage in the spent fuel pool at Rancho Seco and as a part of a dual-purpose cask demonstration program to be carried out with the U.S. Department of Energy." Staffing Summary Sheet (Sept. 28, 1992) (Pl. Ex. 269). SMUD staff again estimated that the savings that could accrue from being in dry

---

Footnote continued from previous page
increased the costs and damages SMUD was seeking to minimize. SMUD's decision to go to a dual-purpose system has been proven correct, as every single-reactor shutdown utility has gone to dual-purpose dry storage, the U.S. Navy has gone to dual-purpose dry storage, and most operating utilities are now doing the same.

storage during the period of DOE's delay, 1998 to 2010, was $33 million. *Id.* SMUD signed the contract with Pacific Nuclear in October 1992. Within two months, the NRC advised Pacific Nuclear that additional and unanticipated testing would be required for the purpose of transportation licensing. *See, e.g.*, Pl. Exs. 267, 295.

In March 1993, SMUD provided the NRC with its environmental report for the decommissioning of Rancho Seco. *See* Letter from J. Shetler to NRC (Mar. 30, 1993) (Pl. Ex. 297). SMUD's report noted that DOE would not be able to begin disposing of fuel until 2010, that interim storage by DOE was not currently an option, and that dual-purpose dry storage was accordingly "the most prudent alternative available." *Id.* at 7. In October 1993, SMUD submitted its application to the NRC for transportation and storage licenses for the dry storage project.

SMUD's understanding was consistent with DOE's announcements throughout the early 1990s that it would not begin acceptance in 1998 as required by the Contract. *See* 1990 ACR at 5 (Pl. Ex. 188) ("If the current linkages to the repository are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF/HLW by DOE would not start until 2007."); *see also, e.g.,* 1991 ACR at 4 (published Dec. 1991) (Pl. Ex. 231) (same); 1992 ACR at 3 (published Mar. 1993) (Pl. Ex. 294) (same). In December 1991, DOE also began to include projections for a possible minimal acceptance rate of 900 tons per year in its ACR, apparently in effort to limit its future liability to utilities. *See* SMUD Rate Brief at 55-57. DOE explained that it developed the 900-ton rate by assuming that Congress might abolish the statutory linkages between the MRS and the repository contained in the 1987 Amendments, but

nonetheless retain a capacity limit of 10,000 tons during the period between 1998 and 2010.[15] *See* 1991 ACR at v.

The MRS, however, never proceeded beyond the conceptual phase. By 1992, DOE publicly announced that it would not be able to open an MRS by 1998. *See DOE Acknowledged Last Week That It Will Not Be Able to Build a Monitored Retrievable Storage (MRS) Facility by 1998*, Inside Energy with Federal Lands at 14 (Dec. 21, 1992). In addition, DOE never began actively planning to accept SNF using the minimal 900-ton rate and did not develop the necessary infrastructure, transportation casks, or receiving capability for doing so.[16] To the contrary, DOE began planning for its failure to accept SNF from utilities, taking the position in 1993 and 1994 that DOE had no obligation to accept waste in the absence of an operating repository. *See Indiana Michigan*, 88 F.3d at 1274 (D.C. Cir. 1996); Notice of Inquiry, 59 Fed. Reg. at 27,007-27,009.

The failure of the DOE program was also evident in other ways. In 1993, after several years of decline, DOE cancelled its "Cask System Development Program," DOE's only effort to develop the necessary transportation infrastructure to collect and transport SNF from utilities. DOE had begun that Program in 1985 to obtain the design, testing and licensing of four different transportation cask designs by four different vendors. DOE marginalized and then cancelled the

---

[15] Under the 900-ton rate schedules published by DOE, SMUD had only 84.2 tons of SNF covered in DOE's ten-year schedule. *Id.* SMUD, however, had 228.4 tons of SNF at its reactor site. Thus, this schedule would have left SMUD with 144.2 tons of SNF for the indefinite future.

[16] The only use that DOE made of the 900-ton rate was to demand, contrary to the provisions of the Contract, *see* Art. V.B.1, that utilities use that rate in filling out Delivery Commitment Schedules ("DCSs"). *See* March 4, 1992 DCS Instructions ¶ 2.7 & 7(b) (Pl. Ex. 249). This Court has already held that "the DCSs imposed no legal obligation on either party to the DOE Standard Contract." Memorandum Opinion dated Jan. 19, 2005 at 14; *see also Commonwealth Edison*, 56 Fed. Cl. at 666 (explaining that "[d]efendant eventually conceded at oral argument that the ACRs were for planning purposes" and that "[t]he parties could not have expected that planning documents would create binding contractual obligations"); SMUD Rate Brief 58-70.

program in the early 1990s after spending nearly $100 million without receiving a single licensed regular type cask design (let alone receiving an actual cask). Without any transport capabilities or SNF acceptance on the horizon, more utilities began pursuing dual-purpose dry storage systems.

Recognizing that it could not meet the 1998 date in any manner, DOE announced in 1994 that its "preliminary view is that it has no statutory obligation to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the Act." Notice of Inquiry, 59 Fed. Reg. at 27,008 . DOE also began investigating the development of a Multi-Purpose Canister ("MPC") system that it could provide to utilities for on-site storage to help offset the costs of DOE's failure to begin accepting SNF. DOE conducted feasibility studies on the MPC concept in 1993 and issued conceptual design reports on it in 1993 and 1994. *See generally* Multi-Purpose Canister System Evaluation, A Systems Engineering Approach (Sept. 1994) (Pl. Ex. 368); Multi-Purpose Canister (MPC) Implementation Program Conceptual Design Phase Report (Sept. 1993) (Pl. Ex. 326). As conceptualized by DOE, the MPC would be a canister-based dry storage system, similar to SMUD's system, that would be suitable for storage, transport, and possibly disposal at the repository.

In 1994, when DOE announced its inability to perform, DOE recognized that the MPC system could produce considerable "cost savings for both utilities and the federal waste management system" and noted that "the Secretary has directed that the options to be explored by the Department should include, to the maximum extent possible, the provision and use of MPCs to address both schedule and cost concerns arising from the potential unavailability of a repository or MRS in 1998." Notice of Inquiry, 59 Fed. Reg. at 27,009.

In 1993 and 1994, SMUD asked DOE to refocus the DOE-SMUD demonstration project to maximize the benefit to DOE's new MPC initiative. *See* Letter from J. Shetler to L. Barrett (June 22, 1993) (Pl. Ex. 311). Mr. Shetler explained that "SMUD is in the unenviable position of having to procure fuel storage technology without knowing how DOE plans to accept spent fuel." *Id.* Mr. Shetler's letter also expressed concern about whether a change to dual-purpose dry storage would impact the timing of DOE's acceptance of SMUD fuel. SMUD sought a commitment from DOE that SNF in dual-purpose canisters would not be moved to the end of the pick up line. *Id.*

In response, DOE refused to make a commitment that fuel in dual-purpose canisters would be accepted in the future without schedule delays, explaining that "[w]hile we share mutual goals of minimizing spent fuel handling and repackaging, until the Nuclear Regulatory Commission completes its certification, it is premature . . . for the Department to commit to accept such canistered fuel, either as a matter of policy or under the terms of the Standard Contract." Letter from L. Barrett to J. Shetler (Sept. 2, 1993) (Pl. Ex. 320). However, DOE did acknowledge the DOE-SMUD demonstration program:

> [W]ill address several important issues relating to the multi-purpose canister system. These issues include: the resolution of licensing and operational issues related to canister transport and storage; the development of a dry cask-to-cask spent fuel transfer system to maximize the use of the canister system at all utilities; and burn-up meter validation tests.

*Id.* Activities associated with the MPC system were later terminated due to funding constraints in the Fiscal Year 1996 appropriations. DOE, however, continued to support and encourage utilities' development of canister-based dry storage systems like that at SMUD.

During 1994, the dry storage project experienced additional delay. This delay resulted from problems associated with the additional testing that the NRC had required, as well as the

NRC's initial review of the transportation license application taking longer than expected. *See, e.g.*, Pl. Ex. 267. The NRC's initial comments also led to significant design changes to the canister.

In August 1994, the NRC issued an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") in connection with SMUD's application to construct and operate the on-site dry storage facility. *See* Letter from C. Haughney to J. Shetler (Aug. 5, 1994), with accompanying FONSI and EA (Pl. Ex. 363). The NRC's analysis explained that shipment of SNF to a permanent federal repository "is SMUD's preferred solution to the storage of spent fuel from Rancho Seco." EA at 7. The NRC explained, however, that "no permanent Federal repository is available" and that "[a]ccording to a November 1989 DOE report, it is not likely that DOE will have a licensed repository ready to receive spent fuel before 2010." *Id.* With respect to a potential MRS, the NRC noted that the statutory linkages would delay its development. *Id.*[17]

The EA also noted that the status quo – the "no action" alternative – would be to continue to store SNF in the wet pool. *Id.* at 8. The NRC recognized the undesirable consequences of SMUD maintaining its wet pool for indefinite storage, explaining that doing so would: (1) require the operation and maintenance of support facilities, which include fire suppression, fuel handling machines, and active cooling; (2) prevent SMUD from being able to complete decommissioning Rancho Seco until DOE accepts the fuel for removal from the site; and (3)

[17] The NRC also addressed the efforts of the Nuclear Waste Negotiator to locate a voluntary host for the MRS, noting that "even this voluntary process was effectively terminated when the first of the potential hosts requested the second level of funding authorized under the act." EA at 7; *see also id.* (explaining that the Bingaman amendment "terminated the current voluntary process and further complicated the uncertainties of schedules for a repository or MRS").

keep the cost to maintain the SNF pool which was estimated at $6 million to $8 million per year. *Id.* The NRC concluded that "[t]he absence of a Federal repository makes storage of spent fuel in dry shielded canisters above ground SMUD's primary alternative." *Id.* Following issuance of the NRC EA and FONSI, work began on the Ranch Seco ISFSI, including the Horizontal Storage Modules and the pad.

**E. SMUD Proceeds With Development Of On-Site Dry Storage / DOE Declares It Has No Obligation – 1995 Through 1997.**

At the same time that SMUD was reconsidering its storage options, DOE provided additional notice that it would not begin performance in January 1998. In May 1995, the Department issued its Final Interpretation regarding its view of the NWPA, stating that "[t]he Act does not impose a statutory obligation on DOE to begin nuclear waste disposal in 1998 in the absence of a disposal or interim storage facility constructed under the Act." Final Interpretation, 60 Fed. Reg. at 21,794-95. The DOE stated that no repository or interim waste acceptance facility would be in operation until 2010, and that no waste acceptance would occur until then. *Id*. DOE also recognized that utilities would have to plan for the long-term storage of SNF in light of DOE's delays, explaining that "important public and private interests are implicated by the need for orderly financial and technical planning with respect to the Department's inability to accept SNF in 1998." *Id.* DOE further acknowledged that "[t]here are also equitable considerations that may argue for some form of relief to help offset costs incurred as a result of the Department's inability to begin acceptance of SNF in 1998." *Id.* at 21,797.[18]

[18] In March 1995, despite the fact that DOE had concluded that an MRS facility was "no longer a viable option," L. Barrett Dep. at 779-80 (Apr. 26, 202), DOE published a 1995 Annual Priority Ranking ("APR")/ACR using the 900-ton rate and still assuming the use of an MRS. 1995 APR/ACR at 3 (Pl. Ex. 396). The testimony of government witnesses demonstrates that the ACR was published with the minimal rate in order to limit the DOE's obligations to utilities. Yankee Trial, pp. 4166-67 (Aug. 5, 2004) (D. Zabransky).

The utilities challenged DOE's interpretation that it had no obligation to accept waste in *Indiana Michigan*. 88 F.3d at 1272. On July 23, 1996, the D.C. Circuit rejected DOE's interpretation of its obligations, concluding that in exchange for the billions of dollars in fees paid by nuclear utilities, the DOE had an unconditional obligation to start removing SNF in 1998. *Id.* at 1276-77.

On December 17, 1996, in response to the D.C. Circuit's decision in *Indiana Michigan*, DOE contracting officer Beth Tomasoni sent a letter to SMUD announcing that DOE "will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998" and requesting comments regarding how the delay could be accommodated. *See* Letter from B. Tomasoni to J. Hastings (Dec. 17, 1996) (Pl. Ex. 500); *see also* DOE Press Release, Department of Energy Notifies Utilities of Anticipated Delay in Accepting Commercial Spent Nuclear Fuel (Dec. 17, 1996) (Pl. Ex. 501).

In a response dated March 13, 1997, SMUD requested that DOE implement the so-called Fort St. Vrain solution,[19] by taking title to SMUD's SNF at the Rancho Seco site and reimbursing SMUD for the on-site dry storage costs. *See* Letter from J. Schori to B. Tomasoni at 3 (Mar. 13, 1997) (Pl. Ex. 527). SMUD's letter explained that it has done "everything possible to reduce the interim costs of storage by proceeding with its plan for dry storage," *id.* at 2, and explained that, "[s]hould DOE fail to remove the spent fuel on an accelerated basis from Rancho Seco beginning in January 1998, SMUD will have no alternative but to seek reimbursement from DOE for the

[19] Fort St. Vrain was a permanently shutdown nuclear reactor in Colorado that built an on-site dry storage facility. In that case, DOE entered into an agreement to pay for the capital cost of building the facility and then took title of the SNF and currently manages the dry storage facility.

cost of design, licensing, construction and operation until such time that DOE takes title." *Id.* at 3.

DOE's response to the *Indiana Michigan* decision, as well as SMUD and other utility comments, was to issue a letter concluding that DOE's delay in beginning disposal of spent fuel was "unavoidable" within the meaning of Article IX of the Contract. *See* Letter from B. Tomasoni to J. Hastings (June 3, 1997) (Pl. Ex. 544). Although DOE disclaimed any contractual obligation to compensate utilities for the delay,

> [DOE] recognize[d] that such delay may have resulted in hardship to certain contract holders . . . [and that] The Department is willing to consider amendments to individual contracts that would mitigate the impacts of the delay particular contract holders will experience in the acceptance of their spent fuel. Possible amendments could include, for example, compensation for onsite storage costs.

*Id.* at 2.[20]

Faced with the lack of any prospect for spent fuel disposal by the federal government prior to 2010, SMUD continued to pursue the development of an interim on-site dry storage facility. Initially, Pacific Nuclear had intended to deliver the dual-purpose casks and canisters by the end of 1995. The project was, however, a first-of-a-kind undertaking, and the NRC had never licensed a cask or canister for both long-term storage and transportation. The original estimate for the project assumed that the majority of the design work was completed, as Pacific Nuclear already had a storage-only canister system, the NUHOMS system, that it hoped to convert to a dual-purpose system with modest technical changes. Within months of entering into

[20] The utilities and state agencies petitioned the D.C. Circuit for a writ of mandamus, seeking to compel DOE to begin disposal of the nuclear materials by January 31, 1998. *Northern States Power Co. v. United States*, 128 F.3d 754, 757 (D.C. Cir. 1997). Although the D.C. Circuit declined to issue a "move fuel" order, the court did "issue a writ of mandamus precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or an interim storage facility." *Id.* at 761. The court expressly rejected the DOE's arguments that it was not responsible for the costs resulting from its failure to perform. *Id.* at 760.

the contract, it became clear that the design for the dual-purpose casks and canisters would have to undergo significant changes for off-site transport. *See, supra*, pp. 18 & 22; *see also* J. McGrath Dep. at 123 (Jan. 12, 2005) (testimony by government expert witness that "hundreds of changes" were made to the cask and canister design).

The vast majority of these changes resulted from directives of the NRC. As the government's expert witness, Mr. McGrath explained:

> The entire project, everything [SMUD and Pacific Nuclear] do, the evolution of the design is based in part on being a functional system operating a[s] it should in meeting the licensing requirements of the NRC. So [that] all the design work that is being done is being done with the backdrop of NRC licensing success.

*Id.* at 134. The concept of a joint storage and transportation canister was new for all parties, and in response to NRC comments and questions, Pacific Nuclear made extensive design changes to the system and added various required testing. *See, e.g.*, *id.* at 134-37 (explaining that "structural shell modification," "canister basket changes," "additional spacers," and "impact limiter testing" were undertaken in response to NRC directives).

Although SMUD initially expected two or three rounds of questioning from the NRC, SMUD and its contractors eventually responded to at least seven rounds of such questioning. *See* SMUD Monthly Report (July 1998) (Pl. Ex. 845) (noting "TNW submitted their response to a seventh round of questions from the NRC"). In addition to various design changes in response to NRC comments, the project schedule was significantly revised on many occasions due to NRC delays and design rework on the project. *See, e.g.*, NSP Dry Cask Storage Workshop Trip Report (July 25, 1995) (Pl. Ex. 425) (stating that Charlie Haughney of the NRC had said that "[r]ulemaking is unpredictable" and "[s]chedules often disappear in the fog"); SMUD Monthly Report (June 1995) (Pl. Ex. 845) (noting "[f]abrication of the cask and canisters is on hold

pending disposition of the NRC for the forging"); Letter from S. Redeker to NRC (Apr. 6, 1995) (Pl. Ex. 404) (explaining that SMUD's contractor had modified the canister "in order to address questions raised by the NRC").

Because SMUD was applying for both a storage license and a transportation license, SMUD had to work with two different NRC branches and staffs. In 1995, the NRC formed the Spent Fuel Project Office and issued an action plan in an effort to consolidate review of spent fuel storage issues. *See* Kathleen Hart, *Selin Warns Staff that QA Problems Could Jeopardize Dry Storage Programs*, at 16, <u>Nuclear Fuel</u> (July 3, 1995) (Pl. Ex. 421). Prior to the formation of the Spent Fuel Project Office, two separate organizations within NRC's Office of Nuclear Materials Safety and Safeguards reviewed spent fuel storage applications and spent fuel transportation applications. Although the NRC made efforts to address these inefficiencies, the NRC's review process contributed to the length of SMUD's project.

In early 1996, the NRC determined that there were substantial quality assurance issues with Vectra Technologies, SMUD's primary vendor on the storage project.[21] SMUD promptly informed DOE that there likely would be additional costs for the dual-purpose cask. *See* Letter from R. Jones to D. Langstaff (Feb. 12, 1996) (Pl. Ex. 449). SMUD and the other utilities purchasing Vectra storage systems, the so-called NUHOMS Owners Group ("NUHOG"), began auditing Vectra's work to insure compliance with NRC regulations. SMUD and Vectra continued to have meetings with NRC officials to determine the scope of the problems.

In July 1996, SMUD informed DOE of additional re-work that would be required on the project and requested that DOE allocate additional funds under the Cooperative Agreement. *See*

[21] Pacific Nuclear changed its name to Vectra Technologies following the acquisition of ABB Impell in 1993.

Letter from S. Redeker to DOE (July 17, 1996) (Pl. Ex. 471). In September 1996, DOE refused SMUD's request. The Vectra problems led to a work stoppage on SMUD's project in December 1996. In response, SMUD conducted a thorough re-analysis of its spent fuel storage options, considering nine different storage options, including simply leaving the SNF in the wet pool until DOE began acceptance in 2010 or 2012. *See* K. Miller Memorandum to S. Redeker (Dec. 31, 1996) (Pl. Ex. 502).

SMUD had intensive negotiations with Vectra during the beginning of 1997 regarding the status of its project. In addition, SMUD continued its storage options re-analysis, performing "an analytical study to determine if the current concept of the Rancho Seco Spent Fuel Program needs to be changed and if so, what other option would be the most cost effective for SMUD." Memorandum from K. Miller to S. Redeker (Feb. 20, 1997) (Pl. Ex. 519); *see also* Memorandum from K. Miller to S. Redeker (Mar. 3, 1997) (Pl. Ex. 524). SMUD's entire analysis was driven by DOE's then-announced breach and assumed that DOE would not start accepting SNF until 2012 at the earliest. As a result of the government's breach, SMUD opted to continue with its on-site dry storage project, despite the problems it had encountered. While the dry storage project did experience technical problems and cost increases, the option of leaving the SNF in the pool until eventual DOE acceptance would have produced higher costs.

In January 1997, while SMUD's reanalysis was ongoing, the NRC issued a "Demand for Information" ("DFI") to Vectra asking why the NRC should not halt Vectra's fabrication activities based on quality assurance concerns. *See* Letter from J. Lieberman to V. Franceschi (Jan. 13, 1997) (Pl. Ex. 509). The DFI required Vectra to conduct a comprehensive review of its design control and design changes, identify the root cause of previously identified problems, and explain why the NRC should not suspend Vectra from all fabrication activities until the problems

were resolved. *Id.* The DFI effectively forced Vectra to stop all work. Throughout the balance of 1997, SMUD met regularly with Vectra, the NUHOMS Owners Group, NRC officials, and DOE officials, to determine how best to proceed with storage of its SNF. Despite its efforts to take corrective action, Vectra ended up declaring bankruptcy in October 1997.

In the same time frame, the Navy issued an Environmental Impact Statement ("EIS") and a Record of Decision ("ROD") declaring that they were pursuing a dual-purpose, canister-based dry storage system similar to that at SMUD. *See* Record of Decision for a Dry Storage Container System for the Management of Naval Spent Nuclear Fuel, 62 Fed. Reg. 1095 (Jan. 8, 1997) ("Navy ROD") (Pl. Ex. 508); Department of the Navy, DOE-EIS-0251, Final Environmental Impact Statement for a Container System for the Management of Naval Spent Nuclear Fuel (Nov. 1996) ("Navy EIS") (Pl. Ex. 494). The Navy considered several options for the dry storage of their fuel between 1995 and 1997, the same time period during which SMUD was reconsidering options for the storage of its SNF. Choosing from six different options, the Navy ultimately selected the same type of dry storage system as that chosen by SMUD, stating that "[t]he overriding benefit of a canister system is that it minimizes fuel handling operations," representing "efficiencies in container manufacturing, fuel reloading operations and radiation exposure." *Id.* at 3-26.

The Navy expressly considered "[t]he direction of the commercial nuclear industry" in selecting a dry storage system, as stated in both the EIS and the ROD. *Id.; see also* ROD at 1097. The Navy considered it "prudent to utilize a system which is similar to the systems being used or planned for use by commercial electric utilities," noting that "[a]ll spent nuclear fuel, commercial and naval, is destined for the same geologic repository." *Id.* at 1097.

**F. SMUD Continues To Reevaluate Its Dry Storage Project / DOE Encourages Utilities To Develop Dry Storage – 1998 Through 2000.**

In November 1997, TransNuclear West ("TNW") purchased Vectra's assets out of the bankruptcy estate. TNW, however, still had to satisfy the NRC that it could restart fabrication of the Vectra designs and had to pass a further NRC audit to do so. SMUD had extensive contract negotiations with TNW for the completion of its dry storage project, ultimately signing a contract in September 1998. *See* Pl. Ex. 598. Also in September 1998, following five years of review and comment, the NRC issued a transportation license to the project. However, the project was still not licensed by the NRC for storage. By order of the Bankruptcy Court, TNW agreed to complete the SMUD project without profit. In November of 1998, NRC finally gave TNW the go ahead to restart fabrication. By this time, the SMUD project had experienced a two-year work stoppage.

Meanwhile, DOE continued to support the development of dual-purpose dry storage systems. In 1998, DOE explained that it continued to support the concept of MPCs and that it was in the nation's "best interest to encourage the utilization of canisters for at-reactor storage that can be subsequently be utilized by the federal waste management system for transportation, storage, and disposal." *See* Letter from L. Barrett at 2 (Sept. 11, 1998), accompanying Draft RFP for Acquisition of Waste Acceptance and Transportation Services for the OCRWM (Pl. Ex. 597). DOE also stated that the transportation and waste contractor, which DOE was soliciting in the RFP, would have the "responsibility to accept purchaser supplied dual-purpose canisters." *Id.* at 3. DOE also recognized that the "disposability" concept for dry storage canisters would "remain uncertain until the NRC issues a license for the monitored geologic

repository." Letter from D. Zabransky to E. Lanning (Aug. 18, 1998) (Pl. Ex. 591); *see also* Letter from D. Zabransky to S. Redeker (Apr. 6, 2001) (Pl. Ex. 678).

In December 2000, DOE issued a "consultation draft" on a congressionally requested plan for transportation cask fabrication and DOE development of waste acceptance capabilities. One of the "key elements" of the plan was a DOE proposal to "accept utility-acquired storage/transportation systems, and if they are suitable for use at the Federal facility the Department would be willing to consider compensation for avoided costs associated with the use of utility supplied equipment." Consultation Draft – Plan for Transportation Cask Fabrication and the Deployment of Waste Acceptance Capabilities (Dec. 2000) (Pl. Ex. 665). Similarly, in January 2001, then Secretary of Energy, Ivan Itkin, stated that "[m]any of the dual-purpose cask systems currently being licensed or manufactured and deployed would potentially be used for transportation of the spent fuel to a Federal repository under the Department's transportation plan as contained in the RFP." Letter from I. Itkin to D. Obey (Jan. 19, 2001) (Pl. App. 669).

As a result of the government's delay, other utilities similarly pursued dual-purpose dry storage. The following chart presents the utilities that have gone or are planning to go to dual-purpose dry storage systems:

Table 2 Summary of U.S. Dual Purpose Dry Storage Facilities

| **Reactor Owner/Operator** | **Plant Name** | **Dry Storage Technology** | **Date of First Loading** |
|---|---|---|---|
| Exelon | Dresden 1, 2, 3 | HI-STAR/HI-STORM 68 | 2000 |
| Exelon | Peach Bottom 2, 3 | TN-68 | 2000 |
| Southern Nuclear | Hatch 1, 2 | HI-STAR/HI-STORM 68 | 2000 |
| SMUD | Rancho Seco | NUHOMS-24P | 2001 |
| Maine Yankee | Maine Yankee | NAC UMS | 2001 |
| PGE | Trojan | HI-STORM 24P | 2002 |

| Reactor Owner/Operator | Plant Name | Dry Storage Technology | Date of First Loading |
|---|---|---|---|
| Amergen | Oyster Creek | NUHOMS-61BT | 2002 |
| Yankee Atomic | Yankee Rowe | NAC MPC | 2002 |
| Energy Northwest | Columbia | HI-STORM 68 | 2002 |
| Consumers Energy | Big Rock Point | BFS FuelSolutions | 2002 |
| Entergy | FitzPatrick | HI-STORM 68 | 2002 |
| Arizona Public Service | Palo Verde 1, 2, 3 | NAC UMS | 2003 |
| Southern Cal. Edison | San Onofre 1, 2, 3 | NUHOMS-24PT | 2003 |
| NMC | Duane Arnold | NUHOMS-61BT | 2003 |
| Connecticut Yankee | Haddam Neck | NAC MPC | 2004 |
| TVA | Sequoyah 1 & 2 | HI-STORM 32 | 2004 |
| Entergy | ANO 1, 2 | HI-STAR 100 24P<br>HI-STAR 100 32P | 2004<br>2004 |
| NMC | Palisades | NUHOMS-32PT | 2004 |
| PPL | Susquehanna 1 & 2 | NUHOMS-61BT | 2004 |
| Duke Energy | McGuire | NAC UMS | 2005* |
| Progress Energy | H.B. Robinson | NUHOMS-24P | 2005* |
| NMC | Point Beach 1 & 2 | NUHOMS-32PT | 2005* |
| Constellation Nuclear | Calvert Cliffs 1 & 2 | NUHOMS-24PTH | 2006* |
| Dominion Generation | Surry 1 & 2 | NUHOMS 32PTH | 2006* |
| Dominion Generation | North Anna 1 & 2 | NUHOMS-32PTH | 2007* |
| Duke Energy | Oconee 1,2,3 | NUHOMS-24PTH | 2007* |
| *Expected | | | |

In 1999 and 2000, SMUD experienced additional difficulties with its dry storage vendor and subcontractors. Due to the project delays experienced in prior years, SMUD and TransNuclear West were forced to transfer the canister fabrication work to a new subcontractor. *See, e.g.*, Pl. Exs. 624, 631. During this period, SMUD also prepared to transfer SNF from its fuel pool to the ISFSI by updating security, developing procedures, fabricating necessary equipment, and training staff. Rancho Seco received the transportation cask in July 2000 and the

first canister in September 2000. Also in September 2000, following seven years of review and comment, the NRC issued a storage license for the project. This meant the project was fully licensed by the NRC.

### G. SMUD Completes The Fuel Transfer / DOE Experiences Further Setbacks To Its SNF Program – 2001 Through 2004.

In early 2001, SMUD worked to resolve fabrication and other issues with the first canister. Because of these continuing issues, SMUD again reevaluated alternatives to the dry storage project. *See* Letter from J. Schori to the Board of Directors (June 13, 2001) (Pl. Ex. 689). Given that the alternatives, including remaining in wet storage, presented risks "significantly greater" than the current system, *id.* at 2, SMUD chose to finish the project with TransNuclear West.

SMUD loaded the first canister with SNF in April 2001. Following the resolution of remaining fabrication issues, SMUD received and loaded the other twenty canisters completing this work in August 2002. From August 2002 through the end of 2003, SMUD incurred additional costs associated with the operation of maintenance of the ISFSI. SMUD's total costs for the dry storage project from 1992 through 2003 were $78,558,212.

Around the same time, the General Accounting Office concluded that "DOE is unlikely to achieve its goal of opening a repository . . . by 2010 and currently does not have a reliable estimate of when, and at what cost, such a repository can be opened." GAO Report No. GAO-02-191, Nuclear Waste: Technical, Schedule, and Cost Uncertainties of the Yucca Mountain Repository Project at 4 (Dec. 2001) (Pl. Ex. 713).

In July 2004, DOE sent a letter to SMUD announcing a "resumption" of the DCS process that DOE had suspended in 1996, and directing SMUD to "inform DOE of their plans for

utilizing their allocations of projected . . . acceptance capacity." Letter from D. Zabransky to J. Hastings with 2004 DCS Instructions, ¶ 1 (July 28, 2004) (Pl. Ex. 780). The 2004 DCS Instructions noted that the prior DCSs were based upon the January 31, 1998 operations date, and that purchasers should submit new DCSs based upon the 2010 date. *Id.* at ¶ 7(a).[22] DOE, however, quickly suspended the DCS process again, explaining in December 2004 that "recent developments . . . have led the Department to conclude that the resumption of the DCS process was premature." Letter from D. Zabransky to J. Hastings (Dec. 1, 2004) (Pl. Ex. 812). Recently, the Director of the Program, Dr. Margaret Chu, announced a further delay from 2010 to 2012. *See* Doug Abrahms, *Yucca Mountain Opening Pushed Back 2 Years*, 2005 WL 62548304, Gannett News Serv. (Feb. 8, 2005). Thus, DOE's delay continues indefinitely.

## III. ARGUMENT

### A. The Government Has Breached Its Obligations Under The Contract And SMUD Should Be Awarded Its Resulting Damages.

The fundamental rule in common law breach of contract cases "is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2002) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997)); *see also Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997); *Estate of Berg v. United States*, 687 F.2d 377, 379 (Cl. Ct. 1982); Restatement (Second) of Contracts § 347 cmt. a (1981). Thus, "[o]ne way the law makes the non-breaching party whole is to give him the benefits he expected to

[22] With the 2004 DCS Instructions, DOE also published an APR/ACR that projected that DOE would again use a 3000-ton annual acceptance rate.

receive had the breach not occurred." *Bluebonnet Savings Bank F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).

As a direct result of the government's breach of the Contract, SMUD has incurred significant damages. In the late 1980s, the DOE began announcing that it would fail to meet its January 31, 1998 disposal deadline. Faced with this delay, SMUD, like other utilities with shutdown nuclear facilities, developed and implemented an interim dry storage facility for its SNF. The evidence establishes that if DOE had properly performed under its Contract with SMUD, it would have removed all SNF from SMUD's Rancho Seco facility by 2006 at the latest and likely several years earlier. In such event, SMUD would not have decided to develop dry storage in the early 1990s, nor would it have continued with the dry storage project during the remainder of that decade.

SMUD's dry storage project costs are recoverable as expectation damages because they were: reasonably foreseeable by the government; caused by the government's breach; and determinable with reasonable certainty. Such damages properly include, as here, the reasonable cost of arranging alternative performance and mitigation, particularly as SMUD's dry storage system has reduced the amount of its overall damages, has been supported by DOE, and is consistent with the actions of other utilities.

SMUD ultimately incurred total costs of $78,558,212 for this project between 1992 and 2003. The government is entitled to offsets to SMUD's damages in the amount of $1,954,810 for costs that SMUD likely would have incurred had the government timely performed. However, the government's arguments that its performance obligations were limited by the 1995 ACR or the DCSs fail because those documents were manipulated to limit the government's

potential liability and they thereby violate the government's obligations of good faith and fair dealing.

### B. Had The Government Properly Performed, It Would Have Picked Up All SNF From SMUD By 2006 At The Latest.

Had the government met its contractual obligations to SMUD, it would have removed all SNF from SMUD's Rancho Seco facility by 2006 at the latest and likely several years earlier. The 2006 date is based upon a total government SNF receipt rate of 3,000 tons that is reached after a five-year "ramp-up" period.[23] A 3,000-ton rate is the rate used to calculate utility fees and system costs, adopted in nearly all DOE program documents, and affirmed by the testimony of numerous DOE witnesses. Because Rancho Seco was a shutdown facility, however, the government likely would have removed its SNF even earlier through the approval of exchanges, the granting of shutdown priority under the contract, or as a result of shipping campaigns.

#### 1. The Government Would Have Performed at a 3,000-Ton Receipt Rate.

The contract between SMUD and the government does not specify a receipt rate for SNF. Where, as here, a contractual term is omitted, the Court must apply a reasonable term based upon the intent of the parties. *See, e.g., David Nassif Assocs. v. United States*, 644 F.2d 4, 7-9 (Ct. Cl. 1981); *David Nassif Assocs. v. United States*, 557 F.2d 249, 259-60, 263 (Ct. Cl. 1977); *Unihealth v. U. S. Healthcare, Inc.*, 14 F. Supp. 2d 623, 627 (D.N.J. 1998); *see also* Restatement (Second) of Contracts § 33 cmt. d & § 204 (1981) ("[W]hen the parties to a [contract] have not

[23] SMUD has used a very conservative ramp-up rate of 400 tons in 1998; 600 tons in 1999; 1200 tons in 2000; 2000 tons in 2001; and 3000 tons in 2002 and thereafter. DOE documents and testimony cited below incorporate similar or faster ramp-up periods.

agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").

In this case, the parties intended that the government's total SNF receipt rate from all utilities would be sufficient to avoid the need for utilities to build additional reactor storage after 1998 and would be able to timely decommission their reactor sites. DOE repeatedly recognized that a 3,000-ton rate was necessary to achieve these goals, and almost all program documents have reflected this rate. Moreover, SMUD's Contract allows it to request the delivery of any quantity of SNF. The government prioritizes the acceptance of SNF from different utilities only in the event that the utilities collectively request the disposal of more SNF than the government can annually accommodate. Thus, even setting the parties' intent aside, the contract ultimately requires the government to receive SNF at a rate equal to the annual capacity of its facility, and the government has consistently planned that such capacity will be 3,000 tons.

#### a. A 3,000-Ton Receipt Rate Is Necessary to Satisfy the Intent of the Parties.[24]

Documentary evidence and deposition testimony establish that the intent of the parties was to prevent utilities from having to build at-reactor storage for SNF after 1998 and to reduce the backlog of SNF at reactors so that timely decommissioning could occur. This includes contemporaneous statements and deposition testimony by several former directors of the SNF program, as well as DOE program documents issued at or about the time SMUD's Contract was executed on June 14, 1983:

- Robert Morgan, the first director of the SNF program, testified that the intent of the program and the NWPA was to avoid having the utilities provide on-site storage and made similar public statements in December 1983. R. Morgan Dep. at 43-46 (Mar.

[24] This argument is set forth in greater detail in the SMUD Rate Brief.

21-22, 2004); Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting at 11 (Dec. 12-15, 1983);

- Michael Lawrence, the second acting director of the SNF program, testified that the intent of the program was to prevent the utilities from having to add SNF storage after 1998 and to reduce the backlog of accumulated SNF. M. Lawrence Dep. at 251, 302-05 (May 21, 2002);

- Lake Barrett, the SNF program's acting or deputy director from 1993 until 2002, testified that the intent of NWPA was to reduce the backlog of SNF located at utilities as soon as practicable. L. Barrett Dep. at 1163-66 (May 10, 2002); L. Barrett Dep. at 52-59, 117-22 (Apr. 22, 2002); L. Barrett Dep. at 1062-65 (May 8, 2002); and

- Tom Pollog, the DOE's Rule 30(b)(6) witness on the acceptance rate under the standard contract, testified that DOE's goal in the mid-1980s was to alleviate the need for additional storage. T. Pollog Dep. at 96 (Apr. 11, 2002);

*See also* SMUD Rate Brief at 8-12 (citing additional DOE testimony and SNF program documents). SMUD shared this intent.

Additional deposition testimony further demonstrates that DOE has consistently recognized that a receipt rate of 3,000 tons is necessary to achieve the goals of the NWPA and the intent of the parties. For example,

- Lake Barrett testified that the 3,000-ton rate has been the DOE's way of achieving the requirement of reducing the existing SNF backlog since he joined the program in 1985, and that each of the system studies prepared by the DOE from the mid-1980s to the mid-1990s supported the 3000-ton rate. L. Barrett Dep. at 52-59, 117-22, 198 (Apr. 22, 2002);

- Tom Pollog testified that the 3,000-ton rate was the rate that the DOE determined in the mid-1980s would achieve the DOE's objective of alleviating the need for utilities to construct additional on-site storage. T. Pollog Dep. at 96-97 (Apr. 11, 2002); and

- Billy Cole, the principal contractor liaison for the SNF program from 1982 until 1989, agreeing in his testimony that the DOE began using the 3,000-ton rate from the outset of the SNF program and that the 3,000-ton rate was "required to work off what utilities were discharging as well as attacking a backlog." B. Cole Dep. at 171-76 (Mar. 12, 2002).

As Mr. Barrett testified, the DOE had a "clearly documented rationale" for the 3,000-ton rate:

> There was one in the old mission plans. It basically was that the rate of 3000 tons per year exceeded a generation rate of a nominal 2000 tons per year and allowed a

> category of a thousand tons per year delta. And for where the program was at that time that was sufficient . . . .

L. Barrett Dep. at 1163-64 (May 10, 2002).

Consideration of this evidence to determine the parties' intent is appropriate. Where, as here, the contract does not provide an unambiguous answer to the question raised, a court may "resort to extrinsic evidence to inform its interpretation of that provision, regardless of whether the content was fully integrated." *McAbee Constr. Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996); *see also Augustine Medical, Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1374 (Fed. Cir. 1999) (noting extrinsic evidence need not be considered regarding the meaning of the agreement where contract is *unambiguous*); *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1375 (Fed. Cir. 1999) (noting a court will consider extrinsic evidence "to discern intent . . . when a contract term is ambiguous."). As the Restatement explains, "[t]he fact that an essential term is omitted may indicate that the agreement is not integrated or that there is partial rather than complete integration." Restatement (Second) of Contracts § 204 cmt. e (1981)

The expert testimony of Eileen Supko, of Energy Resources International, Inc., further confirms that a rate of 3,000 tons meets the parties' intent. Ms. Supko, who has 15 years' experience counseling utilities regarding SNF issues, has determined that a 3,000-ton rate would have: exceeded the annual industry-wide discharge rate of 2,000 tons and thereby limited the amount of additional utility storage needed thereafter; worked off the 37,000-ton backlog of SNF stored at nuclear power plants in 1998 and thereby allowed timely decommissioning; and utilized the system's capacity efficiently. *See* E. Supko Expert Report at 5, 17 (July 12, 2004) (Pl. Ex. 776). Lake Barrett, the acting or deputy director of the Program for almost ten years similarly testified that the 3,000-ton rate "was looked at then as a proper balance for total life-

cycle costs as well as near term cash flow requirements." L. Barrett Dep. at 1333 (May 10, 2002).

**b. The Receipt Rate Would Equal the Annual Capacity of DOE's Disposal Facilities, Which Is 3,000 Tons.**

Even if the intentions of the parties are set aside, the receipt rate under the Contract would still be 3,000 tons. The Contract does not limit the amount of SNF that SMUD may seek to deliver to the DOE in any particular year. *See* Contract Art. V.B.1. The Contract does provide, however, that if utilities collectively request that DOE accept more SNF than the annual capacity of the DOE disposal facilities, then DOE will prioritize such acceptance in a specified manner, subject to certain exceptions. *See id.* Art. VI.B.1. Thus, under the Contract, DOE is ultimately responsible for receiving SNF at an annual rate that is equal to the annual capacity of its disposal facilities. *Id.*

Substantial documentary evidence and deposition testimony establish that the annual capacity of DOE's disposal facilities will be 3,000 tons. Indeed, the vast majority of DOE's program documents use a 3,000-ton rate, and DOE documents and witnesses have recently stated that it will use that rate when it begins accepting SNF. For example,

- DOE used a 3,000-ton rate, or a comparable rate, in all of its initial program documents for the first seven years of the SNF program, including its statutorily-required Mission Plan documents. *See, e.g.,* Pl. Exs. 56, 68, 91, 98, 118;

- DOE used a 3,000-ton rate in its System Requirements Documents which control its SNF planning. *See, e.g.,* Pl. Ex. 717; S. Klein Dep. at 288-90 (Apr. 25, 2002);

- DOE used a 3,000-ton rate for the purpose of calculating the fees paid by the utilities for the SNF program as well as the costs of that program. *See, e.g.,* L. Barrett Dep. at 348-50 (Apr. 23, 2002); S. Klein Dep. at 351-53 (Apr. 25, 2002); R. Morgan Dep. at 93-97, 208-11 (Mar. 21-22, 2002); Pl. Exs. 71, 78, 86, 89, 97, 98, 429, 681;

- DOE has continued to use a 3,000-ton rate in numerous other recent program documents, including its July 2004 APR and ACR. *See e.g.*, Pl. Exs. 603, 681, 772; and
- Susan Klein, DOE's official Rule 30(b)(6) witness on the issue of "what rate the DOE is planning to use once [SNF] acceptance begins," testified that DOE plans to use a 3,000 rate for this purpose. S. Klein Dep. at 240-41 (Apr. 24, 2002).

*See also* SMUD Rate Brief at 19-23 (citing additional DOE testimony and SNF project documents).

This documentary evidence and deposition testimony establishes that the annual capacity of the DOE disposal facilities will be 3,000 tons.[25] Indeed, because a 3,000-ton rate was used to calculate utility fees under the contract, SMUD has effectively paid for a SNF receipt system that will operate at that rate. That was the bargain established by its contract. *See Indiana Michigan*, 88 F.3d at 1276; *Alabama Power Co.*, 307 F.3d at 1302.

### 2. At an Annual Receipt Rate of 3,000 Tons, DOE Would Have Picked Up All of SMUD's SNF by 2006 At the Latest and Likely Several Years Sooner.

Under SMUD's Contract with the government, SMUD is required to provide DOE with prior notice of the SNF that it wishes to deliver. *See* Contract Art. V.B.1. If DOE is asked to receive more SNF than the annual capacity its disposal facility can accommodate, then SNF acceptance is prioritized based on the age of the SNF, with the oldest fuel given the highest priority. *Id*. at Art. VI.B.1. This prioritization, however, is subject to various exceptions,

[25] The government has previously argued that it would have begun performing in 1998 at a much lower rate using a smaller MRS facility. However, DOE officials have testified that DOE had effectively abandoned its work on such a facility by 1994, *see* L. Barrett Dep. at 778-79 (Apr. 26, 2002), and DOE documents establish that under existing federal law such a facility could not have opened until 2007 at the earliest. *See supra*, pp. 10, 18; *see also* 42 U.S.C. § 10168(d)(1) (prohibiting DOE from beginning work on MRS until it received NRC construction authorization license for permanent repository). It is hornbook law that "where a contract does not specifically provide for an illegal mode of performance, it will be assumed that the parties contracted for a lawful performance." 8 Williston on Contracts § 19:40 (4th ed.) (internal quotations and citations omitted).

including that DOE may grant priority to SNF for shutdown facilities, that utilities may trade or "exchange" their priorities, and that utilities may increase their allocation by up to twenty percent. *Id*.; *see also id*. at Arts. V.B. & V.D.

Assuming that DOE was asked to receive more SNF than the annual capacity its disposal facility could accommodate, that is, more than 3,000 tons, then Ms. Supko has determined that, using the Contract's oldest fuel first prioritization, DOE would receive SNF from Rancho Seco as follows: 35.18 tons in 2001; 49.05 tons in 2002; 31.97 tons in 2003; 30.14 tons in 2004; and the remaining 82.03 tons in 2006. *See* E. Supko Expert Report (July 12, 2004) (Pl. Ex. 776). Thus, without any adjustments in the oldest fuel first prioritization, DOE would have taken all of SMUD's SNF by 2006 at the latest.

In addition, Ms. Supko has concluded that had DOE timely performed, SMUD likely could have delivered its SNF to DOE even earlier by using the contract's exchange and shutdown priority provisions. With timely DOE performance, these provisions would have had actual utility because there would be greater confidence in the SNF program, storage needs would be reduced, shutdown reactors would account for relatively little SNF, and early acceptance from them would not necessarily have harmed other reactors.[26] Her conclusion is supported by the testimony of DOE officials that DOE would have been liberal in approving exchanges and that DOE sought to facilitate the timely decommissioning of shutdown reactors. *See, e.g.,* S. Klein Dep. at 524-25 (Apr. 25, 2002) (explaining that DOE "could have given"

[26] In a functioning program, SNF acceptance would not have been a "zero sum" game where taking one assembly from Utility A meant taking one less assembly from Utility B. Rather, as DOE officials have testified, there would have been significant flexibility in the system. *See* Yankee Trial, pp. 4164-65 (Aug. 5, 2004) (D. Zabransky) (testifying that, as a result of the plus twenty percent provision of the Contract, DOE would have and could have developed capability to handle acceptance of 3,600 tons in a year).

acceptance priority to shutdown reactors if the system were operating at 3,000 tons); R. Morgan Dep. at 124 (Mar. 21, 2003) (explaining that DOE would approve exchanges "if at all possible"); 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983) (refusing to delete shutdown priority provision because "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity").

Exchanges or shutdown priority would also allow DOE to remove SMUD's fuel in fewer trainload trips to California (*i.e.*, in campaigns), thereby reducing DOE's transportation costs and increasing its efficiency, particularly as compared to the oldest fuel first prioritization that would have required DOE to return to SMUD in five of six consecutive years to receive relatively small amounts of SNF. Ivan Stuart, who has 35 years' experience in the nuclear industry, has conducted numerous "campaigns" to deliver DOE fuel, and has testified on this issue in the Yankee SNF cases, concluded that, had DOE been performing, transportation campaigns would have occurred and would have benefited DOE. *See* I. Stuart Expert Report (Dec. 23, 2004) (Pl. Ex. 815). Mr. Stuart further determined that the 3,000-ton rate would not have been a fixed or "hard" cap and there would, by necessity, be flexibility in the system. The European experience with SNF acceptance confirms this view, showing typical acceptance rates between 2,500 and 4,500 tons per year. *Id.* DOE witnesses have similarly testified that DOE is unlikely to adhere strictly to the oldest fuel first prioritization because of the attendant costs and inefficiencies. *See, e.g.*, K. Klein Dep. at 56-62 (May 22, 2002); R. Burgoyne Dep. at 132-135 (July 8, 2004).[27]

[27] Both Ms. Supko and Mr. Stuart have determined that the presence of damaged or failed fuel at Rancho Seco, which is present at every utility, would not have impacted the schedule of acceptance of SMUD's fuel. The Contract does not provide for delayed acceptance of failed fuel, only that the utilities would give notice to DOE and obtain delivery and procedure confirmation from DOE prior to delivery. *See* Contract Art. VI.A.2.b. DOE witnesses similarly have stated that, had DOE been performing, DOE would have picked up damaged and failed fuel on the same schedule as other fuel. *See* Letter from R. Bauer to J. Hall (Sept. 13, 1985); *see also* Yankee Trial, pp. 4183-84 (D. Zabransky).

**C. Expectation Damages Are Appropriate In This Case Because SMUD's Costs Were Reasonably Foreseeable, Were Caused By The Government's Breach, And Are Reasonably Certain.**

Expectation damages are appropriately awarded if they "are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet*, 266 F.3d at 1355 (citing Restatement (Second) of Contracts §§ 347, 351, 352 (1981)); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002); *Home Sav. Of Am., F.S.B. v. United States*, 57 Fed. Cl. 694, 726 (2003); *Coast Fed. Bank, F.S.B. v. United States*, 48 Fed. Cl. 402, 408 (2000). Each of these three elements is fully established by the evidence in this case, and therefore SMUD should be awarded the damages it seeks in order to be made whole.

**1. The Need for Additional Storage Was A Reasonably Foreseeable Consequence of a Breach of the Contract.**

In order to recover expectation damages, the resulting damages must either have been "actually foreseen or reasonably foreseeable." *Bluebonnet*, 266 F.3d at 1355. The damages must have been "foreseeable at the time the parties entered the contract, which requires that they 'be the natural and proximate result of the breach.'" *Hughes Communications*, 271 F.3d at 1066 (quoting *Locke v. United States*, 283 F.2d 521, 526 (Ct. Cl. 1960)). In addition, at the time of contracting, it must be reasonably foreseeable that a "breach would cause plaintiffs to incur damages of the nature and magnitude they now claim." *Home Sav.*, 57 Fed. Cl. at 727. In this case, the damages incurred as a result of the government's breach fit either test – they were both foreseen and foreseeable.

When Congress promulgated the NWPA and DOE subsequently entered into the Contract with SMUD, the need for additional or extended storage in light of a DOE breach was foreseen. The NWPA was promulgated to address the "national problem" of "accumulation of . . . spent

nuclear fuel from nuclear reactors" at utility sites across the country. 42 U.S.C. § 10131(a)(2). Congress promulgated the NWPA and required individual contracts as a means of addressing this problem by tying the DOE to a schedule of disposal beginning in January 1998. *See id.* § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories" to receive SNF). The purpose of such a schedule was to ensure that individual utilities would not be burdened with the responsibility and costs of providing additional on-site storage past this date.

At the time of contract execution, it was recognized that the NWPA and the Contract required DOE to accept SNF at a rate and schedule that was sufficient to avoid the need for additional at-reactor storage after January 31, 1998. Shortly after the Contract was signed, DOE assured utilities it would take responsibility for "additional storage" if the repository was delayed, even if that meant providing for storage "at reactor sites." 1984 Draft Mission Plan, Vol. II at 9-6 (Pl. Ex. 69); *see also* Memorandum from Williamson re: Mission Plan Strategy (Sept. 15, 1983) (Pl. Ex. 50) (stating one possibility in the event of non-performance would be for DOE to "take title to the spent fuel, have it placed in dry storage casks and pay a rental fee to the utility to store the casks onsite at the reactor"); K. Klein Dep. at 110-11 (May 22, 2002) (recalls DOE considering providing transportable dry storage casks to utility if performance delayed).

DOE also recognized that a purpose behind the NWPA and the Contract was to reduce the backlog of SNF accumulated prior to that date so that utilities could decommission their reactors in a timely manner. Thus, the potential costs of delayed decommissioning as a result of disposal delay were also foreseen. In the DOE's explanation of various provisions of the contract, and in particular, the inclusion of the priority for shutdown reactors, DOE explained

that the purpose for the priority for shutdown reactors was to prevent utilities from waiting twenty to thirty years to decommission their plants as a result of the continued onsite storage of spent fuel. *See* 48 Fed. Reg. at 16,590, 16,593 (Pl. Ex. 30). Thus, it was the very problem of individual storage at sites across the country and related costs that Congress foresaw and required DOE to enter contracts to prevent.

The damages SMUD has incurred as a result of the government's breach of its obligations were also reasonably foreseeable. It was foreseeable at the time of Contract execution that, in the event DOE delayed disposal of spent nuclear fuel by 12 years or more, SMUD would incur costs due to the continued need for on-site storage of SNF. Where an avowed purpose of the Contract at issue is to help utilities *avoid building* additional on-site SNF storage facilities, it was reasonably foreseeable that DOE's breach of that Contract would lead a utility to incur costs to *build* additional on-site storage, as occurred here. Such damages are the natural and proximate result of the government's breach. *See Hughes Communications*, 271 F.3d at 1066. Judge Lettow recognized this fact in *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 674 n.10 (2004):

> Notably, "the intent of the NWPA and the parties [to the Standard Contract] was to avoid the construction by utilities of additional at-reactor storage [after January 31, 1998.]" *Commonwealth Edison* [*Co. v. United States*, 56 Fed. Cl. 652, 667 (2003)]. DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, *i.e.*, the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants throughout the United States.

*See also Yankee Atomic Elec. Co*, 2004 WL 1535688. at *7 (concurring with analysis in *Tennessee Valley Authority*).

In addition, it was reasonably foreseeable that SMUD would incur damages of the nature and magnitude they now claim. Just as in *Bluebonnet*, where it was "foreseeable that the

heightened regulatory requirements and Bluebonnet's risk of seizure due to failure to meet those requirements" would increase costs, 266 F.3d at 1356, so too was it foreseeable that stringent NRC licensing requirements and the need for quality assurance would result in increased costs for utilities pursuing dry storage. Licensing and high standards of precision and quality assurance are an inherent aspect of any nuclear project, as are the costs that result. Recently in *Boston Edison Company v. United States*, Opinion and Order dated Feb. 15, 2005, at 20, Judge Lettow of this Court concluded that it "is a fair inference that failure to implement the Standard Contract might engender a diminution in the value obtained" from the sale of a utility's property, and that such diminution "resulting from DOE's breach of its obligations under the Standard Contract was thus a foreseeable damage."

It was reasonably foreseeable at the time of contract execution that such a breach by DOE would result in the costs SMUD incurred in the development of on-site dry storage. Given that such damages were foreseeable, they should be awarded to SMUD in this case.

**2. As A Direct Result of DOE's Impending Breach, SMUD Developed and Implemented Its Dry Storage System.**

SMUD's damages in this case were directly caused by the government's breach of its Contract. In order to show causation, "[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered." *San Carlos Irrigation*, 111 F.3d at 1557, 1562-63; *see also Hughes Communications*, 271 F.3d at 1066. The Federal Court has recently explained that a "causal connection between the breach and the loss of profits must be 'definitely established.'" *Cal. Fed. Bank v. United States*, Nos. 03-5070, 03-5082, 2005 WL 95171, at *3 (Fed. Cir. Jan. 19, 2005). However the breach need not "be the sole factor or sole cause [of the

damages]. The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.*

In this case, the government's breach of the Contract caused SMUD to decide in the early 1990s to develop its dry storage system and to continue with that project after it experienced various problems and obstacles, including the suspension of work by its primary vendor, Vectra, in the mid-1990s.

**a. The Government's Breach of Contract Caused SMUD to Decide in the Early 1990s to Develop Dry Storage.**

As early as 1987, the government announced in its Mission Plan Amendment that its SNF repository would be delayed from 1998 to 2003. (Pl. Ex. 118). That announcement was followed in November 1989 by DOE's Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program, which projected a further delay from 2003 to 2010. (Pl. Ex. 169).

This delay was specifically recognized by SMUD in the early 1990s. *See* R. Bowser Dep. at 240-41 (Sept. 16, 2004). The October 3, 1991 SMUD Board of Directors meeting on SNF storage options and decommissioning similarly discussed this delay and DOE's continuing difficulties and raised the possibility that DOE might never pick up SMUD's SNF. The March 1993 environmental report that SMUD prepared on decommissioning similarly noted that "no [permanent federal] repository is expected to be in place until approximately 2010," that interim storage by DOE is "not currently an option," and that "[i]n the absence of such facilities" SMUD had commissioned the Levy study and ultimately decided that dry storage "was the most prudent alternative available." (Pl. Ex. 297 at 7).

Staff recommendations to the SMUD Board of Directors in July 1992 and September 1992 seeking authorization to negotiate and execute the contract with Pacific Nuclear for the design and development of the dry casks and canisters corroborate the causal connection between DOE's delay and SMUD's dry storage system. (Pl. Exs. 261, 269). Both recommendations use the anticipated period of DOE's delay from 1998 to 2010 to estimate SMUD's savings from dry storage, and both recommendations project that these savings would total $33 million for that period. *Id.*

The causal connection between DOE's delay and SMUD's development of dry storage is further confirmed by the testimony of various SMUD officials who were involved in SMUD's original decision. For example, David Freeman, SMUD's then-General Manager, has testified that:

> We entered into a contract with a cask manufacturer, if I can describe them that way. It was for a fair sum of money to start designing and building the casks. I mean, that was the specific step that I recall we took to implement the decision to go in that direction. All driven by the fact that the federal government had taken our money, hadn't come to take our [SNF], and was telling us that they weren't going to come at least until 2010, which put us in a horrible financial situation of having to spend a bunch of money which really was owed to us by the government. But the government kept turning down our requests to pay for all this extra work so we just did what a prudent utility would do. We took steps as fast as we could to mitigate the damages that were being inflicted upon us.
>
> * * *
>
> We were moving toward mitigating the damages and improving the safety of dealing with the spent fuel caused entirely by the knowledge that you weren't going to relieve us of this burden, as you had promised us you would do and we had paid you to do.

D. Freeman Dep. at 42-43, 71 (July 16, 2004)

Jim Shetler, SMUD's then-Assistant General Manager, has similarly testified that:

> A. From my perspective, say, in the 1990, '91,'92 time frame, if I'd had decent assurance that DOE was going to come and pick up the fuel in the

'98 time frame and not have to take on the uncertainty of manufacturing something that basically was a new product line, then that would have been better off to leave it in wet storage and let DOE come, package it one time, and take it.

Q. Now, when you say you would have been better off, is that better off from a cost perspective?

A. Better off from an overall perspective of what's the least risk.

Q. Okay. So from a risk perspective Rancho Seco would have been better off in the early '90s keeping it wet if they had assurances from DOE that there wouldn't be acceptance by '98?

A. That we wouldn't have taken on the uncertainty of expending funds on a new product, the uncertainty of that, the uncertainty of will DOE take it or not. All those questions would not have to have been answered. They would have been answered because DOE was going to take the fuel in 1998, and we would not have to have gone through that sort of scenario. Shelter Dep. at 78.

J. Shetler Dep. at 78 (Sept. 8, 2004).

In addition, SMUD's spent fuel disposition manager from 1990 to 1992, Rita Bowser, explained as follows:

Q. OK. You testified that the anticipated failure to begin acceptance by DOE in 1998 was a substantial factor in your decommissioning activities.

You testified earlier that there was uncertainty as to whether DOE was going to perform on time. When did that uncertainty translate into an anticipated failure?

A. Maybe I undercharacterized it as uncertainty. I would use the general phrase, I didn't believe, and those that I passed opinion or information on to did not believe that DOE would meet its commitment to begin picking up fuel and have a repository in 1998. . . .

R. Bowser Dep. at 240 (Sept. 16, 2004).

Thus, the DOE's announced delay in performing under the Contract was a direct and substantial cause of SMUD's decision to develop dry storage.

### b. The Government's Breach of Contract Also Caused SMUD to Decide in the Mid-to-Late-1990s to Continue With Its Dry Storage Project.

Following SMUD's execution of its contract with Pacific Nuclear in 1992, DOE's SNF program suffered further setbacks. In 1993, DOE cancelled its Cask System Development Program, which would have provided the necessary transportation infrastructure to collect and transport SNF from utilities. In 1994, DOE ceased work on the MRS after years of achieving little or no progress on such a facility. L. Barrett Dep. at 774-79 (Apr. 26, 2002); R. Milner Dep. at 114-17 (May 1, 2002). In 1996, DOE terminated work on the MPC program, which could have provided dry storage canisters to utilities suitable for storage, transport, and possibly disposal of SNF. *See* DOE's Fiscal Year 1995 Annual Report to Congress at 22 (May 1996) (Pl. Ex. 461). These actions eliminated any possibility of timely performance by the DOE.

During the same period, DOE provided additional notice that it would not began accepting SNF until at least 2010. Final Interpretation, 60 Fed. Reg. at 21,793-5. DOE recognized that because of its delays utilities would have to plan for long-term storage of SNF and that "equitable considerations" may argue for some form of relief to help offset those costs. *Id*. at 21,797.

The government's delay in performing under the contract is noted in various documents relating to the dry storage project. For example, the August 1994 NRC Environmental Assessment on the dry storage facility states that SMUD's "preferred solution" to SNF storage is to ship the SNF to the federal repository, but that no such facility will be available until 2010, and that in "[t]he absence" of a repository, SMUD's primary alternative was dry storage. *See* Pl. Ex. 500. In March 1997, SMUD wrote DOE that if the DOE did not timely perform under the Contract, SMUD would seek reimbursement from DOE for the on-site dry storage costs. *See* Pl.

Ex. 527. Following Vectra's suspension of work in November 1996 at the NRC's behest, SMUD conducted a thorough re-evaluation of the dry storage project in late 1996 and early 1997. *See* Pl. Exs. 502, 503, 519. This reevaluation looked at nine storage options, including terminating the dry storage project and keeping the SNF in wet storage. *Id.* It was based upon the assumption that DOE would not begin receiving SNF from Rancho Seco until 2013 that led to SMUD deciding to continue with the dry storage project. *Id.*

The causal connection between DOE's breach of contract and SMUD's continuation of the dry storage project is also corroborated by the testimony of SMUD officials who were involved with that project during the mid-to-late 1990s. For example, Steve Redeker, SMUD's Plant Manager for Rancho Seco, has testified that:

> Q. Now, back in January 1997 if SMUD had found out that DOE was going to begin acceptance in January 1998 pursuant to the standard contract and would have begun accepting spent nuclear fuel from Rancho Seco a few years later in 2001 and it finished within five or six years as you mentioned, would you have recommended that SMUD keep its spent nuclear fuel in its wet pool or go to dry storage?
>
> A. That's an entirely hypothetical question, but yes, I would have recommended leaving it in the pool. Our dry fuel storage program was in severe jeopardy and disarray. And if I had confidence that DOE was going to perform and things were out there happening and cones were being built and casks were being built and we could see things that this was going to happen, I would leave it in the pool because it would be gone before the end of the -- by the time it needed to be gone.

S. Redeker Dep. at 179-80.

Similarly, Jim Shetler has testified that:

> Q. So what made 1997 or 1998 the final decision date?
>
> A. I think it was just looking at where were we with the contract, where were we with the vendor, do we feel comfortable that they have a product that can go forward and, again, looking over our shoulder, is there a miracle coming from DOE or not that would say we're better off just leaving it in wet storage and waiting for DOE to pick it up.

J. Shetler Dep. at 77-78 (Sept. 8, 2004).

Assistant General Manager Richard Ferreira testified that:

> The decision to move to dry storage again was due to the fact that DOE was not going to be able to accept the fuel. And we didn't know whether that would increase--if it would have remained in that state for my lifetime or who knows how long.
>
> So the option was to look at ways to reduce that cost compared to the option of DOE taking the fuel and this was a lower cost option. But obviously every time we were facing a delay in the dry fuel storage that increased the cost of that option.

R. Ferreira Dep. at 145-46 (Nov. 9, 2004). Thus, SMUD's construction of the dry storage project during the remainder of the 1990s was likewise driven by the DOE's stated delay in receiving SNF under the Contract.

**3. The Costs SMUD Incurred Have Been Established With Reasonable Certainty.**

SMUD's damages are also appropriately awarded because the evidence establishes the claimed costs with reasonable certainty. *See Home Sav.*, 57 Fed. Cl. at 727. The standard is well-established: "[c]ertainty is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." *Locke*, 283 F.2d at 521, 524. The damages model "may not be based on mere speculation or hypotheticals." *Home Savings*, 57 Fed. Cl. at 727. If "a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Glendale Fed. Bank, F.S.B. v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004) (internal quotations and citations omitted). SMUD's damages claim is a fair and reasonable approximation of the costs SMUD incurred as a result of the government's breach, and therefore such damages should be awarded in this case.

SMUD has claimed damages for the design, licensing, fabrication, and operation of its on-site dry storage facility.[28] SMUD's damages claim is based on the actual expenses SMUD incurred from the years 1992 to 2003. These expenses are taken directly from SMUD's accounting system, which includes a history of all of SMUD's costs based on a system of work order numbers that are kept in the course of Rancho Seco's ordinary course of business.

As part of the budgetary process, each discrete scope of work is assigned to a work order number. A total of nineteen work orders correspond to the various components of the dry storage project. Costs for these work orders compiled by year and constitute the basis for SMUD's damage claim. Electronic accounting system information and backup documentation – including detailed accounting reports, outside contracts, invoices and timecards – provide extensive support for the costs attributed to each work order.

The certainty of the costs claimed is further supported by SMUD's use of an accounting system that has a variety of internal control policies and procedures designed to insure that all transactions are timely and accurately recorded. Outside invoices are initially reviewed in the accounting department for questionable or unsubstantiated charges, and are then forwarded to the project manager for review to ensure that charges are appropriate and properly allocated. *E.g.*, Pl. Ex. 944. Large invoices and contracts, such as the Pacific Nuclear, Vectra, and TNW contracts, receive increased scrutiny at all levels. Within SMUD, employees allocated their time

[28] SMUD's damages in this case do not include costs related to the storage of Greater-Than-Class-C waste. The government previously raised in this case an issue with respect to its obligations to dispose of GTCC waste. *See* Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater Than Class C Radioactive Waste Arguments, dated Nov. 27, 2001. While SMUD disagrees with the government's legal position, *see* SMUD Opposition Brief, dated Dec. 16, 2002, the issue with respect to GTCC waste has no bearing on this case and is not yet ripe. At some point in the future, should SMUD seek to recover GTCC-related costs, a court may be asked to decide the issue.

on an hourly basis to the particular work order to which their work corresponds. *E.g.*, Pl. Ex. 943. Employee timecards are similarly reviewed to ensure that the work is properly recorded and allocated. As a result of this system, only employee time spent specifically on the dry storage project was included in SMUD's damages.[29]

SMUD's expert, Brian Brinig, has evaluated SMUD's claimed costs and has confirmed that they were indeed incurred and allocated to the dry storage project. The government's own expert, Stephen Kiraly, has independently reviewed the claimed charges and agrees that the costs were indeed incurred. S. Kiraly Dep. at 133-35, 138 (Jan. 7, 2005). SMUD has provided extensive support and background for its claimed costs and for the appropriateness of their allocation to the dry storage project. Thus, as in *Home Savings*, SMUD has "meticulously demonstrated" its costs, providing "a means by which the court can determine, with reasonable certainty, the amount by which [it was] damaged." 57 Fed. Cl. at 728.

### D. SMUD's Dry Storage Costs Are Also Recoverable As Cost Of Mitigation Or Alternative Performance.

"Benefit of the bargain" or "expectation" damages can include both the costs of arranging alternatives to the breaching parties' required performance and mitigation expenses incurred by the non-breaching party. The Restatement (Second) of Contracts provides that expectation damages may be based on the costs to "arrange a substitute transaction." Restatement (Second) of Contracts § 347 cmt. a (1981). Under the Uniform Commercial Code ("UCC"), "[i]f a seller breaches a contract for goods, the buyer may 'cover' or, in other words, obtain substitute goods from another seller." *Hughes Communications*, 271 F.3d at 1065 (citing U.C.C. § 2-712 (1997)).

---

[29] If anything, the employees undercharged the dry storage project work orders for their time. Some employees charged their time to the default work order for general plant maintenance, which is not included in SMUD's damages.

Even where the UCC is inapplicable, the Federal Circuit has found that the concept of cover "provides useful guidance in applying general contract principles." *Id.* at 1066. Applying these principles, the reasonable costs of obtaining substitute goods or services may be recovered. *Id*. at 1066-67. As the victim of the breach, a party is "within its rights to obtain commercially reasonable substitute . . . services, even if the substitute services [are] not identical to those covered by the [contract]." *Id*. at 1067.

In addition to the costs of obtaining substitute services, all "costs incurred in a reasonable effort, whether successful or not, to avoid loss" are recoverable. Restatement (Second) of Contracts § 347 cmt. c. Not only are such mitigation damages recoverable, plaintiffs have "an obligation to avoid by a reasonable effort any damages which it should have foreseen." *Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953); *accord Cienega Gardens v. United States*, 38 Fed. Cl. 64, 79 (1997). Having done so, a plaintiff "may recover as damages the expense incurred in such reasonable effort to avoid harm." *Chain Belt*, 115 F. Supp. at 714. Thus the "guiding principle" is whether, "in the individual circumstances," the party exercised reasonable judgment in its efforts to mitigate its damages. *Northern Helex Co. v. United States*, 524 F.2d 707, 718 (Ct. Cl. 1975) (omitting internal quotations and citations); *see also Home Sav.*, 57 Fed. Cl. at 729 ("The question is whether the mitigation was reasonable."); *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002) (noting recovery turns on "reasonableness" of conduct). "Reasonableness, in turn, 'is to be determined from all the facts and circumstances of each case . . . the person whose wrong forced the choice can not complain that one rather than the other was chosen.'" *Home Sav.*, 57 Fed. Cl. at 729 (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950)).

Finally, "[i]t makes no difference whether the breach has already occurred or where . . . it is merely impending under circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm." *Chain Belt*, 115 F. Supp. at 714. In *Chain Belt*, the plaintiff purchased a manufacturing plant from the government, and the government was obligated to move heavy machinery out of a portion of the plant by a set date – December 10, 1946. When it became apparent that the government would not and could not meet this date, the plaintiff arranged for alternate performance. The court held that the plaintiff was entitled to recover the amount it paid for such performance, including costs paid for work in November. The court noted that "[b]oth parties herein knew that defendant could not get the machinery out by December 10, because of the nature of the task and because defendant had not even started the removal work by November 1946." *Id*. The court noted that plaintiff had an obligation to mitigate its damages and that the arrangement for substitute performance was reasonable. *Id*.

Other Judges on this Court have recognized that utilities were entitled or even obligated to mitigate their damages in light of the government's impending breach. In the *Tennessee Valley Authority* case, Judge Lettow held that the utility was "justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance."

> "Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Restatement (Second) Contracts § 350 cmt. b. *See also Robinson v. United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002) ("[R]easonable efforts in the form of affirmative steps are required to mitigate damages.") (citing Restatement (Second) Contracts § 350). TVA's construction of dry storage facilities for spent nuclear fuel . . . must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial, ongoing breach.

60 Fed. Cl. at 674. As Judge Merow aptly noted in the Yankee cases, "[s]hould plaintiffs have waited until [January] 31, 1998, and then decided what to do with their nuclear waste? The court

thinks not. . . ." *Yankee Atomic*, 2004 WL 1535688, at *6; *but cf. Indiana Michigan Power v. United States*, 60 Fed. Cl. 639, 648 (2004) (stating, in dicta, that plaintiff could not recover pre-breach damages in claim for partial breach).

As in the *TVA* and *Yankee* cases, SMUD's dry storage costs constitute reasonable mitigation of its damages from the government's anticipated and actual non-performance. Dry storage of SNF is less expensive to operate and maintain and more safe than wet storage over a long period of time. *See, e.g.*, NRC's Environmental Assessment (Pl. Ex. 363); DOE's Dry Cask Storage Study (Pl. Ex. 154); DOE's Estimated Utility Cost Backup for the OMB Briefing (Pl. Ex. 565). As Congress and the DOE have recognized, a dual-purpose dry storage system reduces radiation exposure and fuel handling risks. *See supra*, pp. 14-15, 21. It is also more economical because it allows shutdown facilities, like Rancho Seco, to decommission their SNF pool and thereby eliminate the significant costs associated with maintaining that facility. *Id.* Thus, SMUD's dry storage project has reduced the government's damages while increasing public safety during the long period of DOE delay.

The reasonableness of SMUD's mitigation is corroborated by the actions of other utilities and storage system vendors. As Ms. Supko has determined, all shutdown nuclear power plants that have decided to develop dry storage have chosen to utilize dual-purpose casks, nearly all of the dry storage systems completed since 2000 are dual-purpose systems, many of the dry storage systems that began operations in the 1980s and 1990s are transitioning to dual-purpose systems, and dry storage vendors no longer market storage-only designs in the United States. The reasonableness of SMUD's mitigation is further corroborated by the actions of DOE and other government agencies, including DOE's efforts to develop a similar MPC system, DOE's plans to

accept dual-purpose systems at the SNF repository, and the Navy's decision to utilize a similar dual-purpose, dry storage system. *See supra*, pp. 19-22, 28-29.

Finally, the reasonableness of SMUD's mitigation is confirmed by DOE's own involvement with SMUD's dual-purpose dry storage project under the Cooperative Agreement. That Agreement identifies various governmental benefits from SMUD's development of the system, including obtaining information on system licensing and costs. *See* Pl. Ex. 381. Under that Agreement, DOE could participate in project management, received monthly status reports, and received quarterly financial reports. *Id.* Although DOE had various audit and termination rights under the Agreement, it never exercised them or otherwise expressed dissatisfaction with the progress of the project.[30]

**E. Offsets To Damages Claim.**

During the course of fact and expert discovery, the government identified certain offsets to SMUD's damages that it believes SMUD would have incurred even if the government had performed as obligated under the Contract. SMUD has carefully evaluated its claimed damages for any such costs. As a result of this evaluation, SMUD has determined that several offsets are appropriate. These offsets include $667,880 for the gantry crane upgrade, $87,000 for fuel inspection, $450,000 for upgrades to the spent fuel building, and $250,000 for onsite drop mitigation costs. In addition, SMUD agrees that a $500,000 subtraction is appropriate related to

[30] As was the case for nearly every utility, development of the dry storage project for SMUD did take longer and cost more than was originally anticipated. However, much of the delay and cost increase is attributable to problems with, changes to, and more stringent application of the NRC review process for dry storage facilities during the 1990s. *See, supra,* pp. 25-27. Ms. Supko has attributed these changes to the government's delay in receiving SNF in that this delay led to a surge in dry storage development during the 1990s. Other shutdown plants likewise experienced delays in the development of dual-purpose systems, *e.g.* Pl. Exs. 619, 705, and incurred costs of between $70 million and $85 million for dual-purpose systems.

a loan work-out agreement with a vendor. Applying these offsets to SMUD's costs of $78,558,212 reduces SMUD's damages to $76,603,412.

**F. Breach Of Good Faith And Fair Dealing.**

As early as 1987, DOE knew it would not meet its obligations under the Contract to begin acceptance of SNF by January 31, 1998. With this knowledge, DOE continued with the scheduling process under the Contract, but at a rate far below the 3,000-ton rate that the DOE had previously used in its program planning. In 1991, DOE published the 1991 ACR, which included projections based on a minimum 900-ton rate. In 1992, DOE instructed utilities to base their DCS submissions on the allocations in the 1991 ACR. Although the Contract provided that SMUD "shall submit to DOE the delivery commitment schedule(s)" that identifies all SNF SMUD "wishes to deliver to DOE," Contract Art. V.B.1, the DCS Instructions informed the utilities that "the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s)." Instructions ¶ 2.7 (Pl. Ex. 249). The DOE subsequently voided previously approved DCS submittals and then stopped approving DCSs altogether. In 1995, despite the fact that the DOE had already concluded that an MRS was not a "viable option," *e.g.*, L. Barrett Dep. at 779-80 (Apr. 26, 2002), DOE again published its APR/ACR based on the minimal 900-ton rate, purportedly on the assumption that SNF acceptance would begin in 1998 with an MRS. 1995 APR/ACR at 3. DOE has continually asserted throughout this litigation that the DCSs and the lower rate establish the limit of its obligations under the Contract. Thus, DOE has attempted to use this process to limit its liability in the face of the impending breach rather than working toward the achievement of its obligations under the Contract.

The government's actions run afoul of its duty of good faith and fair dealing under the Contract. "[E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," Restatement (Second) of Contracts § 205 (1981), and that duty is equally imposed on the government when it is a party to a contract. *Centex Corp. v. United States*, 395 F.3d 1283, slip op. at 37 (Fed. Cir. Jan 19, 2005); *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1330 (Fed. Cir. 2003). As the Federal Circuit recently reiterated,

> The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.

*Centex Corp.*, slip op. at 36; *see also Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("[E]very contract . . . imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract.") (internal quotations and citations omitted). The duty of good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 cmt. a. During performance, conduct which is an "evasion of the spirit of the bargain" constitutes a breach of that duty. *Id.* § 205 cmt. d.

Here, the government's manipulation of the DCS process and promulgation of the 900 tone rate were admittedly motivated by the desire to limit liability. Former DOE contractor Scott Vance testified at trial in *Yankee* cases that "the reason for [the 900 rate in the 1991 ACR] was that it was obvious at that point that '98 was not going to be met and that they desired to limit the liability to purchasers." Yankee Trial, at p. 7622 (Aug. 30, 2004). DOE employee David Zabransky similarly admitted in his deposition and at the Yankee Trial that the DOE continued to use the 900 rate even though the MRS upon which the rate was based was no longer viable,

and that minimizing DOE's commitments to utilities under the Standard Contract "was a consideration" in it doing so. D. Zabransky Dep. at 3664-65 (Apr. 18, 2002); Yankee Trial, pp. 4166-67. Finally, DOE official Lake Barrett admitted in his deposition that he spoke with DOE lawyers regarding the possibility that DOE could reduce utility damages claims against it by maintaining a low "obligation" rate compared with the higher 3,000-ton rate at which DOE ultimately expected to perform. L. Barrett Dep. at 1426-27 (May 10, 2002). These actions constitute quintessential bad faith.

Several other Judges on this Court have addressed the government's conduct with regard to its obligations under the NWPA and the individual Contracts and found support for such a claim. In *Commonwealth Edison*, Judge Hewitt recognized that the "DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of defendant's duty of good faith and fair dealing." 56 Fed. Cl. at 652, 656. Judge Hewitt noted that DOE has failed to "explain how, in the light of [the limiting instruction], it intended in good faith to carry out the negotiating and revising aspects of the DCS process." *Id.* Likewise, Judge Lettow recently recognized in *Boston Edison Co. v. United States*, Opinion and Order dated Feb. 15, 2005, at 24, that "Boston Edison has alleged facts that, if proved, would make out a viable claim for relief under these implied covenants [of good faith and fair dealing], and it has supported these allegations with detailed facts showing at least a conscious disregard at times by the government of circumstances that have prevented performance."

The government has acted inconsistently with the purposes of the Contract in an effort to limit its own liability and has therefore violated its duty of good faith and fair dealing

## IV. CONCLUSION

As the Eleventh Circuit recognized in *Alabama Power Co.*, "the regulatory scheme contemplates that the ultimate burden of the government's breach to fall on the government, not other utilities." 307 F.3d at 1314-15. The government has breached its obligations to provide storage, and SMUD has incurred damages resulting from shouldering this burden itself. For these reasons, and those set forth above, the Court should enter judgment for SMUD for damages on its breach of contract claim in the amount of $76,603,412.

DATED this 17th day of February, 2005.

Respectfully submitted,

s/ Howard Cayne by s/ Timothy R. Macdonald
Howard Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899
Counsel of Record for
Plaintiff Sacramento Municipal Utility District

Of Counsel:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Memorandum of Contentions of Fact and Law to be filed electronically through the Court of Federal Claims Case Management/ Electronic Case Filing System on February 17, 2005. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Harold D. Lester, Jr.
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/ Timothy R. Macdonald