# Exhibit 1

**EXHIBIT 1**

**David Langstaff Dep. Testimony (Nov. 4, 2004)**

7:22 through 8:17
29:18 through 32:15
36:12-15
37:4 - 15
37:22 through 38:15
64:6 through 65:9
67:17 – 22
74:6 – 18
77:21 through 82:22
84:15 through 85:22
91:13 through 92:2
95:12 through 101:7
103:15 through 105:3
108:3 – 22
109:18 through 110:16
111:10 through 114:12
119:19 – 22
125:8 through 126:22
149:5 – 15
150:10 through 152:6
153:14 through 154:3
178:6 – 19

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------ *
SACRAMENTO MUNICIPAL *
UTILITY DISTRICT, *
Plaintiff, *
vs. * No. 98-488C
THE UNITED STATES OF AMERICA, *
Defendant. *
------------------ *

Deposition of DAVID LANGSTAFF
Washington, D.C.
Thursday, November 4, 2004
9:45 a.m.

Job No. 1-45384
Pages 1 - 186
Reported by: Karen Young

2

Deposition of DAVID LANGSTAFF, held at the offices of:

ARNOLD & PORTER, LLP
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to notice, before Karen Young, Notary Public of the District of Columbia.

3

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER, LLP
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF THE DEFENDANT:
JOSHUA E. GARDNER, ESQUIRE
RUSSELL A. SHULTIS, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7583

4

CONTENTS

EXAMINATION OF DAVID LANGSTAFF PAGE
By Mr. Macdonald .......... 6
By Mr. Shultis .......... 181
By Mr. Macdonald .......... 182
By Mr. Shultis .......... 183

EXHIBITS

1 Report to Congress, November 1989 .......... 47
2 Annual Capacity Report, December 1990 ....... 62
3 60 Federal Register 21793-02 ............... 71
4 Meeting minutes, 9/19/91 ................... 88
5 Williams letter to Bell, 11/27/91 .......... 93
6 Conference Notes on Meeting, 12/18/91 ....... 96
7 Meeting minutes, 4/4/92 ................... 106
8 Meeting minutes, 4/16/92 .................. 115
9 Meeting minutes, 3/4/92 ................... 122
10 McKinnon fax to Laughlin and Langstaff, 9/15/93 ... 135
11 Langstaff fax to Stewart, 5/24/94 .......... 139
12 Redeker letter to Laughlin, 12/19/94 ....... 145
13 Langstaff fax to Miller and Jones, 12/21/94 ........ 146
14 Monthly report, February 1995 .............. 157
15 Jones letter to Langstaff, 3/5/96 .......... 160
16 Redeker letter to Procurement Officer, 4/29/96 .... 165
17 Cooperative Agreement History ............. 174



PROCEEDINGS

DAVID LANGSTAFF,

having been duly sworn, was examined as follows:

- - -

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. MACDONALD:

Q. Good morning, Mr. Langstaff.
**A. Good morning.**
Q. We met briefly off the record, but my name's Tim Macdonald, and I represent Sacramento Municipal Utility District, which I'll refer to as SMUD throughout the deposition. I assume you're familiar with that acronym?
**A. Yes.**
Q. Have you ever had your deposition taken before?
**A. I had a deposition taken in the early '90s.**
Q. Let me just briefly describe the process that we're going to go through for you. I'm going to ask you a series of questions and I'd like you to give verbal audible answers rather than nods of the head or shakes of the head or gestures.



**A. Okay.**
Q. That way the court reporter can take down my question and take down your answers, and if you could wait until I finish a question and I'll wait until you finish an answer, that way the court reporter won't have us talking over each other, all right?
**A. That's good.**
Q. Your counsel may from time to time make objections. The court reporter will take those down for the record, and unless otherwise directed, you are to do the best you can to answer the question, okay?
**A. I can do that.**
Q. Great. Is there any reason you can't give full, complete, truthful testimony today?
**A. No, there's no reason I can't do that.**
Q. The deposition that you referenced in the early '90s, what did that have to do with?
**A. That had to do with a contractor employee issue.**
Q. And was that a contractor of Battelle?
**A. Yes.**
Q. I'd like to start off if we could to just



review a little bit of your work history and your background. Who are you currently employed by?
**A. I'm employed by the Department of Energy.**
Q. And what division or department are you in?
**A. I'm in the Richland field office in the Richland operations or field office.**
Q. And that's in Richland, Washington?
**A. Richland, Washington is the location.**
Q. How long have you been employed out there in Richland for DOE?
**A. I've worked for DOE since 1982, so it's 29 years. Wait. It's not 29 years. It's 22.**
Q. Still a long time.
**A. Yeah.**
Q. And since '82, you've been at the Richland field office of DOE?
**A. That's true.**
Q. What's your current title or job description?
**A. The current title is general engineer, and the position is conduct assessments of organizational and functional performance of the Richland office.**

29

Q. And the casks go into the ISO container; is that right?
**A. Yes.**
Q. Do they then sit on a concrete pad?
**A. To tell you the truth, I didn't go out to observe that.**
Q. And you don't know if that's how they -- how they sit out there at Hanford?
**A. Have not visited, observed that.**
Q. Currently do any of your job responsibilities involve the DOE's program at Yucca Mountain?
**A. No, it doesn't.**
Q. You have no responsibility with respect to the licensing and development of the repository?
MR. SHULTIS: Objection, asked and answered.
**A. No.**
Q. During your work on the cleanout of the B cell from '91 to 2002, did you have any responsibility or involvement in DOE's work on Yucca Mountain?
**A. Yes.**
Q. Describe that work for me.

30

**A. Let's see. I was in a position that provided oversight for by and large work at PNL that supported RW headquarters and/or Yucca Mountain.**
Q. What was the work that PNL was doing for RW headquarters at Yucca Mountain during that period of time?
**A. It was a very broad spectrum of work. It ranged all the way from support for the standard contract and the annual evaluation of the adequacy of the nuclear waste fund fee, the fee adequacy report, to transportation logistics, models, to in the '80s, it was spent fuel characterization and development of testing and standards for glass, waste glass, and performance assessment of the repository. There was a pass program. That's a few examples, but I mean, there was a large number of projects.**
Q. PNL was working on a large number of projects?
**A. Right, and as time went on, my responsibilities varied, you know, until at the last, I was the only person at Richland that was supporting RW work and so it was very broad at that time, and in**

31

**the early '90s, we established the Cooperative Agreements with SMUD and with EPRI.**
Q. You mentioned that at some period of time, you were the only person at Richland that was supporting the RW program.
**A. That's correct.**
Q. Roughly what period of time was that?
**A. In the early '90s, and then Dennis Brown was transitioned in in '96 to take over those responsibilities.**
Q. So in '96, did your responsibilities for supporting the RW program come to an end?
**A. That's right.**
Q. After '96, have you had any responsibilities related to the RW program?
**A. No, I haven't.**
Q. And who transitioned in at that time? What was the name?
**A. Dennis Brown.**
Q. And Dennis Brown is another DOE Richland employee?
**A. Yes.**

32

Q. From the early '90s until '96, you were the only person at DOE Richland that was involved in the RW program though?
**A. That's true.**
Q. And your work was primarily oversight of the work that PNL was doing related to the RW program?
**A. Yes, other than the Cooperative Agreements.**
Q. Describe to me the relationship between DOE and PNL. It's always been a little opaque to me.
**A. DOE has the Pacific Northwest, now it's National Laboratory, and Battelle Memorial Institute is the contractor that DOE has operate that laboratory, and our office, the Richland operations office, holds the contract with Battelle for the operation of that lab.**
Q. So --
**A. Well, okay, until a few months ago, and it's in transition, so I really don't know, but the contract is going over to the Office of Science.**
Q. Let's talk about the period that you know about and forget about the transition for a minute. DOE has -- they essentially own the Pacific Northwest

33

Laboratory?
A. **They own certain buildings and facilities.**
Q. Is it fair to say that the PNL is a DOE facility, Pacific Northwest Laboratory?
MR. SHULTIS: Objection, vague.
A. **It would help if you rephrased the question.**
Q. I'm just trying to understand whether Pacific Northwest Laboratories is a DOE-owned or DOE-run facility.
MR. SHULTIS: Same objection and asked and answered.
A. **It's difficult because there's two contracts. There's --**
Q. What are -- what are those contracts?
A. **DOE has a direct contract for operation, you know, PNL to operate their facilities, and then there's a separate agreement for PNL to have -- work with private industries and use of DOE facilities, and I do not understand the fine points between those two contracts.**
Q. But DOE does own at least some of the buildings at PNL?

34

A. **Yes.**
Q. Some of the facilities.
A. **Yes.**
Q. And Battelle is the operator of the Pacific Northwest Laboratories?
A. **Yes.**
Q. Would there be any separate DOE employees at PNL or would the employees at PNL be Battelle employees?
MR. SHULTIS: Objection, vague.
BY MR. MACDONALD:
Q. If you know.
A. **I'm not sure about your question. Would you rephrase that?**
Q. I'm trying to understand if you go to PNL, are those people DOE employees, to your knowledge?
A. **No.**
Q. Are they Battelle employees?
A. **Yes, they're Battelle employees, my understanding.**
Q. So there wouldn't be separate DOE employees at PNL, at the Pacific Northwest Laboratory?

35

A. **Could you tell me what you mean by "at"? I mean -- the reason I'm asking is because some -- there is a DOE office that has been co-located with the laboratory, DOE office that has DOE employees, but they're not Battelle employees, okay? The people that work for Battelle are Battelle employees. They may be in the same facility.**
Q. So DOE does have offices that are co-located at PNL?
A. **Yes.**
Q. And what is their function?
A. **Their function is to provide oversight of the DOE contract with Battelle.**
Q. And I guess my -- what led to my confusion is you also provided oversight for PNL work; is that right?
A. **Yes, and when I -- well, the location doesn't really matter, but during some of the time that I provided oversight, I was in the Richland federal building. During some of the time, we were in the co-located offices with PNL. Some of the time I was in the 324 building providing oversight. Some of**

36

**the time we were in a Bechtel building. That's where the DOE office was located, and then back to the federal building. So I was in many different locations performing the same function.**
Q. And that function was oversight of PNL?
A. **Yes.**
Q. I think you testified that that started sometime around 1991.
A. **The 324 building B cell oversight started about '91. Oversight of PNL program supporting RW began in 1984.**
Q. So starting in 1984, you had oversight responsibilities for PNL's work related to the RW program?
A. **That's correct.**
MR. SHULTIS: Objection, vague.
BY MR. MACDONALD:
Q. What was the work that you were supporting -- strike that. Starting in 1984, what was the RW work that you were supporting?
MR. SHULTIS: Objection, vague, lack of foundation.

37

A. **That was a long time ago. To tell you the truth, I would have trouble coming up specifically with what programs I was following.**
Q. Let me see if I can get at it another way. You testified previously that some of the work that PNL was doing that you had oversight responsibilities for was support for the standard contract, review of the fee adequacy reports, transportation logistic models, performance assessment of the repository. Those are some examples that you gave, correct?
A. **Uh-huh.**
Q. Is that a yes?
A. **Yes. The materials characterization activities were going on in the mid to late '80s, and so I had responsibility for that.**
MR. SHULTIS: Tim, do you think we could take a break?
MR. MACDONALD: Yeah, that's fine.
(Recessed at 10:42 a.m.)
(Reconvened at 10:54 a.m.)
BY MR. MACDONALD:
Q. Mr. Langstaff, so that I understand your

38

background, I believe you testified that your oversight of the 324 building or the B cell cleanup started in approximately '91?
A. **That's true.**
Q. And that your oversight of PNL on the RW work started in approximately '84?
A. **That's correct.**
Q. Did your -- strike that. And your work supporting PNL on the RW program ended in approximately '96?
A. **That's correct.**
Q. During the period '84 to '96, were you throughout that time period supporting or doing oversight of the PNL work for the RW program?
A. **Yeah, yes.**
Q. During that period, '84 to '96, who did you report to?
A. **My supervisor initially was Phil Craig, and then I'm not sure the sequence after that. There was a fellow named Mike Karroll, and Jim Petersen. I can't remember the other guy. He eventually was deputy manager of RL, and then we reorganized and went**

39

**into the -- in about '88, we reorganized and we became part of the PNL oversight organization, laboratory oversight, and at that time, my division director was Dave Jones, and somewhere in there we had Deborah Trader, and there may have been others but I just can't recall at the moment.**
Q. Did you ever report to anyone at DOE headquarters?
A. **You mean as a counterpart for the program that I was -- there was a number of programs that we and headquarters had at Battelle. That headquarters person had responsibility for the scope and the budget, so they would come to our office to have that scope and dollars included in the contract for Battelle, and that's where we became involved in the oversight, so I always had a counterpart for each of the projects that I had at Battelle. I had a corresponding counterpart at headquarters.**
Q. And when you say each of the projects at Battelle, what were some of those projects?
A. **Well, the ones I mentioned previously.**
Q. Working on the standard contract, working on

40

the fee adequacy reports, things of that nature?
A. **That's right.**
Q. And so each one of those projects you might have a different counterpart at headquarters?
A. **That's -- I would have a counterpart at headquarters. It just depended what assignment the headquarters people had.**
Q. To the best of your recollection, who were some of the primary people at headquarters that you dealt with?
A. **One was Payton. I can't remember her first name. Last name was Payton, P-A-Y-T-O-N. Of course Leroy Stewart was my counterpart for the SMUD Cooperative Agreement. Her name was Mary Lee Payton. I'm trying to think of some of the other names. I just don't -- can't recall offhand.**
Q. Prior to 1984, what was your -- what were your responsibilities?
A. **Okay, from the time I was hired until I transitioned to the repository programs, I was involved in the experimental breeder fuel program and providing oversight of Westinghouse.**

61

**A. Well, the acceptance rate or acceptance schedule for fuel is an important part of repository design and the whole infrastructure that goes to support a repository, and so if you change those numbers, you need to take a careful look at the potential impacts to your overall system, you know, the repository system and the infrastructure.**

Q. Do you recall if DOE was planning for an acceptance rate of 3,000 metric tons per year industry wide?

MR. SHULTIS: Objection, vague.

**A. As I recall, that's what was put out as the -- when the repository was up and running.**

Q. The steady state acceptance rate would be 3,000 tons?

**A. Well, that's -- actually, I don't specifically remember that. That sounds about right, but --**

Q. Do you recall a lower number being used than 3,000 as the design basis?

**A. Actually, I don't remember specifically what it is. I mean, like I said, I haven't even thought of**

62

**this for about ten years.**

\- - -

**(Deposition Exhibit Number 2 was marked for identification.)**

\- - -

**BY MR. MACDONALD:**

Q. Mr. Langstaff, I've marked as Exhibit 2 a December 1990 annual capacity report published by DOE. I'm going to ask you to just take a look at that document.

**A. Okay. And your question?**

Q. Do you recall having seen the 1990 annual capacity report?

**A. Yes.**

Q. In what context do you recall seeing it?

**A. I would imagine that we generated the report or were involved in reviewing this report for technical accuracy.**

Q. And when you say we, do you mean --

**A. Battelle.**

Q. Battelle?

**A. Battelle folks, yeah.**

63

Q. And that was the oversight that you had at the time in 1990?

**A. I would say yes.**

Q. If you would turn to page 5, and the carryover paragraph, the last sentence up at the top, the first paragraph, the last sentence of that paragraph states, "If the current linkages to the repository are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF" slash "HLW by DOE would not start until 2007." Do you see where I'm reading?

**A. Yes, I'm with you.**

Q. Does that statement -- is that statement consistent with your memory?

MR. SHULTIS: Objection, vague.

**A. I wouldn't -- based on memory, I wouldn't -- you know, I don't absolutely remember, but this document is published and I would say it's reasonable to assume I was aware of that.**

Q. If you would turn over a couple pages to page 7 there with the projected waste acceptance rates --

64

**A. Uh-huh.**

Q. Table 2.1 lists a series of rates starting in '98 at 1,200 metric tons, then going up to 2000 metric tons and reaching 3,000 metric tons in 2003.

**A. Correct.**

Q. And staying at 3,000 tons thereafter. Does this refresh your recollection at all that 3,000 tons was a design basis for the repository?

**A. Yes, yeah, I would say that from the numbers, the 3,000 is a design basis.**

Q. Do you recall discussions with employees at SMUD about the slippage in the schedule for accepting fuel?

MR. SHULTIS: Objection, vague, calls for speculation.

**A. Yeah, I don't remember any specific discussions.**

Q. Do you think you would have had discussions with employees at SMUD about the fact that DOE had announced delays in the opening of the repository?

MR. SHULTIS: Objection, calls for speculation.

65

A. **I would imagine that we would have talked about slippage, but I don't remember in any specifics.**
Q. When was your first involvement with SMUD approximately?
A. **Based on memory, I'm thinking 1991.**
Q. And is that the time frame at which DOE, SMUD and EPRI began having discussions or negotiations about Cooperative Agreements?
A. **That's what I recollect.**
Q. Were you involved in the initial discussions or negotiations between DOE and SMUD?
A. **I'm not sure if there was headquarter discussions before headquarters actually directed my office and me to begin a negotiation or discussion with them, so I don't know what preceded that, how much, or if anything did.**
Q. Why were you identified as someone who would be involved with the Cooperative Agreement?
A. **That would be supposition, but I think headquarters was satisfied with our support of the program and our ability to enter into an agreement and to provide oversight for that kind of a project, and**

66

**technically I think we are pretty strong and Battelle was -- had some very technically competent folks.**
Q. And there were some technical aspects of the Cooperative Agreement that could utilize the skills of people at Battelle?
MR. SHULTIS: Objection, assumes facts not in evidence.
A. **Battelle had general support in dry storage technology.**
Q. Did you have discussions with anyone at SMUD about why they were going into dry storage?
A. **Generally speaking, I think they talked about closing their spent fuel pool to be able to close the reactor, close that part of the license to save money.**
Q. Do you recall that dry storage was cheaper on an annualized basis than wet storage?
A. **I believe that was an expectation.**
Q. Do you recall that one of the reasons that SMUD was contemplating going to dry storage was the DOE's slippage in the schedule for the repository?
A. **I really don't know if that would have been**

67

**a driver.**
Q. Do you recall the magnitude or estimates of difference between the annual costs of dry versus the annual costs of wet?
A. **Actually, I don't know what the SMUD cost -- annual cost of maintaining the dry storage would be.**
Q. How about estimates of the annual cost for storing fuel wet?
A. **The estimates that I had heard of for SMUD was two -- one to two million per month based on a Battelle survey.**
Q. Do you recall when that survey was done?
A. **Sometime in the early '90s.**
Q. And you don't recall any estimates for annual costs of dry?
A. **No.**
Q. Was the effort that SMUD was -- strike that. Was the effort to develop a dual-purpose cannister-based dry storage system that SMUD pursued, was that a first-of-a-kind effort in your view?
A. **Development of the dual-licensed cask was -- it was among the first-of-a-kind approaches.**

68

Q. Do you have an understanding of the term "delivery commitment schedules"?
MR. SHULTIS: Objection, vague, foundation.
A. **It's mentioned in this report on -- annual capacity report.**
Q. The delivery commitment schedule?
A. **Yeah.**
Q. And what's your understanding of that term as it relates to the standard contract?
MR. SHULTIS: Same objection.
A. **What is my understanding of the delivery commitment schedule?**
Q. Yes.
A. **Relative to the contract?**
Q. Yes.
A. **Actually, it's not clear what it would be. The utilities are required to report their inventories, and then based on that, DOE is to work out the acceptance rates based on that information, and then that's presented in that delivery commitment schedule. That's my understanding.**
Q. Do you recall whether the delivery

operation and DOE would be prepared to begin acceptance of SNF by January 31, 1998, it since has become apparent that neither a repository nor an interim storage facility constructed under the act will be available by 1998." Do you see where I'm reading?
A. **Yes, I do.**
Q. Do you recall having the knowledge that DOE would not begin performing in '98?
A. **Yeah, I think I had that general knowledge.**
Q. And the following sentence states that DOE currently projects that the earliest possible date for acceptance of waste for disposal at the repository is 2010.
A. **I see that, yeah.**
Q. And you think you also would have had that general knowledge?
A. **Yes.**
Q. You think you would have had that knowledge on or about May of '95 when this document was published?
MR. SHULTIS: Objection, calls for



speculation, assumes facts not in evidence.
A. **Again, I mean, I specifically don't remember, but if it was -- if it was widely known, I'd say yes. If it was just known at headquarters, they may or may not have passed that on.**
Q. Do you recall having discussions with anyone at SMUD, for instance, Rita Bowser or Jim Shetler or Ken Miller, about the schedule slippage for the repository?
A. **I imagine I would have had general discussions.**
Q. Do you remember anyone at SMUD expressing concern that DOE -- that the schedule is slipping for DOE acceptance of fuel?
MR. SHULTIS: Objection, vague.
A. **I think -- yeah, I have a general recollection of we talked about a concern about slipping schedule, acceptance schedule.**
Q. Do you recall if those discussions would have occurred in the '91-'92 time frame?
A. **I don't. Don't recall.**
Q. Do you recall DOE analyzing and looking at



something called the multipurpose canister?
A. **Yes.**
Q. What's your knowledge of the multipurpose canister project at DOE?
A. **It's just general knowledge, and if I may refer back to the earlier question about discussions in '91 about slippage and acceptance rate, we -- I'm not even sure that would have come up because what we were discussing was the Cooperative Agreement, and that was about, you know, acquiring a license -- a dual-licensed cask, and that was the subject of the negotiation. It had nothing to do with acceptance of commercial fuel.**
Q. In 1991?
A. **Yeah.**
Q. Okay. Getting back to the question on -- what's your understanding of the term "multipurpose canister"?
MR. SHULTIS: Objection, foundation.
A. **I don't know why they called it multipurpose canister specifically other than the utilities could put the fuel in these canisters, store it, you know,**



**could be, if you had a dry storage system there that used the canisters, that would be fine. You could transport it if you had a system and that sealed canister could be accepted by DOE and if they had a waste package that used that sealed canister, you could dispose of it, then that would be multipurpose, and the advantage would be that you did not have to rehandle the fuel.**
Q. At any point in time during --
A. **As long as it was in the canister and you could handle the sealed canister, then you did not need to handle the independent fuel elements, and I think that probably is the multipurpose aspect.**
Q. Do you recall DOE considering providing multipurpose canisters to utilities?
MR. SHULTIS: Objection, foundation.
A. **That was not something I was directly involved with.**
Q. If you would turn to the last page of Exhibit 3, and the top of the page -- you'll actually have to look back at the prior page, to look at the first line, it states, "The department believes that

77

important public and private interests are implicated by the need for orderly financial and technical planning with respect to the department's inability to accept SNF in 1998. There are also equitable considerations that may argue for some form of relief to help offset costs incurred as a result of the department's inability to begin acceptance of SNF in 1998," closed quote. Do you see where I'm reading there?

**A. Yes, I do.**

Q. Do you recall discussions at DOE that there would be costs incurred by utilities as a result of the government's inability to begin accepting fuel in '98?

MR. SHULTIS: Objection, vague, assumes facts not in evidence.

THE WITNESS: Would you repeat that please?

MR. MACDONALD: Could you read the question back?

- - -

THE REPORTER: Question: "Do you recall discussions at DOE that there would be costs incurred

78

by utilities as a result of the government's inability to begin accepting fuel in '98?"

- - -

**A. I recall general discussions. Nothing specific.**

Q. What was the nature of the general discussions?

MR. SHULTIS: Same objection.

**A. The nature of the discussion was that it wasn't anticipated in the act.**

Q. I'm sorry. That the delay was not anticipated in the act?

**A. Well, the delay and the consequent potential for costs for storage after 1998.**

Q. Just so the record's clear, the cost for -- the potential for costs for storage after 1998, that was not consistent with the program contemplated by the Nuclear Waste Policy Act, correct?

MR. SHULTIS: Objection, foundation, mischaracterizes prior statements, assumes facts not in evidence.

**A. What I thought I said was that the act**

79

**didn't anticipate having storage costs that wouldn't be consistent with the act, which was that DOE would start taking delivery in '98. I mean, we couldn't take everybody's fuel in '98.**

Q. In your last answer, I just want to be clear that I understand this. You said the act didn't anticipate having storage costs that wouldn't be consistent with the act. I'm not sure I understand that.

MR. SHULTIS: Objection, foundation.

**A. This is a difficult statement. Assuming, you know, an acceptance schedule and it started in 1998, the act assumed that was going to happen, that DOE would start taking acceptance of fuel in '98, and I don't think anybody anticipated any additional costs that would accrue.**

Q. To the utility?

**A. To the utility, from not meeting that date.**

Q. And what would the additional costs be that would accrue to the utility if DOE didn't meet the date? Dry storage costs?

**A. The fuel storage costs.**

80

Q. Do you recall discussions about DOE providing some relief to utilities to offset those fuel storage costs?

MR. SHULTIS: Objection, vague, foundation, mischaracterizes prior testimony.

**A. I recall a general discussion.**

Q. And what's the nature of the general discussion you recall?

**A. There was uncertainty with regard to what those costs would be.**

Q. For the utility?

**A. For the utilities, how to determine the cost, how to -- what the source of funds would be.**

Q. But it was understood that -- strike that. It was understood that utilities would be incurring costs for fuel storage as a result of the delay, correct?

MR. SHULTIS: Objection, assumes facts not in evidence.

**A. Yeah, you know, I would just point at that next sentence after -- where you had stopped reading on the last page --**

81

Q. And --
A. **-- about the equitable considerations that may argue for some sort of relief to help offset the costs incurred as a result of the department's inability to begin acceptance in 1998. I mean, that's the nature of the discussions that I recall.**
Q. Who do you recall having such discussions with?
A. **I don't have any specific recollections. It's just there was a subject of discussion and the nature of it was captured in that sentence.**
Q. Do you recall having discussions about providing relief to SMUD to help offset the costs that it would incur?
A. **Any discussion about compensation would have been outside our Cooperative Agreement and the scope of our -- the scope of our agreement.**
Q. Do you recall SMUD asking to refocus the Cooperative Agreement to include DOE's planning for the multipurpose canister program?
MR. SHULTIS: Objection, vague.
A. **Well, there was a number of times, you know,**

82

**SMUD would suggest that maybe we could -- DOE could just keep the fuel, keep our cask and keep the fuel, and that wasn't very realistic. We just couldn't do that. I mean, it was inconsistent with the purpose of the appropriation and the whole purpose or the need that the Cooperative Agreement was established to meet.**
Q. Did SMUD -- so SMUD suggested that DOE could fill the cask with fuel and take it away as one option?
A. **Yeah, they suggested that several times, but you know, we just -- we could not do that.**
Q. Was it your view -- strike that. Did SMUD express to you the desire to have DOE accept as much of SMUD's fuel as possible?
A. **Yes, but you know, I'm not the person to talk to about that. That's not my purview.**
Q. But you understood that SMUD wanted to be rid of its fuel and as soon as possible?
A. **They and 109 other utilities, yeah.**
Q. Nothing happening yet, is there?
A. **Not that I'm aware of.**

83

MR. SHULTIS: Objection, vague.
BY MR. MACDONALD:
Q. Did SMUD discuss with you the possibility of DOE using the priority for shutdown reactors to accept its fuel?
MR. SHULTIS: Objection, calls for speculation, foundation.
A. **Yeah, that would be speculative. They may have brought that up, but again, it's not my purview.**
Q. Let's be clear. My question is whether SMUD had discussions with you about the priority for shutdown reactors; not whether DOE was going to grant it, so let me make sure the record's clear. Do you recall having discussions with anyone at SMUD about the shutdown priority under the standard contract?
MR. SHULTIS: Same objections.
A. **Yeah, I'm not actually -- it may have occurred, but I'm not specifically recalling that.**
Q. Do you recall that there was a potential for DOE to grant priority to shutdown reactors under the standard contract?
MR. SHULTIS: Objection, vague, lack of

84

foundation, calls for speculation.
A. **I vaguely remember something about shutdown reactors.**
Q. Were you involved in any analysis of the shutdown priority?
MR. SHULTIS: Objection, vague.
THE WITNESS: I didn't do any analysis.
MR. SHULTIS: Tim, are you going to move on to the next exhibit?
MR. MACDONALD: What's that? Let's go off the record.
(Recessed at 1:17 p.m.)
(Reconvened at 1:59 p.m.)
BY MR. MACDONALD:
Q. Mr. Langstaff, did SMUD ever have discussions with you about the prospect of DOE taking title to SMUD's fuel at Rancho Seco?
MR. SHULTIS: Objection, vague.
A. **You have to help me with identifying somebody that would have done that. It didn't have anything to do with the Cooperative Agreement.**
Q. I guess do you recall any discussions about

85

DOE taking title with Ken Miller or Bob Jones or Rita Bowser or Jim Shetler?
A. **Well, you know, I mentioned earlier, any chance they got, they talked about us filling our cask and just keeping the fuel, and -- but my response was we can't do that, you know. We need to have the cask empty and there's just no way. That's not part of the Cooperative Agreement. The purpose of the cask and DOE acquiring a cask was to have it available. That means it's empty and clean. That didn't prevent them from suggesting that we fill it with fuel, but I mean, you couldn't tell whether it was kind of a joke or what, but there was no realistic expectation on my side --**
Q. That DOE --
A. **-- of ever being able to do that. Not under the terms of our agreement and the intended use of the cask.**
Q. When you say under the terms of the agreement, you're referring to the Cooperative Agreement?
A. **Yes, I am.**

86

Q. Do you recall that at the outset of the negotiations for the Cooperative Agreement in approximately 1991, that the plan -- strike that. Do you recall that the concept of the Cooperative Agreement changed over time from when it was initially discussed in '91?
MR. SHULTIS: Objection, assumes facts not in evidence.
A. **The nature -- my attempt was to follow what was in the appropriation language.**
Q. And to the best of your knowledge, what was that?
A. **The best that I can recollect is that that was to facilitate dry storage and develop a dual-purpose cask, a licensed cask, and then the dry transfer system, and that's primarily it.**
Q. Do you recall having discussions with anyone at SMUD about SMUD itself becoming an MRS?
MR. SHULTIS: Objection, vague.
A. **Again, you know, they may have been joking or something, but, you know, I wasn't the right person to talk to and it really was outside the scope of the**

87

**Cooperative Agreement.**
Q. You don't -- I just want to make sure the record is clear. Do you recall any such discussions?
A. **Well, to me, discussion implies a two-way conversation. They may have brought it up, but I don't think I would have entertained a discussion of that.**
Q. Do you recall SMUD having brought up the prospect of SMUD being an MRS?
A. **I could not tell you if anybody specifically brought that up.**
Q. Who at SMUD primarily did you have interactions with?
A. **Ken Miller. He was the main point of contact.**
Q. Anyone else that you can recall?
A. **He was the primary point of contact, and then occasionally we talked to Bob Jones. Isn't that his name, the licensing fellow?**
Q. Yes.
A. **And then Jim Hetzler --**
Q. Shetler?

88

A. **Shetler, yeah, he occasionally would sit in on the meetings.**

\- - -

**(Deposition Exhibit Number 4 was marked for identification.)**

\- - -

**BY MR. MACDONALD:**
Q. Mr. Langstaff, I've had marked as Exhibit 4 a document dated September 19th, 1991, which is meeting minutes for the demonstration project meeting. The Bates number of the first page is SMUD-18754.
A. **Okay.**
Q. Do you recall whether you've seen these minutes before?
A. **I don't recall specifically looking at these minutes.**
Q. You'll notice on the top of the first page, it references a meeting held on September 19th, '91.
A. **Uh-huh.**
Q. And it lists you as one of the attendees along with Jeff Williams, Leroy Stewart and Mikal McKinnon?