A. **That's right.**
Q. Is this consistent with your recollection that you would have attended meetings with SMUD back in September of '91?
A. **Yes, that is true.**
Q. And do you recall if this was near the outset of the negotiations for the Cooperative Agreement?
A. **I can see that it was early in the negotiation.**
Q. And what leads you to conclude that it's early in the negotiation?
A. **The statement under cask transfer and device procurement where it says -- I'm sorry. Where was it? Oh, yeah, where it says SMUD suggested that DOE would buy the first cask and SMUD the second, and the agreement was different than that.**
Q. What was the structure of the agreement on that issue?
A. **As I recall, the agreement stated that DOE would pay one half the invoiced cost, the vendor invoiced cost for the first two casks, licensed casks,**



**NRC-licensed casks.**
Q. Do you recall where as of September of '91, SMUD was considering buying an entire fleet of dual-purpose casks --
MR. SHULTIS: Objection, calls for speculation.
BY MR. MACDONALD:
Q. -- to store its fuel?
A. **They hadn't done their procurement yet, so I don't know what all they considered, because, you know, after they did the procurement, there was a bunch of systems that came under consideration, storage systems.**
Q. As of September of '91, SMUD had made no decision with respect to dry storage; is that right?
MR. SHULTIS: Objection, foundation, calls for speculation.
A. **Yeah, I don't know if they made the decision or not.**
Q. I believe you just testified that SMUD had not issued its --
A. **Procurement. I don't think -- I can't**



**remember exactly the date when they issued the procurement.**
MR. SHULTIS: Can we take a real short break?
MR. MACDONALD: Off the record.
\- - -
(Discussion off the record)
\- - -
BY MR. MACDONALD:
Q. You testified a minute ago that your primary point of contact was Ken Miller?
A. **Ken Miller, yes.**
Q. Exhibit 4 states that a technical management committee will manage the project. Were you on the technical management committee?
A. **I was.**
Q. What was your role on the committee?
A. **Long time ago. I was under the impression I was a co-chair. Is that --**
Q. With Ken Miller?
A. **You know, I really don't remember. I do remember having to take the lead for DOE and I thought**



**it was on a lot of the technical aspects of the agreement.**
Q. You took the lead on a lot of the technical aspects of the agreement?
A. **It seems like it. I don't really -- I don't really remember.**
Q. One of the SMUD employees listed on this exhibit is Rita Bowser, and it states voting committee members will be Rita Bowser representing SMUD. Do you recall Rita Bowser's role in the Cooperative Agreement?
A. **Not very clearly other than they relied on her for the technical support for the storage system.**
Q. And for your benefit, about the middle way down under "Casks and Transfer Device Procurement," it states SMUD will issue an RFP for transportation casks in two weeks.
A. **Oh, okay, yeah.**
Q. Do you recall having reviewed the RFP that SMUD put out for the transportation casks?
MR. SHULTIS: Objection, asked and answered.
A. **I had an informal review. We didn't have**

93

**any approval authority or anything like that.**
Q. What was your informal review of the SMUD RFP for the transportation cask?
**A. Just to read the scope of work statement.**
Q. And to the best of your recollection, what was the scope of work statement?
**A. I really don't recall.**
\- - -
**(Deposition Exhibit Number 5 was marked for identification.)**
\- - -
**BY MR. MACDONALD:**
Q. Mr. Langstaff, I've had marked as Exhibit 5 a letter from the Department of Energy dated November 27th, '91. The subject is draft technical specification for dual-purpose spent nuclear fuel casks. The letter is from Jeff Williams of DOE. On the third page, you'll note that you are included as a cc.
**A. Yes.**
Q. Do you recall having reviewed this letter and its attachment before?

94

**A. No, I don't recall that.**
Q. If you would --
**A. I have no doubt I did, but I don't recall it.**
Q. If you would turn to the pages with handwritten notations on it, there are -- you'll see the attachment has handwritten notes at various places?
MR. SHULTIS: Do you want to identify the Bates range maybe?
BY MR. MACDONALD:
Q. From SMUD-6756 through the end of the document, which is SMUD --
**A. I think we missed a page here.**
Q. 6769.
**A. We're missing 6 I think, or how --**
Q. Well, let me just ask you this. Can you tell if -- is this your handwriting?
**A. I don't recognize that.**
Q. You don't recognize the handwriting?
**A. No.**
MR. SHULTIS: Can I just note for the record

95

that this document doesn't appear to be complete.
THE WITNESS: Yeah.
BY MR. MACDONALD:
Q. Noted. Thank you.
**A. Yes, a lot of this -- I don't know, but it doesn't look -- I don't recognize this.**
Q. You don't recognize it?
**A. No.**
Q. Do you recall -- strike that. If you turn to the front page of the document --
**A. Okay.**
Q. The third sentence states that Department of Energy representatives provide -- also provided general comments to Ms. Rita Bowser during a meeting of the demonstration project participants in San Francisco on November 15th, 1991.
**A. Uh-huh.**
Q. Do you recall providing comments to SMUD on the technical specification for the dual-purpose casks?
**A. I don't recall that. Like I said, that was over 15 years ago.**

96

Q. Any reason to doubt -- do you have any reason to doubt that you as the person that took the technical lead provided comments on the technical specification?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I have no reason to doubt that I would have provided comments.
\- - -
(Deposition Exhibit Number 6 was marked for identification.)
\- - -
BY MR. MACDONALD:
Q. Bringing back some long forgotten memories?
**A. I wondered what the date was. I remember it was December 18th for the preproposal meeting.**
Q. So the record's clear, I've had marked as Exhibit 6 a document dated December 18th, 1991 which discusses a preproposal meeting on SMUD's RFP for dual-purpose casks.
**A. That's correct.**
Q. And the document states that the meeting was held at the SMUD P-A-P or PAP building. Do you recall

attending that meeting?
A. **I recall attending the meeting.**
Q. What was the purpose of the meeting?
A. **Purpose of the meeting was for the respondents to the proposal to come in and meet with Rancho Seco to raise questions, get clarification with regard to the request for proposal.**
Q. And the respondents to the proposal were various companies that manufactured casks; is that right?
A. **I would call them vendors.**
Q. Okay. Cask vendors?
A. **Yeah, storage system vendors.**
Q. And you attended that meeting on behalf of the Department of Energy?
A. **Correct.**
Q. Do you recall the types of systems that were being proposed by the various vendors?
A. **I don't recall that they described their systems. I mean, they weren't presenting. They were -- the subject of discussion was the terms and conditions and the scope of the request for proposal,**



**and they were there to get clarification of that, but there was a lot of people there. I mean a lot of vendors.**
Q. So more than -- more than the five vendors that are listed?
A. **I believe there was more, unless -- unless there was two different meetings.**
Q. And what was your role as a DOE representative at this meeting?
A. **I was an observer, just to observe the interaction, the questions from the potential proposers, respondents to the RFP.**
Q. And was it part of your role to understand the types of systems that the vendors would propose?
A. **I wouldn't say so. I think -- are you talking about a technical understanding of their system?**
Q. Well, I guess I'm trying to understand why you were included in this type of meeting.
A. **I think I was interested in the -- I don't know what you'd call it, the breadth or extent of response. I think that SMUD had -- was under the**



**impression when we started negotiation that there were very few vendors that would even consider bidding or be able to deliver spent fuel storage systems, dry storage, and our position was that there was a number out there, and so we were curious what was actually going to happen in terms of response, and as I recall, there was quite a few.**
Q. Do you recall the number of vendors that responded to SMUD's RFP?
A. **I believe it was more than ten.**
Q. We'll turn to that in a minute. At this meeting or any other that you had with SMUD, did you ever tell them or suggest that they should pursue storage-only casks as opposed to dual-purpose storage and transportation casks?
A. **No.**
Q. Did you think it was in -- did you think -- strike that. Did you think it was a reasonable decision for SMUD to pursue dual-purpose storage and transportation casks?
MR. SHULTIS: Objection, calls for speculation, asked and answered.



A. **It wasn't our business, you know, what they were going to procure. We were just -- in this case, like I said, we were hoping that they would see that there were more vendors there than their original impression. They directed the procurement. DOE really I don't think had any influence on their procurement process.**
Q. Would DOE have been interested in the demonstration project or Cooperative Agreement if SMUD was pursuing storage-only casks?
MR. SHULTIS: Objection, calls for speculation, lack of foundation.
A. **The DOE -- the DOE interest was to support a Cooperative Agreement that would result in a cask that was licensed by the NRC for both storage and transport after extended storage. That was the objective of the DOE involvement, so that's the only expectation that we had with regard to this system.**
Q. And so I'm clear about this, the objective was so that -- strike that. The objective was that an NRC-licensed cask for storage and particularly transport would result; is that right?

101

A. **That's right, after storage. Transport after storage.**
Q. At any of your meetings with employees at SMUD, did you ever express the view that SMUD should simply leave its fuel in the pool and not pursue dry storage?
A. **No.**
Q. Did anyone at DOE express that view to SMUD?
MR. SHULTIS: Objection.
BY MR. MACDONALD:
Q. To your knowledge.
MR. SHULTIS: Objection, calls for speculation.
A. **I have no idea.**
Q. At the meetings you attended, nobody from DOE ever suggested to SMUD that they ought to leave their fuel in the pool; is that right?
MR. SHULTIS: Objection, asked and answered.
A. **I don't ever recall anyone from DOE suggesting that they leave the fuel in the pool.**
Q. Do you think it would have been a reasonable decision for SMUD to leave its fuel in the pool?

102

MR. SHULTIS: Objection, lack of foundation, calls for speculation.
A. **That's their decision. I don't even really have an opinion on that.**
Q. From a technical standpoint, could SMUD have left its fuel in the pool until eventual acceptance by DOE?
A. **It's a decision of their management, of SMUD management. Whatever considerations they bring into their basis for their decision, you know, they can make the decision. I don't know what their bases are and have no understanding at all what would be a good decision to make for them.**
Q. Just so I understand, I'm going to limit the question to your knowledge from a technical basis. Could a utility simply leave its fuel in the pool and decommission the rest of its plant while leaving the fuel in the pool?
MR. SHULTIS: Objection, foundation, calls for speculation.
A. **That's a very complicated question the way you stated that.**

103

Q. What aspect of it is complicated, and I'll try to make it more simple.
A. **When you kind of mix together closing the plant and leaving the pool open, it all has to do with license and license requirements and the costs to maintain the license, and the pool's part of the plant license.**
Q. Can you get a possession-only license to store fuel in the pool?
MR. SHULTIS: Objection, foundation.
A. **Actually, you may be able to, but to me, that changes the whole thing and you're talking about management decisions that the utility would make based on what they have to consider.**
Q. Do you recall DOE wanting SMUD to do a, quote, hot demonstration of a dry transfer system at its Rancho Seco site?
MR. SHULTIS: Objection, assumes facts not in evidence.
A. **That may have been very early in the discussions before anybody really understood what comprised a dry transfer system and what costs were**

104

**associated with constructing one.**
Q. If you could expand upon that, what are the costs associated with constructing one and what sort of issues arise in conducting a hot demonstration of a dry transfer system?
A. **Okay, well, first of all, I mean, the actual -- when we signed the agreement, I think we've gone past that, and there was reasons for that, and the Cooperative Agreement with EPRI was to develop a detailed design for a dry transfer system, and part of the detailed design was a cost estimate to build the detailed design, and that was not available. You know, the cost estimate really wasn't available until '95 or 6. And what we eventually agreed to do was to have SMUD just load their cask with fuel in various configurations and then do temperature monitoring to look at varying loading of the cask and see how that compared to thermal performance models for dry storage.**
Q. Would a dry transfer system be a costly endeavor to design and build?
A. **It would, considering that we could do that**

**demonstration I just mentioned using what they had in their spent fuel pool storage building without any additional construction.**
Q. I'm sorry. I'm a little confused. Who could do the demonstration in the spent fuel pool building?
**A. Rancho Seco. They handle everything within their facility.**
Q. And what is the demonstration you're referring to that they could do in the spent fuel building?
**A. It was loading the cask with various configurations of older and -- well, fuel discharged in the past and fuel discharged recently, because it would be at different temperatures, different heat generation rates.**
Q. So SMUD could do that aspect of the demonstration in the spent fuel building?
**A. Yeah.**
Q. Do you recall if the Cooperative Agreement with SMUD was finally signed and entered into in late 1994? Does that sound right to you?



**A. That would be approximately.**
Q. Can you explain what took from 1991 to the end of '94 to finalize the Cooperative Agreement?
**A. If you go back to Exhibit 4 --**
Q. Okay.
**A. Under the cask and transfer device procurement and SMUD suggesting that they would buy the first cask -- or DOE would buy the first cask and SMUD the second, to get from that point to where we agreed that DOE would pay half the vendor invoice cost of the first two casks was a large part of that discussion.**
Q. And -- strike that.

\- - -

(Deposition Exhibit Number 7 was marked for identification.)

\- - -

BY MR. MACDONALD:
Q. Mr. Langstaff, I've had marked as Exhibit 7 a document dated April 7, '92, which is meeting minutes from a March 4, 1992 meeting for the demonstration project.



**A. You said a March --**
Q. The first paragraph references a March 4th, 1992 meeting.
**A. Okay.**
Q. Do you have that in front of you?
**A. Yes, I do.**
Q. And if you'll note that you are listed as one of the attendees?
**A. That's true.**
Q. Do you recall attending a meeting in Sacramento on March 4th of '92 or thereabouts?
**A. Actually, I don't recall that meeting specifically.**
Q. No reason to deny that you attended?
**A. No.**
Q. If you would turn to the second page --
**A. Third page?**
Q. The second page.
**A. Second page.**
Q. The bottom paragraph references the fact that Ken Miller discussed the five vendor bids for dual-purpose casks received by SMUD. Do you see where



I'm reading?
**A. Yes, I do.**
Q. Does this refresh your recollection whether SMUD received five bids from its RFP as opposed to ten or more?
**A. When I was talking about the -- that pre-bid conference, some of those people didn't bid, so five vendor bids is reasonable.**
Q. This is consistent with your recollection that SMUD received five bids from the RFP?
MR. SHULTIS: Objection, mischaracterizes prior testimony, calls for speculation.
**A. You know, I don't recall the exact number, but I wouldn't be surprised it was five. That wasn't my real focus of attention.**
Q. At this time, what was your real focus of attention?
**A. What the process is, how it was working. In other words, we had multiple vendors and just to follow up and see what SMUD was going to do, how were they going to select.**
Q. And the two sentences below, it references

109

the fact that Ken Miller explained the difference between a dual-purpose cask system and a single dual-purpose cask. Do you recall that difference?
A. **I don't recall his discussion.**
Q. Do you recall that the RFP that SMUD put out sought an entire fleet of dual-purpose casks and that the bids they received proposed a canister-based system with a single dual-purpose cask?
MR. SHULTIS: Objection, asked and answered, calls for speculation.
A. **What it was is that they had been dealing with a cask vendor who had a dual-purpose design, and you would buy multiples of that cask to store the fuel, and SMUD was under the impression that that was all there was available. When they received these other proposals, then that enabled them to realize there was more systems to choose from.**
Q. Were any of the systems that were being proposed actually in existence, a dual-purpose storage and transport cask?
A. **There was no licensed, NRC-licensed dual-purpose casks at that time.**

110

Q. So SMUD was pursuing something that had not yet -- that was not yet in existence?
A. **And that's why -- not yet licensed.**
Q. Not yet licensed.
A. **Yeah, NAC was in the process pursuing a license, but that's why DOE was involved, was to help support the effort to get the licensed -- duly licensed, you know, transport and storage cask.**
Q. DOE was interested in getting a dual-licensed cask for storage and transport?
A. **That's right, yeah, because there was none available and there was a need, an industry need.**
Q. What was that need?
A. **Well, ultimately, the need would be to be able to transport after storage, to be able to transport fuel to a repository.**
Q. And the benefit would be you would not -- if a cask was licensed for storage and then subsequent transport, you would not have to return that fuel to the pool before transporting; is that right?
MR. SHULTIS: Objection, lack of foundation, calls for speculation.

111

A. **That would -- I mean, that would be one of the considerations, but that wasn't the only one because -- anyway, I don't think that the driver was you didn't have to go back to the storage pool.**
Q. What was the benefit then of having a duly licensed cask for storage and then transport?
MR. SHULTIS: Objection, vague.
A. **I'd need to think about that. Okay. You want to rephrase the question?**
Q. I believe you testified just a minute ago that one of the reasons that DOE was interested in a Cooperative Agreement is that the hope was that a dual-licensed storage and transport cask would result, correct?
A. **Correct.**
Q. And you said that there was a need for -- an industry need for such a duly licensed cask, correct?
A. **Correct.**
Q. And that DOE was interested in seeing that type of cask be developed, correct?
A. **Correct.**
Q. And so I'm just trying to understand why DOE

112

was interested in seeing that type of cask be developed.
A. **I would have to -- I'd have to think more about it, but basically it's just so that if you did store the fuel, that you could transport it without having to handle it again. That would be a large advantage. It still is a cask that could be used if you were transporting out of the storage -- yeah, the fuel pool, so I'm saying it's not just for the purpose of not having to go back to the pool.**
Q. But straight out of a pool, you could put fuel into a transport-only cask, correct?
A. **That's true.**
Q. So there wouldn't be -- it wouldn't be necessary if you were just taking fuel out of a pool and putting it into a transport cask, the dual license wouldn't be necessary.
A. **That's true.**
Q. And when you talk about the need for a dual -- an industry need for a dual-licensed cask, was part of that need stemming from the fact that DOE was not going to be able to begin accepting fuel in '98?

113

MR. SHULTIS: Objection, assumes facts not in evidence.
A. **There was pools already -- I mean, there was reactors already running out of storage space that would be out of storage space by '98.**
Q. And by DOE not coming to pick up fuel in '98, would there be many more reactors that would be running out of space?
MR. SHULTIS: Objection, calls for speculation.
A. **Yeah, that depends on the fuel management plan of the reactor, because they would rerack from time to time, so storage capacity could change for a reactor.**
Q. But by definition, if DOE doesn't come to pick up fuel in '98, there will be a greater need for additional dry storage at utilities, correct?
A. **Yeah, all I'm saying is the storage capacity wasn't staying constant.**
Q. I appreciate that, but I just want to make sure the record's clear that DOE not coming to pick up fuel in '98 increases the need for additional dry

114

storage, correct?
A. **Or pool storage.**
Q. Increases the need for storage at reactors.
A. **That's correct.**
Q. Either pool or dry storage.
A. **That would be true.**
Q. And by the development of a dual-licensed cask, that will help the need for utilities to store fuel because they can take fuel out of the pool and put it in a dual-licensed cask, correct?
A. **It provided more flexibility in the overall system.**
Q. And DOE saw that as a benefit, correct?
MR. SHULTIS: Objection, foundation.
BY MR. MACDONALD:
Q. That's one of the reasons they were participating in the Cooperative Agreement, right?
MR. SHULTIS: Same objection.
A. **The difficult thing would be whether the utilities saw the same advantage.**
Q. And explain what you mean by that.
A. **For the companies that were already running**

115

**out of storage space, if they had a dual-purpose system rather than the store-only system, it would be an advantage to them.**
Q. It would be an advantage to other utilities to have a dual-licensed cask system available?
A. **Yes.**
\- - -
**(Deposition Exhibit Number 8 was marked for identification.)**
\- - -
**BY MR. MACDONALD:**
Q. Mr. Langstaff, I've had marked as Exhibit 8 a document that starts on Bates page SMUD 18290, and it references a meeting of the demonstration project of April 16th, 1992.
A. **Yes, I have that.**
Q. I'll note that you are listed as one of the attendees, and that the meeting took place in Las Vegas, Nevada.
A. **Yes.**
Q. Do you recall attending this meeting with SMUD in Nevada in April of '92?

116

MR. SHULTIS: Can I just have a note on the record that the document refers to an agenda, an attached agenda --
MR. MACDONALD: Noted.
MR. SHULTIS: -- that's missing.
BY MR. MACDONALD:
Q. Let me know --
A. **Okay, yeah, go ahead. This was a good refresher.**
Q. This one helps shake some of the cobwebs loose?
A. **Yeah, I thought things were developing and changing, as I recall, and this confirms some of that.**
Q. And tell me what it confirms in terms of things changing.
A. **Well, the concept of the demonstration that we were going to do and whether or not we were going to use the -- we would be using the dry transfer system.**
Q. And if you would turn to the second page, which I notice you are already reading, I want to direct your attention to the paragraph that starts J

period Field discussed the cask vendor bids?
A. **Yes.**
Q. And that paragraph states that the short list of two vendors does not include metal dual-purpose casks.
A. **Uh-huh.**
Q. And goes on to talk about the fact that SMUD plans to canister its fuel. The canisters would be licensed under 10 CFR parts 71 and 72. Is that consistent now with your recollection that --
A. **No, I mean, I don't have that specific recollection, but SMUD was evolving in their understanding of licensing and transport and storage, and they did not have a full understanding I don't think at that point.**
Q. Do you recall SMUD asking about DOE's opinion concerning the use of canistered fuel?
A. **No.**
Q. Do you recall having any opinion about SMUD proposing to canister its fuel?
A. **No, I don't -- I don't remember having any opinion on that.**



Q. Do you recall whether SMUD ultimately signed a contract with Pacific Nuclear to procure a canister and cask-based system?
A. **I was under the impression they signed a contract with VECTRA.**
Q. I'll represent to you that VECTRA took over Pacific Nuclear --
A. **Okay.**
Q. -- in approximately 1993 or thereabouts, so we can look at some additional documents, but sitting here today, you recall that SMUD had a contract with VECTRA to procure the system?
A. **For this NUHOMS system.**
Q. NUHOMS?
A. **Yeah, and the NUHOMS systems was the MP-187 cask and the concrete storage modules basically. It was used to canister, so I don't know if that answers your question. I mean, that's the system that they ended up with and that we dealt with.**
Q. That was the system that you dealt with --
A. **Yeah.**
Q. -- when you were working on the technical



aspects of the development of the demonstration project?
A. **Well, now our focus was that they -- they had total freedom to enter into whatever contract with whomever they wished. Our only requirement was that the cask -- that there be a cask that was licensed, duly licensed with the NRC storage and transport license, okay? That was our driver and we just kept reminding them of that, and we ended up with the NUHOMS system. To me, the way this is written here, there's still some confusion either on the part of whoever's providing input to whoever the author of this thing is or on the writer of the minutes, the author of the minutes, there's a little bit of confusion here.**
Q. And --
A. **And I guess that doesn't bother me too much because I know where we finally ended up.**
Q. And I think you said a minute ago that DOE's -- the driver for DOE was that it have a dual-licensed storage and transport cask at the end of it.
A. **Right.**



MR. MACDONALD: Let's go off the record.
(Recessed at 2:58 p.m.)
(Reconvened at 4:42 p.m.)
BY MR. MACDONALD:
Q. Mr. Langstaff, I appreciate your patience during that long break.
A. **That's fine.**
Q. We were previously looking at Langstaff Exhibit 8, which refers to a meeting in Las Vegas, Nevada on April 16th, 1992 that you attended, and I believe you testified that it brought back some memories about the Cooperative Agreement or the idea for the Cooperative Agreement going through various iterations. Is that fair?
A. **Yes.**
Q. And on the first page, the third paragraph mentions that D. Langstaff discussed the schedule for completing the SCAP and Cooperative Agreements with SMUD and EPRI, and the final sentence references the fact that Leroy Stewart mentioned that July 1st was the date provided to RW and Congress as the expected signing date of the acceptance agreement. I think we

**of years.**
Q. Would you characterize it as a difficult process in light of the fact no cask had ever been licensed for both transport and storage?
MR. SHULTIS: Objection, vague.
**A. Did you want to rephrase that or break up the question?**
Q. Well, I'm just trying to understand whether you would characterize the process of getting an NRC license, a dual license for storage and transport, did you consider that at the time a difficult task?
**A. Yes, I did consider it a difficult task.**
Q. And why -- describe for me -- I'm obviously not an engineer. Why was that? What is difficult about that?
**A. Well, it's not really even about being an engineer. I mean, if you were getting a single license, a transport license, NRC has a very formal process, a disciplined process for reviewing the designs and the steps to progress through the licensing process, and they're very thorough and it takes a long time to do that. In this case, you had a**



**design of a single piece of hardware that was going through that process and the storage requirements were slightly different than transport, and there was two different organizations that NRC involved when we started this, and so you combine those two parallel tracks and depending on where you have the crossover within NRC, I mean, that results in a complex process.**
Q. And did you work with SMUD as they went through that complex process to get the dual-purpose license?
**A. I only worked -- I only went as an observer. I mean, they had their vendor as their guide and they made their decisions on what they wanted to do on the process, and I was along as an observer because I was very interested in how this process would unfold.**
Q. And you were interested because no cask had ever been licensed by the NRC for both storage and transport; is that right?
MR. SHULTIS: Objection, mischaracterizes prior testimony.
**A. I was interested just because I wanted to better understand the NRC process.**



Q. And DOE wanted to better understand the NRC process for the dual license; is that right?
MR. SHULTIS: Objection, foundation, mischaracterizes prior testimony.
**A. I'm not sure if DOE -- if they had an interest. That was being pursued separately from my activity.**
Q. Well, your activity was as -- you were doing your activity as an employee of DOE, correct?
**A. Yes, that's right.**
Q. So it's not that you had just a personal interest in wanting to understand the NRC process. You were working with SMUD as part of your job for DOE, correct?
**A. I wanted to be able to provide feedback from the observation to SMUD as I could to see if we could better understand where we were headed and what we were going to deal with.**
Q. You wanted to provide feedback to SMUD about the licensing process?
**A. Well, how it looked like things were proceeding and what my experience had been, but I**



**think there was somebody different, that headquarters may have actually had somebody interested in the licensing -- the interaction with NRC, that was kind of their area of pursuit. I mean, headquarters I think may have had somebody do that.**
Q. And did you have interactions with that person at headquarters?
**A. No.**
Q. Do you know who that person was?
**A. No. It actually may have been a contractor.**
Q. What was Mike McKinnon's role with respect to the Cooperative Agreement?
**A. Mike McKinnon was an engineer from PNL, and he had expertise in dry storage systems and thermal analysis of the storage systems, you know, thermal performance, code analysis type things.**
Q. He's listed on Exhibit 9 as attending the meetings. Did he typically attend meetings with you?
**A. Yeah, he was my technical support for this Cooperative Agreement.**
Q. And what type of technical support would he provide?

149

system is an important step toward developing spent fuel dry storage equipment. Do you see where I'm reading there?
A. Yes.
Q. Do you agree that developing that licensing of transport and storage was an important step towards developing dry storage equipment?
A. Yes.
Q. The following sentence references a statement that the dual-purpose dry storage would allow the utility to reduce costs while enhancing safe dried storage. Would you agree that going to the dual-purpose dry storage system would allow the utility to reduce costs and enhance safe dry storage?
**A. Yeah, I think that's possible.**
Q. The second page of the draft press release references a statement from DOE Richland manager John Wagoner.
**A. Uh-huh.**
Q. Do you recall what his involvement was with the Cooperative Agreement?
**A. Almost none at all.**

150

Q. Do you know why the draft press release would include a statement from him? Simply because he was the head honcho?
**A. He was the policymaker, stater, whatever.**
Q. Did you report to John Wagoner at the time in 1994?
**A. Indirectly.**
Q. Was there a layer or two between you and he?
**A. Yes, there was.**
Q. The statement attributed to Mr. Wagoner is that the partnership with industry is significant because we are solving a national transportation and storage problem. Do you see where I'm referencing?
**A. Yes, I'm with you.**
Q. What was the national transportation and storage problem that he's referencing?
MR. SHULTIS: Objection, foundation, calls for speculation.
**A. I believe it was that a lot of the plants, the nuclear plants, commercial plants, were approaching their pool storage limits.**
Q. And why would that require a transportation

151

and storage cask to address that problem?
**A. What was available at that time in terms of licensed dry storage wasn't transportable.**
Q. It was not transportable?
**A. Right, and so that meant that they could, you know, get out from under the pool costs that the utilities that -- well, I mean, if they were shutting down, they could do that. Let me back up. If a utility was exceeding their storage capacity, they would have to buy some kind of interim storage, either space in another utility plant's pool or dry storage units, so that would involve additional cost, okay.**
**Having these -- the new designs, especially the NUHOMS system, definitely had the potential to eventually reduce the cost and simplify handling of the spent fuel at the nuclear power plants. If you could have the dual-purpose cask, the canistered fuel and the storage modules, be able to load the storage modules with -- and only have one cask on site, that definitely is -- the potential is there to reduce costs if you needed that additional storage.**
Q. And one of the national problems that

152

increased the need for a dual-purpose transport and storage cask system was DOE's schedule slippage for the repository; is that right?
MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation.
**A. Yeah, that could add to an existing problem.**
Q. If you'd turn to the next page, there's a reference to a quote from Ken Miller, and it references certain costs related to storage.
**A. Oh, yeah.**
Q. Are those numbers that you recall discussing?
**A. Well, the 12 million is. As I was mentioning, it costs them about a million dollars a month to maintain a pool. I hadn't -- I didn't remember the 2.8 million annual cost to -- for the dry storage operation, but I don't remember that exactly, but it seems reasonable.**
Q. The statement following the quote is that, quote, "Miller said the savings is significant in view of the anticipated delay in establishing a permanent repository." Do you see that?

A. **Yes.**
Q. As of May of '94, you agree that there was an anticipated delay in establishing the permanent repository?
A. **Do I agree? I would say that there was -- in the media and other places, yeah, for sure, there was an anticipated delay.**
Q. Do you know if that anticipated delay impacted SMUD's decision-making in going to dry storage in any way?
A. **No, I don't.**
MR. SHULTIS: Objection, foundation.
A. **No, I don't.**
Q. Do you recall, Mr. Langstaff, receiving monthly reports under the Cooperative Agreement from SMUD?
A. **Some monthly reports. I remember requesting monthly reports.**
Q. What did the monthly reports -- why do you remember requesting them? What information did they give you that you thought was helpful?
A. **Well, there's two things you're interested**



**in. One is the, you know, are you on schedule, what work scope is being completed, and the second thing is the cost, are the costs what you planned.**
Q. Let's break those two down. Do you recall the work scope moving ahead on schedule?
A. **It depends on where you are in time. You know, once -- once the license -- the design, license application had been docketed with the NRC and SMUD began the exchange with NRC on questions, I think as you got farther into that, there was more delays.**
Q. There were more schedule delays once they got into the process with NRC?
A. **I think so, yeah.**
Q. Do you know if some of those delays were attributable to the NRC?
MR. SHULTIS: Objection, calls for speculation.
A. **We talked about the process before where the NRC has a defined process pretty well known and stringent expectations, and so it doesn't surprise me if they raise an issue about a design and the applicant fails to satisfy them, that the NRC will**



**send them back to do further analysis, so that's not a surprise to me. I mean, it's not their fault in my opinion. That's their process.**
Q. The NRC process is stringent and can end up taking a lot of time.
A. **I mean, either you do an outstanding job up front -- it's kind of like the oilman, pay me now or pay me later. You try to rush in something that's not really well done and it takes time then until it is well done, because the design will be well done by the time it's approved by the NRC.**
Q. And that can result in a fairly lengthy process, is that fair, before the NRC approves a license of this kind for dual-purpose storage and transport that had never been done before?
A. **Yeah, yeah.**
Q. Do you know whether VECTRA ultimately filed for bankruptcy?
A. **I heard that secondhand, thirdhand.**
Q. It was after you were finished with the Cooperative Agreement in '96?
A. **Yes, yeah.**



Q. Do you know how that impacted the schedule for completion of the dry storage project?
A. **No, I don't.**
Q. You referenced a minute ago that you received and asked for the monthly reports under the Cooperative Agreement.
A. **Yes.**
Q. And we talked a little bit about the -- you using them to make sure the project was on schedule and to see how it was measuring up to the schedule.
A. **That was my intent.**
Q. And you also mentioned that you used it to see how the costs were -- how the costs were accruing on the project more or less?
A. **Yes, and I don't remember actually much cost information coming in that.**
Q. Do you have any recollection of whether the costs for the project while you were involved were meeting the schedule or not meeting it?
A. **No.**

- - -

**(Deposition Exhibit Number 14 was marked for**

Q. Did you have discussions with anyone at DOE in which they talked about whether they would actually accept fuel on an oldest fuel first basis?
MR. SHULTIS: Objection, vague, lack of foundation.
**A. Could you restate the question?**
Q. Did you have discussions with people at DOE about whether DOE would actually accept fuel on an OFF basis?
MR. SHULTIS: Same objections.
**A. I mean, they would just be informal discussions or secondhand. It had nothing to do with policy. You know, I don't have anything to do with establishing policy or input to policy, so --**
Q. What type of informal discussions did you have?
**A. I would even back off from discussion. It probably would have been listening in a meeting because I just -- I wouldn't -- in my roles, I wouldn't really have a discussion about whether they're doing oldest fuel first or not.**
Q. How would that come up in meetings that you



attended?
**A. Well, in the annual capacity report, the subject of acceptance priority would be discussed, and that's by and large decided by the acceptance folks at RW headquarters.**
Q. Were you involved in something called the issue resolution process between DOE and utilities with respect to the ACRs?
**A. Yeah, I was the liaison or project oversight at Hanford for the PNL work that supported the contract, and what that project did at the beginning was analyze the contract, and it identified 34 issues to the execution of the contract.**
Q. And they were -- the 34 issues that were identified -- were they open questions or ambiguities that remained in the contract?
MR. SHULTIS: Objection, foundation, vague.
**A. They were -- I guess you'd call them structural deficiencies in the contract.**
Q. Do you recall what some of those structural deficiencies in the contract were?
**A. Actually, I don't. That was -- again, that**



**was a long time ago and I have not used that information for over ten years.**
Q. Do you recall whether the structural deficiencies that were identified in the issue resolution process, do you recall whether those were resolved by DOE and the utilities?
**A. I recall that it was the Edison Electric Institute I think when we first identified these, and as time went on, there was an agreement between Alan Brownstein and whoever his counterpart was to pick ten -- you know, agree what were the ten top priority issues that they could work for resolution, and they set about developing a plan to work those issues.**
Q. Do you recall whether the issues -- those top ten were resolved?
**A. No, I don't recall what the issues were, and obviously I wouldn't know whether they'd been resolved if I don't know what they were or can't recall what they were.**
MR. MACDONALD: At this time, Mr. Langstaff, I have no further questions for you. There are a few documents trickling in so that there's a very slight



chance we'd have to call you back. I don't expect that to happen, but I appreciate your patience today.
THE WITNESS: Thank you.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. SHULTIS:
Q. Can I just ask a couple questions, because I wanted to clear some things up. Dave, when you talked earlier about working files, providing your working files, those were provided to the Department of Justice for discovery, weren't they?
**A. Yes. Yes, they were.**
Q. Okay. Can I also have you take a look at Exhibit 11? We talked about it a little earlier. The bottom of the page on the page number that's Bates -- the page that's Bates numbered HQR-016-1743.
**A. Okay.**
Q. Are you with me?
**A. Yes.**
Q. You see that paragraph that says "Cask Operations. What are the tradeoffs if DOE takes title to the cask upon delivery," and then parentheses, in 1995, "compared to DOE taking title after DOE has