IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 98-488C<br>(Judge Braden) |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT

Pursuant to this Court's orders dated March 23, July 28, and October 8, 2004, and its order dated February 15, 2005, defendant, the United States, respectfully submits the following memorandum of contentions of law and fact.

INTRODUCTION

This case involves a claim by plaintiff, Sacramento Municipal Utility District ("SMUD"), for the past capital costs allegedly associated with the design, licensing and fabrication of a dry storage facility to store its spent nuclear fuel ("SNF").[1] At trial in this case, SMUD bears the burden to establish that the incurred costs associated with SMUD's dry store storage facility are the direct result of the Government's breach of the Standard Contract between the Department of Energy ("DOE") and SMUD to remove SMUD's SNF from its Rancho Seco Nuclear Generating Station. SMUD simply cannot demonstrate that DOE's breach of the Standard Contract caused the tens of millions of dollars that SMUD now claims as damages.

---

[1] SMUD has submitted two separate damages claims in this case. On April 16, 2004, SMUD submitted a damages claim to the Government totaling $60,168,598, and covering the years 1997-2003. On August 27, 2004, towards the end of fact discovery, SMUD amended its damages claim to include an additional $20,540,286, which encompasses costs incurred from 1992-1996.

Specifically, SMUD cannot establish that DOE's breach of its obligation under the Standard Contract to begin acceptance from contract holders generally in 1998, but not from SMUD specifically until at least 2001, caused SMUD to transfer its SNF from its wet pool to a dry storage facility. Although SMUD asserts that it would have kept its SNF in wet storage had DOE not indicated its intention to breach the Standard Contract, SMUD provides no contemporaneous evidence that its decision to pursue dry storage was caused by DOE's breach. Indeed, quite the opposite is true, as the evidence establishes that SMUD's primary motivation for choosing to pursue dry storage was financial and that it believed the cost of going to dry storage would have paid for itself within two-to-three years. Facing the prospect of 16 years of wet storage under the most generous of assumptions in the non-breach world, SMUD's decision to place its SNF into dry storage made imminent economic sense without regard to DOE's breach of the Standard Contract.

In addition, SMUD cannot escape the fact that the miserable performance of the Rancho Seco Nuclear Generating Station led to a ratepayer referendum that mandated the premature permanent shutdown of the facility and that SMUD viewed the dry storage option as a way to facilitate the decommissioning of the plant so that the site eventually could be converted to another use. Indeed, SMUD believed that pursuit of a dry storage system would <u>increase</u> the chances of, and perhaps even accelerate, DOE's performance under the Standard Contract. In other words, not only was SMUD's decision to pursue dry storage not predicated upon DOE's breach of the Standard Contract, it was predicated upon the possibility of DOE's timely or early performance. Consequently, SMUD cannot establish that, amongst all the factors leading to its decision to pursue dry storage in the early 1990s, DOE's breach of the Standard Contract, under

which DOE was not required to begin acceptance of SMUD's SNF until at least 2001, caused it to pursue dry storage of its SNF.

Even if SMUD could establish causation, SMUD cannot establish entitlement to all the costs included in its damages claims. First, SMUD's damages claims do not take into account its failure properly to mitigate its alleged damages. As we will show at trial, rather than keep its SNF in its wet pool – in which case it would have suffered no damages to date – or pursue an available "off the shelf" dry storage system, SMUD made the business decision to pursue an unlicensed technology that resulted in approximately nine years of delay and tens of millions of dollars in cost overruns. Had SMUD left its SNF in the wet pool or pursued the developed dry storage technology, SMUD's costs associated with the storage of its SNF would have been significantly less.

Second, SMUD's damages claims fail to take into account its possession of failed fuel and Greater Than Class C radioactive waste. As discussed below, both of these items have an effect on the timing of DOE's acceptance of SMUD's SNF, and this effect is not properly reflected in SMUD's damages claims. Third, SMUD's damages claims include costs associated with the transportation of SNF from SMUD to DOE's disposal facility. Under the Standard Contract, however, transportation of SNF is the sole responsibility of DOE, not the utilities. Accordingly, because those transportation costs are included in SMUD's claims, they should be removed and the claim reduced by that amount. Fourth, SMUD does not sufficiently deduct those costs that SMUD would have incurred but for DOE's breach and has failed to provide sufficient detail to support certain of its alleged damages. Finally, SMUD has made no attempt to deduct from its damages claims cost savings that it realized by placing its SNF into dry

storage, such as the savings associated with the facilitation of decommissioning its Rancho Seco nuclear facility. Consequently, even if SMUD could prove that it would not have pursued dry storage but for DOE's breach of the Standard Contract, an analysis of SMUD's claims reveals that many of the costs that SMUD now claims as damages should be deducted from its claims and that offset savings should be considered.

## STATEMENT OF FACTS

SMUD's Rancho Seco Nuclear Generating Station began operating in 1975. From the outset, Rancho Seco was plagued by a poor performance history, including multiple extended outages and placement on a watch list by the Nuclear Regulatory Commission ("NRC") of reactors constituting the "greatest safety significance." Indeed, during the 14-year life span of the Rancho Seco plant, the plant was non-operational more than it was operational. Over the years, public opposition to the continued operation of Rancho Seco increased. This opposition culminated in a June 6, 1989 referendum in which SMUD's ratepayers recommended that Rancho Seco be permanently closed down. Although the referendum was non-binding, SMUD's Board of Directors agreed to abide by the wishes of the voters and shutdown the facility the following day. At the time of the premature shutdown, Rancho Seco had a licence from the NRC to operate through 2008.

On December 8, 1989, following the shutdown of Rancho Seco, SMUD completed the defueling of the Rancho Seco nuclear reactor. SMUD stored all 493 of its SNF assemblies in the wet storage pool within its spent fuel building. Shortly after its decision to shutdown Rancho Seco, SMUD created a Decommissioning Task Force to initiate planning for decommissioning and to place the plant in a “protective lay-up” condition. A major component of this

decommissioning planning was the need to address the storage and disposition of Rancho Seco's SNF.

As early as October 1989, one option that SMUD was considering was placing its SNF into dry storage. This option presented at least two benefits for SMUD. First, dual purpose dry storage represented the quickest and cheapest way to decommission the Rancho Seco facility, because it could not decommission its wet pool as long as SNF remained in the pool. SMUD anticipated that ceasing wet pool operations would result in an annual savings of as much as $8 million.[2] Second, SMUD believed that dual purpose dry storage presented the best chance of having DOE accept its SNF under the Standard Contract through the use of a Monitored Retrievable Storage ("MRS") system by 1998.[3] Indeed, SMUD believed that, if it had its SNF in dual purpose dry storage by 1998, DOE could accept SMUD's SNF at an MRS on a schedule as good as, if not better than, the schedule for acceptance at a Federal repository.

In February 1990, SMUD decided to retain Saul Levy, Inc. ("Levy") as a consultant to evaluate SMUD's storage options for its SNF. Levy provided SMUD a report with its ultimate conclusions on March 31, 1990. Levy considered 15 different storage options for SMUD's SNF and reached the following conclusions:

---

[2] This annual $8 million in estimated savings represented the difference between wet pool storage operation and maintenance costs and dual purpose dry storage operation and maintenance costs. In fact, this estimate likely was conservative, as it failed to take into account the significant costs savings associated with decommissioning and dismantling the wet pool.

[3] The MRS was a Federal storage facility that had been contemplated by Congress since the inception of the Nuclear Waste Policy Act in 1982. See 10 U.S.C. § 10161. The MRS would have served as interim storage until DOE could build a permanent Federal repository. See generally 42 U.S.C. § 10162(b), et seq.

- The most certain approach for SMUD was to continue storing its SNF in its spent fuel pool until disposal in a permanent DOE repository (which was scheduled for 2010 at the earliest). However, this option complicates Rancho Seco's decommissioning and repowering options.

- The option with the lowest capital costs and predictable annual operating costs was storage in the spent fuel pool with a simplified cooling system or in concrete store-only casks.

- The option that offered the best opportunity to keep open the possibility of early off-site shipment, potentially as early as 1998 under a Monitored Retrievable Storage facility ("MRS"), was storage of SMUD's SNF in transportable casks.

DX 165, at SMUD 0031544 (emphasis added).[4] Levy "strongly recommended" that SMUD pursue this third option in conjunction with a demonstration program with DOE to develop the dual purpose cask system. Id. Levy explained that, to accomplish this objective, SMUD should "[e]nter into discussions with the DOE aimed at DOE acceptance of the Rancho Seco spent fuel in 1998." Id. at SMUD 0031606. Notably, Levy acknowledged that:

> The most uncertain element remains the probability that DOE can select a site and make it ready to receive dual purpose casks by 1998. [The dual purpose cask recommendation] only assumes that it is possible this could happen. If, in the intervening eight years it is announced that this will not happen, SMUD can decide to abort pursuit of storage in transportable casks or to continue for other reasons. The other reasons to continue, for example, might be that (1) what is announced is a delay which is judged short compared to an at-that-time reassessment of the time Rancho Seco fuel would be expected to remain in the pool awaiting availability of DOE casks for pickup, or (2) that responsibility for fuel in transportable casks might be taken by DOE at shutdown plants.

[4] "DX __" refers to the Government's exhibits contained on its exhibit list, and "PX ___" refers to SMUD's exhibits contained on its exhibit list. "Pl. Br. ___" refers to SMUD's memorandum of contentions of fact and law filed on February 17, 2005.

> In any case, the only way to be prepared for DOE success in establishing a site by 1998 is to proceed towards storage in transportable casks. No other alternative that could accomplish this objective was found in the course of this study.

Id. at SMUD 0031609 (emphasis added).

Saul Levy presented his recommendations for the disposition of SMUD's SNF at the March 21, 1990 meeting of the Rancho Seco Committee.[5] See DX 159. Levy recommended that:

> SMUD pursue alternative of having all of its spent fuel in transportable storage casks before 1998 primarily because it could lead to shipment to DOE facility by 1998 or to DOE interim acceptance of spent fuel at site by 1998.

Id. at SMUD 085624 (emphasis added). In explaining the rationale for recommending transportable storage casks, Levy reiterated that it "provides [the] earliest opportunity to ship fuel off-site." Id. at SMUD 085632. SMUD management agreed with Levy's conclusions, and, consequently, SMUD's Board of Directors approved of the Rancho Seco general manager's pursuit of the purchase of a dual purpose storage system. At the time, SMUD assumed that it would take two-to-three years to obtain completed, licensed casks. DX 160, at SMUD 085619.

Immediately after the March 1990 Board of Directors meeting, SMUD's general manager, David Boggs, drafted a letter to the Secretary of Energy indicating that, "[a]s a result of the [Levy] study, it was decided that the District pursue dual purpose (storage and transportation) casks or storage only casks that could be effectively interfaced with the early receipt by the DOE of Rancho Seco's spent fuel and subsequent use of the casks by DOE." See DX 164 (emphasis

[5] The Rancho Seco Committee was a committee of the SMUD Board of Directors that oversaw activities at Rancho Seco related to the demobilization of the workforce and development of future plans.

added). Notably, Mr. Boggs' letter also assumed that DOE could identify a storage site by 1998. See id.

Dan Keuter, the Chief Nuclear Officer of Rancho Seco at the time, presented the results of the Levy report at the April 25, 1990 Rancho Seco Committee meeting. See DX 174. Mr. Keuter explained SMUD's strategy as follows:

> [S]et up a demonstration program and construct three dual purpose casks by 1993. At that time, 72 fuel assemblies would be loaded into the three casks and monitored until the DOE takes possession of them in 1998. The remaining 493 assemblies will be maintained in wet storage until 1993. At that time, we should have a commitment from DOE regarding fuel acceptance in 1998. Our decision point regarding concrete casks or dual purpose casks is in 1993. If the DOE will not take our fuel in 1998, or if the dual purpose casks do not prove feasible, we will award a contract to build concrete casks and load the fuel in them by 1995.
>
> . . . .
>
> If a commitment can be obtained from DOE to take possession of the spent fuel by 1998, whether onsite or offsite, then dual purpose casks should be pursued. If a commitment cannot be obtained, onsite concrete cask/canister storage by 1995 should be pursued. This is the earliest that we can put our spent fuel in concrete casks, since it must decay for approximately five years before it is put in cask storage.

Id. at SMUD 0018522 (emphasis added).

SMUD's contemporaneous documents unequivocally reflect that, by May 1990, SMUD had eliminated consideration of leaving its SNF in the wet pool. For example, in a presentation concerning Rancho Seco's decommissioning cost study, SMUD indicated that seven different storage options were evaluated – four involving dry storage and three involving wet storage. See DX 179, at SMUD 0000392. The evaluation indicated that SMUD had rejected each of the wet storage options because "wet [storage is] more expensive than dry." Id.

On June 7, 1990, Rita Bowser, the Rancho Seco Nuclear Fuel Disposition Project Manager who had the responsibility for developing SMUD's dry storage system, submitted to Mr. Keuter a copy of SMUD's independent spent fuel storage installation ("ISFSI") licensing and engineering strategies.[6] See DX 188. In the memorandum transmitting the strategies, Ms. Bowser explained that she was "working with both Licensing and Engineering to immediately implement the generic licensing and design activities necessary for the establishment of the Rancho Seco [ISFSI]." Id. (emphasis added). That same month, Ms. Bowser requested that a work order be opened for "licensing and engineering activities related to dry storage disposition."[7] See DX 187.

The following month, SMUD filed with the NRC a document entitled "Plan For Ultimate Disposition of Rancho Seco Nuclear Generating Station." See DX 194. The document, which is a regulatory requirement, served to "provide the NRC with a status report in the form of advance and preliminary District plans for the ultimate disposition of [Rancho Seco], prior to the filing of the District's [decommissioning plan]." Id., at SMUD 0025395. Consistent with its prior discussion of its intentions, this document reiterates SMUD's plan to place its SNF into dry storage. See id. at SMUD 0025406. Further, similar to its previous statements, SMUD once again expressed its belief that an MRS was expected to be in operation in "about 1998." See id. at SMUD 0025438.

---

[6] An ISFSI is a dry storage complex used for the storage of SNF and other radioactive materials.

[7] SMUD appears to have requested charges at least $4.025 million dollars to this work order prior to 1992. See DX 258; DX 187.

On May 20, 1991, SMUD submitted its proposed decommissioning plan to the NRC. In its plan, SMUD reiterated its intention to place its SNF into dry storage, to have its ISFSI licensed and constructed by 1993, and to transfer its SNF to dry storage by 1998. See DX 248. Further, consistent with SMUD's March 1990 draft decommissioning cost study, SMUD's April 1991 decommissioning cost study that it submitted to the NRC in conjunction with its proposed decommissioning plan again assumed that an MRS would be available to begin accepting SNF by 1998. See DX 237, at 0025652.

On October 3, 1991, Rancho Seco management presented its decommissioning plan, including its dry storage strategy, to the SMUD Board of Directors. At this meeting, Ms. Bowser made a presentation concerning SMUD's ISFSI. DX 274, at SMUD 0027428. The following exchange occurred:

> MS. BOWSER: As a best case, without any negotiations with other utilities which are permitted to improve your place in the queue, they accept it in a policy that's called OFF, oldest fuel first. The first assemblies from Rancho Seco would be scheduled to be received three years after a facility opens, be that a monitored retrievable storage facility or a final repository. That's in the best case.
>
> And it would take approximately ten years from the opening of the facility or an additional seven years from the receipt of our first fuel for them to take the remainder of our assembly.
>
> In a worst case, it would be considerably longer, perhaps up to 20, 25 years.
>
> PRESIDENT SMELOFF: So, it's three years after the Federal Government develops an MRS that they would be required to begin to take spent fuel.
>
> MS. BOWSER: Yes. They may take our first assembly in the best case.
>
> . . . .
>
> PRESIDENT SMELOFF: And is that likely to be 1998 or is that –

> MS. BOWSER: At this time, it is likely that an MRS could be sited by 1998; however, there needs to be some congressional action that would delink the final repository from the MRS. Right now, the two are linked so that you can't actually start to operate an MRS until you've sited a final repository.
>
> With the situation at Yucca Mountain, that seems like it will be tied up in litigation for a while. So, there is actually legislation in the Congress to delink the facilities which would make an MRS likely in 1998.

Id. at SMUD 0027465-66 (emphasis added). Consequently, although SMUD acknowledged that congressional action may be necessary to "de-link" the MRS from the construction of a Federal repository, SMUD management clearly believed that such de-linking was "likely."[8]

The following day, SMUD submitted to the NRC its application to construct and operate an ISFSI. See DX 276. On October 17, 1991, the SMUD Board of Directors issued a resolution approving "the proposal to construct a spent fuel storage facility." DX 282. SMUD issued requests for proposals ("RFPs") for the design and fabrication of the dual purpose casks in December 1991. See DX 293. This was seven years prior to the Government's expected acceptance of SNF on an industry-wide basis, and 10 years prior to date that SMUD believed DOE was obligated to begin accepting SMUD's SNF. More importantly, as discussed above,

---

[8] In its pretrial brief, SMUD appears to focus upon the linkages between the establishment of an MRS and the Federal repository, concluding that the MRS was never a viable option for the disposal of SNF. Pl. Br. at 14, 18. Whether these linkages were actually an impediment to the creation of an MRS is largely irrelevant for purposes of determining SMUD's damages. Rather, the relevant inquiry is whether SMUD based its decision to pursue dry storage upon its belief that an MRS would be available to accept its SNF. As is clear from the contemporaneous documents in this case, SMUD believed that an MRS could be operational beginning in 1998 and that, because SMUD would be one of the first utilities to have its SNF in dual purpose dry storage, DOE could accept SMUD's SNF on a timely basis consistent with the Standard Contract. Indeed, as we will demonstrate at trial, SMUD actively worked with certain Indian tribes during the early 1990s in an attempt to site an MRS. Further, we will show that, throughout the early 1990s, DOE was actively pursuing an MRS.

SMUD's decision to place its SNF into dry storage was expressly predicated upon the belief that DOE could accept its SNF at an MRS on a timely basis consistent with the Standard Contract, and potentially even earlier.

On April 2, 1992, the SMUD Board of Directors approved of the evaluation process and criteria proposed by Rancho Seco management to be used in the selection of a vendor for the dual purpose casks. DX 348. Three months later, Rancho Seco management requested that the Board authorize SMUD's general manager to negotiate and execute a contract with Pacific Nuclear Services, Inc. to purchase dual purpose casks. The staffing summary sheet presented to the Board of Directors containing the request explained:

> In 1990, the Board of Directors, as a result of a District study performed by S. Levy, Inc., concurred the General Manager should pursue the purchase of a dual purpose casking method. The purpose of this activity was to enable the District to dry store Rancho Seco spent nuclear fuel at an onsite location, shutdown the Spent Fuel Building, and further reduce decommissioning cost.

See DX 344 (emphasis added).

On July 7, 1992, the Board of Directors passed a resolution authorizing the general manager to enter into a contract with Pacific Nuclear. See DX 348. In September 1992 – six years before DOE was obligated to begin SNF acceptance on an industry-wide basis, and nine years before, based on SMUD's belief, DOE was obligated to begin acceptance of SMUD's SNF – the Pacific Nuclear contract was signed. See DX 372. SMUD chose to contract with Pacific Nuclear despite the fact that, unlike Nuclear Assurance Corporation ("NAC"), another vendor that submitted a response to SMUD's RFP, Pacific Nuclear had never successfully licensed a transportation cask.

In 1993, for reasons entirely unrelated to the timing of DOE's acceptance of SMUD's SNF, SMUD reevaluated its SNF storage options and decided to continue pursuing dry storage. DX 425. In this 1993 evaluation of spent fuel options, SMUD included a "base case" which assumed that SMUD would place its SNF into dry storage and assumed a 2000 start date for DOE acceptance of SNF. Id. at SMUD 0027393. Clearly, one component of SMUD's early 1990s strategy for fuel disposition was to have DOE begin acceptance of its SNF by 1998.[9]

On May 24, 1994, DOE published a Notice of Inquiry ("NOI") regarding its responsibility to accept SNF after January 31, 1998, and sought comments from the nuclear industry. PX 351; 59 Fed. Reg. 27007 (May 25, 1994). Specifically, DOE requested industry comments upon: (1) whether it had a statutory obligation to accept SNF beginning in 1998 in the absence of an operational repository; (2) the need for interim offsite storage prior to the opening of a permanent repository; and (3) the potential option of offsetting some of the financial burden to the industry through the use of the Nuclear Waste Fund. Id. SMUD submitted comments in response to DOE's NOI on September 21, 1994. See PX 351. In its response, SMUD explained that:

> After a referendum of SMUD's electorate on June 6, 1989, Rancho Seco ceased operating on June 7, 1989. Since then, SMUD has been proceeding with activities to begin the decommissioning of Rancho Seco and to provide required assurances to the NRC that the District will have sufficient funds available to pay for the decommissioning. However, SMUD has not provided funds in its Decommissioning Trust for spent fuel storage after 2010. When

[9] SMUD again reevaluated its dry storage decision in 1997. DX 718. It is undisputed that the sole reason SMUD revisited its decision at this time was because of significant vendor performance issues SMUD was experiencing and the associated increase in costs experienced by the dry storage project. Contrary to the implication contained in SMUD's pretrial brief, SMUD did not reconsider its dry storage decision or decide to continue pursuing dry storage as a result of the Government's future breach.

> funded in 1991, the Trust assumed that DOE would accept all of Rancho Seco's fuel starting in 1998, including the queue, by 2010.

DX 462, at SMUD 0019624 (emphasis added).[10]

Indeed, as late as December 8, 1994, SMUD continued to believe that DOE could timely accept SMUD's SNF. In a presentation as part of a public workshop, SMUD management indicated that SMUD assumed performance from DOE between 1998 and 2013. See DX 481. It is acknowledged by SMUD employees that SMUD's planning during this time period was predicated upon DOE's plan for an MRS by 1998. Further, as late as October 1996, Mr. Shelter, SMUD's chief nuclear officer, believed that:

> [t]he economic aspects of keeping spent fuel in the spent fuel pool as opposed to dry storage indicate that the capital costs associated with dry storage can be recovered in less than two years and a substantial amount can be recovered over the period the plant is in SAFSTOR.

See DX 657, at MOF 023696 (emphasis added).[11]

---

[10] These statements are consistent with the December 2, 1991, presentation SMUD made to the California Senate Committee on Energy and Public Utilities, in which it indicated that one of its waste disposal assumptions was that an MRS may be available by 1998. See DX 291, at SMUD 0029411.

[11] SMUD suggests in its pretrial contentions that DOE could have implemented "the so-called Fort St. Vrain solution, by taking title to SMUD's SNF at the Rancho Seco site and reimbursing SMUD for the on-site dry storage costs." Pl. Br. at 24. As we will show at trial, the facts and circumstances concerning Fort St. Vrain are entirely different from the situation at SMUD. In 1965, the Government entered into a contract with the Public Service Company of Colorado ("PSCC") to construct an experimental nuclear generator. See generally State of Idaho v. U.S. Dep't of Energy, 945 F.2d 295 (9th Cir. 1991). In order to implement the terms of the contract, the Government and PSCC entered into an agreement in which the Government agreed to purchase the fuel generated by the experimental reactor from PSCC upon shipment of the fuel to a Government facility in Idaho. Id. at 296. However, when the State of Idaho opposed the shipment of the fuel, the Government and PSCC agreed that the Government would purchase the fuel on-site at Fort St. Vrain. Therefore, the overwhelming majority of fuel at Fort St. Vrain is owned by the Government, and the Government agreed to pay PSCC for the on-site dry storage

SMUD initially estimated that its dry storage project would be completed by 1995 and that it would have its SNF loaded into dual purpose casks and canisters by 1998. However, because of vendor and subvendor performance issues, poor management oversight, and licensing challenges resulting from its choosing of an unlicensed technology, SMUD did not complete its dry storage project until 2001 – approximately six-and-a-half years after scheduled completion, and did not complete loading its SNF into the dual purpose dry storage system until 2002.

## ARGUMENT

### I. SMUD CANNOT ESTABLISH THAT THE GOVERNMENT'S FAILURE TO BEGIN THE ACCEPTANCE OF SMUD'S SNF BY 2001 CAUSED ITS PURPORTED DAMAGES

#### A. Contentions Of Law Regarding Causation

This Court's predecessor, the Court of Claims, adopted a basic rule for awarding damages for common law breach of contract:

> In awarding compensatory damages, the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract.

Northern Helex Co. v. United States, 207 Ct. Cl. 862, 875, 524 F.2d 707, 713 (1975) (emphasis added) (quoting Restatement of Contracts § 329 cmt. e).

To recover damages, a plaintiff "must prove the requirements for an award of damages by a preponderance of the evidence," and these "requirements include: causation, foreseeability, and reasonable certainty in the amount of damages." Alaska Pulp Corp. v. United States, 59 Fed. Cl.

---

costs of the Goverment's and PSCC's SNF at Fort St. Vrain. Of course, under the Standard Contract, SMUD owns and is responsible for its SNF until the Government takes title to SMUD's SNF.

400, 413-14 (2004). According to the precedent of this circuit, SMUD bears the burden of introducing clear proof that it was injured as a direct result of DOE's delay in accepting SMUD's SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). The venerable decision in Myerle continues to represent the binding standard of this circuit. California Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005) (rejecting the "substantial factor" test and explaining that the claimed damages must "inevitably and naturally, not possibly nor even probably flow from the defendant's breach," and that this causal connection between the breach and the claimed losses must be "definitely established."); Glendale Fed. Bank v. United States, 239 F.3d 1374, 1382 (Fed. Cir. 2001) (non-breaching party may recover reliance "damages for any losses actually sustained as a result of the breach"). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

To be recoverable, damages must be direct and not the result of any intervening incident. See Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Id. Further, "[t]here must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27. Similarly, the loss must be one which the non-breaching party can show that, "but for" the breach of contract, would not have been suffered:

> [T]he loss for which a recovery may be had in an action against a wrongdoer must be the result of the wrong inflicted. The party complaining must show, not only that he has suffered a loss, but also that it would not have been incurred, but for the wrongful act of his adversary . . . .

Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960) (emphasis added) (quoting Osage Oil & Ref. Co. v. Chandler, 287 F. 848, 852 (2d Cir. 1923)); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)); accord United Indus. Syndicate, Inc. v. Western Auto Supply Co., 686 F.2d 1312, 1316 (8th Cir. 1982) ("[t]he fundamental measure of contract damages is that which places the nonbreaching party in the position it would have been but for the breach").

Additionally, SMUD has the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1023 (Fed. Cir. 1996); see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty").

### B. Contentions Of Fact Regarding Causation

#### 1. SMUD's Decision To Pursue Dry Storage Is Unrelated To The Timing Of DOE's Performance Under The Standard Contract

As demonstrated by SMUD's contemporaneous documents and the testimony of its witnesses, SMUD cannot demonstrate that its claimed damages were caused by the Government's breach. SMUD initially considered pursuing dry storage in 1989 – nine years before DOE's obligation to begin SNF acceptance from the nuclear industry, and 12 years before DOE could

have been obligated to begin SNF acceptance from SMUD. At the time, SMUD believed that the cost of placing its SNF into dual purpose dry storage would pay for itself within two-to-three years. More importantly, as late as 1994, SMUD believed that DOE could accept SMUD's SNF through an MRS, and that such acceptance would be consistent with DOE's obligations under the Standard Contract. In fact, SMUD believed that, by being one of the first utilities to utilize a dual purpose dry storage system, there was the potential that DOE could accept SMUD's SNF on an accelerated basis. Further, SMUD's contemporaneous documents unambiguously reflect that, as early as 1991, SMUD intended to pursue some form of dry storage regardless of the timing of DOE's performance under the Standard Contract.

Cliff Hamal, the Government's expert economist, has conducted an economic evaluation of SMUD's decision to place its SNF into dry storage and is expected to explain at trial that SMUD would have developed dual purpose dry storage technology regardless of the timing of DOE's performance. Mr. Hamal is expected to explain that SMUD had at least five primary reasons for committing to dry storage for its SNF, none of which were dependent upon the timing of DOE's performance. These considerations included: (1) annual operating cost savings of approximately $8 million; (2) the reduction in health, environmental, and safety concerns as compared to wet storage; (3) dry storage would facilitate the decommissioning of Rancho Seco, including the abandonment of SMUD's wet pool and the termination of its Part 50 license; (4) dry storage would facilitate the reuse of the Rancho Seco site for other purposes, such as building a new power generation facility; and (5) the use of transportable casks would potentially allow for earlier acceptance than SMUD otherwise expected under existing acceptance schedules.

Consequently, SMUD cannot show that DOE's breach of its contract with SMUD caused SMUD to incur the costs associated with its dry storage project.

In apparent recognition of the tenuousness of its claim, SMUD seeks to push its decision to pursue dry storage forward in time by claiming that it continuously reevaluated its original decision.[12] Specifically, SMUD asserts in its contentions that DOE's breach of the Standard Contract caused SMUD to decide to continue the development of its dry storage project. Pl. Br. at 51-53. As we will show at trial, SMUD's contention is contradicted by the facts in this case.

First, as we have discussed above, we will show at trial that SMUD's decision to pursue its dry storage process was driven by a desire to encourage timely – and perhaps early – acceptance of SMUD's SNF by DOE and to facilitate the process of decommissioning the Rancho Seco plant. See, e.g., DX 165; DX 194. The fact that SMUD reevaluated this decision several times over the decade that it took to implement its dry storage system does not alter the reasons behind that decision. Simply put, because there is no causal link between the breach and SMUD's 1990 dry storage decision, there can be no link between the breach and SMUD's revisiting of that decision.

Second, we will establish at trial that SMUD's reevaluations of its dry storage decisions were driven solely by the poor performance of its dry storage vendors and the extraordinary

---

[12] In submitting its claims to the Government in this case, SMUD itself recognized the importance of the timing of its dry storage decision. Although SMUD clearly had incurred dry storage costs as early as 1990, SMUD's first claim submitted on April 16, 2004, included costs beginning in 1997. See PX 762. When we asked SMUD personnel why the claim did not include pre-1997 costs, they explained that they had removed those costs from the claim at the direction of counsel. Holst depo., p. 67 at 22 - p. 68 at 2. It was only after we established that, had SMUD's dry storage project not been delayed, its post-1997 costs would have been minimal at most did SMUD submit its second claim in which it now claimed the roughly $20 million in dry storage coss costs incurred between 1992 and 1997. See PX 787.

delays they experienced in designing, licensing, and manufacturing SMUD's dry storage facility, not DOE's breach of the Standard Contract.[13]

## II. SMUD CANNOT PROVE ITS BASIC ASSUMPTION THAT DOE WAS OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTUs OR AT A SPECIFIC "RAMP-UP" RATE FOR THE FIRST FIVE YEARS

### A. Because SMUD Elected To Pursue Dry Storage Without Regard To The Acceptance Rate, Resolution Of This Issue Is Unnecessary Here

SMUD spends a great deal of time in its pretrial brief explaining why, had DOE begun accepting SNF from utilities beginning in 1998, it would have accepted at a 3,000 Metric Ton Unit ("MTU") annual receipt rate. Pl. Br. at 36-44. Yet SMUD does not explain how a 3,000 MTU rate of acceptance would affect its damages claims in this case. Indeed, there is absolutely no evidence in this case that SMUD's decision was predicated upon a particular rate of acceptance of its SNF by DOE. As explained above, regardless of the timing of DOE's performance, SMUD would have pursued dry storage. Consequently, a determination of the appropriate rate of acceptance is unnecessary for determining damages in this case. Moreover, because SMUD does not seek future damages, or damages for the operation and maintenance of its dry storage facility, a determination of the appropriate rate of acceptance will have little, if any, effect on SMUD's damages claims in this case.[14]

---

[13] Indeed, as we discuss below, SMUD's decision to stay the course of pursuing the NUHOMS dual purpose dry storage system in the face of mounting costs and delays is further evidence of its failure to mitigate its damages by switching to either a store-only cask or the NAC-STC dual purpose dry storage system which, by 1995, had been fully licensed for transportation by the NRC. Indeed, as a technical matter, SMUD was unable to remove all of its SNF from its pool before 1995 because it would take this long for its more recently discharged fuel to cool sufficiently to place into dry storage.

[14] Unlike other SNF cases, in which plaintiffs have sought future damages, the parties in this case have stipulated that SMUD will seek damages in this case only through 2003.

B. DOE Expressly Rejected The Industry's Request To Include A Particular Rate Of Acceptance In The Standard Contract

To the extent the Court believes it is necessary to resolve this issue, as discussed in detail in the Government's motion for partial summary judgment concerning the rate and schedule of acceptance and, as we are prepared to demonstrate at trial, SMUD cannot establish that DOE was obligated to accept SNF at a annual rate of 3,000 MTUs, or that it was required to utilize a specific "ramp up" rate for the first five years of SNF acceptance.[15]

Although the Standard Contract provides that DOE would begin SNF acceptance by January 31, 1998, it contains no criteria obligating DOE to continue that acceptance after January 31, 1998, at any particular rate. See 10 C.F.R. § 961.11, Art. II. SMUD asserts that, "[h]ad the government met its contractual obligations to SMUD, it would have removed all SNF from SMUD's Rancho Seco facility by 2006 at the latest . . ." Pl. Br. at 36. SMUD appears to contend that DOE contractually obligated itself to accept SNF and/or HLW at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF and/or HLW already stored by utilities up until that deadline. SMUD asserts that, to meet this goal, DOE would have to accept SNF at a rate of 3,000 metric tons uranium ("MTUs") per year, after a short five-year "ramp-up" period. SMUD's basic assumptions are wholly in error and unsupported by either the Standard Contract or the Nuclear Waste Policy Act ("NWPA").

[15] These issues are fully discussed in our pending motion for partial summary judgment upon the rate of spent nuclear fuel acceptance issues, dated November 28, 2001, and we respectfully incorporate the arguments raised in that motion here. As evident from that motion, no trial is necessary to resolve the rate of acceptance issues because they may be decided as a matter of law. However, to ensure that these issues are preserved in the event that the Court denies our summary judgment motion, we will briefly summarize that motion.

The evidence is completely contrary to SMUD's assertions that DOE was required to create an acceptance rate that satisfied SMUD's two-part "test." As the Court is aware, DOE published the Standard Contract at issue here as a "proposed rule" in the Federal Register. See 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983). In response to that proposed rule, several nuclear utilities and industry groups submitted comments, requesting, among other things, that DOE place into the Standard Contract an obligation requiring DOE to accept SNF at some pre-determined minimum rate or to adopt as contractual obligations the acceptance rates that would be identified in the statutorily-required Mission Plan. See, e.g., DX 76.063, DX 76.034, DX 76.043, DX 76.017, DX 76.036. Although "[a]ll comments received by DOE in response to its proposed rule of February 4, 1983, both at the public hearing and the written comments received thereafter, were carefully reviewed and fully considered in the formulation of this final rule," 48 Fed. Reg. 16,590, 16,590 (Apr. 18, 1983), DOE declined to agree to such requests. In the final Standard Contract that it promulgated in the Federal Register, DOE intentionally excluded the creation of any contractual obligations to meet any pre-determined acceptance rate or to satisfy the two part "test" that SMUD has proposed.

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected

annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE, with a right to appeal to the Energy Board of Contract Appeals if the disagreement cannot be resolved through negotiation. Id., Art. V.B.2 & XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions

and determination of the rights and obligations of the parties under the provisions of the contract").

Nothing in those terms creates an obligation upon DOE's part to accept SNF at a rate that: (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998; and (2) would work off the "backlog" of SNF. In fact, SMUD can identify absolutely no contractual language in the Standard Contract creating any such obligation. Further, the integration clause in the Standard Contract, Article XXII.A, expressly precludes reading any unwritten "agreement" into the contract: "Any representation, promise, or condition not incorporated in this contract shall not be binding on either party," and "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in the contract." DX 88, Art. XXII.A. SMUD's proposed requirement for a rate that precludes additional at-reactor storage and reduces the "backlog" of SNF violates standard rules of contract interpretation. As this Court recently recognized in another SNF case in response to the same argument that SMUD is raising here, "[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations." Florida Power & Light Co. v. United States, No. 98-483C, 2005 WL 318678, at *30 (Fed. Cl. Jan. 31, 2005).

Further, it is clear that, even if the Court were to accept parol evidence to determine whether the contract contains any such obligation, SMUD consistently understood that it did not. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "A principle of contract interpretation is that the contract

must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Here, the history of the notice-and-comment rulemaking itself is extremely clear in evidencing that DOE did not obligate itself to satisfy SMUD's two-part test and that the nuclear utilities were well aware of that fact. See, e.g., DX 76.063, DX 76.034, DX 76.043, DX 76.017, DX 76.036, DX 88. Further, in submitting DCSs to DOE in the early 1990s, SMUD never complained that the acceptance rates upon which DOE had requested the contract holders base their DCSs were somehow inappropriate or in conflict with the requirements of the Standard Contract. DX 366, DX 381, DX 389, DX 400. SMUD's "understanding" that DOE had some minimum acceptance rate obligation was created after disputes about timely SNF acceptance began. The contemporaneous evidence should preclude any litigation-driven reading of SMUD's two-part test into the Standard Contract.

### C. SMUD's Equation Of The Acceptance Rate With The Annual Capacity Of A Federal Repository Is Inappropriate

SMUD appears to assert that the 3,000 MTU rate is somehow mandatory because it has appeared in numerous DOE planning documents. Pl. Br. at 40. However, the documents upon which SMUD relies to show DOE's eventual "intent" to accept 3,000 MTUs of SNF annually depend upon the existence of an operational repository. Id. The Standard Contract, however, does not require DOE to begin SNF acceptance at a repository. To the contrary, the language of the Standard Contract explicitly contemplates that DOE may accept SNF either at a repository or at "such other facility(ies) to which [SNF] and/or [HLW] may be shipped by DOE prior to its transportation to a disposal facility." DX 88, Art. I.10. In fact, between the proposed rule and

the final rule, the definition of the type of "facility" to which DOE could deliver SNF was expanded to expressly state, "in accordance with the [NWPA], that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository." 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). As we discussed in prior briefing upon summary judgment, pursuant to the rationale of the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE was not obligated to have an operational repository by January 31, 1998. Accordingly, SMUD should be precluded from arguing that DOE was somehow obligated to accept SNF at the rates it had anticipated for SNF acceptance at a repository. Because DOE was entitled to accept SNF at a facility other than a repository, SMUD's reliance upon planning documents relating to SNF acceptance at a repository is meaningless.

Further, the planning documents upon which SMUD relies uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes. Pl. Br. at 40. Each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations. See DX 105, DX 11, DX 218. Although SMUD appears to rely in part upon the 1985 Mission Plan and its drafts to establish DOE's "intent" to accept SNF at a 3,000 annual rate, several commenters, prior to the promulgation of the final Standard Contract, had requested that DOE add a contract provision obligating itself to accept SNF at whatever rates were identified in the Mission Plan. See DX 76.043, DX 76.072. However, DOE intentionally declined to create any such obligation. See 48

Fed. Reg. 5458, 5463 (Feb. 4, 1983); 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983); DX 88.[16] SMUD has identified no language in which DOE somehow agreed or even suggested that the acceptance rates in any planning documents which DOE issued were contractually binding or constituted anything other than DOE's hopes and goals for its program.[17] See National By-Products, Inc. v. United States, 186 Ct. Cl. 594, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction").

### D. SMUD's Claim That It Would Have Had Early Fuel-Out Dates Because DOE Would Have Granted It Priority As A Shutdown Facility Or That It Would Have Engaged In Exchanges Of Its Queue Position Is Unsupported By Any Evidence

SMUD also asserts that it is "likely" that it could have delivered its SNF to DOE even earlier than 2006 through the use of the Standard Contract's priority for shutdown reactor and

[16] Importantly, the 1985 Mission Plan upon which SMUD relies was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3). After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between an MRS facility and a repository. 42 U.S.C. §§ 10133, 10161-69. SMUD's reliance upon documents prepared for Congress that relate to possible circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

[17] To the extent that the Court finds it necessary to define a rate of SNF acceptance for the Standard Contract, nothing in the Standard Contract precludes DOE from performing at a minimal rate of acceptance. As discussed in our motion for partial summary judgment, at most, the acceptance schedule to which DOE could be held to perform cannot exceed the rates contained in the DCSs that it approved, given that SMUD never took any actions prior to 1998 (or any time thereafter) to establish SNF acceptance amounts 63 months in the future (as required by the DCS provision) greater than those identified in the 1991 through 1995 ACRs and APRs.

exchanges provisions. Pl. Br. at 42. As we will show at trial, this assertion is completely unsupported by the evidence in this case.

Although Article VI.B.1(a) provides that "acceptance priority shall be based upon the age of the SNF and/or HLW . . .," it contains an exception to that general rule: "Except as may be provided for in subparagraph (b) below . . . ." 10 C.F.R. § 961.11, Art. VI.B.1(a). Subparagraph (b) of Article VI.B.1 defines that exception: "Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." Id. (emphasis added). The use of the word "may" in relation to priority reflects the permissive nature of this provision. See Huston v. United States, 956 F.2d 259, 262 (Fed. Cir. 1992) ("[w]hen, within the same statute, Congress uses both "shall" and "may," it is differentiating between the mandatory and discretionary tasks"); Green v. Gen. Servs. Admin., 220 F.3d 1313, 1318 (Fed. Cir. 2000) (agency had discretion to permit employee to withdraw from separation agreement because regulation uses the word "may"); Hubbard v. Merit Sys. Prot. Bd., 205 F.3d 1315, 1320 (Fed. Cir. 2000) (words such as "may" show intent to provide broad discretion).

To the extent that SMUD alleges that the Court should find that DOE was obligated to provide, or would have provided, priority in acceptance of its SNF, such an allegation is completely unsupported by the evidence in this case. First, this provision provides DOE with the discretion, not the obligation, to provide a contract holder with a shutdown reactor priority in the SNF acceptance queue. Second, the testimony and SMUD's contemporaneous documents will firmly establish that SMUD has never believed that DOE was obligated to exercise its discretion to grant it priority. Nor did SMUD believe that, in fact, DOE would grant it priority as a shut

down reactor. Indeed, in SMUD's contemporaneous planning documents, it has never assumed priority for shutdown reactors. As previously discussed, in interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone, Omni, 41 Fed. Cl. at 591, and a "principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City, 697 F.2d at 1058. SMUD's current interpretation of the priority provision conflicts with its pre-litigation interpretation.[18]

Further, SMUD's claim that it is "likely" that it would have engaged in exchanges ignores the fact that, under the Standard Contract, DOE is entitled, "in its sole discretion," to disapprove any proposed exchange approval. Had any requests for exchanges been submitted to DOE, DOE could have disapproved them for numerous legitimate reasons, including equity to other utilities or increased costs to DOE and the Nuclear Waste Fund resulting from the proposed exchange. The mere fact that DOE has the discretion to disapprove exchange requests renders SMUD's hypothetical exchanges argument speculative. See San Carlos Irrigation, 111 F.3d at 1563 ("[t]oo many contingencies – including, most importantly, the discretion of the agency to dispose of excess water – exist in the causal chain from the government's breach to the asserted lack of water.").

---

[18] In addition, SMUD's contention that it is "likely" that it would have received priority as a shutdown facility completely ignores the fact that it has consciously placed its SNF into "multiple element sealed containers" ("MESCs"), commonly referred to as "canisters," which currently constitute a nonstandard waste form under the Standard Contract. Because DOE is not obligated pursuant to the Standard Contract to accept SMUD's SNF in its current configuration, SMUD cannot show that it would have received priority in the DOE acceptance schedule as a shutdown reactor.

Additionally, SMUD has produced no evidence that it would have engaged in exchanges. Nor has it identified the contract holders with which it would have engaged in exchanges. In fact, the evidence in this case demonstrates that, when SMUD was approached by another utility to engage in an exchange of queue slots, SMUD declined the utility's offer. Consequently, SMUD cannot meet its burden of demonstrating that it would have been granted priority by DOE or that it would have engaged in exchanges. Certainly, it cannot establish the manner in which it would have reached a specific fuel-out date – through specific exchanges with specific contract holders – and it has identified no contract holders (all of which are plaintiffs in the SNF cases pending before the Court) that are willing to move their SNF acceptance allocations (for purposes of their own damages claims) back in the acceptance queue based upon "would have been" exchanges with SMUD. This lack of evidence precludes post hoc reliance upon exchanges to establish the fact of injury.

## III. EVEN IF THE COURT ACCEPTS THAT SMUD PURSUED DRY STORAGE AS A DIRECT RESULT OF THE GOVERNMENT'S BREACH, MANY OF SMUD'S DAMAGES ARE NOT RECOVERABLE

### A. Contentions Of Law Regarding Damages

SMUD has the burden of establishing that each of the claimed damages is incremental to DOE's partial breach and that, had there been no delay, SMUD would not have incurred those costs. Willems Indus., 155 Ct. Cl. at 376, 295 F.2d at 831 (damages must be caused by the breach). As the Federal Circuit has explained, "[t]o derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." Bluebonnet Sav. Bank v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003). SMUD also must provide appropriate documentary or other

support from its records to establish its damages claims. Roseburg, 978 F.2d at 667 (plaintiff must provide adequate support for claimed costs). The contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, preclude any recovery of those costs. Barrow Utils. & Elec. Co. v. United States, 20 Cl. Ct. 113, 121 (1990). Finally, SMUD must establish that its alleged damages are not speculative. San Carlos Irrigation, 111 F.3d at 1563 (plaintiff may not recover speculative damages). If SMUD fails to meet its burden with regard to any particular claimed damage, it cannot recover that claimed damage, and SMUD cannot place upon the Government the burden of disproving a presumption that each of its damages is adequately supported and reasonably certain. See Quiman, S.A. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). The burden of proof in this case rests squarely upon SMUD.

Further, it is axiomatic that, after a breach of contract has occurred, a non-breaching party is obligated to mitigate its damages. See id. at 185; Midwest Indus., Painting of Florida, Inc. v. United States, 4 Cl.Ct. 124, 133 (1983) ("[T]he nonbreaching or injured party may not recover those damages which could have been avoided by reasonable precautionary action on its part."); see also Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1448 (3d Cir. 1996) (applying Pennsylvania law) (duty to mitigate only "arises upon defendant's breach of the contract."). "As a general rule, a party cannot recover damages for loss that he could have avoided by *reasonable efforts*." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (emphasis in original, citation omitted). The duty of mitigation reflects the policy of encouraging an injured party to attempt to avoid loss when it can do so without undue risk or burden. In this way, the amount of

damages that the injured party could have avoided by taking reasonable steps to reduce its damages are subtracted from the amount that would otherwise have been recoverable as damages. See Restatement (Second) of Contracts § 350 cmt. b (1981); Dittmore-Freimuth Corp. v. United States, 182 Ct. Cl. 507, 390 F.2d 664, 679 (1968).

B. Contentions Of Fact Regarding Damages

1. Summary

Even if SMUD could demonstrate that it decided to place its SNF into dual purpose dry storage as a result of the Government's breach, the damages claims that SMUD has presented in this case are fundamentally flawed.[19] Damages are generally defined as the incremental difference in costs incurred between the non-breach and breach worlds.[20] SMUD has failed to adequately present its view of the "but for" world, either through expert or fact witnesses, or how the costs it is now claiming as damages would not have been incurred had the Government begun timely acceptance of SMUD's SNF in a manner required by the Standard Contract. The result is that SMUD's damages claims are simply an overstated and inaccurate accounting of the costs it has incurred throughout its dry storage project, without any reference to whether any of these claimed costs would have been incurred regardless of the timing of DOE's performance.

---

[19] In addition to the deficiencies contained in SMUD's damages claims listed below, as discussed in our separate motion filed simultaneously with these contentions, SMUD may not claim an anticipatory repudiation in the context of a partial breach of contract, or claim pre-breach mitigation damages.

[20] The proper measure of damages in this case is the incremental difference between the costs that SMUD would have incurred had DOE satisfied its performance obligations under the Standard Contract and the costs that it has been required to incur in the actual world. The fact that DOE may have planned to perform beyond what the Standard Contract required does not mean that these plans form a proper "but for" world upon which damages may be measured against.

SMUD's damages claims suffer from other serious deficiencies. First, SMUD has failed to mitigate its alleged damages, as it pursued an undeveloped, unlicensed dual purpose dry storage technology while a similar, developed technology existed. We will show at trial that, had SMUD pursued the developed technology, SMUD's dry storage costs would have been reduced significantly. Indeed, as explained below, had SMUD kept its SNF in its wet pool, it would currently be entitled to no damages. Further, even if SMUD acted reasonably in choosing dry storage, it could have pursued a cheaper store-only technology in conjunction with a dry transfer system that was contemplated by SMUD's demonstration program with DOE. Consequently, of the storage options available to SMUD, it chose the most risky, most costly option. To the extent that the Court views SMUD's actions as an attempt to mitigate the alleged impending breach, it should conclude that SMUD's actions constitute failed mitigation.

Second, SMUD's damages claims fail to account for the fact that SMUD possesses failed fuel and Greater Than Class C radioactive waste and that such material may remain on-site at SMUD's Rancho Seco plant far beyond the anticipated schedule for acceptance of standard fuel. Consequently, the cost of SMUD's dry storage facility should be offset by the cost associated with storing these materials. Third, SMUD chose a storage technology that included transportation features. However, DOE is responsible for providing transportation casks to utilities for shipment of SNF off-site. Because SMUD assumed costs that are the responsibility of the Government, SMUD is not entitled to claim those costs against the Government as damages. Fourth, SMUD's damages claims inappropriately include costs that would have been

incurred regardless of the time of DOE's performance under the Standard Contract, including modifications to its spent fuel pool, spent fuel building and cranes.[21]

Fifth, SMUD's damages claims include the costs associated with the significant delays it experienced throughout its dry storage project. Because SMUD acknowledges that these massive delays were foreseeable, and hence, avoidable, SMUD should not be able to pass these costs on to the Government in the form of damages claims. Sixth, the Government will demonstrate at trial that SMUD's damages claims suffer from a variety of accounting and other errors, including the improper inclusion of over $2 million dollars that was the result of double-counting costs,[22] the improper identification of certain costs and invoices, and the failure to deduct from its damages claim certain fixed overhead costs. Finally, SMUD's damages claim does not take into account the substantial operation and maintenance savings that it realized from transferring its SNF from the wet pool to dry storage. At bottom, even if SMUD's damages claims bear a causal relationship to the Government's failure to accept SMUD's SNF, its damages claims are so fundamentally flawed that it is entitled to nominal, if any, damages in this case.

---

[21] For the first time in this litigation, SMUD concedes in its pretrial contentions that the costs associated with the gantry crane upgrade, SMUD's fuel inspection, upgrades to the spent fuel building, and its onsite drop tests should be removed from its claims. Pl. Br. at 59-60. As we explain in detail below, these deductions are just several of many that SMUD should take to ensure its claims properly reflect the "but for" world.

[22] During the course of discovery, SMUD acknowledged that its claims included double-counted costs. However, when it did so, it failed properly to deduct those costs. Further, Brian Brinig, SMUD's accounting expert who performed a pre-submission "audit" of SMUD's claims, failed to discover SMUD's double-counting error.

2. SMUD Has Failed To Mitigate Its Alleged Damages

In putting forth its claims, SMUD asks the Court to assume that the dry storage system taht SMUD pursued represented a reasonable and prudent option in responding to DOE's breach of the Standard Contract.[23] First, SMUD concedes that it could have left its SNF in its wet pool. As discussed below, had SMUD chosen this path, it would currently be entitled to nominal, if any, damages. Second, SMUD could have chosen to place its SNF into dry store-only containers. Had it chosen this option, SMUD's damages would be reduced significantly. Third, SMUD's choice of dual purpose dry vendors was inappropriate, as the facts and, indeed, one of SMUD's own experts establish that despite warnings, SMUD choose to pursue the untested, undeveloped, and unlicensed NUHOMS system that cost SMUD more money and time than a viable and fully developed dual purpose dry storage system that SMUD could have chosen from NAC. In addition, SMUD's choice of this untested technology needlessly led to SMUD placing its SNF in a form that decreased its chances of acceptance by DOE on the queue as set forth in the Standard Contract.

a. Had SMUD Kept Its SNF In Its Wet Pool, It Would Have No Damages

SMUD concedes in its pretrial brief that it could have left its SNF in its wet pool. Pl. Br. at 2. SMUD argues, however, that had it left its SNF in the wet pool, "SMUD would have been

[23] To the extent that SMUD attempts to justify the reasonableness of its decision to pursue the NUHOMS dual-purpose dry storage system by claiming the United States Navy chose a similar system, such a claim is without merit. As we will demonstrate at trial, the Navy, which possesses fuel that is subject to certain unique security requirements, is not a party to a Standard Contract with DOE. Consequently, it is responsible for the cost of transporting its SNF to a DOE facility. Indeed, as we will demonstrate at trial, had DOE had the responsibility to provide transportation casks to the Navy, the Navy likely would have considered other dry storage options.

entitled to recover the resulting increased decommissioning costs and the costs of at least an additional 14 years of wet pool storage costs resulting from DOE's 1998 to 2012 delay." Id. SMUD's contention is misplaced.

SMUD concedes that, had it not been granted priority as a shutdown reactor by DOE or engaged in exchanges, it would have had SNF on-site until 2006.[24] Pl. Br. at 41. However, had SMUD kept its SNF in the wet pool, it likely would have incurred minimal capital costs associated with its wet pool.[25] Additionally, because the operation and maintenance ("O&M") cost of wet storage does not vary depending upon the quantity of SNF stored, SMUD's wet storage O&M costs would not decrease so long as it had any SNF. Therefore, even under SMUD's assumptions, SMUD would not have incurred costs that it could claim as damages until 2007 – the first year, in SMUD's view, after the Government would have accepted the last of SMUD's SNF in the "but for" world. In other words, had SMUD kept its SNF in the wet pool, it currently would have no claim for damages. Yet, by choosing a risky and unlicensed dual purpose dry storage technology, SMUD claims that it incurred approximately $78 million in damages. However, even assuming that a non-breaching party can somehow attempt to mitigate its damages prior to a breach and claim that the breach "caused" the mitigation, a non-breaching party must mitigate any potential damages "at the least cost to the defendant." LaSalle Talman Bank, FSB v. United States, 45 Fed. Cl. 64, 111 (1999), rev'd on other grounds, 317 F.3d 1363

---

[24] Indeed, this date is extremely optimistic, because it is predicated upon a 3,000 MTU rate of acceptance which, as explained above, is not required by the Standard Contract.

[25] As we will show at trial, these minimal capital costs associated with the maintenance of the wet pool would have been incurred by SMUD regardless of the timing of DOE's acceptance of SMUD's SNF.

(Fed. Cir. 2003). SMUD cannot credibly argue that it somehow properly mitigated its damages by engaged in an activity that will allegedly cost the Government $78 million, rather than the zero cost to the Government absent this "mitigation." To the extent that SMUD's pre-breach activities can be viewed as "mitigation" efforts, they are unreasonable.

b. SMUD Could Have Utilized A Dry Transfer System, Which Would Have Saved It Millions Of Dollars

Even if it was prudent for SMUD to pursue a dry storage system for its SNF, SMUD could have chosen a much less costly option as compared to the dual purpose dry storage system it ultimately chose. Specifically, SMUD could have chosen a readily-available store-only system. At the time SMUD signed the contract with Pacific Nuclear for dual-purpose dry storage in 1992, the cost of a store-only dry storage system was approximately $9 million.

SMUD may contend that a store-only system would have resulted in greater long-term costs because SMUD would have been required to maintain its wet pool, which had significant operation and maintenance costs associated with its continued operation. As we will demonstrate at trial, this argument is without merit for several reasons.

First, had SMUD fulfilled its obligations under the demonstration program with DOE, SMUD would have developed a dry transfer system.[26] Such a dry transfer system, which DOE

[26] The Government anticipates that SMUD will contend that DOE somehow encouraged SMUD's decision to pursue a dual purpose dry storage system by entering into a demonstration program with SMUD. However, as we will demonstrate at trial, the demonstration program post-dates SMUD's decision to pursue dry storage by at least four years, and was the product of a congressional mandate to provide SMUD money to assist it in its SNF storage efforts. The demonstration program required DOE to provide money to SMUD to develop both a dual purpose dry storage system and a dry transfer system. The demonstration program required that, of the two transportation casks that were contemplated, SMUD would retain title to one and DOE would retain title to the other. Although DOE and SMUD began initial discussions concerning the demonstration program in the early 1990s, the agreement was not actually signed until 1994.

has subsequently developed without SMUD's assistance, would have allowed SMUD to place its SNF in storage-only casks while abandoning its wet pool, thereby saving millions of dollars in costs as compared to the unlicensed, untested technology that SMUD ultimately chose.

Second, even absent the dry transfer system, SMUD has presented absolutely no credible evidence to suggest that SMUD would have had to maintain its wet pool in operating condition had it placed its SNF into store-only casks. Indeed, it is likely that SMUD could have drained its wet pool while placing its SNF into store-only casks, thereby significantly reducing its operation and maintenance costs. Consequently, SMUD consciously disregarded a significantly cheaper dry storage alternative in favor of an unlicensed and untested technology that resulted in millions of dollars in delay costs.

c. SMUD Chose A More Expensive Dual-Purpose Dry Storage System When Other Licensed Options Were Available

Finally, even if SMUD acted reasonably in choosing a dual purpose dry storage technology, its choice of dry storage vendors clearly was unreasonable. In the early 1990s, while SMUD was making its decision to pursue dry storage, and ultimately to pursue a dual purpose dry storage system, there were several systems from which SMUD could have chosen. DX 348, at SMUD 0027227. Indeed, in response to its request for proposals ("RFP") for dual purpose dry storage systems, SMUD received proposals from five separate vendors. Id. As stated above, the unique feature that SMUD desired was the ability to place its SNF in a system that could be used

DOE ultimately paid SMUD $2 million despite SMUD's inability to provide DOE with a fully-licenced dual purpose cask. Indeed, the focus of the demonstration program from DOE's perspective was to design and construct a dry cask transfer system. DX 1328, at HQR3100004 - 05. Yet, once SMUD decided to develop the dual purpose dry storage system, it abandoned all efforts to develop a dry transfer system.

for both storage and transportation offsite. For that to occur, the system that SMUD chose would have to be fully licensed by the NRC for both storage and transportation of SNF. SMUD was aware that this licensing process, particularly as it related to the transportation of SNF, could be extremely challenging from a cost-risk standpoint. DX 375, at SMUD 330058; DX 378, at SMUD 0022589. Significantly, of the proposals that SMUD received, only one offered a system that had been subject to NRC review regarding storage and transportation of SNF. That system was offered by the Nuclear Assurance Corporation ("NAC"). The system that NAC offered to SMUD, the NAC-STC system, was a transportable cask system whereby SNF is loaded as bare fuel assemblies into casks, not canisters, and the SNF is stored and eventually transported to a DOE facility. DX 1339. Mr. Ivan Stuart, then a Vice President of NAC, and currently identified by SMUD in this matter as an expert regarding the propriety of SMUD's decision to pursue a dual purpose dry storage system, was responsible for the sale of the NAC-STC system and met with SMUD personnel regarding NAC's proposal to SMUD for a dual purpose dry storage system. Mr. Stuart believed that, by the time SMUD was making its dry storage decision, NAC had already been through the "pain and suffering" surrounding the licensing of a dual purpose dry storage system. Indeed, during the solicitation process, Mr. Stuart and other NAC officials made clear to SMUD that NAC's experience having gone through the NRC licensing experience removed significant risk from the NAC proposal that was present in the NUHOMS-187, to be designed and manufactured by Pacfic Nuclear Corp., the proposal that SMUD chose. Despite the warnings of Mr. Stuart and the president of NAC, John Stobbs, SMUD proceeded with the procurement of the NUHOMS dual purpose dry storage project.

On September 25, 1992, SMUD entered into a contract with Pacific Nuclear Systems Inc. ("Pacific Nuclear") for the design, licensing, fabrication, and delivery of all hardware and support equipment to begin the offloading of SMUD's SNF from the wet pool to the dry storage facility.[27] DX 374, at SMUD 102088. The contract performance period for all the above-mentioned activities was approximately two years. DX 384, at SMUD 0022740-42. The total cost for the system under the contract was $12.4 million. DX 374, at SMUD 102091.

In reality, the completion of the SMUD NUHOMS system took more than nine years from the time of contract award and ultimately required dozens of funded change orders, which increased the cost of the project by tens of millions of dollars. The project was plagued with a myriad of delays and issues largely related to problems that NAC had telegraphed to SMUD during the procurement process. The Government's scheduling expert, John McGrath, has conducted a detailed analysis of the delays associated with the NUHOMS project and will, at trial, show how virtually every aspect of project took far more time than scheduled.

By the time that the NUHOMS system was designed, licensed, manufactured, and ready to begin accepting SMUD's SNF, the NRC had: (1) issued an alarming seven rounds of questions to Pacific Nuclear, which later became Vectra; and (2) been forced to take the dramatic step of issuing a Demand For Information ("DFI") from Vectra, which led to the complete shutdown of all progress on the NUHOMS project for almost two years. DX 283, at SMUD 0009845, 0009877-78; DX 707; DX 712, at SMUD 044710; DX 889; DX 862. The NRC did not license

---

[27] One possible explanation for SMUD's rush to embrace this risky endeavor despite clear warnings against that course of action was a belief by SMUD that it could share in the royalties paid upon the storage system being developed by Pacific Nuclear and its successors in interest.

the NUHOMS system for both storage and transportation until the middle of 2000. DX 874; DX 1049. By that time, Vectra had plunged into bankruptcy, largely because of the NRC DFI, and had been replaced by another vendor, TransnuclearWest, Inc. ("TNW"), by court order. DX 804, at SMUD 0036379; DX 1342. In addition, because of the massive problems that Pacific Nuclear and its successors encountered, by the time SMUD's canisters were ready to be built, Ranor, the leading manufacturer of transportation canisters and the company that Pacific Nuclear had originally chosen to manufacture the canisters, was unable to accommodate SMUD's request. DX 918, at SMUD 049125-27. This meant that TNW had to choose another canister manufacturer, Precision Components Corp. ("PCC"), which itself encountered so many manufacturing problems that SMUD had to take the extreme steps of placing an onsite representative at PCC; conducting a full blown audit of PCC, which concluded that PCC's billing practices were questionable at best; and ultimately providing to PCC extra contractual "completion bonuses" in excess of $3 million and a forgiven "loan" of $1.5 million simply to have PCC complete the canister work. DX 283, at SMUD 0009962; DX 1163. In the meantime, by the fall of 1994, the NRC had issued a transportation certificate of compliance for the NAC-STC system.

In short, SMUD's failure to heed the warnings of NAC representatives, one of whom SMUD is now relying upon as an expert regarding its dry storage decision, resulted in SMUD choosing a dry storage system that took years longer to develop than the NAC system and cost tens of millions of dollars more to complete.

Further, by pursuing the NUHOMS system over the NAC-STC system, SMUD consciously chose a system that emplaced SMUD's SNF into sealed containers, which, under the

terms of the Standard Contract, entitles DOE to remove that SNF from the SNF acceptance queue and defer its acceptance. See DX 88, Art. XI.A.2(b) & App. E. SMUD's decision and implementation of that decision greatly increase the chances that the acceptance of the fuel will be delayed and that future loading costs will be dramatically increased, as SMUD will have to remove the fuel from the NUHOMS canisters prior to DOE acceptance.

At trial, we will show that, far from being reasonable mitigation, SMUD's decision to pursue the untested, unlicensed, and risky NUHOMS system, in the face of clear and prudent warnings by undisputed experts in the area of dry storage, was an unreasonable action for which the Government should not be responsible. SMUD undoubtedly will argue at trial that its damages in this matter were "forseeable." Pl. Br. at 44. We will show that what was truly forseeable to SMUD was that the choice of the NUHOMS system would lead to years of delay and "pain" that could have been avoided by heeding the advice of SMUD's current expert regarding "the development of the dry storage market." Pl. Wit. List at 3. Those foreseeable problems, and the costs associated with those problems, are not compensable.

3. The Fact That SMUD Possesses Greater Than Class C Radioactive Waste And Failed Fuel, Which It Is Responsible For Storing Indefinitely, Precludes A Finding That No Continuing Storage Costs Or Dry Storage Construction Costs Would Have Been Incurred Absent DOE's Delay

a. SMUD Possesses GTCC Waste

The fact that SMUD's SNF has been completely loaded into the ISFSI does not alone establish causation for all of SMUD's alleged increased storage and ISFSI construction costs resulting from DOE’s SNF acceptance delay. SMUD admits that it possesses Greater Than Class C radioactive waste ("GTCC waste"). Although it claims that it is not seeking the costs related to

the storage of GTCC waste and, therefore, that "the issue with respect to GTCC waste has no bearing on this case and is not yet ripe," Pl. Br. at 54 n.28, we will demonstrate at trial that, because the Government is not obligated to accept GTCC under the Standard Contract or on the same schedule as standard fuel, SMUD would have built at least a portion of its dry storage facility for storage of GTCC waste regardless of the timing of DOE's performance under the Standard Contract.

As we have explained in prior briefing, DOE has a statutory obligation to develop a plan for the disposal of commercially-generated GTCC waste, pursuant to the Low-Level Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021b-2021i. However, that statute does not require DOE to develop or implement an acceptance and disposal plan by any particular date. Further, the statute requires that "the beneficiaries of the activities resulting in the generation of [GTCC] bear all reasonable costs of disposing of such wastes," id. § 2021c(b)(3)(E), and no utility has yet contracted for or paid for the disposal of its GTCC. Accordingly, at the present time, SMUD is legally responsible for the continuing storage of its GTCC waste for the indefinite future.

Because SMUD is responsible for the indefinite storage of its GTCC waste, it cannot pass to the Government those costs that it would have to incur regardless of DOE's delay. Indeed, as we will demonstrate at trial, not only is GTCC not covered by the Standard Contract, SMUD's own contemporaneous documents reflect this understanding. Further, to the extent SMUD claims that DOE "would have" accepted GTCC concurrently with SMUD's SNF, this argument is predicated upon pure speculation, particularly since the amount due for that disposal has not yet been established and SMUD has not yet contracted or paid for that disposal. Consequently,

SMUD is responsible for all costs associated with the continued storage of its GTCC waste. So long as SMUD has to store any GTCC waste on-site, it will be required to incur significant costs for that storage that are duplicative of the costs that it would have to incur if it was storing only SNF. The removal of all SNF from SMUD's site will not eliminate the costs that it would otherwise have to incur to store its GTCC waste indefinitely. It cannot recover those non-incremental costs in this litigation. At trial, Mr. Kiraly will explain the methodology for deducting the costs associated with the storage of GTCC from SMUD's damages claims.

b. SMUD Possesses Failed Fuel

The Standard Contract provides three broad classifications of fuel: (1) Standard Fuel; (2) Nonstandard Fuel; and (3) Failed Fuel. See DX 88, App. E, ¶ A. Although DOE is required to accept and dispose of failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel. Instead, DOE is entitled effectively to remove other than standard fuel (including failed fuel) from the "oldest fuel first" priority ranking for acceptance of SNF and, at its discretion, to delay its acceptance. Id. Art. VI.A.2(b).

As the Government's technical expert, Jerry Burford, will explain at trial, and as Mr. Stuart confirmed in his deposition, SMUD possesses failed fuel. See SMUD 002 2578. Indeed, Mr. Burford will explain at trial that, in addition to the SNF classified by SMUD as failed, SMUD may possess even more failed fuel, as that term is defined in the Standard Contract, based upon SMUD's SNF classification procedures.[28]

[28] As we will show at trial, based upon SMUD's faulty classification of fuel, it potentially has much more failed fuel than it initially calculated. To the extent that SMUD has placed this fuel in standard fuel canisters and casks, SMUD may have jeopardized the acceptance schedule

If it is determined that failed fuel requires special handling, its acceptance by DOE may be delayed, as permitted by the Standard Contract. Thus, "but for" DOE's delay in beginning SNF acceptance, SMUD could still have been required to store failed fuel for an indefinite period of time and, therefore, cannot recover costs resulting from its storage of failed fuel. At trial, Mr. Kiraly will provide a methodology for deducting the costs associated with the storage of failed fuel.

4. SMUD Has Usurped The Responsibility Of DOE To Provide For Transportation

The Standard Contract unequivocally states that DOE is responsible for the arrangement and provision of "all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility."[29] SMUD has chosen a dry storage technology that includes transportation features and has included the costs associated with these transportation features in its damages claims. Because these are costs for which DOE is responsible, both in the "but for" and the breach world, SMUD has improperly included these costs in its damages claims. Mr. Jerry Burford, the Government's technical expert, will identify at trial those aspects of SMUD's damages claims associated with transportation and will present a methodology for extracting these costs from SMUD's damages claims. Mr. Stephan Kiraly, the Government's expert

---

for all of its SNF.

[29] DOE's obligation to provide transportation includes, but is not necessarily limited to, the provision of: (1) "written procedures for cask handling and loading, including specifications on Purchaser-furnished cannisters for containment of failed fuel;" (2) "training for Purchaser's personnel in cask handling and loading, as may be necessary;" (3) "technical information, special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s);" and (4) "sufficient documentation on the equipment supplied by DOE." DX 88, at SMUD 0020665.

accountant, will explain at trial that the removal of these costs will substantially reduce SMUD's damages claims.

5. SMUD's Management Decisions Resulted In Substantial Schedule And Cost Overruns, And These Overruns Are Not Recoverable As Damages

SMUD has included in its damages claims costs associated with the substantial delays that occurred throughout the course of its dry storage project, including costs associated with the bankruptcy of its prime contractor, the correction of engineering and fabrication defects, and costs associated with the premature mobilization of on-site support services. As described above, and as Mr. McGrath will show at trial, these delays resulted in SMUD's dry storage project being completed 88 months after planned completion. Indeed, as discussed above, SMUD admits that these delays were entirely foreseeable (Pl. Br. at 47), and we will demonstrate at trial that SMUD could have chosen less risky and less costly SNF storage options. At trial, Mr. Burford will discuss why costs associated with these delays should be removed from SMUD's damages claims, and Mr. Kiraly will provide a methodology for deducting these costs from SMUD's damages claims.

6. SMUD's Damages Claims Include Costs That It Otherwise Would Have Incurred

As Mr. Burford will explain at trial, SMUD's damages claims also improperly include costs that would have been incurred regardless of the date of DOE's performance, including, among other items, design changes and modifications of the spent fuel pool and building; crane upgrades performed by SMUD personnel as well as contractors; procedure changes related to spent fuel support systems; and calculations, testing, and reevaluating cask drop into the spent

fuel pool, including subsequent criticality concerns.[30] At trial, Mr. Burford will identify these costs that otherwise would have been incurred regardless of the time of performance, and Mr. Kiraly will explain how such costs should be deducted from SMUD's damages claims.

7. SMUD's Damages Claims Include Other Serious Deficiencies

In addition to the above-mentioned defects in SMUD's damages claims, SMUD also has failed to identify with sufficient particularity certain cost categories contained in its damages claims. For example, Mr. Burford will identify certain classes of labor charges that are included in SMUD's damages claims that may be attributable to other continuing work at Rancho Seco that is unrelated to its dry storage project, such as work related to decommissioning or the packaging of low-level radioactive waste. To date, SMUD has failed to justify these cost categories with detailed time sheets or other appropriate documentation. Similarly, Mr. Kiraly will explain at trial that many of SMUD's claimed labor hours involved SMUD personnel who either were only charging a few hours to its SNF project or were charging to the SNF project sporadically. Mr. Kiraly has concluded that, because these costs would have been incurred regardless of the Government's alleged breach, these costs are fixed and should not be included in SMUD's damages claims.

Further, Mr. Kiraly will explain at trial that SMUD applied indirect markups to its direct labor markups and that these markups include fixed cost distributions. Because fixed costs are not incremental to an alleged breach, such costs should be removed from SMUD's damages

[30] Although SMUD concedes for the first time in its pretrial contentions that certain costs contained in its damages claims would have been incurred regardless of the timing of DOE's performance under the Standard Contract, as we will show at trial, it has failed to remove all such "but for" costs from its damages claims.

claims. In addition, in reviewing SMUD's damages claims, Mr. Kiraly has discovered at least one instance in which SMUD has failed to match credits with previously recorded costs. As Mr. Kiraly will explain at trial, SMUD's damages claims should be reduced by $500,000 to correct SMUD's posting errors.

Mr. Kiraly also will identify other potential defects in SMUD's damages claims, including: (1) potential revenue opportunities resulting from any licensing fees or royalties relating to the design of the ISFSI or NUHOMS system; (2) any obligations into which SMUD entered prior to the Government's alleged breach, but which could not have been avoided even absent the breach; (3) the possible avoidance of severance pay and termination costs; (4) continuing costs for contracts associated with the design, licensing, planning and construction of the ISFSI; and (5) any obligations made prior to 1992 concerning the leasing of equipment or the rental of property associated with SMUD's dry storage project.

8. SMUD's Damages Claims Do Not Provide An Offset For The Savings Associated With Decommissioning Or Wet Storage Operating Costs

SMUD now claims that, had it had assurances that DOE would have timely performed under the Standard Contract, it would have kept its SNF in the wet pool. Yet, as discussed in our motion regarding pre-breach damages, which is being filed concurrently with this brief, SMUD never requested such assurances, making the legal theory upon which it is proceeding in seeking recovery of its costs unclear. Nevertheless, SMUD has estimated that the annual cost of keeping its wet pool operational is approximately $10.6 million. Mr. Hamal will explain at trial that a proper damages claim would deduct these wet pool operational costs from the point at which the last assembly was placed in dry storage in the actual world until DOE was obligated to finish

accepting SMUD's SNF in the "but for" world, which SMUD asserts is 2006 and the Government will show would be even later.[31] Further, Mr. Hamal will explain at trial that SMUD's damages claims fail to account for the significant cost savings associated with decommissioning. Specifically, by moving its SNF from the wet pool to dry storage, SMUD was able to decommission its wet pool, resulting in substantial cost savings to its decommissioning plan. SMUD had failed to offset these cost savings from its damages claims.

## IV. SMUD's ARGUMENT THAT THE GOVERNMENT HAS BREACHED AN IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING, AND ITS ARGUMENT THAT IT IS ENTITLED TO DAMAGES FOR THAT BREACH, ARE UNFOUNDED

### A. Contentions Of Law Regarding Implied Duty Of Good Faith And Fair Dealing

Although "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," Restatement (Second) of Contracts § 205, "[t]he obligation of good faith . . . is not an 'independent source of duties for parties to a contract.'" Allstate Fin. Corp. v. Utility Trailer of Ill., Inc., 936 F. Supp. 525, 529 (N.D. Ill. 1996) (quoting Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992)). "Rather, it guides the construction of explicit terms of an agreement." Allstate, 936 F. Supp. at 529 (emphasis added). "The implied covenant is limited to assuring compliance with the express covenants or promises of the contract, and cannot be extended to create obligations not contemplated in the contract." Kucharczyk v. Regents of Univ. of Calif., 946 F. Supp. 1419, 1432 (N.D. Cal. 1996); see Jarvis v. United States, 43 Fed. Cl. 529, 534 (1999); State of Alaska v. United States, 35 Fed. Cl. 685,

[31] Because SMUD is only seeking damages through 2003, and it had fully loaded its SNF into dry storage by 2002, the Court need not decide the date that DOE was obligated completely to accept all of SMUD's SNF for purposes of this calculation.

704 (1996), aff'd, 119 F.3d 16 (Fed. Cir. 1997).[32] This "implied duty" does not entitle anyone to require the Government to provide greater benefits than specified in the contract. LaSalle Nat'l Bank v. Metropolitan Life Ins. Co., 18 F.3d 1371, 1375 (7th Cir. 1994) (emphasis added). "[S]uch generalized obligations as not interfering with the other party's performance, or failure to act in good faith, must have a contract performance referent to have any relevance." C.B.C. Enterprises, Inc. v. United States, 24 Cl. Ct. 1, 5 (1991). There must be a "nexus alleged between the Government's allegedly tortious breach of these implicit conduct obligations and any express term of the contract." Id.; see Village on Canon v. Bankers Trust Co., 920 F. Supp. 520, 534 (S.D.N.Y. 1996) (duty of good faith "does not create any new contractual rights" other than those expressly stated in the contract itself, "nor does it provide an independent basis for recovery"); Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 598 (1994) ("defendant only had a duty to render a decision within a reasonable time if it had an explicit contractual obligation to take some action on the applications"); Heagy v. United States, 12 Cl. Ct. 694 (1987) (no breach of contract can exist unless it is based upon actual requirement contained in the contract), aff'd, 848 F.2d 1244 (Fed. Cir. 1988). As the United States Court of Appeals for the Federal Circuit held in Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed. Cir. 2002), the presumption that the Government acted in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has been equated with evidence of some specific

[32] In Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005), which is not final, the Federal Circuit concluded that certain legislation specifically targeted to plaintiffs which deprived them of the benefits of their contract violated the general duty of good faith and fair dealing. Id. SMUD has not alleged, and could not establish, any specific intent by DOE to harm it. Further, the contractual obligations that SMUD now seeks to impose under a good faith theory were specifically excluded from the Standard Contract when it was being promulgated, precluding reliance upon an implied duty to add that term. See Jarvis, 43 Fed. Cl. at 534.

intent to injure the plaintiff." Indeed, allegations of bad faith have generally arisen in instances involving "fraud" or "quasi-criminal wrong-doing" by Government officials. Id. at 1240.[33]

### B. Contentions Of Fact Regarding Implied Duty Of Good Faith And Fair Dealing

Although SMUD admits that the Standard Contract itself does not identify any particular, or minimum, rate of SNF acceptance, it claims that DOE manipulated the DCS process through the promulgation of the 900 MTU rate. Pl. Br. at 61. As explained above, that assertion is unsupported by the plain language of the Standard Contract and seeks to incorporate into the Standard Contract obligations that were expressly excluded from it, as evidenced by the record of administrative rulemaking. As a result, SMUD's claim of an "implied duty" breach is baseless.[34]

SMUD also apparently views as a "breach" of the implied duty of good faith DOE's instructions for the completion of DCSs, as well as the DCSs that SMUD submitted and that

---

[33] Recently, the Court issued a decision in Boston Edison Company v. United States, No. 99-447C, 2005 WL 375603 (Feb.15, 2005) (slip op.), in which it denied the Government's motion to dismiss an SNF plaintiff's claim for breach of the implied covenant of good faith and fair dealing. To the extent that the Court there held that a failure to begin SNF acceptance constitutes a breach of the implied duty of good faith and fair dealing, we respectfully disagree. The development of a Federal facility for the disposal of SNF is an extremely complicated and politically sensitive project. There has been absolutely no showing in this case that DOE's inability to develop such a Federal facility was deliberate or done with an intent to injure contract holders.

[34] Even if this claim had merit, it is time-barred. DOE promulgated the ACR containing an annual rate of acceptance of 900 MTU in 1991. SMUD filed its original complaint on June 9, 1998, seven years after the promulgation of the 1991 ACR. "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Because SMUD's breach claims concerning DOE's promulgation of an annual 900 MTU rate of acceptance accrued more than six years ago, it is time-barred, and this Court lacks jurisdiction to adjudicate this claim.

DOE approved. Pl. Br. at 60.[35] As discussed above, DOE issued the 1991 ACR and APR and, in instructions issued to assist contract holders in completing DCSs, explained that DCS submissions would be approved in accordance with the SNF acceptance rates identified in the 1991 ACR. Although SMUD argues that the DCS instructions somehow violate the implied duty of good faith and fair dealing, SMUD does not identify a single express term of the Standard Contract that conflicts with the DCS instructions. Further, rather than utilizing the Standard Contract's "Disputes" clause to object to DOE's request that contract holders use the 1991 ACR acceptance rates in their DCSs, SMUD actually submitted DCSs in accordance with the 1991 ACR rates, and DOE approved SMUD's submitted DCSs. By failing to challenge DOE's acceptance rates through the contractual mechanisms, SMUD waived any claims of a breach of any unstated duties.[36]

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government's favor.

---

[35] To the extent that SMUD is asserting that DOE's suspension of the DCS process constitutes a breach of the implied duty of good faith and fair dealing, such a claim is without merit. DOE stopped approving DCSs only in 1997 once it realized that it would be unable to accept SNF by January 31, 1998. Indeed, it would seem inappropriate to approve of DCSs when it knew that it would be unable to accept SNF by January 31, 1998. Rather, DOE took appropriate and responsible actions in suspending the DCS process when it realized it would be unable to begin industry-wide acceptance. SMUD cannot show that this suspension was an attempt specifically to injure contract holders.

[36] SMUD suggests that the Government's legal arguments in SNF cases that liability should be limited to amounts of SNF indicated in approved DCSs constitutes a breach of the implied covenant of good faith and fair dealing. Pl. Br. at 60. SMUD has provided absolutely no authority for the proposition that positions taken in litigation can somehow constitute a breach of the implied covenant of good faith and fair dealing.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Russell A. Shultis
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

JOSHUA E. GARDNER
SCOTT R. DAMELIN
TODD J. COCHRAN
ELIZABETH THOMAS
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

February 28, 2005

CERTIFICATE OF FILING

I hereby certify that, on this 28th day of February 2005, a copy of foregoing "DEFENDANT'S MEMORANDUM OF CONTENTION OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner