58

MR. DAMELIN: No.
Q Let me ask you this: On the second page on the left column it indicates a few lines down "Action: Notice of proposed rulemaking" and the words "Summary: This notice publishes for comment a proposed standard contract to be used by the Department of Energy (DOE) in furnishing disposal services to the owners or generators of spent nuclear fuel and/or high-level radioactive waste and DOE's proposed procedures designed to implement Section 302 of the Nuclear Waste Policy Act of 1982."
Do you recall whether this Federal Register "Notice of proposed rulemaking" was a draft of the standard contract before it was finalized?
A You're asking whether there was a document preceding this?
Q Let me ask you this: Is it your understanding that -- that -- the standard contract which SMUD ultimately entered into with the federal government, June 14th, 1983, was a draft of that standard contract published in the Federal Register at any point?

59

A Well, I assume this is probably it.
Q Do you recall if the -- the "Notice of proposed rulemaking" for the proposed standard contract is, in fact, what's being shown to you as Deposition Exhibit Number 2?
A You lost me there with verbiage.
Q Let me go back.
Deposition Exhibit Number 1 was a contract entered into by SMUD and --
A Right.
Q -- the United States government?
A Right.
Q Prior to either June 14th or the May 1983 date, do you recall ever reviewing a draft of the standard contract prior to what's been shown as Deposition Exhibit Number 1?
MR. NESLIN: I'll object as asked and answered. I think Mr. Powers previously testified that he did.
THE WITNESS: Yes.
BY MR. DAMELIN:
Q Deposition Exhibit Number 2, is this a draft

60

that was considered or reviewed by the Nuclear Fuel Committee at SMUD, to the best of your recollection?
A We would have reviewed the draft or the proposed contract. And if this faithfully represents the contract, I would say yes. I mean, I can't tell.
MR. DAMELIN: I'm going to have this marked as Deposition Exhibit Number 3.
(Exhibit 3 marked.)
BY MR. DAMELIN:
Q Take a moment and review that. I understand that the print is small also, so just do your best.
A Okay.
Q Okay. Do you recognize this document, Deposition Exhibit Number 3?
A When you say "recognize," I mean, I recognize what it purports to be. But, you know, do I remember seeing and reviewing this? Not specifically. Would I have in that time frame? I'm sure.
Q Well, let me just identify for the record that Deposition Exhibit Number 3 is dated Monday, April 18th, 1983, and reads "Part II Department of Energy Standard Contract for Disposal of Spent Nuclear

61

Fuel and/or High-Level Radioactive Waste."
The second page reads under "Action" on the left-hand column "Final rule. Summary: This rule establishes a standard contract to be used by the Department of Energy (DOE) in furnishing disposal services to the owners or generators of spent nuclear fuel and/or high-level radioactive waste and procedures to implement the Nuclear Waste Policy Act of 1982."
Now do you recall whether the Nuclear Fuel Committee, of which you indicate you were a member, reviewed what's represented as Deposition Exhibit Number 3 as the final standard contract as promulgated in the Federal Register?
A Do I have a specific recollection of a meeting on that? No. Do I know by practice that this occurred? Yes.
Q Was that because during this particular period of time -- this would have been early 1983 -- one of the issues the Nuclear Fuel Committee was addressing was the standard contract?
A Yes.

74

Q Now are you aware in the standard contract whether there is a particular schedule set forth in the contract DOE accepting spent nuclear fuel and/or high-level waste from Rancho Seco?
MR. NESLIN: Do you wish to refer him to a particular portion of the contract, Scott?
BY MR. DAMELIN:
Q I'm just asking based on your recollection, and I would refer you to Deposition Exhibit Number 1, if you want to take a look at it.
MR. NESLIN: Is there a particular portion you'd like him to --
BY MR. DAMELIN:
Q I'm just asking -- let's start off in general, if you recall.
A I don't see one.
Q Do you recall whether the standard contract contained not a schedule but a rate of acceptance for DOE to accept spent nuclear fuel? And I can give you an example.
Was there a rate of acceptance, say, that the DOE would have to accept X amount of metric tons of

75

uranium per year from the nuclear facility in the standard contract?
MR. NESLIN: Do you wish to point him to a particular portion of the contract?
BY MR. DAMELIN:
Q I'm first just asking if you recall whether there was a rate of acceptance specified.
A I don't know. I don't recall.
Q Do you recall whether a rate of acceptance issue was a concern to anyone at SMUD prior to your entering into the standard contract?
A No, I don't recall that.
Q Do you recall whether the lack of a schedule separate and apart from the rate of acceptance for DOE to accept spent nuclear fuel was a cause of concern to anyone at SMUD?
A I don't recall.
Q If there wasn't a rate of acceptance in the standard contract, would that have been of concern to you or anyone else at SMUD?
MR. NESLIN: Object to the form of the question as calling for speculation.

76

You may answer.
THE WITNESS: I don't know where the words are, but, you know, there was a general assurance from either the contract or other documents that DOE intended to be able to accept and remove fuel at a rate that was consistent with our needs.
BY MR. DAMELIN:
Q Just a moment.
We'll have this -- are we on Exhibit Number 4?
(Exhibit 4 marked.)
BY MR. DAMELIN:
Q If you can just take a look at that and let me know when you've had an opportunity to review it.
A Okay.
Q Now Mr. Powers, do you recognize this particular document?
A Yes, I do.
Q What is it?
A It's my declaration with regard to the standard contract.
Q Now do you know when you made this

77

declaration?
A 11th of December, 2002.
Q And that's indicated on the second page of this declaration?
A That's correct.
Q And it's a two-page declaration; is that correct?
A Yes.
Q Now why did you prepare this declaration?
A I was requested to prepare a declaration by counsel.
Q And that's counsel to SMUD?
A Yes.
Q Now at the time that you signed this declaration, December 11th, 2002, you had not been employed at SMUD for approximately 14 years; is that correct?
A '88 to 2002, yes.
Q Now do you know for what purpose this declaration was used, if at all?
A I was told that SMUD was suing the Department of Energy.

78

Q Do you have any specific recollection as to -- as to what this declaration was actually going to be used for as part of that litigation?
A No.
Q Do you recall whether -- or do you know -- have you done any other declarations besides this one as part of the SMUD litigation against the government?
A No.
Q Now prior to signing this declaration or completing it in December of 2002, did you review any documents as part of your preparation of this declaration?
A I don't recall.
Q Did you have conversations with anyone at SMUD regarding the contents of this declaration?
A No.
Q Now referring to the first page of the declaration it reads "Roger Powers declares as follows:" And the first paragraph, first part indicates that "I am a retired Nuclear Engineer who previously worked at Sacramento Municipal Utility District ('SMUD')."

79

Second paragraph, "From approximately 1970 until approximately 1988, I served successively as a Senior Nuclear Engineer and as a Supervisory Nuclear Engineer at SMUD."
Are those statements correct?
A Yes.
Q Referring to paragraph number three, "As a Supervisory Nuclear Engineer at SMUD during the 1980s, my duties included serving as technical advisor to a SMUD committee that reviewed proposed contracts relating to nuclear fuel, including the Standard Contract for the Disposal of Spent Nuclear Fuel ('SNF') and/or High Level Waste ('HLW')('Standard Contract').
Now the SMUD committee which you reference in the first sentence of paragraph number three, is that the Nuclear Fuel Committee --
A That's correct.
Q -- that we've been talking about?
A That's correct.
Q And you indicated that your duties, again, included serving as a technical advisor to that

80

committee.
Would you characterize your duties to that committee as anything else other than a technical advisor?
A No.
Q Now the -- you indicate that the -- you say "included serving as technical advisor to a SMUD committee that reviewed proposed contracts relating to nuclear fuel."
Are there any other contracts besides the standard contract we've been discussing that relate to the disposal of spent nuclear fuel or high-level waste?
A Not that I'm aware of.
Q Now the next line indicates that "In fulfilling these duties, I became familiar with the Standard Contract prior to its execution by SMUD in 1983."
Can you describe for me how you became familiar with the standard contract prior to its execution by SMUD in 1983?
MR. NESLIN: Object as having previously been

81

asked and answered. In your question of Mr. Powers regarding how the committee operated in connection with the standard contract, I believe he testified as to his activities and different kinds of documents that he reviewed, but you may answer.
THE WITNESS: I would have read the -- all of the available documentation published by DOE. And there were various utility groups reviewing the standard contract, and we would have read their publications also to be aware of their comments with regard to the standard contract.
BY MR. DAMELIN:
Q Prior to the contract being executed in 1983, do you recall what Department of Energy or, let's say, government documents that you would have reviewed prior to SMUD entering into the standard contract?
A Not by name.
Q Do you recall the types of documents that you reviewed?
A They would have been things coming from the Federal Register and any other related publications --
Q Again --

82

A -- planning -- planning documents, whatever -- whatever DOE was publishing in that time period related to the standard contract.

Q Do you recall whether DOE published what you might describe as planning documents prior to June 1983 related to the standard contract?

A I believe they did, but that's -- you know, that's the best of my recollection.

Q You don't recall at this time?

A I don't recall for sure.

Q Do you know when you signed this declaration in December of 2002 that you had a specific recollection of which documents you used to become familiar with the standard contract that -- that were published by government agencies?

A I'm having trouble with the wording of the question.

Q You had just -- I thought you had just used the word "planning documents."

A Right.

Q Okay. And you indicated you didn't have a specific recollection at this time of which planning

83

documents.

What type of planning documents, if you recall, would you have reviewed at that time?

A Whatever was available with regard to the contract, but I don't recall. You know, I'm sure there were some. I don't know how many.

Q Now you also indicate in the fourth sentence here "I also gained an understanding of how DOE was expected to perform under the Standard Contract through my review of program documents and discussions with representatives of DOE, SMUD, and other utilities."

Now let's take the first part, "through my review of program documents." Are you referring to documents produced or published by Department of Energy when you say "program documents"?

A Yes.

Q Now do you --

A Okay. They might also have been published by various utility groups. There would be related documents by Edison Utility Waste Management Group and I think the public utilities also had a file of sorts

84

that probably published comments related to the standard contract.

Q Okay. Now when you say here "I also gained an understanding of how DOE was expected to perform under the standard contract," was that an understanding that you gained prior to SMUD entering into this contract in June of 1983 based on your review of program documents and discussions with these various representatives?

A Yes.

Q Now these discussions with representatives of DOE, SMUD and utilities, are you referring to discussions that you personally had with these various representatives or that other people had and conveyed to you or a combination of both?

A I don't recall direct interaction with DOE personally. But the second part of the question implies information I gleaned from what others told me or that I might have had directly with -- certainly I talked to other people at SMUD and other utilities in addition to reviewing documents.

Q In order to gain this understanding of how

85

DOE was expected to perform under the standard contract, do you recall who you had discussions with to gain that understanding?

A No.

Q Do you recall what time period you would have had these discussions that are specifically referenced here?

MR. NESLIN: Object as having been asked and answered. Mr. Powers just testified that these discussions preceded the execution of the standard contract.

MR. DAMELIN: Thank you. I would say at this point, though, Mr. Neslin, I understand that -- you know, if the objection is asked and answered, that's fine, and I can ask Mr. Powers to answer it. I would ask that you not testify on his behalf. I think that it's clear that I'm trying to test Mr. Powers' recollection.

And the fact is that he did fill out this declaration two years ago, and I think it's appropriate to ask the extent of his recollection about the -- about the issues and events that are set

86

forth in here.
Q I will try to avoid asking repetitive questions, but I think that the question is the time frame of when you had these discussions. That's what I -- that was the question. If you don't remember the specific discussions, do you recall the time frame or the period of time when they would have occurred?
A Prior to signing the contract, but I can't place it in either '83 or late '82.
Q In order to gain an understanding of how DOE was expected to perform under the standard contract, are you relying on your review of program documents that might have been produced or published after June 1983?
A No, not that I'm aware of.
Q In order -- when you gained an understanding of how DOE was expected to perform under the standard contract, and you referenced discussions with representatives of DOE and SMUD and other utilities, do you rely on any discussions that occurred after June 1983 to form the basis of your understanding?
A I'm aware there had been changes in later

87

documents that created different -- different parameters that were in existence in '83, but there was an evaluation and understanding that was offered in '83 prior to signing the contract. And that's all I'm -- I'm testifying to, that I -- I gained an understanding of that.
Q Let's go to the second page, briefly.
Now there's a fourth and final paragraph, and it reads "It was my understanding that, under the Standard Contract, SMUD would pay certain fees to DOE."
Just so I have the time frame correct, when you say "it's my understanding," is that prior to or at the time that SMUD entered into this contract with the government, which would have been June 1983?
A I believe so, but I'm not totally confident that all the fees were identified at that time or the form of the fees and so on.
Q Was it a concern to SMUD that -- or was it a concern or did SMUD discuss the nature of the fees that it would be paying to DOE under the standard contract?

88

A I'm sure that we did.
Q Now what is your understanding, given the standard contract, of the nature of the fees that SMUD would be required to pay to DOE?
A There was to be a fee on current generation and a fee related to previously discharged fuel.
Q Now at the time that the contract was entered into, was there a particular formula or rate at which SMUD was to pay based on its prior, I guess, and its ongoing power generation?
A I assume there was, but I -- you know, I'd have to reread the contract to know what it says.
Q Okay. Do you recall if the contract would have required SMUD to continue paying any type of fee to DOE if it stopped generating nuclear power?
A I don't believe it did except for previously discharged, if that was still a part of it, the payment.
Q Okay. Now the second sentence reads "In return" -- that phrase "In return," are you referring to in returning for SMUD paying certain fees to DOE?
A Yes.

89

Q Okay. It reads "In return, DOE would accept SNF and HLW from SMUD beginning January 31, 1998 at a rate that would:" -- let me just ask you about that phrase, and you can read the rest of it, if that would help you.
Was it your understanding, given this standard contract, that DOE would start accepting the SNF and HLW from SMUD beginning in January, January 31st, 1998?
A Or shortly thereafter. They would start accepting industry fuel on that date, and I don't recall where our position in the, quote, "cue" was at that time.
Q So the January 31st, 1998, date that is referenced here, is that the date that DOE would have to start accepting spent nuclear fuel from the nuclear industry but not necessarily SMUD?
A That's correct.
Q Now the rest of the -- of the sentence reads "eliminate any need for SMUD to create additional SNF and HLW storage after that date;"
Now "after that date," are you, again,

referring to January 31st, 1998?
A Yes.
Q It reads on, "and reduce the amount of SNF and HLW present at SMUD's plant as of that date so as to allow for timely decommissioning of the plant."
Now, again, when you say "as of that date," January 31st, 1998?
A Um-hum.
Q Now the first part of that, "eliminate any need for SMUD to create additional SNF and HLW storage," what are you referring to when you say that would have, I guess, been one of the results of this standard contract?
A Well, it was continuing to generate fuel for discharge, and it had a defined fuel storage capacity. And at some point we would run out of full core discharge capability, so that's what I was referring to.
Q And just so I'm straight, at the time the contract was entered into in 1993, was all of Rancho Seco's spent nuclear fuel being stored in the wet --
A You wanted to say 1983. You said '93.



Q That's what I meant to say, 1983.
Was Rancho Seco storing all of its spent nuclear fuel in its wet fuel pool?
A Yes.
Q And when I say "wet fuel pool," do you know what I mean regarding Rancho Seco?
A Yes.
Q And that is a -- a wet pool that is -- at Rancho Seco was in the --
A Spent fuel storage.
Q Spent fuel storage.
And that was close in proximity to the reactor?
A Yes.
Q Now when you say full core offload or discharge capability, what are you referring to?
A That there were enough spaces in the spent fuel pool so that if for some reason during a refueling they needed to download the entire reactor, we could do that. Rancho Seco had 177 fuel assemblies.
Q So the point is at some point if you did not



have 177 spaces in your pool, you would lose full core discharge capability at that point?
A Right.
Q Were you required or would you have been required to stop plant operations if you did not have a full core discharge capability in your -- in your pool? Again, talking about the 1983 period.
MR. NESLIN: Object to the form of the question as calling for speculation.
You may answer.
THE WITNESS: Probably not, but you'd be running a risk that something could fail that really would have required you to download. At that point you'd be dead in the water.
BY MR. DAMELIN:
Q Now the second part of the sentence where you say "eliminate any need for SMUD to create additional storage," what type of storage are you referring to?
A Well, it could be a reracking of the pool or it could be dry storage. It could be anything that would free up spots in the pool.
Q When you made this statement, were you



referring to any particular type of different storage options that you just mentioned?
A I think in that time frame we were mainly talking reracking the pool or modifying it in some way.
Q Okay. Do you know or are you aware of any studies that would have permitted Rancho Seco to rerack its pool back in, I guess I would say, 1998?
MR. NESLIN: In 1998? Is that the date you're referring to, Counsel?
MR. DAMELIN: Right.
THE WITNESS: I left in '98.
BY MR. DAMELIN:
Q Yeah, I understand that.
A There may have been studies. I'm not aware of them.
Q Now the second part of the sentence, or the final part says "reduce the amount of SNF and HLW present at SMUD's plant as of that date so as to allow for timely decommissioning of the plant."
Why was that important?
A If you can't decommission in a timely

Page 94

fashion, you're continuing to incur expenses that -- that wouldn't happen if you had been able to go ahead and decommission.
Q Now when the contract was entered into in 1983, was -- was SMUD planning for decommissioning of the plant at any time?
A Well, yes. I mean, the operating -- the terms of the operating license was limited to 40 years. And without a license for renewal -- which we probably would have applied for but not being guaranteed -- we would have had to plan for decommission. And I know we generated funds for decommissioning as part of the regular fuel charge.
Q And is that statement that it -- that it -- "to allow for timely decommissioning of the plant" because if there was spent nuclear fuel that needed to be stored at Rancho Seco, it would prevent the plant from decommissioning?
A It would certainly -- you couldn't completely decommission until the fuel was off site. I mean, you could -- I'm not saying you couldn't do anything, but you -- you were more limited in what you could do

Page 95

until the fuel is off site.
Q And what is your understanding as to why that's -- that's not possible to decommission until all the fuel is off site?
A Well, the fuel continues a need for cooling, so you have to have operating cooling systems. Maintaining the water circulation would have been important.
Q And that would be in the wet pool you're referring to?
A Wet pool.
MR. DAMELIN: Can we take a five-minute break?
MR. NESLIN: Sure.
(Recess.)
MR. DAMELIN: Why don't we go back on the record.
Q Now Mr. Powers, I wanted to stay on the declaration here, paragraph four. Now referring to the -- the phrase or the part of the sentence that reads "In return, DOE would accept SNF and HLW from SMUD beginning January 31, 1998," I believe you

Page 96

testified earlier that was at least the date for beginning acceptance for utilities as a whole.
A Um-hum.
Q What was your understanding, again, at the time that the standard contract was -- was entered into of when DOE would make its first pickup of spent nuclear fuel from SMUD?
A I don't know that I had an understanding at that time.
Q Okay.
A I was aware of their commitment to try to keep all the reactors operating so that -- you know, I think our -- our position in the cue would be dependent on our need.
Q And other than your general understanding, what was -- what was the basis of -- of the statement you just made in the sense of are you basing that on particular documents or discussions you might have had?
A I think there's language like that in the contract, but I'd have to review it to see.
Q Now was it of concern to you or, if you know,

Page 97

others at SMUD that it was -- you weren't sure when the first pickup by DOE from SMUD would occur?
A I'm sure there's always a measure of apprehension when you don't have a specific date, but I think the overall stated policy and intent made people comfortable with the idea that things would be done in a timely manner.
Q Was this issue or concern addressed to the Department of Energy by SMUD in any way?
MR. NESLIN: Object as asked and answered. You may answer.
THE WITNESS: If it was, it would have been through one of the industry groups in our participation with those industry groups.
BY MR. DAMELIN:
Q Now are you familiar with what is known as -- as oldest fuel first as its used in the standard contract?
A I -- I remember that there is that kind of phrase, yes.
Q Well, let me refer you to page 10 of -- I believe it's Exhibit Number 1, the standard contract,