# Exhibit 2

# Exhibit 2

Salomon Levy Dep. Testimony (June 22, 2004)

12:11-15
16:18 through 17:18
21:8-16
23:11 through 24:7
26:18 through 27:9
28:18 through 29:9
35:1-7
51:15 through 53:7
63:15 through 65:12
76:12 through 81:15
87:14 through 91:10
103:10 through 105:7
108:11 through 111:13
113:16 through 115:4
125:13 through 127:4
142:19 through 143:22
146:5 through 148:18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--o0o--

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 98-488 C |
| | ) | |
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| ______________________________ | ) | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF SALOMON LEVY

TUESDAY, JUNE 22, 2004

Deposition of SALOMON LEVY, taken on behalf of Defendant, at 3425 South Bascom Avenue, Suite 225, Campbell, California, commencing at 9:30 a.m., on Tuesday, June 22, 2004, before RICHARD M. RAKER, CSR No. 3445, Certified Shorthand Reporter.

10

A. That arbitration was in Florida.
Q. Okay. Because you seem like you've been deposed several times and you probably know the drill, I just want to briefly re-explain to you what the deposition is going to entail.
Today I'm going to be asking you a series of questions, and I would expect you to answer the questions as fully, accurately and honestly as you can to the best of your recollection. You represented to me that you're represented by counsel. To the extent that counsel objects to questions, you are still under an obligation to answer unless counsel instructs you otherwise. Do you understand that?
A. Yes.
Q. Okay. Are you currently taking any medication today that would prevent you from answering all the questions honestly, accurately and truthfully?
A. No.
Q. Are you under any other condition that would prevent you from answering all the questions

11

today accurately, honestly and truthfully?
A. No.
Q. If for whatever reason you do not understand any of my questions, please ask me to restate it and I will do my best to rephrase it or explain the question. Do you understand?
A. Yes.
Q. And that's a nice way to one of my final instructions. Because we have a court reporter today, I need you to answer all the questions audibly rather than with your head nods. You took an oath before we started this morning or right actually when we started this morning. Do you understand the nature of that oath?
A. Do I understand what?
Q. The nature of that oath.
A. Yes.
Q. Okay. And what's your understanding of the nature of that oath?
A. Supposed to tell the truth.
Q. Basically that's right.
Do you plan on reading and signing your

12

deposition?
MR. MACDONALD: We can -- we'll sort out how we're going to do that.
MR. GARDNER: We'll reserve that question for the end, then.
BY MR. GARDNER:
Q. Can you please give me your full name and address for the record.
A. Okay. My full -- my last name is Levy, L-e-v-y. First name is Salomon, S-a-l-o-m-o-n.
Q. And your address, sir?
A. My address -- office or home?
Q. Office would be fine.
A. Office? 3425 South Bascom Avenue, Suite 225, Campbell, California 95008.
Q. At any time today if you need a break, please just let me know and we'll try to take a break. If we're in the middle of a question, I would expect that we can just complete the answer to the question, but otherwise just let me know and we'll take as many breaks as you feel necessary.
A. At my age I'll do that.

13

Q. Fair enough. Not a problem.
When did you first learn that the United States was going to take your deposition in this case?
A. I think when he called me.
Q. And approximately how long ago was that?
A. I'd say it was about a month ago.
Q. About a month ago?
Okay. Aside from meeting with counsel, if you did meet with counsel, what did you do to prepare for today's deposition?
A. I just read the report which is to be the subject, as I understand, of your questions.
Q. Now, when you say this report, can I see what you're referring to, please?
A. Sure.
Q. Now, this report is entitled Rancho Seco Nuclear Generation Station Nuclear Fuel Storage Options. It's dated March 31, 1990. And there is no Bates on it. I'm going to ask you to hold --
A. There is a date.
Q. Yeah, there is a date. There is no

14

Bates number. I'll ask you to hold onto that. Aside from reviewing --
A. If you want, you could use this number. It's the report number.
Q. That won't be necessary, but thank you.
Aside from reviewing this Rancho Seco Nuclear Generation Station Nuclear Fuel Storage Options document, did you review any other documents in preparation for today's deposition?
A. No.
Q. No.
Did you speak to anyone other than counsel with regards to today's deposition?
A. No.
Q. Okay. Do you have an understanding of the nature of this litigation?
A. Probably not a complete understanding.
Q. Have you ever seen the complaint in this case?
A. No.
Q. Okay. When you said you have an understanding but not a complete one, can you tell me

15

what your understanding of the case is?
A. My understanding is that some utilities are suing the government because the government has not met the date of 1998 to take their spent fuel away.
Q. And what is the basis for your understanding of the nature of this lawsuit?
A. That's the extent of it. I understand they're trying to get some compensation, but that's about it.
Q. And my question to you is, how did you come to this understanding of the nature of this lawsuit?
A. I'm very active in the nuclear business. Even today I'm still being asked to consult for utilities and for EPRI and other places.
Q. So do you think you read about the litigation. Is that --
A. Oh, yeah. I get the -- I get the ANS nuclear journal every month. I get the NEI reports --
Q. Okay.

16

A. -- every week, so I'm -- I'm abreast, but I don't -- that's not my favorite subject in terms of nuclear work.
Q. What's your favorite subject?
A. My favorite subject is performance of the nuclear power plants and safety.
Q. And when you mean performance, what does that entail exactly?
A. My involvement?
Q. Yes. When you say that performance is one of your favorite subjects, what do you mean by "performance?"
A. Well, by performance, especially when my specialty is with respect to the reactor core analysis, performance of the core, safety of the core and things of this type. So -- and also overall safety of the power plant.
Q. Are you currently employed?
A. I'm self-employed.
Q. And do you have a company that you're self-employed with?
A. I have what's called Levy & Associates

17

now. I'm the full owner of that.
Q. And how long have you been the owner of Sal Levy Incorporated, you said, or --
A. No.
Q. -- Associates?
A. It's Levy & Associates.
Q. I see.
A. I've been the sole owner of that for about six years.
Q. Okay. And prior to Sal Levy & Associates, what was your previous job?
A. I was the president and chairman of the board of S. Levy Incorporated.
Q. And what was the difference between S. Levy Incorporated and Sal Levy & Associates?
A. The difference is that I sold S. Levy Incorporated and opened up a consulting firm in which I'm the only employee involved.
Q. Was S. Levy Incorporated also a consulting firm?
A. Excuse me. S. Levy Incorporated was a corporation.

18

Q. No. No. Was it also a consulting firm?
A. Yeah, S. Levy Incorporated was primarily a consulting firm.
Q. What else did they do?
A. Well, we did some manufacturing in the control and instrumentation area.
Q. And, I'm sorry, how long ago did you sell Sal Levy -- or S. Levy Incorporated?
A. About four to five years ago.
Q. Okay. About four to five years ago.
Since you founded Sal Levy -- Sal Levy & Associates --
A. It's called Levy & Associates.
Q. Sal Levy Associates.
MR. MACDONALD: No Sal. It's just Levy & Associates.
MR. GARDNER: Ah-hah!
Q. Since you founded them, what -- you're doing consulting work; is that correct?
A. Yeah. I still do consulting work.
Q. What kind of consulting work are you doing now?

19

A. Right now I'm on the -- what's called the Off-Site Safety Review Committee for the Paliverde plants. I just did consulting work for FirstEnergy. Whenever they have a problem at the power plants out of the ordinary, I get called in, like fuel failures or channel boring or deposition, things like this. So I get called in for short periods of time and review the problem and provide an opinion.
Q. Prior to your current position, how long were you involved with S. Levy Incorporated?
A. I was involved with it since it was formed.
Q. And do you recall what year that was?
A. What year?
Q. What year.
A. It was formed -- it was formed after I resigned from General Electric Company. I resigned from General Electric Company in 1977.
Q. And were you the president of S. Levy Incorporated?
A. Yes.

20

Q. How many people worked for S. Levy Incorporated?
A. Eventually it had about 60 people.
Q. Six zero?
A. 60, six zero.
Q. And were all of these 60 employees, were they consultants as well?
A. Could you repeat the ending question?
Q. Yes. Of the 60 people you identified, were all 60 consultants as well?
A. No. But I would say about 45 were engineers capable of consulting. The other were secretaries, engineering assistants, things of that type.
Q. So about 15 support staff, 45 engineers?
A. Very correct.
Q. And the 45 engineers were the consultants; is that correct?
A. The consulting.
Q. I see.
A. Different levels of consulting.
Q. How did you define the levels of consultants?

21

A. By their salary.
Q. I see. And was that a product of seniority?
A. No, it was more a matter of capability. You know, we had what we call a senior consultant, just consultants, et cetera.
Q. I see. And you said prior to 1977 you had worked with General Electric?
A. That's correct.
Q. And how long were you with General Electric?
A. I joined General Electric in 1953.
Q. So from 1953 to 1977 you were at General Electric?
A. Yes.
Q. And what did you do for General Electric?
A. I started at the Knolls Atomic Power Lab in Schenectady, New York --
Q. Can you spell that?
A. Knolls, K-n-o-l-l-s -- and moved to the

22

commercial business in 1953.
Q. Okay.
A. And I had many positions. Worked in development engineering first; then moved on to -- to design engineering. Became eventually the manager of design engineering. Went on from there to become the general manager of the fuel department. Then became the general manager of the system -- the boiling water reactor systems department, and then took over what's called the boiling water reactor operation -- I was the general manager of that -- which was responsible for all the engineering and all the manufacturing for General Electric Company. And I resigned from that position in 1977.
Q. Now, when you said that you had worked -- you were the general manager of the fuel department, I believe?
A. Yes.
Q. What were your job responsibilities as general manager?
A. My responsibility involved the fabrication of all the fuel, design of all the fuel.

23

We had a reprocessing plant that was supposed to be started and never got started. And I was responsible also for buying the uranium, for buying zirconium and all these kinds of things.
Q. I see. And when you started at the Knolls atomic generation plant, what was your position there?
A. I was -- I was just an engineer. I worked on the steam generators that were to be installed on the Seawolf reactor.
Q. Since founding S. Levy Incorporated back in 1977, have you ever done any work for SMUD?
A. Yes.
Q. When was the first time you did consulting work for SMUD?
A. To the best of my recollection, I was involved with SMUD at the time they were shut down and they were trying to come back on line.
Q. Can you recall a date of your first involvement?
A. It was -- it was pretty close to the date on this report, which is 1990. I suspect I

24

started to work for SMUD in -- somewhere about 1988.
Q. And just so we're clear, when you say that you had done work for them when they had shut down, are you talking about the final shutdown or are you talking about a temporary shutdown?
A. A temporary shutdown when they were making changes to the plant to come back on line.
Q. I see. And what work did you do for SMUD with respect to their early shutdown?
A. I reported directly to the vice president who was running the Rancho Seco plant.
Q. And who was the vice president then?
A. Yeah.
Q. No, who?
A. Carl Andognini, A-n-d-o-g-n-i-n-i. And I was asked to look at the engineering function because they were behind schedule. And I won't take all credit for it, but we got them back on schedule and they got to do the work they were supposed to do. And then I was asked to do a review -- what's called Readiness Review for Startup, and I was in charge of that review.

25

Q. What does a readiness review entail?
A. Readiness review involves looking at the status of the plant, talking to the people who are going to be in charge of the operation. And the way it was carried out is I ask all these various managers to come in and just state why they felt they were ready and asked a lot of questions.
Q. I see. And do you recall when that first engagement with SMUD wrapped up?
A. I think I left the job after they started the unit.
Q. After what?
A. After -- the unit restarted, and when the unit shut down I was asked to do this study.
Q. You mean the final shutdown?
A. The final shutdown.
Q. I see. And so when there was the final shutdown you were asked to do -- when you point to this study, you mean the Nuclear Fuel Storage Option study?
A. Right.
Q. I see. Okay.

26

A. I should tell you that we had a few engineers assigned to the site to help -- to work during -- trying to get the unit ready for restart.
Q. So you mean in your initial engagement with SMUD, it was you and other engineers from S. Levy Incorporated?
A. Yeah, except I reported at one place. They reported to the plant people.
Q. So the other engineers or the other consultants for S. Levy Inc. -- incorporated, who did they report to?
A. They reported to wherever they are assigned in the organization.
Q. Approximately how many engineers or consultants?
A. I'd say about four to five.
Q. Four to five?
Okay. Now, in your -- was the second engagement the one involving the nuclear fuel storage options?
A. Yes.
Q. Okay. And how many people from S. Levy

27

Incorporated were involved with that engagement?
A. They appear in the title -- it appears the authors of this report. There were three other people from S. Levy Incorporated involved.
Q. And who were they?
A. They were Harold Klepfer, Jerry Heald, and Sid Smith. And we had some help from two other people. They appear there. R. Jones and Joe Friscia.
Q. Now, were R. Jones and J. Friscia, were those also consultants with S. Levy?
A. He was a contractor to S. Levy Incorporated.
Q. They both were?
A. Hmmm?
Q. There is an R. Jones and a J. Friscia.
A. He was a contractor.
Q. Is R. Jones Robert Jones?
A. Yes.
Q. And he was a contractor for S. Levy Incorporated?
A. Correct. He was a contractor to S. Levy

28

Incorporated.
Q. Did you know -- did R. Jones ultimately work for SMUD?
A. Yes. We bid that job and we didn't get it. S. Levy Incorporated bid, and he bid the job separately. We didn't get the job. He got it.
Q. Which job are you referring to?
A. I think the job that followed this. There was a request for a proposal and S. Levy Incorporated bid it. And it was bid primarily by Sid Smith, who was the licensing engineer.
Q. I see. And when you say there was a request for proposal, do you know what the subject matter of that request for proposal was?
A. I think it was for a follow assistance to SMUD to carry out what they were going to do with the spent fuel.
Q. Okay. You had just described a second engagement with SMUD, which would have been the preparation of the nuclear fuel storage options. Have you had any other engagements with SMUD since then?

29

A. No.
Q. So you've only been engaged by SMUD twice to provide consulting services?
A. Yes, that's to the best of my recollection.
Q. Have you ever conducted a study or review for any other utility evaluating spent nuclear fuel storage options?
A. No.
Q. No?
So was the study of nuclear fuel storage options for SMUD the first study you had done?
A. Yes.
Q. Okay. Have you done any studies since this one evaluating nuclear fuel storage options?
A. No.
Q. What's been your experience either at GE or S. Levy Incorporated with respect to the storage of this position of spent nuclear fuel?
A. Probably not very large. I was high enough at GE that -- as you sense. I had a reprocessing facility reporting to me, so that gives

34

A. Probably -- my memory of the name is not as good as it used to be. I'd probably rather skip answering your question.
Q. That's fine.
When you refer to aspects of packaging, what do you mean by that?
A. Aspect of packaging is, the spent fuel will arrive at the site, then the design that we reviewed had a water pool in which that fuel would go, and then in turn they would move -- be taken out from the fuel, be put in the cask, and when that cask was loaded, then it would go into the tunnels to repository and be put within those tunnels.
(Interruption.)
THE WITNESS: And put the rest in those tunnels.
My job was doing both the design of the facility and also -- and also look at how the cask was designed, look at how they would close it, look at how they would move it, and we raised questions about issues of operations of that facility.
BY MR. GARDNER:

35

Q. I see. Very briefly, can you give me your educational background?
A. My educational background? I got a bachelor's degree in mechanical engineering at Berkeley, a master's degree in mechanical engineering at Berkeley, and a Ph.D. degree in mechanical engineering at Berkeley, '49, '51, '53.
Q. What were the dates? I'm sorry?
A. '49, '51 and '53.
Q. Are you currently a licensed professional engineer?
A. No.
Q. No. Were you ever a licensed professional engineer?
A. No. I don't believe I need that.
Q. You don't believe what?
A. I don't believe I need a license to be a professional engineer. Our experience will speak for what I do.
Q. I think you had testified earlier that at some point in time you were hired by SMUD to evaluate various options for spent nuclear fuel

36

storage; is that correct?
A. Yes.
Q. Can you tell me how your involvement with SMUD for this evaluation took place? For example, were you approached by someone at SMUD?
A. Yes, I was approached by someone at SMUD. I believe -- and I have no confirmation of that. I believe that somebody was still -- they still had a review committee reporting to SMUD -- to the general management of SMUD, and they were looking for somebody to do the study, and I believe he recommended me to do it, and I believe that's how I got the job.
Q. And do you recall who that person from SMUD was who contacted you?
A. I believe that -- you know, I believe a fellow by the name of Matlock, M-a-t -- Matlock, Bob Matlock, M-a-t-l-o-c-k. Bob. I worked with Bob Matlock on many safety review committees on power plants.
Q. Now, Bob Matlock was a SMUD employee?
A. No. He was a consultant to SMUD.

37

Q. And was he --
A. He was on their review committee for SMUD.
Q. Do you know who Bob Matlock worked for?
A. Bob Matlock was an independent consultant.
Q. And when you say he's independent, did he just work by himself?
A. Works by himself. And as I say, I'm guessing to that.
Q. Okay. Which part are you guessing about? About who contacted you?
A. That they recommended me. All I know is I got -- I was called by SMUD and asked to do this study. I should probably stop at that point and not get Matlock involved because --
Q. Do you recall the time frame in which you were contacted to conduct this study?
A. Just about -- the report indicated when we got the contract -- we received a very quick contract. We carried the study in a very short period of time because that's what they wanted.