and I'm not trying to avoid your question and I'd rather not try to guess at names.

Q. I appreciate you not trying to guess.

Do you recall if Dan Cowder ever attended meetings?

A. I can't say yes or no.

Q. What about Jim Field?

A. That name sounds familiar.

Q. Could you explain to me your overall level of involvement with this project for SMUD, you personally?

MR. MACDONALD: Objection; vague.

THE WITNESS: My involvement was heavily oriented towards strategy, toward review of the work the other people were doing. Like the table of the options would not have left without my change in it or rearranging it and adding options. So my involvement was more at a higher level. The report does not go out unless I read it all and make changes to it.

BY MR. GARDNER:

Q. Can you walk me through the stages that



it took to prepare the final report for SMUD, the final evaluating?

A. I can't tell you what those changes are today.

Q. Not the changes, but you had been tasked pursuant to this contract to evaluate certain options for SMUD.

A. Yeah.

Q. Can you walk me through chronologically how you end up coming up with your evaluations?

MR. MACDONALD: Objection; vague. Objection; compound.

THE WITNESS: I'm not too sure what the question is.

BY MR. GARDNER:

Q. Okay. At some point in time you had a contract to evaluate options for SMUD's spent nuclear fuel disposition, correct?

A. (Witness nods head.)

Q. Okay. And after you received that contract, what did you do to satisfy the terms of the contract?



A. To satisfy terms of the contract, we first laid out what the option might be, and at those meetings we reviewed them with SMUD.

Q. I'm sorry?

A. We reviewed them with SMUD.

Q. Okay.

A. We've changed them during the course of the contract because I showed a strong preference for something that was not as an objective of SMUD. I showed a very strong personal preference for how we can get the fuel away from SMUD as early as possible.

I felt that that was the best solution. And so you will see that the report orientation went to a dual-cask demonstration program, a dual cask being available for them to load their fuel in, the ability to have their fuel loaded in casks which could go to the final repository.

It was my idea that said that if you had it loaded and it's ready for shipment, maybe you can get the government to take it over from your hands and you're out of this business. So my focus was how to get SMUD out of there as soon as possible, and I



would probably take credit for that concept.

Q. So this notion, and then you say how to get SMUD out of their, quote, unquote, was that an objective that SMUD had given you or that's an objective that you had taken upon yourself?

A. No. It's an objective that I added to the study in the system, in the report.

Q. In these meetings that you said were held between S. Levy Incorporated employees and SMUD employees, was this new objective discussed?

A. As far as I know, we probably made them aware of it.

Q. And do you understand what SMUD's reaction was to this additional objective?

MR. MACDONALD: Objection to the extent it calls for speculation as to what SMUD's reaction was.

THE WITNESS: The only answer I can give you is that nobody told me to stop doing it.

BY MR. GARDNER:

Q. At these meetings with SMUD, do you recall the attendance by a SMUD employee named

62

you to take Exhibit 2 --
A. Yes.
Q. -- and could you please turn to 0031604.
A. It's this one. Page 60?
Q. Actually, there isn't a page 60, which is sort of my question. Why don't you go to page 59 --
A. Page 59.
Q. -- of Exhibit 2.
Okay. Now, sir, is there -- do you see a page 60 of Exhibit 2?
A. Yes.
Q. You do have a page 60. For Exhibit 2?
A. Page 60 -- okay. This is Exhibit 3. This is Exhibit 2, right? Page 60 is missing on this.
Q. Okay. Do you know -- is it your recollection that in your final report you provided to the board that you included a Section 8.2.1., which is in Exhibit 3 on page 60?
A. As far as I know, the report we gave

63

them was -- had an 8.2.1.
MR. GARDNER: Okay. Counsel, I would ask, if you could, if you could provide us with a complete report.
Q. What we're going to do -- let's refer to Exhibit 3 for now, which is the Nuclear Fuel Storage Options, at SMUD 0031243.
A. That's this one here.
Q. Yes.
A. Okay.
Q. If you could turn to little Roman ii, which is the executive summary. It's on SMUD 0031245.
A. Yes. Yes.
Q. Okay. Do you see bullet point one which says, "The most certain approach is continued storage in the spent fuel pool at Rancho Seco until disposal in the permanent daily repository now scheduled at the earliest for 2010"?
A. Yes.
Q. What is meant by "the most certain approach"?

64

A. It means -- it means we were asked to talk about risk. That is the approach with a minimum amount of risk.
Q. Risk in terms of what?
A. Risk in terms of licensing. Risk in terms of performance. We've been storing fuel in pools for about 20 years at that time. So you could just continue to do it. So the issue more becomes a matter of cost. This is the most certain. There is no risk. There is no licensing issues.
Q. So for this first bullet point here, your testimony is that there was no licensing cost with continuing storage in the spent fuel pool?
A. No. There is licensing costs. I say there is licensing risk.
Q. What does "licensing risk" mean?
A. It means approval by the regulatory body.
Q. And in this case it would have been the Nuclear Regulatory Commission?
A. Yes.
Q. I see. And when you say there is no

65

risk getting approval, does this option presuppose that you would be able to continue your then currently existing license for the --
A. No. You would have to change your license. That change in license is straightforward versus creating a new storage facility.
Q. So when you create a new storage facility, that creates licensing risk, in your opinion?
A. Yes. At that time it was viewed that way. You got to understand the time when this report was written.
Q. I see. And then you also mentioned performance.
A. Yes.
Q. What do you mean by "performance"?
A. Performance is that the other storage casks are concrete -- do you follow me? -- and have not been really deployed. There is only one deployment in the configuration and that was rather expensive, so that explains that issue.
Q. And what does "deployment" mean?

74

MR. MACDONALD: I direct the witness to page 3.
THE WITNESS: Page 3? Okay. On page 3 at end of the first paragraph.
BY MR. GARDNER:
Q. Can you read that for me?
A. The sentence says, "Originally, Department of Energy had planned to accept spent fuel by 1998. Recently DOE has delayed the repository date to 2010 and there is a good chance that further schedule slippages may occur."
Q. Now, where did you get that information from?
A. It was -- it was probably published in the ANS journal or probably in the -- probably appeared in many documents at that time.
Q. What's the ANS journal?
A. It's the American Nuclear Society news, which was probably published in other -- like Nucleonics. There was another journal that came out, and actually we were subscribing to those kinds of magazines.

75

Q. And so you think the basis for the last two sentences you read came from journals?
A. Came from publications.
Q. Did the basis for these statements come from any DOE publications?
A. I suspect that DOE put out an announcement.
Q. Do you recall a specific announcement by the Department of Energy?
A. I'm pretty sure it was pretty solid information. That's all I could tell you. See, we were subscribing to the government publication. All the government publication related to nuclear. We used to get Nucleonics Week, which was a gossip magazine for the business. We used to get American Nuclear Society news.
So in the day when I had my company, we were probably current with everything that was going on in the business. And I think if it appears here, we probably saw it in one of those publications. And I suspect we may have even -- I suspect that SMUD had the same information or they would have told us to

76

take it out from this report. But I can't tell you specifically what announcement it is and so on. I think it makes it very clear that it was a DOE decision.
Q. Going back to little ii on page SMUD 0031245. It's the Executive Summary.
A. Yes.
Q. I want to direct you to bullet point two. It says storage -- I'm sorry. I didn't mean to -- are you ready?
A. Yes.
Q. It says, "Storage in the spent fuel pool with a simplified cooling system or in concrete storage-only casks are the lowest-cost option if the Rancho Seco fuel must wait for the permanent repository." Do you see that?
A. Yes.
Q. Can you describe for me the rationale supporting this statement?
A. Yeah. I think -- I think what this says was that -- I think there is a cost analysis later on in the report that I could point to again, the one I

77

showed you on that page. I think what this says is that if you kept it in the spent fuel pool, you took action to simplify its cooling system by making it cheaper, by making, you know, the need for security less, et cetera, then I think your capital costs requirement would be low for the pool, but your operating costs would be high because it'd still be a nuclear-type facility. It could go clear to Co (phonetic) in the pool.
My contrast -- concrete casks would require a greater investment of capital cost, but less for security and for operation because the cask had a passive system of cooling. The area that you would have to secure would be smaller. You couldn't shrink the pool size, but the cask area could be smaller.
So what you end up with is if you stay in the pool, you have less capital investment but more operating costs. If you go to the cask's outside concrete or metal, you would have capital investment but less operating costs. So they about balance each other. We didn't do the official cost

78

study because, you know, that's something that SMUD would do because it involves interest rate and cost of money with time, et cetera.
Q. I see. And at the end of bullet point two it says, "If the Rancho Seco fuel must wait for the permanent repository."
A. Yes.
Q. What do you mean by the end of that sentence?
A. That means it must wait until there is a government repository to take the fuel.
Q. Does that assume that the permanent repository would be in '98?
A. No. I think at that time we were all -- at that time we were all assuming that their permanent repository would only be available 2010. In my opinion at that time, which is reflected in this report, I was still optimistic.
Q. Now, does the end of the sentence about Rancho Seco fuel must wait for the permanent repository, does this option assume the availability of an MRS by '98?

79

A. No, this report does not assume an MRS in '98. It assumes an MRS in 2010.
Q. And where does it say that in this report?
A. I think it says -- I think it says right on page 3 that the repository will not happen until 2010.
Q. Now, that's the repository. I'm asking you a separate question about the MRS. Do you know what an MRS is?
A. MRS was to be the name of their repository before it became a repository.
Q. So your understanding that the MRS and the federal repository are one in the same?
MR. MACDONALD: Objection to the extent it mischaracterizes prior testimony.
THE WITNESS: It was a place where the fuel will leave Sacramento to be kept in storage. Whether it's called MRS or whether it's called a permanent facility -- this study was made about when the fuel leaving the site. And if there was an MRS, that's where their fuel would go. That's my view of

80

what I interpreted the program was at that time.
BY MR. GARDNER:
Q. I see. So -- just so I understand what you're saying, are you -- did you assume for purposes of this report that the MRS and the federal repository were interchangeable?
MR. MACDONALD: Objection to the extent it mischaracterizes his prior testimony.
THE WITNESS: I assume that there will be a government facility to which the SMUD fuel could go by 2010 at the earliest.
BY MR. GARDNER:
Q. Okay. So is it your testimony that none of your evaluations assumed a pickup date by 1998?
A. Except for the one I described, that if I had a dual-purpose cask I could argue that the government would pick them up.
Q. And how could the government have picked them up under the dual-purpose cask recommendation?
A. They're the dual-purpose cask. That's a cask that's ready to ship the fuel. It's good for both storage and shipment. And in my view, SMUD

81

would have argued that point. We did all we have to do. It's ready in 1998. New government. Belongs to you at that point.
Q. And did you have any idea under that scenario where the fuel would have gone in 1998?
A. I think -- you've got to understand. This is an idea I had that you could tell the government, look, you either pick it up and put it someplace where you want to put it or you could own it in place at the SMUD site. That is purely a concept developed that never was pursued. Okay.
Q. Never pursued by whom?
A. Never pursued by SMUD.
Q. So SMUD didn't pursue the dual cask?
A. Did not pursue the dual-cask approach.
Q. Do you understand what approach SMUD did pursue?
MR. MACDONALD: Objection to the extent it calls for speculation.
THE WITNESS: As far as I'm concerned, I don't work on a job unless somebody asks me to. When this report was finished, we stopped doing work for

86

Q. Did you say that you recommended storage option number 3?
A. We recommended 3 on the basis that it would be the earliest one -- opportunity for them to remove -- to lose control of their fuel, okay, that they would give it to the government.
We did not say number 1 was not good. We didn't say number 2 was not good. We said that this has the minimum risk. This probably has lower costs.
Q. But when we talk about this, let's just --
A. The first bullet is less risk. Second bullet, less cost. Their repository does not happen until 2010. Third bullet was a -- at this point just a conceptual idea that they might give you the minimum amount of time for SMUD to have ownership of that spent fuel.
Q. So is it fair to say that you gave the greatest weight as between cost and risk to the earliest pickup date possible?
MR. MACDONALD: Objection to the extent

87

it mischaracterizes his prior testimony.
THE WITNESS: We didn't do that. We offered the third one, we recommended it, because it would also develop a cask -- dual-purpose cask which was wanted by many people. So you got to understand, it was not our -- we clearly understood it was not our company making a decision for SMUD. They were going to make their own choice.
BY MR. GARDNER:
Q. But you did ultimately make a recommendation as to which option --
A. We make at the end a recommendation on this dual cask.
Q. Going to bullet point number 3 in the Executive Summary, the little ii, it says, "Storage and transportable casks offers the best opportunity for early off-site shipment, possibly as early as 1998, to an interim deal restorage facility."
Now, what is this 1998 date premised upon?
MR. MACDONALD: Objection; vague.
THE WITNESS: What it is based upon was

88

the original government commitment to take away the spent fuel.
BY MR. GARDNER:
Q. And how did you understand that the Department of Energy would pick up spent fuel as early as 1998?
MR. MACDONALD: Objection to the extent it mischaracterizes his testimony that he understood the DOE would pick up fuel by '98.
THE WITNESS: What I've indicated to you is that if it's all available in cask that go into a repository, I felt you could get the government to take ownership. They can move it to Hanford. They can move it to North Carolina, anyplace they want to, but it's no longer SMUD fuel. Ownership of it moves to the government at that point. I have no basis of saying that would happen, okay, but that was a strategy I was pursuing.
BY MR. GARDNER:
Q. Now, when you say they could have gone to Hanford or North Carolina, what's Hanford?
A. South Carolina. Hanford is a facility

89

that was used to develop weapons. And I meant South Carolina, again, the facility there that's used -- that's owned by DOE.
Q. So you thought the one possibility was that DOE could ship it to an already existing DOE facility by '98?
MR. MACDONALD: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: I said it could be shipped to a facility owned by DOE.
BY MR. GARDNER:
Q. So does this 1998 date presuppose the possibility of an MRS by 1998?
A. No.
Q. By the date of this report in 1990, did you assume that an MRS would not be available by 1998?
A. That's correct.
Q. Okay. The next sentence here on bullet point number 3 says, "Another possibility is interim acceptance by DOE by 1998 of the spent fuel in transferable casks at the Rancho Seco. Under such

circumstances transportable storable casks become the least cost and the preferred option." Do you see that?
A. Yes.
Q. Can you explain to me in detail the basis for this statement, where this comes from?
MR. MACDONALD: Objection; vague.
THE WITNESS: Which part of the statement?
MR. MACDONALD: Top.
BY MR. GARDNER:
Q. The last two sentences.
A. The last sentence? If DOE accepts those casks, which are transportable, it becomes their property, then SMUD no longer has to take care of those casks, and therefore they no longer have the operational costs associated with that facility and that's when this -- that plan would be the minimum cost to SMUD.
Q. And what was your basis for understanding that the Department of Energy could take title without disposing --



A. There was no understanding. Just -- and one of the reasons that was not pursued by SMUD was that they had some doubt that that would happen. But I'm a great believer there is no harm in trying something new and different. And I felt they might have been able to follow that strategy, reduce their costs, move the fuel as being owned by SMUD. The final result is that they never pursued it.
Q. They never pursued what?
A. This third bullet strategy.
Q. Okay. The last paragraph on this page --
A. And they never explained to me why or why not.
Q. How do you know that they did not pursue that option, then?
A. Because -- because I heard they were going to go with a separate cask. My job was finished when the report is issued, and I don't go out looking for work after that. If they want my advice, they'll come and ask me. Nobody asked for my advice after this report was delivered. Nobody told



me very much about what they were doing, and that's their privilege.
Q. The last paragraph in the Executive Summary, in little ii, it says, "It's strongly recommended that the transportable cask option be pursued for the Rancho Seco spent fuel, particularly if it can be coupled to a two to three transportable cask demonstration program described in the report and sponsored jointly by DOE, SMUD, cask vendors and other utilities." Do you see that?
A. Yes.
Q. Can you explain to me what you envisioned in terms of this demonstration program?
A. I think it's described in the end of the report in detail. The basic idea was such casks were not available. The idea was that they would keep the fuel in the pool until they can demonstrate such casks.
DOE was interested in the development of such casks. As I mentioned in the report, EPRI was interested in the development of such casks. Other utilities may have been interested in the development



of such casks. And if you notice, actually I even talked to the -- to the people at DOE who were sponsoring such programs. And I can't say they showed any interest, okay, but they were pursuing a similar program with other vendors.
Q. Who did you talk to at DOE with respect to --
A. Actually, I talked to Mr. Duffy.
Q. You talked to Mr. Duffy.
Do you remember when you talked to Mr. Duffy?
A. Just about before we issued the report.
Q. So sometime prior to March 31, 1990?
A. Yeah.
Q. Did anyone from SMUD participate in this meeting?
A. No.
Q. So were you alone with Mr. Duffy?
A. Yes. Well, Mr. Duffy and somebody else, but --
Q. Someone else from the Department of Energy?

the job from start to end. He was pursuing this, and did not get a positive response from the utilities.
Q. And do you recall approximately the time in which this not positive response was?
A. It was done while this report was being finished, because we indicate we did not get a positive response.
Q. So, in other words, by March 31, 1990, transferring the once-burned assemblies to another nuclear facility was not a viable option?
A. The limited work we did at that point, it was not a viable option.
Q. Now, why was Duke the only nuclear utility contacted?
MR. MACDONALD: Objection to the extent it mischaracterizes prior testimony that Duke was, in fact, the only one. He testified he could not remember.
THE WITNESS: I think I'll answer your question broadly because I didn't say Duke was the only one. That type of fuel would only fit in certain power plants. We cannot move it to all the



power plants first. It has to be a B & W reactor. Second, there is a limited number of reactors, and B & W changed their fuel configuration as they sold more plants. So there is a very limited set of power plants in which that fuel could go in.
MR. GARDNER: Why don't we take a very quick break.
(Counsel went off the record.)
BY MR. GARDNER:
Q. Sir, can you tell me what the ultimate recommendation that S. Levy made to SMUD was?
MR. MACDONALD: Objection; best evidence. The report speaks for itself as to its recommendations.
THE WITNESS: I think our recommendations are those in the executive summary and it says it's probably presented as shown here.
BY MR. GARDNER:
Q. Which page are you on, sir?
A. The executive summary of the report, our recommendation was if you want to select the least-risk path, you go with water. If you want



to -- if you want to look to availability of long-term storage, you could go either water or concrete. Probably concrete would be cheaper the longer the storage facility by the government is delayed. And we also said there may be some special opportunities in this dual cask.
Q. Did the third option, third bullet point that you reference in the Executive Summary, did that assume being able to dismantle the wet fuel pool?
MR. MACDONALD: Objection; calls for speculation.
THE WITNESS: I think the report says that -- that those dry storage facilities -- I mean, if you're in a pool, that's pretty straightforward. At the dry storage facility, the report indicated that at that time, after you put the fuel in a dry storage facility and government was ready to accept fuel, you would have to take the fuel from that dry storage facility and put it in a different cask which would take the spent fuel now to their repository.
At that time it was not very clear that anybody had determined how to do this. In those days



the only way -- feasible way to do it was to take the fuel back to the pool and then to put it into a cask -- shippable cask. That was the state of knowledge at that time.
Now, there were programs to try to develop means to do dry storage transfer, but they were not available in this report.
BY MR. GARDNER:
Q. So did you consider for the dual-purpose cask option the possibility that SMUD could get rid of their spent fuel pool?
A. I think with a dry cask dual-purpose you would get rid of the pool. That's why it was being pushed. You would just only keep this new facility secured and guarded and -- but you would have to get a commitment from the government that they would -- that they would accept that fuel. You would have to get a commitment from the government.
Q. When you mean a commitment from the government, is that from the Department of Energy or the Nuclear Regulatory Commission?
A. Well, first you would have to get the