Nuclear Regulatory Commission to agree that those are dual-purpose casks that are licensable, and then you would have to get agreement from the DOE that -- that they agree with that conclusion.

Q. To what extent did SMUD's decommissioning needs drive your conclusions?

MR. MACDONALD: Objection to the vagueness of SMUD's, quote, decommissioning needs. Objection to the speculation.

THE WITNESS: I think at that point in time the only knowledge we were given was that they were hoping to use that facility for other generation of power.

BY MR. GARDNER:

Q. What do you mean by "other generation of power"?

A. Produce electricity.

Q. As a nuclear power plant?

A. No. It would use like the steam turbine generator. It could put a fossil boiler in and produce electricity.

Q. So was it your understanding when you



were evaluating the different options, that SMUD had a desire to generate electricity through other means than nuclear power?

MR. MACDONALD: Objection to the speculation as to what SMUD's, quote, desire was in 1990. Objection to the vagueness.

THE WITNESS: I didn't -- they didn't -- they weren't specific about what they were going to do to that facility except they were generating plans for it again. And we were told that there was a possibility that they would use it for generation of electricity, but at that time, you know, we were not told that they were considering it or that they intended to do it.

BY MR. GARDNER:

Q. Who at SMUD told you about this possibility?

A. The people we were working with. And even after the plant was closed, it still had a chief nuclear person at that site.

Q. Can you recall anybody by name who would have --



A. No, I don't recall the name now. I knew it then, but don't recall.

Q. I want to go to page 65. It's SMUD 0031311.

A. Page 65?

Q. Yeah. And it is the second full paragraph, I guess, or third if you count this right. It's the one that begins "in any case." Do you see that?

A. Yep.

Q. It says, "In any case the only way to be prepared for DOE success in establishing a site by 1998 is to proceed towards storage and transportable casks."

What did you mean when you said "DOE success in establishing a site by 1998"?

A. Just to identify a site that will eventually be used for that purpose.

Q. Does this statement include the federal repository?

A. It doesn't have to include a repository.

Q. What else could it have included?



A. You could just put these casks on the ground and leave them there and in the building.

Q. On SMUD property?

A. No, not on SMUD. I'm not talking about -- it says the DOE can select a site.

Q. Your ultimate recommendation to pursue a dual-purpose cask system, is that predicated upon the belief that that would provide an opportunity for SMUD to begin disposing spent nuclear fuel by 1998?

A. Yes, if the government is willing to take control of those casks. There's a big if to that assumption.

Q. Had you believed a federal repository could have been opened by 1998?

A. I didn't believe a federal repository could have been opened by 1998.

Q. I understand that.

Had you believed that, would that have changed the ultimate recommendation that you made to SMUD?

MR. MACDONALD: Objection to the hypothetical. Objection to the vagueness.

THE WITNESS: I'm not too sure I understand the question.
BY MR. GARDNER:
Q. You made a recommendation that SMUD should pursue a dual cask, a new dual-purpose cannister system, correct? And that is premised upon your belief that Yucca Mountain -- or a federal repository would not have been available by 1998; is that correct?
A. Yes.
Q. Okay. Had you believed that a federal repository would have been opened by 1998, would that have changed your ultimate recommendation to SMUD?
MR. MACDONALD: Same objections. You can answer.
THE WITNESS: You want me to deal with an assumption that a federal repository would have been opened by 1998?
BY MR. GARDNER:
Q. Yes, sir.
A. Even though I knew at that time that it was impossible?



Q. Yes, sir.
A. Okay. If a repository was available by 1998 and DOE actually said we're going to do that, that it will be available, it would have changed my recommendation.
Q. How?
A. I would have stayed in the pool.
Q. So it's your testimony that had you believed that the Department of Energy would have had a federal repository by 1998, your recommendation would have been for SMUD spent nuclear fuel to stay in the wet pool?
A. To stay in the pool, yes.
Q. When you issued your ultimate recommendation in your report, was it your understanding that all of SMUD's spent nuclear fuel would have been picked up at one time?
A. I don't have -- you know, I was not shown their contract with the government and so on, but my understanding is that not all the fuel would be picked up at one time.
Q. Sir, if I could refer you to page 66 of



your report, SMUD 0031312.
A. Yeah.
Q. Number 7 as a reference lists the Department of Energy standard contract. Do you see that?
A. Yes.
Q. Did you just testify that you did not review the standard contract in issuing your recommendation?
MR. MACDONALD: Objection to the extent it mischaracterizes prior testimony. Objection to the extent that Mr. Levy himself had multiple people working on and preparing the report, and, in fact, testified previously that he reviewed the report and other people primarily wrote it.
MR. GARDNER: I would request that there not be speaking objections, Counsel.
THE WITNESS: I would say that I'd probably read that contract superficially, and I probably don't even remember what it says now.
BY MR. GARDNER:
Q. I want to refer your attention to



Exhibit 2, which is apparently another version of the Nuclear Fuel Storage Options.
A. Yes. What's the number at the bottom?
Q. It's SMUD 0031541.
A. 1541. Okay.
Q. And if I could show you 31548.
A. Which page are we on?
Q. It's page 3.
A. Page 3.
Q. And I want to show you -- I'm sorry. I think it's a different page. Give me two seconds. Wrong number. I apologize. It's page 39, actually. It's SMUD page 39, 0013584. It should start off with -- there is a number 2 and the number 3?
A. Yes.
Q. Number 2, the top of that says, "A preliminary discussion with DOE management raised the possibility for shipment of Rancho Seco spent fuel to the proposed monitored retrieval storage facility." Do you see that?
A. Yes.
Q. Was that a preliminary discussion that

you had with DOE management?
A. Yes.
Q. Okay. And when did you have that discussion with DOE management?
A. At the same time that I went to talk about a dual-purpose cask.
Q. So it was the same meeting?
A. Yes.
Q. And who was the DOE?
A. I mentioned before it was Mr. Fry.
Q. And can you tell me how that conversation -- what did you say to the DOE manager with respect to the shipment to an MRS?
MR. MACDONALD: Objection to the extent it calls for speculation.
THE WITNESS: I think I'm reflecting the answer to that question. I think -- what I found out is, one, the MRS was not going to be available by 1998 as far as -- it hadn't even started the licensing process. So that's why I'm concerned. It was out of the question. It's my personal opinion, anyway. But -- and second, the reflection that we



got at that time is that, you know, we would take your fuel as per the contract that says, you know, you can't ship at all to us. We can only take it as the contract says.
BY MR. GARDNER:
Q. Just so I can understand what you just said, did you say that it was your personal opinion that the MRS wouldn't be available in 1998 or that is what the DOE representative said to you at this meeting?
A. I think what it says there is clearly -- you know, the possibility of shipment to monitored retrieval storage came up during that conversation. I think at that time that facility did not receive any authorization by Congress.
And the point I was made is that even if it was available, we would not accept all your fuel at one time. I think this is a reflection of what was said at that meeting.
Q. I want to make sure I understand what you're saying. Are you saying that at this meeting the DOE representative said that MRS would not be



available?
A. I think what it says, he raised a possibility for shipment to monitored retrievable storage. That's probably where he stopped.
The next sentence, "This facility has not received final authorization by Congress." It's something he might have said, but it's something I knew. Say maybe a reflection in my opinion, but he probably had the same opinion because it hadn't been approved at that time.
Q. Now, when you say "he probably had the same opinion," why do you say that?
A. Because it was not approved at that time.
Q. Did he tell you that was his opinion?
A. No, I can't say that he said so. I would rather attribute that statement to myself.
Q. I want to refer you to the following sentence after the "however, this facility." It begins "in this regard." Do you see that?
A. Where are we?
Q. It's also number 2. It's actually the



last two sentences. It begins, in this regard, it should be noted that SMUD has a spent fuel disposal contract with DOE and an implied position of the operating plant fuel pickup queue?
A. Right.
Q. Where it says the DOE -- sorry. When it says that "an implied position in the operating plant fuel pickup queue," what does that mean?
A. You're talking about the last sentence on that paragraph?
Q. The second-to-last paragraph in number 2 where it says, "An implied position in the operating plant fuel pickup queue," what did you mean by that?
A. As I understand, their -- the standard contract implies that your fuel gets in line in the queue and gets picked up in the queue. I can't give you the details now. Probably knew them then. And so that's the way the process was.
That contract did not deal with shutdown plant, or it assumed shutdown plant would get the same treatment as operating plant. And as you notice the next statement, I felt very strongly that the

here.

Q. Well --

MR. MACDONALD: It's on page 1.

MR. GARDNER: Page 1 it says February 21, 1990.

THE WITNESS: Okay. Progress report was presented orally to the board. That's when the presentation was made. This was probably not that -- probably not -- this is dated 2-16.

MR. GARDNER: Yes.

THE WITNESS: See, I don't remember -- I don't have a copy. You've got to understand I don't have anything from the files of S. Levy Incorporated anymore. When I sold the corporation, they took everything. So I have nothing on this subject except what you have and what he has. So if I had all those files, I probably would have brushed up on all that, so -- so I can't say whether this is what was used at the board or not. It's possible it was used at the first presentation. But I think you should be able to get the first presentation made to the board from the SMUD files to verify that it was used. But



anyway, let's go ahead with this version.

BY MR. GARDNER:

Q. Sure. If you thumb through Exhibit 4, you'll notice a lot of marginalia throughout --

A. That might be -- see, because it has the SL initials at the bottom. That's how I -- that's how I identified the charts when I use them in any presentation. Those are my initials.

Q. So is it your testimony, then, that you think because of these initials, this would have been a document --

A. Because this shows SL, that says I prepared those charts.

Q. Does that also mean that this would have been a document that would have been presented to SMUD's board?

A. It could have been a document presented to the SMUD board. All it says is that I prepared those charts on 2-16.

Q. If you flip through this document, sir, Exhibit 4, you'll notice a lot of handwriting throughout the documents.



A. Yes.

Q. Is this your handwriting?

A. No.

Q. Do you know whose handwriting it might be?

A. I don't know.

Q. You do not know.

Okay. When you presented your progress report in your final presentation as you represented from Exhibit 2, were those -- it says that they were presented orally to the Rancho Seco SMUD board on February 21st in the final presentation.

Were hard copies of documents also given to the board at that time?

MR. MACDONALD: Objection; asked and answered.

THE WITNESS: To the best, again, of my knowledge, no. Every time I made a presentation, there were transparencies made and a set of the transparencies printed and made available to pass to the board.

BY MR. GARDNER:



Q. Does Exhibit 4 look like a presentation to you that would have been provided to the board?

MR. MACDONALD: Objection; vague.

THE WITNESS: I would say it's probably overdetailed for a presentation to the board. That's why I'm hesitating to say that's my board presentation.

MR. GARDNER: Okay.

THE WITNESS: I think the presentations to the board were a lot shorter and certainly less technical.

BY MR. GARDNER:

Q. I see. I want to refer you to page 2 of Exhibit 4. It's SMUD 0018930. It's entitled Alternatives Under Evaluation. Do you see that page?

A. Yes.

Q. The last bullet point says, "Earlier Department of Energy pickup." What does this mean, earlier Department of Energy pickup?

A. It's involved with the idea that the Department of Energy could pick up the spent fuel earlier than when a final repository is available.

126

Q. And when did you assume a final repository would be available?
A. At that time, I assumed 2010.
Q. So this Alternatives Under Evaluation, the last bullet point, one of the alternatives under study was earlier Department of Energy pickup, then 2010?
A. Yes.
Q. I see. Okay.
A. We contacted the Department of Energy to see if they would accept fuel in casks and store it for SMUD so that SMUD did not have to have a facility. And the answer was quick. The answer was no.
Q. And did an individual tell you why they were refusing?
A. I don't think they owed us an explanation. I think -- I don't think. They just said we're not interested in doing that. There's a way of doing it.
Q. Now, when you said they're not interested, do you mean not interested in pursuing

127

the demonstration program?
A. No. They're not interested in providing storage for the spent fuel if we put it in cask and it's ready to be shipped to any DOE facility.
Q. I see. And this statement was made by a DOE official at the meeting you attended?
A. I think probably during that meeting. You know, they made it very clear -- and I can understand why they would say no. You know, if they gave SMUD that right, they would have to do it for other utilities, too.
So to me, they were looking for special treatment because it's a shutdown plant. We were looking for a way to again get SMUD out of having to keep that fuel. If it's ready, could we get it to another place? And so that's why it was the earlier pickup. The Department of Energy would accept it even if they don't have a permanent facility available.
Q. So did this earlier Department of Energy pickup bullet point mean earlier than 1998?
A. It could be whenever SMUD was ready. It

128

had it all in cask, ready to go. They had proven that those are acceptable casks, et cetera.
Q. I see. The next statement down after earlier Department of Energy states: Variations, slash, combinations of above alternatives being considered as well as licensing and political risks. Do you see that?
A. Yes.
Q. What were the licensing risks that you mentioned?
A. The licensing risks are covered and detailed at the end of that report. There is a whole section that discuss licensing risks for every option.
Q. Okay.
A. And the licensing risks are multiple. There's an RC. Okay. There is also the issue of public participation and any transportation out of that site, public participation accepting the new storage facility. So we described all of those. And there is also acceptance at the arrival point. Those all require licensing and public potential

129

participation.
Q. Is the public potential participation what you're referring to when you say political risks?
A. Yes, when I talk -- when I talk about public participation. And then it says political risks have grown substantially.
Q. And what were the political risks involved?
A. Political risk is that the public won't accept it at the arrival or the public wouldn't let you ship it.
Q. What do you mean the public wouldn't accept the shipment?
A. Well, the public would not accept, for example, the transportation path that you have selected to remove the fuel from the SMUD site and get it to whatever it is we were going to get it to.
But in case you don't know, if you're not familiar, there's been great trouble just bringing fuel back from research reactor and have it travel from the arrival port in California to get it

couple-minute break. Off the record.
MR. MACDONALD: Back on the record.

EXAMINATION

BY MR. MACDONALD:
Q. I have just a few follow-up questions for you, Mr. Levy.
First, you're not -- and today you haven't been -- you're not speaking on behalf of SMUD; is that correct?
A. That's correct.
Q. You're not currently employed by SMUD?
A. That's correct.
Q. To the best of your recollection, you've done no work for SMUD since approximately 1990 or 1991?
A. That's correct.
Q. During your discussions with Mr. Gardner, you testified that as of 1990 it was your belief that DOE would not start picking up fuel by 1998; is that correct?



A. Yes.
MR. GARDNER: Objection to the extent it mischaracterizes his prior testimony.
BY MR. MACDONALD:
Q. Is that correct?
A. That's correct.
Q. And as of 1990, was it your belief that DOE would not start picking up fuel until 2010 at the earliest?
A. That's correct. And I felt that was optimistic.
Q. And did your belief that DOE would not start performing until 2010 at the earliest cause you to make the recommendations you did in your March 31, 1990 report?
A. The key assumption in that report was that DOE would not be able to receive fuel in the permanent repository until 2010.
Q. And the assumption that DOE would not perform caused you to make the recommendations set forth in your report?
A. That's correct.



MR. MACDONALD: No further questions.

FURTHER EXAMINATION

BY MR. GARDNER:
Q. I have just one more follow-up question.
In your assumptions and for your final report, did you believe there was a difference between having a permanent repository available in 2010 or having an MRS available on an earlier date?
A. You treat the MRS -- there was a debate where there would be a temporary storage facility that never was allowed. My perception of what happened was that the MRS, the so-called monitored retrievable storage, eventually became the permanent repository. The monitored retrievals -- the MRS was never approved, as far as I can tell. So it was just something that was put up there but never officially happened.
Q. So is it your testimony that your understanding is that the temporary storage system is different than the MRS?



MR. MACDONALD: Objection to the extent it mischaracterizes prior testimony.
THE WITNESS: I view any storage system -- see, but my understanding of the MRS was -- when I went to work on the Yucca Mountain only two or three years ago, it was called the MRS when we started. Then the title was changed to become the so-called repository. So the MRS as I looked at it was more like a permanent facility. It was not anything like a temporary facility to store spent fuel.
BY MR. GARDNER:
Q. Did you then understand that there was the potential for DOE to provide a temporary storage facility by 1998?
A. There was some discussion about providing it -- an interim facility to store spent fuel. And it might have been built by 1998, but they never received authorization to do so from Congress.
Q. Do you understand when DOE did not get that authorization from Congress?
MR. MACDONALD: Objection to the extent

it calls for a legal conclusion or speculation.
THE WITNESS: All I know is that they never received the authorization.
BY MR. GARDNER:
Q. Was it your understanding that in 1990 when you drafted your report that DOE had not received authorization?
A. At that time, in 1990, DOE had not received authorization for an MRS or an interim storage facility.
Q. You had just stated that you thought 2010 was an optimistic date, correct?
A. Yes.
Q. Why, then, did you make your ultimate recommendation that -- that SMUD should pursue a dual-cask system for early pickup if you thought that 2010 was an optimistic date?
A. I made that recommendation because the dual-purpose cask first eliminated the need for a pool. Second, the dual-purpose cask is ready to go to that facility when and if DOE has it available. And I took the liberty of acting as a lawyer and



thinking that I could talk DOE into doing it legally or -- even though it was not possible. So I'm trying to give you what I did.
I assume that if it was in a cask, that it was transportable, that at that point what SMUD would be is in a position to respond to anything DOE does. To build a facility sooner, we're ready. If they build their facility, if it goes beyond 2010, you're ready. You could stop worrying about the pool, about the transfer from it. So there was some good reasons why I pushed the dual-purpose cask.
Q. But isn't it true that the primary reason you pursued the recommendation -- or you recommended a dual-purpose cask is to potentially allow for early DOE pickup, correct?
MR. MACDONALD: Objection to the extent it mischaracterizes his prior testimony.
THE WITNESS: No. I believed that the facility I was looking for -- and that's the facility report -- would not be available until 2010. What I had in mind was that we would have it in these casks and then SMUD would be working with DOE to see if



they could take ownership of those casks at the SMUD facility or wherever they would allow shipment to those casks to a different site that DOE owned.
BY MR. GARDNER:
Q. And that --
A. That would happen before 2010.
Q. But is it your understanding, then -- let me back up.
In your ultimate recommendation or evaluation, did you consider the possibility of temporary or interim storage facilities by the Department of Energy?
MR. MACDONALD: Objection; best evidence. Report speaks for itself.
THE WITNESS: I did not consider that then because they were not allowed at that time by Congress, and it was very clear that Congress was not going to allow it.
BY MR. GARDNER:
Q. And just to be clear, your testimony is that the temporary or interim storage facilities was different in your mind than the MRS?



MR. MACDONALD: Objection to the extent it mischaracterizes his prior testimony.
THE WITNESS: I view the MRS as the thing that eventually led to the permanent repository. I view an interim facility as a large pool of water where you could put the fuel like you do the power plants. That's my perception of what those facilities are.
BY MR. GARDNER:
Q. So you viewed an interim storage facility by DOE as being a wet pool-type facility?
A. A wet pool facility, yes.
MR. GARDNER: I have no further questions.
MR. MACDONALD: Nothing further here.
MR. GARDNER: Before we get off the record, your counsel can explain to you the process for reviewing your transcript, getting an errata sheet, and being able to correct any errors that you may find in the transcript.
THE WITNESS: Yeah, I've done that before. Send me this transcript. I'll probably mark