No. 98-488C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY AND EVIDENCE REGARDING PLAINTIFF'S REQUEST FOR PRE-BREACH DAMAGES

---

Howard Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

March 9, 2004

## TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUE....................2

STATEMENT OF THE CASE....................2

ARGUMENT....................4

I. AN ISSUE OF FACT REMAINS WHETHER THE GOVERNMENT BREACHED THE CONTRACT PRIOR TO JANUARY 31, 1998....................4

II. SMUD IS NOT PRECLUDED FROM RECOVERING THE DAMAGES IT INCURRED IN REASONABLE MITIGATION OF THE GOVERNMENT'S BREACH OF ITS OBLIGATIONS UNDER THE CONTRACT....................5

A. Expectation Damages Are Equally Available For Claims Of Partial And Total Breach Of Contract....................6

B. Mitigation Damages Are An Integral Part Of Expectation Damages And Are Necessary To Reimburse SMUD for Costs Incurred As a Result of the Government's Breach....................7

C. Damages That Are Incurred Prior To A Partial Breach Are Not Precluded As A Matter Of Law....................9

D. There Are Strong Policy Reasons For Rejecting A Rule that Pre-Breach Damages Are Precluded As A Matter of Law....................14

CONCLUSION....................15

## TABLE OF AUTHORITIES

**Pages**

### Cases

*Bluebonnet Savs. Bank, F.S.B. v. United States*,
266 F.3d 1348 (Fed. Cir. 2001) .......... 6

*Boston Edison Co. v. United States*,
No. 99-447, 2005 WL 375603 (Fed. Cl. Feb. 15, 2005).......... 4, 5

*Cal. Fed. Bank v. United States*,
No. 03-5075, 03-5082, 2005 WL 95171 (Fed. Cir. Jan. 19, 2005).......... 5

*Chain Belt Co. v. United States*,
115 F. Supp. 701 (Ct. Cl. 1953).......... 7, 10, 11, 12

*Cities Serv. Helex v. United States*,
543 F.2d 1306 (Ct. Cl. 1976) .......... 7

*Coast Fed. Bank, F.S.B. v. United States*,
48 Fed. Cl. 402 (2000) .......... 6

*Dunkin Donuts of Am., Inc. v. Minerva, Inc.*,
956 F.2d 1566 (11th Cir. 1992) .......... 7

*Energy Capital Corp. v. United States*,
302 F.3d 1314 (Fed. Cir. 2002) .......... 6

*Entergy Nuclear Generation Co. v. United States*,
No. 03-2626, 2005 WL 503724 (Fed. Cl. Mar. 3, 2005) .......... 4

*Home Savs. of Am, F.S.B. v. United States*,
No. 04-5020, -5032 (Fed. Cir. Mar. 7, 2005) .......... 8

*Home Savs. of Am., F.S.B. v. United States*,
57 Fed. Cl. 694 (2003) .......... 5, 8

*Hughes Communications Galaxy, Inc. v. United States*,
271 F.3d 1060 (Fed. Cir. 2001) .......... 5, 8

*In re S.N.A. Nut Co.*,
247 B.R. 7 (Bankr. N.D. Ill. 2000) .......... 10

*Indiana Michigan Power Co. v. United States*,
60 Fed. Cl. 639 (2004),
*appeal pending*, No. 04-5122 (Fed. Cir. docketed July 26, 2004).......... 1, 8, 13

*Ketchikan Pulp Co. v. United States*,
20 Cl. Ct. 164 (1990) ........................................ 7

*Lucente v. International Business Machines Corporation*,
310 F.3d 243 (2d Cir. 2002) ........................................ 13

*Middleton v. United States*,
175 Ct. Cl. 786 (1966) ........................................ 14

*Pinewood Realty Ltd. P'ship v. United States*,
617 F.2d 211 (Ct. Cl. 1980) ........................................ 7

*Reynolds v. United States*,
158 F. Supp. 719 (Ct. Cl. 1958) ........................................ 13

*Robinson v. United States*,
305 F.3d 1330 (Fed. Cir. 2002) ........................................ 7, 8

*San Carlos Irrigation & Drainage Dist. v. United States*,
111 F.3d 1557 (Fed. Cir. 1997) ........................................ 5

*San Carlos Irrigation & Drainage Dist. v. United States*,
23 Cl. Ct. 276 (Cl. Ct. 1991) ........................................ 6

*Schism v. United States*,
316 F.3d 1259 (Fed. Cir. 2002) (*en banc*) ........................................ 14

*Tennessee Valley Authority v. United States*,
60 Fed. Cl. 655 (2004) ........................................ 10, 12, 13

*Yankee Atomic Elec. Co. v. United States*,
No. 98-126, 2004 WL 1535688 (Fed. Cl. June 28, 2004) ........................................ 4, 5, 10, 12, 13

**Statutes**

U.C.C. § 2-712(2) (2002) ........................................ 8

**Other Authorities**

24 Williston on Contracts, 4th ed. § 66.44 ........................................ 10

59 Fed. Reg. 27,007 (May 25, 1994) ........................................ 3, 8

60 Fed. Reg. 21,793 (May 3, 1995) ........................................ 3, 9

62 Fed. Reg. 1095 (Jan. 8, 1997) ........................................ 9

Dan B. Dobbs, Handbook on the Law of Remedies § 12.6(2) (2d ed. 1993) ........................................ 8

E. Allan Farnsworth, Farnsworth on Contracts § 12.11 (2d ed. 1998) .......... 8

Restatement (Second) of Contracts § 347 (1981) .......... 5, 7, 8

Restatement (Second) of Contracts § 350 (1981) .......... 10, 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 98-488 C |
| THE UNITED STATES OF AMERICA, | ) | (Judge Braden) |
| Defendant. | ) | |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY AND EVIDENCE REGARDING PLAINTIFF'S REQUEST FOR PRE-BREACH DAMAGES**

Plaintiff Sacramento Municipal Utility District ("SMUD") submits the following Response to Defendant's Motion *In Limine* to exclude testimony and evidence regarding pre-breach damages ("Gov. Motion"). This Court has previously ruled that the Department of Energy ("DOE") breached its obligations to SMUD under the June 14, 1983 Contract by failing to begin disposal services by January 31, 1998. *Sacramento Municipal Utility Dist. v. United States*, 63 Fed. Cl. 495, 503 (2005). SMUD should be compensated for the costs that result from the government's breach. There is no legal basis for precluding SMUD from introducing evidence or testimony regarding such costs on the ground that they were incurred prior to the government's breach.[1] Accordingly, SMUD requests that the Court deny the government's motion.

[1] Nor would such an order promote judicial efficiency. The issue of whether spent nuclear fuel plaintiffs like SMUD may recover damages prior to the government's breach is currently pending before the Federal Circuit in *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 648 (2004), *appeal pending*, No. 04-5122 (Fed. Cir. docketed July 26, 2004). In the event that this Court grants the government's motion, and the Federal Circuit holds

## STATEMENT OF THE ISSUE

Whether the damages SMUD incurred as a result of the government's breach of its obligations under the Contract, including the damages incurred throughout the 1990s in reasonable mitigation of the government's breach, should be awarded in this case.

## STATEMENT OF THE CASE

As the government acknowledges, this Court has previously ruled that "the Government was obligated under the June 14, 1983 DOE Standard Contract to begin accepting SNF and/or HLW from utilities no later than January 31, 1998," and that the government's failure to begin such services constituted a breach of SMUD's Contract. *Sacramento Municipal Utility Dist.*, 63 Fed. Cl. at 505.[2] The government now seeks to limit its damages by arguing that any damages incurred prior to January 31, 1998 are unrecoverable as a matter of law. The government's motion is premised on the remarkable suggestion that this Court should conclude, without any reference to the facts of this case, that the only possible date of breach is January 31, 1998, and that no actions taken prior to that date could possibly be caused by the anticipated breach or result in compensable damages in this case.

In making this argument, the government ignores nearly every fact in this case, including (1) the many official program documents published starting in 1989 announcing that DOE would not open the repository until 2010, *see*, *e.g.*, Report to Congress on the Reassessment of the Civilian Radioactive Waste Management Program, at vii (Nov. 29, 1989) ("1989 Reassessment") (Pl. Ex. 169) (previously attached to SMUD's Reply to Defendant's Supplemental Response Regarding Liability, App. at 52 (Oct. 29, 2004) (Dckt. #265)); (2) the government's unilateral

---

that pre-breach damages are recoverable as a matter of fact or law, then the determination of such damages in this case would require a second trial.

[2] The government recognizes that this Court has already determined that "the statutory and contractual deadline for the Department of Energy to begin acceptance of SMUD's spent nuclear fuel and high-level radioactive waste was January 31, 1998." Gov. Motion at 2 (internal acronyms omitted).

action in seeking to artificially limit its liability with Delivery Commitment Schedules ("DCSs") and the 900 ton rate in the early 1990s, *see, e.g.*, 1991 Annual Capacity Report (Pl. Ex. 231); DCS Instructions (Pl. Ex. 231) (previously attached to Plaintiff's Cross-Motion for Partial Summary Judgment on Acceptance Rate, App. at 1548, 1640.1 (Dec. 16, 2002) (Dckt. # 162)); (3) the Notice of Inquiry that DOE published in the Federal Register in May 1994 announcing its inability to perform and denying its obligations under the Contract, *see* Notice of Inquiry, 59 Fed. Reg. 27,007, 27,009 (May 25, 1994) (Pl. Ex. 351); (4) the Final Interpretation of the NWPA that DOE published in May 1995 announcing that it would not perform until 2010, *see* Final Interpretation, 60 Fed. Reg. 21,793, 21,794-95 (May 3, 1995) (Pl. Ex. 410); and (5) the letter DOE sent to SMUD in December 1996 announcing unequivocally that it would not perform under the Contract, *see* Letter from Tomasoni to Schori, dated Dec. 17, 1996 (Pl. Ex. 500) (attached as Exhibit 1).

Moreover, the government ignores the express testimony of SMUD witnesses. Rita Bowser, who was SMUD's spent fuel disposition manager in 1990 and 1991, testified that she had numerous meetings with DOE officials in which she sought reasonable assurances as to whether DOE would be able to begin performance in 1998. Ms. Bowser testified as follows:

> Q. Is this a correct understanding then, that Mr. Bartlett or Mr. Milner [of the DOE] indicated at the meetings that there were schedule delays in the creation of a federal repository?
>
> A. Yes. That would be the kind of information that we walked away from those meetings with.
>
> Q. What kind of scheduled delay do you recall Mr. Bartlett describing to you?
>
> A. I don't recall specifically but the scheduled delays that come to memory from DOE meetings were well beyond 1998. 2005, 2010 or beyond come to mind but in a specific, attributable way.
>
> . . . .

Q. Do you recall the first time that either Mr. Bartlett or Mr. Milner would have told you about scheduling delays in deciding the creation or the building of a federal repository?

A. In the meetings that we held very early on, from the first meetings we held with DOE.

R. Bowser Dep. at 62-63 (Sept. 16, 2004) (previously attached to SMUD's Motion for Leave to File Designated Testimony, App. at 2240 (Feb. 17, 2005) (Dckt. #288); *see also id.* at 61-62 (testifying that SMUD requested assurances of timely DOE performance and that DOE failed to provide any such assurance). The government ignores these facts, and many others, and argues that SMUD has no basis for recovery of any damages prior to January 31, 1998.

## ARGUMENT

### I. AN ISSUE OF FACT REMAINS WHETHER THE GOVERNMENT BREACHED THE CONTRACT PRIOR TO JANUARY 31, 1998.

Although this Court concluded that the government's failure to begin services by January 31, 1998 constituted a breach of contract for which DOE is liable, this holding does not preclude the possibility that DOE breached the contract prior to January 31, 1998. In *Boston Edison Co. v. United States*, No. 99-447, 2005 WL 375603, at *16 (Fed. Cl. Feb. 15, 2005), Judge Lettow recognized that the government may have breached the contract "in 1997 when the government first suspended the DCS process." 2005 WL 375604, at *16. Similarly, in *Yankee Atomic Elec. Co. v. United States*, No. 98-126, 2004 WL 1535688, at *6 (Fed. Cl. June 28, 2004), Judge Merow recognized that "DOE had an obligation to take actions necessary to be ready to commence performance starting at the end of 1998," and DOE's "[f]ailure to do so may have commenced an earlier partial breach." The issue of the date of DOE's possible breaches has not been presented to this Court and this issue of fact is best addressed at trial. *See Entergy Nuclear Generation Co. v. United States*, No. 03-2626, 2005 WL 503724, at *6 (Fed. Cl. Mar. 3, 2005);

*see also Boston Edison*, 2005 WL 375603, at *19; *Yankee Atomic*, 2004 WL 1535688, at *6. Given this outstanding factual issue, the government's motion should be denied.

## II. SMUD IS NOT PRECLUDED FROM RECOVERING THE DAMAGES IT INCURRED IN REASONABLE MITIGATION OF THE GOVERNMENT'S BREACH OF ITS OBLIGATIONS UNDER THE CONTRACT.

The government's motion would be without merit even if the factual issue regarding the timing of the government's breach of Contract were ignored. The cardinal principle of damages in contract cases is to award sufficient damages "to place the injured party in as good a position as he or she would have been had the breaching party fully performed." *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997)); *see also Home Savs. of Am., F.S.B. v. United States*, 57 Fed. Cl. 694, 723 n.47 (2003). Such "[e]xpectation damages are generally measured by the 'loss in value to [the injured party] of the other party's performance caused by its failure or deficiency plus . . . any other loss, including incidental or consequential loss, caused by the breach . . . .'" *Home Savings*, 57 Fed. Cl. at 723 n.47 (alterations in original) (citations omitted). Expectation damages can include both mitigation expenses and the costs of providing substitute or alternative performance. Restatement (Second) of Contracts § 347 cmts. a, c (1981) (noting expectation interest measure includes costs to "arrange a substitute transaction" and "costs incurred in a reasonable effort, whether successful or not, to avoid loss"); *Home Savings*, 57 Fed. Cl. at 722.

The Federal Circuit has consistently held that expectation damages are recoverable where (1) the damages are reasonably foreseeable to the breaching party at the time of contracting; (2) the damages are caused by the breach; and (3) the damages are shown with reasonable certainty. *Cal. Fed. Bank v. United States*, No. 03-5075, 03-5082, 2005 WL 95171, at *2 (Fed. Cir. Jan. 19, 2005); *Home Savings*, 57 Fed. Cl. at 726; *Energy Capital Corp. v. United States*,

302 F.3d 1314, 1320 (Fed. Cir. 2002); *Bluebonnet Savs. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *Coast Fed. Bank, F.S.B. v. United States*, 48 Fed. Cl. 402, 408 (2000). These requirements ensure that the damages are appropriately limited by the bounds of contract doctrine. No further limitations on expectation damages exist at law and none should be newly-crafted in this case.

### A. Expectation Damages Are Equally Available For Claims Of Partial And Total Breach Of Contract.

Despite the government's attempts to argue otherwise, the government offers no basis for the conclusion that a party claiming pre-breach damages should not be awarded its expectation damages. The government notes that "a claim for partial breach is one for damages based upon 'only part of the injured party's remaining rights to performance,' while a claim for damages for total breach is 'one for damages based on all of the injured party's remaining rights to performance.'" Gov. Motion at 7 (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 23 Cl. Ct. 276, 279 (Cl. Ct. 1991)). This principle, however, adds nothing to the question of recovering damages prior to the date of breach.

SMUD is not seeking damages in this case for the permanent failure by DOE to remove fuel from SMUD's facility, damages which would be hundreds of millions of dollars.[3] Rather, SMUD seeks only those damages resulting from the design, construction, and operation of a temporary storage facility at SMUD's Rancho Seco site as a result of the government's partial breach. Thus, SMUD's damages are only for part of its existing contract rights – the part that

[3] The government asserts that the distinction is material because "although a plaintiff could establish a total breach prior to the performance due date by demonstrating an anticipatory repudiation, a plaintiff cannot establish a *partial* breach through an anticipatory repudiation." Gov. Motion at 9; *see also id.* at 12. Despite the government's assertions, this issue need not be addressed by the Court. The actual date of the government's breach in this case is a factual issue appropriately reserved for trial. To the extent that SMUD has incurred and claimed damages prior in time to any breach, these damages are recoverable as long as they were reasonably incurred in mitigation of the government's breach.

has been breached by the government's failure to date to dispose of SMUD's waste as required by the Contract. SMUD is entitled to recover the damages that resulted from the government's breach. The principle underlying the provision of expectation damages is to try to put the injured party in as good a position as if the other party had not breached.[4] The cases cited by the government support this conclusion. *See Cities Serv. Helex v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976) (a party asserting a partial breach may recover its damages stemming from that partial breach); *Dunkin Donuts of Am., Inc. v. Minerva, Inc.*, 956 F.2d 1566, 1571 (11th Cir. 1992) (same); *Pinewood Realty Ltd. P'ship v. United States*, 617 F.2d 211, 215 (Ct. Cl. 1980) (same). Unless the injured party fails to show that the damages were foreseeable, caused by the partial breach, or reasonably certain, "the injured party has a right to damages based on his expectation interest." Restatement (Second) of Contracts § 347 (1981).

### B. Mitigation Damages Are An Integral Part Of Expectation Damages And Are Necessary To Reimburse SMUD for Costs Incurred As a Result of the Government's Breach.

It is a basic tenet of contract law that, when faced with a breach, the non-breaching party is entitled, and indeed required, to try to avoid further losses through mitigation efforts or by engaging in substitute transactions designed to obtain the goals of the contract. *See Robinson v. United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002) (noting "reasonable efforts in the form of affirmative steps are required to mitigate damages"); *Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 165 (1990). As long as the substitute transaction was reasonable at the time it was entered into, the non-breaching party is entitled to recover the cost incurred in arranging the substitute transaction as expectancy damages. *Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953) ("[P]laintiff is entitled to recover the amount proved to have been spent as

[4] In this case, no award of damages can restore SMUD to as good a position as if the government had not breached. SMUD wants to be out of the nuclear waste storage business with its attendant risks and costs. Only government removal of SMUD's spent fuel can satisfy the government's contractual obligations.

expenses incurred in a reasonable effort to avoid the harm which both parties had reason to foresee would be the probable result of defendant's breach of the contract."); *Home Savings*, 57 Fed. Cl. at 722-23; *see also* U.C.C. § 2-712(2) (2002);[5] Restatement (Second) of Contracts § 347(b) cmt. c (1981) (noting "the general principle is that all losses, however described, are recoverable"); E. Allan Farnsworth, Farnsworth on Contracts § 12.11 (2d ed. 1998); Dan B. Dobbs, Handbook on the Law of Remedies § 12.6(2), at 131 (2d ed. 1993) ("Courts usually treat the issue [of mitigation] in most of these cases as simply one of reasonableness under the circumstances."). The Federal Circuit recently reaffirmed this principle, stating that "[w]hen mitigating damages from a breach, a party 'must only make those efforts that are fair and reasonable under the circumstances.'" *Home Savs. of Am, F.S.B. v. United States*, No. 04-5020, -5032, slip op. at 19 (Fed. Cir. Mar. 7, 2005) (quoting *Robinson*, 305 F.3d at 1333).

The government began announcing in the late 1980s and early 1990s that it was unlikely to begin performance in 1998. *See Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 649 n.22 (2004) ("Defendant made statements in 1987 and 1989 suggesting that DOE might not meet the 1998 deadline."). As noted above, in 1989 the government announced that acceptance at the repository would be delayed until at least 2010, a twelve-year delay from the 1998 start date. *See* 1989 Reassessment, at vii ("This schedule shows a significant slip for the expected start of repository operations – from the year 2003 to approximately 2010."). In 1994, in recognition of this delay, DOE announced that its "preliminary view is that it has no statutory obligation to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the Act." 59 Fed. Reg. at 27,008. The Department

[5] Although Article 2 of the U.C.C., governing the sale of goods, is not directly applicable, the Federal Circuit in *Hughes Communications* recognized that principles reflected in the U.C.C. are nevertheless useful in evaluating contracts generally.

issued its Final Interpretation in May 1995, stating that no repository or interim waste acceptance facility would be in operation until 2010 and that no waste acceptance would occur prior to that date. 60 Fed. Reg. at 21,794-95. Faced with these announcements of delay, SMUD, like many utilities, began making alternative plans for the long-term storage of its spent fuel. SMUD ultimately developed its own dry storage facility for its spent nuclear fuel ("SNF") – the same action taken by nearly all utilities and such government entities as the U.S. Navy. *See, e.g.*, Record of Decision, 62 Fed. Reg. 1095 (Jan. 8, 1997) (Pl. Ex. 508).

The government now suggests in this case that SMUD should have left its spent nuclear fuel in the wet pool and done nothing while waiting to see if the government arrived to remove its waste. Defendant's Memorandum of Contentions of Law and Fact, at 35-36 (Feb. 28, 2005) (Dckt. # 292). Such a position is untenable. The fundamental principles of contract law support the idea that a party is entitled and even obligated to mitigate its damages in light of an impending breach. These principles are particularly important in this case. Given that no market exists for the permanent disposal of spent nuclear fuel, SMUD could not have awaited performance and then covered by arranging alternate performance at the time the government breached. The government's breach was apparent long before January 31, 1998, and SMUD took appropriate action to limit its damages and maintain safe long-term storage of its nuclear waste until DOE eventually performs under the Contract. SMUD's actions to mitigate its damages were reasonable and are recoverable under fundamental damages principles.

### C. Damages That Are Incurred Prior To A Partial Breach Are Not Precluded As A Matter Of Law.

The government argues for a rule that would abandon these principles. The government seeks to impose a *per se* rule forever barring recovery of costs incurred to arrange a substitute transaction before the breach occurred in partial breach cases without regard to factual

considerations, such as the reasonableness of the actions or the likelihood of the expected breach at the time the substitute transaction is arranged. Under the government's argument, a non-breaching party incurring pre-breach mitigation or substitute transaction costs can *never* be made whole. Neither logic nor law, however, requires the non-breaching party in a partial breach case either to wait until after the breach actually occurs to begin mitigating or arranging a substitute transaction or to forfeit the ability to recover costs incurred before the breach. Rather, the right – and in the case of mitigation, the obligation – to arrange substitute transactions to avoid losses and obtain the purposes of the contract arises "[o]nce a party has reason to know that performance by the other party will not be forthcoming." Restatement (Second) of Contracts § 350 cmt. b (1981). *See Yankee Atomic*, 2004 WL 1535688, at *6-7, *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 655, 674 (2004); *In re S.N.A. Nut Co.*, 247 B.R. 7, 17-18 (Bankr. N.D. Ill. 2000) (where nut supplier indicated that nuts would be unavailable temporarily in the future, buyer was entitled to cover prospectively for the partial breach and recover resulting damages); Restatement (Second) of Contracts § 350, cmts. c, e, f & h. A buyer can obtain cover damages even if it has not cancelled the contract and has accepted a partial delivery. 24 Williston on Contracts 4th ed. § 66.44, pp. 610-13.

The Court of Claims has previously recognized that pre-breach damages *are* available for a contract breach that is pursued based on a partial breach theory. *Chain Belt*, 115 F. Supp. at 705. Despite the government's characterization of *Chain Belt* as a "total" breach case, in actuality *Chain Belt* is a partial breach case with circumstances analogous to the facts of this case. In *Chain Belt*, the plaintiff entered into a contract with the government for the purchase of real property, including the buildings and installations. As part of the contract, the defendant agreed to move its machinery off the premises by December 10, 1946. "When, by October 1,

1946, defendant had done nothing to prepare for removal of the machinery, plaintiff commenced writing to defendant calling attention to the magnitude of the removal task and to the fact that unless defendant commenced removal operations at once, the plant would not be cleared within the [required] contract period." *Id.* Because it was apparent that the defendant would be unable to perform by the date in the contract, the plaintiff began moving the machinery in November and finished the "bulk of it" prior to the contracted date of performance. *Id.* at 713. Plaintiff did not sue based on a theory of total breach of contract; rather, plaintiff sued for its damages resulting from the delay in removal of machinery.

Defendant argued that plaintiff was not entitled to any costs that were incurred prior to the date upon which performance was due under the contract. *Id.* at 713. The Court disagreed, stating in language equally applicable here:

> [P]laintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm . . . . *It makes no difference whether the breach has already occurred, or where . . . it is merely impending* under circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm.

*Id.* at 714 (emphasis added). The Court recognized that "[b]oth parties herein knew that defendant could not get the machinery out by December 10, because of the nature of the task and because defendant had not even started the removal work in November 1946." *Id.* at 714. The Court awarded plaintiff its mitigation costs.

The building was, in fact, transferred to plaintiff and the government received $1,422,000 in return. Thus, the dispute in the case involved the government's breach of a separate, relatively minor provision that certainly was not the essence of the contract. The government went on to fulfill its obligation to remove equipment from the premises, albeit not by the contractual deadline. *Id.* at 707. In truth, the distinction between "total" and "partial" breaches is irrelevant

to the availability of damages for costs incurred before a breach to mitigate or arrange a substitute transaction, a point confirmed not only by *Chain Belt*'s facts, but also by the Court's failure to address or even mention the distinction.[6]

Two other Judges in this Court have rejected the government's argument for a *per se* bar on recovery of pre-breach damages in spent nuclear fuel cases. In both cases, the Courts have recognized that established law allows recovery of such costs to arrange substitute spent nuclear fuel storage methods, as long as those costs can be shown to have been caused by the reasonably-anticipated breach of DOE's obligations. *See Yankee Atomic*, 2004 WL 1535688, at *7 (Merow, S.J.); *Tennessee Valley Authority*, 60 Fed. Cl. at 674-75 (Lettow, J.). As Judge Merow explained,

> Plaintiffs proffer that logic and exigencies and basic contract principles dictated that they start dealing with this failure [by DOE to meet the 1998 date]. To limit damages as defendant's suggest would reduce the court's analysis to expenditures only from [January] 31, 1998 on. The court declines to do so. Consider the ramifications of defendant's position. Should plaintiffs have waited until [January] 31, 1998 and then decided what to do with their nuclear waste? The court thinks not, and accordingly, will not preclude evidence and argument in this regard.

*Id.* at *6. Judge Lettow made a similar observation in his *Tennessee Valley Authority* decision:

> When it became obvious to TVA that DOE would not perform under the contract, TVA was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance. "Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." TVA's construction of dry storage facilities for spent nuclear fuel at [TVA's] nuclear plants must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial, ongoing breach.

---

[6] The government's attempts to distinguish *Chain Belt* are also to no avail. The government argues that the pre-breach costs incurred in *Chain Belt* were "closely-tied" in time to the breach and "minor in nature." In actuality, based on the overall period of the contract and the total amount of the contract, *Chain Belt* is not as limited as the government argues. Nor does the decision suggest that the relative amount or temporal scope of the pre-breach costs were important considerations.

60 Fed. Cl. at 674 (quoting Restatement (Second) Contracts § 350 cmt. b (1981)) (additional citations omitted).[7]

The cases Defendant cites do not support a contrary conclusion.[8] The government's reliance on *Lucente v. International Business Machines Corporation*, 310 F.3d 243, 262-263 (2d Cir. 2002), is misplaced. The government cites *Lucente* for the proposition that breach of contract damages are recoverable only from the date of the breach forward. *See* Def. Motion at 6. This argument misconstrues the breadth of the language in *Lucente*. In that case, the court was determining the reference point in time by which to measure the loss in value of stock sustained by the plaintiff. *Id.* at 262. The court questioned, without deciding, the lower court's conclusion to measure the damages as of eight months *after* the breach rather than the date of the breach. *Id.* The court did not address the issue whether damages prior to a breach are recoverable where necessary to put the party in as good a position as if the breaching party had never breached. Likewise in *Reynolds v. United States*, 158 F. Supp. 719, 725 (Ct. Cl. 1958), the Court was determining the damages the party suffered by the value of the land that would have been received had the party performed as expected under the contract, measured by the date upon which the party would have received the land had the breaching party performed. *Id.* at 725. These cases all reflect the principle that expectation damages should be awarded to put the party in as good a position as if the breaching party had actually performed. They do not address the question of recovering damages actually incurred prior to the date of performance in mitigation of the impending breach.

---

[7] To the extent that the court in *Indiana Michigan* concluded otherwise, 60 Fed. Cl. at 647-48, such discussion was dicta and made only after a full trial on the merits. *See Yankee Atomic*, 2004 WL 1535688, at *7.

[8] In order not to burden the court, we have not addressed every case cited by the government. It is important to note, however, that the government has merely cobbled together language from various cases to support its arguments. The cases are not analogous to the facts at hand and do not address the unique issue of pre-breach damages.

The case that the government offers as disapproving "pre-breach" mitigation, *Middleton v. United States*, 175 Ct. Cl. 786 (1966), is not even a contract case. It involved the appropriate setoff to a claim for back pay by an improperly discharged seaman – a dispute of the type the Federal Circuit has held conclusively is not founded in contract, but instead is a creature of administrative law. *See Schism v. United States*, 316 F.3d 1259, 1271-75 (Fed. Cir. 2002) (*en banc*). Moreover, *Middleton* was decided on causation grounds, not on the timing of the "mitigation" expenses. Read broadly, *Middleton* merely stands for the proposition that a plaintiff seeking mitigation damages must prove the damages were caused by the breach.

### D. There Are Strong Policy Reasons For Rejecting A Rule that Pre-Breach Damages Are Precluded As A Matter of Law.

In addition to the above legal basis for rejection of the government's arguments, there are also substantial policy reasons for rejecting a rule that pre-breach damages are precluded as a matter of law. The government argues for a *per se* rule against recovery for mitigation of damages prior to a partial breach. Rather than encourage mitigation of damages, such a rule would provide an incentive for parties to sit back and allow damages to accrue and increase despite their knowledge of an impending breach. The government now argues SMUD should have done nothing while waiting for DOE to perform, despite the repeated announcements of delay throughout the 1990s. As discussed above, such a rule runs counter to the strong policy supporting mitigation of damages in the face of a breach. The policy reasons in support of such mitigation are equally applicable in a partial breach case.

In addition, the partial breach remedy is an important device for allowing recovery for a breach while also providing for the preservation of as much of the parties' agreement as possible. Resort to the partial breach remedy should not be discouraged by arbitrary rules that artificially limit the recovery available under this remedy. The government's rule, which would result in

incomplete relief, would provide an incentive for parties to claim a total breach. This consideration is particularly appropriate in the spent fuel cases since disposal of utilities' spent nuclear fuel is ultimately necessary to preserve human health and national security, and by statute (the Nuclear Waste Policy Act) such disposal is a DOE responsibility.

## CONCLUSION

As this Court has recognized, DOE had an obligation under the Contract to begin disposal of spent nuclear fuel by January 31, 1998. Testimony and evidence of SMUD's pre-breach damages are directly relevant to the amount of damage SMUD suffered as a result of this breach. SMUD will prove at trial that such damages were foreseeable, caused by the government's breach, and reasonably certain. Accordingly, such damages should be awarded. A further limitation on SMUD's recovery is not warranted by existing law or considerations of policy. This Court should deny the government's motion *in limine* to exclude testimony and evidence regarding SMUD's pre-breach damages.

DATED this 9th day of March, 2005.

Respectfully submitted,

s/ Howard Cayne by s/ Timothy R. Macdonald
Howard Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899
Counsel of Record for
Plaintiff Sacramento Municipal Utility District

Of Counsel:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Response To Defendant's Motion *In Limine* To Exclude Testimony And Evidence Regarding Plaintiff's Request For Pre-Breach Damages to be filed electronically through the Court of Federal Claims Case Management/ Electronic Case Filing System on March 9, 2005. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Harold D. Lester, Jr.
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/ Timothy R. Macdonald