No. 98-488C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO DEFENDANT'S MOTION IN OPPOSITION TO PLAINTIFF'S EXPERT WITNESS, EILEEN M. SUPKO

---

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

Howard Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

March 18, 2005

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

# TABLE OF CONTENTS

**Page**

BACKGROUND ....................................................................................................................2

ARGUMENT ......................................................................................................................4

I. Ms. Supko's Testimony is Admissible under Rule 702 of the Federal Rules of Evidence....................................................................................................................4

II. The Government Mischaracterizes Ms. Supko's Testimony and Analysis Regarding the Acceptance Rate. ......................................................................6

III. Ms. Supko's Testimony Regarding Failed Fuel is Proper Rebuttal Testimony. ...............10

IV. Ms. Supko's Rebuttal Testimony Regarding Issues Related to Dual Purpose Storage and the Delays Stemming from NRC-Requested Changes is Admissible under FRE 702. ...............................................................................................12

CONCLUSION..................................................................................................................15

# TABLE OF AUTHORITIES

**Pages**

**Cases**

Cal. Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) .......... 5

Daubert v. Merrill Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) .......... 4, 5

Kumho Tire Co., Ltd. v. Carmichael,
526 U.S. 137 (1999) .......... 4, 5

Netword, LLC v. Centraal Corp.,
242 F.3d 1347 (Fed. Cir. 2001) .......... 6

United States v. Cruz,
363 F.3d 187 (2d Cir. 2004) .......... 9

**Rules**

29 Charles Alan Wright & Victor J. Gold, Federal Practice and Procedure § 6266 (1997) .......... 5

Federal Rules of Evidence 702 .......... 4, 5, 6, 10, 12, 15

**Other Authorities**

McCormick on Evid. § 13 (5th ed.) .......... 5

Restatement (Second) of Contracts § 204 .......... 9

Restatement (Second) of Contracts § 33 .......... 9

# INDEX TO APPENDIX

**Page**

1. Jerry Burford, Expert Report, November 22, 2004 (excerpts) ..........1

2. Burford Dep. Testimony (Jan. 5-6, 2005) (excerpts) ..........9

3. Kiraly Dep. Testimony (Jan. 7, 2005) (excerpts)..........33

4. McGrath Dep. Testimony (Jan. 12, 2005) (excerpts) ..........36

5. Hamal Dep. Testimony (Feb. 1, 2, & 11, 2005) (excerpts) ..........39

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | ) |
| Plaintiff, | ) |
| v. | ) No. 98-488 C |
| THE UNITED STATES OF AMERICA, | ) (Judge Braden) |
| Defendant. | ) |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO DEFENDANT'S MOTION IN OPPOSITION TO PLAINTIFF'S EXPERT WITNESS, EILEEN M. SUPKO**

Plaintiff, Sacramento Municipal Utility District ("SMUD"), files this Response to Defendant's Motion in Opposition to Plaintiff's Expert Witness, Eileen M. Supko ("Gov. Mot."). Ms. Supko's testimony reflects her application of technical and specialized knowledge to issues of importance in this case and will assist the Court in understanding the evidence and determining facts in issue. Ms. Supko's testimony therefore satisfies the requirements of Rule 702 of the Federal Rules of Evidence ("FRE") and is admissible.

The government makes two primary arguments in seeking to exclude certain elements of the opinions expressed by Ms. Supko. The government's first argument is that Ms. Supko offers the Court "nothing more than her legal interpretation of the NWPA and the terms of the Standard Contract." Gov. Mot. at 12. As set forth below and as demonstrated by the extensive and detailed analysis in Ms. Supko's reports, this argument has no foundation and is based on a fundamental mischaracterization of the opinions offered by Ms. Supko. See Supko Original Report at 4-26 (included in Appendix to Gov. Motion).

The government's second argument again mischaracterizes the opinions of Ms. Supko, suggesting that she is proffered in this case as a "damages expert," as opposed to the nuclear expert that she is. As established in her Rebuttal Report, Ms. Supko primarily responds to the opinions of the government's technical expert, Mr. Burford, who is neither an economist nor a damages expert. See Supko Rebuttal Rep. at 3-23 (included in Appendix to Gov. Motion); Burford Rep. at 2-3, A8. Unlike Mr. Burford, who has no experience related to dry fuel storage, Ms. Supko has extensive experience analyzing fuel storage and applicable regulations over the last 15 years. Id.

Ms. Supko's testimony is based on her specialized knowledge of the nuclear industry, is based on reliable methodology and analysis, and will assist the trier of fact. Accordingly, SMUD requests that the Court deny Defendant's Motion and admit Ms. Supko's expert testimony into evidence.[1]

## BACKGROUND

Ms. Supko has 20 years of experience working in the nuclear industry, with primary expertise in the storage and disposal of nuclear waste and the Department of Energy's ("DOE") plans regarding that storage and disposal. Ms. Supko has a Bachelor of Science in Nuclear Engineering from Pennsylvania State University. Supko Original Rep. at 2. After graduation,

[1] The government acknowledges that Ms. Supko's expert testimony "modeling a 3,000 MTU rate of acceptance for SMUD" is admissible and proper expert testimony, but does not explain further what testimony it intends this concession to cover. Gov. Mot. at 2 n.1. Regardless, the concession acknowledges that Ms. Supko has the necessary technical knowledge and expertise to serve as an expert in this case on the modeling of acceptance rates. This is not surprising, as the government stipulated to the validity of Ms. Supko's acceptance rate model and her qualification as an expert witness in the Indiana-Michigan SNF case. The government also does not dispute that Ms. Supko has the requisite knowledge to assess the development of the dry storage market in the 1990s and the NRC's regulatory changes associated with spent fuel storage and transport, see Supko Rebuttal Rep. at 6-20, or that these issues are relevant to the defenses raised by the government.

Ms. Supko began working in the nuclear industry on issues related to nuclear fuel, beginning as Nuclear Fuel Projects Engineer at the Carolina Power and Light Company. Id. Since 1990, Ms. Supko has worked as a consultant at Energy Resources International, consulting in the area of SNF, nuclear waste management, and radioactive materials transport. See id. at 2, apps. B, C.

In her work, Ms. Supko has assisted and advised commercial utilities, members of the U.S. Congress, Congressional staff, state and local officials, and the Nuclear Energy Institute ("NEI") on a variety of nuclear fuel issues, including analysis of DOE's civilian waste management program, nuclear fuel storage, transport and disposal issues, and nuclear fuel cycle issues. Id., app. B. She has authored over 35 reports, presentations, and publications in leading nuclear energy journals and has been an invited speaker at over a dozen conferences sponsored by leaders in the nuclear industry. Id., apps. B, C.

Ms. Supko's experience has given her expertise not only in the broad subject matter of the nuclear industry, but also more specifically on matters highly relevant to the present case, particularly in matters related to spent nuclear fuel storage issues and related licensing matters. See Supko Rebuttal Rep. at 1-2. At the recommendation of DOE, she was invited to serve as a U.S. technical expert to the International Atomic Energy Agency ("IAEA") and has assisted that agency's preparation of an IAEA technical report concerning international spent fuel storage by contributing an overview of the U.S. dry storage licensing and operations experience. Id. at 1.

In addition, Ms. Supko has assisted clients who were planning to construct Independent Spent Fuel Storage Installations ("ISFSIs") by helping them to understand dry storage licensing issues and schedules for constructing the ISFSI, including schedules for licensing the facility, and has provided consulting services to Private Fuel Storage LLC, a consortium of nuclear utilities seeking to establish a private spent fuel storage facility. Id. at 2. She has assisted clients

in understanding the licensing status of various storage-only and dual-purpose systems and the record of those licenses before the Nuclear Regulatory Commission ("NRC") and has consulted on recent changes in the NRC's regulatory requirements for dry storage casks. Id. Ms. Supko has presented the results of technical analyses on behalf of the NEI to NRC staff regarding the need for changes to NRC staff regulatory guidance for storage and transport systems that would increase the allowable burn-up of the spent fuel contained in those systems. Id. at 2.

Relying on her 20 years of experience and her resulting specialized knowledge of the field, Ms. Supko's testimony provides opinions on the real world effect of different SNF acceptance rates and issues related to SMUD's pursuit of a dual-purpose, as opposed to a store-only, dry storage system. Ms. Supko's testimony therefore provides highly-relevant context against which the Court may assess SMUD's actions as it reaches its determinations of fact.

## ARGUMENT

### I. Ms. Supko's Testimony is Admissible under Rule 702 of the Federal Rules of Evidence

Under FRE 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education" may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . . " FRE 702. To be admissible under FRE 702, the testimony must be based upon sufficient facts or data, the testimony must be the product of reliable principles and methods, and the witness must have applied the principles and methods reliably to the facts of the case. Id. The Court has broad discretion in exercising its "gatekeeper function" under FRE 702. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999); Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). In performing its function, the objective of the Court is to ensure both the reliability and the relevance of expert testimony. Kumho Tire, 526 U.S. at 152.

The determination of reliability is based on two elements. First, the witness must be qualified to act as an expert based on her "knowledge, skill, experience, training, or education" and the proffered testimony must relate to the expert's qualifications. FRE 702. Qualification may be based on education or experience and specialized knowledge may stem from years in the field regardless of formal training. See McCormick on Evid. § 13 (5th ed.) (noting an expert's knowledge "may be derived from reading alone in fields (education), from practice alone in other fields (experience), or as is more commonly the case from both"). In the present case, Ms. Supko has both formal education in nuclear engineering and extensive knowledge, skill, and experience in the field.

In addition, reliability will be assessed by examining the methodology and principles the expert relied on to reach her conclusions. See FRE 702(1)-(3). FRE 702(2) requires that the expert testimony be "the product of reliable principles and methods." "The objective of [Daubert's gatekeeping] requirement is to … make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. "In the non-scientific context, the reliability of an expert's methodology will be determined by common sense, logic, and practices common to or accepted in the area of expertise in question." 29 Charles Alan Wright & Victor J. Gold, Federal Practice and Procedure § 6266 (1997) ; see, e.g., Cal. Fed. Bank v. United States, 395 F.3d 1263, 1270 (Fed. Cir. 2005) (allowing consideration of government expert's testimony because it "shed light on the economics of finance and banking and thus helped explain why CalFed sold the ARMs following FIRREA's enactment").

Here, Ms. Supko employs a sophisticated methodology for her acceptance rate analysis and brings her considerable expertise and experience to bear on the issues of the appropriateness of the storage system chosen by SMUD. As discussed below, Ms. Supko is qualified to testify on the matters addressed in her testimony, her testimony is based on a sound methodology and the application of specialized knowledge to facts in a principled manner, and her testimony sheds light on important matters at issue in the present case and will therefore assist the trier of fact, the Court. As such, it is reliable, relevant, and admissible under FRE 702.

## II. The Government Mischaracterizes Ms. Supko's Testimony and Analysis Regarding the Acceptance Rate.

The heart of the government's motion is the assertion that Ms. Supko has offered opinions about the SNF acceptance rate "that are nothing more than her legal interpretation of the NWPA and the terms of the Standard Contract." Gov. Mot. at 12; see also id. at 1-2. In making this assertion, the government misreads and mischaracterizes Ms. Supko's report. Ms. Supko's report does not provide a legal opinion as to the requirements for the acceptance rate under the NWPA or the Standard Contract. Instead, Ms. Supko conducted the quintessential tasks of an expert, performing an extensive analysis regarding "the effect that various spent fuel acceptance rates would have on utility requirements for additional spent fuel storage capacity and the effect on the timely decommissioning of nuclear power plants." Supko Original Rep. at 5, 6-25.

The task of modeling the effect of different acceptance rates is precisely the type of work that requires expert analyses and the specialized knowledge that Ms. Supko has developed in the course of 20 years work advising nuclear utilities regarding these issues. Id. at 2-3; see Netword, LLC v. Centraal Corp., 242 F.3d 1347, 1356 (Fed. Cir. 2001) (noting that expert's testimony is particularly helpful to the court in "dealing with complex technologies or those outside the

court's expertise"). The government's motion does not dispute Ms. Supko's actual analysis, and, indeed, does not even address it. The scope and conclusion of Ms. Supko's report demonstrates that, contrary to the government's arguments, she is not simply offering a legal interpretation of the Contract:

> Based on my work in analyzing the effect that various spent fuel acceptance rates would have on utility requirements for additional spent fuel storage capacity as well as the effect on the timely decommissioning of nuclear power plants, I have determined that if DOE had begun acceptance of spent nuclear fuel by January 31, 1998, an overall stead-state spent fuel acceptance rate of 3,000 metric tons of uranium (MTU) per year, with a five-year ramp up rate to the steady-state capacity, would have limited the amount of additional storage capacity needed at nuclear power plants after that date, kept up with the annual discharge rate of 2,000 MTU of spent fuel, and would have worked off the 37,000 MTU backlog of SNF in storage at nuclear power plants to allow timely decommissioning. In addition, a 3,000 MTU acceptance rate would have been fully utilized for almost 30 years of a 40-year program, ensuring that the waste management system capacity has not been overbuilt and underutilized. In addition, the 3,000 MTU overall steady-state acceptance rate is consistent with the overall acceptance rate contained in more than a dozen DOE program documents and with statements and testimony made by DOE officials and witnesses.

Supko Original Rep. at 1.

Ms. Supko modeled the effect of different annual acceptance rates, such as 900 tons, 3000 tons, 4000 tons, and 6000 tons. Id. at 11-17. She included sensitivity analyses regarding different potential ramp-up rates, id. at 17-19, as well as the intra-utility use of acceptance rights. Id. at 19-21. Ms. Supko "reviewed DOE and DOE contractor methodology for the projection of spent nuclear fuel discharges, as well as DOE's model for projecting spent nuclear fuel discharges and acceptance rights." Id. at 3-4. In conducting her analysis, Ms. Supko used a computer simulation model for spent fuel acceptance developed by ERI called the "SPNTFUEL model" and noted that, assuming similar input assumptions, "both the DOE model and ERI's

SPNTFUEL model will result in similar projected spent nuclear fuel acceptance rights." Id. at 4.[2] Ms. Supko considered a number of different acceptance rates and detailed the results of the analyses in her report. Ms. Supko's final step was to compare the results of her analyses using the SPNTFUEL program against DOE's own articulated views of its obligations under the Contract. Ms. Supko's testimony was therefore developed through the application of a testable and principled methodology to reliable facts.

In the face of this extensive analysis, the government nonetheless asserts that Ms. Supko offers the Court "nothing more than her legal interpretation." Gov. Mot. at 12. The apparent basis for this assertion is that Ms. Supko discusses the fact that DOE officials understood and DOE documents reflected two primary requirements for DOE's design of the program for accepting SNF at the repository. Supko Original Rep. at 4, 6-8; id. at 1 (explaining that she was asked to prepare a report regarding the acceptance rate that was required to meet the requirements of the NWPA and the Contract "as those requirements have been articulated by DOE"). DOE's understanding of the design and operating requirements for the repository are simply facts that inform Ms. Supko's analysis, and the government makes no effort to dispute

[2] The government's suggestion that Ms. Supko's analysis "is not based upon some type of independent in-depth research," id. at 14, is remarkable. Using data submitted to the DOE by commercial nuclear utilities regarding their own spent fuel discharge, Ms. Supko's model takes account of plant-specific operating parameters for each nuclear power plant, the storage location of the plant's fuel, the storage location identification number, the spent fuel discharge date, the number of assemblies that are permanently discharged, the weight of the assemblies discharged, and the assemblies' burnup. See Supko Original Rep., app. A. The model projects nuclear power plant discharge data, including the number of fuel assemblies discharged, fuel weight discharged, and fuel burnup. Id. These factors in turn affect the storage capacity and needs of utilities. Ms. Supko conducted an "independent in-depth" analysis of the effects of different acceptance rate based on the outputs in her model. The data and calculations that go into the SPNTFUEL database are elaborated in Ms. Supko's Expert Report at Appendix A, and have been used in numerous contexts to allow Ms. Supko to advise clients on matters related to the storage and disposal of SNF.

them. Cf. United States v. Cruz, 363 F.3d 187, 192-93 (2d Cir. 2004) (noting that an expert can offer an interpretation of evidence before the court).

Instead, in an effort to prevent the Court from hearing the one witness who has completed a detailed analysis of the effects of various acceptance and ramp-up rates on the nation's utilities, the government struggles to turn Ms. Supko's opinion into something that it is not.[3] In contrast, it is the government's expert, Mr. Burford, who actually does offer an opinion that is nothing more than his legal interpretation of the Contract. Mr. Burford opines that SMUD's costs for the transportation component of dual-purpose dry storage should be excluded from SMUD's damage claim solely because they were the "responsibility" of DOE under the Contract. Burford Rep. at 15. When questioned at his deposition about the basis for this opinion, Mr. Burford admitted that it was based on his interpretation of the Contract:

> Q. I asked you why you said it was inappropriate that the transportation costs be included in the damage claim and you responded that "because those were responsibilities for the Department of Energy and the standard contract."
>
> A. That's correct.
>
> Q. And I'm asking whether there is any other basis for your opinion that the transportation costs are inappropriate for the damage claim?
>
> A. I don't have any other basis or any other reason for that.

[3] The government has acknowledged in its prior briefing on the acceptance rate that the Contract does not specify a specific acceptance rate for SMUD's SNF. Where, as here, a contractual term is omitted, the Court must apply a reasonable term based upon the circumstances. See, e.g., Restatement (Second) of Contracts § 33 cmt d & § 204 ("[W]hen the parties to a [contract] have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."). Ms. Supko's expertise and analysis provides highly relevant testimony on the question of the reasonableness of different rates.

Burford Dep. Testimony at 148:8-13 (Jan. 5, 2005); see also id. at 157:3-10 ("Q. And in your view, SMUD should not have taken any of those things on, is that right? A. No, in my view, SMUD should not have included those costs in the damage claim. Q. And just so we're clear, the basis for that is your opinion that those were DOE responsibilities under the contract? A. That's correct."); id. at 229:4-9 ("Q. And that's based on your interpretation of the contract? A. My understanding of the scope of the Department of Energy in the contract, yes. As hopefully, I've properly stated and stated in my opinion.").[4]

Unlike Mr. Burford, Ms. Supko does not offer a legal opinion about the Contract. Her testimony is based on her technical knowledge about the industry, is supported by a sophisticated methodology, and will assist the Court. As such, it is admissible under FRE 702.

**III. Ms. Supko's Testimony Regarding Failed Fuel is Proper Rebuttal Testimony.**

The government also asserts that Ms. Supko's opinion regarding the acceptance of failed fuel is improper rebuttal testimony because it fails to rebut the opinion of the government's expert, Jerry Burford. Gov. Mot. at 15-16. A simple reading of Mr. Burford's report refutes this assertion. Mr. Burford's report states as follows: "I understand that Failed Fuel would not be accepted by DOE ahead of standard fuel and therefore would remain in the ISFSI long after 2006." Burford Rep. at 31 (emphasis added). In its current motion, the Government states that Mr. Burford was basing his opinion on the same argument that the Department of Justice has made, and the Court has rejected, in this case – that the non-binding Delivery Commitment

---

[4] Mr. Burford admits that DOE failed to satisfy its "responsibilities" to provide transportation casks, training, procedures, and associated equipment for loading SMUD's SNF. See Burford Dep. Testimony at 151:12-152:3, 224:22-225:5 (Jan. 5, 2005). Mr. Burford also does not deny that DOE's satisfaction of its obligations would have been "vital to the utility." Id. at 235:21-236:9. Mr. Burford makes no effort to explain, however, why SMUD's cost of developing the dual-purpose storage system is not reasonable mitigation or cover for the government's failure to satisfy its obligations under the Contract.

Schedules ("DCSs") that SMUD submitted in 1992 and 1993 form the basis of DOE's liability.[5] Mr. Burford, however, never mentions Delivery Commitment Schedules in the entirety of his report and references instead the 1995 Acceptance Priority Ranking and Annual Capacity Report, which provided that "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." Pl. Ex. 396.

With respect to the substance of Ms. Supko's opinions on failed fuel, Ms. Supko has extensive knowledge on the issue gained from her role as a participant in technical exchanges between the nuclear industry and DOE starting in 1990 on the issue resolution process. Supko Rebuttal Rep. at 2. The subject of failed fuel, and the lack of any definition of "radioactive leakage" in the Contract, was the subject of substantial discussion between the industry and DOE. The government's complaint that Ms. Supko offers improper legal opinions about failed fuel rings hollow in light of Mr. Burford's opinion, which includes a section titled "Failed Fuel as Referenced Under the Standard Contract." Burford Rep. at 3; see also Burford Dep. Testimony at 558:2-11 (Jan. 6, 2005) ("It's my project manager reading of the standard contract that [DOE] would have the option of determining technical feasibility of receipt."). Ms. Supko has experience and technical knowledge regarding the meaning of failed fuel as well as the issue of special handling for such fuel. Her knowledge and expertise will assist the Court in its determination of this matter and is admissible under FRE 702.

[5] This Court rejected the government's argument that its liability is limited to SNF set forth in the DCSs. See Opinion dated Jan. 19, 2005, at 12 ("SMUD's DCSs were issued and approved on March 10, 1993, after the DOE had publicly stated that it would not begin collection of any SNF and/or HLW by the statutory and contractual deadline of January 31, 1998.").

**IV. Ms. Supko's Rebuttal Testimony Regarding Issues Related to Dual Purpose Storage and the Delays Stemming from NRC-Requested Changes is Admissible under FRE 702.**

In order to impugn Ms. Supko's rebuttal testimony, the government similarly attempts to mischaracterize that testimony by claiming that Ms. Supko is acting as a damages expert and is "unqualified" to offer her opinions. Gov. Mot. at 17-20. Ms. Supko's rebuttal report demonstrates, however, that she is a nuclear expert who has expansive knowledge and experience about the development of U.S. dry storage market and the NRC's regulatory guidance for spent fuel storage and transport. See Supko Rebuttal Rep. at 1-2, 6-20. Ms. Supko has been actively involved on behalf of the nuclear industry in dry storage development for more than a decade. Id. She has provided consulting services to a consortium of utilities seeking to establish a private spent fuel storage facility in Utah, Private Fuel Storage LLC. Id. at 1. On the recommendation of DOE, Ms. Supko was invited to serve as a U.S. technical expert to the International Atomic Energy Agency and assisted the IAEA in preparing a report concerning international spent fuel storage and the U.S. dry storage licensing and operations experience. Id.[6]

The government makes no attempt to impugn Ms. Supko's qualifications regarding her knowledge of the nuclear industry, nor could they. Instead, they criticize her for not being an economist or a "damages analyst." Gov. Mot. at 17. The government fails to mention that Mr. Burford, the expert to whom most of her rebuttal report responds, is not an economist, has no training in economics, and is not being proffered by the government as a "damages expert." Burford Rep. at 2-3, A8. Indeed, when asked at his deposition about a myriad of issues set forth

[6] Ms. Supko also has assisted utility clients who were planning to construct Independent Spent Fuel Storage Installations in understanding dry storage licensing issues and schedules, in analyzing the licensing status of various storage-only and dual-purpose systems, and in understanding the NRC's recent changes in regulatory requirements for dry storage casks. See Supko Rebuttal Rep. at 2.

in his report related dry storage and facility costs, Mr. Burford was unable to provide independent opinions about those costs.[7] Ms. Supko's specialized knowledge in the fuel storage industry stands in sharp contrast to the lack of experience of Mr. Burford.[8] When asked about his knowledge of dry fuel storage systems, Mr. Burford responded as follows:

> Q. Are you familiar with what was happening with respect to dry storage vendors in the 1997 time frame?
>
> A. No.
>
> Q. Are you familiar with the number of vendors of storage only systems in the 1997 time frame, how many vendors of storage only systems there were in the 1997 time frame?
>
> A. No.
>
> Q. Are you familiar with the actual costs that utilities were paying for storage only systems in the '97 time frame?
>
> A. No.
>
> Q. The costs set forth on page 29 of your expert report for a storage only, four components of a storage only system total 9.168 million, do you see that?
>
> A. Yes, I do.
>
> Q. Do you know whether a utility could have purchased these four components for 21 canistered storage only system in 1997?

---

[7] See Burford Dep. Testimony at 350 (Jan. 6, 2005) (no knowledge about cost of demineralized water), 352 (no knowledge about cost of pool liner repairs); id. at 360 (no knowledge about cost of procedure changes); id. at 361 (no knowledge about the cost of cask drop); id. at 363 (no knowledge about cost of cask loading and decontamination); id. at 372-73 (no knowledge about the cost of vacuum drying a canister); id. at 378 (no knowledge about the cost of procedure revisions).

[8] Mr. Burford actually relies in his report on a cost-benefit analysis prepared by Ms. Supko in his effort to determine the costs of a storage-only system. See Burford Rep. at 27 n.51 (same as Def. Ex. 1005). Although he relied on Ms. Supko's report – one of only three sources that he considered – Mr. Burford could not explain the basis for the cost numbers that he used from Ms. Supko's report. Burford Dep. Testimony at 507:8-508:11 (Jan. 6, 2005).

A. Pardon me, in 1997?

Q. Correct.

A. No.

Burford Dep. Testimony at 497:1-498:6 (Jan. 6, 2005) (objections omitted).[9]

Similarly, at deposition, both Mr. Kiraly and Mr. McGrath admitted that they had no experience or knowledge related to spent nuclear fuel. Kiraly Dep. Testimony at 65:17-68:4 (Jan. 7, 2005); McGrath Dep. Testimony 47:22-48:13 (Jan. 12, 2005). Further, the expert that the government does proffer as a "damages expert" in the present case, Mr. Cliff Hamal, fails the test that the government sets up for a putative damages expert.[10]

Ms. Supko has extensive experience in the nuclear industry and sharing her specialized knowledge with the Court will provide a context for and assist the Court in determining the reasonableness of SMUD's actions during the relevant time period. Ms. Supko reviewed extensive literature from DOE, NRC, and the nuclear industry over the relevant time period and supplemented this review with her own professional experience from that time period. See

[9] See also Burford Dep. Testimony at 127:22-129:9 (Jan. 5, 2005) (Mr. Burford never managed a dry storage project, never purchased a dual purpose canister, had no responsibility for licensing a cask or canister, no involvement in designing a cask or canister, no responsibility for loading a dry storage system); id. at 134-135 (no opinion about operating and maintenance costs at an ISFSI, never been responsible for managing an ISFSI); Burford Dep. Testimony at 412 (Jan. 6, 2005) (never supervised a canister loading project of this magnitude, never transferred fuel from a pool to an ISFSI, never prepared written procedures for a fuel move); id. at 493-494 (no expertise in determining the cost of upgrading a cask for transportation, no expertise in problems experienced by dry storage vendors).

[10] Mr. Hamal has no undergraduate or graduate degree in economics. Hamal Dep. Testimony at 16:21-17:10, 11:2-16 (Feb. 1, 2005). His only education in economics consists of a few courses taken as part of his M.S. in Industrial Administration. Id. at 11:2-13:12. Cf. Gov. Mot. at 17. Mr. Hamal has never been qualified at trial as an expert on any matter, including economic or damages analysis and has never testified regarding the estimated value of a damages claim. Hamal Dep. Testimony at 353:21-355:16 (Feb. 2, 2005). Cf. Gov. Mot. at 17. Mr. Hamal also admitted that he did not define the "but for" and breach worlds for purposes of conducting a damages analysis. Hamal Dep. Testimony at 669:3-11 (Feb. 11, 2005). Cf. Gov. Mot. at 18.

Supko Rebuttal Rep. at 2-3, app. C. Next, Ms. Supko compared SMUD's actions and experience against those of the industry in general and expressed opinions about the reasonableness of those actions. Ms. Supko's rebuttal testimony follows the accepted approach of applying specialized knowledge to the facts of the case in a principled manner and is therefore reliable.

## CONCLUSION

For the reasons set out above, Plaintiff respectfully requests the Court to deny Defendant's Motion and to admit the testimony of Ms. Supko. Ms. Supko's testimony is based on her specialized and extensive knowledge of the nuclear industry, particularly issues relating to the storage and disposal of SNF, and will assist the Court in its fact-finding role in this case. This testimony is therefore admissible under FRE 702.

DATED this 18th day of March, 2005.

Respectfully submitted,

s/ Howard Cayne by s/ Timothy R. Macdonald
Howard Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899
Counsel of Record for
Plaintiff Sacramento Municipal Utility District

Of Counsel:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Response to Defendant's Motion in Opposition to Plaintiff's Expert Witness, Eileen M. Supko, to be served electronically through the Court of Federal Claims Case Management / Electronic Case Filing System on March 18, 2005 upon the following:

Harold D. Lester, Jr.
Russell A. Shultis
Alan J. Lo Re
Todd J. Cochran
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/ Timothy R. Macdonald