# EXHIBIT 2

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - X
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
Plaintiff, :
v. : Case No.
THE UNITED STATES OF : 98-488C
AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - - X

Deposition of JERRY N. BURFORD
Washington, D.C.
Wednesday, January 5, 2005
9:00 a.m.

Job No.: 1-48436
Pages 1 through 320
Reported by: Cynthia R. Simmons

2

Deposition of JERRY N. BURFORD, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest, Room 1001A
Washington, D.C. 20004

Pursuant to agreement, before Cynthia R. Simmons, Registered Merit Reporter, Certified Realtime Reporter and Notary Public of the District of Columbia.

3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
TIMOTHY MACDONALD, ESQUIRE
ARNOLD & PORTER
370 17th Street, Suite 4500
Denver, Colorado 80202
(303) 863-2334

ON BEHALF OF THE DEFENDANT:
JOSHUA GARDNER, ESQUIRE
ALAN J. LO RE, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Civil Division
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7583

4

C O N T E N T S


| EXAMINATION OF JERRY N. BURFORD | PAGE |
|---|---|
| By Mr. Macdonald | 5 |


E X H I B I T S
(Attached to the Transcript)


| DEPOSITION EXHIBIT | PAGE |
|---|---|
| 1 Expert report of Burford dated November 22nd, 2004 | 146 |
| 2 Report of Kiraly dated November 22nd, 2004 | 270 |
| 3 Exhibits to Kiraly report | 270 |

correct?
**A No, sir.**
Q You were never a fuel engineer, fuels engineer?
**A No, sir.**
Q Never had responsibility for fuel management?
**A Responsibility for fuel management, at FP&L, no.**
Q Have you been a fuel manager anywhere since you left FP&L?
**A FP&L, no.**
Q Do you know the annual cost of operating and maintaining the wet pools at St. Lucie or Indian Point?
MR. GARDNER: Objection, vague. Are you referring to current costs?
BY MR. MACDONALD:
Q At the time you were there.
**A Oh, as I understood your question, you said St. Lucie or Indian Point.**
Q Yes.



**A Did you mean to say Turkey Point.**
Q I did mean to say Turkey Point, thank you.
**A Because I worked at Indian Point also. Do I know the O&M costs for operating the pool? No, I'm not aware of those.**
Q Did you know the O&M cost for operating the pool when you were employed at FP&L?
**A It was never really segregated out in that methodology, as I recall, for most personnel were shared back and forth and operations were shared and everybody shared. It's very -- to my knowledge, we never really at that time segregated that out.**
Q You didn't have a separate amount which you could pinpoint and say this is the cost for O&M of the pool?
**A Segregated out from the rest of the operating unit, no, not to my knowledge, I don't recall that.**
Q And when you say the personnel were shared, what were they shared with?
**A Well, personnel and systems are shared at nuclear plants, the cooling system and the down range**



**part of the cooling systems come from somewhere else. The buses and electrical power, they're all on -- it's hard to say what is just doing the spent fuel function. Operators are shared, they stand duty for different things depending on their license.**
Q Spent fuel pool operators?
**A Operators that are licensed to move fuel. A lot of the indicators and indication for spent fuel pool equipment are in the control room and it shares, the control room has everything else in it. So it's difficult, it would be difficult in an operating utility or at least at the Florida Power & Light operating utility that you asked me about, I was unaware of separate costing for that, as you had asked the question.**
Q And while you were employed at Florida Power & Light, all of its reactors were operating reactors, is that right?
**A Yes, they had operating licenses, yes.**
Q None of them were permanently shutdown?
**A That's correct, none of them were.**
Q Have you ever managed a dry storage



project?
**A No, I have not.**
Q Have you ever purchased a dry storage project?
**A No, I have not.**
Q Have you ever purchased a dual purpose canister?
**A No, I have not.**
Q Have you ever been responsible for purchasing a dual purpose canister?
**A No, I have not.**
Q Ever been responsible for purchasing a dual purpose cask?
**A No, I have not.**
Q Ever been responsible for getting a license for a dual purpose cask or canister?
**A No, I have not.**
Q Have you ever been involved in designing a dual purpose cask or canister?
**A No, I have not.**
Q Do you have any experience in constructing an independent spent fuel storage installation or

ISFSI?

**A No, I have not.**

Q Have you ever been responsible for loading a dry storage system?

**A For loading a dry storage system? No, I have not.**

Q Have you ever had responsibility for managing the security requirements at an ISFSI?

**A No, I have not.**

Q Do you know the cost of operating and maintaining a wet pool after the shutdown of the nuclear reactor?

MR. GARDNER: Objection, incomplete hypothetical.

THE WITNESS: A nuclear reactor, or -- are you selecting any nuclear reactor or just --

BY MR. MACDONALD:

Q Whether you have an estimate of the cost for operating and maintaining a wet pool at a shutdown reactor?

**A Other than as stated in my expert opinion from the SMUD records and documentation, there were**



**numerous estimates of that cost. And I've cited like a range in my expert report. Other than that information, the answer's no.**

Q Prior to your review of SMUD documents?

**A Yes.**

Q Did you have any knowledge about the cost of operating a wet pool at a shutdown reactor?

**A At a shutdown reactor, no.**

Q Sitting here today, do you have an estimate of the O&M costs at -- strike that.

Do you have an estimate of the O&M costs for operating a wet pool at SMUD's reactor Rancho Seco?

**A Do I have an estimate that I prepared or --**

Q An opinion as to what you think the estimate for the O&M costs of wet storage at Rancho Seco would be?

MR. GARDNER: Objection, vague.

THE WITNESS: I have no particular opinion on what it would be. I have only, you know, I have located what their calculations were and what they



have provided in their internal, in their documentation. And it ranged, you know, six and a half million a year to nine to 10 million many times, depended on which particular document over time you were looking at that's in the SMUD database. But I have no opinion on the validity of those, I did not review the background of the validity of those estimates.

BY MR. MACDONALD:

Q You don't know whether the cost of O&M for wet storage at Rancho Seco is six million or some other number, is that correct?

**A I know only the cost estimates that SMUD had in their internal documentation. I can't give an opinion on whether or not I thought they were accurate or not. I did not review, wasn't tasked to do a review of that type.**

Q You have no opinion as to the validity of the estimates or O&M costs in the SMUD documents you reviewed?

**A Not that I can recall, at this time, I mean.**



Q And you don't have any opinion generally about what the O&M costs for wet storage at a shutdown reactor ought to be?

**A No.**

Q Do you have any opinion about the costs for O&M at a dry storage facility?

MR. GARDNER: Objection, vague.

THE WITNESS: Could I ask you to elaborate a little bit more on your question.

BY MR. MACDONALD:

Q Well, we've talked about whether you have an opinion about the O&M costs for wet storage?

**A Right.**

Q And I believe you've testified that you do not have an opinion as to what that number is at a shutdown utility, correct?

**A That's correct.**

Q And I'm trying to understand whether you have an opinion about what the O&M costs at an ISFSI at a shutdown reactor are?

**A Again, my report does not, I have not tried to provide any opinions regarding the O&M costs**

**for an operating ISFSI, that's a loaded operating ISFSI I assume we're talking about. I am again aware of the cost estimates over time of what that would be on the SMUD project.**

Q What's your understanding of the range of estimates that SMUD had for the O&M costs for the ISFSI?

**A My understanding on what the range of the estimates are is based on the sort of like the timing of when they did the estimate. I believe it's back in 1991 in one of their documents before the board they, in their licensing document they were getting ready to send to the NRC, they sort of indicated as far as a personnel standpoint they planned on using personnel -- they didn't see any additional cost associated with operating the ISFSI.**

**And that evolves through time to various estimates over time that maybe got a little more formalized to a million a year, to one million dollars a year. It kind of graduated in time to one and a half million, I can remember maybe two million. And then toward the end of the, actually the most**



**recent documentation I think was one of the SMUD documents that was filed on the damage claim. I believe it had some materials attached to it that estimated the cost of operating the ISFSI.**

**And again, I wasn't asked to review these for detail, you're asking from my memory, I thought that was 5 to 5.7 million dollars, that's my recollection of what I have seen in the record on the cost of operating the ISFSI, O&M.**

Q Do you have any opinion about what the O&M cost for an ISFSI ought to be at a shutdown reactor?

**A In order for me to have that opinion, I would have to do a cost analysis. I have not done such a cost analysis, I've looked at the one that was attached to the damage claim and that came up to 5.7 million dollars. Are you asking me if I have an opinion on that one or do I have an opinion on what it ought to be?**

Q Do you have an opinion of what the O&M costs at a shutdown utility ought to be?

MR. GARDNER: Objection, outside the scope of Mr. Burford's expert report.



THE WITNESS: Yeah, it is outside the scope of my report. On an operating ISFSI?

BY MR. MACDONALD:

Q Yes.

**A Is that correct? No, I don't have an opinion on that, on what that cost should be.**

Q You've never operated, been responsible for managing an ISFSI, is that right?

**A No, sir.**

MR. GARDNER: Objection, asked and answered.

BY MR. MACDONALD:

Q With respect to the SMUD, the most recent SMUD estimate for the O&M cost for the ISFSI, do you have an opinion about that estimate?

MR. GARDNER: Objection, outside the scope of Mr. Burford's expert report.

THE WITNESS: I can recall briefly, just briefly looking at it because it is outside, was outside of my report and outside of what I -- I didn't know we were dealing in O&M costs, but I did look at it because it was in one of the documents



that I looked at. And without further analysis, I would really not want to render an opinion. It looked to be, as far as personnel assignment, level, number of people, et cetera, et cetera, it looked to be perhaps a little high but I'm not an expert in that area.

Q You have no opinion about whether it is in fact high, low, or just right?

MR. GARDNER: Objection, asked and answered, objection, outside the scope of Mr. Burford's expert report.

THE WITNESS: Yes, but if you asked me, I'd say it's high.

BY MR. MACDONALD:

Q High by how much?

**A It -- I think that the, based on the internal documentation, let me see, the documentation that I saw from the 2000 and 2001, I believe time frame -- I can't recall, it seemed to get, it seemed to go up quite a bit. I thought those were perhaps more reasonable, two and a half, three million dollars, I don't know. I am not an expert on it and**

estimating costs in the nuclear industry?
A As a project manager and preparing cost estimates in the past, my work on the integrated schedules and cost estimating associated with that, yes.
Q On any topic within the nuclear industry?
A No one -- the answer is no. Of any topic in the nuclear industry.
Q How about on dry storage projects?
A Estimates on dry storage projects.
Q Yes.
A Would I be able to independently provide estimates on dry storage projects or would I feel competent to review the ones provided from vendors, et cetera, et cetera.
Q Well, let's take each one. Would you feel competent to provide -- to provide, independently provide estimates on dry storage projects?
MR. GARDNER: Objection, vague.
THE WITNESS: I've made no attempt in my opinions to do this with regards to an entire project. I can review cost estimates that are



provided by vendors and break them down, if asked, and I believe I'm competent to do that and have done that in the past. Not on dry storage.
BY MR. MACDONALD:
Q You've never done it for dry storage?
A No, sir, not on -- not before June, I mean not on this project either.
(Deposition Exhibit Number 1 was marked for identification and attached to the transcript.)
BY MR. MACDONALD:
Q Mr. Burford, I've had marked as Exhibit 1 a copy of a document entitled expert report. It's dated November 22nd, 2004. It is prepared by, states that it's prepared by you, Jerry N. Burford, and there's a signature at the bottom?
A Yes.
Q Is this your expert report in this case?
A Yes, it is.
Q This is your signature at the bottom of the first page?
A Yes, it is.
Q If you could turn to page 15 of your



report. And on page 15, the top of the title at 5.1.1 states that "SMUD's costs related to pursuing an off site transportation system should not be included in the damage claim." Do you see that?
A Yes.
Q Is it your opinion that the costs related to the transportation aspect of SMUD's dry storage system should be removed from SMUD's damage claim?
A Yes.
Q What is the basis for that opinion?
A As stated in my report, the standard contract specifies Department of Energy responsibilities regarding off site transportation. Rancho Seco took those responsibilities on and as such it's inappropriate that they be included in the damage claim.
Q And when you say it's inappropriate that they be included in the damage claim, why is that?
A Because those were responsibilities for the Department of Energy and the standard contract.
Q Is there any other basis for your opinion that these costs ought to be removed from SMUD's



damage claim?
MR. GARDNER: Objection, vague. Do you mean transportation costs?
BY MR. MACDONALD:
Q Yes.
A Could you repeat that one more time, pardon me.
Q I asked you why you said it was inappropriate that the transportation costs be included in the damage claim and you responded that "because those were responsibilities for the Department of Energy and the standard contract."
A That's correct.
Q And I'm asking whether there is any other basis for your opinion that the transportation costs are inappropriate for the damage claim?
A I don't have any other basis or any other reason for that.
Q That is the basis?
A Yes.
Q On page 15 in the second sentence, you describe the costs related to development of the

transportation system as gratuitous.
MR. GARDNER: Under the second sentence, Tim?
THE WITNESS: He's up on the top paragraph.
MR. GARDNER: It's the third sentence, right, Tim?
THE WITNESS: Oh, consequently.
BY MR. MACDONALD:
Q It is the third sentence.
MR. GARDNER: That's fine.
THE WITNESS: I'm sorry, could you start over?
BY MR. MACDONALD:
Q Sure. You see here in the third sentence where you refer to --
**A Yes.**
Q SMUD's incurring the cost for transportation system as being gratuitous, correct?
**A Yes, and improper for inclusion in the damage claim.**
Q And explain to me why again you think it's



gratuitous?
**A They took on the responsibilities under a contract of the Department of Energy to do, first off, a kind licensing, and provide a cask and do all the activities that the Department of Energy, it's their responsibility for. And now that's been included in a damage claim and I think that is inappropriate.**
Q And it's inappropriate from an engineering standpoint?
**A From a project management standpoint, it's inappropriate from a contract standpoint.**
Q You think it is inappropriate from a contract standpoint?
**A To take on another, the Department of Energy's contractual responsibilities and take on all the costs associated with that, which were significant, and then to put them in the damage claim, yes.**
Q Did the Department of Energy satisfy its contractual responsibilities with respect to transportation?



MR. GARDNER: Objection, calls for a legal conclusion.
THE WITNESS: Yeah, I did not offer an opinion on -- in my expert opinion regarding that.
BY MR. MACDONALD:
Q In several of your answers you have talked about the Department of Energy's "responsibility" for transportation?
**A Under the contract, yes.**
Q Under the contract?
**A Yes.**
Q And so I'm asking you whether you believe that the Department of Energy satisfied its responsibilities for transportation under the contract?
MR. GARDNER: Same objection.
THE WITNESS: Have they satisfied the responsibilities under the contract regarding their transportation scope in the contract?
BY MR. MACDONALD:
Q Correct.
**A Not to my knowledge.**



Q They have not satisfied those responsibilities?
**A Not to my knowledge.**
Q Would you know if they had?
**A I don't know if I would be in a position to know if they had for some, but not to my knowledge.**
Q In the start of the first paragraph, I'm sorry, the start of the second paragraph on page 15, you state "under the standard contract, the DOE is to provide the licensing, fabrication and delivery of a suitable shipping cask for Rancho Seco's spent fuel." Do you see that?
**A Uh-huh.**
Q And that is your opinion as to DOE's obligation under the contract?
**A Along with the balance of that paragraph.**
Q Okay. This is one of DOE's responsibilities under the contract, to provide the licensing, fabrication and delivery of a suitable shipping cask?
**A That's correct. That's my interpretation**

157

**the cask as delineated, Rancho Seco took all of that on.**
Q And in your view, SMUD should not have taken any of those things on, is that right?
**A No, in my view, SMUD should not have included those costs in the damage claim.**
Q And just so we're clear, the basis for that is your opinion that those were DOE responsibilities under the contract?
**A That's correct.**
Q And it's your opinion they're inappropriate for the damage claim even though DOE didn't provide a shipping cask or loading procedures under the standard contract?
MR. GARDNER: Objection, mischaracterizes his previous testimony.
THE WITNESS: Could you repeat that, because I'm more than willing to answer the first part of it. I remembered that.
BY MR. MACDONALD:
Q It's your opinion that SMUD's costs related to transportation are inappropriate for the

158

damage claim even though DOE did not provide a shipping cask or loading procedures or training under the standard contract?
MR. GARDNER: Same objection.
BY MR. MACDONALD:
Q Is that right?
**A It's my opinion that as a consequence of them taking on the risks associated with all of that material, and the costs associated with it, that it's inappropriate to include in the damage claim.**
Q Have you ever analyzed whether costs are appropriate for a damage claim before?
**A I have worked on damage claims. Two of them related to lawsuits with attorneys which I prefer not to discuss, not having to do with fuel, having to do with steam generators. And I have as a project manager, you know, completed an entire damage claim assessment, report, and filed for insurance recovery. Post Hurricane Andrew.**
Q And your opinion that SMUD should not take on any aspect related to -- strike that.
Is it your opinion that SMUD should not

159

have taken on any aspect that was a "DOE responsibility" under the contract?
MR. GARDNER: Objection, mischaracterizes his previous testimony.
THE WITNESS: In my, in my report, okay, I try to make it very clear that the taking on of DOE's responsibilities and the costs and the risks associated with that are inappropriate to place in this damage claim.
I have in no place in my report tried to say was it prudent or imprudent or the right decision for SMUD to make. In their proper, in what they believed to be the proper representation of their utility, and their ratepayers.
BY MR. MACDONALD:
Q If SMUD made its decision to develop dual purpose dry storage as a result of the Department of Energy's anticipated delay, is it still your opinion that the costs related to transportation are inappropriate for the damage claim?
MR. GARDNER: Objection, assumes facts not in evidence. Objection, incomplete hypothetical.

160

Objection outside the scope of Mr. Burford's expert reports.
THE WITNESS: That -- your question is outside the scope of my expert report. And I would like it again reread, so that if there's some assumptions here I need to figure out what they are.
BY MR. MACDONALD:
Q I'll just restate it for you.
**A Okay.**
Q If SMUD made a decision to develop dual purpose dry storage as a result of the DOE's anticipated delay, is it still your opinion that the costs related to transportation are inappropriate for the damage claim?
MR. GARDNER: Same objection.
THE WITNESS: That has too many hypotheticals in it for me to answer. If you could break it down. You're asking me to give an opinion that I, you know, if and were and had, then would it be okay. I mean, it's -- I'm sorry, I'm uncomfortable in considering how I would answer that question.

**intermodal access and, you know, it's quite a lengthy report, evaluated them going through various cities and towns and impact on the general public, et cetera.**

Q Do you know whether it assumed the DOE would transport dual purpose systems from utilities?

MR. GARDNER: Objection, asked and answered.

THE WITNESS: Yeah, I did not look at it in that viewpoint. I looked at it at the viewpoint at the time that they did. It's rail cask, a rail cask was a rail cask and held this many elements.

Q And I don't want to talk at cross-purposes, is it your testimony that you don't know whether it assumed DOE would transport dual purpose systems from utilities?

MR. GARDNER: Objection, asked and answered.

THE WITNESS: The transportation under that was assumed to be conducted by the Department of Energy. The casks would be delivered, loaded, and it would leave. And in the environmental report, I



don't think the environmental report entertained on site storage concepts with regards to that.

It did assume that, you know, where they, you know, knew rail was in place, that there would be a rail shipment and they assumed maybe a rail cask where there were no rail spurs at particular facilities. And maybe there was a barging facility. It assumed certain types of transportation aspects, I'm not familiar with that, what those assumptions were.

Q So you don't know if it assumed the DOE would transport dual purpose systems?

MR. GARDNER: Objection, asked and answered.

THE WITNESS: Transport a dual purpose system.

BY MR. MACDONALD:

Q Take a dual purpose system from a utility?

**A As far as transportation goes, you're in a transport certified cask and that's all I'm aware of. And the transport certified cask under part 71 would transport in -- be received and transported into the**



**system. Whether the DOE was interested in whether or not it was sitting in an ISFSI or in spent fuel, I don't know that that was included in there, in that report. The loading of it, is that what you mean?**

Q Are you familiar with the waste design basis documents for Yucca Mountain?

**A Waste --**

Q Waste design basis?

**A Waste design basis. I'm sorry, I'm drawing a blank on that under that terminology.**

Q It's probably me who's not getting the right terminology. How about the system requirements document?

**A System requirements documents I am generally familiar with them, yes.**

Q Do you know if DOE assumes in those documents that utilities are going to transfer their fuel to dual purpose dry storage systems?

MR. GARDNER: Objection, beyond the scope of Mr. Burford's expert report.

THE WITNESS: And the answer to your question is I do not know.



BY MR. MACDONALD:

Q You have no opinion whether it was a reasonable decision by SMUD to develop a dual purpose dry storage system, is that right?

MR. GARDNER: Objection, asked and answered.

THE WITNESS: I have no opinion regarding whether there was an appropriate or inappropriate decision to go that route. No, my opinion is as stated in my report, in embarking on dual purpose they picked up the transportation requirements from the Department of Energy, that's a decision they made. I have tried not to, you know, offer any opinion on the prudence of that or not, but I do not believe it is appropriate to put the cost of that into the claim.

MR. GARDNER: Tim, is this a good time to take maybe a five minute break or do you need to keep going.

(Recess.)

BY MR. MACDONALD:

Q Mr. Burford, if you could turn to page 15

225

of your report. And the second paragraph, second sentence states "the DOE is also to develop cask loading procedures, technical information on the shipping casks, the training of SMUD personnel in cask handling and loading and provide other special equipment and information required for conducting cask maintenance."
Do you see that?
**A Yes, sir.**
Q Is it your opinion that this, that the items you've described here were DOE responsibilities under the contract?
**A Yes, that's my reading and understanding of the contracts, yeah.**
Q Did DOE develop cask loading procedures and provide them to SMUD?
**A Not to my knowledge.**
Q Did DOE provide technical information on the shipping cask to SMUD?
**A Not to my knowledge.**
Q Did DOE provide training of SMUD personnel on cask handling and loading?

226

**A Not to my knowledge.**
Q Did they provide other special equipment and information required for conducting cask maintenance?
**A Not to my knowledge.**
Q Would it have saved SMUD time and effort if DOE had provided cask handling and loading procedures?
MR. GARDNER: Objection, calls for speculation, objection, vague.
THE WITNESS: I'm sorry, would it have saved SMUD time if what?
BY MR. MACDONALD:
Q And effort if DOE had provided cask handling and loading procedures as you state they were required to do under the contract?
MR. GARDNER: Same objections.
THE WITNESS: These come along with the first sentence, which is the cask, okay, so I have a little bit of a problem with isolating them from the casks. They are associated with the casks that DOE was responsible to license, fabricate and deliver to

227

Rancho Seco. These are supporting attributes and responsibilities for that cask.
BY MR. MACDONALD:
Q And I think you already testified to this. To your knowledge, DOE did not provide the licensing, fabrication, delivery of the cask as required by the contract, correct?
**A Let's see, we discussed the words binding commitment, they did not provide one to Rancho Seco.**
Q And to your knowledge, they did not provide one to any utility, correct?
MR. GARDNER: Objection, calls for speculation.
THE WITNESS: I can't answer that. To my knowledge, I'm not aware of one that they did provide to the utilities.
BY MR. MACDONALD:
Q Okay. In the final sentence of that same paragraph, you state that SMUD "needlessly" assumed this responsibility thereby incurring "unnecessary costs".
**A As related to the contract, yes.**

228

Q Explain to me in what way the costs were unnecessary.
**A The cost of transportation?**
Q All the costs that you have just identified that, in the prior two sentences that you believe ought to be removed from SMUD's damage claim.
**A Okay, now I understand what you're saying. Now, what was the question again?**
Q Explain to me how the cost that SMUD incurred for developing cask loading procedures, training of SMUD personnel, and providing other special equipment was unnecessary.
MR. GARDNER: Objection.
BY MR. MACDONALD:
Q As reflected in your report?
MR. GARDNER: Objection, asked and answered.
THE WITNESS: SMUD, by pursuing the transportation program, took on these responsibilities that were DOE's responsibilities under the contract. And in my view, it is my opinion that in taking those on, the risks and costs

associated with that are inappropriate for the damage claim.

BY MR. MACDONALD:

Q And that's based on your interpretation of the contract?

**A My understanding of the scope of the Department of Energy in the contract, yes. As hopefully, I've properly stated and stated in my opinion.**

Q Could DOE have met its responsibility to provide casks by purchasing SMUD's cask?

MR. GARDNER: Objection, calls for a legal conclusion.

THE WITNESS: You're implying that SMUD had a cask to sell to the DOE? I'm sorry, that was the interpretation of your question.

BY MR. MACDONALD:

Q That SMUD in fact had a cask that was, had the capability for transport, yes.

**A I had no knowledge and -- I have no knowledge and have tried not to express an opinion in this report whether or not the shipping casks SMUD**



**ultimately did license and build would be of any value to the Department of Energy.**

Q Could the Department of Energy have met some of its responsibilities and not others, and let me just explain what I mean. You state in your report on page 15 that DOE was to provide the licensing, fabrication and delivery of a suitable shipping cask and to your knowledge they haven't done that?

**A That is correct.**

Q Even though DOE did not deliver a suitable shipping cask, should they have nonetheless developed cask loading procedures, technical information on the shipping casks and trained SMUD personnel on cask handling and loading?

**A As regards DOE's role in the, in these areas, they, to my knowledge, have generated fairly large, lengthy technical reports regarding cask loading, types of casks, technical information, et cetera. In that regard, they did supply the industry with, in my view, some intelligence and information regarding the concept. Did they do it specifically**



**for SMUD? To my knowledge, they did not.**

Q And do you understand what cask loading procedures are?

**A Yes.**

Q What are they?

**A The cask loading procedure would be the -- well, in this particular case, it would have to do with the bringing of the cask into the building, laying it down in the pool and going through step-wise loading procedures and resealing of the cask, depending on the cask, wash down, et cetera, et cetera, and removal. Replacement back on the transport vehicle and exit, receipt at the site.**

Q You've never developed such procedures, have you?

**A No, I have not.**

Q To your knowledge, DOE has not developed such procedures, correct?

MR. GARDNER: Objection, calls for speculation.

THE WITNESS: Because I would be unknowledgeable of that, that does not mean that they



have or have not. To my knowledge, I'm unaware of such procedures.

BY MR. MACDONALD:

Q My question was, to your knowledge, DOE has not developed such procedures?

MR. GARDNER: Same objection.

THE WITNESS: And I'm unaware, I have no knowledge regarding the subject.

BY MR. MACDONALD:

Q And yet you understand that that was a responsibility of DOE under the contract, correct?

MR. GARDNER: Objection, vague. What was the responsibility of SMUD under the contract?

THE WITNESS: As stated, I'm sorry.

BY MR. MACDONALD:

Q You understand that it was a responsibility of DOE under the contract to develop cask loading procedures?

**A Develop cask loading procedures as I've stated in my opinion, yes.**

Q Could they have done that even though they didn't deliver a suitable shipping cask to Rancho

233

Seco?
**A I don't see how.**
Q What if Rancho Seco had a transport cask called an MP-187, could DOE have developed cask loading procedures for that cask?
MR. GARDNER: Objection, calls for speculation.
THE WITNESS: If you would like me to speculate on that, and they had the full package on the cask, they could probably provide -- working with SMUD, have provided some assistance. I don't know. I can't speak to their labor and their availability, their timing of the scheduling of DOE employees.
BY MR. MACDONALD:
Q Well, had they performed under the contract, they would have had to develop some cask loading procedures, correct?
MR. GARDNER: Objection, calls for legal conclusion. Objection, assumes facts not in evidence.
THE WITNESS: My understanding under the contract that these are support features that the

234

Department of Energy would deliver and supply with the cask. With the DOE cask.
BY MR. MACDONALD:
Q Would it assist SMUD for DOE to provide training of SMUD personnel in cask handling and loading?
MR. GARDNER: Objection, vague.
THE WITNESS: I'm sorry, you're going to have to repeat that for me, would it assist?
BY MR. MACDONALD:
Q Would it help SMUD for DOE to provide the training of SMUD personnel in cask handling and loading?
MR. GARDNER: Same objection.
THE WITNESS: I can't answer to whether SMUD personnel would -- I can't speak for SMUD personnel, whether they would think that would be of benefit to them or not. Maybe I misunderstood the question.
BY MR. MACDONALD:
Q Do you know why the requirement for DOE to provide training in cask handling and loading was in

235

the standard contract?
MR. GARDNER: Objection, calls for speculation.
THE WITNESS: Would you like me to speculate on that?
BY MR. MACDONALD:
Q I'd like your opinion.
**A Opinion. I would assume that the casks, and there could be numerous types, there could be -- and they would all have different cask handling attributes. And the cask handling would be specific very often to the casks regarding the lifting trunnions and hooks, et cetera, and that the cask handling would be very specific to that cask.**
**The loading of the cask I would expect would also have to do with that, and the casks would have a C of C, it would discuss, you know, loading limitations, what can go into the cask, what cannot go into the cask, not different from the MP-187 C of C rev 9, so -- end of response.**
Q And would DOE's provision of training on the handling and training for the loading be of

236

benefit to the utility? In your opinion?
MR. GARDNER: Objection, vague.
THE WITNESS: The Department of Energy delivered the cask, the loading procedures, and the technical information on the cask would be, I expect, vital to the utility. And the training of the utility employees to that cask, I would expect to be of benefit to the utility and required for the utility.
BY MR. MACDONALD:
Q If you were advising SMUD in '92, would you have advised them to go store only?
MR. GARDNER: Objection.
BY MR. MACDONALD:
Q Dry storage?
MR. GARDNER: Objection, beyond the scope of Mr. Burford's expert report.
THE WITNESS: If I were advising SMUD in '92, would I make a selection for them on the type of dry storage system to use.
BY MR. MACDONALD:
Q If you were advising SMUD in '92, would

321

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - X
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
Plaintiff, :
v. : Case No.
THE UNITED STATES OF : 98-488C
AMERICA, :
Defendant. :
\- - - - - - - - - - - - - - - - X

Deposition of JERRY N. BURFORD, Volume 2
Washington, D.C.
Thursday, January 6, 2005
8:15 a.m.

Job No.: 1-48444
Pages 321 through 611
Reported by: Cynthia R. Simmons

322

Deposition of JERRY N. BURFORD, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest, Room 1001A
Washington, D.C. 20004

Pursuant to agreement, before Cynthia R. Simmons, Registered Merit Reporter, Certified Realtime Reporter and Notary Public of the District of Columbia.

323

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
TIMOTHY MACDONALD, ESQUIRE
ARNOLD & PORTER
370 17th Street, Suite 4500
Denver, Colorado 80202
(303) 863-2334

ON BEHALF OF THE DEFENDANT:
JOSHUA GARDNER, ESQUIRE
TODD COCHRAN, ESQUIRE
ALAN J. LO RE, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Civil Division
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7583

324

C O N T E N T S


| EXAMINATION OF JERRY N. BURFORD | PAGE |
|---|---|
| By Mr. Macdonald | 325 |


E X H I B I T S
(Attached to the Transcript)


| DEPOSITION EXHIBIT | PAGE |
|---|---|
| 4 Standard contract between DOJ and SMUD | 383 |
| 5 Contract between Watkins and DOJ | 454 |
| 6 Regulatory guidance on damaged fuel from NRC | 574 |
| 7 Letter dated September 13th, 1985 from Bauer to Hall | 596 |
| 8 Series of e-mails | 599 |

349

**A The routing of demineralized water to the spent fuel pool building, such as they had to do that for cask washdown. Items like that, there are other items that were done in the building that do not really constitute a permanent change to the, in the form of design change modification to the building, but were conducted. And in the event that they were conducted and charged to the design, to the claim, they should be removed.**

Q Other than the routing of the demineralized water, are there any other changes that you're aware of?

**A Again, we are going from my memory. They installed new safety railings, items like that that they believed that they needed to install. And I would assume that the need to install new safety railings, as they indicated, was a personnel safety issue. And that issue existed independent of the type of casks — that installation would be required and was independent of the type of cask that they would bring into the building.**

Q Is there anything else besides new safety

350

railings that you're aware of?

MR. GARDNER: Objection, mischaracterizes previous testimony.

THE WITNESS: Right now, I'm having trouble recalling the other items that they did around the spent fuel pool area that were not really large design change modifications, but preparations for cask receipt type of items.

BY MR. MACDONALD:

Q Do you know whether the safety railings that were installed were related to the necessity of welding the canisters?

**A No.**

Q You don't know?

**A No.**

Q Do you know the cost of routing the demineralized water?

**A No.**

Q Do you know whether SMUD included the cost of routing the demineralized water in its damages claim?

**A Specifically, no.**

351

Q Do you know generally?

**A Do I have an opinion regarding that?**

Q Well, I'd like to know whether you know whether those costs with respect to the demineralized water were included in the damages claim?

MR. GARDNER: Objection, asked and answered.

THE WITNESS: I do not -- in answer to your previous question, I do not specifically know that the costs for the demineralized water reroute to the cask washdown area was included in the claim.

BY MR. MACDONALD:

Q Do you know if the cask could have been washed down in a location that had demineralized water?

MR. GARDNER: Objection, calls for speculation.

THE WITNESS: No.

BY MR. MACDONALD:

Q The fourth bullet that you list on page 19 describes pool liner repairs and other ongoing maintenance and repair of the pool and support

352

systems. What pool liner repairs and other ongoing maintenance of the pool and support systems did SMUD undertake?

**A I will go back again to the lead-in and indicate to the extent that these categories of costs have been included in SMUD's damage claim, they should be removed. Now, your question is, am I aware of what they did, actually did?**

Q That is my question.

**A I am aware that they had ongoing pool liner leakage and had plans to do repairs over time and had conducted numerous maintenance activities and minor repairs of the pool liner over quite a time. As I recall, they had quite a history of pool liner leakage and they were sort of chasing that problem for many years.**

**To the extent that those repairs, maintenance, et cetera, have been charged to the claim, they should be removed.**

Q Do you know whether any such costs were charged to the claim?

**A Specifically, no.**

ended up going against the damage claim.
BY MR. MACDONALD:
Q You don't know that for a fact, do you?
**A As I indicated earlier, I believe, I hope I did, that specifically on each of these items, I don't know, I can't answer specifically to each of these items and provide you with an example that they were charged to the, that's -- pardon me, let me rephrase that. Other than I already testified to, I can not specifically show you where, at least in my review, where they were charged to the, to the claim.**
**To the extent that they were, they should be removed.**
Q Did you look at the SMUD work orders related to and the cost associated with the decommissioning of Rancho Seco?
**A Not to my knowledge, I didn't look at those.**
Q You didn't look at the series of work orders not included in the damage claim, is that right?
**A I didn't look at the series of work orders**



**that were not included in the damage claim -- I'm sorry, that were not, that were -- you'll have to rephrase the question for me. I can not answer the question the way you asked it.**
Q I'm trying to understand whether you looked at and examined all the costs that were incurred at Rancho Seco that are not part of SMUD's damage claim. Did you look at time cards and --
**A I looked at examples of time cards, I did not look at all. Your question was all. The answer is no.**
Q Do you know how much cost SMUD incurred at Rancho Seco during the period '92 to 2003 that is not included in the damage claim?
**A No.**
Q No idea?
**A No.**
Q And you don't know whether costs for pool liner repairs and other modifications to the spent fuel pool building are included in those costs, do you?
MR. GARDNER: Objection, vague.



Objection, mischaracterizes previous testimony.
THE WITNESS: No, but to the extent that they have been included, if it is determined they have been included, they should be removed.
MR. GARDNER: Off the record for a second.
(Recess.)
BY MR. MACDONALD:
Q Mr. Burford, if we could turn to the fourth bullet of page 19, you list procedure changes related to spent fuel support systems.
MR. GARDNER: Tim, just for the record, you mean the fifth bullet point.
MR. MACDONALD: Yes, thank you.
BY MR. MACDONALD:
Q Could you describe to me what you mean by procedure changes related to spent fuel support systems?
**A As I recall in my readings they -- there were significant procedure changes made to, as a shutdown nuclear plant, to focus on spent fuel support systems and defocus the decommissioned parts of those systems.**



**And there were procedure changes made to the systems, many of the systems that do support the spent fuel, cooling, electric, hydraulics, heat transfer, et cetera. And to the extent that those were charged to the project, they should -- charged to the damage claim, they should be removed.**
Q Do you know for a fact whether they were charged to the damage claim?
**A I do not.**
Q Do you know the magnitude of those costs?
MR. GARDNER: Objection, vague.
THE WITNESS: So I -- it is vague. I mean, if you want me to assess a magnitude --
BY MR. MACDONALD:
Q Do you know the amount of costs that SMUD incurred related to the procedure changes for spent fuel support systems?
**A I believe I already answered that. The answer's no.**
Q With respect to the next bullet on page 19, calculations testing and reevaluating cask drop into the spent fuel pool?

361

**A Correct.**
Q Do you know the magnitude of costs that SMUD incurred for that cask drop testing?
**A No.**
MR. GARDNER: Objection, vague.
BY MR. MACDONALD:
Q Do you know whether SMUD had analyzed a cask drop for its spent fuel pool at the time the plant was designed and licensed?
**A I know that they were required to.**
Q Do you know the weight of the cask for which that cask drop analysis was done?
**A No.**
Q Do you know whether SMUD would have had to do additional cask drop testing for a legal weight truck cask?
MR. GARDNER: Objection, speculation.
THE WITNESS: If you could refine that for me. There are legal weight truck casks up to the maximum legal weight.
BY MR. MACDONALD:
Q What is that?

362

**A A four element cask, Gulf Atomic's, or a single element cask.**
Q What is the maximum legal weight truck cask?
**A I believe it was the Gulf Atomic 4, I'm not sure. And I do not know which casks they did their original analysis on.**
Q So you don't know whether SMUD would have had to do additional cask drop testing with a truck cask?
MR. GARDNER: Same objection.
THE WITNESS: If SMUD's original analysis was for a single element and they brought in a four element truck cask, I would assume they would have to revise their calculations.
BY MR. MACDONALD:
Q That wasn't really an answer to my question.
**A Pardon me.**
Q Do you know whether SMUD would have had to do additional cask drop testing if DOE brought a truck cask?

363

MR. GARDNER: Objection, asked and answered. And objection, calls for speculation.
THE WITNESS: You said testing, it would be calculations in that case, no.
BY MR. MACDONALD:
Q You don't know?
**A I don't know.**
Q The next bullet on page 19 mentions labor for spent fuel cask loading, cask decontamination and other activities conducted inside the spent fuel building. Have you tried to determine the cost that SMUD incurred for cask loading, cask decontamination activities?
MR. GARDNER: Objection, vague.
THE WITNESS: No, to the extent that they are included, those are scope items under the contract that are SMUD's, and they should be removed from the damage claim.
BY MR. MACDONALD:
Q Did SMUD incur additional costs because of the necessity to weld the canisters?
MR. GARDNER: Objection, vague.

364

THE WITNESS: Excuse me, additional, compared to what?
BY MR. MACDONALD:
Q Compared to loading a bolted cask?
**A Yes.**
Q It requires more effort and more cost to load and weld a canister, is that correct?
**A Yes, to weld a canister.**
Q And if DOE brought a bolted cask for SMUD to load, it would not have had to do any welding for that cask, is that correct?
MR. GARDNER: Objection, calls for speculation.
THE WITNESS: To the best of my knowledge, yes. They would not have.
BY MR. MACDONALD:
Q But you yourself have never supervised or managed a cask loading project, is that correct? And let me refine that. You yourself have never supervised or managed a project loading spent fuel into a cask or canister, is that right?
**A Based on my understanding of what you're**

369

**into the pool building.**
**That's basically, in summary, the complications and cycling for moving one element from one building's pool to another building's pool. That was complicated, if I recall that you used that word.**
Q Do you know how much it costs to conduct that fuel move?
**A No, I do not.**
Q Do you know how long it took?
**A I can't give you the total time span. We were able to average, I believe, three elements on a 24 hour cycle with two shifts.**
Q Did you have to upgrade the gantry crane to do that move?
**A You used the terminology of a gantry crane. The crane that was used to lift our cask in and out of the pool required no upgrade for the single element cask. The crane that was used to move the cask between the buildings was a fairly coarse crane. We did, as I recall, did some control modifications in order to ensure that we were not moving too quickly, and we had good brakes and we**

370

**could stop.**
Q Do you know the cost of those modifications?
**A No.**
Q Who was the project manager for that project?
**A I do not recall.**
Q But it wasn't you?
**A I've answered that question, the answer's no.**
Q Did the cask have to be vacuum-dried and back-filled with helium?
**A No.**
Q Have you had any involvement in a fuel move of any type since the early to mid '80s?
MR. GARDNER: Objection, vague.
THE WITNESS: I'm sorry, could you repeat the question?
BY MR. MACDONALD:
Q You describe your experience with this fuel move from one pool to another pool at Turkey Point in the mid '80s, and I'd like to know whether

371

you've been involved in a fuel move since that time?
MR. GARDNER: Same objection.
THE WITNESS: Cask loading fuel moves?
BY MR. MACDONALD:
Q Yes.
**A No.**
Q What was the weight of those single element casks?
**A I do not recall.**
Q Approximately?
**A 12, 14, 15 ton.**
Q Would the amount of vacuum drying be the same between the canisters that SMUD used and a bolted lid cask that DOE provided under the standard contract?
MR. GARDNER: Objection, calls for legal conclusion.
THE WITNESS: Could you ask that again? I'm prepared to answer it, I think, but I want to make sure that I understand the question.
BY MR. MACDONALD:
Q Would the amount of vacuum drying that is

372

required be the same between the sealed canisters that SMUD is currently using and a bolted lid cask that DOE provided under the standard contract for delivery to the spent fuel repository?
**A No.**
Q The amount of vacuum drying would not be the same?
**A No.**
Q And describe to me the basis for that opinion?
**A As I recall, in reading the SMUD record, the vacuum drying of their DSCs was -- had some planning. The plan was, I believe it was going to take a day maybe to do the vacuum drying, but it ended up taking as long as four to five days for vacuum drying.**
Q And that is significantly more than would be required for a bolted lid cask, is that correct?
**A It's my understanding, yes, that would be.**
Q And do you know the cost that would be incurred to spend that additional time to vacuum dry the SMUD canisters?

A **No.**
Q The last bullet you list on page 19 describes procedure revisions for work inside the spent fuel pool -- excuse me, spent fuel building related to loading and/or transfer of spent nuclear fuel. And you have a footnote 33 that references Peabody Associates.
Can you tell me what that reference to Peabody Associates is in footnote 33?
A **As I understand, if I recall, that's an estimate for doing such procedure revisions and reviews by that Peabody Associates.**
Q Do you know for a fact whether Peabody Associates had any involvement in procedure revisions for work activities inside the spent fuel building related to loading or transfer of spent fuel?
MR. GARDNER: Objection, vague.
THE WITNESS: Related to the procedure revisions?
BY MR. MACDONALD:
Q Correct.
A **It's my understanding they did.**



Q What's that opinion based on?
A **From this document.**
Q Have you talked with anyone at Peabody Associates about whether they did that type of work?
A **No.**
Q Have you talked with anyone at SMUD about whether Peabody Associates did that type of work?
A **No.**
Q Yesterday I believe you testified that DOE was required to provide procedures for fuel loading under the standard contract, is that correct?
A **Cask loading.**
Q For cask loading, is that right?
MR. GARDNER: Objection, asked and answered.
THE WITNESS: Yes.
BY MR. MACDONALD:
Q If DOE had provided those procedures for cask loading, SMUD would not have had to perform its own procedures for cask loading, is that correct?
MR. GARDNER: Objection, calls for speculation.



THE WITNESS: As I recall, that question was asked repeated -- numerous times yesterday in my testimony. And if you would like, we could read that back at this time.
BY MR. MACDONALD:
Q What I'd like you to do is answer the question.
A **Please state the question again.**
Q If DOE had provided those procedures for cask loading, SMUD would not have had to perform its own procedures for cask loading?
MR. GARDNER: Objection, asked and answered. Objection, calls for speculation.
BY MR. MACDONALD:
Q Is that right?
A **As I recall, yesterday in my testimony, the procedures for cask loading are dependent on the cask type. And the procedures that SMUD developed for loading the cask was for their MP-187 cask. I can not say to you that the Department of Energy would have provided an MP-187 cask and associated procedures.**



Q I appreciate that answer, but it's not an answer to the question I asked. So if you don't have an opinion on this question, you can just say that, that's fine. What I'm trying to understand is whether you have an opinion about whether SMUD would have had to perform its own, develop its own procedures for cask loading if DOE had provided those procedures under the standard contract?
MR. GARDNER: Okay. Objection, asked and answered for multiple times, and objection, calls for speculation.
THE WITNESS: Cask loading procedures are dependent on the cask type, Rancho Seco's -- pardon me, SMUD is to perform their own development and manufacture of a cask, and cask loading procedures for that cask are required for that cask. And they were required to develop those cask loading procedures. If the Department of Energy would deliver a cask, they would provide cask loading procedures and training on said cask loading procedures.
It is dependent on the type of cask. Cask

377

loading procedures for one cask would be totally inapplicable for another cask, another type of cask. So I am unable to offer you an opinion regarding that.
BY MR. MACDONALD:
Q So you don't know whether SMUD would have had to develop its own additional procedures for cask loading after receiving cask loading procedures from the Department of Energy?
MR. GARDNER: Objection, asked and answered for I believe the fifth time now. And again, objection, calls for speculation.
MR. MACDONALD: There is yet to be an answer to the question. Please answer that.
MR. GARDNER: An answer you like, Mr. Macdonald. He's answered the question or he's endeavored to answer the question five times now.
THE WITNESS: I have no opinion on that. The actual cask loading, the sequence of the fuel assemblies going into the cask, the fact that it is dependent on the cask CofC, category I heating. It is dependent on the cask CofC and the procedures. It

378

would be different for a different cask.
BY MR. MACDONALD:
Q Your final bullet on page 19, discussing procedure revisions, do you have any estimate of the cost that SMUD incurred to conduct those procedure revisions?
**A No.**
Q On page 20, your first bullet lists in pool fuel assembly, visual, video or other forms of inspection. Do you have any estimate of the cost for those inspections?
**A No.**
Q Do you know if in fact SMUD included the cost of those inspections in its damage claim?
**A Specifically, no. To the extent that they have, they should be removed.**
Q But you don't know whether they've been included, correct?
MR. GARDNER: Objection, asked and answered.
THE WITNESS: I do not know.
BY MR. MACDONALD:

379

Q The next bullet on page 20 lists activities related to personnel radiation protection, have you made any effort to estimate the cost related to radiation protection?
**A No.**
Q Do you know if in fact SMUD included the cost for radiation protection as you describe here in his damage claim?
**A As I recall, there are personnel -- radiation technicians and radiation protection personnel that were charged against the damage claim. To the extent that they are, were providing personnel radiation protection, it should be removed from the damage claim. Specific, factual, I did not detail out the numbers.**
Q Would there have been additional radiation exposure to personnel to load a welded system?
MR. GARDNER: Objection, speculation.
THE WITNESS: Yes, I would have to speculate, but I would say yes.
BY MR. MACDONALD:
Q Why does that require you to speculate,

380

I'm asking for your opinion. Is it your opinion that it would -- that loading a welded system would produce additional radiation exposure?
**A Compared to, compared to what, sir?**
Q Loading a bolted cask?
**A A multi-element, 24 element bolted cask?**
Q Sure.
**A Yes.**
Q And I'm not trying to make you answer the question. Again, I just want to make sure the record is clear. It's your opinion that loading a welded system as compared to a bolted system would produce additional radiation exposure?
MR. GARDNER: Objection, mischaracterizes his previous testimony.
THE WITNESS: I'm sorry, when you just asked that question, you asked me a dose related question. I have not tried to make any attempts in this, in my opinions regarding dose to personnel, workers. I've tried to indicate -- I thought we were talking costs.
BY MR. MACDONALD:

witness, Ed Abbott?
MR. GARDNER: Objection, vague. With respect to a particular topic, Tim?
BY MR. MACDONALD:
Q Period.
**A I don't know who Ed Abbott is, so I'm sure I haven't.**
Q Do you know whether the 22nd horizontal storage module at SMUD would have been required for additional shielding even if there was no -- even if it was not going to be used for storage of GTCC?
**A I did not question SMUD's shielding or assumptions that they needed that HSM for GTCC for shielding. I mean, I didn't question the fact that SMUD wanted to stick, wanted to have the provision for GTCC inside an HSM. I didn't question that with regard -- regarding shielding aspects.**
Q Again, that's an answer to a different question. The question is, do you have an opinion as to whether the 22nd module would be required for shielding of the 21st module that has spent fuel in it?



**A That question is different than the first one. Could you ask me again regarding a shielding question? Okay.**
Q Do you have an opinion as to whether the 22nd module would be required for shielding of the 21st module that has spent fuel in it?
**A Do I have an opinion that the 22nd HSM would be required for shielding the 21st HSM that contains, I believe for the failed fuel DSC. Is that your question? If that's the question, then I'd probably restate I have no opinion.**
Q You have no opinion as to whether the 22nd HSM would be required to provide shielding for the 21st HSM with spent fuel in it?
MR. GARDNER: Objection to the extent it mischaracterizes his previous testimony.
THE WITNESS: No.
BY MR. MACDONALD:
Q Do you know if GTCC waste inventories were included by DOE in the Yucca Mountain EIS?
MR. GARDNER: Objection, calls for speculation.



THE WITNESS: As I recall, GTCC, I don't recall the discussion of GTCC in, with great -- it could likely be in the -- in that report. My focus when I was there was the -- had to do primarily with spent fuel. I'm sorry, GTCC is in the environmental report. I'm running through the tables in my mind.
BY MR. MACDONALD:
Q You recall that GTCC is in --
**A It is discussed in the, that report.**
Q If I could ask you to turn to page 24 of your expert report. On page 24, you address the mobilization of cask loading at Rancho Seco. And you express the opinion that "SMUD mobilized cask loading, labor and equipment rentals long before they were needed for actual spent fuel offloading from the spent fuel pool."
Do you see that on page 24?
**A Yes, before the actual, long before the actual operations, yes.**
Q What is the basis of your opinion that SMUD mobilized the labor long before they were needed?



**A Review of contracts, contract scope of certain of these vendors.**
Q You've never supervised a canister cask loading project of this magnitude, correct?
MR. GARDNER: Objection, vague.
THE WITNESS: No.
BY MR. MACDONALD:
Q Never transferred fuel from a pool to an ISFSI, correct?
**A No.**
Q Never prepared written procedures --
**A I mean, correct. Pardon me.**
Q Never prepared written procedures for a fuel move from a pool to an ISFSI?
**A That's correct, I have not.**
Q And yet it's your opinion that SMUD should have delayed doing any training, procedure development or equipment development until three months prior to its demonstration of the move of the cask into the spent fuel building?
MR. GARDNER: Objection to the extent it mischaracterizes the opinions set forth in

as I recall, which, you know, changes your view of options.
Let me succinctly say that prudent management would have directed staff, in my view, to get into dry storage as soon as possible and take benefit of the cost reductions that were promised back in 1992. And to demonstrate to me that we can continue to economically -- in a proper economic way of going about continuing to pursue what the cost would be to pursue upgrading one of those casks for transportation.
Q You have no expertise in determining what the cost of upgrading one of those casks for transportation would be, correct?
**A No.**
MR. GARDNER: Objection, vague.
BY MR. MACDONALD:
Q Do you know whether the vendor problems that you described also applied to the design and manufacture and fabrication of single purpose systems during the '97 time frame?
MR. GARDNER: Objection, compound.



THE WITNESS: I am not aware of the vendor production of the standard DSCs for the 24P perhaps that Oconee had purchased. And I'm not aware of vendor problems, any vendor problems in those regards. I haven't evaluated that.
BY MR. MACDONALD:
Q It's not an area you have expertise in?
**A That is correct.**
Q Do you know what the cost of purchasing 21 store only canisters would have been in the 1997 time frame?
MR. GARDNER: Objection, vague.
THE WITNESS: I'd like to go off the record for a minute.
BY MR. MACDONALD:
Q Well, you can answer the question, then we can go off the record.
**A Please repeat the question.**
Q Do you know what the cost of purchasing 21 store only canisters would have been in the '97 time frame?
MR. GARDNER: Same objection.



THE WITNESS: I have provided a cost analysis of this type of -- that addresses your question, I believe, in my report.
BY MR. MACDONALD:
Q Is it your opinion that the cost analysis set forth in your report on page 29 would accurately reflect the cost of those four components of a store only system being purchased in the 1997 time frame?
**A Let me be, again, assured I understand your question. Your first question before that had to do with DSCs. And my referencing you to page 29 where I have provided that for DSCs, we are now looking at that page. And you are expanding your question to the other three component types that are here.**
Q Fair enough. Let's talk just about the DSCs for the moment. Is it your opinion that the costs set forth on page 29 for DSCs, which is 5.7 million, is an accurate reflection for what the costs for those canisters would have been in the '97 time frame?
**A From the same vendor, the same types of**



**DSCs? These costs that are provided here are for 24P, NUHOMS-24P DSCs.**
Q And my question is, do you think they're an accurate reflection of what the costs would have been in the 1997 time frame?
**A I would say in the mid '90s -- I'm sorry, in order, if you recall -- well, if you recall reading -- if you recall the derivation of these to sort of even the playing field, I believe I stated used information from the original 1992 contract, used information from two other sources, as nominal values in the '95 time frame, I think, the '96 time frame. I believe they're reasonable for that.**
MR. GARDNER: Off the record.
(Whereupon, at 12:53 p.m., the above-entitled matter was recessed until 1:59 p.m.)
BY MR. MACDONALD:
Q Mr. Burford, are you familiar with the dry storage vendors, the industry, the state of the industry in the 1997 time frame?
MR. GARDNER: Objection, vague.
BY MR. MACDONALD:

Q Let me restate the question. Are you familiar with what was happening with respect to dry storage vendors in the 1997 time frame?
MR. GARDNER: Same objection.
THE WITNESS: No.
BY MR. MACDONALD:
Q Are you familiar with the number of vendors of storage only systems in the 1997 time frame, how many vendors of storage only systems there were in the '97 time frame?
**A No.**
Q Are you familiar with the actual costs that utilities were paying for storage only systems in the '97 time frame?
MR. GARDNER: Objection, vague.
THE WITNESS: No.
BY MR. MACDONALD:
Q The costs set forth on page 29 of your expert report for a storage only, four components of a storage only system total 9.168 million, do you see that?
**A Yes, I do.**



Q Do you know whether a utility could have purchased these four components for 21 canistered storage only system in 1997?
**A Pardon me, in 1997?**
Q Correct.
**A No.**
Q Do you know if the NRC would have allowed SMUD to decommission its pool if SMUD had gone to store-only dry storage in the 1997 time frame?
MR. GARDNER: Objection, calls for speculation. But you may answer.
THE WITNESS: I'm sorry, I don't see any reason why not.
BY MR. MACDONALD:
Q Do you know if NRC prevented the Trojan reactor from beginning to decommission its pool until it had received a part 71 license for its fuel?
MR. GARDNER: Objection, assumes facts not in evidence.
THE WITNESS: No. I don't know of any reason, I'm sorry. That's the correct answer, I mean. No, I don't know of anything regarding Trojan,



okay.
BY MR. MACDONALD:
Q If SMUD had switched to a store-only system -- strike that.
If SMUD had decided to pursue a store-only system in 1997, when do you think SMUD would have received the canisters for that system?
MR. GARDNER: Objection, calls for speculation. Objection, vague. Objection, hypothetical.
THE WITNESS: Excuse me, I mean, it sits on assumptions for me to make an answer. Given the assumption that they would not shift the fabrication and all the materials and designs and everything away from Ranor to PCC, which I believe was subsequent to '97, it sits on assumptions.
BY MR. MACDONALD:
Q Let's take it out of any assumptions and if a utility had decided to pursue store-only system for dry storage in '97?
**A In '97?**
Q Made that decision in '97.



**A Right.**
Q When is the earliest it could have received its canisters for storage of fuel?
MR. GARDNER: Objection, calls for speculation. Objection, hypothetical.
THE WITNESS: The first canister or 21 canisters.
BY MR. MACDONALD:
Q 21 canisters.
**A So as I understand your question, had the utilities signed a contract for the construction of 20 -- I'll speak first with regards to 20 of the DSCs or 21 of the DSCs, when would I expect that would have arrived. I would estimate they could have had them based on the standard 24Ps, I would say within a year and a half.**
Q Do you know if the fabricators of the NUHOMS systems were shutdown for a period of several years from fabricating in 1997 and 1998?
**A '97 and '98, I don't recall the years, there were shutdowns that were, they stopped working at Ranor, the various -- I don't remember all the**

A **That's correct.**
Q Did you examine any other sources in coming up with the range of costs that you believed are appropriate for a store-only canister?
A **The only other source that I saw that I dispelled was on a web site that was sort of, was -- the source, the number that was provided there was on a web site that was more of a commercial nature explaining -- it was Mr. LaGuardia's web site and there's just one paragraph there. And you had a number in there and I -- there's no, you know, I didn't use that as a source.**
Q What was the number in Mr. LaGuardia's web site?
A **It wasn't out of line with these. I don't recall the number exactly.**
Q Did you look at any other sources beyond the ones you've described?
A **No.**
Q Did you talk to any vendors of store-only dry storage systems about the cost for their systems?
A **No.**



Q Do you know how much Wisconsin Electric ultimately paid on average for each of its canisters?
A **No.**
Q You used an estimate from a 1994 environmental impact statement from Wisconsin Electric, is that right?
A **From Wisconsin Electric, the public service commission, it's an independent evaluation that they did on cost, yes.**
Q It was a 1994 study, right?
A **I believe it was 1994, yes, August '94.**
Q The PAC Nuclear contract number that you used was from the 1992 PAC Nuclear contract, correct?
A **The 1992 PAC Nuclear contract. Well, wait a minute, as you will recall from yesterday's testimony, the -- I made use of the 1992 exhibits that are in the contract. They also -- those exhibits were updated through time with regards to cost increases on certain things. I don't recall if I used those cost increases or not for the DSCs. I don't recall that. I would have to look.**
Q Your statement at the bottom of 27 states



"SMUD's original contract with Pacific Nuclear included pricing of $241,000"?
A **$241,000, yes.**
Q Does that suggest to you that you did not use any of the cost increases in the contract?
A **I used the total cost that I have divided by the 17 that were in that particular document.**
Q The third reference that you used to come up with your range of estimates for the cost of a canister set forth in footnote 51, the cost benefit analysis for private fuel storage, is that right?
A **Yeah, the April 2000 publication.**
Q Do you know the basis for the cost estimates set forth in that cost benefit analysis?
A **The -- pardon me, the basis for it?**
Q Yes.
A **The -- as I recall, it was a -- there was a tabularization in that report regarding 24 element dry canisters storage, dry storage canisters that I can't recall right now. But I believe they were even culled out as NUHOMS and there's a cost range associated in that report of between -- using**



**canister fuel of between $250 and $280,000.**
Q And do you know the basis that -- strike that.
Do you know how that report came up with the range of cost between 250 and $280,000?
A **I don't recall it right at the moment, no.**
Q You don't know whether SMUD could have purchased canisters for $285,000 per canister in 1997?
A **I believe I've answered that before. If I haven't, the answer's no.**
Q On page 28 you discuss the reasonable cost basis for an on site transfer cask, and you first reference the cost of 2.2 million dollars which you state was the original contract price in the PAC Nuclear contract for the design licensing fabrication delivery of two shipping casks?
A **Yes, that was the turnkey price for the two shipping casks in the Pacific Nuclear contract, 1972, with SMUD.**
Q 1992?
A **'92, thank you.**

557

**likely prefer to have standard fuel.**

Q And when you say likely prefer to have standard fuel, have you talked with anyone at DOE about that preference?

**A No.**

Q Have you looked at any of the depositions of DOE officials about the acceptance of failed fuel?

**A I have not looked at any DOE official, depositions of any DOE officials.**

Q And yet -- go ahead.

**A To add to this, there is documentation at Rancho Seco that has been presented for this case which -- I'm sorry, I thought echoed SMUD's understanding that they would be shipping and planned that they would ship failed fuel last. So I didn't believe that this would raise such ire, but -- pardon me, go ahead.**

Q Is it your understanding that failed fuel would be -- the acceptance of failed fuel would be delayed by the Department of Energy?

MR. GARDNER: Objection, vague.

BY MR. MACDONALD:

558

Q Delayed as compared to standard fuel?

**A It's my project manager reading of the standard contract that they would have the option of determining technical feasibility of receipt. And were the fuel labeled correctly and described correctly as required under the contract, and it was labeled as F2, radioactive leakage or F3 in a can, then they would have the option of technically stating that it's not technically feasible to receive this fuel at this time. But if you -- that's it, end of response.**

Q If it was technically feasible for the DOE to accept failed fuel, is it your opinion that it would be accepted without additional delay as compared to standard fuel?

MR. GARDNER: Objection, speculation.

THE WITNESS: Again, my project manager reading of the contract, as I stated earlier, if a -- the DOE during the review of a requested shipment determines that the, based on the description supplied by the licensee that the fuel has failed and that they are now, at that point in time and whatever

559

the schedule is technically, it's technically feasible to take receipt of that fuel, they would indicate and approve that shipment.

BY MR. MACDONALD:

Q If it was technically feasible, it's your opinion that they would so indicate and approve the shipment?

**A During their evaluation if they determined that, yes.**

Q If you would turn to the standard contract, page 14 of that contract. Paragraph B states that "DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel."

Do you see where I'm reading there?

**A I'm sorry, I don't. Oh, up here under (b), little b, okay.**

Q Yes, I'm sorry, little (b). The paragraph continues that "however" to state "however, for any SNF which has been designated by the purchaser as other than standard fuel, as that term is defined in appendix E, the purchaser shall obtain delivery and

560

procedure confirmation from DOE prior to delivery."

**A That's right.**

Q Is this consistent with a process that you just described as to how you believe the handling of acceptance --

**A That's my interpretation. And following along with the reading "DOE shall advise purchaser within 60 days after receipt of such confirmation request as to the technical feasibility of disposing such fuel under currently agreed to schedule, and any schedule adjustment for such services."**

**And it's my view that they have, if it is not technically feasible to accept and dispose of the fuel, that they -- they can object to taking receipt of it. That's my reading.**

Q Do you have any experience in transporting failed fuel?

MR. GARDNER: Objection, vague.

THE WITNESS: Physical transport of failed fuel?

BY MR. MACDONALD:

Q Yes.