# EXHIBIT 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------x
SACRAMENTO MUNICIPAL UTILITY )
DISTRICT, )
Plaintiff, ) No. 98-488C
v. ) (Judge Braden)
THE UNITED STATES OF AMERICA, )
Defendant. )
--------------------------------x

Deposition of CLIFF W. HAMAL
Washington, D.C.
Tuesday, February 1, 2005
9:24 a.m.

Job No.: 1-50059
Pages 1 - 344
Reported By: Joan V. Cain



Deposition of CLIFF W. HAMAL, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFF:
HOWARD N. CAYNE, ESQUIRE
ARNOLD & PORTER LLP
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
Telephone: (202) 942-5000

ALSO ON BEHALF OF PLAINTIFF:
TIMOTHY R. MACDONALD, ESQUIRE
ANNECOOS WIERSEMA, ESQUIRE
ARNOLD & PORTER LLP
Suite 4500
370 Seventeenth Street
Denver, CO 80202-1370
Telephone: (303) 2334



APPEARANCES CONTINUED

ON BEHALF OF DEFENDANT:
ALAN J. LO RE, ESQUIRE
SCOTT DAMELIN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
Room 12070
1100 L Street, Northwest
Washington, D.C. 20530
Telephone: (202) 307-0226

9

services it provided?
A **The -- this utility provided water services to 450 homes, thereabouts, to a community on Blue Ridge Shores, which is a developed lake community in central Pennsylvania.**
Q And how did you become affiliated with that utility?
A **I own a piece of property there.**
Q Do you pay for your services?
A **Yes.**
Q And can you describe for me your role as a director of that utility?
A **There were approximately seven directors of that utility, and we would meet every month or two to administer whatever needed to be done at that utility to run the utility, making the bigger decisions associated with the operations of that utility.**
Q How many employees did the utility have?
A **Three, I think. I'm not exactly sure if it was three or not. That's approximately correct.**
Q How large was the annual budget of that

10

utility?
A **I think it was about $250,000 a year.**
Q Were there internal disputes on the board of directors during the year that you served that caused you to leave?
A **No, I wouldn't say there were internal disputes on the board utility.**
Q What did cause you to leave?
MR. LO RE: Objection, asked and answered.
THE WITNESS: I left because I didn't feel that it was productive for me to continue to participate in running that utility.
BY MR. CAYNE:
Q Why did you reach that conclusion?
A **I reached that conclusion because of the -- my attempts to work with the president of that utility to provide some economic guidance to what they were doing over the long term I felt wasn't met with an open willingness to talk about those issues, work through those issues, so therefore I concluded what I thought I had to contribute to that utility wasn't really being used or necessary, and so I**

11

**resigned.**
Q Can you describe for me your economic training?
A **I graduated from Carnegie-Mellon University with a master's of science in industrial administration, which includes -- what is essentially a master's of business administration degree, and in fact that program has changed its name since I graduated into an MBA degree. While I was there I took a number of courses in economics and finance, and while they did not offer minors or formal concentrations, I heavily emphasized courses of economics and finance in the electric courses I had.**
Q But you did not major in economics?
A **I did not major in economics.**
Q What courses in economics did you take while you attended Carnegie Mellon?
A **I hadn't completed my answer to the earlier question.**
Q Please continue that then, sir.
A **Following graduation from Carnegie-Mellon,**

12

**I was employed by a number of firms, and since 1989 I've worked, as outlined in my resume, in a number of areas where I worked on issues related to economics, finance, and so part of my experience and my education and training is what came out of all that experience for the last 15 years or so.**
Q Now, my next question is, what economic courses did you take while at Carnegie-Mellon?
MR. LO RE: Objection, asked and answered.
THE WITNESS: I remember taking a course in microeconomics, a course in finance, general finance, a course in risk, risk management, a course in options, courses in operations research, courses in probability and statistics, and others. That's what comes to mind at the moment.
BY MR. CAYNE:
Q Have you taken any graduate courses in economics?
A **I believe those were economics courses, and that was in a graduate program.**
Q Have you taken any economic courses following your graduation from Carnegie-Mellon?

A No.
Q Have you had any professional training in economics following your graduation from Carnegie-Mellon?
A Since then, as I mentioned before, I've been working for a number of companies that work in economics and finance, and as a result of that, I believe I've gained a considerable amount of on-the-job training in economics and finance.
Q In addition to your on-the-job training, have you taken any courses in economics following your graduation from Carnegie-Mellon?
MR. LO RE: Objection, asked and answered.
THE WITNESS: No, I haven't.
BY MR. CAYNE:
Q Have you ever taught any courses in economics?
A I have not taught any courses in economics associated with a formal degree program or university. I have taught -- I have given speeches and seminars that relate to that issue, and whether that qualifies as training, may be a judgment call,



and whether some of those were -- well, I'll leave it at that.
Q What speeches or other programs did you give relating to economics?
A Those are detailed in my resume. I've given speeches on things such as market power, antitrust analysis, valuation of assets, market design, things of that nature.
Q Have you ever taken any courses, in college or elsewhere, on antitrust?
A The -- while at Carnegie-Mellon, some of my courses touched on antitrust and considerations of antitrust. I did not take a complete course dedicated to antitrust.
Q Which courses did you take at Carnegie-Mellon that touched on antitrust?
A We had a course on law. I forget the title of the course, but it was taught by a lawyer talking about ethics in law. We had other courses talking about economics in general, touched on issues of monopoly and pricing and oligopoly and behavior of firms, and in that way touched on antitrust.



Q What was the name of the professor?
A Professor Kerr comes to mind. I'm not certain that's right.
Q How do you spell that?
A What comes to mind is K-e-r-r.
Q But you're not sure if that's correct?
A I'm not sure.
Q What other training have you had in antitrust?
A In addition -- is this separate and apart from my experience?
Q Detail anything you consider training in antitrust, please.
A I have worked on antitrust cases, where I have worked with individuals who've been involved with evaluating antitrust issues such as mergers and behavior of firms. As part of that, worked with other individuals who have a considerable amount of experience in antitrust.
Q Who are the individuals that you're referring to?
A I've worked with Joe Pace, Howard Pifer,



George Schink, S-c-h-i-n-k, Alan Madian, M-a-d-i-a-n, David Teece, T-e-e-c-e, Cleve Tyler, Jim Ratliff, Jim Speyer, George Hall, Charles Stallen. The other people -- I've worked in a matter where the issues of antitrust were important, and I worked not directly with, but sort of in combination with other people that weren't associated with the firm I was working with.
I'm thinking of one instance in particular. I worked with Larry Ruff, Ron Daniels. I've worked with lawyers associated with this as well.
Q Do you have a law degree?
A No, I do not.
Q Do you have any legal training?
A I mentioned one course that I've had in -- while at graduate school that touched on legal issues and was taught by a lawyer previously. It a course in -- that touched on law and legal issues in my undergraduate degree, and I've had experience working on legal matters.
Q Where'd you go to college?
A Went to the United States Merchant Marine

Academy.
Q What was your major?
**A I had a dual major in marine transportation and marine engineering.**
Q Did you take economic courses in college?
**A I think I might have. It was not -- there may have been a course that touched on economic issues.**
Q But you're not sure?
**A I'm not sure.**
Q You received your MS in industrial administration; that's correct?
**A That is correct.**
Q What is industrial administration?
**A Industrial administration courses -- program is defined by Carnegie-Mellon as a program, which has since been named a master's of business administration. The MSIA degree by Carnegie-Mellon was started in the late '50s. It focuses on issues relevant to people wanting to go into business, making decisions, management. It's got a heavy emphasis on finance and quantitative analysis.**



Q What professional training do you have in making damages assessments?
MR. LO RE: Objection, asked and answered.
THE WITNESS: My training related to damage assessment's built upon all the coursework I've had and discussed before, as well as experience in issues of damages analysis, per se, and also in business decisions, business analysis, things of that nature.
BY MR. CAYNE:
Q What experience were you just referring to in damages assessments?
**A I believe I was talking about two different things. One is experience working on damages analysis, and the other was experience on issues related to what you'd need to do to do damages.**
Q Okay. Can you elaborate on both of those points for me what you mean?
**A The first category is working in matters where there was a damage analysis being performed.**
Q What matters have you worked on?
**A I have worked on and testified on a damages**



**matter related to an extended duration of a nuclear power plant and the damages associated with that. I have worked on other damages cases. These are outlined in my resume. They include a matter with the -- having to do with the failed performance of a chemical processing facility that was associated with power plant.**
**There were -- there's a case associated with damage having to do with blocking of a utility merger, tortious interference with a merger, involved damages. There's a damages case related to failed performance of equipment that was on a nuclear power plant. There may be more.**
Q Can you think of any more sitting here today?
**A Nothing comes to mind at the moment.**
Q You indicated, Mr. Hamal, that your first work in a damages assessment capacity involved issues relating to extended duration of a nuclear plant; is that correct?
**A That's not correct. That's the first one I mentioned. I didn't say it was the first one I did.**



Q Okay. That was the first one you mentioned. What did that work involve?
**A There was a nuclear power plant that was shut down for two years.**
Q Where?
**A In New Jersey, Salem Nuclear Power Plant, S-a-l-e-m.**
Q And when was it shut down?
**A I believe it was the early '90s.**
Q '91?
**A I don't think I can more specific as to when it was shut down.**
Q When did you become involved?
**A I was involved in this matter roughly '97.**
Q Who retained you?
**A I was retained By Public Service Electric & Gas.**
Q What were you retained to do?
**A Retained to evaluate damages associated with that outage.**
Q And what was the nature of the damages associated with that outage?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
Plaintiff, : CASE NO. 98-488C
v. : (Judge Braden)
THE UNITED STATES OF AMERICA, :
Defendant. :

--------------------------------x

Deposition of CLIFF W. HAMAL
Washington, D.C.
Wednesday, February 2, 2005
8:11 a.m.

Job No.: 1-50061
Pages: 345 - 659, Volume 2
Reported By: Joan V. Cain



Deposition of CLIFF W. HAMAL, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
HOWARD N. CAYNE, ESQUIRE
ARNOLD & PORTER, LLP.
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

ALSO ON BEHALF OF PLAINTIFF:
TIMOTHY R. MACDONALD, ESQUIRE
ANNECOOS WIERSEMA, ESQUIRE
ARNOLD & PORTER, LLP.
Suite 4500
370 Seventeenth Street
Denver, CO 80202-1370
(303) 863-1000



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT:
ALAN J. LO RE, ESQUIRE
SCOTT DAMELIN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
Room 12070
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-0226

353

THE WITNESS: I based that based on my experience that we've talked about earlier today -- yesterday, and working in the firms that I've worked, and projects that I've worked on, and my understanding of the treatises we looked at yesterday, the other seminars that I was involved with we talked about yesterday, and my general understanding of what we were trying to measure, which is the consequence of damages, my own inherent understanding of what that might be. It's a combination of all those things.
BY MR. CAYNE:
Q On page 6 you state that you have testified on issues relating to economic damages due to poor nuclear power plant performance. Do you see that?
MR. LO RE: Counsel, do you have a --
MR. CAYNE: Page 6, last sentence, first paragraph.
THE WITNESS: I testified -- yes.
BY MR. CAYNE:
Q In which court did you testify on issues relating to economic damages due to poor nuclear

354

power plant performance?
A **I've submitted written testimony, as indicated in my resume, which is attached, in the United States District Court for the Eastern District of Pennsylvania.**
Q Other than the written testimony you submitted in that particular case, have you ever testified in court on issues -- first let me be clear.
In the case you just referenced, you never actually provided live testimony in court; is that correct?
A **As we discussed yesterday, I gave a deposition in that matter, but that matter was settled before it went to court, so I did not provide testimony in court.**
Q Other than the written testimony you provided in the case you just referenced, have you testified in any other court cases in any other litigations on issues relating to economic damages?
MR. LO RE: Objection, asked and answered.
THE WITNESS: Well, as I just said, what

355

you left out of your answer (sic), I gave deposition testimony in that case.
BY MR. CAYNE:
Q Other than that?
A **I believe we went through this yesterday, and that we discussed other cases I was involved with, but they did not lead to testimony on damages.**
Q So is the simple answer to my question that other than the one case in the Eastern District of Pennsylvania to which you've just referred, you have never -- you have not provided any testimony in any other case on issues relating to economic damages?
MR. LO RE: Objection, asked and answered.
THE WITNESS: That case is the only case where I provided testimony, written or otherwise, in a damage case.
BY MR. CAYNE:
Q Could you please turn, Mr. Hamal, to -- well, remain on page 6. Do you see on the bottom it says -- it refers to the description of your assignment?
A **Yes.**

356

Q And you describe the scope of your work as being to provide an economic review and analysis of the claim of damages provided by SMUD relating to the alleged breach of contract; is that correct?
A **That's right.**
Q Was that the extent of your work on this assignment?
A **First let's be clear, as we went through yesterday, how we define this assignment. There was the FPL matter, which may or may not be included in this assignment, depending how you want to define it. I'm perfectly clear to say that the FPL was not part of this assignment.**
Q I'm referring to the SMUD right now, the SMUD litigation.
A **I'm just -- because it's the same contract one could argue -- you know, there's a distinction that could be raised.**
Q With that clarification, could you respond to my question?
A **The -- the economic review and analysis that I did -- yeah, I think that captures what I've**

660

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SACRAMENTO MUNICIPAL UTILITY )
DISTRICT, )
Plaintiff, ) No. 98-488C
v. ) (Judge Braden)
THE UNITED STATES OF AMERICA, )
Defendant. )

--------------------------------x

Continued Deposition of CLIFF W. HAMAL
Washington, D.C.
Friday, February 11, 2005
8:12 a.m.

Job No.: 1-50839
Pages 660 - 827, Volume 3
Reported By: Joan V. Cain

661

Continued Deposition of CLIFF W. HAMAL, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.

662

APPEARANCES

ON BEHALF OF PLAINTIFF:
HOWARD N. CAYNE, ESQUIRE
ARNOLD & PORTER LLP
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
Telephone: (202) 942-5000

ALSO ON BEHALF OF PLAINTIFF:
ANNECOOS WIERSEMA, ESQUIRE
ARNOLD & PORTER LLP
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
Telephone: (303) 863-1000

663

APPEARANCES CONTINUED

ON BEHALF OF DEFENDANT:
ALAN J. LO RE, ESQUIRE
JOSHUA E. GARDNER, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
Room 12070
1100 L Street, Northwest
Washington, D.C. 20530
Telephone: (202) 307-0226

A **Generally, yes.**
Q Generally, yes what?
A **Generally, yes. What I mean by that is by 1990 the Department of Energy had made statements that its permanent repository would not be up and operational until roughly 2010.**
Q Do you agree that SMUD reevaluated its decision to continue with the dry-storage project throughout the 1990s?
A **As we discussed in the earlier deposition, yes, I believe that SMUD did revisit the question of whether to proceed with its dry-storage program through the '90s.**
Q You may want to pull your expert report in front of you. And if you can turn to page 33 of Exhibit 2, your expert report.
A **Okay.**
Q You say in the first sentence of the first full paragraph of page 33 you state, "In order to address these infirmities in SMUD's claims, one needs to make very specific assumptions about what would have transpired in the but-for world." Do you



see that?
A **I do.**
Q Did you attempt to define a but-for world in this case?
A **I did not define a but-for world in this case. I did some analysis that made some assumptions that were related to a but-for world, but I did not go out to try to -- to, as this sentence refers to, make very specific assumptions about what would have transpired in the but-for world.**
Q So you don't believe that you yourself defined a but-for world as precisely as would be necessary to determine SMUD's damages in this case; is that correct?
A **I defined it sufficiently -- let me start over.**
**I reviewed the damage claim submitted by SMUD, and as I discuss in this report, talk about the infirmities and the difficulties of defining the but-for world associated with that damage claim. I then went about conducting additional analysis which**



**included some but-for assumptions, and those assumptions were sufficient for me to draw the conclusion that there were no damages here, but those assumptions do not lead to a complete description of what would have happened in the but-for world.**
Q Did you speak to anyone in the Department of Justice as to what that person or anyone at the Department of Justice thought the but-for world would have been in this case?
A **The but-for world includes the assumptions about the minimally acceptable acceptance rate, and I had conversations with the Department of Justice about that.**
Q What does that mean, The but-for world includes assumptions about the minimally acceptable acceptance rate?
A **As I describe in my report, part of calculating damages involves defining the but-for world and defining an acceptance rate for fuel that would have occurred in the but-for world. That's what I mean.**



Q What acceptance rate was that?
A **We did not come up with an acceptance rate. That conversation did not lead to a conclusion of what would be an appropriate but-for world acceptance rate for spent nuclear fuel.**
Q But you concluded you would need to know what the acceptance rate would have been in order to construct a but-for world?
A **In order to do a complete analysis, one would have to come up with that assumption. I, as I mentioned a moment ago did sufficient analysis to conclude there was no damages in this case. I did that by assuming the acceptance rates provided by Ms. Supko, and therefore since I think that those represent a conservative, meaning a quicker acceptance rate that would be -- may otherwise be developed consistent with the Department of Justice view on what's required under the contract, because there were no damages under her assumption rate, therefore, I was able to conclude there were no damages, even though we didn't come up with, perhaps, a better assumption rate for the acceptance**