# In the United States Court of Federal Claims

No. 98-488C
Filed: April 21, 2005
**TO BE PUBLISHED**

| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Nuclear Waste Fund;<br>Nuclear Waste Policy Act, 42 U.S.C. §§ 10101, *et seq*.;<br>RESTATEMENT (SECOND) OF CONTRACTS § 152 (Mutual Mistake);<br>RESTATEMENT (SECOND) OF CONTRACTS § 272 (Impracticability of Performance);<br>Restitution;<br>10 C.F.R. § 961.11 at Art. II;<br>10 C.F.R. § 961.2. |

**Howard N. Cayne,** Arnold & Porter, LLP, Washington, D.C.; **David S. Neslin** and **Timothy R. Macdonald**, Arnold & Porter, LLP, Denver, Colorado, counsel for plaintiff.

**Russell Alan Shultis, Alan J. Lo Re, Scott Damelin, Joshua E. Garnder,** and **Todd J. Cochran**, United States Department of Justice, Civil Division, Commercial Litigation Branch, counsel for defendant.

## MEMORANDUM OPINION AND ORDER TO SHOW CAUSE WHY THE STANDARD CONTRACT SHOULD NOT BE HELD VOID AND RESTITUTION AWARDED FROM THE NUCLEAR WASTE FUND

**BRADEN, *Judge***

After the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101, *et seq*., was enacted, nuclear plant operators in the United States entered into Standard Contracts with the Department of Energy ("the Government") that established the terms under which the Government would "accept title to, transport, and dispose of . . . spent fuel and waste . . . [i]n exchange for . . . fees specified in the contract[.]" 10 C.F.R. § 961.2. The Standard Contract stated that the Government would provide disposal services to begin no later than January 31, 1998 and "shall continue until such time as all [spent nuclear fuel] and/or [high-level radioactive waste] from the civilian nuclear power reactors . . . has been disposed of." 10 C.F.R. § 961.11 at Art. II; *see also* 42 U.S.C. § 10222(5)(B).

In this case, plaintiff executed a Standard Contract on June 14, 1983 and subsequently paid approximately $40 million in fees that were deposited into the Nuclear Waste Fund. *See* Amended Compl. ¶¶ 8, 30; *see also* Gov't Answer ¶¶ 8, 30. On January 19, 2005, the court issued a

Memorandum Opinion and Order that determined the Government's failure to commence performance on January 31, 1998, as required by the June 14, 1983 Standard Contract, was a breach. *See Sacramento Municipal Utility District*, 63 Fed. Cl. at 503.

On March 21-25, 2005 and March 28, 2005-April 1, 2005, the court held an evidentiary hearing to determine whether plaintiff was entitled to damages as a result of that breach ("TR ___"). During that hearing, the court became aware of facts that seriously call into question the viability and vitality of the Standard Contract in this case. As of March 1, 2001, 17 sites, including plaintiff's site, in 13 states had licensed commercial dry storage facilities and 15 additional sites were then under contract. *See* PX 0675 at HQR249 0176. As of December 9, 2002, there were 27 spent fuel dry storage sites projected for 2003 and 36 projected by 2006. *See* TR 1794. It appears, however, that none of the spent nuclear fuel being stored in this manner is considered by the Department of Energy to be standard fuel subject to the Standard Contracts, because it is not compatible with the environmental and safety requirements for Yucca Mountain. *See*, *e.g.*, TR 1628-29, 1633, 1637-43; *see also* TR 1641 (SMUD's multi-element sealed dry storage canisters are handled horizontally, while Yucca Mountain is being designed to store spent nuclear fuel vertically); TR 1646 (SMUD's dual purpose casks are not disposable and sufficiently durable for the time period and therefore will not be licensed by the Nuclear Regulatory Commission); DX 849 at Issue 22 and 23 (Department of Energy advised the industry that it would not accept dual-purpose casks or multi-element sealed canisters prior to the signing of the Standard Contracts); DX 1298 ("As we have discussed previously, it remains the Department's position that multi-assembly storage and transport systems for spent fuel are not covered by the Standard Contract[.]"). More importantly, the type of canister that will be suitable and authorized for use at Yucca Mountain was not known in 1983 and is still not known. *See* TR 1640-43. In fact, although the Department of Energy has prepared a design and safety analysis, none of this information has been submitted to the Nuclear Regulatory Commission for a license and therefore no approved storage canisters have been manufactured. *See* TR 1646, 1700-02, 1704; *see also* DX 1298. Bid packages were just recently issued to vendors for an "analysis for the usability of currently licensed systems at Yucca Mountain for aging." *See* TR 1770. Therefore, the Department of Energy has taken the position that the Standard Contracts will have to be modified or renegotiated if this fuel is to be transported to and stored at Yucca Mountain. *See* TR 1638, 1696, 1768; *see also* DX 1298.

For these and other reasons discussed during the evidentiary hearing, the Department of Energy's December 2004 Report to Congress advising that the Government "anticipate[s] shipment of spent nuclear fuel and high-level radioactive waste to the repository in 2010" does not appear to be credible. *See* Office of Civilian Radioactive Waste Management, Department of Energy Annual Report to Congress (DOE/RW-0569) (Dec. 2004) ("OCRWM Annual Report") Appendix at 3; *see also Maine Yankee Atomic Power Co.* v. *United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("At present there are no schedules containing specific dates for disposing of the waste of particular companies. It is uncertain when they will be adopted and to what extent, if any, they will, or could effectively reflect the Department's breach of the contract.").

Although the United States Court of Appeals for the D.C. Circuit[1] and the United States Court of Appeals for the Federal Circuit[2] have addressed issues concerning the Nuclear Waste Policy Act, neither has been asked to adjudicate whether the Standard Contract should be held void because of mutual mistake, *see* RESTATEMENT (SECOND) OF CONTRACTS (1981) ("RESTATEMENT") at § 152[3] and/or impracticability of performance. *See* RESTATEMENT § 261;[4] *see also* TR 1740-50, 1752-53. Nor has either appellate court been asked whether the appropriate remedy should be restitution,

---

[1] In *Nuclear Energy Institute, Inc.* v. *Environmental Protection Agency*, 373 F.3d 1251, 1257 (D.C. Cir. 2004), the United States Court of Appeals for the D.C. Circuit held that regulations issued by the Environmental Protection Agency, the Nuclear Regulatory Commission, and the Department of Energy, based on a 10,000-year compliance period, violated Section 801 of the Energy Policy Act as not "based upon and consistent with" the findings and recommendations of the National Academy of Sciences and vacated 40 C.F.R., part 197, insofar as it incorporated a 10,000-year compliance period. The D.C. Circuit, however, held that congressional resolution selecting Yucca Mountain as the site for a Repository under the Nuclear Waste Policy Act was an appropriate exercise of Congress's Article IV, section 3 authority and the Department of Energy's and the President's selection of the Yucca Mountain site was not subject to judicial review. *Id.*

In *Indiana Michigan Power Co.* v. *United States Department of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996), the United States Court of Appeals for the D.C. Circuit held that the January 31, 1998 date to commence performance under the Standard Contract was not conditioned on the availability of a repository. In *Northern States Power Co.* v. *United States Department of Energy*, 128 F.3d 754, 759 (D.C. Cir. 1997), however, the United States Court of Appeals for the D.C. Circuit declined to issue a writ of *mandamus* ordering the Department of Energy to meet the January 31, 1998 deadline, but instructed that "petitioners must pursue the remedies provided in the Standard Contract in the event that DOE does not perform its duty to dispose of the [Spent Nuclear Fuel.]"

[2] In *Northern States Power Co.* v. *United States*, 224 F.3d 1361, 1366 (Fed. Cir. 2000), the United States Court of Appeals for the Federal Circuit held that the presence of contractual administrative dispute resolution provisions in the Standard Contract does not preclude the filing of a breach of contract action in the United States Court of Federal Claims. In *Maine Yankee Atomic Power Co.* v. *United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000), the United States Court of Appeals for the Federal Circuit affirmed summary judgment against the Government for breach of the Standard Contract by failing to commence performance on January 31, 1998.

[3] RESTATEMENT § 152(1) provides: "Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake[.]"

[4] RESTATEMENT § 261 provides: "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or circumstances indicate the contrary."

rather than damages. *See* RESTATEMENT § 272.[5] And, if restitution is the appropriate remedy, why it should not be paid from the Nuclear Waste Fund,[6] rather than the Judgment Fund. Although the United States Court of Appeals for the Eleventh Circuit held in *Alabama Power*, 307 F.3d at 1312, that the Nuclear Waste Policy Act did not authorize the Government to utilize monies from the Nuclear Waste Fund "to pay for the interim storage costs of the [Government's] contract creditors," neither that appellate court, nor any other, has been asked whether a final judgment holding that the Standard Contract is void and awarding restitution from the Nuclear Waste Fund would violate the Nuclear Waste Policy Act of 1982 or otherwise be contrary to law.[7]

Therefore, the parties are ordered to show cause why the court should not hold that the June 14, 1983 Standard Contract with plaintiff is void and the Government be ordered to refund all monies paid to date by plaintiff into the Nuclear Waste Fund as restitution. In addition, plaintiff is ordered to show cause how such an order could prejudice its interests, since during the hearing, plaintiff admitted that when decisions were made both to enter, and later to exit, the business of generating nuclear power, the financial risks associated therewith, including the disposal of spent nuclear fuel, was assumed by the utility's rate payers. *See* TR 927-28. Moreover, the court is

---

[5] The United States Court of Appeals for the D.C. Circuit issued a writ of *mandamus* "precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility." *Northern States Power*, 128 F.3d at 761. The court does not read the language of the writ to preclude the Government from proffering evidence and arguing in this court that basic assumptions on which the Standard Contract was founded either were based on a mistake(s) by both parties that had a material effect on the agreed exchange of performance or became impractical for reasons that have nothing to do with the Government's conduct, particularly since the United States Court of Appeals for the Federal Circuit has not had occasion to consider these issues.

[6] In the most recent report to Congress, for the fiscal year ending September 30, 2003, the Nuclear Waste Fund had approximately $18 billion of assets. *See* OCRWM Annual Report Appendix at 13. The OCRWM Annual Report advised Congress, however, that 34 utilities filed cases for breach of contract in the United States Court of Federal Claims collectively seeking $6.18 billion. *Id.* at 25. The industry has estimated damages could be as much as $50 billion. *Id.* The Government advised Congress that the actual total damages suffered by all utilities "are more likely to be in the range of between $2 billion and $3 billion[.]" *Id.* Moreover, the Government estimates that "[o]ther than ascertaining the actual amount of damages, the only outstanding issue is how that liability is to be satisfied. At this time, it is uncertain whether damages will be paid from the Judgment Fund, the Nuclear Waste Fund or some other source." *Id.* at 25-26 (citing *Alabama Power* v. *U.S. Department of Energy*, 307 F.3d 1300 (11th Cir. 2002) (to "suggest" that the Nuclear Waste Fund would not be an "appropriate source for paying damages.").

[7] *See Northern States Power*, 224 F.3d at 1367 (citing *Armour & Co.* v. *Wantock*, 323 U.S. 126, 133 (1944) and *Canadian Imperial Bank of Commerce* v. *Wells Fargo Bank*, 811 F.2d 1490, 1494 (Fed. Cir. 1987)) ("[B]road language in an opinion must be read in light of the issue before the court.").

interested to know why restitution is not an appropriate remedy in this case, since plaintiff would be restored to the same financial position it held as of June 14, 1983.

Likewise, the Government also is ordered to show cause how such an order could prejudice its interests, since there is no evidence in the record that the Government had reason to believe in 1983, 1989, or at present that: Yucca Mountain ever will be licensed to store spent nuclear fuel and high-level radioactive waste; an appropriate means of transporting such fuel and waste to the site will be authorized and licensed; and/or an appropriate method of temporary storage for transport and/or permanent storage will be identified, licensed, and manufactured. *Compare* OCRWM Annual Report at 9 ("[T]he Program must seek and secure authorization to begin operation of the repository from the [Nuclear Regulatory Commission].") *with* TR 1701 (the repository is not yet licensed and the application has not been filed with the Nuclear Regulatory Agency) and *with* OCRWM Annual Report at 9 (*after* seeking and securing a license from the Nuclear Regulatory Commission, the Program must "begin constructing the repository, receive a license amendment to allow the receipt of waste and operation of the repository, and develop the system for accepting waste from civilian and defense storage sites and shipping it to the repository."); *see also Nuclear Energy Institute, Inc., supra* footnote 1; TR 1655 ("[T]he repository design is *currently being configured*, as it will exist in our license application, it primarily handles fuel dry."); TR 1656 ("handling the fuel dry . . . at an elevated temperature, which it all is, is exposed to oxygen and the oxygen reaches the pellets because there's a breach in the cladding, it can change its form from a small compact pellet to a more voluminous powder, further ripping the rod open and dumping the powders out on the floor, and that's potentially a safety issue. It's certainly *a contamination issue that we're trying to figure out how to deal with. But it may mean that, as we go forth, that leakage is more important to us than we thought it was earlier on*.") (emphasis added); TR 1674 (ACR/DCS process was suspended in 1997 because "it was clear that we were not going to perform on the time frame that was envisioned[.]"); TR 1750 (DOE has had "no discussions on [the canister program] in the last five years."); TR 1777 ("So far [Bechtel SAIC, LLC, the M&O Contractor for Yucca Mountain] haven't come up with a way of [accepting] horizontal canisters."); DX 678 (DOE is "unable at this time to complete final design and acceptance criteria for the disposability aspects of [a multi-purpose storage disposal] system for commercial spent nuclear fuel."). Moreover, the court is interested to know why restitution is not an appropriate remedy in this case, since if, and when, the Government is in a position to accept title to, transport, and dispose of spent nuclear fuel and waste, the parties can enter into a new contract for such services. And, in the interim, and even if plaintiff in this case and all other plaintiffs with breach of contract actions pending in the United States Court of Federal Claims are awarded restitution, the Nuclear Waste Fund, as of September 30, 2003, has accumulated over $10 billion in interest that will remain in the Fund and continue to accumulate interest. *See* OCRWM Annual Report Appendix at 30; TR at 1649-51.

The parties are ordered to file briefs to address these issues no later than 60 days hereafter, *i.e.*, June 20, 2005. Any interested entity also may file an *amicus* on that date, not to exceed 25 pages.

**IT IS SO ORDERED.**

**s/SUSAN G. BRADEN**
**Judge**