**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on July 7, 2005)

| | | |
|---|---|---|
| **SACRAMENTO MUNICIPAL UTILITY DISTRICT,** Plaintiff, | ) | |
| v. | ) | No. 98-488C (Judge Braden) |
| **THE UNITED STATES,** Defendant. | ) | |

**BRIEF OF *AMICI CURIAE* FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, SOUTHERN NUCLEAR OPERATING COMPANY, GEORGIA POWER COMPANY, ALABAMA POWER COMPANY, WISCONSIN ELECTRIC POWER COMPANY, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT, PSEG NUCLEAR L.L.C., PUBLIC SERVICE ELECTRIC AND GAS COMPANY, VERMONT YANKEE NUCLEAR POWER CORPORATION, THE DETROIT EDISON COMPANY, SYSTEM FUELS, INC., ENTERGY NUCLEAR INDIAN POINT 2, LLC, ENTERGY ARKANSAS, INC., ENTERGY GULF STATES, INC., ENTERGY NUCLEAR GENERATION COMPANY, ENTERGY NUCLEAR FITZPATRICK, LLC, ENTERGY NUCLEAR INDIAN POINT 3, LLC, ENTERGY NUCLEAR OPERATIONS, INC., ENTERGY NUCLEAR VERMONT YANKEE, LLC, AND FPL ENERGY SEABROOK, LLC IN RESPONSE TO THE COURT'S APRIL 21, 2005 SHOW CAUSE ORDER**

Of Counsel:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7940
(703) 770-7901 (fax)
Counsel for *Amici Curiae*

July 7, 2005

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ iii

**INDEX TO APPENDIX** ........ v

**FACTUAL BACKGROUND** ........ 2

I. THE NUCLEAR WASTE POLICY ACT REQUIRED DOE TO ENTER INTO CONTRACTS WITH UTILITIES, AND THE COURTS MAY NOT REVERSE SUCH A STATUTORY DIRECTIVE ........ 4

II. THE SHOW CAUSE ORDER IS CONTRARY TO APPELLATE DECISIONS WHICH HAVE REJECTED THE UNAVAILABILITY OF A REPOSITORY AS AN EXCUSE FOR DOE NONPERFORMANCE ........ 7

III. A RESTITUTION AWARD, WITH OR WITHOUT THE PAYMENT OF INTEREST, WOULD NOT FINANCIALLY RESTORE THE *AMICI* TO THEIR POSITION PRIOR TO THE STANDARD CONTRACT'S EXECUTION ........ 9

IV. VOIDING THE STANDARD CONTRACT WOULD HAVE ADVERSE CONSEQUENCES FOR NUCLEAR UTILITIES, THE NATION'S ECONOMY, AND THE PUBLIC INTEREST ........ 12

**CONCLUSION** ........ 16

# TABLE OF AUTHORITIES

## Cases & Decisions

Ala. Power Co. v. Dep't of Energy,
307 F.3d 1300 (11th Cir. 2002) ........ 11

Am. Tel. and Tel. Co. v. United States,
177 F.3d 1368 (Fed. Cir. 1999) ........ 5

Indiana Michigan Power Co. v. Dep't of Energy,
88 F.3d 1272 (D.C. Cir. 1996) ........ 8

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004) ........ 3

Library of Congress v. Shaw,
478 U.S. 310 (1986) ........ 10, 11

Longshore v. United States,
77 F.3d 440 (Fed. Cir. 1996) ........ 5, 6

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) ........ 2, 6

Nat'l Ass'n of Regulatory Util. Comm'rs v. Dep't of Energy,
851 F.2d 1424 (D.C. Cir. 1988) ........ 14

Northern States Power Co. v. Dep't of Energy,
128 F.3d 754 (D.C. Cir. 1997) ........ 8, 9

Northern States Power Co. v. United States,
43 Fed. Cl. 374 (1999) ........ 2

Northern States Power Co. v. United States,
224 F.3d 1361 (Fed. Cir. 2000) ........ 2

Roedler v. Dep't of Energy,
255 F.3d 1347 (Fed. Cir. 2001) ........ 5

United States v. Winstar Corp.,
518 U.S. 839 (1996) ........ 5

## Statutes, Rules & Regulations

42 U.S.C. § 10107 ........ 14

42 U.S.C. § 10131 ........ 4

42 U.S.C. § 10222 ........ 5, 12

10 C.F.R. § 50.92 .......... 13

10 C.F.R. § 50.100 .......... 14

Standard Contract, 10 C.F.R. § 961.11 .......... 8

**Other Authorities**

H.R. Rep. No. 97-491 (1982) .......... 4

Private Fuel Storage, LLC (Independent Spent Fuel Storage Installation), CLI-05-12, 61 NRC ___ (Jun. 20, 2005) .......... 7

Restatement of Restitution § 156 (1937) .......... 10

**Miscellaneous**

David E. Sanger, *Bush Makes Renewed Push for Strategy on Energy*, N.Y. TIMES, Mar. 10, 2005, at A-20 .......... 13

Ralph Vartabedian, *Nuclear Industry Lays Foundation for Comeback*, L.A. TIMES, Jun. 23, 2005, at 1 .......... 13

# INDEX TO APPENDIX

| **Description** | **Page** |
|---|---|
| DOE Office of Civilian Radioactive Waste Management, "Monthly Summary of Program Financial and Budgetary Information as of February 28, 2005" (excerpt) | 1 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on July 7, 2005)

| | | |
|---|---|---|
| **SACRAMENTO MUNICIPAL UTILITY DISTRICT,** | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 98-488C |
| | ) | (Judge Braden) |
| **THE UNITED STATES,** | ) | |
| Defendant. | ) | |

**BRIEF OF *AMICI CURIAE* FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, SOUTHERN NUCLEAR OPERATING COMPANY, GEORGIA POWER COMPANY, ALABAMA POWER COMPANY, WISCONSIN ELECTRIC POWER COMPANY, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT, PSEG NUCLEAR L.L.C., PUBLIC SERVICE ELECTRIC AND GAS COMPANY, VERMONT YANKEE NUCLEAR POWER CORPORATION, THE DETROIT EDISON COMPANY, SYSTEM FUELS, INC., ENTERGY NUCLEAR INDIAN POINT 2, LLC, ENTERGY ARKANSAS, INC., ENTERGY GULF STATES, INC., ENTERGY NUCLEAR GENERATION COMPANY, ENTERGY NUCLEAR FITZPATRICK, LLC, ENTERGY NUCLEAR INDIAN POINT 3, LLC, ENTERGY NUCLEAR OPERATIONS, INC., ENTERGY NUCLEAR VERMONT YANKEE, LLC, AND FPL ENERGY SEABROOK, LLC IN RESPONSE TO THE COURT'S APRIL 21, 2005 SHOW CAUSE ORDER**

Pursuant to the Court's April 21, 2005 Opinion and Order (the "Show Cause Order" or "Order"), *amici curiae* respectfully submit this response showing why the Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste ("Standard Contract") should not be held void and why restitution from the Nuclear Waste Fund should not be awarded to Plaintiff Sacramento Municipal Utility District ("SMUD"). Since SMUD will demonstrate in

its response to the Show Cause Order why there is no basis for voiding its Standard Contract for mutual mistake of fact or impracticability – views which the *amici* share and adopt fully – the *amici* do not engage in any substantive discussion of those particular issues below. Rather, the *amici*, as similarly-situated parties to the Standard Contract, explain why a decision in this case to void SMUD's contract violates the clear intent of Congress and would have severe, adverse consequences on this nation's nuclear utilities and the public interest if adopted in this and other spent nuclear fuel ("SNF") damages cases.

## FACTUAL BACKGROUND

In 1998, following the Department of Energy's ("DOE") failure to begin accepting spent nuclear fuel from this nation's nuclear plants by January 31, 1998, several of the *amici* filed actions in this Court alleging that DOE's performance failures constituted a partial breach of the Standard Contract.[1] In 1999, this Court dismissed the breach of contract claim of *amicus* Northern States Power Company ("NSP"), 43 Fed. Cl. 374, 376 (1999) (holding that NSP was obliged to pursue its demand for monetary relief at the agency level, specifically through a claim for equitable adjustment submitted in accordance with the contract's disputes clause). A year later, that decision was reversed on appeal. Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000). There, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") held, consistent with its companion decision in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("Maine Yankee"), that the Standard Contract does not bar a suit seeking damages for DOE's failure to begin performance by the contract's January 31, 1998 deadline. The Federal Circuit also held in Maine Yankee that

[1] Florida Power & Light Co. v. United States, No. 98-483C (Baskir, J.); Northern States Power Co. v. United States, No. 98-484C (Wiese, S.J.); Duke Power v. United States, No. 98-485 (Wiese, S.J.); Indiana Mich. Power Co. v. United States, No. 98-486C (Hodges, J.); Southern Nuclear Operating Co. v. United States, No. 98-614C (Merow, S.J.).

Defendant (the "Government") breached the Standard Contract with respect to the entire nuclear electric industry. Id.

The other *amici* have filed similar breach of contract suits in this Court. The Government has been found liable for breach of the Standard Contract in several of these cases.[2] *Amicus* Indiana Michigan Power Company has already completed its damages trial,[3] three of the *amici* (Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company) have a damages trial in this Court scheduled for October 2005, three of the *amici* (Wisconsin Electric Power Company, Omaha Public Power District, and System Fuels, Inc.) have damages trials in this Court scheduled for 2006, and several of the other *amici* are in the process of having their damages trials scheduled as well. On April 21, 2005, shortly after SMUD's damages trial, the Court issued the Show Cause Order asking why the Standard Contract should not be held void and why restitution should not be awarded to SMUD from the Nuclear Waste Fund. Order at 4-5. The Show Cause Order also permitted "[a]ny interested entity" to file an *amicus* brief by June 20, 2005 addressing the various legal issues discussed therein. Id. at 6. By order dated June 16, 2005, the Court extended the due date for briefs to July 7, 2005.

---

[2] Northern States Power Co. v. United States, No. 98-484C (Wiese, S.J.); Florida Power & Light Co. v. United States, No. 98-483C (Baskir, J.); Indiana Mich. Power Co. v. United States, No. 98-486C (Hodges, J.) ("Indiana Michigan"); Southern Nuclear Operating Co. v. United States, No. 98-614C (Merow, S.J.); Wisconsin Elec. Power Co. v. United States, No. 00-697C (Merow, S.J.); Entergy Nuclear Generation Co. v. United States, No. 03-2626 (Lettow, J.); Entergy Nuclear Indian Point 2, LLC v. United States, No. 03-2622 (Lettow, J.); System Fuels, Inc. v. United States, No. 03-2623 (Lettow, J.); Duke Power v. United States, No. 98-485 (Wiese, S.J.).

[3] This Court issued a decision in Indiana Michigan's trial, 60 Fed. Cl. 639 (2004) ("Indiana Michigan II"), which decision is currently on appeal, No. 04-5122 (Fed. Cir.).

## I. THE NUCLEAR WASTE POLICY ACT REQUIRED DOE TO ENTER INTO CONTRACTS WITH UTILITIES, AND THE COURTS MAY NOT REVERSE SUCH A STATUTORY DIRECTIVE

This Court lacks the authority to void SMUD's Standard Contract, since doing so would run squarely against the purpose, policies, and provisions embodied in the Nuclear Waste Policy Act ("NWPA"). The NWPA, enacted by Congress in 1982, acknowledged and codified the Government's long-standing policy of accepting responsibility and providing for the timely disposal of commercial spent nuclear fuel and high-level radioactive waste generated by civilian nuclear power plants. See 42 U.S.C. § 10131(b)(2) (indicating that one purpose of the NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel . . . ."). The Act also expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. § 10131(a)(2)(A). The legislative history of the NWPA, likewise, included the observation that "[t]he failure of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated." H.R. Rep. No. 97-491, pt. 1, at 28 (1982), reprinted in 1982 U.S.C.C.A.N. 3792, 3794; see also 42 U.S.C. § 10131(a)(3) ("Federal efforts during the past 30 years to devise a permanent solution to the problems of the civilian radioactive waste disposal have not been adequate . . . .").

In light of these considerations, Congress in the NWPA specified the responsibilities of DOE to carry out the disposal of SNF from commercial nuclear power plants and directed DOE to enter into contracts with utilities for the disposal of their SNF. Section 302 of the NWPA (entitled "Contracts") stated that "the Secretary [of DOE] is authorized to enter into contracts with any person who generates or holds title to high level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of

such waste or spent fuel." 42 U.S.C. § 10222(a)(1). The NWPA also effectively required each nuclear utility to execute a contract with DOE. Id. § 10222(b)(1)(A)(i) & (ii) ("The [Nuclear Regulatory] Commission shall not issue or renew a license to any person or production facility . . . unless (i) such person has entered into a contract with the Secretary [of DOE] under this section; or (ii) the Secretary [of DOE] affirms in writing that such person is actively and in good faith negotiating with the Secretary [of DOE] for a contract under this section."). See also Roedler v. Dep't of Energy, 255 F.3d 1347, 1350 (Fed. Cir. 2001) ("The [NWPA] requires the producers of nuclear-generated power to enter into contractual agreements with the Department of Energy in accordance with the terms of a Standard Contract . . ."), cert. denied, 534 U.S. 1056 (2001).

Since Congress viewed the disposal of this nation's commercial SNF as DOE's responsibility and specifically required DOE to enter into contracts with the owners and generators of SNF to formalize such an obligation, voiding the Standard Contract here would frustrate, if not completely nullify, Congress' intent. See Roedler, 255 F.3d at 1352 (interpreting the Standard Contract by examining the NWPA's purpose, since the contract "implements a statutory enactment"); cf. Am. Tel. and Tel. Co. v. United States, 177 F.3d 1368, 1374 (Fed. Cir. 1999) (recognizing a general policy of courts "supporting the integrity of contracts made by and with the United States"). If Congress itself cannot abrogate valid contractual rights via legislation, see United States v. Winstar Corp., 518 U.S. 839, 883 (1996), then surely this court lacks the authority to modify or reverse such a direct congressional mandate. See also Longshore v. United States, 77 F.3d 440, 443 (Fed. Cir. 1996) ("Congress has undoubted

capacity to oversee the performance of Executive Branch agencies . . . It is not for this court to instruct Congress on how to oversee and manage its creations.”).[4]

Many courts have recognized, as did the Show Cause Order, that DOE’s performance of its obligations under the Standard Contract has been problematic. E.g., Maine Yankee, 225 F.3d at 1338 (summarizing DOE’s inability to begin accepting SNF as required by the Standard Contract). Unlike the Show Cause Order, however, these prior courts have fashioned their remedies in a way that remains consistent with the relief that the plaintiffs have sought and faithful to the intent of the NWPA. Indeed, as detailed below, the appellate courts have interpreted the NWPA as directing DOE to assume an unqualified obligation to accept SNF and/or HLW by January 31, 1998. The *amici* recognize that the Court appears to view the Standard Contract as flawed, but any contract flaws are not inherent in how the parties formed the agreement – rather, they are solely attributable to DOE’s administration of the contract and its continuing failure to perform its obligations. It is those failures for which the *amici* seek compensation in their pending lawsuits before this Court. None of the *amici*, SMUD, or the Government have sought to void the Standard Contract, a draconian measure that would further neither the intent of Congress as expressed in the NWPA nor the need of the *amici* for the ultimate disposition of their SNF.

---

[4] In Longshore, the plaintiff alleged that the application fee levied by Congress for participation in a federal lottery for cellular radio system licenses violated the Fifth Amendment prohibition against takings without just compensation. This court dismissed plaintiff’s suit and the Federal Circuit affirmed, noting that “[i]t would ill-behoove this court to tell Congress it could not lawfully make those decisions [to set the application fee],” especially where “there is absolutely no ambiguity” regarding congressional intent. 77 F.3d at 443-44.

## II. THE SHOW CAUSE ORDER IS CONTRARY TO APPELLATE DECISIONS WHICH HAVE REJECTED THE UNAVAILABILITY OF A REPOSITORY AS AN EXCUSE FOR DOE NONPERFORMANCE

The Show Cause Order cites several DOE performance obstacles that, from the Court's perspective, "seriously call into question the viability and the vitality of the Standard Contract in this case. Order at 2. The primary basis for this conclusion is the Court's determination that DOE does not consider SNF stored in canisters at utility sites to be SNF covered under the Standard Contract and that the Standard Contract "will have to be modified or renegotiated if this fuel is to be transported to and stored at Yucca Mountain." Id. To the extent that DOE maintains that SNF stored in dual-purpose canisters does not constitute "standard fuel" as defined in the Standard Contract, the *amici* do not agree with or accept that contention.[5] Moreover, the Government's contention neither excuses nor obviates DOE's fundamental, unconditional obligation to accept SNF under the Standard Contract. But for the Government's breach, plaintiff utilities (including some of the *amici*) would not have needed to build dry storage facilities in the first place, or to store their fuel in dual-purpose canisters. Thus, the Government cannot credibly cite such storage of utilities' SNF as a justification or excuse for DOE's continuing non-performance. Nor can the Court consider the storage of *amici*'s fuel in canisters as somehow detrimental to the viability and vitality of the Standard Contract.

Moreover, to the extent that DOE is unwilling to accept canistered fuel (e.g., based on the erroneous contention that the fuel is not "standard fuel" under the contract) when it finally begins

[5] Even if the Court were correct as to the need to amend the Standard Contract to explicitly address canistered SNF, the fact is that, as recently determined by the U.S. Nuclear Regulatory Commission, the proposed Yucca Mountain facility is being designed to receive fuel in dual-purpose canisters and one of the requirements of the geologic repository is that it include facilities for dealing with SNF in a variety of dual-use (i.e., storage and transportation) canisters. Private Fuel Storage, LLC (Independent Spent Fuel Storage Installation), CLI-05-12, 61 NRC ___, slip op. at 10-11 (Jun. 20, 2005).

picking up fuel from utility sites, the utilities could open the canisters and remove the "standard fuel" to repackage it in DOE-provided containers. The *amici* respectfully submit that, under this scenario, the costs of unloading the canistered fuel and disposing of canisters would constitute damages in their cases because, as explained above, the alternative storage of SNF would not have been necessary but for the Government's breach. In other words, these would be reasonable mitigation measures that are properly recoverable as breach of contact damages. Ultimately, however, DOE is obligated to accept the utilities' SNF regardless of how the fuel is currently stored at utility sites.

The Court's rationale is also completely inconsistent with the ruling by the U.S. Court of Appeals for the District of Columbia Circuit that DOE's contractual obligations are not dependent on the availability of a repository. See Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d 1272, 1274-77 (D.C. Cir. 1996) (DOE's duty to begin SNF acceptance by January 31, 1998 was "without qualification or condition"). Similarly, in Northern States Power Co. v. Dep't of Energy, 128 F.3d 754, 760 (D.C. Cir. 1997) ("Northern States I"), the D.C. Circuit again rejected the unavailability of a repository as an excuse for DOE nonperformance.

Voiding SMUD's contract on the grounds of impracticability or mutual mistake would endorse DOE's hiding behind the "unavoidable delays" clause[6] in the Standard Contract. The Government had argued to the D.C. Circuit that it was not obligated to provide a financial remedy for its performance delay "because the delay, in the Department's estimation, was 'unavoidable.'" Northern States I, 128 F.3d at 757. The D.C. Circuit ruled, however, that to allow the Government to invoke the unavoidable delays clause would be akin to "absolv[ing]

[6] Article IX of the Standard Contract defines an unavoidable delay as a party's failure to perform obligations that arise "out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A.

itself from bearing the costs of its delay if the delay is caused by the government's own acts. This cannot be a valid interpretation, as it would allow the Executive Branch to void an unequivocal obligation imposed by Congress." Id. at 760.

Although the Show Cause Order may not be invoking the "unavoidable delays" clause as the Government sought to do in Northern States I, the evidence that the Court cites in questioning the viability and vitality of the Standard Contract is precisely the same as the Government's rationale for unavoidable delays in Northern States I: "technical problems; regulatory delays; roadblocks to implementation of interim or monitored retrieval storage; funding restrictions; litigation delays; and consultation requirements . . . ." Id. Moreover, as a practical matter, voiding the Standard Contract here would let the Government off the hook for its failure to perform. As explained below, even the award of restitution to the utilities, the non-breaching parties, would leave the Government, the breaching party, in a much better position than if it had never signed the Standard Contract in 1983.

## III. A RESTITUTION AWARD, WITH OR WITHOUT THE PAYMENT OF INTEREST, WOULD NOT FINANCIALLY RESTORE THE *AMICI* TO THEIR POSITION PRIOR TO THE STANDARD CONTRACT'S EXECUTION

Contrary to the Court's apparent view, voiding the Standard Contract and awarding SMUD restitution, if adopted similarly in other cases, would not restore *amici* to their financial position prior to signing the Standard Contract. Just as importantly, the *amici* do not seek to be restored to their pre-Standard Contract position. Rather, their consistent position throughout the SNF litigation has been that they want – and need – DOE to perform its obligations under the Standard Contract. This is in significant part why *amici*'s SNF lawsuits are for partial (rather than total) breach of contract. Of course, the *amici* and other nuclear utilities continue to pay

hundreds of millions of dollars each year to the Government in exchange for DOE's continuing performance obligation.

Restitution, even if available and desirable to the *amici*, would not be an adequate or appropriate remedy if applied in their breach of contract cases. Here, the Court has suggested that restitution (i.e., a Government refund to the utilities of all monies paid to date by them into the Nuclear Waste Fund) would restore the utilities to the same financial position they held as of June 14, 1983. Order at 4-5. This statement is inaccurate. The utilities have lost the use of $9.4 billion in interest that has accumulated over the last two decades on the $13.4 billion that they have paid into the Fund. In addition, the utilities have failed to receive any performance from the Government in exchange for their payments into the Fund.[7]

As with SMUD, the only way that *amici* can be restored "to the same financial position [they] held as of June 14, 1983" would be to refund to them both the principal and the interest that has accumulated on their payments into the Nuclear Waste Fund. Generally speaking, restitution awards include the payment of interest when the benefit conferred on the breaching party consisted of a definite sum of money. See Restatement of Restitution § 156 (1937). However, prejudgment interest is far from certain in cases where, as here, the Government is the defendant and there is no specific waiver of sovereign immunity. See Library of Congress v.

[7] The Court implied that the accrued interest that would remain in the Nuclear Waste Fund after the principal had been returned to the utilities could fund the Government's performance of its Standard Contract obligations. Order at 5. However, the $10 billion in interest posited by the Court would be wholly inadequate to fund the Government's performance as currently envisioned. Specifically, the Office of Civilian Radioactive Waste Management's most recent summary of the Civilian Radioactive Waste Management Program budget states that the estimated total system life cycle cost of the program, through the year 2119, will be $57.52 billion in 2000 dollars. See DOE Office of Civilian Radioactive Waste Management, "Monthly Summary of Program Financial and Budgetary Information as of February 28, 2005" at 1-4 (Feb. 28, 2005); Appendix at 8.

Shaw, 478 U.S. 310, 321 (1986). If this Court were to find that the Standard Contract does not authorize the payment of prejudgment interest, a restitution award could never restore the *amici* to the same financial position they held as of June 1983.

The Court's proposed remedy of restitution to SMUD out of the Nuclear Waste Fund also runs squarely into the Eleventh Circuit's decision in Alabama Power v. Dep't of Energy, 307 F.3d 1300 (11th Cir. 2002). That decision prohibited the Government from using the Fund to remedy the Government's breach of contract, because that would cause the utilities to pay for the Government's breach. See id. at 1314. If this Court were to void the Standard Contract in other SNF cases and provided restitution from the Nuclear Waste Fund, the plaintiff utilities would pay for the Government's breach by paying the costs of indefinite "interim" storage. The Court's related suggestion that the utilities and the Government could enter into a "new contract" when the Government is in a position to perform is similarly flawed. Putting aside the question whether the NWPA authorizes a "new contract," if this new contract were to meet the NWPA's requirement that the utilities would pay for the cost of disposing of their SNF, the utilities will over time simply replenish the Nuclear Waste Fund with the same fees the Court awarded as restitution. Thus, in this scenario, the utilities will also effectively pay for the Government's breach, a solution that the Eleventh Circuit aptly labeled as "pure sophistry." Id. at 1315.

Even assuming that *amici* could be "made whole" with a restitution award that includes the payment of interest, as a practical matter the utilities would still be worse off. As explained in Section IV *infra*, not having a Standard Contract would expose *amici* to substantial regulatory risks involving their nuclear plants. Moreover, without a contract with DOE, current law does not seem to permit DOE to dispose of the utilities' SNF and would not authorize any other entity (including the utilities themselves) to undertake that responsibility. Nor would there be any clear

obligation under the NWPA for DOE to negotiate a new contract, let alone agree to reasonable terms and conditions.

## IV. VOIDING THE STANDARD CONTRACT WOULD HAVE ADVERSE CONSEQUENCES FOR NUCLEAR UTILITIES, THE NATION'S ECONOMY, AND THE PUBLIC INTEREST

For the reasons set forth by SMUD in its response to the Show Cause Order, *amici* do not believe that the doctrines of mutual mistake or impracticability are applicable here. But even apart from this compelling legal constraint, voiding the Standard Contract would have very negative and costly practical consequences to the utilities and their ability to conduct activities licensed by the NRC.[8] Such a result is unwarranted, since the nuclear utilities are non-breaching parties.

It must first be emphasized that, unlike SMUD (which has permanently shut down its nuclear plant), the nuclear power plants that *amici* own and operate continue to generate – in a safe and efficient manner – a significant share of this nation's electrical energy. On a nationwide basis, nuclear power plants provide twenty percent of U.S. electricity. As a result, any action that endangers the continued operation of these plants will have a major impact on the U.S. energy supply and its economy.

As noted above, Section 302(b)(1)(A) of the NWPA states that the NRC shall not "issue or renew" a nuclear power reactor operating license to a utility unless it has entered into a contract with DOE for the disposal of SNF or DOE affirms that the utility is "actively and in good faith negotiating" with DOE for such a contract. 42 U.S.C. § 10222(b)(1)(A). Most nuclear utilities have not yet renewed their initial operating licenses and these utilities, including

[8] The consequences detailed herein are another reason why the *amici* did not sue for total breach of contract (which would have ended the parties' respective obligations under the Standard Contract).

many of the *amici*, have submitted – or plan to submit in the near future – applications to renew those licenses.[9] Under the express language of NWPA Section 302(b)(1)(A), the NRC may not renew nuclear plant operating licenses if the Court voids the Standard Contract and there is no replacement contract with DOE.[10] If operating licenses cannot be renewed, nuclear plants would be forced to shut down when their initial operating licenses expire. Those shutdowns would result in significant economic impacts to the utilities as well as substantial losses to the nation's power supply, potentially leading to severe economic consequences throughout the United States. The absence of a Standard Contract similarly would bar the NRC from licensing any new nuclear plants, the planning for which is actively underway.[11]

Voiding the Standard Contract, if adopted in other SNF cases, could impact not only nuclear plant license renewals, but even the ability of nuclear plants to operate under their existing licenses. Nuclear plants regularly require amendments to their licenses in order continue operation. When the NRC determines whether to grant such license amendment requests, it is "guided by the considerations which govern the issuance of initial licenses." 10 C.F.R. § 50.92(a). Absent the Standard Contract, the NRC could refuse to grant license amendments, since, under the NWPA, the existence of the Standard Contract is one of the considerations

[9] For example, the operating licenses for Unit 1 of *amicus* Indiana Michigan's Cook plant and *amicus* Northern States Power's Monticello plant both expire within the next decade. Indiana Michigan and Northern States Power submitted their license renewal applications to the NRC during the past year. "Status of License Renewal Applications and Industry Activities," at http://www.nrc.gov/reactors/operating/licensing/renewal/applications.html (last visited June 23, 2005).

[10] Although NWPA Section 302(b)(1)(A)(ii) would allow the NRC to renew a nuclear power plant operating license if the Secretary of Energy "affirms in writing" that the utility is actively and in good faith negotiating for a contract, there is nothing to compel (or even to authorize) DOE to negotiate or to affirm in writing.

[11] See, e.g., David E. Sanger, *Bush Makes Renewed Push for Strategy on Energy*, N.Y. TIMES, Mar. 10, 2005, at A-20; Ralph Vartabedian, *Nuclear Industry Lays Foundation for Comeback*, L.A. TIMES, Jun. 23, 2005, at 1.

governing the granting of the initial license. Since license amendments are critical to a nuclear plant's ability to operate, it is readily conceivable that voiding the Standard Contract could lead to nuclear plant shutdowns.

If this Court voided the Standard Contract in other cases, this could also allow the NRC to revoke, suspend, or modify a utility's license. NRC's regulations provide that a license "may be revoked, suspended, or modified, in whole or in part . . . because of conditions revealed by the application for license or statement of fact or any report, record, inspection or other means, which would warrant the Commission to refuse to grant a license on an original application." 10 C.F.R. § 50.100. Since a nuclear utility must have in place a contract with DOE for SNF disposal in order to obtain an initial operating license, if this Court voids the Standard Contract, the NRC might determine that it had the right (or perhaps even the obligation) to revoke, suspend, or modify those licenses.

In addition to the impacts that voiding the Standard Contract would have for the *amici*, all the nation's other nuclear utilities, and the national economy, voiding the Standard Contract and directing restitution to the utilities of their payments into the Nuclear Waste Fund would also cripple this nation's program to dispose of thousands of tons of high-level radioactive waste from its atomic energy defense programs. The NWPA required the President to determine within two years of the Act's passage whether a separate repository should be developed for high-level *defense* wastes. 42 U.S.C. § 10107(b)(1). In 1985, President Reagan determined that defense waste would be disposed of in the same repository as SNF from civilian nuclear reactors. See Nat'l Ass'n of Regulatory Util. Comm'rs v. Dep't of Energy, 851 F.2d 1424, 1426 (D.C. Cir. 1988). As a result, congressionally appropriated funds for the program to dispose of defense wastes are combined with funds from the Nuclear Waste Fund's collection from nuclear utilities

to finance the overall disposal program. Id. If the Nuclear Waste Fund is depleted by restitution, it is by no means clear where the overall nuclear waste program will get adequate funding, thereby calling into question not only the disposal of SNF from nuclear utilities' reactors, but also the disposal of high-level radioactive wastes from atomic energy defense programs.[12]

For these reasons, if the Standard Contract were voided in other SNF cases, it would have severe consequences for the nation's power supply, the economy, and the public interest.

[12] Since the start of the Nuclear Waste Program, more than two-thirds of the funds have come from the Nuclear Waste Fund with less than a third coming the defense appropriations. See DOE Office of Civilian Radioactive Waste Management, "Monthly Summary of Program Financial and Budgetary Information as of February 28, 2005" at A-3; Appendix at 11.

## CONCLUSION

For the foregoing reasons, the *amici* respectfully urge the Court to recognize the inappropriateness of voiding the Standard Contract and the severe consequences which such action would have for the *amici*, for all other nuclear utilities, and for the nation's economy, power supply, and the public interest. The Court should decline to impose such a result here, and instead should determine the amount of damages SMUD is entitled to recover as a result of the Government's breach.

Dated: July 7, 2005

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel for *Amici Curiae*
Florida Power and Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Omaha Public Power District, Nebraska Public Power District, PSEG Nuclear, L.L.C., Public Service Electric and Gas Company, Vermont Yankee Nuclear Power Corporation, The Detroit Edison Company, System Fuels, Inc., Entergy Nuclear Indian Point 2, LLC, Entergy Arkansas, Inc., Entergy Gulf States, Inc., Entergy Nuclear Generation Company, Entergy Nuclear Fitzpatrick, LLC, Entergy Nuclear Indian Point 3, LLC, Entergy Nuclear Operations, Inc., Entergy Nuclear Vermont Yankee, LLC, and FPL Energy Seabrook, LLC

Of Counsel:

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

Of Counsel:

Ronald A. Schechter
Jeffrey L. Handwerker
**ARNOLD & PORTER LLP**
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5160
(202) 942-5999 (fax)

s/ M. Stanford Blanton by s/ Jack Y. Chu
M. Stanford Blanton
**BALCH & BINGHAM LLP**
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417
(205) 488-5879 (fax)

Counsel for *Amici Curiae*
Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company

Of Counsel:

Donald J. Carney
**PERKINS COIE LLP**
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675
(202) 434-1690 (fax)

s/ Richard W. Oehler by s/ Jack Y. Chu
Richard W. Oehler
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8419
(206) 359-9000 (fax)

Counsel for *Amicus Curiae*
Wisconsin Electric Power Company