**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed July 7, 2005)

| | | |
|---|---|---|
| **SACRAMENTO MUNICIPAL UTILITY DISTRICT,** Plaintiff, | ) | |
| v. | ) | No. 98-488C (Judge Braden) |
| **THE UNITED STATES,** Defendant. | ) | |

**BRIEF OF *AMICI CURIAE***
**NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS,**
**ALABAMA PUBLIC SERVICE COMMISSION,**
**PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK,**
**NORTH DAKOTA PUBLIC SERVICE COMMISSION,**
**NORTH CAROLINA UTILITIES COMMISSION,**
**MINNESOTA PUBLIC UTILITIES COMMISSION,**
**IN RESPONSE TO THE SHOW CAUSE ORDER**

JAMES BRADFORD RAMSAY,
*General Counsel*
GRACE D. SODERBERG,
*Assistant General Counsel**

National Association of Regulatory Utility Commissioners
1101 Vermont Ave. NW, Suite 200
Washington, D.C. 20005
Phone: 202.898.2200
*Counsel of Record

****OF COUNSEL:**

**G. SCOTT MORRIS
*Deputy Attorney General*
Alabama Public Service Commission
100 North Union Street, Suite 836
Montgomery, AL 36104

*Attorney for Alabama Public Service Commission*

(Additional Counsel listed on inside cover)

Dated: July 7, 2005

DAWN JABLONSKI RYMAN
*General Counsel*
**JOHN L. FAVREAU
Assistant Counsel
Public Service Commission of the State of New York
Three Empire State Plaza
Albany, N.Y. 12223

*Attorneys for Public Service Commission of the State of New York*

**LOUIS S. WATSON, JR.
Staff Attorney
North Carolina Utilities Commission
4325 Mail Service Center
Raleigh, N.C. 27699

*Attorney for North Carolina Utilities Commission*

**WILLIAM W. BINEK (ID # 02990)
*Special Assistant Attorney General*
North Dakota Public Service Commission
600 East Boulevard Ave. Dept. 408
Bismarck, ND 58505-0480

*Attorney for North Dakota Public Service Commission*

MIKE HATCH
Attorney General
**KARI VALLEY ZIPKO (#330413)
Assistant Attorney General
Minnesota Office of the Attorney General
445 Minnesota Street, Suite 1100
Saint Paul, MN 55116
(651) 296-1408

*Attorneys for Minnesota Public Utilities Commission*

Dated: July 7, 2005

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ iv

**STATEMENT OF THE CASE** ........ 1

***AMICI CURIAE* STATEMENT** ........ 4

**ARGUMENT** ........ 8

**I. Ordinary Contract Principles, such as Mutual Mistake and/or Impracticability, Not Apply to the "Standard Contract" Created in the Nuclear Waste Policy Act.** ........ 8

**II. Voiding the SMUD Standard Contract Violates the Nuclear Waste Policy Act of 1982.** ........ 11

**III. Even if Ordinary Contract Principles Apply, There is No Basis for Voiding the SMUD Standard Contract on the Basis of Mutual Mistake or Impracticability.** ........ 12

**a. There Was No Mutual Mistake in 1983.** ........ 12

**b. Impracticability of Performance is Not Applicable to the Facts of this Case.** ........ 13

**IV. Awarding Restitution From the Nuclear Waste Fund Violates the Nuclear Waste Policy Act Of 1982.** ........ 15

**V. Other Concerns Raised in the Show Cause Order Lack Support in the Record.** ........ 16

**CONCLUSION** ........ 19

# TABLE OF AUTHORITIES

**Supreme Court:**


*F.C.C. v. Beach Communications,* 9
508 U.S. 307 (1993).

*Minnesota v. Clover Leaf Creamery Co.,* 9
449 U.S. 456 (1981).

*Turner Broadcasting System, Inc. v. F.C.C.,* 10
520 U.S. 180 (1997).


**Court of Appeals:**

**Federal Circuit**:


*Atlas Corp. v. United States,*
895 F.2d 745 (Fed. Cir. 1990), cert denied, 498 U.S. 811 (1990). 12

*Dairyland Power Coop. v. United States,* 13
16 F.3d 1197 (Fed. Cir. 1994).

*Maine Yankee Atomic Power Co. v. United States,* 1, 2, 8, 14, 15,17
225 F.3d 1336 (Fed. Cir. 2000).

*Northern States Power Co. v. United States,* 1 ,14, 15, 17
224 F.3d 1361 (Fed. Cir. 2000).

*Roedler v. Dep't of Energy,* 1
255 F.3d 1347 (Fed. Cir. 2001).


**D.C. Circuit**:


*Indiana Michigan Power Co v. DOE.,* 1, 8, 10, 17
88 F.3d (D.C. Cir. 1996).

*NARUC, et al. v. ICC,* 4
41 F.3d 721 (D.C. Cir 1994).

*Northern States Power Co. v DOE,* 1, 8, 11, 12, 16
128 F.3d (D.C. Cir. 1997).

*Nuclear Energy Institute, Inc. v. Environmental Protection Agency*, 373 F.3d 1251 (D.C. Cir. 2004). 17, 18

*Wisconsin Electric Power Co. v. DOE*, 778 F.2d 1 (D.C. Cir. 1985). 11

**5th Circuit**:

*USA v. Southern Motor Carrier Rate Conference, et al.*, 467 F.Supp. 471 (N.D. Ga. 1979), aff'd 672 F.2d 469 (5th Cir. 1982); aff'd en banc, 702 F.2d 532 (5th Cir. 1983), rev'd, 471 U.S. 48 (1985). 4

**7th Circuit:**

*Indianapolis Power and Light Co. v. ICC*, 587 F.2d 1098 (7th Cir. 1982). 4

**9th Circuit:**

*Rendleman v. Bowen*, 860 F.2d 1537 (9th Cir. 1988). 9

*State of Nevada v. Herrington*, 827 F.2d 1394 (9th Cir. 1987). 15

*Washington Utilities and Transportation Commission v. FCC*, 513 F.2d 1142 (9th Cir. 1976). 4

**11th Circuit:**

*Alabama Power Co. v. United States*, 307 F.3d 1300 (11th Cir. 2002). 16

**Federal Claims:**

*Commonwealth Edison Co. v. United States*, 56 Fed.Cl. 652 (2003). 2

*Detroit Edison Co. v. United States*, 56 Fed.Cl. 299 (2003). 2

*Florida Power & Light Co. v. United States*, 64 Fed. Cl. 37 (2005). 1

*Indiana Michigan Power Co. v. United States*, 60 Fed.Cl. 639 (2004). 1

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003). 2

*L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296 (2004). 14

*Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495 (2005). 1

*Short Bros., PLC v. United States*, 2005 U.S. Claims LEXIS 160 (2005). 13

*Tennessee Valley Auth. v. United States*, 60 Fed.Cl. 665 (2004). 1

*Yankee Atomic Elec. Co. v. United States*, 42 Fed.Cl. 223 (1998). 2

*Westinghouse Electric Corporation v. United States*, 41 Fed. Cl. 229 (1998). 13

**Statutes:**

Nuclear Waste Policy Act of 1982 ("NWPA")
Pub. L. 97-425, 96 Stat. 2202 (Jan. 7, 1983), as amended,
Nuclear Waste Policy Amendments Act of 1987,
Pub. L. No. 100-203, § 5011, 101 Stat. 1330-1, 1330-228, as amended,
Yucca Mountain Development Act ("YMDA"),
Pub. L. 107-200; 107th Cong., 2d Sess, 116 Stat. 735.
(codified, as amended, at 42 U.S.C. 10101 et seq.). passim

47 U.S.C. § 410(c) (1971). 4

47 U.S.C. § 254 (1996). 4

Section 801 of the Energy Policy Act, 42 USC § 8287. 18

**Other Authorities:**

10 C.F.R. § 961.11. 11

40 C.F.R. Part 197. 18

Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 5,458 (Feb. 4, 1983) (codified at 10 C.F.R. § 961.11). 12

**Restatements:**

Section §261 of Restatement (Second) of Contracts. 13,14

Restatement (Second) of Contracts (1981) at §151. 13

**State Authority:**

Minn. Stat. §§ 216A.03 and 216A.05 (2004). 5

N.Y. Pub. Serv. Law, §§ 65, 66. 5

N.C. Gen. Stat. 62-3(23)a.1. 6

N.C. Gen. Stat. 62-48(a). 6

**NARUC Resolutions:**

*Resolution Supporting Reform of the Nuclear Waste Fund* (March 10, 2004). 8

*Resolution Supporting Needed Reform of the Nuclear Waste Fund* (February 26, 2003). 8

## STATEMENT OF THE CASE

The Sacramento Municipal Utility District ("SMUD") executed a Standard Contract on June 14, 1983 ("SMUD Standard Contract") and subsequently paid approximately $40 million into the Nuclear Waste Fund. On January 19, 2005, this Court issued a *Memorandum Opinion and Order* finding the United States' failure to commence accepting nuclear waste was a breach of the SMUD Standard Contract.[1] In March 2005, this Court held an evidentiary hearing to determine if SMUD is entitled to damages as a result of the breach. As a result of that hearing, on April 21, 2005, this Court ordered the United States and SMUD to show cause why it should not hold the SMUD Standard Contract void and order the United States to refund all monies SMUD paid into the Nuclear Waste Fund as restitution ("*Show Cause Order*" or "*Order*"). The *Order* invites interested parties to file as *Amici*.[2]

A decision voiding the SMUD Standard Contract will have a far-reaching impact on the entire nuclear electric industry. Currently, there are over sixty lawsuits before this Court involving utilities from which the United States was supposed to begin accepting nuclear waste for disposal beginning in 1998.[3]

---

[1] *Sacramento Municipal Utility District v. United States*, 63 Fed.Cl. 495 (2005).

[2] Consultation with the Office of the Clerk of the Court confirmed that the Court's invitation negated the requirement for a motion specified in Rule 20 of the Rules of the United States Court of Federal Claims.

[3] The Federal Courts have established DOE had a statutory deadline of nuclear waste acceptance on January 31, 1998 irrespective of whether a geologic repository was available. See, e.g., *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1350-51 (Fed. Cir. 2001); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337-40 (Fed. Cir. 2000)("*Maine Yankee Atomic Power Co.*"); *Northern States Power Co. v. United States*, 224 F.3d 1361, 1364 (Fed. Cir. 2000)("*Northern States Power Co.*"); *Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 756-58 (D.C. Cir. 1997)("*Northern States Power Co.*"); *Indiana Michigan Power Co. v. United States*, 88 F.3d 1272, 1273-74 (D.C. Cir. 1996)("*Indiana Michigan Power Co.*"); *Florida Power & Light Co. v. United States*, 64 Fed.Cl. 37 (2005); *Tennessee Valley Auth. v. United States*, 60 Fed.Cl. 665, 666-70 (2004); *Indiana Michigan Power Co. v. United States*, 60 Fed.Cl. 639, 640-42 (2004)("*Indiana Michigan Power Co.*"); *Indiana Michigan Power Co. v. United*

If all these Standard Contracts, and possibly others,[4] are deemed void, there will be no fee payments to the Nuclear Waste Fund ("NWF") during this period.[5] Moreover, if the estimated $13 billion in restitution is awarded to SMUD, and all the other Plaintiffs, Congress will have to address whether the Nuclear Waste Policy Act of 1982 ("NWPA")[6] must be completely overhauled. Because the estimated balance of $16 billion in the Fund is basically an *accounting entry*, this decision could effectively dismantle the Nuclear Waste Program ("NWP").[7]

---

*States*, 57 Fed.Cl. 88, 90-94 (2003)(*"Indiana Michigan Power Co."*); *Commonwealth Edison Co. v. United States*, 56 Fed.Cl. 652, 654-55 (2003); *Detroit Edison Co. v. United States*, 56 Fed.Cl. 299, 300 (2003); *Yankee Atomic Elec. Co. v. United States*, 42 Fed.Cl. 223, 225-229 (1998). Thus, as a matter of law, DOE's failure to begin removing nuclear waste from the utilities in 1998 was a breach of the Standard Contract. The Federal Circuit held that utilities could file breach of contract lawsuits against the Federal government. See *Maine Yankee Atomic Power Co.*, 225 F.3d at 1336. Damages are to be established in individual breach of contract cases now progressing through this Court.

4 The Statute effectively made entry into the Standard Contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses to any operator who has not entered into a contract. Since the Standard Contract serves as a template for the individual contracts between the utilities and DOE in every material respect, there is no material difference between the Standard Contract, the SMUD Standard Contract, and all other operator contracts.

5 To finance the creation and operation of repositories, the Nuclear Waste Policy Act of 1982 established the Nuclear Waste Fund to ensure that the costs of carrying out activities relating to nuclear waste disposal will be borne by the persons responsible for generating such waste. Accordingly, nuclear energy producers are required to pay assessments into the Fund based on the amount of electricity they generate and sell.

6 Pub. L. 97-425, 96 Stat. 2202 (Jan. 7, 1983) (codified, as amended, at 42 U.S.C. 10101 et seq.).

7 The money in the Nuclear Waste Fund has been used for other Federal government purposes and will only be available through Congressional appropriations of other money for that purpose. While there are no actual funds residing in a separate NWF, the *balance* continues to earn interest because Section 302(e)(3) of the NWPA allows the Secretary of the Treasury to invest the balance in obligations of the United States and accumulate *returns on investment* that have totaled over $8 billion since 1985. The Statute allows for borrowing of funds available in the NWF to meet repository program needs during a fee hiatus. See Section 302(e)(5) of the NWPA. This approach would, in effect, shift the civilian radioactive waste management program from a pay-as-you-go financing plan to a payment on delivery scheme that would

Voiding these Standard Contracts can only lead to continued indefinite storage of nuclear waste at utility storage sites in approximately 35 States. Those reactor storage sites were never planned or built for providing indefinite storage.

Nuclear power fuels 20 percent of the nation's electricity supply. Continued generation of electricity by nuclear fuel depends largely on the ability of nuclear power plants to manage the waste generated there. Effective management and permanent disposal of nuclear waste are essential to minimize the life cycle costs of the existing nuclear plants. Cost increases for expanding on-site storage, reactor decommissioning and centralized disposal of nuclear wastes increase the overall costs of nuclear energy, which, in turn, can have a significant adverse affect on energy costs to consumers.

Collapse of the NWP is not an acceptable outcome. When Congress passed the NWPA, it recognized that the disposition of high level radioactive waste ("HLW")[8] and spent nuclear fuel ("SNF")[9] represented a national problem[10] and that the Federal government has the responsibility to provide for permanent disposal in order to protect the public health and safety.[11] Voiding the Standard Contracts would clearly undermine the structure of the NWP and would inevitably provide a basis for the Federal government to further delay meeting its obligation to accept civilian nuclear waste. This, in turn, can only exacerbate the problem of accumulated SNF and HLW stored on-site at civilian reactors.

---

involve taxpayer-bridge financing until the repository opens and all accumulated disposal fees comes due.

[8] HLW generally is highly radioactive material either resulting from reprocessing of spent fuel or otherwise determined to require permanent isolation. 42 U.S.C. § 10101(12), (23).

[9] SNF is unreprocessed fuel withdrawn from a nuclear reactor.

[10] 42 U.S.C. § 10131(a)(2)-(A).

[11] 42 U.S.C. § 10131(a).

## ***AMICI CURIAE*** **STATEMENT**

The National Association of Regulatory Utility Commissioners ("NARUC") is a quasi-governmental nonprofit organization founded in 1889. Its members include the governmental bodies of the fifty States, the District of Columbia, Puerto Rico, and the Virgin Islands charged with the duty of overseeing the intrastate operations of common carriers and public utilities. NARUC's mission is to serve the public interest by seeking to improve the quality and effectiveness of public regulation in the United States. NARUC's members have the obligation under State law to assure the establishment and maintenance of such energy utility services as may be required by the public convenience and necessity, and to ensure that such services are provided at rates and under terms and conditions that are just, reasonable, and nondiscriminatory for all customers. NARUC's members, *inter alia*, scrutinize the costs of electric utilities in their respective jurisdictions to ensure that the ratepayers pay only utility costs that are reasonable and prudent. The Congress of the United States and Federal Courts have recognized NARUC as a proper representative of the collective interests of the State's public utility regulatory commissions.[12]

[12] See, e.g., 47 U.S.C. § 410(c) (1971) (Congress specified that NARUC, "the national organization of the State commissions" responsible for the economic and safety regulation of utilities, nominates members to FCC Joint Federal-State Boards which consider universal service, separations, and related concerns and provide formal recommendations that the FCC must act upon.); Cf. 47 U.S.C. § 254 (1996) (describing functions of the Joint Federal-State Board on Universal Service). Cf. *NARUC, et al. v. ICC,* 41 F.3d 721 (D.C. Cir. 1994) (where the Court explains "…Carriers, to get the cards, applied to… [NARUC], an interstate umbrella organization that, as envisioned by Congress, played a role in drafting the regulations that the ICC issued to create the "bingo card system".). See also *USA v. Southern Motor Carrier Rate Conference, et al.*, 467 F.Supp. 471 (N.D. Ga. 1979), aff'd 672 F.2d 469 (5th Cir. 1982); aff'd en banc, 702 F.2d 532 (5th Cir. 1983), rev'd, 471 U.S. 48 (1985). See also *Indianapolis Power and Light Co. v. ICC*, 587 F.2d 1098 (7th Cir. 1982); *Washington Utilities and Transportation Commission v. FCC,* 513 F.2d 1142 (9th Cir. 1976).

The North Dakota Public Service Commission ("NDPSC") is a three-member body created by the Constitution of the State of North Dakota and is statutorily charged with the duty to regulate utility services within North Dakota. Xcel Energy ("Northern States Power Co. d/b/a Xcel Energy") operates as an electric utility in North Dakota under the regulatory jurisdiction of the NDPSC. Fees paid into the NWF by Xcel Energy have been passed along to Xcel Energy's ratepayers in North Dakota since Xcel Energy's nuclear plants in the State of Minnesota became operational.

The Public Service Commission of the State of New York ("NYPSC") is responsible for regulating retail electric utility service in the State of New York to ensure that electricity is furnished to consumers in a manner that is safe and adequate and at just and reasonable rates.[13] New York's electric utilities have divested their nuclear generation and thus the costs of such generation are not directly recovered in retail rates in New York. Nuclear generators do, however, sell electricity on the New York wholesale market and nuclear costs, including the costs of waste storage, are thus eventually reflected in retail rates. The NYPSC is also interested in the continued reliability and economic viability of generators in New York, and is very concerned about potential impacts if the Federal government does not take waste currently stored at New York's nuclear plants.

The Minnesota Public Utilities Commission ("MPUC") is a five-member body created by the Legislature of the State of Minnesota to regulate the provision of electric, natural gas and telecommunications utility services in Minnesota.[14] The MPUC is vested with the authority to create and maintain a regulatory environment that ensures safe, reliable and efficient utility

---

[13] See N.Y. Pub. Serv. Law, §§ 65, 66.

[14] See Minn. Stat. §§ 216A.03 and 216A.05 (2004).

services at fair and reasonable rates.[15] Xcel Energy and Interstate Power and Light Company ("IPL") provide electric service to Minnesota ratepayers from nuclear-powered generating facilities. The amounts paid by Xcel Energy and IPL into the NWF have been passed along to their Minnesota ratepayers through retail rates.

The North Carolina Utilities Commission ("NCUC") is an agency created by the North Carolina General Assembly for the purposes of regulating the rates, terms, and conditions of service provided by "public utilities" in accordance with North Carolina law. Pursuant to N.C. Gen. Stat. 62-48(a), the NCUC is authorized to "appear in . . . proceedings before federal and State courts and agencies . . . to secure for the users of public utility service in [North Carolina] just and reasonable rates and service." According to N.C. Gen. Stat. 62-3(23)a.1, an entity "[p]roducing, generating or furnishing electricity . . . to or for the public for compensation" is a "public utility" subject to the NCUC's regulatory jurisdiction. A number of the electric utilities regulated by the NCUC, such as Carolina Power and Light Company (d/b/a "Progress Energy Carolinas, Inc."); Duke Power, a division of Duke Energy Corporation; and Virginia Electric and Power Company (d/b/a "Dominion North Carolina Power"), generate electricity using nuclear energy and sell that electricity to retail consumers in North Carolina. As a result, the rates paid for retail electric service in North Carolina subject to the jurisdiction of the NCUC include amounts assessed against electric utilities providing service in North Carolina for nuclear waste disposal. In addition, the NCUC is responsible for ensuring the safe and reliable provision of electric service in North Carolina, so that the NCUC an has interest in ensuring that the nuclear generating facilities providing service to North Carolina ratepayers are able to operate in accordance with applicable safety regulations. Finally, nuclear waste is stored at reactor sites in

15 Id.

North Carolina, and the NCUC is concerned about any risk that the Federal government will not honor its obligations under the Nuclear Waste Policy Act to remove such waste for disposal in an appropriate geologic repository.

Pursuant to constitutional and statutory authority, the Alabama Public Service Commission ("APSC") is responsible for the regulation of electric and gas utilities that serve the residents of Alabama. The APSC's responsibilities include the regulation of rates, charges and practices of electric utilities, the regulation of the issuance of securities, certification of new generating and transmission plants, and supervision of all other aspects of retail electric service. The APSC's mandate is to regulate public utilities in a manner which is reasonable and just to both the utility and the public. Alabama Power Company ("Alabama Power") operates as an electric utility in Alabama under the regulatory jurisdiction of the APSC. Nuclear power from Alabama Power's two nuclear units (Farley 1 and 2) accounts for over 17% of Alabama Power's electric generation. Because of this generation, Alabama Power has paid many millions of dollars into the Nuclear Waste Fund and these fees have been passed on to Alabama Power's customers through rates regulated by the APSC.

This Court has recognized that the financial risks associated with the disposal of HLW and SNL are assumed by utility rate payers. That is why *Amici* are compelled to participate in this proceeding. Customers that purchase nuclear generated electricity effectively pay fees that are ultimately deposited into the NWF for development of a permanent nuclear waste repository. The fees utility owners pay to the Federal government for nuclear waste disposal is one cost element recovered from rate-regulated electric utility consumers through rates approved by NARUC member commissions or otherwise authorized by State law. Thus, State regulators have an obvious and compelling economic and reliability interest in assuring the efficiency and

success of the NWP.[16] The proposal to void these Standard Contracts undermines the achievement of the goal of ensuring that the Federal government fulfills its obligations to accept waste under the NWPA.

## ARGUMENT

### *I. Ordinary Contract Principles, Such as Mutual Mistake and/or Impracticability, Do Not Apply to the "Standard Contract" Created in the Nuclear Waste Policy Act.*

This *Show Cause Order* asks whether the Standard Contract should be held void because of mutual mistake and/or impracticability of performance. However, the Standard Contract is hardly a normal agreement. The Department of Energy ("DOE" or "Department") and SMUD certainly are not typical contracting parties, negotiating and executing a bilateral agreement. As recognized by the Federal Circuit, "[t]he Act effectively made entry into [the Standard Contract] mandatory for the utilities . . . ." [17] The "plain language of the Statute . . . mandates that DOE assume a contractual obligation" to dispose of SNF.[18]

The question is not whether the parties entered into the Standard Contract mistakenly. Rather, to interpret the Standard Contract, the intention and understanding of Congress is relevant. That intention could not be clearer. Congress intended to regulate the disposal and

---

16 NARUC's members remain concerned that $22 billion (plus interest) in fees paid into the NWF by utilities, and recouped from their customers since 1983, have gone into the United States Treasury without any assurance that they will be utilized in support of the NWP. During the same time frame, Congress has appropriated a mere $6 billion to support the repository program. See *Resolution Supporting Reform of the Nuclear Waste Fund* (March 10, 2004); *Resolution Supporting Needed Reform of the Nuclear Waste Fund* (February 26, 2003).

17 *Maine Yankee Atomic Power Co.*, 225 F.3d at 1337.

18 *Northern States Power Co.*, 128 F.3d at 757. Accord, *Indiana Michigan Power Co.*, 88 F.3d at 1276 (**"**[T]he NWPA . . . clearly demonstrates a congressional intent that the Department assume a contractual obligation to perform by the 1998 deadline, 'without qualification or condition.'").

storage of SNF. The public interest, not private contractual expectations, requires this Court to uphold the SMUD Standard Contract.

In *Rendleman v. Bowen,*[19] the Ninth Circuit considered a Federal Statute under which medical students can receive scholarships if they enter into a standard scholarship contract agreeing to subsequent public service. As is the case here, "[t]he exact terms to be included in the contract are specified in the [S]tatute."[20] The Ninth Circuit discussed the nature of the Standard Contract for scholarship and the applicable rules of interpretation and application:

> In passing the Statute, Congress intended to implement certain public policy goals by conditioning receipt of scholarship aid upon compliance by the recipient with Federal statutory and administrative directives. These conditions do not arise from a negotiated agreement between the parties; rather, they are provided for in the Statute. Statutory intent, therefore, is more relevant to the interpretation of these conditions than are common law contract principles. . . .The only terms contained in the written agreement signed by a recipient are those required by the Statute. . .. Thus, the obligations of the Secretary are to be based on statutory and not contractual principles.[21]

Given these rules of construction, it would not be appropriate for the Court to relieve DOE from its responsibilities under the NWPA based on a theory of mistake or some concern that performance has become impracticable.[22] As the Supreme Court said:

> [C]ourts must accord substantial deference to the predictive judgments of Congress. . . . Our sole obligation is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.... We owe Congress' findings deference . . . because it evaluates the vast amounts of data bearing upon legislative questions. . . [C]ourts must perform appropriately deferential examination of Congress' evaluation . . . This principle has special significance in cases, like this one, involving congressional judgments concerning

---

19 860 F. 2d 1537, 1539 (9th Cir. 1988).

20 Id. at 1539.

21 Id. at 1541-1542.

22 See *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 470 (1981) ("[I]t is not the function of courts to substitute their evaluation of legislative facts for that of the legislature."); *F.C.C. v. Beach Communications*, 508 U.S. 307, 315 (1993) ("[L]egislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

> regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technological change. . . . We owe Congress' findings an additional measure of deference out of respect for its authority to exercise the legislative power. Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy. [23]

In sum, the facts as understood by the DOE and the nuclear industry are immaterial to the validity of the Standard Contract. It is what Congress understood that is relevant because Congress mandated the contractual relationship.

As referenced earlier, an operational waste repository is not a prerequisite for a valid contract under these conditions. The D.C. Circuit has already held that the NWPA binds the Federal government though the Standard Contract to accept waste beginning in 1998 regardless of the fact that the repository is not yet available.[24]

In discussing "impractability," the *Show Cause Order* states that, as of March 1, 2001, 17 sites, including SMUD's site, in 13 states had licensed commercial dry storage facilities and 15 additional sites were then under the Standard Contract. The *Order* concludes that none of the SNF stored in this manner is considered by the DOE to be "standard fuel" subject to the Standard Contracts, because it is not compatible with the environmental and safety requirements for Yucca Mountain. According to the *Order*, the type of canister that will be suitable and authorized for use at Yucca Mountain was not known in 1983 and is still not known. Although DOE has prepared a design and safety analysis, according to the *Order*, none of this information has been

---

[23] *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180, 195-96 (1997).

[24] *Indiana Michigan Power Co.*, 88 F.3d at 1272. Although DOE may have contemplated "Yucca Mountain" as its disposal facility, there is no indication in the Standard Contract itself to indicate that "Yucca Mountain" was viewed as the exclusive means of performance. Even if DOE may have relied on the basic assumption that "Yucca Mountain" would be developed, that assumption was only an expectation that was never incorporated into the Standard Contract. Thus, the doctrine of mistake has no application to the Standard Contract.

submitted to the NRC for a license and therefore no approved storage canisters have been manufactured.

Whether the manner in which SMUD's SNF is currently being stored is compatible with the environmental safety requirements for Yucca Mountain is irrelevant to the question of the validity of the Standard Contract. The plain language of the Standard Contract requires DOE to "dispose of spent nuclear fuel".[25] It does not define storage canisters, nor is there mention of "Yucca Mountain". In fact, the Standard Contract expressly states DOE shall provide transportation casks and all necessary transportation of SNF from the Purchaser's site to DOE's facility.[26] SMUD's manner of storage should then not be relevant to the necessity for DOE's performance, nor render it impracticable.

## *II. Voiding The SMUD Standard Contract Violates The Nuclear Waste Policy Act of 1982.*

The Court asks if a final judgment voiding the SMUD Standard Contract violates the Nuclear Waste Policy Act of 1982 or is otherwise contrary to law. The short answer is yes. Voiding the Standard Contract is clearly at odds with the intent and purpose of the Statute. If, as here, Congress has unambiguously spoken to the issue, we respectfully submit that Courts are required to follow the statutory text.[27]

The Statute specifies that the Federal government has ultimate responsibility for permanent disposal of SNF and HLW.[28] Other Federal Courts have consistently rejected efforts to dilute this *clear* and *unconditional* obligation to dispose of nuclear waste.[29] The mechanism specified in the Nuclear Waste Policy Act of 1982 for providing waste acceptance, transportation

25 10 C.F.R. § 961.11 (2005).
26 Id.
27 *Wisconsin Electric Power Co. v. DOE*, 778 F.2d 1 (D.C. Cir. 1985).
28 42 U.S.C. § 10131(b).
29 See, e.g., *Northern States Power Co.*, 128 F.3d at 759.

and eventual disposal in the permanent geologic repository is the Standard Contract between each nuclear utility and DOE.[30] To effectuate DOE's unconditional duty, utilities that have signed Standard Contracts must be able to enforce them in a meaningful way.[31] Since Standard Contracts are the vehicle for enforcing the NWPA, declaring them void frustrates Congressional intent.

***III. Even If Ordinary Contract Principles Apply, There Is No Basis For Voiding the SMUD Standard Contract on the Basis of Mutual Mistake or Impracticability.***

Assuming *arguendo*, the Court determines ordinary contract principles apply to the SMUD Standard Contract, the defenses of "mutual mistake" and "impracticability of performance" are not available to void the SMUD Standard Contract.

***A. There Was No Mutual Mistake in 1983.***

It is well established that the elements of the contract defense of mutual mistake are: "(i) the parties to a contract were mistaken in their belief regarding a fact; (ii) the mistake constitutes a basic assumption underlying the contract; (iii) the mistake had a material effect on the bargain; and (iv) the contract did not put the risk of the mistake on the party alleging the mistake".[32] The mistake under the first prong must be "an erroneous belief as to an existing fact" at the time of contract formation.[33] Here, the parties' belief in 1983 that SNF and HLW could be delivered and disposed in a geologic repository by 1998 fails to satisfy the first prong of this test.

In 1983, SMUD and the Federal government entered into the SMUD Standard Contract, whereby the Federal government agreed to provide disposal services for SNF and HLW

---

[30] See Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 5,458 (Feb. 4, 1983) (codified at 10 C.F.R. § 961.11). See also 42 U.S.C. § 10222(a)(1).

[31] *Northern States Power Co.*, 128 F.3d at 759.

[32] *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990), cert denied, 498 U.S. 811 (1990).

[33] Id.

beginning no later than January 31, 1998. In 1983, the parties believed that SNF and HLW could be transported to and stored in a Federal repository by 1998. There was a sound basis at that time for believing that a repository could be licensed somewhere, although a site had yet to be selected.

Subsequent events have demonstrated that the parties were obviously "mistaken" as to performance by 1998. This fact does not, contrary to the *Show Cause Order*, justify voiding the SMUD Standard Contract for mutual mistake. To void a contract by mutual mistake, the parties' erroneous belief must relate to the facts existing at the time of the making of the contract.[34] "A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact]."[35] It is a well accepted principle that a mutual mistake of fact cannot relate to a future event.[36] In this case, the parties' belief that SNF and HLW would be delivered and disposed by a particular date is not a mistake as to a fact existing in 1983, because it was not known that SNF and HLW would not be delivered or stored in a Federal repository at that time. The fact that delivery and storage did not occur within the time frame the parties assumed does not constitute a mutual mistake of an existing fact, and therefore, the SMUD Standard Contract cannot be deemed void on the grounds of mutual mistake.

***B. Impracticability of Performance is Not Applicable to the Facts of this Case.***

Section §261 of Restatement (Second) of Contracts states that:

---

34 Restatement (Second) of Contracts (1981) at §151.

35 *Westinghouse Electric Corp. v. United States.*, 41 Fed.Cl. 229, 238 ( 1998).

36 *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994); See also *Short Bros., PLC v. United States*, 2005 U.S. Claims LEXIS 160 at 346-348 (2005)(Holding that contract reformation was not proper under the doctrine of mutual mistake when the existence of a fact is not known to the contracting parties, because they cannot form a belief concerning that fact, and, therefore, there is no mistake).

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, . . .

The SMUD Standard Contract cannot be deemed void for "impracticability" because there has been no "occurrence of an event" that, had it been known in 1983, would have caused the parties to refrain from entering into the SMUD Standard Contract. Therefore, the Federal government's failure to accept SNF and HLW by 1998 does not constitute the necessary "impracticability".

To prevail on the issue of "impracticability", the Federal government has the burden to show: (i) a supervening event (usually an Act of God or an act of a third party); (ii) the non-occurrence of which was a basic assumption upon which the contract was based; (iii) the occurrence of the event was not the [Federal government's] fault; and (iv) the [Federal government] did not assume the risk of the occurrence of the event.[37]

In this case, there has been no supervening event sufficient to trigger a finding of "impracticability". The fact that the delivery and storage of SNL and HLW has been delayed does not constitute a supervening event, and cannot void the Federal government's longstanding contractual obligation. Further, the delay has been attributed to the Federal government in previous Court cases.[38] Therefore, neither the first nor the third prong of the "impracticability" test has been satisfied.

Finally, even if the delay in delivery and disposal was not the fault of the Federal government and constitutes a supervening event, there is no provision in the SMUD Standard

---

[37] *L.W. Matteson, Inc. v. United States*, 61 Fed.Cl. 296, 320 (2004).

[38] See *Maine Yankee Atomic Power Co.*, 225 F.3d at 1341-1343. See also *Northern States Power Co.*., 224 F.3d at 1367 (Holding that the avoidable and unavoidable delay contract provisions were not applicable when the Federal government did not begin to perform its contractual obligation to accept SNF and HLW by 1998, and, therefore, breach of contract claims could be maintained against the Federal government).

Contract assigning the risk that the delivery and storage of SNF and HLW would not be possible by 1998.[39] As such, the risk has been assumed by the Federal government, so that the fourth prong of the impracticability defense has not been satisfied by the Federal government. As a result, the SMUD Standard Contract should continue to bind the Federal government.

## *IV. Awarding Restitution From The Nuclear Waste Fund Violates the Nuclear Waste Policy Act Of 1982.*

The *Show Cause Order* asks why restitution should not be deemed an appropriate remedy given that (i) SMUD would be restored to the same financial position it held as of June 14, 1983; (ii) if, and when, the Federal government can accept title to, transport, and dispose of SNF and HLW, the parties can enter into a new Standard Contract for such services; and, (iii) in the interim, even if all proper payments are returned, the NWF, as of September 30, 2003, has accumulated over $10 billion in interest that will remain in the NWF and continue to accumulate interest.

A restitution remedy cannot, however, be squared with the express text of the current law because a final judgment awarding restitution from the Nuclear Waste Fund would violate the Nuclear Waste Policy Act of 1982. The NWF was created by the Statute to pay the costs incurred to develop and operate nuclear waste repositories.[40] The Fund was created as a separate account in the United States Treasury to pay *only* the costs authorized by the Statute, so that Congress has limited the purposes for which Fund monies may be used.[41] Restitution is not one of the enumerated uses for monies in the NWF because the Statute authorizes expenditures only

---

[39] *Maine Yankee Atomic Power Co.*, 225 F.3d at 1343. See also *Northern States Power Co.*, 224 F.3d at 1367.

[40] *State of Nevada v. Herrington*, 827 F.2d 1394, 1395 (9th Cir. 1987). See also 42 U.S.C. § 10131(b).

[41] *Herrington*, 827 F.2d at 1398. See also 42 U.S.C. § 10222(c).

"for the purposes of radioactive waste disposal activities."[42] Indeed, the 11th Circuit has affirmed that the NWF may only be used for purposes specified by the Statute.[43] The *Alabama Power* decision indicates that payment of restitution from the NWF would be inconsistent with the Statute because any shortfall will be made up by fees paid by other Standard Contract holders to compensate for this unauthorized expenditure.[44] The 11th Circuit also held that the NWPA does not authorize use of the NWF to pay SNF interim storage costs.[45] If restitution is awarded to SMUD from the NWF, the funds will be used for interim storage costs, which is, as per the 11th Circuit's rationale, clearly contrary to Congressional intent. Utilities like SMUD should not get their money back as restitution, particularly where they have not asked for this specific remedy. Rather, they should receive the benefit of their bargain – the Federal government must honor the Statutory and contractual obligation to remove the SNF and HLW. Federal Courts have consistently rejected efforts to destroy the *quid pro quo* created by Congress so this Court should do likewise.[46]

***V. Other Concerns Raised in the Show Cause Order Lack Support in the Record.***

The April 21 *Show Cause Order* indicates " . . .there is no evidence in the record that the Government had reason to believe in 1983, 1989, or at present that Yucca Mountain ever will be licensed to store spent nuclear fuel and high-level radioactive waste."[47] *Amici* respectfully

---

42 42 U.S.C. § 10222(d)(1-5).

43 *Alabama Power Co. v. United States*, 307 F.3d 1300 (11th Cir. 2002).

44 Id. at 1309.

45 Id. at 1312. The Statute expressly requires capacity provided by DOE to be funded from a separate Interim Storage Fund financed by those utilities receiving the benefits of the additional storage capacity. See 42 U.S.C. § 10156.

46 *Northern States Power Co.*, 128 F.3d at 759.

47 In 1987, Congress enacted significant amendments to the NWPA as part of the Omnibus Budget Reconciliation Act of 1987 requiring DOE to limit site characterization to only Yucca Mountain. See Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, § 5011, 101 Stat. 1330-1, 1330-228. On February 14, 2002, the Secretary of Energy transmitted his

disagree. In 1983, when the NWPA was enacted, there was a clearly a sound basis for believing that a repository could be licensed somewhere, although a site had yet to be selected.[48] In 1987, Congress directed that Yucca Mountain be the sole site to be characterized for suitability. Finally, the Secretary of Energy 2002 recommendation that Yucca Mountain be deemed a suitable repository site rests on record evidence that the facility can be licensed. However, even assuming *arguendo* that facility is not licensed, the existence of a specific geologic repository is not a prerequisite for the Federal government's unconditional obligation to provide for permanent waste disposal as specified by Congress.[49]

The *Show Cause Order* also challenges the credibility of DOE's December 2004 Report to Congress insofar as it anticipates shipment of HLW and SNF to Yucca Mountain in 2010. For a variety of reasons, including the strong objections of the State of Nevada to the designation of Yucca Mountain, the project *has* encountered many delays. Fortunately, the D.C. Circuit has resolved and rejected most of Nevada's challenges to the Yucca Mountain designation.[50]

---

Recommendation of Yucca Mountain to the President as suitable for geologic disposal. On February 15, 2002, the President, transmitted to Congress his Recommendation of the Yucca Mountain Site for the development of a nuclear waste repository. On July 23, 2002, the President signed the Joint Resolution and it became law. <u>See</u> Yucca Mountain Development Act ("YMDA"), Pub. L. 107-200; 107th Cong., 2d Sess, 116 Stat. 735.

[48] <u>See</u> *Maine Yankee Atomic Power Co.*, 225 F.3d at 1341-1343. <u>See also</u> *Northern States Power Co.*., 224 F.3d at 1367.

[49] <u>See</u> *Indiana Michigan Power Co.*, 88 F.3d at 214.

[50] The D.C. Circuit considered challenges by the State of Nevada, local communities, several environmental organizations, and the nuclear energy industry to the statutory and regulatory scheme devised to establish and govern the operation of the Yucca Mountain nuclear waste repository, as well as the constitutionality of the joint resolution by which Congress selected Yucca Mountain as the repository site (and certain actions of the President and Energy Secretary leading to approval of the Yucca Mountain site). *Nuclear Energy Institute, Inc. v. Environmental Protection Agency*, 373 F.3d 1251 (D.C. Cir. 2004). The D.C. Circuit concluded, among other things, that the Congressional Resolution selecting the Yucca Mountain site for development represented an appropriate exercise of Congress's Article IV, Section 3 authority over Federal property and that the actions of the DOE and the President leading to the selection of the Yucca Mountain site are unreviewable.

While the development of the geologic repository has taken more time than expected, significant progress has been made and substantial resources have been expended. While uncertainties remain as to how the EPA will revise 40 C.F.R. Part 197, there is no basis to believe that whatever substantive changes may be made will render the repository unlicensable.[51] Nor do the understandable delays associated with licensing and constructing this unique facility mean that the repository will never become operational.

The *Show Cause Order* also asks if "an appropriate means of transporting such fuel and waste to the site will be authorized and licensed". SNF can be transported today under existing authority using current transport casks. Although many details of waste acceptance and transportation remain unresolved, there is no basis to believe SNF transportation will not be authorized and licensed.

The *Show Cause Order* also asks whether "an appropriate method of temporary storage for transport and/or permanent storage will be identified, licensed, and manufactured." There are existing licensed containers for transportation. While others may need to be designed and licensed for certain types of fuel for either rail or highway shipment, ample time is available for the licensing and manufacturing of such containers.[52] Temporary storage is already licensed at many reactor sites and transport is occurring using licensed transport casks. Indeed, there is a

---

[51] In the *Nuclear Energy Institute* case, 373 F.3d at 1251, Petitioners also challenged regulations issued by the three agencies with responsibility for the site - the Environmental Protection Agency ("EPA"), the Nuclear Regulatory Commission ("NRC"), and DOE. The D.C. Circuit vacated the EPA and NRC regulations insofar as they include a 10,000-year compliance period because that standard violated Section 801 of the Energy Policy Act, 42 USC § 8287, which required the standard to be based upon and consistent with the findings and recommendations of the National Academy of Sciences. Currently, EPA is tackling the remand from the D.C Circuit of the 10,000-year compliance period, as per 40 C.F.R. Part 197. EPA plans to issue a proposed Rule for comment in September, 2005.

[52] Section 180 of NWPA states that DOE will ship SNF to the repository in packages certified by the NRC and will notify State and local governments of shipments just as it has done in the past with previous shipments of other government-owned SNF.

mature spent fuel cask and transportation industry that is preparing to supply licensed casks once DOE is ready to accept and transport SNF.

## CONCLUSION

For the foregoing reasons, this Court should not hold the SMUD Standard Contract void, nor order the United States to refund all monies paid to date by SMUD into the NWF in the form of restitution. As argued, *supra*, such relief is contrary to the mandate of the NWPA and will result in a profound setback to the NWP. Ordinary contract principles, such as mutual mistake and impracticability, should not be applied to the SMUD Standard Contract because it was established by Statute. Even if the doctrines of mutual mistake and impracticability are applicable to the SMUD Standard Contract, there is no basis for voiding it on these grounds. Rather than restitution, the Court should instead determine the damages SMUD is entitled to as a result of this breach.

Respectfully submitted,

***James Bradford Ramsay***
***GENERAL COUNSEL***

***Grace D. Soderberg***
***ASSISTANT GENERAL COUNSEL***
***By: _________/s/___________***
**Grace D. Soderberg**

**National Association of**
**Regulatory Utility Commissioners**
**1101 Vermont Avenue, N.W., #200**
**Washington, D.C. 20005**
**202.898.1350**

Dated: July 7, 2005

****OF COUNSEL:**

**G. SCOTT MORRIS
*Deputy Attorney General*
Alabama Public Service Commission
100 North Union Street, Suite 836
Montgomery, AL 36104

*Attorney for Alabama Public Service Commission*

DAWN JABLONSKI RYMAN
*General Counsel*
**JOHN L. FAVREAU
Assistant Counsel
Public Service Commission of the State of New York
Three Empire State Plaza
Albany, N.Y. 12223

*Attorneys for Public Service Commission of the State of New York*

**LOUIS S. WATSON, JR.
Staff Attorney
North Carolina Utilities Commission
4325 Mail Service Center
Raleigh, N.C. 27699

*Attorney for North Carolina Utilities Commission*

**WILLIAM W. BINEK (ID # 02990)
*Special Assistant Attorney General*
North Dakota Public Service Commission
600 East Boulevard Ave. Dept. 408
Bismarck, ND 58505-0480

*Attorney for North Dakota Public Service Commission*

MIKE HATCH
Attorney General
**KARI VALLEY ZIPKO (#330413)
Assistant Attorney General
Minnesota Office of the Attorney General
445 Minnesota Street, Suite 1100
Saint Paul, MN 55116
(651) 296-1408
Attorneys for Minnesota Public Utilities Commission