No. 98-488C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S RESPONSE TO THE COURT'S SHOW CAUSE ORDER

---


PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7561
Facsimile: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

JOSHUA E. GARDNER
SCOTT R. DAMELIN
TODD J. COCHRAN
ELIZABETH THOMAS
Trial Attorneys
U.S. Department of Justice
Washington, D.C. 20530


July 7, 2005

TABLE OF CONTENTS

PAGE

SUMMARY OF ARGUMENT ..... 1

ARGUMENT ..... 2

I. THE GOVERNMENT IS UNABLE TO IDENTIFY ANY BASIS FOR CONCLUDING THAT THE STANDARD CONTRACT IS VOIDABLE BASED UPON THE MUTUAL MISTAKE DOCTRINE ..... 2

A. Under the Mutual Mistake Doctrine, The Mutual Mistake Of Fact Cannot Be A Fact Regarding A Future Event ..... 2

B. Because We Cannot Identify Any Mistaken Belief Of Facts Existing At The Time Of Contract Formation, The Contract May Not Be Deemed Voidable Based Upon The Doctrine Of Mutual Mistake ..... 4

II. THE GOVERNMENT IS CURRENTLY NOT IN BREACH OF THE STANDARD CONTRACT AS A RESULT OF SMUD's DECISION TO EMPLACE ITS SNF IN MESCs ..... 5

A. DOE Ceased Being In Breach At The Time SMUD Placed All Of Its SNF In MESCs Because DOE Does Not Have A Contractual Obligation To Accept SNF While Contained In MESCs From Which It Cannot Be Removed ..... 6

B. Performance By DOE Is Currently Impossible Or Impracticable ..... 8

C. Because SMUD Is Not Currently Able To Perform, DOE's Performance Obligations Are Indefinitely Suspended ..... 10

III. RESTITUTION IS INAPPROPRIATE UNDER THESE CIRCUMSTANCES ..... 12

IV. EVEN IF THE COURT CONCLUDES THAT RESTITUTION IS OTHERWISE APPROPRIATE, THE COURT LACKS AUTHORITY TO ORDER THAT RESTITUTION BE PAID DIRECTLY FROM A PARTICULAR FUNDING SOURCE ..... 13

TABLE OF CONTENTS (cont'd)

PAGE

V. DECLARING THE STANDARD CONTRACT VOID AND ORDERING RESTITUTION DIRECTLY FROM THE NUCLEAR WASTE FUND WOULD PREJUDICE THE GOVERNMENT'S INTERESTS ......................... 17

A. The Department Of Energy's Radioactive Waste Disposal Program Could Be Placed In Significant Jeopardy If The Court Declares The Standard Contract Void And Requires The Government To Pay SMUD Restitution Directly From The NWF ......... 17

B. The Government Would Be Prejudiced If It Was Required To Stop Work On A Repository ..................................................................... 20

CONCLUSION ........................................................................................................... 25

TABLE OF AUTHORITIES

CASES PAGE(S)

Alabama Power Co. v. Department of Energy,
307 F.3d 1300 (11th Cir. 2002) ........ 16

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) ........ 3

Christopher Village, L.P. v. United States,
360 F.3d 1319 (Fed. Cir. 2004) ........ 5

Dairyland Power Coop. v. United States,
16 F.3d 1197 (Fed. Cir. 1994) ........ 3

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) ........ 12

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996) ........ 5

Landmark Land Co. v. Federal Deposit Insurance Corp.,
256 F.3d 1365 (Fed. Cir. 2001) ........ 12

Moore v. Ford Motor Co.,
901 F. Supp. 1293 (N.D. Ill. 1995) ........ 11

Nevada v. Department of Energy,
400 F.3d 9 (D.C. Cir. 2005) ........ 15

Northern States Power Co. v. United States,
128 F.3d 754 (D.C. Cir. 1997), cert. denied, 525 U.S. 1015 & 1016 (1998) ........ 5

Potter v. United States,
167 Ct. Cl. 28 (1964) ........ 11

Rochester Pure Waters District v. EPA,
960 F.2d 180 (D.C. Cir. 1992) ........ 16

Sacramento Municipal Utility District v. United States,
65 Fed. Cl. 180 (2005) ........ 1, 2, 20

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) ........ 9

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

South Corp. v. United States,
690 F.2d 1368 (Fed. Cir. 1982) (en banc) .................... 11

United States v. Penn Foundry & Mfg. Co.,
337 U.S. 198 (1949) .................... 11

STATUTES

28 U.S.C. § 2517(a) .................... 14, 17

42 U.S.C. § 10139 .................... 5

42 U.S.C. § 10221 .................... 21

42 U.S.C. § 10222 .................... passim

MISCELLANEOUS

69 Fed. Reg. 18,557 (Apr. 8, 2004) .................... 24, 25

28 Am. Jur. 2d Damages § 488 .................... 10

17B C.J.S. Contracts § 716 (1999) .................... 11

Restatement (Second) of Contracts § 151 (1981) .................... 3

Restatement (Second) of Contracts § 152 (1981) .................... 3

Restatement (Second) of Judgments § 26 (1982) .................... 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 98-488C<br>(Judge Braden) |

DEFENDANT'S RESPONSE TO THE COURT'S SHOW CAUSE ORDER

Pursuant to this Court's order to show cause dated April 21, 2005, defendant, the United States, respectfully submits this response.

SUMMARY OF ARGUMENT

In its April 21, 2005 memorandum opinion and order, this Court requested that the Government show cause as to why: (1) the Court should not hold that the Standard Contract between Sacramento Municipal Utility District ("SMUD") and the Government is void under the doctrines of mutual mistake or impracticability; (2) if the Court concludes that the Standard Contract is void, SMUD is not entitled to a refund of all monies paid to date by plaintiff into the Nuclear Waste Fund ("NWF") as restitution; and (3) an order by the Court holding the Standard Contract void and awarding SMUD restitution would prejudice the Government's interests. Sacramento Mun. Util. Dist. v. United States, 65 Fed. Cl. 180, 183 (2005). The Government cannot identify any mistaken belief of fact existing at the time the Standard Contract was executed in 1983, and, as a result, we are unable to identify any basis for deeming the Standard Contract voidable based upon the doctrine of mutual mistake.

Nevertheless, the Court's show cause order has highlighted the fact that SMUD removed its SNF from its wet storage pool and encased it in multi-element sealed canisters ("MESCs")

from which it currently has no ability to remove the SNF. As the Court indicates in its order, DOE "has taken the position that the Standard Contract will have to be modified or renegotiated if this fuel is to be transported to and stored at Yucca Mountain." SMUD, 65 Fed. Cl. at 181. Because SMUD's SNF is contained in unacceptable canisters, DOE is currently not in breach, either because SMUD does not currently possess SNF that is capable of being delivered to DOE in an acceptable form, rendering it impossible or impracticable for DOE to perform or because SMUD is not ready, willing, and able to perform its obligations under the contract.

Moreover, because the Standard Contract remains in effect and the Government fully intends to perform its contractual obligations, albeit beginning at some time after the date, January 31, 1998, specified in the Standard Contract, restitution under these circumstances would be inappropriate, as it would confer a windfall upon SMUD. Even if restitution were appropriate under the circumstances, this Court lacks the authority to order an award of restitution directly from the NWF. Finally, as explained below, the Government would be severely prejudiced if this Court concludes that the Standard Contract is void and orders restitution from the NWF.

## ARGUMENT

### I. THE GOVERNMENT IS UNABLE TO IDENTIFY ANY BASIS FOR CONCLUDING THAT THE STANDARD CONTRACT IS VOIDABLE BASED UPON THE MUTUAL MISTAKE DOCTRINE

#### A. Under The Mutual Mistake Doctrine, The Mutual Mistake Of Fact Cannot Be A Fact Regarding A Future Event

To establish mutual mistake so as to justify rescission of a contract, a party must show the following: (1) the parties were mistaken in their belief regarding facts; (2) the mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material

effect on the parties' bargain; and (4) the contract did not put the risk of mistake on the party seeking recision or reformation. Dairyland Power Coop. v. United States, 16 F.3d 1197, 1203 (Fed. Cir. 1994); Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990). A "mistake" that can support reformation of a contract is a belief that is not in accord with the facts in existence at the time of contracting. Atlas, 895 F.2d at 750 (rejecting claim of mutual mistake where fact had not come into existence at time of contracting). Where a contract is entered into on the basis of a mutual mistake, "the contract is voidable by the aversely affected party unless he bears the risk of the mistake." Restatement (Second) of Contracts § 152(1) (1981).

"A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined" under the mutual mistake doctrine. Restatement (Second) of Contracts § 151 cmt. a (1981). In Dairyland Power Cooperative v. United States, 16 F.3d 1197 (Fed. Cir. 1994), the United States Court of Appeals for the Federal Circuit rejected the party's claim of mutual mistake where, when the plaintiff purchased a nuclear power plant from the United States Atomic Energy Commission, the parties believed that reprocessing facilities would be available in the future. The Federal Circuit held that the existence of reprocessing in the future did not constitute an "existing fact" when the parties entered into the contract and that "there is uniformity among the circuit courts of appeals and the commentators that mutual mistake of fact cannot lie against a future event." Id. at 1203.

### B. Because We Cannot Identify Any Mistaken Belief Of Facts Existing At The Time Of Contract Formation, The Contract May Not Be Deemed Voidable Based Upon The Doctrine Of Mutual Mistake

In this case, although the Government and SMUD may have believed when they signed the Standard Contract that DOE would be able to begin accepting SNF on an industry-wide basis

beginning in 1998, and that there would be no impediments to such performance, the fact that such events did not occur does not lead to the conclusion that a mutual mistake of fact existed when the Standard Contract was executed in 1983. The parties were not mistaken as to the existence of a fact at the time they entered into the Standard Contract. The most that could be said is that the parties erred in their prediction of a future event.

Moreover, the fact that the Standard Contract does not mention MESCs does not constitute a mutual mistake. As discussed above, application of the mutual mistake doctrine requires an erroneous belief as to existing fact at the time of contract formation. MESCs did not exist, and DOE did not envision MESCs, when the Standard Contract was executed in 1983. See Tr.1629:18-22 (Zabransky). As a result, at the time of contract formation, the parties had no reason to anticipate that SMUD would emplace its SNF into MESCs or some other storage container from which it could not retrieve the SNF, and the parties had no reason to mention MESCs in the Standard Contract. To the contrary, the Standard Contract clearly provided for SMUD to deliver bare fuel assemblies to DOE for transport in DOE-provided transport casks (see, e.g., Tr. 173:18-20, 222:4-10 (Shelter); DX 88, Art. I(18)), and that contract requirement is one that SMUD simply elected to disregard when deciding to emplace its SNF into MESCs.

Finally, we have been unable to identify any other mutual mistake at the time of contract formation that would justifying concluding that the Standard Contract is voidable. Consequently, we do not believe there is any basis for declaring the Standard Contract voidable based upon the doctrine of mutual mistake.

## II. THE GOVERNMENT IS CURRENTLY NOT IN BREACH OF THE STANDARD CONTRACT AS A RESULT OF SMUD's DECISION TO EMPLACE ITS SNF IN MESCs

As result of SMUD's decision to place its SNF in MESCs, the Government is not currently in breach of the Standard Contract. This conclusion results from any one of three legal theories.[1]

---

[1] As the Court is aware, this litigation has a significant history before the United States Court of Appeals for the District of Columbia Circuit pursuant to the "Judicial Review" provision of the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10139 (1994). Part of that history involves the decision of the D.C. Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996). In that case, the D.C. Circuit held "that section of [NWPA] create[d] an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998." Id. at 1274. Subsequently, a number of utilities and state agencies filed separate petitions for writs of mandamus in the D.C. Circuit that, among other things, sought to compel DOE to begin accepting SNF by January 31, 1998. In its decision on the petition, Northern States Power Co. v. United States, 128 F.3d 754 (D.C. Cir. 1997), cert. denied, 525 U.S. 1015 & 1016 (1998), the court granted the petitions for a writ of mandamus in part by ordering DOE to

> proceed with contractual remedies in a manner consistent with the NWPA's command that it undertake an unconditional obligation to begin disposal of SNF by January 31, 1998. More specifically, we preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim.
>
> This necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of "acts of Government in either its sovereign or contractual capacity."

Id. at 760. The D.C. Circuit retained jurisdiction to enforce its writ. Id. at 761. The Government filed a petition for a writ of certiorari on the grounds that the D.C. Circuit lacked jurisdiction to interpret the Standard Contract. The petition was denied.

Our records indicate that SMUD was not a party to either the Indiana Michigan case or the Northern States case.

In Christopher Village, L.P. v. United States, 360 F.3d 1319, 1333 (Fed. Cir. 2004), the

A. DOE Ceased Being In Breach At The Time SMUD Placed All Of Its SNF In MESCs Because DOE Does Not Have A Contractual Obligation To Accept SNF While Contained In MESCs From Which It Cannot Be Removed

We established at trial that the Standard Contract contemplates that DOE would accept bare assemblies of fuel from contract holders. Tr. 173:18-20 (Shetler) ("It was clear at that time that at least bare fuel is what would be considered a standard fuel from and under the contract would be accepted by DOE."). Further, we established that MESCs were not contemplated when the Standard Contract was executed in 1983 and do not constitute a waste container that DOE is contractually required to accept.[2] Tr. 222:4-10 (Shetler) ("The concept originally was DOE would come with a system, transportation system already designed to receive that bare fuel, put it in whatever canister or cask they were electing to use, transport that to whatever facility they may have, and deal with that fuel in accordance with whatever process they put together . . ."); DX 88, Art. I(18) (defining the term "spent nuclear fuel" as "fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing"). Although DOE has an obligation to accept the bare SNF itself, DOE is not

United States Court of Appeals for the Federal Circuit held that a judgment of a court which lacks jurisdiction may not be given preclusive effect if to do so would infringe upon the authority of another tribunal and would impinge upon the sovereign immunity of the United States.

[2] Indeed, SMUD easily could have maintained its SNF in a manner consistent with the Standard Contract simply by keeping its SNF in the wet pool or placing it in store-only casks. James Shetler, the assistant general manager for energy supply at SMUD, testified at trial that SMUD could have continued to keep its SNF in its wet pool, but that placing its SNF in MESCs would result in an estimated cost savings of approximately $8 to $12 million a year. Tr. 265:7-266:21 (Shetler). SMUD determined that, even without any delay by DOE, it would save money by going to dry storage, and its dry storage decision was independent of DOE's delay. Thus, SMUD believed, for business reasons, that it was more economical to place its SNF into a container that DOE was not contractually obligated to accept and from which it had no ability to remove the SNF for delivery to DOE.

obligated to accept MESCs or, by extension, the SNF that is encased in MESCs from which it cannot be removed. See DX 88, Art. I(18), IV.A.2(a), IV.B.2, & VI; DX 1298; Tr. 1638:23-1639:12 (Zabransky).

At trial, SMUD offered evidence to suggest that DOE had acquiesced in the acceptance of MESCs under the Standard Contract. See PX 320 (September 2, 1993 letter from Lake Barrett to James Shetler, stating in part that, "[o]nce the Nuclear Regulatory Commission has certified [SMUD's] transport storage system, the Department [of Energy] would be willing to initiate the appropriate actions to include such a system as an acceptable waste form under the terms of the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste"); see also Tr. 1693-94 (Zabransky). Notwithstanding SMUD's efforts, David Zabransky, DOE's contracting officer for the Standard Contract, testified that he was unaware of the September 3, 1993 letter to SMUD or any "special deal" with that utility. Tr. 1695:22-1696:17 (Zabranksy). In fact, Mr. Zabransky stated at trial that, "I don't believe DOE has ever expressed a desire as to how utilities store fuel in their sites." Tr. 1681:2-3 (Zabransky). In addition, Mr. Zabransky testified that, in September 2003, in response to a number of letters that he had received "that acted like [MESCs were] covered under the contract," DOE decided to make its position clear to the utilities. Accordingly, on September 25, 2003, Mr. Zabransky sent a letter to SMUD indicating that "multi-assembly storage and transport systems," including MESCs, "are not covered by the Standard Contract" and that, "absent a contract modification, spent fuel stored in such a canister is not presently an acceptable waste form." DX 1298; see Tr. 1699:17-1700:9 (Zabransky). Mr. Zabransky also made clear that Yucca Mountain is currently not licensed to accept MESCs and, in fact, is not currently

licensed at all. Tr. 1701:17-1702:1 (Zabransky). Mr. Zabransky further testified that, notwithstanding DOE's general belief that, "from a purely engineering and handling standpoint, it would be nice to have a container that you could load at the utility site, transport to a repository, and subsequently bury it without having to reopen it," Tr. 1703:1-7, DOE has made clear to utilities that, to date, DOE has been "unable . . . to complete final design and acceptance criteria for the disposalability aspects of such a system for commercial spent nuclear fuel." PX 678; see Tr. 1703:1-7 (Zabransky).[3]

In short, although DOE could one day agree to enter into contract amendments (with compensation to DOE) through which it would accept SMUD's MESCs for transporting SNF to Yucca Mountain, they are neither covered under the Standard Contract nor currently a part of the design or licensing plan for Yucca Mountain.

Given that all of SMUD's SNF is now contained in MESCs, that DOE is not contractually obligated to accept MESCs, and that SMUD has no mechanism for removing the SNF from the MESCs for delivery to DOE, DOE is not contractually obligated to accept SNF from SMUD as currently stored. Accordingly, DOE is not currently in breach of its contract with SMUD.

B. Performance by DOE Is Currently Impossible or Impracticable

At the time of contracting, the parties contemplated that the fuel which DOE was obliged to accept would be in the form of bare assemblies. Tr. 173:18-20, 222:4-10; DX 88, Art. I(18).

[3] Indeed, as Mr. Zabransky testified, SMUD's MESCs are horizontal, and Yucca Mountain is currently being designed to handle fuel vertically. Tr. 1641:1-12 (Zabransky). Accordingly, as Mr. Zabransky testified, it is unclear whether this mismatch will even be "addressable." Tr. 1641:5-12; 1703 (Zabransky).

Subsequently, SMUD made the decision to place its fuel in MESCs which DOE cannot accept. SMUD's decision has invalidated a major predicate of the contract upon which DOE relied when it entered into the contract and has made it impossible for DOE to perform as long as the fuel is contained in MESCs.[4] At the very least, SMUD's decision to place its fuel in MESCs without a means of removing the fuel from the MESCs has suspended DOE's obligation to accept SMUD's spent fuel.

Before emplacing its SNF in MESCs, SMUD made an intentional decision not to construct a dry storage transfer facility or to maintain its wet pool following MESC emplacement, either one of which could have provided SMUD with the means to remove the SNF from the MESCs and deliver the bare SNF to DOE. Tr. 460:19-461:11 (Shetler) (explaining that, by September 1992, pursuit of a dry transfer system had become "less of an interest" for SMUD because it was actively pursuing dual purpose canisters and "there was less of a likelihood to need to worry about handling the bare fuel assemblies onsite"); Tr. 336:18-24

---

[4] In addition to considering whether DOE's performance obligations may be excused based upon either impossibility or impracticability, we also have considered whether performance potentially may be excused based upon frustration of purpose. The Federal Circuit has held that, to excuse performance based upon frustration of purpose, a party must establish that: (1) a supervening event occurred; (2) the moving party did not bear the risk of the supervening event; and (3) the event rendered the value of performance worthless. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1296 (Fed. Cir. 2002). This final requirement is distinct from commercial impracticability because, to establish impracticability, a party must show that the supervening event rendered performance impracticable or impossible rather than worthless. Id. In this case, the Government's inability to begin to accept SNF in a Federal repository by January 31, 1998 did not render the value of ultimate performance worthless. Indeed, each of the utilities that has sued the Government in the Court of Federal Claims has sued for partial breach of contract precisely because they view delayed performance under the Standard Contract as having value. Therefore, because the actions resulting in the delay in DOE's performance did not render ultimate performance worthless, frustration of purpose may not serve as a basis to void the Standard Contract.

(Shetler) (explaining that dry transfer system would have allowed for the handling of SMUD's SNF without having to return to its wet pool); Tr. 365:3-12 (Shetler) (acknowledging that if SMUD's MESCs are deemed unacceptable, then SMUD will have to transfer its SNF from MESCs to an acceptable waste package). Because DOE is under no obligation to accept MESCs and, in fact, cannot do so under current Yucca Mountain design parameters, and because SMUD currently has no ability to remove its SNF from the MESCs, SMUD has made it currently impossible or impracticable for DOE to accept SMUD's spent fuel.[5]

### C. Because SMUD Is Not Currently Able To Perform, DOE's Performance Obligations Are Indefinitely Suspended

DOE is not currently in breach because SMUD is not willing, ready, and able to perform. In a breach of contract action, the plaintiff must show its performance or willingness to perform in compliance with the contract, its ability to perform at the time of the other party's breach,[6] or that the plaintiff has always been ready, willing, and able to perform the contract:

> In a breach of contract action, the plaintiff must show performance or willingness to perform in compliance with the contract alleged, or ability to perform at the time of the other party's breach, or that the plaintiff has always been ready, willing, and able to perform the contract.

[5] As discussed at trial, DOE is willing to entertain discussions with contract holders concerning an amendment to the Standard Contract, with compensation to DOE, through which DOE would agree to accept MESCs from contract holders. Tr. 1696:13-17; 1697:3-7; 1699:9-20 (Zabransky). However, to date, no contract holder has approached DOE about such a contract amendment. Tr. 1736:14-22 (Zabransky).

[6] In a partial breach case like this one, a new partial breach occurs each time that DOE fails to accept SMUD's SNF, see Restatement (Second) of Judgments § 26 cmt. g, at 241 (1982); 28 Am. Jur. 2d Damages § 488, and SMUD must be ready to perform each time a new partial breach occurs.

> Neither party to a contract can maintain an action for damages for its violation without showing a readiness and ability to comply with his own engagements under the contract, unless it is alleged and proved that the defendant has refused to perform on his part, and has actually prevented performance by the plaintiff.

17B C.J.S. Contracts § 716, at 449 (1999) (footnotes omitted); see Moore v. Ford Motor Co., 901 F. Supp. 1293, 1299 (N.D. Ill. 1995) (under Illinois law, to seek specific performance of a contract or seek recovery of damages from the breach of a contract, plaintiff must establish that he has always been ready, willing, and able to perform the contract on his part). In Potter v. United States, 167 Ct. Cl. 28 (1964),[7] plaintiffs sued to recover damages for alleged breach of their contract to deliver certain items to the General Services Administration, following the Government's termination of the contract. The Court of Claims held that, regardless of the propriety of the termination, plaintiffs failed to show that they were ready and able to deliver the items in question within a reasonable time after the delivery deadlines set forth in the contract. Id. at 31 (citing United States v. Penn Foundry & Mfg. Co., 337 U.S. 198 (1949)). As the Court of Claims stated, "[plaintiffs] would still have to demonstrate their willingness, readiness and capacity to perform the contract before recovery could be had." Id. (emphasis added); see Penn Foundry, 337 U.S. at 199 (findings of fact were not sufficient "because of (1) the absence of any finding of the readiness and capacity of [Penn Foundry] to perform certain of its contractual obligations upon which its profits were contingent and (2) the presence of certain affirmative findings which preclude the drawing of any sufficient inference of such readiness and capacity from the other findings"). SMUD is not ready,

---

[7] The Federal Circuit has adopted the decisions of the Court of Claims as binding precedent. South Corp. v. United States, 690 F.2d 1368, 1370 & n.2 (Fed. Cir. 1982) (en banc).

willing, and able to meet its obligations under the Standard Contract because of its decision to place all 493 of its SNF assemblies into MESCs, without any ability to retrieve the SNF.

In sum, SMUD has emplaced its SNF in MESCs so that, when DOE arrives to accept its SNF, SMUD will be unable to deliver the SNF to DOE in the manner required by the Standard Contract. Although SMUD may construct appropriate facilities in the future that would allow it to remove its SNF from its MESCs and deliver the SNF to DOE, or the parties may mutually agree at some point in the future in exchange for appropriate consideration that DOE will accept and dispose of the MESCs, there is no evidence in the record that SMUD has the ability to deliver its SNF to the transportation cask that DOE is obligated to bring to SMUD's site. Accordingly, because SMUD emplaced its SNF in MESCs that are not acceptable under the Standard Contract, and because it lacks the current ability to remove its SNF from the MESCs, SMUD is not currently ready, willing, and able to perform its contract obligations and should not be able to recover damages based upon DOE's failure to accept SMUD's SNF.

## III. RESTITUTION IS INAPPROPRIATE UNDER THESE CIRCUMSTANCES

As discussed above, we are unable to identify any basis for concluding that the Standard Contract is void or voidable. Rather, the Government is not currently in breach because SMUD does not possess SNF in containers that DOE is obligated to accept, because SMUD has made it impossible or impracticable for DOE to perform, or because SMUD has no current ability to satisfy its obligation to deliver bare SNF to DOE. Under these circumstances, restitution would be improper.

In this Court, restitution is a remedy for breach of contract. Landmark Land Co. v. Federal Deposit Insur. Corp., 256 F.3d 1365, 1372 (Fed. Cir. 2001). Accordingly, restitution is available

only where there has been a material breach of a contract and the non-breaching party has exercised its right in that circumstance to declare the contract at an end. Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1309 (Fed. Cir. 2004) (relief in restitution is only available if breach gives rise to a claim for total breach rather than partial breach). Here, as a result of its business decision, SMUD has placed its SNF in containers that DOE is not obligated to accept under the Standard Contract and is unable to satisfy its own contract obligations.

As a result, DOE is not curently in breach. Because DOE is not currently in breach, restitution is not available. There is no unfairness in this result because the decision to place its SNF in containers not covered by the Standard Contract without a means of removal was a decision that SMUD made for its own business reasons.

In any event, SMUD has asserted a partial breach of contract in this case and continues to seek performance from the Government, and the Government has every intention of performing, albeit at a delayed date. Of course, SMUD will have to develop a mechanism for removing its SNF from the MESCs or pursue a contract amendment, with compensation to DOE for the MESC disposal, before SMUD will be in a position to deliver its SNF to DOE. However, at the present time, the contract is not at an end. Because the contract is not at end, an award of restitution would be inappropriate.

## IV. EVEN IF THE COURT CONCLUDES THAT RESTITUTION IS OTHERWISE APPROPRIATE, THE COURT LACKS AUTHORITY TO ORDER THAT RESTITUTION BE PAID DIRECTLY FROM A PARTICULAR FUNDING SOURCE

Assuming that restitution would be proper if the Court declares the Standard Contract voidable, because Congress is responsible for appropriating funds from the NWF to DOE, the Court

cannot direct that restitution be paid directly out of the Nuclear Waste Fund ("NWF"), rather than some other funding source that Congress may make available.

Section 2517(a) of Title 28 of the United States Code provides that every final judgment that this Court renders against the United States is to be paid "out of any general appropriation therefor" on presentation to the Secretary of the Treasury:

> Except as provided by the Contract Disputes Act of 1978, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the Secretary of the Treasury of a certification of the judgment by the clerk and the chief judge of the court.

28 U.S.C. § 2517(a).

The NWF itself is not a general appropriation, but, rather, is money that is deposited in the Treasury of the United States, from which Congress makes specific appropriations to the Department of Energy for use in the development of a Federal waste disposal program. Pursuant to 42 U.S.C. § 10222(c) of the NWPA, Congress established the NWF, as provided for in the statute:

> There hereby is established in the Treasury of the United States a separate fund, to be known as the Nuclear Waste Fund. The Waste Fund shall consist of --
>
> (1) all receipts, proceeds, and recoveries realized by the Secretary under subsections (a), (b), and (e) of this section, which shall be deposited in the Waste Fund immediately upon their realization;
>
> (2) any appropriations made by the Congress to the Waste Fund; and
>
> (3) any unexpended balances available on January 7, 1983, for functions or activities necessary or incident to the disposal of civilian high-level radioactive waste or civilian spent nuclear fuel, which shall automatically be transferred to the Waste Fund on such date.

42 U.S.C. § 10222(c)(1)-(3).

However, the Secretary of Energy's authorization to make expenditures from the NWF is subject to the requirement for specific appropriations made by law:

> Administration of Waste Fund
>
> (1) The Secretary of the Treasury shall hold the Waste Fund and, after consultation with the Secretary, annually report to the Congress on the financial condition and operations of the Waste Fund during the preceding fiscal year.
>
> (2) The Secretary shall submit the budget of the Waste Fund to the Office of Management and Budget triennially along with the budget of the Department of Energy submitted at such time in accordance with chapter 11 of Title 31. The budget of the Waste Fund shall consist of the estimates made by the Secretary of expenditures from the Waste Fund and other relevant financial matters for the succeeding 3 fiscal years, and shall be included in the Budget of the United States Government. <u>The Secretary may make expenditures from the Waste Fund, subject to appropriations which shall remain available until expended. Appropriations shall be subject to triennial authorization.</u>

42 U.S.C. § 10222(e) (emphasis added). Therefore, the Secretary of Energy's authority to direct payments from the NWF is circumscribed by Congress' appropriation of monies from the NWF.

The United States Court of Appeals for the District of Columbia Circuit recently discussed the congressional appropriations process underlying the NWF in <u>Nevada v. Department of Energy</u>, 400 F.3d 9 (D.C. Cir. 2005). In <u>Nevada</u>, the State of Nevada sought to compel the Department of Energy to provide it with grant money pursuant to section 116 of the NWPA, which provides that the Secretary of Energy "shall make grants to the State of Nevada" from the NWF. <u>Id.</u> at 10. In Fiscal Year 2004, Congress had appropriated $190 million from the NWF, with $1 million from an alternative funding source directed to be given to the State of Nevada. <u>Id.</u> at 12. The State of

Nevada told DOE that it intended to spend $5 million on the license application for Yucca Mountain and demanded that DOE make up the difference in grant money from the NWF. Id. The State of Nevada maintained that "'the provisions of Section 116 and those establishing the Nuclear Waste Fund' create a continuing appropriation for the state." Id. The D.C. Circuit rejected Nevada's argument, noting that Congress has exclusive control over appropriations:

> Commanding that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I § 9, cl. 7, the Appropriations Clause of the U.S. Constitution "vests Congress with exclusive power over the federal purse." Rochester Pure Waters Dist. v. EPA, 960 F.2d 180, 185 (D.C. Cir. 1992). For Nevada to prevail, then, it must identify not just a command to make grants, but an appropriation of Waste Fund money that DOE may use for that purpose.

Id. at 13.

The D.C. Circuit rejected Nevada's contention that section 116 of the NWPA constituted a continuing appropriation, explaining that section 302 of the NWPA makes expenditures from the NWF "subject to appropriations." Id. (citing 42 U.S.C. § 10222(e)(2)). The court stated that "requiring waste producers to finance the entire project is perfectly consistent with Congress's desire to maintain annual control over how much Waste Fund money DOE spends and how DOE spends it." Id. at 15. Consequently, the D.C. Circuit held that DOE lacked authority to provide Nevada with additional funds from the NWF. Id. at 17.

Further, the language of the NWPA expressly provides that expenditures from the NWF may be made only for purposes of radioactive waste "disposal" activities. 42 U.S.C. § 10222(d). In Alabama Power Co. v. Department of Energy, 307 F.3d 1300, 1313 (11th Cir. 2002), the United States Court of Appeals for the Eleventh Circuit stated that none of the activities cited in the statute expressly accommodate an expenditure for a judgment pursuant to a claim under the Standard

Contract and that expenditures from the NWF had to be related to the "advancement or step toward" permanent disposal. Although the Eleventh Circuit did not expressly consider the issue presented in the Court's show cause order, the payment of restitution does not appear to fall within that category of expenditures listed in the NWF.

The NWF is not a "general appropriation" for the payment of judgments of this Court, but, instead, is a fund of money that Congress retains the discretion to appropriate – in the amounts that it elects to appropriate – to support DOE's work on SNF disposal under the NWPA. Given that the Court does not possess general injunctive powers and in light of the doctrine of separation of powers (which requires a congressional appropriation before money may be authorized from the Treasury), the Court lacks the ability to order the Government to disregard 28 U.S.C. § 2517(a) and 42 U.S.C. § 10222(e)(2).

## V. DECLARING THE STANDARD CONTRACT VOID AND ORDERING RESTITUTION DIRECTLY FROM THE NUCLEAR WASTE FUND WOULD PREJUDICE THE GOVERNMENT'S INTERESTS

The Court has ordered the Government to show how it would be prejudiced if the Court held that the Standard Contract was void and required the repayment of fees paid by SMUD from the NWF.

### A. The Department of Energy's Radioactive Waste Disposal Program Could Be Placed In Significant Jeopardy If The Court Declares The Standard Contract Void And Requires The Government To Pay SMUD Restitution Directly From The NWF

DOE relies almost exclusively upon monies that Congress appropriates from the NWF to run the Federal radioactive waste disposal program. Because contract holders' obligation to pay fees into the NWF derives solely and directly from the Standard Contract, see DX 88, VIII.B,

should the Court declare the Standard Contract void, DOE would lose its primary source of funding for the Federal waste disposal program.[8]

Although DOE has faced significant obstacles in developing a permanent repository or an interim storage facility, as discussed below, DOE has made significant progress in developing the Federal radioactive waste disposal program. If DOE is deprived of its primary revenue source, the progress that DOE has made to date could be slowed or even stopped. As Mr. Kouts explained at trial:

> Okay. Well, if for some reason the income stream, the 1 mil per kilowatt hour wasn't coming in anymore to the government, then part of the funding stream for this program would go away.
>
> *        *        *
>
> . . . And the only remaining would be the defense appropriations, which would not be enough to move the program forward, certainly not enough to pay the billions of dollars that we're going to need to build a repository or, you know, in the short time frame that we would need in order to construct it.

Tr. 2147:18-2148:4 (Kouts).

Moreover, Mr. Kouts testified at trial that, if DOE's primary funding stream were eliminated, the Nuclear Regulatory Commission ("NRC") might be forced to revisit its waste confidence rule-making, jeopardizing the continuation of nuclear power in the country:

> Part of the rationale for the existence of nuclear power in this country is what's called a waste confidence rule-making that the [Nuclear] Regulatory Commission issues. The last time they revisited it was sometimes in the '90s, and they had the, they made a finding at that

---

[8] In this case, because SMUD is a shut-down facility that no longer generates electricity, DOE is no longer collecting quarterly fees from SMUD pursuant to the Standard Contract. However, should the Standard Contract be deemed void in other cases involving operating utilities, DOE would lose its primary revenue source from those contract holders.

> point that they expected a repository to be available in the first quarter part of the century, by 2025. If the funding stream was removed from this program, then I think that could be cause for the NRC to revisit the waste confidence rule-making, and the waste confidence rule-making is also the underpinning as to – one of the underpinnings as to continuation of nuclear power in the country. So that's something that you have to think about as to whether or not that would drive that policy decision and would force the NRC to reconsider [its waste confidence rule-making] . . .

Tr. 2157:7-24 (Kouts).

Further, although the Government would not have a contractual obligation to SMUD should the Standard Contract be deemed void, DOE would still have a statutory obligation to develop a Federal radioactive waste disposal program. The loss of its primary funding source would hinder DOE's ability to meet its statutory obligations under the NWPA. DOE's Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, DOE/RW-0533, May 2001 ("TSLCC") represents OCRWM's most recent estimate of the costs to dispose of the country's SNF and HLW. PX 680. The TSLCC analysis projects that the total system costs through 2119 for a single geologic repository system are $57.520 billion in current constant dollars, and includes the costs for the Monitored Retreivable Storage ("MRS") facility, transporting waste to the potential repository at Yucca Mountain, and other associated programmatic costs. Id. at PA-224109-224110, PA-224150. At the time the TSLCC was issued in May 2001, the total estimated future cost to complete the system was $49.3 billion. Id.

Following full restitution of the utilities' fee payments, any remaining interest income in the NWF would be insufficient to continue and complete the civilian radioactive waste management program. Therefore, if the Court concludes that the Standard Contract is void and orders restitution

directly from the NWF, DOE's ability to ultimately accept SNF would be severely compromised, and the future of the nuclear industry could be put into question.

B. The Government Would Be Prejudiced If It Was Required To Stop Work On A Repository

The Court indicated in its order to show cause that the Government might not be prejudiced if it was required to stop work on a repository because, according to the Court, "there is no evidence in the record that the Government had reason to believe in 1983, 1989, or at present that: Yucca Mountain ever will be licensed to store spent nuclear fuel and high-level radioactive waste; an appropriate means of transporting such fuel and waste to the site will be authorized and licensed; and/or an appropriate method of temporary storage for transport and/or permanent storage will be identified, licensed, and manufactured . . . ." SMUD, 65 Fed. Cl. at 183.

We respectfully disagree. The record in this case is replete with evidence that, although DOE has announced delays in the Federal waste acceptance program, DOE has always believed that it would develop and implement a workable program to accept SNF from contract holders. As discussed below, that belief existed in 1983, continued through and beyond 1989, and, despite announced delays in the program, continues to this day.

In the June 1985 Mission Plan for the Civilian Radioactive Waste Management Program ("1985 Mission Plan"), DOE explained that, "to meet the directives of the [NWPA], the DOE intends to site, design, construct and start operating a mined geologic repository by January 31, 1998." PX 91, at iii (HQ0005267). DOE assumed, at that time, that there would be two geologic repositories and that an MRS would begin operation as early as 1996. PX 91, at 24-25 (HQ0005304-5305). In the 1985 Mission Plan, DOE projected that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence

operations in 2006. PX 91, at 25 (HQ0005305) ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized").

In his cover letter providing the 1985 Mission Plan to Congress, Ben Rusche, Director of OCRWM, stated that the purpose of this plan was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." PX 91, at HQ0005266 (emphasis added); see 42 U.S.C. § 10221 (1982). The 1985 Mission Plan also described an improved performance system that would include a Monitored Retrievable Storage ("MRS") facility that could start receiving SNF in 1996, two years ahead of the first repository (although DOE recognized that it lacked statutory authority to pursue this approach absent congressional approval of the MRS proposal to be submitted pursuant to section 10161), which would "service[] the first repository." PX 91, at 24, 28-29 (HQ0005304, HQ0005309-5310).

On May 27, 1986, the Secretary nominated five sites as suitable for characterization and recommended to the President that three of these sites (Yucca Mountain, Nevada; Deaf Smith County, Texas; and Hanford, Washington) be characterized as candidate sites for the first geologic repository. The President approved the Secretary's recommendation on May 28, 1986. Each of the five nominations was accompanied by detailed environmental assessments, which represented years of work gathering and analyzing data that began even before the enactment of the NWPA. PX 118, at 1-2 (HQ0005805-5806).

Following the Secretary's nominations of sites, DOE plans and efforts to develop a geologic repository continued forward. Despite achieving several important milestones, DOE recognized that an extension of the schedule for the first geologic repository would be necessary. Based in part on a decrease in OCRWM's budget for Fiscal Year 1987 and uncertainty about Fiscal Year 1988 funding, DOE reassessed and adjusted the baseline program for the first repository. DX 106. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023:

> As already mentioned, several important milestones have been achieved. However, the experience gained in achieving those milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (see Table 1). The new schedule shows a 5-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. (As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility).

DX 106, at 6 (HQR0031634) (footnote omitted). Therefore, despite acknowledged challenges facing the program, DOE unequivocally expressed its belief that it could develop a licensed Federal waste acceptance facility, and that a temporary facility could be available by 1998.

In November 1989, prior to the issuance of the 1990 annual capacity report ("ACR"), DOE prepared a report to Congress from the Secretary of Energy titled "Report To Congress On Reassessment Of The Civilian Radioactive Waste Management Program" ("1989 Report"). PX 169. In the 1989 Report, DOE responded to a congressional directive to describe "in detail how the Department plans to respond to the Committee's . . . concerns dealing with endemic schedule slips, problems in management structure, and lack of integrated contractor efforts." PX 169, at iii

(DB0001445). The 1989 Report emphasized OCRWM's intent to complete certain milestones directed at the scientific investigation of the potential site at Yucca Mountain. Id. at vii-x (DB0001448-1451). The Secretary also announced a three-point action plan centered on restructuring OCRWM, gaining access to the Yucca Mountain site to continue the scientific investigation needed to evaluate the site's suitability for a repository, and an initiative for establishing an integrated MRS with a target for SNF acceptance in 1998. Id.

On December 18, 1998, DOE submitted a Viability Assessment of a Repository at Yucca Mountain, the culmination of 15 years of scientific investigation and design work at Yucca Mountain, to the President and Congress. The Viability Assessment demonstrated how DOE expected to safely contain waste in a geologic setting at Yucca Mountain, and OCRWM concluded that work should proceed to support a decision by the Secretary on whether to recommend the site. PX 604, at 1866 ("Taken together, the five volumes of the [Viability Assessment] present a comprehensive and integrated description of the Yucca Mountain site, Monitored Geologic Repository and waste package designs, overall repository performance, plans to move forward from [Viability Assessment] to License Application (LA), and associated costs"); see PX 603.

DOE continued to pursue development of the geologic repository. On February 14, 2002, after over 20 years of research and billions of dollars of planned and reviewed scientific work, the Secretary recommended the Yucca Mountain site to President Bush, and the President recommended it to Congress. PX 724. Congress passed a joint resolution approving the Yucca Mountain site, which the President signed into law on July 23, 2002, which then became known as the Yucca Mountain Development Act (Public Law 107-200).

The President's action completed the site selection process for a geologic repository mandated by the NWPA. OCRWM's focus then shifted from scientific study to licensing and constructing a geologic repository and developing a transportation system. See OCRWM Annual Report to Congress, Dec. 2004, at 4. Indeed, the December 2004 Office of Civilian Radioactive Waste Management Annual Report to Congress ("2004 Annual Report"), upon which the Court relies for its conclusion that there is no evidence in the record that DOE currently has reason to believe that Yucca Mountain will ever be licensed to store SNF and HLW actually supports the conclusion that DOE does believe that Yucca Mountain will be licensed. As noted in the preface of the 2004 Annual Report, the purpose of the report was to highlight "the progress [OCRWM] has made towards achieving a critical objective: the submission to the Nuclear Regulatory Commission if a high-quality, defensible application for the authorization to construct a Yucca Mountain repository." 2004 Annual Report, at 3 (emphasis added). The Secretary restructured the OCRWM program into three main projects: the Yucca Mountain Project to seek a license and construct the repository; the National and Nevada Transportation Project to develop the system for transporting waste to the repository; and the Waste Acceptance Project to establish the particular means by which waste will be accepted at the repository. Id. DOE reiterated that OCRWM's "key objective is to begin receiving waste at the NRC-licensed Yucca Mountain repository." Id. at 9.

Similarly, DOE has been working actively towards the development of a system to safely and efficiently transport SNF and HLW from contract holders' sites to a Federal facility. For example, in November 2003, DOE published its Strategic Plan for the Safe Transportation of Spent Nuclear Fuel and High-Level Radioactive Waste to Yucca Mountain. See OCRWM Annual Report to Congress, Dec. 2004, at 30-35. The Plan presents DOE's strategy and describes the process that

OCRWM will use to work cooperatively with states, federally recognized tribes, governments, utilities, the transportation industry, and other interested parties to refine the transportation system as it is developed.

Among the actions that DOE has taken to develop its nationwide transportation program, DOE published a Record of Decision in the Federal Register on April 8, 2004, announcing that it had decided to select, both nationally and in the state of Nevada, the mostly rail transportation mode for the shipment of waste to the Yucca Mountain site. 69 Fed. Reg. 18,557 (Apr. 8, 2004). DOE also decided in the same Record of Decision to select the Caliente rail corridor in which to examine possible alignments for construction of a rail line that would connect the repository to an existing main rail line in Nevada. Id. Further, a Notice of Intent to Prepare an EIS for the Alignment, Construction, and Operation of a Rail Line from a site near Caliente, Nevada, to the Yucca Mountain site, was published in the Federal Register on April 8, 2004. 69 Fed. Reg. 18,565 (Apr. 8, 2004).

In summary, DOE consistently has stated its conviction that, despite technical, financial, and political challenges, it can develop and license a Federal waste disposal facility, including a safe and efficient program for transporting SNF and HLW. Consequently, for the reasons discussed above, the award of restitution from the NWF would result in serious prejudice to the Government.

## CONCLUSION

For the foregoing reasons, we are unable to identify any mutual mistake that would justify declaring the Standard Contract voidable based upon SMUD's unilateral business decision to place its SNF into a waste container that is not covered by the Standard Contract and from which it currently has no ability to remove the SNF. However, DOE is no longer in breach because SMUD

no longer possesses SNF in a container which DOE is obligated to accept or because SMUD has made DOE's performance temporarily impossible or impracticable or because SMUD is not ready, willing, and able to perform. Under these circumstances, where SMUD has elected to sue for a partial breach of the Standard Contract and expects the Government to perform its contractual obligations, the award of restitution would be improper. Further, to the extent that the Court believes that restitution is otherwise proper, because the NWF is not a general appropriation for the payment of judgments, the Court cannot direct that DOE pay restitution directly from the NWF. Finally, a conclusion that the Standard Contract is void and that DOE must pay restitution directly from the NWF could severely compromise DOE's ability to continue to develop a Federal repository, as its primary funding source would be unavailable and would severely jeopardize DOE's often expressed intention of fulfilling its mandate to construct a repository for SNF.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

JOSHUA E. GARDNER
SCOTT R. DAMELIN
TODD J. COCHRAN
ELIZABETH THOMAS
Trial Attorneys

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Russell A. Shultis
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7561
Fax: (202) 307-2503

July 7, 2005

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July 2005, a copy of foregoing "DEFENDANT'S RESPONSE TO THE COURT'S SHOW CAUSE ORDER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.