No. 98-488C
(Judge Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO MEMORANDUM OPINION AND ORDER TO SHOW CAUSE DATED APRIL 21, 2005**

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

July 7, 2005

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

# TABLE OF CONTENTS


**Page**

INTRODUCTION ....1

BACKGROUND ....5

ARGUMENT ....10

I. There Is No Basis For Voiding The Contract Based On Mutual Mistake Of Fact. ....10

A. The Doctrine Of Mutual Mistake Of Fact Is Inapplicable To This Case. ....10

B. SMUD, As The Adversely Affected Party, Has Not Elected To Void The Contract. ....14

II. There Is No Basis For Voiding The Contract Based On Impracticability Of Performance. ....16

A. The Government's Performance Under The Contract Has Not Been Rendered Impracticable By Some Supervening Event. ....17

1. The Absence Of A Repository Or Interim Storage Facility Cannot Form The Basis For A Claim Of Impracticability. ....18

2. The Government Has The Resources And Physical Capability To Perform Its Obligations Under The Contract. ....19

3. The Transfer Of Spent Nuclear Fuel To Canisters Has Not Rendered The Government's Performance Impracticable. ....26

B. The Delay Is Attributable To The Fault Of The Government. ....33

C. The Government Assumed The Risks Of Delay And Knew That Difficulties Were Likely. ....36

III. A Court Order Voiding The Contract And Ordering Restitution Would Prejudice SMUD's Interests. ....39

A. An Order Voiding The Contract Could Take Away SMUD's Right To Have The DOE Dispose Of Its Fuel. ....39

B. An Order Of Restitution Would Not Compensate SMUD For Its Damage And Would Likely Increase SMUD's Overall Costs. ....41

C. An Order Voiding The Contract Could Jeopardize SMUD's Licensing With The Nuclear Regulatory Commission. .....43

IV. Any Order Awarding Restitution Should Direct That The Funds Be Awarded From The Judgment Fund And Not The Nuclear Waste Fund. .....45

V. Any Order Awarding Restitution Should Include The Profits Accrued On The $40 Million While In The Nuclear Waste Fund. .....49

A. SMUD Is Entitled To Receive The Direct Profits Of Its Funds. .....50

B. SMUD Is Entitled To Receive The Interest On Its Funds If The Court Orders Restitution .....54

CONCLUSION .....55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama Power v. U.S. Department of Energy*,
307 F.3d 1300 (11th Cir. 2002) .......... 47, 48

*Atlas Corp. v. United States*,
895 F.2d 745 (Fed. Cir. 1990) .......... 10

*Centex v. United States*,
395 F.3d 1283 (Fed. Cir. 2005) .......... 20

*Consumers Energy Co. v. United States*,
65 Fed. Cl. 364 (2005) .......... 6

*Dairyland Power Coop. v. United States*,
16 F.3d 1197 (Fed. Cir. 1994) .......... 10, 11, 13

*Economy Plumbing & Heating Co. v. United States*,
470 F.2d 585 (Ct. Cl. 1972) .......... 55

*Edwards v. E.I. Du Pont De Nemours & Co.*,
183 F.2d 165 (5th Cir. 1950) .......... 15

*Fidelity Const. Co. v. United States*,
700 F.2d 1379 (Fed. Cir. 1983) .......... 54

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) .......... 50

*Harriscom v. Svenska*,
3 F.3d 576 (2d Cir. 1993) .......... 16

*Hooper-Mankin Fuel Co. v. Chesapeake & O. Ry. Co.*,
30 F.2d 500 (4th Cir. 1929) .......... 15

*Indiana Michigan Power Co. v. U.S. Dep't of Energy*,
88 F.3d 1272 (D.C. Cir. 1996) .......... 3, 18, 21, 38

*Jennie-O Foods, Inc. v. United States*,
217 Ct. Cl. 314 (1978) .......... 26

*Land Grantors v. United States*,
64 Fed. Cl. 661 (2005) .......... 11, 40, 50

*Landmark Land Co., Inc. v. F.D.I.C.*,
256 F.3d 1365 (Fed. Cir. 2001) .......... 51

*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000) .......... passim

*Nevada v. Herrington*,
827 F.2d 1394 (9th Cir. 1987) .......... 47

*Northern States Power Co. v. U.S. Dep't of Energy*,
128 F.3d 754 (D.C. Cir. 1997) .......... passim

*Northern States Power Co. v. United States*,
224 F.3d 1361 (Fed. Cir. 2000) .......... 6, 34

*Orlandi v. Goodell*,
760 F.2d 78 (4th Cir. 1985) .......... 14

*Raytheon Co. v. White*,
305 F.3d 1354 (Fed. Cir. 2002) .......... 19

*Rochester Gas & Elec. Corp. v. United States*,
65 Fed. Cl. 431 (2005) .......... 52

*Roth Steel Prods. v. Sharon Steel Corp.*,
705 F.2d 134 (6th Cir. 1983) .......... 17

*Scott Timber Co. v. United States*,
40 Fed. Cl. 492 (1998) .......... 20

*Seaboard Lumber Co. v. United States*,
308 F.3d 1283 (Fed. Cir. 2002) .......... 16, 25

*System Fuels, Inc. v. United States*,
65 Fed. Cl. 163 (2005) .......... 6

*Transatlantic Fin. Corp. v. United States*,
363 F.2d 312 (D.C. Cir. 1966) .......... 16

*U.S. Shoe Corp. v. United States*,
296 F.3d 1378 (Fed. Cir. 2002) .......... 54

*Underwater Devices Inc. v. Morrison-Knudsen Co., Inc.*,
717 F.2d 1380 (Fed. Cir. 1983) .......... 17

*United States v. N.Y. Rayon Importing Co.*,
329 U.S. 654 (1974) ........ 55

*United States v. S.W. Elec. Coop., Inc.*,
869 F.2d 310 (7th Cir. 1989) ........ 10

*United States v. Winstar*,
518 U.S. 839 (1996) ........ 20, 36, 37, 38

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
342 F.3d 1298 (Fed. Cir. 2003) ........ 51

*Yankee Atomic Elec. Co. v. United States*,
42 Fed. Cl. 223 (Fed. Cl. 1998) ........ 47

**Statutes**

42 U.S.C. § 10101 ........ 7

42 U.S.C. § 10132 ........ 11

42 U.S.C. § 10134 ........ 8, 11

42 U.S.C. § 10161 ........ 18

42 U.S.C. § 10163 ........ 18

42 U.S.C. § 10165 ........ 18

42 U.S.C. § 10168 ........ 18

42 U.S.C. § 10172 ........ 35

42 U.S.C. § 10198 ........ 14

42 U.S.C. § 10222 ........ passim

**Other Authorities**

10 C.F.R. § 50.100 ........ 44

10 C.F.R. § 50.92 ........ 44

10 C.F.R. Part 72 ........ 7

30 Williston on Contracts § 77:56 (4th ed.) ........ 20, 33, 36

61 Fed. Reg. 25,092 (May 17, 1996) ........ 23

61 Fed. Reg. 9,441 (Mar. 8, 1996) ........ 23

62 Fed. Reg. 1,782 (Jan. 13, 1997) ........ 24

64 Fed. Reg. 32,069 (June 15, 1999) ........ 24

64 Fed. Reg. 68,005 (Dec. 6, 1999) ........ 44

66 Fed. Reg. 31,260 (June 11, 2001) ........ 23

69 Fed. Reg. 69,901 (Dec. 1, 2004) ........ 23

Corbin on Contracts § 1.7 (rev. ed.) ........ 14

Dobbs Law of Remedies § 1.7 (2d ed. 1993) ........ 15

Fed. R. Civ. P. 8 ........ 17

H.R. Rep. No. 97-491 (1982),
*reprinted in* 1982 U.S.C.C.A.N. 3792 (96 Stat. 3792) ........ 46

Restatement (First) of Restitution § 150 (1937) ........ 49

Restatement (First) of Restitution § 156 (1937) ........ 51, 54

Restatement (First) of Restitution § 157 (1937) ........ 50, 51, 52

Restatement (Second) of Contracts § 151 (1981) ........ 10, 11, 12

Restatement (Second) of Contracts § 152 (1981) ........ 10, 14, 15

Restatement (Second) of Contracts § 236 (1981) ........ 2

Restatement (Second) of Contracts § 261 (1981) ........ 16, 17, 19, 33

Restatement (Second) of Contracts § 344 (1981) ........ 49

Restatement (Second) of Contracts § 354 (1981) ........ 54

Restatement (Second) of Contracts § 371 (1981) ........ 49

Restatement (Second) of Contracts § 7 (1981) ........ 14

# INDEX TO APPENDIX


| Pl. Ex. No. | Description | Page |
|---|---|---|
| 44 | Contract for the Disposal of Spent Nuclear Fuel No. DE-CR01-83NE44415.000, June 14, 1983 | 1 |
| 50 | Memorandum from R. Williamson, Sept. 15, 1983 | 15 |
| 59 | Draft OCRWM Mission Plan Vol. I, Dec. 20, 1983 | 18 |
| 68 | Draft Mission Plan Vol. I, Apr. 1984 | 20 |
| 69 | Draft Mission Plan Vol. II, Apr. 1984 | 24 |
| 70 | Memorandum from T. Overcast & S. Carney to E. Moore, Apr. 26, 1984 | 27 |
| 82 | Letter from DOE D. Hodel to J.B. Johnson, Sept. 7, 1984 | 29 |
| 97 | Nuclear Waste Fund Fee Adequacy: An Assessment, March 1986 | 31 |
| 113 | Monitored Retrievable Storage Submission to Congress, Mar. 1987 | 36 |
| 185 | Nuclear Waste Fund Fee Adequacy: An Assessment, Nov. 1990 | 44 |
| 320 | Letter from L. Barrett to J. Shetler, Sept. 2, 1993 | 51 |
| 325 | Letter from J. Shetler to L. Barrett, Sept. 28, 1993 | 53 |
| 327 | Letter from L. Barrett to N. Dicks, Oct. 4, 1993 | 55 |
| 429 | Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, Sept. 1995 | 57 |
| 527 | Letter from J. Schori to B. Tomasoni, Mar. 13, 1997 | 62 |
| 596 | Letter from W. Kane to R. Grenier, Sept. 10, 1998 | 66 |
| 597 | Letter from L. Barrett, Sept. 11, 1998 | 73 |

| | | |
|---|---|---|
| 603 | Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, Dec. 1998 | 76 |
| 665 | Plan For Transportation Cask Fabrication And The Deployment of Waste Acceptance Capabilities, Dec. 2000 | 83 |
| 669 | Letter from I. Itkin to D. Obey and accompanying Plan For Transportation, Jan. 19, 2001 | 88 |
| 680 | Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, May 2001 | 94 |
| 681 | Nuclear Waste Fund Fee Adequacy: An Assessment, May 2001 | 99 |
| 721 | Final Yucca Mountain EIS, Feb. 2002 | 102 |
| 724 | Letter from S. Abraham to The President, Feb. 14, 2002 | 105 |
| 730 | Statement of L. Barrett, Mar. 14, 2002 | 109 |
| 757 | Strategic Plan For The Safe Transportation of Spent Nuclear Fuel and High-Level Radioactive Waste To Yucca Mountain, Nov. 18, 2003 | 114 |
| 780 | Letter from D. Zabransky to J. Hastings, July 28, 2004 | 119 |
| 820 | “Canister Considerations for Commercial Spent Nuclear Fuel”, T. Pollog | 121 |
| 962 | Letter from W. Brach to S. Redeker, Jun. 30, 2000 | 124 |
| 981 | System Requirements Document Rev. 06, Sept. 2004 | 128 |
| 997 | Project Operational Thermal Management Strategy, Feb. 9, 2005 | 132 |
| 998 | Yucca Mountain Science and Engineering Report, May 2001 | 134 |
| 1001 | Written Direct Testimony of I. Stuart | 136 |
| 1002 | Written Direct Testimony of E. Supko | 139 |

| Attachment No. | Description | Page |
|---|---|---|
| A | Statement by T. Garrish, Mar. 10, 2005 | 141 |
| B | OCRWM Annual Report to Congress, Dec. 2004 | 149 |
| C | Pre-Hearing Questions, Subcommittee on Nuclear Regulation, United States Senate, Apr. 23, 1987 | 154 |
| D | Indiana Michigan Trial Transcript, Mar. 10, 2004 | 157 |
| E | GAO, DOE Should Provide More Information on Monitored Retrievable Storage, June 1987 | 162 |
| F | OCRWM, Why Yucca Mountain?, Frequently Asked Questions | 167 |
| G | DOE Cooperative Agreement No. DE-FC01-92NE37990, dated Nov. 27, 1991, amended Mar. 19, 1992 | 170 |
| H | Inside INEEL, Fall 2001 | 177 |
| I | GAO Report, Yucca Mountain Project Management and Funding Issues, July 1, 1993 | 179 |
| J | GAO Report, Yucca Mountain Project Behind Schedule and Facing Major Scientific Uncertainties, May 1993 | 181 |
| K | GAO Report, Quarterly Report on DOE's Nuclear Waste Program as of June 30, 1987, dated Aug. 1987 | 184 |
| L | GAO Report, Quarterly Report on DOE's Nuclear Waste Program as of Sept. 30, 1986, dated Nov. 1986 | 188 |
| M | GAO Report, Quarterly Report on DOE's Nuclear Waste Program as of Dec. 31, 1985, dated Jan. 1986 | 190 |
| N | GAO Report, Status of the DOE's Implementation of the NWPA as of Dec. 31, 1984, dated Jan. 31, 1985 | 193 |
| O | GAO Report, Institutional Relations Under the Nuclear Waste Policy Act of 1982, Feb. 1987 | 198 |
| P | OCWRM Program Financial and Budget Information, Feb. 28, 2005 | 200 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, Plaintiff, | ) | |
| v. | ) | No. 98-488 C |
| THE UNITED STATES OF AMERICA, Defendant. | ) | (Judge Braden) |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO <u>MEMORANDUM OPINION AND ORDER TO SHOW CAUSE DATED APRIL 21, 2005</u>**

## INTRODUCTION

On April 21, 2005, this Court issued a Memorandum Opinion And Order To Show Cause ordering the parties to "show cause why the court should not hold that the June 14, 1983 Standard Contract with plaintiff is void and the Government be ordered to refund all monies paid to date by plaintiff into the Nuclear Waste Fund as restitution." Memorandum Opinion and Order to Show Cause at 4 (Apr. 21, 2005) ("Order"). The Court requested the parties to address whether the Contract was void under the doctrines of mutual mistake of fact or impracticability. This Court also requested Plaintiff Sacramento Municipal Utility District ("SMUD") to show cause "how such an order could prejudice its interest," "why restitution is not an appropriate remedy in this case," and "if restitution is the appropriate remedy, why it should not be paid from the Nuclear Waste Fund, rather than the Judgment Fund." *Id.* at 4-5.

SMUD has carefully considered the Court's Order, but has concluded that releasing the government from performing its contractual obligation to take title to and remove SMUD's spent fuel would cause SMUD greater damage over the long term. Accordingly, SMUD respectfully requests that the Court refrain from entering such an order. SMUD believes that there is no basis for finding the June 13, 1983 Contract between the Department of Energy ("DOE") and SMUD void based on either mutual mistake of fact or impracticability. *See generally* Contract for the Disposal of Spent Nuclear Fuel No. DE-CR01-83NE44415.000 between DOE & SMUD (June 14, 1983) (Pl. Ex. 44) ("Contract" or "Standard Contract"). Specifically, SMUD respectfully requests that this Court not take any action that would have the effect of releasing the government from its binding obligation of performance under the Contract. SMUD filed this claim for partial breach of contract to recover the damages it incurred as a result of the government's delay in performance. SMUD has chosen to pursue a partial breach remedy, rather than declaring the Contract at an end, because it remains of utmost importance to SMUD to have DOE accept its fuel in the future. SMUD, as the non-breaching party, is entitled to choose this remedy. *See* Restatement (Second) of Contracts § 236 (1981) ("Restatement") (noting a party's ability to elect between damages for a total and partial breach).

Furthermore, an order of restitution would prejudice SMUD's interests in multiple ways. It would deprive SMUD of its current right to have the government dispose of its nuclear fuel; it could allow the government to seek larger payments and more onerous terms for such disposal in the future; it would subject SMUD to additional delay and associated fuel storage costs before such disposal occurs; it would not fully compensate SMUD for the damages it has incurred to

date; and it would potentially jeopardize SMUD's licensing with the Nuclear Regulatory Commission ("NRC").

Prior cases demonstrate that there is no basis to void the contract on the grounds of mutual mistake of fact or impracticability. In enacting the Nuclear Waste Policy Act ("NWPA"), Congress established that the government would have an "unconditional," "unqualified," and "unequivocal" obligation to begin acceptance of fuel from utilities by January 31, 1998 and that such obligation would be a contractual duty. *See Northern States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758-61 (D.C. Cir. 1997) ("*Northern States I*"); *Indiana Michigan Power Co. v. U.S. Dep't of Energy*, 88 F.3d 1272, 1274-77 (D.C. Cir. 1996). Although Congress and DOE recognized that there could be difficulties in developing interim or permanent storage facilities, the government's contractual obligations were not premised on the availability of Yucca Mountain or any other site. Rather, by requiring an "unconditional" contractual obligation, Congress required that the government assume the risk of failing to meet the required start date. *See Indiana Michigan*, 88 F.3d at 1276 ("The only limitation placed on the Secretary's duties under [Section 302(a)(5)(B)] is that that duty [to begin disposing of SNF by January 31, 1998] is 'in return for the payment of fees established by this section.'"); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("Congress found [the January 1, 1998 start date] so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement."). Therefore, the doctrines of mutual mistake of fact and impracticability have no application to the government's binding obligation under this congressionally-mandated contract.

In addition, the D.C. Circuit expressly rejected the government's argument that its failure to perform its obligations "arises out of causes beyond the control and without the fault or negligence of the party failing to perform." Contract Art. IX.A; *Northern States I*, 128 F.3d at 757-60 (delay not "unavoidable" under the Contract). In *Northern States I*, DOE had identified six factors that "supposedly support the conclusion that DOE experienced an unavoidable delay in this case: technical problems; regulatory delays; roadblocks to implementation of interim or monitored retrievable storage; funding restrictions; litigation delays; and consultation requirements." 128 F.3d at 760. The D.C. Circuit rejected this argument, explaining that "[u]nder the Department's interpretation of the contractual provisions, however, the government can always absolve itself from bearing the costs of its delay if the delay is caused by the government's own acts. *This cannot be a valid interpretation, as it would allow the Executive Branch to void an unequivocal obligation imposed by Congress.*" *Id.* (emphasis added) The D.C. Circuit accordingly issued a writ of mandamus precluding the government from excusing its own delay "on the ground that it has not yet prepared a permanent repository or interim storage facility" or "on the grounds of acts of Government in either its sovereign or contractual capacity." *Id.* at 760, 761 (internal citations omitted); *see also Maine Yankee*, 225 F.3d at 1339 (noting that the D.C. Circuit "issued a writ of mandamus prohibiting the Department from relying on the unavoidable delays provision of the contract."). Accordingly, these decisions have rejected DOE's prior claims of impossibility based on the absence of a repository or interim storage facility.

Pursuant to the express mandate of Congress, the government's obligation to begin performance by January 31, 1998 is unconditional. Given this background, the common law doctrines of mistake of fact and impracticability have no application in this case. For the Court to allow "the Executive Branch to void an unequivocal obligation imposed by Congress" would not be a proper interpretation of the NWPA or the Contract. The government clearly understood the obligation it was undertaking when it entered into contracts with utilities for performance by a date certain. Given this unconditional obligation and the government's subsequent breach, SMUD is entitled to recover the resulting damages caused by the government's partial breach.

If the Court does nonetheless order restitution, SMUD submits that any such restitution should be awarded from the Judgment Fund because of the restrictions in the NWPA on the use of Nuclear Waste Fund monies and the inequities that would result from an award from that Fund. In addition, such award should include the substantial profit earned on SMUD's funds while in the government's possession.

## BACKGROUND

SMUD filed this lawsuit on June 6, 1998. On January 19, 2005, this Court entered an order concluding that the government's failure to begin accepting SNF and HLW constituted a breach of the SMUD Contract, ruling that "the Government was obligated under the June 14, 1983 DOE Standard Contract to begin accepting SNF and/or HLW from utilities no later than January 31, 1998." Memorandum Opinion at 14 (Jan. 19, 2005). This decision followed the Federal Circuit's prior decisions holding that the government's failure to begin accepting SNF by January 31, 1998 constituted a breach of contract. *See Maine Yankee*, 225 F.3d at 1343;

*Northern States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000) ("*Northern States II*"). It was also consistent with numerous other orders from the Court of Federal Claims that have recognized this breach and found liability against the government for breach of contract. *See*, *e.g.*, *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364 (2005); *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005).

Following the entry of its liability order, the Court held a two week trial to determine the damages to which SMUD is entitled as a result of the breach. The trial and witness testimony focused on issues related to damages. The government's pre-trial brief did not raise mutual mistake of fact or impracticability and none of its witnesses testified that its performance was or ever has been "impracticable" for any reason. The government presented no evidence that the Contract is "void," has never identified any fact that it believes constituted a mutual mistake of fact, and has never argued during the seven year duration of this case that performance of the Contract has become impracticable or impossible.[1]

In the Show Cause Order, this Court stated that, during the damages trial in this case, "the court became aware of facts that seriously call into question the viability and vitality of the Standard Contract in this case." Order at 2. The Court first identified the fact that "[a]s of March 1, 2001, 17 sites, including plaintiff's site, in 13 states had licensed commercial dry storage facilities and 15 additional sites were then under contract" and that "[a]s of December 9, 2002, there were 27 spent fuel dry storage sites projected for 2003 and 36 projected by 2006."

[1] To the contrary, DOE officials have repeatedly announced to the public, testified in this and other SNF cases, and represented to Congress that DOE would be able to begin accepting spent fuel from utilities in 2010, a date that was recently moved back to 2012. *See* pp. 22-23.

*Id.* The Court then referenced the testimony of DOE witness David Zabransky for the conclusion that DOE does not consider the fuel stored in dry storage canisters to be standard fuel subject to the Standard Contract "because it is not compatible with the environmental and safety requirements for Yucca Mountain." *Id.*

The dual-purpose canisters at SMUD and other utility sites, however, were not designed to be used as DOE's waste "disposal package" for final emplacement at the eventual repository. *See* 42 U.S.C. § 10101(10) (defining the terms "disposal package" and "package" to mean "the primary container that holds, and is in contact with, solidified high-level radioactive waste, spent nuclear fuel, or other radioactive materials, and any overpacks *that are emplaced at a repository*") (emphasis added). SMUD's dual-purpose canisters were intended and designed for two different purposes – *temporary storage* of the fuel at SMUD's on-site dry storage facility or Independent Spent Fuel Storage Installation ("ISFSI") and subsequent *transport* of the fuel on the public highways inside a separate container called a transportation cask.[2] Under the

---

[2] The fact that the canisters can be used for two purposes – storage and then transportation – has led them to be called "dual-purpose canisters" or DPCs. For transport on the public highways, the canisters still must be placed inside a separate transportation *cask*. The difference between the canisters and the cask is that the cask is a more robust design, has thicker metal walls, includes substantial impact limiters in case of potential drops, and is significantly more expensive to design and construct. Tr. at 499-00, 504-09. SMUD initially considered procuring an entire fleet of casks that could be used for both storage at the ISFSI and then direct transportation to a DOE facility. Tr. at 457-58. SMUD, however, like nearly every utility, opted for the less expensive design that includes dual-purpose canisters for storage on-site and only one transportation cask for transportation from the pool to the ISFSI. At the ISFSI, the canisters are stored in thick concrete overpacks called Horizontal Storage Modules or HSMs. The NRC licensed SMUD's dry storage system under 10 C.F.R. Part 71 (for transportation) in 1998 (Pl. Ex. 596) and under 10 C.F.R. Part 72 (for storage) in 2000 (Pl. Ex. 962). SMUD has 21 dual-purpose canisters at its dry storage facility, each containing 24 separate fuel assemblies (except for one canister that holds only 13 assemblies), and one transportation cask that was used to move each of the canisters from the wet pool to the dry storage facility. Tr. at 144-46, 496-00.

Contract, when it begins performance, DOE is obligated to provide the necessary transportation casks and arrange for transport of the fuel from the utility site to the DOE facility. *See* Contract Art. IV.B.2.

The fact that SMUD's and other utilities' dual-purpose canisters were not designed to be the "disposal package" in which DOE would finally emplace fuel in Yucca Mountain (or any other site) is a red herring. It has no bearing on the claims in this lawsuit or the doctrines of mutual mistake of fact or impracticability. It is DOE's responsibility under the NWPA and the Contract to design and construct the final waste disposal package in which it will place the spent fuel in the repository or an interim storage facility. *See* 42 U.S.C. § 10134(a)(1)(B); Contract Art. IV.B.1 ("DOE shall accept title to all SNF and/or HLW, of domestic origin, generated by the [Purchaser], provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract."), Art. VII ("DOE shall be *solely responsible* for control of all material upon passage of title. DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title.") (emphasis added).

As this Court noted in its Order, DOE must seek a construction license for the repository from the NRC, which will include, among many other things, criteria for the final waste package.[3] Whatever those criteria are for the final waste package and permanent emplacement at

[3] DOE is currently finalizing its license application for submittal to the NRC and has stated that it intends to submit the license application to the NRC in late 2005. Statement of T. Garrish at 11 (Mar. 10, 2005) (included in appendix as Attachment A, hereinafter Att. A); Tr. at 2203-04; *see also* OCRWM Annual Report to Congress at 9 (Dec. 2004) (Att. B) The license application is "expected to be about 5,500 pages long, with several hundred key supporting references, approximately 400 engineering drawings, and 33 system description documents describing how individual systems will work. . . . The license application and its supporting references also will include design information for the three major site elements – the underground repository, the surface facilities, and the waste package – as well as descriptions of key repository programs,

Footnote continued on next page

the repository, they will not affect how DOE *transports* the spent fuel from the utility sites to the surface facilities at the repository. *See* Contract Art. IV.B.2 (Contract requires DOE to transport the fuel from the utility site and provide transportation casks "suitable for use at the Purchaser's site"). The overwhelming documentary evidence (*see infra* at pp. 26-33) demonstrates that DOE has been planning to and anticipates transporting spent fuel in its canistered form from the utility sites to the surface facilities at the repository. DOE's representations to Congress, the utilities, and the public during the past decade establish unequivocally that DOE encouraged the utilities to use dual-purpose canisters for temporary storage of fuel at reactor sites during the period of DOE's delay and that DOE would accept such canisters for transportation at the time it developed a facility.

Notably, DOE did not disclose or assert in its statutorily-required Environmental Impact Statement for Yucca Mountain (Pl. Ex. 721) ("EIS") that there would be any problems or difficulties with transporting fuel stored in dual-purpose canisters; DOE's System Requirement Document requires that DOE be able to accept all types of dual-purpose canisters for transportation (Pl. Ex. 981); DOE's analysis for the Total System Life Cycle Costs of the program and the adequacy of the fees paid by the utilities for those costs assumes that DOE will accept dual-purpose canisters for transportation from the utility site to the repository (Pl. Ex. 680); and DOE has never informed Congress or the NRC that the existence of fuel in dual-

---

Footnote continued from previous page
such as quality assurance, radiation protection, performance confirmation, and the total system performance assessment." OCRWM Annual Report to Congress at 9 (Dec. 2004) (Att. B).

purpose canisters presents any type of impediment to the development of the repository program. *See infra* at pp. 26-33.

## ARGUMENT

### I. There Is No Basis For Voiding The Contract Based On Mutual Mistake Of Fact.

The Court has ordered SMUD to show cause why the Standard Contract should not be held void based on a mutual mistake of fact. *See* Order at 3-4. The doctrine of mutual mistake of fact is inapplicable to the facts of this case and rescission is not, in any event, a remedy that has been requested by SMUD.

#### A. The Doctrine Of Mutual Mistake Of Fact Is Inapplicable To This Case.

Section 152(1) of the Restatement provides that "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of mistake." Restatement § 152(1). A mistake is defined as "a belief that is not in accord with the facts." Restatement § 151.

The Federal Circuit has explained that any such mistake must be regarding a fact *in existence at the time of contracting*, not a prediction regarding future events. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202-03 (Fed. Cir. 1994) ("The mistake doctrine does not apply to predictions or promises of future conduct.") (internal citations omitted); *see also Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990); *United States v. S.W. Elec. Coop., Inc.*, 869 F.2d 310, 3156 (7th Cir. 1989) (noting that the "rules governing rescission for either mutual mistake or singular mistake are inapplicable where, as here, a party's erroneous

prediction or judgment as to future events is involved"). The Restatement similarly notes that "a party's erroneous belief must relate to the facts as they exist at the time of the making of the contract;" thus a "party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here." Restatement § 151, cmt. a; *see also Dairyland*, 16 F.3d at 1203 (noting that there is agreement "among the circuit court of appeals and the commentators that mutual mistake of fact cannot lie against a future event"); *Land Grantors v. United States*, 64 Fed. Cl. 661, 703 (2005) (quoting Restatement and finding mutual mistake regarding absence of coal, gas, oil, and other mineral deposits under land at time of contracting).

Accordingly, any beliefs or predictions at the time of contracting regarding the future of the nuclear waste disposal program cannot form the basis for voiding the Contract based on mutual mistake of fact. The parties could not have held a mistaken belief regarding any aspect of Yucca Mountain at the time of contract formation because Yucca Mountain as a waste storage site did not exist at the time of contracting. Neither the Standard Contract nor the 1983 NWPA mention Yucca Mountain. Instead, the NWPA contained a statutory scheme for DOE to identify, characterize, and then study multiple sites that would lead to DOE's development of a storage facility by January 31, 1998. *See* 42 U.S.C. §§ 10132(b), § 10134(a)(2)(A), 10134(b). Any belief in 1983 regarding whether there *would be* a repository or interim storage facility operating in 1998 was not an erroneous belief as to facts existing in 1983, but rather an implicit prediction or judgment regarding the government's future performance. To the extent this prediction or

judgment was erroneous, such an error in judgment cannot constitute a "mistake" under this doctrine. *See* Restatement § 151, cmt. a.

In addition, while the government did not present any testimony at the recent trial from DOE officials employed at DOE at the time of contract formation in 1983, the documentary record demonstrates that DOE understood from the outset of the program that there could be a delay in repository operations, and that, if so, DOE would need to take other actions to carry out the purpose of the Contract. For example, shortly after the Contract was signed in 1983, DOE stated that it "does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998." Draft OCRWM Mission Plan Vol. I at 2-1 (Dec. 20, 1983) (Pl. Ex. 59). Again in 1983, DOE stated that "the lack of existence of particular type of facilities will not delay or postpone the acceptance of spent fuel." Memorandum from R. Williamson at 1 (Sept. 15, 1983) (Pl. Ex. 50); *see also* Letter from DOE D. Hodel to J.B. Johnson at 1 (Sept. 7, 1984) (Pl. Ex. 82) ("[I]t is my intention that this commitment in the contracts, together with the overall structure of the Act, will create an obligation for the Department to accept spent fuel in 1998 whether or not a repository is in operation."). Thus, there was not a mistaken belief about the repository in any event.

The fact that many utilities, including SMUD, have recently transferred some of their spent fuel into dry canisters for temporary storage at their reactor sites, *see* Order at 2, also cannot form the basis for a mutual mistake of fact. SMUD did not transfer its fuel from its wet pool into dual-purpose canisters until 2001 and 2002, three years after the government was obligated to begin performance and eighteen years after the Contract was signed. The vast

majority of utilities are planning to move fuel into dry storage after 2000. These are not facts that were in existence at the time of contracting in 1983.[4] As noted, a party's prediction as to future events cannot constitute a mutual mistake under the doctrine. *Dairyland*, 16 F.3d at 1203.

In addition, the form in which fuel would reside at a utility's site at the time of DOE's performance (e.g., in the wet pool, in dual-purpose canisters, in storage-only canisters, etc.) is not the basis of a "mistake" and was not a basic assumption upon which the Contract was made. Indeed, the Contract does not address in any way the form in which the utility would store its fuel prior to acceptance by DOE. Instead, the Contract requires that DOE "shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility." Contract Art. IV.B.1. The Contract further specifies that "[s]uch cask(s) *shall be suitable for use at the Purchaser's site*." *Id.* (emphasis added). Nothing about this contractual arrangement has changed as a result of the fact that some fuel is stored in dual-purpose canisters. Just as SMUD itself procured a suitable transportation cask for moving its fuel, DOE still can and is planning to provide a transportation cask "suitable for use at Purchaser's site." *See supra* n.2 & *infra* at pp. 27-33.

DOE's obligation is not dependent on whether the utility has stored its fuel in a wet versus dry form. Nowhere does the Contract or the statute require the utility to maintain its fuel in "bare" form or in the wet pool. To the contrary, the NWPA contemplated that some utilities may develop dry storage and required DOE to establish, by January 1984, a demonstration

---

[4] The same is true regarding the fact that DOE has not finalized its waste disposal package. DOE's plans for its final disposal package were not intended to and cannot be finalized until the NRC issues a license for the repository. *See supra* n.3.

program(s) with utilities "for the *dry storage* of spent nuclear fuel . . . with the objective of establishing one or more technologies that [the NRC] may, by rule, approve for use at the sites of civilian nuclear power reactors." 42 U.S.C. § 10198(a) (emphasis added). Since the advent of commercial dry storage systems, DOE has been actively involved in and has supported utilities' efforts in developing such systems and has included plans for the acceptance of dual-purpose canisters at Yucca Mountain. Thus, the way the fuel is currently stored cannot be the basis for a mistake of fact.

### B. SMUD, As The Adversely Affected Party, Has Not Elected To Void The Contract.

The Restatement § 152 provides that where there is a mutual mistake of fact, the contract "*is voidable by the adversely affected party* unless he bears the risk of mistake." The doctrine of mutual mistake of fact does not, "as a matter of law, void [the] contract." *Orlandi v. Goodell*, 760 F.2d 78, 80 (4th Cir. 1985). Rather, the contract is only "voidable." A "voidable" contract "is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance." Restatement § 7. "The propriety of calling a transaction a voidable contract rests primarily on the traditional view that the transaction is valid and has its usual legal consequences until the power of avoidance is exercised." *Id.* § 7, cmt. e.[5] Thus where a mutual

[5] Under the tenets of contract law, there is a difference between "void" contracts and "voidable" contracts. A "void" contract is not really a contract at all, as it "has no legal operation whatever." Corbin on Contracts § 1.7 (rev. ed.). In the case of voidable contracts, the contract is legally operable until a party to the contract exercises its right to void the contract. Restatement § 7, cmt. e. There is no basis for voiding the contract absent such an election on the part of the aggrieved party.

mistake of fact exists, the contract is valid and enforceable until this power of avoidance is exercised.

In the case of mutual mistake of fact, by definition this power lies with the "adversely affected party." Restatement § 152. Here, SMUD is the adversely affected party. It has performed all of its obligations under the Contract, the government has more than $16 billion of the utilities' funds, and this Court, like the Federal Circuit, already ruled that the government breached its contractual obligations when it failed to begin performance on January 31, 1998. Given that SMUD has neither plead nor pursued avoidance of the Contract, there is no basis for voiding the Contract based on the doctrine of mutual mistake of fact.

This express delegation of the power of avoidance to the adversely affected party merely emphasizes SMUD's existing right as plaintiff to elect its remedies. A plaintiff has a right of an election, or choice, between available remedies. No one "can take away such right of election of remedies after it has been exercised." *Edwards v. E.I. Du Pont De Nemours & Co.*, 183 F.2d 165, 168 (5th Cir. 1950). Thus, "[w]here one or more remedies are available, a party is not to be deprived of his right to elect which remedy he will pursue." *Hooper-Mankin Fuel Co. v. Chesapeake & O. Ry. Co.*, 30 F.2d 500, 502 (4th Cir. 1929). Rather, a "plaintiff's choice of remedy should be respected." Dobbs Law of Remedies § 1.7 (2d ed. 1993). Given that SMUD has elected to pursue a partial breach and has not pursued avoidance of the contract in this case because of the extreme importance of receiving the performance it has paid for, this Court should refrain from independently voiding the contract and terminating the government's obligations.

## II. There Is No Basis For Voiding The Contract Based On Impracticability Of Performance.

The doctrine of discharge by supervening impracticability applies only in those limited situations where "a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement § 261. This doctrine is the modern version of the traditional doctrine of impossibility. *See Transatlantic Fin. Corp. v. United States*, 363 F.2d 312, 315 (D.C. Cir. 1966). While the modern doctrine does not require that performance be made "absolutely impossible," nevertheless "'impracticability' means more than 'impracticality.'" Restatement § 261, cmt. d.

In order for the government's performance to be discharged under the doctrine of impracticability, the government must prove that:

(a) a supervening event made the government's performance impracticable;

(b) the occurrence of the event was not the government's fault;

(c) the non-occurrence of the event was a basic assumption upon which the contract was made; and

(d) the government did not assume the risk of the occurrence.

*See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294-95 (Fed. Cir. 2002). The government cannot meet any of these requirements.

First, the government has not identified any supervening event that made performance impracticable.[6] Indeed, there is no evidence that performance is impracticable; to the contrary,

[6] A claim of commercial impracticability is an affirmative defense to liability. *See Harriscom v. Svenska*, 3 F.3d 576, 580 (2d Cir. 1993); *Roth Steel Prods. v. Sharon Steel Corp.*,705 F.2d 134,

Footnote continued on next page

the government has repeatedly represented to Congress, the public, the courts, and the utilities that it will perform its obligations, albeit delayed by many years. Second, to the extent the government asserts its performance has been rendered impracticable due to a delay in the development of a permanent repository or interim storage facility, such impracticability would be attributable to the fault of the government. Third, in creating an unconditional and unqualified obligation to begin performance by January 31, 1998, Congress required that the risk of delay be assumed by the government. For all these reasons, there is no basis in fact or law for voiding the contract based on impracticability.

### A. The Government's Performance Under The Contract Has Not Been Rendered Impracticable By Some Supervening Event.

Because "[c]ontractual liability is strict liability," and it is "an accepted maxim that . . . contracts are to be kept," this doctrine of impossibility applies only where an "extraordinary circumstance" arises that makes performance "so vitally different from what was reasonably expected so as to alter the essential nature of that performance." Restatement § 261, ch. 11, int. note. The government's own pronouncements and the documentary record establish that no supervening event has occurred since Contract formation that would make performance impossible.

---

Footnote continued from previous page
149-50 (6th Cir. 1983). Federal Rule of Civil Procedure 8(c) requires such affirmative defenses to be set forth in the defendant's responsive pleadings, and "[f]ailure to plead an affirmative defense is a waiver of that defense." *Underwater Devices Inc. v. Morrison-Knudsen Co., Inc.*, 717 F.2d 1380, 1388 (Fed. Cir. 1983). During the seven year duration of this case, the government never once raised the defense of commercial impracticability. Based on this record, there is waiver of the defense of impracticability.

**1. The Absence Of A Repository Or Interim Storage Facility Cannot Form The Basis For A Claim Of Impracticability.**

The absence of a repository or interim storage facility[7] cannot form the basis for a claim of impracticability, as the government's obligation is not dependent on the existence of such facilities. *Indiana Michigan*, 88 F.3d at 1274-77; *Northern States I*, 128 F.3d at 758-61. The D.C. Circuit has explicitly recognized that the "NWPA directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility." *Northern States I*, 128 F.3d at 760. The court went on to preclude DOE "from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Id.* The government thus has an unconditional obligation per Congress's directive to begin performance by a date certain.[8]

---

[7] The NWPA as originally enacted required that DOE study and submit a proposal to Congress for the construction of one or more Monitored Retrievable Storage facilities by June 1, 1985. 42 U.S.C. § 10161. DOE prepared such a study in March 1987. *See* Monitored Retrievable Storage Submission to Congress (Mar. 1987) (Pl. Ex. 113). In the Nuclear Waste Policy Amendments Act of 1987, Pub. L. 100-120, 101 Stat. 1329-1401, 1329-121 ("1987 Amendments"), Congress authorized DOE to construct an MRS, subject to certain restrictions. 42 U.S.C. §§ 10163(b), 10165(b), 10168(d). To prevent the MRS from becoming the de-facto repository, the 1987 restrictions linked the opening of an MRS to the opening of a geologic repository. *Id.*

[8] Several statements by DOE during the early and mid 1980s illustrate DOE's own belief that it had an obligation to perform independent of the existence of a repository. Then–DOE Secretary Donald Hodel sent a letter to Senator Benett Johnston in September 1984 stating that DOE had an obligation to accept fuel in 1998 "whether or not a repository is in operation." Letter from D. Hodel to J.B. Johnson at 1 (Sept. 7, 1984) (Pl. Ex. 82). Similarly, in promulgating the Contract in 1983, and responding to utility concerns about possible nonperformance, DOE stated that "we believe we should be consistent with the language of the Act. The 1998 date is called for in the Act, and we believe it to be a reasonable date. Our performance will be judged by meeting this date." Final Rule on Standard Contract, 48 Fed. Reg. 16,590, 16,598 (Apr. 18, 1983). In 1987, then-DOE Secretary Herrington reiterated that DOE had an obligation, as set forth explicitly in the Contract, to begin performance by January 31, 1998. Pre-Hearing Questions, Subcommittee on Nuclear Regulation, United States Senate, Answer to Question 1 at 2 (Apr. 23, 1987) (Att. C).

Because the government's obligation to perform is absolute and statutorily derived, any delay or difficulty in the development of a repository or interim storage facility cannot give rise to a claim of impracticability. For this reason alone, the doctrine of impracticability cannot apply in this case.

**2. The Government Has The Resources And Physical Capability To Perform Its Obligations Under The Contract.**

The Restatement explains that "[a] mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials, or costs of construction, unless well beyond the normal range, does not amount to impracticability since it is this sort of risk that a fixed-price contract is intended to cover." Restatement § 261, cmt. d. "A contract is said to be commercially impracticable when, because of unforeseen events, it can be performed only at an excessive and unreasonable cost." *Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002) (internal citations omitted). Here, the Standard Contract is a "full cost recovery" contract in which the fees paid by utilities must cover the entire cost of performance for the program. *See* 42 U.S.C. § 10222(a)(4). The government today holds approximately $16 billion in unspent utility fees reserved solely for DOE's eventual performance. *See* Statement by T. Garrish at 6 (March 10, 2005) (Att. A). Because the Contract is "full cost recovery," there is no sense in which performance could cause "excessive and unreasonable cost" to the government. *Raytheon Co.*, 305 F.3d at 1367.

Furthermore, as required by the NWPA, from 1983 to the present, DOE has prepared periodic "Fee Adequacy Reports" to analyze whether the billions in fees being paid by the

utilities will be sufficient to cover the life cycle costs of the program. *See* Pl. Exs. 97, 185, 681 (Fee Adequacy Reports); 42 U.S.C. § 10222(a)(4). DOE also has prepared detailed "Total System Life Cycle Cost" ("TSLCC") reports to analyze what the full costs of the life of the program will be. *See* Pl. Exs. 429, 603, 680 (TSLCC Reports). In every one of the Fee Adequacy and TSLCC Reports, including the most recent reports prepared in 2001 and updated in 2003, DOE has concluded that the fees paid by the utilities will be sufficient to cover the life cycle costs of the program. Thus, the government has no basis to assert a lack of resources made performance of its obligations under the Contract impracticable.[9]

Deputy Director of the Program, Theodore Garrish, recently testified before Congress regarding the status of the Program, stating that "the Program is well situated for the future. We are moving ahead deliberately, step-by-step, toward development of a geologic repository at Yucca Mountain." Statement by T. Garrish at 11 (Mar. 10, 2005) (Att. A). He also elaborated

[9] The government has never asserted in this case that a lack of funding made performance impracticable, and, in any event, there is no support for such a claim. Deputy Director Theodore Garrish testified to Congress in March of 2005 that, "[u]ntil recently, the repository program's requirements were substantially below the annual fee revenues." *See* Statement by T. Garrish at 6 (Mar. 10, 2005) (Att. A). The Department's current focus on the need for adequate funding is based on the anticipated increased cost of the program over the next few years. Both "DOE and Congress have been aware for many years that funding requirements for the Program would increase substantially as it approached construction and transportation system development." OCRWM Annual Report to Congress at 16 (Dec. 2004) (Att. B). As DOE witness Christopher Kouts testified at trial, with regard to performance, it would be difficult to say if increased funding "would have made a difference." Tr. at 2142. If the government did limit DOE's access to funds, and such limitation did prevent the government from carrying out its contractual obligations, any such limitation would be the government's fault and could not provide a defense to non-performance. *See United States v. Winstar*, 518 U.S. 839, 896 (1996); *Centex v. United States*, 395 F.3d 1283, 1311 (Fed. Cir. 2005); *Scott Timber Co. v. United States*, 40 Fed. Cl. 492, 507 (1998). "Impracticability is not available as a defense when a law is enacted that only serves to undermine the government's contract obligations." 30 Williston on Contracts § 77:56 (4th ed.).

on several "reasons why this Program is poised for success." *Id.* Then-Deputy Director Lake Barrett made similar representations to Congress in 2002, noting all the ways in which DOE had made "significant" progress toward the development of a repository during 2002 and would continue to develop a program in 2003 to ensure performance by the end of the decade. Statement of L. Barrett at 1-2 (Mar. 14, 2002) (Pl. Ex. 730).

DOE similarly has assured utilities of performance. In December 2003, OCRWM's Director, Margaret Chu, distributed to utilities OCRWM's strategic plan for the transportation of spent nuclear fuel from commercial utility sites. Strategic Plan For The Safe Transportation of Spent Nuclear Fuel and High-Level Radioactive Waste To Yucca Mountain (Nov. 18, 2003) (Pl. Ex. 757). DOE stated it "plans to begin operating the repository under a license from the Nuclear Regulatory Commission . . . in 2010," and that OCRWM would develop the necessary transportation system to support such operations over the next six years. *Id.* at 1. In a letter to SMUD in July of 2004, DOE contracting officer David Zabransky assured SMUD that it "plans to begin operation of the repository at Yucca Mountain beginning in 2010." Letter from D. Zabransky to J. Hastings (July 28, 2004) (Pl. Ex. 780). DOE witness Christopher Kouts pointed to such statements and documents at trial in *Indiana Michigan* to support his assertions that DOE was actively engaged in moving toward meeting its obligations under the NWPA and the Standard Contract. *Indiana Michigan* Tr. at 1952-1961 (Att. D).

From the inception of the program through today, the government also has had the physical capability to begin acceptance of spent nuclear fuel as required under the Contract. In fact, the government has admitted on several occasions that it has the physical capacity to

remove and store spent nuclear fuel. For example, DOE witness Thomas Pollog admitted at trial that, in 1995, while DOE was in the process of developing a truck cask, "if we really wanted to do something, we probably could have issued contracts for currently other available systems that were out there." Tr. at 2054. Mr. Pollog further clarified that "[i]f we needed to move fuel, we probably could have procured other casks that were currently certified." *Id.*; *see also* GAO Report, DOE Should Provide More Information on Monitored Retrievable Storage at 3 (June 1987) (Att. E) (criticizing DOE's failure to sufficiently analyze the available alternatives for storage in lieu of an MRS).

The government's physical capacity to perform under the Contract is illustrated by evidence that the government has accepted, transported and stored SNF, from a variety of sources, at numerous facilities already in existence throughout the United States. DOE acknowledges that "since 1965, government and industry groups have transported more than 10,000 spent fuel assemblies in more than 2,700 shipments over more than 1.6 million miles." OCRWM, Why Yucca Mountain?, Frequently Asked Questions at 17 (Att. F); *see also* OCRWM Annual Report to Congress at 30 (Dec. 2004) (Att. B) (noting that the "Department and industry have safely completed approximately 3,000 shipments of SNF"). SMUD's expert, Ivan Stuart, worked with DOE throughout the 1990s and testified at trial regarding his involvement with approximately 1000 DOE shipments of spent fuel during that time period. Tr. at 1448. He also testified that frequently these shipments included failed fuel, including severely damaged fuel far in excess of the level of damage SMUD has encountered. Tr. at 1447-1448; Written Direct Testimony of I. Stuart at 12 (Pl. Ex. 1001).

There is also "extensive worldwide experience" in the area of SNF transportation; over the past twenty-five years, more than 70,000 metric tons of SNF have been shipped safely throughout the world. OCRWM Annual Report to Congress at 30 (Dec. 2004) (Att. B). Mr. Stuart testified regarding the transportation of fuel around the world and noted that the "European experience transporting SNF internationally demonstrates that achieving a 3000 MTU annual rate or higher would be readily acceptable in the United States." Written Direct Testimony of I. Stuart at 11 (Pl. Ex. 1001).

DOE has also stored spent nuclear fuel, from a variety of sources, throughout the country. In 1996, DOE published a Record of Decision providing for the storage of spent nuclear fuel from numerous foreign research reactors. *See* Record of Decision, 61 Fed. Reg. 25,092 (May 17, 1996). That decision established a program providing for the shipment of spent nuclear fuel from forty-one different countries to the United States for transport and storage at DOE's facilities at the Savannah River Site in South Carolina and the Idaho National Engineering Laboratory. The program provides for interim storage and treatment prior to final disposal at the repository. *Id.* at 25,092. Just recently, in December 2004, the Record of Decision was revised to extend the acceptance program for an additional ten years, through 2016. Revision of the Record of Decision, 69 Fed. Reg. 69,901 (Dec. 1, 2004); *see also* Amendment to Record of Decision, 61 Fed. Reg. 9,441 (Mar. 8, 1996) (reporting more than 1000 spent fuel shipments to Savannah River Site and Idaho National Engineering Laboratory).[10]

---

[10] There are many more such examples. DOE has shipped spent nuclear fuel from Three Mile Island to an Independent Spent Fuel Storage Installation located at DOE's Idaho National Engineering Laboratory. *See* Notice of Docketing of Materials License SNM-2508 Amendment, 66 Fed. Reg. 31,260 (June 11, 2001); DOE Notice of Consideration of Issuance of a Material

Footnote continued on next page

In addition, DOE has accepted responsibility for fuel storage by taking possession of spent fuel onsite. Fort St. Vrain Nuclear Generating Station, located in Colorado, was a commercial nuclear reactor first developed as a DOE demonstration project and subsequently run by Public Service Company of Colorado as a commercial entity. The Fort St. Vrain plant was the first commercial reactor to shut down, closing in 1989 prior to the expiration of its license. As part of its decommissioning efforts, Fort St. Vrain transferred its fuel to an onsite independent spent fuel storage facility. As a result of a settlement following a lawsuit, DOE "agreed to take title and possession of that facility." Tr. at 1948. DOE took possession of the fuel at the utility's ISFSI, and the NRC issued a license amendment providing "for the transfer of control, operation, and ownership of the [Fort St. Vrain] ISFSI" to DOE. Notice of Issuance of License Amendment, 64 Fed. Reg. 32,069, 32,070 (June 15, 1999).[11]

DOE also has demonstrated its ability to develop a deep geological repository. The Waste Isolation Pilot Plant ("WIPP"), developed by DOE and certified in 1998, is a "deep geological repository for disposition of U.S. defense-generated transuranic waste." *See* Bd. On Radioactive Waste Management, *Disposition of High-Level Waste and Spent Nuclear Fuel: The Continuing Societal and Technical Challenges* at 65 (2001), *available at* The National

---

Footnote continued from previous page
License, 62 Fed. Reg. 1,782 (Jan. 13, 1997). In November 1991, DOE signed an agreement to accept shipment and delivery of 176 spent fuel assemblies from a private reactor in New York State. *See* DOE Cooperative Agreement No. DE-FC01-92NE37990 (dated Nov. 27, 1991, amended Mar. 19, 1992) (Att. G).

[11] SMUD specifically requested that DOE perform in a similar manner for SMUD by taking title of SMUD's SNF at its Rancho Seco ISFSI. *See* Letter from J. Schori to B. Tomasoni at 3 (Mar. 13, 1997) (Pl. Ex. 527). Although DOE has the technical ability to perform in such manner, it has refused to do so to date.

Academies Press, http://www.nap.edu/execsumm/0309073170.html#contents. "The repository consists of mined shafts, tunnels, and waste disposal rooms in 250-million-year-old bedded salt about 650 meters beneath the surface." *Id.* Immediately following the beginning of WIPP's operations in March 1999, the Department "began a major transportation program to support disposal of transuranic waste." Plan For Transportation Cask Fabrication And The Deployment of Waste Acceptance Capabilities at 3 (Dec. 2000) (Pl. Ex. 665). In the first year alone, over 100 shipments were completed, and continued shipments are expected to be made from over 23 sites around the country, spanning several decades. *Id.*

Similarly, the private industry has proven that interim dry storage of spent nuclear fuel is possible. Numerous utilities across the country have, like SMUD, designed and built interim storage facilities for the storage of spent nuclear fuel during DOE's delay. *See* Written Direct Testimony of E. Supko at 49 (Pl. Ex. 1002) (summarizing U.S. Dual Purpose Dry Storage Facilities and noting 27 such facilities are in existence or are in the process of development). SMUD itself has designed, built, and received a license from the NRC for its interim storage facility for the temporary storage of spent nuclear fuel. *See* Pl. Exs. 596, 962.

As illustrated above, the government has engaged in the acceptance, transport, and storage of spent nuclear fuel throughout the country during the 1990s and continuing today. In addition, because the government has failed to perform under the Contract, others have been forced to provide for the interim storage of spent nuclear fuel. Based on this evidence, the government can establish neither objective nor subjective impossibility.[12] Given that such

[12] *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002) ("Performance is only excused under this doctrine when it is objectively impossible."); *Jennie-O*

Footnote continued on next page

performance is not only possible but has actually occurred, the government cannot be excused from its obligations under the doctrine of impracticability.

**3. The Transfer Of Spent Nuclear Fuel To Canisters Has Not Rendered The Government's Performance Impracticable.**

As discussed in detail at the hearing on damages in this case, SMUD has placed its fuel in dual-purpose canisters and transferred those canisters to SMUD's ISFSI for temporary storage until eventual DOE performance. This transfer of fuel to dry storage at SMUD and other utilities around the country has in no way made performance of this Contract impracticable. In fact, there is overwhelming evidence to the contrary. DOE has been on notice that SMUD and other utilities were pursuing transfer of its fuel to dry storage since the early 1990s. Further, DOE has continually reassured the public and the utilities that it will accept and transport the fuel in canistered form. Most importantly, there is extensive evidence that DOE expects to transport canistered fuel when it begins performance, and that such transport is practicable. The government's own witnesses testified at trial that DOE anticipates that fuel will arrive at the surface facilities at the repository site in canisters and is planning for the handling of such fuel. Tr. at 2185-86, 2193, 2209 (C. Kouts); Tr. at 2078-79 (T. Pollog).

---

Footnote continued from previous page
*Foods, Inc. v. United States*, 217 Ct. Cl. 314, 328 (1978) ("The [commercial impracticability] doctrine may be utilized only when the promisor has exhausted all its alternatives, when in fact it is determined that all means of performance are commercially senseless. There can be little sympathy for contractors who seek refuge behind the label of commercial senselessness (impracticability) without proof that they have made an effort to obtain performance in an alternative fashion.").

Throughout the 1990s, DOE has represented to the public and to utilities that it will accept canistered fuel when it eventually performs. DOE witness Thomas Pollog acknowledged preparing and approving a paper entitled "Canister Considerations for Commercial Spent Nuclear Fuel." (Pl. Ex. 820). The paper was presented at several public conferences from 2001 to 2002 only after approval by DOE witness David Zabransky and the Director of the Waste Acceptance and Transportation Division at the time, James Carlson. *See* Tr. at 2076-77; Deposition Designations App. at 1955. The DOE presentation recognizes the "widespread use of single and dual purpose casks and canisters" by utilities and DOE's "need to establish standards to assure compatibility of the numerous single and dual purpose systems with the various system interfaces." Canister Considerations for Commercial Spent Nuclear Fuel at 1 (Pl. Ex. 820). The presentation describes DOE's efforts in developing "cask and canister acceptance standards," expressly stating that:

> *The use of DPC's [dual purpose canisters] allows utilities to load cask/canisters for storage and later, when the Federal repository begins operations, to transport these cask/canisters directly to the repository.* It is anticipated that the canister can be shipped without further handling of the individual spent fuel assemblies until they arrive at the Federal repository.

*Id.* (emphasis added). DOE explained in the paper that:

> DOE has surveyed components and features of the population of existing and pending canister and cask transport/storage systems for commercial spent fuel and concluded that generally the system features and characteristics that meet NRC requirements for storage and transport should be compatible with the current repository design.

*Id.* at 3. Mr. Pollog acknowledged that one of the dual-purpose storage systems that DOE studied prior to presenting the paper was SMUD's NUHOMS canisters. Thus, DOE has made

clear to the public that it understands that spent fuel is being stored in dual-purpose storage systems, that it is studying these issues, and that it anticipates acceptance and subsequent transport of such canistered fuel.

DOE has made similar representations to SMUD. DOE repeatedly represented to SMUD that it would accept SMUD's canistered fuel as long as it was certified for storage and transport by the NRC. In both letters and in person, DOE senior official Lake Barrett, who was Acting Director or Deputy Director of the Program from 1993 to 2002, made clear to SMUD that "[o]nce the Nuclear Regulatory Commission has certified Sacramento Municipal Utility District's transport storage system, the Department would be willing to initiate the appropriate actions to include such a system as an acceptable waste form under the terms of the Standard Contract." Letter from L. Barrett to J. Shetler at 1 (Sept. 2, 1993) (Pl. Ex. 320). After meeting with DOE Official Barrett to discuss DOE's position at greater length, SMUD official Jim Shetler confirmed that "[w]e now understand that as long as we have an NRC certified system, the fuel will eventually be accepted by the DOE." Letter from J. Shetler to L. Barrett at 1 (Sept. 28, 1993) (Pl. Ex. 325). DOE Official Barrett shared these assurances with Congressman Dicks as well, noting that he "assured Mr. Shetler" that DOE would take any necessary steps to accept the fuel in canistered form once it was certified by the NRC. Letter from L. Barrett to N. Dicks (Oct. 4, 1993) (Pl. Ex. 327). Jim Shetler confirmed these assurances at trial, stating that "[b]ased on my discussions with Mr. Barrett, . . . it was my understanding that DOE, as long as the fuel was licensed by the NRC, would be willing to take the fuel." Tr. at 220. These

assurances made clear that DOE would accept SMUD's canistered fuel as long as it was certified for transportation by the NRC, which it was in 1998. *See* Pl. Ex. 596 (Part 71 license).

Such assurances have been extended to the other utilities as well. In 1998, in a letter to all "Potential Offerors and Other Interested Parties," Deputy Director Lake Barrett stated that "although OCRWM no longer funds the development of multi-purpose canister designs, we *continue to support the concept and believe that it is in the nation's best interest to encourage the utilization of canisters for at-reactor storage* that can subsequently be utilized by the federal waste management system for transportation, storage and disposal" and that contractors transporting waste to the repository would have "responsibility to accept [utility] supplied dual purpose canisters." Letter from L. Barrett at 2-3 (Sept. 11, 1998) (Pl. Ex. 597). The Director of the Program, Ivan Itkin, made similar representations in 2001, stating in an accompanying report that the private cask industry is "developing new generation dual-purpose storage and transportation systems that have the improved efficiencies the Department desires for its waste acceptance and transportation needs." Letter from I. Itkin to D. Obey and accompanying Plan For Transportation at 7 (Jan. 19, 2001) (Pl. Ex. 669).

DOE documents fully support the assurances that DOE has made. DOE's planning documents support the conclusion that DOE is planning to accept canistered fuel and that such acceptance is possible. In the voluminous EIS prepared for the repository at Yucca Mountain, DOE included as one of its two scenarios the acceptance of 80% of commercial spent nuclear fuel in dual-purpose canisters. This scenario included acceptance and shipment in dual-purpose canisters, followed by removal of the assemblies at the repository for permanent disposal in the

final waste package. *See* Final Yucca Mountain EIS at 2-8 (Feb. 2002) (Pl. Ex. 721). Thus, the EIS anticipates the acceptance of fuel in canistered form at Yucca Mountain. DOE witness David Zabransky confirmed this at trial, agreeing that DOE planned to accept different waste forms at Yucca Mountain as detailed "in the environmental impact statement." Tr. at 1936.

In addition to the EIS, DOE's System Requirements Document, which "establishes requirements for the design, development, and operation" of the Civil Radioactive Waste Management Program, requires that DOE's repository facilities "shall be capable of accommodating a range of storage and transportation technologies, including multipurpose, dual-purpose, and single-purpose canisters, as well as bare SNF assemblies." System Requirements Document Rev. 06 at 1, 9 (Sept. 2004) (Pl. Ex. 981). The requirement that the program accommodate dual-purpose canisters is reflected throughout DOE's planning documents. The transportation plans reflect that a number of the casks needed for transport of spent nuclear fuel to the federal repository may be dual-purpose cask/canister transport systems. Plan For Transportation Cask Fabrication And The Deployment Of Waste Acceptance Capabilities at 12-13 (Dec. 2000) (Pl. Ex. 665). DOE's plans for the receiving facilities at Yucca Mountain also provide for the handling of commercial dual-purpose canisters upon arrival at the repository. *See* Project Operational Thermal Management Strategy at 10 (Feb. 9, 2005) (Pl. Ex. 997); Yucca Mountain Science and Engineering Report at 2-34, 2-35 (May 2001) (Pl. Ex. 998). As DOE witness Christopher Kouts confirmed at trial, one can infer from these documents that DOE is "going to make capabilities within its facilities in order to handle these materials." Tr. at 2193.[13]

[13] A single DOE witness, Mr. Zabransky, testified that DOE and its contractors were studying how to handle the dozens of dry-storage systems, including some of DOE's own systems, that

Footnote continued on next page

In addition to planning for such receipt, DOE has also calculated the ongoing fees paid by the utilities and system costs based on a program that would accept fuel in canistered form. OCRWM's Analysis of the Total System Life Cycle Cost ("TSLCC") represents its "most recent estimate of the costs to dispose" of the nation's spent nuclear fuel and high level waste and "provides the basis for assessment of the adequacy of the Nuclear Waste Fund Fee as required by the NWPA." TSLCC at iii (May 2001) (Pl. Ex. 680). The May 2001 TSLCC describes the planned surface facilities where the nuclear wastes destined for disposal will be received and packaged for final storage. The plans provide for three processing lines as part of the disposal process, including a line "used to extract SNF assemblies from transportation casks or non-disposable canisters and place them in disposal containers." *Id.* at 3-2. Thus, DOE has planned

---

Footnote continued from previous page
are stored horizontally. Tr. at 1641 ("we are initiating some activities with the different vendors to say is there a way you can help us figure out how to do this?"). Although not an issue on which the government witnesses were heavily cross-examined, as the issue was not raised by the government during the seven years of this litigation, no DOE witness suggested that horizontally-stored canisters presented an insurmountable problem for the handling facilities at Yucca Mountain. Mr. Kouts confirmed at trial that DOE's System Requirements Document (Pl. Ex. 981) requires that DOE must incorporate methods for handling all dual purpose canisters, including horizontal systems such as SMUD's system, the NUHOMS Dual Purpose Canister. Tr. at 2209. Mr. Kouts testified that "all of the different types of commercially available packages are being looked at in terms of their handling capabilities and, yes, there are design considerations at the repository to address their handling." *Id.* DOE presentations that Mr. Zabransky himself approved in 2001 or 2002 confirmed that DOE had surveyed the existing canister and cask transport/storage systems and "concluded that generally the system features and characteristics that meet NRC requirements for storage and transport should be compatible with the current repository design." Canister Considerations for Commercial Spent Nuclear Fuel at 3 (Pl. Ex. 820); Tr. at 2076-77 (confirming that SMUD's canisters were reviewed and studied by DOE prior to the public presentations that stated they were compatible with the repository design). Finally, DOE itself currently stores spent nuclear fuel destined for the repository in horizontal storage modules at its ISFSI at the Idaho National Engineering and Environmental Laboratory ("INEEL"). *See* Inside INEEL (Fall 2001) (Att. H) (describing the transfer of SNF to horizontal storage modules at INEEL's ISFSI). Given that DOE itself has fuel that is stored horizontally in canisters, the evidence strongly supports the conclusion that the surface facilities at the repository will be designed to accommodate such canisters.

for the acceptance of fuel in dual-purpose or non-disposable canisters and the transfer of fuel to permanent disposal containers. Christopher Kouts agreed at trial that DOE assumed for purposes of preparing the TSLCC and evaluating the adequacy of the fees that the utilities pay to DOE that fuel would be arriving at the permanent repository in dual-purpose canisters. Tr. at 2196-97. In other words, the utilities are paying for DOE to be able to transport fuel stored in dual-purpose canisters. The evidence in this case thus overwhelmingly supports the conclusion that DOE is planning to accept the fuel in canistered form and that such acceptance is possible.

The fact that SMUD's canisters were not designed as the "disposal package" for permanent emplacement at Yucca Mountain also does not make performance impracticable. SMUD's dry storage system was designed and licensed to provide for the interim storage and transport of spent nuclear fuel, not permanent disposal at a repository. *See* Pl. Exs. 962 (Part 72 license), 596 (Part 71 license). SMUD pursued on-site dry storage in order to mitigate its damages resulting from DOE's indefinite delay in performance.[14] SMUD was under no obligation to develop and license a system for permanent disposal under the Contract. It is DOE's obligation to design, license, and provide permanent waste forms for the final disposal of

[14] As an alternative to developing dry storage, SMUD could have simply left its spent fuel in the wet pool, awaiting DOE's performance and incurring $6 million to $12 million in damages each year of delay. It would be highly inequitable to find performance impracticable on the ground that utilities like SMUD moved fuel to dry storage starting in 2001. Had the government been actively preparing throughout the 1990s to begin accepting fuel in January 1998, and providing utilities with information regarding the types and sizes of transportation casks that DOE was developing to ship the fuel to a DOE facility, utilities would not have undertaken the laborious process of developing alternative interim on-site dry storage facilities. It is because of the government's long-announced failure to begin acceptance that SMUD and other utilities placed their SNF in canisters for interim storage. The government should not be able to relieve itself from its obligations by breaching and using the aggrieved party's mitigation as a defense to liability.

spent nuclear fuel, and this obligation would exist regardless of the current form of SMUD's fuel. *See* Contract Arts. IV.B.1, VII. The fact that SMUD's fuel is stored in canisters designed for interim storage does not preclude DOE from removing the fuel and placing it in a waste package for permanent storage.

In sum, the government can identify no supervening event that has made performance impracticable.

**B. The Delay Is Attributable To The Fault Of The Government.**

By definition, a party will be relieved of its obligations under the doctrine of impracticability only if such performance is made impracticable "without his fault." Restatement § 261.

> A party who is contractually obligated to render a performance that can be performed must make good on the promise unless . . . it is rendered impossible by an act of God, the law, or the other party. A party cannot *by its own act* place itself in a position that renders it unable to perform, then plead that this inability to perform provides an excuse for nonperformance.

30 Williston on Contracts § 77:9 (4th ed.) (emphasis added). Thus, although a supervening act may make a contract impracticable, "[i]f the event is due to the fault of the obligor himself, [the doctrine] does not apply." Restatement § 261, cmt. d. "As used here 'fault' may include not only 'willful' wrongs, but such other types of conduct as that amounting to breach of contract or to negligence." *Id.* Here, even if the Court concluded that a supervening event made performance impossible, such impracticability is the fault of the government and cannot relieve its obligations.

The D.C. Circuit has already ruled on this argument in *Northern States I*. In that case, DOE argued that six factors combined together, including "technical problems; regulatory delays; roadblocks to implementation of interim or monitored retrievable storage; funding restrictions; litigation delays; and consultation requirements," rendered its performance unavoidably delayed. *Northern States I*, 128 F.3d at 760. The court rejected these arguments, concluding that DOE's arguments were just another way of explaining why it did not have a "state-of-the-art, deep geologic facility for the permanent disposal of the Nation's spent nuclear fuel and high-level waste ready by 1998." *Id.* (internal citations omitted). The court reaffirmed its previous holding in *Indiana Michigan* that DOE had assumed "an unqualified obligation to take the materials by the statutory deadline," whether or not it had a repository or interim storage facility. *Id.* Given this obligation, the court found DOE could not "absolve itself from bearing the costs of its delay if the delay [was] caused by the government's own acts." *Id.*

The court also precluded DOE from arguing an interpretation of the contract in the future that "excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity.'" *Id.* (citing Contract Art. IX.A.). The Federal Circuit has similarly held that DOE's obligation to perform by January 31, 1998 is unconditional. *Northern States Power II*, 224 F.3d at 1364-65; *Maine Yankee*, 225 F.3d at 1138-39. In *Northern States II*, the court concluded that "the unavoidable delays provision deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998." 224 F.3d at 1367.

The government's failure to perform by January 31, 1998 is the direct result of its own delays, which have been documented in numerous General Accounting Office ("GAO") reports to Congress from the inception of the program.[15] As part of the 1987 Amendments, Congress directed DOE to focus its study solely on Yucca Mountain. 42 U.S.C. § 10172. This work, however, was not completed until February 14, 2002, some four years after the January 31, 1998 statutory and contractual start date. Thus, the delay in the development of the project was the result of the government's own failure to perform in the time required by the NWPA and the Contract.

The government cannot point to its own failure to timely accept waste from the utilities as the basis for impracticability. As described *supra* at pp. 19-25, the government had vast resources and the capability to perform its obligations by January 31, 1998. In fact, DOE

---

[15] *See*, *e.g.*, GAO Report, Yucca Mountain Project Management and Funding Issues at 1 (July 1, 1993) (Att. I) (noting that DOE was giving low priority to the scientific investigations at Yucca Mountain and only requesting half the funds needed); GAO Report, Yucca Mountain Project Behind Schedule and Facing Major Scientific Uncertainties at 3 (May 1993) (Att. J) (noting one reason for DOE's delay was that "DOE [was] not requesting the amounts of funds that it has estimated are needed to maintain the project's schedule"); GAO Report, Quarterly Report on DOE's Nuclear Waste Program as of June 30, 1987 at 6 (Aug. 1987) (Att. K) (noting DOE failed to complete the detailed study of the need for and feasibility of an MRS by the June 1985 deadline, instead submitting it to Congress in March 1987); GAO Report, Quarterly Report on DOE's Nuclear Waste Program as of Sept. 30, 1986 at 5 (Nov. 1986) (Att. L) (noting DOE's recommendation of three sites for further testing in May 1986 fell more than a year after January 1, 1985 – the date by which DOE was to make such a recommendation); *id.* at 5 (noting environmental assessments were to be completed by January 1, 1985, and that DOE failed to complete them until May 28, 1986); GAO Report, Quarterly Report on DOE's Nuclear Waste Program as of Dec. 31, 1985 (Jan. 1986) (Att. M) (noting that DOE had failed to meet many of the NWPA's deadlines, including completion of final assessments and MRS proposal); GAO Report, Status of the DOE's Implementation of the NWPA as of Dec. 31, 1984 at ii-iv (Jan. 31, 1985) (Att. N) (noting that "key requirements of the act" continue to be delayed, such as the Mission Plan, which was produced a full year after its June 1984 due date); *id.* at ii (noting that DOE issued guidelines to evaluate the proposed sites on December 6, 1984, seventeen months after the Act's required date of July 1983).

performed similar tasks in the 1990s when it transported, stored, and disposed of wastes for a wide array of foreign and domestic entities. The government continues to have sufficient resources, capability, and experience to perform. The fact that the government failed to begin accepting the utilities spent fuel and continues to fail to perform lies squarely on the fault of the government. Just as the D.C. Circuit rejected the government's arguments of technical problems, regulatory delays, roadblocks to implementation of interim or monitored retrievable storage, funding restrictions, litigation delays, and consultation requirements, so too should this Court. "Impracticability is no excuse if the negative outcome could have been avoided had the promisor originally proceeded with due diligence to perform the promise." 30 Williston on Contracts § 77:39 (4th ed.) . The government has failed to perform by the date contracted, and such failure is a breach for which the government is liable.

### C. The Government Assumed The Risks Of Delay And Knew That Difficulties Were Likely.

Even assuming that performance was made impracticable by some supervening event, and that such impracticability was not the fault of the government, the government still must show that the non-occurrence of the supervening event was a basic assumption of the Contract and that it did not assume the risk of occurrence. "The premise of this requirement is that the parties will have bargained with respect to any risks that are both within their contemplation and central to the substance of the contract." *Winstar Corp.*, 518 U.S at 839, 906. In order to satisfy these requirements, the non-performing party must show that the occurrence of the event was not foreseeable at the time the parties entered into the contract. *Seaboard Lumber Co*, 308 F.3d at 1283, 1294-95; *see also Transatlantic Financing*, 363 F.2d at 312, 315 (requiring that the event

rendering performance impossible be "something unexpected"); *see generally Winstar*, 518 U.S. at 906 n.53 (collecting cases). The government can make no such showing here.

In this case, there is overwhelming evidence demonstrating that the government assumed the risk of delay and knew that difficulties were possible. Indeed, at the time of Contract formation, the government expressly considered what it would do if the repository were delayed, explaining that: "If by 1994 it is known that the first repository will be delayed, then . . . to be able to accept fuel in 1998 . . . DOE will take title to the spent fuel, *have it placed in dry storage casks* and pay a rental fee to the utility to store the casks onsite at the reactor." Memorandum from R. Williamson at 2 (Sept. 15, 1983) (Pl. Ex. 50) (emphasis added). In 1984, DOE issued its Draft Mission Plan to the utilities and the public, noting that "if the Department fails to meet the schedule shown in Table 9-2 [3000 ton acceptance rate], then the additional storage capacity needed to accommodate the delay in schedule will be provided by the Department, possibly at reactor sites." Draft Mission Plan Vol. II at 9-6 (Apr. 1984) (Pl. Ex. 69); *see also* Memorandum from T. Overcast & S. Carney to E. Moore at 2 (Apr. 26, 1984) (Pl. Ex 70) ("Rosselli [a senior DOE official responsible for development of the Contract in 1983] stated that DOE 'plans to provide the capability to accept waste *at the reactor site* in accordance with the waste acceptance schedule so that utilities will not be required to continue adding additional storage capacity beyond 1998.'") (emphasis added); Draft Mission Plan Vol. I. at 2-5 (Apr. 1984) (Pl. Ex. 68) (DOE explained that "[i]f there is a delay in the first repository . . ., the Department will accept waste for disposal at the rate shown in Table II-1 [3000 ton acceptance rate] through means such as Federal at-reactor storage.").

Despite the risks in developing a repository site, Congress required that the government undertake an "unconditional," "unqualified," and "unequivocal" contractual obligation to begin accepting waste by January 31, 1998. *Northern States I*, 128 F.3d at 760. Referring to the January 31, 1998 performance date, the Federal Circuit explained that "Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement." *Maine Yankee*, 225 F.3d at 1342. Therefore, by requiring an "unconditional" obligation, Congress required that the government assume the risk of failing to meet the required start date. *See Indiana Michigan*, 88 F.3d at 1276. As noted above, the government understood this obligation and its attendant risks when it entered into the Contracts.

Moreover, there is no question that obstacles to performance such as lack of funding, technical difficulty, and political opposition were known at the time of contracting.[16] *Cf. Winstar*, 518 U.S. at 906 (concluding that "there is no doubt that some changes in the regulatory structure governing thrift capital reserves were both foreseeable and likely when these parties contracted with the Government"). Despite the obstacles, the government entered into a binding contractual obligation to perform by January 31, 1998 with knowledge of the risks that were

[16] For example, in the 1970s, prior to enactment of the NWPA, the Energy Research and Development Administration ("ERDA") was formed. As part of its mission, it sought a possible permanent repository for the nation's nuclear waste. *See* GAO Report, Institutional Relations Under the Nuclear Waste Policy Act of 1982 at 10 (Feb. 1987) (Att. O). Although the ERDA engaged in a multi-state survey to identify a potential repository site, the effort failed and the project was decreased in scope "due to decreased funding and political opposition from states." YuccaMountain.org, Timeline: The Nuclear Waste Policy Dilemma, *at* http://www.yuccamountain.org/time.htm.

inherent in such contracts. Accordingly, the occurrence of such events and any resulting delay cannot form the basis of a claim of impracticability.

## III. A Court Order Voiding The Contract And Ordering Restitution Would Prejudice SMUD's Interests.

### A. An Order Voiding The Contract Could Take Away SMUD's Right To Have The DOE Dispose Of Its Fuel.

The Contract at issue in this case is unique for many reasons. In promulgating the NWPA, Congress required DOE to undertake a contractual obligation with every commercial nuclear utility in the United States for the permanent disposal of spent nuclear fuel and high level waste. No other possibility for the permanent disposal of spent fuel existed at the time or exists today. The NWPA also made such contracts mandatory for utilities that wanted to continue operating nuclear plants by making license issuance and renewals by the NRC dependent upon the existence of a contract with DOE. *See* 42 U.S.C. § 10222(b)(1)(A). As a result, every commercial utility in the United States has entered into essentially the same Standard Contract with the government for the disposal of spent nuclear fuel. No other options for permanent disposal have been developed and no market exists for such development.

Given these unique circumstances, an order voiding the Contract would result in unique prejudice. Such an order would leave SMUD with no contract for the disposal of its nuclear waste. SMUD's primary goal is and has always been to have its waste permanently disposed of as soon as possible. *See* Tr. at 150-51. SMUD has elected to sue for partial breach so that it can continue to pursue permanent disposal from the government. If this Court voids the Contract and orders restitution, SMUD would no longer have a contract in place for the ultimate disposal of its fuel. Given that the federal government is the sole entity in the United States responsible for the

ultimate disposal of spent nuclear fuel, SMUD would be left with no other options for disposal. Thus, such an order would not just end the contract in this case, it would deprive SMUD of its very right to maintain a contract for the permanent disposal of its fuel.[17]

Without such a contract, SMUD would be left with nuclear fuel stored on its property with no plans for its permanent disposal. SMUD's ISFSI was designed and licensed by the NRC to store SMUD's nuclear waste for the interim period of DOE's delay in performance. SMUD neither planned for nor designed the ISFSI to provide for permanent storage of spent nuclear fuel. SMUD's Part 72 storage license was issued for only twenty years based on this interim nature of the storage facility. *See* Letter from E.W. Brach to S. Redeker and attached license at 1 (June 30, 2000) (Pl. Ex. 962). If the Contract was voided, SMUD would have no basis for assuring the people of California that the government would take the fuel. In addition, SMUD would be in the disadvantaged position of being the only utility in the United States without a plan for permanent disposal.

The Court suggests that the parties could "enter into a new contract for such services." Order at 5. There is no guarantee that the government would enter into such a contract. Further, if the government did enter into such a new contract, SMUD would be placed at a significant disadvantage in its bargaining position. SMUD would have no other options for disposal, may be forced to enter into a contract in order to gain license renewal for its ISFSI, and may be forced

[17] In this respect, SMUD's position and objectives are dramatically different from those of the plaintiffs in the *Land Grantors* case. In that case, the lands in question had been conveyed decades earlier, and the plaintiffs did not seek performance by the government beyond the payment of monetary damages. *See* 64 Fed. Cl. at 697. In the present case, the government has not yet taken title to SMUD's nuclear waste and SMUD seeks to preserve the government's obligation to receive and dispose of such waste.

to pay much higher fees than under the initial contract. Furthermore, SMUD would be forced to pay for the costs of interim storage of its spent fuel until long after such fuel would have been picked up had the Contract remained in force. It is for these reasons that SMUD has elected to sue only for partial breach and continue to demand performance under the Contract.

SMUD and the government have entered into the Contract for the permanent disposal of SMUD's waste. SMUD has performed its obligations under the Contract and the government has repeatedly represented it will eventually perform. SMUD has brought a claim for damages for partial breach, and thus the Contract remains valid and enforceable.

### B. An Order Of Restitution Would Not Compensate SMUD For Its Damages And Would Likely Increase SMUD's Overall Costs.

SMUD has brought suit against the government to recover its damages resulting from the government's partial breach of its contract obligations in this case. Memorandum of Contentions of Fact and Law at 4 (Feb. 17, 2004). SMUD seeks to recover its costs from 1998 to 2003 of $56,249,867 (minus appropriate offsets), incurred after the government had breached the Contract, for the resumption and completion of its dry storage project following the bankruptcy of its primary vendor. SMUD also seeks to recover the costs incurred from 1992 to 1997 of $22,308,345, incurred after the government had announced it would be unable to begin performance in 1998, related to the initial development of its dual-purpose dry storage system. SMUD pursued the design, licensing, and fabrication of its own on-site dry storage facility to store its spent fuel during the now 14-year period of the government's delay. SMUD's actions had the effect of mitigating the damages it will suffer as a result of the government's breach.

Because such costs were reasonably foreseeable, were caused by the government's failure to perform under the Contract, and have been established with reasonable certainty, it is appropriate to award SMUD its damages.

An award of restitution, on the other hand, would be measured based on the benefit conferred on the government – approximately $40 million, plus the profits the government has earned on the funds if so awarded. If such profits are not awarded, SMUD would receive back only the $40 million in fees it paid to DOE in the 1980s under the Contract. Given inflation and the time value of money, SMUD would be receiving back only a small fraction of what it originally paid to the government approximately twenty years ago. Given the substantial interest that the government has earned on SMUD's payment, the government would retain an unjust windfall.

In addition, as explained above, SMUD would be left without a contract for the disposal of its fuel. To obtain such disposal, SMUD would have to negotiate a new contract with the government, which may result in higher fees and more onerous terms. SMUD could also lose its place in the fuel queue, resulting in substantial additional delay and associated interim storage expenses. As a result, SMUD's overall costs would likely increase.

The Court suggests that restitution would not prejudice SMUD's interests because, according to the Court, "plaintiff admitted that when decisions were made both to enter, and later to exit, the business of generating nuclear power, the financial risks associated therewith, including the disposal of spent nuclear fuel, was assumed by the utility's rate payers." Order at 4 (citing testimony by former SMUD Vice President Dick Ferriera). This testimony, however,

merely reflects that the ratepayers are the ones who ultimately are financially impacted by the decisions of the utility. Tr. at 927-928. SMUD, as a municipal utility, is responsible to its ratepayers just as a corporation is responsible to its shareholders. Similarly, like shareholders, ratepayers are impacted financially as a result of the choices of the company. In SMUD's case, the ratepayers are the ones who ultimately must pay for any expenditures, as rates are the only source of funding. To alleviate such risks, SMUD entered into a contract with the government and paid more than $40 million in exchange for the government's obligation to dispose of its nuclear waste and to begin such services by January 31, 1998. By entering into this Contract, the government assumed an obligation to perform and assumed the potential liability of any failure to perform. *See* Tr. at 926 (testimony of Mr. Ferriera explaining that "[t]he Department had a contract to take the fuel . . . [a]nd had the Department taken that fuel, that would have addressed our risk and liabilities and costs."). SMUD and its ratepayers have a right to the damages that result from the government's partial breach, and damages in restitution would not provide compensation for such damage.

### C. An Order Voiding The Contract Could Jeopardize SMUD's Licensing With The Nuclear Regulatory Commission.

Finally, the NWPA provides that execution of such a contract with DOE is a prerequisite to the issuance or renewal of a nuclear power plant license by the U.S. Nuclear Regulatory Commission. 42 U.S.C. § 10222(b)(1)(A). This requirement has long been interpreted to require utilities to maintain a contract with DOE for the permanent disposal of spent nuclear fuel under the NWPA. In addition, given that license amendments are "guided by the considerations

which govern the issuance of initial licenses," 10 C.F.R. § 50.92(a), SMUD similarly may be unable to obtain license amendments from the NRC.

These requirements may be interpreted more broadly to apply to all phases of NRC licensing. *See* Waste Confidence Decision Review, 64 Fed. Reg. 68,005, 68,007 (Dec. 6, 1999) (reaffirming prior NRC decision that "spent fuel could be safely stored and managed under existing processes," but noting that the NRC would "consider undertaking a comprehensive evaluation [of safety disposal issues] . . . if significant and pertinent unexpected events occur"). This is especially true given that SMUD's current licensing was implemented based on the understanding at the time that SMUD was under contract for permanent disposal of its fuel with the federal government. Under current regulations, a license "may be revoked, suspended or modified, in whole or in part . . . because of conditions revealed by the application for license or statement of fact or any report, record, inspection or other means, which would warrant the Commission to refuse to grant a license on an original application." 10 C.F.R. § 50.100. This regulation may be interpreted to allow the NRC to revoke, suspend or modify SMUD's license based on the absence of a contract for permanent disposal of the fuel. In addition, SMUD received its storage license for the ISFSI from the NRC while it was under a contract with the federal government for eventual permanent disposal of its fuel. *See* Letter from E.W. Brach to S. Redeker and attached License at 5.5-1 (June 30, 2000) (Pl. Ex. 962) (noting that SMUD must implement various programs "to ensure the safe operation and maintenance of the ISFSI . . . *until the DOE takes title to the fuel*") (emphasis added). This license could similarly be susceptible to

revocation or modification based on changed circumstances. Thus, SMUD's current and future licensing may be impacted if this Court voids the Contract.

For all these reasons, an order from this Court voiding the Contract would cause significant prejudice to SMUD's interests.[18]

## IV. Any Order Awarding Restitution Should Direct That The Funds Be Awarded From The Judgment Fund And Not The Nuclear Waste Fund.

If this Court does award restitution, any such award should be ordered from the Judgment Fund and not the Nuclear Waste Fund. Mandating an award from the Nuclear Waste Fund would exceed the Court's jurisdiction, would contravene the intent of Congress, would result in inequities among the utilities, and could spell the end of the Nuclear Waste program. Given these considerations, this Court should order damages, no matter the form, from the Judgment Fund.

Section 302(a) authorizes the Secretary to "enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin" and also provides that the Secretary "shall . . . establish a 1 time fee . . . in an amount equivalent to an average charge of 1.0 mil per kilowatt-hour for electricity generated by such spent nuclear

---

[18] Should this Court believe an order voiding the Contract is appropriate, judgment should not be rendered without allowing further discovery and presentation of evidence. The issues of mutual mistake of fact and impracticability were not raised by either party during discovery, the liability briefing, the pre-trial briefing, or the trial on damages. As a result, the trial in this case did not address the issues of mutual mistake of fact or impracticability. None of the witnesses at trial were employed by DOE at the time of Contract formation in 1983, and DOE presented no evidence that the Contract was based on a mistake of fact in existence in 1983 or that performance of its obligations has subsequently become impracticable. Nor was any evidence presented regarding the effect of voiding the Contract on SMUD's interests.

fuel." 42 U.S.C. § 10222(a)(3). This section also establishes criteria for the payment of the fees under the NWPA, stating that such fees "shall be paid to the Treasury of the United States and shall be deposited in" the "Waste Fund immediately upon their realization." *Id.* § 10222(a)(3), (c).

Both the NWPA and the Contract expressly limit the use of the fees that are deposited in the Nuclear Waste Fund. The NWPA limits the use of the fees by requiring DOE to "make expenditures from the Waste Fund . . . only for purposes of radioactive waste disposal activities." 42 U.S.C. § 10222(d) (specifying activities). The NWPA also states that "[n]o amount may be expended by the Secretary under this subchapter for the construction or expansion of any facility unless such construction or expansion is expressly authorized," and that the Secretary is only "authorized to construct one repository and one test and evaluation facility." *Id.* The Contract similarly limits the use of such funds by defining "cost" to include "application of Nuclear Waste Fund monies for those uses expressly set forth in section 302(d) and (e) of the said Act and all other uses specified in the Act." Contract Art. I.11. Congress has thus purposefully imposed limitations on the use of such funds.

The legislative history of the Act illustrates that Congress intended that the use of such funds be very restricted. The history, which states that "[f]unds collected under this section are required to be paid into a special trust fund and used only for expenses of repository development authorized under this [Act]," reflects that this restrictive scheme was established to ensure the availability of funds for the project. H.R. Rep. No. 97-491, at 59 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3824 (96 Stat. 3792). Thus, the NWPA

> [L]imits the uses to which funds collected for and deposited into the Nuclear Waste Trust Fund may be put. The fund is intended to be used *only* for Federal activities directly related to the development of licensed repositories for high level waste and spent nuclear fuel, and for such treatment or packaging as is technically required to be accomplished prior to disposal of such waste or fuel.

*Id.* at 59-60.

The courts have recognized Congress's intent regarding use of the funds and have construed DOE's authority to make expenditures narrowly. In *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 234 (Fed. Cl. 1998), the court recognized that "DOE's authority to make expenditures from the [Nuclear] Waste Fund is restricted to specifically listed activities." In *Alabama Power v. U.S. Department of Energy*, 307 F.3d 1300 (11th Cir. 2002), the court held that the Department is not authorized to use money from the Nuclear Waste Fund to compensate utilities for their on-site storage costs resulting from the Department's breach of their Standard Contracts. Upon analyzing the statutory language stating that the Secretary "may make expenditures from the Waste Fund . . . only for purposes of radioactive *waste disposal activities*," 42 U.S.C. § 10222(d) (emphasis added), the court concluded that payments for interim storage costs "simply are not payments for 'disposal.'" *Alabama Power*, 307 F.3d at 1313. The Ninth Circuit also construed the language of the Act narrowly, holding the Act's authorization for funding of "review" was limited to State's individual evaluation of siting activities and did not extend to judicial review. *Nevada v. Herrington*, 827 F.2d 1394, 1399-1400 (9th Cir. 1987).

These cases all support the conclusion that Congress intended to explicitly limit the eligible uses of the funds to those expressly enumerated in the Act. Use of the funds to restore

the benefits SMUD has conferred on the government does not directly relate to the development of a licensed repository. Thus, such restitution would contravene Congress's intent in establishing the fund.

Moreover, restitution out of the Nuclear Waste Fund would result in inequities to the utilities. Given the entire statutory scheme that placed the government under contractual obligation, any burden resulting from the government's breach rightfully should fall directly on the government. *Alabama Power*, 307 F.3d at 1314. If restitution is made out of the Nuclear Waste Fund, the government will never be held liable. Rather, the Department could merely argue that the "costs" resulting from restitution to select utilities justify future fee increases for those utilities with remaining Contracts. Such fee increases would indirectly force those remaining utilities to bear the costs of the Department's breach. Such a scheme would

> thwart[] the quid pro quo arrangement in which each utility roughly pays the costs of disposing of its waste and no more (using kilowatt-hours as a proxy for waste production). By establishing a contract and a quid pro quo arrangement, the regulatory scheme contemplates that the ultimate burden of the government's breach to fall on the government, not other utilities.

*Id.*

Finally, the Court asserts that "even if plaintiff in this case and all other plaintiffs with breach of contract actions pending . . . are awarded restitution, the Nuclear Waste Fund, as of September 30, 2003, has accumulated over $10 billion in interest that will remain in the Fund and continue to accumulate interest." Order at 5. As argued below, upon restitution, any profit accumulated on the deposited funds should be returned to the utilities. If the interest is not included in any restitution, however, $10 billion still is not sufficient to fund the program.

Restitution of the original funds essentially would mark the end of the program. Through fiscal year 2002, the program expended $7.5 billion. *See* OCWRM Program Financial and Budget Information at 1-4 (Feb. 28, 2005) (Att. P). The total estimated cost to complete the program, from 2003 to 2119 is $48.5 billion in 2000 dollars. *Id.*

Given Congress's express intent to limit the use of the Nuclear Waste Funds, the inequity that would result if restitution was ordered for only a portion of the utilities, and the impact on the entire program if such an award was ordered from the Nuclear Waste Fund, any such award should be ordered from the Judgment Fund.

### V. Any Order Awarding Restitution Should Include The Profits Accrued On The $40 Million While In The Nuclear Waste Fund.

The Court's Order states that even if restitution is awarded out of the Nuclear Waste Fund, the government would still have "accumulated over $10 billion in interest that will remain in the Fund and continue to accumulate interest." Order at 5. If this Court does award restitution, any such award should include the return of any profits earned on the funds while in the government's possession.

An award of restitution is meant to protect the injured party's "interest in having restored to him any benefit that he has conferred on the other party." Restatement § 344(c). If the benefit conferred "consists simply of a sum of money received by the party from whom restitution is sought, there is no difficulty in determining this amount." Restatement § 371. The measure of recovery in that situation "is the amount of money received." Restatement (First) of Restitution § 150 (1937). Although the benefit conferred is measured in this way, the amount of money conferred "does not determine the amount which a successful party is entitled to recover."

*Id.* § 150 cmt. a. In order to fully restore the benefits conferred and prevent unjust enrichment, the party may also recover interest or profits. *Id.* Recovery of the government's profits, *i.e.*, the interest earned on the funds while in the government's possession, in addition to the funds themselves, is the correct measure of restitution in this case.

**A. SMUD Is Entitled To Receive The Direct Profits Of Its Funds.**

"A person under a duty to another to make restitution of property received by him or of its value is under a duty . . . to account for the direct product of the subject matter received while in his possession." Restatement (First) of Restitution § 157(1). This rule is based on the fundamental purpose of restitution, which is to restore the party to his original position by returning any benefit conferred. "In all cases the person entitled is fully restored to his original position only if compensation is made for the use of the subject matter for the period during which he was deprived." *Id.* § 157, cmt. a. The Supreme Court has recognized this form of equitable restitution, noting that if "a plaintiff is entitled to a constructive trust on particular property held by the defendant, he may also recover profits produced by the defendant's use of the property." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 n.2 (2002). Thus, where a person receives corporate shares or bonds and receives dividends on those shares or interest on the bonds, upon restitution the party would be required to return the dividends or interest along with the shares or bonds. Restatement (First) of Restitution § 157, cmt. b; *see also, e.g.*, *Land Grantors*, 64 Fed. Cl. at 709 (suggesting that restitution includes profits received by government from sale and lease of plaintiffs' property).

The Federal Circuit has recognized that the remedy of restitution includes such compensation for profits in order to account for loss of use. "The remedy of restitution may include compensation for lost use value where necessary to restore the plaintiff to its status quo ante by providing compensation 'for the use of the subject matter for the period during which [it] was deprived.'" *Landmark Land Co., Inc. v. F.D.I.C.*, 256 F.3d 1365, 1374 (Fed. Cir. 2001) (citing Restatement (First) of Restitution §157). "No wooden formulas exist for determining when restitution of profits realized by a party is permissible." *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298, 1311 (Fed. Cir. 2003). In cases such as dividends on shares or interest on bonds, "the direct product represents the value of the use so that the claimant would not be entitled to both the direct product and compensation for its use." Restatement (First) of Restitution § 157, cmt. b.[19]

---

[19] An award of profits is separate from an award of interest, which is covered under a separate Restatement Section and to which unique rules of recovery apply. *See* Restatement (First) of Restitution § 156 (1937) . Given that an award of profits would not constitute prejudgment interest, such an award is not barred by the no-interest rule that precludes an award of interest against the government. This conclusion is further supported by the commentary to § 156, which addresses the difference between profits that are made up of interest and an award of interest under § 156. The commentary states:

> The rule stated in this Section has reference only to those situations where interest is given as compensation for the deprivation of the benefit. It is to be distinguished from other situations in which the whole or a part of the benefit for which there is a duty to account consists of interest. Thus, a person who pays an interest bearing debt of another and who is subrogated to the creditor's position, obtains restitution not only for the principal but also for the interest due and paid on the debt at the time when it was paid; upon the total amount so paid, he may also be entitled to interest under the rule stated in this Section.

*Id.* § 156, cmt. c.

The award of profits in this case is legally appropriate and necessary in order to prevent unjust enrichment on the part of the government. If restitution is awarded, the government, as a person "under a duty to another to make restitution," will also be "under a duty to account for the direct product of the subject matter received." Restatement (First) of Restitution § 157(1). The funds that were paid by SMUD were placed directly into the Nuclear Waste Fund and interest has accrued on the funds as required under the statute. The profits on the $40 million are the direct product of the funds and represent the value of the use of the funds. *See Rochester Gas & Elec. Corp. v. United States*, 65 Fed. Cl. 431, 433 (2005) (illustrating the government's ability to calculate the total amount owed, including interest accrued, where the utility chose the delayed payment option). As such, they should be awarded as part of any restitutionary remedy. Such an award is necessary to return to SMUD the full benefit that it has conveyed to the government under the Contract.

Most importantly, such an award is necessary to prevent unjust enrichment and unfair treatment in this case. The government received more than $40 million from SMUD approximately twenty years ago.[20] The money was placed directly in the Nuclear Waste Fund, where it has remained, collecting substantial interest. The interest that has accrued represents the use value of the funds that the government has held. As a result of this Contract, the government has received a benefit of both the funds and the interest. It would be unjust for SMUD to receive

[20] The contract requires payment of two separate fees, as discussed above. SMUD elected to pay the one-time fee in accordance with Option 3 under the Contract. Contract Art. VIII.B.2.c. Under this option, SMUD paid $28,570,188.00 to the DOE on June 28, 1985. SMUD also paid 1.0 mill per kilowatt-hour generated from April 7, 1983 to June 6, 1989, the date of SMUD's shutdown. In total, SMUD paid approximately $40 million under the contract.

only its original $40 million as restitution. Given inflation, the $40 million is worth significantly less today than when SMUD initially paid its fees into the Fund. In addition, SMUD has lost the use of this money for the entire period while the government has directly benefited from its use.

This inequity is compounded by the different situations of the various utilities regarding payment under the Contract. Under the NWPA and the Standard Contract, utilities are assessed two kinds of fees. The first is a one-time charge for disposal of any spent fuel that existed prior to April 7, 1983. Contract Art. VIII.A.3. Utilities are also charged 1.0 mill (one tenth of a cent) per kilowatt-hour (1M/KWH) generated after April 7, 1983. *Id.* Art. VIII.A.1. The Contract provides three options for payment of the one-time fee. *Id.* Art. VIII.B.2. The various options allow utilities to pay within two years of contracting, prorate payments over ten years (*i.e.* forty quarters), or pay prior to actual delivery with interest in favor of the government accruing the entire time. *Id.* Because of the various forms of payment, similarly situated utilities would be compensated very differently under a theory of restitution that did not include the government's profits on the payments. Those utilities that paid into the Waste Fund within two years of contracting – like SMUD – would receive only the dollar amount they paid to the government at the time. If not compensated for interest or use value, they would essentially receive back only a fraction of what they actually conferred upon the government. Those utilities that have not yet paid the one-time fee would have retained the use of the money throughout the period while also having a contractual obligation for fuel disposal. Those who chose not to pay the one-time fee would be in a much better situation because they would not be deprived of the benefit of its use

over the last twenty years. Extreme inequity would result between those utilities that chose to pay the fee shortly after contracting and those that decided to wait to pay prior to disposal.

The provision in the Restatement exists to remedy this type of situation. Any award of restitution should therefore account for both the original funds and the profit the government received as a result of their use.

### B. SMUD Is Entitled To Receive The Interest On Its Funds If The Court Orders Restitution

In the alternative, SMUD should be awarded interest on the $40 million it paid to the federal government approximately twenty years ago. Where a party is under a duty to pay restitution of a benefit conferred, the party "also is under a duty to pay interest upon such value." Restatement (First) of Restitution § 156. The Restatement confirms that interest is appropriately awarded as an element of damages. Restatement § 354. While interest is generally not allowable on a claim against the federal government, absent constitutional requirements, explicit waiver of sovereign immunity, or express contractual provision, *see Fidelity Const. Co. v. United States*, 700 F.2d 1379, 1383 (Fed. Cir. 1983), interest is nevertheless appropriate in this case based on the equitable remedy of restitution.

The remedy of restitution is based on the theory of preventing unjust enrichment. Although the Federal Circuit recently denied such a recovery against the government based on the equitable principles of restitution, *see U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1386 (Fed. Cir. 2002), this case is distinguishable. In *U.S. Shoe*, an exporter brought an action against the government challenging a tax on exports. The lower court found the tax unconstitutional and ordered damages. On appeal, the party argued unsuccessfully that interest on the returned tax

was appropriate under the equitable doctrines of restitution and unjust enrichment. *Id.* Unlike in *U.S. Shoe*, an award of interest here would not impose the same burden on the government. SMUD is not requesting that the government come up with the funds to pay interest on an unforeseen liability. In this case, the original fees paid and any interest collected are set aside in the Nuclear Waste Fund. The burden on the government to pay interest is small given that the fees and interest are available and segregated from the United States' general treasury.

While the burden on the government is small, SMUD would face great inequity if it was not awarded interest as part of its restitution. In order to return to SMUD the full benefit that it conveyed to the government, the government must return both the $40 million as well as interest. Allowing the government to retain the interest accrued on the funds would violate the very principles of unjust enrichment, resulting in a windfall to the government that is far beyond anything contemplated by the statute. Such a windfall is aptly pointed out by this Court's recognition that $10 billion in interest would remain in the Fund if full restitution was granted to all utilities. Order at 5.

The equities in this case set it apart from past cases denying such relief. *Cf. Economy Plumbing & Heating Co. v. United States*, 470 F.2d 585 (Ct. Cl. 1972); *United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 659 (1974). In order to prevent such unjust enrichment on the part of the government, interest is warranted in this case.

**CONCLUSION**

SMUD filed this claim against the United States in order to recover the costs of DOE's breach of its obligation to begin disposal of spent nuclear fuel under its Contract with SMUD by

January 31, 1998. This Court has recognized DOE's partial breach of its obligations and has entered an order of liability in this case. Because SMUD has elected to sue for only a partial breach, the Contract remains valid and the government is continuing forward with performance. There is no basis for voiding the Contract in spite of SMUD's election based on either the doctrine of mutual mistake of fact or impracticability. SMUD therefore respectfully requests that this Court refrain from entering such an Order, which would substantially prejudice its interests.

DATED this 7th day of July, 2005.

Respectfully submitted,

s/ Howard N. Cayne
Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899
Counsel of Record for
Plaintiff Sacramento Municipal Utility District
Of Counsel:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Response to Memorandum Opinion and Order Dated April 21, 2005 to be filed electronically through the Court of Federal Claims Case Management/ Electronic Case Filing System on July 7, 2005. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Harold D. Lester, Jr.
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/Howard N. Cayne