No. 98-488C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S POST-TRIAL LEGAL BRIEF**

---

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

August 22, 2005

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....... 1

BACKGROUND ....... 4

ARGUMENT ....... 11

I. SMUD Is Entitled To Its Expectation Damages In The Form Of Mitigation Expenses And Substitute Performance Costs. ....... 11

II. The Government's Failure To Begin Acceptance Of Spent Fuel Caused SMUD To Incur Damages. ....... 17

A. DOE's Failure To Begin Acceptance Of Spent Fuel In 1998 Was Preceded By Eleven Years Of Announcements And Actions Indicating That Such Acceptance Would Be Delayed Significantly. ....... 19

B. SMUD's Initial Decisions To Begin And Continue Funding The Dry Storage Project From 1992 Through 1997 Were Caused By The Government's Statements Indicating That Fuel Acceptance Would Be Delayed. ....... 22

C. SMUD's Decisions To Re-Start The Dry Storage Project In 1998 And Continue With The Project In 2000 and 2001 Were Directly Caused By The Government's Failure To Begin Accepting Fuel In 1998. ....... 27

III. The Damages Incurred By SMUD Were Reasonably Foreseeable. ....... 33

IV. SMUD Has Proven Its Damages With Reasonable Certainty. ....... 37

A. SMUD's Damages From 1992 Through 1997. ....... 41

B. SMUD's Damages From 1998 Through 2003. ....... 42

C. Offsets To Damages That SMUD Made And Acknowledged Prior To Trial. ....... 44

V. SMUD's Mitigation Efforts Were Reasonable. ....... 45

A. SMUD's Management Of The Dry Storage Project Was Commercially Reasonable. ....... 47

B. Leaving Its Fuel In The Wet Pool Would Have Caused SMUD Significant Damages. ....51

C. The Government's "Dry Transfer" And "Store-Only" Arguments Are Unsupported. ....54

D. The Government's "NAC" Argument Is Unsupported. ....57

VI. Potential Offsets Raised At Trial. ....60

A. Wet To Dry Savings For 2003. ....60

B. Costs Of Loading And Transfer Of Fuel To Dry Storage. ....61

C. Labor Costs And Labor Burden. ....63

D. Decommissioning Costs. ....68

VII. Additional Issues Raised By The Government Do Not Affect SMUD's Damages. ....69

A. Greater-Than-Class-C Waste Does Not Affect SMUD's Damages. ....69

B. Damaged Or Failed Fuel Does Not Affect SMUD's Damages. ....70

C. The Government's New "Canister" Arguments Are Litigation Inspired And Unsupported. ....72

VIII. If The Court Needs To Reference A Non-Breach World Acceptance Rate, All Of The Evidence Demonstrates That DOE Would Perform At A 3,000-Ton Rate. ....74

IX. The Issue Of Notice Raised By The Court At Trial ....76

CONCLUSION ....78

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489 (2d Cir. 1985) ........ 13

*American Capital Corp. v. United States*, No. 95-523C, 2005 WL 1308314 (Fed. Cl. May 31, 2005) ........ 17, 18, 33

*Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002) ........ 73

*Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ........ 16, 33, 37, 38

*Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005) ........ 15, 37, 75

*California Federal Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005) ........ 17

*Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct. Cl. 1953) ........ 13, 14, 15

*Cities Service Helex, Inc. v. United States*, 543 F.2d 1306 (Ct. Cl. 1976) ........ 12

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ........ 37, 69, 74, 76

*Consumers Energy Co. v. United States*, 65 Fed. Cl. 364 (2005) ........ 12, 53

*Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) ........ 67

*Cuyahoga Metro. Housing Auth. v. United States*, 65 Fed. Cl. 534 (2005) ........ 13, 15, 17, 46, 57

*Dunn Appraisal Co. v. Honeywell Information Sys. Inc.*, 687 F.2d 877 (6th Cir. 1982) ........ 66

*Entergy Nuclear Generation v. United States*, 64 Fed. Cl. 336 (2005) ........ 16

*Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515 (2005) ........ 13, 15, 16

*First Heights Bank, FSB v. United States*,
No. 04-5021, -5022, 2005 WL 1962989 (Fed. Cir. Aug. 17, 2005)................ 14, 16, 45, 46, 55

*Fontenot v. Mesa Petroleum Corp.*,
791 F.2d 1207 (5th Cir. 1986) .......................................................................................... 76

*Freeport Sulphur Co.v. S/S Hermosa*,
526 F.2d 300 (5th Cir. 1976) ........................................................................... 65, 66, 67

*Glendale Fed. Bank, FSB v. United States*,
378 F.3d 1308 (Fed. Cir. 2004) ....................................................................................... 38

*Home Sav. of Am., FSB v. United States* ,
399 F.3d 1341 (Fed. Cir. 2005) ....................................................................................... 14

*Home Sav. of Am., FSB v. United States*,
57 Fed. Cl. 694 (2003), *aff'd in part*, 399 F.3d 1341 (Fed. Cir. 2005).................................... 15

*Hughes Communications Galaxy, Inc. v. United States*,
271 F.3d 1060 (Fed. Cir. 2002) ................................................................ 15, 16, 33, 36

*In re Kellett Aircraft Corp.*,
186 F.2d 197 (3d Cir. 1950) ...................................................................................... 15, 46

*Indiana Michigan Power Co. v. U.S. Dep't of Energy*,
88 F.3d 1272 (D.C. Cir. 1996)...................................................................................... 4, 74

*Koby v. United States*,
53 Fed. Cl. 493 (2002)..................................................................................................... 55

*LaSalle Talman Bank, FSB v. United States*,
317 F.3d 1363 (Fed. Cir. 2003) ....................................................................................... 45

*Locke v. United States*,
283 F.2d 521 (Ct. Cl. 1960)......................................................................................... 38, 41

*LTV Corp. v. Gulf States Steel, Inc.*,
969 F.2d 1050 (D.C. Cir. 1992)........................................................................................ 76

*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000) ......................................................................................... 4

*Mass. Bay Transp. Auth. v. United States*,
129 F.3d 1226 (Fed. Cir. 1997) ....................................................................................... 15

*Mid-America Tablewares Inc. v. Mogi Trading Co.*,
100 F.3d 1353 (7th Cir. 1996) .......... 45

*Northern Helex Co. v. United States*,
524 F.2d 707 (Ct. Cl. 1975) .......... 46

*Northern States Power Co. v. U.S. Dep't of Energy*,
128 F.3d 754 (D.C. Cir. 1997) .......... 4

*Premier Corp. v. Economic Research Analysts, Inc.*,
578 F.2d 551 (4th Cir. 1978) .......... 76

*R.E. Davis Chemical Corp. v. Diasonics, Inc.*,
924 F.2d 709 (7th Cir. 1991) .......... 45

*Record Club of Am. v. United Artists Records, Inc.*,
643 F. Supp. 925 (S.D.N.Y. 1986) .......... 13

*Robinson v. United States*,
305 F.3d 1330 (Fed. Cir. 2002) .......... 14

*S.N.A. Nut Co. v. Häagen-Dazs Co.*,
247 B.R. 7 (Bankr. N.D. Ill. 2002) .......... 14

*Sacramento Municipal Utility District v. United States*,
63 Fed. Cl. 495 (2005) .......... 11, 75

*Specialty Assembling & Packing Co. v. United States*,
355 F.2d 554 (Ct. Cl. 1966) .......... 38

*System Fuels Inc. v. United States*
No. 03-2642C, 2005 WL 1804314 (Fed. Cl. July 29, 2005) .......... 7, 12, 13, 53, 75, 76

*System Fuels, Inc. v. United States*,
65 Fed. Cl. 163 (2005) .......... 12, 15, 16

*Tennessee Valley Authority v. United States*,
60 Fed. Cl. 665 (2004) .......... 12, 13, 16, 36, 37

*United States v. The John R. Williams*,
144 F.2d 451 (2d Cir. 1944) .......... 66

*Yankee Atomic Elec. Co. v. United States*,
No. 98-126C, 2004 WL 1535688 (Fed. Cl. June 28, 2004) .......... 13, 37, 74

**Statutes**

42 U.S.C. § 10131(a)(2) .......... 36

42 U.S.C. § 10198(a) .......... 36

48 Fed. Reg. 16,590 (Apr. 18, 1983) .......... 34

U.C.C. § 2-712 (1997) .......... 15

**Other Authorities**

11 Corbin On Contracts § 1009 (2002) .......... 37

128 Cong. Rec. 27,775 (daily ed. Nov. 29, 1982) .......... 36

128 Cong. Rec. 7,974 (daily ed. Apr. 28, 1982) .......... 35

24 Williston on Contracts § 66.44 (4th ed. 1990) .......... 72

RESTATEMENT (SECOND) OF CONTRACTS § 236 (1981) .......... 12

RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981) .......... 14, 15, 16

RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981) .......... 12, 14, 57

RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981) .......... 16

RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981) .......... 16, 37

RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(b) and (e) .......... 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-488 C<br><br>(Judge Braden) |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S**
**POST-TRIAL LEGAL BRIEF**

**INTRODUCTION**

Plaintiff Sacramento Municipal Utility District ("SMUD") respectfully files this Post-Trial Legal Brief in support of its claim for damages resulting from the government's partial breach of contract. In this case, SMUD seeks to recover the damages it incurred as a result of the government's delay in performing its obligations under the June 13, 1983 Contract between the Department of Energy ("DOE") and SMUD. *See generally* Plaintiff's Exhibit ("PX") 44 (Contract for the Disposal of Spent Nuclear Fuel between DOE and SMUD) ("Contract" or "Standard Contract").

The evidence demonstrates that SMUD is entitled to recover the expenses it incurred as a reasonable effort to mitigate its damages and to provide substitute interim performance as a result of the government's failure to perform. From the moment that SMUD began its mitigation efforts to design, license, and fabricate an on-site dry storage facility, it engaged in a continuous

process of evaluation, reevaluation, and reconsideration of the project. The initial contract with Pacific Nuclear and then VECTRA Technologies ("Vectra") went through 11 contract change orders from 1992 through Vectra's bankruptcy in 1997. PX 267. The subsequent contract with Transnuclear West ("TNW") went through 11 contract change orders of its own from 1998 to 2003. PX 598. SMUD also undertook additional, and in some cases full-scale, reevaluations of its storage options in 1997, 1998, 2000, and 2001. *See* PFF ¶¶ 145-67.

There is no question that the development of the on-site dry storage facility at SMUD was a long and difficult process, and that these difficulties led SMUD to reconsider the direction of its mitigation efforts repeatedly. *See* PFF ¶¶ 92-110, 145-67, 287-326. At no time during the design and implementation of this project, however, did SMUD have any certainty about when the government would perform or how long its delay would last. The ever-growing likelihood and then certainty that DOE would fail to timely perform its contractual obligations drove SMUD to initiate and continue implementing its dry storage program notwithstanding the obstacles and difficulties it encountered. Had the government been actively preparing to perform throughout the 1990s, or actually performing in 1998, SMUD would have avoided the myriad risks associated with its first-of-a-kind dry storage project and left its fuel in the wet pool. *See* PFF ¶¶ 130-36, 139, 145-55, 157, 160-68. As demonstrated by the evidence at trial, SMUD in a "non-breach" world would not have contracted for dry storage in 1992, nor continued with the project during subsequent reassessments, including restarting the project in 1998 after a two-year hiatus stemming from the Vectra bankruptcy.

From 1992 through 1997, SMUD incurred approximately $21.5 million in damages for the initial dry storage design work, including $12.1 million paid to outside vendors, $3.7 million in internal SMUD labor, and $3.4 million for materials. *See* PFF ¶¶ 199-06. From 1998 through 2003, following the restart of the project with TNW, SMUD incurred approximately $55.05 million in damages for the final design, licensing, fabrication, operation, loading and transfer of spent fuel to the Independent Spent Fuel Storage Installation ("ISFSI"). *See* PFF ¶¶ 212-41. These costs include approximately $42.2 million paid to outside vendors, $10.1 million in internal SMUD labor, and $1.1 million for materials (agreed offsets for both time periods are described in § IV.C below).[1] *See* PFF ¶¶ 215-32.

SMUD's efforts to seek substitute performance or "cover" for the government's failure to dispose of SMUD's spent fuel ultimately were successful and enabled SMUD to substantially mitigate the damages caused by DOE's breach. With the completion of the transfer of its fuel to the ISFSI in 2002, SMUD was able to reduce its annual fuel storage costs by approximately $4.2 million. *See* PFF ¶¶ 392-95. This reduction will produce significant savings compared to the damages SMUD would have incurred had it remained in the wet pool during the period of the government's delay in performance.

---

[1] SMUD does not seek to recover the tens of millions of dollars that it spent storing its spent fuel in the wet pool through 2002 or the approximately $300 million it has spent on decommissioning. Transcript ("Tr.") at 698 (Redeker).

## BACKGROUND[2]

Under the Contract, the government was obligated to begin accepting spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") on January 31, 1998. This obligation was "unconditional," "unqualified," and "unequivocal." *Northern States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758-61 (D.C. Cir. 1997); *Indiana Michigan Power Co. v. U.S. Dep't of Energy*, 88 F.3d 1272, 1274-77 (D.C. Cir. 1996). The Federal Circuit explained that "Congress found [the January 31, 1998 start date] so important when it promulgated the [Nuclear Waste Policy] Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000).

The government did not begin accepting fuel on January 31, 1998, and more than 7½ years after the contractually-required start date, still has not provided any date when it will begin accepting SMUD's spent fuel. During most of the period at issue, the government has acknowledged that its performance would be delayed by at least 12 years, from 1998 until 2010. *See* PFF ¶¶ 117, 120, 122. Recently, it has admitted that there will be additional delay, with performance not beginning until 2012 or later. PX 972 (announcing additional delay); PX 812 (aborting resumption of renewed DCS planning).

The government first began informing SMUD and other utilities about delays in the repository program in 1987 and 1988. PX 109, 118, 113, 142, 143, 144; *see also* PFF ¶¶ 117-18.

---

[2] A more complete and detailed description of the factual background with citations to the record is set forth in Plaintiff's Proposed Findings of Fact ("PFF") which accompany this brief.

In mid-1988, DOE sent SMUD a letter stating that its projected waste acceptance would not begin until 2003, a 5-year delay in performance. PX 144. These DOE acknowledgements forced SMUD to analyze and address the need to store fuel at Rancho Seco over an uncertain and extended duration. *See* PFF ¶¶ 126-33.

In June 1989, SMUD decided to permanently shut down Rancho Seco following a public referendum in favor of closing the plant. Tr. at 889-95 (Ferreira). SMUD then began the process of evaluating what to do with the plant and the spent fuel, with the knowledge that DOE's performance likely would be delayed. *See* PFF ¶¶ 123, 125-27. What SMUD did not have was any assurance, certainty, or progress report indicating how long DOE's delay likely would last.

In November 1989, shortly after SMUD's decision to shut down, DOE announced another delay in its performance—"a significant slip in the expected start of repository operations—from the year 2003 to approximately 2010." PX 169 at vii. Although DOE suggested that it might still begin accepting fuel in 1998 on an interim basis through a monitored retrievable storage facility ("MRS"), it also acknowledged that this would require the identification of a host site and the amendment of the Nuclear Waste Policy Act ("NWPA") provisions which tied the development of such a facility to development of the repository. *Id.* at x, 11-12.

In response to the premature closure of Rancho Seco and the growing uncertainty surrounding the date on which DOE would begin accepting spent fuel, SMUD sought to responsibly evaluate and address its fuel storage needs. *See* PFF ¶¶ 125-31. This multi-step process began with the retention of a consultant, S. Levy, Incorporated ("Levy"), to address the

uncertainties in long-term fuel storage options in light of DOE's announced delays. PX 176; *see also* PX 297 at 7. Because of the unsettled environment and uncertainties associated with DOE performance, Levy recommended in 1990 that SMUD pursue a "dual-purpose" or transportable dry storage system, which would offer the best opportunity for early offsite shipment to an interim DOE storage facility, if one were ever developed, or for interim acceptance by DOE on-site at the Rancho Seco facility. PX 176 at ii. As suggested by Levy, and in furtherance of its early mitigation efforts, SMUD began having discussions and meetings with DOE officials regarding the prospect of a "demonstration project" or Cooperative Agreement involving dry storage technology. *See* PFF ¶¶ 129, 573. Meanwhile, DOE's continued announcements and actions during this period indicated that a delay in fuel acceptance was growing ever more likely. *E.g.*, PX 188, 217, 973; *see also* Corrected Appendix to Accompany SMUD's Motion to File Designated Deposition And Trial Testimony, dated February 24, 2005 (hereinafter "Designations Appendix") (Dckt. #310) at 2290-91 (Freeman); *id.* at 2237-40, 2251-52 (Bowser); PFF ¶¶ 117-21.

Therefore, in order to position itself to deal responsibly with the long-term storage problems arising from the threatened breach, SMUD signed a contract with Pacific Nuclear (which later became Vectra Technologies, Inc.) in October 1992 for the design, licensing, and fabrication of dual-purpose casks and canisters. PX 267; PFF ¶¶ 91-92, 130-32. Pacific Nuclear's original contract cost was approximately $12 million. *Id.* The project, however, got off to a rocky start and, within months, the Nuclear Regulatory Commission ("NRC") advised Pacific Nuclear that additional testing would be required for its proposed design. PX 267, 295;

PFF ¶¶ 93-94. As a result of NRC safety and technical requirements, the project experienced substantial schedule delays and cost increases from the outset, and these problems continued as NRC scrutiny intensified during the decade. PFF ¶¶ 289-93. These delays and cost increases resulted in 11 change orders to the Pacific Nuclear contract over the next 4 years, all of which presented potential off-ramps to the project had there been any improvement in DOE's prospects for performance. Tr. at 433 (Shetler); DX 425 at 2-3 (discussing efforts for "back loading the dollar expenditures as much as possible"); PX 267; *see also* DX 53, 406, 415, 434, 483, 490, 561, 590, 615, 643, 683, 762, 792, 797.

In May 1994, and again in May 1995, DOE issued formal pronouncements in the Federal Register reiterating that it would not begin performance until at least 2010. PX 251, 410; *see also System Fuels, Inc. v. United States*, No. 03-2642C, 2005 WL 1804314, at *2 (Fed. Cl. July 29, 2005) (noting that "[o]n May 25, 1994, however, DOE announced that it would not be able to start accepting SNF from any nuclear utilities until 2010, at the earliest"). In response to DOE's May 1994 notice, SMUD informed DOE that it should reimburse SMUD for the costs of dry storage if the government failed to accept SMUD's spent fuel as contractually required. PX 369 at 7-8. Also in late 1994, SMUD and DOE formally entered into a "Cooperative Agreement" for the demonstration of a dual-purpose transportable storage cask. Under this Cooperative Agreement, SMUD regularly reported to DOE on the status and costs of the dry storage project during the next five years. *See* PX 411, 424, 434, 448, 459, 476, 492, 514, 571, 845; PFF 296.

On December 17, 1996, DOE sent formal notice to SMUD, again stating that it would not meet its obligations under the Contract. PX 500. In response, SMUD formally requested that DOE assist it in mitigating the consequences of the impending breach by implementing the so-called "Fort St. Vrain solution," whereby DOE would take title to SMUD's SNF at the Rancho Seco site and reimburse SMUD for the on-site storage costs.[3] PX 528 at 2-3. SMUD explained that it was doing "everything possible to reduce the interim costs of storage by proceeding with its plan for dry storage." *id.* at 2. SMUD informed the government that if DOE failed to begin acceptance of SNF as required by the Contract, "SMUD will have no alternative but to seek reimbursement from DOE for the cost of design, licensing, construction and operation until such time that DOE takes title." *Id.*

In response, DOE did not suggest that SMUD should leave its SNF in the wet pool or that it should abandon the dry storage project, charge vendors, or pursue other alternatives. DOE never suggested that SMUD should pursue a "storage-only" system or the dual-purpose cask designed by Nuclear Assurance Corporation ("NAC"). Instead, in 1997, DOE "recognize[d] that such delay may have resulted in hardship to certain contract holders" and that it was willing to consider "compensation for onsite storage costs." PX 544 at 2; *see also* PX 537 at 3 (DOE

---

[3] DOE had suggested since Contract formation that one option in the event of a delay in the repository was for DOE to take title of a utility's spent fuel at the reactor site. *See infra* at pp. 35-36; PFF ¶¶ 49-51. One of SMUD's primary goals, since shutdown and still today, was to have DOE take responsibility for the spent fuel as soon as possible, and SMUD has sought to facilitate and foster that objective throughout its mitigation efforts. Tr. at 152 (Shetler); PX 528; PX 1012. Despite DOE's earlier acknowledgements that it could take title to spent fuel at a utility's site in the event of a delay in DOE performance, and its actual actions in doing so at the Fort St. Vrain reactor, DOE has refused to accept responsibility for the fuel at Rancho Seco. DX 861; PX 1013.

testimony to Congress in 1997 stating that DOE was considering approaches to address its delay, including "financial compensation and the Department taking title to some fuel at the reactor sites").

During the same period, from 1996 through 1998, there was essentially no progress on SMUD's dry storage project because of technical difficulties and the bankruptcy of its primary vendor, Vectra Technologies Inc. ("Vectra"). PFF ¶¶ 297-301. At that time, no casks or canisters had been delivered, and the project faced continuing regulatory risks. As a result, SMUD conducted a comprehensive study to reevaluate its options and reconsider what to do with its spent fuel during the long period of DOE's already announced delay. PX 502, 503, 519, 524. One of the options explicitly studied and carefully considered by SMUD was leaving the fuel in the pool during the government's announced minimum 12-year delay and incurring the significantly higher operating costs of wet storage throughout the breach. PFF ¶¶ 145-51. That option was rejected, however, due to what SMUD management reasonably viewed as the even greater uncertainties, risks and costs that would result from leaving the fuel in the pool during the entirety of DOE's indefinite delay. PFF ¶¶ 152, 154-55.

TNW purchased Vectra's assets out of the bankruptcy estate in November 1997. PFF ¶ 104. SMUD conducted extensive contract negotiations with TNW in 1998 for the completion of the dry-storage project, ultimately signing a contract with TNW in September 1998. PX 598, 598A. By order of the Bankruptcy Court, TNW agreed to complete the SMUD project at "cost-without-profit," and it restarted fabrication of the casks and canisters in late 1998. PX 585; PFF ¶¶ 105-06, 305-07, 311. Like the original contract, the new TNW contract was the subject of 11

change orders to address cost increases and delays resulting from NRC requirements, and in approving these changes, SMUD again expressly considered the option of leaving its fuel in wet storage. PX 598; *see also* DX 950, 915, 947, 963, 978A, 1039, 1054, 1099, 1142, 1149, 1144, 1279.

In 1999 and 2000, SMUD experienced additional difficulties with TNW and its subcontractors. PFF ¶¶ 314-21. Due to the project delays experienced in prior years, SMUD and TNW were forced to transfer the canister fabrication work to a new subcontractor. *See, e.g.*, PX 624, 631. This led SMUD to conduct another reevaluation of the alternatives to the dry storage project. PX 642, 672. Because of the actual delay in DOE's fuel acceptance, this reevalution similarly concluded that continuing with the dry storage project would best mitigate SMUD's damages during the delay. SMUD also updated security requirements, developed procedures, fabricated necessary equipment, and trained staff in preparation to transfer SNF from the pool to the ISFSI. PFF ¶¶ 230, 323-26. Rancho Seco received the first canister in September 2000. PFF ¶ 109.

In early 2001, SMUD worked to resolve fabrication and other issues with the remaining 20 canisters. PFF ¶¶ 319-22. Because of these continuing issues, SMUD again reevaluated alternatives to the dry storage project. *See* PX 689. Ultimately, however, SMUD management concluded that the alternatives, including remaining in wet storage, presented risks "significantly greater" than the current system, *id.* at 2, and so SMUD chose to finish the project with TNW. PFF ¶¶ 166-67.

SMUD loaded the first canister with SNF in April 2001. Following the resolution of additional fabrication issues, SMUD received and loaded the remaining 20 canisters over a 16-month period in 2001 and 2002, completing this work in August 2002. PFF ¶¶ 110-16. In 2002 and 2003, SMUD incurred approximately $700,000 in annual costs associated with the operation and maintenance of the ISFSI. PFF ¶¶ 396-98. SMUD began dismantling its wet pool in 2003.

At any point prior to 2003, SMUD could have left its SNF in the wet pool for indefinite storage pending eventual acceptance by DOE under the Contract. Had SMUD done so, it likely would have incurred higher damages because of the greater costs of operating and maintaining the wet pool during the entire period of DOE's continuing, open-ended delay. PFF ¶¶ 340-48. SMUD, however, did not sit back with its fuel in the pool and incur the higher operating costs of wet storage for a lengthy and indefinite period. Instead, SMUD took fair and reasonable steps to mitigate its contractual losses and seek substitute performance by becoming an industry leader in pursuing the development of a dual-purpose dry storage system, a step that has now been replicated by dozens of other utilities.

## ARGUMENT

### I. SMUD Is Entitled To Its Expectation Damages In The Form Of Mitigation Expenses And Substitute Performance Costs.

This Court has already concluded that the government breached the SMUD Contract, ruling that "the Government was obligated under the June 14, 1983 DOE Standard Contract to begin accepting SNF and/or HLW from utilities no later than January 31, 1998." *Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 505 (2005); *see also, e.g., System*

*Fuels, Inc.*, 2005 WL 1804314, at *6-7; *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 374-75 (2005); *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 176-77 (2005). Because it remains of utmost importance to SMUD, for a range of financial and regulatory reasons, to have DOE accept its fuel in the future, SMUD has chosen to pursue damages for partial breach, rather than declaring the Contract at an end and pursuing all damages that would stem from a total breach.[4] SMUD is entitled to choose this remedy. *See Cities Service Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976) (holding that a material breach "merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it"); RESTATEMENT (SECOND) OF CONTRACTS § 236 (1981) ("RESTATEMENT").

Once DOE began announcing that it would not likely commence performance as required by the Contract, as well as when it actually failed to perform beginning in 1998, SMUD was entitled, and likely contractually required, to engage in mitigation efforts and to seek substitute arrangements or cover for DOE's lack of performance. *Id.* § 350 cmt. b ("Once a party has reason to know that performance by the other party will not be forthcoming," he is "expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise."). In *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 674 (2004), the Court recognized the obligation of utilities to mitigate their damages, explaining that:

---

[4] Notably, neither has the government sought to end its obligations under the Contract.

> When it became obvious to TVA that DOE would not perform under the contract, TVA was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance. . . . TVA's construction of dry storage facilities for spent fuel at its [plants] must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial ongoing breach.

The government's notifications that it would not perform as required by the Contract constituted a partial repudiation of its contract obligations that entitled, if not required, SMUD to begin immediately mitigating its damages. *Id.*; *see also Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 1535688, at *6 (Fed. Cl. June 28, 2004) ("Should plaintiffs have waited until [January] 31, 1998, and then decided what to do with their nuclear waste? The court thinks not . . . ."); *Entergy Nuclear Indian Point 2 v. United States*, 64 Fed. Cl. 515, 522 (2005) (concluding that costs to design, license, and construct a dry storage facility could be recovered as incidental losses if incurred to mitigate damages); *Cuyahoga Metro. Housing Auth. v. United States*, 65 Fed. Cl. 534, 547 (2005) (concluding that "reasonable cost-avoiding steps include affirmative efforts to make substitute arrangements"); *cf. System Fuels Inc.*, 2005 WL 1804314, at *10 ("A long lead time is required to plan and construct SNF dry storage facilities due to the extremely hazardous nature of SNF, the logistical problems associated with storing it safely, and the significant public interest in safely storing such materials.").[5] SMUD's duty to mitigate

---

[5] *See, e.g.*, *Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953); *Record Club of Am. v. United Artists Records, Inc.*, 643 F. Supp. 925, 941 (S.D.N.Y. 1986) (plaintiff properly mitigated its damages where the plaintiff had reason to doubt the defendant's future performance "[b]ased on [the defendant's] shoddy performance under the contract from the beginning, and [the defendant's] repeated unequivocal repudiations of the contract"); *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985) (holding that "[w]hen plaintiffs learned . . . that [the defendant] intended to breach the contract, . . . [t]hey were obligated to take whatever reasonable actions they could to minimize their damages"); *S.N.A. Nut Co. v. Häagen-Dazs Co.*, 247 B.R. 7,

Footnote continued on next page

continues during DOE's delay until the government performs its obligations under the Contract. RESTATEMENT § 350 cmt. g (where "the breach is accompanied by assurances that performance will be forthcoming," the injured party "may be expected to take some steps to avoid loss due to a delay in performance").

"When mitigating damages from a breach, a party 'must only make those efforts that are fair and reasonable under the circumstances.'" *Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (quoting *Robinson v. United States*, 305 F.3d 1330, 1333 (Fed. Cir. 2002)); *First Heights Bank, FSB v. United States*, No. 04-5021, -5022, 2005 WL 1962989, at *3-4 (Fed. Cir. Aug. 17, 2005). The non-breaching party is not required to mitigate damages in the "cheapest form" possible or at "least cost" to the defendant. *Home Sav.*, 399 F.3d at 1353. "[F]air and reasonable efforts to mitigate are all that the law requires." *Id.*

Moreover, all "costs incurred in a reasonable effort, whether successful or not, to avoid loss" are recoverable. RESTATEMENT § 347 cmt. c; *see also Chain Belt*, 115 F. Supp. at 714 (plaintiff in a partial breach case was entitled to recover expenses incurred "in a reasonable effort to avoid the harm which both parties had reason to foresee would be the probable result of defendant's breach of the contract"). "Reasonableness, in turn, 'is to be determined from all the facts and circumstances of each case . . . the person whose wrong forced the choice can not

---

Footnote continued from previous page

17-18 (Bankr. N.D. Ill. 2002) (holding that where supplier indicated that goods would be temporarily unavailable in the future, supplier "partially repudiated" the contract, and the buyer was entitled to immediately mitigate its damages for the partial repudiation).

complain that one rather than the other was chosen.'" *Home Sav. of Am., FSB v. United States*, 57 Fed. Cl. 694, 729 (2003) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950)), *aff'd in part*, 399 F.3d 1341 (Fed. Cir. 2005). Finally, "[i]t makes no difference whether the breach has already occurred, or where . . . it is merely impending under circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm." *Chain Belt*, 115 F. Supp. at 714.

SMUD's mitigation expenses and the costs of providing substitute or alternative performance during the government's partial breach are recoverable as a form of expectancy damages. *See, e.g.*, *Entergy Nuclear Indian Point 2*, 64 Fed. Cl. at 522; *System Fuels, Inc.*, 65 Fed. Cl. at 175-76; *Cuyahoga Metro.*, 65 Fed. Cl. at 543-44, 547; *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 179-80 (2005) (holding that expectancy damages were proper in a partial breach case). The injured party's expectation interest is "intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." RESTATEMENT § 347 cmt. a; *see also Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2002); *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997).[6]

---

[6] Under the Uniform Commercial Code ("UCC"), "[i]f a seller breaches a contract for goods, the buyer may 'cover' or, in other words, obtain substitute goods from another seller." *Hughes Communications*, 271 F.3d at 1066 (citing UCC § 2-712 (1997)). Even where the UCC is inapplicable, the Federal Circuit has found that the concept of cover "provides useful guidance in applying general contract principles." *Id.* Applying these principles, the reasonable costs of obtaining substitute goods or services may be recovered. *Id*. at 1066-67. As the victim of the

Footnote continued on next page

To recover its damages, SMUD must show that they were reasonably foreseeable, caused by the breach, and proven with reasonable certainty. *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (citing RESTATEMENT §§ 347, 351, 352). Here, the evidence demonstrates that SMUD's many actions to continue funding the design, licensing, and fabrication of an interim on-site dry storage facility were caused by the government's breach, were reasonably foreseeable, and were proven with reasonable certainty. SMUD's efforts were also fair and reasonable under the circumstances. *First Heights Bank*, 2005 WL 1962989 at *3-4. As such, SMUD's damages incurred from 1992 to 1997 and from 1998 to 2003 are recoverable in this case.[7]

---

Footnote continued from previous page

breach, a party is "within its rights to obtain commercially reasonable substitute . . . services, even if the substitute services [are] not identical to those covered by the [contract]." *Id*. at 1067.

[7] The parties entered into a stipulation and the Court entered an Order preserving SMUD's ability to seek damages incurred after 2003. *See* Joint Stipulation and Order Regarding Damages, dated Sept. 27, 2004 (Dckt. #257); *see also System Fuels Inc.*, 65 Fed. Cl. at 177 (adopting the exceptions to the rule of merger and bar in accordance with RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(b) and (e) and holding that plaintiffs may bring subsequent claims for future damages); *Entergy Nuclear Indian Point 2*, 64 Fed. Cl. at 525-26 (same); *Entergy Nuclear Generation v. United States*, 64 Fed. Cl. 336, 345-46 (2005) (same); *Tennessee Valley Authority*, 60 Fed. Cl. at 677-78 (same). Because SMUD effectively mitigated its damages and reduced operating and maintenance costs for the dry storage facility to approximately $700,000 in 2003, SMUD expects that any future damages claim would be modest. SMUD anticipates that the operating costs for the ISFSI will remain relatively constant until basic decommissioning activities at the reactor are completed, which is planned for 2008. After 2008, costs for operating and securing the ISFSI will likely increase because all activity at the site will relate only to the ISFSI.

## II. The Government's Failure To Begin Acceptance Of Spent Fuel Caused SMUD To Incur Damages.

The Federal Circuit has recently held that the "causal connection between the breach and the loss of profits must be 'definitely established.'" *California Federal Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005)(citations omitted). The Federal Circuit further explained, however, that the breach need not "be the sole factor or sole cause" of the loss of profits, and that the "existence of other factors operating in confluence with the breach will not necessary preclude recovery based on the breach." *Id.*

This standard has been satisfied by SMUD here.[8] SMUD's multiple and discrete decisions to pursue and continue with its dry storage project were each preceded and motivated by DOE announcements, statements, and actions which initially indicated and then confirmed that DOE's acceptance of spent fuel would be delayed substantially. PFF ¶¶ 117-24. This created significant uncertainty about DOE's future fuel acceptance and led SMUD to believe that it would have to continue to store spent fuel at the non-operating Rancho Seco facility for an extended and unknown time period, which would increase SMUD's future storage costs.

This uncertainty and delay caused SMUD to contract for and continue with the dry storage project during the initial development phase from 1992 through 1997. Although SMUD

---

[8] The Federal Circuit has not spoken directly to the issue of whether the "definitely established" standard articulated in *California Federal Bank* for lost profits is equally applicable to other forms of expectancy damages. However, this Court has suggested that the standard articulated in *California Federal* is essentially the same as the multi-faceted approach that the Court has previously applied in addressing causation. *See, e.g., American Capital Corp. v. United States*, No. 95-523C, 2005 WL 1308314, at *84 (Fed. Cl. May 31, 2005), ; *Cuyahoga Metro.*, 65 Fed. Cl. at 546 n.15.

plainly recognized that dry storage would facilitate decommissioning Rancho Seco and early DOE acceptance of SMUD fuel, the trial evidence demonstrated that the decision to initiate and continue with the dry storage program was driven by the growing uncertainties and anticipated delay associated with DOE's future fuel acceptance. PFF ¶¶ 125-44. If DOE had at any time during this period provided SMUD with adequate assurance of contractual performance, as opposed to constant insecurity and uncertainties, then SMUD would have abandoned its dry storage mitigation efforts, given the licensing, manufacturing, and acceptance queue risks. *See infra* n.12; PFF ¶ 134.

The causal connection is even more dramatic with respect to SMUD's later decisions to restart work on the dry storage project in 1998, after work had been suspended, and to continue with the project in 2000 and 2001, when further problems with substantial financial consequences were experienced. PFF ¶¶ 145-68. At each of these junctures, SMUD reconsidered its options with the knowledge that DOE had already failed to meet its 1998 start date and that extended and open-ended onsite storage was a reality. Had DOE been accepting fuel at that time as required by the Standard Contract, then SMUD would have not have continued with dry storage given the continuing problems and risks involved.[9]

---

[9] This Court has cited with approval Professor Corbin's discussion of causation as "uniformity of sequence" between action and injury. *See American Capital Corp.*, 2005 WL 1308314, at *79-80. Insofar as this approach is applied here it further supports the conclusion that DOE's actions caused SMUD to initiate, restart, and continue with the dry storage project as many other utilities that have prematurely shutdown or are still operating have similarly developed or are developing dual-purpose dry storage systems. *See* E. Supko Written Direct at ¶ 113, ¶ 122, Table 9 (PX 1002); Tr. at 1458 (Stuart).

### A. DOE's Failure To Begin Acceptance Of Spent Fuel In 1998 Was Preceded By Eleven Years Of Announcements And Actions Indicating That Such Acceptance Would Be Delayed Significantly.

Although DOE's breach of the Standard Contract occurred on January 31, 1998 when it failed to start accepting spent fuel, *see Sacramento Municipal Utility District*, 63 Fed. Cl. at 503, that failure had been preceded by eleven years of DOE announcements, statements, and actions indicating that it would not meet the 1998 start date and that its acceptance of fuel from SMUD and other utilities would be delayed until 2010 or later. *See* PFF ¶¶ 117-24.

Early DOE announcements of anticipated delay included the January 1987 Draft Mission Plan Amendment, the June 1987 Final Mission Plan Amendment, the March 1987 Monitored Retrievable Storage Submission to Congress, the June 1988 Draft Mission Plan Amendment, the 1988 Annual Capacity Report, and a July 1988 letter to SMUD, all of which stated that DOE would not begin accepting spent fuel at a permanent repository until 2003, *see* PX 109 at 5; PX 118 at 6; PX 113 at 2, 10, 22; PX 143 at 15; PX 142 at 4-5; and PX 144, and the November 1989 Report to Congress on Reassessment of the Civilian Radioactivity Waste Management Program, which announced a further "significant slip" in the opening of the repository until "approximately 2010." PX 169 at vii.[10]

Subsequent DOE statements of delay included the May 1994 Notice of Inquiry and May 1995 Final Interpretation, both of which were published in the Federal Register and stated

[10] In addition, in the 1989-1991 period, the head of DOE's Office Civilian Radioactive Waste Management ("OCRWM"), John Bartlett, and his deputy, Ron Milner, verbally advised SMUD of delays in the development of the permanent repository. Designations Appendix (Dckt. #310) at 2237, 2239-40 (Bowser).

DOE's belief that its obligation to commence fuel acceptance was conditional upon the existence of an operating repository or interim storage facility and reiterated that the earliest possible date for acceptance of waste at a repository would be 2010, *see* PX 351 at 3, 4; PX 410 at 2, 3, 9, and DOE's December 1996 letter advising SMUD that DOE would be unable to begin accepting spent fuel by January 31, 1998. PX 500.

Although DOE suggested in the late 1980s and early 1990s that it might still meet the 1998 start date by accepting fuel on an interim basis at an MRS, it also recognized that this would require not only that the federal government identify a host site, but also that Congress amend the NWPA and abolish the statutory linkages between an MRS and the repository; those linkages effectively preclude operation of an MRS until three years before the repository opens, that is, until 2007 at the earliest. *See* PFF ¶ 119. Early DOE announcements that discussed the siting requirements and statutory linkages and their effect in delaying the future development of an MRS include the June 1988 Draft Mission Plan Amendment, the November 1989 Reassessment Report, and the 1990, 1991, and 1992 Annual Capacity Reports. PX 143 at 15; PX 169 at x, 11-12; PX 188 at 5; PX 231 at 4; PX 294 at 3.

Other developments during the early 1990s confirmed that the timely receipt of spent fuel by DOE was unlikely. *See* PFF ¶ 121. These developments included: the General Accounting Office's 1991 finding that an MRS was unlikely to open by 1998, PX 217 at 3-4, 19-23, 30-31; the failure and termination of the federal government's efforts to locate a host site for an MRS, PX 265; PX 363 at 7; DOE's inability to meet any siting, engineering, permitting, or construction milestones for an MRS, Tr. at 2170-2173 (Kouts); the 1993 cancellation of DOE's program to

develop transportation casks, *see* I. Stuart Written Direct at ¶ 7 (PX 1001); and DOE's failure to make progress generally. *See* Designations Appendix (Dckt. #310) at 2290-91 (Freeman); *id.* at 2251-52 (Bowser).

These DOE announcements, statements, and actions led SMUD to believe that DOE likely would not begin accepting spent fuel until sometime well after 1998 and that Rancho Seco would probably have to continue to store spent fuel until well after 2010. PFF ¶ 123. This belief initially arose in the late 1980s and became progressively more certain throughout the 1990s. It is reflected in various SMUD documents, including the 1990 Levy report, *e.g.*, PX 176 at 59, the 1992 staff recommendations to the Board of Directors regarding the Pacific Nuclear contract, PX 259 at 2; PX 269A, a 1993 environmental assessment on Rancho Seco decommissioning, PX 297 at 7, and SMUD's March 1997 response to the DOE's December 1996 letter, PX 528 at 2. It was also the subject of testimony by current and former SMUD officials, including former General Manager David Freeman, Assistant General Manager Jim Shetler, Rancho Seco Plant Manager Steve Redeker, and former Rancho Seco Fuel Disposition Manager Rita Bowser. *See* PFF ¶¶ 123-24. Although some at SMUD were hopeful that an MRS could be developed, SMUD recognized that this would require legislative action, and it considered this increasingly unlikely to occur and understood that the MRS process terminated entirely by the mid-90s. *See* Designations Appendix (Dckt. #310) at 2310-13 (Freeman) (testifying that his view in the early 1990s was that "monitored retrievable storage wasn't going to work").[11]

---

[11] *See also* PX 973; Designations Appendix (Dckt. #310) at 43-44, 205-08 (Barrett) (testifying that by Oct. 1993, when the funding for the MRS was cut by Congress, an MRS was "unlikely");

Footnote continued on next page

Thus, throughout the period in question, SMUD knew that DOE would likely breach the Standard Contract and that SMUD would therefore have to store fuel at Rancho Seco for an extended and uncertain period of time. This knowledge drove SMUD's efforts to pursue reasonable damages mitigation through the development of the dry storage system as explained below. PFF ¶¶ 124-27, 130-34, 150-52, 160-67.

**B. SMUD's Initial Decisions To Begin And Continue Funding The Dry Storage Project From 1992 Through 1997 Were Caused By The Government's Statements Indicating That Fuel Acceptance Would Be Delayed.**

By the time that SMUD's Rancho Seco reactor prematurely shut down in June 1989, DOE already was projecting that it would probably not begin accepting fuel in 1998. *See* PFF ¶ 117; *see also* Tr. at 154 (Shetler) ("By the late '80s, early '90s, it was becoming apparent that the 1998 receipt date from DOE was not going to be met."). This forced SMUD to consider how to manage spent fuel at a non-operating reactor for up to several decades in a manner that would be safe, cost effective, and allow for the loss of experienced staff. *See* PFF ¶¶ 126-27.

For this purpose, SMUD retained S. Levy, Incorporated to evaluate its fuel management options in light of the increasing probability that DOE's fuel acceptance would be delayed. *See* PFF ¶¶ 128-30; PX 297 at 7 (explaining that the Levy report was prepared in light of DOE's

---

Footnote continued from previous page

*id.* at 223, 273 (testifying that by late 1994 and early 1995, the MRS concept was "not viable"); *id.* at 419-22 (Milner) (testifying that DOE had given up plans for an MRS by 1994); *id.* at 649 (Brownstein); *see also* PX 380 at 1 (DOE December 1994 Program Plan concluding that "by 1993, it had become clear that continuation of the Program with then current approach was no longer a viable option").

announcements of delay). Levy's March 1990 report analyzed 15 fuel storage options for Rancho Seco, including both wet and dry storage both on-site and off-site. *See* PX 176 at ii, 9-43. A key factor was Levy's recognition that the "schedule for DOE pickup is currently highly uncertain with the earliest conceivable pickup date being 1998 and a much more likely pickup date well after 2010." *Id*. at 59; Motion for Leave to File Testimony of S. Levy & R. Powers, dated March 7, 2005 ("Levy Motion") (Dckt. #300) at 143 (Levy Dep.) (describing this as "*the key assumption*") (emphasis added). Levy also determined that the most certain approach would be continued wet storage until disposal at the DOE repository in 2010 or later, but that dry storage in transportable casks, *i.e.*, a dual-purpose system, offered the best opportunity for early offsite shipment to an interim DOE storage facility or for interim acceptance by DOE on-site at Rancho Seco. PX 176 at ii, 56-65. Under these circumstances, Levy "strongly recommended" that SMUD pursue the transportable cask option, particularly if coupled with a joint SMUD/DOE demonstration program to resolve any technical or regulatory requirements for such casks. *Id*.

Based upon the Levy study, which as noted was prepared in light of the government's announcements of likely delay in performance, SMUD decided in 1990 and 1991 to pursue dual-purpose dry storage (although SMUD opted to utilize less expensive dual-purpose canisters, as opposed to a fleet of dual-purpose casks) to address the uncertainties and prospective delay in DOE fuel acceptance, while also continuing to consider further wet storage as an option. *See* PFF ¶¶ 130-34; *see also* Tr. at 160 (Shetler) ("we were now talking rather than maybe eight or ten years of storage, a couple of decades of potential storage"). SMUD believed that a dual-purpose dry storage system could help address the uncertainties created by DOE's announced

delays in the program by encouraging prompt DOE acceptance of SMUD's fuel, either at the Rancho Seco site or whenever DOE began taking fuel to a storage facility, and by reducing annual operation and maintenance costs over the long term if DOE did not begin accepting fuel until 2010 or later. *See* PFF ¶¶ 131, 138-39; *see also* Tr. at 172 (Shetler) (dry storage offered "a cheaper way of dealing with storage of the fuel" and "could facilitate transport to the DOE"). SMUD's expectation of delay is illustrated by the 1992 recommendations by SMUD's staff to its Board of Directors to negotiate and execute the contract with Pacific Nuclear for the dry storage cask and canisters, which assume that the opening of the federal repository will be delayed by 12 years and project that dry storage will yield savings during this period. PX 259 at 2; PX 269A; PFF ¶¶ 132-33.

The effect that this uncertainty and anticipated delay had on SMUD's decision to contract for dry storage was further addressed in the trial testimony of SMUD's then-Deputy Assistant General Manager Jim Shetler:

> [O]ur first alternative and our preference would have been to keep it in the pool and have the DOE receive it if there were an ability on the part of DOE to accept the fuel on the original schedule, such that it would be off site in a timely manner. Based on the schedule delays that were known in the early 1990s, what we were facing is a significant cost associated with delays in that performance and then having to store that for a long period of time. So we did not consider that [storage in the pool] to be the [solution], though it was probably the preferred [solution] from the standpoint of assuming acceptance, it was not from the standpoint of cost of storage in the long term.

Tr. at 194; *see also id*. at 360 (Shetler) (stating that if SMUD had assurance that DOE would begin fuel acceptance in 1998 it would have kept the fuel in wet storage to avoid the risks of

pursuing a first of its kind technology and of DOE characterizing the canistered fuel as non-standard and further delaying its acceptance).[12]

SMUD's then-General Manager, S. David Freeman, provided similar testimony at his deposition:

> [SMUD's actions] were driven by the fact that the federal government had taken our money, hadn't come to take our [spent fuel], and was telling us they weren't going to come until at least 2010, which put us in a horrible financial situation having to spend a bunch of money that really was owed to us by the government.
>
> * * *
>
> *And we had an obligation to try to make those damages as small as possible, both to protect our own cash flow because you wouldn't pay for it, and also because that's what you would claim we should have done in the lawsuit, which is what we did and it wasn't easy.*

Designations Appendix (Dckt. #310) at 2288-89 (Freeman) (emphasis added).[13]

The causal relationship between DOE's anticipated delay in fuel acceptance and SMUD's decision to develop dry storage is corroborated by the NRC's 1994 Environmental Assessment on the Rancho Seco ISFSI. *See* PX 363 (Att. 2). In the Environmental Assessment, the NRC recounts SMUD's consideration of various alternatives, including shipping the spent fuel to a

---

[12] SMUD had received verbal and written assurance from DOE that DOE would accept canistered fuel for disposal at a federal facility so long as the canister had been licensed for storage and transportation by the NRC. *See* DX 425 at 1-2; PX 320 at 1; PX 325 at 1. However, DOE had declined to address whether it would later seek to characterize such fuel as "non-standard" under the Standard Contract and move it to the end of the fuel queue. *Id.* If this occurred, it could further delay the acceptance of SMUD's fuel. Tr. at 364-365 (Shetler). *See generally* PFF ¶¶ 148, 512-21.

[13] SMUD consultant Soloman Levy similarly testified at deposition that if he had assurance that DOE would begin accepting fuel in 1998, he would have recommended that SMUD leave its fuel in wet storage. Levy Motion (Dckt. #300) at 111 (Levy Dep.).

permanent federal repository and wet and dry storage. It explains that shipping the fuel to a permanent repository "is SMUD's preferred solution to the storage of spent fuel from Rancho Seco; however no permanent Federal repository is available" and it discusses in detail "the uncertainties of schedule for a repository or MRS." *Id*. at 7. Accordingly, it states that "[t]he absence of a Federal repository makes storage of spent fuel in dry [storage] SMUD's primary alternative." *Id*. at 8.[14]

DOE's May 1994 Notice of Inquiry and May 1995 Final Interpretation further reinforced SMUD's decision to develop dry storage because they indicated that DOE would neither accept fuel on a timely basis nor provide interim assistance. *See* PFF ¶ 136. The same was true of DOE's December 1996 letter. *See* PFF ¶ 122.

Thus, DOE's announcements and other actions during the late 1980s and early 1990s created significant insecurity for SMUD and uncertainty about DOE's future fuel acceptance and led SMUD to believe that it would likely have to continue to store fuel at Rancho Seco for an extended period. This uncertainty and belief were the direct and proximate cause of SMUD's

---

[14] The dry storage project was part of SMUD's decommissioning plan for Rancho Seco, and was expected to facilitate decommissioning by reducing the required long-term staff and allowing decommissioning of the wet pool. However, it was not a prerequisite for decommissioning, and, in fact, SMUD will now have to complete additional decommissioning activities at the ISFSI because of the contamination created by storing fuel there. In addition, decommissioning was not initially projected to begin at Rancho Seco until 2008 due to funding limitations; continued operation of the spent fuel pool would not have precluded SMUD from decommissioning the remainder of Rancho Seco, and indeed SMUD began active decommissioning of the site in the 1990s while the pool was in operation; and no matter how the fuel was stored, final decommissioning cannot conclude until all fuel is removed by DOE. *See* PFF ¶¶ 438-59.

decisions to contract for dry storage in 1992 and to continue with the dry storage mitigation efforts from 1992 until work was suspended in 1996.

### C. SMUD's Decisions To Re-Start The Dry Storage Project In 1998 And Continue With The Project In 2000 and 2001 Were Directly Caused By The Government's Failure To Begin Accepting Fuel In 1998.

By 1997, SMUD recognized that an MRS would not be developed, that DOE would not begin accepting spent fuel until at least 2010, and that SMUD would have to continue to store fuel at Rancho Seco for an extended and uncertain length of time. *See* § II.A. *supra*.

At that time, work on SMUD's dry storage project had stopped because of the technical stop-work order that NRC issued to Vectra. The project was far behind the initial schedule, and the cost already exceeded the initial budget. *See* PFF ¶¶ 146-47. The NRC had not yet issued a transportation or storage license, neither the cask nor any canisters had been fabricated, and a variety of licensing, design, and manufacturing issues remained open. *See* PFF ¶¶ 288-93. Although SMUD believed that these issues could be resolved, it recognized that they posed obstacles that could further complicate and delay completion of the project. SMUD also recognized that there was a risk that DOE might later declare canistered fuel to be "non-standard" fuel under the Standard Contract and attempt to move such fuel to the end of the fuel acceptance queue, which could further delay the acceptance of SMUD's fuel. *See* PFF ¶¶ 148, 518-19.

Under these circumstances, SMUD comprehensively reevaluated and reassessed its dry storage strategy in 1997, and as part of this reevaluation considered nine alternatives including leaving the fuel in wet storage. *See* PX 502, 503, 519, 524. The analysis was driven by SMUD's

certain knowledge that DOE would not begin accepting spent fuel for many years and SMUD's assumption that fuel would likely remain at Rancho Seco for another 30 years. SMUD sought to ensure that it pursued the most cost-effective, yet safe fuel storage strategy, while recognizing that the longer the fuel remained in wet storage the higher the annual operating and maintenance costs would be. *See* PFF ¶¶ 149-51. SMUD ultimately concluded in mid-1997 that continuing with the dry storage project was the best option available under the circumstances because the government's delay would cause SMUD to store the Rancho Seco fuel for at least another 20 or 30 years and dry storage would significantly reduce SMUD's damages during that period. *See* PFF ¶ 152; *see also* Tr. at 604 (Redeker) ("A significant impact on that was that we really didn't believe that the fuel was going to be gone for a long time. And we would be paying for fuel storage costs for a significant period of time.").

SMUD's point person for the reevaluation, Rancho Seco Plant Manager Steve Redeker,[15] testified that DOE's announced delay in performance until 2010 caused SMUD to continue with the dry storage project in 1997. As Mr. Redeker explained at trial:

> And at this point in 1997, it was a fact that they weren't starting up in '98. The 2010 date was in my mind very optimistic because I hadn't seen the kinds of progress that would need to be made. DOE had some specific milestones they had to reach, weren't being made. And that the 2010 was in jeopardy as well. And that some date out in the late 2020s was my best estimate of when the

---

[15] In response to the Court's question whether he was the person responsible for SMUD continuing with dry storage after 1997, Mr. Redeker answered affirmatively: "The buck stopped with me relative to making the recommendation. I was the one [that the Board and the most senior managers looked to]. Tr. at 621 (Redeker); *see also* Tr. at 919 (Ferreira) ("the point person was Mr. Redeker. He was the project manager").

> fuel would be gone. So that played an important part in this. *Had they been performing and saying, yes, we're coming in 1998 and that fuel will be gone by 2006, that would have changed the outcome of this entirely. It would have made the spent fuel pool an absolute certainty*. They are coming, they are going to take it out of our pool, the risk will be gone. And I wouldn't have to worry about that, licensing of a transportation system, I wouldn't have to worry about whether they could manufacture the thing, if they had said I'm coming, we're going to perform.

Tr. at 620-21 (Redeker) (emphasis added).

In March 1997, in response to the DOE's December 1996 letter (PX 500), SMUD submitted a letter to DOE requesting that DOE take title to SMUD's spent fuel, as DOE had done at the Fort St. Vrain reactor in Colorado, and pay the costs of "continued on-site storage of spent fuel . . . at the Rancho Seco site." PX 528 at 3; *id.* (noting that "SMUD is willing to operate the dry cask storage facility for DOE with full cost recover in a similar manner to Public Service of Colorado at Fort St. Vrain."). SMUD explained that if DOE failed to perform its obligations, SMUD would be forced to "seek reimbursement from DOE for the cost to design, licensing, construction and operation until such time that DOE takes title." *Id.* SMUD concluded that "[i]t is now time for DOE to honor its contractual obligation by accepting spent fuel as soon as possible and to reimburse utilities such as SMUD for their interim storage costs in the meantime." *Id.*[16]

Then-SMUD Assistant General Manager Richard Ferreira confirmed at trial that DOE's announced failure to live up to its contractual obligations caused SMUD to proceed with the dry

[16] In 1997, DOE recognized that its delay was causing "hardship" and acknowledged that it was considering "compensation for onsite storage costs" and "taking title to some fuel at the reactor sites." PX 537 at 3; PX 544 at 2. DOE ultimately declined to take either action.

storage project in 1997, explaining that "had DOE responded favorably and was willing to assume responsibilities, then we would not have continued with the dry fuel storage program." Tr. at 907 (Ferreira). Mr. Ferreira explained that:

> the objective was to try to minimize the risk and the cost, and that's why, at this time, we were proceeding with the dry, the dual fuel dry storage program, and it was the only alternative that we had determined, at that time, to address the issue of the cost of long-term wet storage, given that DOE would not be taking the fuel any time in the foreseeable future.

*Id.* at 905-06 (Ferreira); *see also id.* at 593 (Redeker) ("We're about, let's see, this is about a year before '98 and that essentially reaffirmed that the issues—that getting the fuel off the site to DOE wasn't going to happen at the schedule that was anticipated or originally anticipated. And that the dry storage continued to be the preferable option. Long-term fuel storage on Rancho Seco site continued to be—just reaffirmed that long-term onsite storage was going to be an issue for us.").

Vectra's bankruptcy precipitated yet another reevaluation and reconsideration of the dry storage mitigation project by SMUD during 1998. PFF ¶ 158. TNW, which acquired the Vectra assets out of the bankruptcy estate, was not willing to continue the SMUD project unless it was assured that it would receive full reimbursement of all project costs. PX 585; Tr. at 921 (Ferreira).[17] SMUD's decision in late 1998 to enter into a new contract with TNW for

[17] One of the problems that Vectra had with the SMUD project was that it was a fixed price contract for a first-of-its-kind design and development project. The fact that Vectra assumed the risk for most cost overruns was one of the reasons Vectra eventually filed for bankruptcy. Tr. at 921 (Ferreira).

completion of the project was compelled by DOE's failure to begin required contractual performance earlier that year. Mr. Redeker explained:

> The fact that they had officially breached at this time, it had an impact in that how long would the fuel be in dry storage. It is going to be a long time. This is the best course of action to mitigate the damage that is now occurring, because the fuel isn't going to be gone when we had expected it to. And the further it went, as I discussed before, what is the uncertainty of when the fuel is finally going to be out.

Tr. at 633-34 (Redeker). Mr. Ferreira similarly testified:

> Court: Why, in your mind, is the government responsible for paying for that, all of your problems with the vendors and the rest of it, why is it that this is their responsibility?
>
> Witness: The Department had a contract to take the fuel.
>
> Court: Right. And they breached it.
>
> Witness: And had the Department taken that fuel, then that would have addressed our risk and liabilities and costs.

*Id.* at 926.

Had DOE been accepting fuel, SMUD would not have entered into a new contract to complete the project with all of its associated risks and uncertainties; SMUD would have taken the more certain, less risky approach and left the fuel in the pool. *See* PFF ¶ 160-62. Again, Plant Manager Steve Redeker testified as follows:

> Q. . . . The first sentence [of PX 570] says, "the question of how much longer should SMUD continue to pursue the dry spent fuel storage option lingers." What is that referring to?
>
> A. Well that question is in quotes. And that's in quotes because those are almost exactly the words that go back and forth between me and the board every time I go make my quarterly report. One of my board members would say: Steve, how long are you going to keep doing this? Why don't we just stop. I mean, this was –

> Court: Stop what?
>
> A. Stop this project and leave the fuel in the pool. This was the ongoing question. This is a troubled project, costs are going up, schedule is moving out. And quite frankly, I was extremely nervous. This was my job and it wasn't working out very well.

Tr. at 628-29 (Redeker).

As costs continued to escalate, SMUD undertook another reevaluation of the dry and wet storage options in late 1999 and early 2000 to decide again whether to stop or modify the dry storage project. *See also* PX 642; PX 672. At that time, SMUD still had not received a transfer cask or any storage canisters, and the project continued to face obstacles and delays. *See* PFF ¶ 163. Because DOE was not projected to pick up all of the spent fuel from Rancho Seco until sometime in the 2020s, this reevaluation indicated that it would be beneficial to continue with the dry storage project. *See also* Tr. at 653 (Redeker) ("the significant factor . . . is how long is the fuel going to be there? At this point, I'm looking at . . . the late 2020s time frame. So DOE is not performing"); Tr. at 930-31 (Ferreira) (Q. And at this time, in January of 2000, what alternatives did SMUD have to continuing with the project? A. Well, again, the alternatives were to suspend or stop the project and just maintain the fuel in wet storage, looking at possibly switching to another vendor, but the risk of moving in that direction, I think, as the Judge indicated earlier, didn't have too many options."). The dispositive point here is that had DOE been accepting fuel under the Standard Contract, then there would have been no reason for SMUD to continue with the dry storage project, as Mr. Redeker and Mr. Ferreira explained; in that "non-breach world," SMUD could have had the certainty of DOE taking away its spent fuel by leaving the fuel in the pool. *See* PFF ¶¶ 164-65.

In 2001, because of the continuing risk, cost, fabrication and delivery issues, SMUD completed yet another reevaluation of alternatives to its dry storage project. *See* PFF ¶¶ 166-67; *see also* PX 689. SMUD concluded that it would be beneficial to complete the current project as other alternatives, including wet storage, presented "significantly greater risks," *id.* at 2, "nothing had significantly changed in the DOE world," Tr. at 668 (Redeker), and the project had made major progress, *id.*

Thus, DOE's actual failure to begin accepting spent fuel in 1998 created ongoing insecurity and uncertainty about when, if ever, DOE would perform its obligations. This breach led SMUD to believe that it would have to continue to store fuel at Rancho Seco until at least the 2020s or later. This breach and the uncertainty it engendered were the direct and proximate cause of SMUD's decisions to restart the dry storage project in 1998 and continue with the dry storage project in 2000 and 2001.

**III. The Damages Incurred By SMUD Were Reasonably Foreseeable.**

In order to recover damages, they must either have been "actually foreseen or reasonably foreseeable" at the time the parties entered the contract. *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2002); *American Capital Corp. v. United States*, No. 95-523C, 2005 WL 1308314, at *79 (Fed. Cl. May 31, 2005). In this case, the damages incurred as a result of the government's breach fit both tests—they were both foreseeable and foreseen.

At the time of Contract formation, and still today, there are no alternative methods of disposing of spent nuclear fuel for a commercial utility. PFF ¶¶ 20-25. The government banned reprocessing of fuel during the Carter administration. PFF ¶ 24; Tr. at 119 (Shetler). Until the government performs its contractual obligations, SMUD will be forced to store its own spent fuel at the Rancho Seco site. The government understood when the NWPA was enacted and the Contract signed that its performance was the only method available to SMUD of disposing of its spent fuel. *See* PFF ¶¶ 28-30. Accordingly, it was directly foreseeable at the time of Contract execution that, in the event that the government delayed disposal of SMUD's spent fuel, SMUD would be forced to continue to store that fuel at considerable expense during the period of the government's delay. *Cf. Home Sav. of Am. v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (concluding that "the regulators undoubtedly would have understood when they promised to allow supervisory goodwill that taking away this inducement would cause [the plaintiff] to re-evaluate its capital ratio and take on replacement capital") (internal quotation and alterations omitted).

The government also understood at Contract formation that continued storage of fuel at a shutdown reactor was costly, and, as a result, expressly included the provision providing for shutdown priority in the Contract, explaining that such provision was "necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." Final Rule, 48 Fed. Reg. 16,590, 16,593 (Apr. 18 1983) (PX 30). In addition, speaking in opposition to an amendment (eventually defeated) to an earlier bill that would have

delayed the siting of the repository by three years, Senator McClure, the chief sponsor of the NWPA, stated:

> [W]e . . . begin to run into the problem that there is not enough room to store all those rods at that site, in the pools that have been constructed, because they were not designed to do that. . . . *They will have to apply some new technologies on that site*, or they simply will have to shut down because they cannot refuel. There is a time urgency, and it can be satisfied.

128 Cong. Rec. 7,974 (daily ed. Apr. 28, 1982) (emphasis added).

Significantly, DOE official Keith Klein specifically recalled that DOE actually foresaw the need to develop "transportable dry storage casks" for use by utilities in the event that DOE failed to perform. Designations Appendix (Dckt. #310) at 1137-38 (K. Klein). Mr. Klein testified at his deposition that he recalled that DOE's plans at the time of Contract formation were that, if there was a delay in the repository, DOE "would take title or—or potentially at the reactor sites and provide dry storage casks. I think we were thinking ideally transportable dry storage casks or—or at least baskets that could be put into a transport cask." *Id.* This testimony is consistent with DOE's public proclamations shortly after the Contract was signed, where DOE assured utilities that it would take responsibility for "additional storage" if the repository was delayed, even if that meant providing for storage "at reactor sites." PX 69, Vol. II at 9-6; *see also* PX 50 (stating that "[i]f by 1994 it is known that the first repository will be delayed, then . . . to be able to accept fuel in 1998" one option is that "DOE will take title to the spent fuel, have it placed in dry storage casks and pay a rental fee to the utility to store the casks onsite at the reactor"); PX 70 at 2 ("In the event of a one to three year lag in the 1998 deadline for a geologic

repository, the Department of Energy is considering taking title to spent fuel at commercial reactor sites and storing it in casks at the sites."); *see generally* PFF ¶¶ 49-51.

Thus, that fuel would have to be stored on-site either in the wet pool or separately in a new technology like dry storage was directly foreseeable and actually foreseen at the time of Contract formation. *See* 42 U.S.C. § 10198(a) (requiring DOE to establish, by January 1984, a demonstration program with utilities "for the *dry storage* of spent nuclear fuel . . . with the objective of establishing one or more technologies that [the NRC] may, by rule, approve for use at the sites of civilian nuclear power reactors."); *see also* 128 Cong. Rec. 27,775 (daily ed. Nov. 29, 1982) (Representative Bereuter) (stating that "[w]aste storage cannot continue in the temporary, unsafe fashion that it has maintained for these decades. We are just courting disaster if we continue to take that course").

In addition, where an avowed purpose of the Standard Contract is to avoid the development of additional on-site storage facilities at reactor sites around the country, *see Commonwealth Edison Co v. United States*, 56 Fed. Cl. 652, 667 (2003); *Indiana Michigan v. United States*, 57 Fed. Cl. 88, 99 (2003); *Tennessee Valley Auth.*, 60 Fed. Cl. at 674 n.10; *see also* 42 U.S.C. § 10131(a)(2) ("A national problem had been created by the accumulation . . . of spent nuclear fuel from nuclear reactors."), it was reasonably foreseeable that DOE's breach of that Contract would lead a utility to incur costs for additional on-site storage, as occurred here. Such damages are the natural and proximate result of the government's breach. *See Hughes Communications*, 271 F.3d at 1066. Judge Lettow recognized this fact in *Tennessee Valley Authority*:

> Notably, "the intent of the NWPA and the parties [to the Standard Contract] was to avoid the construction by utilities of additional at-reactor storage [after January 31, 1998.]" *Commonwealth Edison* [*Co. v. United States*, 56 Fed. Cl. 652, 667 (2003)]. DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, *i.e.*, the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants throughout the United States.

60 Fed. Cl. at 665, 674 n.10; *see also Yankee Atomic*, No. 98-126C, 2004 WL 1535688, at *7 (Fed. Cl. June 28, 2004) (concurring with analysis in *Tennessee Valley Authority*). Recently in *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 183-84 (2005), this Court concluded that it "is a fair inference that failure to implement the Standard Contract might engender a diminution in the value obtained" from the sale of a utility's property, and that such diminution "resulting from DOE's breach of its obligations under the Standard Contract was thus a foreseeable damage." *See also* 11 Corbin On Contracts § 1009 (2002) ("The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach.").

It was reasonably foreseeable at the time of contract execution that a breach by DOE in failing to accept spent fuel would result in the need to store fuel on-site. Given that such damages were foreseeable and foreseen, they should be awarded to SMUD in this case.

**IV. SMUD Has Proven Its Damages With Reasonable Certainty.**

SMUD's damages are properly awarded in this case because they have been proven with reasonable certainty. *See Bluebonnet*, 266 F.3d at 1355 ("Expectation damages are recoverable provided they are . . . proved with reasonable certainty."); RESTATEMENT § 352 ("Damages are

not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.”).

“Certainty is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages.” *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960); *see also Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 572 (Ct. Cl. 1966) (noting “it is not essential that the amount of damages be ascertainable with absolute exactness or mathematical precision”). Thus, if “a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.” *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004) (internal citations omitted); *see also Locke*, 283 F.2d at 524; *Bluebonnet*, 266 F.3d at 1356-57. SMUD had proven the costs it has incurred as a result of the government’s breach with certainty sufficient to enable this Court to make a fair and reasonable approximation of SMUD’s damages, and therefore such damages should be awarded in this case.

SMUD’s damages are based on its actual expenses related to the dry storage project, as recorded in SMUD's accounting system, with appropriate offsets described in § IV.C *infra*. SMUD’s accounting system is based on a work order system, which is used to track both internal and external costs. *See* PFF ¶¶ 169-70. In the case of large projects, like SMUD’s dry storage project, work orders are created and assigned to smaller segments of the project so that these segments can be tracked. *See* PFF ¶ 171. Costs are also assigned to particular cost categories, such as outside services or internal labor, so costs can be summarized by category as well. *See* PFF ¶¶ 175-76. When external invoices or internal costs are charged, those charges are broken

down and assigned within the accounting system to the applicable work order. For its internal labor, SMUD employees record their hours and the appropriate work order to which their time corresponds, and the time is then charged through the system accordingly. *See* PFF ¶¶ 172-74. Thus, total costs can be summarized based on the applicable work order or by a particular cost category. *See* PFF ¶¶ 178-79.

Nineteen work orders were assigned to the various segments of the dry storage project. *See* PFF ¶ 194. The costs of the dry storage project, generated from the accounting system by year and work order, were compiled by SMUD dry storage project manager Jim Field and SMUD supervisor of nuclear records and documents Luana Holst. Tr. at 1045-50, 1054-61 (Field); Tr. at 1231-46 (Holst). The damages in this case were determined based upon review of the electronic detail from the accounting system, the hard copy data, and the backup documentation, including detailed accounting reports, outside contracts, invoices, and timecards. Thus, there is extensive evidence that the costs were actually incurred and correctly attributed to the dry storage project. *See* PFF ¶¶ 195-98.

The certainty of SMUD's damages is proven further by the internal control policies and procedures that exist to insure all of SMUD's costs are timely and accurately recorded. *See* PFF ¶¶ 179-90. Numerous witnesses testified at trial regarding the multiple layers of review undertaken with regard to both internal and external charges. Tr. at 674-77 (Redeker); Tr. at 1046-48 (Field); Tr. at 1234-35 (Holst). Outside invoices—including the supporting documentation such as timesheets, purchase orders, and travel claims—were reviewed by the accounting department to determine the appropriateness of the charges, and any concerns

regarding questionable or unsubstantiated charges were noted. The project manager—for the dry storage project since 1999, Jim Field—then independently reviewed the invoices to ensure all charges were appropriate and properly allocated. *See* PFF ¶¶ 183-84. Any outstanding issues were resolved through the contractor, either through revision of the invoice or denial of charges. *See* PFF ¶ 185. Employee timecards were similarly scrutinized by supervisors and the timekeeping department. The plant manager, Steve Redeker, reviewed a summary of the time for the entire plant on a weekly basis. *See* PFF ¶¶ 180-82. Actual costs were regularly compared to budgeted costs and any deviations were investigated. *See* PFF ¶¶ 186-88. This system ensures that only those costs and employee time specifically attributable to the dry storage project were charged to the appropriate work orders.

Finally, the certainty of SMUD's damages is further ensured based on the extensive review undertaken by SMUD employees, including Jim Field and Luana Holst. *See* PFF ¶¶ 193-98. Furthermore, SMUD's accounting expert, Brian Brinig, "analyze[d] and test[ed] the costs that SMUD incurred," "prepared 53 binders of invoices, timecards, and spreadsheets that provide detail of this analysis," and "reviewed the annual audit reports prepared by SMUD's independent accountants, discussed the accounting system with client personnel, and tested the application of the accounting and internal controls procedures as they relate to cost accumulation for the dry storage project." B. Brinig Written Direct at ¶¶ 2-20 (PX 1000); *see also* PFF ¶¶ 191-92. Based on this extensive testing of SMUD's damages, Mr. Brinig determined that SMUD's costs were incurred and accurately attributed by SMUD's accounting system. B. Brinig Written Direct at ¶¶ 21-25. The government's accounting expert, Stephen Kiraly, also conducted an independent

detailed review of the invoices, time sheets, and accounting data, in both electronic and hard copy form, and similarly confirmed that SMUD incurred its costs as recorded through the accounting system. *See* PFF ¶ 246. Thus, there should be no dispute that these costs were actually expended by SMUD and related to the development and operation of the dry storage system. Tr. at 2796 (statement by government that it is "not challenging the amount that was actually expended by SMUD").

As discussed further below, SMUD has set forth extensive evidence to show the costs claimed are a "fair and reasonable approximation" of the damages it has incurred as a result of the government's breach. *See Locke*, 283 F.2d at 524. Thus, SMUD has proven with reasonable certainty that it has incurred its damages related to the dry storage project.

**A. SMUD's Damages From 1992 Through 1997.**

From 1992 to 1997, SMUD incurred a total of approximately $22.3 million in costs related to the dry storage project. Of these total costs, $12.1 million are attributable to outside services contracts with vendors. Internal labor during this period constituted approximately $3.7 million of SMUD's costs, while $3.4 million of the costs are attributable to materials. *See* PFF ¶¶ 199-206. With respect to the $12.1 in major vendors costs, almost all of those costs are attributable to Vectra at $11.7 million. *See* PFF ¶¶ 203-04.

After subtracting offsets for the gantry crane refurbishments ($667,880) and the fuel inspection ($87,000), discussed further below, SMUD has proven that it has incurred and is entitled to damages of approximately $21.5 million from 1992 to 1997. *See* PFF ¶¶ 200-01, 249-

53, 265-69. The following chart identifies SMUD's damages by category for the period 1992 to 1997:

**Damages for 1992-1997**

| Categories | Amount |
|---|---|
| Outside Services | $12.1 million |
| Labor | $3.7 million |
| Materials | $3.4 million |
| Indirect Labor / Other | $3.1 million |
| Sub-Total | $22.3 million |
| Offset in § IV.C | ($750,000) |
| Total Damages for 1992-1997 | $21.5 million |

**B. SMUD's Damages From 1998 Through 2003.**

From 1998 to 2003, SMUD incurred a total of approximately $56.25 million in costs resulting from the final design, licensing, fabrication, and operation of its on-site dry storage facility. *See* PFF ¶ 212. Of these costs, $42.3 million are attributable to outside services contracts with vendors. *See* PFF ¶¶ 215-29. SMUD labor constitutes $10.1 million and the purchase of materials constitutes $1.1 million of the total costs during this period. *See* PFF ¶¶ 230-32.[18]

Of the $42.3 million in outside vendor costs, TNW, as the primary vendor responsible for designing, licensing, and fabricating the casks and canisters following Vectra's bankruptcy, received the majority of these costs at $25.8 million. *See* PFF ¶¶ 217-18. PCC, which initially

[18] SMUD employees were critical to the successful completion of the project. During this period, SMUD staff extensively reviewed and analyzed the technical work of the contractors, provided substantial oversight of fabrication, assisted with loading and transfer, and provided operations, maintenance, and security for the ISFSI. *See* PFF ¶ 230; PX Dem. 75B-D.

billed through TNW as a subcontractor, but, toward the end of the project, contracted directly with SMUD, received payments totaling $5.5 million. *See* PFF ¶¶ 219-21.

Bigge and Numanco were two contractors during this period that provided additional staff to facilitate the actual transfer of fuel from the wet pool to the ISFSI. Bigge provided contract labor during the loading process for a total of $5.5 million. *See* PFF ¶¶ 222-23. Numanco provided radiation protection technicians to augment SMUD's staff at total cost of $1.5 million. *See* PFF ¶¶ 224-25.

After subtracting offsets for the spent fuel building upgrades ($450,000), onsite drop mitigation costs ($250,000), and loan workout credit ($500,000) discussed further below, SMUD's has proven it has incurred and is entitled to a total of approximately $55.05 million from 1998 to 2003. *See* PFF ¶¶ 212-14, 254-64, 270-77.

The following chart identifies SMUD's damages by category for the period 1998 to 2003:

**Damages for 1998-2003**

| Categories | Amount |
|---|---|
| Outside Services | $42.3 million |
| Labor | $10.1 million |
| Materials | $1.1 million |
| Indirect Labor / Other | $2.75 million |
| Sub-Total | $56.25 million |
| Offset in § IV.C | ($1.2 million) |
| Total Damages for 1998-2003 | $55.05 million |

### C. Offsets To Damages That SMUD Made And Acknowledged Prior To Trial.

SMUD set forth in its Memorandum of Contentions of Fact and Law various offsets to its total damages and agreed to such offsets prior to trial. SMUD's calculation of offsets that likely would have been incurred had DOE performed is as follows:

- Gantry Crane Offset. Rancho Seco originally had a 100-ton hook weight capacity gantry crane that serviced the turbine generator and could handle the transfer of a cask in and out of the spent fuel building. *See* PFF ¶¶ 249-50. In 1994 or 1995, SMUD refurbished the gantry crane and spent $667,880 doing so. Because of the age of the gantry crane, SMUD may have had to refurbish the gantry crane even if DOE had performed as required under the Contract. Thus, SMUD agreed to an offset of these costs. *See* PFF ¶¶ 251-53.

- Spent Fuel Building Upgrade. SMUD also agreed that an offset for spent fuel building upgrades is appropriate. Mr. Field testified that, based on his calculations and personal knowledge, the costs of the necessary building upgrades would have totaled $450,000. *See* PFF ¶¶ 254-64. These costs are appropriately deducted from SMUD's 1998 to 2003 costs, as upgrades to the building continued through this period.

- Fuel Inspection Offset. In order to properly classify the fuel under the Contract and accurately determine the condition of each fuel assembly prior to transfer, SMUD conducted a visual inspection of the fuel while it was still in the pool. *See* PFF ¶¶ 265-67. SMUD incurred $87,000 in labor and materials related to the inspection. *See* PFF ¶¶ 268-69. Because SMUD would have engaged in a fuel inspection had DOE performed under the Contract, SMUD has offset this cost.

- On-Site Drop Mitigation Offset. Rancho Seco was initially designed to accommodate a 100-ton cask and the plant's initial specifications included calculations to withstand the drop of a 100-ton cask. *See* PFF ¶ 270. Because this analysis was done in the early 1970s, however, SMUD engaged in further analysis and added certain drop mitigation limiters prior to fuel transfer to ensure that the site was properly equipped for any possible accidents. *See* PFF ¶ 271. SMUD staff believe that it is reasonably likely that they would have undertaken a similar analysis had DOE performed. SMUD has subtracted the cost of these efforts—$250,000—from SMUD's total damages incurred between 1998 and 2003. *See* PFF ¶¶ 272-73.

- Loan Work-Out Offset. This offset stemmed from the fact that a single $500,000 payment was credited to the wrong work order number. In order to reconcile this

payment, SMUD agreed in its pre-trial Memorandum that an offset of $500,000 is appropriate for the 1998 to 2003 period. *See* PFF ¶¶ 274-77.

- $2 Million Mistake For 1994 Costs Acknowledged By SMUD And Removed From Claim Months Before Trial. After review of backup material for SMUD's claim, SMUD employee Luana Holst discovered an error in the initial damages submission for the year 1994. Ms. Holst immediately informed SMUD's counsel, and SMUD counsel promptly informed government counsel of the mistake prior to Ms. Holst's deposition. *See* PFF ¶¶ 278-82. The government agreed at trial that this issue has been "resolved." Tr. at 1049-50.

SMUD "need only prove its damages with reasonable certainty, not with mathematical precision." *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709 (7th Cir. 1991). Thus, a party can "employ average costs rather than actual costs" when demonstrating its damages. *Id.* In addition, "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002) ("[T]he risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.") (quoting *Mid-America Tablewares Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1366 (7th Cir. 1996)). As noted above, all of the offsets are already subtracted from the total damage numbers in the relevant period.

## V. SMUD's Mitigation Efforts Were Reasonable.

SMUD's mitigation efforts must be judged only by whether they were "fair and reasonable" under the circumstances. *See First Heights Bank, FSB v. United States*, No. 04-5021, -5022, 2005 WL 1962989, at *3-4 (Fed. Cir. Aug. 17, 2005) ("The law requires that the non-breaching party make only 'those efforts that are fair and reasonable under the circumstances.'") (quoting *Home Sav.*, 399 F.3d at 1353). The "guiding principle" is whether, "in the individual circumstances," the party exercised reasonable judgment in its efforts to

mitigate its damages. *Northern Helex Co. v. United States*, 524 F.2d 707, 718 (Ct. Cl. 1975). "The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." *Cuyahoga Metro. Housing Auth. v. United States*, 65 Fed. Cl. 534, 546-47 (2005) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950)).

Both at trial and in its pre-trial memorandum, the government raised a litany of arguments suggesting that SMUD failed to act reasonably in mitigating its damages, including:

(a) that SMUD mismanaged the project so that costs associated with project delays and the bankruptcy of SMUD's vendor should be excluded, *see* Def. Mem. Cont. Law & Fact at 46 (Dckt. # 292);

(b) that SMUD could have left its spent fuel in the wet pool during the entire period of DOE's delay and not incurred damages, *see* Def. Mem. Cont. Law & Fact at 35-37; Tr. at 101;

(c) that SMUD should have purchased a "store-only" system, as well as designed, licensed, and fabricated a "dry transfer" system, *see* Def. Mem. Cont. Law & Fact at 37, 45; Tr. at 95; and finally,

(d) that SMUD should have chosen NAC's dual-purpose cask, rather than the system it did choose, *see* Def. Mem. Cont. Law & Fact at 38-42; Tr. at 93-94.

None of these arguments are supported by the evidence. More importantly, the Federal Circuit recently made clear that the test for mitigation is not whether there were other possible actions to take in response to a breach, but whether the actions actually undertaken were themselves reasonable under the circumstances. *See First Heights Bank*, 2005 WL 1962989, at *5 (noting that "the government's argument addresses only the possibility of mitigation, not the

reasonability of the actions actually taken"). The evidence at trial demonstrates that SMUD acted reasonably and responsibly in its decisions to pursue a dual-purpose dry storage system and in overseeing the development of that project.

### A. SMUD's Management Of The Dry Storage Project Was Commercially Reasonable.

The evidence in this case demonstrates that development of a dual-purpose dry storage system was complex, time-consuming, costly, and involved extensive oversight by the NRC. *See* PFF ¶¶ 288-321. The evidence also demonstrates that SMUD carefully managed the project, reevaluated its options throughout, always sought to control costs, and placed a premium on completing the project safely and properly. *See*, *e.g.*, PFF ¶¶ 322-28. These were the actions of a prudent and reasonable utility trying to make the best of a very difficult project undertaken as a result of the government's delay in performance. *See* Tr. at 925 (Ferreira) ("It was difficult, it was probably one of the most difficult contract situations I've been into, and a first of a kind, trying to move the bar in terms of technology.").

It is true that the costs increased significantly from Pacific Nuclear's original bid in 1992, but that fact cannot be attributed to any type of mismanagement by SMUD. Pacific Nuclear's original cost and schedule estimates were based on the assumption that the majority of the design work was already completed because Pacific Nuclear already had a licensed "storage-only" canister and a licensed "transport-only" cask that it believed it could convert to a dual-purpose system (storage *and* transport) with modest technical changes. *See* Tr. at 537-39 (Redeker); Tr. at 986 (Field); *see also* PFF ¶ 92. This turned out to be wrong and the original cost and schedule

estimates were modified repeatedly after the project began as the complexity and scope increased. *See* PFF ¶¶ 289-91.

Seven rounds of NRC comments and questions led to significant changes to the canister and cask designs on many occasions. The design changes resulted in significant additional expense and complexity to the project and NRC review often delayed the schedule. *See, e.g.*, Tr. at 575-76 (Redeker) (describing NRC's "intrusive oversight or tougher design reviews of the cask and canister design" and explaining that such actions "made it more costly and more delays associated with it. It made it more difficult."); *id.* at 546 (Redeker) (explaining that the NRC's drop testing requirement "took [the project] from a system that would have been relatively easy to manufacture to a system that became very difficult to manufacture"); *id.* at 990-92 (Field) (describing the NRC-required change from 8 to 26 spacer disks for the canister design and explaining that this required a lot more effort for SMUD and created significant fabrication difficulties); *id.* at 993-94 (Field) (describing the NRC-required change to the standard for structural integrity of cask and effect on type of steel required); *see also* PX 421; PX 423; PX 426; PX 436; PX 464 at 51-52; PX 497; E. Supko Written Direct at ¶¶ 126-140 (PX 1002). In the end, from 1992 to 1997, SMUD implemented 11 different change orders to the Pacific Nuclear/ Vectra contract. PX 267; PFF ¶ 294. For each proposed contract change, SMUD staff had to justify the change and seek management approval. Throughout the project, SMUD kept a careful watch on the vendors and shared significant information with DOE officials through the Cooperative Agreement meetings, monthly reports, and financial reports. *See* PFF ¶¶ 295-96, 315, 320, 322.

In early 1996, the NRC determined that there were substantial quality assurance issues with Vectra. PFF ¶ 293. In response, SMUD, together with the other utility members of the NUHOMS Owners Group, started an extensive audit of Vectra's design and engineering work to insure compliance with NRC regulations and guidance. Tr. at 1003-04 (Field); PFF ¶¶ 293, 300. These again were the actions of a reasonable and prudent utility under the circumstances. In addition, Vectra's problems led SMUD to carefully reevaluate and reconsider all of its interim storage options in late 1996 and early 1997. The NRC forced Vectra to stop work on all of its dry storage projects because of concerns with quality control in early 1997. PX 509; PX 511; PFF ¶ 297. Because of the financial drain of NRC's stop work order and the fixed cost nature of the SMUD contract, Vectra filed for bankruptcy in late 1997. *See* PFF ¶ 301; Tr. at 997 (Field). As a result of the years of design and licensing problems, little tangible progress had been made on the project at that point. PFF ¶ 299.

SMUD's difficulty with its vendor, however, was not unusual. Other utilities had similar, if not more severe, problems with their dry storage projects and vendors. *E.g.*, PX 444 at 9613, 9669, 9672; PX 539; PX 705; PFF ¶ 102. Mr. Redeker explained at trial:

> There were other dry fuel storage projects that were having significant issues with licensing. . . . Trojan and Dresden and two other nuclear plants that were considering dry storage [had received] over 100 questions from the NRC on their applications. So what we were doing and what we were experiencing was not at all different than what was happening with all the utilities that were working kind of in parallel with us on dry – transportable dry storage systems. . . . So there were significant issues in the dry storage arena. What we had originally anticipated to be take the fuel, put it in the steel can and put it out in the backyard in concrete, it was not that. It was a lot more complicated and more difficult than anyone anticipated, even the Nuclear Regulatory Commission. . . . So there was a very strong, very tight heightening

> of awareness and oversight by the Nuclear Regulatory Commission on this. And rightfully so. We were not different than anybody else here.

Tr. at 578-79; *see also* E. Supko Written Direct at ¶¶ 19, 124, 126-45 (PX 1002) (discussing effect of NRC regulatory changes in delaying dry storage projects generally and comparing SMUD's dry storage project costs to those at other shutdown utilities); PFF ¶ 334 (noting that DOE's own cost estimates for the vendor costs for a dry storage project of SMUD's size would equal approximately $33 million and that SMUD spent approximately $35 million for the casks, canisters, and ISFSI after the bankruptcy of its vendor).

After signing the new contract with TNW for resumption of the project in late 1998, SMUD continued to closely monitor the design and fabrication work, sought to keep costs contained as much as possible, and worked to insure compliance with the NRC's increasingly tight regulation of dry storage projects. *See* PX 607 at 9904; DX 954, 979; Tr. at 636-38, 647-50 (Redeker); PFF ¶¶ 313, 318, 319. Mr. Ferreira, the Assistant General Manager at the time, explained his efforts as follows:

> I spent a lot of time pressing Steve Redeker in terms of managing the cost. I did participate in several meetings with Transnuclear and the cask and canister manufacturers. I visited both sites' manufacturing facilities for the program, continued to impress upon the manufacturing companies the concerns that I had of maintaining the cost. It was difficult having to continue to go back to the board and ask for cost, cost increases under the contract, and that we weren't successful in showing significant, substantive process, that in fact it could jeopardize our ability to continue with the program.

Tr. at 921-22; *see also* Tr. at 964-65 (Field). SMUD also audited TNW to insure that it was not overcharging SMUD on the project. DX 1003; Tr. at 662-63 (Redeker). Throughout the final fabrication process, the SMUD project manager, Jim Field, and his staff continued to closely

monitor and oversee the completion of the project. DX 976, 1066, 1190, 1065, 1131, 1136, 1213; *see also* Tr. at 964-66, 1007-25 (Field); PFF ¶¶ 313, 318, 319.

In addition, SMUD and its contractors engaged in substantial training during the period 1999 to 2001 in order to properly prepare for the transfer of fuel to the ISFSI. *See* PFF ¶ 324. By engaging in training and test runs prior to the actual transfer, SMUD was able to locate and address problems with the equipment and procedures in time to correct them. *See* PFF ¶ 325. The success of this approach is proven by SMUD's smooth transfer of fuel from the pool to the ISFSI without incident. *See* PFF ¶¶ 326-27; Tr. at 641 (Redeker).[19]

### B. Leaving Its Fuel In The Wet Pool Would Have Caused SMUD Significant Damages.

In the face of the government's breach of contract, SMUD could have continued storing its fuel in the wet pool and incurred even greater damages in the form of the long-term cost to operate and maintain the pool during DOE's minimum 12- to 14-year delay in performance. In fact, SMUD reconsidered leaving its fuel in the wet pool with nearly every significant contract change, price increase, and reevaluation. *See* PFF ¶ 336. SMUD Plant Manager, Steve Redeker, explained the decision to agree to a 1996 contract change order:

> Well, our choice was at this point we either extend the contract or cancel the project. And canceling the project meant leaving the

[19] Other utilities have had various incidents during their fuel transfers, resulting in risks to the public, additional time, and expense. *See, e.g.*, "Transtor Coating Problem Prompts PGE To Halt Cask Loading at Trojan" (Aug. 9, 1999) (PX 619) (noting cask began dissolving in borated water during initial load); PX 705 (describing Trojan's switch of vendors); Tr. at 988-89 (Field) (explaining that the Trojan plant had to abandon its dry storage vendor in the midst of loading and start again with a new vendor and new design); *see* PFF ¶ 327. Such incidents provide further evidence that SMUD properly and reasonably managed the project.

> fuel in the spent fuel pool or starting off on another dry fuel storage project.
>
> And by the end of 1996, it was clear, as we previously looked at, DOE said they didn't have a statutory obligation to start taking the fuel. I was thinking that 2010 was in serious jeopardy and it would probably be, you know, later than that. And stopping the project at this point would just leave us stranded with our fuel in the pool for much longer than we should have had DOE come to take the fuel, so extending the project at this point made sense for the long-term reasons I outlined.

Tr. at 573-74.

SMUD did indeed continue to store fuel in the wet pool from shutdown in 1989 (and before) through 2002 (costs for which are not included in SMUD's damage claim), and fuel could have remained in the pool for another 20 years. Two shutdown facilities (one a former power plant, and the other a former reprocessing plant) have continued to store fuel in their pools and will incur the higher operating and maintenance costs until eventual DOE acceptance.[20] PFF ¶ 335.

The government's ongoing breach and delay (already at more than 7 years) causes a corresponding delay in every utility's acceptance. *See Consumers Energy Co.*, 65 Fed. Cl. at

---

[20] One explanation for why these two facilities opted to remain in wet storage is that they have very large quantities of spent fuel, relative to SMUD and most other shutdown utilities, and would have had to purchase significantly more casks and canisters. The quantity of spent fuel determines the number of dry casks and canisters that a utility must purchase for a dry storage system. Development of a dry storage system has both a fixed and variable component. *See* E. Supko Written Direct at ¶ 125 (PX 1002). The costs for the actual ISFSI pad, fencing, security, and road are largely fixed, while the number of casks, canisters, and storage modules depends on the amount of fuel. *Id.* For example, the GE Morris facility, which has approximately 700 metric tons of spent fuel to be stored, would have to purchase more than 3 times the number of casks or canisters that SMUD purchased. *See* I. Stuart Written Direct at ¶ 22 (PX 1001).

364, 375 (holding that "any delay in the start of DOE's SNF acceptance as of January 31, 1998, negatively implicated the acceptance dates of every contract holder down the line"); *System Fuels, Inc. v. United States*, No. 03-2642C, 2005 WL 1804314, slip op. at 16 n.12 (Fed. Cl. July 29, 2005) ("DOE's suggestion that it might accelerate acceptance immediately after it commences performance is unconvincing, in light of DOE's inability to complete a storage facility after more than 15 years of planning and commencement of construction."). Had SMUD simply left its fuel in the pool, the 7½ years of additional wet storage costs (using an estimate of $7.5 million per year for operating and maintaining a stand-alone pool) would equate to at least $56 million in damages, 12 years of additional wet storage costs would equate to at least $90 million, and 14 years of additional wet storage costs would equate to at least $105 million, with the potential that all of these figures could have been higher because of the heightened and changing security requirements for pool storage of nuclear waste.[21]

There can be little doubt that, had SMUD simply left its spent fuel in the wet pool during the entirety of DOE's delay and sought as damages all of the associated operating and maintenance costs resulting from the delay, the government would argue that SMUD failed to reasonably mitigate its damages. It would point to the dozens of utilities that have implemented or are implementing dry storage, *see, e.g.*, PX Dem. 38, and claim that SMUD failed to act as a reasonably prudent utility under the circumstances. DOE would, no doubt, also point to the

[21] SMUD recognizes that there were a number of cost estimates made at different times for the annual operations of a wet pool at Rancho Seco. *See* PFF ¶ 341. SMUD has used the $7.5 million estimate here simply to illustrate that it would have had very significant damages had it left its spent fuel in the wet pool during the entirety of DOE's delay.

undisputed fact that the costs to operate and maintain a wet pool are significantly more than the costs to operate and maintain a dry storage facility and claim that the government cannot be responsible for the higher wet storage costs during its delay.[22] PFF ¶ 344-49.

Now that SMUD has reasonably mitigated its losses by going to dry storage, however, the government has taken the opposite approach, second-guessing SMUD and hypothesizing that maintaining wet storage may been the better option. In actual fact, SMUD did what a prudent utility would do under the circumstances: it evaluated and reevaluated its options numerous times, sought to control costs, and implemented a dual-purpose dry storage system, similar to nearly every other utility, that will save significant costs during the government's delay. PX 357 at 2-3 (NRC describing the "substantial delay" in the repository program and concluding that it "increasingly views dry storage as the preferred method of interim storage of spent fuel for plants in permanent shutdown, as well as for supplementary storage in many operating plants"); PFF ¶ 351. SMUD's actions were fair and reasonable under the circumstances.

### C. The Government's "Dry Transfer" And "Store-Only" Arguments Are Unsupported.

In deciding how to store its fuel during the government's delay in performance, SMUD had only two realistic options: keeping the fuel in the pool or transferring the fuel to dual-purpose dry storage. SMUD's decision to pursue a dual-purpose dry storage system was fair and reasonable under the circumstances. Notably, every shutdown nuclear power plant that has

---

[22] Notably, SMUD's total damages for 2003—which consisted almost entirely of dry storage O&M costs—were only approximately $700,000. If the government's delay continues, these greatly reduced costs will be to the government's benefit.

developed dry storage has chosen to utilize "dual-purpose" systems, including Big Rock Point, Dresden 1, Haddam Neck, Maine Yankee, San Onofre 1, Trojan, and Yankee Rowe. *See* E. Supko Written Direct at ¶ 122 (PX 1002); PFF ¶¶ 352-55. Moreover, even the operating nuclear plants that are utilizing dry storage systems either chose dual-purpose systems at the outset or are now transitioning from store-only to dual-purpose systems. *Id.* at ¶ 112 & Table 9 (further noting that dry storage vendors no longer even market storage-only designs in the United States); *see also* I. Stuart Written Direct at ¶¶ 17-18 (PX 1001). This evidence, on its own, demonstrates what a "reasonable person, acting in light of the known facts and circumstances" actually did, and should resolve the government's "store-only" arguments. *Koby v. United States*, 53 Fed. Cl. 493, 496-97 (2002) (explaining that the relevant question in evaluating mitigation is "whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages"); *see also First Heights Bank*, 2005 WL 1962989, at *3-5 (holding that the issue for mitigation is "the reasonability of the actions actually taken").

Furthermore, if SMUD had used a store-only system, it would have needed to maintain its wet pool in an operational status for the entire time of DOE's delay in order to handle the eventual transfer of the fuel to a transportable container. PFF ¶ 361. Maintaining the wet pool, in addition to paying for dry storage, would have created even higher damages because of the significant operating and maintenance expenses for the pool during DOE's delay. *See supra* § V.B; *see also* E. Supko Written Direct at ¶¶ 113, 120-21 (PX 1002); PFF ¶¶ 340, 362. In addition, if SMUD had utilized a store-only system, it would have resulted in spent fuel having

to be handled and moved multiple times, including: (1) transfer of the spent fuel from the wet pool into the storage-only system for at-reactor storage in an ISFSI; (2) return of the spent fuel from the storage-only system to the wet pool for subsequent loading to DOE; and (3) loading of the spent fuel into a DOE transportation cask for shipment off-site. Each of these fuel and cask handling activities would result in increasing the radiation exposure to workers as well as increasing the risk associated with handling fuel assemblies and spent fuel casks. *See* E. Supko Written Direct at ¶ 119; PFF ¶¶ 357-58. Minimizing spent fuel handling results in safety benefits as well as cost savings because of the risks associated with handling spent fuel. PFF ¶ 359.

If SMUD had a store-only dry storage system, the only alternative to maintaining the wet pool would be for SMUD to design, seek a NRC license for, and attempt to fabricate a “dry transfer” system that does not presently exist. PFF ¶ 364. The government’s suggestion at trial that a “dry transfer” system was a viable option for a commercial utility is again contradicted by the evidence. To date, no “dry transfer” system has even been “hot tested” with actual spent nuclear fuel in the United States, let alone licensed by the NRC or used by a commercial utility or DOE. *See* Tr. at 2293, 2296-97 (Williams); PFF ¶¶ 365, 370. Thus, an effort to develop such a system would be more risky than the dry storage project that SMUD, and many other utilities, actually undertook. PFF ¶¶ 366, 371-72.

DOE itself has made only a tentative step toward the design of a “dry transfer” system by submitting a Topical Safety Analysis Report to the NRC. Tr. at 2280 (Williams). In response to DOE’s submission, however, the NRC noted the “inherent limitations such as no site-specific parameters, limited to one B&W fuel assembly design, no damaged fuel handling capabilities

and limitations on the types of transfer casks and receiver casks that can be used," and concluded that "there was not enough information provided to allow a user to implement the DTS [Dry Transfer System] without a significant supplemental application." DX 1095 at vi; *accord id.* at App. A (listing some 200 items of additional information that would be required). Moreover, the costs to develop a "dry transfer" system would be substantial, the development would be financially risky, and NRC approval would not be guaranteed. *See* I. Stuart Written Direct at ¶ 21 (PX 1001). SMUD was not required to be the only utility to subject itself to such undue risk in seeking to mitigate its damages. *See Cuyahoga Metro.*, 65 Fed. Cl. at 547 (holding that efforts to secure substitute performance "need not be entered into if they would expose the party to undue risk or significantly compromise its interests") (citing RESTATEMENT, § 350 cmts. c & g) .

SMUD's decision not to procure and utilize a store-only dry storage system during the long period of DOE's delay in performance was commercially reasonable.

### D. The Government's "NAC" Argument Is Unsupported.

Both in 1992 and during subsequent reevaluations of the dry storage project, SMUD considered several different vendors of dry storage technologies. PFF ¶ 374. Each time, SMUD thoroughly evaluated its options, made presentations to its Board of Directors, and sought to make the best decision based on all of the facts it had at the time. The evidence demonstrates that SMUD's decision not to procure the dual-purpose cask being designed by NAC was fair, reasonable, technically sound, and, even in hindsight, the correct decision to make. PFF ¶¶ 375-88. Moreover, even if the NAC cask *had* been a reasonable option, "the person whose wrong

forced the choice can not complain that one rather than the other was chosen." *Home Sav.*, 57 Fed. Cl. at 729 (internal quotation omitted)

When SMUD initially considered its storage options in 1991 and 1992, it considered, among other options, a possible dual-purpose cask that was under development by NAC called the NAC STC cask. *See* PFF ¶ 374; *see also* PX 991; Tr. at 201-03 (Shetler).[23] Although the NRC review process for the NAC STC cask design was underway and at a more advanced stage than the then-Pacific Nuclear design, NAC did not have a storage or transportation license from the NRC at that time. *See* PFF ¶ 380. Moreover, NAC's $38 million bid to SMUD in 1991 did not include any of the costs that SMUD would have for the project and was more than triple the proposal from Pacific Nuclear at the time. *See* PFF ¶ 377. While the actual Pacific Nuclear (and then Vectra and TNW) costs increased significantly, it was the opinion of Mr. Stuart, who was then NAC's Senior Vice President of Engineering and Design Services, that, had NAC won the bid, it was "very likely" that the $38 million NAC cost also would have increased as a result of fabrication issues like those faced by Pacific Nuclear, Vectra, and TNW. Tr. at 1446 (Stuart).[24]

In addition to the significantly higher bid proposal cost, the dimensions of the NAC cask design did not fit SMUD's fuel length and would have required significant modifications in order to be used by SMUD. *See* PFF ¶ 381; Tr. at 197-98, 203 (Shetler); Tr. at 608-10 (Redeker). This

[23] SMUD again considered the NAC STC cask when it comprehensively reevaluated its storage options in late 1996 and early 1997. *See* PX 519 at 16; Tr. at 609-10 (Redeker).

[24] It is worth noting that the total costs paid to Pacific Nuclear, Vectra, TNW, and PCC, for the design, licensing, and fabrication of the casks and canisters for SMUD's project was approximately $43 million, not far from NAC's original 1992 proposal of $38 million. PFF ¶¶ 204, 218, 221.

could have created additional licensing risk for SMUD with the NRC and led to further delays and cost increases. Because of its cost, and because it was a dual-purpose *cask*, rather than a *canister*-based system, the NAC cask became the "white elephant" of the industry. PFF ¶¶ 386-87. No U.S. utility ever purchased it, and it was never fabricated. *See* Tr. at 609-10 (Redeker).

Indeed, shortly after NAC received its license from the NRC, NAC abandoned the NAC STC cask design altogether. Tr. at 1431-32, 1438 (Stuart). Instead, NAC decided to develop a *canister*-based dry storage system, similar to SMUD's system, because "the impression was very, very clear to the industry that DOE would use that concept as the acceptable package for picking up spent fuel." Tr. at 1435 (Stuart); *see also* PFF ¶ 384. All of the other dry storage vendors, including NAC, turned to the canister-based systems because of the actions and encouragement of DOE. Tr. at 1437-38 (Stuart).

Mr. Stuart, who had attempted to sell the NAC cask to SMUD in 1992, explained that SMUD's decision to pursue a canister-based dual-purpose system

> was a very prudent decision on their part. And in fact, as time went by, I feel their decision was validated more and more with time because of what the Department of Energy was doing, namely adopting a dual-purpose canister system, and what the cask vendors such as NAC [were] doing, and because more and more utilities were opting to purchase dual-purpose systems.

Tr. at 1430.

SMUD behaved in a commercially reasonable fashion in declining to choose the "white elephant" of the industry, and its decision has been proven correct over time. PFF ¶ 388.

## VI. Potential Offsets Raised At Trial.

SMUD has proven its damages with reasonable certainty and therefore such damages should be awarded by this Court. The evidence does not support the remaining offsets asserted by the government at trial.

### A. Wet To Dry Savings For 2003.

Because the spent nuclear fuel pool requires extensive labor and support systems, it is expensive to maintain. *See* PFF ¶¶ 389-90. Dry storage, on the other hand, is a passive system, requiring less system support and fewer personnel for oversight, monitoring, and security. *See* PFF ¶ 391; *see also* Tr. at 523 (Redeker) ("You monitor to see if it is behaving properly but there are no active systems as opposed to the pool that has pumps and valves and ventilation and all those kinds of things."). Thus, there is a significant savings in annual operating costs between wet and dry storage. PFF ¶¶ 392-95. In order to reduce these costs during the government's extended delay, SMUD decided to transfer its fuel to dry storage.[25]

SMUD finished loading its fuel into the ISFSI in August 2002. *See* PFF ¶ 399. Following the final transfer of fuel, SMUD engaged in a period during which the systems associated with the spent fuel pool were shut down and staffing was reduced. *See* PFF ¶ 400. SMUD was then able to determine the actual savings realized from dry storage. The majority of these savings resulted from staffing costs. In order to ascertain the amount, Jim Field

---

[25] Although SMUD estimated various different cost savings throughout its pursuit of the project, *see* PFF ¶ 138, such estimates were particularly difficult given that the costs of dry storage were unknown and the exact costs associated with the maintenance of the pool were not separately tracked. PFF ¶ 341-43.

> went through the organization and looked at who we had laid off, what positions we had eliminated following achieving dry storage condition, and [he] interviewed several other superintendents at the site to be clear on the staffing reductions they had made, and whether they had been associated with maintaining the fuel in the pools, as opposed to dry.

Tr. at 972-73 (Field). This study indicated that thirty positions were eliminated, resulting in annual labor savings of $4,146,360. *See* PFF ¶ 394; *see also* PX Dem. 76. The closure of the spent nuclear fuel pool also has resulted in savings in materials and electrical consumption, totaling $50,000. *See* PFF ¶ 395. Thus the total annual savings in operating and maintenance costs between wet and dry storage is $4,196,360. *See* PFF ¶¶ 394-95.

SMUD began to see such savings gradually, as labor and material costs were reduced as the pool was shutdown, post-transfer work was completed, and staff eliminated. *See* PFF ¶¶ 400-01. SMUD did not begin to realize the monetary benefits of the transfer of fuel from wet to dry until 2003. *See* PFF ¶ 402. Given the possibility of exchanges, shutdown priority, and campaigns, had DOE begun accepting spent fuel in 1998, SMUD could have had its fuel removed by 2003. *See* PX 44, Arts. V.E., VI.B.1.b.; I. Stuart Written Direct at ¶¶ 32-40 (PX 1001); E. Supko Written Direct at ¶¶ 47, 107-109, 152 (PX 1002); PFF ¶¶ 556-71. Thus, SMUD has not deducted the cost savings it accrued in 2003 from transferring the fuel to dry storage. If this Court concludes that SMUD would not have had all of its fuel removed prior to 2003, however, a deduction of $4,196,360 for 2003 would be appropriate.

### B. Costs Of Loading And Transfer Of Fuel To Dry Storage.

SMUD's proven costs include the costs of loading the fuel into the dual-purpose canisters and transferring the canisters to the ISFSI. The loading and transfer costs include approximately

$5.5 million paid to Bigge, which provided the fuel transfer teams. *See* PFF ¶ 409. These costs should be awarded to SMUD, as SMUD would not have incurred these costs had the government performed as required under the Contract.

While the Contract provides that SMUD "shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility," PX 44, Art. IV.A.2, this provision is inapplicable to SMUD's transfer of its fuel to dry storage. This provision provides that *upon DOE's performance*, SMUD will have to arrange for and provide the necessary activities for transfer and subsequent transportation by DOE. *Id.* DOE has not yet performed, however, and when it does, SMUD will still have to pay the costs of providing "all preparation, packaging, required inspections, and loading activities" for transportation to a DOE facility. Thus, SMUD's loading, transport, and unloading of the spent nuclear fuel at the ISFSI constitute activities *in addition to* SMUD's obligations under the Contract. *See* PFF ¶¶ 403-05.[26] Because SMUD has incurred the expense in loading and transferring the fuel to the ISFSI in mitigation of the government's breach and in addition to the future loading costs that it will bear under the Contract when DOE performs, SMUD is entitled to recover the ISFSI loading costs as part of its damages.

---

[26] In addition, the process of loading SMUD's dry storage canisters, which had to be seal-welded shut using special equipment, filled with helium, and placed inside a bolted-lid transportation cask, was both different from and more difficult than loading fuel directly into a bolted-lid DOE transportation cask would have been. *See* PFF ¶¶ 406-08.

### C. Labor Costs And Labor Burden.

In calculating its damages, SMUD has included those employee labor hours billed directly to the dry storage project. From 1998 to 2003, the labor costs totaled $10,074,941 and for 1992 to 1997 the labor costs totaled $3,737,099. *See* PFF ¶¶ 205, 231. These employee hours were spent mitigating the government's breach and thus are properly awarded in this case.

SMUD incurred nearly $15 million in labor costs during the life of the project because of the intrusive oversight required by the NRC and the complicated nature of the project. Jim Field testified that the NRC

> gave us a very strong message that they expected what they called intensive oversight of our vendors, and that was a very strong message. They wanted us in there very deeply, very actively in everything that was going on.

Tr. at 965-66 (Field). As a result:

> We've had a lot of oversight of the project. We had engineers that were reviewing all the technical work that was being done by Vectra, PCC, Transnuclear, from an engineering viewpoint, reviewing design drawings, calculations, reports, license documents. And then we, we also were heavily involved in the fabrication, and we had an engineer, a quality assurance engineer that was full-time in PCC's shop during this course of fabrication. We had quality engineers that would go to various contractors, primarily Vectra and PCC, and do periodic audits, where they may audit them for several weeks, but were not there full-time. Engineers would go with them and assist them in evaluating technical work. We also had a resident expediter at PCC to expedite fabrication.

Tr. at 964-65 (Field); *see also id.* at 966-67 & PX Dem. 75A-D (SMUD had to review and approve 3,000 to 4,000 drawings, calculations, and documents related to cask and canister design); *see also* PFF ¶ 230.

SMUD employees record their hours and the appropriate work order number to which their time is devoted. This time is then charged to the appropriate work order through the accounting system. *See* PFF ¶¶ 174, 413. Because SMUD has only included those costs associated with the work orders for SMUD's dry storage project, only those employee hours specifically spent on the dry storage project are included in SMUD's costs. *See* PFF ¶¶ 411-413. Based on SMUD's system of charging labor, these direct labor costs are, by their nature, incremental to the dry storage project. Tr. at 1324 (Brinig) ("by virtue of the fact that they charged it to the job, it is incremental").

There is no basis for deducting the hours for employees who billed less than half of their time to the dry storage project, as the government's expert, Stephen Kiraly, asserts. Mr. Kiraly's argument is based on the assertion that these employees would not have been contributing in any productive way to SMUD if they had not been spending time on the dry storage project. Tr. at 2741 (Kiraly) (noting employee may have been "idle" during these periods). There is no basis for such a conclusion in fact or law.

There is extensive evidence that SMUD is an efficient company that maximizes its employees' time and eliminates positions whenever possible. *See* PFF ¶ 414. Mr. Redeker testified that since he became Plant Manager in 1993, the Rancho Seco labor force has decreased from about 150 to about 80. Tr. at 677-78 (Redeker); PFF ¶¶ 417-26. As Mr. Redeker explained, "We look for, and I drive my staff to look for every opportunity to combine work forces, to combine jobs, to be more efficient. . . . There is continuing pressure to reduce staff at Rancho Seco." Tr. at 678-79 (Redeker); *accord* Tr. at 953 (Field). Numerous exhibits support

this testimony. *See, e.g.*, PX 838 at 4 (1992 Rancho Seco budget indicating that staff would decrease from 397 to 186 between 1990 and 1992); PX 274 at 10 (1993 Rancho Seco budget indicating that staff would decrease from 224 to 163 between 1991 and 1993); PX 505 at 1603 (1997 Rancho Seco budget indicating that full-time staff would decrease from 142 to 128 between 1995 and 1997); PX 1172 (2001 Redeker e-mail directing staff to "[t]hink out of the box, be aggressive, recommend the hard things" to reduce staff and increase efficiency).[27]

Furthermore, the government's approach has been refuted by SMUD's expert, Brian Brinig, and rejected by the courts. Mr. Brinig opined that "[i]t is not reasonable to assume that the employee, were he not working on the project in question, would be unproductive and not performing valuable tasks for the employer. Consequently, the employer suffers a loss when the employee directly works on the project." B. Brinig Written Direct at ¶ 27.a.ii.1. (PX 1000); *see also* Tr. at 1322-24 (Brinig); PFF ¶ 415.

Numerous appellate courts have agreed with Mr. Brinig. For example, in *Freeport Sulphur Co.v. S/S Hermosa*, 526 F.2d 300 (5th Cir. 1976), the defendant asserted plaintiff could not recover the work of its own salaried engineers and draftsmen on the ground that no incremental cost or expense was incurred by plaintiff for their work. In affirming the lower court's award of labor costs, the Fifth Circuit stated:

---

[27] Furthermore, the government is essentially proposing that the time for 240 of the 256 employees, or ninety-four percent of the total employees who charged labor to the dry storage project, should be deducted. The government has presented no support for the proposition that 16 employees working part time, or four full-time employees, could have completed a project of this magnitude. The government also has failed to produce any evidence that the labor hours charged were not appropriate for a project of this magnitude.

> Freeport has arranged with an independent engineering concern to be furnished supplemental personnel when its own salaried engineering staff is overworked. Because Freeport found it unnecessary to tap this outside [firm] during the period of the engineering work on the dock, Pansuiza contends that, were it not for the dock work, Freeport's engineers would have been idle or engaged in essentially nonproductive work. Pansuiza argues, therefore, that the engineering work was performed without any additional expense or overhead. We reject this argument as being wholly based on speculation. It is at least as plausible that there were other Freeport projects that would have been worked on by Freeport's internal engineers, but were not of such an emergency nature that they required the immediate employment of the outside firm.

*Id.* at 303.

Similarly, in *United States v. The John R. Williams*, 144 F.2d 451, 452-53 (2d Cir. 1944), the court awarded damages to the government based on its in-house costs incurred in repairing a submarine cable with its own repair vessel. The court rejected the defendant's argument that the costs should be denied, stating

> The [defendant] contends that . . . these expenses during the period of the repair work were a necessary cost of maintaining a vessel which it regularly kept for repairing cables. The [defendant] showed that the repairing of the cable . . . did not prevent the use of the vessel for other repair work and, therefore, added nothing to the [government's] necessary outlay. But, if the government had not maintained such a vessel it would have had to employ an outside contractor to make the repairs. We can see no reason why the [defendant], who caused the damage to the government's cable, should not pay the expense of the repairs while they are being made.

*Id.*[28] Thus, the facts and law support the award of SMUD's claimed labor in this case.

---

[28] *See also Dunn Appraisal Co. v. Honeywell Information Sys. Inc.*, 687 F.2d 877, 884 (6th Cir. 1982) (affirming award of damages for management time spent on resolving problems with defective computer system because loss of time deprived plaintiff of services it paid for); *Convoy*

Footnote continued on next page

Employee labor is also "loaded" or "burdened" as it is charged in the accounting system to reflect the cost of employer-provided benefits and the overhead attributable to those hours. PFF ¶¶ 428-35. The government has challenged a total of $2,497,724 of labor burden associated with the costs of personal computers, software, phones, human resources, and licenses. *See* S. Kiraly Written Direct at ¶¶ 19-20 and Att. 2 (calculating that the overhead burden during FMIS period (1992-Oct. 1999) was $564,974 and was $1,932,750 during the SAP period (Nov. 1999-Dec. 2003); Tr. at 2274-79 (Kiraly). Again, the facts and law support an award of SMUD's indirect labor burden costs in this case.

SMUD employees testified that such overhead costs are incremental at Rancho Seco. *See* PFF ¶ 436. As Mr. Redeker testified, through the accounting system, the project is "charged for every telephone, every computer monitor, every beeper that we have. . . . So when somebody goes, we find his beeper, his telephone, everything and get rid of it because we don't want to pay for it." Tr. at 681 (Redeker). Furthermore, only the overhead burdening related to the hours worked on the dry storage project have been included in SMUD's claim. Such overhead is recoverable in this case. *See Freeport Sulphur Co.*, 526 F.2d at 304 (noting the "costs of repairs incurred internally by the injured party, including overhead," are recoverable).

---

Footnote continued from previous page

*Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785-86 (9th Cir. 1982) (awarding cost of hours supervisor spent to remedy unsatisfactory computer system because "[t]he issue is not whether [the plaintiff] would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived [the plaintiff] of the services it paid for").

**D. Decommissioning Costs.**

SMUD has not realized any decommissioning savings as a result of the government's breach and delay in performance of at least twelve years in the disposal of SMUD's fuel. In fact, SMUD's decommissioning costs will increase because of the need to decommission the ISFSI site and pad. Thus, there is no support for the government's assertion that its breach has resulted in a savings to SMUD.

Regardless of when various aspects of decommissioning are completed, SMUD has to complete the same activities and incur the same costs. *See* PFF ¶ 459. The reduced costs from the closure of the spent fuel pool (stemming from terminating employees) are already reflected in the difference between wet and dry storage costs discussed above. The transfer of spent nuclear fuel to the ISFSI has not accelerated the final decommissioning of the plant because that requires that all fuel is removed from the site. *See* PFF ¶ 438. Thus, SMUD must continue to maintain its NRC license and pay all required NRC fees. *See* PFF ¶¶ 439-40. Nor was dry storage necessary for SMUD to pursue its initial decommissioning strategy, which anticipated active decommissioning commencing in 2008, or its revised strategy, which involved incremental decommissioning around the pool. *See* PFF ¶¶ 442-47, 453-57; *see also* Tr. at 216-18 (Shetler); Tr. at 696-97 (Redeker).

SMUD also now has the added expense of decommissioning its ISFSI following fuel removal. SMUD has not included these increased decommissioning costs in its damages because they will be incurred in the future. Thus, there is no evidence that DOE's breach has "saved" SMUD any costs regarding decommissioning.

## VII. Additional Issues Raised By The Government Do Not Affect SMUD's Damages.

The government has raised several additional arguments that have no bearing on the amount of damages to which SMUD is entitled in this case.

### A. Greater-Than-Class-C Waste Does Not Affect SMUD's Damages.

Prior to trial, the government moved for partial summary judgment regarding the government's obligations to dispose of Greater-Than-Class-C ("GTCC") waste. *See* Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater Than Class C Radioactive Waste Arguments, dated Nov. 27, 2001 (Dckt. #92). While SMUD disagrees with the government's legal position with regard to whether GTCC is covered under the Contract, *see* SMUD Opposition Brief, dated Dec. 16, 2002 (Dckt. #161 & 162), the legal issue of whether DOE has an obligation to dispose of SMUD's GTCC under the Contract is not ripe and has no bearing on this case given that SMUD is not pursuing its GTCC-related costs. *See Commonwealth Edison Co v. United States*, 56 Fed. Cl. 658, 652, 659 (2003) (holding that the GTCC question was not yet ripe).

SMUD does have irradiated steel within its reactor vessel that constitutes GTCC waste. *See* PFF ¶¶ 461-64. Following decommissioning of the reactor, SMUD intends to remove this waste and place it in a special GTCC canister for placement in the ISFSI in the twenty-second horizontal storage module. *See* PFF ¶ 466. SMUD has yet to remove this waste and through 2003 did not incur costs related to the design and fabrication of the canister. *See* PFF ¶ 467. SMUD has included the cost of the twenty-second horizontal storage module, totaling $95,000, as this cost is not GTCC-related. *See* PFF ¶ 470. The twenty-second module is a necessary part

of the ISFSI design that would have been included regardless of the future use of the module. In addition, GTCC does not require storage in an ISFSI or special canister. Tr. at 693-95 (Redeker) (GTCC does not require security or cooling and can be stored on a long-term, interim basis "in some kind of shielded concrete container"); PFF ¶¶ 471-72.

Given that SMUD has not claimed any damages related to its GTCC, the government's arguments with regard to GTCC are irrelevant. As the government acknowledged at trial, the amount of SMUD's GTCC is "de minimus." Tr. at 54. For these reasons, the government's arguments regarding SMUD's GTCC have no bearing on the award of damages in this case.

### B. Damaged Or Failed Fuel Does Not Affect SMUD's Damages.

The government's arguments with regard to failed fuel are similarly irrelevant to this Court's determination of damages. DOE is obligated under the Contract to "accept title to *all* SNF and/or HLW, of domestic origin, generated by civilian nuclear power reactor(s)." PX 44 Art. IV.B.1 (emphasis added). The Contract specifically states that this obligation "extends to other than standard fuel." *Id.* at Art. VI.A.2.b. Thus, regardless of how SMUD's spent nuclear fuel is classified, DOE has an obligation under the Contract to transport SMUD's spent nuclear fuel to the repository for ultimate disposal. PFF ¶ 473-75.

Furthermore, the Contract does not give DOE discretion to defer acceptance of failed fuel. The Contract merely provides that,

> for any SNF which has been designated by Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days of receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

*Id.* at Art. VI.A.2.b. SMUD has proven that its damaged fuel, placed in a canister for containment, can be handled like any other spent nuclear fuel, so that "technical feasibility" would not have been an issue. *See* PFF ¶ 477. Although SMUD took the precaution of loading its damaged fuel into a special canister designed with individual sleeves to surround the fuel assemblies, all the fuel was loaded using "normal equipment and no special handling was required." Tr. at 687 (Redeker).

SMUD engaged in a visual inspection of its fuel prior to loading and, upon review, determined that although a few of SMUD's assemblies exhibited some damage, none of the fuel required special handling under the Contract, and this conclusion was independently confirmed by Electric Power Research Institute. *See* PFF ¶ 487-95. SMUD's expert, Ivan Stuart, whom the government has acknowledged has "quite a bit of experience with failed fuel," Tr. at 1450, has also reviewed the videotapes and confirmed that "[n]one of the fuel assemblies exhibit any features that would require special handling as noted in the Standard Contract." I. Stuart Written Direct at ¶¶ 41-44 (PX 1001); *accord* Tr. 1399, 1454-55 (Stuart), PFF ¶ 496.[29]

Furthermore, there is extensive evidence that DOE would have accepted failed fuel on the same schedule as standard. *See* PFF ¶ 484-86. At the time of Contract formation, placing failed fuel in containers was part of the normal operating procedures for maintaining a spent nuclear fuel pool. *See* PFF ¶ 486. DOE officials have since represented that DOE will handle such fuel

---

[29] Mr. Stuart had substantial personal experience in moving failed fuel, including shipments of DOE's own fuel; some of this fuel "was severely damaged and in one case had to be vacuumed into the can. Subsequently, it was handled without special treatment. . . ." I. Stuart Written Direct at ¶ 44.

in the same way as intact fuel and on the same schedule. *See* PFF ¶ 484-85. In addition, SMUD's expert, Ivan Stuart, testified that "DOE could have and would have accepted these assemblies [SMUD's damaged fuel] on the same schedule as the rest of SMUD's fuel." I. Stuart Written Direct at ¶ 42 (PX 1001); *see also* E. Supko Written Direct at ¶ 148 (PX 1002). Thus, the evidence demonstrates that the presence of a small number of damaged fuel assemblies does not affect SMUD's damages in this case.

### C. The Government's New "Canister" Arguments Are Litigation Inspired And Unsupported.

Finally, DOE's arguments with regard to SMUD's placement of its fuel in canisters are unavailing. As discussed at length in SMUD's Response to the Court's Show Cause Order Dated April 21, 2005 (Dckt. #326 & 329), SMUD's placement of fuel in canisters has no effect on the government's liability in this case. Even if the government were correct (which it is not) that SMUD's final transfer of fuel into dry storage in 2002 somehow made that fuel no longer "covered" by the Contract, SMUD's efforts to provide substitute interim performance or cover during DOE's delay – whether "inside" or "outside" the Contract – are recoverable as mitigation expenses. Williston explains that "[a] buyer can obtain cover damages even if it has not cancelled the contract and has accepted a partial delivery." 24 Williston on Contracts § 66.44, pp. 610-613 (4th ed. 1990). By their very nature, "cover" damages are likely to be outside the literal terms of a contract because the buyer is forced to seek *other* performance as a result of the defendant's breach of that contract.

In addition, SMUD placed its fuel in dual-purpose canisters only after receiving verbal and written assurance from the Acting Director of OCRWM, Lake Barrett, that DOE would

accept its canistered fuel if the canisters were licensed by NRC. *See, e.g.*, PX 319 at 1-2; PX 320 at 1; PX 325 at 1; Tr. at 353, 438 (Shetler), PFF ¶¶ 512-19. Rather than incur the expense of operating a wet pool for an indefinite period into the future, and based upon DOE's affirmative assurances, SMUD transferred its fuel into dual-purpose canisters for storage during DOE's delay. Regardless of how it is currently stored, DOE has an obligation to dispose of SMUD's fuel under the Contract. PFF ¶ 507-09

The government's current position that it has no obligation to dispose of SMUD's fuel given how it is currently stored is unsupported and results solely from DOE's attempt to avoid liability in this case.[30] In fact, DOE endorsed the development of a dual-purpose dry storage system throughout the 1990s. *See* PFF ¶ 520,523-31; *see also* PX 591 (encouraging the use of dual-purpose canisters). DOE's current position marks a change from its position throughout the 1990s that DOE would accept the fuel, and the only issue would be the classification of the fuel under the Contract. Despite DOE's current litigation position, DOE has continuously anticipated the acceptance of such fuel in its transportation and repository planning. *See* PFF ¶ 538-51. Thus, the government's arguments offer no basis for denying SMUD its damages caused by DOE's breach.

---

[30] The government's refusal to take the actions that Mr. Barrett assured SMUD it would take, and the current assertion that the government no longer has an obligation to accept SMUD's spent fuel because SMUD relied on Mr. Barrett's assurances, appear to be done with the "specific intent to injure" SMUD. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002). As such, the government's actions and its canister arguments, if accepted, constitute a breach of the duty of good faith and fair dealing.

## VIII. If The Court Needs To Reference A Non-Breach World Acceptance Rate, All Of The Evidence Demonstrates That DOE Would Perform At A 3,000-Ton Rate.

Based upon DOE statements and actions beginning in the late 1980s, SMUD believed that DOE's receipt of spent fuel under the Standard Contract would not occur until at least 2010, and so SMUD paid little attention during the period at issue to what the acceptance rates would have been in the hypothetical "non-breach world." SMUD was living in the real world, effectively the breach world, since DOE's announcements of delay and uncertainty in 1988 and 1989, and its actions were motivated by its belief and eventual knowledge that DOE's fuel acceptance would be delayed by an uncertain and lengthy period.[31]

Nevertheless, the overwhelming evidence demonstrates that had DOE timely performed under the Standard Contract, then it would have employed a total receipt rate of approximately 3,000 tons per year that would have removed all fuel from Rancho Seco by 2006 at the latest and likely several years earlier. See PFF ¶ 554. A 3,000-ton receipt rate is the rate that DOE has consistently used to calculate utility fees and system costs under the Standard Contract, is used in nearly all DOE program documents, and was affirmed by the trial and deposition testimony of numerous DOE officials. See PFF ¶ 555; *see also Indiana Michigan v. United States*, 57 Fed. Cl. 88, 99 (2003); *Commonwealth Edison Co v. United States*, 56 Fed. Cl. 652, 667 (2003); *Yankee Atomic*, No. 98-126C, 2004 WL 1535688, at *7 (Fed. Cl. June 28, 2004).

---

[31] Some SMUD documents did include fuel acceptance dates for Rancho Seco, but these documents did not purport to address the non-breach world and they merely reflected either guesstimates by SMUD staff or instructions by DOE. *See, e.g.*, Tr. at 393-95 (Shetler); Tr. at 629-31(Redeker).

In addition, this rate was supported by the expert testimony of Eileen Supko, who explained that a 3,000 ton annual receipt rate with a five-year ramp-up period would have achieved DOE's acknowledged requirements for its spent fuel program (avoiding the need for utilities to construct additional storage after 1998 and eliminating the existing backlog of spent fuel to allow timely decommissioning), and is supported by numerous DOE program documents. E. Supko Written Direct at ¶¶10-12, 16-99, 150-51 (PX 1002). Ms. Supko further testified that this rate would have resulted in the removal of all spent fuel from Rancho Seco by 2006 at the latest, and that DOE would likely have removed the fuel even earlier if SMUD had utilized either the exchange provision or the shutdown priority provision of the Standard Contract. *Id.* at ¶¶ 13, 44-46, 152; I. Stuart Written Direct at ¶¶ 32-40; *see also* PFF ¶¶ 556-71.

This issue is further addressed in SMUD's Cross-Motion For Partial Summary Judgment On The Acceptance Rate And Memorandum In Opposition To Defendant's Motion For Partial Summary Judgment On The Acceptance Rate dated December 16, 2002 (Dckt. #165 & 167) and in its Pre-Trial Memorandum of Contentions of Fact and Law (Dckt. #286), and in the interest of brevity SMUD will incorporate those arguments by reference.[32]

---

[32] DOE has argued that a lower rate would have applied in the non-breach world during the decade following 1998 based upon the Delivery Commitment Schedule documents that were exchanged by the parties in the early 1990s. However, this Court has previously ruled that these documents could not alter the DOE's obligations under the Standard Contract. *See, e.g., System Fuels, Inc. v. United States*, No. 03-2642C, 2005 WL 1804314, slip op. at 12-13 (Fed. Cl. July 29, 2005); *Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 504-06 (2005). In addition, the documents in question reflect DOE's effort to manipulate the acceptance rate to limit its liability in the spent fuel litigation in violation of its duty of good faith and fair dealing. *See* SMUD's Pretrial Memorandum of Contentions of Fact and Law at 60-63; *see also Boston Edison*, 64 Fed. Cl. at 186-87 (concluding that the utility plaintiff has alleged facts regarding DOE's planning process that "if proved, would make out a viable claim for relief under these implied covenants [of good faith and fair dealing]"); *Commonwealth Edison Co*, 56

Footnote continued on next page

## IX. The Issue Of Notice Raised By The Court At Trial.

During trial, the Court raised the issue of whether the notice requirement of indemnification law is applicable to the mitigation issues raised in this case, citing *LTV Corp. v. Gulf States Steel, Inc.*, 969 F.2d 1050 (D.C. Cir. 1992). Tr. at 1106. In *LTV*, it does not appear that the D.C. Circuit read a notice requirement into the contract between the parties. Rather, the D.C. Circuit based its ruling on an express notice requirement in the agreement. *LTV*, 969 F.2d at 1056-57. Thus, the Court enforced the notice agreement within the contract, noting that the applicable state law required enforcement of the notice provision in the indemnity agreement. *Id.*

The present case is not analogous to the facts of *LTV Corp.*, as there is no notice requirement within the Contract. With regard to indemnification law generally, "[w]here the indemnity agreement does not require notice, the courts will not infer a notice requirement as a condition precedent to a right to recover on the indemnity contract." *Fontenot v. Mesa Petroleum Corp.*, 791 F.2d 1207, 1221 (5th Cir. 1986); *see also Premier Corp. v. Economic Research Analysts, Inc.*, 578 F.2d 551, 554 (4th Cir. 1978) (noting "general rule that notice is unnecessary unless the contract of indemnity requires it"). Furthermore, SMUD has not found any cases requiring notice to the breaching party in the mitigation context. Even if such a notice

---

Footnote continued from previous page

Fed. Cl. at 665 ("The court agrees that DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of good faith and fair dealing"); *but see System Fuels*, 2005 WL 1804314, slip op. at 17 (dismissing claim for breach of good faith and fair dealing relating to DCS and ACR process).

requirement were imposed in certain circumstances, it would be futile in this case, as DOE made it clear that it would not accept fuel by January 31, 1998, and declined to pursue other options such as accepting possession or taking title onsite.

Moreover, even if notice were required, SMUD did give notice to DOE. In 1994, in response to DOE's Notice of Inquiry, SMUD notified DOE that if it didn't perform, DOE should reimburse SMUD for its costs of on-site storage of the fuel. PX 369, PFF ¶ 577. Again in 1997, in a letter from SMUD's general manager to DOE, SMUD reiterated that DOE should reimburse SMUD for the costs of its mitigation:

> SMUD believes that if DOE cannot dispose of the Rancho Seco spent fuel on the schedule set forth in the DOE-SMUD Standard Contract, DOE should follow the precedent established at Fort St. Vrain with respect to Public Service of Colorado, i.e., reimbursing SMUD for the on-going costs of on-site spent fuel storage at Rancho Seco from January 31, 1998, until such time as DOE can fulfill its contractual obligation to off-load and transport the spent fuel to an interim or permanent DOE storage facility.

PX 528 at 1, PFF ¶¶ 583-84. Finally, noting it was "unable to obtain relief" from DOE in other ways, in July 1998, SMUD sent a letter to then-Director Lake Barrett notifying him that "SMUD has reluctantly filed a claim with the U.S. Court of Federal Claims on June 9, 1998." DX 861, PFF ¶ 588. DOE clearly had notice that SMUD was going to hold DOE accountable for its costs incurred, and since 1998 had the ability to investigate those costs through discovery had it wished to.

In addition, throughout the entire period of the project, SMUD notified DOE of the general status of the project through substantial correspondence and direct meetings. SMUD also notified DOE of the costs of the project and increases in the expected costs as they were

incurred. *See* PFF ¶ 572-94. Thus DOE had ample notice of the nature of SMUD's mitigation, the costs that were being incurred, and SMUD's intent to hold DOE accountable for such costs.

**CONCLUSION**

For the foregoing reasons, SMUD respectfully requests that the Court enter judgment awarding SMUD damages in the amount of $21,553,462 for 1992 to 1997 and $55,049,870 for 1998 to 2003.

DATED this 22nd day of August, 2005.

Respectfully submitted,

/s/ Howard N. Cayne

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

Of Counsel:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Post-Trial Legal Brief to be filed electronically through the Court of Federal Claims Case Management/ Electronic Case Filing System on August 22, 2005. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Alan Lo Re
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

/s/ Timothy R. Macdonald