No. 98-488C
(Judge Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S PROPOSED FINDINGS OF FACT**

**TO ACCOMPANY ITS POST-TRIAL LEGAL BRIEF**

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

August 22, 2005

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

# TABLE OF CONTENTS

Page

I. Introduction And Overview....1

II. Background....2

A. Disposal Of Nuclear Waste And Passage Of The NWPA....2

B. SMUD and Its Development of a Dual-Purpose Dry Storage System....12

III. The Government's Failure To Begin Acceptance Of Spent Nuclear Fuel and SMUD's Response....20

A. Eleven Years Of Announced Delay And DOE's Ultimate Failure to Begin Acceptance in 1998....20

B. SMUD's Initial Decision To Pursue Dry Storage....27

C. SMUD's Continued Reevaluation Of The Project And Commitment To Proceed In Light Of Breach....32

IV. SMUD's Damages As A Result of Breach....37

B. SMUD's Damages from 1992 to 1997....41

A. SMUD's Damages From 1998 To 2003....43

B. SMUD's Total Damages....48

V. Acknowledged Offsets To Damages....50

A. Gantry Crane Upgrade....50

B. Spent Fuel Building Upgrades....51

C. Fuel Inspection Offset....52

D. On-Site Drop Mitigation Offset....53

E. Loan Workout Offset....54

F. $2 Million In "Double Counting."....54

VI. SMUD's Commercially Reasonable Management Of The Project....55

A. Wet Pool Storage....66

B. Store-Only Dry Storage Systems. ....71

C. The "NAC" System. ....75

VII. Disputed Offsets Raised At Trial. ....79

A. Wet Storage Costs. ....79

B. Costs to Transfer Fuel From Wet to Dry Storage. ....81

C. SMUD Labor Costs. ....82

D. Labor Burden. ....84

E. Decommissioning Costs. ....86

VIII. Additional Issues Raised By Government. ....90

A. Greater Than Class C Radioactive Waste. ....90

B. Failed Fuel. ....92

C. Canisters. ....96

IX. Rate. ....104

X. Notice. ....108

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | ) |
| Plaintiff, | ) |
| v. | ) No. 98-488 C |
| THE UNITED STATES OF AMERICA, | ) (Judge Braden) |
| Defendant. | ) |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S PROPOSED FINDINGS OF FACT**

Plaintiff Sacramento Municipal Utility District ("SMUD") submits the following post-trial Proposed Findings of Fact ("PFF").

**I. <u>Introduction And Overview.</u>**

1. In accordance with the Nuclear Waste Policy Act of 1982, 42 U.S.C. §10101 *et seq.* ("NWPA"), DOE and SMUD entered into a contract for the acceptance and disposal of SMUD's spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW") on June 13, 1983. *See* Contract for the Disposal of Spent Nuclear Fuel between DOE & SMUD (June 13, 1983) (Plaintiff's Exhibit ("PX") 44) ("Contract" or "Standard Contract").

2. SMUD has paid the Department of Energy ("DOE") a total of approximately $40 million in fees under its Contract with DOE, thus satisfying its obligation of performance under the Contract. *See* Memorandum Opinion dated Jan. 19, 2005 at 4 ("Memorandum Opinion") (noting "SMUD has paid all applicable fees required by the DOE Standard Contract"); Gov't Answer at ¶ 22 (noting payment of fees is undisputed).

3. With interest, those fees were worth approximately $100 million in 1997. Letter from J. Schori at 2 (Mar. 14, 1997) (PX 528). Today, SMUD's payments to DOE under the Contract would be worth far more than $100 million.

4. DOE has breached its reciprocal obligation under the Contract—the "quid pro quo created by Congress" in the D.C. Circuit's words—to commence acceptance of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") by January 31, 1998, and thereafter to remove SNF and HLW from contracting utilities, including SMUD, in a reasonable manner. *Indiana Michigan Power Co. v. United States*, 88 F.3d 1272 (D.C. Cir. 1996); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000).

5. Because of the government's breach, SMUD has incurred substantial damages resulting from the design, licensing, and fabrication of its own on-site storage facility, referred to as an Independent Spent Fuel Storage Installation or ISFSI, for the long term dry storage of its spent fuel. As detailed further below, SMUD has incurred $21,553,462 in damages from 1992 to 1997 and $55,049,870 in damages from 1998 to 2003. *See* PFF ¶¶ 199-241.

## II. <u>Background.</u>

### A. <u>Disposal Of Nuclear Waste And Passage Of The NWPA.</u>

6. Nuclear reactors generate electricity by using ceramic pellets containing uranium oxide placed in the core of the reactors; these solid pellets are sealed in metal rods, or pins, which are approximately sixteen feet long. Transcript ("Tr.") at 117-118 (Shetler).

7. The rods are bundled together into an overall fuel assembly. *Id*.

8. The fuel assemblies are placed in the reactor vessel, where the nuclear fission reaction occurs. In SMUD's case, the reactor was designed to hold 177 fuel assemblies. Tr. at 122 (Shetler).

9. Spent nuclear fuel is nuclear power plant fuel that has been burned (irradiated) in a nuclear reactor to the point where it no longer contributes efficiently to the nuclear chain reaction that produces heat to generate electricity. At that point, the SNF must be removed from the core and replaced. Tr. at 132 (Shetler).

10. When SNF leaves a nuclear reactor, it is thermally hot and highly radioactive. Tr. at 138 (Shetler).

11. Much of the thermal heat dissipates after about five years, but the SNF remains potentially dangerous for much longer periods of time. Tr. at 147 (Shetler).

12. Once the fuel assemblies are permanently discharged from the reactor, they are transferred to a spent fuel pools or "wet pool" on the nuclear reactor site. Tr. at 132-33 (Shetler).

13. Spent fuel is stored in a pool in order to allow it to cool and to provide shielding from the lethally radioactive fuel. Tr. at 138 (Shetler).

14. Spent fuel pools are pools of borated water. Tr. at 137-139 (Shetler).

15. The SNF assemblies are stored in stainless steel storage racks underwater in the spent fuel pools. Tr. at 137 (Shetler).

16. Once a spent fuel pool becomes full, the SNF must be moved from the pool and placed into storage, either on site at the nuclear reactor or elsewhere. Tr. at 133 (Shetler).

17. As of January 31, 1998, there was 37,000 metric tons of spent nuclear fuel that had been permanently discharged from commercial nuclear power plants and was being stored at locations across the country. E. Supko Written Direct at 20 (PX 1002).

18. In the 1950s, under the authority of the Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2011, *et seq.*, and President Eisenhower's Atoms-for-Peace program, the federal government embarked upon a program to encourage and sponsor the peaceful use of atomic

energy. *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 244 (4th Cir. 1987). The development of a commercial nuclear electric industry was the centerpiece of this program.

19. One of the major issues surrounding public acceptance of nuclear power and the willingness of the private sector to embrace nuclear power in the 1950s was the need to provide for the permanent disposal of SNF and other high-level waste ("HLW") discharged by the production of nuclear-generated electricity. S. Rep. No. 96-548, at 10 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6933, 6933.

20. The disposal of SNF has been described as the "most pressing" concern in the promotion and sustenance of this country's nuclear power industry. *Id.* at 10, *reprinted in* 1980 U.S.C.C.A.N. at 6933-34; *Florida Power*, 826 F.2d at 246 (stating that the government's assumption of the responsibility to dispose of SNF was "critical to the promotion of a nuclear power industry").

21. As part of its program to encourage the development of a nuclear power industry, the federal government agreed early on to assume the responsibility for the permanent disposal of SNF. This commitment is reflected in the Atomic Energy Commission's ("AEC") statement of its "Policy Relating to the Siting of Fuel Processing Plants and Related Waste Management Facilities," adopted in 1970, which provides that "[d]isposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government." 10 C.F.R. Part 50, App. F.

22. In the 1960s and early 1970s, the general understanding was that the "fuel would be stored onsite for an interim period until such time as it could be taken and reprocessed for reuse." Tr. at 116 (Shetler).

23. In order to reprocess fuel, one "would cut up the assembly and through chemical treatment, recover the uranium or plutonium that's in the fuel pellets and be able to re-pelletize that, repackage it and reuse it in nuclear assemblies." *Id.*.

24. The government's effort to manage the disposal of SNF and HLW was redirected when, in 1977, President Carter issued an executive order in 1977 that effectively halted reprocessing of spent nuclear fuel by private industry. 13 Weekly Comp. Pres. Doc. 502, 503 (1977); *see also* H.R. Rep. No. 97-785, pt. 1, at 46-47 (1982); *see also* Tr. at 119 (Shetler) ("In the 1970s during President Carter's administration, it was determined for primarily nuclear nonproliferation purposes that reprocessing would not be a method for dealing with spent fuel in the United States. And so reprocessing was basically stopped as an alternative.").

25. Thus, at the time of Contract formation, and today, there are no alternative methods of disposing of spent nuclear fuel for a commercial utility. 42 U.S.C. § 10222(b) ("No [SNF or HLW] may be disposed of by the Secretary … unless the generator or owner of such [SNF or HLW] has entered into a contract with the Secretary under this section."); *see also* PFF ¶¶ 20-24, 32-40.

26. The majority of spent fuel pools existing at nuclear reactor sites were sized with the intention that SNF would be stored therein temporarily before being shipped to a reprocessing facility. H.R. Rep. No. 97-785, pt. 1, at 47.

27. The lack of a reprocessing alternative meant that the SNF eventually would have to be removed from the pool and stored in a safe and secure location. *Id*.

28. This SNF storage crisis was one of the primary catalysts for the promulgation of the Nuclear Waste Policy Act. As Representative Bereuter stated, "[w]aste storage cannot

continue in the temporary, unsafe fashion that it has maintained for these decades. We are just courting disaster if we continue to take that course." 128 Cong. Rec. 27,775 (1982).

29. Representative Moorhead explained that Congress needed to address not only long-term permanent disposal of SNF but also the short-term problem of storage of SNF and/or HLW:

> It is clear that comprehensive nuclear waste disposal must provide not only for the long-term problem of permanent disposal of nuclear waste, but it also must alleviate the short-term problem of a lack of interim storage capacity for spent nuclear fuel. A June 1982 Report, prepared for the Nuclear Regulatory Commission, projects that as many as 39 nuclear power plants in 19 States may run out of onsite storage capacity by 1990. This would inevitably result in plant shutdowns, and clearly this would be a disaster that must be prevented.

128 Cong. Rec. 26,314 (1982).

30. Senators reiterated this concern when debating the Nuclear Waste Policy Act. For example, Senator McClure, the chief sponsor of the NWPA in the Senate, stated

> [We] . . . begin to run into the problem that there is not enough room to store all those rods at that site, in the pools that have been constructed, because they were not designed to do that . . . They will have to apply some new technologies on that site, or they will have to shut down because they cannot refuel. There is a time urgency, and it can be satisfied.

128 Cong. Rec. 7,974 (1982).

31. On January 7, 1983, after being signed by President Reagan, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-245, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)) was enacted.

32. In enacting the NWPA, the federal government assumed the legal duty to "provide for the permanent disposal" of spent nuclear fuel and/or high-level radioactive waste from

utilities across the country by providing long-term storage of such waste. *See* 42 U.S.C. § 1013(a)(4).

33. In the NWPA, Congress expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors." 42 U.S.C. § 10131(a)(2).

34. The NWPA provided for the safe, permanent disposal of the wastes of nuclear power generation by the federal government, an obligation which the federal government had recognized since the passage of the Atomic Energy Act of 1954. *See* Corrected Appendix to Accompany SMUD's Motion to File Designated Deposition And Trial Testimony, dated February 24, 2005 (hereinafter "Designations Appendix") (Dckt. #310) at 1709 (Lawrence), 2039-40 (Rusche); Robert Morgan, Remarks Before the International Atomic Energy Agency, at 3 (October 12, 1983), (PX 52); 128 Cong. Rec. 26,317 (1982) (Representative Skeen); 128 Cong. Rec. 8,002 (1982) (Senator McClure); *see also* 42 U.S.C. § 7133(a)(8)(C) (providing for the creation of the Department of Energy with responsibility for "the establishment of temporary and permanent facilities for storage, management, and ultimate disposal of nuclear wastes").

35. One of the key purposes of the NWPA was to impose upon the government a firm schedule and deadline by which the government would assume responsibility for the disposal of commercially-generated SNF. *See* 42 U.S.C. § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories" to receive SNF and high-level waste).

36. Congress intended that DOE's acceptance of SNF, beginning in 1998, would be expeditious and timely. *See* 42 U.S.C. § 10222(a)(5) (mandating that contracts provide that DOE "shall take title to the high-level radioactive waste or spent nuclear fuel involved *as expeditiously*

*as practicable* upon the request of the generator or owner of such waste or spent fuel") (emphasis added).

37. DOE officials recognized that the requirements for its spent fuel program were to implement a program that would: (1) avoid the need for utilities such as SMUD to build additional SNF storage space at their reactor sites after 1998, and (2) accept SNF at a rate that would reduce the existing SNF backlog to allow timely decommissioning. Designations Appendix (Dckt. #310) at 137 (Barrett), 452-53 (Milner), 2084 (Rusche); *see also* E. Supko Written Direct at 16-20, 39-43 (PX 1002); *Indiana Michigan v. United States*, 57 Fed. Cl. 88, 89 (2003); *Commonwealth Edison v. United States*, 56 Fed. Cl. 652, 657 (2003); *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 674 n.10: *Yankee Atomic Electric Co. v. United States*, No. 98-126, 2004 WL 1535688, *7 (Fed. Cl. June 28, 2004).

38. Robert Morgan, the first Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), indicated the government's intent of was that "beginning in 1998 utilities will not have to provide any additional storage facilities on site." Designations Appendix (Dckt. #310) at 1980 (Morgan).

39. Representative Mariott stated:

> We need a national waste repository, and it must be in place by the turn of the century. All waste that is now stored is temporarily stored. . . . Without a proper repository for interim and permanent waste, as many as 28 nuclear power plants may be forced to close for lack of storage.

128 Cong. Rec. 26,310-26,311 (1982).

40. The NWPA set January 31, 1998 as the date for DOE to begin spent nuclear fuel removal and required DOE and the owners and generators of SNF and HLW to enter into contracts calling for DOE to dispose of waste beginning on that date. 42 U.S.C. § 10222(a) (1982); see also *id.* § 10222(b) ("No [SNF or HLW] may be disposed of by the Secretary …

unless the generator or owner of such [SNF or HLW] has entered into a contract with the Secretary under this section.").

41. Pursuant to the NWPA, DOE established a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. *See* Final Rule, 48 Fed. Reg. 16,590 (Apr. 18, 1983); 10 C.F.R. § 961.11.

42. The Standard Contract provides that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors . . . has been disposed of." Contract Art. II (PX 44).

43. The NWPA contemplated a series of steps which would lead to the operation of a repository and acceptance of SNF and HLW beginning in January 1998. 42 U.S.C. §§ 10132-10145; H.R. Rep. 97-785, pt. 1, at 32-34 (1982); *Indiana Michigan Power Company v. Dep't of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996).

a. DOE was to issue guidelines for site characterization 180 days after January 7, 1983. 42 U.S.C. § 10132(a) (1982). DOE was then to nominate five sites for site characterization for selection as the site for the first repository. 42 U.S.C. § 10132(b)(1)(A) (1982).

b. DOE was to recommend site characterization at three of the nominated sites by January 1, 1985. 42 U.S.C. § 10132(b)(1)(B) (1982). Upon approval of these site recommendations by the President, DOE was to conduct site characterization at the approved sites. 42 U.S.C. § 10133 (1982).

c. By March 31, 1987 the President was to submit a recommendation to Congress to site the first repository at one of the three characterized sites. 42 U.S.C. § 10134(a)(2)(A) (1982) (now amended).

d. After the President's recommendation, the state or Indian tribe where the recommended site was located had the opportunity to disapprove the selection, and Congress could then override that disapproval. 42 U.S.C. §§ 10134-10136 (1982) (now amended).

e. After the site recommendation was complete, DOE was to submit an application for construction authorization to the NRC within 90 days. 42 U.S.C. § 10134(b) (1982). The NRC would then act on the application within four years of submission. 42 U.S.C. § 10134(d) (1982).

44. These provisions were intended to create a schedule leading to the establishment of a repository in 1998. A House report on an early version of the NWPA containing similar interim deadlines noted: "With respect to the establishment of a repository, the purposes are to establish a schedule for the siting, construction, and operation of repositories that will provide assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive wastes." H.R. Rep. 97-785, pt. 1, at 32 (1982).

45. The NWPA provided that "the Secretary is authorized to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1).

46. The NWPA further required all utilities to enter into the Contract by providing that the execution of a contract with DOE is a prerequisite to the issuance or renewal of a nuclear

power plant license by the Nuclear Regulatory Commission ("NRC"). 42 U.S.C. § 10222(b)(1)(A).

47. Congress expected the contracts to be a quid pro quo under which DOE would dispose of waste and the utilities would pay for the service. H.R. Rep. No. 97-491, pt. 1, at 58 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 3824 ("Section 124 authorizes the Secretary to contract with utilities … to provide repository services in exchange for payments. . . ."); H.R. Rep. No. 97-491, pt. 1, at 59 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3825 (DOE is "responsible for disposing of [SNF] … in permanent disposal facilities, beginning not later than January 1998, *in return for the payment* of fees established by this section." (emphasis supplied)). *See also Indiana Michigan Power Company v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996); *Alabama Power Co. v. Dep't of Energy*, 307 F.3d 1300, 1302 (11th Cir. 2002).

48. Having required utilities to pay fees into the Nuclear Waste Fund for removal of SNF starting in January of 1998, DOE did not intend that the utilities would have to pay *again* to build additional on-site storage. Designations Appendix (Dckt. #310) at 276-78 (Barrett).

49. In 1983, the parties anticipated and intended that if a repository was not operational in time for DOE to begin acceptance of SNF by January 31, 1998, DOE would take title to the fuel at the utility site and pay for its dry storage. *See* Memorandum Accompanying Draft Mission Plan Strategy at 2 (Sept. 15, 1983) (PX 50) (noting "the lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel" and stating one possibility in the event of non-performance would be for DOE to "take title to the spent fuel, have it placed in dry storage casks and pay a rental fee to the utility to store the casks on-site at the reactor").

50. DOE assured utilities that it would take responsibility for "additional storage" if the repository was delayed, even if that meant providing for storage "at reactor sites." PX 69, Vol. II at 9-6.

51. DOE official Keith Klein testified that at the time the Contract was signed, DOE's plans in the event of delay in repository were that DOE "would take title or—or potentially at the reactor sites and provide dry storage casks. I think we were thinking ideally transportable dry storage casks or—or at least baskets that could be put into a transport cask." Designations Appendix (Dckt. #310) at 1137-38 (Klein).

52. The Contract allows DOE to grant "priority" to shutdown reactors. Contract Art. VI.B.1.b.

53. DOE explained at the time of Contract formation that the shutdown priority provision in the Contract was "necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." Final Rule, 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983) (PX 30).

### B. SMUD and Its Development of a Dual-Purpose Dry Storage System.

54. Sacramento Municipal Utility District ("SMUD") is a municipal utility district in the State of California. Tr. at 110-111 (Shetler).

55. Because SMUD is a public agency, SMUD does "not have stockholders like an investor-owned utility would." Tr. at 111 (Shetler). Rather, SMUD's customers are its owners.

56. SMUD is responsible for providing electric power to private residents, commercial enterprises, and industry in its service area. SMUD serves a population of approximately 1.3 million and has approximately 550,000 customers. Tr. at 113 (Shetler).

57. SMUD gets electricity from a variety of sources, including hydro generation, cogeneration plants, and renewable technologies. Tr. at 113-14 (Shetler).

58. SMUD also purchases power on the wholesale market to meet requirements and reduce costs. Tr. at 113-14 (Shetler).

59. SMUD is governed by an elected seven member Board of Directors. Tr. at 111 (Shetler).

60. The members of the Board are elected for staggered four-year terms, and each represents a different geographic area within SMUD's service area. Tr. at 111 (Shetler).

61. The Board of Directors makes policy decisions for SMUD and appoints the General Manager, who is responsible for all of SMUD's operations. Tr. at 111-12 (Shetler).

62. Rancho Seco Nuclear Generating Station ("Rancho Seco") was built on approximately 2400 acres of land in southeast Sacramento County in the mid-1970s. Tr. at 131 (Shetler).

63. The nuclear power plant at Rancho Seco was a pressurized water reactor licensed to operate through 2008. Tr. at 122, 291 (Shetler).

64. As a result of various outages at SMUD during the 1980s, and the resultant increases in rates, in 1988 the citizens of Sacramento put an initiative on the ballot proposing to close down Rancho Seco. Tr. at 127-28 (Shetler); Tr. at 876 (Ferreira).

65. A majority of SMUD's Board of Directors were in favor of continuing to support Rancho Seco and placed a counter-initiative on the ballot in 1998 that proposed keeping Rancho Seco operating for up to eighteen months as a trial period, which would be followed by another electoral vote on whether to continue operation of the plant. *Id*.

66. The 1988 vote to close Rancho Seco failed by approximately 1%, 51% to 49%. Tr. at 877 (Ferreira). The vote to continue the operation of Rancho Seco for the trial period passed by about 3% or 4%. *Id.*; Tr. at 128 (Shetler).

67. As a result of a surplus of power in California in the late 1980s, SMUD was able to negotiate long-term contracts for backup power supply at favorable fixed rates. Tr. at 887-91 (Ferreira). Because SMUD could purchase this replacement power at a comparable cost to operating Rancho Seco at least 75% of the time, which was right around the national average, the executive management team recommended to the Board in 1980 that Rancho Seco be shut down. Tr. at 890-93 (Ferreira).

68. Of the five Board members at the time in 1989, four favored continued operation of Rancho Seco. Tr. at 893 (Ferreira).

69. The Board of Directors, however, represented to the public that if the result of the election was a vote to shutdown the plant, the Board would initiate shutdown immediately. Tr. at 895 (Ferreira) (noting "the board had conveyed to the community that . . . they would allow the customers to vote on the outcome of and the future of the nuclear power facility, so it's unlikely that the board at that point would take a position that would be in conflict with . . . what the customer base was supporting at that time").

70. The second election regarding the future of Rancho Seco was held in June 1989. By a vote of approximately 53% to 47%, the voters elected to close Rancho Seco. Tr. at 128 (Shetler); Tr. at 893 (Ferreira).

71. The Board of Directors initiated shutdown of the Rancho Seco nuclear power plant on June 7, 1989. Tr. at 129 (Shetler).

72. There are no current plans for reuse of the Rancho Seco plant. Tr. at 136 (Shetler).

73. At the time of shutdown, SMUD had 493 spent nuclear fuel assemblies. Tr. at 133 (Shetler).

74. The most recent estimate for the total cost of decommissioning Rancho Seco, projected through the end of 2008 in present year dollars, is $524 million. Tr. at 698 (Redeker).

75. SMUD has incurred approximately $300 million in decommissioning costs. Tr. at 698 (Redeker).

76. Decommissioning involves the dismantlement and decontamination of the plant and site in a manner that satisfies the NRC's requirements.

77. Total decommissioning of a nuclear power plant cannot be accomplished until all of the spent nuclear fuel and high-level radioactive waste is removed from the site. Tr. at 2624 (Burford).

78. During its operation and through 2002, Rancho Seco utilized a wet pool for the storage of its spent nuclear fuel. Tr. at 137, 140-41 (Shetler).

79. A crane is used to move the fuel assemblies from the reactor vessel into the spent fuel pool, to move assemblies around within the pool, and to load the assemblies into a canister. Tr. at 133 (Shetler); 508-510 (Redeker).

80. At the time of shutdown, all of the spent fuel was stored in SMUD's spent fuel pool, DOE already had begun announcing delays in its repository program, and SMUD began studying its options for managing the spent fuel at Rancho Seco in light of the likelihood that DOE would not begin performance in 1998. *See* PFF ¶¶ 117-132.

81. SMUD's pursuit of a dry storage system was closely coupled with a demonstration project involving DOE as suggested by the 1990 study by SMUD's consultant, S. Levy Incorporated. *See* PFF ¶¶ 128-130.

82. The demonstration project was spurred on in part by Fiscal Year 1991 appropriations in which Congress directed DOE to pursue a cooperative research and demonstration project to demonstrate dual-purpose casks. Tr. at 187 (Shetler); Tr. at 2234-43 (Williams).

83. In 1991, SMUD began negotiations with DOE for a demonstration project and began developing potential specifications for a dry storage system. PX 220, 224, 229, 233, 236, 245, 246, 253, 258; *see also* PFF ¶¶ 296, 573.

84. In December 1991, SMUD issued a Solicitation for Dual Purpose Casks and Request for Proposal, seeking proposals from vendors for casks that could be used for an on-site dry storage facility. *See* Memorandum Regarding Solicitation for Dual Purpose Cask and Proposers Site Visit (Dec. 5, 1991) (PX 233); Request for Proposal (Jan. 15, 1992) (Defendant's Exhibit ("DX") 308).

85. SMUD shared its solicitation and specification for the dual purpose casks with DOE officials. PX 229, 236; *see also* Tr. at 980-81 (Field).

86. SMUD received five bids from different storage vendors for the cask and canister portion of the storage facility, ranging from approximately $12 million to $72 million. *See* Staffing Summary Sheet (DX 35) (listing five bidders and total bids); Tr. at 981-82 (Field).

87. The proposed bids did not include the necessary costs of SMUD engineering activities, oversight, management, nor the costs of loading and transferring the fuel to the ISFSI. Tr. at 982 (Field).

88. SMUD's dry fuel canisters are large metal containers that hold a total of twenty-four spent nuclear fuel assemblies. Tr. at 142 (Shetler).

89. SMUD's canisters were designed for two purposes: 1) dry storage of the fuel in a storage facility, and 2) ultimate transport on highways in a cask. Tr. at 143 (Shetler) ("The cask provides the shielding necessary to handle the device out of the water or the canister out of the water and also provides the support structure for shipping and protecting the fuel during transportation.").

90. At the time SMUD contracted for its system, no company had a cask or canister that was licensed for both storage *and* transportation of SNF—a "dual-purpose" system. Tr. at 190 (Shetler); Tr. at 2249 (Williams).

91. SMUD signed a contract with Pacific Nuclear, the lowest bidder, for a dual-purpose dry storage system in October 1992 after a thorough and complete evaluation. *See* SMUD Contract E-776 (Sept. 25, 1992) (PX 267); DX 315.

92. Pacific Nuclear's original cost and schedule estimate for the dry-storage project assumed that the majority of the design work was completed because Pacific Nuclear already had a licensed storage-only canister system, the NUHOMS system, and a licensed transport-only cask, the 125-B cask, that it believed it could convert to a dual-purpose (storage and transport) system with modest technical changes. Tr. at 537-38 (Redeker); 985-87 (Field).

93. In early 1993, within months of SMUD and Pacific Nuclear signing the contract, the NRC advised Pacific Nuclear that additional testing would be required for the design of the casks and canisters to insure that the system was sufficient for safe transport of SNF. PX 267, 295; Tr. at 537-38 (Redeker).

94. Pacific Nuclear and SMUD initially expected two or three rounds of questioning from the NRC, but received at least seven. PX 845.

95. Pacific Nuclear changed its name to Vectra Technologies after acquiring ABB Impell in 1993. DX 442.

96. Because the contract changed in scope over the course of the project, SMUD and Vectra signed 11 different change orders formally memorializing these changes. *See* SMUD Contract E-776 and accompanying change orders (PX 267); *see, e.g.*, Tr. at 225 (Shetler) (noting contract change to accommodate NRC requirement of impact limiter testing); PFF ¶¶ 294.

97. Vectra had contracts with a number of other utilities to develop dry storage systems. Tr. at 997-99 (Field). The Vectra dry storage systems were named the "NUHOMS" system. Tr. at 1003-04 (Field).

98. These utilities, including SMUD, often collaborated in their interaction with Vectra and formed a working group called the NUHOMS Owners Group. Tr. at 1003-04 (Field).

99. After three years of meetings and negotiations, SMUD and DOE officially signed a Cooperative Agreement in December 1994. Notice of Financial Assistance Award (Sept. 30, 1994) (PX 371).

100. In 1996, as a result of additional NRC-required testing, SMUD informed DOE that there likely would be additional costs for the dual-purpose cask as part of the DOE / SMUD Cooperative Agreement. PX 449.

101. In January 1997, NRC issued a "Demand for Information" ("DFI") to Vectra asking why the NRC should not halt Vectra's fabrication activities based on quality assurance concerns. PX 509.

102. In the late 1990s, many vendors of dry storage systems were experiencing similar technical and financial difficulties as Vectra in developing their own dry storage systems. Tr. at 997-1000 (Field); Tr. at 578-79 (Redeker).

103. Vectra declared bankruptcy in October 1997. Tr. at 237 (Shetler); Tr. at 997 (Field).

104. In November 1997, Transnuclear West, Inc. ("TNW") purchased Vectra's assets out of the bankruptcy estate. Tr. at 238 (Shetler).

105. By order of the bankruptcy court, TNW agreed to complete the SMUD project without profit. Tr. at 634 (Redeker); PX 585.

106. In May 1998, NRC gave TNW approval to begin limited fabrication of NUHOMS components. PX 580. TNW and its subcontractors began fabrication for SMUD's project in late 1998, early 1999. Tr. at 1141 (Field); Plaintiff's Demonstrative Exhibit ("PX Dem.") 75.

107. In September 1998, the NRC issued a transportation license to TNW under 10 C.F.R. Part 71 concluding that the design for the cask and canisters would be sufficient for off-site transportation of SNF. PX 596.

108. In September 2000, the NRC issued a storage license to SMUD under 10 C.F.R. Part 72 concluding that SMUD could store SNF in its ISFSI using the licensed canister design. PX 962.

109. In September 2000, SMUD received the first completed canister. *See* Rancho Seco Weekly Updates at SMUD 0010102 (PX 640).

110. SMUD loaded the first canister with spent nuclear fuel in April 2001. Tr. at 665 (Redeker).

111. SMUD ultimately received 21 dual-purpose canisters and loaded each of them with 24 separate fuel assemblies (except for one canister that holds only 13 assemblies). Tr. at 144-46 (Shetler); Tr. at 496-522 (Redeker).

112. Each of the 21 dual-purpose canisters, loaded with SMUD's spent nuclear fuel, have been placed in SMUD's Independent Spent Fuel Storage Installation ("ISFSI") for storage. Tr. at 665-68 (Redeker).

113. The ISFSI is composed of twenty-two horizontal storage modules located on a concrete pad. Tr. at 144-45 (Shetler).

114. The horizontal storage modules are made of concrete, which provides shielding for the spent nuclear fuel, and includes vents for the circulation of air for cooling purposes. Tr. at 145 (Shetler).

115. SMUD used the single transportation cask to move each of the canisters from the wet pool to the ISFSI. Tr. at 144-46 (Shetler), 496-00 (Redeker).

116. SMUD finished loading the fuel into the ISFSI in August 2002. Tr. at 668 (Redeker).

## III. <u>The Government's Failure To Begin Acceptance Of Spent Nuclear Fuel and SMUD's Response.</u>

### A. <u>Eleven Years Of Announced Delay And DOE's Ultimate Failure to Begin Acceptance in 1998</u>.

117. Beginning in 1987, DOE made periodic announcements indicating that it would not meet the July 31, 1998 starting date for spent fuel acceptance under the Standard Contract and that its acceptance of such fuel from SMUD and other utilities would be delayed until 2010 or later.

a. In its January 1987 Draft Mission Plan Amendment DOE announced that it would not begin accepting spent fuel at the permanent repository until 2003, and his announcement was repeated in its March 1987 Monitored Retrievable Storage Submission to Congress and its June 1987 Final Mission Plan Amendment PX 109 at 5; PX 113 at 2; PX 118 at 6.

b. In its June 1988 Draft Mission Plan Amendment and 1988 Annual Capacity Report, DOE similarly projected that waste acceptance would not begin at the permanent repository until 2003. PX 143 at 15; PX 142 at 5.

c. In its November 1989 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program ("Reassessment Report"), DOE announced that the repository would not begin operations until at least 2010. PX 169 at vii.

d. In its May 1994 Notice of Inquiry in the Federal Register ("Notice of Inquiry"), DOE stated that "[t]hus far, neither the efforts of the Department nor any other organization . . . have achieved the level of success needed to realize significant success in developing a site by 1998" and expressed its "preliminary view" that it had "no obligation to accept spent nuclear fuel in 1998." PX 351 at 3, 4.

e. In its May 1995 Final Interpretation of Nuclear Waste Acceptance Issues in the Federal Register ("Final Interpretation"), DOE stated its conclusion that its obligation to commence fuel acceptance by January 1998 was conditional upon the existence of an operating repository or interim storage facility constructed under the NWPA, reiterated its belief that "the earliest possible date for acceptance of waste for disposal at a repository is 2010," and acknowledged that utilities would have to plan for the long-term storage of spent fuel in light of this delay. PX 410 at 3, 9.

118. In mid-1988, DOE sent SMUD a letter stating that its projected waste acceptance would not begin until 2003, a 5-year delay in performance. PX 144.

119. Although DOE suggested in the late 1980s and early 1990s that it might still meet the 1998 start date by accepting fuel on an interim basis at a monitored retrievable storage facility ("MRS"), it also recognized that this would not only require that the federal government identify a host site, but also that Congress amend the NWPA and abolish the statutory linkages between an MRS and the repository. These linkages prohibit development of an MRS until after the NRC authorizes construction of the repository, 42 U.S.C. § 10168(d)(1), and effectively preclude operation of an MRS until three years before the repository opens. PX 169 at 19; Designations Appendix (Dckt. #310) at 20-21 (Milner); Designations Appendix (Dckt. #310) at 775 (Barrett).

a. In its June 1988 Draft Mission Plan Amendment, DOE recognized that because of the statutory linkages between an MRS and the repository, it was unlikely to begin accepting fuel at an MRS in 1998. PX 143 at 15.

b. In its November 1989 Reassessment Report, DOE stated that "the current linkages between the repository and the MRS program make it impossible for DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository," and that if the current statutory linkages were maintained, then an MRS could not open before 2007. PX 169 at x, 17.

c. In its 1990, 1991, and 1992 Annual Capacity Reports, DOE similarly recognized that "[i]f the current linkages to the repository are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF/HLW by the DOE would not start until 2007." PX 188 at 5; PX 231 at 4; PX 294 at 3.

d. In 1992, DOE publicly announced that it would not be able to open an MRS by 1998. *DOE Acknowledged Last Week That It Will Not Be Able to Build a Monitored Retrievable Storage (MRS) Facility by 1998*, Inside Energy With Federal Lands at 14 (Dec. 21, 1992) (PX 973).

120. In the 1989 to 1991 time frame, the head of DOE's Office of Civilian Radioactive Waste Management, John Bartlett, and his deputy, Ron Milner, verbally advised SMUD that there were delays in the development of the permanent repository. Designations Appendix (Dckt. #310) at 2237, 2339-40 (Bowser).

121. Other actions during the early 1990s confirmed that the receipt of spent fuel by DOE before at least 2010 was unlikely.

a. The General Accounting Office found in 1991 that an MRS was unlikely to open by 1998. PX 217 at 3-4, 19-23, 30-31.

b. Efforts to locate a voluntary host for an MRS were unsuccessful and were legislatively terminated in the early 1990s. PX 265 (trade press article discussing opposition to siting MRS in Wyoming); PX 363 (Environmental Assessment) at 7 (discussing lack of siting success and legislative termination; PX 283 at 2 ("letter from then-Secretary of Energy Watkins stating that "[t]he Office of the Nuclear Waste Negotiator . . . has spent more than two years seeking a voluntary host and site for an MRS facility. That office has not been able to identify a viable candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel receipt by January 1998 as planned. Thus, alternative actions are required.").

c. DOE did not meet any siting, engineering, permitting, or construction milestones for the development of an MRS. Tr. at 2170-73 (Kouts).

d. DOE officials testified and DOE documents confirm that an MRS was unlikely by 1993 and not viable by 1994 and 1995. *See* Designations Appendix (Dckt. #310) at 43-44, 205-08 (Barrett) (testifying that by Oct. 1993, when the funding for the MRS was cut by Congress, an MRS was "unlikely"); *id.* at 223, 273 (testifying that by late 1994 and early 1995, the MRS concept was "not viable"); Designations Appendix (Dckt. #310) at 419-22 (Milner) (testifying that DOE had given up plans for an MRS by 1994); Designations Appendix (Dckt. #310) at 649 (Brownstein); *see also* PX 380 at 1 (DOE December 1994 Program Plan concluding that "by 1993, it had become clear that continuation of the Program with then current approach was no longer a viable option").

e. DOE's program to develop transportation cask designs for collecting and transporting spent fuel from utilities, known as the Cask Systems Development Program ("CSDP") "experienced long delays and was cancelled by 1993." I. Stuart Written Direct at 3 (PX 1001) (noting that "[w]hen cancelled, the program had not produced a functioning cask, notwithstanding the fact that the Government had spent approximately $100,000,000 on the project according to the GAO"); *see also* Tr. at 1403-04 (Stuart).

f. DOE failed to make progress on the development of a repository. Dep. Des. at 44-45 (Freeman); Dep. Des. 52, 57, 62-63, 151-53 (Bowser).

122. In December 1996, DOE advised SMUD by letter "that DOE anticipates it will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." PX 500. This letter further reinforced SMUD's decision to develop dry storage because it indicated that DOE would not accept fuel on a timely basis. Tr. at 593 (Redeker).

123. These DOE announcements, statements, and actions led SMUD to believe that DOE would probably not begin accepting spent fuel until sometime well after 1998, and that SMUD would probably have to continue to store spent fuel at Rancho Seco until well after 2010. This belief initially arose in the late 1980's and became more certain throughout the 1990s.

a. In the 1989 to 1990 period, it was apparent to SMUD that DOE probably would not begin accepting spent fuel in 1998, and SMUD retained S. Levy, Incorporated ("Levy") to evaluate its options for managing the spent fuel at Rancho Seco in light of this probability. Tr. at 154-55, 158 (Shetler).

b. In 1990, Levy reported to SMUD that the "schedule for DOE pickup is currently highly uncertain with the earliest conceivable pickup date being 1998 and a much more likely pickup date well after 2010." PX 176 at 59.

c. By late 1990, SMUD had a "pretty firmly held belief that . . . we shouldn't count on DOE picking up the fuel . . . in the next decade" based on statements at industry meetings, trade journal coverage, and the lack of congressional and physical activity. Designations Appendix (Dckt. #310) at 2251-52 (Bowser).

d. SMUD's General Manager from 1990 to 1994, David Freeman, testified that, based on his prior experience as Chairman of the Tennessee Valley Authority, the prospect for an MRS was a "dream" and that he "didn't think the above-ground storage option was going to happen." Designations Appendix (Dckt. #310) at 2310-13 (Freeman).

e. Although SMUD was hopeful that an MRS could be developed, it recognized that this would require legislative action and considered this unlikely to occur. Designations Appendix (Dckt. #310) at 2313 (Freeman) (testifying that his view

regarding the MRS was "that that dog wasn't going to hunt"); Tr. at 254, 440-441, 466-468 (Shetler); Tr. at 534-35 (Redeker). SMUD understood that DOE abandoned the MRS process sometime in the mid-1990s. Tr. at 441 (Shetler).

f. By 1992, SMUD was projecting that DOE's acceptance of spent fuel would be delayed by 12 years from 1998 until 2010. PX 259 at 2; PX 269A; Designations Appendix (Dckt. #310) at 2290 (Freeman) (explaining that "my recollection is more the date when you, the government, in plain English, told us that it would be 2010 before you would pick it up"); Tr. at 209 (Shetler).

g. In a March 1993 Environmental Assessment on decommissioning Rancho Seco, SMUD stated that a federal repository for spent fuel is "not currently available and no such repository is expected to be in place until approximately 2010" and that interim storage by DOE "is also not currently an option." PX 297 at 7.

h. DOE's May 1994 Notice of Inquiry and May 1995 Fuel Interpretation provided additional evidence to SMUD that DOE would not begin accepting fuel in 1998 and raised questions about DOE's ability to begin fuel acceptance in 2010. Tr. at 556, 566-67, 573 (Redeker). Tr. at 253, 258 (Shetler).

i. In its March 1997 response to DOE's December 1996 delay letter, SMUD noted that DOE's anticipated failure to begin accepting spent fuel in 1998 meant that "continued, long-term on-site storage at Rancho Seco will be necessary for the foreseeable future." PX 528 at 2.

124. DOE's expected and actual failure to begin accepting fuel in 1998 was a "basic premise" behind SMUD's efforts to develop the dry storage system. Tr. at 463-64 (Shetler).

**B. <u>SMUD's Initial Decision To Pursue Dry Storage.</u>**

125. By the time that SMUD's Rancho Seco reactor prematurely shut-down in June 1989, DOE was already projecting that it would probably not begin accepting spent fuel in 1998. PFF ¶¶ 117-120.

126. During the remainder of 1989 and early 1990, SMUD sought to evaluate its options for managing the spent fuel at Rancho Seco in light of the probability that DOE would not begin accepting fuel in 1998. Tr. at 155 (Shetler).

127. This forced SMUD to consider how to manage spent fuel at a non-operating reactor for up to several decades in a manner that would be safe, and cost-effective and would allow for the anticipated loss of experienced staff over time. Tr. at 160 (Shetler).

128. SMUD retained Levy to analyze its fuel storage options given that DOE's fuel acceptance was likely to be delayed. Tr. at 158 (Shetler); PX 176.

129. The Levy study evaluated 15 fuel storage options for Rancho Seco, including both wet and dry storage, and suggested that SMUD pursue dry storage. PX 176 *passim*.

a. It noted that the DOE pickup schedule was "highly uncertain" and that pickup would likely occur "well after 2010." PX 176 at 59; *see* Motion for Leave to File Testimony of S. Levy & R. Powers, dated March 7, 2005 ("Levy Motion") (Dckt. #300) at 143 (Levy Dep.) ("The key assumption in that report was that DOE would not be able to receive spent fuel in the permanent repository until 2010.").

b. It determined that the most certain storage approach would be continued wet storage until disposal at the DOE repository in 2010 or later, but that dry storage in transportable casks offered the best opportunity for early offsite shipment to an interim

DOE storage facility or for interim acceptance by DOE onsite at the Rancho Seco facility. PX 176 at ii, 56-65.

c. Under these circumstances, the Levy study "strongly recommended" that SMUD pursue the transportable cask option, particularly if coupled with a joint SMUD/DOE demonstration program to resolve any technical or regulatory requirements for such casks. *Id.*

130. Based upon the Levy study, SMUD decided in 1990 and 1991 to pursue a dual purpose dry storage system to address the uncertainties and prospective delay associated with DOE acceptance, while continuing to consider further wet storage as an option. Tr. at 193, 209-10 (Shetler); Designations Appendix (Dckt. #310) at 2251-53 (Bowser).

131. SMUD believed that the development of a dual purpose dry storage system would help address the uncertainties and prospective delay associated with DOE fuel acceptance by encouraging prompt DOE acceptance of SMUD's spent fuel whenever it began performance and by reducing annual operation and maintenance costs over the long-term if DOE did not begin accepting fuel until 2010 or later. Tr. at 172-73, 345-46 (Shetler).

132. In deciding to negotiate and execute the contract with Pacific Nuclear in 1992 for the design and development of the dry storage casks and canisters, SMUD assumed that the opening of the federal repository would be delayed by 12 years and projected that dry storage would yield substantial savings during this period. PX 259 at 2; PX 269A; Tr. at 209 (Shetler).

133. SMUD was not driven by the date of DOE's performance obligation under the Contract, but rather by DOE's announcements that it would not begin performance until at least 2010. Dep. Des. at 42-43 (Freeman).

134. If SMUD had assurance that DOE would begin accepting fuel in 1998, then SMUD would have kept its spent fuel in wet storage and not contracted for the development of a dry storage system in 1992.

a. Tr. at 194 (Shetler) ("I think our first alternative and our preference would have been to keep it in the pool and have DOE receive the fuel on the original schedule, such that it would be offsite in a timely manner. Based on the schedule delays that were known in the early 1990s, what we're facing is a significant cost associated with delays in that performance and then having to store that for a long period of time.").

b. Tr. at 360 (Shetler) ("Q…you had testified that had you had assurances from DOE that it would have begun acceptance in 1998, you would have kept your spent fuel in the pool, correct? A. Correct. Q. And that's based on your concern that the risks of pursuing a first of its kind technology, correct? A. That and any risks associated with DOE not accepting the fuel as standard form in accordance with the original schedule.").

c. Designations Appendix (Dckt. #310) at 2288-89 (Freeman) (SMUD's actions "were driven by the fact that the federal government had taken our money, hadn't come to take our [spent fuel], and was telling us they weren't going to come until at least 2010, which put us in a horrible financial situation….").

d. Levy Motion (Dckt. #300) at 111 (Levy Dep.) ("If a repository was available by 1998 and DOE actually said they're going to do that, that it will be available, it would have changed my recommendation. Q. How? A. I would have stayed in the pool. Q. So it's your testimony that had you believed that the Department of Energy could have had a federal repository by 1998, your recommendation would have been for SMUD spent nuclear fuel to stay in the wet pool? A. To stay in the pool, yes.")

135. In August 1994, the NRC issued an Environmental Assessment on the Rancho Seco ISFSI. PX 363 (Att. 2). The Environmental Assessment states that shipping spent fuel to a permanent repository "is SMUD's primary solution to the storage of spent fuel at Rancho Seco; however, no permanent Federal repository is available." *Id.* at 7. Accordingly, [t]he absence of a Federal repository makes storage of spent fuel in dry [storage] SMUD's primary alternative." *Id.* at 8.

136. DOE's May 1994 Notice of Inquiry and May 1995 Final Interpretation reinforced SMUD's decision to develop dry storage because they indicated that DOE would neither accept spent fuel on a timely basis nor provide interim assistance. Tr. at 253, 258 (Shetler); Tr. at 556-57, 567 (Redeker).

137. The dry storage project was part of SMUD's decommissioning plan for Rancho Seco, and was expected to facilitate decommissioning. However, it was not a prerequisite for decommissioning. Decommissioning was not initially projected to begin until 2008 due to funding limitations, continued operation of the spent fuel pool would not have precluded SMUD from decommissioning the remainder of Rancho Seco, and SMUD eventually began active decommissioning of the site in the 1990s while the pool was in operation. Tr. at 215-18 (Shetler); 696-97 (Redeker).

138. SMUD consistently projected that dry storage would reduce annual savings operating and maintenance costs of fuel storage, but the estimated amount of these savings varied over time due to changes in assumptions and new information. Tr. at 265, 476-77 (Shetler); *see also, e.g.*, PX 176 at 58 ($.5 – $1 million); PX 269A (less than $3 million); PX 272 at 2 ($6 million); DX 280 at SMUD-0029434 ($8 million); *see* PFF ¶¶ 341-344, 347-48.

139. Thus, DOE's announcements and other actions during the late 1980s and early 1990s created significant uncertainty about its future spent fuel acceptance and led SMUD to believe that it would probably have to continue to store fuel at Rancho Seco pool for an extended period and that any opportunity for earlier fuel receipt by DOE would require dry storage. This uncertainty and belief caused SMUD to decide to contract for dry storage in 1992 and to continue with the dry storage project from 1992 until the work was suspended in 1996. PFF ¶¶ 125-138.

140. In 1994, the Chairman of the NRC, Ivan Selin, recognized that "[t]he history of spent fuel management in this country has taken several turns, with a final resolution still out of reach. Several repository programs have started, stalled, and stopped. The latest effort at Yucca Mountain is progressing but, at best, is years from the early phases of licensing, much less the actual underground disposal of spent fuel." PX 357 at 1.

141. The NRC Chairman also concluded with respect to a Monitored Retrievable Storage facility that "no such facility is clearly on the horizon." PX 357 at 1.

142. Because of these facts, the NRC Chairman explained that "[a]ll of these recent developments have changed the circumstances that we face in spent fuel management. The obvious conclusion is that an increasing number of plants, both operating and permanently shut-down reactors, will have to provide for additional spent fuel storage on-site for a longer period than originally planned, and even after plant decommissionings, prudence requires that provision be made for continual, stand-alone on-site storage." PX 357 at 1.

143. The NRC Chairman further noted that "[a]n operational high-level waste repository remains years away in a program that has suffered substantial delays in the past. The future of the MRC is uncertain. Most plants have expanded their pool storage by re-racking to

the extent possible. Clearly, the use of a dry cask storage system at reactor sites is increasingly becoming the only available option for continued operation of many of our nation's nuclear plants." PX 357 at 3.

144. Mr. Ivan Stuart, who had extensive interactions with both DOE and the utilities, explained that "it is clear to me that they [the utilities] felt, because of the extensive delay in DOE program, that they needed to consider options, and one of their, the options that they almost all considered was the utilization of dual-purpose containers or casks." Tr. at 1458.

### C. SMUD's Continued Reevaluation Of The Project And Commitment To Proceed In Light Of Breach.

145. By 1997, SMUD believed that an MRS would not be developed, that DOE would not begin accepting spent fuel until at least 2010, and that SMUD would have to continue to store fuel at Rancho Seco for an extended and unknown period. PX 500; *see* PFF ¶¶ 121-124.

146. At that time, almost all work on the dry storage system had stopped due to technical issues between Vectra and the NRC, the NRC's issuance of a demand for information to Vectra, and Vectra's bankruptcy. PX 509, 511; PFF ¶¶ 101-06; 293-94.

147. When work on the dry storage system stopped, the project was behind its initial schedule and the costs exceeded its initial budget. The NRC had not yet issued a transportation or storage license, neither the cask nor any canisters had yet been fabricated, and a variety of licensing, design, and manufacturing issues remained open. Although SMUD expected that these issues would be resolved, it recognized that they posed obstacles that could further complicate and delay completion of the project. Tr. at 628-29 (Redeker) ("This was a troubled project, costs are going up, schedule is moving out. And quite frankly, I was extremely nervous. This was my job and it wasn't working out very well"). PFF ¶¶ 297-304.

148. SMUD also recognized that there was a risk that DOE might later declare canistered fuel to be "non-standard" fuel under the Standard Contract and attempt to move such fuel to the end of the fuel acceptance queue. If this occurred, it would further delay the acceptance of SMUD's fuel. PX 286 at SMUD-0009332; PX 319 at 1-2; PX 320; PX 325; Tr. at 173, 218 (Shetler).

149. Under these circumstances, SMUD comprehensively reevaluated and reanalyzed its spent fuel storage strategy during the period from December 1996 through May 1997 (the "1997 Reevaluation"). This reevaluation went through multiple iterations and involved consideration of nine alternatives, including other dry storage systems and leaving the spent fuel in the spent fuel pool. PX 502 at 1; PX 503; PX 519 at 18-20.

150. The 1997 Reevaluation was driven by SMUD's expectation that DOE would not begin accepting spent fuel for many years and SMUD's assumption that fuel would remain at Rancho Seco until approximately 2027. Tr. at 238 (Shetler); PX 519 at 19.

151. The 1997 Reevaluation sought to assure that SMUD pursued the most cost-effective, yet safe fuel storage strategy, while recognizing that the longer the fuel remained in wet storage the higher the costs would be. PX 512 at 2; Tr. 596:22-598:12 (Redeker).

152. The 1997 Reevaluation ultimately concluded that continuing with the current dry storage project was the best fuel storage option available under the circumstances because SMUD would have to store the Rancho Seco fuel for at least another 20 or 30 years and dry storage would minimize the costs over the long period of DOE's delay in performance. PX 524; PX 538 at 9, 12; Tr. at 604, 610, 620 (Redeker).

153. In March 1997, in response to the DOE's December 1996 delay letter (PX 500), SMUD submitted a letter to DOE requesting that DOE take title to SMUD's spent fuel, as DOE

had done at the Fort St. Vrain reactor in Colorado, and pay the costs of "continued on-site storage of spent fuel . . . at the Rancho Seco site." PX 528 at 3. SMUD concluded that "[i]t is now time for DOE to honor its contractual obligation by accepting spent fuel as soon as possible and to reimburse utilities such as SMUD for their interim storage costs in the meantime." *Id.* at 3.

154. DOE's announced failure to live up to its contractual obligations caused SMUD to proceed with the dry storage project in 1997. Tr. at 593, 619-22 (Redeker); Tr. at 905-07 (Ferreira) (explaining that "had DOE responded favorably and was willing to assume responsibilities, then we would not have continued with the dry fuel storage program").

155. If SMUD had assurance that DOE would begin accepting spent fuel in 1998, then SMUD would have abandoned the dry storage project at that time and left its fuel in wet storage. Tr. at 619-22 (Redeker) (timely performance by DOE "would have changed the outcome of this entirely. It would have made the spent fuel pool an absolute certainty. They are coming, they are going to take it out of our pool, the risk will be gone").

a. This would have allowed SMUD to avoid the licensing and manufacturing risks associated with dry storage. Tr. at 620-21 (Redeker); *see also* PFF ¶¶ 287-304.

b. It would also have allowed SMUD to avoid the risk of DOE subsequently attempting to defer acceptance of the fuel because it had been canistered. Tr. at 621-22 (Redeker); *see also* PFF ¶ 512-518.

156. In mid-1997, SMUD requested that DOE take title to SMUD's SNF at Rancho Seco and stated that SMUD would seek reimbursement of its dry storage costs if DOE failed to perform its obligations. PX 528 at 3.

157. DOE's failure to begin accepting fuel in January 1998 reinforced SMUD's belief that it had made the right decision in pursuing dry storage. Tr. at 242-44 (Shetler). SMUD

would not have continued with the dry storage project had DOE begun performance. Tr. at 907, 926 (Ferreira); Tr. at 628, 29, 633-34 (Redeker).

158. Vectra's bankruptcy precipitated yet another reevaluation and reconsideration of the project by SMUD during 1998. PX 585; Tr. at 620-21 (Redeker); Tr. at 905-07 (Ferreira).

159. TNW, which acquired the Vectra assets out of the bankruptcy estate, was not willing to continue the SMUD project unless it was assured that it would have its costs reimbursed. Tr. at 921 (Ferreira).

160. During 1998, following the bankruptcy of Vectra, SMUD continued to consider other options for spent fuel storage, including a wet storage contingency plan to minimize the cost of long-term wet storage and negotiations with TNW for a new contract to restart and complete the project. PX 570; PX 685. Because of the knowledge of DOE's breach, the expectation that SMUD would have to continue to store Rancho Seco fuel for several decades, and the cost savings afforded by dry storage during DOE's delay in performance, SMUD concluded in 1998 (the "1998 Decision") that the "appropriate plan" was to continue with the current dry storage project while also continuing to consider other options. PX 570 at 4-5; Tr. at 626-29 (Redeker).

161. SMUD's 1998 Decision to enter into a new contract with TNW for completion of the dry storage project was driven by DOE's failure to begin accepting fuel in January 1998 and SMUD's belief that dry storage would best address the additional costs and uncertainty associated with the long-term storage of spent fuel at Rancho Seco. Tr. at 633-34 (Redeker); Tr. at 926 (Ferreira); PX 585.

162. Had DOE been accepting fuel, SMUD would not have entered into a new contract to complete the project with all of its associated risks and uncertainties; SMUD would have taken the more certain, less risky approach and left the fuel in the pool. Tr. at 628-29 (Redeker).

163. During the period from December 1999 through February 2000, SMUD undertook a further reevaluation and reanalysis of wet and dry storage (the "2000 Reevaluation"). PX 642. It was undertaken to determine whether to stop the dry storage project. Tr. at 652 (Redeker). At that time, SMUD had still not received a transfer cask or any storage canisters, and the project continued to face licensing obstacles and manufacturing delays. PFF ¶ 109, 314-322.

164. Because DOE was not projected to pick up all of the spent fuel from Rancho Seco until at least 2024, the 2000 reevaluation indicated that it would be beneficial to continue with the dry storage project. Tr. at 653 (Redeker) (noting "the significant factor . . . is how long is the fuel going to be there? At this point, I'm looking at . . . the late 2020s time frame. So DOE is not performing[.]"); Tr. at 656, 658 (Redeker) (same); Tr. at 930-31 (Ferreira); PX 642 at 1 and SMUD-062828; PX 672.

165. If DOE had begun accepting spent fuel under the Standard Contract in 1998, then SMUD would not have continued with the dry storage project in 2000 to avoid further potential licensing, manufacturing, and acceptance queue problems. Tr. at 653 (Redeker); Tr. at 930-31 (Ferreira); *see* PFF ¶ 318.

166. In June 2001, because of continuing fabrication and delivery issues, SMUD undertook another reevaluation of alternatives to the dry storage system (the "2001 Reevaluation"). PX 689. At that time, SMUD had already begun transferring fuel to the ISFSI,

but SMUD wished to confirm that the dry storage project remained appropriate. PX 689; Tr. at 667-68 (Redeker).

167. The 2001 Reevaluation focused on alternative dry storage systems and concluded again that dry storage would provide savings compared to wet storage because of the anticipated length of the time that SMUD would have to store fuel at Rancho Seco. PX 689 at 1-2.

168. Thus, DOE's failure to begin accepting spent fuel in 1998 created significant uncertainty about its future fuel acceptance and led SMUD to believe that it would have to continue to store fuel at Rancho Seco until sometime in the 2020s or later. This uncertainty and belief caused SMUD to re-start the dry storage project in 1998, continue with the dry storage project in 2000, and transfer its fuel from wet storage to the ISFSI in 2001 and 2002. *See* PFF ¶¶ 145-167.

## IV. <u>SMUD's Damages As A Result of Breach.</u>

169. SMUD utilizes an automated accounting system to record accounting transactions. Tr. at 1046 (Field), 1233 (Holst).

a. Prior to October 31, 1999, SMUD used the Financial Management Information Systems, Ltd. ("FMIS") accounting system.

b. As of November 1, 1999, SMUD converted its accounting records to the Systems Applications and Processes ("SAP") accounting software.

170. Both the FMIS and SAP accounting systems utilize a work order system to track both internal and external costs. Tr. at 1046 (Field).

171. A work order number is created for each new project undertaken at SMUD; a large project may have numerous work order numbers associated with it, each corresponding to various segments of the project. Tr. at 1233-34 (Holst); PX 1000 at 2.

172. As invoices for external costs are received, charges are assigned to the appropriate corresponding work order number. Tr. at 1048 (Field).

173. SMUD also tracks its internal costs through the work order system. Tr. at 1233-34 (Holst).

174. SMUD employees record their hours and the activity to which they devoted those hours based on the appropriate work order number to which their work corresponds. PX 943 (example timesheets). The time is then charged through the accounting system to the appropriate work order number. Tr. at 1234 (Holst).

175. In addition to the designated work order number, costs are assigned to particular cost categories for general tracking, including outside services (outside vendor contracts), labor, indirect labor, materials, materials surcharge and other. B. Brinig Written Direct at 5 (PX 1000).

176. Reports can be generated grouping the costs by a particular cost category or a particular work order for a particular period of time. Tr. at 1233; B. Brinig Written Direct at 4 (PX 1000).

177. Because all expenses—internal and external—are tracked through this accounting software, the total cost of a project can be determined by identifying the work order numbers that correspond to that project and running a report that lists the total costs associated with the work orders identified. Tr. at 1233 (Holst).

178. SMUD's accounting system allows one to track the exact costs that were incurred for a particular project, just as if it were contracted out to another company. Tr. at 1233 (Holst).

179. SMUD's accounting system "has a variety of internal control policies and procedures designed to insure that all transactions are timely and accurately recorded." PX 291 at 5.

180. Timecards are reviewed by supervisors and submitted to the time keeping department for review. Any issues are raised directly with the plant manager, Steve Redeker. Tr. at 674-75 (Redeker).

181. A summary of the time for the entire plant is produced weekly and reviewed by Mr. Redeker. Tr. at 674-75 (Shetler).

182. The process of timecard review has been in place since before the inception of the dry storage project. Tr. at 674-75 (Redeker).

183. Monthly invoices, including documentation such as timesheets, purchase orders, and travel claims, are reviewed to determine the appropriateness of the charges and concerns are identified by the accounting department. Tr. at 676-77 (Redeker), 1046-48 (Field).

184. The project manager independently reviews all invoices, as well as any concerns raised, and signs off on the work billed and all charges. Tr. at 676-77 (Redeker), 1046-48 (Field).

185. Any issues raised are then resolved with the contractor, through revision or denial of charges. Tr. at 676-77 (Redeker), 1046-48 (Field).

186. Reconciliations between the budget and the actual costs incurred, including running summary cost reports on the project, comparing actual costs to the budget, and investigating the budget, are made on a monthly basis. Tr. at 1234-35 (Holst).

187. Concerns raised during reconciliations are noted and the reports and any concerns are forwarded to the project manager. Tr. at 1234-35 (Holst).

188. A final reconciliation is reviewed by the plant manager, Steve Redeker. Reconciliations also are forwarded up through SMUD's organization to SMUD's budget office. Tr. at 677 (Redeker), 1234-35 (Holst).

189. SMUD's books and records are audited annually by independent accountants. Annual financial statements audit reports were conducted by PricewaterhouseCoopers LLP from 1996 to 2003 and Macias, Gini & Company LLP from 1996-2000. *See, e.g.*, PX 510.

190. During these audits, no material audit qualifications or weaknesses with respect to SMUD's system were noted. *See* B. Brinig Written Direct at 3 (PX 1000).

191. The audit process in this litigation was rigorous and comprehensive. *See* PFF ¶¶ 192-198.

192. SMUD's expert, Brian Brinig, "reviewed the annual audit reports prepared by SMUD's independent accountants, discussed the accounting system with client personnel, and tested the application of the accounting and internal controls procedures as they relate to cost accumulation for the dry storage project." B. Brinig Written Direct at 2-3 (1000).

193. SMUD's damages claim was prepared using the same work order system and accounting software SMUD uses on a daily basis as part of its general accounting system in order to track all of the company's costs. Tr. at 1232-34 (Holst).

194. Nineteen specific work order numbers were created for the various aspects of the spent fuel project. Tr. at 1050 (Field).

195. SMUD's total costs related to the dry storage project were identified by gathering the related work orders and totaling the costs incurred for each work order by year. Tr. at 1236-42 (Holst); *see* PX Dem. 43.

196. In order to compile the total costs SMUD incurred related to the dry storage project, the project manager, Jim Field, reviewed SMUD's work order numbers to identify those that were appropriately considered part of the overall dry storage project. Tr. at 1239 (Holst);

197. Mr. Field identified the work orders based on his "knowledge of the work that [SMUD] has done over the last 10, 15 years." Tr. at 1050 (Field).

198. Luana Holst reviewed the work order list to ascertain if any additional work orders should be included and verified that all the work orders selected were part of the dry storage project. Tr. at 1239-41 (Holst).

**B. <u>SMUD's Damages from 1992 to 1997.</u>**

199. SMUD has proven it has incurred $22,308,342 in costs related to the dry storage project from 1992 to 1997. *See* B. Brinig Written Direct at Ex. C (PX 1000).

200. SMUD has agreed to offsets totaling $754,880 during this period, including $667,880 in costs for the gantry crane refurbishment and $87,000 for the fuel inspection. *See* PFF ¶¶ 249-253, 265-269.

201. Thus, SMUD has proven it has incurred and is entitled to recover $21,553,462 in damages from 1992 to 1997. *See* PFF ¶¶ 199-200.

202. Of SMUD's total damages from 1992 to 1997, $12,112,865 are attributable to outside services, or vendor contracts. *See* B. Brinig Written Direct at 5 (PX 1000).

203. Almost all of the costs for outside services during the 1992 to 1997 period were attributable to Vectra. Tr. at 962 (Field).

204. Vectra was responsible for designing, licensing, and fabricating the cask and canisters from 1992 until Vectra's bankruptcy in 1997. The total cost attributable to Vectra under this contract was $11.7 million. Tr. at 962 (Field); PX Dem. 77.

205. $3,737,099 of SMUD's costs from 1992 to 1997 were costs attributable to internal labor. *See* B. Brinig Written Direct at 8 (PX 1000).

206. $3,399,284 of SMUD's costs from 1992 to 1997 were costs attributable to materials. *See* B. Brinig Written Direct at 10 (PX 1000). The remaining costs for 1992 to 1997 are set forth in detail in B. Brinig Written Direct at Ex. C (PX 1000).

207. SMUD's costs can also be broken down by Work Order number, as opposed to the above categories. Work Order 604026 is entitled Spent Fuel Disposition. The total cost for this work order from 1992 to 1997 is $14,797,972. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order encompasses the costs for the design and development of the cask and canister, including costs associated with the major vendors, such as Vectra and Pacific Nuclear. Tr. at 1054-55 (Field).

208. The design, fabrication, testing, delivery and documentation of cask, canisters and all rental equipment fall within this category. Tr. at 213 (Shetler); Tr. at 955 (Field).

209. Work Order 604025 is entitled Construct ISFSI. The total cost for this work order from 1992 to 1997 is $2,928,321. *See* B. Brinig Written Direct at Ex. C (PX 1000). Work captured under this work order includes the design and construction costs of the ISFSI project, including building the on-site facility, which is composed of a concrete pad, fencing, lighting, security system, roadways. Tr. at 1055-56 (Field).

210. Work Order 701804 is entitled Site Improvement/Fuel. The total cost for this work order from 1992 to 1997 is $2,151,656. *See* B. Brinig Written Direct at Ex. C (PX 1000). Work captured under this work order includes improvements to the spent fuel building to accommodate casking, building modifications to create a training facility, roadway work, and cask drop evaluations.

211. Modifications to the gantry crane were made in the period 1992 to 1997.

a. Work Order 702035 is entitled Gantry Crane Refurbishment, and $7,095 in costs were incurred for this work order from 1992 to 1997. Tr. at 1043 (Field); *see* B. Brinig Written Direct at Ex. C (PX 1000).

b. Work Order 702036 is entitled Gantry Crane Upgrade, and $660,734 in costs were incurred for this work order from 1992 to 1997. These work orders include the costs of modifications to the gantry crane. Tr. at 1043 (Field); *see* B. Brinig Written Direct at Ex. C (PX 1000).

**A. <u>SMUD's Damages From 1998 To 2003</u>.**

212. SMUD has proven it has incurred a total of $56,249,870 in costs related to the dry storage project from 1998 to 2003. *See* B. Brinig Written Direct at Ex. C (PX 1000).

213. SMUD has agreed to offsets totaling $1.2 million during this period, including offsets for spent fuel building upgrades ($450,000), onsite drop mitigation costs ($250,000), and loan workout credit ($500,000). PFF ¶ 248.

214. Thus, SMUD has proven that it has incurred and is entitled to recover total damages of $55,049,870 from 1998 to 2003.

215. Of this total amount, SMUD incurred $42,260,138 in costs attributable to outside services, or vendors. *See* B. Brinig Written Direct at 5-6 (PX 1000).

216. SMUD's main contractors from 1998 to 2003 were Transnuclear West, Inc., PCC, Bigge, Numanco, PacTech, and Hartford Steam. Tr. at 957-63 (Field); PX Dem. 77.

217. Transnuclear West was responsible for designing, licensing, and fabricating the casks and canisters following Vectra's bankruptcy in 1997 until the completion of the project.

218. The total cost attributable to the contract with TNW was $25.8 million. Tr. at 962-63 (Field); PX Dem. 77.

219. PCC was the fabricator of the cask and canisters. The majority of work by PCC was contracted for by Vectra and TNW through a subcontract. Tr. at 960-61 (Field).

220. In 2000 and 2001, however, SMUD entered into a separate contract directly with PCC, and payments were made directly to PCC as part of this arrangement. Tr. at 960 (Field).

221. The total cost of these direct payments to PCC was $5.5 million. Tr. at 960 (Field); PX Dem. 77.

222. At the time of the fuel transfer, SMUD contracted with Bigge to provide additional staff necessary to complete the transfer. This contract spanned from approximately 1999 to 2002. Tr. at 957 (Field).

223. The total cost attributable to the contract with Bigge was $5.5 million. Tr. at 957 (Field); PX Dem. 77.

224. Following shutdown, SMUD reduced its radiation protection staff such that additional staff was necessary to support the dry storage project. Radiation protection technicians set work standards and practices to ensure radiation protection and provide oversight. Tr. at 957-58 (Field).

225. SMUD contracted with Numanco in order to augment its staff. The total cost attributable to this contract was $1.5 million. Tr. at 957-58 (Field); PX Dem. 77.

226. PacTech assisted in evaluating issues regarding the potential for dropping the cask on-site. As a result of this assistance, cushioning impact limiters were placed in selective areas in order to limit the impact of any cask drop. Tr. at 959 (Field).

227. The total for the PacTech contract was $925,000. Tr. at 959 (Field); PX Dem. 77.

228. An independent third-party overseer was included in the project planning to ensure quality of the project. Tr. at 960 (Field).

229. SMUD contracted with Hartford Steam for this third-party assistance, with a total of $754,000 in total costs under the contract. Tr. at 960 (Field); PX Dem. 77.

230. Although SMUD contracted out large portions of the work associated with the dry storage project, SMUD also had employees devoting substantial time to the project.

a. SMUD engineers reviewed all the technical work that was done by Vectra, PCC, and Transnuclear, including between 3,000 and 4,000 design drawings, calculations, reports, and licensing documents. Tr. at 966-67 (Field). SMUD engineers reviewed 470 designs in 1999 alone. Tr. at 964-66 (Field).

> "[F]or example, Demonstrative 56, there's some typical Pacific Nuclear drawings, and so for any aspect of the project, they would do drawings, and they would, before they were finalized, they would be submitted to, to us formally. And I would have an engineer take the drawing, review it against our design specification, review it against the applicable industry standards, and comment on the drawing, either by marking it up or providing a typewritten list of comments. And then it was submitted to me for concurrence, and I would do my own review, if comments were extensive. Frequently, a[n] engineer would sit down with me, and we'd sit for a period of time and go over the drawings and the comments, and once we'd agreed on the comments, they were provided back to our document control center, who then formally transmitted the drawings and comments back to whoever the design organization was. . . . And so over the course of the project, there was somewhere between . . . 3 and 4000 document submittals to us, where we would . . . go through that process."

Tr. at 966-67 (Field).

b. SMUD employees were also heavily involved in overseeing the fabrication and ensuring compliance with NRC requirements. Tr. at 965 (Field); PFF ¶¶ 318-19.

c. A quality assurance engineer was placed full-time at PCC's manufacturing facility during the course of the fabrication. Tr. at 965 (Field).

d. Quality engineers engaged in periodic audits of the various contractors. As part of this audit, engineers would evaluate the technical work. Tr. at 965 (Field).

e. A resident expediter was also placed at PCC to expedite fabrication. Tr. at 965 (Field).

f. SMUD employees developed and engaged in classroom and hand-on training with regard to all aspects of loading and transferring the fuel to the ISFSI. Tr. at 639-40 (Redeker).

231. $10,074,941 of SMUD's costs from 1998 to 2003 were costs attributable to internal labor. *See* B. Brinig Written Direct at 9 (PX 1000).

232. SMUD also incurred total costs of $1,123,960 attributable to materials from 1998 to 2003. *See* B. Brinig Written Direct at 11 (PX 1000).

233. SMUD's costs can also be grouped by the various segments of the dry storage project, each categorized by work order number. *See* B. Brinig Written Direct at Ex. C (PX 1000).

234. Work order numbers reflect the total costs of the segment of the project, combining all internal and external costs. Tr. at 1233 (Holst).

235. Work Order 604026 is entitled Spent Fuel Disposition. The total cost for this work order from 1998 to 2003 is $44,729,800. *See* B. Brinig Written Direct at Ex. C (PX 1000).

a. This work order encompasses the costs for the design and development of the cask and canister, including costs associated with the major vendors, such as Transnuclear West. Tr. at 1054-55 (Field).

b. The design, fabrication, testing, delivery and documentation of cask, canisters and all rental equipment fall within this category. Tr. at 213 (Shetler); Tr. at 955 (Field).

c. SMUD internal labor associated with managing these large contracts is also included. Tr. at 1054-55 (Field).

236. Work Order 4000372 is entitled Spent Fuel Offload & Storage. All costs charted to this work order, totaling $3,826,290 were incurred between 1998 and 2003. Tr. at 1056-57 (Field). This work order was set up to capture the actual cost of transfer of the fuel to the ISFSI. Tr. at 1056-57 (Field).

237. Work Order 705184 is entitled Fuel Off-Load Training. All costs charged to this work order, totaling $1,804,016 were incurred between 1998 and 2003. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order represents the development of the training materials and the actual training of SMUD personnel. Tr. at 1059-60 (Field).

238. Work Order 4000371 is entitled General Support Spent Fuel. All costs charged to this work order, totaling $1,532,133, were incurred between 1998 and 2003. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order includes activities associated with the dry storage project, including planning and procedure development. It also encompasses support activities for spent fuel storage, including equipment maintenance and DOE reporting until the fuel is moved to the ISFSI. Tr. at 1057-58 (Field).

239. Work Order 701804 is entitled Site Improvement/Fuel. The total cost for this work order from 1998 to 2003 is $1,242,043. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order includes improvements needed to prepare the site for fuel transfer, including improvements to the spent fuel building to prepare the site for transfer, upgrades to the roadway

and buildings for training, and onsite cask drop evaluations and mitigation actions. Tr. at 1058-59 (Field).

240. Work Order 4002862 is entitled Nuclear Fuel Storage. The total cost for this work order from 1998 to 2003 is $1,220,672. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order represents SMUD's costs of managing the fuel once it was placed in the ISFSI, including ongoing operation, maintenance, and monitoring of the fuel and support activities such as equipment maintenance. Tr. at 1056 (Field).

241. Work Order 702468 is entitled Computer Project—ISFSI Security. A total of $1,040,837 was charged to this work order number between 1998 and 2003. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order includes the costs of designing and installing the ISFSI security system for both on and off site monitoring. Tr. at 1059 (Field).

**B. <u>SMUD's Total Damages.</u>**

242. SMUD has established that it is entitled to recover total damages from 1992 to 2003 of $76,603,332. SMUD is entitled to this amount based on the evidence presented at trial, as adjusted by offsets agreed to by SMUD. *See* B. Brinig Written Direct at Ex. C (PX 1000); *see also infra* § V (specifying offsets).

243. SMUD's total damages of $76,603,332 are derived as follows:

a. $78,558,212 in costs SMUD incurred related to the development and operation of SMUD's dual-purpose dry storage system from 1992 to 2003, *see* Brinnig Written Direct at Ex. C;

b. Minus offsets totaling $1,954,880 agreed to prior to trial. *See generally* PFF ¶¶ 248-282.

244. SMUD has proven total costs, grouped by cost category, as follows:

a. Outside services, or vendor invoices, total $54,373,003.

b. SMUD's internal labor for the project totals $13,812,040. Indirect labor totals $4,548,851.

c. Materials costs total $4,523,244.

d. The category of materials surcharge totals $391,314 and "other" totals $164,254.

e. A total of $676,922 falls under corporate allocation.

f. A credit of $1,220,964 is included under the category "non cash."

g. A total of $1,289,547 falls under the category of miscellaneous work orders. *See* B. Brinig Written Direct at 4-5 (PX 1000).

245. SMUD's expert Brian Brinig confirmed, "based on [his] evaluation, analysis and testing of SMUD's claims and supporting documentation," that SMUD accurately accounted for its costs and did in fact incur a total of $78,558,212 related to the dry storage project. B. Brinig Written Direct at 12 (PX 1000).

246. The government's expert witness, Stephen J. Kiraly, conducted a detailed review of the invoices, time sheets, and accounting data supporting SMUD's claim, in both electronic and hard copy form. Kiraly Written Direct at 12-13; Tr. at 2795 (Kiraly). Mr. Kiraly independently confirmed that SMUD incurred $78,558,212 related to the dry storage project. Kiraly Written Direct at 17, Att. 1; Tr. at 2797 (Kiraly).

247. The government has stipulated that these costs were actually expended by SMUD related to the development and operation of SMUD's dual-purpose dry storage system. Tr. at 2796.

## V. **Acknowledged Offsets To Damages.**

248. SMUD agreed prior to trial to various offsets to SMUD's total costs incurred in development and operation of its dry storage project. *See* SMUD's Memorandum of Contentions of Fact and Law at 4.

a. Gantry Crane Upgrade: $667,880

b. Spent Fuel Building Upgrades: $450,000

c. Spent Fuel Inspection: $87,000

d. Onsite Drop Mitigation: $250,000

e. Loan Workout Credit: $500,000

f. Double-Counting: $2,500,000 (previously deducted)

### A. **Gantry Crane Upgrade.**

249. SMUD's gantry crane was originally intended to service the turbine generator, but it also was used for handling the cask during transfer in and out of the spent fuel building. Tr. at 1043 (Field).

250. SMUD's original gantry crane was a 100-ton hook weight capacity crane. Tr. at 2594 (Burford).

251. SMUD determined in the mid-1990s that it was necessary to refurbish the gantry crane. Tr. at 1044 (Field).

252. The costs for the gantry crane refurbishment were tracked under work orders 702035 (Gantry Crane Refurbishment) and 702036 (Gantry Crane Upgrade). The cost of refurbishing the gantry crane was $667,880 and was incurred between 1992 and 1997. Tr. at 1043-44 (Field).

253. It is appropriate to offset the costs of refurbishing the crane, as SMUD may have had to refurbish and make operational improvements to the crane even if DOE had performed as required under the Contract. Tr. at 1044 (Field).

### B. Spent Fuel Building Upgrades.

254. The Contract requires that DOE "arrange for, and provide, a cask(s)," that "[s]uch cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries," and that "[s]uch cask(s) shall be suitable for use at the Purchaser's site." Contract Art. IV.B.2.

255. Rancho Seco as initially constructed included a 100-ton hook weight capacity crane. Tr. at 2594 (Burford).

256. DOE's expert, Jerry Burford, agreed that "[a] 100-ton cask would constitute a cask suitable for SMUD, for Rancho Seco." Tr. at 2602-03 (Burford).

257. In the late 1980s, DOE engaged in the Facility Interface Capability Assessment (FICA) Project, the object of which was to "access the capability of each of the relevant commercial facilities to handle spent-fuel shipping casks." Facility Interface Capability Assessment (FICA) Project Report at 1 (June 2001) (PX 207).

258. After reviewing data and engaging in visits to the various nuclear power plant facilities, DOE published the FICA Report in June 1991. PX 207. This report included information on the capacity of various utilities to accept a legal weight truck cask, an overweight truck cask, a 100-ton rail/barge cask, and a 125-ton rail/barge cask. PX 207.

259. In the original FICA, SMUD was listed as having the capacity to handle an overweight truck cask and a 100-ton rail/barge cask upon implementation of administrative changes. PX 207 at 7-17, 7-18.

260. When DOE resumed the aborted DCS process for a short period in 2004, DOE began the process of updating its information from the FICA study in order to have all the information available to provide equipment suitable for each utility upon performance. PX 812.

261. SMUD was required to undertake many modifications to the spent fuel building, many of which were "attributable to the fact that we're dealing with a welded canister, as opposed to a cask with just a bolted lid." Tr. at 1029-31 (Field) (noting numerous design changes required due to dual-purpose nature of system).

262. If a transportation cask suitable for SMUD's originally designed facility was provided by DOE, many of the modifications made by SMUD for the dual-purpose canister based system would not have been required. Tr. at 1031 (Field).

263. In the mid-1990s, if a suitable transportation cask was provided by DOE, only a small number of modifications to the facility would be required, including additional piping; lighting, power, and communication improvements; and modifications for cask decontamination. Tr. at 1034, 1038 (Field).

264. A conservative estimate of the modifications that would have been required to accommodate a cask in the non-breach world is $450,000. Tr. at 1039 (Field).

**C. <u>Fuel Inspection Offset.</u>**

265. The Contract requires purchasers to classify their SNF and/or HLW prior to delivery in accordance with the descriptions in the Appendix. Contract Art. VI.A.1.b.

266. In the mid-1990s, SMUD conducted a visual fuel inspection wherein a videotape of the fuel was made and reviewed to determine the condition of each fuel assembly. Tr. at 1041-42 (Field).

267. SMUD employed the videotape to classify the fuel in accordance with the Contract. Tr. at 685 (Redeker).

268. In conducting this visual fuel inspection, SMUD incurred $87,000 in labor and materials costs, all charged prior to 1998. Tr. at 1041-42 (Field).

269. It is appropriate to offset the costs of the fuel inspection, as it would have been necessary if the government had performed as required under the Contract. Tr. at 1041-42 (Field).

### D. <u>On-Site Drop Mitigation Offset.</u>

270. Rancho Seco was originally designed to accommodate a 100-ton cask, including the ability to withstand the drop of a 100-ton cask. Tr. at 1040 (Field).

271. Because the original on-site drop mitigation analysis was done in the 1970s, it might not meet current standards. Therefore, if DOE had properly performed under the Contract, SMUD likely would have had to reevaluate its earlier analysis and potentially undertake certain modifications, including: (1) an impact limiter, or foam cushion, where the cask would impact, and (2) a raised platform to limit the distance that it would fall. Tr. at 1040, 1205-06 (Field).

272. Jim Field estimated that the cost of this analysis and the resulting modifications would be $250,000. Therefore, an off-set in this amount is appropriate. Tr. at 1040, 1191-92 (Field).

273. SMUD also undertook additional mitigation analysis and modifications that were required solely because of the increased weight of the dual-purpose canister; such modifications would not have been required had DOE provided a suitable cask upon performance. Tr. at 1191-92, 1196-97 (Field).

**E. <u>Loan Workout Offset.</u>**

274. As part of a Loan and Workout Agreement between SMUD and Precision Components Corp. ("PCC"), SMUD made a payment to PCC of $1.5 million. Loan and Workout Agreement (May 2001) PX 683. This cost was charged to work order 604026. *See* Contract E776A Change Order No. 9 (PX 598).

275. As part of this agreement, SMUD's contractor, Transnuclear West, Inc., made a $1.1 million payment to SMUD in May, 2001. *See* Contract E776A Change Order No. 9 (PX 598). While $600,000 was credited to work order 604026, the remainder of this payment, $500,000, was credited to SMUD's general account number, work order 14249. DX 1156.

276. Because work order 14249 is not associated with the dry storage project, it was not included when formulating SMUD's damages claim. *See* Memorandum of Contentions of Fact and Law at 5 (Dckt. #286).

277. Because this work order, and therefore this $500,000 credit, was not accounted for in SMUD's damages claim, an offset of $500,000 is appropriate in the period 1998 to 2003. *See* B. Brinig Written Direct at 12 (PX 1000).

**F. <u>$2 Million In "Double Counting."</u>**

278. SMUD's initial damages disclosure for 1992 through 1996 was prepared from FMIS summary printouts rather than an electronic system, as the FMIS system had been replaced at SMUD by the SAP accounting system in 1999. Tr. at 1240 (Holst).

279. The summary printout for 1994 erroneously included the totals for 1992 and 1993, resulting in a double-count of these costs in SMUD's initial claim of approximately $2 million. Tr. at 1241-42 (Holst).

280. Upon review of the detailed backup information for the accounting system for the period 1992 to 1996, Ms. Holst discovered the double counting error and notified counsel. Tr. at 1241 (Holst).

281. SMUD notified the government of this error at Ms. Holst's deposition and by correspondence dated November 5, 2004. Tr. at 2790; Kiraly Written Direct at Att. 1, n.3.

282. The $2 million double counting was addressed prior to the trial and was deducted from SMUD's claim prior to SMUD's submission of its Memorandum of Contentions of Fact and Law (Dckt. #286). The government agreed at trial that this issue has been "resolved." Tr. at 1049-50.

## VI. SMUD's Commercially Reasonable Management Of The Project.

283. SMUD's decisions to start and then continue with the procurement of a dual purpose dry storage system were reasonable and prudent in light of the long delays projected by DOE for its waste acceptance program and DOE's support for the development of such a system. *See* I. Stuart Written Direct at 2-6 (PX 1001); E. Supko Written Direct at 10 (PX 1002).

284. Since 1987, the DOE's announcements and actions increasingly indicated that its acceptance of spent fuel would probably be delayed for a significant period and that is in fact what has happened. *See* PFF ¶¶ 117-124.

285. During the 1990s, the DOE supported and encouraged the development of dual-purpose dry storage systems. This encouragement included the Cooperative Agreement between DOE and SMUD, DOE interest in and support for multi-purpose canister systems, and DOE statements indicating that it planned to accept dual-purpose systems at the permanent repository. *See* I. Stuart Written Direct at 4-6 (PX 1001); E. Supko Written Direct at 49-52 (PX 1002); PX 591; PFF ¶¶ 523-550.

286. After DOE failed to begin performance in 1998, SMUD used its best efforts to restart and then complete the development of a dual-purpose dry storage system for the on-site interim storage of SNF. Tr. at 634 (Redeker) ("The fact that they had officially breached at this time, it had an impact in that how long would the fuel be in dry storage. It is going to be a long time. This is the best course of action to mitigate the damage that is now occurring, because the fuel isn't going to be gone when we had expected it to.").

287. The delays that SMUD experienced in completing the dry-storage project resulted from a myriad of factors, including the many years taken by the NCR to complete its reviews, the bankruptcy of SMUD's primary contractor (Vectra), the complexity of the project, and the fact that safety is paramount when designing a system for the handling, storage, and transport of SNF. *See* PFF ¶¶ 288-329.

288. SMUD's project was a first-of-a-kind effort because it sought to develop a dual-purpose dry storage system. Designations Appendix (Dckt. #310) at 1060 (Stewart).

289. During the development of its dry storage system, SMUD and its vendors responded to at least seven rounds of detailed questions from the NRC. PX 845 at 36395 ("TNW submitted their response to a seventh round of questions from the NRC").

290. NRC comments and questions led to further study of and significant changes to the canister and cask designs on many occasions. PX 404, 423, 425, 434, 444 at 9657, 845; DX 483, 619, 683; Tr. at 537-39, 546-47, 569-71 (Redeker) (describing NRC-required changes); Tr. at 990-94 (Field) (same).

291. The design changes resulted in significant additional expense to the project and NRC review often delayed the schedule. Tr. at 225 (Shetler) (describing NRC-required changes that "added material cost and schedule impacts"); Tr. at 575-76 (Redeker) (describing NRC's

"intrusive oversight" and explaining that such action made the project "more costly" and created "more delays"); PX 425 (NRC official Charles Haughney explaining in 1995 that NRC schedules for review of dry storage projects "often disappear in the fog"); PX 453; DX 593.

292. Because SMUD was applying for both a storage license and a transportation license, SMUD initially had to work with two different branches of the NRC, one for storage and one for transportation. Each of these NRC branches had its own set of requirements and this led to inefficiencies and delays in NRC review of license applications. E. Supko Written Direct at 57-58 (PX 1002) (noting "NRC review of applications for dual purpose casks were performed by two separate staffs, which could result in reviews that were not efficient or timely, as experienced by Vectra"); Tr. at 382 (Shetler) (discussing conflicting regulatory requirements between two different regulatory branches of the NRC).

293. In early 1996, the NRC determined that there were substantial quality assurance issues with Vectra Technologies, SMUD's primary contractor on the project. In response, the NUHOMS Owners Group, including SMUD, started an extensive audit of Vectra's design and engineering work to insure compliance with NRC regulations and guidance. Tr. at 236-37 (Shetler); PX 451 (NUHOMS Joint QA Audit); PX 452 ("Vectra and SMUD have worked diligently to resolve the issue in the most expedient and cost-effective manner possible."); PX 449 (discussing licensing hurdles and cost impacts).

294. Also in 1996, Vectra requested a significant contract change order for costs that resulted from many of the technical changes to the project. PX 453. SMUD vigorously challenged and tested Vectra's requests. DX 593. The initial contract with Pacific Nuclear, and then Vectra, went through 11 contract change orders from 1992 through 1997. PX 267; *see also*

DX 53, 406, 415, 434, 483, 490, 561, 590, 615, 643, 683, 762, 792, 797. Many of these change orders were directly or indirectly attributable to NRC comments and questions. *Id.*

295. Each contract change order required a thorough evaluation by SMUD staff and concurrence by senior management. PX 267.

296. As part of the DOE/SMUD Cooperative Agreement, SMUD updated DOE regularly regarding all aspects of the project.

a. SMUD provided DOE with regular monthly reports on the status of the project from 1995 through September 1998. PX 845.

b. DOE officials had many meetings with SMUD throughout the life of the Cooperative Agreement and would contact SMUD managers if they had any questions. Designations Appendix (Dckt. #310) at 1059 (Stewart) (agreeing that SMUD officials were "always available to discuss your concerns or any issues that you had about the cooperative agreement and the fabrication process"); *id* at 1060 (acknowledging meetings at both Rancho Seco and Washington, D.C.); *id*. at 1053 (initially estimating 50, 60, or 70 meetings with SMUD and then stating that he had "no idea" how many meetings he had).

c. DOE analyzed the data, prepared test reports, and diligently oversaw the Cooperative Agreement. Designations Appendix (Dckt. #310) at 1061, 1065 (Stewart).

d. SMUD provided DOE with quarterly financial reports with detailed cost data for the dry storage project from 1995 through 1999. *See, e.g.*, PX 399, 411, 424, 434, 448, 459, 476, 492, 514, 571, 611 (quarterly financial reports forwarded to DOE); Tr. 562-65 (Redeker) (discussing financial reporting to DOE).

297. On January 13, 1997, the NRC issued a "Demand for Information" to Vectra that required Vectra to show cause why the NRC should not halt all of Vectra's fabrication activities

based on quality assurance concerns. PX 509. The Demand for Information required Vectra to conduct a comprehensive review of its design control and design changes, identify the root cause of previously identified problems, and explain why the NRC should not suspend Vectra from all fabrication activities until the problems were resolved. PX 509, 513; Tr. at 594-96 (Redeker).

298. From late 1996 through 1998, SMUD conducted several comprehensive reevaluations of its storage options, analyzing each alternative and carefully considering all of the viable options. PX 502, 503, 513, 519.

299. As a result of the NRC's Demand for Information and Vectra's technical problems, there was little to no progress made on SMUD's project from 1996 through the end of 1998. Tr. at 236-37 (Shetler); Tr. at 595 (Redeker) (explaining that the Demand for Information "essentially shut down progress on the project" and that "without an adequate quality assurance program, you can't design, you can't fabricate, you can't do very much of anything").

300. Throughout 1997, however, SMUD officials met regularly with Vectra, other utilities in the NUHOMS Owners Group, NRC officials, and DOE officials to determine how to address Vectra's quality assurance problems. Tr. at 236-37 (Shetler).

301. In October 1997, Vectra filed for federal bankruptcy protection in the Western District of Washington. PX 598; PX 598A.

302. Transnuclear Inc. purchased Vectra's assets and intellectual property out of the bankruptcy estate. *Id.*; PX 585.

303. Transnuclear Inc. then formed Transnuclear West, Inc. for the purpose of taking over the Vectra operations. PX 585.

304. One of the problems that led to Vectra's bankruptcy was that it had a fixed price contract for the SMUD project and assumed the risk for most of the cost overruns. Tr. at 921 (Ferreira).

305. Before signing a contract with TNW to complete the dry storage project, SMUD had extensive negotiations with TNW. Tr. at 237-38 (Shetler); Tr. at 919 (Ferreira); PX 585.

306. SMUD officials met with officials of TNW's French parent company, COGEMA, to insure that TNW would provide sufficient resources for the restart and completion of SMUD's project. Tr. at 631-32 (Redeker).

307. SMUD signed a contract with TNW in September 1998 to complete the dry storage project. PX 598, 598A. By order of the Bankruptcy Court, TNW agreed to complete the SMUD project at "cost-without-profit," on a time and materials basis. Tr. at 634 (Redeker); PX 585.

308. The TNW contract went through 11 contract change orders of its own from 1998 to 2003. PX 598; *see also* DX 950, 915, 947, 963, 978A, 1039, 1054, 1099, 1142, 1149, 1144, 1279. As with the Pacific Nuclear/Vectra contract, many of these change orders were directly or indirectly attributable to NRC comments and questions. *Id.*

309. TNW agreed to abide by the Defense Contract Audit Agency procedures to distribute its indirect costs uniformly among its customers. PX 585. DOE was one of TNW's customers at the time. PX 585; Tr. at 999-1002 (Field) (noting Idaho National Lab was also a customer of TNW and a member of the NUHOMS owners' group).

310. SMUD exchanged information regarding SMUD's experiences with TNW and the progress of its program with DOE employees at Idaho National Lab. Tr. at 1002 (Field).

311. Before the NRC would allow TNW to resume any fabrication activities, it was required to demonstrate to the NRC that TNW had sufficient quality control and assurance so that it could resume design and fabrication activities for the dry storage systems. PX 580; PX 845 at 36381-95. In late 1998 and 1999, TNW restarted fabrication on SMUD's cask and canisters. PX 580.

312. TNW, however, had many other utility clients that it acquired from the Vectra bankruptcy for whom it was developing casks and canisters. Tr. at 641-43 (Redeker). As with SMUD's project, the other utilities' projects also had been on hold for the last two years, and there was a significant backlog for fabrication at the primary fabricator, Ranor. PX 918; DX 962; DX 918; Tr. at 641-43 (Redeker) ("There were 72 canisters in the backlog at the factory.").

313. SMUD actively managed and audited TNW's work on the dry storage project, and sought to keep costs down, while insuring a quality product. DX 976; DX 985A; DX 999; DX 1003; Tr. at 662-63 (Redeker).

314. When TNW resumed work in 1999, many operating utilities had a significant need for dry storage systems because DOE's failure to begin accepting fuel was causing the operating utilities' SNF discharges to approach the capacity of their wet pools. E. Supko Written Direct at 71 (PX 1002); Tr. at 641-43 (Redeker); *see also* Tr. at 467 (Shetler) ("[S]ince the Department was not performing on taking fuel under the original schedule, those plants that were operating were now being forced to deal with increased spent fuel storage. And it was having impacts on their operating costs because they were having to either build dry storage or rerack their pools."); DX 960 (describing that "[a] failure to deliver three canisters before the end of 1999 would have dire consequences on the upcoming outage for Oconee Unite 3," a Duke Energy plant).

315. Because of the needs of operating plants, TNW moved SMUD's project to the back of the line at Ranor. Tr. at 644 (Redeker); Tr. at 1007-08 (Field).

316. As a result, SMUD and TNW transferred the canister fabrication work to a new subcontractor, Precision Components Company ("PCC"). PX 624, 631; Tr. at 644-45 (Redeker).

317. PCC was regarded as a credible and competent fabricator of dry storage systems. Tr. at 1442 (Stuart) (explaining his opinion of PCC that "they were a highly reputable fabricator with many years of experience fabricating nuclear equipment for the Navy, which [PCC] felt was under much more stringent conditions to provide equipment to the Navy than for the civilian program").

318. SMUD, along with TNW, actively participated in overseeing and managing PCC's work on SMUD's project. DX 988; DX 1018; DX 1065; DX 1086; DX 1136; DX 1213; DX 1242; Tr. at 239-40 (Shetler) ("Because of the concerns, we actually put an individual on the PCC manufacturing site to monitor their performance and to help expedite issues and concerns between PCC and Transnuclear West to try to act on the schedule and monitor any of the cost concerns that might be out there."); Tr. at 646 (Redeker) (same).

a. PCC, however, experienced technical and financial difficulties in its fabrication of SMUD's dry storage system. Tr. at 645 (Redeker); Tr. at 239-40 (Shetler); *see also* DX 1139 (describing PCC financial problems); DX 1066 (dropped canister); DX 1068 (strike); DX 1190 (storm); DX 1127; DX 1191.

b. Other utilities experienced similar, if not more serious, problems with their dry storage projects. Tr. at 578-80 (Redeker); PX 444 at 9603 ("[many] of the attendees voiced similar complaints about their vendors"), 9613 (discussing "hydrogen gas explosion" during canister welding at another utility), 9657 (noting that problems at other

plants had led to "get tough attitude" by NRC), 9669 ("other utilities and their storage systems are experiencing NRC licensing and system design issues similar or greater than" SMUD's) 9672 ("each utility is experiencing similar problems with their vendors as we are with Vectra"); PX 555, 590, 619; E. Supko Written Direct at 71-72 (PX 1002).

319. As a result of NRC's close scrutiny, SMUD actively managed the project and sought to contain the costs and keep it on schedule as much as possible. Tr. at 554-55 (Redeker) ("We found that we had to have what the NRC came to call intrusive oversight. We were at the manufacturers or at the design—at the vendors' offices frequently. They were meeting with us. We became much more involved in this process to help keep the costs down and to make sure that things were being done properly as well, so our involvement level in the project rose over what we had initially done in order to help keep costs down."); *see also* Tr. at 576-79, 588-91 (Redeker) (same); Designations Appendix (Dckt. #310) at 1060 (Stewart) (SMUD kept a careful watch on how fabrication was going on the project); PX 444 at 9657, 9663, 9672.

320. In an effort to contain costs for the fabrication of the canisters, SMUD directed TNW to negotiate a fixed-price contract with PCC, which had previously been operating on a time and materials basis as a subcontractor to TNW. Tr. at 649-50 (Redeker); DX 979 at 2; DX 1013.

321. PCC subsequently suffered additional financial and technical problems that required additional negotiations and another contract change. DX 1163; DX 1149.

322. Because of SMUD's close oversight of the fabrication process, the 21 canisters and the cask were completed and delivered to SMUD from 2000 through 2002. Tr. at 665-68 (Redeker).

323. Given the significant public health and safety issues involved with the transfer of nuclear fuel, extensive training and preparations were necessary prior to actual transfer in order to ensure that the actual transfer occurs without incident. Tr. at 1027-28 (Field) (noting the nuclear environment requires "very exhaustive training").

324. SMUD engaged in extensive training from 1999 to 2001 to prepare for the fuel transfer. Tr. at 640 (Redeker).

a. The initial training included a classroom period where employees and contractors were educated about the system, the technical specifications, transfer procedures, safety limits, and requirements on temperatures, pressures, and time. Tr. at 1028 (Field).

b. Classroom training was followed by hands-on training with the equipment, a training cask, and the actual cask and canister. Tr. at 639-40 (Redeker), 1028 (Field).

325. By engaging in extensive training and test runs prior to actual loading, SMUD was able to locate and address any problems with the equipment and procedures. By beginning training early, SMUD had the time to address any problems that arose. Tr. at 641 (Redeker).

326. Because of its careful preparation SMUD did not experience any incidents during the actual transfer of spent nuclear fuel. Tr. At 641 (Redeker) ("The most positive indicator to me that we didn't start too early is that the fuel off-load went extremely well. The crews were very proficient. And it paid off. . . . We trained very hard for very long and it paid off in spades as the actual project went very smoothly.").

327. Other utilities did experience problems during their fuel transfers. *See, e.g.*, "Transtor Coating Problem Prompts PGE To Halt Cask Loading at Trojan" (Aug. 9, 1999) (PX 619) (noting cask began dissolving in borated water during initial load).

328. SMUD's pursuit of a dual-purpose system has proven reasonable, as 25 other utilities have developed or are developing similar systems across the United States. E. Supko Written Direct at 48 & Table 9 (PX 1002).

329. Most utilities who were seeking dry storage systems spent more than they had originally planned because of the complexity of the projects. PX 444 at 9672 ("most of the utilities have dedicated considerable resources, more than they had originally planned to the oversight of their vendors and cask fabricators."); Designations Appendix (Dckt. #310) at 1055 (Stewart) (agreeing that a new construction, design, and licensing project was more likely to have cost overruns and be over budget because there are more unknowns).

330. SMUD used its best efforts to manage the dry-storage project in a commercially reasonable manner during its duration. *See* PFF ¶¶ 286-329.

331. After restarting the dry storage project in 1998 following the bankruptcy of its primary dry storage contractor, SMUD spent approximately $42.3 million in outside services on the project, which included the additional costs for loading and transferring the fuel to the ISFSI by the contractors at Bigge with a cost of approximately $5.5 million. *See* PFF ¶¶ 215, 222-223. Accordingly, SMUD paid approximately $36.8 million to outside vendors from 1998 to 2003 for the final design, licensing, and fabrication of its cask and canisters. *Id.*

332. In 1999, in a series of briefings, DOE was estimating the annual operating and maintenance cost for a dry storage facility at $5 million per year. PX 625 at 21; PX 626 at 14; PX 633 at 25.

333. In the same briefings, DOE estimated that the fixed component of startup costs for a dry storage facility were $10 million and that the variable costs for procuring storage casks were $100 per kilogram of fuel. *Id.*

334. SMUD has 228 metric tons of spent fuel, which equates to 228,000 kilograms (one metric ton = 1000 kilograms). *See* http://www.metric-conversions.org/weight/tonne-conversion.htm. Using DOE's variable cost estimate of $100/kg for storage casks and the 228,000 kilograms of SMUD's fuel produces a variable cost estimate of $22.8 million for storage casks, plus a fixed component estimate of $10 million in startup costs, for a total of approximately $33 million. PX 625 at 21; PX 626 at 14; PX 633 at 25.

**A. <u>Wet Pool Storage.</u>**

335. SMUD could have left its SNF in the wet pool at Rancho Seco during the extended period of DOE's delay. Tr. at 1539-42 (Supko) (explaining that SMUD had only two realistic options: keeping the fuel in the pool or moving to dual-purpose dry storage); I. Stuart Written Direct at 7-8 (PX 1001) (explaining that some non-operating plants continue to store SNF in their wet pool and that all operating plants continue to store SNF in their pool); DX 978A (stating that the alternative to contract change was "Leave the fuel in the spent fuel pool"); DX 1032 (same).

a. The Zion nuclear power plant owned by Exelon, which is a shutdown reactor, and the GE-owned Morris facility in Illinois, which does not operate because it was originally designed as a reprocessing plant, have continued to store SNF in their wet pools waiting for DOE's eventual performance. I. Stuart Written Direct at 7-8 (PX 1001).

b. The GE Morris facility has approximately 700 metric tons of SNF in its wet pool and has been storing its fuel in the wet pool for several decades; the NRC recently extended the license for the Morris wet pool for another 20 years. *Id*.

c. Most shutdown utilities, however, have opted to transfer their fuel to a dual-purpose dry storage system because of the long-term cost savings and improved safety compared to indefinite storage in a pool. *Id.* at 8.

336. SMUD considered leaving its fuel in the wet pool with nearly every significant contract change, price increase, and reevaluation. Tr. at 194 (Shetler); Tr. at 360 (Shetler); Tr. at 620-21 (Redeker); Tr. at 628-29 (Redeker); PX 503, 519, 524, 538, 978A, 1031.

337. The government's present delay (already 7½ years) causes a corresponding delay in every utility's acceptance. *See Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 375 (2005) (holding that any delay in the start of DOE's SNF acceptance as of January 31, 1998, negatively impacted the acceptance dates of every contract holder down the line"); *System Fuels, Inc. v. United States*, No. 03-2642C, 2005 WL 1804314, at *12 n.12 (Fed Cl. July 19, 2005) ("DOE's suggestion that it might accelerate acceptance immediately after it commences performance is unconvincing, in light of DOE's inability to complete a storage facility after more than 15 years of planning and commencement of construction.").

338. The NRC announced in 1994 that "[b]oth pool storage and dry storage are safe technologies. But there are significant differences; pool storage requires a greater and more consistent operational vigilance and the satisfactory performance of a larger number of active systems, while dry storage is almost passive." PX 357 at 1.

339. The NRC described the "substantial delay" in the repository program and concluded that it "increasingly views dry storage as the preferred method of interim storage of spent fuel for plants in permanent shutdown, as well as for supplementary storage in many operating plants." PX 357 at 2-3.

340. Leaving the SNF in the wet pool would have increased SMUD's damages during the 12 to 14-year period of DOE's delay because of the increased costs of operating and maintaining the wet pool during that period. Tr. at 1540 (Supko) (explaining that SMUD would have had to maintain the pool with all of the associated expense).

341. SMUD estimated the annual costs for operating and maintaining the wet pool at Rancho Seco at different times:

a. DX 934 (estimating $450,000 per month or $5.4 million per year delay in project).

b. PX 363 at 29043 (estimating wet storage costs at $6 to $8 million per year).

c. PX 642 at 62828; DX 978A (estimating wet storage costs at $2.25 per year prior to 2008, and $7.5 million per year thereafter, when basic decommissioning would be complete); DX 986 (estimating wet storage costs at $7.5 million per year).

d. PX 519 at 4, 19 (estimating pool costs prior to 2008 at $9.6 million per year and $4.8 million per year thereafter); PX 528 at 3 (estimating the wet storage costs at approximately $800,000 per month or $9.6 million per year).

e. PX 319 (estimating wet storage costs at $10.6 million per year).

f. *See also* PFF ¶¶ 138.

342. The primary cost component in operating and maintaining a wet pool is the labor cost, Tr. at 1056 (Field), and approximately 50 to 80 employees would be necessary to support a stand-alone wet pool at Rancho Seco depending on the assumptions used for staffing. Tr. at 527-28 (Redeker).

343. There are several reasons that there were different estimates for the operating and maintenance ("O&M") costs for the wet pool at different times, including that:

a. SMUD, like most utilities, did not have a separate work order number to segregate the O&M costs for the pool.

b. SMUD was never in the position of operating a stand-alone pool and there were other jobs and tasks occurring at the site during operation of the pool (*i.e.*, employees performed multiple tasks or job functions).

c. The O&M costs for a pool could be different depending on whether the plant is operating, permanently shutdown, actively decommissioning, or in a mothball state.

d. Different assumptions can be used regarding potential staff reductions and there were a number of unknowns related to licensing changes and staff requirements.

e. Estimates varied based whether it accounted for only those employees who worked solely on the pool or if it included all of the ancillary employees who would be necessary to support a "stand-alone" pool.

Tr. at 526-32 (Redeker); Tr. at 332-33, 476-77 (Shetler); Tr. at 948-49 (Ferreira); Tr. at 973-74, 977-78 (Field) ("[W]hen we were still [in] wet storage, it was very difficult to, to get a grasp on what positions would actually be eliminated, and so it was—we didn't feel that we could really do a[n] extremely accurate job. So we had to wait until after, and a period of time after, where we actually achieved the staffing reductions, before we could actually go back and take a look. . . .").

344. DOE officials agree that the annual O&M costs for a wet pool are significantly more than those for dry storage. Tr. at 2255 (Williams); Designations Appendix (Dckt. #310) at 1046 (Stewart).

345. SMUD completed its transfer of SNF from the wet pool to dry storage in August 2002. Tr. at 668 (Redeker).

346. If SMUD had left its SNF in the wet pool during the 12 to 14 year delay in DOE's performance, SMUD would have incurred the higher operating and maintenance costs of wet storage during those 12 to 14 years.

347. After completing the transfer of its SNF to dry storage in 2002, SMUD was able to lay off approximately 30 employees whose jobs had been associated principally with operating and maintaining the wet pool. Tr. at 1170-71 (Field); PX Dem. 72.

348. By transferring its fuel from wet to dry storage and terminating approximately 30 employees, SMUD was able to save approximately $4.2 million in annual labor costs in 2003 that had previously been required to operate and maintain the wet pool. Tr. at 1170-71 (Field); PX. Dem. 72; *see also* DX 976A, 977, 978A (estimating in 2000 that cost savings would be at least $4 million per year).

349. In 2003, SMUD incurred and billed approximately $700,000 dollars for operating and maintaining the dry storage facility at Rancho Seco. B. Brinig Written Direct at Ex. C (PX 1000); Tr. at 1056 (Field) (explaining that the $616,000 in costs for work order "Nuclear Fuel Storage" in 2003 was for ISFSI security and technicians).

350. With the exception of the decommissioning of the ISFSI and its associated materials, which cannot be done until DOE removes all of the fuel, the remaining

decommissioning activities at the Rancho Seco are expected to be complete in approximately 2008. Tr. at 698 (Redeker).

351. SMUD's decision not to simply leave its SNF in the wet pool while waiting for DOE to perform was commercially reasonable and has effectively mitigated SMUD's damages. Tr. at 194 (Shetler) ("[W]e did not consider that [pool storage] to be the [solution], though it was probably the preferred from the standpoint of assuring acceptance, it was not from the standpoint of cost of storage in the long term."); Tr. at 573, 597-98 (Redeker) (discussing possibility of leaving fuel in the pool and noting that "[t]he highest cost option generally was to leave the fuel in the pool. That was certainly an option for us."); Designations Appendix (Dckt. #310) at 1061 (Stewart) (stating that neither he nor anyone else at DOE recommended that SMUD leave its fuel in the pool).

**B. <u>Store-Only Dry Storage Systems.</u>**

352. More than 90% of ISFSIs commissioned since 2000 have loaded spent fuel into dual-purpose systems, rather than store-only systems. E. Supko Written Direct at 48-49 & Table 9 (PX 1002).

353. Dry storage vendors no longer even market store-only systems in the United States. *Id*. at 48.

354. All operating nuclear plants that are storing spent fuel in dry storage have either chosen dual-purpose systems at the outset or are now transitioning to dual purpose systems. Tr. at 1548 (Supko); E. Supko Written Direct at 48 (PX 1002).

355. All shutdown nuclear power plants that have developed dry storage facilities have chosen to utilize dual-purpose systems, including Big Rock Point, Dresden 1, Haddam Neck,

Maine Yankee, San Onofre 1, Trojan, and Yankee Rowe. E. Supko Written Direct at 54 (PX 1002); Tr. at 1548 (Supko).

356. One of the benefits of spent fuel storage in a dual purpose system is that the fuel does not have to be handled multiple times for the eventual transfer to DOE repository, thereby reducing worker exposure to radiation. E. Supko Written Direct at 48, 53 (PX 1002).

357. If SMUD had chosen a store-only system, it would have resulted in spent fuel having to be handled and moved multiple times, including: (1) transfer of the spent fuel from the wet pool into the storage-only system for at-reactor storage in an ISFSI; (2) return of the spent fuel from the storage-only system to the wet pool for subsequent loading to DOE; and (3) loading of the spent fuel into a DOE transportation cask for shipment off-site. *Id.*; Tr. at 195-96 (Shetler) ("The concern we had with storage-only systems was that it did mean there would have to be a rehandling of the fuel."). In addition, there may have been additional fuel handling steps to perform fuel inspection at the time the spent fuel was returned from the store-only system to the spent fuel pool. E. Supko Written Direct at 53 (PX 1002).

358. Each of these fuel and cask handling activities would result in increasing the radiation exposure to workers as well as increasing the risk associated with handling fuel assemblies and spent fuel casks. E. Supko Written Direct at 53 (PX 1002); PX 357 (NRC Chairman explaining that "[t]he dual-purpose and MPC concepts will further reduce fuel handling, packaging, and occupational exposure"); DX 427 at 1 (Acting Director of OCRWM stating that DOE and SMUD "share mutual goals of minimizing spent fuel handling and repackaging").

359. Minimizing spent fuel handling results in safety benefits as well as cost savings because of the risks associated with handling spent fuel. E. Supko Written Direct at 48

(PX 1002); Tr. at 197 (Shetler) (explaining that there is "risk associated with that [rehandling fuel] as well as cost.").

360. The NRC license for a "store-only" system does not permit transport of SNF off a reactor site. I. Stuart Written Direct at 7 (PX 1001).

361. If SMUD had used a store-only dry storage system to store its spent fuel on site, SMUD would have needed to maintain its spent fuel pool in an operational status for the entire time of DOE's delay. I. Stuart Written Direct at 7 (PX 1001); E. Supko Written Direct at 48, 53-54 (PX 1002); Tr. at 1540 (Supko) (explaining that SMUD would have had to maintain the pool with all of the associated expense); Tr. at 1393 (Stuart) (agreeing that a store-only system would be costly compared to a dual-purpose system because the wet pool would have to remain open); Tr. at 195-96 (Shetler).

362. Maintaining the wet pool during DOE's indefinite delay would have created significant additional damages for the operating and maintenance expenses. I. Stuart Written Direct at 7 (PX 1001); E. Supko Written Direct at 48, 53 (PX 1002).

363. A store-only system was not a viable option for a shutdown utility like SMUD because of the additional cost of maintaining the wet pool would make it a more expensive and risky alternative. Tr. at 1539-42 (Supko) (explaining that SMUD had only two realistic options: keeping the fuel in the pool or moving to dual-purpose dry storage); E. Supko Written Direct at 48, 52-54 (PX 1002); I. Stuart Written Direct at 11-12 (PX 1001).

364. If SMUD had a store-only dry storage system, the only alternative to maintaining the wet pool would be for SMUD to design, seek an NRC license for, and fabricate a "dry transfer" system that does not presently exist. I. Stuart Written Direct at 7 (PX 1001); Tr. at 195-96 (Shetler).

365. No “dry transfer” system has ever been licensed for use in the United States. I. Stuart Written Direct at 7 (PX 1001); Tr. at 2296 (Williams) (confirming that the dry transfer system has never been licensed by the NRC at any reactor or DOE facility in the United States); Tr. at 2291-92 (Williams) (confirming that DOE never performed a test of a dry transfer system using actual spent fuel assemblies).

366. Such a transfer system would need to be developed commercially, and NRC approval would not be guaranteed. I. Stuart Written Direct at 7 (PX 1001) DX 1095 at vi, App. A (detailing extensive list of information that would be required for a site-specific application).

367. DOE submitted a Topical Safety Analysis Report (“TSAR”) application to the NRC in 1996 describing a possible design for a “dry transfer” system. DX 653.

368. In November 2000, in response to DOE’s TSAR, the NRC responded that “because the TSAR has inherent limitations such as no site-specific parameters, limited to one B&W fuel assembly design, no damaged fuel handling capabilities and limitations on the types of transfer casks and receiver casks that can be used, the NRC staff decided there was not enough information provided to allow a user to implement the DTS [Dry Transfer System] without a significant supplemental application.” DX 1095 at vi; Tr. at 2303-04 (Williams).

369. With respect to DOE’s submittal regarding the dry transfer system, the NRC concluded that “a complete review addressing all the requirements of 10 CFR Parts 20 and 72 is not possible.” DX 1095 at vi. It identified approximately 200 items of additional information that would be required. *Id.* at App. A; Tr. at 2305-06 (Williams).

370. No utility in the United States has ever utilized a dry transfer system. I. Stuart Written Direct at 7 (PX 1001); Tr. at 1457 (Stuart); Tr. at 2297 (Williams).

371. The costs to develop a "dry transfer" system would be substantial and the development financially risky. I. Stuart Written Direct at 7 (PX 1001); Tr. at 1393-94 (Stuart) (discussing dry transfer).

372. The development of such a system would have been more complicated than the dry storage project that SMUD undertook. I. Stuart Written Direct at 7 (PX 1001).

373. SMUD's decision not to procure and utilize a store-only dry storage system during the long period of DOE's delay in performance was commercially reasonable. Tr. at 1393-94, 1458 (Stuart); Tr. at 194-97 (Shetler).

**C. <u>The "NAC" System.</u>**

374. When SMUD initially considered its storage options in 1992, it considered, among other options, a possible dual-purpose cask that was under development by the Nuclear Assurance Corporation ("NAC") called the NAC STC cask. Tr. at 197-203 (Shetler); Tr. at 1436 (Stuart); PX 991. When SMUD comprehensively reconsidered its storage options in late 1996 and early 1997, it reconsidered, among other options, the NAC STC cask. Tr. at 608-10 (Redeker); PX 519 at 8.

375. The NAC STC design was for a bolted lid cask that was a very expensive product relative to the canister-based systems that were available to the utilities. Tr. at 1437-38 (Stuart).

376. The difference between a cask and a canister is that the cask is a more robust design, has thicker metal walls, includes substantial impact limiters in case of potential drops, and is significantly more expensive to design and construct. Tr. at 499-00, 504-09 (Redeker); Tr. at 458 (Shetler); Tr. at 984 (Field).

377. NAC provided a bid to SMUD in 1992 for a fleet of dual-purpose casks at a cost of $38 million. Tr. at 1381, 1388 (Stuart); DX 35 (showing "Base Case" costs for all five

bidders). This cost did not include any costs that SMUD would have had for the project, including internal SMUD engineering, design, and review costs, costs associated with training to use and load the casks, or the actual loading and transfer costs for the ISFSI. Tr. at 1389 (Stuart); Tr. at 207 (Shetler).

378. NAC was not a fabricator of casks and would have used an outside subcontractor to do the fabrication. Tr. at 1441 (Stuart). NAC typically anticipated that 85% of the cost of its bid was attributable to the fabrication. Tr. at 1443 (Stuart).

379. The $38 million bid proposal to SMUD did not take into account any potential contract changes that would have been necessary during design and fabrication. Tr. at 1446 (Stuart). It was Mr. Stuart's opinion at the time, as well as currently, that "because of the experience in the nuclear industry, that many, many contracts overran their initial cost estimating, that it was very likely that if we had won the order with SMUD, that we would be facing those same kind of issues. We had faced them before in other project with other fabricators." Tr. at 1446 (Stuart).

380. In 1992, the NRC review process for the NAC STC cask design was underway but NAC did not have a storage or transportation license from the NRC. Tr. at 1382, 1384 (Stuart); Tr. at 202 (Shetler).

381. SMUD officials concluded that the dimensions of the NAC cask design would not fit SMUD's fuel length and that significant modifications would have been required. PX 519 at 16; Tr. at 197-98 (Shetler) (explaining that the NAC cask "would not accept our fuel without modification to either the fuel or the cask in order to work for our system"); Tr. at 609 (Redeker) (stating that "you would have to modify the design of the cask and lengthen it and then license the longer cask or cut the 'tops or the bottoms off of our fuel assembly so they would fit"); Tr. at

1387-88 (Stuart) (noting that he told SMUD that NAC essentially had the license "but there were issues with the cask that could easily have caused the NRC to conclude otherwise"); *id.* (noting that SMUD "had other concerns about the cask" and that "[t]hey didn't actually agree with me that it would be quite easy to get the NRC to approve the use of the cask for the SMUD fuel").

382. The NAC cask would have required modification to fit SMUD's fuel, which would have resulted in further NRC review. Tr. at 608 (Redeker) (stating that there would be a need to "go through the licensing process relative to that"); Tr. at 1080 (Field) ("[W]e recognized that it had to be re-reviewed because the product that was proposed did not fit the SMUD fuel, that either it would have to be completely redesigned to be large enough to accept the SMUD fuel, or we would have to go in and somehow cut up the spent fuel and make it small enough to fit into their cask.").

383. NAC ultimately received storage and transportation licenses from the NRC for its STC cask design in October 1994. Tr. at 1385 (Stuart).

384. Shortly after NAC received the licenses from the NRC, NAC effectively abandoned its dual-purpose cask system. Tr. at 1431-32, 1438 (Stuart). Instead, NAC decided to develop a *canister*-based dry storage system, similar to the one that SMUD purchased from TNW, because "the impression was very, very clear to the industry that DOE would use that concept as the acceptable package for picking up spent fuel." Tr. at 1435 (Stuart); *id.* at 1431-32 (Stuart) ("I use the word 'endorse' purposefully because the effect of that [MPC] program was that every cask vendor in the industry started to develop an MPC, so the attitude of the industry was the handwriting is on the wall, DOE wants to have a dual-purpose canistered system."); Tr. at 989 (Field) (NAC "never sold the [STC] to anyone, and they subsequently then developed a canister-based system to remain competitive on the market").

385. DOE's actions encouraged the dry storage vendors to develop canister-based dry storage systems. Tr. at 1432 (Stuart) ("[E]ven NAC, who had spent so much time and money to develop a dual-purpose cask, basically abandoned that cask concept and started spending money to develop a dual-purpose canister system. So that's what I mean when I say DOE adopted, they certainly sent out the message that they were going to utilize that concept. They spent a significant amount of money to do so, and the industry started developing them, and the utilities started buying them." ).

386. The NAC STC dual-purpose cask became the "white elephant" of the industry because all of the other vendors, including NAC, were turning to the dual-purpose canister based systems. Tr. at 1437-38 (Stuart).

387. No U.S. utility ever purchased the NAC STC dual-purpose cask. Tr. at 1436 (Stuart); Tr. at 608-09 (Redeker); PX 519 at 16 ("NAC has never sold nor fabricated an STC cask.").

388. SMUD thoroughly evaluated the potential vendors in 1992 and in subsequent reevaluations and acted in a commercially reasonable fashion in making its selections of a canister-based dual-purpose system. Tr. at 1430 (Stuart) (explaining that SMUD's decision to pursue dual-purpose dry storage systems "was a very prudent decision on their part. And in fact, as time went by, I feel their decision was validated more and more with time because of what the Department of Energy was doing, namely adopting a dual-purpose canister system, and what the cask vendors such as NAC was doing, and because more and more utilities were opting to purchase dual-purpose systems."); *see also* Tr. at 199-212 (Shetler); Tr. at 608-610 (Redeker) (discussing reasons for rejecting the NAC cask); PX 991, 512, 503, 519, 524, 689.

## VII. Disputed Offsets Raised At Trial.

### A. Wet Storage Costs.

389. After completing the transfer of its SNF to dry storage in 2002, SMUD was able to lay off approximately thirty employees whose jobs related primarily to operating the spent fuel pool. Tr. at 1170-71 (Field); PX Dem. 76; *see also* Tr. at 332-33 (Shetler).

390. In addition to labor, several different systems were necessary to support the operation of the wet pool at Rancho Seco.

a. Cooling systems were required to maintain the water temperature. Tr. at 139-40 (Shetler).

b. Cleanup systems were necessary to filer and demineralize the water. *Id.*

c. These systems utilized various filters, pumps, valves, piping, demineralizers, heat exchangers, and cooling equipment. *Id.*; Tr. at 524 (Redeker).

391. The ISFSI is a passive system, requiring less system support and fewer personnel for oversight, monitoring, and security. Tr. at 146 (Shetler) (noting that the ISFSI is designed so that a proper fuel temperature can be maintained through natural air flow); Tr. at 523 (Redeker) (noting that, "[t]o safely store the fuel, there are no active support systems required").

392. There is a significant savings in annual operating costs between wet and dry storage. Tr. at 1070-71 (Field); *see also* PFF ¶ 344.

393. The source of the majority of the savings results from the number of necessary employees, as the costs of running a wet pool are primarily staffing costs. Tr. at 332 (Shetler), 608 (Redeker).

394. The total overall annual labor savings, calculated now that all of the reductions in staff have occurred, is $4,146,360. PX Dem. 72; Tr. at 1170-71 (Field); *see also* DX 976A, 977, 978A (estimating in 2000 that cost savings would be at least $4 million).

395. The elimination of the spent nuclear fuel pool also results in savings on materials and electrical consumption. These non-labor savings result in a total savings of less than $50,000 annually. Tr. at 976 (Field).

396. The primary costs for operating and maintenance the ISFSI in 2003 were approximately $600,000 to $700,000. Tr. at 1056 (Field); PFF ¶ 349.

397. The first year after completion of the ISFSI and final loading of the fuel, the total cost for management of the ISFSI was $616,344. *See* B. Brinig Written Direct at Ex. C (PX 1000) (noting costs of $616,344 incurred under work order 4002862).

398. These costs are primarily SMUD labor costs, including security and ISFSI technician costs. Tr. at 1056 (Field).

399. SMUD finished loading its fuel into the ISFSI in August 2002. Tr. at 668 (Redeker).

400. Following final loading of the last spent fuel into the ISFSI, labor in support of the spent fuel pool and the transfer of the fuel to the ISFSI continued for a period while SMUD wrapped up its activities associated with the transfer of the fuel. SMUD experienced savings gradually, as staff was reduced. Tr. at 1170-71 (Field).

401. SMUD reduced its staff as it was feasible. *See* PFF ¶¶ 414-424.

402. SMUD did not begin to see the monetary benefits of the transfer of fuel from wet to dry until 2003. Tr. at 1170-71 (Field).

B. **Costs to Transfer Fuel From Wet to Dry Storage.**

403. The Contract provides that the Purchaser, in this case SMUD, "shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility." Contract Art. IV.A.2.

404. Upon DOE performance, SMUD will still be responsible under the Contract for the loading activities necessary for transportation of the fuel. *Id*. SMUD will have to remove the canister from the ISFSI and load it into the transportation cask for transport to the repository. *Id.*

405. SMUD's loading, transport, and unloading of the spent nuclear fuel at the ISFSI constituted activities *in addition to* the load that SMUD is responsible for under the Contract.

406. Loading the fuel into SMUD's dual-purpose canisters is much more labor intensive than transferring the fuel to a bolted lid transportation cask.

a. After fuel is loaded into the dual-purpose canister, after the water is removed "two cover plates "are welded in place so that there are two welded seals between the fuel and the outside world." Tr. at 502-03, 511 (Redeker); PX Dem. 8.

b. Welding was done remotely using an automatic programmed welding machine over several shifts. Tr. at 514-16 (Redeker); PX Dem. 21, 23, 24.

c. In order to prevent corrosion over time, water is blown out, a vacuum is run on the canister, and then helium is back-filled into the canister. Tr. at 502-03, 516-517 (Redeker); PX Dem 25.

d. The cask, with the loaded canister, has to be transported to the ISFSI on a modified tractor. Tr. at 518 (Redeker); PX Dem. 27, 28.

e. The cask is backed up to the ISFSI, the canister is transferred to a horizontal storage module, and concrete lids are welded over the horizontal storage modules. Tr. at 518-520 (Redeker); PX Dem. 29, 30.

407. If DOE would have performed and provided a bolted lid transportation cask, SMUD would have merely loaded the fuel into the cask, bolted the lid rather than welded it, and sent it off by rail. Tr. at 521-22 (Redeker)

408. Loading spent fuel into a bolted lid transportation cask would have been "significantly easier" than loading the same fuel into SMUD's dual-purpose canister based system. Tr. at 1031-32 (Field).

409. The loading and transfer costs include approximately $5.5 million paid to Bigge, which provided additional contract labor for the fuel transfer teams. Tr. at 957 (Field); PX Dem. 77.

410. Because SMUD incurred expense in loading and transferring the fuel to the ISFSI in mitigation of the government's breach and in addition to the later loading costs SMUD will incur upon eventual performance, SMUD has appropriately included these costs in its damages claim. *See* PFF ¶¶ 403-409.

### C. <u>SMUD Labor Costs.</u>

411. SMUD's claimed labor costs are incremental to the project because only those employee labor hours spent on the dry storage project have been included. Tr. at 1324 (Brinig) ("Speaking from an accounting perspective, I would say if I have a cost accounting system that charges direct labor to this project here, by definition, I'm telling you it's incremental."). *See* PFF ¶¶ 173-174.

412. Many of the SMUD employees who worked on the dry storage project also billed time to other projects at Rancho Seco. *See* Kiraly Written Direct at Att. 3 (noting hours worked on claimed work orders versus non-claimed work orders).

413. Only labor charges for employee time specifically attributable to work orders for the dry storage project are included in the total cost of the project. Tr. at 673 (Redeker).

414. SMUD is an efficient company that makes every effort to productively use its employees' time, combine positions, and reduce staff whenever possible. Tr. 678-79 (Redeker) ("We look for, and I drive my staff to look for every opportunity to combine work forces, to combine jobs, to be more efficient. . . . There is continuing pressure to reduce staff at Rancho Seco."); Tr. at 953 (Field) ("since the time we shut the plant down, we strive to reduce staff as workload is decreased"); PX 1172.

415. The diversion of an employee's time to the dry storage project was a loss of productive time that could have been devoted to another activity at Rancho Seco or elsewhere at SMUD that would have resulted in a benefit to SMUD. Tr. at 1324-28 (Brinig); *see also* PFF ¶¶ 414, 425.

416. Positions could have also been combined and jobs eliminated if employees were not devoting a portion of their time to the dry storage project. *See* B. Brinig Written Direct at 13 (PX 1000).

417. SMUD has continually reduced its labor force as part of its "ongoing effort to make sure that [it is] being as cost-effective as possible." Tr. at 678 (Redeker).

418. SMUD downsized its workforce following shutdown and has continued to reduce the number of employees as the workload is reduced. Tr. at 953-54 (Field), 2766-72 (Kiraly).

419. In 1990, SMUD employed 397 employees at Rancho Seco. Rancho Seco 1992 Budget at 4 (PX 838).

420. By the end of 1992 that number had been reduced to 186. *Id.*; *see also* 1993 Budget at 6 (PX 274) (noting reduction in staff).

421. By 1997, the number of permanent positions had decreased to 128. *See* Rancho Seco 1997 Budget at 6 (PX 505).

422. Today, SMUD employs approximately 80 employees at Rancho Seco. Tr. at 677-678 (Redeker).

423. As permanent positions become vacant, SMUD fills the positions with current SMUD personnel or contractors. Rancho Seco 1997 Budget (PX 505).

424. SMUD constantly sought for ways to reduce staff. PX 1172 (2001 email from Redeker directing staff to "[t]hink outside of the box, be aggressive, recommend the hard things" to reduce staff and increase efficiency).

425. SMUD was prohibited from decreasing its staff below a certain level because of the need for staff to support the dry storage project. Tr. at 680 (Redeker).

426. Following the completion of fuel loading and the closure of the spent fuel pool, there was a "significant reduction" in the labor force at Rancho Seco, resulting in the elimination of thirty full-time SMUD employees. Tr. at 680-81 (Redeker); PX Dem. 76.

**D. <u>Labor Burden.</u>**

427. SMUD's indirect labor costs are incremental to the project and properly included in SMUD's claim. *See* PFF ¶¶ 173-174; 428-436.

428. Employee labor charged to a work order is "loaded" by the accounting system. PX 291 at 5.

429. First, the labor is burdened using a predetermined benefit loading percentage, with dollars that reflect the cost of employer-provided benefits. Tr. at 1244 (Holst).

430. The benefit rate includes such costs as paid leave, pension contributions, employer FICA contributions, health insurance premiums, workers' compensation costs, and unemployment insurance costs. *See* PX 536, 566; Tr. at 1244 (Holst).

431. The labor also is burdened with overhead costs, including costs for human resources, office space, vehicles, SAP licenses, personal computers, software, and phones. PX 822; Tr. at 1244 (Holst).

432. Benefit and overhead loading were recorded differently during the two different accounting periods. *See* S. Kiraly Written Direct at 19 (DX 2003).

433. During the SAP period, from 1999 to 2003, the benefit loading percentage was charged directly as part of SMUD labor. The government has not objected to the inclusion of these costs. *See id.* 19-20.

434. During the SAP period, the overhead loading was charged as indirect labor. *See* S. Kiraly Written Direct at 19-20. The government proposes a deduction of $1,932,750 for the loading during this period. *Id.* at 19-20, Att. 2.

435. During the FMIS period, from 1992 to 1999, multiple markups were applied directly to SMUD labor, including both benefits and corporate overhead. *See id.* at 20. The government has only proposed a deduction of the overhead markups during this period, totaling $563,974. *Id.* at 20, Att. 2.

436. SMUD's overhead burdening is incremental, as SMUD reallocates or eliminates supplies, equipment, software, and licenses as the labor force is reduced. Tr. at 681 (Redeker) (through the accounting system, the project is "charged for every telephone, every computer

monitor, every beeper that we have. . . . So when somebody goes, we find his beeper, his telephone, everything and get rid of it because we don't want to pay for it").

**E. <u>Decommissioning Costs.</u>**

437. The government's breach has not resulted in savings to SMUD with regard to its decommissioning. *See* Designations Appendix (Dckt. #310) at 2322 (Freeman) ("There weren't any savings at all. It was a question of trying to mitigate the extra money that we would have to spend in keeping this power plant under a—kind of an operating license until we can get rid of the spent fuel in the tanks and mitigating the cost."); *see also* PFF ¶¶ 438-459.

438. The transfer of spent nuclear fuel to dry storage has not accelerated the ultimate decommissioning of the plant, as the site cannot be completely decommissioned until all the fuel is removed from the site, including the fuel from the ISFSI. Tr. at 617 (Redeker, noting that "[y]ou can't decommission totally until the fuel is gone, no matter where it is, even if it is in [the] ISFSI, the dry storage, you are still not finished with decommissioning until the fuel is gone"), 735-37 (Redeker) (same); 2624 (Burford) (agreeing total decommissioning is not possible until all the fuel is picked up by DOE).

439. SMUD must continue to maintain its NRC license and pay all required NRC fees. *See* Tr. at 2624 (Burford) (recognizing that SMUD will have to maintain its licensing until all the fuel is gone).

440. Because SMUD must maintain its licensing while spent nuclear fuel remains onsite, SMUD will have to maintain its licensing for at least an additional twelve to fourteen years due to the government's breach. *See* PFF ¶¶ 438-39.

441. Because Rancho Seco was shut down prematurely and unexpectedly, SMUD did not have the funds set aside in 1989 for decommissioning. Tr. at 213-14 (Shetler).

442. Although prompt decommissioning is strongly encouraged, SMUD was able to develop a plan with the NRC that allowed for a delayed decommissioning plan. Designations Appendix (Dckt. #310) at 2281, 2297-98 (Freeman) (noting "I was successful in persuading the NRC to allow us to postpone the decommissioning of the reactor and all the expense involved there until a later date").

443. SMUD's original decommissioning plan provided for the stabilization of the existing facilities at the Rancho Seco plant through 2008 to allow adequate decommissioning funds to accumulate. Tr. at 212 (Shetler).

444. Active decommissioning was to be deferred until after 2008. Rancho Seco Proposed Decommissioning Plan at 1-1, 1-18 (PX 945); Tr. at 214, 285 (Shetler).

445. The decommissioning plan called for a period of initial decommissioning, called Custodial-SAFSTOR, followed by a period of Hardened-SAFSTOR, during which the plant decommissioning would be delayed and the plant would be left dormant. Rancho Seco Proposed Decommissioning Plan at 1-18 (PX 945); Tr. at 270 (Shetler).

446. The final period, called Deferred-DECON, was to be implemented beginning in 2009, wherein the plant would be decommissioned, including dismantlement and decontamination. Rancho Seco Decommissioning Plan at 2-5 (PX 945).

447. SMUD's initial decommissioning plan was not developed based on where the fuel was stored. Tr. at 216 (Shetler) ("The decommissioning plan itself was somewhat independent of where the fuel was stored. . . . Decommissioning could have been accomplished whether the fuel was in dry storage or wet storage, depending on the performance of the DOE.").

448. If the government had performed its obligations under the contract and removed all of SMUD's fuel by 2006, SMUD's fuel would have been removed by the time SMUD began

decommissioning in 2008. Tr. at 216 (Shetler) ("The decommissioning plan envisioned that we would place the plant in some sort of safe storage mode, mothball mode. It could be done whether the fuel was in wet storage or not. And come back in 2008. If the DOE had performed under the original schedule, the fuel would have been gone by then.").

449. Storage of the fuel in the pool until removal by DOE would not have affected SMUD's decommissioning plans. Tr. at 216, 285 (Shetler).

450. DOE's announcements that it would not begin acceptance under the Contract at any utility until at least 2010 impacted SMUD's plans to decommission the plant, as SMUD initially contemplated that its fuel would be removed prior to the start of decommissioning. Tr. at 315 (Shetler) (noting that "depending on . . . when the fuel would be taken, it would impact decommissioning").

451. Because of DOE's announcements that it would not begin removal until at least 2010, SMUD was forced to consider the impact of the government's delay on its decommissioning plans. Tr. at 447 (Shetler).

452. In March 1993, SMUD's environmental report for the decommissioning of Rancho Seco noted that DOE would not be able to begin disposing of fuel until 2010, that interim storage by DOE was currently not an option, and that dual-purpose dry storage was accordingly "the most prudent alternative available." PX 297 at 7; Tr. at 216 (Shetler).

453. SMUD subsequently transitioned to incremental decommissioning in late 1996, early 1997. Tr. at 697 (Redeker).

454. SMUD began incremental decommissioning because it had accumulated some decommissioning trust fund balances, it had knowledgeable staff onsite at the time, and it was

able to dispose of low level radioactive waste at a facility in Utah relatively inexpensively. Tr. at 217-18 (Shetler); Tr. at 697 (Redeker).

455. Under the revised incremental decommissioning plan, SMUD began a two year process of decommissioning particular segments of the plant as they became available. Tr. at 217 (Shetler), 697 (Redeker).

456. SMUD engaged in incremental decommissioning of the plant while the fuel was still in the spent fuel pool. Thus, SMUD decommissioned around a partially islanded spent nuclear fuel pool. Tr. at 218 (Shetler); 697 (Redeker) (noting SMUD "decommissioned around the pool").

457. SMUD currently is in the process of decommissioning the pool. Tr. at 1031 (Field).

458. If SMUD would have left the fuel in the pool and awaited DOE's performance, SMUD would have simply waited to decommission the pool. Tr. at 315 (Shetler).

459. SMUD would have had to complete the same decommissioning activities no matter when SMUD decommissioned the pool. *See* Tr. at 617, 735-37 (Redeker); Designations Appendix (Dckt. #310) at 2333-34 (Freeman) (noting that with regard to a notation regarding reducing "decommissioning costs," "there is no thought given to what the words decommissioning costs meant and it certainly is not going to reduce the cost of tearing down a reactor or entombing it. The reactor and the other buildings in the decommissioning was a separate concern and item from the spent fuel and we—the staff uses this word decommissioning to cover both, and it can be kind of confusing.").

## VIII. Additional Issues Raised By Government.

### A. Greater Than Class C Radioactive Waste.

460. Greater Than Class C ("GTCC") waste is radioactive waste that contains concentrations of certain radioactive nuclides, such as Cesium-137 or Carbon-14, that exceed the concentration limits established by the NRC for Class C waste. *See* 10 C.F.R. § 61.55.

461. GTCC waste from nuclear reactors comes primarily from metal components in the reactor that absorb neutrons during the reactor's operation and become irradiated, such as the inside of the core shroud that surrounds the nuclear core, control rods, and the support plates that hold the reactor core in place. 66 Fed. Reg. 51823, 51824 (Oct. 11, 2001).

462. SMUD has irradiated steel within Rancho Seco's reactor vessel that constitutes Greater Than Class C ("GTCC") waste. Tr. at 690-91 (Redeker).

463. SMUD's irradiated steel is located near the reactor core and is part of the basket that held the fuel assemblies in place within the reactor vessel. *Id.*

464. Counsel for the government admitted at trial that SMUD only has a "relatively small amount" of GTCC and that this amount is "de minims" in the government's opinion. Tr. at 54.

465. Counsel for the government represented at trial that it "simply is irrelevant" how "GTCC will ultimately be treated and/or how it is regulated." Tr. at 2614.

466. SMUD plans to remove the irradiated steel from the reactor in segments and place it all into one canister to be stored in the twenty-second horizontal storage module at the ISFSI. Tr. at 693 (Redeker).

467. SMUD has not yet removed its GTCC from the reactor vessel. Tr. at 800 (Redeker). Thus, SMUD has not yet incurred the costs of removal of the GTCC, loading, or fabrication of the GTCC canister.

468. The GTCC waste container will "contain solid reactor-related waste only, consisting of activated reactor vessel internals and core instrumentation." Application to NRC for ISFSI (July 29, 2004) (DX 1365).

469. SMUD obtained a license from the NRC allowing SMUD to store its GTCC at the dry fuel storage facility. The costs of obtaining this license were not included in SMUD's damages claim. *Id.*

470. SMUD has included the cost of the twenty-second horizontal storage module ("HSM") in its damages claim. The total cost of this module is $95,000. Tr. at 2609-10 (Burford).

471. GTCC is not subject to the same stringent requirements of storage and security as spent nuclear fuel.

a. GTCC is not subject to any security requirements. Tr. at 693-94 (Redeker).

b. Because GTCC does not have an elevated temperature, it does not require cooling. Tr. at 694 (Redeker).

c. The only requirement for storage of GTCC is that it is properly shielded, due to its highly radioactive nature. Tr. at 694 (Redeker).

472. SMUD has several other options for the storage of GTCC besides placement in the ISFSI. Tr. at 695 (Redeker).

a. SMUD could have stored the GTCC in its radioactive waste storage building without a license from the NRC. Tr. at 694-95 (Redeker).

b. SMUD could have left the fuel in the reactor building under its current Part 50 license until it was removed for final disposal by DOE. Tr. at 2610-11 (Burford).

**B. <u>Failed Fuel.</u>**

473. DOE is obligated under the Contract to "accept title to all SNF and/or HLW, of domestic origin, generated by civilian nuclear power reactor(s), . . . provide subsequent transportation of such material to the DOE facility, and dispose of such material." Contract Art. IV.B.1 (emphasis added).

474. DOE is obligated to accept SNF and/or HLW that "meets the General Specifications for such fuel and waste as set forth in Appendix E," including Standard Fuel, Nonstandard Fuel, and Failed Fuel. *Id.* Art. VI.A.1.a., App. E.A.

475. Thus, "DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel." *Id.* Art. VI.A.2.b.

476. "[F]or any SNF which has been designated by Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days of receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services." Contract Art. VI.A.2.b.

477. Failed fuel placed in a canister for containment of that fuel, like that at Rancho Seco, can be handled like any other SNF assembly, so that "technical feasibility" of disposing of SMUD's fuel would not have been an issue. *See* PFF ¶¶ 478-502.

478. The same tools that are used to pick up a spent fuel assembly can be used to pick up a failed assembly in a canister. I. Stuart Written Direct at 12 (PX 1001).

479. Failed fuel has been transported throughout the United States and the world. *Id.*

480. DOE has frequently shipped failed fuel, including severely damaged fuel far in excess of the level of damage SMUD has encountered. Tr. at 1447-1448 (Stuart); I. Stuart Written Direct at 12 (PX 1001) (stating that as part of DOE's Research Reactor Return program, he was involved with the shipment of spent fuel that was so severely damaged that it "in one case had to be vacuumed into the can," and that this fuel "was handled without special treatment in a standard licensed transport cask").

481. Even severely damaged fuel is able to be handled without special treatment once it is placed in a standard licensed transport cask. I. Stuart Written Direct at 12 (PX 1001).

482. Damaged and failed fuel have been moved safely under NRC guidelines on many occasions. "It was standard practice if there were any concern about the integrity of a particular assembly of fuel to insert it in a 'look-a-like' can" that could then be placed in a cask and moved just like regular fuel. *Id.*

483. If DOE had timely performed under the contract, it could and would have accepted SMUD's damaged fuel on the same schedule as the rest of SMUD's fuel. *Id.*

484. In 1984, DOE represented to utilities that "[f]ailed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel." PX 989 (emphasis added).

485. Lake Barrett stated his belief that "[w]hen all is said and done, my expectation, what I really think will happen is when it moves along it will move together—contemporary, it

will all move contemporary, that's the failed fuel and standard fuel." Designations Appendix (Dckt. #310) at 392 (Barrett).

486. At the time of contract formation, placing failed fuel in canisters, if needed, was not unusual, but rather part of the normal operating procedures of maintaining a spent fuel pool. Final Rule, 48 Fed. Reg. 16,590, 16,597 (Apr. 18, 1983) (DOE comments accompanying the publication of the standard contract in the Federal Register) ("the furnishing of such containers [for failed fuel] is part of the normal utility cost for the operation of its spent fuel storage basin").

487. SMUD engaged in a detailed visual inspection of its fuel to determine the condition of each fuel assembly. Tr. at 685, 791 (Redeker).

488. The visual inspection consisted of videotaping the fuel while it was underwater in the spent fuel pool with underwater radiation hardened cameras. Tr. at 1041 (Field).

489. Videotapes of each of the fuel assemblies were made and reviewed by senior SMUD personnel to determine the classification of the fuel. *Id*.

490. Based on the results of the visual inspection, SMUD has no fuel assemblies that require special handling. Memorandum from R. Colombo at 1 (July 16, 1996) (PX 470).

491. The visual inspection revealed that SMUD has "0 failed assemblies." *Id.* at 2.

492. SMUD did determine that it had nine damaged fuel assemblies that it classified as F2, meaning it had gross cladding failure but no pinhole leaks or cracks requiring special handling. *Id*. at 1.

493. SMUD had an independent company, Electric Power Research Institute ("EPRI"), review the videotapes and make an independent determination with regard to categorization of SMUD's fuel. *Id*. at 2; Tr. at 794-95 (Redeker).

494. EPRI concurred that SMUD has no failed fuel assemblies that requires special handling. Letter from EPRI at 2 (Aug. 27, 1996) (PX 489).

495. EPRI agreed that the nine assemblies were correctly categorized, if not somewhat "conservatively," and also suggested one additional assembly should be classified F2. *Id.* at 2.

496. SMUD's expert, Ivan Stuart, reviewed the videotapes and determined that "[n]one of the fuel assemblies exhibit any features that would require special handling as noted in the Standard Contract." I. Stuart Written Direct at 12 (PX 1001); Tr. 1399, 1454-55 (Stuart).

497. SMUD's twenty-first canister was designed with "slight internal differences" to accommodate storage of SMUD's damaged fuel. Tr. at 505-06 (Redeker).

498. Rather than being open at the top and bottom for a fuel assembly to slide in and out, the canister contains individual sleeves for the assemblies "[s]o that should there be fuel that has loose fuel pellets that fall out, or broken and damaged fuel rods, . . . those pellets don't go all over the place inside the can and they are held inside." *Id.*

499. The individual sleeves can be removed using a crane and any debris would remain in the can, but the outside of the canister is no different than any of the other twenty canisters. Tr. at 506 (Redeker).

500. SMUD notified DOE of the condition of its fuel. Tr. at 689 (Redeker).

501. SMUD followed approved NRC procedures when transferring and loading its damaged fuel into the appropriate canister. I. Stuart Written Direct at 12 (PX 1001).

502. SMUD loaded all of the fuel into the canisters using normal equipment and without any special handling. Tr. at 687 (Redeker); I. Stuart Written Direct at 12 (PX 1001); s*ee also* Tr. at 1455 (Stuart) (stating that it would have been "technically simple" for DOE to take the fuel just like SMUD's remaining spent nuclear fuel).

### C. **Canisters.**

503. SMUD has placed its spent nuclear fuel in dual-purpose canisters, which were designed and licensed for the temporary storage of spent nuclear fuel at SMUD's dry storage facility and for subsequent transport of the fuel on public highways. PX 596 (Part 71 license for transportation issued Sept. 10, 1998); PX 962 (Part 72 license for storage issued June 30, 2000).

504. SMUD did not transfer its fuel from the wet pool into dual-purpose canisters until 2001 to 2002, Tr. at 665-68 (Redeker), three years after the government was obligated to begin performance under the Contract. Contract Art. II.

505. DOE is obligated under the Contract to "arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility." Contract Art. IV.B.2 (PX 44).

506. DOE is obligated under the Contract to provide transportation casks that are "suitable for use at the Purchaser's site." Contract Art. IV.B.2 (PX 44).

507. DOE is obligated under the Contract to accept "SNF and/or HLW which meets the General Specifications for such fuel and waste as set forth in Appendix E," which includes standard, nonstandard, and failed fuel. *Id.* at Art. VI(A)(1)(a), App. E (PX 44).

508. The Standard Contract explicitly states that "DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel." *Id.* at Art. VI(A)(2)(b).

509. DOE has an obligation to accept SMUD's spent nuclear fuel under the Contract, regardless of how it is currently stored. Tr. at 1943-44 (Zabransky) (agreeing that the fuel is still covered by the contract, regardless of how it is currently stored).

510. The NWPA contemplated that some utilities may develop dry storage and required DOE to establish, by January 1984, a demonstration program with utilities "for the *dry storage*

of spent nuclear fuel . . . with the objective of establishing one or more technologies that [the NRC] may, by rule, approve for use at the sites of civilian nuclear power reactors." 42 U.S.C.§ 10198(a) (emphasis added).

511. DOE has been on notice that SMUD and other utilities were pursuing the development of dry storage since the early 1990s. *See* PFF ¶¶ 99, 100, 285, 296, 523-550, 573.

512. When SMUD was weighing its options regarding long term storage of its fuel, SMUD recognized risk and uncertainty regarding how DOE would interpret the Contract with regard to canistered fuel in a dry storage facility. Tr. at 173-74 (Shetler).

513. In order to alleviate the perceived risks with regard to acceptance of canistered fuel, SMUD "reach[ed] out to DOE to try to get some kind of a determination as to how DOE would treat [] dry canister fuel in terms of receipt schedule and receipt." Tr. at 218 (Shetler); *accord* Tr. at 777-778 (Redeker).

514. DOE assured SMUD that, as long as the system was NRC certified, DOE would accept such canisters for transportation at the time it developed a facility. Tr. at 434, 438 (Shetler).

515. Following a meeting with acting OCRWM Director Lake Barrett, Jim Shetler memorialized his understanding of these assurances in a letter to Mr. Barrett:

> I understand the Secretary may not be in a position to ensure future acceptance of canistered fuel as "standard" fuel. However, should canistered fuel *not* be accepted as "standard" fuel, our position in the 1991 Acceptance Priority Ranking could be seriously impacted. Conversely, as you indicated, should canistered fuel be accepted as "standard" fuel, DOE would accept SMUD's spent fuel in licensed transportable canisters in accordance with the Acceptance Priority Ranking. However, *either way it is my understanding that DOE would be required to accept the fuel,* transport it to its disposal facility, and repackage as required for disposal as long the canistered system was NRC licensed for storage and transportation.

Letter from J. Shetler to L. Barrett at 1 (June 22, 1983) (PX 311) (emphasis added).

516. In a response letter from Lake Barrett to Jim Shetler in September 1993, Mr. Barrett assured SMUD that the Department would be "willing to initiate the appropriate actions to include such a system as an acceptable waste form under the terms of the Standard Contract." PX 320.

517. Mr. Barrett also shared such assurances with Congressman Dicks. Letter from L. Barrett to N. Dicks (Oct. 4, 1993) (PX 327).

518. Mr. Shetler confirmed such assurances at trial, stating "[b]ased on my discussions with Mr. Barrett, [which] I had documented here, it was my understanding that DOE, as long as the fuel was licensed by NRC, would be willing to take the fuel. The open question was whether it would be standard fuel or not." Tr. at 220; *see also* 220 (Shetler) (noting that "at least we had, as I understand it, an assurance that they would be taking our fuel either way"), 353 (noting with regard to the risk of new technology, "part of that was gaining some assurances from DOE that they would receive the fuel in the canisters, which we felt we did get"), 429-30, 434-35 (Shetler) (noting the issue was "when would they accept it," not whether they would accept it).

519. Given DOE's assurances, SMUD believed the risk with regard to acceptance was a matter of when DOE would pickup the fuel in the queue rather than whether DOE would accept the canistered fuel. Tr. at 219-21 (Shetler).

520. DOE maintained throughout the 1990s that as long as the NRC licensed SMUD's system, DOE would accept the fuel. *See* PX 320, 327, 678.

521. DOE's current position marks a change in its position throughout the 1990s that DOE would accept canistered fuel, and the only issue would be the classification of the fuel under the Contract. *Compare* PX 320, 327, 678 *with* DX 1298.

522. DOE endorsed the use of dual-purpose canisters by commercial utilities for temporary storage of spent nuclear fuel at reactor sites during the period of DOE's delay. Tr. at 1431-32 (Levy); *see also* PFF ¶¶ 384, 527-31.

523. In the early 1990s, DOE conducted feasibility studies on the concept of a multi-purpose canister ("MPC") system that would include on-site storage, eventual transportation, and eventual disposal. Multi-Purpose Canister System Evaluation, A Systems Engineering Approach (Sept. 1994) (PX 368); E. Supko Written Direct at 50-51 (PX 1002).

524. DOE released a request for proposals for the design and certification of an MPC system in 1994. *See* 1994 Annual Report to Congress at 37 (May 1995) (PX 409). A contract was subsequently awarded to Westinghouse Electric Corporation.

525. The MPC program was later terminated due to funding restraints. 1995 Annual Report to Congress at 22 (May 1996) (PX 461).

526. Congress stopped funding the MPC program because it believed that, given the proliferation of commercial systems, "the industry had enough technology to do whatever DOE needed to do." Tr. at 1432-34 (Stuart).

527. In a letter to the entire utility community, Mr. Barrett made it clear that DOE "continue[d] to support the [MPC] concept and believe[d] that it is in the nation's best interest to encourage the utilization of canisters for at-reactor storage." PX 597 at 2.

528. DOE has stated that the commercial systems being developed "have the improved efficiencies the Department desires for its waste acceptance and transportation needs." PX 669 at 7.

529. DOE supported the development of a transportable storage system through the cooperative agreement it signed with SMUD in 1994. Notice of Assistance Award (PX 381).

530. The joint objectives of the cooperative agreement included sharing in the licensing process, demonstrating an NRC-licensed store-now/transport later system (i.e., a dual-purpose storage and transport system), and gaining insight into the regulatory process for licensing a storage facility. (PX 381); Tr. at 560-62 (Redeker) (noting DOE was "looking forward to having to license systems for transportation relative to the repository, . . . [a]nd they needed to get [] benefit from our licensing experience working with the Nuclear Regulatory Commission because they didn't have a lot of experience in licensing with and interfacing with the NRC.").

531. DOE recognized it would benefit from SMUD's development of a dual-purpose system. PX 381 at 3-4 (stating objectives of cooperative agreement); Tr. at 465 (Shetler) (DOE "acknowledged that there were benefits to them and the industry from investigating a dual-purpose system. It was along the lines of some of the concepts they had with the multi-purpose canisters."); Tr. at 465-66 (Shetler) (noting with DOE's "interest in multi-purpose canisters at that time, they thought the design, procurement, licensing process for that would have a benefit for them as well); Tr. at 2320, 2324-25 (Williams) (agreeing that DOE believed that the transportable storage system aspect of the cooperative agreement would potentially provide important contributions to DOE's MPC initiative).

532. DOE was actively involved in the development of SMUD's dual-purpose system. Tr. at 183-84 (Shetler) (noting that SMUD had several cooperative agreement meetings with DOE wherein they sent many attendees); Tr. at 980 (Field) (noting DOE had an opportunity to review the bid specification and comment on it); PX 246 (example cooperative meeting minutes); Tr. 562-63 (Redeker) (noting SMUD submitted quarterly financial reports to DOE,

including a detailed breakdown of the costs of the project); PX 514 (example quarterly report). *See* PFF ¶¶ 129, 296, 573.

533. In May 1997, DOE sent a letter to SMUD regarding the Contract's requirement that the description of spent nuclear fuel be subject to verification by DOE prior to shipment. PX 540; Contract Art. VI.B.2. This letter stated that:

> The Department of Energy (DOE) is aware that contract holders are loading or are planning to load spent fuel into canisters and/or casks. Several of these contract holders have requested guidance regarding DOE's plans for verification. The purpose of this letter is to provide additional information and to clarify the verification requirement under this article in the Standard Contract.

PX 540 at 1.

534. DOE adopted a Verification Plan that enumerated DOE's requirements for verification and identification of the fuel under the Contract. *Id.* This Verification Plan does not "require the actual witnessing of canister loadings by DOE personnel or its contractors to accomplish verification." Rather, DOE stated its belief that "it is appropriate to rely upon the Purchasers' records to adequately describe the spent fuel which will be accepted by DOE." *Id.*

535. Such verification is necessary because, as DOE made clear in its letter to SMUD in 1997, DOE has "no intent to reopen the canisters prior to DOE's acceptance." Verification Plan at 1 (Mar. 1997) (PX 521).

536. SMUD notified DOE of its intent to load its fuel into the dual-purpose system in January 2001 and invited DOE to observe the loading activities and review SMUD's fuel inspection records prior to the transfer. PX 670 at 1.

537. In response to SMUD's notice that it was planning to load its fuel into the canisters, DOE stated "in accordance with the commitment made in our previous correspondence, the Department will initiate actions to include storage systems certified by the

Commission for both transportation and storage (dual-purpose systems) as acceptable waste forms under the disposal contract with SMUD." PX 678 at 1.

538. DOE assured utilities and the public that DOE would accept such canisters for transportation at the time it developed a facility. *See* PFF ¶¶ 513-520.

539. In DOE's transportation plan, accompanying a January 2001 letter from then Director of OCRWM Ivan Itkin, DOE recognized that the dual-purpose systems developed by the private industry have "improved efficiencies the Department desires for its waste acceptance and transportation needs." PX 669.

540. DOE has been planning to and anticipates accepting and transporting spent fuel in canistered form from the utility sites. *See* PFF ¶¶ 541-550.

541. DOE stated in its December 2000 Plan for Transportation submitted to Congress that "[m]any of the dual-purpose cask systems currently being licensed or manufactured and deployed would potentially be used for the transport of the spent nuclear fuel to a Federal repository under the Department's transportation plan." PX 665; *see also* Tr. at 2188-89 (Kouts).

542. In this Plan, DOE presented its strategy for transportation of spent nuclear fuel to the repository, which included the acceptance and use of dual-purpose canisters in order to "make maximum use of private industry capabilities." PX 665 at 1.

543. OCRWM's Civilian Radioactive Waste Management System Requirements Document requires that DOE be capable of accepting and transporting a range of dual-purpose canisters in addition to bare spent nuclear fuel assemblies. PX 981 at 9.

544. DOE's 2001 Draft Waste Input Report recognizes that "[d]ual-purpose canisters (DPCs) will be used for required dry storage at most sites," and that the transportation cask assumptions for ultimate transport to Yucca Mountain "reflect current licensing actions and

plans, and current cask designs, including DPC systems being ordered or planned by the utilities." PX 722 at 4.

545. In determining whether the 1 mill/kwh fee was adequate to support the costs of DOE's current program, DOE has assumed that it will accept dual-purpose canisters for transportation from the utility site to the repository. PX 680 at 3-2; *see also* Tr. at 2196-97 (Kouts, confirming that such assumptions were the basis for DOE's fee analysis).

546. In a paper presented to the public in 2000 to 2001, DOE employees represented that "DOE will endeavor to make the repository system compatible with existing and pending transport/storage systems." PX 820 at 2-3; Tr. at 2075-2079 (Pollog).

547. "DOE has surveyed components and features of the population of existing and pending canister and cask transport/storage systems for commercial spent fuel and concluded that generally the system features and characteristics that meet NRC requirements for storage and transport should be compatible with the current repository design." PX 820 at 3.

548. DOE has been planning to and anticipates receiving spent fuel in canistered form at the repository. PX 717 at vii. Tr. at 2185-86, 2193, 2209 (Kouts); Tr. at 2078-79 (Pollog).

549. DOE plans include receipt of various waste forms at Yucca Mountain, including dual purpose canisters. PX 997 at 10; PX 998 at 2-34 to -35 (stating that "[c]ommercial spent nuclear fuel would arrive as individual fuel assemblies placed directly into transportation casks, or in dual-purpose canisters").

550. One of the scenarios included in the EIS for Yucca Mountain assumes acceptance of 80% of commercial spent fuel in dual-purpose canisters. PX 721 at 2-7 to 2-8; Tr. at 2193 (Kouts); Tr. at 1936-37 (Zabransky) (noting Yucca Mountain expects to receive different types of waste forms, as outlined in the EIS).

551. Thus, DOE's current plans include acceptance of dual-purpose canisters at Yucca Mountain. *See* PFF ¶¶ 541-550.

552. Twenty-six spent fuel dry storage facilities have been developed at utilities across the United States, E. Supko Written Direct at 49 (PX 1002), and approximately 36 spent fuel dry storage sites are projected for 2006. Tr. at 1794 (Zabransky).

553. As DOE continues to delay performance, and more and more utilities are forced to transfer fuel to canisters, the likelihood of DOE accepting fuel in canistered form will only increase and "the significance of 'standard' v. 'nonstandard' [will be] dissipated." I. Stuart Written Direct at 9 (PX 1001).

**IX. <u>Rate.</u>**

554. A 3,000-ton receipt rate is the rate that DOE has consistently used to calculate utility fees and system costs under the Standard Contract, is used in nearly all DOE program documents, and was affirmed by the trial and deposition testimony of numerous DOE officials. *See generally* Plaintiff's Proposed Findings of Uncontroverted Fact Regarding the Acceptance Rate of Spent Nuclear Fuel dated December 16, 2002 (Dckt. #167), incorporated herein by reference.[1]

555. "[I]f DOE had begun acceptance of spent nuclear fuel by January 31, 1998, at an overall spent fuel acceptance rate of 3,000 MTU per year, all of the spent nuclear fuel from the Rancho Seco nuclear power plant would have been accepted by DOE for disposal and transported off-site by 2006, *at the latest*, assuming an oldest-fuel-first acceptance priority and

---

[1] SMUD has included as Attachment 1 to these Proposed Findings a chart ("Conversion of Acceptance Rate Appendix To Exhibits At Trial") that provides the trial exhibit number for the documents cited in the Acceptance Rate briefing and proposed findings.

that SMUD does not utilize either the 'exchange' provision in the Standard Contract or the shutdown priority provision." *See* E. Supko Written Direct at 9 (PX 1002) (emphasis added).

556. DOE would likely have removed the fuel even earlier if SMUD had utilized either the exchange provision or the shutdown priority provision of the Contract. E. Supko Written Direct at 9-10 (PX 1002) ("[I]f SMUD were to take advantage of the 'exchange' provision or the shutdown reactor priority provision, the DOE would likely have accepted SMUD's SNF earlier than 2006.").

557. The Contract provides that, "[n]otwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." Contract Art. VI.B.1.b.

558. At the time of Contract formation, the parties understood and expected that DOE would implement priority acceptance of spent fuel and high-level radioactive waste from shutdown reactors, as provided in Article VI.B.1.b, if and as necessary to prevent shutdown utilities from waiting a substantial period of time to complete their decommissioning. 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983).

559. During the process of developing the Standard Contracts, DOE rejected requests by certain utilities to omit the Article VI.B.1.b. priority acceptance provision, explaining that "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." 48 Fed. Reg. 16,590, 16, 593 (Apr. 18, 1983). The first Director of the DOE spent fuel program, Robert Morgan, testified he agreed with this statement in 1983, explaining that DOE "didn't want to hold up" decommissioning and this was one of DOE's objectives. Designations Appendix (Dckt. #310) at 2011-12 (Morgan).

560. SMUD's expert, Mr. Stuart, opined that if there were a functioning DOE program, "it is very likely that exchanges of acceptance rights between utilities would happen." I. Stuart Written Direct at 10 (PX 1001).

561. DOE has maintained the position that "[i]f the Department had the unconstrained capability to provide for the storage or disposal of spent nuclear fuel, and if the rate of spent fuel acceptance exceeds the acceptance rates published in the Annual Capacity Report (400, 600, 900 MTU/year), the Department would have the flexibility to address the issue of priority acceptance of spent nuclear fuel from permanently shutdown reactors." PX 418; *see also* Designations Appendix (Dckt #310) at 1861-62 (S. Klein) (explaining that DOE "could have given" acceptance priority to shutdown reactors if the system were operating at 3,000 tons).

562. Lake Barrett testified that he believed "it was in the nation's interests to support [shutdown utilities] who were trying to clean up their sites and return that real estate to useful societal purpose in that we should try to move the fuel off as quickly as we practically could, consistent with sound national policies." Designations Appendix (Dckt. #310) at 386-87 (Barrett).

563. In 1989, the government commissioned a study entitled, "Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis," which analyzed "a class of acceptance schemes in which the acceptance capacity of the federal radioactive waste management system is allocated principally to shutdown commercial reactors. PX 168 at iii. That study concluded that significant program cost efficiencies could be realized by giving priority to spent fuel located at shutdown plants and at operating reactors with fuel pools.

564. The Contract provides that "Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF

and/or HLW, provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges." Contract Art. V.E (PX 44).

565. DOE officials have testified that DOE would have been liberal in approving exchanges. *See, e.g.*, Designations Appendix (Dckt #310) at 1991 (Morgan) (explaining that DOE would have approved exchanges "if at all possible").

566. As Daniel Dreyfus, former Director of OCRWM, has stated, the exchange provision "was included in the Standard Contract in response to comments received during the Standard Contract rulemaking, in order to allow Purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department." PX 433.

567. Had DOE been performing, transportation campaigns likely would have occurred and would have benefited DOE. *See* I. Stuart Written Direct at 10 (PX 1001).

568. DOE was interested in pursuing transportation campaigns because they would have been more efficient for DOE and utilities. The 1990 ACR explained that "using annual allocations could result in DOE accepting less than full cask loads of SNF. Summing allocations over a longer period could result in a reduction in the frequency of deliveries (*larger shipping campaigns*) when serving each Purchaser. DOE will keep Purchasers apprised of the results of this analysis." PX 188 at 10. The ACR further noted that "[t]he exact chronological order of deliveries within each year is not specified in the Appendix A tables because the dates in the Final Delivery Schedules to be submitted to DOE for approval will be arranged to accommodate, to the extent possible, both the Purchasers' and DOE's operational requirements." PX 188 at 9.

569. DOE witnesses have testified that DOE is unlikely to adhere strictly to the oldest fuel first prioritization because of the attendant costs and inefficiencies. *See*, *e.g.*, Designations Appendix (Dckt #310) at 1930-32 (Burgoyne); *see also* I. Stuart Written Direct at 10 (PX 1001) (noting there "would be some flexibility or 'slack' in the system" making campaigning possible).

570. DOE has insisted on the use of campaigns in the transport of its own fuel. Tr. at 1455-56 (Stuart).

571. Delivery of multiple rail casks in campaigns would allow for early removal of all of SMUD's spent nuclear fuel. I. Stuart Written Direct at 9-10 (PX 1001).

**X. <u>Notice.</u>**

572. DOE met with SMUD in the early 1990s regarding SMUD's pursuit of a dual-purpose dry storage system and the potential for a cooperative agreement between SMUD and DOE. *See, e.g.*, PX 220, 224, 229, 233, 236, 245, 246, 253, 258.

573. DOE was actively involved in the development of SMUD's dual-purpose system.

a. As part of the cooperative agreement negotiations, DOE reviewed and commented on SMUD's technical specifications for the dry storage system. Letter from J. Bell to DOE (Oct. 23, 1991) (PX 224) (attaching copy of technical specification for DOE's review); Letter from J. Williams to J. Bell (Nov. 27, 1991) (including comments from DOE regarding SMUD's technical specification); Memorandum Regarding Solicitation (Dec . 5, 1991) (PX 233) (including multiple DOE personnel on distribution list).

b. DOE officials visited SMUD's site for a meeting regarding the demonstration project. *See* Facsimile from R. Bowser to J. Williams (Sept. 14, 1991) (PX 220) (noting Sept. 19, 1991 meeting with DOE was held at the Rancho Seco plant).

c. SMUD forwarded monthly progress reports to DOE. PX 845.

d. DOE officials met with SMUD employees on multiple occasions to discuss the progress of SMUD's project. *See* Meeting Minutes PX 246, 255, 258, 431.

e. Throughout the project, SMUD "kept DOE informed of what was going on." Tr. at 234 (Shetler).

574. Jim Shetler met with then-Director Lake Barrett in 1993 to discuss SMUD's plans for transfer of its fuel to dual-purpose canisters and the acceptability of such canistered fuel under the Contract. *See* Letter from J. Shetler (Sept. 28, 1993) (PX 325); Letter from J. Shetler (June 22, 1993) (PX 311).

575. In 1994, in a briefing to the Director of the Program, Dan Dreyfus, DOE recognized that if there was no performance in 1998 "[s]hutdown reactors must maintain their spent fuel pools or dry storage facilities for a longer time—causing utility costs to increase." PX 334 at 23. DOE also acknowledged that "Utilities may sue DOE for failure to perform according to Standard Contract (no waste acceptance in 1998)." PX 334 at 22.

576. In the same briefing, DOE stated that "[a]lthough safe, at-reactor dry storage of spent nuclear fuel will increase significantly and be required in 31 states by 2010, the year the repository is currently planned to start operation." PX 334 at 4.

577. In 1994, Steve Cohn, General Counsel for SMUD, sent DOE comments in response to its Notice of Inquiry, making it clear that SMUD expected reimbursement for its costs associated with its on-site storage of spent fuel during the period of SMUD's delay:

> [I]f DOE cannot develop [an interim storage facility to accept waste by 1998], DOE should use portions of the Nuclear Waste Fund, supplemented as needed by additional federal funds, to reimburse SMUD and other utilities for their reasonable costs incurred to store spent fuel at their respective sites beyond January 31, 1998. SMUD should be reimbursed at a pre-negotiated rate for

> on-site storage of spent fuel based on DOE's inability to meet schedules set forth in the 1991 Acceptance Priority Ranking. Additionally, this funding could take the form of DOE's reimbursing utilities for the purchase and maintenance of multi-purpose canisters and storage modules for temporary storage of spent fuel.

Letter from S. Cohn at 7 (Sept. 21, 1994) (PX 369); Tr. at 255-56 (Shetler).

578. SMUD received quarterly financial reports that included a detailed breakdown of the costs of the project from 1995 to 1998. *See* Tr. at 562-63 (Redeker); *see, e.g.*, PX 399, 411, 424, 434, 448, 459, 476, 492, 514, 571, 611 (quarterly financial reports forwarded to DOE).

579. In February 1996, SMUD sent a letter to DOE to "make [DOE] aware of this licensing hurdle, and the impact it may have on the cost of the casks." PX 449.

580. On March 5, 1996, Bob Jones from SMUD sent a letter to David Langstaff informing DOE of the increasing costs of the project. PX 452.

581. In April 1996, SMUD sent D. Langstaff the invoices to date on the project for his review. PX 456.

582. On July 17, 1996, Steve Redeker wrote a letter informing DOE of the continued difficulties incurred during the design and fabrication process, and the resultant cost overruns on the project, noting that "[t]he additional costs to rework the cask's inner shell are far in excess of anything we could have anticipated" and requesting DOE to contribute additional funds toward the project. Letter from S. Redeker at 1 (July 17, 1996) (PX 471).

583. On March 14, 1997, SMUD's General Manager Jan Schori wrote a letter to DOE stating that

> SMUD believes that if DOE cannot dispose of the Rancho Seco spent fuel on the schedule set forth in the DOE-SMUD Standard Contract, DOE should follow the precedent established at Fort St. Vrain with respect to Public Service of Colorado, i.e., reimbursing SMUD for the on-going costs of on-site spent fuel storage at Rancho Seco from January 31, 1998, until such time as DOE can

> fulfill its contractual obligation to off-load and transport the spent fuel to an interim or permanent DOE storage facility.

Letter from J. Schori at 1 (Mar. 14, 1997) (PX 527).

584. In her 1997 letter to DOE, Ms. Schori stated that DOE should reimburse SMUD for its storage and transportation costs, including the following categories: "Ongoing operating costs of storage," "Capital cost of the dry storage and transportation system," "Cost of loading the canisters from the wet storage pool to the ISFSI," and "Cost of off-loading and transport of the interim or permanent storage facility, whenever that occurs." Letter from J. Schori at 3-4 (Mar. 14, 1997) (PX 527).

585. In April 1997, Acting Director of the Program, Lake Barrett, testified before Congress and explained that Secretary of Energy Pena met with representatives of the utility industry "to discuss ways of mitigating the impacts of the delay." PX 537 at 5; *see also* PX 545. Mr. Barrett noted in his testimony that DOE was "proceeding with the following dual-track approach to address the delay in the acceptance of spent fuel," and that "[o]ptions that have been suggested for consideration include financial compensation and the Department taking title to some fuel at the reactor sites." PX 537 at 5.

586. In August 1997, Steve Redeker wrote DOE that "SMUD remains willing to discuss DOE's assumption of costs and responsibility for continued storage of spent fuel at Rancho Seco Nuclear Generating Station ("Rancho Seco"), as outlined in SMUD's letter to DOE dated March 14, 1997." Letter from S. Redeker to B. Tomasoni (Aug. 4, 1997) (PX 1012).

587. SMUD's plant manager, Steve Redeker, met with DOE's Director of the Program, Lake Barrett, in late 1997 to discuss the status of the dry fuel storage project. PX 845 at 36381

a. SMUD also explored with DOE the possibility for additional funding for the cask. PX 845 at 36381.

b. SMUD informed DOE that it expected the cost of the cask to increase due to the Vectra bankruptcy and the Transnuclear takeover. PX 845 at 36381.

c. At the meeting between Mr. Redeker and Mr. Barrett, "DOE stated that OCRWM could not provide additional money through the waste fund, but perhaps something could be worked out through the DOE Environmental Management branch." PX 845 at 36381.

588. In July 1998, SMUD sent a letter to then-Director Lake Barrett notifying him that "[a]s we were unable to obtain relief, SMUD has reluctantly filed a claim with the U.S. Court of Federal Claims on June 9, 1998." Letter from J. Schori to L. Barrett (July 14, 1998) (DX 861).

589. Steve Redeker sent a letter in March 1998 again informing DOE of the progress of the project, including Vectra's bankruptcy, and the increased costs anticipated by SMUD. PX 575.

590. SMUD notified the Secretary of Energy in April 1999 that it was interested in negotiating with DOE "the federal government's taking title to SMUD's spent nuclear fuel at Rancho Seco." Letter from J. Schori to B. Richardson (Apr. 19, 1999) (PX 1012).

591. In 2000, DOE general counsel, Mary Anne Sullivan, explained that "[t]he Department has acknowledged for some considerable period of time that we are responsible for the costs associated with the delay in beginning spent fuel acceptance." PX 660 at 1.

592. In January 2001, SMUD informed DOE of its intent to begin loading its fuel into canisters beginning in the spring of 2001, and "invite[d] DOE to observe our fuel load activities and review our fuel inspection records." Letter from S. Redeker to D. Zabransky at 1 (Jan. 22, 2001) (PX 670).

593. In June 2003, Steve Redeker sent a letter to David Zabransky requesting an update on the status of DOE's efforts regarding inclusion of SMUD's dual purpose system as a standard waste form.

> As you are aware, SMUD was forced to store its fuel in the dual-purpose system as a result of DOE's failure to begin fuel acceptance as required by the standard contract. . . . DOE must recognize that, as a result of DOE's extended delay of performance under the contract, SMUD and other utilities were forced to take certain actions, store their fuel, and attempt to minimize storage costs."

Letter from S. Redeker to D. Zabransky at 1 (June 16, 2003) (DX 1295).

594. DOE has closely followed the development and utilization of dry storage by the utility industry, including SMUD. PX 675. For purposes of its Spent Fuel Storage Projections, one of DOE's assumptions was that: "Without specific information to the contrary, all 'Additional Storage Requirements' are accommodated through on-site dry storage." PX 675 at HQR249-0183.

a. DOE assumed that if it never picked up fuel that all utilities would have to utilize dry storage. PX 675 at HQR249-0180 (describing the "No Pickup" scenario).

b. DOE further assumed that all shutdown reactors would transfer fuel to dry storage five years after shutdown. PX 675 at HQR249-0183 ("In the absence of information to the contrary, all SNF at sites with all reactors shutdown is assumed to be placed in dry storage five years after shutdown of the last reactor at that site.").

DATED this 22nd day of August, 2005.

Respectfully submitted,

/s/ Howard N. Cayne /s/ Timothy R. Macdonald

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

Of Counsel:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Proposed Findings of Fact to Accompany Its Post-Trial Legal Brief to be filed electronically through the Court of Federal Claims Case Management/ Electronic Case Filing System on August 22, 2005. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Alan Lo Re
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

/s/ Timothy R. Macdonald