IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 98-488C<br>(Judge Braden) |

DEFENDANT'S PROPOSED FINDINGS OF FACT

Defendant, the United States, submits the following post-trial proposed findings of fact ("DPFOF").

## I. THE NUCLEAR WASTE POLICY ACT AND THE PROMULGATION OF THE STANDARD CONTRACT

1. On January 7, 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)).

2. The NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF and HLW]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures." Id.

3. On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983).

4. Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.
>
> Beginning on April 1, 1991, DOE shall issue an annual acceptance ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6) (emphasis added).

5. The proposed rule requested that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.

6. Certain utilities and nuclear industry groups requested that DOE insert into the Standard Contract a specific rate of acceptance. DX 0076.063 at ADM002.0482, DX 64, at SMUD 0011731.

7. On April 18, 1983, DOE issued the terms of the Standard Contract as a final rule. 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983). In the final Standard Contract terms, DOE expressly chose not to include a minimum rate obligation in the Standard Contract because, as of 1983, DOE did not know what DOE's capabilities would be in 1998 and was unwilling to commit to the minimum rate obligations that the utilities proposed. Def. Counter-Designation of R. Morgan, at Tr.57:20-23, Tr.129:11-17, Tr.203:16-19 (3/21-22/02).

8. In the final rule, DOE also modified the definition of the "facility" to which SNF could be delivered beginning in 1998. Although the proposed rule would have required delivery to a repository in 1998, the final rule provided that DOE could deliver SNF in 1998 either to a repository or to “such other facility(ies) to which [SNF and/or HLW] may be shipped by DOE prior to its transportation to a” permanent repository. 10 C.F.R. § 961.11, Art. I.10.

9. The final rule also included provisions providing DOE with the sole discretion to approve exchanges by utilities of approved delivery commitment schedules, and to grant utilities that had shutdown priority in the acceptance queue. 10 C.F.R. § 961.11, Art. V.E, VI.B.1(b).

10. The final rule did not provide any provision allowing transportation campaigns, but instead generally required that DOE accept SNF under oldest-fuel-first principles. 10 C.F.R. § 961.11, Art. IV.B.5(a).

11. The final rule expressly granted DOE the discretion to defer the acceptance of failed fuel if DOE determined that the disposal of such fuel was not technically feasible. 10 C.F.R. § 961.11, Art. VI.A.2.b.

12. SMUD and DOE signed the Standard Contract on June 14, 1983. DX 88.

## II. OVERVIEW OF THE RANCHO SECO NUCLEAR FACILITY

13. SMUD's Rancho Seco facility began operating in 1975. Tr.114:20-21 (Shetler). From the outset, Rancho Seco was plagued by a poor performance history, including multiple extended outages and placement upon a watch list by the Nuclear Regulatory Commission ("NRC") of reactors constituting the "greatest safety significance." DX 10; Tr.120:17-121:14 (Shetler); Direct Testimony of Cliff Hamal, at ¶ 30.

14. During the mid-1980s, Rancho Seco suffered a 27-month outage, from December

1985 though early 1988. Tr.155:13-16, Tr.156:1-3 (Shetler). During the 14-year life span of the Rancho Seco plant, the plant was non-operational more than it was operational. Direct Testimony of Cliff Hamal, at ¶ 29.

15. S. David Freeman, SMUD's general manager characterized SMUD's operating history as follows:

> . . . [SMUD was] a very troubled utility at the time. They had raised the electric rate seven or eight times. They had a nuclear power plant, that if it were an employee, you would have fired it because it operated half the time . . . .

Def. Counter-Designation D. Freeman, Tr.24:14-18 (7/16/04).

16. As a result of the extended outages at the Rancho Seco facility, SMUD had to pay for replacement power, which accounted for half of Rancho Seco's overall generation of electricity. Tr.127:6-16 (Shetler). Consequently, SMUD had to raise rates for its ratepayers significantly during the mid-to-late 1980s. Tr.127:17-18 (Shetler). Rancho Seco's extended outages, coupled with the significant rate increases, resulted in the placement on the local ballot two separate voter initiatives to close Rancho Seco, the second of which, dated June 6, 1989, passed. Tr.127:22-23, Tr.155:21-22 (Shetler); Tr.876:1-4 (Ferreira).

17. The following day, SMUD's Board of Directors immediately agreed to abide the June 6, 1989 referendum to close Rancho Seco. Tr.129:1-12 (Shetler); Tr.895:1-10 (Ferreira). At the time of the shutdown, Rancho Seco was licensed by the NRC to operate through 2008. DX 248, at SMUD 0029716.

18. SMUD's shutdown of its Rancho Seco facility occurred nine years before DOE was obligated to begin the acceptance of SNF from the industry generally, and 12 years before DOE was obligated to begin the acceptance of SMUD's SNF.

## III. SMUD PURSUED DRY STORAGE IN 1990 FOR REASONS WHOLLY UNRELATED TO THE GOVERNMENT'S 1998 BREACH OF THE STANDARD CONTRACT

### A. As A Result Of Rancho Seco's Premature Shutdown In 1989, SMUD's Focus Was To Decrease The Size Of Its Nuclear Footprint

19. Upon the decision to shut down Rancho Seco, SMUD personnel placed their focus upon decommissioning the plant. DX 122; DX 125; DX 131; DX 133; DX 134; DX 139. On December 8, 1989, following the shutdown of Rancho Seco, SMUD completed the defueling of the Rancho Seco nuclear reactor. DX 135, at SMUD 0000501. SMUD stored all 493 of its SNF assemblies in the wet storage pool within its spent fuel building. DX 141, at SMUD 0019082. Shortly after its decision to shutdown Rancho Seco, SMUD created a Decommissioning Task Force to initiate planning for decommissioning and to place the plant into a "protective lay-up" condition. DX 122; DX 125.

20. SMUD had two primary goals after Rancho Seco's premature shutdown in 1989.

a. First, SMUD sought to reduce its nuclear footprint as quickly as possible. Tr.263:11-15 (Shetler). To achieve this goal, SMUD had to decommission its Rancho Seco facility. Tr.263:16-18 (Shetler). The Rancho Seco site could not be decommissioned until its pool was eliminated. Tr.617:2-4 (Redeker). SMUD believed that, by placing its SNF into dry storage, SMUD gained the ability to decommission its wet pool. Tr.263:25-264:1-3 (Shetler). By decommissioning its wet pool, SMUD in turn gained the ability to decrease the amount of staff and ultimately reduce its costs associated with Rancho Seco. Tr.264:4-10 (Shetler); Tr.833:2-12 (Redeker). SMUD recognized that its desire to decommission Rancho Seco was an important element in SMUD's decision to pursue dry storage. Def. Counter-Designation of R. Bowser, at Tr.229:24-230:5 (9/16/04).

b. Second, SMUD sought the removal of its SNF from the site as quickly as possible. SMUD hoped that dry storage would lead DOE to accept SMUD's fuel earlier than it was otherwise entitled under the Standard Contract and as soon as possible. Tr.264:11-15 (Shetler).

21. SMUD believed that dry storage could help it achieve both of these goals. First, dual-purpose dry storage represented the quickest and cheapest way to decommission the Rancho Seco facility, because SMUD could not decommission its wet pool as long as any radioactive materials, including SNF, remained in the pool. DX 721, at SMUD 061592; Tr.734:21-735:8; 736:7-737:9 (Redeker) (acknowledging cost in maintaining Part 50 license, and inability to eliminate Part 50 license until wet pool is decommissioned). In the early 1990s, SMUD estimated that ceasing wet pool operations would result in an annual savings of as much as $8 million. DX 287, at SMUD 0018294. Second, SMUD believed that dual-purpose dry storage presented the best chance of having DOE accept its SNF under the Standard Contract through the use of a Monitored Retrievable Storage ("MRS") system by 1998. Id.; Tr.254:21-25 (Shetler) ("[I]f there was a potential for any kind of an interim storage facility that could take the fuel earlier, having fuel in a dual-purpose system would hopefully expedite the ability to get fuel moved there."); Tr.278:15-19 (Shetler). SMUD believed that, although its first acceptance in the non-breach world would have been 2001, its SNF could be accepted earlier at an MRS if it had its SNF in dual-purpose dry storage by 1998. Tr.704:22-705:1 (Redeker); DX 202, at Attachment at SMUD 0019251 ("Storage in transportable casks offers the best opportunity explored to keep open the possibility of early off-site shipment, possibly as early as 1998 should DOE develop a . . .

MRS."); DX 217, at SMUD 0025576 (stating that "the District believes that by storing spent fuel in dual purpose storage and transport casks that early acceptance by DOE would be possible").

22. SMUD's own expert, Ivan Stuart, believed that SMUD's placement of its SNF into dual-purpose dry storage increased the chances that DOE could timely accept SMUD's SNF. Tr.1374:15-25 (Stuart).

23. SMUD's pursuit of its two stated goals were wholly independent of the Government's delay in the acceptance of SNF. Neither of these two goals, which were discussed in the early 1990s, were in any way related to the Government's post-1998 delay in the acceptance of SNF. See DPFOF ¶¶ 20-22.

24. Mr. Shetler testified that, in the early 1990 time frame, SMUD's "primary goal" was "to try and get the fuel in the safest mode, low cost mode and ultimately in the DOE's hands as soon as possible." Tr.150:22-151:1, Tr.152:12-14 (Shetler). Mr. Shetler explained that "SMUD was no longer in the nuclear business, if you will. They are not going to be generating electricity from nuclear power from our perspective, it was in our ratepayer's best interest to minimize the cost and get the fuel in a position where DOE could take it." Tr.152:16-21 (Shetler).

25. As early as September 1989, SMUD was considering placing its SNF into dry storage. DX 125, at SMUD 0020872 (noting that "spent fuel will be placed in wet storage in the existing spent fuel pool initially and then dry cask storage following the appropriate fuel decay period."); Tr.268:10-23 (Shetler) (acknowledging that dry storage was an option SMUD was considering at the time and it was the option SMUD ultimately pursued); Tr.1064:8-13 (Field) (admitting that SMUD began considering dry storage option within months after the June 1989

shutdown of Rancho Seco). In October and December 1989, SMUD assumed, for purposes of its proposed decommissioning plan, that it would place its SNF into dry storage beginning in 1995. DX 134, at SMUD 0027908; Tr.271:22-272:1 (Shetler) (explaining that dry storage was one of the planning assumptions SMUD was considering as of December 1989); Tr.1070:3-5, Tr.1071:1-3 (Field) (acknowledging that, as of October 1989, dry storage was "certainly" an option, that cost studies regarding dry storage were being conducted, and that "considerable system reductions" were possible with dry storage).

### B. SMUD's Board Of Directors Made The Decision In 1990 That SMUD Place Its SNF Into Dry Storage

26. In February 1990, SMUD retained Saul Levy, Inc. ("Levy") as a consultant to evaluate SMUD's storage options for its SNF. DX 144. On March 31, 1990, Levy provided SMUD a report with its ultimate conclusions. DX 165.

27. Levy considered 15 different storage options for SMUD's SNF and reached the following conclusion:

> The option that offered the best opportunity to keep open the possibility of early off-site shipment, potentially as early as 1998 under a Monitored Retrievable Storage facility ("MRS"), was storage of SMUD's SNF in transportable casks.

DX 165, at SMP 0680004.

28. Levy "strongly recommended" that SMUD pursue this option in conjunction with a demonstration program with DOE to develop the dual-purpose cask system. DX 165, at SMP 0680004. Levy explained that, to accomplish this objective, SMUD should "[e]nter into discussions with the DOE aimed at DOE acceptance of the Rancho Seco spent fuel in 1998." Id., at SMP 0680067. Notably, Levy acknowledged that:

> . . . the only way to be prepared for DOE success in establishing a site by 1998 is to proceed towards storage in transportable casks. No other alternative that could accomplish this objective was found in the course of this study.

Id., at SMP 0680070.

29. SMUD did not submit Saul Levy's report to DOE. Tr.184:24-185:2 (Shetler).

30. S. David Freeman, SMUD's general manager at the time, could not recall Saul Levy or the report that Mr. Levy issued. Def. Counter-Designation D. Freeman, at Tr.38:16-22 (5/16/02). Mr. Freeman explained his managerial philosophy as follows:

> Let me just state for the record that a general manager of a utility can do one of two things; they can either manage the utility or read all the paper. There is not enough time to do both, and I chose to manage the utility. So I initialed a lot of routine things without reading them and [am] proud of it.

Def. Counter-Designation D. Freeman, at Tr.48:13-22 (5/16/02).

31. Saul Levy presented his recommendations for the disposition of SMUD's SNF at the March 21, 1990 meeting of the Rancho Seco Committee of the SMUD Board of Directors. DX 159. Levy recommended that:

> SMUD pursue alternative of having all of its spent fuel in transportable storage casks before 1998 primarily because it could lead to shipment to DOE facility by 1998 or to DOE interim acceptance of spent fuel at site by 1998.

Id., at SMUD 085624 (emphasis added). In explaining the rationale for recommending transportable storage casks, Levy reiterated that it "provides [the] earliest opportunity to ship fuel off-site." Id. at SMUD 085632.

32. SMUD relied upon the recommendations made by Mr. Levy in planning for the

disposition of its SNF. Tr.273:16-20 (Shetler). SMUD management agreed with Levy's recommendation to pursue dual-purpose dry storage, and, consequently, in March 1990, SMUD's Board of Directors approved of the Rancho Seco general manager's pursuit of the purchase of a dual-purpose storage system. Tr.172:2-7, Tr.193:1-8 (Shetler) ("As a result of our review of the Saul Levy report and his recommendation, our recommendation to our board was that we pursue that option and go and look at dual purpose transportable system.").

33. After the Levy recommendation, SMUD saw dry storage as a "cheaper way" of dealing with fuel storage that could facilitate transport to DOE perhaps even sooner than to a Federal repository. Tr.172:17-24 (Shetler).

34. Immediately after the March 1990 Board of Directors meeting, SMUD's general manager, David Boggs, drafted a letter to the Secretary of Energy indicating that, "[a]s a result of the [Levy] study, it was decided that the District pursue dual purpose (storage and transportation) casks or storage only casks <u>that could be effectively interfaced with the early receipt by the DOE of Rancho Seco's spent fuel</u> and subsequent use of the casks by DOE." DX 164 (emphasis added). Mr. Boggs' letter also assumed that DOE could identify an SNF storage site by 1998. <u>Id.</u>

35. Consistent with this decision to place its SNF into dry storage, Dan Keuter, the Chief Nuclear Officer of Rancho Seco at the time, presented the results of the Levy report at the April 25, 1990 meeting of SMUD's Rancho Seco Committee. DX 174. Mr. Keuter explained SMUD's strategy as follows:

> [S]et up a demonstration program and construct three dual purpose casks by 1993. At that time, 72 fuel assemblies would be loaded into the three casks and monitored <u>until the DOE takes possession of them in 1998.</u> The remaining 493 assemblies will be maintained in wet storage until 1993. <u>At that time, we should have a commitment from DOE regarding fuel acceptance in 1998. Our</u>

> decision point regarding concrete casks or dual purpose casks is in 1993. If the DOE will not take our fuel in 1998, or if the dual purpose casks do not prove feasible, we will award a contract to build concrete casks and load the fuel in them by 1995.
>
> * * *
>
> If a commitment can be obtained from DOE to take possession of the spent fuel by 1998, whether onsite or offsite, then dual purpose casks should be pursued. If a commitment cannot be obtained, onsite concrete cask/canister storage by 1995 should be pursued. This is the earliest that we can put our spent fuel in concrete casks, since it must decay for approximately five years before it is put in cask storage.

Id. at SMUD 0018522 (emphasis added).

36. By May 1990, SMUD had eliminated consideration of leaving its SNF in the wet pool. In a presentation concerning Rancho Seco's decommissioning cost study, SMUD indicated that seven different storage options were evaluated – four involving dry storage and three involving wet storage. DX 179, at SMUD 0000392. The evaluation indicated that SMUD had rejected each of the wet storage options because "wet [storage is] more expensive than dry." Id.

**C. SMUD's Early Implementation Of Its Dry Storage Project**

37. On June 7, 1990, Rita Bowser, the Rancho Seco Nuclear Fuel Disposition Project Manager who had the day-to-day project management oversight for implementing SMUD's dry storage project, submitted to Mr. Keuter a copy of SMUD's independent spent fuel storage installation ("ISFSI") licensing and engineering strategies. DX 188; Tr.311:20-25 (Shetler).

38. In the memorandum transmitting the strategies, Ms. Bowser explained that she

was "working with both Licensing and Engineering to immediately implement the generic licensing and design activities necessary for the establishment of the Rancho Seco [ISFSI]." DX 188, at SMUD 0019288 (emphasis added).

39. Although Ms. Bowser and Ken Miller were project managers for the implementation of the dry storage project, they did not have the authority to make the decision to pursue dry storage. Tr.177:7-19 (Shetler). Ms. Bowser considered herself a “fairly junior” Rancho Seco staff member. Def. Counter-Designation of R, Bowser at Tr.65:4-9, Tr.96:6-10, Tr.121:2-8, Tr.201:6-16, Tr.208:8-20 (9/16/04).

40. During Ms. Bowser’s deposition, counsel for SMUD objected to questions from Government counsel on the basis that “Miss Bowser does not speak on behalf of SMUD.” Def. Counter-Designation of R. Bowser, at Tr.108:15-22, Tr.154:17-18, Tr.150:20-21 (9/16/04) (objecting to questions on grounds that it calls for speculation as to what were SMUD’s intentions).

41. The decision to pursue dry storage was made at a higher level of management than Ms. Bowser and Mr. Miller. Tr.177:12-14 (Shetler). However, Mr. Shetler relied upon the work of Ms. Bowser and Mr. Miller as part of the development of SMUD’s overall dry storage planning strategy. Tr.312:1-5 (Shetler).

42. Jim Field, the chief engineer at Rancho Seco who worked on the specification for SMUD’s dry storage project, recognized that no one ever told him SMUD was pursuing dry storage because DOE was not going to perform. Tr.1071:13-20 (Field).

43. At the time that Mr. Field became involved in implementing SMUD’s dry storage

plan, SMUD was not considering store-only dry storage, but was only pursuing dual-purpose dry storage. Tr.1072:8-19 (Field).

44. In June 1990, Ms. Bowser requested that a work order be opened for "licensing and engineering activities related to dry storage disposition." DX 187; Tr.174:18-24 (Shetler) (explaining that it was SMUD standard practice to open up a work order to start collecting costs once a new project is initiated).

45. SMUD requested charges of at least $4 million dollars to this work order prior to 1992. DX 258; DX 187. Similarly, Luana Holst, SMUD's supervisor of nuclear records and documents, who along with Jim Field was responsible for the collection of work orders to be included in SMUD's damages claim, admitted at trial that this work order related to SMUD's dry storage project, but that this work order was not included in SMUD's damages claim. Tr.1231:19-22, Tr.1236:12-20, Tr.1269:7-12 (Holst).

46. Ms. Bowser recognized that SMUD was incurring costs associated with its dry storage project before June 1990. Def. Counter-Designation of R. Bowser, at Tr.134:2-6 (916/04).

47. In July 1990, SMUD filed with the NRC a document entitled "Plan For Ultimate Disposition of Rancho Seco Nuclear Generating Station." DX 194. The document, which is a regulatory requirement, served to "provide the NRC with a status report in the form of advance and preliminary District plans for the ultimate disposition of [Rancho Seco], prior to the filing of the District's [decommissioning plan]." Id. at SMUD 0025395; Tr.280:5-9 (Shetler).

48. Consistent with its prior discussion of its intentions, SMUD's "Plan For Ultimate

Disposition of Rancho Seco Nuclear Generating Station" reiterated SMUD's plan to place its SNF into dry storage. DX 194, at SMUD 0025406. Additionally, this document stated that "[i]t is expected that spent fuel will be accepted by DOE before decommissioning is initiated." Id., at SMUD 0025406. As of July 1990, SMUD planned upon initiating decommissioning in the 2008 or 2009 time frame. Tr.285:16-19 (Shetler). Further, similar to its previous statements, SMUD once again expressed its belief that an MRS was expected to be in operation in "about 1998." DX 194, at SMUD 0025438.

49. On May 20, 1991, SMUD submitted its proposed decommissioning plan to the NRC, which reflected SMUD's then-current intentions. DX 248; Tr.287:1-3, Tr.288:1-2 (Shetler). In its plan, SMUD reiterated its intention to place its SNF into dry storage, to have its ISFSI licensed and constructed by 1993, and to transfer its SNF to dry storage by 1998. DX 248, at SMUD 0029733. Further, consistent with SMUD's March 1990 draft decommissioning cost study, SMUD's April 1991 decommissioning cost study that it submitted to the NRC as part of its proposed decommissioning plan again "presumes the availability of [an MRS] facility such that DOE can meet its obligation to begin receiving fuel by 1998." Id. at SMUD 0030074 (emphasis added).

50. In a June 28, 1991 briefing to the Nuclear Regulatory Commission concerning its decommissioning plan, SMUD represented that it would save $8 million a year from moving its SNF from wet storage to dry storage. DX 255, at SMUD 0029454.

51. On October 3, 1991, Rancho Seco management presented its decommissioning plan, including its dry storage strategy, to the SMUD Board of Directors. DX 274. At this meeting, SMUD staff presented its best information to the Board with respect to its dry storage

plans. Tr.357:10-13 (Shetler). Although much of the presentation was made by Rancho Seco staff members Ms. Bowser and Mr. Miller, SMUD chose not to present those witnesses at trial and instead relied upon the trial testimony of Mr. Shetler, who explained at trial that he ultimately would have reviewed and approved of whatever was presented to the Board of Directors at this meeting. Tr.313:9-13 (Shetler). General Manager S. David Freeman did not object to the proposal that Mr. Shetler and his staff made to the Board of Directors. Tr.357:14-16 (Shetler).

52. As of October 1991, the SMUD Board of Directors was composed of Ed Smeloff, President; Peter Keat, Vice President; Joe Bounaiuto; Dave Cox; and Wendy B. Reid. DX 274, at SMUD 0027402. None of these Board members had a background working in the nuclear industry. Tr.322:2-323:25 (Shetler). At the time, Mr. Smeloff was a consultant advising the California State Legislature. Tr.321:17-20 (Shetler). Mr. Keats owned a book store in Sacramento. Tr.322:6-10 (Shetler). Mr. Bounaiuto was a high school teacher. Tr.322:14-23 (Shetler). Mr. Cox worked as an insurance broker at an insurance agency. Tr.323:2-5 (Shetler). Ms. Reid worked as an employee of the California Energy Commission. Tr.323:10-13 (Shetler).

53. Mr. Shetler told the Board of Directors at this meeting that SMUD's fuel disposition project was "tied very strongly" to its decommissioning program. DX 274, at SMUD 0027409; Tr.772:3-8 (Redeker) (acknowledging that there is a "direct link" between SMUD's dry fuel storage options and its decommissioning efforts).

54. Both Mr. Miller and Ms. Bowser repeatedly told the Board at the October 1991 meeting that SMUD expected to achieve an $8 million annual savings by transferring its SNF from wet storage to dry storage, or $80 million over a ten-year period. DX 274, at SMUD 0027419, SMUD 0027433-34, SMUD 0027436. Mr. Miller told the Board that SMUD staff

recommended going to dry storage "because we can prudently save the District a great deal of money over the storage period." Id. Indeed, at trial, Mr. Shetler agreed that the $8 million in annual savings was a factor in SMUD's decision to place its spent fuel into dry storage. Tr.266:7-10 (Shetler).

55. During the October 1991 meeting, Ms. Bowser emphasized to the Board the significant cost savings that SMUD could achieve by transferring its SNF into dry storage, explaining:

> If you look at the fact that a repository isn't projected until 1998, or an MRS until 1998, with a repository in 2010, and it will take DOE approximately 10 years to accept all of SMUD's fuel, the cost savings can range somewhere between $60 to $156 million over the lifetime of decommissioning.

DX 274, at SMUD 0027436 (emphasis added).

56. Mr. Shetler explained at trial that this difference between $60 million and $156 million in savings reflected the difference in assumptions between DOE acceptance at an MRS beginning in 1998 compared to DOE acceptance at a Federal repository beginning in 2010. Tr.327:20-24 (Shetler).

57. In response to a question regarding the estimated timing for DOE's acceptance of SNF, Ms. Bowser told the Board:

> MS. BOWSER: As a best case, without any negotiations with other utilities which are permitted to improve your place in the queue, they accept it in a policy that's called OFF, oldest fuel first. The first assemblies from Rancho Seco would be scheduled to be received three years after a facility opens, be that a monitored retrievable storage facility or a final repository. That's in the best case.

> And it would take approximately ten years from the opening of the facility or an additional seven years from the receipt of our first fuel for them to take the remainder of our assembly.
>
> In a worst case, it would be considerably longer, perhaps up to 20, 25 years.
>
> PRESIDENT SMELOFF: So, it's three years after the Federal Government develops an MRS that they would be required to begin to take spent fuel.
>
> MS. BOWSER: Yes. They may take our first assembly in the best case.
>
> * * *
>
> PRESIDENT SMELOFF: And is that likely to be 1998 or is that –
>
> MS. BOWSER: <u>At this time, it is likely that an MRS could be sited by 1998</u>; however, there needs to be some congressional action that would delink the final repository from the MRS. Right now, the two are linked so that you can't actually start to operate an MRS until you've sited a final repository.
>
> With the situation at Yucca Mountain, that seems like it will be tied up in litigation for a while. <u>So, there is actually legislation in the Congress to delink the facilities which would make an MRS likely in 1998.</u>

DX 274, at SMUD 0027465-66 (emphasis added).

58. General Manager Freeman expressed his agreement with Rancho Seco staff's proposal to place its SNF into dry storage, stating, "I think getting the fuel into casks and having them transportable in case the Department of Energy has a really good place to take them, it's a prudent thing to do." DX 274, at SMUD 0027471-72. Rancho Seco staff believed that, regardless of the timing of DOE's performance in accepting SNF, placing SMUD's SNF into dry

storage would ensure that it could timely decommission the rest of Rancho Seco. Id. at SMUD 0027466-67.

59. When Rancho Seco staff made its proposal that the Board pursue dual purpose dry storage in October 1991, the notion that dry storage was in response to the Government's potential inability to begin SNF acceptance in 1998 had not even been contemplated. The following discussion took place at the October 3, 1991 meeting:

> PRESIDENT SMELOFF: What is the legal responsibility of the Department of Energy to take the fuel beginning in 1998. Suppose, for whatever reason – lack of authorization of Congress, failure to characterize the Yucca Mountain site – they are simply unable to take the fuel? Do they have any legal responsibility to compensate us for the storage of this fuel?
>
> ASSISTANT GENERAL MANAGER SHETLER: We might want to do a review on that.
>
> MS. SCHORI: Yes, I suspect we should review that. I think their obligation is a contract obligation. And the question you're asking is whether or not they're in breach of contract if they fail to take the fuel. And I think probably I should look at that –

DX 274, at SMUD 0027468-69 (emphasis added).

60. The following day, October 4, 1991, SMUD submitted to the NRC its application to construct and operate an ISFSI. DX 276.

61. On October 17, 1991, Mr. Shetler presented to the SMUD Board of Directors a presentation similar to the one presented at the October 3, 1991 meeting. DX 280. This presentation indicated that there was an $8 million annual savings from transferring SMUD's fuel from wet storage to dry storage, and an estimated capital cost of $20 million. Id. at SMUD 0029434. Mr. Shetler agreed that, based upon these numbers, which were provided to the Board, the dry storage project would pay for itself in two-and-a-half years. Tr.329:10-14 (Shetler).

Further, Mr. Shetler agreed that these figures represented SMUD's best estimates at the time and that SMUD utilized these numbers for its planning assumptions concerning the storage of its SNF. Tr.329:21-330:1-4 (Shetler).

62. Mr. Shetler's October 17, 1991, presentation assumed either an MRS by 1998 (with final acceptance of SMUD's fuel in 2008) or a Federal repository in 2010 (with final acceptance of SMUD's fuel in 2020). DX 280, at SMUD 0029434.

63. The SMUD Board of Directors issued a resolution that same day approving "the proposal to construct a spent fuel storage facility." DX 282.

64. In 1994, SMUD represented to DOE that, when it made the decision to pursue dual-purpose dry storage, it assumed DOE would timely perform under the Standard Contract.

a. On May 25, 1994, DOE published a Notice of Inquiry ("NOI") regarding its responsibility to accept SNF after January 31, 1998, and sought comments from the nuclear industry. PX 351; 59 Fed. Reg. 27007 (May 25, 1994). Specifically, DOE requested industry comments upon: (1) whether it had a statutory obligation to accept SNF beginning in 1998 in the absence of an operational repository; (2) the need for interim offsite storage prior to the opening of a permanent repository; and (3) the potential option of offsetting some of the financial burden to the industry through the use of the Nuclear Waste Fund. Id.

b. In response to DOE's NOI, SMUD submitted a letter on September 21, 1994 and explained to DOE its belief that SMUD began its dry storage project believing that DOE would perform the Standard Contract in a timely manner. Specifically, SMUD stated that:

> After a referendum of SMUD's electorate on June 6, 1989, Rancho Seco ceased operating on June 7, 1989. Since then, SMUD has been proceeding with activities to begin the decommissioning of Rancho Seco and to provide required assurances to the NRC that

> the District will have sufficient funds available to pay for the decommissioning. However, SMUD has not provided funds in its Decommissioning Trust for spent fuel storage after 2010. When funded in 1991, the Trust assumed that DOE would accept all of Rancho Seco's fuel starting in 1998, including the queue, by 2010.

DX 462, at SMUD 0019624 (emphasis added).

**D. SMUD Awards Dry Storage Contract To Pacific Nuclear**

65. In December 1991, SMUD issued requests for proposals ("RFPs") for the design and fabrication of the dual-purpose casks. DX 293.

66. Also in December 1991, Mr. Shetler made a presentation, which had the approval of General Manager Freeman, concerning SMUD's decommissioning and spent fuel disposition plans to the California Senate Committee on Energy and Public Utilities. DX 291; Tr.358:2-359:8 (Shetler). This presentation contained a slide identical to the one utilized with the Board of Directors in the October 17, 1991 meeting, indicating an $8 million in annual savings and the possibility of an MRS by 1998. DX 291, at SMUD 0029418, SMUD 0029411. These assumptions were the best that SMUD had at the time. Tr.332:2-4 (Shetler).

67. On April 2, 1992, the SMUD Board of Directors approved the evaluation process and criteria proposed by Rancho Seco management to be used in the selection of a vendor for the dual-purpose casks. DX 348.

68. On July 7, 1992, Rancho Seco management requested that the Board authorize SMUD's general manager to negotiate and execute a contract with Pacific Nuclear Services, Inc., to purchase dual-purpose casks. The staffing summary sheet presented to the Board of Directors containing the request explained:

> In 1990, the Board of Directors, as a result of a District study performed by S. Levy, Inc., concurred the General Manager should

> pursue the purchase of a dual purpose casking method. The purpose of this activity was to enable the District to dry store Rancho Seco spent nuclear fuel at an onsite location, shutdown the Spent Fuel Building, and further reduce decommissioning costs.

DX 344, at SMUD 0027221 (emphasis added).

69. Two days later, on July 9, 1992, the SMUD Board of Directors had a meeting that was attended by Ivan Stuart, a vice president at Nuclear Assurance Corporation and currently one of SMUD's expert witnesses in this case. DX 353, at SMP 0310940. NAC was one of the bidders on the dry storage project. Id. Mr. Stuart asked the SMUD Board of Directors why the performance schedule changed between the request for proposal and the time that SMUD evaluated the bids. Id. Mr. Stuart also expressed concern to the Board of Directors that the NRC had not licensed Pacific Nuclear's NUHOMS system for transportation. Id.

70. On August 21, 1992, NAC's president, John Stobbs, sent a letter to Mr. Freeman indicating that SMUD has "so unfairly treated our company [NAC], that I am compelled to write directly to you and request your intervention and reversal of plans apparently underway at SMUD." DX 365. Mr. Stobbs referred to Mr. Stuart's unsuccessful efforts to persuade the SMUD Board of Directors and noted that SMUD's request for proposal clearly requested bids on dual-purpose casks that had already been approved by the NRC, or that where close to NRC approval, so that SMUD could receive the casks by mid-1993. Id. Mr. Stobbs noted that NAC was currently the only vendor that had a cask in the NRC review process. Id. Mr. Stobbs also wrote that SMUD had changed the terms of the proposal without allowing NAC the opportunity to re-bid. Id. Mr. Stuart further warned SMUD that the multi-element sealed canister ("MESC") concept that SMUD had selected was neither licensed by the NRC nor acceptable to DOE for transportation off-site to a DOE facility. Id. at RS 005062. Mr. Stobbs concluded his letter by

indicating that, "[i]n view of all the above facts, I must conclude that [SMUD's] bidding process has not followed the customary propriety of equal treatment of all bidders." Id.

71. Both before and after the July 7, 1992 meeting, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF. Tr.400:21-24 (Shetler). Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition." Tr.440:25-441:2 (Shetler) (emphasis added).

72. In December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998 and was representing this assumption to members of the general public. DX 481, at SMUD 0033398; Tr.383:17-24, Tr.388:19-21 (Shetler) ("I think we still had an expectation there was a possibility it could happen, yes."); Tr.705:2-5 (Redeker). In a presentation as part of a public workshop – of which General Manager Jan Schori was aware and the contents to which she did not make changes – SMUD management indicated that SMUD assumed performance from DOE between 1998 and 2013 and that all of SMUD's SNF would be accepted within a 14-year queue. DX 481, at SMUD 0033398; Tr.386:15-387:11 (Shetler).

73. SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995. Tr.710:16-20 (Redeker).

74. SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry. Tr.1377:3-19 (Stuart) (acknowledging that there was a general belief in the industry that the Government was spending money on the MRS and that an MRS might break the logjam regarding the acceptance of SNF under the Standard Contract).

75. Even after 1995, Mr. Stuart, as an employee of NAC International, was having

discussions with individuals from DOE regarding the possibility of an MRS. Tr.1381:1-5 (Stuart).

76. In 1993, SMUD reevaluated its decision to pursue dual-purpose dry storage. This reevaluation was motivated solely by its concern that, by placing its SNF into canisters, SMUD would render its packaged fuel as either non-standard or unacceptable. DX 425, at SMUD 0027391 (indicating that 1993 reevaluation was to "quantify [the] risk" of placing its SNF into canisters and potentially making its fuel nonstandard or unacceptable); Tr.367:4-17 (Shetler) (explaining reason for 1993 reevaluation was based upon concerns about DOE's acceptance of canistered fuel and the ability to license its first-of-a-kind dual purpose dry storage system).

a. The 1993 evaluation included a "base case" which assumed that SMUD would place its SNF into dry storage, assumed a 2000 start date for DOE acceptance of SNF, and assumed that all fuel would be accepted under DOE's then-planned receipt schedule of 15 years. DX 425, at SMUD 0027393, SMUD 0027390; Tr.374:1-14 (Shetler) (explaining that the "base case" was the plan with which SMUD was moving forward at the time, that it assumed an MRS by 1998, and that it was the reference point against which all other options were compared).

b. Consistent with previous estimates, this 1993 evaluation of SMUD's storage options included, as an assumption, an $8 million in annual savings from transferring its SNF from wet storage to dry storage. DX 425, at SMUD 0027393. In 1993, SMUD also assumed $15.8 million in capital costs, which reflected all of the costs related to the construction of the dual-purpose dry storage system at that time. Tr.471:16-22 (Shetler). SMUD's 1993 evaluation assumed that SMUD would begin loading SNF into dry storage beginning in mid-1995 and that the dry storage project would pay for itself in less than two years. DX 425, at SMUD

0027393; Tr.372:25-373:3 (Shetler) (explaining that the numbers utilized in the evaluation were accurate at the time).

c. Mr. Shetler, the author of the 1993 reevaluation, ultimately recommended that SMUD continue with the licensing and construction of the dry storage project. DX 425, at SMUD 0027382.

d. Then-General Manager Freeman concurred with this recommendation. Tr.370:7-10, Tr.374:15:23 (Shetler).

**E. SMUD's Reevaluation Of Its Decision To Place Its SNF Into Dry Storage Was Unrelated To The Government's January 31, 1998 Delay In SNF Acceptance**

77. When Mr. Field initially assembled SMUD's damages claim, dated April 16, 2004, he collected costs beginning in 1997 at the direction of counsel. Tr.1172:5-11 (Field); PX 762, at SMUD 044014. These post-1996 costs totaled $60.1 million. Tr.1174:6-8 (Field); PX 762, at SMUD 044014. Mr. Field acknowledged at trial that SMUD's initial plan was to have its SNF loaded into dry storage by 1998 and that, had it loaded its SNF by that date, there would not be costs associated with most of the work order numbers contained in SMUD's April 2004 damages claim. Tr.1178:3-6, Tr.1180:12-15 (Field). In other words, SMUD would have had virtually no costs associated with its dry storage project after 1998 had SMUD adhered to its initial plan.

78. It was only after Mr. Field's deposition in this case that SMUD submitted a revised damages claim, asserting $20 million in damages for the period extending from 1992-1996. Tr.1183:20-1184:25 (Field).

79. Even after SMUD concluded that DOE would breach the Standard Contract,

SMUD recognized that, regardless of the breach, the pursuit of dry storage project was the best option financially because it paid for itself quickly. Specifically, in October 1996, Mr. Shelter presented a paper at the TLG Conference, in which he stated:

> [t]he economic aspects of keeping spent fuel in the spent fuel pool as opposed to dry storage indicate that the capital costs associated with dry storage can be recovered in less than two years and a substantial amount can be recovered over the period the plant is in SAFSTOR.

DX 657, at MOF 023696 (emphasis added). Mr. Shetler projected an annual cost of operating the wet pool of $15.1 million dollars, an annual cost of operating dry storage of $3.8 million, and the total capital costs of dual-purpose storage of $18 million. This estimate was SMUD's best at the time. Tr.390:16-19 (Shetler). General Manager Schori was aware of the general substance of this presentation, and Mr. Shetler would not have made this presentation if Ms. Schori disagreed with any of the general substance contained in the presentation. Tr.389:20-390:2 (Shetler).

80. On July 25, 1996, Mr. Miller authored a study in which he estimated that the total cost for the dry storage project would total approximately $21.3 million. DX 613; Tr.722:8-14 (Redeker).

81. Similar to Mr. Shelter's paper, Mr. Field authored a paper in 1996 in which he stated that, "[r]ecovery of the investment in such a [dry] storage system and facility would be realized in less than three years." DX 682; Tr.1078:7-21 (Field) (explaining that the 1996 paper contained "the best information available at the time I wrote the paper").

82. SMUD's revisiting of its decision to pursue dual-purpose dry storage was due solely to the fact that, almost from its inception, SMUD's dry storage project suffered from massive delays and significant cost overruns. As Mr. Redeker explained at trial:

> We were doing re-evaluations because the project started getting into trouble. There started being cost overruns and started being issues and we said if there are problems with this, with this project, why don't we leave the fuel in the spent fuel pool.

Tr.535:12-27, Tr.628:25-629:1 (Redeker) ("This is a troubled project, costs are going up, schedule is moving out.").

83. Every time that SMUD performed a reevaluation, it concluded that the project paid for itself so quickly that DOE's breach of the Standard Contract was immaterial to its consideration as to whether to continue with the dry storage project. DPFOF ¶¶ 79-81, 85-87, 89-90, 103, 105, 109.

84. SMUD reevaluated its dry storage project on several occasions throughout the mid-to-late 1990s and early 2000 time frame. These evaluations were performed by Rancho Seco staff under the direction of Mr. Redeker. Tr.712:22-25 (Redeker). Mr. Redeker testified at trial that he would report the result of these analyses to the Board of Directors and that he endeavored to provide the Board with the most accurate and best information that he could. Tr.716:25-717:9 (Redeker).

85. SMUD conducted a reevaluation of its 1990 dry storage decision on March 3, 1997. DX 721. By this point, the dry storage project was "well underway." Tr.910:7-9 (Ferreira). SMUD conducted the 1997 reevaluation because its dry storage vendor, Vectra, stopped work on the dry storage project. Tr.723:20-724:12 (Redeker). Mr. Redeker acknowledged that, as of the 1997 reevaluation, the dry storage project was floundering, and it was somewhat unclear as to whether the project would even continue. Tr.725:22-726:2 (Redeker).

86. The 1997 reevaluation concluded that SMUD's most cost-effective option was to

continue with the current dual-purpose dry storage concept on an unexpedited schedule because of "reduced staff and the use of contractors." DX 721, at SMUD 061590. This option assumed that SMUD's SNF would be loaded into dry storage by August 31, 1999. DX 721, at SMUD 061600. The 1997 evaluation also concluded that store-only dry storage was not a preferred option, because it would delay SMUD's ability to decommission its wet pool, resulting in additional costs in maintaining its Part 50 operating license. DX 721, at SMUD 061592; Tr.734:21-735:8, Tr.736:7-17 (Redeker).

87. In conjunction with the 1997 reevaluation, Mr. Redeker made a presentation to the Board of Directors in which he represented that the annual cost savings from going from wet storage to dry storage would be $10-$12 million. PX 519. Similar to the 1993 reevaluation, Rancho Seco management recommended to the SMUD Board of Directors that it continue pursuing the existing dual-purpose dry storage project, and the Board concurred with that recommendation. Tr.612:10-11, Tr.619:23-24 (Redeker).

88. Under SMUD's 1997 analysis, the cost of going to dual-purpose dry storage would have paid for itself by 2001 – the year that SMUD would have had its <u>first</u> acceptance of SNF from DOE under the terms of the Standard Contract. DPFOF ¶¶ 86, 87, 109.

89. Throughout this time period , SMUD management repeatedly represented that it would save $10-to-$12 million annually by placing its SNF into dual-purpose dry storage.

a. In May 1997, Mr. Redeker made a presentation to the SMUD Board of Directors in which he presented the 1997 study of SNF storage options and represented that there would be annual savings of $10-$12 million by placing its SNF into dual-purpose dry storage. DX 755, at SMUD 061109.

b. Similarly, in a May 2, 1997 letter from SMUD's external lobbyist to SMUD's in-house lobbyist discussing a meeting that SMUD management had with staff members of its congressional delegation, SMUD management indicated that it would save "approximately $10 to $12 million dollars annually in labor, maintenance, safety, and security expenses," after the SNF was transferred from the wet pool to dry storage in mid-1999. DX 749, at SMUD 062342.

c. On June 3, 1997, Mr. Redeker made a presentation to the SMUD Board Finance Committee, indicating identical annual cost savings by going to dry storage. DX 760, at SMUD 0028714.

d. Four months later, in October 1997, Mr. Redeker made a presentation to a subcommittee of the SMUD Board of Directors, the Board Integrated Resources and Customer Service Committee, in which he again represented an annual savings of $10-$12 million. DX 794, at SMUD 062405. In this October 1997 presentation, Mr. Redeker indicated that the capital costs associated with completion of the dual-purpose dry storage were $23 million. DX 794, at SMUD 062422; Tr.761:4-11 (Redeker) (stating that he put the best information he could in these presentations and believed the information was accurate).

e. By October 1997, SMUD had expended $17 million on capital expenses associated with the dry storage project. DX 794, at SMUD 062422; Tr.766:21-24 (Redeker). However, for purposes of its payback analysis, SMUD looked at capital costs that were expected in the future, rather than costs already incurred. Tr.766:25-767:3 (Redeker).

90. The Government's expert economist, Cliff Hamal, conducted an analysis of SMUD's 1997 reevaluation and concluded that SMUD would not have rationally abandoned its dry storage project given the substantial annual savings that SMUD assumed at the time. Direct

Testimony of Cliff Hamal, at ¶ 78. Mr. Hamal explained that SMUD's own 1997 analysis demonstrates that it would achieve payback of its investment from the savings achieved from moving from wet to dry storage by 2002 and that this payback analysis does not include consideration of other cost benefits to SMUD's decommissioning program. Id. Even assuming the acceptance rate schedule that SMUD has argued in this litigation, Mr. Hamal concluded that the net present value of the savings achieved from the dry storage program would be $13 million (and that the savings would be as much as $30 million under a slower acceptance schedule). Id. Based upon SMUD's own study, Mr. Hamal concluded at trial that there was no basis for concluding that SMUD would have cancelled the dry storage project at the time of the 1997 study. Id.

91. Mr. Hamal also explained that, even if SMUD had demonstrated that it would have abandoned its dry storage project had DOE not breached the Standard Contract, SMUD would not be entitled to any costs prior to the date of abandonment, nor would it be entitled to any of the termination costs, as these would have been costs incurred in the non-breach world. Id. at ¶ 80. SMUD has never identified or quantified the costs associated with contract termination.

92. SMUD made the conclusion to continue with its dual-purpose dry storage project not just internally, but also announced its decision to the general public, including DOE. On March 14, 1997, SMUD's General Manager, Jan Schori, wrote a letter to DOE in which she indicated that "SMUD is spending $20 million in capital for the dry storage and transportation system in an effort to enhance safety at the site and to reduce substantially the interim annual costs of wet storage." DX 729, at RS 006102 (emphasis added); Tr.738:17-20 (Redeker) (explaining that he prepared this letter and wanted the information contained therein to be the best

it could be). Ms. Schori also indicated in her letter that SMUD was incurring approximately $800,000 a month in wet storage costs and that it anticipated incurring approximately $125,000 a month once SMUD placed its SNF into dual-purpose dry storage. DX 729, at RS 006101. SMUD represented to DOE that it anticipated an annual savings of $8 million based upon moving its SNF from wet storage to dry storage. Tr.741:13-17 (Redeker). SMUD further indicated to DOE that all of SMUD's SNF would be in dry storage by December 1999. DX 729, at RS 006101; Tr.740:3-6 (Redeker). Consequently, as of March 1997, SMUD anticipated that the cost of going to dry storage would pay for itself in two-and-a-half years, or by mid-2002.

93. According to Mr. Shetler, SMUD officials believed that one of the major impetuses for revisiting SMUD's dry storage decision during the mid-to-late 1990s and early 2000 was the increased costs that SMUD was experiencing with the dry storage project. Tr.375:6-13 (Shetler); Tr.597:3-15 (Redeker) (explaining that SMUD conducted 1997 analysis of storage options "in anticipation that things might not go well" with its dry storage vendors).

94. Specifically, one of the primary drivers for SMUD revisiting its decision during this time period was the manufacturing issues related to SMUD's vendors. Tr.375:17-25 (Shetler).

95. SMUD's then-general manager, Mr. Ferreira, believed at that time that, because of the relative cost-benefit of dry storage, it was in SMUD's best interest to move forward with the dry storage project as of 1997. Tr.910:22-911:6 (Ferreira).

96. Mr. Ferreira believed that, in assessing the risks associated with continuing with the pursuit of the dual-purpose dry storage system, SMUD focused not upon "sunk" costs, but the so-called "going forward" costs to complete the project. Tr.914:16-915:6 (Ferreira). Mr. Ferreira

further believed that, if SMUD could move its fuel to dry storage at the costs projected in 1997, dry storage would lower SMUD's costs and reduce the risks associated with maintaining fuel in SMUD's wet pool. Id.; Tr.913:25-914:12 (Ferreira).

97. Mr. Ferreira acknowledged that ultimately it is SMUD's customers, rather than DOE, that bears the financial risk of SMUD's pursuit a first-of-its kind storage technology. Tr.928:13-16 (Ferreira). Similarly, Mr. Shetler believed that the substantial costs and schedule delays that SMUD faced in its dry storage project were "the risk one takes when you become the first person out the door." Tr.383:11-16 (Shetler).

98. On February 3, 1998, Mr. Redeker made a presentation to SMUD's Board Finance Committee in which, consistent with other contemporaneous presentations, he stated: "there is a significant cost savings to have fuel in dry storage (between 10 to 12 million dollars per year) primarily due to decreased staff costs to maintain the fuel in dry storage." DX 819, at SMUD 0085312; Tr.768:24-769:10 (Redeker) (stating that he received this document in normal course of business and made no changes to document).

99. On June 9, 1998, SMUD filed its complaint in the United States Court of Federal Claims.

100. After SMUD filed its lawsuit in this case, SMUD revisited its dry storage decision several more times, and, as in previous evaluations, concluded that it made economic sense to continue with its dry storage project. Tr.652:21-23 (Redeker) ("I concluded that there was still a significant positive net present value" of continuing with the dual purpose dry storage project).

101. According to Mr. Redeker, these reevaluations occurred, not because of the

Government's breach, but because "our project was continuing to cost a lot." Tr.651:19-20 (Redeker).

102. Rather than explain that DOE's partial breach of the Standard Contract caused SMUD somehow to change or modify its dry storage plans, Mr. Shetler explained that DOE's partial breach simply "reinforced our decision that we were making the right decision in putting the fuel in dry storage based on what we were seeing from the lack of performance." Tr.242:25-243:1-3 (Shetler).

103. In a September 1998 presentation to Board Integrated Resources and Customer Services Committee, Mr. Redeker indicated $10-$12 million in annual savings by moving to dual-purpose dry storage. DX 871, at SMUD 062619. Mr. Redeker indicated that SMUD had already invested $24 million into its dry storage project and that it was projected that the project could be completed for an additional $13 million. DX 871, at SMUD 062627; Tr.773:13-23 (Redeker). Mr. Redeker testified at trial that these figures represented SMUD's best estimate at the time. Tr.775:6-7 (Redeker).

104. Based upon SMUD's own payback analysis performed in September 1998, in which SMUD only looked at capital costs that had yet to be incurred, SMUD's dry storage project would have paid for itself by some time in late 1999 -- two years before its first scheduled acceptance by the Government. DPFOF ¶¶ 103, 109.

105. In December 1999, SMUD conducted a net present value analysis comparing the cost of wet storage versus dry storage. PX 642, at SMUD 062826. This analysis concluded that SMUD could complete the dry storage project for $15.3 million. Id.; Tr.847:13-848:16 (Redeker).

106. As in previous analyses, under this analysis, SMUD's dry storage project paid for itself prior to SMUD's first scheduled acceptance in 2001 by the Government under the Standard Contract. DPFOF ¶¶ 105, 109.

107. In a February 2000 update to this study, SMUD estimated that the project could pay for itself prior to 2008. PX 672, at SMUD 062797; Tr.851:1-12 (Redeker).

108. As late as June 2003, SMUD's General Counsel, Steve Cohn, was unsure whether SMUD's decision to place its SNF into dry storage was caused by the Government's delay in the acceptance of SNF. In a June 2003 e-mail to SMUD's accounting expert in this case, Brian Brinig, Mr. Cohn explained that, "[i]n addition, SMUD spent over 60 million in capital funds to transfer our spent fuel to a new dry storage facility," and "<u>[t]he purpose of that was to reduce our ongoing operating costs (and/or mitigate the government's damages) from about 10 to 12 million a year to 2 million a year."</u> PX 950, at SMUD 090279 (emphasis added); Tr.1299:6-1302:23 (Brinig) (acknowledging receipt of e-mail and his understanding that e-mail described what the case was about).

109. Under SMUD's own payback analysis, which it conducted multiple times over nearly a decade, the cost of pursuing dry storage paid for itself long before DOE's final acceptance of SMUD's SNF – even under SMUD's litigation-driven position regarding the acceptance rate. The following chart represents SMUD's payback analysis:

| | Oct 1991 | Aug 1993 | Oct 1996 | May 1997 | Oct 1997 | Sep 1998 | Dec 1999 | Feb 2000 |
|---|---|---|---|---|---|---|---|---|
| Capital Cost of Project | $16-$20 M | $15.8 M | $18 M | $19 M | $6 M [1] | $13 M [2] | $15.3 M [3] | $15.3 M [4] |
| Annual Cost Savings | $8 M/Yr | $8 M/Yr | $11.3 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr |
| Completion of Fuel Loading | By 1998 | By 1998 | Early 1998 | Mid-1999 | March 1999 | By 2001 | Mid 2001 | Mid 2001 |
| Years to Pay-Back | 2 to 2 $^{1}/_{2}$ Yrs | < 2 Yrs | < 2 Yrs | < 2 Yrs | < $^{1}/_{2}$ Yrs | < 1 $^{1}/_{3}$ Yrs | 1 $^{1}/_{4}$ to 1 $^{1}/_{2}$ Yrs | 1 $^{1}/_{4}$ to 1 $^{1}/_{2}$ Yrs |
| Date of Pay-Back | By Mid 2000 | By 2000 | By Early 2000 | Mid 2001 | Late 1999 | Early 2002 | Late 2002 | Late 2002 |
| Final Acceptance of SMUD Spent Fuel per Supko | 2006 | 2006 | 2006 | 2006 | 2006 | 2006 | 2006 | 2006 |

110. SMUD's several payback analyses unequivocally demonstrate that SMUD believed its dry storage project would pay for itself prior to the final shipment of its SNF. As Mr. Hamal explained at trial, "[a]s long as SMUD concluded that the capital cost of its dry storage program could be recovered from operating cost savings in just a few years, the project will pay for itself before all of SMUD's fuel would be accepted by DOE in a non-breach world. Thus, the program would be economically justified and not properly included as damages." Direct Testimony of Cliff Hamal, at ¶ 75. Further, Mr. Hamal explained that the cost savings calculations that SMUD performed in the 1990s did not consider how Rancho Seco's overall decommissioning is facilitated by closing its pool and that, had the pool not be closed, SMUD's decommissioning efforts to date could not have been accomplished. Id., at ¶ 76.

111. Although SMUD's July 1992 staffing summary sheet indicates that SMUD would

realize "an estimated savings of approximately $33 Million by dry storing spent nuclear fuel," DX 344, at SMUD 0027222, no SMUD witness could explain the source of this figure, or how this figure compared to the consistent $8-12 million in annual savings that is identified in dozens of contemporaneous documents and to which multiple witnesses testified at trial.

a. Mr. Shetler did not know whether the $33 million number represented net savings over the course of the project or gross savings, or even whether the figure represents a net change to a prior decommissioning cost estimate. Tr.405:7-11, Tr.485:13-23 (Shetler).

b. Mr. Shetler could not explain whether the $33 million in savings included the amount of capital costs associated with the dry storage project. Tr.405:17-20 (Shetler). Other than stating that the $33 million figure represented a comparison between wet and dry storage options, Mr. Shetler could not explain what this $33 million figure represented. Tr.405:21-406:3 (Shetler).

c. In a presentation given by Mr. Shetler concerning the approval of the Pacific Nuclear contract, Mr. Shetler indicated that the dry storage proposal "mitigates potential decommissioning cost increases of $21 million, based on SAR/suggested design." PX 991, at SMP 0330404. Mr. Shetler did not know whether this $21 million would be added to the $33 million to determine actual annual cost savings. Tr.481:14-25 (Shetler).

112. The Government's expert economist, Cliff Hamal, provided unrefuted testimony that, in light of Mr. Shetler's testimony, it was unreasonable to interpret the $33 million figure as an indication of operating savings from 1998 through 2010, particularly because that number would be inconsistent with other contemporaneous documents. Direct Testimony of Cliff Hamal, at ¶ 70.

## IV. SMUD FAILED TO PROVE THAT DOE WAS CONTRACTUALLY OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTUs

113. There is no rate of acceptance specified in either the NWPA or the Standard Contract. DX 88; Tr.1481:15-20 (Supko).

114. The administrative record unequivocally reflects that DOE rejected for inclusion in the Standard Contract both the two-part test relied upon by Ms. Supko and the 3,000 MTU steady state rate.

a. DOE published the Standard Contract at issue here as a "proposed rule" in the Federal Register. See 48 Fed Reg. 5458 (Feb. 4, 1983).

b. In response to that proposed rule, several nuclear utilities and industry groups submitted comments, requesting, among other things, that DOE place into the Standard Contract an obligation requiring DOE to accept SNF at some pre-determined minimum rate or to adopt as contractual obligations the acceptance rates that would be identified in the statutorily-required Mission Plan.

c. For example, the Tennessee Valley Authority ("TVA") stated that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance with corresponds to the purposes of the Act." DX 0076.063, at ADM002.0482. TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or

HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id.

d. Similarly, on January 20, 1983, the American Public Power Association ("APPA"), of which SMUD was a member, submitted the following comments on DOE's proposed Standard Contract:

> 1. DOE's Obligation To Dispose Of SNF and HLW
>
> a. DOE should be required to start accepting SNF and HLW by a date certain (the 1998 date in the Act is appropriate) at not less than the rate SNF and HLW are produced from individual nuclear power plants.
>
> b. DOE should have the further obligation to accept delivery of each Purchaser's backlog of SNF and HLW during the remaining projected life of such Purchaser's power plants.

DX 64, at SMUD 0011731; Tr. 1489:3-5 (Supko) (acknowledging that SMUD was a member of the APPA).

e. In its written comments, Consolidated Edison Company of New York suggested that the Mission Plan might provide a basis for defining DOE's performance, but requested that, in any event, DOE keep contract holders informed of DOE's views, "as they develop," of a schedule of performance under the Standard Contract:

> As this contract provides for considerable pre-payments over a period of nearly two decades, it would be most helpful if DOE's performance was as precisely defined as possible. Presentation by DOE of the "Mission Plan", in the Spring of next year, may provide such an opportunity. In any event, the Purchasers should be kept informed of DOE's views, as they develop, concerning the detailed schedule of its performance under the contract.

DX 0076.072, at ADM002.0587.

115. Although "[a]ll comments received by DOE in response to its proposed rule of February 4, 1983, both at the public hearing and the written comments received thereafter, were carefully reviewed and fully considered in the formulation of this final rule," 48 Fed. Reg. 16590, 16590 (Apr. 18, 1983), DOE expressly declined to agree to such requests.

116. In the final Standard Contract that it promulgated in the Federal Register, DOE intentionally excluded the creation of any contractual <u>obligations</u> to meet any pre-determined acceptance rate. 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983).

117. Although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report <u>for planning purposes</u>. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years, following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b (emphasis added).

118. In the final Standard Contract, DOE did not adopt TVA's request that DOE add a

provision to require DOE to "start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . ." 10 C.F.R. § 961.11.

119. Similarly, DOE did not adopt the APPA's request to add a contract clause to require DOE to accept SNF and/or HLW "at not less than the rate SNF and HLW are produced from individual nuclear power plant," and to "accept delivery of each Purchaser's backlog of SNF and HLW during the remaining projected life of such purchaser's power plants." 10 C.F.R. § 961.11.

120. Mr. Morgan explained that the reason that DOE expressly rejected the inclusion of a specific acceptance rate into the Standard Contract was because, based upon "the uncertainties and the optimistic schedule that we were looking at, we felt it was inappropriate to commit to a rate at this time in the contract." Def. Counter-Designation of R. Morgan, at Tr.57:20-23, Tr.203:16-19 (3/21-22/02) (stating that DOE considered every comment and addressed those comments as to whether we accepted or rejected the comments).

121. Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process.

a. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected

annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b).

b. Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

c. Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1. If DOE approved the DCS, the parties had effectively agreed and defined the amount of SNF that DOE would accept from that contract holder 63 months later. Id. If DOE disapproved the first DCS submission, the contract holder was entitled to make a second DCS submission, again for DOE's approval or disapproval. Id.

122. Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an Annual Capacity Report ("ACR"). Each of the ACRs expressly stated that, "[a]s specified in the Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the purchaser." DX 105, at HQ0002712; DX 111, at HQ0002616; DX 218, at HQ0002493.

123. Each ACR issued between 1987 and 1990 advised contract holders that, beginning

in 1991, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers, containing the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 105, at HQ0002712; DX 218, at HQ0002493; Tr.1976:2-6, Tr.1978:4-7 (Pollog) (stating that these statements comported with his understanding of the role of the 1991 ACR).

124. At the time DOE issued the 1991 ACR, DOE was planning on accepting SNF at an MRS that had a capacity limit of 10,000 MTU. Def. Counter-Designation of R. Milner, at Tr.4742:2-11 (8/11/04).

125. As DOE made clear in the 1991 ACR, pursuant to the 1987 amendments to the NWPA, DOE planned to commence performance of the Standard Contract through the use of an MRS. In that document, which DOE provided to all Standard Contract holders, DOE made clear that it intended to initiate acceptance of SNF through an MRS. "[A] site for a Monitored Retrievable Storage (MRS) facility will be obtained and the facility will initiate operations in 1998 . . . ." PX 231, at HQ0003592.

126. DOE also made clear to all Standard Contract holders in the 1991 ACR that the acceptance rates set forth by the ACR assumed that:

> During the first 10 years following projected commencement of the Federal Waste Management System (FWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU. This is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA.

PX 231, at HQ0003592.

127. Accordingly, the rates of acceptance in the 1991 ACR were: 400 MTU in 1998, 600 MTU in 1999, then 900 MTU each year until 2007. PX 231, at HQ0003598. These amounts totaled 8200 MTU for the first 10 years of performance of the Standard Contract. Id.

128. Neither the NWPA nor the Standard Contract contains reference to the two "primary requirements" relied upon by Eileen Supko in this case, namely, that the rate: (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF and/or HLW already stored by utilities up until that date. Tr.1484:1-10, Tr.1490:21-1491:1 (Supko).

129. Ms. Supko is an industry advocate who was not involved in the negotiations leading to the formation of the Standard Contract.

130. Ms. Supko testified at trial that the two "primary requirements" she identified were contained in DOE's 1983 draft mission plan. Tr.1502:2-7 (Supko); PX 59.

a. Ms. Supko was not involved in the promulgation of the 1983 draft Mission Plan. Tr.1503:22-25 (Supko).

b. Ms. Supko recognized that the final version of the Mission Plan submitted to Congress was not published until 1985, and, when it was published, did not contain a reference to Ms. Supko's two "primary requirements." Tr.1507:21-1508:7 (Supko).

c. The 1983 draft Mission Plan expressly states that, "[t]he disposal contracts

with the utilities specify that priority will be given to the oldest spent nuclear fuel or high-level wastes. In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations." PX 59, at CTR 0421071 (emphasis added).

131. Ms. Supko understood the 1991 date references in the 1983 draft Mission Plan to relate to the 1991 Annual Capacity Report that DOE published. Tr.1506:7-9 (Supko). The 1991 Annual Capacity Report projects the first ten years of SNF acceptance at a 900 MTU rate. DX 290, at HQ0002369. Notwithstanding her admission, Ms. Supko does not rely upon the 1991 Annual Capacity Report and, instead, concluded that "I don't believe that the rate of acceptance in the 1991 Annual Capacity Report was reasonable." Tr.1506:10-15 (Supko). Ms. Supko admits that, based upon her purported experience, she is simply making a judgment that the 1991 Annual Capacity Report is invalid. Tr.1507:18-20 (Supko).

132. Ms. Supko's views of the draft Mission Plan and its role in determining an appropriate rate of acceptance are flatly rejected by the testimony of Robert Morgan, the former director of the Office of Civilian Radioactive Waste Management, who expressly rejected the view that the Mission Plan's articulation of two program goals somehow contractually obligated DOE to accept SNF at a particular rate of acceptance:

> You are trying desperately to get me to say that we had an obligation under the contract to accept fuel at a given rate. We did not.
>
> And what's in the mission plan is not what's in the contract. We set the mission plan as an ideal goal that we wanted to meet.

Def. Counter-Designation R. Morgan, at Tr.129:11-17 (3/21-22/02) (emphasis added).

133. Mr. Morgan has unequivocally stated that the information contained in the

Mission Plan simply represented the goals of the program and what DOE would like to accomplish, but that it clearly did not represent a contractual obligation or requirement. Def. Counter-Designation R. Morgan, at Tr.3644:9-20 (8/2/04). In particular, Mr. Morgan explained that the discussion in the Mission Plan concerning DOE's intent to accept SNF at a rate that precluded additional at-reactor storage did not reflect contractual intent, and that, even under a 3,000 MTU rate of acceptance, some utilities still would have to have added additional at-reactor storage. Def. Counter-Designation R. Morgan, at Tr.3644:4-3646:2, Tr.3648:22-3649:16 (8/2/04); see Def. Counter-Designation B. Rusche, at Tr.162:22-163:5 (5/16/02) (agreeing that DOE's strategy was to help utilities avoid some amount of additional, at-reactor storage by commencing operations in 1998, but that there was possibility that some utilities would have to add on-site storage after 1998); Def. Counter-Designation A. Brownstein, Tr.412:5-14 (4/10/02) (distinguishing between DOE program goals and objectives in eliminating the need to add additional at-reactor storage and contractual commitments).

134. In June 1985, DOE issued a Mission Plan, DX 101, pursuant to the requirements of 42 U.S.C. § 10221 for "submission to the appropriate committees of the Congress." 42 U.S.C. § 10221(b)(3). Although the Mission Plan contained potential acceptance rates based upon various assumptions regarding the availability of two repositories and a Monitored Retrievable Storage ("MRS") facility, these rates were not intended to be contractually binding or to create some obligation upon DOE to satisfy some particular acceptance rate, regardless of whether the assumptions in the Plan proved accurate:

a. In his cover letter providing the Mission Plan to Congress, Mr. Ben Rusche, Director of OCRWM, stated that the purpose of this plan was to "provide an

informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this Act." DX 101, at HQ0005266 (emphasis added); see 42 U.S.C. § 10221 (1982). In the Mission Plan, DOE projected, for informational purposes, that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 101, at HQ0005305 ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"). The 1985 Mission Plan also described an improved performance system that would include a Monitored Retrievable Storage ("MRS") facility that could start receiving SNF in 1996, two years ahead of the first repository (although DOE recognized that it lacked statutory authority to pursue this approach absent congressional approval of the MRS proposal to be submitted pursuant to section 10161), which would "service[] the first repository." DX 101, at HQ0005304, HQ0005308-09.

b. In the Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses." DX 101, at HQ0005309. Further, in the Mission Plan, DOE advised Congress that it would not begin to publish firm waste acceptance schedules until 1991, as follows:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin

> to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

DX 101, at HQ0005309. Accordingly, in the Mission Plan, DOE pointed to the 1991 ACR as the document by which firm acceptance schedules would be established.

c. In section 2.7 of the 1985 Mission Plan, DOE expressly represented that the estimated schedule contained in it, based upon particular assumptions, was only an approximation of the how the system "may operate," that it was subject to considerable variation, and that actual acceptance rates had not yet been determined as follows:

> These schedules are for illustrative purposes only at this time. The amount of Defense waste to be disposed of in the repository, and the actual acceptance rates, have not yet been determined by the DOE.
>
> * * *
>
> It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.

DX 101, at HQ0005308-09 (emphasis added).

d. In section 2.4 of the 1985 Mission Plan, DOE explained that, although the baseline assumption of the Mission Plan was that the repository would be built on schedule, a substantial delay in the repository would require DOE to pursue contingency approaches, with potentially significant effects upon DOE's SNF acceptance capabilities:

> [A]ll those involved in, and concerned about, these activities recognize that this program is highly controversial; involved in it are a number of important constituencies with widely varying views of how, when, and whether elements of the program should be carried out. . . .
>
> * * *

> The baseline program assumption, of course, is that the repository is built on schedule. Should the repository be substantially delayed, one of two contingency approaches would be pursued. If the MRS facility is authorized by Congress and constructed, it can begin to accept spent fuel in a timely manner and package and store it (up to the authorized storage-capacity limit) until a repository becomes operational. . . .
>
> If site characterization shows that none of the candidate sites for the first repository are suitable or should successive notices of disapproval be made and upheld, the DOE has two main contingency plans. If an MRS facility has been authorized and constructed, it can accept spent fuel on or ahead of schedule, packaging and storing it (up to the authorized storage-capacity limit) until the "second" repository is authorized (which, of course, would then become the first repository) and becomes operational. If an MRS facility has not been authorized, spent fuel will continue to be stored at reactor sites in spent-fuel pools and possibly in dry storage.

DX 101, at HQ0005299-300 (emphasis added); see DX 101, at HQ0005300 ("Should no repository be constructed and an MRS facility no be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.").

e. Earlier drafts of the Mission Plan contained similar waste acceptance schedules based upon DOE's then-current program plans, including the development of two repositories. PX 59, at CTR0421069 ("The Mission Plan . . . defin[es] the program objective, strategy, and current program plans . . ..") (emphasis added) and CTR0421072. In Section II, Program Strategy, of the December 1983 draft Mission Plan, DOE stated that it would not begin publishing firm acceptance schedules until 1991:

> A. Waste Acceptance Schedule
>
> This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. The schedule will eventually be further developed to show not only the aggregate acceptance schedule, but

> also an acceptance priority ranking by utility and fuel element. Under the terms of the utility contracts for disposal services, an annual capacity report with projected annual receiving capacities and rankings will be issued by the Department for planning purposes, beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level waste. In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations.
>
> * * *
>
> While the Department's aggregate acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date.

PX 59, at CTR0421071-73 (emphasis added). DOE did not intend this schedule to reflect contractual obligations or intent.

135. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023:

> As already mentioned, several important milestones have been achieved. However, the experience gained in achieving those milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (see Table 1). The new schedule shows a 5-year extension of the date for waste acceptance at the first repository, from 1998 to

> 2003. (As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility).[1]

DX 106, at HQR0031634. Further, in the 1987 Mission Plan Amendment, DOE stated that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation." DX 106, at HQR0031687 (emphasis added). Again, these acceptance rates were not intended or understood to be contractually binding. DOE also represented in the 1987 Mission Plan Amendment the importance of the Annual Capacity Report that would be issued in 1991:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.

DX 106, at HQR0031687.

136. SMUD's actions and contemporaneous documents reflect that it did not believe that DOE was contractually obligated to accept SNF at an annual 3,000 MTU steady-state rate.

a. In submitting DCSs to DOE in the early 1990s, SMUD never complained that the acceptance rates upon which DOE had requested the contract holders base their DCSs were somehow inappropriate or in conflict with the requirements of the Standard Contract. DX 389. Mr. Shetler admitted at trial that SMUD neither protested its allocations set forth in the 1991

---

[1] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

ACR or DOE's direction to use the allocations set forth therein the preparation of its DCSs. Tr.394:24-395:4, Tr.396:1-3 (Shetler).

b. SMUD never requested that DOE accept more SNF from SMUD than what was established in the 1991 ACR. Tr.395:5-8 (Shetler).

c. Mr. Redeker conceded at trial that the 3,000 MTU steady-state rate upon which Ms. Supko opines, and upon which SMUD now relies in this litigation, "was not consistent with the DCS submittals." Tr.729:22-730:4 (Redeker). Mr. Redeker also testified that he was unaware of anyone at SMUD ever performing an analysis with respect to a rate of acceptance by DOE in the non-breach world under the Standard Contract. Tr.730:12-23 (Redeker).

d. SMUD never sought to utilize the Disputes Clause contained in the Standard Contract to object to the rates contained in the 1991 ACR. Tr.397:23-398:2 (Shetler).

e. At the October 1991 SMUD Board of Directors meeting, Ms. Bowser informed the Board that SMUD's SNF would be accepted over the course of ten years. DX 274, at SMUD 0027465 (stating that "[t]he first assemblies from Rancho Seco would be scheduled to be received three years after a facility opens . . . [a]nd it would take approximately ten years from the opening of the facility . . . for them to take the remainder of our assembly"); see also DX 280, at SMUD 0029434 (assumes 10 year acceptance queue); DX 291, at SMUD 0029418 (same).

f. Two years later, in 1993, Mr. Shelter told Mr. Ferreira that, under DOE's then-current acceptance schedule, SMUD's SNF would be accepted over the course of 15 years. DX 425; see also DX481, at SMUD 0033398 (assuming 14-year acceptance queue); Tr.630:17-18 (Redeker) (assuming that SMUD's SNF would be accepted over a 14-year queue).

137. Under the 900 MTU rate of acceptance contained in the DCSs submitted by

SMUD, DOE's last acceptance of SMUD's standard SNF, had it begun accepting SNF from utilities in 1998, would have been in 2019. Tr.2006:2-5 (Pollog).

## V. SMUD's CLAIM THAT IT WOULD HAVE HAD EARLY ACCEPTANCE DATES BECAUSE DOE WOULD HAVE GRANTED IT PRIORITY AS A SHUTDOWN REACTOR AND/OR BECAUSE SMUD WOULD HAVE ENGAGED IN EXCHANGES OR TRANSPORTATION CAMPAIGNS IS UNSUPPORTED BY ANY EVIDENCE

### A. SMUD Failed To Meet Its Burden Of Establishing That It Would Have Obtained Priority As A Shutdown Reactor

138. Article VI.B.1 of the Standard Contract provides DOE with the discretion, not the obligation, to provide a contract holder with a shutdown reactor priority in the SNF acceptance queue:

> Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

DX 88, Art. VI.B.1.b (emphasis added), Def. Counter-Designation of R. Milner, at Tr.137:2-8 (5/8/02) (explaining that priority for shutdown reactor provision provided DOE with discretion to grant priority, but did not require DOE to grant priority).

139. SMUD recognized that DOE is entitled to exercise its discretion in granting priority for shutdown reactors.

a. In a 1991 memorandum from Ms. Bowser to Mr. Shetler, Ms. Boswer projected DOE's acceptance of SMUD's SNF, and assumed that "no preferential treatment is given SMUD regarding their position in the acceptance queue." DX 249.

b. Similarly, in August 1993, Mr. Shetler wrote a letter to Mr. Ferreira stating

that "the likelihood of DOE agreeing to [the request for shutdown priority] is very doubtful," in part because "the pressure will be on DOE to move spent fuel out of operating plants before they deal with prematurely shutdown plants on any kind of expedited basis." DX 425, at SMUD 0027391.

c. When SMUD ultimately requested that DOE grant it priority acceptance in 1991, SMUD recognized that "DOE has not determined whether or not such priority will be accorded to shutdown reactors, or if priority is granted, under what circumstances." PX 211.

140. A large number of utilities have been opposed to priority for shutdown reactors, DX 215; PX 849, and DOE's contracting officer for the Standard Contract, Mr. Zabransky, explained at trial the reason for such opposition:

> [Priority for shutdown reactors] was being raised because, under the contract, DOE was permitted to grant priority to shutdown reactors, and amongst the utilities, there was a lot of discussion and concern about that because, for operating reactors, there was a concern that the only way for DOE to grant priority to the shutdown reactors was to short the operating reactors, since there's a finite amount of capacity and that since the contract also contained provisions that allowed utilities to exchange places in line with DOE approval, that if DOE started allocating capacity to shutdown reactors, that would render that part of the process not meaningful.
>
> So the shutdown, the operating reactors had an opinion, the shutdown reactors had an opinion that differed from them, and it was an issue that the group thought about.

Tr.1625:12-1626:3 (Zabransky); Def. Counter-Designation of R. Milner, at Tr.73:15-24 (5/8/02) (explaining that outcome of discussions between DOE and members of the industry was that oldest fuel first priority should be utilized instead of priority for shutdown reactors); Def. Counter-Designation of R. Milner, at Tr.206:10-13, Tr.208:16-19 (5/8/02) ("Well, I think that the view held by a large number of utilities were that any priority afforded a shutdown reactor would

aversely affect them," and this was true regardless of what the rate of acceptance was); Def. Counter-Designation of N. Slater, at Tr.55:6-12 (4/21/99) (explaining that "[t]o afford priority to a shutdown reactor was to impede the ability of another utility to deliver. And the group was very divided in terms of whether a shutdown priority should be provided."); Def. Counter-Designation of L. Barrett, at Tr.364:11-19 (5/15/02) (explaining that granting priority to a shutdown reactor would necessarily result in schedule impact to other utilities).

141. In May 1990 – eight years before the Government was obligated to begin the acceptance of SNF on an industry-wide basis – the Edison Electric Institute ("EEI"), a nuclear industry organization, expressed its disagreement with SMUD's view regarding the use of the priority provision. DX 1366. In a May 30, 1990 letter to the EEI/UWASTE steering committee, Steven Kraft, the director of Nuclear Waste and Transportation Activities for EEI stated:

> On March 30, the General Manager of the Sacramento Municipal Utility District wrote to Secretary Watkins. Since Rancho Seco has been shut down, SMUD has been investigating possible ways to reduce their expenditures and operations at the site. They are currently considering placing the fuel in dual purpose casks, and they are interested in DOE cooperation in a demonstration project. SMUD has also been working with their Representatives in Congress to obtain direction from DOE to carry out such a project.
>
> <u>EEI/UWASTE is very concerned about these efforts to gain special treatment for one reactor, and to provide priority to a shutdown reactor; the ACR Response Team reviewed the SMUD position and had no sympathy whatsoever for it. We will continue to express our position to DOE.</u>

DX 1366, at SMUD 0036648 (emphasis added).

142. Ms. Supko admitted that the May 30, 1990 EEI/UWASTE letter was consistent with her recollection as to the view of operating utilities with respect to the priority provision of the Standard Contract in the early 1990s. Tr.1513:22-25 (Supko).

143. Ms. Supko expressed this identical view in a memorandum she wrote to the head of UWASTE in May 1992, in which she stated, "[i]t should be noted that while priority for decommissioned reactors would benefit those plants that have shutdown in the early 1990s . . ., by removing spent fuel from those sites at a faster rate than if no priority were granted, such a priority would increase the average time following decommissioning that spent fuel would remain stored at other plant sites on an industry-wide basis." DX 336, at NET0010333.

144. SMUD failed to present any testimony or evidence concerning what effect the grant of priority in SNF acceptance would have in terms of DOE's acceptance of SMUD's SNF. Ms. Supko admitted at trial that she did not conduct any analysis to determine how much earlier SMUD would have had its SNF accepted by DOE had DOE granted such a request for priority. Tr.1510:2-10 (Supko).

### B. SMUD Failed To Establish That It Would Have Engaged In Exchanges Or How Such Exchanges Would Have Affected Its Acceptance Rights

145. SMUD failed to present at trial any witness or contemporaneous documents concerning SMUD's desire to engage in exchanges with other utilities in the DOE acceptance queue.

146. Although exchanges of approved delivery commitment schedules are permitted under the Standard Contract, such exchanges are expressly subject to DOE's approval:

> Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; provided, however, that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. Not less than six (6) months prior to the delivery date specified in the Purchaser's approved delivery commitment

> schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

DX 88, Art. V. E (emphasis in original and emphasis added).

147. DOE does not have to approve exchanges of approved delivery commitment schedules, and may reject such proposed exchanges for many reasons. See Def. Counter-Designation R. Milner, at Tr.435:16-436:5 (5/3/02) (explaining that, based upon DOE's preference to take older, cooler fuel, DOE potentially could reject request by utility in possession of 20-year-old fuel to exchange an approved DCS with a utility in possession of five-year-old fuel); Def. Counter-Designation N. Slater, at Tr.196:1-197:19 (4/21/99) (discussing factors for considering exchanges, including available acceptance capacity, the location of the two utilities who wish to engage in exchange, and transportation-related issues).

148. Although SMUD presented expert testimony from Ivan Stuart concerning exchanges, he admitted during cross-examination that he has never previously testified as an expert with respect to exchanges of SNF acceptance dates. Tr.1419:8-13 (Stuart). Mr. Stuart acknowledged that he has never previously modeled a world where exchanges of SNF acceptance rights would occur, and did not endeavor to provide such a model in this case. Tr.1420:4-11 (Stuart). Mr. Stuart testified that, although he reviewed depositions from SMUD employees in preparing his expert report, he found no mention or discussion of exchanges by any of these deponents. Tr.1424:8-11 (Stuart).

149. Although Mr. Stuart testified that he believed exchanges would work in a manner

similar to the exchange of uranium, Mr. Stuart also admitted that: (1) he has never been qualified as an expert with respect to the propriety of uranium exchanges; (2) he did not perform any written analysis in reaching this conclusion; and (3) the basis for his conclusion were statements others at his former company, NAC, made, and he did not consult with those individuals when he prepared his direct testimony. Tr.1420:25-1422:9 (Stuart).

150. Ms. Supko admitted at trial that she did not perform any analysis regarding the effect of exchanges on SMUD's fuel outdates. Tr.1515:3-6 (Supko). Ms. Supko acknowledged that in modeling her "non-breach" acceptance scenario, she did not endeavor to model a "non-breach" exchanges market. Tr.1521:5-8 (Supko). Ms. Supko admitted at trial that she did not endeavor to identify which utility would move down in the acceptance queue had SMUD engaged in exchanges. Tr.1518:16-22 (Supko). Ms. Supko also acknowledged that she conducted no written analysis in reaching her conclusion that the exchanges market for SNF would function in a similar manner to the uranium market. Tr.1517:12-16 (Supko). Ms. Supko conceded at trial that she has never endeavored to perform an analysis to compare how the SNF and uranium exchanges markets would be similar or dissimilar. Tr.1518:9-15 (Supko). Ms. Supko does not have a degree in economics and has never been qualified as an expert in market theory or market development. Tr.1519:3-10 (Supko).

### C. SMUD Failed To Establish That It Would Have Engaged In Transportation Campaigns

151. The Standard Contract requires DOE to assign allocations to utilities based upon an oldest-fuel-first ("OFF") priority. DX 88, Art.IV.B.5(a). Oldest-fuel-first priority means that DOE will accept SNF from utilities based upon "the date of discharge of [SNF and/or HLW] from

the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance," subject to certain limited exceptions. Id.

152. Transportation campaigns are not currently contemplated by the Standard Contract, and, in fact, are in contradiction to OFF principles contained in the Standard Contract. DX 88, Art.IV.B.5(a).

153. Mr. Stuart conceded at trial that he did not analyze the order in which transportation campaigns would have occurred in the non-breach world. Tr.1401:11-25 (Stuart). Further, the Standard Contract does not contain any provision related to transportation campaigns. Tr.1400:3-18 (Stuart); Tr.1676:4-7 (Zabransky).

a. Mr. Stuart agreed that acceptance rights under the Standard Contract are dictated by the oldest fuel first principle. Tr.1411:22-1412:1 (Stuart). Yet Mr. Stuart conceded that, under his concept of a transportation campaign, if DOE accepted all of a utility's SNF in a single campaign, another utility would not have its oldest fuel accepted by DOE. Tr.1418:23-1419:4 (Stuart).

b. Mr. Zabransky explained at trial that, although transportation campaigns potentially could be more efficient than accepting SNF on a strict oldest fuel first basis, no utility wanted to be placed later in the acceptance queue as a result of campaigns. Tr.1677:20-1678:17 (Zabransky).

## VI. SMUD's DAMAGES CLAIM IS FATALLY FLAWED

### A. SMUD Has Failed To Properly Mitigate Its Alleged Damages

#### 1. Had SMUD Left Its SNF In Its Wet Pool, It Would Have Incurred No Costs That Are Attributable To The Government's Breach

154. SMUD had other, significantly less costly options than the pursuit of dual-purpose dry storage. DPFOF ¶¶ 155-197.

155. Mr. Shetler testified at trial that, from a technical basis, SMUD could have left its SNF in its wet pool. Tr. 265:7-10 (Shetler).

156. SMUD's own expert, Ivan Stuart, agreed that SNF can be stored safely in wet storage over extended periods of time. Direct Testimony of Ivan Stuart, at ¶ 22.

157. Mr. Shetler admitted at trial that the number of fuel assemblies in the pool does not dictate the amount of operations and maintenance costs. Tr.333:13-20 (Shetler). That is, because the amount of necessary operation and maintenance work does not vary depending upon the amount of SNF being stored, SMUD would incur the same operation and maintenance costs regardless of whether it possesses one fuel assembly or 500 fuel assemblies.

158. SMUD is responsible for its operation and maintenance costs until the last acceptance by DOE in the non-breach world. DX 88, Art.VII ("DOE shall be solely responsible for control of all materials <u>upon passage of title</u>.")

159. Had SMUD left its SNF in its wet pool, it would have avoided the substantial capital costs it incurred in pursuing dual-purpose dry storage, and it would have maintained the same level of operation and maintenance through the last acceptance of its SNF by DOE. Tr.333:13-20 (Shetler).

**2. Because The Government Is Obligated To Provide Transportation Casks Under The Standard Contract, SMUD's Pursuit Of Casks That Contain Transportation Features Cannot Constitute Proper Mitigation**

160. The Standard Contract provides that DOE is responsible for providing transportation casks to the utilities for the acceptance of SNF:

> DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility.

DX 88, Art. IV.B.2.

161. In the early 1990s, storage-only casks were being used by other utilities. Tr.265:11-14 (Shetler).

162. SMUD was one of the first utilities to pursue dual-purpose dry storage. Tr.265:15-17 (Shetler).

163. SMUD's own expert, Ms. Supko, agreed at trial that, in both the non-breach and breach worlds, DOE is obligated to provide transportation casks to utilities. Tr.1540:5-13 (Supko).

164. At her deposition, Ms. Bowser explained why SMUD decided to pursue casks that had transportation features despite the fact that DOE was obligated under the Standard Contract to provide transportation casks:

> The reason that we were . . . pursuing the investigation of alternatives on transportable systems was to eliminate as many road blocks as possible towards DOE not fulfilling its obligation to remove fuel.
>
> Certainly through the demonstration program we saw earlier, we though that would be a useful contribution to DOE's ability to move forward.

Def. Counter-Designation of R. Bowser, at Tr.228:10-22 (916/2004).

165. Jerry Burford, the Government's technical expert, developed a methodology for extracting transportation-related costs from SMUD's damages claim. Direct Testimony of Jerry Burford, at ¶¶ 64-75. In conjunction with the Government's damages expert and accountant, Stephen Kiraly, the Government determined that the total costs associated with the transportation-related aspects of SMUD's dry storage system totaled $17,038,533. Direct Testimony of Stephen Kiraly, at ¶¶ 76-81 & Att. 10.

### 3. SMUD Could Have Pursued A Dry Transfer System, Which Would Have Allowed SMUD To Abandon Its Wet Pool And Pursue Store-Only Dry Storage

166. On March 30, 1990, having decided to pursue a strategy to place its SNF in a dual-purpose cask, SMUD sought DOE's assistance in licensing its dual-purpose casks by proposing a joint demonstration project. DX 164, at SMUD 0029491; DX 165, at SMP 0680004; DX 160, at SMUD 085618.

167. In addition to seeking assistance from DOE, SMUD lobbied Congress as well. After SMUD officials met with Congressman Fazio, the House Appropriations Committee recommended an appropriation of $3 million for DOE to engage in a demonstration project "in cooperation with a west coast utility which has a nuclear reactor permanently shut down due to a citizen's initiative." DX 254, at SMUD 0018606; DX 175, at SMUD 0018539; H.R. Rep. No. 101-536, at 78 (1990).

168. Rather than simply appropriating funds, as SMUD had requested, the Conference Committee directed DOE to "develop a plan" to implement a cooperative research, development, and demonstration project. H.R. Conf. Rep. No. 101-889, at 54 (1990); Tr.2238:18-2239:16, Tr.2241:5-2242:19, Tr.2243:6-2244:25 (Williams).

169. In its efforts to develop a plan, DOE invited representatives from the National Academy of Sciences, the Electric Power Research Institute ("EPRI"), the National Association of Regulatory Utility Commissioners, and the Edison Electric Institute, as well as SMUD, to provide input. DX 254; Tr.2245:4-2246:22 (Williams).

170. SMUD proposed a project in which three casks would be purchased by DOE, loaded with SMUD's SNF, and stored until DOE assumed responsibility for the casks as well at the SNF within them. DX 254, at SMUD 0018610. The proposal that DOE submitted to Congress was considerably different from the one that SMUD advocated. The primary feature of DOE's proposal was the construction of a dry transfer system "capable of transferring fuel assemblies from the [spent fuel] pool to a [transportable storage cask] or other storage cask and from one [transportable storage cask] to another or from a storage-only cask to a transport-only cask . . . ." DX 254, at SMUD 0018613; Tr.2246:24-2252:6 (Williams). While the successful vendor of the dry transfer system would provide the necessary documentation to "facilitate NRC approval of its use at the Rancho Seco site," DOE was to provide funding for the dry transfer system which, upon completion of the demonstration program, would be placed in safe storage for use at Rancho Seco. DX 254, at SMUD 0018613.

171. It was noted that EPRI had already obtained a conceptual design for the dry transfer system. DX 254, at SMUD 0018612.

172. Congress funded DOE's plan beginning with fiscal year 1992 appropriations. S. Rep. No. 102-80, at 99 (1991); H.R. Rep. No. 102-75, at 79, 80 (1991); H.R. Rep. No. 102-177, at 67 (1991); Tr.2258:25-2262:10 (Williams).

173. While developing the design for dry transfer system in conjunction with EPRI,

DOE sent SMUD a solicitation on December 3, 1992. DX 1351; Tr.2262:14-2263:25 (Williams). The solicitation expressly stated that the first objective of the demonstration project, "in order of importance" was:

> To demonstrate an NRC-licensed system for the dry transfer of spent nuclear fuel between 1) the pool and a dry spent fuel [transportable storage system] and 2) between two dry spent fuel [transportable storage system] transport units (licensed for long term storage followed by transportation). Meeting this objective will demonstrate the ability to recover from an off-normal occurrence at an ISFSI with and without the use of a reactor's spent fuel storage pool, may eliminate the need to maintain a reactor pool for recovery from off-normal occurrences at an ISFSI, and will allow the use of a [dry transfer system] to transfer fuel from dry storage casks to transportation casks without the use of a reactor pool.

DX 1351, at HQR3100767.

174. SMUD submitted a nonresponsive proposal to the solicitation suggesting, among other things, that the demonstration use dummy fuel assemblies instead of SNF and that the project deal with issues related to DOE's acceptance of failed fuel and multi-element sealed canisters ("MESCs"). DX 399; Tr.2268:1-2273:6 (Williams).

175. DOE agreed to perform a demonstration of the dry transfer system using dummy fuel assemblies, but refused to change the scope of the project to deal with the failed fuel and MESC issues. DX 414.

176. In the cooperative agreement signed at the end of 1994, SMUD agreed that the first objective of the demonstration project "in order of precedence" was:

> A. to facilitate the demonstration of an NRC-licensable system for the dry transfer of spent fuel between two TSSs (systems licensed for long term storage followed by transportation). Meeting this objective will provide a demonstration of the ability to recover from an off-normal occurrence at an ISFSI

> without the use of a reactor's spent fuel storage pool and associated fuel handling system. The demonstration may eliminate the need to maintain a reactor pool for recovery from off-normal occurrences at an ISFSI and will allow the use of a DTS to transfer fuel from dry storage systems to transportation casks without the use of a reactor pool.

DX 1328, at HQR3100004-05; Tr.2275:4-2278:1 (Williams).

177. The project was to proceed in two phases, with Phase I consisting of activities associated with the procurement of two dual-purpose casks and Phase II involving the procurement of a dry transfer system and using that system to demonstrate the transfer of spent fuel from one cask to another. DX 1328, at HQR31000004.

178. Although DOE's commitment for the acquisition of dual-purpose casks in Phase I was limited to $2 million, DOE was responsible for the "full cost" of the dry transfer system in Phase II. DX 1328, at HQR3100008, HQR3100091; Tr.2353:21-25 (Williams).

179. On September 25, 1996, after experiencing delays in the fabrication of the dual-purpose casks that were to be used for the demonstration project, SMUD requested that DOE amend the cooperative agreement to commit an additional $500,000 to complete the fabrication of the second dual-purpose cask. DX 647. SMUD claimed it was under no obligation to continue work without additional funds, and SMUD threatened that "the delivery of the DOE cask [was] at risk." DX 647; DX 650. DOE denied SMUD's request for additional funds. DX 650.

180. Through 1997, SMUD continued to experience delays in fabricating its dual-purpose casks, particularly after its cask vendor declared bankruptcy. DX 719; DX 815; DX 820.

181. In the spring of 1998, SMUD admitted that it could not deliver a licensed, dual-purpose cask to DOE for the $2 million upon which the parties had agreed. DX 833.

182. On September 30, 1998, DOE decided to negotiate a mutual termination of the

cooperative agreement with SMUD. DX 882; Tr.2286:10-2289:7 (Williams).

183. In the meantime, DOE was proceeding with the process of developing the dry transfer system. DOE submitted a topical safety report, the initial submission in the licensing process, to the NRC on September 30, 1996. DX 653, at PNL1811319; Tr.2280:16-2281:7 (Williams).

184. Because it was unable to do so at Rancho Seco, DOE built a dry transfer system and performed a demonstration of that system at its Idaho facility in 1998-1999. Tr.2284:21-2285:19 (Williams).

185. On November 13, 2000, the NRC issued an assessment report in response to DOE's topical safety report and concluded that, although the dry transfer system had merit, it could not be licensed without information regarding the specific site where the dry transfer system would be used. DX 1095; Tr.2280:10-15, Tr.2354:4-2355:19 (Williams). DOE responded in September 2002 admitting that some information "can only be supplied by the applicant for a site-specific license." DX 1332, at 1.1-1.

#### 4. Even If The Court Concludes That SMUD Acted Reasonably In The Pursuit Of Dual-Purpose Dry Storage, SMUD Chose A More Expensive Dual-Purpose System

186. Another less expensive dual-purpose dry storage option was available to SMUD when it sought bids to construct its dual-purpose dry storage system.

187. SMUD's own expert, Ivan Stuart, worked for NAC International, a company that had already gone through the time and effort necessary for NRC review for its dual-purpose system. Tr.1383:1-5 (Stuart).

188. Mr. Stuart sought to sell its NAC-STC dual-purpose dry storage system to SMUD

and, when SMUD rejected NAC's bid, he warned SMUD that there were higher risks in terms of receiving a license for the NUHOMS system that SMUD ultimately pursued than had it pursued the NAC-STC system. Tr.1382:2-13 (Stuart).

189. At the time of SMUD's award of the dry storage contract to Pacific Nuclear in 1992, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system because the NUHOMS system was unlicensed. Tr.1383:6-16 (Stuart).

190. In 1992 when SMUD was seeking bids for its dual-purpose dry storage system, Mr. Stuart believed that SMUD did not make the right decision in pursuing the NUHOMS system. Tr.1383:17-1384:13 (Stuart).

191. The NAC-STC ultimately received its certificate for compliance for a Part 71 transportation license in 1994. Tr.1385:1-4 (Stuart).

192. Mr. Stuart testified that, had NAC had any customers for its NAC-STC, it could have been fully licensed as early as October 1994. Tr.1386:13-22 (Stuart).

193. Although Mr. Shetler and Mr. Redeker testified at trial that the NAC-STC would have had to have been relicensed or redesigned to hold SMUD's SNF, Tr.198:3-8 (Shetler); Tr.609:2-9 (Redeker), Mr. Stuart believed that it would be quite easy to have the NRC approve the NAC-STC for use with SMUD's SNF. Tr.1388:2-8 (Stuart).

194. Mr. Stuart believed that, had SMUD chosen the NAC-STC, SMUD could have had all of its SNF fully loaded into dual-purpose dry storage by 1998. Tr.1386:23-1387:6 (Stuart).

195. NAC's fixed-price bid was for $38 million that did not contain any provisions for

additional funding. Tr.1388:19-24, Tr.1459:24-1460:16 (Stuart). Mr. Stuart agreed that, had SMUD purchased the NAC-STC system and fully loaded its SNF by 1998, the NAC-STC system would have paid for itself in five to seven years after loading was completed. Tr.1388:25-1389:25 (Stuart).

196. The NAC-STC system provided an additional significant benefit to SMUD. The NAC-STC system did not involve the use of canisters, but rather utilized a bolted cask system. Tr.1390:8-16 (Stuart).

197. In fact, John Stobbs, the president of NAC, and Mr. Stuart's former boss, wrote a letter to General Manager Freeman shortly after SMUD awarded its contract to Pacific Nuclear, warning:

> Clearly the concept selected [by SMUD] is neither an accepted nor licensed technology. The DOE letter discusses the acceptability to DOE of the storage canister, known as MESC, of the type the Districts' staff has selected for its so-called dual purpose cask system. As you will note, the MESC is not acceptable to DOE for transportation off-site to the DOE spent fuel storage facility.

DX 365, at RS 005062.

### B. SMUD's Damages Claim Fails To Consider The Effect Of Multi-Element Sealed Canisters, Greater Than Class C Low Level Radioactive Waste, And Failed Fuel

#### 1. Because SMUD Has Placed Its SNF Into MESCs, Which Currently Are Unacceptable Under The Standard Contract, The Costs That SMUD Has Incurred For Dry Storage Would Have Been Incurred Regardless Of The Timing Of The Government's Acceptance Of SMUD's SNF

198. DOE repeatedly has informed SMUD that MESCs are unacceptable under the Standard Contract and that, consequently, absent a contract modification, SNF will have to be removed from SMUD's MESCs before DOE will accept SMUD's SNF. DX 1298; Tr.1699:17-

1700:9 (Zabransky); Def. Counter-Designation of N. Slater Thompson, at Tr.153:15-21 (6/13/02) (explaining her understanding that, when she worked in DOE's waste acceptance division, MESCs were not considered a standard waste form).

199. To date, no utility has sought a contract amendment to permit the acceptance of MESCs. Tr.1736:5-1737:2 (Zabransky).

200. Mr. Kiraly explained at trial that the cost of designing and building its ISFSI generally was a fixed cost that was not dependent upon the amount of SNF stored. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83. SMUD's own expert, Ms. Supko, agrees with this conclusion. Direct Testimony of Eileen Supko, at ¶ 125 (acknowledging that dry storage fixed costs include design, engineering, construction, licensing, quality assurance, operations, and equipment).

201. Because SMUD's SNF is currently contained in unacceptable MESCs, SMUD would have incurred the cost of storage of its SNF regardless of the timing of the Government's performance. Therefore, the costs associated with designing and constructing SMUD's ISFSI should be removed from its damages claim.

202. Consequently, Mr. Kiraly concluded that the cost associated with the design and construction of the ISFSI pad, $3,146,520, should be removed from SMUD's damages claim, because these costs would have been incurred regardless of the breach because of the presence of MESCs. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83 & Att. 11, 12.

**2. Because DOE Is Not Responsible For The Acceptance Of GTCC Under The Standard Contract, The Cost SMUD Has Incurred For The Storage Of SNF Would Have Been Incurred Regardless Of The Timing Of DOE's Performance**

203. SMUD is in possession of 25,000 pounds of Greater Than Class C low level radioactive waste ("GTCC"). Tr.145:17-20 (Shetler); Tr.800:7-12 Tr.803:12-21 (Redeker); DX 1365, at 3-1.1.

204. SMUD has not paid any money to DOE pursuant to the Standard Contract for SMUD's GTCC. Tr.299:3-7 (Shetler).

205. Mr. Redeker explained that he was unaware of any schedule for DOE to accept GTCC with SNF. Tr.805:10-13 (Redeker).

206. At trial, both Mr. Shetler and Mr. Redeker testified that SMUD intended to store its GTCC in SMUD's twenty-second HSM. Tr.145:11-20 (Shetler); 693:17-22, Tr.800:7-12 (Redeker). SMUD plans to place its GTCC low level radioactive waste into a single canister. Tr.802:16-22 (Redeker); DX 1365. In addition, SMUD asserted at trial that its claim includes its entire ISFSI pad, which includes the 22nd HSM. Tr. 801:10-12 (Redeker).

207. Because SMUD is responsible for the indefinite storage of its GTCC low level radioactive waste, it cannot pass to the Government those costs that it would have incurred regardless of DOE's delay in standard SNF acceptance. Direct Testimony of Stephen Kiraly, at ¶ 82. The $3,146,520 identified above for the design and construction of the ISFSI includes the deduction based upon the presence of GTCC low level radioactive waste. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83 & Att. 11, 12.

**3. Because SMUD Possesses Failed Fuel, Which It May Possess Indefinitely, SMUD Would Have Incurred The Cost Of SNF Storage Regardless Of The Timing Of The Government's Acceptance Of SMUD's Standard SNF**

208. Article VI of the Standard Contract sets forth the criteria and acceptance procedures for different types of SNF, including providing the classification criteria that utilities are to use prior to shipping their SNF. DX 88, at SMUD 0020669; Tr.1659:16-25 (Zabransky).

209. The Standard Contract provides three broad classifications of fuel: (1) Standard Fuel; (2) Nonstandard Fuel; and (3) Failed Fuel. 10 C.F.R. § 961.11, App. E, ¶ A. The term "failed fuel" is defined as "SNF that meets the specifications set forth in subparagraphs 1 through 3 or paragraph B below, and which is classified as Failed Fuel Class F-1 through F-3 pursuant to subparagraph 6 of paragraph B below." Id. Class F-1 through F-3 are defined as follows:

> Class F-1: Visual Failure or Damage
> Class F-2: Radioactive "Leakage"
> Class F-3: Encapsulated

DX 88, at SMUD 0020701.

210. Further, the Standard Contract provides:

> Visual Inspection
>
> Assemblies shall be visually inspected for evidence of structural deformity or damage to cladding or spacers which may require special handling. Assemblies which [i] are structurally deformed or have damaged cladding to the extent that special handling may be required or [ii] for any reason cannot be handled with normal fuel handling equipment shall be classified as Failed Fuel – Class F-1.

DX 88, at SMUD 0020700.

211. DOE's obligation to accept SNF extends to standard, nonstandard, and failed fuel, but the Standard Contract permits DOE to adjust the schedule for acceptance of both nonstandard

and failed fuel if it sees issues with the "technical feasibility" of accepting such fuel on the schedule for acceptance of standard fuel:

> DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel; however, for any SNF which has been designated by the Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

DX 88, at Art. VI.A.2(b).

212. SMUD is in possession of F-2 failed fuel under the Standard Contract. Direct Testimony of Jerry Burford, at ¶27; Tr.796:9-799:21 (Redeker).

213. At trial, SMUD presented the testimony of Ms. Supko and Mr. Stuart in an attempt to demonstrate that SMUD's failed fuel would be accepted on the same schedule as SMUD's standard fuel. Direct Testimony of Eileen Supko, at ¶¶ 21-22, 146-149; Direct Testimony of Ivan Stuart, at ¶ 42. Both Ms. Supko and Mr. Stuart concluded that, because SMUD's SNF does not require special handling, there is no basis to believe that DOE would not accept SMUD's failed fuel on the same schedule as SMUD's standard fuel. Direct Testimony of Eileen Supko, at ¶ 67; Direct Testimony of Ivan Stuart, at ¶ 42; Tr.1395:24-1396:5 (Stuart) (stating that his definition of failed fuel under the Standard Contract hinge upon the concept of special handling).

214. Ms. Supko testified that, based upon her reading of the Standard Contract, "technically feasible" should be equated with the concept that special handling of the SNF is not required. Tr.1523:5-16, Tr.1524:20-24 (Supko). However, Ms. Supko conceded at trial that there

is no definition of the term "technical feasibility" contained in the Standard Contract. Tr.1524:16-19 (Supko).

215. Mr. Stuart conceded under cross-examination that the special handing requirement did not appear in the definition of F-2 failed fuel, but rather only referenced the definition for F-1 failed fuel. Tr.1398:21-23 (Stuart). Mr. Stuart agreed that he did not know what criteria DOE applies in making the determination with respect to the technical feasibility of accepting failed SNF. Tr.1459:11-14 (Stuart).

216. Mr. Zabransky, the contracting officer of the Standard Contract, explained at trial the distinction between F-1 failed fuel and F-2 failed fuel:

> Well, F-1 fuels are fuels, again, where the idea is really more of a physically size or structural capability. F-2 fuels are leakage, so they may have no physical special handling, as far as needing a different tool, but they may have no structural deformities or structural integrity issues, but they may have holes in the cladding.

Tr.1665:21-1666:6 (Zabransky).

217. Mr. Zabransky further explained the distinction between technical feasibility and special handling under the Standard Contract:

> In my mind, they're related, but they're not the same. We often sometimes get sloppy and use them interchangeably, but in reality, special handling just sort of tells you, you need a special procedure or a special tool. Having known that, you would then have to look to see if you have the technical feasibility to do that. For instance, even though you may need a special tool, and you can get the special tool, you may not have the licensing room, the approval to use that tool in your facility without changing your license.
> So the technical feasibility would still have to get looked at. The special handling really is a discriminator, so when you do you do your visual inspection, you can classify it as F-1 or not, if it didn't require special handling, even though it may have certain damage to it, you could see a tear in the grid strap, you would never classify it as F-1.

Tr.1667:17-1668:14 (Zabransky).

218. Mr. Zabransky explained that, unlike F-1 failed fuel, if a utility had F-2 failed fuel, DOE would have to ensure that it had the technical capabilities of disposing of it at DOE's facilities, that DOE's license would allow for such disposal, and that there were no health and safety issues associated with that particular F-2 failed fuel. Tr.1668:23-1669:4 (Zabransky).

219. Before DOE could make a determination that particular F-2 failed fuel would be accepted on the same schedule as standard SNF, DOE would have to know the specific type or amount of leakage that the fuel exhibits. Tr.1669:7-8 (Zabransky). In addition, DOE would have to have a licensed facility so that it would know what conditions would exhibit. Tr.1669:8-10 (Zabransky).

220. If DOE determines that failed fuel requires special handling or for some other reasons is not technically feasible, its acceptance by DOE may be delayed, as permitted by the Standard Contract. Mr. Zabransky also explained at trial the consequence if the disposal of a utility's SNF is determined to be not technically feasible. He stated that DOE would contact the contract holder as to what schedule change is needed to give DOE time to make disposal of the fuel technically feasible. Tr.1670:15-20 (Zabransky). Mr. Zabransky explained, "[i]n other words, if it wasn't technically possible, we'd have to take some more time and do what was necessary to make it technically safe, technically regulatory, to be approved to bring them in." Tr.1663:13-17 (Zabransky).

221. Similarly, Ronald Milner, the acting deputy director and chief operating officer for OCRWM, previously has explained the rationale for the potential delay in acceptance of failed fuel:

> And I guess just to use a hypothetical example, if you have some very, very badly failed fuel, and out of all the assemblies that we will accept, ultimately, if that's the only one that requires that type of handling, do you stop everything and try to deal with that one assembly or do you put if further back in the queue.
>
> You know, for example, if the requirement was that you had to physically put this in a hot cell and deal with it, that's a different matter than unloading a standard fuel assembly.

Def. Counter-Designation R. Milner, at Tr.52:19-25, Tr.53:15-19 (5/8/02).

222. Because SMUD has F-2 failed fuel, SMUD may have SNF onsite after the acceptance of its standard fuel. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83 & Att. 11, 12. In other words, even if DOE had begun accepting SMUD's standard SNF in 2001, SMUD potentially would have incurred many of the ISFSI pad design and construction costs for the storage of its failed fuel.

223. Mr. Kiraly explained that the cost of designing and fabricating the failed fuel canister should be removed from SMUD's damages claim because it is a cost that SMUD would have incurred regardless of the Government's breach of the Standard Contract. Mr. Kirlay determined that the cost of designing and fabricating the failed fuel canister was $1,574,138. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83 & Att. 11, 12.

224. Further, Mr. Burford provided unrefuted testimony at trial that, of the 12 failed SNF assemblies in SMUD's possession that exhibit radioactive leakage, two are improperly stored in non-failed fuel canisters and, consequently, SMUD is not in compliance with its storage license and cannot ship that failed fuel under its current Certificate of Compliance with the NRC. Testimony of Jerry Burford, at ¶¶ 60, 61, 62.

225. Consequently, even if DOE had taken most of SMUD's failed SNF on the same or

similar schedule as SMUD's standard SNF, SMUD would have been unable to ship at least two of its failed fuel assemblies. Direct Testimony of Jerry Burford, at ¶ 62.

226. The costs that SMUD has or will incur as a result of the storage of these two failed fuel assemblies is not dependent upon the timing of the Government's performance, but rather is dependent upon SMUD coming into compliance with its Certificate of Compliance and DOE determining that the handling of such fuel is technically feasible.

**C. SMUD May Not Recover The 2003 Operation & Maintenance Cost For Its ISFSI**

227. SMUD has improperly included in its damages claims $695,715 for the operation and maintenance costs associated with its ISFSI for 2003. Pl. Br. 54, n.22.

228. SMUD is responsible for its operation and maintenance costs associated with the storage of its SNF until DOE would have accepted the last of SMUD's SNF in the non-breach world. DX 88, Art.VII ("DOE shall be solely responsible for control of all materials upon passage of title").

229. Regardless of the rate of acceptance, had DOE performed in accordance with oldest fuel first principles as provided for in the Standard Contract, and begun acceptance of SMUD's SNF beginning in 2001, SMUD would still be responsible for its operation and maintenance costs at least through 2003. DX 88, Art.VII ("DOE shall be solely responsible for control of all materials upon passage of title").

230. Consequently, SMUD is currently responsible for the operation and maintenance costs associated with the storage of its SNF in its ISFSI. DPFOF ¶¶ 228-229.

231. In addition to being a categorically improper claim, Mr. Kiraly questioned the $695,715 figure for three independent reasons.

a. First, this $695,715 figure for operation and maintenance costs includes labor overhead in the amount of $162,438. EXX 0050019.

b. Second, $526,682 of the $695,715 total represents fixed labor that is not incremental to the breach. EXX 0050019.

c. Third, $6,594 of the $695,715 included the amounts incurred after loading was completed in 2002, and encompasses costs incurred for the monitoring of GTCC radioactive waste and failed fuel. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83, Att. 12, & EXX 0050019.

**D. SMUD Is Responsible For The Costs Associated With The 88-Month Delay In Its Dry Storage Project**

232. The majority of the costs that SMUD is claiming as damages in this case were incurred after January 31, 1998 and many of these costs were incurred as a result of delays in its dry storage project. Direct Testimony of Stephen Kiraly, at ¶¶ 84-86 & Att. 1 & 13.

233. SMUD was one of the first utilities to consider pursuing dual-purpose dry storage technology. Tr.190:6-12, Tr.265:15-17 (Shetler). Despite the pursuit of this novel technology, SMUD assumed that it would take two to three years to obtain completed, licensed casks. DX 160, at SMUD 085619.

234. When SMUD signed the contract to fabricate its casks and canisters in 1992, SMUD represented to the NRC that it did not anticipate any delays in placing its SNF in dry storage. DX 322, at SMUD 0035200 ("Based on discussions with the NRC and the prospective cask vendor, the District does not anticipate any delays in placing the fuel in dry storage at the Rancho Seco ISFSI.").

235. Eileen Supko believes that SMUD's assumption that it could have completed the

licensing process in three years was unreasonable:

> As I said, the thought that a company proceeding with a new technology and having just signed the contact in 1992 would have licensed and loaded 21 packages within three years was just unreasonable . . .

Tr.1538:23-1539:2 (Supko).

236. SMUD's dry storage project was delayed by a total of 88 months, largely because of the inability of SMUD's vendors to obtain the proper licensing for the construction of SMUD's "first-of-a-kind" dry storage facility. Direct Testimony of John McGrath, at ¶ 17.

237. Mr. Burford, the Government's technical expert who has over 30 years in the nuclear energy field specializing in project management and regulatory compliance, explained that, by assuming the risk of the first-of-a-kind licensing and development of a dual-purpose system for its SNF, SMUD bore the responsibility for any resulting delays. Direct Testimony of Jerry Burford, at ¶ 76.

238. Specifically, Mr. Burford explained that, as a nuclear licensee under 10 C.F.R. Part 50, SMUD was responsible for the safe storage of its SNF, and was obligated to store its SNF in a cost-effective manner that was in the best financial interests of its ratepayers. Direct Testimony of Jerry Burford, at ¶ 80.

239. Mr. Burford stated that SMUD assumed substantial risk with its decision to abandon its wet pool and pursue a first-of-its-kind dry storage technology, and, consequently, SMUD bore the risk associated with the delays in the pursuit of this technology. Direct Testimony of Jerry Burford, at ¶¶ 81, 89-90.

240. David Langstaff, a DOE employee responsible for oversight of the cooperative

agreement, explained at his deposition some of SMUD's shortcomings in managing its dry storage project. DPFOF ¶¶ 241-243.

241. Mr. Langstaff explained that SMUD did not understand the NRC's process for licensing casks for transport or storage. Def. Counter-Designation of D. Langstaff, at Tr.129:22-130:2 (11/4/04). Mr. Langstaff testified that, although SMUD appeared to have a better understanding of the licensing process as the dry storage project progressed, SMUD ignored some of Mr. Langstaff's key comments regarding licensing, particularly with regard to the NRC's shift from one-dimensional modeling to two-dimensional modeling. Def. Counter-Designation of D. Langstaff, at Tr.130:16-131:12 (11/4/04).

242. Further, Mr. Langstaff criticized SMUD's direction to its vendor, VECTRA, indicating that SMUD's direction caused problems in the storage project. Def. Counter-Designation of D. Langstaff, at Tr.133:11-19 (11/4/04). Mr. Langstaff explained:

> Well, as a result of the buckling analysis and when SMUD decided that one of the - - the option they would pursue was cutting out a section of the cask that had already been fabricated or that was in fabrication, that was a major decision, and I asked SMUD, you know . . . have you done a change analysis on that, and they said no, and they decided to go ahead because I said you're responding to one person's comments on a deficiency and I said be careful about making changes to the design without fully analyzing that.

Def. Counter-Designation of D. Langstaff, at Tr.133:22-134:10 (11/4/04).

243. Mr. Langstaff further explained that the delays SMUD experienced on its dry storage project were not attributable to the NRC, but rather related to SMUD's actions in rushing into the dry storage project without spending the time up front to prepare proper designs:

> I mean, you either do an outstanding job up front - - it's kind of like the oilman, pay me now or pay me later. You try to rush in something that's not really well done and it takes time then until it

> is well done, because the design will be well done by the time it's approved by the NRC.

Def. Counter-Designation of D. Langstaff, at Tr.155:6-11 (11/4/04).

244. Ms. Supko admitted that she did not endeavor to determine whether SMUD's implementation and management of the dry storage project was imprudent. Tr.1532:15-20 (Supko). In fact, Ms. Supko conceded that she did not review the costs specifically to determine what the causes were for the delays in SMUD's dry storage project. Tr.1532:15-20 (Supko). Nor did Ms. Supko ever conduct any analysis regarding the amount of delays that SMUD incurred in the course of the dry storage project. Tr.1535:4-8 (Supko). When asked how much of the delay was attributable to the NRC's oversight of dry storage projects, all she could do was reference the fact that other utilities faced some delays in their dry storage projects. Tr.1535:9-16 (Supko). She could not identify the specific amount of delay attributable to the NRC's oversight. Tr.1536:19-22 (Supko). Ms. Supko admitted under cross-examination that SMUD's dry storage project was initially scheduled to be completed in 1995, and the NRC actions that she considered as having an impact upon SMUD's dry storage project did not occur until 1995. Tr.1537:9-22 (Supko). Further, although she relies heavily upon the NRC's oversight as a cause for the delays, she admitted upon cross-examination that there were other delays associated with the fabrication of the dry storage project. Tr.1534:17-22 (Supko).

245. Ms. Supko simply concluded that, because the industry as a whole was experiencing delays as a result of the NRC's oversight, SMUD must have experienced these delays as well. Tr.1535:17-1536:22 (Supko).

246. Ms. Supko has offered no testable methodology or reasoned analysis for her

conclusion that all costs associated with the delays are appropriate for inclusion in SMUD's damages claims.

247. The cost associated with SMUD's 88-month delay in its dry storage project totaled $13,527,736. Direct Testimony of Stephen Kiraly, at ¶¶ 84-85 & Att. 13.

### E. SMUD's Damages Claim Includes Other Significant Flaws

248. SMUD's damages claim is simply an accounting of incurred costs. Tr.2693:7-8 (Kiraly).

249. SMUD's damages claim contains absolutely "no analysis done about what deductions should have been made from those incurred costs in a variety of matters." Tr.2693:11-12 (Kiraly).

250. At trial, SMUD presented the testimony of Brian Brinig, who counsel asserted was "an expert in connection with the confirmation of SMUD's costs that were incurred in connection with this project . . ." Tr.1277:6-12. Mr. Brinig acknowledged at trial that, had SMUD incurred costs in the breach world that it otherwise would have incurred in the non-breach world, it would be inappropriate to include those costs in a damages claim. Tr.1298:3-13 (Brinig). Yet Mr. Brinig did not offer any analysis regarding a comparison of costs incurred in both the breach and non-breach worlds. Tr.1298:14-17 (Brinig). In fact, Mr. Brinig expressly stated that he is offering no opinion about costs that SMUD would have incurred but for the Government's breach. Tr.1297:22-1298:2 (Brinig). Rather, Mr. Brinig relied upon SMUD employees, specifically Mr. Field and Luana Holst, to identify those charges that SMUD believed were related to its dry storage project.

251. Although Mr. Field was responsible for collecting the work orders that he

believed were associated with SMUD's dry storage project, Tr.1045:13-22 (Field); Tr.1239:7-19 (Holst), Mr. Field was not a decision-maker with respect to SMUD's decision to pursue dry storage. Tr.1072:2-17 (Field) (explaining that "I was not a decision-maker and, to my recollection, was not involved in that whole study determination. That was done by a different part of the organization, and my responsibility was to implement the direction, rather than develop the direction").

252. Mr. Field has no basis for explaining why SMUD decided to pursue dry storage.

253. Similarly, Ms. Holst testified at trial that she did not specifically segregate costs that SMUD incurred as a result of the breach, but rather she segregated costs that "had to do with the spent fuel storage project." Tr.1254:8-12 (Holst). She made no independent determination as to which costs were related to or were otherwise incremental to the Government's partial breach. Tr.1269:21-24 (Holst).

254. Consequently, no one involved in the preparation or analysis of SMUD's damages claim can establish that the costs allegedly incurred as a result of its dry storage project were a direct result of the Government's breach.

255. The Government's expert economist, Cliff Hamal, explained the significant flaws in SMUD's damages claims as follows:

> SMUD's simple summation of costs associated with the dry storage program and its failure to consider other cost implications of the dry storage strategy does not result in a valid calculation of damages. SMUD has not detailed how it would have managed its SNF and the rest of its operations at Rancho Seco absent the breach. Such an explanation would include specifying what decisions might have been made, stating when they might have been made, and detailing how such hypothetical decisions would be consistent with SMUD's contemporaneous objectives. This information would allow one to consider the reasonableness of the assumed SMUD decisions. By

> addressing the non-breach world in only the vaguest of terms, SMUD's damages claim diverts attention from its Achilles Heel: The claimed costs are not damages because similar actions would have been taken regardless of the breach. I expect a proper damages analysis would show that SMUD has not suffered material damages due to the breach.

Direct Testimony of Cliff Hamal, at ¶ 19.

**1. <u>SMUD Has Failed To Establish That Its Claimed Labor Costs Were Incremental To The Partial Breach</u>**

256. SMUD has included in its damages claim approximately $14 million associated with labor costs that it claims were incurred as a direct result of the Government's breach. Direct Testimony of Stephen Kiraly, at ¶¶ 55-62 & Att. 2.

257. Mr. Kiraly concluded that SMUD's damages claim improperly included labor hours for SMUD personnel who were typically charging few hours to the dry storage project, or who were charging to the project on a sporadic basis. Direct Testimony of Stephen Kiraly, at ¶ 59.

258. Mr. Kirlay explained at trial that a cost that would have been incurred regardless of the breach is not a proper element of damages. Direct Testimony of Stephen Kiraly, at ¶ 53. SMUD's own expert, Mr. Brinig, agreed with this conclusion. Tr.1298:3-13 (Brinig) (stating that had SMUD incurred costs in the breach world that it otherwise would have incurred in the non-breach world, it would be inappropriate to include those costs in a damages claim).

259. Mr. Kiraly testified that, of the 256 employees that SMUD included in its damages claim as labor costs, only 16 of the employees should be considered as an incremental cost because these employees charged a majority of their time to the dry storage project. Tr.2737:7-20 (Kiraly).

260. Mr. Kiraly explained that these remaining 240 employees likely were charging the majority of their time to other projects, such as decommissioning, and, therefore, such labor costs were fixed from a damages perspective. Direct Testimony of Stephen Kiraly, at ¶ 59.

261. Mr. Kiraly explained at trial that 47 percent of all the employees that charged to the spent fuel project spent less than 30 percent of their total time to the project, and 55 percent of the employees that charged to the spent fuel project charged less than 40 percent of their total time. Direct Testimony of Stephen Kiraly, at Fig. 16.

262. Further, the Government's expert, Jerry Burford, explained that certain classes of labor charges included in SMUD's damages claim could be attributed to other continuing work at Rancho Seco, and the time sheets and invoices produced by SMUD in this litigation lacked sufficient detail to determine if these types of labor activities were incremental to the breach. Direct Testimony of Jerry Burford, at ¶¶ 111-113.

263. Mr. Kiraly concluded that $9,380,065 should be excluded from SMUD's damages claim as fixed labor costs because those costs were not incurred as a direct result of the Government's breach. Direct Testimony of Stephen Kiraly, at ¶¶ 62, 70-71 & Figure 16.

264. Mr. Redeker testified that Rancho Seco's labor force has reduced since 1993 from approximately 150 employees to 80 employees, and "[t]hat [reduction] has occurred as we have continued our ongoing effort to make sure that we are being as cost-effective as possible. We look for, and I drive my staff to look for every opportunity to combine work forces, to combine jobs, to be more efficient." Tr.677:23-678:11 (Redeker).

265. However, rather than explain that the reduction in labor was the result of the end

of the dry storage project, Mr. Redeker admitted that the reduction in the labor force also "reflects the decreasing staff requirements because we are decommissioning the facility." Tr.678:12-14 (Redeker).

266. Mr. Redeker also testified that the dry storage project resulted in SMUD not being able to decrease staff as quickly as it otherwise would have had it not pursued the dry storage project, and that after the dry storage project was completed, the Rancho Seco staff was reduced by 30 full-time employees. Tr.680:13-681:2 (Redeker).

267. After considering Mr. Redeker's testimony, Mr. Kiraly explained that it did not change his conclusion that SMUD's labor costs were fixed, stating:

> Well, for one, it's not specific enough as to what is the actual impact that is associated with these people. There's no demonstration there that the costs are directly related to this project and not to the overall SMUD cost base. So without a more detailed analysis that would lay out for me who we're talking about when they say, we are reducing, or we planned to reduce from a certain number to a certain number, I can't make a judgment any different than the one I've made based upon my own analysis.

Tr.2801:24-2802:8 (Kiraly).

268. Mr. Kiraly explained the fatal flaw in SMUD's damages claim as follows:

> Well, what I would have expected to see is starting with the baseline of the incurred costs and then identifying those costs that were either incurred specifically and only for this cost – the spent fuel, or deductions of costs that were basically fixed, and deduction of the costs of the, essentially, would have been world. There's been no accounting for that in these costs.

Tr.2802:15-22 (Kiraly).

**2. SMUD Has Failed To Demonstrate That Its Claimed Labor Overhead Markups Were Incremental To The Partial Breach**

269. SMUD has improperly included $2,497,724 related to the cost of labor overhead markups in its damages claim. Direct Testimony of Stephen Kiraly, at ¶¶ 55-58 & Att. 2.

270. Mr. Kiraly explained at trial that he and his team reviewed SMUD's labor overhead markups, and concluded that the markups included fixed costs that were not incremental to the Government's breach. Direct Testimony of Stephen Kiraly, at ¶ 57. These labor overhead markup costs included such items as human resource costs, office space, vehicles, the license for SMUD's accounting software, personal computers, software, and telephones, among other items. Id.

271. Mr. Kiraly concluded that the costs associated with these items would not have increased as a result of the hours that SMUD personnel spent on the dry storage project and, consequently, such costs should be excluded from SMUD's damages claim. Id.

272. Mr. Kiraly explained that,

> [B]y definition, with SMUD including them as indirect expenses and indirect expense is when you cannot tie directly to the project. They may have been used on it, they may not have been, but these costs are then allocated over all of the labor within SMUD, of which the spent fuel project was only a small portion.

Tr.2775:23-2776:4 (Kiraly).

273. At trial, SMUD claimed that its labor overhead markup costs were variable rather than fixed. Specifically, Mr. Redeker claimed that, when SMUD reduced its labor force, the overhead associated with that labor force decreased as well. Tr.681:6-10 (Redeker). As an example, Mr. Redeker testified that, "[y]ou know, we have got a guy sitting at a desk with a computer. When he leaves, that computer leaves." Tr.681:10-12 (Redeker).

274. In response to Mr. Redeker's testimony, Mr. Kiraly explained that, "[e]ven if overhead is variable, if you apply it to the base and the base is excluded, included in the excluded cost would also be that portion of overhead that is allocated to that excluded cost." Tr.2801:3-6 (Kiraly).

275. For example, with respect to SMUD's SAP license, Mr. Kiraly explained that, if SMUD had laid off an employee, he would not expect SMUD's SAP license costs to decrease. Tr.2800:9-12 (Kiraly).

### 3. Although SMUD Concedes That It Would Have Incurred Costs Associated With Its Dry Storage Project In The Non-Breach World, SMUD's Calculation Of The Proposed Offsets Is Understated

276. SMUD's damages claim improperly included $2 million that was the result of a double-counting error, and $500,000 related to a loan work-out that one of its vendors repaid to SMUD. Direct Testimony of Stephen Kiraly, at ¶¶ 66-68; see Pl. Br. 44-45.

277. SMUD's expert accountant, Mr. Brinig, overlooked both this $2 million double-counting error, which accounted for 10 percent of SMUD's $20 million in claimed damages from 1992 to 1996, and the $500,000 credited back to SMUD. Tr.1297:9-21, Tr.1308:12-1313:1 (Brinig). When asked about this oversight at trial, Mr. Brinig explained that, "the simple answer is I missed it." Tr.1297:13-16 (Brinig).

#### a. Gantry Crane

278. SMUD proposes a $667,800 offset associated with the refurbishment of its gantry crane. Pl. Br. 44.

279. Mr. Burford explained that this figure only encompassed work on this crane

through 1997, and that $158,043 in costs associated with upgrade work after 1997 was included in SMUD's damages claim. Direct Testimony of Jerry Burford, at ¶ 92 & ¶ 102. Consequently, a proper deduction for the crane upgrade is $825,871, rather than $667,880. Direct Testimony of Stephen Kiraly, at ¶ 64-65 & Att. 4; Tr.2724:16-2725:10 (Kiraly).

280. At trial, SMUD appeared to claim that, although it would have modified its crane, it would have utilized smaller casks had DOE performed in the non-breach world and, therefore, that any modifications to the crane over 100 tons are properly claimed as damages. Tr.1043:10-1044:24 (Field).

281. Mr. Field's testimony is contradicted by its contemporaneous documents. For example, in 1992, when SMUD submitted its delivery commitment schedules, it represented to DOE that it would utilize a 130-ton crane. DX 381, at COF0042422.

282. In response to SMUD's submission of its DCSs, DOE asked SMUD to confirm that it was in fact planning to utilize a 130-ton gantry crane, as the information that DOE had indicated that SMUD was then currently capable of utilizing a 97.5 ton crane. DX 381, COF0042420.

283. In response to DOE's letter, Mr. Shetler wrote in a December 7, 1992 letter that, "you questioned the crane capacity and spent fuel shipping methods. Your data should be updated to reflect a recent increase in capacity of the maximum lifting weight of the cask to 130 tons." DX 389, at SMUD 0019613.

284. SMUD's contention that it would have used smaller casks also is in conflict with

its own expert, Ivan Stuart. Mr. Stuart testified that a utility such as SMUD may legitimately decide to upgrade its facility to accept larger casks because it would allow for the faster removal of SNF. Direct Testimony of Ivan Stuart, at ¶ 31.

285. In addition, Mr. Burford concluded that SMUD included in its damages claim $45,600 for the refurbishing its Polar Crane. Direct Testimony of Jerry Burford, at ¶ 110.

286. Mr. Burford explained that the Polar Crane is located inside the reactor building and, therefore, cannot be used in or around the Spent Fuel Building. Id. Consequently, Mr. Burford concluded that the refurbishment of the Polar Crane likely was done to support other decommissioning work and, therefore, is inappropriately included in SMUD's damages claim. Id. This testimony was unrefuted.

**b. On-Site Drop Mitigation Test**

287. Similarly, although SMUD contends that $250,000 should be offset from its damages claim for its on-site drop mitigation testing that would have been conducted in the non-breach world, Pl. Br. 44, Mr. Burford explained at trial that this number was grossly understated. Direct Testimony of Jerry Burford, at ¶ 103.

288. SMUD's own records reflect that one of its outside contractors, Packaging Technologies, charged SMUD $924,571 for an analysis of cask drops and design, fabrication, and delivery of cask drop impact limiters, and SMUD itself estimated that it would spend $419,000 of its own resources to install the impact limiters. DX 1359.

289. Further, another outside contractor, Vectra, charged SMUD $799,888 for impact limiter related services.

290. Consequently, rather than a deduction of $250,000, as SMUD suggests, Mr.

Burford concluded that costs related to onsite drop mitigation totaled approximately $2.14 million. Id. This testimony was unrefuted at trial.

**4. SMUD's Inclusion Of The Cost Of Loading SNF Into Its ISFSI Should be Offset From Its Damages Claim**

291. SMUD has included in its damages claim $4,274,856 for the costs associated with the preparation, packaging, inspection and loading of its SNF into its ISFSI. Direct Testimony of Stephen Kiraly, at ¶ 74-75 & Att. 9.

292. Mr. Burford explained at trial that these costs would have been incurred in the non-breach world. Direct Testimony of Jerry Burford, at ¶ 94.

**5. SMUD's Damages Claim Fails To Consider Unavoidable Costs**

293. SMUD's damages claim fails to provide any evidence that it has appropriately accounted for costs that were otherwise unavoidable. Direct Testimony of Stephen Kiraly, at ¶ 93.

294. Mr. Kiraly stated that any obligations into which SMUD entered prior to the Government's breach, but which could not be avoided even absent the breach, should not be included in a damages claim. Id.

295. Examples of unavoidable costs potentially included in SMUD's damages claim includes labor severance costs, contract termination costs, and lease and/or rental obligations. Id., at ¶¶ 95-100.

296. Mr. Kiraly determined that these unavoidable costs would have been included in the $11,607,819 adjustment for miscellaneous questioned amounts. Direct Testimony of Stephen Kiraly, at ¶ 93.

297. The miscellaneous adjustment made by Mr. Kiraly represented "the various adjustments that are indeterminable with the information available." Direct Testimony of Mr. Kiraly, at Att. 1.

298. Specifically, at trial, Mr. Kiraly explained that this miscellaneous adjustment was the result of Mr. Kiraly's top down analysis looking at the total costs incurred, and Mr. Burford's conclusions regarding the maximum that a store-only dry storage system should cost. Tr.2703:17-21 (Kiraly).

299. Mr. Kirlay explained that Mr. Burford indicated that a store-only system would cost no more than $9 million, and that Mr. Kiraly was able to identify with specificity all but $20 million. Tr.2707:8-17 (Kiraly). In other words, the $11 million miscellaneous adjustment represents the difference between the $20 million arrived at by Mr. Kiraly and the $9 million arrived at by Mr. Burford for the costs associated with the major components for a store-only system.

300. For example, Mr. Kiraly identified the types of costs included in the $11 million, such as the bonuses paid to PCC, and some of the fixed plant costs associated with having an ISFSI. Tr.2707:18-2708:7 (Kirlay).

#### 6. SMUD's Damages Claim Improperly Includes Costs Related To Premature Mobilization Of Its Labor Force Associated With The Loading Of Its ISFSI

301. SMUD's damages claim includes all labor costs associated with the loading of SNF into dry storage. Direct Testimony of Stephen Kiraly, at ¶¶ 72-75 & Att. 8 & 9.

302. SMUD brought on site contractor mechanics, welders, and fuel team specialists as

early as July 1999, despite the fact that SMUD did not receive the MP187 cask until July 2000, or the first canister until September 2000. DX 956, DX 1027, DX 936, DX 1069, DX 1081.

303. Mr. Burford explained at trial that, based upon his significant project management experience at nuclear utilities, "a three month mobilization time frame for this project would have been sufficient to support training, readiness reviews, and other onsite preparation activities related to loading and transferring the fuel." Direct Testimony of Jerry Burford, at ¶ 86.

304. Further, Mr. Burford explained that February 1, 2001 was the proper date for labor and equipment mobilization, because that was the date that a fuel loading "dry run" was conducted with the cask. Id. at ¶ 87.

305. Consequently, Mr. Burford stated that costs associated with mobilization of support labor and equipment rentals that occurred prior to November 1, 2000 should be excluded from SMUD's damages claim. Id. at ¶ 88.

306. Mr. Kiraly testified that the costs associated with this premature mobilization totaled $2,550,131. Direct Testimony of Stephen Kiraly, at ¶¶ 72-73, at Att. 8. Additionally, Mr. Kiraly questioned $4,274,856 due to SMUD's failure to demonstrate that these costs were incremental during the loading period for the ISFSI. Direct Testimony of Stephen Kiraly, at ¶¶ 74-75 & Att. 9.

**7. SMUD's Damages Claim Fails To Provide A Proper Offset For The Substantial Cost Savings That SMUD Realized By Placing Its SNF Into Dry Storage**

307. One of the primary reasons that SMUD decided to pursue dual-purpose dry storage was the substantial cost savings it would realize by abandoning its wet pool. DPFOF ¶¶ 20-22, 109. SMUD claimed at trial that the actual, realized savings from abandoning its wet pool and

placing its SNF into dry storage was $4,146,360, and that such savings began to accrue in 2002. Tr.1170:19-25 (Field).

308. SMUD has failed to account for this substantial cost savings in its damages claim. Tr.1171:12-14 (Field).

309. SMUD's damages claim should be offset by $4,146,360 in annual savings beginning in 2002.

**8. SMUD's Damages Claim Fails To Account For The Savings Associated With Decommissioning Its Wet Pool**

310. Mr. Hamal testified at trial that SMUD's damages claim fails to consider the benefits that SMUD received as a result of decommissioning its wet pool. Direct Testimony of Cliff Hamal, at ¶¶ 95-96.

311. As Mr. Hamal explained:

> The decommissioning of the Rancho Seco site is an enormous task that has been planned and executed since the unit was shut down. It is my understanding significant progress has been made on this effort, and Mr. Redeker testified that approximately $300 million of the $524 million project has been completed. Decommissioning is directly affected by the method of storing the SNF because nuclear safety concerns impose significant restrictions on what can be done at the site when the fuel is in the pool. This not only affects decommissioning of the pool, but the continued need for systems used to maintain the safety of the SNF in the pool would have restricted decommissioning activities elsewhere at the station unless further modifications were made at the station.

Direct Testimony of Cliff Hamal, at ¶ 95; see DX 41.

312. Mr. Hamal explained that, had SMUD left its SNF in its wet pool, it would have had to have made material changes to its decommissioning plan. Direct Testimony of Cliff Hamal, at ¶ 96.

313. Consequently, Mr. Hamal concluded that a proper damages claim would have considered the cost savings associated with decommissioning its wet pool. Direct Testimony of Cliff Hamal, at ¶ 96. This testimony went unrebutted at trial.

314. SMUD's contemporaneous documents unequivocally reflect that SMUD believed there was a significant cost savings in going to dual-purpose dry storage, because it would facilitate the elimination of its wet pool and, consequently, SMUD's Part 50 operating license. DX 721, at SMUD 061592 (1997 evaluation concluding that store-only dry storage was not a preferred option, because it would delay SMUD's ability to decommission its wet pool, thereby resulting in additional costs in maintaining its Part 50 operating license); Tr.734:21-735:8, Tr.736:7-17, Tr.772:3-8 (Redeker) (acknowledging that there is a "direct link" between SMUD's dry fuel storage options and its decommissioning efforts).

315. Absent the placement of SMUD's SNF into dry storage, SMUD would have had to maintain its wet pool. Tr.736:10-737:3 (Redeker). Had it maintained its wet pool, SMUD would be unable to eliminate its Part 50 operating license. Id.

316. The elimination of its wet pool and, consequently, its Part 50 operating license represents a cost savings to SMUD that SMUD has not considered in presenting its damages claim or provided as a credit to the Government in that claim.

#### 9. Many Of SMUD's Claimed Incurred Costs Are Not Proper Damages For Multiple Reasons

317. Mr. Kiraly explained that, in some cases, more than one reason may exist for questioning a claimed cost. Direct Testimony of Stephen Kiraly, at ¶ 101.

318. For example, the overhead markups on a labor expense may be questioned: (1) because of the nature of the overhead pool; (2) because of questions regarding the underlying

work; and (3) because of questions regarding the incremental nature of the labor costs. Direct Testimony of Stephen Kiraly, at ¶ 101.

319. Although Mr. Kiraly made adjustments to the claim only once, Mr. Kiraly explained that "there often are still secondary or tertiary reasons for questioning particular costs." Direct Testimony of Stephen Kiraly, at ¶ 102.

320. Mr. Kirlay concluded that, if SMUD is able to establish a causal link between its claimed cost and the Government's breach, SMUD's damages claim should be reduced to no more than $9.263 million and as little as $3.08 million. Direct Testimony of Stephen Kiraly, at ¶ 102.

a. Most of the reductions identified by Mr. Kiraly were computed from specific questions regarding the claimed damages. Direct Testimony of Stephen Kiraly, at ¶ 102.

b. The remaining reduction was computed using the "should have been" estimate determined by Mr. Burford. Direct Testimony of Stephen Kiraly, at ¶ 102.

## VII. SMUD HAS FAILED TO MEET ITS BURDEN OF DEMONSTRATING THAT THE GOVERNMENT HAS BREACHED IT DUTY OF GOOD FAITH AND FAIR DEALING

321. Mr. Zabransky and Mr. Pollog both testified at trial that the reason the 900 MTU rate of acceptance was carried over from the 1991 ACR was that there simply was no basis for the use of a different rate of acceptance. Tr.1674:2-5 (Zabransky); Tr.1992:10-15 (Pollog).

322. Susan Klein unequivocally stated that the use of the 900 MTU rate was not for purposes of litigation, and that DOE had always viewed the approved DCS as its legal obligation even before the litigation. Def. Counter-Designation of S. Klein, at Tr.354:17-355:13 (4/25/02).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell Shultis
RUSSELL A. SHULTIS
Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7561
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

JOSHUA E. GARDNER
SCOTT R. DAMELIN
TODD J. COCHRAN
ELIZABETH THOMAS
Trial Counsel

September 20, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that, on this 20th day of September 2005, a copy of foregoing "DEFENDANT'S PROPOSED FINDINGS OF FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner