IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 98-488C<br>(Judge Braden) |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to this Court's order dated July 27, 2005, defendant, the United States, respectfully submits its post-trial brief.[1]

SUMMARY OF ARGUMENT

Plaintiff, Sacramento Municipal Utility District ("SMUD"), bore the burden at trial of proving that its claimed damages were caused by the Department of Energy's breach of the Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste ("Standard Contract"). SMUD failed to prove that the Department of Energy's breach caused the tens of millions of dollars in costs that it has claimed as damages in this case. In addition, even if the Court were to conclude that SMUD had met its burden of showing that it incurred

[1] For the convenience of the Court, we incorporate by reference the various pre-trial briefs the Government has submitted in this case, including the Government's motion for partial summary judgment concerning the rate and schedule of SNF acceptance; the Government's motion for partial summary judgment concerning the status of Greater Than Class C radioactive waste; and the Government's motion to exclude the testimony of Eileen Supko. Additionally, we incorporate by reference the Government's post-trial response to the Court's show cause order. We note that plaintiff similarly has incorporated by reference its previous briefing on several of these issues. Although RCFC 5.2(b)(3) appears to limit the incorporation of previous briefing in a brief or memorandum, we believe it is in the interest of the speedy and inexpensive administrative of justice to incorporate by reference our previous briefing rather than refile the voluminous previous briefing in this case. See RCFC 1. Accordingly, we request that the Court permit the Government to incorporate by reference the above-cited briefs. In the alternative, we request that the Court permit us to refile those briefs at the Court's convenience.

costs as a result of DOE's breach, SMUD has failed to establish that the damages it seeks are supported by the evidence or are reasonable.

As the United States Court of Appeals for the Federal Circuit recently held, plaintiffs in spent nuclear fuel cases are precluded, as a matter of law, from recovering costs allegedly associated with mitigating the Government's breach of the Standard Contract before 1994. Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563, *4 (Sept. 9, 2005). Accordingly, as a matter of law, SMUD is not entitled to recover as mitigation damages costs it expended and is claiming in this case prior to 1994. Further, as the Federal Circuit made clear, the fact that a plaintiff engages in alleged mitigation activities does not relieve the plaintiff of meeting its burden of demonstrating that those activities were the direct result of the breach. Id. at *5. As discussed below, like the plaintiff in Indiana Michigan, SMUD has failed to demonstrate that any costs related to its pursuit of dual-purpose dry storage was directly related to the Government's breach of the Standard Contract.

As we demonstrated at trial, SMUD shut down its Rancho Seco nuclear facility in 1989 and immediately committed to decommissioning the Rancho Seco site. As part of this decommissioning effort, SMUD made its decision to pursue dry storage in 1990 – eight years before DOE was obligated to begin the acceptance of SNF on an industry-wide basis and 11 years before DOE was obligated to begin accepting SNF from SMUD. Rather than pursue dry storage because of DOE's delay in acceptance, SMUD made the decision to pursue dry storage because of its belief that the Government could perform in a timely manner and, indeed, that DOE might accept SMUD's SNF earlier than DOE was contractually obligated to do so. In fact, SMUD made its decision to pursue dry storage for reasons entirely independent of the

Government's delay in acceptance; it believed that it could save anywhere from $8-$12 million in annual operation and maintenance costs by placing its SNF into dry storage and shutting down its wet pool and facilitate decommissioning Rancho Seco. As we established at trial, even when SMUD revisited its decision to place its SNF into dry storage in the mid-to-late 1990s, SMUD consistently decided to continue with the project precisely because it believed that the substantial savings in wet pool operation and maintenance costs would pay for the incremental cost to complete the project in approximately two to three years – well before the Government's last acceptance of SMUD's SNF in the "but for" nonbreach world, and long before the SNF pool would otherwise be emptied. Consequently, because SMUD's decision to place its SNF into dry storage was not driven by, and would not have changed absent, the Government's breach, SMUD has failed to meet its burden of demonstrating that the Government's delay in acceptance caused SMUD to incur the costs associated with dry storage.

At trial, SMUD attempted to show that, despite DOE's express rejection of such a term during contract negotiations, DOE was somehow obligated to accept SNF at an annual steady-state rate of 3,000 metric ton units ("MTUs") from nuclear utilities. Pl. Br. 74-75. As a threshold matter, because we demonstrated at trial that SMUD believed its dry storage project would pay for itself prior to or concurrently with DOE's first acceptance of SMUD's SNF, the Court need not reach the issue of DOE's rate of SNF acceptance. However, to the extent the Court believes the determination of the rate and schedule of SNF acceptance is relevant to determining SMUD's damages, SMUD has failed to meet its burden of establishing that DOE was contractually obligated to accept SNF at a 3,000 MTU steady-state rate of acceptance. Nor did SMUD meet its burden of establishing that its acceptance rights would be moved forward in

the queue, or how those rights would otherwise be affected, based upon the use of various contractual provisions such as exchanges and priority for shutdown reactors. Thus, even if the Court believed that the rate and schedule of DOE's acceptance of SNF was relevant to a determination of SMUD's damages, SMUD failed to meet its burden of establishing that DOE was contractually obligated to accept SNF and/or HLW at a 3,000 MTU steady-state rate (or at any other particular rate, for that matter).

Even if SMUD could somehow establish that its claimed damages were caused by the Government's delay in the acceptance of its SNF, SMUD's damages claim suffers from significant flaws. First, assuming the Court viewed SMUD's actions as an attempt to mitigate its alleged damages, SMUD has failed to engage in reasonable mitigation. As we showed at trial, SMUD could have left its SNF in its wet pool, and had it done so, SMUD would be unable to claim any damages against the Government until after the last acceptance of SMUD's SNF by DOE in the "but for" world. Instead of leaving its SNF in its wet pool, SMUD decided, for business reasons, to place its SNF into dry storage at a cost of almost $80 million. Under these circumstances, SMUD's attempt at mitigation is unreasonable. At a minimum, SMUD's damages claim fails to include as an offset the substantial annual savings that it realized as a result of eliminating its wet pool and placing its SNF into dry storage.

Second, even if SMUD's decision to pursue dry storage constituted reasonable mitigation, its decision to pursue dual-purpose dry storage does not, and the mere fact that SMUD pursued dry storage does not necessarily mean that SMUD can claim the costs associated with such storage as damages. Although SMUD clearly had storage options other than dual-purpose dry storage, SMUD chose dual-purpose dry storage because it would facilitate

decommissioning and result in a significant cost savings. However, as we established at trial, DOE is contractually obligated to provide a transportation cask to SMUD at the time that DOE accepts SMUD's SNF. To the extent that SMUD has usurped that contractual obligation from DOE by pursuing "first-of-its-kind" dual-purpose dry storage technology, resulting in tens of millions in costs, the inclusion of such costs in SMUD's damages claim is inappropriate. This is particularly true where other storage-only dry storage technologies were available when SMUD made its decision to pursue dry storage. In fact, even if SMUD's decision to pursue dual-purpose dry storage otherwise was reasonable, its decision to reject the NAC-STC cask, which had already incurred the initial "pain and suffering" of licensing, as its dry storage system was unreasonable.

Finally, as we demonstrated at trial, SMUD's damages claim suffers from significant flaws, such as the inclusion of non-incremental costs and offsets for benefits SMUD received by pursuing dual-purpose dry storage. At bottom, SMUD failed to meet its burden of proving that DOE's breach caused SMUD to pursue dry storage or that its pursuit of dual-purpose dry storage constitutes reasonable mitigation.

## DISCUSSION

### I. SMUD BEARS THE BURDEN OF PROVING EVERY ELEMENT OF ITS DAMAGES CLAIMS, INCLUDING CAUSATION, AND RESULTANT DAMAGE

To recover damages, a plaintiff "must prove the requirements for an award of damages by a preponderance of the evidence," and these "requirements include: causation, foreseeability, and reasonable certainty in the amount of damages." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, SMUD bore the burden of

introducing clear proof that it was injured as a direct result of DOE's delay in accepting its SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). The venerable decision in Myerle continues to represent the binding standard of this circuit. Glendale Federal Bank v. United States, 239 F.3d 1374, 1382 (Fed. Cir. 2001) (holding that non-breaching party may recover reliance "damages for any losses actually sustained as a result of the breach"). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992). Further, SMUD bore the burden at trial of establishing a realistic "but for" world. Bluebonnet Sav. Bank FSB v. United States, No. 95-532C, 2005 WL1983695 (Aug. 16, 2005) (citing Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 430 n.25 (2000); Southern Cal. Fed. Sav. & Loan v. United States, 57 Fed. Cl. 598 (2003), aff'd in relevant part, Nos. 04-5036, 04-5038, 2005 WL 2001022 (Fed. Cir. Aug. 22, 2005)). Indeed, as the Federal Circuit recently explained, "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred by [plaintiff] to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Indiana Michigan, 2005 WL 2173563, at *5.

At trial, SMUD bore the burden of establishing that its claimed damages are not speculative, remote, or unforeseeable. Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). It further bore the burden of establishing reasonable certainty as to each item within its damages claims. Wells Fargo Bank, 88 F.3d at

1023; see also Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty").

SMUD has failed to meet its burden in this case. In short, the law required SMUD to establish at trial that, "but for" DOE's failure to begin acceptance of SNF from commercial nuclear utilities by 1998, and from SMUD in 2001, SMUD would not have built its dry storage facilities, the cost of which it now claims as damages from the Government. As we established at trial, and as we set forth in detail below, SMUD has failed to carry its burden. Indeed, the record unequivocally establishes that SMUD's decision to build dry storage and the costs associated therewith are wholly independent of DOE's breach. Consequently, SMUD is not entitled to the costs associated with its dry storage system.

## II. SMUD CANNOT ESTABLISH THAT THE GOVERNMENT'S BREACH OF THE STANDARD CONTRACT CAUSED ITS PURPORTED DAMAGES RELATED TO ITS PURSUIT OF DRY STORAGE

### A. SMUD Is Precluded As A Matter Of Law From Recovering Any Of Its Claimed Costs Prior to 1994

The Federal Circuit recently held that plaintiffs in spent nuclear fuel cases are not entitled to recover damages arising before 1994 because the plaintiffs' duty to mitigate only arose when DOE issued its May 1994 notice of inquiry "unequivocally announcing" that it would not perform by January 31, 1998. Indiana Michigan, 2005 WL 2173563, at *4; PX 351. In other words, because mitigation is a duty, and not a right, SMUD's obligation to mitigate any alleged breach by the Government necessarily did not arise until the May 1994 notice of inquiry, at the earliest. Accordingly, as a matter of law, SMUD may not recover any alleged costs incurred prior to DOE's issuance of the May 1994 notice of inquiry.

B. SMUD Pursued Dry Storage For Reasons Wholly Unrelated To The Government's Delay In SNF Acceptance

1. SMUD Decided To Pursue Dry Storage Eight Years Before The Government Was Obligated To Commence SNF Acceptance

a. SMUD's Rancho Seco Plant Had A Troubled Operating History, Resulting In Its Premature Shutdown In 1989

To understand why SMUD made the business decision to place its SNF into dry storage, the Court should consider the history of SMUD's Rancho Seco Nuclear Generating Station. SMUD's Rancho Seco facility began operating in 1975. From the outset, Rancho Seco was plagued by a poor performance history, including multiple extended outages and placement on a watch list by the Nuclear Regulatory Commission ("NRC") of reactors constituting the "greatest safety significance." DPFOF ¶ 13. In fact, during the mid-1980s, Rancho Seco suffered a 27-month outage, from December 1985 though early 1988. DPFOF ¶ 14. During the 14-year life span of the Rancho Seco plant, the plant was non-operational more than it was operational. Id. As S. David Freeman, SMUD's general manager, explained,

> . . . [SMUD was] a very troubled utility at the time. They had raised the electric rate seven or eight times. They had a nuclear power plant, that if it were an employee, you would have fired it because it operated half the time . . . .

DPFOF ¶ 15.

As a result of the extended outages, SMUD had to pay for replacement power, which accounted for half of Rancho Seco's overall generation of electricity. DPFOF ¶ 16. Consequently, SMUD had to raise rates for its ratepayers significantly during the mid-to-late 1980s. Id. Rancho Seco's extended outages, coupled with the significant rate increases, resulted in the placement on the local ballot two separate voter initiatives to close Rancho Seco, the

second of which, dated June 6, 1989, passed. Id. SMUD's Board of Directors immediately agreed to abide by the wishes of the voters and shut down the facility the following day. DPFOF ¶ 17. At the time of the premature shutdown, Rancho Seco was licensed by the NRC to operate through 2008. Id.

These events occurred nine years before DOE was obligated to begin the acceptance of SNF from the industry generally, and 12 years before SMUD contends that DOE was obligated to begin the acceptance of SMUD's SNF. DPFOF ¶ 18.

b. As A Result Of Rancho Seco's Premature Shutdown In 1989, SMUD's Focus Was To Eliminate Its Part 50 Operating License

Upon the decision to shut down Rancho Seco, SMUD personnel placed their focus upon decommissioning the plant. On December 8, 1989, following the shutdown of Rancho Seco, SMUD completed the defueling of the Rancho Seco nuclear reactor. SMUD stored all 493 of its SNF assemblies in the wet storage pool within its spent fuel building. Shortly after its decision to shutdown Rancho Seco, SMUD created a Decommissioning Task Force to initiate planning for decommissioning and to place the plant in a "protective lay-up" condition. DPFOF ¶ 19.

SMUD had two primary goals after Rancho Seco's premature shutdown in 1989. First, SMUD sought to decommission the plant as quickly as possible. Tr.263:11-15 (Shetler) (explaining that SMUD's goal was to reduce its "nuclear footprint" as quickly as possible). To achieve this goal, SMUD had to decommission its Rancho Seco facility. Tr.263:16-18 (Shetler). The Rancho Seco site could not be decommissioned until its pool was eliminated. Tr.617:2-4 (Redeker). By placing its SNF into dry storage, SMUD gained the ability to decommission its wet pool. Tr.263:25-264:1-3 (Shetler). By decommissioning its wet pool, SMUD in turn had the

ability to decrease the amount of staff and ultimately reduce its costs associated with Rancho Seco. Tr.264:4-10 (Shetler); Tr.833:2-12 (Redeker) (explaining that SMUD's goal was to (1) complete dry storage project in order to abandon its wet pool, (2) decommission Rancho Seco, and (3) reduce ongoing operation and maintenance costs). The decommissioning of Rancho Seco was undisputedly an important element in SMUD pursuing dry storage. Def. Counter-Designation of R. Bowser, at Tr.229:24-230:5 (Sept. 16, 2004); DPFOF ¶ 20a.

In addition to decommissioning Rancho Seco, SMUD's second goal regarding the Rancho Seco plant was to achieve the removal of SMUD's SNF from the site as quickly as possible. Indeed, SMUD wanted to persuade DOE to accept SMUD's fuel earlier than it was otherwise entitled under the Standard Contract and as soon as possible. DPFOF ¶ 20b.

SMUD believed that dry storage could help it achieve both of these goals. First, dual-purpose dry storage represented the quickest and cheapest way to decommission the Rancho Seco facility, because SMUD could not decommission its wet pool as long as SNF remained in the pool. In the early 1990s, SMUD estimated that ceasing wet pool operations would result in an annual savings of as much as $8 million.[2] DX 287, at SMUD 0018294. Second, SMUD believed that dual-purpose dry storage presented the best chance that DOE would accept SMUD's SNF under the Standard Contract through the use of a Monitored Retrievable Storage ("MRS") system by 1998.[3] Id., Tr.254:21-25 (Shetler) ("[I]f there was a potential for any kind of

---

[2] This annual savings would later be estimated to be as much as $12 million. This annual estimated savings represented the difference between wet pool storage operation and maintenance costs and dual-purpose dry storage operation and maintenance costs.

[3] The MRS was a Federal storage facility that had been contemplated by Congress since the inception of the Nuclear Waste Policy Act in 1982. See 10 U.S.C. § 10161. The MRS would have served as interim storage until DOE could build a permanent Federal repository. See

an interim storage facility that could take the fuel earlier, having fuel in a dual purpose system would hopefully expedite the ability to get fuel moved there."); Tr.278:15-19 (Shetler). Indeed, SMUD believed that, if it had its SNF in dual-purpose dry storage by 1998, DOE could accept SMUD's SNF at an MRS on a schedule as good as, if not better than, the schedule for acceptance at a Federal geologic repository. Tr.704:22-705:1 (Redeker) (explaining that although SMUD's first acceptance in non-breach world would have been 2001, SMUD believed its SNF could be accepted earlier at an MRS); DX 202, at Attachment at SMUD 0019251 ("Storage in transportable casks offers the best opportunity explored to keep open the possibility of early off-site shipment, possibly as early as 1998 should DOE develop a . . . MRS."); DX 217, at SMUD 0025576 (stating that "the District believes that by storing spent fuel in dual purpose storage and transport casks that early acceptance by DOE would be possible"); DPFOF ¶ 21.[4] Significantly, SMUD's pursuit of its two stated goals was wholly independent of the Government's delay in the acceptance of SNF. In fact, neither of these two goals, which were discussed in the early 1990s, was in any way related to the Government's post-1998 delay in the acceptance of SNF. DPFOF ¶ 23.

Indeed, Mr. Shetler testified that, in early 1990, SMUD's "primary goal" was "to try and get the fuel in the safest mode, low cost mode and ultimately in the DOE's hands as soon as possible." Tr.150:22-151:1, 152:12-14 (Shetler). Mr. Shetler explained that "SMUD was no longer in the nuclear business, if you will. They are not going to be generating electricity from

---

generally 42 U.S.C. § 10162(b), et seq.

[4] Notably, SMUD's own expert, Ivan Stuart, believed that SMUD's placement of its SNF into dual-purpose dry storage increased the chances that DOE could timely accept SMUD's SNF. Tr.1374:15-25 (Stuart).

nuclear power from our perspective, it was in our ratepayer's best interest to minimize the cost and get the fuel in a position where DOE could take it." DPFOF ¶ 24.

As the facts at trial established, SMUD began considering and planning for dry storage nine years before DOE was to begin accepting SNF from the nuclear industry, and more than a decade before DOE would have been obligated to even begin the acceptance of SMUD's SNF in the non-breach world. Indeed, as early as September 1989, SMUD was considering placing its SNF into dry storage. DX 125, at SMUD 0020872 (noting that "spent fuel will be placed in wet storage in the existing spent fuel pool initially and then dry cask storage following the appropriate fuel decay period."); Tr.268:10-23 (Shetler) (acknowledging that dry storage was an option SMUD was considering at the time and it was the option SMUD ultimately pursued); Tr. 1064:8-13 (Field) (admitting that SMUD began considering dry storage option within months after the June 1989 shutdown of Rancho Seco). SMUD made similar statements in October and December 1989, where SMUD assumed, for purposes of its proposed decommissioning plan, that it would place its SNF into dry storage beginning in 1995. DX 134, at SMUD 0027908; Tr.271:22-272:1 (Shetler) (explaining that dry storage was one of the planning assumptions SMUD was considering as of December 1989); Tr. 1070:3-5, Tr.1071:1-3 (Field) (acknowledging that, as of October 1989, dry storage was "certainly" an option, that cost studies regarding dry storage were being conducted, and that "considerable system reductions" were possible with dry storage); DPFOF ¶ 25. Consequently, SMUD's initial plans to pursue dry storage in 1989 were necessarily made independent of the Government's breach of the Standard Contract in 1998.

c. SMUD's Board Of Directors Made The Decision In 1990 That SMUD Place Its SNF Into Dry Storage

Similarly, SMUD's ultimate adoption of a dry storage plan in 1990 was made independent of the Government's 1998 breach of the Standard Contract and, indeed, focused upon early performance by DOE. In February 1990, SMUD decided to retain Saul Levy, Inc. ("Levy") as a consultant to evaluate SMUD's storage options for its SNF. Levy provided SMUD a report with its ultimate conclusions on March 31, 1990. DX 165. Levy considered 15 different storage options for SMUD's SNF and reached the following conclusion:

> The option that offered the best opportunity to keep open the possibility of early off-site shipment, potentially as early as 1998 under a Monitored Retrievable Storage facility ("MRS"), was storage of SMUD's SNF in transportable casks.

DPFOF ¶ 27.[5]

Levy "strongly recommended" that SMUD pursue this option in conjunction with a demonstration program with DOE to develop the dual purpose cask system. DPFOF ¶ 28. Levy explained that, to accomplish this objective, SMUD should "[e]nter into discussions with the DOE aimed at DOE acceptance of the Rancho Seco spent fuel in 1998." Id. Notably, Levy acknowledged that:

---

[5] Mr. Freeman could not recall Saul Levy or the report that he issued. DPFOF ¶ 30. Mr. Freeman explained his managerial philosophy as follows:

> Let me just state for the record that a general manager of a utility can do one of two things; they can either manage the utility or read all the paper. There is not enough time to do both, and I chose to manage the utility. So I initialed a lot of routine things without reading them and am proud of it.

Id.

> . . . the only way to be prepared for DOE success in establishing a site by 1998 is to proceed towards storage in transportable casks. No other alternative that could accomplish this objective was found in the course of this study.

Id.

Saul Levy presented his recommendations for the disposition of SMUD's SNF at the March 21, 1990 meeting of the Rancho Seco Committee of the SMUD Board of Directors.[6] See DX 159. Levy recommended that:

> SMUD pursue alternative of having all of its spent fuel in transportable storage casks before 1998 primarily because it could lead to shipment to DOE facility by 1998 or to DOE interim acceptance of spent fuel at site by 1998.

DPFOF ¶ 31. In explaining the rationale for recommending transportable storage casks, Levy reiterated that it "provides [the] earliest opportunity to ship fuel off-site." Id.[7]

SMUD relied upon the recommendations made by Mr. Levy in planning for the disposition of its SNF. DPFOF ¶ 32. SMUD management agreed with Levy's recommendation to pursue dual-purpose dry storage and, consequently, in March 1990, SMUD's Board of

---

[6] The Rancho Seco Committee was a committee of the SMUD Board of Directors that oversaw activities at Rancho Seco related to the demobilization of the workforce and development of future plans.

[7] SMUD has suggested that Mr. Levy prepared his report "in light of DOE's announcements of likely delay in performance" and refers to a March 30, 1993 supplement to a California Environmental Quality Act environmental report that SMUD submitted to the Nuclear Regulatory Commission. Pl. Br. 22-23 (citing PX 297). Yet, this March 30, 1993 submission to the NRC says no such thing. Rather, all this submission indicates is that a permanent Federal repository was not expected until approximately 2010, and that interim storage was not "currently" an option. PX 297, at SMUD 0018875. Of course, DOE had no obligation to have an interim storage facility available by 1993. In short, nothing in this submission to the NRC is suggestive of the fact that Mr. Levy prepared his report "in light of DOE's announcement of delays." This is particularly true given his recommendation that SMUD pursue dual-purpose dry storage so that DOE could accept its SNF in an MRS by 1998.

Directors approved of the Rancho Seco general manager's pursuit of the purchase of a dual-purpose storage system. Id. Mr. Shetler explained at trial that:

> What dry storage offered was a cheaper way of dealing with storage of fuel, so less impact from a cost standpoint. And at least in looking at what Mr. Levy was pulling together, based on potential options, a possibility that it would be in a form that could facilitate transport to the DOE in the long term and perhaps even sooner than the repository, if another mechanism were to come up.

Tr. 172:17-24 (Shetler).

Indeed, SMUD's contemporaneous documents reflect its belief that, at the time it made the decision to pursue dry storage, it believed that DOE could timely perform under the Standard Contract. For example, immediately after the March 1990 Board of Directors meeting, SMUD's general manager, David Boggs, drafted a letter to the Secretary of Energy indicating that, "[a]s a result of the [Levy] study, it was decided that the District pursue dual purpose (storage and transportation) casks or storage only casks that could be effectively interfaced with the early receipt by the DOE of Rancho Seco's spent fuel and subsequent use of the casks by DOE." DPFOF ¶ 34. Mr. Boggs' letter also assumed that DOE could identify an SNF storage site by 1998. Id. The clear goal of Mr. Boggs' letter was to encourage DOE's performance by 1998.[8] Consequently, more than eight years before DOE was to begin the acceptance of SNF on an industry-wide basis, and more than a decade before DOE was to begin the acceptance of SMUD's SNF, SMUD decided to place its SNF into dry storage, and assumed that DOE could begin performance in the non-breach world on a timely basis.

---

[8] Tellingly, SMUD chose not to call Mr. Boggs as a witness at trial.

Consistent with this decision to place its SNF into dry storage, Dan Keuter, the Chief Nuclear Officer of Rancho Seco at the time, presented the results of the Levy report at the April 25, 1990 Rancho Seco Committee meeting. See DX 174. Mr. Keuter explained SMUD's strategy as follows:

> [S]et up a demonstration program and construct three dual purpose casks by 1993. At that time, 72 fuel assemblies would be loaded into the three casks and monitored until the DOE takes possession of them in 1998. The remaining 493 assemblies will be maintained in wet storage until 1993. At that time, we should have a commitment from DOE regarding fuel acceptance in 1998. Our decision point regarding concrete casks or dual purpose casks is in 1993. If the DOE will not take our fuel in 1998, or if the dual purpose casks do not prove feasible, we will award a contract to build concrete casks and load the fuel in them by 1995.
>
> . . . .
>
> If a commitment can be obtained from DOE to take possession of the spent fuel by 1998, whether onsite or offsite, then dual purpose casks should be pursued. If a commitment cannot be obtained, onsite concrete cask/canister storage by 1995 should be pursued. This is the earliest that we can put our spent fuel in concrete casks, since it must decay for approximately five years before it is put in cask storage.

DPFOF ¶ 35. Clearly, as of the date SMUD made the decision to pursue dry storage, it believed that DOE could timely perform under the Standard Contract.[9]

---

[9] SMUD's contemporaneous documents unequivocally reflect that, by May 1990, SMUD had eliminated consideration of leaving its SNF in the wet pool. For example, in a presentation concerning Rancho Seco's decommissioning cost study, SMUD indicated that seven different storage options were evaluated – four involving dry storage and three involving wet storage. DPFOF ¶ 36. The evaluation indicated that SMUD had rejected each of the wet storage options because "wet [storage is] more expensive than dry." Id.

As it turned out, of course, DOE did not make a commitment to accept SMUD's SNF by 1998. Yet SMUD appears to have continued with the dual-purpose dry storage project without serious reconsideration of Mr. Keuter's conclusion: If DOE was not going to accept SNF by 1998, the lower cost storage-only dry storage was preferred.

d. SMUD’s Early Implementation Of Its Dry Storage Project

SMUD’s early work on the dry fuel storage project unequivocally reflects that: (1) it pursued the dry storage project because it believed that DOE could perform in a timely, and perhaps even early, manner; and (2) it believed that the cost savings by moving to dry storage were so great that the dry storage project would pay for itself by approximately 1998. In short, the trial record plainly reflects that SMUD was not motivated in the early 1990s by an “impending” breach by DOE, but instead pursued dry storage for business reasons wholly unrelated to the Government’s 1998 breach of contract.

On June 7, 1990, Rita Bowser, the Rancho Seco Nuclear Fuel Disposition Project Manager who was responsible for the day-to-day oversight of the implementation of SMUD's dry storage project, submitted to Mr. Keuter a copy of SMUD's independent spent fuel storage installation ("ISFSI") licensing and engineering strategies.[10] DPFOF ¶ 37. In the memorandum transmitting the strategies, Ms. Bowser explained that she was "working with both Licensing and Engineering to immediately implement the generic licensing and design activities necessary for the establishment of the Rancho Seco [ISFSI]." DPFOF ¶ 38. Notably, Jim Field, the chief engineer at Rancho Seco who worked on the specification for SMUD’s dry storage project,

[10] Although Ms. Bowser and Ken Miller were project managers for the implementation of the dry storage project, they did not have the authority to make the decision to pursue dry storage. DPFOF ¶ 39. Indeed, Ms. Bowser repeatedly stated throughout her deposition that she was a “fairly junior” Rancho Seco staff member. Id. In fact, during Ms. Bowser’s deposition, counsel for SMUD objected to questions from Government counsel on the basis that, “Miss Bowser does not speak on behalf of SMUD.” DPFOF ¶ 40.

The decision to pursue dry storage would have been made at a higher level of management than Ms. Bowser and Mr. Miller. DPFOF ¶ 41. However, Mr. Shetler stated at trial that he would rely upon the work of Ms. Bowser and Mr. Miller as part of the overall dry storage planning strategy. Id.

admitted at trial that no one ever told him SMUD was pursuing dry storage because DOE was not going to perform. DPFOF ¶ 42.[11]

That same month, Ms. Bowser requested that a work order be opened for "licensing and engineering activities related to dry storage disposition." DPFOF ¶ 44; DX 187; Tr.174:18-24 (Shetler) (explaining that it was SMUD standard practice to open up a work order to start collecting costs once a new project is initiated). In fact, SMUD appears to have requested charges of at least $4 million dollars to this work order prior to 1992. DPFOF ¶ 45. Similarly, Luana Holst, SMUD's supervisor of nuclear records and documents, who along with Jim Field was responsible for the collection of work orders to be included in SMUD's damages claim, admitted at trial that this work order related to SMUD's dry storage project, but that this work order was not included in SMUD's damages claim. DPFOF ¶ 45. Ms. Bowser testified at her deposition that, in fact, SMUD was incurring costs associated with its dry storage project before June 1990. DPFOF ¶ 46.

The following month, SMUD filed with the NRC a document entitled "Plan For Ultimate Disposition of Rancho Seco Nuclear Generating Station." DPFOF ¶ 47. The document, which is a regulatory requirement, served to "provide the NRC with a status report in the form of advance and preliminary District plans for the ultimate disposition of [Rancho Seco], prior to the filing of the District's [decommissioning plan]." Id. Consistent with its prior discussion of its intentions, this document reiterated SMUD's plan to place its SNF into dry storage. DPFOF ¶ 48. Additionally, this document stated that "[i]t is expected that spent fuel will be accepted by

---

[11] Mr. Field also admitted at trial that, at the time he became involved in implementing SMUD's dry storage plan, SMUD was not considering store-only dry storage, but was only pursuing dual-purpose dry storage. DPFOF ¶ 43.

DOE before decommissioning is initiated." Id. Mr. Shetler explained at trial that, as of July 1990, SMUD planned on initiating decommissioning in the 2008 or 2009 time frame. Id. Further, similar to its previous statements, SMUD once again expressed its belief that an MRS was expected to be in operation in "about 1998." Id.

On May 20, 1991, SMUD submitted its proposed decommissioning plan to the NRC. DPFOF ¶ 49. Mr. Shetler, who was responsible for reviewing the proposed decommissioning plan, testified at trial that the proposed decommissioning plan would have reflected SMUD's then-current intentions. Tr.287:1-3, Tr.288:1-2. In its plan, SMUD reiterated its intention to place its SNF into dry storage, to have its ISFSI licensed and constructed by 1993, and to transfer its SNF to dry storage by 1998. DPFOF ¶ 49. Further, consistent with SMUD's March 1990 draft decommissioning cost study, SMUD's April 1991 decommissioning cost study that it submitted to the NRC as part of its proposed decommissioning plan again "presumes the availability of [an MRS] facility such that DOE can meet its obligation to begin receiving fuel by 1998." Id. Additionally, in a June 28, 1991 briefing to the Nuclear Regulatory Commission concerning its decommissioning plan, SMUD represented that it would save $8 million a year from moving its SNF from wet storage to dry storage. DPFOF ¶ 50.

On October 3, 1991, Rancho Seco management presented its decommissioning plan, including its dry storage strategy, to the SMUD Board of Directors. DPFOF ¶ 51.[12] At this

---

[12] As of October 1991, the SMUD Board of Directors was composed of Ed Smeloff, President; Peter Keat, Vice President; Joe Bounaiuto; Dave Cox and Wendy B. Reid. DPFOF ¶ 52. None of these Board members had a background working in the nuclear industry. Id. At the time, Mr. Smeloff was a consultant advising the California State Legislature. Id. Mr. Keats owned a book store in Sacramento. Id. Mr. Bounaiuto was a high school teacher. Id. Mr. Cox worked as an insurance broker at an insurance agency. Id. Ms. Reid worked as an employee of the California Energy Commission. Id.

meeting, SMUD staff presented its best information to the Board with respect to its dry storage plans. Id. Although much of the presentation was made by Rancho Seco staff members Ms. Bowser and Mr. Miller, SMUD chose not to present those witnesses at trial and instead relied upon the trial testimony of Mr. Shetler, who explained at trial that he ultimately would have reviewed and approved of whatever was presented to the Board of Directors at this meeting. Id.[13]

Mr. Shetler told the Board of Directors at this meeting that SMUD's fuel disposition project was "tied very strongly" to its decommissioning program. DPFOF ¶ 53; see Tr.772:3-8 (Redeker) (acknowledging that there is a "direct link" between SMUD's dry fuel storage options and its decommissioning efforts).

Both Mr. Miller and Ms. Bowser repeatedly told the Board at this meeting that SMUD expected to achieve an $8 million annual savings by transferring its SNF from wet storage to dry storage, or $80 million over a ten-year period. DPFOF ¶ 54. Mr. Miller told the Board that the reason SMUD staff recommended moving to dry storage was "because we can prudently save the District a great deal of money over the storage period." Id. Indeed, at trial Mr. Shetler agreed that the $8 million in annual savings was a factor in SMUD's decision to place its spent fuel into dry storage. Id.

Ms. Bowser emphasized to the Board the significant cost savings SMUD could achieve by transferring its SNF into dry storage, explaining:

> If you look at the fact that a repository isn't projected until 1998, or an MRS until 1998, with a repository in 2010, and it will take

[13] General Manager Freeman did not object to the proposal Mr. Shetler and his staff made to the Board of Directors. DPFOF ¶ 51.

> DOE approximately 10 years to accept all of SMUD's fuel, the cost savings can range somewhere between $60 to $156 million over the lifetime of decommissioning.

DPFOF ¶ 55. Mr. Shetler explained at trial that this difference between $60 million and $156 million in savings reflected the difference in assumptions between DOE acceptance at an MRS beginning in 1998 compared to DOE acceptance at a Federal repository beginning in 2010. DPFOF ¶ 56.

In response to a question regarding the estimated timing for DOE's acceptance of SNF, Ms. Bowser told the Board:

> MS. BOWSER: As a best case, without any negotiations with other utilities which are permitted to improve your place in the queue, they accept it in a policy that's called OFF, oldest fuel first. The first assemblies from Rancho Seco would be scheduled to be received three years after a facility opens, be that a monitored retrievable storage facility or a final repository. That's in the best case.
>
> And it would take approximately ten years from the opening of the facility or an additional seven years from the receipt of our first fuel for them to take the remainder of our assembly.
>
> In a worst case, it would be considerably longer, perhaps up to 20, 25 years.
>
> PRESIDENT SMELOFF: So, it's three years after the Federal Government develops an MRS that they would be required to begin to take spent fuel.
>
> MS. BOWSER: Yes. They may take our first assembly in the best case.
>
> * * *
>
> PRESIDENT SMELOFF: And is that likely to be 1998 or is that –

> MS. BOWSER: At this time, it is likely that an MRS could be sited by 1998; however, there needs to be some congressional action that would delink the final repository from the MRS. Right now, the two are linked so that you can't actually start to operate an MRS until you've sited a final repository.
>
> With the situation at Yucca Mountain, that seems like it will be tied up in litigation for a while. So, there is actually legislation in the Congress to delink the facilities which would make an MRS likely in 1998.

DPFOF ¶ 57.

General Manager Freeman expressed his agreement with Rancho Seco staff's proposal to place its SNF into dry storage, stating, "I think getting the fuel into casks and having them transportable in case the Department of Energy has a really good place to take them, it's a prudent thing to do." DPFOF ¶ 58. Rancho Seco staff believed that, regardless of the timing of DOE's performance in accepting SNF, placing SMUD's SNF into dry storage would ensure that it could timely decommission the rest of Rancho Seco. DPFOF ¶ 58.

Remarkably, at the time Rancho Seco staff made its proposal that the Board pursue dual-purpose dry storage in October 1991, the notion that dry storage was in response to the Government's potential inability to begin SNF acceptance in 1998 had not even been contemplated. The following discussion took place at the October 3, 1991 meeting:

> PRESIDENT SMELOFF: What is the legal responsibility of the Department of Energy to take the fuel beginning in 1998. Suppose, for whatever reason – lack of authorization of Congress, failure to characterize the Yucca Mountain site – they are simply unable to take the fuel? Do they have any legal responsibility to compensate us for the storage of this fuel?
>
> ASSISTANT GENERAL MANAGER SHETLER: We might want to do a review on that.

> MS. SCHORI: Yes, I suspect we should review that. I think their obligation is a contract obligation. And the question you're asking is whether or not they're in breach of contract if they fail to take the fuel. And I think probably I should look at that –

DPFOF ¶ 59.[14]

The following day, October 4, 1991, SMUD submitted to the NRC its application to construct and operate an ISFSI. DPFOF ¶ 60. On October 17, 1991, Mr. Shetler presented to the SMUD Board of Directors a presentation similar to the one presented at the October 3, 1991 meeting. DPFOF ¶ 61. This presentation indicated that there was an $8 million annual savings from transferring SMUD's fuel from wet storage to dry storage, and an estimated capital cost of $20 million. Id. Mr. Shetler agreed at trial that, based upon these numbers, which were provided to the Board, the cost of going to dry storage would pay for itself in two-and-a-half years. Id. Further, Mr. Shetler agreed that these figures represented SMUD's best estimates at the time and that SMUD utilized these numbers for its planning assumptions concerning the storage of its SNF. Id. Additionally, the presentation assumed either an MRS by 1998 (with final acceptance of SMUD's fuel in 2008), or a Federal repository in 2010 (with final acceptance of SMUD's fuel in 2020). DPFOF ¶ 62. The SMUD Board of Directors issued a resolution that same day approving "the proposal to construct a spent fuel storage facility." DPFOF ¶ 63.[15]

---

[14] Ms. Schori was the general counsel for SMUD at the time of the October 1991 Board of Directors meeting, and she eventually became the General Manager of SMUD. Further, despite the burden of proof lying squarely on SMUD in this case, SMUD failed to call at trial Ms. Schori, Mr. Freeman, Mr. Keuter or any of the members of the SMUD Board of Directors.

[15] Notably, as late as 1994, SMUD represented to DOE that, when it made the decision to pursue dual-purpose dry storage, it assumed DOE would timely perform under the Standard Contract. On May 24, 1994, DOE published a Notice of Inquiry ("NOI") regarding its responsibility to accept SNF after January 31, 1998, and sought comments from the nuclear industry. DPFOF ¶ 64a. Specifically, DOE requested industry comments upon: (1) whether it

SMUD issued requests for proposals ("RFPs") for the design and fabrication of the dual-purpose casks in December 1991. DPFOF ¶ 65. That same month, Mr. Shetler made a presentation concerning SMUD's decommissioning and spent fuel disposition plans to the California Senate Committee on Energy and Public Utilities. DPFOF ¶ 66. This presentation contained a slide identical to the one utilized with the Board of Directors in the October 17, 1991 meeting, indicating an $8 million in annual savings and the possibility of an MRS by 1998. Id. Mr. Shetler acknowledged at trial that these were the best assumptions SMUD had at the time. Id. General Manager Freeman approved of the concepts contained in Mr. Shetler's presentation. Tr.358:2-359:8 (Shetler).

---

had a statutory obligation to accept SNF beginning in 1998 in the absence of an operational repository; (2) the need for interim offsite storage prior to the opening of a permanent repository; and (3) the potential option of offsetting some of the financial burden to the industry through the use of the Nuclear Waste Fund. Id.

In response to DOE's NOI, SMUD submitted a letter on September 21, 1994 and explained to DOE its belief that SMUD began its dry storage project believing that DOE would perform the Standard Contract in a timely manner. DPFOF ¶ 64b. Specifically, SMUD stated that:

> After a referendum of SMUD's electorate on June 6, 1989, Rancho Seco ceased operating on June 7, 1989. Since then, SMUD has been proceeding with activities to begin the decommissioning of Rancho Seco and to provide required assurances to the NRC that the District will have sufficient funds available to pay for the decommissioning. However, SMUD has not provided funds in its Decommissioning Trust for spent fuel storage after 2010. When When funded in 1991, the Trust assumed that DOE would accept all of Rancho Seco's fuel starting in 1998, including the queue, by 2010.

Id. In other words, SMUD's response to the NOI provides further evidence that SMUD's decision to pursue dry storage was wholly independent of DOE's breach of the Standard Contract.

On April 2, 1992, the SMUD Board of Directors approved of the evaluation process and criteria proposed by Rancho Seco management to be used in the selection of a vendor for the dual-purpose casks. DPFOF ¶ 67. Three months later, on July 7, 1992, Rancho Seco management requested that the Board authorize SMUD's general manager to negotiate and execute a contract with Pacific Nuclear Services, Inc. to purchase dual-purpose casks. DPFOF ¶ 68. The staffing summary sheet presented to the Board of Directors containing the request explained:

> In 1990, the Board of Directors, as a result of a District study performed by S. Levy, Inc., concurred the General Manager should pursue the purchase of a dual purpose casking method. The purpose of this activity was to enable the District to dry store Rancho Seco spent nuclear fuel at an onsite location, shutdown the Spent Fuel Building, and further reduce decommissioning costs.

Id. Mr. Shetler testified at trial that, both before and after this July 7, 1992 meeting, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF. DPFOF ¶ 71. Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition." Id. Astonishingly, as SMUD itself concedes in its proposed finding of facts, "SMUD believed that the development of a dual purpose dry storage system would help address the uncertainties and prospective delay associated with DOE fuel acceptance by encouraging prompt DOE acceptance of SMUD's spent fuel whenever it began performance and by reducing annual operation and maintenance costs over the long-term if DOE did not begin accepting fuel until 2010 or later. Tr. at 172-73, 345-46 (Shetler)." Pl. PFOF ¶131.

Indeed, in December 1994, SMUD still believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public. DPFOF ¶ 72; DX 481, at SMUD 0033398; Tr.383:17-24, Tr.388:19-21

(Shetler) ("I think we still had an expectation there was a possibility it could happen, yes."); Tr.705:2-5 (Redeker). In a presentation as part of a public workshop – which General Manager Schori was aware of and did not make changes to its contents – SMUD management indicated that SMUD assumed performance from DOE between 1998 and 2013, and that all of SMUD's SNF would be accepted within a 14-year queue. DPFOF ¶ 72. SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued into 1995. DPFOF ¶ 73.[16] In short, as SMUD repeatedly recognized both at the time and at trial, through at least 1994 SMUD continued to believe that DOE could perform the Standard Contract in a timely manner.

Simply put, the overwhelming evidence adduced at trial clearly establishes that SMUD's decision to pursue dry storage was not the result of DOE's breach of the Standard Contract. Accordingly, SMUD failed to establish at trial that its decision to place its SNF into dry storage was a "direct result" of the Government's delay in performance, particularly when it believed there was a "50/50" chance that the Government would perform in a timely manner and that SMUD believed the pursuit of dual-purpose dry storage was advantageous <u>regardless</u> of when

---

[16] SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry. Tr.1377:3-19 (Stuart) (acknowledging that there was a general belief in the industry that the government was spending money on the MRS, and that an MRS might break the logjam regarding the acceptance of SNF under the standard contract). In fact, even after 1995, Mr. Stuart, as an employee of NAC International, was having discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Further, SMUD's reliance upon the NRC's 1994 Environmental Assessment on the Rancho Seco ISFSI as "corroborating" the causal relationship between DOE's "anticipated delay" and SMUD's decision is misplaced. Pl. Br. 25 (citing PX 363). Regardless of the NRC's view on the possibility of an MRS by 1998, SMUD's contemporaneous documents unequivocally reflect that <u>SMUD</u> believed, at least into 1995, that DOE could accept SNF by 1998 in an MRS.

DOE began performing under the Standard Contract. See, e.g., California Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005) (rejecting "substantial factor" test and holding that the causal connection between the breach and the damages alleged must be "definitively established").[17] SMUD represented this belief to DOE, the NRC and the general public throughout this time period. Tr.401:2-7 (Shetler). It is only now, in its current litigation posture, that SMUD has attempted to construct a post hoc self-serving reason for its dry storage decision. This position is belied by the evidence at trial and should be rejected by this Court.

SMUD's decision to place its SNF into dry storage, a full eight years before the Government's obligation to begin acceptance from the industry in general, and 11 years before the Government's obligation to begin acceptance of SMUD's SNF, was not caused by the Government's breach of the Standard Contract. Rather, as demonstrated at trial and as discussed above, SMUD made a business decision based upon its status as a shutdown utility. SMUD determined that the placement of its SNF into dry storage made business sense based upon its desire to decommission, its projected cost savings of $8-12 million a year, and, most importantly, its belief that the placement of its SNF into dual-purpose dry storage could facilitate DOE's early acceptance at an MRS. These objectives have nothing to do with the Government's delay in performance.

Indeed, despite the Government raising these significant flaws in SMUD's causation argument at trial, SMUD's post-trial brief is absolutely silent on this issue. SMUD's sole

---

[17] SMUD makes the curious argument that SMUD would not have contracted for dry storage in 1992 in the "but for" world. Pl. Br. 2. Of course, 1992 is by definition the "but for" world, particularly in light of this Court's determination that the Government breached the Standard Contract on January 31, 1998. In fact, by 1992, DOE had not made any announcement suggesting that it would not perform with SNF acceptance at an MRS beginning in 1998.

argument is that, because the Government's 1998 performance as of 1990 was "uncertain," that "uncertainty" somehow justified or drove SMUD's decision to pursue dual-purpose dry storage. Of course, as explained above, such a contention is wholly unsupported by the actual facts of this case, as demonstrated by SMUD's own documents. Consequently, SMUD has failed to establish that the Government's breach of the Standard Contract in 1998 caused it to pursue dry storage in the early 1990s. See Indiana Michigan, 2005 WL 2173563, at *7 (affirming trial court's conclusion that utility's rerack of spent fuel pool, which it began to expend funds on in 1989, was not caused by Government's delay in the acceptance of SNF).

2. SMUD's Reevaluation Of Its Decision To Place Its SNF Into Dry Storage Was Unrelated To The Government's January 31, 1998 Delay In SNF Acceptance

Apparently recognizing the futility of its argument that SMUD's decision to place its SNF into dry storage over a decade before the Government was obligated to accept SMUD's SNF can constitute recoverable mitigation, SMUD presents the novel argument that its revisiting

of the dry storage decision at several times after 1998 somehow establishes causation.[18] This argument does not withstand even casual scrutiny.

First, SMUD has presented absolutely no legal support for the proposition that, despite the fact that it made the decision to pursue dry storage 11 years before the Government was obligated to accept SMUD's SNF, because of 88 months of delays in SMUD's dry storage project (none of which SMUD has even attempted to allege were the fault of DOE), SMUD's reconsideration as a result of these delays can somehow create a causal link between SMUD's dry storage project and DOE's 1998 breach of the Standard Contract. Simply put, SMUD's novel causation theory lacks any legal support.

---

[18] SMUD does not even attempt to suggest that its 1993 reevaluation of its dry storage project somehow was the direct result of the Government's breach. Indeed, it is beyond dispute that this 1993 reevaluation was motivated solely by its concern that, by placing its SNF into canisters, SMUD would render its packaged fuel as either non-standard or unacceptable. DX 425, at SMUD 0027391 (indicating that 1993 reevaluation was to "quantify [the] risk" of placing its SNF into canisters and potentially making its fuel nonstandard or unacceptable); Tr.367:4-17 (Shetler) (explaining reason for 1993 reevaluation was based upon concerns about DOE's acceptance of canistered fuel and the ability to license its first-of-a-kind dual-purpose dry storage system). In fact, the 1993 evaluation also included a "base case" which assumed that SMUD would place its SNF into dry storage and assumed a 2000 start date for DOE acceptance of SNF, and that all fuel would be accepted under DOE's then-planned receipt schedule of 15 years. Id., at SMUD 0027393, SMUD 0027390; Tr.374:1-14 (Shetler) (explaining that the "base case" was the plan SMUD was moving forward with at the time, that it assumed an MRS by 1998, and was the reference point against which all other options were compared); DPFOF ¶ 76a-d. This 1993 analysis plainly reflects a belief on the part of SMUD that DOE could would perform by 1998, and its reevaluation was motivated by its concerns over the storage container in which it would place its SNF.

Further, SMUD's 1993 reconsideration itself proves that SMUD pursued dual-purpose dry storage irrespective of the Government's breach. SMUD effectively concluded that the benefits of pursuing dry storage outweighed any potential risk in a delay in DOE's acceptance of SMUD's SNF caused by the placement of SMUD's SNF into canisters.

Second, even if SMUD could somehow demonstrate, as a matter of law, that its reevaluations of its dry storage project could potentially have been caused by DOE's delay, as we demonstrated at trial, SMUD's decision to reevaluate its dry storage project was not motivated by the Government's breach of the Standard Contract, and its decision to continue with the dry storage project was not caused by the Government's breach.[19] As demonstrated at trial and as explained below, SMUD's reevaluations were motivated by substantial delays in the dry storage project, and its decision to continue with the project was based upon the significant cost savings that it would realize regardless of any delay. In fact, SMUD determined that the project would pay for itself before DOE's first scheduled acceptance of SMUD's SNF in the non-breach world. Consequently, SMUD's consistent decision to stay the course clearly was not caused by the Government's delay in acceptance after 1998.

Significantly, even after SMUD concluded that DOE would breach the Standard Contract, SMUD recognized that, regardless of the breach, the pursuit of dry storage project was the best option financially. Specifically, in October 1996, Mr. Shelter presented a paper at the TLG Conference, in which he stated:

---

[19] Notably, when Mr. Field initially put SMUD's damages claim together on April 16, 2004, he started the collection of costs beginning in 1997 at the direction of counsel. DPFOF ¶ 77. These post-1996 costs totaled $60.1 million. Id. Mr. Field acknowledged at trial that SMUD's initial plan was to have its SNF loaded into dry storage by 1998, and, had it loaded its SNF by that date, there would not be costs associated with most of the work order numbers contained in SMUD's April 2004 damages claim. Id. Indeed, it was only after Mr. Field's deposition in this case that SMUD submitted a revised damages claim, asserting $20 million in damages running from 1992-1996. DPFOF ¶ 78. SMUD's revision of its damages claim is an explicit acknowledgment of the fact that, but for the significant delays in SMUD's dry storage program, it would have suffered no damages in this case, as any costs incurred would have been before the Government's partial breach in 1998.

> [t]he economic aspects of keeping spent fuel in the spent fuel pool as opposed to dry storage indicate that the capital costs associated with dry storage can be recovered in less than two years and a substantial amount can be recovered over the period the plant is in SAFSTOR.

DPFOF ¶ 79. Mr. Shetler projected an annual cost of operating the wet pool of $15.1 million dollars, an annual cost of operating dry storage of $3.8 million, and the total capital costs of dual-purpose storage of $18 million. This was SMUD's best estimate at the time. Id.[20] Mr. Shetler explained at trial that General Manager Schori was aware of the general substance of this presentation, and that he would not have made this presentation if she disagreed with any of the general substance contained in the presentation. Id. Similarly, Mr. Field authored a paper in 1996 in which he stated that, "[r]ecovery of the investment in such a [dry] storage system and facility would be realized in less than three years." DPFOF ¶ 81.

At trial, SMUD attempted to show that it revisited its 1990 dry storage decision throughout the 1990s because of DOE's breach. The trial record, however, establishes that SMUD's reevaluation of its dry storage decision was not driven by DOE's breach, but rather by concerns associated with the dry storage project's escalating costs and increasing delays. SMUD's revisiting of its decision was due to the fact that, almost from its inception, SMUD's dry storage project suffered from massive delays and significant cost overruns. As Mr. Redeker explained at trial:

> We were doing re-evaluations because the project started getting into trouble. There started being cost overruns and started being issues and we said if there are problems with this, with this project, why don't we leave the fuel in the spent fuel pool.

[20] On July 25, 1996, Mr. Miller authored a study in which he estimated that the total cost for the dry storage project would total approximately $21.3 million. DPFOF ¶ 78.

Tr. 535:12-27 (Redeker), Tr. 628:25-629:1 (Redeker) ("This is a troubled project, costs are going up, schedule is moving out."); DPFOF ¶ 82. Yet, every time SMUD performed a reevaluation, it concluded that the project paid for itself so quickly that DOE's breach of the Standard Contract was immaterial to its consideration as to whether to continue with the dry storage project. DPFOF ¶ 83.

SMUD reevaluated its dry storage project on several occasions throughout the mid-to-late 1990s and early 2000 time frame. These evaluations were performed by Rancho Seco staff under the direction of Mr. Redeker. DPFOF ¶ 84. Mr. Redeker testified at trial that he would report the result of these analyses to the Board of Directors and that he endeavored to provide the Board with the most accurate and best information that he could. Id.

For example, SMUD conducted a reevaluation of its 1990 dry storage decision on March 3, 1997. DPFOF ¶ 85. By this point, the dry storage project was "well underway." Tr.910:7-9 (Ferreira). The reason SMUD conducted the 1997 reevaluation was because its dry storage vendor, Vectra, stopped work on the dry storage project. DPFOF ¶ 85. Indeed, Mr. Redeker acknowledged at trial that, as of the 1997 reevaluation, the dry storage project was floundering, and it was somewhat unclear as to whether the project would even continue. Id.

The 1997 reevaluation concluded that the most cost-effective option was to continue with the current dual-purpose dry storage concept on an unexpedited schedule because of "reduced staff and the use of contractors." DPFOF ¶ 86. This option assumed that SMUD's SNF would be loaded into dry storage by August 31, 1999. Id. The 1997 evaluation also concluded that store-only dry storage was not a preferred option, because it would delay SMUD's ability to

decommission its wet pool, thereby resulting in additional costs in maintaining its Part 50 operating license. Id.[21]

In conjunction with the 1997 reevaluation, Mr. Redeker made a presentation to the Board of Directors in which he represented that the annual cost savings from going from wet storage to dry storage would be $10-$12 million. DPFOF ¶ 87. Similar to the 1993 reevaluation, Rancho Seco management recommended to the SMUD Board of Directors that it continue pursuing the existing dual-purpose dry storage project, and the Board concurred with that recommendation. Id. Indeed, using SMUD's own numbers, the cost of going to dual-purpose dry storage would have paid for itself by 2001 – the year that SMUD would have had its first acceptance of SNF from DOE in the non-breach world. DPFOF ¶ 88. Even under Eileen Supko's litigation-inspired analysis, assuming an oldest fuel first acceptance priority, DOE would have accepted SNF from SMUD through 2006. Direct Testimony of Eileen Supko, at ¶ 13.[22] Consequently, it

[21] Mr. Redeker claimed at trial that, had SMUD believed in 1997 that DOE was going to begin accepting SNF by 1998, SMUD would have left the SNF in its wet pool. Tr. 726:20-727:1. However, on cross-examination, Mr. Redeker admitted that, in conjunction with the 1997 reevaluation, he never conducted any analysis – either on paper or in his head – to reach this conclusion. Tr. 728:7-13 (Redeker) (explaining that "the thought never entered my mind."). Indeed, the only time that Mr. Redeker ever performed such an analysis was after SMUD filed the lawsuit in this case. Tr. 728:14-25 (Redeker). Even then, Mr. Redeker did not memorialize this analysis in writing. Tr. 729:1-3 (Redeker). The Court should reject this unsupported, litigation-inspired contention.

[22] Under a 900 MTU steady state rate of acceptance, DOE's last acceptance of SMUD's standard SNF would have been in 2019. Tr.2006:2-5 (Pollog). Under a 900 MTU rate of acceptance that ramped up to 3,000 MTUs after 2010, SMUD's last acceptance would have been in approximately 2013. Tr.2006:17-23 (Pollog). In other words, SMUD's cost savings are even greater if the Court finds that DOE was not contractually obligated to accept standard SNF at the aggressive rate that SMUD has proposed.

is beyond dispute that, as of 1997, SMUD would have proceeded with the dry storage project irrespective of any delay in the Government's acceptance of SNF.

Throughout this time period , SMUD management repeatedly represented that it would save $10-to-$12 million annually by placing its SNF into dual-purpose dry storage. DPFOF ¶ 89. For example, in May 1997, Mr. Redeker made a presentation to the SMUD Board of Directors in which he presented the 1997 study of SNF storage options and represented that there would be annual savings of $10-$12 million by placing its SNF into dual-purpose dry storage. DPFOF ¶ 89a.[23] Similarly, on June 3, 1997, Mr. Redeker made a presentation to the SMUD Board Finance Committee, indicating identical annual cost savings by going to dry storage. DPFOF ¶ 89c. Four months later, Mr. Redeker made a presentation to a subcommittee of the SMUD Board of Directors, the Board Integrated Resources and Customer Service Committee, in which he again represented an annual savings of $10-$12 million. DPFOF ¶ 89d. In this October 1997 presentation, Mr. Redeker indicated that the capital costs associated with completion of the dual-purpose dry storage were $23 million. Id.[24]

The Government's expert economist, Cliff Hamal, conducted an analysis of SMUD's 1997 reevaluation and concluded that SMUD would not have rationally abandoned its dry

---

[23] Indeed, in a May 2, 1997 letter from SMUD's external lobbyist to SMUD's in-house lobbyist discussing a meeting that SMUD management had with staff members of its congressional delegation, SMUD management indicated that it would save "approximately $10 to $12 million dollars annually in labor, maintenance, safety, and security expenses," after the SNF was transferred from the wet pool to dry storage in mid-1999. DPFOF ¶ 89b.

[24] By October 1997, SMUD had expended $17 million on capital expenses associated with the dry storage project. DPFOF ¶ 89e. However, for purposes of its payback analysis, SMUD looked at capital costs that were expected in the future, rather than costs already incurred. Id.

storage project given the substantial annual savings that SMUD assumed at the time. DPFOF ¶ 90. Mr. Hamal explained that SMUD's own 1997 analysis demonstrates that it would achieve payback of its incremental investment (i.e., remaining costs "to go") from the operating cost savings achieved from moving from wet to dry storage by 2002, and that this payback analysis does not include consideration of other cost benefits to SMUD's decommissioning program. Id. Indeed, even assuming Ms. Supko's acceptance rate schedule (which we will discuss below), Mr. Hamal concluded that the net present value of the savings achieved from the dry storage program would be $13 million (and that the savings would be as much as $30 million under a slower acceptance schedule). Id. Consequently, based upon SMUD's own study, Mr. Hamal concluded at trial that there was no basis for concluding that SMUD would have cancelled the dry storage project at the time of the 1997 study. Id.[25]

Mr. Redeker was not the only SMUD official to conclude that dry storage should be pursued regardless of DOE's breach of the Standard Contract. In fact, SMUD made this conclusion to continue with its dual-purpose dry storage project not just internally, but also announced its decision to the general public, including DOE. On March 14, 1997, SMUD's General Manager, Jan Schori, wrote a letter to DOE in which she indicated that "SMUD is spending $20 million in capital for the dry storage and transportation system in an effort to enhance safety at the site and to reduce substantially the interim annual costs of wet storage."

[25] Mr. Hamal explained that, even if SMUD had demonstrated that it would have abandoned its dry storage project had DOE not breached the Standard Contract, SMUD would not be entitled to any costs prior to the presumptive date of abandonment, nor would it be entitled to any of the termination costs, as these would have been costs incurred in the non-breach world. DPFOF ¶ 90. Of course, SMUD has never identified or quantified the costs associated with contract termination.

DX 729, at RS 006102 (emphasis added); Tr.738:17-20 (Redeker) (explaining that he prepared this letter and wanted the information contained therein to be the best it could be). Ms. Schori also indicated in her letter that SMUD was incurring approximately $800,000 a month in wet storage costs, and that it anticipated incurring approximately $125,000 a month once SMUD placed its SNF into dual-purpose dry storage. DX 729, at RS 006101. In other words, SMUD represented to DOE that it anticipated an annual savings of $8 million based upon moving its SNF from wet storage to dry storage. Tr.741:13-17 (Redeker). SMUD further indicated to DOE that all of SMUDs SNF would be in dry storage by December 1999. DX 729, at RS 006101; Tr.740:3-6 (Redeker). Consequently, as of March 1997, SMUD anticipated that the cost of going to dry storage would pay for itself in two-and-a-half years, or by mid-2002. DPFOF ¶ 92.

Mr. Shetler summarized the sentiment of SMUD officials when he explained at trial that one of the major impetuses for revisiting its dry storage decision during the mid-to-late 1990s and early 2000 was the increased costs that SMUD was experiencing with the dry storage project. Tr.375:6-13 (Shetler); Tr.597:3-15 (Redeker) (explaining that SMUD conducted 1997 analysis of storage options "in anticipation that things might not go well" with its dry storage vendors); DPFOF ¶ 93. Specifically, one of the primary motives for SMUD revisiting its decision during this time period was the manufacturing issues related to SMUD's vendors. DPFOF ¶ 94. As Mr. Shetler explained at trial:

> I think the primary impetus was the status of the project, the costs, what was the schedule, what was our expectation, could the manufacturer manufacture it, at what cost. All of that was rolled together in our reviews of what was going on.

Tr.377:1-5 (Shetler).

Similarly, Mr. Ferreira explained at trial:

> We didn't have any certainty as to, as to whether or not we would be able to successfully address all the licensing and design issues. We certainly were aware that we had, had the higher costs to continue to maintain fuel in wet storage. Our best estimates, which changed over time, about the cost to complete the project, still indicated to me and to the general manager, that it still was cost-effective to continue to move forward with the dry storage.

Tr.910:22-911:6 (Ferreira).

Mr. Ferreira proceeded to explain the risks associated with continuing with the pursuit of the dual-purpose dry storage system:

> Well, the risk related to the delays and cost overruns, and it seems like, at times, never-ending design questions from NRC trying to address the fabrication issues for the casks and the canister and trying to determine whether or not, at the end of the day, we, we would be successful, but each time, looking at the forward going, the forward costs, the sunk costs, what we had already spent was irrelevant.
>
> Those were sunk costs at that point in time. So, again, we kept comparing the cost of going forward, and if we could complete the project with the capital outlay and move the fuel into dry storage, then it would have been, we would have been able to lower our costs and reduce our risk of continuing to maintain fuel in wet storage.

Tr.914:16-915:6 (Ferreira).

Mr. Ferreira acknowledged at trial that ultimately it is SMUD's customers, rather than DOE, that bears the financial risk of SMUD's pursuit a first-of-its kind storage technology. DPFOF ¶ 97. Indeed, Mr. Shetler testified that the substantial costs and schedule delays SMUD faced in its dry storage project were "the risk one takes when you become the first person out the door." Tr.383:11-16 (Shetler).[26]

---

[26] In both its briefing and at trial, SMUD has suggested that the NRC is somehow to blame for the delays in SMUD's dry storage project because of its aggressive oversight of the

On June 9, 1998, SMUD filed its complaint in the United States Court of Federal Claims. DPFOF ¶ 99. After SMUD filed its lawsuit in this case, SMUD revisited its dry storage decision several more times, and, as in previous evaluations, concluded that it made economic sense to continue with its dry storage project. Tr.652:21-23 (Redeker) ("I concluded that there was still a significant net present value" of continuing with the dual purpose dry storage project); DPFOF ¶ 100. Mr. Redeker testified at trial that these reevaluations occurred, not because of the Government's breach, but because "our project was continuing to cost a lot." DPFOF ¶ 101. SMUD concedes as much in its post-trial brief, stating that the 1998 reevaluation was precipitated not by the Government's breach, but by its contractor Vectra's bankruptcy. Pl. Br. 30. Indeed, rather than explain that DOE's partial breach of the Standard Contract caused SMUD to somehow change or modify its dry storage plans, Mr. Shetler explained that DOE's partial breach simply "reinforced our decision that we were making the right decision in putting the fuel in dry storage based on what we were seeing from the lack of performance." DPFOF ¶ 102.

For example, in a September 1998 presentation to Board Integrated Resources and Customer Services Committee, Mr. Redeker indicated $10-$12 million in annual savings by moving to dual-purpose dry storage. DPFOF ¶ 103.[27] Mr. Redeker indicated that SMUD had

---

then-burgeoning dual-purpose dry storage industry. This suggestion is nonsense, and the Court should reject SMUD's veiled attempt to shift the blame to the NRC in this case simply because SMUD, for business reasons, chose to pursue a "first-of-its-kind" technology that it did not need for the storage of its SNF.

[27] Similarly, on February 3, 1998, Mr. Redeker made a presentation to SMUD's Board Finance Committee in which, consistent with other contemporaneous presentations, he stated: "there is a significant cost savings to have fuel in dry storage (between $10 to 12 million dollars per year) primarily due to decreased staff costs to maintain the fuel in dry storage." DPFOF ¶

already invested $24 million into its dry storage project, and that it was projected that the project could be completed for an additional $13 million. Id. Mr. Redeker testified at trial that these figures represented SMUD's best estimate at the time. Id. In fact, based upon SMUD's own payback analysis, in which one only looks at capital costs that have yet to be incurred, SMUD's dry storage project would have paid for itself by some time in late 1999 - two years before its first scheduled acceptance by the Government. DPFOF ¶ 104.

In December 1999, SMUD conducted a net present value analysis comparing the cost of wet storage versus dry storage. DPFOF ¶ 105. This analysis concluded that SMUD could complete the dry storage project for $15.3 million. Id. Again, under this analysis, SMUD's dry storage project paid for itself prior to its first scheduled acceptance by the Government. DPFOF ¶ 106. In a February 2000 update to this study, SMUD estimated that the project could pay for itself by 2002. DPFOF ¶ 107.[28]

In summary, under SMUD's own payback analyses, the cost of pursuing dry storage paid for itself long before DOE's final acceptance of SMUD's SNF – even under Ms. Supko's litigation-inspired analysis. The following chart summarizes several of SMUD's payback analyses conducted on a nine-year period:

---

98.

[28] As late as June 2003, SMUD's general counsel, Steve Cohn, was unsure of whether SMUD's decision to place its SNF into dry storage was caused by the Government's delay in the acceptance of SNF. In a June 2003 e-mail to SMUD's accounting expert in this case, Brian Brinig, Mr. Cohn explained that "[i]n addition, SMUD spent over 60 million in capital funds to transfer our spent fuel to a new dry storage facility," and "[t]he purpose of that was to reduce our ongoing operating costs (and/or mitigate the government's damages) from about 10 to 12 million a year to 2 million a year." DPFOF ¶ 108. Mr. Cohen's views of SMUD's decisions relating to dry storage are telling.

**Date of SMUD Analyses**

| | Oct 1991 | Aug 1993 | Oct 1996 | May 1997 | Oct 1997 | Sep 1998 | Dec 1999 | Feb 2000 |
|---|---|---|---|---|---|---|---|---|
| Capital Cost of Project | $16-$20 M | $15.8 M | $18 M | $19 M | $6 M [1] | $13 M [2] | $15.3 M [3] | $15.3 M [4] |
| Annual Cost Savings | $8 M/Yr | $8 M/Yr | $11.3 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr |
| Completion of Fuel Loading | By 1998 | By 1998 | Early 1998 | Mid-1999 | March 1999 | By 2001 | Mid 2001 | Mid 2001 |
| Years to Pay-Back | 2 to 2 1/2 Yrs | < 2 Yrs | < 2 Yrs | < 2 Yrs | < 1/2 Yrs | < 1 1/3 Yrs | 1 1/4 to 1 1/2 Yrs | 1 1/4 to 1 1/2 Yrs |
| Date of Pay-Back | By Mid 2000 | By 2000 | By Early 2000 | Mid 2001 | Late 1999 | Early 2002 | Late 2002 | Late 2002 |
| Final Acceptance of SMUD Spent Fuel per Supko | 2006 | 2006 | 2006 | 2006 | 2006 | 2006 | 2006 | 2006 |

DPFOF ¶ 109.

SMUD's several payback analyses unequivocally demonstrate that SMUD believed its dry storage project would pay for itself prior to the final shipment of its SNF. As Mr. Hamal explained at trial, "[a]s long as SMUD concluded that the capital cost of its dry storage program could be recovered from operating cost savings in just a few years, the project will pay for itself before all of SMUD's fuel would be accepted by DOE in a non-breach world. Thus, the program would be economically justified and not properly included as damages." DPFOF ¶ 110. Indeed, Mr. Hamal explained that the cost savings calculations that SMUD performed in the 1990s did not consider how Rancho Seco's overall decommissioning is facilitated by closing its pool, and that, had the pool not been closed, SMUD's decommissioning efforts to date could not have been accomplished. Id.

At trial, SMUD's sole basis for suggesting that the projected annual cost savings in placing its SNF into dry storage were less than $8-12 million was the July 1992 staffing summary sheet. Although the July 1992 staffing summary sheet indicates that SMUD would realize "an estimated savings of approximately $33 Million by dry storing spent nuclear fuel," DX 33, at SMUD 0027222, no SMUD witness could explain the source of this figure, or how this figure compared to the consistent $8-12 million in annual savings that is contained in dozens of contemporaneous documents. DPFOF ¶ 111. For example, Mr. Shetler did not know whether the $33 million number represented net savings over the course of the project or gross savings, or even whether the figure represents a net change to a prior decommissioning cost estimate. DPFOF ¶ 111a. Nor could Mr. Shetler explain whether the $33 million in savings included the amount of capital costs associated with the dry storage project. DPFOF ¶ 111b. Indeed, other than stating that the $33 million figure represented a comparison between wet and dry storage options, Mr. Shetler could not explain what this $33 million figure represented. Id.[29] The Government's expert economist, Cliff Hamal, provided unrefuted testimony that, in light of Mr. Shetler's testimony, it was unreasonable to interpret the $33 million figure as an indication of operating savings from 1998 through 2010, particularly because that number would be inconsistent with other contemporaneous documents. DPFOF ¶ 112.

In summary, the record at trial established that neither SMUD's decision to pursue dual-purpose dry storage nor its decision to continue with the project throughout the 1990s was

[29] In a presentation given by Mr. Shetler concerning the approval of the Pacific Nuclear contract, Mr. Shetler indicated that the dry storage proposal "mitigates potential decommissioning cost increases of $21 million, based on SAR/suggested design." DPFOF ¶ 111c. Mr. Shetler did not know whether this $21 million would be added to the $33 million to determine actual annual cost savings. Id.

caused by DOE's breach of the Standard Contract. Indeed, the record establishes that SMUD's initial pursuit of dry storage was at least partially motivated by an expectation of timely or even early performance of the Standard Contract by DOE and that SMUD believed that the pursuit of dual-purpose dry storage made sound business sense regardless of DOE's breach. Accordingly, SMUD has failed to establish that the costs it incurred in developing dry storage were the result of DOE's breach. As required by this Circuit, SMUD is therefore not entitled to recover those costs. Myerle, 33 Ct. Cl. at 27.

## III. SMUD FAILED TO PROVE THAT DOE WAS CONTRACTUALLY OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTUs

### A. SMUD Has Failed To Establish That DOE Was Contractually Obligated To Accept SNF At A Rate Sufficient To Preclude Additional At-Reactor Storage And To Accept Some "Backlog" Of Utility-Stored SNF

Although unnecessary to the Court's resolution of this case, SMUD contends that, had DOE timely performed under the Standard Contract, it would have employed an annual steady state receipt rate of "approximately" 3000 MTU, resulting in the removal of all of SMUD's SNF by 2006 at the latest. Pl. Br. 74.[30] SMUD concedes that there is no specific rate of acceptance specified in the Standard Contract. DPFOF ¶ 113. Rather, SMUD's entire rate argument is premised upon the Court's acceptance of the notion that the Department of Energy was somehow obligated to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF

[30] SMUD has asserted that 2006 is the latest date of DOE's final acceptance because SMUD could have taken advantage of certain provisions contained in the Standard Contract, as well as extra-contractual transportation campaigns, to obtain an earlier acceptance date. As discussed below, such a contention is contrary to the contemporaneous documentary evidence, as well as SMUD's own beliefs.

and/or HLW already stored by utilities up until that date. To the extent the Court concludes that the determination of an appropriate rate of acceptance is necessary to determine either causation or the quantum of damages in this case, SMUD has failed to meet its burden of establishing that a 3,000 MTU steady state rate is required under the Standard Contract.[31]

SMUD's argument is directly contrary to the language of the Standard Contract and the record of the administrative rulemaking supporting the development of the contract terms. In response to the proposed rule publishing the Standard Contact's proposed terms, numerous utilities submitted comments to DOE suggesting changes. Several utilities specifically requested that DOE include an obligation to accept fuel at a rate that satisfied the two-part requirement that SMUD now identifies. DPFOF ¶ 114a-e. Yet, DOE specifically and intentionally decided not to impose such a contractual obligation upon itself. DPFOF ¶ 115. As Mr. Morgan testified, DOE could not commit itself in such a manner in 1983 because it could not know what obstacles would be encountered or what the technical capabilities would be by 1998. DPFOF ¶ 120. Accordingly, in the final rule containing the ultimate Standard Contract language, DOE did not agree to obligate itself in the manner that SMUD now suggests. DPFOF ¶ 116. Having failed to obtain that contract obligation in 1983, SMUD now attempts to obtain through the "back door" what it could not obtain through the front door – to have this Court add a requirement to the contract that DOE intentionally refused to create when entering the contract in 1983.

In support of its argument that the Court should impose this two-part requirement into the Standard Contract, SMUD offered the testimony of Eileen Supko, an industry advocate who was

[31] The parties in this case have engaged in extensive briefing concerning the issue of rate and schedule of SNF acceptance. In the interest of space, we will only highlight our arguments and the evidence adduced at trial, and reassert the arguments made in our motion.

not involved in the negotiations leading up to the formation of the Standard Contract. Ms. Supko discussed at trial what she believed was DOE's intent in administering the waste acceptance program. Tr. 1494:2-7. Putting to one side the obvious inappropriateness of utilizing expert testimony to explicate a party's intent, Ms. Supko testified at trial that the two "primary requirements" she identified were contained in DOE's 1983 draft mission plan. DPFOF ¶ 130. First, Ms. Supko was not involved in the promulgation of the 1983 draft Mission Plan. DPFOF ¶ 130a. Second, Ms. Supko conceded at trial that the final version of the Mission Plan submitted to Congress was not published until 1985, and, when it was published, did not contain a reference to Ms. Supko's two "primary requirements." DPFOF ¶ 130b. Finally, and perhaps most significantly, the 1983 draft Mission Plan expressly states that, "[t]he disposal contracts with the utilities specify that priority will be given to the oldest spent nuclear fuel or high-level wastes. In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations." DPFOF ¶ 130c. Ms. Supko admitted that she understood the 1991 date references in the 1983 draft Mission Plan to relate to the 1991 Annual Capacity Report that DOE published. DPFOF ¶ 131. The 1991 Annual Capacity Report projects the first ten years of SNF acceptance at a 900 MTU rate. Id. Notwithstanding her admission, Ms. Supko does not rely upon the 1991 Annual Capacity Report, and instead concluded that "I don't believe that the rate of acceptance in the 1991 Annual Capacity Report was reasonable." DPFOF ¶ 131. Ms. Supko admits that, based upon her experience, she is simply making a judgment that the 1991 Annual Capacity Report is invalid. Id. Ms. Supko's conclusions are invalid for several reasons. First, the mere reliance upon "experience" is an improper basis for the promulgation of expert testimony. Zenith Electronics

Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416, 418 (7th Cir. 2005) (rejecting purported expert testimony based solely on "experience" without any other discernable methodology).

Second, Ms. Supko's views of the Mission Plan and its role in determining an appropriate rate of acceptance are flatly rejected by the testimony of Robert Morgan, the former director of the Office of Civilian Radioactive Waste Management, who expressly rejected the view that the Mission Plan's articulation of two program goals somehow contractually obligated DOE to accept SNF at a particular rate of acceptance:

> You are trying desperately to get me to say that we had an obligation under the contract to accept fuel at a given rate. We did not.
>
> And what's in the mission plan is not what's in the contract. We set the mission plan as an ideal goal that we wanted to meet.

DPFOF ¶ 132. Indeed, Mr. Morgan has unequivocally stated that the information contained in the Mission Plan simply represented the goals of the program and what DOE would like to accomplish, but that it clearly did not represent a contractual obligation or requirement. DPFOF ¶ 133. In particular, Mr. Morgan explained that the discussion in the Mission Plan concerning DOE's intent to accept SNF at a rate that precluded additional at-reactor storage did not reflect contractual intent, and that, even under a 3,000 MTU rate of acceptance, some utilities still would be required to add additional at-reactor storage. Def. Counter-Designation R. Morgan, Tr.3644:4-3646:2, Tr.3648:22-3649:16 (8/2/04). See Def. Counter-Designation B. Rusche, Tr.162:22-163:5 (5/16/02) (agreeing that DOE's strategy was to help utilities avoid some amount of additional, at-reactor storage by commencing operations in 1998, but that there was possibility that some utilities would have to add on-site storage after 1998); Def. Counter-Designation A.

Brownstein, Tr.412:5-14 (4/10/02) (distinguishing between DOE program goals and objectives in eliminating the need to add additional at-reactor storage and contractual commitments).

Nothing in the Standard Contract creates an obligation upon DOE's part to accept SNF at a rate that: (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would reduce the "backlog" of SNF. In fact, SMUD can identify absolutely no contractual language in the Standard Contract creating any such obligation. SMUD’s own expert, Ms. Supko, admitted as much at trial. Tr. 1482:24-1484:10 (Supko) (admitting that neither the Nuclear Waste Policy Act nor the Standard Contract contain a reference to the two “primary requirements” identified by SMUD). Further, the integration clause in the Standard Contract, Article XXII.A, expressly precludes reading any unwritten "agreement" into the contract. DX 88, at Art. XXII.A. SMUD’s proposed requirement for a rate that precludes additional at-reactor storage and reduces the "backlog" of SNF violates standard rules of contract interpretation. As this Court recently recognized in another SNF case in response to the same argument that SMUD is raising, “[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations.” Florida Power & Light Co. v. United States, 64 Fed. Cl. 37, 48 n.12 (2005), vacated on other grounds, 66 Fed. Cl. 93 (2005).

Further, it is clear that, even if the Court were to accept parol evidence to determine whether the contract contains a specific acceptance obligation by DOE, SMUD consistently understood that it did not. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "A principle of contract interpretation

is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Here, the history of the notice-and-comment rulemaking itself is extremely clear in evidencing that DOE did not obligate itself to satisfy SMUD's alleged two-part requirement and that the nuclear utilities were well aware of that fact. DPFOF ¶ 113-133.

In submitting DCSs to DOE in the early 1990s, SMUD never complained that the acceptance rates upon which DOE had requested the contract holders base their DCSs were somehow inappropriate or in conflict with the requirements of the Standard Contract. DX 389. Indeed, Mr. Shetler admitted at trial that SMUD neither protested its allocations set forth in the 1991 ACR nor DOE's direction to use the allocations set forth there for the preparation of its DCSs. DPFOF ¶ 136a. Further, SMUD never requested that DOE accept more SNF from SMUD than the amount established in the 1991 ACR. DPFOF ¶ 136b. Mr. Redeker conceded at trial that the 3,000 MTU steady-state rate that Ms. Supko opines upon, and upon which SMUD now relies in this litigation, "was not consistent with the DCS submittals."[32] DPFOF ¶ 136c. SMUD never sought to utilize the Disputes Clause contained in the Standard Contract to object to the rates contained in the 1991 ACR. DPFOF ¶ 136d.

SMUD's contention that it "paid little attention during [the 1990s] to what the acceptance rates would have been in the hypothetical 'non-breach world'" is contradicted by its contemporaneous documents. Pl. Br. 74. First, based upon the Federal Circuit's recent decision

---

[32] Mr. Redeker also testified that he was unaware of anyone at SMUD ever performing an analysis with respect to a rate of acceptance by DOE in the non-breach world under the Standard Contract. DPFOF ¶ 136c.

in Indiana Michigan, any date before 1994 is necessarily the non-breach world. Indiana Michigan, No. 04-5122, 2005 WL 2173563, at *4. Second, and more importantly, SMUD's contemporaneous documents reflect SMUD's understanding that a 3,000 MTU rate of acceptance was not a requirement of the Standard Contract. For example, at the October 1991 SMUD Board of Directors meeting, Ms. Bowser informed the Board that SMUD's SNF would be accepted over the course of ten years. DX 274, at SMUD 0027465 (stating that "[t]he first assemblies from Rancho Seco would be scheduled to be received three years after a facility opens . . . [a]nd it would take approximately ten years from the opening of the facility . . . for them to take the remainder of our assembly"); see also DX 280, at SMUD 0029434 (assumes 10 year acceptance queue); DX 291, at SMUD 0029418 (same); DPFOF ¶ 136e. Two years later, in 1993, Mr. Shelter told Mr. Ferreira that, under DOE's then-current acceptance schedule, SMUD's SNF would be accepted over the course of 15 years. DX 425; see also DX481, at SMUD 0033398 (assuming 14-year acceptance queue); Tr.630:17-18 (Redeker) (assuming that SMUD's SNF would be accepted over a 14-year queue); DPFOF ¶ 136f.

Consequently, SMUD's "understanding" that DOE had some minimum acceptance rate obligation was created after disputes about timely SNF acceptance began. The contemporaneous evidence should preclude any reading of Ms. Supko's two-part requirement into the Standard Contract.

B. SMUD Has Failed To Establish That An Annual Acceptance Rate Of 3,000 MTU Is Necessary To Satisfy The Requirements To Which SMUD Contends DOE Obligated Itself Or That DOE Ever Obligated Itself To Satisfy A 3,000 MTU Rate

Even if SMUD could establish the existence of the two-part requirement (eliminating additional at-reactor storage, and accepting some "backlog"), it failed to establish at trial that an

annual steady-state rate of 3,000 MTU is necessary to satisfy that "requirement." Having established that the annual generation rate of SNF is approximately 2,000 MTUs per year, Direct Testimony of Eileen Supko, at ¶ 11, SMUD offered no evidence at trial that any acceptance rate above 2,000 MTU would not satisfy such a requirement. Indeed, Ms. Supko analyzed no acceptance rates between 900 MTU and 3,000 MTU to determine if some rate below 3,000 MTU could satisfy the two-part test she constructed. In fact, on its face, an acceptance rate anywhere from 2,001 MTUs or above would seem to satisfy SMUD's alleged requirement, yet SMUD presented no testimony to establish the reasons that a 3,000 MTU rate was, indeed, the only acceptable acceptance rate. The absence of this evidence precludes any finding that some annual rate lower than 3,000 MTU would be insufficient to meet this unwritten requirement.

During trial, and in its post-trial briefing, SMUD appears to assert that the 3,000 MTU rate is somehow mandatory because it has appeared in numerous DOE planning documents. Pl. Br. 74. However, the documents upon which SMUD relies to evidence DOE's eventual "intent" to accept 3,000 MTUs of SNF annually depend upon the existence of an operational repository. DPFOF ¶ 134. Yet, the Standard Contract does not require DOE to begin SNF acceptance at a repository. To the contrary, the language of the Standard Contract explicitly contemplates that DOE may accept SNF either at a repository or at "such other facility(ies) to which [SNF] and/or [HLW] may be shipped by DOE prior to its transportation to a disposal facility." DX 88, Art. I.10. In fact, between the publication of the proposed rule and the final rule, the definition of the type of "facility" to which DOE could deliver SNF was expanded to expressly state, "in accordance with the [NWPA], that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository." 48 Fed. Reg. 16590, 16591 (Apr. 18,

1983); DPFOF ¶ 8. As we discussed in prior briefing upon summary judgment, pursuant to the rationale of the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 , 1275 (D.C. Cir. 1996), DOE was not obligated to have an operational repository by January 31, 1998, precluding any argument that DOE was somehow obligated to accept SNF at the rates it had anticipated for SNF acceptance at a repository. Because DOE was entitled to accept SNF at a facility other than a repository, SMUD's reliance upon planning documents relating to SNF acceptance at a repository is meaningless.[33]

As DOE made clear in its 1991 ACR, pursuant to the 1987 amendments to the NWPA, DOE planned to commence performance of the Standard Contract through the use of an MRS. DPFOF ¶ 124. In that document, which DOE provided to all Standard Contract holders, DOE made clear that it intended to initiate acceptance of SNF through an MRS. "[A] site for a Monitored Retrievable Storage (MRS) facility will be obtained and the facility will initiate operations in 1998 . . . ." DPFOF ¶ 125. DOE also made clear to all Standard Contract holders that the acceptance rates set forth by the ACR assumed that:

> [D]uring the first 10 years of acceptance following projected commencement of the Federal Waste Management System

---

[33] Remarkably, SMUD asserted in its amended complaint that the 1987 amendments to the NWPA constitute a breach of Standard Contract. This argument is both substantively wrong and moot. As noted above, the D.C. Circuit has unequivocally held that the Government was not obligated to have a permanent Federal repository by 1998. Indiana Michigan, 88 F.3d at 1275. Further, SMUD acknowledges that there is no rate of acceptance contained in the Standard Contract. Therefore, the MRS's 10,000 MTU SNF acceptance limit can not constitute a breach of the Standard Contract. Indeed, even if it somehow could, SMUD's claim is time-barred. 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.").

> (FWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU. This is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA.

DPFOF ¶ 126.

Accordingly, the rates of acceptance in the 1991 ACR were: 400 MTU in 1998, 600 MTU in 1999, then 900 MTU each year until 2007. DPFOF ¶ 127. These assumptions totaled 8200 MTU for the first 10 years of performance of the Standard Contract. DPFOF ¶ 127.[34]

DOE made the same assumptions regarding commencement of acceptance at an MRS with a statutorily mandated limit in its December 1990 addendum to the May 1989 Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management ("1990 Addendum"). In that publically issued document, DOE assumed commencement of acceptance at an MRS and further stated:

> This analysis continues to assume . . . that the capacity limits on the MRS facility of 10,000 MTUs prior to the start of operations at the repository and 15,000 MTUs thereafter, as imposed by the Amendments Act, remain in effect.

PX 189 at 10. DOE's 1990 Addendum assumed acceptance rates of 400 MTU for 1998 and 1999, and 900 MTU thereafter through 2010, when the Federal Repository was to commence operation.[35]

[34] Because the Standard Contract only required DOE to set forth acceptance rates for a ten year period, the 1991 ACR did not set forth specific acceptance rates for 2008 and 2009. Acceptance rates of 900 MTU for each of those years, however, would be consistent with the 10,000 MTU limit established by the 1987 Amendments to the NWPA.

[35] This acceptance rate was identical to the rate set forth in DOE's 1991 ACR except for 1999, where the ACR assumed an acceptance rate of 600 MTU, compared to the Addendum rate for that year of 400 MTU. PX 231 at HQ 0003598; PX 189, at A-1.

Both the 1991 ACR and the 1990 Addendum made clear that although the 1987 amendments to the NWPA required that the MRS be delayed until after approval of construction authorization for the Federal Repository, which was not anticipated until 2007, DOE would be able to break the schedule linkages between the MRS and the Federal Repository thus permitting the MRS to open in 1998. PX at HQ 0003592, 97; PX 189 at 10.

Further, the planning documents upon which SMUD relies uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes. DPFOF ¶¶ 117, 122, 134, 135. Each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations. DPFOF ¶ 123. Although SMUD appears to rely in part upon the 1985 Mission Plan and its drafts to establish DOE's "intent" to accept SNF at a 3,000 MTU annual rate, several commenters, prior to the promulgation of the final Standard Contract, had requested that DOE add a contract provision obligating itself to accept SNF at whatever rates were identified in the Mission Plan. DPFOF ¶ 114. However, DOE intentionally declined to create any such obligation. DPFOF ¶¶ 116, 118-120, 132, 133.[36] SMUD has identified no language in which

[36] Importantly, the 1985 Mission Plan upon which SMUD relies was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3) After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. SMUD's reliance upon documents prepared for Congress that relate to possible

DOE somehow agreed or even suggested that the acceptance rates in any planning documents which DOE issued were contractually binding or constituted anything other than DOE's hopes and goals for its waste management program.

The Court of Claims has recognized that, "[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 558–59, 405 F.2d 1256, 1263 (1969); see Barseback Kraft AB v. United States, 121 F.3d 1475, 1481 (Fed. Cir. 1997) (rejecting plaintiff's contention that statements of intent are simply aspirational, and do not rise to the level of a contractual obligation); see Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("the Railroad's historical practice – which has not been incorporated in any written pronouncement for the information of the public – could not modify the plain language of the sales contract between the plaintiff and the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose"); The Federal Group, Inc. v. United States, No. 02-70C, 2005 WL 1797042, at *17 (Fed. Cl. July 29, 2005) (explaining distinction between expressions of intent and contractual obligations). Because DOE has never obligated itself to satisfy a 3,000 MTU acceptance rate, the Court cannot incorporate such a requirement into the Standard Contract.

circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

C. To The Extent That The Court Finds It Necessary To Define A Rate Of SNF Acceptance For The Standard Contract, The Acceptance Schedule To Which DOE Could Be Held To Perform Could Not Exceed The Rates Contained In The DCSs That It Approved

To the extent that the Court finds it necessary to define a specific rate of SNF acceptance applicable to the Standard Contract, the maximum rate that it can identify should be by reference to the DCSs that SMUD submitted and DOE approved. In its June 26, 2003 decision upon the Government's motion for summary judgment, the Court placed the issue of the meaning and effect of the DCSs in issue for trial in this case. In its decision, the Court relied upon this Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), in which the Court found that "plaintiff's submission and defendant's acceptance of the proposed DCSs did not create a contractually binding obligation for either party." Id. at 666. However, even if DCSs were not "contractually binding," that fact does not render the submission of DCSs meaningless. To the contrary, under the acceptance mechanism of the Standard Contract, a contract holder had to submit a DCS to DOE for a specific amount of SNF 63 months in advance of the date upon which it wanted DOE to accept that amount of SNF. 10 C.F.R. § 961.11, Art. V.B.1. Under the Standard Contract, if the contract holder did not submit that DCS in a timely manner, the contract holder would not have satisfied the contract prerequisites and requirements for scheduling SNF deliveries and acceptances.

Although SMUD and numerous other contract holders submitted DCSs that DOE approved, SMUD appears to believe that, regardless of those submissions, it had some right to some greater acceptance of SNF beginning in 1998. Yet, it failed to present any evidence at trial regarding how it, or any other contract holder, would have been able to legally obligate DOE, in 1998, to accept significantly more SNF than that identified in previously approved DCSs. Under

its theory of the contract, had DOE begun SNF acceptance in 1998, apparently all of the previously approved DCSs would have been worthless, and DOE would somehow have accepted SNF in substantially greater quantities than those to which it previously had agreed. In essence, SMUD simply reads the 63-month notice requirement in the acceptance schedule contract provisions out of the contract, in violation of standard contract interpretation principles. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

SMUD's attempts to obtain damages based upon acceptance obligations that far exceed any commitments that DOE made when approving DCSs 63 months before SNF acceptance was to commence are unsupported. Under the 900 MTU rate of acceptance contained in the DCSs submitted by SMUD, DOE's last acceptance of SMUD's standard SNF would have been in 2019. DPFOF ¶ 137.

## IV. SMUD's CLAIM THAT IT WOULD HAVE HAD EARLY FUEL-OUT DATES BECAUSE DOE WOULD HAVE GRANTED IT PRIORITY AS A SHUTDOWN REACTOR AND/OR BECAUSE IT WOULD HAVE ENGAGED IN EXCHANGES IS UNSUPPORTED BY ANY EVIDENCE

SMUD contends that the 2006 date about which Ms. Supko opined as SMUD's last acceptance date would in fact be escalated had SMUD utilized several provisions in the Standard Contract. Specifically, SMUD contends that, had it utilized the provision in the Standard Contract for priority for shutdown reactors, or engaged in the exchange of acceptance rights with other utilities, SMUD could have moved up in the acceptance queue. However, as explained below, SMUD has failed to meet its burden of establishing that it would have been able to take advantage of either of these contract provisions. Further, SMUD failed to provide any evidence at trial as to how the use of such provisions would have affected SMUD's acceptance schedule.

Consequently, SMUD cannot establish that it would have had earlier acceptance rights from DOE under the priority or exchange provisions of the Standard Contract.

A. SMUD Failed To Meet Its Burden Of Establishing That It Would Have Obtained Priority As A Shutdown Reactor

SMUD argues that the Court should find that DOE was obligated to provide, or would have provided, priority in acceptance to its SNF because of its status as a shutdown reactor. Although Article VI.B.1(a) provides that "acceptance priority shall be based upon the age of the SNF and/or HLW . . .," it contains an exception to that general rule: "Except as may be provided for in subparagraph (b) below . . . ." 10 C.F.R. § 961.11, Art. VI.B.1(a). Subparagraph (b) of Article VI.B.1 defines that exception: "Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." Id. (emphasis added). However, this provision provides DOE with the discretion, not the obligation, to provide a contract holder with a shutdown reactor priority in the SNF acceptance queue. DPFOF ¶ 138; see Huston v. United States, 956 F.2d 259, 262 (Fed. Cir. 1992) ("[w]hen, within the same statute, Congress uses both "shall" and "may," it is differentiating between the mandatory and discretionary tasks"); Green v. Gen. Services Admin., 220 F.3d 1313, 1318 (Fed. Cir. 2000) (agency had discretion to permit employee to withdraw from separation agreement because regulation uses the word "may"); Hubbard v. Merit Systems Prot. Board, 205 F.3d 1315, 1320 (Fed. Cir. 2000) (words such as "may" show intent to provide broad discretion).

The documentary evidence presented at trial firmly established that, prior to this litigation, SMUD recognized that DOE is entitled to exercise its discretion in granting priority. DPFOF ¶ 139. As previously discussed, in interpreting the requirements of a contract, the

behavior of parties before the "advent of controversy" is often more revealing than the contract language alone, Omni, 41 Fed. Cl. at 591, and a "principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City, 697 F.2d at 1058. For example, in a 1991 memorandum from Ms. Bowser to Mr. Shetler, Ms. Boswer projected DOE's acceptance of SMUD's SNF, and assumed that "no preferential treatment is given SMUD regarding their position in the acceptance queue." DX 249. Similarly, in August 1993, Mr. Shetler wrote a letter to Mr. Ferreira stating that "the likelihood of DOE agreeing to [the request for shutdown priority] is very doubtful," in part because "the pressure will be on DOE to move spent fuel out of operating plants before they deal with prematurely shutdown plants on any kind of expedited basis." DX 425, at SMUD 0027391.

In fact, even when SMUD ultimately requested that DOE grant it priority acceptance in 1991, SMUD recognized that "DOE has not determined whether or not such priority will be accorded to shutdown reactors, or if priority is granted, under what circumstances." PX 211. SMUD's current interpretation of the priority provision conflicts with its pre-litigation interpretation.

As previously explained, this Court cannot base a damages award upon a belief that DOE "would have" or "might have" exercised its discretion in a certain way, but instead must award damages based upon DOE's failure to perform its actual obligations. See Marketing & Management, 62 Fed. Cl. at 130-31. Even if it could, the evidence at trial in this case confirmed that DOE's consistent position in rejecting priority for shutdown reactors has been wholly

reasonable. The majority of utilities have been opposed to priority for shutdown reactors, DX 215; PX 849, and Mr. Zabransky explained at trial the reason for such opposition:

> [Priority for shutdown reactors] was being raised because, under the contract, DOE was permitted to grant priority to shutdown reactors, and amongst the utilities, there was a lot of discussion and concern about that because, for operating reactors, there was a concern that the only way for DOE to grant priority to the shutdown reactors was to short the operating reactors, since there's a finite amount of capacity and that since the contract also contained provisions that allowed utilities to exchange places in line with DOE approval, that if DOE started allocating capacity to shutdown reactors, that would render that part of the process not meaningful.
>
> So the shutdown, the operating reactors had an opinion, the shutdown reactors had an opinion that differed from them, and it was an issue that the group thought about.

Tr. 1625:12-1626:3 (Zabransky); Def. Counter-Designation of R. Milner, Tr.73:15-24 (5/8/02) (explaining that outcome of discussions between DOE and members of the industry was that oldest fuel first priority should be utilized instead of priority for shutdown reactors); Def. Counter-Designation of R. Milner, Tr.206:10-13, 208:16-19 (5/18/02) ("Well, I think that the view held by a large number of utilities were that any priority afforded a shutdown reactor would aversely affect them," and this was true regardless of what the rate of acceptance was); Def. Counter-Designation of N. Slater, Tr.55:6-12 (4/21/99) (explaining that "[t]o afford priority to a shutdown reactor was to impede the ability of another utility to deliver. And the group was very divided in terms of whether a shutdown priority should be provided."); Counter-Designation of L. Barrett, Tr.364:11-19 (5/15/02) (explaining that granting priority to a shutdown reactor would necessarily result in schedule impact to other utilities).

Indeed, as early as May 1990 – eight years before the Government was obligated to begin the acceptance of SNF on an industry-wide basis – the Edison Electric Institute ("EEI"), a nuclear industry organization, expressed its disagreement with SMUD's view regarding the use of the priority provision. DX 1366. In a May 30, 1990 letter to the EEI/UWASTE steering committee, Steven Kraft, the director of Nuclear Waste and Transportation Activities for EEI stated:

> On March 30, the General Manager of the Sacramento Municipal Utility District wrote to Secretary Watkins. Since Rancho Seco has been shut down, SMUD has been investigating possible ways to reduce their expenditures and operations on site. They are currently considering placing the fuel in dual purpose casks, and they are interested in DOE cooperation in a demonstration project. SMUD has also been working with their Representatives in Congress to obtain direction from DOE to carry out such a project.
>
> <u>EEI/UWASTE is very concerned about these efforts to gain special treatment for one reactor, and to provide priority to a shutdown reactor; the ACR Response Team reviewed the SMUD position and had no sympathy whatsoever for it. We will continue to express our position to DOE.</u>

DX 1366, at SMUD 0036648 (emphasis added). Ms. Supko admitted at trial that this letter was consistent with her recollection as to the view of operating utilities with respect to the priority provision of the Standard Contract in the early 1990s. DPFOF ¶ 142. In fact, Ms. Supko expressed this identical view in a memorandum she wrote to the head of UWASTE in May 1992, in which she stated, "[i]t should be noted that while priority for decommissioned reactors would benefit those plants that have shutdown in the early 1990s . . ., by removing spent fuel from those sites at a faster rate than if no priority were granted, such a priority would increase the average time following decommissioning that spent fuel would remain stored at other plant sites on an industry-wide basis." DPFOF ¶ 143. Ms. Supko's litigation-inspired opinion that DOE

would have granted priority for shutdown reactors should be rejected. Accordingly, SMUD failed to prove that DOE was obligated to grant it priority acceptance and cannot base an increased damages award upon the priority provision.

In any event, even if it established that DOE was obligated to grant priority, SMUD failed to present any testimony or evidence concerning what effect the grant of priority in SNF acceptance would have in terms of DOE's acceptance of SMUD's SNF. In fact, Ms. Supko admitted at trial that she did not conduct any analysis to determine how much earlier SMUD would have had its SNF accepted by DOE had DOE granted such a request for priority. DPFOF ¶ 144. Therefore, even if SMUD could establish that it would have sought, and DOE would have granted, priority based upon SMUD's status as a shutdown facility, SMUD failed to meet its burden of establishing the affect upon SMUD's acceptance schedule had such a provision been utilized.

B. SMUD Failed To Establish That It Would Have Engaged In Exchanges, Or How Such Exchanges Would Have Affected Its Acceptance Rights

Similar to its argument concerning priority for shutdown reactors, SMUD contends that the 2006 final acceptance of SNF projected by Ms. Supko would have occurred even earlier had SMUD engaged in exchanges of acceptance rights with other utilities. Like its argument concerning priority for shutdown reactors, SMUD failed to meet its burden of establishing that SMUD would have engaged in exchanges of SNF acceptance rights, or what impact such exchanges would have had in the acceptance of SMUD's SNF.

Although exchanges of approved delivery commitment schedules are permitted under the Standard Contract, such exchanges are expressly subject to DOE's approval:

> Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; provided, however, that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. Not less than six (6) months prior to the delivery date specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

DX 88, Art. V. E (emphasis in original and emphasis added). Indeed, DOE does not have to approve exchanges of approved delivery commitment schedules, and may reject such proposed exchanges for many reasons. See DPFOF ¶ 147; Defendant's Counter-Designation R. Milner, at Tr.435:16-436:5 (5/3/02) (explaining that, based upon DOE's preference to take older, cooler fuel, DOE potentially could reject request by utility in possession of 20-year-old fuel to exchange an approved DCS with a utility that in possession of five-year-old fuel); Defendant's Counter-Designation N. Slater, at Tr.196:1-197:19 (4/21/99) (discussing factors for considering exchanges, including available acceptance capacity, the location of the two utilities who wish to engage in exchange, and transportation-related issues).[37]

---

[37] Although the Standard Contract permits, subject to DOE approval, the exchange of approved delivery commitment schedules, the approved delivery commitment schedules only extend through the first 10 years of the Federal waste acceptance program. See DX 88, Art. IV.B.5, Art.V.B.1 (stating that, after DOE has issued the 1991 ACR, which contains the first 10 years of acceptance for the Federal waste acceptance program, utilities are to submit DCSs 63 months in advance of DOE's acceptance of the utility's SNF).

SMUD failed to present at trial any witness or contemporaneous documents concerning SMUD's desire to engage in exchanges with other utilities in the DOE acceptance queue. Further, SMUD failed to present at trial any witness or contemporaneous document identifying with whom SMUD would have engaged in exchanges of delivery commitment schedules. The only evidence SMUD presented concerning exchanges is that, in the non-breach world, utilities generally could have engaged in exchanges of acceptance rights. This is plainly insufficient to meet its burden in this case.

Although SMUD presented expert testimony from Ivan Stuart concerning exchanges, he admitted during cross-examination that he has never previously testified as an expert with respect to exchanges of SNF acceptance dates. DPFOF ¶ 148. Indeed, Mr. Stuart acknowledged that he has never previously modeled a world where exchanges of SNF acceptance rights would occur, and did not endeavor to provide such a model in this case. DPFOF ¶ 148. Mr. Stuart testified that, although he reviewed depositions from SMUD employees in preparing his expert report, he found no mention or discussion of exchanges by any of these deponents. DPFOF ¶ 148. Further, although Mr. Stuart testified that he believed exchanges would work in a manner similar to the exchange of uranium, Mr. Stuart also admitted that: (1) he has never been qualified as an expert with respect to the propriety of uranium exchanges;[38] (2) he did not perform any written analysis in reaching this conclusion; and (3) the bases for his conclusion were statements others at his former company, NAC, made, and he did not consult with those individuals when he prepared his direct testimony. DPFOF ¶ 149. Consequently, Mr. Stuart's

[38] Indeed, Mr. Stuart admitted that he did not even include a reference to uranium exchanges in his expert report. Tr.1420:17-20 (Stuart). For this reason alone, Mr. Stuart's testimony regarding exchanges should be disregarded.

testimony cannot establish either that SMUD would have engaged in exchanges in the non-breach world, or what effect exchanges would have had regarding SMUD's position in the DOE acceptance queue.

Similarly, although Ms. Supko contends that if SMUD chose to utilize the exchanges provision of the Standard Contract, "it is likely that spent fuel could have been removed from the Rancho Seco site earlier than the 2006 date," Direct Testimony of Ms. Supko, ¶ 107, she admitted at trial that she did not perform any analysis regarding the effect of exchanges on SMUD's fuel outdates. DPFOF ¶ 150. Indeed, Ms. Supko acknowledged that in modeling her "non-breach" acceptance scenario, she did not endeavor to model a "non-breach" exchanges market. DPFOF ¶ 150. Ms. Supko admitted at trial that she did not endeavor to identify which utility would move down in the acceptance queue had SMUD engaged in exchanges. DPFOF ¶ 150. Ms. Supko also acknowledged that she conducted no written analysis in reaching her conclusion that the exchanges market for SNF would function in a similar manner to the uranium market. DPFOF ¶ 150. Indeed, Ms. Supko conceded at trial that she has never endeavored to perform an analysis to compare how the SNF and uranium exchanges markets would be similar or dissimilar. DPFOF ¶ 150.[39] Even if this Court were to accept Ms. Supko's qualifications to opine about the nature of the potential exchanges market in the non-breach world, Ms. Supko's testimony failed to establish: (1) that SMUD would have engaged in exchanges in the non-breach world; or (2) the effect of such an exchange on SMUD's overall acceptance rights. Consequently, SMUD has failed to meet its burden of establishing an otherwise earlier

---

[39] Notably, Ms. Supko does not have a degree in economics and has never been qualified as an expert in market theory or market development. DPFOF ¶ 150.

acceptance scenario for SMUD, and the Court should reject SMUD's arguments concerning the use of priority for shutdown reactors and exchanges.[40]

## V. EVEN IF THE COURT CONCLUDES THAT DOE'S DELAY IN ACCEPTANCE OF SMUD's SNF CAUSED SMUD TO CONSTRUCT DRY STORAGE, MANY OF SMUD's CLAIMED DAMAGES ARE NOT RECOVERABLE

### A. Assuming That The Court Accepts All Of The Premises Underlying SMUD's Damages Claim, SMUD Still Is Required To Prove That Each Of Its Alleged Costs Were Incremental To The Breach, Are Adequately Supported, Are Reasonably Certain, And Are Reasonable In Amount

Even assuming that the Court accepts all of the premises underlying SMUD's argument concerning causation related to its pursuit of dry storage, SMUD still bore the burden of proving

---

[40] Mr. Stuart stated in his direct testimony that it is "reasonably likely that had DOE been performing under the Standard Contract, all of SMUD's SNF would have been removed in the first 4 or 5 years of the program," and that this would have been accomplished through some amorphous and undefined combination of priority for shutdown reactors, exchanges, and transportation campaigns. Direct Testimony of Ivan Stuart, at ¶ 32-33. As explained above, Mr. Stuart provided no analysis concerning how exchanges would work in the non-breach world, and he provided absolutely no testimony concerning how SMUD's acceptance rights would be impacted by the priority provision of the Standard Contract. Further, Mr. Stuart conceded at trial that he did not analyze the order in which campaigns would have occurred in the non-breach world. DPFOF ¶ 153. Mr. Stuart's unsupported conclusion that it was "reasonably likely" that SMUD's SNF would have been accepted in the first four to five years of the DOE program should be rejected. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999) (affirming trial court's rejection of expert for unreliable methodology).

Further, as we established at trial, the Standard Contract does not contain any provision that would permit to transportation campaigns. DPFOF ¶ 153. Mr. Stuart agreed that acceptance rights under the Standard Contract are dictated by the oldest fuel first principle. DPFOF ¶ 153a. Yet Mr. Stuart conceded that, under his concept of a transportation campaign, if DOE accepted all of a utility's SNF in a single campaign, then another utility would not have its oldest fuel accepted by DOE. DPFOF ¶ 153a. Indeed, Mr. Zabransky explained at trial that, although transportation campaigns potentially could be more efficient than accepting SNF on a strict oldest fuel first basis, no utility wanted to be placed later in the acceptance queue as a result of campaigns. DPFOF ¶ 153b. Simply stated, Mr. Stuart's notions of a campaign are in direct conflict with the requirements of the Standard Contract.

at trial that each of its claimed damages is recoverable with admissible evidence. SMUD bore the burden of establishing that each of the claimed damages is incremental to DOE's partial breach, and that, had there been no delay, SMUD would not have incurred those costs. Willems Indus., 155 Ct. Cl. at 376, 295 F.2d at 831 (damages must be caused by the breach). SMUD also bore the burden of providing appropriate documentary or other support from its records to establish its damages claims. Roseburg, 978 F.2d at 667 (plaintiff must provide adequate support for claimed costs). Finally, SMUD bore the burden of establishing that its alleged damages are not speculative. San Carlos, 111 F.3d at 1563 (plaintiff may not recover speculative damages). If SMUD failed to meet its burden with regard to any particular claimed damage, it cannot recover that claimed damage, and SMUD cannot place upon the Government the burden of disproving a presumption that each of its damages are adequately supported and reasonably certain. See Quiman, 39 Fed. Cl. at 183. The burden of proof in this case lies squarely on SMUD. As we explain below, SMUD has failed to meet its burden.

B. To The Extent The Court Views SMUD's Decision To Place Its SNF Into Dry Storage As An Attempt To Mitigate Its Alleged Damages, SMUD Has Failed Properly To Mitigate

1. Had SMUD Left Its SNF In Its Wet Pool, It Would Have Incurred No Costs That Are Attributable To The Government's Breach

SMUD contends that its decision in the early 1990s to place its SNF into dry storage was an attempt to mitigate its alleged damages as a result of the uncertainty of the Government's ability to begin performance in 1998. Pl. Br. 1-2. Even if the Court concludes that SMUD's actions constituted an attempt at mitigation, as discussed below, such mitigation should be deemed both failed and unreasonable.

As we demonstrated at trial, SMUD had other, significantly less costly options than the pursuit of dual-purpose dry storage. For example, Mr. Shetler testified at trial that, from a technical basis, SMUD could have left its SNF in its wet pool. DPFOF ¶ 155. Indeed, SMUD's own expert, Ivan Stuart, agreed that SNF can be stored safely in wet storage over extended periods of time. DPFOF ¶ 156. Further, Mr. Shetler admitted at trial that the number of fuel assemblies in the pool does not dictate the amount of operations and maintenance costs. DPFOF ¶ 157. In other words, had SMUD left its SNF in its wet pool, it would have avoided the substantial capital costs it incurred in pursuing dual-purpose dry storage, and it would have maintained the same level of operation and maintenance through the last acceptance of its SNF by DOE. DPFOF ¶ 159. Consequently, even if the Court were to accept Ms. Supko's opinion that SMUD's last acceptance would have occurred in 2006, SMUD would not have incurred <u>any</u> damages had it left its SNF in its wet pool until, at the earliest, 2007. As we established at trial, rather than leave its SNF in its wet pool, SMUD chose, for business reasons, to spend in excess of $70 million dollars to place its SNF into a "first-of-its-kind" dual-purpose dry storage. Under these circumstances, even if the Court were to conclude that SMUD's decision to pursue dual-purpose dry storage constituted mitigation, such mitigation is unreasonable as a matter of law.

To determine whether an attempt at mitigation is appropriate, courts consider whether a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid certain damages. <u>Koby v. United States</u>, 54 Fed. Cl. 493, 497 (Fed. Cl. 2002). It is undisputed that losses that a party could have limited or avoided without undue risk, burden, or humiliation "are not recoverable." <u>Restatement (Second) of Contracts</u> § 350(1). Further, like any contracting party responding to a contract breach, SMUD has an affirmative obligation to

mitigate its damages and to do so "at the least cost to the defendant." LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003); see Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 713 (1975) (quoting Restatement of Contracts, § 329, cmt. a). The "least cost" principle implements the general test for the mitigation of damages that "a party cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002); see Phillips v. United States, 230 Ct. Cl. 805 (1982) ("plaintiff has the burden to show that he sought to minimize his losses and mitigate the damage as much as possible").[41]

SMUD suggests in its post-trial brief that, had it continued storing SNF in its wet pool, it would have incurred even greater damages. Pl. Br. 51. The basis for SMUD's assertion appears to be that, had it continued the wet pool, SMUD could have claimed as damages the operation and maintenance costs associated with the wet pool beginning in 1998. Pl. Br. 53. SMUD is mistaken. SMUD is responsible for the operation and maintenance costs associated with whatever storage technology it decided to use until DOE's last acceptance of SMUD's SNF in the non-breach "but for" world. DPFOF ¶ 158. In other words, even if SMUD's 3,000 MTU

---

[41] SMUD cites to the Federal Circuit's recent, non-final, decision in Home Savings of America v. United States, 399 F.3d 1341 (2004), for the proposition that "the non-breaching party is not required to mitigate damages in the 'cheapest form' possible or at the 'least cost' to the defendant." Pl. Br. 14. Plaintiff has misstated the Federal Circuit's decision in Home Savings. In Home Savings, the plaintiff had historically maintained a particular margin between its actual regulatory capital and the minimum required by the Government. 399 F.3d at 1352. The Government claimed that the plaintiff could have reduced the size of its "cushion," which would have been less costly than raising capital. Id. at 1353. The Federal Circuit simply held that it was reasonable for the plaintiff in that particular case to maintain its historic business practice of maintaining the size of its cushion. Id. The Federal Circuit neither expressly nor implicitly overruled the well-established principle that mitigation must be both reasonable and at the least cost to the breaching party.

acceptance rate argument were accepted, SMUD would have been responsible for its storage costs until at least the end of 2006. Therefore, to date, SMUD would still be solely responsible for its operation and maintenance costs, and SMUD's contention that its "damages" would be substantially higher had it stayed wet is simply wrong.[42] Because SMUD could have left its SNF in its wet pool – and consequently would be entitled to no damages – but instead decided to spend tens of millions of dollars on a first-of-its-kind technology, SMUD's mitigation is unreasonable under the circumstances.

2. Because The Government Is Obligated To Provide Transportation Casks Under The Standard Contract, SMUD's Pursuit Of Casks That Contain Transportation Features Cannot Constitute Proper Mitigation

Even if the pursuit of dry storage generally constituted reasonable mitigation, the type of dry storage that SMUD pursued was unreasonable. Mr. Shetler admitted at trial that, in the early 1990s, storage-only casks were being used by other utilities. DPFOF ¶ 161. In fact, SMUD was one of the first utilities to pursue dual-purpose dry storage. DPFOF ¶ 162. As the Court explained in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 2005 WL 2173563 (Fed. Cir. Sept. 9, 2005), "DOE was responsible for transportation, so the cost of a combination system was not necessary." Id. at 658 (citing Standard Contract, Art. IV(A)(2)(a)-(c)). Indeed, SMUD's own expert, Ms. Supko, agreed at trial that, in both the "but for" and breach worlds, DOE is obligated to provide transportation casks to utilities. DPFOF ¶ 163. At

[42] Similarly, SMUD notes in its brief that it is not claiming to recover "the tens of millions of dollars that it spent storing its spent fuel in the wet pool through 2002 or the approximately $300 million it has spent on decommissioning." Pl. Br. 3. Of course, such costs plainly are unrecoverable because, as mentioned above, they are costs that were SMUD's responsibility in the non-breach world.

her deposition, Ms. Bowser explained why SMUD decided to pursue casks that had transportation features despite the fact that DOE was obligated under the Standard Contract to provide transportation casks:

> The reason that we were . . . pursuing the investigation of alternatives on transportable systems was to eliminate as many road blocks as possible towards DOE not fulfilling its obligation to remove fuel.
>
> Certainly through the demonstration program we saw earlier, we though that would be a useful contribution to DOE's ability to move forward.

DPFOF ¶ 164. In other words, and as we discussed above, SMUD believed that by placing its SNF into dual-purpose dry storage, it would increase the changes of early acceptance by DOE. Under these circumstances, SMUD's usurpation of the Government's contractual obligation cannot be deemed reasonable mitigation.

Jerry Burford, the Government's technical expert, developed a methodology for extracting transportation-related costs from SMUD's damages claim. DPFOF ¶ 165. In conjunction with the Government's damages expert and accountant, Stephen Kiraly, the Government determined that the total costs associated with the transportation-related aspects of SMUD's dry storage system totaled $17,038,533. DPFOF ¶ 165.[43] Therefore, even if the Court

---

[43] At trial, SMUD sought to introduce the testimony of Ms. Supko and Mr. Stuart to establish that SMUD's pursuit of dry storage was reasonable. Ms. Supko and Mr. Stuart claimed that they were offering testimony concerning the reasonableness of SMUD's dry storage decision in rebuttal to the expert testimony of Jerry Burford. Tr.1521:9-25 (Supko); Direct Testimony of Ivan Stuart, at ¶ 3. However, as SMUD itself established at trial, and as the Government certainly agrees, Mr. Burford is not offering an opinion as to whether SMUD's decision to pursue dual-purpose dry storage was reasonable. Tr.2558:11-18 (Burford). Consequently, because Ms. Supko and Mr. Stuart's testimony are not proper rebuttal, as well as for the other reasons stated in the Government's motion in limine regarding Ms. Supko, the Court should strike paragraphs 14-17, 47-126, and 153-155, of Ms. Supko's testimony, and

concludes that SMUD's actions in pursuing dry storage generally constituted reasonable mitigation, the costs associated with its assumption of the Government's contractual obligation should be excluded from SMUD's damages claim.

3. SMUD Contention That A Dry Transfer System Was Not Viable Is Unsupported By The Record

SMUD claims that there is insufficient evidence to support the Government's argument that SMUD could have reduced its damages by supporting the construction of a dry transfer system. Pl. Br. 54-57. SMUD claims that DOE's efforts to develop a dry transfer system were "tentative" and that the cost of developing a dry transfer system would have been too

---

paragraphs 3-24 of Mr. Stuart's testimony. Rodriguez v. Olin Corp., 780 F.2d 491, 496 (5th Cir. 1986); see also United States v. Posey, 647 F.2d 1048, 1052 (10th Cir. 1981); Crowley v. Chait, 322 F.Supp.2d 530, 551 (D.N.J. 2004) (holding that rebuttal "is not 'an opportunity for the correction of any oversights in the plaintiff's case in chief").

Moreover, Ms. Supko lacks the requisite qualifications to opine upon whether the costs associated with a dual-purpose dry storage system are appropriate for inclusion in SMUD's damages claim. Ms. Supko has never provided testimony at trial in which she has estimated the dollar value of a plaintiff's damages claim, and has never been qualified as an expert in economic analysis or damages estimation. Tr.1545:14-21 (Supko). Further, Ms. Supko admitted that she drew no distinction between the reasonableness of SMUD's decision to pursue dual-purpose dry storage and the appropriateness of the inclusion of the costs associated with dual-purpose dry storage in SMUD's damages claim. Tr.1540:14-20 (Supko). Indeed, Ms. Supko conceded that she did not endeavor to conduct any sort of "but for" analysis in determining what costs are appropriate for inclusion in SMUD's damages claim. Tr.1541:21-25 (Supko). Ms. Supko's conclusion regarding the reasonableness of SMUD's decision was not even based upon SMUD's own decision making; rather, she based her conclusion upon "what was going on in the industry." Tr.1543:12-18 (Supko). Ms. Supko agreed that what SMUD believed at the time it made its decision to pursue dual-purpose dry storage was irrelevant to her conclusion that transportation costs are appropriate for inclusion in SMUD's damages claim. Tr.1547:9-15 (Supko). Of course, Ms. Supko also conceded that a utility's decision with respect to the storage of SNF is highly dependent upon that individual utility's particular facts and circumstances. Tr.1548:16-21 (Supko). In short, Ms. Supko has presented no legitimate methodology for the conclusions she has offered in this case. Consequently, Ms. Supko has failed to meet the requirements necessary to be deemed an expert with respect to the reasonableness of inclusion of costs in a damages claim. See Kumho Tire, 526 U.S. at 153.

"financially risky" for SMUD to undertake. Pl. Br. 56-57. However, the evidence shows that a dry transfer system was not constructed at Rancho Seco because SMUD failed to fulfill its obligations pursuant to its cooperative agreement with DOE. Further, that venture was not financially risky because DOE would have paid for the construction of a dry transfer system at Rancho Seco. DPFOF ¶ 178. DOE's efforts to build a dry transfer system are "tentative" only in the sense that Rancho Seco is not available for a license application.

The cooperative agreement between SMUD and DOE was part of a demonstration project which grew from SMUD's efforts to obtain Government assistance to develop its dual-purpose cask. DPFOF ¶¶ 166, 167. On March 30, 1990, having decided to pursue a strategy to place its SNF in a dual-purpose cask, SMUD sought DOE's assistance in licensing its dual-purpose casks by proposing a joint demonstration project. DPFOF ¶ 166. In addition to seeking assistance from DOE, SMUD lobbied Congress as well. DPFOF ¶ 167. After SMUD officials met with Congressman Fazio, the House Appropriations Committee recommended an appropriation of $3 million for DOE to engage in a demonstration project "in cooperation with a west coast utility which has a nuclear reactor permanently shut down due to a citizen's initiative [and which] has an immediate need for development of dual-purpose cask storage . . . ." DPFOF ¶ 167. Rather than simply appropriating funds, as SMUD had requested, the Conference Committee directed DOE to "develop a plan" to implement a cooperative research, development, and demonstration project. DPFOF ¶ 168.

In its efforts to develop a plan, DOE invited representatives from the National Academy of Sciences, the Electric Power Research Institute ("EPRI"), the National Association of Regulatory Utility Commissioners, and the Edison Electric Institute, as well as SMUD, to

provide input. DPFOF ¶ 169. SMUD proposed a project in which three casks would be purchased by DOE, loaded with SMUD's SNF, and stored until DOE assumed responsibility for the casks as well at the SNF within them. DPFOF ¶ 170. The proposal that DOE submitted to Congress was considerably different from the one advocated by SMUD. DPFOF ¶ 170. The primary feature of DOE's proposal was the construction of a dry transfer system "capable of transferring fuel assemblies from the [spent fuel] pool to a [transportable storage cask] or other storage cask, and from one [transportable storage cask] to another or from a storage-only cask to a transport-only cask . . . ."[44] DPFOF ¶ 170. While the successful vendor of the dry transfer system would provide the necessary documentation to "facilitate NRC approval of its use at the Rancho Seco site," DOE was to provide funding for the dry transfer system which, upon completion of the demonstration program, would be placed in safe storage for use at Rancho Seco. DPFOF ¶ 170. Congress funded DOE's plan beginning with fiscal year 1992 appropriations. DPFOF ¶ 172.

While developing the design for dry transfer system in conjunction with EPRI, DOE sent SMUD a solicitation on December 3, 1992. DPFOF ¶ 173. The solicitation expressly stated that the first objective of the demonstration project, "in order of importance" was:

> To demonstrate an NRC-licensed system for the dry transfer of spent nuclear fuel between 1) the pool and a dry spent fuel [transportable storage system] and 2) between two dry spent fuel [transportable storage system] transport units (licensed for long term storage followed by transportation). Meeting this objective will demonstrate the ability to recover from an off-normal occurrence at an ISFSI with and without the use of a reactor's spent fuel storage pool, may eliminate the need to maintain a

---

[44] It was noted that EPRI had already obtained a conceptual design for the dry transfer system. DPFOF ¶ 171.

> reactor pool for recovery from off-normal occurrences at an ISFSI, and will allow the use of a [dry transfer system] to transfer fuel from dry storage casks to transportation casks without the use of a reactor pool.

DPFOF ¶ 173. SMUD submitted a nonresponsive proposal to the solicitation suggesting, among other things, that the demonstration use dummy fuel assemblies instead of SNF and that the project deal with issues related to DOE's acceptance of failed fuel and multi-element sealed canisters ("MESCs"). DPFOF ¶ 174. DOE agreed to perform a demonstration of the dry transfer system using dummy fuel assemblies, but refused to change the scope of the project to deal with the failed fuel and MESC issues. DPFOF ¶ 175.

In the cooperative agreement signed at the end of 1994, SMUD agreed that the first objective of the demonstration project "in order of precedence" was:

> A. to facilitate the demonstration of an NRC-licensable system for the dry transfer of spent fuel between two TSSs (systems licensed for long term storage followed by transportation). Meeting this objective will provide a demonstration of the ability to recover from an off-normal occurrence at an ISFSI without the use of a reactor's spent fuel storage pool and associated fuel handling system. The demonstration may eliminate the need to maintain a reactor pool for recovery from off-normal occurrences at an ISFSI and will allow the use of a DTS to transfer fuel from dry storage systems to transportation casks without the use of a reactor pool.

DPFOF ¶ 176. The project was to proceed in two phases, with Phase I consisting of activities associated with the procurement of two dual-purpose casks and Phase II involving the procurement of a dry transfer system and using that system to demonstrate the transfer of spent fuel from one cask to another. DPFOF ¶ 177. Although DOE's commitment for the acquisition of dual-purpose casks in Phase I was limited to $2 million, DOE was responsible for the "full cost" of the dry transfer system in Phase II. DPFOF ¶ 178.

On September 25, 1996, after experiencing delays in the fabrication of the dual-purpose casks that were to be used for the demonstration project, SMUD requested that DOE amend the cooperative agreement to commit an additional $500,000 to complete the fabrication of the second dual-purpose cask. DPFOF ¶ 179. SMUD claimed it was under no obligation to continue work without additional funds and SMUD threatened that "the delivery of the DOE cask [was] at risk." DPFOF ¶ 179. DOE denied SMUD's request for additional funds. DPFOF ¶ 179. Through 1997, SMUD continued to experience delays in fabricating its dual-purpose casks, particularly after its cask vendor declared bankruptcy. DPFOF ¶ 180. In the spring of 1998, SMUD admitted that it could not deliver a licensed, dual-purpose cask to DOE for the $2 million that the parties had agreed upon. DPFOF ¶ 181. On September 30, 1998, DOE decided to negotiate a mutual termination of the cooperative agreement with SMUD. DPFOF ¶ 182.

In the meantime, DOE was proceeding with the process of developing the dry transfer system. DPFOF ¶ 183. DOE submitted a topical safety report, the initial submission in the licensing process, to the NRC on September 30, 1996. DPFOF ¶ 183. Because it was unable to do so at Rancho Seco, DOE built a dry transfer system and performed a demonstration of that system at its Idaho facility in 1998-1999. DPFOF ¶ 184. On November 13, 2000, the NRC issued an assessment report in response to DOE's topical safety report and concluded that the dry transfer system had merit, but that it could not be licensed without information regarding the specific site where the dry transfer system would be used. DPFOF ¶ 185. DOE responded in September 2002 admitting that some information "can only be supplied by the applicant for a site-specific license." DPFOF ¶ 185.

The main reason the dry transfer system was not constructed at Rancho Seco is that SMUD hindered its development at every opportunity. Although SMUD might have preferred a simple subsidy for its dual-purpose cask, Congress chose to fund a project that focused upon the development of a dry transfer system. DPFOF ¶¶ 170, 172. DOE issued a solicitation which adhered to Congress' decision, but SMUD sought to change that purpose when negotiating the terms of its cooperative agreement. Even though the cooperative agreement that SMUD signed expressly provides that the primary goal was to develop a dry transfer system, SMUD's failure to develop its dual-purpose cask in a timely manner or for the amount of money that the parties had agreed upon forced DOE to proceed with the project on its own. DPFOF ¶¶ 176, 179, 183-184. Although DOE has not yet constructed a fully-licensed dry transfer system, the main reason the system has not been licensed is that the specific site that SMUD would have provided at Rancho Seco is now lacking. SMUD's claims that development of the dry transfer system was too financially risky ignores the simple truth that DOE would have paid for the cost of constructing a fully-licensed dry transfer system – there was no financial risk for SMUD to bear. DPFOF ¶ 178. SMUD's criticisms regarding the Government's dry transfer argument are simply wrong.

4. Even If The Court Concludes That SMUD Acted Reasonably In The Pursuit Of Dual-Purpose Dry Storage, SMUD Chose A More Expensive Dual-Purpose System

As we demonstrated at trial, another less expensive dual-purpose dry storage option was available to SMUD and the time it sought bids to construct its dual-purpose dry storage system. In fact, SMUD's own expert, Ivan Stuart, worked for NAC International, a company that had already gone through the pain and suffering of NRC review for its dual-purpose system. DPFOF ¶ 187. Mr. Stuart sought to sell its NAC-STC dual-purpose dry storage system to SMUD and,

when SMUD rejected NAC's bid, he warned SMUD that there were higher risks in terms of receiving a license for the NUHOMS system that SMUD ultimately pursued than had it pursued the NAC-STC system. DPFOF ¶ 188. Indeed, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system because the NUHOMS system was unlicensed. DPFOF ¶ 189. Indeed, Mr. Stuart was ultimately proven correct. In short, in 1992 when SMUD was seeking bids for its dual-purpose dry storage system, SMUD's own expert believed that SMUD did not make the right decision in pursuing the NUHOMS system. DPFOF ¶ 190.

The NAC-STC ultimately received its certificate for compliance for a Part 71 transportation license in 1994. DPFOF ¶ 191. In fact, Mr. Stuart testified that, had NAC had any customers for its NAC-STC, it could have been fully licensed as early as October 1994. DPFOF ¶ 192. Although Mr. Shetler and Mr. Redeker testified at trial that the NAC-STC would have had to have been relicensed or redesigned to hold SMUD's SNF, Mr. Stuart believed that it would be quite easy to have the NRC approve the NAC-STC for use with SMUD's SNF. DPFOF ¶ 193. Mr. Stuart also testified that, had SMUD chosen the NAC-STC, SMUD could have had all of its SNF fully loaded into dual-purpose dry storage by 1998. DPFOF ¶ 194. NAC's fixed-price bid was for $38 million. DPFOF ¶ 195.[45] Mr. Stuart agreed that, had SMUD purchased the NAC-STC system and fully loaded its SNF by 1998, the NAC-STC system would have paid for itself in five to seven years after loading was completed. DPFOF ¶ 195. In other words, if SMUD had pursued the NAC-STC system, SMUD's system would have been fully

[45] NAC provided SMUD a firm, fixed price bid that did not contain any provisions for additional funding. DPFOF ¶ 195.

paid for no later than 2005, a full year before the final acceptance of SMUD's SNF even under SMUD's unsubstantiated annual steady-state SNF acceptance rate of 3,000 MTU.

The NAC-STC system provided an additional significant benefit to SMUD. As we demonstrated in our response to the Court's Show Cause Order, by placing its SNF into MESCs, SMUD has placed its SNF into a form that is unacceptable under the Standard Contract. In contrast, the NAC-STC system did not involve the use of canisters, but rather utilized a bolted cask system. DPFOF ¶ 196. In fact, John Stobbs, the president of NAC, and Mr. Stuart's former superior, wrote a letter to General Manager Freeman shortly after SMUD awarded its contract to Pacific Nuclear, warning:

> Clearly the concept selected [by SMUD] is neither an accepted nor licensed technology. The DOE letter discusses the acceptability to DOE of the storage canister, known as MESC, of the type the District's staff has selected for its so-called dual purpose cask system. As you will note, the MESC is not acceptable to DOE for transportation off-site to the DOE spent fuel storage facility.

DPFOF ¶ 197.

Therefore, even if the Court concludes that SMUD's actions in choosing to place its SNF into dual-purpose dry storage was reasonable, its choice of dual-purpose vendors was clearly unreasonable. SMUD elected a dry storage vendor that not only had not been licensed, it chose a storage technology that resulted in all of its SNF being currently deemed unacceptable under the Standard Contract. Consequently, to the extent SMUD's dry storage plan generally is viewed as reasonable mitigation, its decision to pursue the NUHOMS system should be deemed failed or unreasonable mitigation.

C. The Fact That SMUD Possesses SNF Contained In MESCs, In Addition To GTCC Low Level Radioactive Waste And Failed Fuel, Which It Is Responsible For Storing Indefinitely, Precludes A Finding That SMUD Would Have Incurred No Continuing Storage Costs Or Dry Storage Construction Costs Absent DOE's Delay

As we demonstrated at trial, SMUD has placed its SNF into MESCs, which currently are an unacceptable waste form under the Standard Contract. Further, SMUD is in possession of Greater Than Class C low level radioactive waste ("GTCC"), which DOE is not obligated to accept under the Standard Contract. Finally, SMUD is in possession of failed SNF, which the Government may accept on a separate, later schedule than standard SNF. In other words, SMUD would have had to store its SNF stored in MESCs, GTCC low level radioactive waste, and failed fuel regardless of the timing of the Government's performance under the Standard Contract. Mr. Kiraly explained at trial that the cost of designing and building SMUD's ISFSI generally was a fixed cost that was not dependent upon the amount of SNF stored. DPFOF ¶ 200. SMUD's own expert, Ms. Supko, agrees with this conclusion. DPFOF ¶ 200. Consequently, Mr. Kiraly concluded that the cost associated with the design and construction of the ISFSI, $3,146,520, should be removed from SMUD's damages claim, because these costs would have been incurred regardless of the breach because of the presence of MESCs, GTCC low level radioactive waste, and failed fuel. DPFOF ¶ 202. Further, Mr. Kiraly explained that the cost of designing and fabricating the failed fuel canister should be removed from SMUD's damages claim because it is a cost SMUD would have incurred regardless of the Government's breach of the Standard Contract. DPFOF ¶ 223. Mr. Kirlay determined that the cost of designing and fabricating the failed fuel canister was $1,574,138. DPFOF ¶ 223. The removal of the cost of designing and building the failed fuel canister and ISFSI is $4,720,658. Direct Testimony of Stephen Kiraly, at

¶¶ 82-83 & Att. 11, 12. Because SMUD would have incurred those costs regardless of DOE's breach, these costs should be removed from SMUD's damages claim.

1. SMUD Has Placed Its SNF Into A Waste Container That Is Not Covered By The Standard Contract

As discussed in detail in the Government's response to the Court's show cause order, SMUD has placed its SNF into MESCs, which are not covered by the Standard Contract. Moreover, because SMUD has eliminated its wet pool, it currently does not have any means of transferring its SNF from the MESCs to an acceptable waste disposal container. Consequently, even had the Government accepted SMUD's SNF on a timely basis pursuant to the Standard Contract, SMUD is not willing, ready, and able to have the Government perform.

SMUD asserts in its post-trial brief that the Government's position that MESCs are not covered by the Standard Contract is both "new" and an attempt to avoid liability in this case. Pl. Br. 72-73. SMUD errs in this assertion. As stated above, in the early 1990s, SMUD recognized that by placing its SNF into MESCs, DOE's acceptance of such fuel would be uncertain. DX 425, at SMUD 0027390-91. Indeed, SMUD was so concerned about the possibility that its SNF contained in MESCs would not be acceptable that it conducted a reevaluation in 1993 to determine whether the cost of placing its SNF into dry storage was worth the risk that its SNF would not be accepted on the same schedule as other utilities' SNF. DPFOF ¶ 76.

Further, as explained in our response to the Court's show cause order, DOE's position on the acceptance of MESCs has remained entirely consistent. DOE repeatedly has informed SMUD that MESCs are unacceptable under the Standard Contract and, consequently, absent a contract modification, the SNF will have to be removed from SMUD's MESCs before DOE will accept SMUD's SNF. DPFOF ¶ 198. To date, no utility has sought a contract amendment to

permit the acceptance of MESCs. DPFOF ¶ 199. SMUD's assertions that DOE has somehow provided assurances that it would simply accept SNF contained in MESCs in the absence of a contract amendment and appropriate compensation are not supported by the record.[46]

Because SMUD's SNF will remain on-site until SMUD either places it into an acceptable waste container or negotiates a contract amendment, SMUD is not willing, ready, and able to have its SNF accepted. Consequently, DOE is no longer in breach of the Standard Contract. Further, as noted above, because SMUD's SNF is currently contained in unacceptable MESCs, SMUD would have incurred the cost of storage of its SNF regardless of the timing of the Government's performance. Therefore, the costs associated with designing and constructing SMUD's ISFSI should be removed from its damages claim. DPFOF ¶ 201.

2. SMUD Has Failed To Established That GTCC Low Level Radioactive Waste Is Covered By The Standard Contract, And Because SMUD May Have Been Required To Store GTCC Longer Than Its Standard Fuel In The Non-Breach World, SMUD Cannot Show That, "But For" The Government's Breach, It Would Not Have Incurred Costs Associated With The Storage Of SNF

As discussed in detail in the Government's Motion for Partial Summary Judgment Regarding Plaintiff's Greater Than Class C Waste, dated November 27, 2001 (Dckt. #92), SMUD possesses GTCC low level radioactive waste, which is not covered by the Standard Contract. DPFOF ¶ 203. SMUD claims that GTCC low level radioactive waste is actually

[46] Because DOE has never "assured" SMUD or any other utility that it would accept SNF contained in MESCs in the absence of a contract amendment and appropriate compensation, DOE's refusal to accept MESCs cannot result in a breach of the duty of good faith and fair dealing, as suggested by SMUD. Pl. Br. 73, n.30. Indeed, even if such an unqualified assurance were given, because MESCs are not covered by the Standard Contract, SMUD cannot point to any provision of the Standard Contract that DOE has violated by its refusal to accept MESCs.

covered by the Standard Contract, and that DOE is required to dispose of it on the same schedule as SNF, because the NRC has defined GTCC waste as HLW. SMUD's argument is wrong.

The Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPA"), Pub. L. No. 99-240 (codified at 42 U.S.C. §§ 2021b-2021i), rather than the NWPA, makes the disposal of GTCC a Federal responsibility. 42 U.S.C. § 2021c(b). However the LLRWPA does not identify any specific deadlines by which DOE must act to accept or dispose of GTCC low level radioactive waste. It further does not establish any specific deadlines by which DOE must enter into agreements with commercial utilities regarding their payment of the costs associated with the acceptance and disposal of their GTCC low level radioactive waste.

The LLRWPA also requires DOE to study and identify the options for insuring that "the beneficiaries of the activities resulting in the generation of [GTCC] bear all reasonable costs of disposing of such wastes." Id. § 2021c(b)(3)(E). The NRC has stated that "it is likely that a separate fund, similar to the HLW Nuclear Waste Fund, would be established to provide for payment of disposal costs by the generators of GTCC wastes, either as an advance fee or as a charge upon waste receipt." 54 Fed. Reg. 22,578, 22,580 (May 25, 1989). To date, DOE has not established a mechanism for recovering the costs of accepting and disposing of GTCC waste and, further, has not made any definitive determinations regarding the long-term disposal of GTCC low level radioactive waste. At trial, SMUD admitted that it had not paid any money pursuant to the Standard Contract for its GTCC. DPFOF ¶ 204.

In addition, Congress recently has directed DOE to designate an office to study GTCC low level radioactive waste disposal, to develop a plan for such disposal, and to report this plan to Congress. Energy Policy Act of 2005, Pub. L. No. 109-58, § 631(a)-(b), 119 Stat. 594 (2005).

Upon making its report to Congress, DOE is required to wait for further direction from Congress. Id. As this enrolled bill demonstrates, Congress does not view GTCC radioactive waste as HLW currently covered by the NWPA.

Despite the fact that DOE's obligations to accept and dispose of GTCC low level radioactive waste are explicitly governed by the LLRWPA rather than the NWPA, SMUD asserts that DOE is obligated to accept and dispose of its GTCC low level radioactive waste under the NWPA because GTCC is "high-level radioactive waste." The NWPA defines "high-level radioactive waste" as follows:

> (A) the highly radioactive material resulting from reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and
>
> (B) other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation.

42 U.S.C. § 10101(12) (emphasis added).

It is clear that, in its published final rules, the NRC has never "required" DOE to dispose of GTCC in "permanent isolation," has left DOE with the discretion to determine the most appropriate manner in which to recommend disposing of GTCC, and has affirmatively interpreted its own rules as not turning GTCC low level radioactive waste into HLW. See, e.g., 53 Fed. Reg. 17,709, 17,710 (May 18, 1988) ("[s]ince the possibility of using [an intermediate disposal] facility is left open, the Commission is not now determining that the [GTCC] wastes, even if highly radioactive, do in fact 'require permanent isolation;' accordingly, the NWPA definition of HLW does not apply"); 54 Fed. Reg. 22,578, 22,279 (May 25, 1989) ("GTCC wastes would not be classified as HLW under these amendments," emphasizing that "these

amendments preserve DOE's flexibility to pursue either one of these alternatives" [permanent isolation in a repository or intermediate disposal methods]); id. at 52,582 ("[t]he rule identifies one approved method [for GTCC disposal] if DOE so desires, but allows DOE to plan and develop an alternative method if DOE so desires, subject to Commission approval"). As a result, the NRC plainly did not "determine, by rule," that GTCC low level radioactive waste requires permanent isolation or that GTCC low level radioactive waste is highly radioactive.

Further, the NRC has issued a final rule concerning the licensing requirements for the interim storage of GTCC low level radioactive waste. See 66 Fed. Reg. 51,823 (Oct. 11, 2001). In this final rule, the NRC responded to two commentors who believed that the definition of GTCC low level radioactive waste should be changed, one proposing that GTCC be classified as SNF and the other that it be reclassified as HLW. Id. at 51,827. The NRC responded by stating that "[t]he NRC believes, at this time, that defining all GTCC waste as spent fuel or high-level waste . . . could lead to confusion and inefficiency." Id. at 51,828. It determined that, "[i]f GTCC waste is defined as spent fuel or high-level waste, DOE would be required to dispose of this waste in a deep geologic repository (e.g., Yucca Mountain) and would not have the flexibility to explore potentially more efficient disposal plans." Id. The final rule authorized the storage of GTCC low level radioactive waste in interim storage facilities, rather than requiring emplacement in a deep geologic repository. Id. at 51,825. In addition, the final rule reemphasized that, although "GTCC is generally unsuitable for near-surface disposal at low-

level waste (LLW)," it is still "considered as LLW," not highly radioactive material. Id. at 51,823.[47]

Given that the NWPA defines HLW as "other highly radioactive material that the [NRC] . . . determines by rule requires permanent isolation,"42 U.S.C. § 10101(12), the NRC's interpretation of whether it has determined GTCC to constitute HLW would be entitled to substantial deference. "[S]ubstantial deference is given to the agency's interpretation of its own regulations unless 'it is plainly erroneous or inconsistent with the regulation.'" Westberry v. Principi, 255 F.3d 1377, 1382 (Fed. Cir. 2001) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)). Deference is especially appropriate where Congress has explicitly delegated to the NRC the responsibility for making the highly technical determination of what constitutes HLW. See Glaxo Operations UK Ltd. v. Quigg, 894 F.2d 392, 399 (Fed. Cir. 1990) ("Significant deference is due to an agency's technical expertise when Congress has explicitly or implicitly delegated to the agency the making of scientific determinations."). See generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984) (holding that deference should be given to agency regulations when Congress expressly delegates to an agency the authority to make a particular determination).

SMUD asserts in its post-trial brief that it is "not pursuing its GTCC-related costs." Pl. Br. at 69. However, at trial, both Mr. Shetler and Mr. Redeker testified that SMUD's was going

---

[47] Although it would be inappropriate for the Court to consider parol evidence in interpreting the meaning of rules published in the Federal Register, to the extent that the Court accepts any evidence from SMUD regarding its beliefs about the meaning of the NRC's rules, the Court should equally consider that the NRC has reiterated its position that GTCC low level radioactive waste has not been defined as HLW and that the definition of HLW should not be changed to include GTCC low level radioactive waste. DX 1175 (noting that "the NRC has decided, consistent with past decisions, not to classify GTCC as HLW").

to store SMUD's GTCC in the 22nd HSM. DPFOF ¶ 206. In addition, SMUD asserted at trial that its claim includes its entire ISFSI pad, which obviously includes the 22nd HSM. DPFOF ¶ 206. As a result, SMUD is in fact claiming a portion of its costs associated with the storage of GTCC.

Because SMUD is responsible for the indefinite storage of its GTCC low level radioactive waste, it cannot pass to the Government those costs that it would have incurred regardless of DOE's delay in standard SNF acceptance. DPFOF ¶ 207. As the testimony at trial established, so long as SMUD has to store any GTCC low level radioactive waste on-site, it will be required to incur significant costs for that storage that are duplicative of the costs that SMUD would have to incur to store SNF. The removal of all standard SNF from SMUD will not eliminate the costs that it would otherwise have to incur to store its GTCC low level radioactive waste indefinitely. Consequently, SMUD cannot recover those non-incremental costs in this litigation.

3. Because SMUD Possesses Failed Fuel, And May Have Been Required To Store Such Fuel Longer Than Its Standard Fuel In The "But For" World, SMUD Cannot Show That, "But For" The Government's Breach, It Would Not Have Incurred Costs Associated With The Storage Of SNF

Because SMUD is in possession of failed fuel, even had DOE performed in a timely manner under the Standard Contract, SMUD may still have been required to store failed fuel for an indefinite period of time and, therefore, cannot demonstrated that, but for the Government's breach, it would not have incurred the costs associated with the storage of SNF. Therefore, contrary to SMUD assertions, the determination that SMUD has failed fuel is not only relevant to its damages claim, it is absolutely fatal.

Article VI of the Standard Contract sets forth the process that DOE and the utilities must utilize to meet the criteria for the disposal of SNF, including providing the classification criteria utilities are to use prior to shipping their SNF. DX 88, at SMUD 0020669; Tr.1659:16-25 (Zabransky). Section VI.B of the Standard Contract provides:

> DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel; however, for any SNF which has been designated by the Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

DX 88, at SMUD 0020670.

The Standard Contract provides three broad classifications of fuel: (1) Standard Fuel; (2) Nonstandard Fuel; and (3) Failed Fuel. 10 C.F.R. § 961.11, App. E, ¶ A. The term "failed fuel" is defined as "SNF that meets the specifications set forth in subparagraphs 1 through 3 or paragraph B below, and which is classified as Failed Fuel Class F-1 through F-3 pursuant to subparagraph 6 of paragraph B below." Id. Class F-1 through F-3 are defined as follows:

> Class F-1: Visual Failure or Damage
> Class F-2: Radioactive "Leakage"
> Class F-3: Encapsulated

DX 88, at SMUD 0020701. Further, the Standard Contract provides:

> Visual Inspection
>
> Assemblies shall be visually inspected for evidence of structural deformity or damage to cladding or spacers which may require special handling. Assemblies which [i] are structurally deformed or have damaged cladding to the extent that special handling may be required or [ii] for any reason cannot be handled with normal

> fuel handling equipment shall be classified as Failed Fuel – Class F-1.

DX 88, at SMUD 0020700.

As an initial matter, it is unrefuted that SMUD possesses F-2 failed fuel, as defined by the Standard Contract. DPFOF ¶ 212. At trial, SMUD presented the testimony of Ms. Supko and Mr. Stuart in an attempt to demonstrate that SMUD's failed fuel would be accepted on the same schedule as SMUD's standard fuel. Direct Testimony of Eileen Supko, at ¶¶ 21-22, 146-149; Direct Testimony of Ivan Stuart, at ¶ 42. Both Ms. Supko and Mr. Stuart concluded that because SMUD's SNF does not require special handling, there is no basis to believe that DOE would not accept SMUD's failed fuel on the same schedule as SMUD's standard fuel. Direct Testimony of Eileen Supko, at ¶ 67; Direct Testimony of Ivan Stuart, at ¶ 42; Tr.1395:24-1396:5 (Stuart) (stating that the definitions of failed fuel under the Standard Contract hinge upon the concept of special handling). However, this testimony completely misses the point.[48]

Mr. Stuart conceded on cross-examination that the special handing requirement did not appear in the definition of F-2 failed fuel, but rather only referenced the definition for F-1 failed fuel. DPFOF ¶ 215. In fact, Mr. Stuart agreed that he did not know what criteria DOE applies in making the determination with respect to the technical feasibility of accepting failed SNF.

---

[48] Ms. Supko testified that based upon her reading of the Standard Contract, "technically feasible" should be equated with the concept that special handling of the SNF is not required. DPFOF ¶ 214. However, Ms. Supko conceded at trial that there is no definition of the term "technical feasibility" contained in the Standard Contact. DPFOF ¶ 214. Ms. Supko is not an attorney, and her opinion concerning her interpretation of the Standard Contract is not proper expert testimony. See Blake Constr. Co. v. United States, 987 F.2d 743, 746 (Fed. Cir. 1993) (holding that "interpretation of a contract provision is an issue of law"); Greco v. Department of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988) (same).

DPFOF ¶ 215.[49] Further, Mr. Zabransky, the contracting officer of the Standard Contract, explained at trial the distinction between F-1 failed fuel and F-2 failed fuel:

> Well, F-1 fuels are fuels, again, where the idea is really more of a physically size or structural capability. F-2 fuels are leakage, so they may have no physical special handling, as far as needing a different tool, but they may have no structural deformities or structural integrity issues, but they may have holes in the cladding.

DPFOF ¶ 216. Mr. Zabransky further explained the distinction between technical feasibility and structural handling under the Standard Contract:

> In my mind, they're related, but they're not the same. We often sometimes get sloppy and use them interchangeably, but in reality, special handling just sort of tells you, you need a special procedure or a special tool. Having known that, you would then have to look to see if you have the technical feasibility to do that. For instance, even though you may need a special tool, and you can get the special tool, you may not have the licensing room, the approval to use that tool in your facility without changing your license.
> So the technical feasibility would still have to get looked at. The special handling really is a discriminator, so when you do you do your visual inspection, you can classify it as F-1 or not, if it didn't require special handling, even though it may have certain damage to it, you could see a tear in the grid strap, you would never classify it as F-1.

DPFOF ¶ 217. Mr. Zabransky explained that, unlike F-1 failed fuel, if a utility had F-2 failed fuel, DOE would have to ensure that it had the technical capabilities of disposing of it at DOE's facilities, that DOE's license would allow for such disposal, and that there were no health and safety issues associated with that particular F-2 failed fuel. DPFOF ¶ 218. Indeed, before DOE

---

[49] In an apparent effort to bolster Mr. Stuart's credentials, SMUD resorts to quoting the Government out of context regarding Mr. Stuart's experience with failed fuel. Pl. Br. 71. Although we did not dispute that Mr. Stuart may have experience with failed fuel, we correctly pointed out that such experience had nothing to do with the interpretation of how failed fuel would be handled under the Standard Contract. Tr.1450:4-11. Indeed, Mr. Stuart openly admitted his lack of expertise in this regard under cross-examination. Tr.1459:8-14 (Stuart).

could make a determination that particular F-2 failed fuel would be accepted, DOE would have to know the specific type or amount of leakage the fuel exhibits. DPFOF ¶ 219. In addition, DOE would have to have a licensed facility before it could know what types of fuel it was permitted to accept under that license. DPFOF ¶ 219. Therefore, Ms. Supko and Mr. Stuart's testimony concerning the lack of special handling required for SMUD's SNF fails to address the technical feasibility issues associated with SMUD's F-2 failed fuel.

Although DOE is required to accept and dispose of failed fuel and nonstandard fuel under the Standard Contract, DOE is expressly not obligated to accept such fuel under the same schedule as standard fuel. DPFOF ¶ 211. Instead, as mentioned above, DOE is entitled to remove other than standard fuel (including failed fuel) from the "oldest fuel first" priority ranking for acceptance of SNF and, at its discretion, to place it at the end of the acceptance queue for all contract holders' SNF. DX 88, Art. VI.A.2(b).

If DOE determines that failed fuel requires special handling or raises other issues of technical feasibility, its acceptance by DOE may be delayed, as permitted by the Standard Contract. DPFOF ¶ 220. Mr. Zabransky also explained at trial the consequence if a utility's SNF is determined not to be technically feasible. He stated that DOE would contact the contract holder as to what schedule change is needed to give DOE time to accept the fuel. DPFOF ¶ 220. Mr. Zabransky explained, "[i]n other words, if it wasn't technically possible, we'd have to take some more time and do what was necessary to make it technically safe, technically regulatory, to be approved to bring them in." DPFOF ¶ 220.

Similarly, Ronald Milner, the acting deputy director and chief operating officer for OCRWM, previously has explained the rationale for the potential delay in acceptance of failed fuel:

> And I guess just to use a hypothetical example, if you have some very, very badly failed fuel, and out of all the assemblies that we will accept, ultimately, if that's the only one that requires that type of handling, do you stop everything and try to deal with that one assembly or do you put if further back in the queue.
>
> You know, for example, if the requirement was that you had to physically put this in a hot cell and deal with it, that's a different matter than unloading a standard fuel assembly.

DPFOF ¶ 221.

Consequently, the fact that SMUD has F-2 failed fuel means that SMUD may have SNF on-site after the acceptance of its standard fuel. In other words, SMUD would have incurred many of the ISFSI design and construction costs for the storage of its failed fuel, even if DOE had accepted SMUD's standard fuel beginning in 2001. DPFOF ¶ 222. Thus, "but for" DOE's delay in beginning SNF and/or HLW acceptance, SMUD would still have been required to store failed and nonstandard fuel for a potentially indefinite period of time and, therefore, cannot recover costs resulting from its storage of failed fuel. See Fawick, 149 Ct. Cl. at 637.

Further, Mr. Burford provided unrefuted testimony at trial that, of the 12 failed SNF assemblies in SMUD's possession that exhibit radioactive leakage, two are improperly stored in non-failed fuel canisters and, consequently, SMUD is not in compliance with its storage license and cannot ship that failed fuel under its current Certificate of Compliance with the NRC. DPFOF ¶ 224. Consequently, even if DOE would have taken most of SMUD's failed SNF on the same or similar schedule as SMUD's Standard SNF, SMUD is currently unable to ship at

least two of its failed fuel assemblies. DPFOF ¶ 225. The costs SMUD has or will incur as a result of the storage of these two failed fuel assemblies are not dependent upon the timing of the Government's performance, but rather are dependent upon SMUD coming into compliance with its Certificate of Compliance and the DOE determining that the handling of such fuel is technically feasible. DPFOF ¶ 226.

D. SMUD May Not Recover The 2003 Operation And Maintenance Cost For Its ISFSI

SMUD has improperly included in its damages claims $695,715 for the operation and maintenance costs associated with its ISFSI for 2003. Pl. Br. 54, n.22. SMUD is responsible for its operation and maintenance costs associated with the storage of its SNF until DOE would have accepted the last of SMUD's SNF in the non-breach world. DPFOF ¶ 228. Under a 900 MTU steady-state rate of acceptance, SMUD's last acceptance of standard fuel from DOE would have been no earlier than 2019. DPFOF ¶ 137. Consequently, in the non-breach world, SMUD would have been responsible for the operation and maintenance costs associated with the storage of its standard SNF until at least 2019. Even if the Court were to accept SMUD's assertion concerning the appropriateness of a 3,000 MTU steady-state acceptance rate, SMUD's last acceptance of standard SNF in the non-breach world would have been in 2006. In other words, regardless of the rate of acceptance, SMUD is currently responsible for its operation and maintenance costs associated with spent fuel storage, and the inclusion of such costs in its damages claim is inappropriate. DPFOF ¶ 230.[50]

[50] In addition, Mr. Kiraly questioned the $695,715 figure for three independent reasons. DPFOF ¶ 231. First, this $695,715 figure for operation and maintenance costs includes labor overhead in the amount of $162,438. DPFOF ¶ 231a. Second, $526,682 of the $695,715 total represents fixed labor that is not incremental to the breach. DPFOF ¶ 231b. Third, Mr. Kiraly

E. SMUD's 88-Month Delay In Dry Storage Project May Not Be Recovered Against The Government As Damages

It is well-settled that a nonbreaching party has a duty to avoid incurring damages as a result of the other party's action. Midwest Industrial Painting of Florida, Inc. v. United States, 4 Cl. Ct. 124 (1983) (citing Ford Motor Co. v. Dallas Power & Light Co., 499 F.2d 400, 414-15 (5th Cir. 1974); Alcoa Steamship Co. v. Charles Ferran & Co., 251 F. Supp. 823, 832 (E.D. La. 1966) aff'd 383 F. 2d 46 (5th Cir. 1967) cert. denied 393 U.S. 836 (1968)). Just as a contractor is responsible for the performance of its subcontractor, see Johnson Management Group CFC, Inc. v. Martinez, 308 F.3d 1245, 1252-53 (Fed. Cir. 2002), SMUD is responsible for the costs associated with the delays in the dry storage project either due to its own fault or based upon its contractors' untimely performance. Wilner v. United States, 23 Cl. Ct. 241, 244 (1991) (holding that Government may not be held responsible for delays in contractor project that Government did not cause). Those delays gave rise to an increased damages claim because, had SMUD's dry storage project been completed according to SMUD's original schedule, it would have been finished before 1998. Indeed, the majority of the costs SMUD is claiming as damages in this case were incurred after 1998, and were incurred as a result of delays in its dry storage project.

Damages must be direct – there can be no intervening incident to the breach, the cause must produce the effect inevitably and naturally, not possibly or even probably. Ramsey v.

---

questioned $6,594 of the $695,715 because this included the amounts incurred after loading was completed in 2002, and encompasses costs incurred for the monitoring of GTCC radioactive waste and failed fuel. DPFOF ¶ 231c.

United States, 101 F. Supp. 353, 356 (Ct. Cl. 1951) (citing Myerle v. United States, 33 Ct. Cl. 1, 27 (1897)). Here, SMUD cannot meet this burden.[51]

We demonstrated at trial that SMUD's dry storage project was delayed by a total of 88 months, largely because of the inability of SMUD's vendors to obtain the proper licensing for the construction of SMUD's "first-of-a-kind" dry storage facility. Direct Testimony of John McGrath, at ¶ 17. Mr. Burford, the Government's technical expert who has over 30 years in the nuclear energy field specializing in project management and regulatory compliance, explained that, by assuming the risk of the first-of-a-kind licensing and development of a dual-purpose system for its SNF, SMUD bore the responsibility for any resulting delays. DPFOF ¶ 237. Specifically, Mr. Burford explained that, as a nuclear licensee under 10 C.F.R. Part 50, SMUD was responsible for the safe storage of its SNF, and was obligated to store its SNF in a cost-effective manner that was in the best financial interests of its ratepayers. DPFOF ¶ 238. Mr. Burford stated that SMUD took on substantial risk with its decision to abandon its wet pool and pursue a first-of-its-kind dry storage technology and, consequently, SMUD bore the risk associated with the delays in the pursuit of this technology. DPFOF ¶ 239.

David Langstaff, a DOE employee responsible for oversight of the cooperative agreement, explained at his deposition some of SMUD's shortcomings in managing its dry storage project. He explained that SMUD did not understand the NRC's process for licensing casks for transport or storage. DPFOF ¶ 241. Mr. Langstaff testified that, although SMUD

---

[51] Indeed, to the extent that SMUD now argues that delays in its dry storage project were foreseeable, SMUD took a very different view before the NRC in 1992. DX 322, at SMUD 0035200 ("Based on discussions with the NRC and the prospective cask vendor, the District does not anticipate any delays in placing the fuel in dry storage at the Rancho Seco ISFSI.")

appeared to have a better understanding of the licensing process as the dry storage project progressed, SMUD ignored some of Mr. Langstaff's key comments regarding licensing, particularly with regard to the NRC's shift from one-dimensional modeling to two-dimensional modeling. DPFOF ¶ 241. Further, Mr. Langstaff criticized SMUD's direction to its vendor VECTRA, indicating that SMUD's direction caused problems in the storage project. DPFOF ¶ 242. Mr. Langstaff explained:

> Well, as a result of the buckling analysis and when SMUD decided that one of the - - the option they would pursue was cutting out a section of the cask that had already been fabricated or that was in fabrication, that was a major decision, and I asked SMUD, you know . . . have you done a change analysis on that, and they said no, and they decided to go ahead because I said you're responding to one person's comments on a deficiency and I said be careful about making changes to the design without fully analyzing that.

DPFOF ¶ 242. Mr. Langstaff further explained that the delays SMUD experienced on its dry storage project were not attributable to the NRC, but rather related to SMUD's actions in rushing into the dry storage project without spending the time in the beginning to prepare proper designs:

> I mean, you either do an outstanding job up front - - it's kind of like the oilman, pay me now or pay me later. You try to rush in something that's not really well done and it takes time then until it is well done, because the design will be well done by the time it's approved by the NRC.

DPFOF ¶ 243.[52]

---

[52] At the time, SMUD was one of the first utilities to consider pursuing dual-purpose dry storage technology. DPFOF ¶ 162. Despite the pursuit of this novel technology, SMUD assumed that it would take two-to-three years to obtain completed, licensed casks. DX 160, at SMUD 085619. Eileen Supko, one of SMUD's claimed experts, believes that SMUD's assumption that it could have completed the licensing process in three years was unreasonable:

> As I said, the thought that a company proceeding with a new technology and having just signed the contact in 1992 would have

At trial, SMUD presented the testimony of Ms. Supko in an attempt to establish that the inclusion of costs associated with the delay of SMUD's dry storage project are appropriate for inclusion in its damages claim. Notably, Ms. Supko did not disagree with Mr. Burford's conclusions that SMUD was responsible for the safe and cost-effective storage of its SNF. Nor did Ms. Supko disagree with Mr. Burford's conclusion that SMUD assumed substantial risk in the pursuit of this first-of-its-kind, untested technology. Instead, rather than provide a reasoned or testable methodology for her blanket conclusion that all costs associated with SMUD's dry storage project are properly included in its damages claim, Ms. Supko's basis for her conclusion regarding the appropriateness of project delays can be summed up as follows: costs associated with delays in SMUD's dry storage project are appropriate for inclusion in its damages claim because: (1) the Nuclear Regulatory Commission increased its oversight of dry storage projects; and (2) other utilities experienced delays in their dry storage projects. Direct Testimony of Eileen Supko, at ¶ 158. Ms. Supko's conclusion is deeply flawed.

Ms. Supko admitted that she did not endeavor to determine whether SMUD's implementation and management of the dry storage project was imprudent. DPFOF ¶ 244. In fact, Ms. Supko conceded that she did not review the costs specifically to determine what the causes were for the delays in SMUD's dry storage project. DPFOF ¶ 244. Nor did Ms. Supko ever conduct any analysis regarding the amount of delays that SMUD incurred in the course of the dry storage project. DPFOF ¶ 244. When asked how much of the delay was attributable to

---

> licensed and loaded 21 packages within three years was just unreasonable . . .

Tr.1538:23-1539:2 (Supko).

the NRC's oversight of dry storage projects, all she could do was reference the fact that other utilities faced some delays in their dry storage projects. DPFOF ¶ 244. She could not identify the specific amount of delay attributable to the NRC's oversight. DPFOF ¶ 244. Indeed, Ms. Supko admitted under cross-examination that SMUD's dry storage project was initially scheduled to be completed in 1995, and the NRC actions that she considered as having an impact upon SMUD's dry storage project did not occur until 1995. DPFOF ¶ 244. Further, although she relies heavily upon the NRC's oversight as a cause for the delays, she admitted upon cross-examination that there were other delays associated with the fabrication of the dry storage project. DPFOF ¶ 244. Simply put, all Ms. Supko did was conclude that, because the industry as a whole was experiencing delays as a result of the NRC's oversight, then SMUD must have experienced these delays as well. DPFOF ¶ 245. Notably, Ms. Supko has offered no testable methodology for her conclusion that all costs associated with the delays are appropriate for inclusion in SMUD's damages claims. DPFOF ¶ 246. Consequently, Ms. Supko's testimony cannot assist the Court as the trier of fact, and such testimony should be rejected.

Simply put, whether SMUD's delays were caused by SMUD, its contractors, or another third party, those costs cannot be charged to the Government as part of SMUD's damages claim.[53] Wilner, 23 Cl. Ct. at 244. Consequently, $13,527,736 should be removed from

[53] Further, as discussed above, to the extent that SMUD claims that its efforts to build an ISFSI was in an attempt to mitigate its damages, it was required to mitigate in a manner that was at the "least cost" to the Government. LaSalle Talman Bank F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999), vacated in part on other grounds, 317 F.3d 1363 (Fed. Cir. 2003). To the extent that SMUD did not properly monitor its contractors, that its contractors incurred unnecessary costs (for which SMUD presumably could charge the contractors), or that SMUD itself was responsible for unnecessary costs, the Government should not be responsible for those costs under the "least cost" principle and SMUD's obligation, pursuant to its duty to mitigate, to minimize the costs incurred as part of mitigation.

SMUD's damages claim as a result of SMUD's delay in the completion of its dry storage project. DPFOF ¶ 247.

### F. SMUD's Damages Claim Includes Other Significant Flaws

SMUD's damages claim is simply an accounting of incurred costs. DPFOF ¶ 248. Indeed, SMUD's damages claim contains absolutely "no analysis done about what deductions should have been made from those incurred costs in a variety of matters." Tr.2693:11-12 (Kiraly). At trial, SMUD presented the testimony of Brian Brinig, who counsel claimed was "an expert in connection with the confirmation of SMUD's costs that were incurred in connection with this project . . ." Tr.1277:6-12. Mr. Brinig acknowledged at trial that, had SMUD incurred costs in the breach world that it otherwise would have incurred in the non-breach world, then it would be inappropriate to include those costs in a damages claim. DPFOF ¶ 250. Yet Mr. Brinig was not asked by SMUD to offer any analysis regarding a comparison of costs incurred in both the breach and non-breach worlds. DPFOF ¶ 250. In fact, Mr. Brinig expressly stated that he is offering no opinion about costs that SMUD would have incurred but for the Government's breach. DPFOF ¶ 250. Rather, Mr. Brinig relied upon SMUD employees, specifically Mr. Field and Luana Holst, to identify those charges that SMUD believed were related to its dry storage project. DPFOF ¶ 250.

In fact, although Mr. Field was responsible for collecting the work orders that he believed were associated with SMUD's dry storage project, Mr. Field was not a decision maker with respect to SMUD's decision to pursue dry storage. DPFOF ¶ 251; Tr. 1072:1-17 (Field) (explaining that "I was not a decision-maker and, to my recollection, was not involved in that whole study determination. That was done by a different part of the organization, and my

responsibility was to implement the direction, rather than develop the direction.").[54] Mr. Field has no basis for explaining why SMUD decided to pursue dry storage and, consequently, no one involved in the preparation or analysis of SMUD's damages claim can establish that the costs allegedly incurred as a result of its dry storage project were a direct result of the Government's breach. Simply put, SMUD failed to meet its burden of proof.

The Government's expert economist, Cliff Hamal, explained the significant flaws in SMUD's damages claims as follows:

> SMUD's simple summation of costs associated with the dry storage program and its failure to consider other cost implications of the dry storage strategy does not result in a valid calculation of damages. SMUD has not detailed how it would have managed its SNF and the rest of its operations at Rancho Seco absent the breach. Such an explanation would include specifying what decisions might have been made, stating when they might have been made, and detailing how such hypothetical decisions would be consistent with SMUD's contemporaneous objectives. This information would allow one to consider the reasonableness of the assumed SMUD decisions. By addressing the non-breach world in only the vaguest of terms, SMUD's damages claim diverts attention from its Achilles Heel: The claimed costs are not damages because similar actions would have been taken regardless of the breach. I expect a proper damages analysis would show that SMUD has not suffered material damages due to the breach.

DPFOF ¶ 255. These flaws in SMUD's damages claim are discussed in detail below.

[54] Similarly, Ms. Holst testified at trial that she did not specifically segregate costs SMUD incurred as a result of the breach, but rather she segregated costs that "had to do with the spent fuel storage project." DPFOF ¶ 253. She made no independent determination as to which costs were related to or were otherwise incremental to the Government's partial breach. Id.

1. SMUD Has Failed To Establish That Its Claimed Labor Costs Were Incremental To The Partial Breach

SMUD has included in its damages claim approximately $15 million associated with labor costs that it claims were incurred as a direct result of the Government's breach. DPFOF ¶ 256. SMUD failed to establish at trial that its claimed labor costs included in its damages claim constitute an incremental cost that it otherwise would not have incurred. "Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach." Boyajian v. United States, 423 F.2d 1231, 1235 (Ct. Cl. 1970). "The costs must be tied in to fault on defendant's part." Id. (quoting River Constr. Corp. v. United States, 159 Ct. Cl. 254, 270 (1962)). "[T]he proper amount of damages for defendant's breaches is the amount of plaintiff's extra costs directly attributable to said breaches." Id. (quoting J.D. Hedin Constr. Co. v. United States, 11 Ct. Cl. 70, 108, 347 F.2d 235, 259 (1965)). Simply put, SMUD may only recover for labor performed by its employees to the extent that it can show it represents an incremental cost. See also Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked but for the delay).

Consistent with this principle, salaries or wages generally may represent an incremental cost or damage under two circumstances. First, an employer may recover where the employer actually pays his employee because of the breach. In this regard, the United States Court of Appeals for the Eighth Circuit has refused to award such damages to a corporate employer where there was no evidence that its employee "requested payment, that payment was made, or that the parties intended such a payment to be made" for the additional time he had worked because of the breach. Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim

that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend on project); see also AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). SMUD presented no testimony concerning whether it would have fired certain employees had it not pursued the dry storage project. Further, SMUD presented no specific evidence of who it would have terminated, the work that these individuals otherwise would have performed, or the costs that SMUD had to pay to non-salaried employees to perform the work.

Second, courts have generally sustained recovery for employees' lost time only where the plaintiff has foregone other contractual opportunities. Thus, recovery is only available where "salary and other overhead items allocated as a bookkeeping matter to a broken contract would in fact have been recovered in a substitute contract." Autotrol Corp. v. Cont'l Water Sys. Corp, 918 F.2d 689, 693 (7th Cir. 1990) (Posner J.); 22 Am. Jur. 2d *Damages* § 416 (2004); accord S.W. Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 978-979 (5th Cir. 1990); Willred Co. v. Westmoreland Metal Mfg. Co., 200 F. Supp. 59, 66 (E.D. Pa. 1961). It is a question for the fact-finder to determine whether such a contract reasonably could have been acquired. Autotrol, 918 F.2d at 693. Here, this type of damage award is wholly inappropriate because SMUD failed to demonstrate any alternative, profitable responsibilities to which it could have allocated its employees but for the Government's breach. Cf. id. (noting that "[t]here was testimony that

Autotrol's controls division was consistently overbooked with new projects and had a consistent record of profitability. . . .").[55]

Mr. Kiraly concluded that SMUD's damages claim improperly included labor hours for SMUD personnel who were typically charging few hours to the dry storage project, or who were charging to the project on a sporadic basis. DPFOF ¶ 257. He explained at trial that a cost that would have been incurred regardless of the breach is not a proper element of damages. DPFOF ¶ 258. SMUD's own expert, Mr. Brinig, agreed with this conclusion. DPFOF ¶ 258. Mr. Kiraly testified that, of the 256 employees that SMUD included in its damages claim as labor costs, only the cost of 16 of the employees should be considered as an incremental cost because these employees charged a majority of their time to the dry storage project. DPFOF ¶ 259. Mr. Kiraly explained that these remaining 240 employees likely were charging the majority of their time to other projects, such as decommissioning, and, therefore, such labor costs were fixed from a damages perspective. DPFOF ¶ 260.[56] Further, the Government's expert, Jerry Burford,

---

[55] The cases that SMUD cites do not change this conclusion. As an initial matter, two of the four cases cited by SMUD in support for its conclusion that labor costs are incremental to a breach are not contract cases. See Freeport Sulphur Co. v. The S/S Hermosa, 526 F.2d 300 (5th Cir. 1976) (tort claim based upon vessel collision with dock); United States v. The John R. Williams, 144 F.2d 451 (2d Cir. 1944) (admiralty claim based upon negligence of party for damage to submarine telephone cable). Further, in Convoy Co. v. Sperry Rand Corp., 672 F.2d 781 (9th Cir. 1982), the United States Court of Appeals for the Ninth Circuit expressly noted that the district court found that the plaintiff had lost the benefit of its supervisors' services as a direct result of the breach. Id. at 785-86. The court in Dunn Appraisal Co. v. Honeywell Information Sys. Inc., 687 F.2d 877 (6th Cir. 1982), reached a similar conclusion. Id. at 884 (relying upon Convoy and holding that the breach deprived the plaintiff of the salary employee's services). This is the precise showing that SMUD failed to make in this case.

[56] Mr. Kiraly explained at trial that 47 percent of all the employees that charged to the spent fuel project spent less than 30% of their total time to the project, and 55 percent of the employees that charged to the spent fuel project charged less than 40 percent of their total time. DPFOF ¶ 261.

explained that certain classes of labor charges included in SMUD's damages claim could be attributed to other continuing work at Rancho Seco, and the time sheets and invoices produced by SMUD in this litigation lacked sufficient detail to determine if these types of labor activities were incremental to the breach. DPFOF ¶ 262. Mr. Kiraly concluded that $9,380,065 should be excluded from SMUD's damages claim as fixed labor costs. DPFOF ¶ 263.

In its post-trial brief, SMUD takes issue with Mr. Kiraly's analysis, contending that Mr. Kiraly's conclusion necessarily assumes that SMUD employees were otherwise unproductive. Pl. Br. 64. SMUD is simply attempting to shift its burden of proof.[57] SMUD has the burden to show, with specific evidence, that its employees would otherwise have been utilized for other projects or terminated but for the Government's breach. At trial, and again in its post-trial brief, the best SMUD could do is claim that SMUD employees spent time on the project and that "SMUD is an efficient company that maximizes its employees' time and eliminates positions wherever possible." Pl. Br. 64 (citing Pl. PFOF ¶ 414). Regardless of the veracity of these statements, they do nothing to establish that SMUD's labor costs were incremental to the breach.

For example, Mr. Redeker testified that Rancho Seco's labor force has been reduced since 1993 from approximately 150 employees to 80 employees, and "[t]hat [reduction] has occurred as we have continued our ongoing effort to make sure that we are being as cost-effective as possible. We look for – and I drive my staff to look for every opportunity to

---

[57] In fact, SMUD contends that the Government failed to demonstrate at trial that 16 employees working part time, or four full-time employees, could have completed the dry storage project. Pl. Br. 65. Again, SMUD misconstrues Mr. Kiraly's critique of SMUD's damages claim. Mr. Kiraly stated that SMUD produced no evidence that the overwhelming majority of its employees' time was incremental to the Government's breach. This burden lay squarely on SMUD.

combine work forces, to combine jobs, to be more efficient." DPFOF ¶ 264. However, rather than explain that the reduction in labor was the result of the end of the dry storage project, Mr. Redeker admitted that the reduction in the labor force also "reflects the decreasing staff requirements because we are decommissioning the facility." DPFOF ¶ 265. Mr. Redeker also testified that the dry storage project resulted in SMUD not being able to decrease staff as quickly as it otherwise would have had it not pursued the dry storage project, and that after the dry storage project was completed, the Rancho Seco staff was reduced by 30 full-time employees. DPFOF ¶ 266.

After considering this testimony, Mr. Kiraly explained that it did not change his conclusion that SMUD's labor costs were fixed, stating:

> Well, for one, its not specific enough as to what is the actual impact that is associated with these people. There's no demonstration there that the costs are directly related to this project and not to the overall SMUD cost base. So without a more detailed analysis that would lay out for me who we're talking about when they say, we are reducing, or we planned to reduce from a certain number to a certain number, I can't make a judgment any different than the one I've made based upon my own analysis.

DPFOF ¶ 267.

Simply put, Mr. Kiraly explained the fatal flaw in SMUD's damages claim as follows:

> Well, what I would have expected to see is starting with the baseline of the incurred costs and then identifying those costs that were either incurred specifically and only for this cost – the spent fuel, or deductions of costs that were basically fixed, and deduction of the costs of the, essentially, would have been world. There's been no accounting for that in these costs.

DPFOF ¶ 268.

In summary, SMUD has failed to meet its burden of proving that its labor costs claimed as damages in this case were incremental to the Government's breach of the Standard Contract. LaSalle, 45 Fed. Cl. at 97-98; see ECDC Envir., L.C. v. New York Marine & Gen. Ins. Co., No. 96-6033, 1999 WL 777883, at *6 (S.D.N.Y. Sept. 29, 1999) (holding that salaried employee's salary was not recoverable because it was a cost that would have been incurred regardless of the breach).

2. SMUD Has Failed To Demonstrate That Its Claimed Labor Overhead Markups Were Incremental To The Partial Breach

In addition to fixed labor, SMUD has inappropriately included $2,497,724 related to the cost of labor overhead markups in its damages claim. DPFOF ¶ 269. Mr. Kiraly explained at trial that he and his team reviewed SMUD's labor overhead markups and concluded that the markups included fixed costs that were not incremental to the Government's breach. DPFOF ¶ 270. These labor overhead markup costs included such items as human resource costs, office space, vehicles, the license for SMUD's accounting software, personal computers, software, and telephones, among other items. Id. Mr. Kiraly concluded that the costs associated with these items would not have increased as a result of the hours that SMUD personnel spent on the dry storage project, and, consequently, such costs should be excluded from SMUD's damages claim. DPFOF ¶ 271. Indeed, Mr. Kiraly explained that,

> [B]y definition, with SMUD including them as indirect expenses and indirect expense is when you cannot tie directly to the project. They may have been used on it, they may not have been, but these costs are then allocated over all of the labor within SMUD, of which the spent fuel project was only a small portion.

DPFOF ¶ 272.

At trial, SMUD claimed that its labor overhead markup costs were variable rather than fixed. Specifically, Mr. Redeker claimed that, when SMUD reduced its labor force, the overhead associated with that labor force decreased as well. Tr.681:6-10 (Redeker). As an example, Mr. Redeker testified that, "[y]ou know, we have got a guy sitting at a desk with a computer. When he leaves, that computer leaves." Tr.681:10-12 (Redeker).

In response to Mr. Redeker's testimony, Mr. Kiraly explained that, "even if overhead is variable, if you apply it to the base and the base is excluded, included in the excluded cost would also be that portion of overhead that is allocated to that excluded cost." DPFOF ¶ 274. For example, with respect to SMUD's SAP license, Mr. Kiraly explained that, if SMUD had laid off an employee, he would not expect SMUD's SAP license costs to decrease. DPFOF ¶ 275. Mr. Kiraly's testimony went unrebutted by SMUD.

In summary, as with SMUD's direct labor costs that it is claiming as damages, SMUD has failed to meet its burden of showing with any specificity that its labor overhead markup costs would not otherwise have been incurred but for the Government's breach.

3. Although SMUD Concedes That It Would Have Incurred Costs Associated With Its Dry Storage Project In The Non-Breach World, SMUD's Calculation Of The Proposed Offsets Is Understated

SMUD concedes in its post-trial brief that certain of the costs included in its damages claim should be offset because they would have been incurred in the non-breach world. Pl. Br. 44. Specifically, SMUD admits that costs associated with the gantry crane upgrade, the spent fuel building upgrade, the fuel inspection, and the on-site drop mitigation testing all would have

been incurred even had DOE timely performed under the Standard Contract. Id.[58] As the Government's experts explained at trial, however, SMUD's proposed offsets with respect to the gantry crane upgrade and on-site drop mitigation testing are substantially understated.

SMUD proposes a $667,800 offset associated with the refurbishment of its gantry crane. Pl. Br. 44. Mr. Burford explained that this figure only encompassed work on this crane through 1997, and that $158,043 in costs associated with upgrade work after 1997 was included in SMUD's damages claim. DPFOF ¶ 279. Consequently, a proper deduction for the crane upgrade is $825,871, rather than $667,880.[59] Id.[60]

---

[58] In addition, SMUD concedes that its damages claim improperly included $2 million that was the result of a double-counting error, and $500,000 related to a loan work-out that one of its vendors paid back to SMUD. Pl. Br. 44-45. Notably, Mr. Brinig, who SMUD retained as "an expert in connection with the confirmation of SMUD's costs that were incurred in connection with the [dry storage] project, overlooked both this $2 million double-counting error, which accounted for 10 percent of SMUD's $20 million in claimed damages from 1992 to 1996, and the $500,000 credited back to SMUD. Tr.1277:6-9, Tr. 1297:9-21, Tr. 1308:12-1313:1 (Brinig). When asked about this oversight at trial, Mr. Brinig explained that, "the simple answer is I missed it." DPFOF ¶ 277.

[59] Mr. Burford also concluded that SMUD included in its damages claim $45,600 for the refurbishing its Polar Crane. DPFOF ¶ 285. Mr. Burford explained that the Polar Crane is located inside the reactor building, and therefore cannot be used in or around the Spent Fuel Building. Id. Consequently, Mr. Burford concluded that the refurbishment of the Polar Crane likely was done to support other decommissioning work, and therefore is inappropriately included in SMUD's damages claim. DPFOF ¶ 286. This testimony was unrefuted.

[60] At trial, SMUD appeared to claim that, although it would have modified its crane, it would have utilized smaller casks had DOE performed in the non-breach world, and therefore, any modifications to the crane over 100 tons are properly claimed as damages. Tr.1043:10-1044:24 (Field). Of course, SMUD's litigation-inspired testimony is flatly contradicted by its contemporaneous documents. For example, in 1992, when SMUD submitted its delivery commitment schedules, it represented to DOE that it would utilize a 130-ton crane. DPFOF ¶ 281. Indeed, in response to SMUD's submission of its DCSs, DOE asked SMUD to confirm that it was in fact planning on utilizing a 130-ton gantry crane, as the information DOE had indicated that SMUD was then currently capable of utilizing a 97.5 ton crane. DPFOF ¶ 282. In response to DOE's letter, Mr. Shetler wrote in a December 7, 1992 letter that, "you questioned the crane capacity and spent fuel shipping methods. Your data should be updated to reflect a

Similarly, although SMUD contends that $250,000 should be offset from its damages claim for its on-site drop mitigation testing that would have been conducted in the non-breach world, Pl. Br. 44, Mr. Burford explained at trial that this number was grossly understated. DPFOF ¶ 287. Indeed, SMUD's own records reflect that one of its outside contractors, Packaging Technologies, charged SMUD $924,571 for an analysis of cask drops and design, fabrication, and delivery of cask drop impact limiters, and SMUD itself estimated that it would spend $419,000 of its own resources to install the impact limiters. DPFOF ¶ 288. Further, another outside contractor, Vectra, charged SMUD $799,888 for impact limiter related services. DPFOF ¶ 289. Consequently, rather than a deduction of $250,000, as SMUD suggests, Mr. Burford concluded that costs related to onsite drop mitigation totaled approximately $2.14 million. DPFOF ¶ 290.

4. SMUD's Inclusion Of The Cost Of Loading SNF Into Its ISFSI Should Be Offset From Its Damages Claim

SMUD has inappropriately included in its damages claim $4,274,856 for the costs associated with the preparation, packaging, inspection and loading of its SNF into its ISFSI. Direct Testimony of Stephen Kiraly, at ¶74-75 & Att. 9 As we demonstrated at trial, because

---

recent increase in capacity of the maximum lifting weight of the cask to 130 tons." DPFOF ¶ 283. Because 1992 clearly represents the non-breach world, SMUD's current contention that it would have utilized smaller casks but for the Government's breach is simply that: an unsupported, litigation-inspired contention.

Further, SMUD's contention that it would have used smaller casks is in conflict with its own expert, Ivan Stuart. Mr. Stuart testified that a utility such as SMUD may legitimately decide to upgrade its facility to accept larger casks because it would allow for the faster removal of SNF. DPFOF ¶ 284.

these costs would have been incurred in the non-breach world, the inclusion of such costs in SMUD's damages claim is inappropriate. DPFOF ¶ 292.

SMUD makes the entirely inconsistent argument that, on the one hand, it specifically pursued dual-purpose dry storage because such storage would minimize handling by SMUD employees and would allow DOE to accept SMUD's SNF without re-loading into a DOE transportation cask, based upon the assumption that MESCs are an acceptable waste form under the Standard Contract, and, on the other hand, that SMUD will still have to pay costs associated with the preparation, packaging, required inspections, and loading activities for transportation to a DOE facility, apparently because MESCs are unacceptable under the Standard Contract. Compare Pl. Br. 55-56 with Pl. Br. 62; Tr.173:1-7 (Shetler) ("What we were looking at by having a transportable system is it was a system that would not have to be handled again, so it could be picked up and moved without having to remove or rehandle the fuel, which is a concern.").

SMUD cannot have it both ways. Had SMUD believed that it would have to reload its SNF into DOE-provided transportation casks because MESCs were unacceptable under the Standard Contract, SMUD's actions simply demonstrate the unreasonableness of its decision to pursue dual-purpose dry storage. In summary, SMUD cannot claim that MESCs will be accepted by DOE under the Standard Contract as standard SNF, but that SMUD will somehow incur costs for reloading its SNF into DOE-approved transportation casks when DOE accepts SMUD's SNF. SMUD's inconsistent argument is pure sophistry, and the $4,274,856 associated with preparation, packaging, inspection and loading of its SNF into its ISFSI should be offset from SMUD's damages claim.

5. SMUD's Damages Claim Fails To Consider Unavoidable Costs

SMUD's damages claim also fails to provide any evidence that SMUD has appropriately accounted for costs that were otherwise unavoidable. Direct Testimony of Stephen Kiraly, at ¶ 93. Mr. Kiraly stated that any obligations that SMUD entered into prior to the Government's breach, but which could not be avoided even absent the breach, should not be included in a damages claim. DPFOF ¶ 294. Examples of unavoidable costs potentially included in SMUD's damages claim includes labor severance costs, contract termination costs, and lease and/or rental obligations. DPFOF ¶ 295. Mr. Kiraly determined that these unavoidable costs would have been included in the $11,607,819 adjustment for miscellaneous questioned amounts. DPFOF ¶ 296.[61]

6. SMUD's Damages Claim Improperly Includes Costs Related To Premature Mobilization Of Its Labor Force Associated With The Loading Of Its ISFSI

SMUD's damages claim improperly includes all labor costs associated with the loading of SNF into dry storage. DPFOF ¶ 301. For example, SMUD brought on site contractor

[61] The miscellaneous adjustment made by Mr. Kiraly represented "the various adjustments that are indeterminable with the information available." DPFOF ¶ 297. Specifically, at trial, Mr. Kiraly explained that this miscellaneous adjustment was the result of Mr. Kiraly's top down analysis looking at the total costs incurred, and Mr. Burford's conclusions regarding the maximum that a store-only dry storage system should cost. DPFOF ¶ 298. Mr. Kirlay explained that Mr. Burford indicated that a store-only system would cost no more than $9 million, and that Mr. Kiraly was able to identify with specificity all but $20 million. DPFOF ¶ 299. In other words, the $11 million miscellaneous adjustment represents the difference between the $20 million arrived at by Mr. Kiraly and the $9 million arrived at by Mr. Burford for the costs associated with the major components for a store-only system. DPFOF ¶ 299. For example, Mr. Kiraly identified the types of costs included in the $11 million, such as the bonuses paid to PCC, and some of the fixed plant costs associated with having an ISFSI. DPFOF ¶ 300. Of course, it is SMUD's burden to prove with specificity the costs it alleges are damages in this case.

mechanics, welders, and fuel team specialists as early as July 1999, despite the fact that SMUD did not receive the MP187 cask until July 2000, or the first canister until September 2000. DPFOF ¶ 302. Mr. Burford explained at trial that, based upon his significant project management experience at nuclear utilities, "a three month mobilization time frame for this project would have been sufficient to support training, readiness reviews, and other onsite preparation activities related to loading and transferring the fuel." DPFOF ¶ 303. Further, Mr. Burford explained that February 1, 2001 was the proper date for labor and equipment mobilization, because that was the date that a fuel loading "dry run" was conducted with the cask. DPFOF ¶ 304. Consequently, Mr. Burford stated that costs associated with mobilization of support labor and equipment rentals that occurred prior to November 1, 2000 should be excluded from SMUD's damages claim. DPFOF ¶ 305. Mr. Kiraly testified that the costs associated with this premature mobilization totaled $2,550,131. DPFOF ¶ 306.[62]

#### 7. SMUD's Damages Claim Fails To Provide A Proper Offset For the Substantial Cost Savings That SMUD Realized By Placing Its SNF Into Dry Storage

As we demonstrated at trial, and as discussed above, one of the primary reasons SMUD decided to pursue dual-purpose dry storage was the substantial cost savings it would realize by abandoning its wet pool. Indeed, SMUD claimed at trial that the actual, realized savings from

---

[62] At trial, Mr. Redeker testified that SMUD did not prematurely mobilize its labor force, and that this was demonstrated by the fact that SMUD had no accidents in the loading of its SNF into its ISFSI. Tr.640:17-641:12. In other words, because SMUD did not experience any problems or delays in loading its ISFSI, it necessarily follows that SMUD did not prematurely mobilize its labor force. Of course, Mr. Redeker's testimony is pure speculation, and he provided no testimony of a causal link between the timing of SMUD's mobilization of its labor force and the success of SMUD's loading of its SNF. Consequently, the Court should reject Mr. Redeker's self-serving and speculative testimony concerning SMUD's mobilization of its labor force.

abandoning its wet pool and placing its SNF into dry storage was $4,146,360, and that such savings began to accrue in 2002. DPFOF ¶ 307.[63] Yet SMUD has failed to account for this substantial cost savings in its damages claim. DPFOF ¶ 308.

SMUD does not dispute that this offset generally is appropriate. Rather, it contends that DOE would have accepted SMUD's SNF by 2003 based upon some amorphous combination of exchanges, priority for shutdown reactors, and extra-contractual transportation campaigns. Pl. Br. 61. As explained above, SMUD has fallen woefully short of meeting its burden that: (1) such contractual provisions or extra-contractual mechanisms would have been utilized by SMUD, or that DOE would have approved the use of such provision and/or mechanisms; and (2) the effect of such contractual provisions and extra-contractual mechanisms had SMUD chosen to utilize them. Consequently, SMUD's damages claim should be offset by the $4,146,360 in annual savings beginning in 2002. DPFOF ¶ 309.[64]

8. SMUD's Damages Claim Fails To Account For The Savings Associated With Decommissioning Its Wet Pool

As Mr. Hamal testified at trial, SMUD's damages claim fails to consider the benefits that it received as a result of decommissioning its wet pool. DPFOF ¶ 310. As Mr. Hamal explained:

[63] SMUD suggests in its post-trial brief that its savings associated with the elimination of the wet pool actually began to accrue in 2003, rather than 2002. Pl. Br. 61 & Pl. PFOF ¶ 402. Nothing in the record supports this assertion.

[64] Of course, if the Court ultimately determines that a 900 MTU steady-state rate of acceptance is appropriate, SMUD's last standard SNF assembly would be accepted in 2019, DPFOF ¶ 137, and SMUD's failed fuel and GTCC low level radioactive waste could remain on-site even longer. Tr. 1663:9-20, Tr.1648:5-20, Tr.1670:15-20 (Zabransky). Consequently, the total amount of benefits that SMUD would have received by moving to dry storage in the non-breach world ultimately would be many times what SMUD is claiming as damages in this case.

> The decommissioning of the Rancho Seco site is an enormous task that has been planned and executed since the unit was shut down. It is my understanding significant progress has been made on this effort, and Mr. Redeker testified that approximately $300 million of the $524 million project has been completed. Decommissioning is directly affected by the method of storing the SNF because nuclear safety concerns impose significant restrictions on what can be done at the site when the fuel is in the pool. This not only affects decommissioning of the pool, but the continued need for systems used to maintain the safety of the SNF in the pool would have restricted decommissioning activities elsewhere at the station unless further modifications were made at the station.

DPFOF ¶ 311. Mr. Hamal explained that, had SMUD left its SNF in its wet pool, it would have had to made material changes to its decommissioning plan. DPFOF ¶ 312. Consequently, Mr. Hamal concluded that a proper damages claim would have considered the cost savings associated with decommissioning its wet pool. DPFOF ¶ 313. This testimony was unrebuted at trial. DPFOF ¶ 313. At trial, SMUD bore the burden to consider the beneficial effects of mitigation in its damages calculation. Citizens Fed. Bank, FSB v. United States, 59 Fed. Cl. 507, 526 (2004). SMUD has failed to meet this burden.

SMUD contends in its post-trial brief that it "has not realized any decommissioning savings as a result of the government's breach," and, in fact, its decommissioning costs will increase because of the need to decommission its ISFSI. Pl. Br. 68. Yet, SMUD concedes in its brief that dry storage facilitated decommissioning. Pl. Br. 17-18 ("SMUD plainly recognized that dry storage would facilitate decommissioning Rancho Seco and early DOE acceptance of SMUD fuel . . ."). SMUD's contemporaneous documents unequivocally reflect that SMUD believed there was a significant cost savings in moving to dual-purpose dry storage, because it would facilitate the elimination of its wet pool and, consequently, SMUD's Part 50 operating license. DPFOF ¶ 314; DX 721, at SMUD 061592 (1997 evaluation concluding that store-only

dry storage was not a preferred option, because it would delay SMUD's ability to decommission its wet pool, thereby resulting in additional costs in maintaining its Part 50 operating license); Tr.734:21-735:8, 736:7-17; Tr.772:3-8 (Redeker) (acknowledging that there is a "direct link" between SMUD's dry fuel storage options and its decommissioning efforts). Indeed, Mr. Redeker admitted under cross-examination that SMUD could not eliminate its Part 50 license until it decommissioned its pool, and that there is a cost associated with continuing to carry a Part 50 license. Tr.735:12-14, Tr.736:3-9 (Redeker). Simply put, absent the placement of SMUD's SNF into dry storage, SMUD would have had to maintain its wet pool. DPFOF ¶ 315. Had it maintained its wet pool, SMUD would be unable to eliminate its Part 50 operating license. DPFOF ¶ 315. The elimination of its wet pool and, consequently, its Part 50 operating license, represents a cost savings to SMUD, and SMUD has failed to meet its burden to consider, and quantify, this cost savings in presenting its damages claim. See Citizens Fed. Bank, 59 Fed. Cl. at 526.

## VI. SMUD FAILED TO INTRODUCE ANY EVIDENCE THAT DOE ACTED WITH A SPECIFIC INTENT TO HARM IT, PRECLUDING ITS CLAIM FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

SMUD's pre-trial assertion that the Government breached the covenant of good faith and fair dealing by failing to take appropriate action to meet its contractual commitment to begin accepting its SNF by January 31, 1998, has been relegated to two footnotes in its post-trial brief. The reason for this is obvious: SMUD presented absolutely no evidence to support this theory. As the United States Court of Appeals for the Federal Circuit held in Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed. Cir. 2002), the presumption that the Government acted in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has

been equated with evidence of some specific intent to injure the plaintiff." Indeed, allegations of bad faith have generally arisen in instances involving "fraud" or "quasi-criminal wrong-doing" by Government officials. Id. at 1240.

To establish that the Government's delay in performance was in bad faith, SMUD had to present "clear and convincing evidence" equivalent to what is necessary to establish that DOE's conduct was "motivated alone by malice," Gadsden v. United States, 78 F. Supp. 126, 128 (Ct. Cl. 1948), "designedly oppressive," Struck Construction Co. v. United States, 96 Ct. Cl. 186, 222 (Ct. Cl. 1942), or "actuated by animus toward the plaintiff," Librach v. United States, 147 Ct. Cl. 605, 612 (1959), cited in Kalvar Corp. v. United States, 543 F.2d 1298, 1302 (Ct. Cl. 1976), and Am-Pro Protective Agency, 281 F.3d at 1240.[65]

---

[65] Although "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," Restatement (Second) of Contracts § 205, "[t]he obligation of good faith . . . is not an 'independent source of duties for parties to a contract.'" Allstate Fin. Corp. v. Utility Trailer of Ill., Inc., 936 F. Supp. 525, 529 (N.D. Ill. 1996) (quoting Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992)). "Rather, it guides the construction of explicit terms of an agreement." Allstate, 936 F. Supp. at 529 (emphasis added). "The implied covenant is limited to assuring compliance with the express covenants or promises of the contract, and cannot be extended to create obligations not contemplated in the contract." Kucharczyk v. Regents of Univ. of Calif., 946 F. Supp. 1419, 1432 (N.D. Cal. 1996); see State of Alaska v. United States, 35 Fed. Cl. 685, 704 (1996) ("implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties"), aff'd, 119 F.3d 16 (Fed. Cir. 1997), cert. denied, 1108 (1998). "[S]uch generalized obligations as not interfering with the other party's performance, or failure to act in good faith, must have a contract performance referent to have any relevance." C.B.C. Enterprises, Inc. v. United States, 24 Cl. Ct. 1, 5 (1991). There must be a "nexus alleged between the Government's allegedly tortious breach of these implicit conduct obligations and any express term of the contract." Id.; see Village on Canon v. Bankers Trust Co., 920 F. Supp. 520, 534 (S.D.N.Y. 1996) (duty of good faith "does not create any new contractual rights" other than those expressly stated in the contract itself, "nor does it provide an independent basis for recovery"); Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 598 (1994) ("defendant only had a duty to render a decision within a reasonable time if it had an explicit contractual obligation to take some action on the applications"); Heagy v. United States, 12 Cl. Ct. 694 (1987) (no breach of contract can exist unless it is based upon actual requirement contained in the contract), aff'd, 848 F.2d 1244

Here, SMUD appears to present two different bases for the Government's alleged breach of the duty of good faith and fair dealing. First, SMUD suggests that the Government's assertion in this litigation that DOE does not have an obligation to accept SNF contained in MESCs violates the Government's duty of good faith and fair dealing. Pl. Br. 73, n.30. Yet, SMUD has provided no support for the proposition that a party's legal argument may form the basis for a claim of a violation of the duty of good faith and fair dealing. Further, as explained in detail in the Government's response to the Court's Show Cause Order, DOE has consistently taken the position, and expressly informed SMUD, that MESCs are not covered under the Standard Contract, but that DOE would be willing to consider the acceptance of MESCs should the parties modify the Standard Contract and the utilities provide appropriate compensation for the costs associated with the acceptance of MESCs. More fundamentally, SMUD has failed to show by clear and convincing evidence how DOE's belief concerning the acceptability of MESCs represents a specific intent to injure SMUD.

Second, SMUD suggests that DOE's use of a 900 MTU rate in the 1990s "reflect[s] DOE's effort to manipulate the acceptance rate to limit its liability in the spent fuel litigation," and that such manipulation constitutes a violation of the duty of good faith and fair dealing. Pl. Br. 75, n.32. SMUD is wrong as both a matter of fact and law.

As we mentioned in our pre-trial brief, SMUD acknowledges that the Standard Contract does not contain a particular rate of acceptance, and the Court has found the DCSs did not create binding contractual commitments. Absent the identification of an express contractual provision,

---

(Fed. Cir. 1988). To prevail upon its claim for a breach of the duty of good faith and fair dealing, the plaintiff must identify an express requirement within the contract that DOE breached.

SMUD cannot demonstrate that the promulgation of the 1991 ACR containing a 900 MTU rate of acceptance over the first 10 years of the waste acceptance program constituted a breach of the implied duty of good faith and fair dealing. Nor can it establish that the continued use of the 900 MTU rate in the 1995 ACR constitutes a breach of the duty of good faith and fair dealing. As Mr. Zabransky and Mr. Pollog testified at trial, the reason the 900 MTU rate of acceptance was carried over from the 1991 ACR was that there simply was no basis for the use of a different rate of acceptance. DPFOF ¶ 321. In fact, Susan Klein unequivocally stated at her deposition that the use of the 900 MTU rate was not for purposes of litigation, and that DOE had always viewed the approved DCS as its legal obligation even before the litigation. DPFOF ¶ 322. This plainly does not constitute clear and convincing evidence of an intent to injure SMUD.[66]

This Court rejected a spent nuclear fuel plaintiff's claim of a breach of the implied covenant of good faith and fair dealing based on similar contentions. System Fuels Inc. v. United States, No. 03-2642C, 2005 WL 1804314, at *12 (Fed. Cl. July 29, 2005) (rejecting claim of violation of good faith and fair dealing based upon: (1) DOE's implementation and cancellation of the DCS process; (2) DOE's failure to publish annual APRs and ACRs; (3) DOE's use of the ACR process to unilaterally limit the amount of SNF and/or HLW it would accept from each utility; and (4) the Government's arguments made in the various SNF lawsuits since the 1990s). Consequently, SMUD's claim premised upon the duty of good faith and fair dealing should be dismissed. See Am-Pro Protective Agency, 281 F.3d at 1240 ("the requirement of 'well-nigh irrefragable' proof [] sets a high hurdle for a challenger seeking to

[66] Further, as discussed above, SMUD never protested or otherwise expressed disagreement with the rates contained in the 1991 ACR when it submitted its DCSs. Consequently, SMUD has waived any challenge to the DCS process.

prove that a government official acted in bad faith"); Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("contractor can overcome [the presumption that the government acts in good faith] only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it"); Sanders v. United States Postal Service, 801 F.2d 1328, 1331 (Fed. Cir. 1986) ("there is a strong presumption in the law that administrative actions are correct and taken in good faith"); Torncello v. United States, 681 F.2d 756, 770 (Ct. Cl. 1982) (Government "is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary").

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell Shultis
RUSSELL A. SHULTIS
Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7561
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

JOSHUA E. GARDNER
SCOTT R. DAMELIN
TODD J. COCHRAN
ELIZABETH THOMAS
Trial Counsel

September 20, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that, on this 20th day of September 2005, a copy of foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner