IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, Plaintiff, | ) | |
| v. | ) | No. 98-488 C |
| THE UNITED STATES OF AMERICA, Defendant. | ) | (Judge Braden) |

**DEFENDANT'S RESPONSE TO SACRAMENTO**
**MUNICIPAL UTILITY DISTRICT'S PROPOSED FINDINGS OF FACT**

**I. Introduction And Overview.**

1. In accordance with the Nuclear Waste Policy Act of 1982, 42 U.S.C. §10101 *et seq.* ("NWPA"), DOE and SMUD entered into a contract for the acceptance and disposal of SMUD's spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW") on June 13, 1983. *See* Contract for the Disposal of Spent Nuclear Fuel between DOE & SMUD (June 13, 1983) (Plaintiff's Exhibit ("PX") 44) ("Contract" or "Standard Contract").

RESPONSE: The Government does not dispute SMUD's proposed finding of fact.

2. SMUD has paid the Department of Energy ("DOE") a total of approximately $40 million in fees under its Contract with DOE, thus satisfying its obligation of performance under the Contract. *See* Memorandum Opinion dated Jan. 19, 2005 at 4 ("Memorandum Opinion") (noting "SMUD has paid all applicable fees required by the DOE Standard Contract"); Gov't Answer at ¶ 22 (noting payment of fees is undisputed).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First,

SMUD's proposed finding of fact is not supported by any admissible evidence. Second, SMUD has presented no evidence that it is prepared to unload its multi-element sealed canisters ("MESCs") for the delivery of SNF to DOE and, therefore, SMUD is unable currently to satisfy its performance obligations under the Standard Contract. Further, SMUD has not paid DOE any money for the disposal of the 25,000 pounds of Greater Than Class C low level radioactive waste ("GTCC") in SMUD's possession. DPFOF ¶¶ 203-204.[1]

3. With interest, those fees were worth approximately $100 million in 1997. Letter from J. Schori at 2 (Mar. 14, 1997) (PX 528). Today, SMUD's payments to DOE under the Contract would be worth far more than $100 million.

RESPONSE: The Government objects to this proposed finding of fact to the extent that SMUD has provided absolutely no evidence as to what the worth of its payments would be in today's dollars. Further, this proposed finding of fact by SMUD is unnecessary to the Court's decision in this case.

4. DOE has breached its reciprocal obligation under the Contract—the "quid pro quo created by Congress" in the D.C. Circuit's words—to commence acceptance of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") by January 31, 1998, and thereafter to remove SNF and HLW from contracting utilities, including SMUD, in a reasonable manner. *Indiana Michigan Power Co. v. United States*, 88 F.3d 1272 (D.C. Cir. 1996); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000).

RESPONSE: The Government objects to this proposed finding of fact to the extent that it is a conclusion of law. The Government does not dispute that the United States Court of Appeals for the Federal Circuit has held that DOE partially breached the Standard Contract by failing to commence acceptance of SNF, under the acceptance terms set forth in that contract, beginning on January 31, 1998. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000). However, the Standard Contract does not require that SNF be accepted in a "reasonable manner" (see DPFOF ¶¶ 113-126), and neither the United States Court of Appeals for the D.C. Circuit in Indiana Michigan Power Co. v. United States, 88 F.3d 1272 (D.C. Cir. 1996), nor the Federal Circuit in Maine Yankee, held that such a requirement existed.

[1] "DPFOF" refers to the Defendant's proposed findings of fact that we filed on September 20, 2005.

5. Because of the government's breach, SMUD has incurred substantial damages resulting from the design, licensing, and fabrication of its own on-site storage facility, referred to as an Independent Spent Fuel Storage Installation or ISFSI, for the long term dry storage of its spent fuel. As detailed further below, SMUD has incurred $21,553,462 in damages from 1992 to 1997 and $55,049,870 in damages from 1998 to 2003. *See* PFF ¶¶ 199-241.

RESPONSE: The Government disputes SMUD's contention that it has incurred damages related to the design, licensing, and fabrication of an on-site storage facility. As detailed in the Government's proposed findings, the costs that SMUD seeks to recover in this litigation are costs unrelated to the Government's breach, and would have been incurred regardless of the timing of the Government's performance. See DPFOF ¶¶ 19-126; see also Gov't Resp. to PFOF ¶¶ 199-241.[2]

## II. **Background**.

### A. **Disposal Of Nuclear Waste And Passage Of The NWPA**.

6. Nuclear reactors generate electricity by using ceramic pellets containing uranium oxide placed in the core of the reactors; these solid pellets are sealed in metal rods, or pins, which are approximately sixteen feet long. Transcript ("Tr.") at 117-118 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

7. The rods are bundled together into an overall fuel assembly. *Id*.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

8. The fuel assemblies are placed in the reactor vessel, where the nuclear fission reaction occurs. In SMUD's case, the reactor was designed to hold 177 fuel assemblies. Tr. at 122 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

[2] "Gov't Resp. to PFOF" refers to the Government's response to SMUD's proposed findings of fact.

9. Spent nuclear fuel is nuclear power plant fuel that has been burned (irradiated) in a nuclear reactor to the point where it no longer contributes efficiently to the nuclear chain reaction that produces heat to generate electricity. At that point, the SNF must be removed from the core and replaced. Tr. at 132 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, SMUD's reliance upon Mr. Shetler's testimony does not support the contention that spent nuclear fuel is nuclear power plant fuel that has been burned (irradiated) in a nuclear reaction to the point where it no longer contributes efficiently to the nuclear chain reaction that produces heat to generate electricity. Further, Mr. Shelter's testimony does not support the statement that SNF must be removed from the core and replaced once it no longer contributes efficiently to the nuclear chain reaction.

10. When SNF leaves a nuclear reactor, it is thermally hot and highly radioactive. Tr. at 138 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

11. Much of the thermal heat dissipates after about five years, but the SNF remains potentially dangerous for much longer periods of time. Tr. at 147 (Shetler).

RESPONSE: The Government objects to this proposed finding of fact because it is not supported by the evidence cited. Mr. Shetler's specific testimony on this issue was that "it will be thousands of years before it totally cools down. It will reach an equilibrium that is acceptable but it will be thousands of years before it cools down." Tr.147:6-9 (Shelter). Mr. Shelter never testified that "[m]uch of the thermal heat dissipates after about five years."

12. Once the fuel assemblies are permanently discharged from the reactor, they are transferred to a spent fuel pools or "wet pool" on the nuclear reactor site. Tr. at 132-33 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is not supported by the evidence cited. Mr. Shetler did not testify that the fuel assemblies are permanently discharged from the reactor to the spent fuel pool.

13. Spent fuel is stored in a pool in order to allow it to cool and to provide shielding from the lethally radioactive fuel. Tr. at 138 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

14. Spent fuel pools are pools of borated water. Tr. at 137-139 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

15. The SNF assemblies are stored in stainless steel storage racks underwater in the spent fuel pools. Tr. at 137 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, Mr. Shetler did not state that the storage racks are made of stainless steel.

16. Once a spent fuel pool becomes full, the SNF must be moved from the pool and placed into storage, either on site at the nuclear reactor or elsewhere. Tr. at 133 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact, which is not supported by the evidence cited. Mr. Shetler's testimony does not establish that, once a spent fuel pool becomes full, the SNF must be moved from the pool and placed into storage, either on site at the nuclear reactor or elsewhere. Indeed, because SMUD's spent fuel pool was not full, SMUD could have left its SNF in the pool. DPFOF ¶ 156. The evidence shows that SMUD chose to transfer its SNF from its wet pool to dry storage for business reasons. See DPFOF ¶¶ 19-64.

17. As of January 31, 1998, there was 37,000 metric tons of spent nuclear fuel that had been permanently discharged from commercial nuclear power plants and was being stored at locations across the country. E. Supko Written Direct at 20 (PX 1002).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

18. In the 1950s, under the authority of the Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2011, *et seq.*, and President Eisenhower's Atoms-for-Peace program, the federal government embarked upon a program to encourage and sponsor the peaceful use of atomic energy. *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 244 (4th Cir. 1987). The development of a commercial nuclear electric industry was the centerpiece of this program.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The first sentence is *dicta* from a court of appeals decision excusing Westinghouse Electric Corporation from a breach of its contract with Florida Power & Light Company to reprocess Florida Power's SNF because performance was deemed impossible. Florida Power, 826 F.2d at 262-274. The second sentence is not supported by any evidence and is irrelevant to any issue in the above-captioned case.

19. One of the major issues surrounding public acceptance of nuclear power and the willingness of the private sector to embrace nuclear power in the 1950s was the need to provide for the permanent disposal of SNF and other high-level waste ("HLW") discharged by the production of nuclear-generated electricity. S. Rep. No. 96-548, at 10 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6933, 6933.

RESPONSE: The Government objects to SMUD's proposed finding of fact as misleading. The Senate Report that SMUD cites is legislative history to the Low-Level Radioactive Waste Policy Act, Pub. L. No. 96-573 (1980), as it existed in 1980, not the Nuclear Waste Policy Act, Pub. L. No. 97-425 (1982). Thus, this proposed finding is misleading because SMUD is not citing to legislative history dealing with the law that gave rise to the standard contract, but to another statute altogether. Furthermore, the proposed finding is irrelevant to any issue in the above-captioned matter.

20. The disposal of SNF has been described as the "most pressing" concern in the promotion and sustenance of this country's nuclear power industry. *Id.* at 10, *reprinted in* 1980 U.S.C.C.A.N. at 6933-34; *Florida Power*, 826 F.2d at 246 (stating that the government's assumption of the responsibility to dispose of SNF was "critical to the promotion of a nuclear power industry").

RESPONSE: The Government objects to SMUD's proposed finding of fact as misleading. The Senate Report being cited is legislative history to the Low-Level Radioactive Waste Policy Act, Pub. L. No. 96-573 (1980), as it existed in 1980, not the Nuclear Waste Policy Act, Pub. L. No. 97-425 (1982). Thus, this proposed finding is misleading because SMUD is not citing to legislative history addressing the law that gave rise to the standard contract, but to an altogether separate statute. Similarly, the statement from Florida Power is misleading because the Federal responsibility to which the court was referring was the responsibility to reprocess SNF in the event that there was no commercial service available. Florida Power, 826 F.2d at 246. Furthermore, the proposed finding is irrelevant to any issue in the above-captioned matter.

21. As part of its program to encourage the development of a nuclear power industry, the federal government agreed early on to assume the responsibility for the permanent disposal of SNF. This commitment is reflected in the Atomic Energy Commission's ("AEC") statement of its "Policy Relating to the Siting of Fuel Processing Plants and Related Waste Management Facilities," adopted in 1970, which provides that "[d]isposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government." 10 C.F.R. Part 50, App. F.

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact as misleading. 10 C.F.R., Part 50, App. F refers to an NRC regulation that governs the siting of facilities established to reprocess "high-level liquid radioactive wastes," defined as "aqueous wastes resulting from the operation of the first cycle solvent extraction system, or equivalent, and the concentrated wastes from subsequent extraction cycles, or equivalent, in a facility for reprocessing irradiated reactor fuels." 10 C.F.R., Part 50, App. F, ¶2. It does not establish the Government's responsibility for disposal of SNF and is, therefore, misleading. Because this regulation refers to high-level radioactive waste, as opposed to SNF, it is also irrelevant to any issue in the above-captioned matter.

22. In the 1960s and early 1970s, the general understanding was that the "fuel would be stored onsite for an interim period until such time as it could be taken and reprocessed for reuse." Tr. at 116 (Shetler).

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact because Mr. Shetler's testimony does not support the proposed finding. First, Mr. Shetler explained that he "can probably only speak for our general understanding of the nuclear steam supply provider with Babcock & Wilcox and my experience there." Tr.116:1-3 (Shetler). Consequently, Mr. Shetler lacks the foundation to discuss a more "general understanding." Second, Mr. Shetler was only asked about his understanding in the 1970s time frame, not the 1960s. Tr.115:22-25 (Shetler). Third, Mr. Shetler did not testify as to what SMUD's understanding was with respect to nuclear fuel management at the time it built its Rancho Seco nuclear power plant and, therefore, Mr. Shetler's testimony is irrelevant to any issue in the above-captioned matter.

23. In order to reprocess fuel, one "would cut up the assembly and through chemical treatment, recover the uranium or plutonium that's in the fuel pellets and be able to re-pelletize

that, repackage it and reuse it in nuclear assemblies." *Id.*

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although Mr. Shetler testified to that effect, it was based upon his understanding which, as noted in above, was limited. See Gov't Resp. to PFOF ¶ 22.

24. The government's effort to manage the disposal of SNF and HLW was redirected when, in 1977, President Carter issued an executive order in 1977 that effectively halted reprocessing of spent nuclear fuel by private industry. 13 Weekly Comp. Pres. Doc. 502, 503 (1977); *see also* H.R. Rep. No. 97-785, pt. 1, at 46-47 (1982); *see also* Tr. at 119 (Shetler) ("In the 1970s during President Carter's administration, it was determined for primarily nuclear nonproliferation purposes that reprocessing would not be a method for dealing with spent fuel in the United States. And so reprocessing was basically stopped as an alternative.").

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law about which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). Further, the House Report being cited, which was issued in 1982, does not support the proposed finding. Moreover, the report states that "[i]t has been clear for several years that neither adequate reprocessing capacity nor a repository was likely to be available in time to relieve the spent fuel storage problems of utilities." H.R. Rep. No. 97-785, at 47 (1982). The Government also objects because Mr. Shetler, who is a SMUD employee, cannot testify to the Government's efforts to manage the disposal of SNF or HLW. This proposed finding is also irrelevant, especially in light of the fact that President Reagan lifted the ban on commercial reprocessing in 1981. 17 Weekly Comp. Pres. Doc., 1101-02 (October 12, 1981).

25. Thus, at the time of Contract formation, and today, there are no alternative methods of disposing of spent nuclear fuel for a commercial utility. 42 U.S.C. § 10222(b) ("No [SNF or HLW] may be disposed of by the Secretary … unless the generator or owner of such [SNF or HLW] has entered into a contract with the Secretary under this section."); *see also* PFF ¶¶ 20-24, 32-40.

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. Furthermore, the proposed finding is misleading. Section 10222(b) of the Nuclear Waste Policy Act states:

b) Advance contracting requirement

(1)(A) The Commission shall not issue or renew a license to any person to use a utilization or production facility under the authority of section 2133 or 2134 of this title unless -

(I) such person has entered into a contract with the Secretary under this section; or

(ii) the Secretary affirms in writing that such person is actively and in good faith negotiating with the Secretary for a contract under this section.

(B) The Commission, as it deems necessary or appropriate, may require as a precondition to the issuance or renewal of a license under section 2133 or 2134 of this title that the applicant for such license shall have entered into an agreement with the Secretary for the disposal of high-level radioactive waste and spent nuclear fuel that may result from the use of such license.

(2) Except as provided in paragraph (1), no spent nuclear fuel or high-level radioactive waste generated or owned by any person (other than a department of the United States referred to in section 101 or 102 of Title 5) may be disposed of by the Secretary in any repository constructed under this chapter unless the generator or owner of such spent fuel or waste has entered into a contract with the Secretary under this section by not later than--

(A) June 30, 1983; or

(B) the date on which such generator or owner commences generation of, or takes title to, such spent fuel or waste; whichever occurs later.

42 U.S.C. § 10222(b).

The cited provision does not support the proposed finding because the statute does not state that there are no alternative methods of disposing of SNF. Rather, the cited statute constrains DOE from disposing of any commercial SNF unless that SNF is covered by a Standard Contract. Moreover, the statute does not indicate whether there are any alternative methods for disposing of commercial SNF.

26. The majority of spent fuel pools existing at nuclear reactor sites were sized with the intention that SNF would be stored therein temporarily before being shipped to a reprocessing facility. H.R. Rep. No. 97-785, pt. 1, at 47.

RESPONSE: Although the cited report does state that storage pools at the nuclear power plants in the mid-1960's and 1970's were designed to hold only several years of spent fuel discharge, it also notes that, despite that fact, no reactor had yet shut down due to the lack of storage space because utilities had expanded their storage capacity. H.R. Rep. No. 97-785, pt. 1, at 47 (1982). Moreover, the report states that "[i]t has been clear for several years that neither adequate reprocessing capacity nor a repository was likely to be available in time to relieve the spent fuel storage problems of utilities." H.R. Rep. No. 97-785, at 47 (1982).

27. The lack of a reprocessing alternative meant that the SNF eventually would have to be removed from the pool and stored in a safe and secure location. *Id*.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the document cited does not state that the lack of a reprocessing alternative necessitated that SNF would eventually have to be removed from spent fuel pools and stored in a secure location. To the contrary, the House Report notes that "[i]t has been clear for several years that neither adequate reprocessing capacity nor a repository was likely to be available in time to relieve the spent fuel storage problems of utilities." H.R. Rep. No. 97-785, at 47 (1982). It was also noted that, when DOE offered to develop alternative technologies to store SNF in modular or mobile storage casks at the site of the reactor, no utility was interested in discussing the possibility. Id. Second, the lack of a reprocessing alternative does not necessarily require that the SNF be removed from the pool nor does it eliminate the need for SNF disposal. Indeed, it is unrefuted that SMUD could have left its SNF in its wet pool, but decided, for business reasons unrelated to the Government's delay in SNF acceptance, to place its SNF in dry storage. DPFOF ¶¶ 19-64, 155. Finally, reprocessing results in the creation of high-level waste which also requires permanent isolation.

28. This SNF storage crisis was one of the primary catalysts for the promulgation of the Nuclear Waste Policy Act. As Representative Bereuter stated, "[w]aste storage cannot continue in the temporary, unsafe fashion that it has maintained for these decades. We are just courting disaster if we continue to take that course." 128 Cong. Rec. 27,775 (1982).

RESPONSE: This proposed finding is not a finding of fact, but a conclusion of law. Furthermore, to the degree that SMUD is suggesting the views of any congressman is relevant to interpreting a statute, the statements of a legislator are not suggestive of the legislation's intent,

which is memorialized in the language of the statute. Barnhart v Sigmon Coal Co,. Inc., 534 U.S. 438, 456-57 (2002). Finally, this proposed finding is irrelevant to any issue in the above-captioned matter.

29. Representative Moorhead explained that Congress needed to address not only long-term permanent disposal of SNF but also the short-term problem of storage of SNF and/or HLW:

> It is clear that comprehensive nuclear waste disposal must provide not only for the long-term problem of permanent disposal of nuclear waste, but it also must alleviate the short-term problem of a lack of interim storage capacity for spent nuclear fuel. A June 1982 Report, prepared for the Nuclear Regulatory Commission, projects that as many as 39 nuclear power plants in 19 States may run out of onsite storage capacity by 1990. This would inevitably result in plant shutdowns, and clearly this would be a disaster that must be prevented.

128 Cong. Rec. 26,314 (1982).

RESPONSE: This proposed finding is not a finding of fact, but a conclusion of law. Furthermore, to the degree that SMUD is suggesting the views of a congressman is relevant to interpreting a statute, the statements of a legislator are not suggestive of the legislation's intent, which is memorialized in the language of the statute. Barnhart v Sigmon Coal Co,. Inc., 534 U.S. 438, 456-57 (2002). Finally, this proposed finding is irrelevant to any issue in the above-captioned matter.

30. Senators reiterated this concern when debating the Nuclear Waste Policy Act. For example, Senator McClure, the chief sponsor of the NWPA in the Senate, stated

> [We] . . . begin to run into the problem that there is not enough room to store all those rods at that site, in the pools that have been constructed, because they were not designed to do that . . . They will have to apply some new technologies on that site, or they will have to shut down because they cannot refuel. There is a time urgency, and it can be satisfied.

128 Cong. Rec. 7,974 (1982).

RESPONSE: This proposed finding is not a finding of fact, but a conclusion of law. Furthermore, to the degree that SMUD is suggesting the views of any senator is relevant to

interpreting a statute, the statements of a legislator are not suggestive of the legislation's intent, which is memorialized in the language of the statute. Barnhart v Sigmon Coal Co,. Inc., 534 U.S. 438, 456-57 (2002). Finally, this proposed finding is irrelevant to any issue in the above-captioned matter.

31. On January 7, 1983, after being signed by President Reagan, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-245, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)) was enacted.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

32. In enacting the NWPA, the federal government assumed the legal duty to "provide for the permanent disposal" of spent nuclear fuel and/or high-level radioactive waste from utilities across the country by providing long-term storage of such waste. *See* 42 U.S.C. § 1013(a)(4).

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. Further, the cited section is not part of the Nuclear Waste Policy Act. Section 10103(a)(4) actually provides that:

> while the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment, the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel.

42 U.S.C. § 10103(a)(4) (emphasis added). Thus, the statute actually provides that the Government has the "responsibility" to provide for the permanent disposal although "the costs of such disposal should be the responsibility of the generators and owners of such waste . . . ." 42 U.S.C. § 10103(a)(4). Therefore, to the degree that this may be a proposed finding of fact, it is misleading. To the degree that SMUD accurately quotes part of the Nuclear Waste Policy Act, the Court is free to take judicial notice of its contents. Cf. United States v. Casson, 434 F.2d 415, 417-18 (D.C. Cir. 1970).

33. In the NWPA, Congress expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors." 42 U.S.C.

§ 10131(a)(2).

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. Moreover, 42 U.S.C. § 10103(a)(4) actually provides that:

> a national problem has been created by the accumulation of (A) spent nuclear fuel from nuclear reactors; and (B) radioactive waste from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources.

42 U.S.C. § 10131(a)(2). Thus, the "national problem" was created for several reason and, to the degree that this may be a proposed finding of fact, it is misleading. To the degree that this proposed finding merely quotes the Nuclear Waste Policy Act, the Court may take judicial notice of its contents. Cf. United States v. Casson, 434 F.2d 415, 417-18 (D.C. Cir. 1970).

34. The NWPA provided for the safe, permanent disposal of the wastes of nuclear power generation by the federal government, an obligation which the federal government had recognized since the passage of the Atomic Energy Act of 1954. *See* Corrected Appendix to Accompany SMUD's Motion to File Designated Deposition And Trial Testimony, dated February 24, 2005 (hereinafter "Designations Appendix") (Dckt. #310) at 1709 (Lawrence), 2039-40 (Rusche); Robert Morgan, Remarks Before the International Atomic Energy Agency, at 3 (October 12, 1983), (PX 52); 128 Cong. Rec. 26,317 (1982) (Representative Skeen); 128 Cong. Rec. 8,002 (1982) (Senator McClure); *see also* 42 U.S.C. § 7133(a)(8)(C) (providing for the creation of the Department of Energy with responsibility for "the establishment of temporary and permanent facilities for storage, management, and ultimate disposal of nuclear wastes").

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law about which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). Further, it should be noted that Dr. Morgan also stated that the Nuclear Waste Policy Act "clearly states that utilities have the responsibility for interim storage of their spent fuel." PX 52 at 919. To the extent that SMUD is suggesting the views of any Congressman is relevant to interpreting a statute, the statements of a legislator are not suggestive of the legislation's intent, which is memorialized in the language of the statute. Barnhart v

Sigmon Coal Co,. Inc., 534 U.S. 438, 456-57 (2002). To the degree that this proposed finding merely quotes the Nuclear Waste Policy Act, the Court is free to take judicial notice of its contents. Cf. United States v. Casson, 434 F.2d 415, 417-18 (D.C. Cir. 1970).

35. One of the key purposes of the NWPA was to impose upon the government a firm schedule and deadline by which the government would assume responsibility for the disposal of commercially-generated SNF. *See* 42 U.S.C. § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories" to receive SNF and high-level waste).

RESPONSE: The Government disputes this proposed finding which is a conclusion of law, not a finding of fact. Furthermore, nowhere, particularly not in the cited passage, does the statute impose a "firm schedule" or a "deadline" by which the Government would assume responsibility for the SNF. Section 10131(b)(1) actually states that one of the purposes of the law was:

> to establish a schedule for the siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository

42 U.S.C. § 10131(b)(1). Thus, although the statute provides that DOE was to establish a schedule for the siting, construction, and operation of repositories, it does not require that the Government accept any particular amount of any utility's SNF by any particular date. See DPFOF ¶¶ 4-7, 113-126. Moreover, to the degree that this proposed finding merely quotes the Nuclear Waste Policy Act, the Court is free to take judicial notice of its contents. Cf. United States v. Casson, 434 F.2d 415, 417-18 (D.C. Cir. 1970).

36. Congress intended that DOE's acceptance of SNF, beginning in 1998, would be expeditious and timely. *See* 42 U.S.C. § 10222(a)(5) (mandating that contracts provide that DOE "shall take title to the high-level radioactive waste or spent nuclear fuel involved *as expeditiously as practicable* upon the request of the generator or owner of such waste or spent fuel") (emphasis added).

RESPONSE: The Government objects to SMUD's proposed finding, which is a

conclusion of law, not a finding of fact. Moreover, section 10222(a)(5) actually states:

> Contracts entered into under this section shall provide that –
>
> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5). Specifically, the statute provides that, once a repository is operational, DOE shall take title to SNF "as expeditiously as practicable." The statute separately provides that, in exchange for the payment of fees, DOE will begin to dispose of SNF – either at a repository or in another facility – by January 31, 1998. Id. The statute does not require that DOE have an operational repository by January 31, 1998, given that the obligation to take title to SNF "as expeditiously as practicable" after a repository is operational is separate and distinct from the obligation to begin SNF acceptance by January 31, 1998. See Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Thus, SMUD is attempting to merge the requirements of subparagraphs (a)(5)(A) and (a)(5)(B) of 42 U.S.C. § 10222 to create an obligation that does not exist. The Court has no basis upon which to rewrite the statute to create obligations that otherwise are not contained within it. See, e.g., CUNA Mutual Life Ins. Co. v. United States, 169 F.3d 737, 742 (Fed. Cir. 1997) (court "cannot rewrite the statute to accomplish what we might believe Congress may have intended to do"); Newport News Shipbuilding & Dry Dock Co. v. Garrett, 6 F.3d 1547, 1558 (Fed. Cir. 1993) ("court is empowered to rewrite neither statutes nor regulations, however unwise, nor does it have the information base nor expertise to do so effectively"). The NWPA did not identify any other requirements for the contracts specified by 42 U.S.C. § 10222(a)(5).

37. DOE officials recognized that the requirements for its spent fuel program were to implement a program that would: (1) avoid the need for utilities such as SMUD to build additional SNF storage space at their reactor sites after 1998, and (2) accept SNF at a rate that would reduce the existing SNF backlog to allow timely decommissioning. Designations Appendix (Dckt. #310) at 137 (Barrett), 452-53 (Milner), 2084 (Rusche); *see also* E. Supko Written Direct at 16-20, 39-43 (PX 1002); *Indiana Michigan v. United States*, 57 Fed. Cl. 88, 89

(2003); *Commonwealth Edison v. United States*, 56 Fed. Cl. 652, 657 (2003); *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 674 n.10: *Yankee Atomic Electric Co. v. United States*, No. 98-126, 2004 WL 1535688, *7 (Fed. Cl. June 28, 2004).

RESPONSE: This proposed finding is not a finding of fact, but a conclusion of law about which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). Moreover, the proposed finding is misleading. Mr. Barrett and Mr. Milner testified that one of the program's goals was to remove SNF, thereby reducing the need for on-site SNF storage and allowing utilities to timely decommission. Mr. Rusche testified that another program's goal was for the DOE to eventually accept commercial SNF at a rate that exceeded the discharge rate. Thus, Mr. Barrett, Mr. Milner, and Mr. Rusche all were speaking to program goals, not requirements. Indeed, Robert Morgan, the former director of the Office of Civilian Radioactive Waste Management, has unequivocally stated that the two alleged goals referenced in SMUD's proposed finding of fact were not contractual obligations, and that even under a 3,000 MTU steady-state rate of acceptance, some utilities would still have to add additional at-reactor storage after 1998. DPFOF ¶¶ 132-133. Finally, Ms. Supko, as a SMUD expert, cannot speak for the Government and what the Government viewed as its requirements or obligations.

38. Robert Morgan, the first Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), indicated the government's intent of was that "beginning in 1998 utilities will not have to provide any additional storage facilities on site." Designations Appendix (Dckt. #310) at 1980 (Morgan).

RESPONSE: The Government objects to SMUD's proposed finding of fact. In the testimony SMUD cites from Mr. Morgan, Mr. Morgan was testifying about his personal impression of the "intent " of the Nuclear Waste Policy Act based upon his conversations with Congressional "staffers." Thus, Mr. Morgan was actually speaking to an issue of law about which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). Further, Mr. Morgan has unequivocally stated that DOE did not have a contractual obligation to accept SNF at a particular rate, and that DOE was not contractually obligated to accept SNF at a rate that, "beginning in 1998 utilities will not have to provide any additional storage facilities on site." DPFOF ¶¶ 132-133. Indeed, Mr. Morgan explained that, even under a 3,000 MTU steady-state rate, some utilities would still have to add additional at-reactor storage after 1998. DPFOF ¶ 133.

39. Representative Mariott stated:

> We need a national waste repository, and it must be in place by the

> turn of the century. All waste that is now stored is temporarily stored. . . . Without a proper repository for interim and permanent waste, as many as 28 nuclear power plants may be forced to close for lack of storage.

128 Cong. Rec. 26,310-26,311 (1982).

RESPONSE: This proposed finding is not a finding of fact, but a conclusion of law. Furthermore, to the extent that SMUD is suggesting the views of any congressman is relevant to interpreting a statute, the statements of a legislator are not suggestive of the legislation's intent, which is memorialized in the language of the statute. Barnhart v Sigmon Coal Co,. Inc., 534 U.S. 438, 456-57 (2002). Thus, this proposed finding is irrelevant to any issue in the above-captioned matter.

40. The NWPA set January 31, 1998 as the date for DOE to begin spent nuclear fuel removal and required DOE and the owners and generators of SNF and HLW to enter into contracts calling for DOE to dispose of waste beginning on that date. 42 U.S.C. § 10222(a) (1982); see also *id.* § 10222(b) ("No [SNF or HLW] may be disposed of by the Secretary … unless the generator or owner of such [SNF or HLW] has entered into a contract with the Secretary under this section.").

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. Defendant further responds to the plaintiff's assertion of law by asserting that, contrary to SMUD's assertion, the NWPA does not require DOE to enter into contracts calling for DOE to dispose of waste beginning on January 31, 1998. Rather, as the NWPA recites, "[i]n the performance of his functions under this chapter, the Secretary [of Energy] is authorized to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel . . . ." 42 U.S.C. § 10222(a)(1) (emphasis added).

41. Pursuant to the NWPA, DOE established a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. *See* Final Rule, 48 Fed. Reg. 16,590 (Apr. 18, 1983); 10 C.F.R. § 961.11.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

42. The Standard Contract provides that "[t]he services to be provided by DOE under

this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors . . . has been disposed of." Contract Art. II (PX 44).

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. The Government responds to SMUD's conclusion of law by asserting that the Government does not dispute that SMUD has properly represented the provision of the Standard Contract to which it cites in the proposed finding. However, rather than identify a "fact" that should be the subject of the Court's determination, this proposed finding merely quotes the Standard Contract, of which the Court may take judicial notice. Cf. United States v. Casson, 434 F.2d 415, 417-18 (D.C. Cir. 1970).

SMUD's proposed finding also fails to explain that the Standard Contract contained a contractual mechanism by which DOE and the utilities would determine the rate and schedule of acceptance for SNF and/or HLW beginning January 31, 1998. See DPFOF ¶¶ 113-137.

The Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b).

Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a). The contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1.

If DOE approved the DCS, the parties had effectively agreed and defined the amount of SNF that DOE would accept from that contract holder 63 months later. Id. If DOE disapproved the first DCS submission, the contract holder was entitled to make a second DCS submission, again for DOE's approval or disapproval. Id.

43. The NWPA contemplated a series of steps which would lead to the operation of a repository and acceptance of SNF and HLW beginning in January 1998. 42 U.S.C. §§ 10132-10145; H.R. Rep. 97-785, pt. 1, at 32-34 (1982); *Indiana Michigan Power Company v. Dep't of*

*Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996).

a. DOE was to issue guidelines for site characterization 180 days after January 7, 1983. 42 U.S.C. § 10132(a) (1982). DOE was then to nominate five sites for site characterization for selection as the site for the first repository. 42 U.S.C. § 10132(b)(1)(A) (1982).

b. DOE was to recommend site characterization at three of the nominated sites by January 1, 1985. 42 U.S.C. § 10132(b)(1)(B) (1982). Upon approval of these site recommendations by the President, DOE was to conduct site characterization at the approved sites. 42 U.S.C. § 10133 (1982).

c. By March 31, 1987 the President was to submit a recommendation to Congress to site the first repository at one of the three characterized sites. 42 U.S.C. § 10134(a)(2)(A) (1982) (now amended).

d. After the President's recommendation, the state or Indian tribe where the recommended site was located had the opportunity to disapprove the selection, and Congress could then override that disapproval. 42 U.S.C. §§ 10134-10136 (1982) (now amended).

e. After the site recommendation was complete, DOE was to submit an application for construction authorization to the NRC within 90 days. 42 U.S.C. § 10134(b) (1982). The NRC would then act on the application within four years of submission. 42 U.S.C. § 10134(d) (1982).

RESPONSE: The Government objects, in part, to SMUD's proposed finding of fact. The NWPA specifically contemplated the potential implementation of a monitored retrievable storage ("MRS") facility as part of the civilian radioactive waste management program. 42. U.S.C. § 10161; Tr.2112:16-2114:5 (Kouts). The NWPA including provisions allowing the

Secretary to study the possibility of creating MRS facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in [MRS] facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. 10161(a)(1) (1982). The NWPA did not contemplate or create any obligation that acceptance of SNF and/or HLW would begin from every nuclear utility beginning in 1998. See DPFOF ¶¶ 113-135.

The proposed finding of fact is inappropriate because it is a conclusion of law. Further, the proposed conclusion of law is irrelevant to the claim for damages here because the statutory deadlines identified in subparts (a)-(e) were not incorporated into the Standard Contract, and plaintiff has no right to rely upon non-contractual statutory deadlines. See Fenn v. United States, 908 F.2d 955, 959 (Fed. Cir. 1990) ("the law itself, as a rule of conduct, may be changed at the whim of the legislature, unless prevented by constitutional limitations.").

44. These provisions were intended to create a schedule leading to the establishment of a repository in 1998. A House report on an early version of the NWPA containing similar interim deadlines noted: "With respect to the establishment of a repository, the purposes are to establish a schedule for the siting, construction, and operation of repositories that will provide assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive wastes." H.R. Rep. 97-785, pt. 1, at 32 (1982).

RESPONSE: The Government objects to SMUD's proposed finding of fact. This proposed finding regarding the "intention" of the NWPA provisions cited in PFOF ¶ 43 is not a proposed finding of fact, but a conclusion of law. See, e.g., Berry, 25 F.3d at 1353. See also Gov't Response to PFOF ¶ 43. The NWPA is the best evidence of its contents. Although individuals may have hoped that a repository could be operational by January 31, 1998, the statute did not create any obligation to have a repository available by that date. Accordingly, the statute did not create the "intent" that the proposed conclusion of law infers. As many utility plaintiffs successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that a repository be operational by January 31, 1998. See Indiana Michigan, 88 F.3d at 1276. Finally, the House report cited by SMUD, on a bill that was never enacted, is not probative of the issues involved in this case. Holder v. Hall, 512 U.S. 874, 932 n.28 (1994) (Thomas, J., concurring in judgment); Conroy v. Aniskoff, 507 U.S. 511, 520 n.2 (1993) (Scalia, J., concurring in judgment).

45. The NWPA provided that "the Secretary is authorized to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of

domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1).

RESPONSE: The Government does not object to SMUD's proposed finding of fact to the extent that SMUD has properly represented the provision of the NWPA to which it cites in this proposed finding. However, rather than identify a "fact" that should be the subject of the Court's determination, this proposed finding merely quotes the NWPA, of which the Court may take judicial notice. Cf. United States v. Casson, 434 F.2d 415, 417-18 (D.C. Cir. 1970).

46. The NWPA further required all utilities to enter into the Contract by providing that the execution of a contract with DOE is a prerequisite to the issuance or renewal of a nuclear power plant license by the Nuclear Regulatory Commission ("NRC"). 42 U.S.C. § 10222(b)(1)(A).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The NWPA did not contain a requirement that the nuclear utilities enter into the Standard Contract. See 42 U.S.C. § 10222 (1982). The language cited summarizes the provision that the NRC "shall not issue or renew a license" unless the utility entered into a contract or was actively and in good faith negotiating such a contract. 42 U.S.C. § 10222(b)(1)(a)(i),(ii).

47. Congress expected the contracts to be a quid pro quo under which DOE would dispose of waste and the utilities would pay for the service. H.R. Rep. No. 97-491, pt. 1, at 58 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 3824 ("Section 124 authorizes the Secretary to contract with utilities … to provide repository services in exchange for payments. . . ."); H.R. Rep. No. 97-491, pt. 1, at 59 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3825 (DOE is "responsible for disposing of [SNF] … in permanent disposal facilities, beginning not later than January 1998, *in return for the payment* of fees established by this section." (emphasis supplied)). *See also Indiana Michigan Power Company v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996); *Alabama Power Co. v. Dep't of Energy*, 307 F.3d 1300, 1302 (11th Cir. 2002).

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). The Government

objects to this proposed finding of fact to the extent that it is a conclusion of law. The Government does not dispute that the United States Court of Appeals for the Federal Circuit has held that DOE partially breached the Standard Contract by failing to commence acceptance of SNF, under the acceptance terms set forth in that contract, beginning on January 31, 1998. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000).

48. Having required utilities to pay fees into the Nuclear Waste Fund for removal of SNF starting in January of 1998, DOE did not intend that the utilities would have to pay *again* to build additional on-site storage. Designations Appendix (Dckt. #310) at 276-78 (Barrett).

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law about which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) Defendant further responds to the plaintiff's assertion of law by asserting that it disputes the proposed finding because it is unsupported by the evidence cited and contrary to the evidence presented at trial. The "full cost recovery nature" of the Standard Contract requires that the utilities pay for all the costs of the program through the fees collected on electricity generated. 42 U.S.C. § 10222. Program costs do not include utility storage costs. See Dep. Desig. 5/8/02 Milner, 267:11-16 ("full cost recovery only refers to DOE expenditures. Full-cost recovery doesn't consider utility costs.").

Some utilities would have required additional on-site storage even if DOE had begun accepting SNF at an annual steady-state acceptance rate of 3,000 MTU. DPFOF ¶ 133. Mr. Morgan explained that the discussion in the Mission Plan concerning DOE's intent to accept SNF at a rate that precluded additional at-reactor storage did not reflect contractual intent, and that, even under a 3,000 MTU rate of acceptance, some utilities still would have to have added additional at-reactor storage. DPFOF ¶¶ 132-133.

Ms. Supko, SMUD's expert witness, acknowledged that neither the NWPA nor the Standard Contract contains reference to the two "primary requirements" that SMUD has relied upon in this case, namely, that the rate: (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF and/or HLW already stored by utilities up until that date. DPFOF ¶ 128.

49. In 1983, the parties anticipated and intended that if a repository was not operational in time for DOE to begin acceptance of SNF by January 31, 1998, DOE would take title to the fuel at the utility site and pay for its dry storage. *See* Memorandum Accompanying Draft Mission Plan Strategy at 2 (Sept. 15, 1983) (PX 50) (noting "the lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel" and stating one

possibility in the event of non-performance would be for DOE to "take title to the spent fuel, have it placed in dry storage casks and pay a rental fee to the utility to store the casks on-site at the reactor").

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law about which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). Defendant further responds to the plaintiff's assertion of law by asserting that the parties' "intent" is defined by reference to the language of the contract itself, not to extraneous materials, particularly in light of the integration clause contained in the Standard Contract. DX 88, Art. XXII.A. Yet, in its proposed finding, plaintiff does not refer to any contract language, precluding a finding of contractual intent. Further, as we noted above, DOE's statutory obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a facility in which to dispose of it. Cf. Indiana Michigan, 88 F.3d at 1276.

Moreover, the document cited by SMUD for this portion of the proposed finding is a draft of a strategy memorandum that was intended to guide drafters of the 1983 Draft Mission Plan. DPFOF ¶¶ 132-134. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Id. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." 42 U.S.C. § 10221(a). Ultimately, the Mission Plan was to be submitted to Congress so that Congress could review and make decisions regarding the progress and scope of the program. See 42 U.S.C. § 10221(b)(3). Further, it is inappropriate for SMUD to rely upon a draft document promulgated after the parties signed the Standard Contract as a means of evincing the parties' intent.

The Government specifically disputes the portion of this proposed finding which asserts that, in 1983, the parties anticipated that, if DOE had no disposal facility available in 1998, DOE would "take title to fuel at the utility and pay for its dry storage." That assertion by SMUD is completely without citation to authority, is not supported by any evidence admitted at trial, and should be rejected by the Court. Indeed, SMUD did not present a single witness at trial who worked at SMUD in 1983, and who could testify as to SMUD's intent at the time it signed the Standard Contract.

50. DOE assured utilities that it would take responsibility for "additional storage" if the repository was delayed, even if that meant providing for storage "at reactor sites." PX 69, Vol. II at 9-6.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The

proposed finding relies solely upon PX 69, a 1984 document titled Draft Mission Plan for the Civilian Radioactive Waste Management Program, Volume II: Information Required by Nuclear Waste Policy Act of 1982. Moreover, the document cited by SMUD for this portion of the proposed finding is a draft Mission Plan. The Mission Plan, its drafts, and its amendments are not contractually binding documents. DPFOF ¶¶ 133-135. Instead, the Mission Plan was intended "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." 42 U.S.C. § 10221(a). Ultimately, DOE was to submit the Mission Plan to Congress so that Congress could review and make decisions regarding the progress and scope of the program. See 42 U.S.C. § 10221(b)(3).

SMUD fails to provide any other citation to support this proposed finding, and such an "assurance" is not set forth in the NWPA or the Standard Contract. This assertion by SMUD is not supported by any evidence admitted at trial, and should be rejected by the Court.

51. DOE official Keith Klein testified that at the time the Contract was signed, DOE's plans in the event of delay in repository were that DOE "would take title or—or potentially at the reactor sites and provide dry storage casks. I think we were thinking ideally transportable dry storage casks or—or at least baskets that could be put into a transport cask." Designations Appendix (Dckt. #310) at 1137-38 (Klein).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD failed to cite to any contractual language purporting to create the contractual obligation that it identified. This assertion by SMUD is not supported by any evidence admitted at trial, and should be rejected by the Court. See Gov't Resp. To PFOF ¶ 50.

Further, DOE is precluded as a matter of law from taking title to utility SNF at the reactor sites. Section 135 of the NWPA authorized DOE to accept a limited amount (no more than 1,900 MTUs) of commercial spent fuel for a limited period (until January 1, 1990) for storage either at a Federal facility or at a civilian nuclear power plant. It also provided that use of an existing Federal facility would not "render such facility subject to licensing under the Atomic Energy Act of 1954 . . . or the Energy Reorganization Act of 1974 . . ." 42 U.S.C. § 10155(a)(1)(A)(i). These provisions clearly would not have been necessary if DOE already possessed the authority to store the utilities' SNF and was exempt from NRC licensing. Simply put, SMUD presented no evidence and has offered no legal basis for the proposition that DOE could have taken title to a particular utility's SNF if there were delays in the development of a Federal disposal facility.

52. The Contract allows DOE to grant "priority" to shutdown reactors. Contract Art.

VI.B.1.b.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The Standard Contract has language allowing DOE the discretion to accord priority for SNF and/or HLW from reactors that have been shutdown. Article VI.B.1 of the Standard Contract provides DOE with the discretion, not the obligation, to provide a contract holder with a shutdown reactor priority in the SNF acceptance queue:

> Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

DX 88, Art. VI.B.1.b (emphasis added), Def. Counter-Designation of R. Milner, at Tr.137:2-8 (5/8/02) (explaining that priority for shutdown reactor provision provided DOE with discretion to grant priority, but did not require DOE to grant priority). SMUD recognized that DOE is entitled to exercise its discretion in granting priority for shutdown reactors. See DPFOF ¶¶ 138-144.

A large number of utilities have been opposed to priority for shutdown reactors, DX 215; PX 849, and DOE's contracting officer for the Standard Contract, Mr. Zabransky, explained at trial the reason for such opposition:

> [Priority for shutdown reactors] was being raised because, under the contract, DOE was permitted to grant priority to shutdown reactors, and amongst the utilities, there was a lot of discussion and concern about that because, for operating reactors, there was a concern that the only way for DOE to grant priority to the shutdown reactors was to short the operating reactors, since there's a finite amount of capacity and that since the contract also contained provisions that allowed utilities to exchange places in line with DOE approval, that if DOE started allocating capacity to shutdown reactors, that would render that part of the process not meaningful.
>
> So the shutdown, the operating reactors had an opinion, the shutdown reactors had an opinion that differed from them, and it was an issue that the group thought about.

Tr.1625:12-1626:3 (Zabransky); Def. Counter-Designation of R. Milner, at Tr.73:15-24 (5/8/02) (explaining that outcome of discussions between DOE and members of the industry was that oldest fuel first priority should be utilized instead of priority for shutdown reactors); Def. Counter-Designation of R. Milner, at Tr.206:10-13, Tr.208:16-19 (5/8/02) ("Well, I think that the view held by a large number of utilities were that any priority afforded a shutdown reactor

would aversely affect them," and this was true regardless of what the rate of acceptance was); Def. Counter-Designation of N. Slater, at Tr.55:6-12 (4/21/99) (explaining that "[t]o afford priority to a shutdown reactor was to impede the ability of another utility to deliver. And the group was very divided in terms of whether a shutdown priority should be provided."); Def. Counter-Designation of L. Barrett, at Tr.364:11-19 (5/15/02) (explaining that granting priority to a shutdown reactor would necessarily result in schedule impact to other utilities).

In May 1990 – eight years before the Government was obligated to begin the acceptance of SNF on an industry-wide basis – the Edison Electric Institute ("EEI"), a nuclear industry organization, expressed its disagreement with SMUD's view regarding the use of the priority provision. DX 1366. In a May 30, 1990 letter to the EEI/UWASTE steering committee, Steven Kraft, the director of Nuclear Waste and Transportation Activities for EEI stated:

> On March 30, the General Manager of the Sacramento Municipal Utility District wrote to Secretary Watkins. Since Rancho Seco has been shut down, SMUD has been investigating possible ways to reduce their expenditures and operations at the site. They are currently considering placing the fuel in dual purpose casks, and they are interested in DOE cooperation in a demonstration project.
>
> SMUD has also been working with their Representatives in Congress to obtain direction from DOE to carry out such a project.
>
> <u>EEI/UWASTE is very concerned about these efforts to gain special treatment for one reactor, and to provide priority to a shutdown reactor; the ACR Response Team reviewed the SMUD position and had no sympathy whatsoever for it. We will continue to express our position to DOE.</u>

DX 1366, at SMUD 0036648 (emphasis added).

SMUD failed to present any testimony or evidence concerning what effect the grant of priority in SNF acceptance would have had in terms of DOE's acceptance of SMUD's SNF.

53. DOE explained at the time of Contract formation that the shutdown priority provision in the Contract was "necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." Final Rule, 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983) (PX 30).

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact because it is not supported by the evidence cited and is contrary to the evidence presented at trial. <u>See</u> Gov't Resp. to PFOF ¶ 52. Further, SMUD has failed to cite any contemporaneous statement regarding

how or why DOE would have exercised its authority pursuant to this provision.

**B. SMUD and Its Development of a Dual-Purpose Dry Storage System**.

54. Sacramento Municipal Utility District ("SMUD") is a municipal utility district in the State of California. Tr. at 110-111 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

55. Because SMUD is a public agency, SMUD does "not have stockholders like an investor-owned utility would." Tr. at 111 (Shetler). Rather, SMUD's customers are its owners.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the referenced testimony of Mr. Shetler does not support the statement that "SMUD's customers are its owners."

56. SMUD is responsible for providing electric power to private residents, commercial enterprises, and industry in its service area. SMUD serves a population of approximately 1.3 million and has approximately 550,000 customers. Tr. at 113 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the referenced testimony does not support the statement that "SMUD is responsible for providing electric power to private residents, commercial enterprises, and industry in its service area."

57. SMUD gets electricity from a variety of sources, including hydro generation, cogeneration plants, and renewable technologies. Tr. at 113-14 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the referenced testimony of Mr. Shetler does not support this finding.

58. SMUD also purchases power on the wholesale market to meet requirements and reduce costs. Tr. at 113-14 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the referenced testimony of Mr. Shetler does not support this finding.

59. SMUD is governed by an elected seven member Board of Directors. Tr. at 111

(Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, and agrees that SMUD has accurately stated the testimony of Mr. Shetler, we would note that, in the 1989-1991 time frame, SMUD had a five member Board of Directors. Tr.876:4-5 (Ferreira) (noting that at time of shutdown, SMUD had a five member board); PX 222, at HQR 0160500.

60. The members of the Board are elected for staggered four-year terms, and each represents a different geographic area within SMUD's service area. Tr. at 111 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

61. The Board of Directors makes policy decisions for SMUD and appoints the General Manager, who is responsible for all of SMUD's operations. Tr. at 111-12 (Shetler).

RESPONSE: The Government objects to the extent the evidence does not support SMUD's proposed finding of fact. The cited testimony of Mr. Shetler does not state that the Board of Directors makes policy decisions for SMUD. Further, Mr. Shetler testified that "the general manager is the chief executive officer of the District and she, in turn, is responsible for the hiring of all other employees." Tr.111:22-24 (Shetler). Mr. Shetler did not testify that the general manager is responsible for all of SMUD's operations.

62. Rancho Seco Nuclear Generating Station ("Rancho Seco") was built on approximately 2400 acres of land in southeast Sacramento County in the mid-1970s. Tr. at 131 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we would note that Mr. Shetler testified that "[t]his is the Rancho Seco boundary, the fenced area that we would call the security area. That's roughly 80 acres. SMUD owns about 2400 acres out of this facility, this total site." Tr.131:17-21 (Shetler).

63. The nuclear power plant at Rancho Seco was a pressurized water reactor licensed to operate through 2008. Tr. at 122, 291 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, SMUD's citation to Mr. Shetler's testimony does not support its proposed finding. With respect to the date associated with its operational license, SMUD has cited to counsel for the Government's reading of SMUD's proposed decommissioning plan, DX 248, and not to any

testimony of Mr. Shetler.

64. As a result of various outages at SMUD during the 1980s, and the resultant increases in rates, in 1988 the citizens of Sacramento put an initiative on the ballot proposing to close down Rancho Seco. Tr. at 127-28 (Shetler); Tr. at 876 (Ferreira).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

65. A majority of SMUD's Board of Directors were in favor of continuing to support Rancho Seco and placed a counter-initiative on the ballot in 1998 that proposed keeping Rancho Seco operating for up to eighteen months as a trial period, which would be followed by another electoral vote on whether to continue operation of the plant. *Id.*

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the testimony cited by SMUD does not support its proposed finding. Mr. Shetler did not testify that a majority of the Board of Directors were in favor of continuing to support Rancho Seco. Further, Mr. Ferreira testified that, "[a]t the time, there was a five member board, there was probably four to one in favor of continuing to support the nuclear power plant." Tr.876:11-13 (Ferreira) (emphasis added). Mr. Ferreria's testimony is much more equivocal than SMUD's proposed finding suggests.

66. The 1988 vote to close Rancho Seco failed by approximately 1%, 51% to 49%. Tr. at 877 (Ferreira). The vote to continue the operation of Rancho Seco for the trial period passed by about 3% or 4%. *Id.*; Tr. at 128 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, Mr. Shetler's cited testimony does not support SMUD's factual finding that the "vote to continue the operation of Rancho Seco for the trial period passed about 3% or 4%."

67. As a result of a surplus of power in California in the late 1980s, SMUD was able to negotiate long-term contracts for backup power supply at favorable fixed rates. Tr. at 887-91 (Ferreira). Because SMUD could purchase this replacement power at a comparable cost to operating Rancho Seco at least 75% of the time, which was right around the national average, the

executive management team recommended to the Board in 1980 that Rancho Seco be shut down. Tr. at 890-93 (Ferreira).

RESPONSE: The Government does not object to the first sentence of SMUD's proposed finding of fact. The Government does object to the second sentence of SMUD's proposed finding of fact because it is not supported by the record in this case. First, Mr. Ferreira did not testify as to the reasons why the "executive management team" recommended to the Board that Rancho Seco be shut down. Rather, Mr. Ferreira explained the reasons why he recommended that the Rancho Seco plant be shut down. Tr.890:24-891:25 (Ferreira). Second, the recommendation to shut down the Rancho Seco plant occurred in 1989, not 1980. Tr.889:10-24 (Ferreira).

68. Of the five Board members at the time in 1989, four favored continued operation of Rancho Seco. Tr. at 893 (Ferreira).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

69. The Board of Directors, however, represented to the public that if the result of the election was a vote to shutdown the plant, the Board would initiate shutdown immediately. Tr. at 895 (Ferreira) (noting "the board had conveyed to the community that . . . they would allow the customers to vote on the outcome of and the future of the nuclear power facility, so it's unlikely that the board at that point would take a position that would be in conflict with . . . what the customer base was supporting at that time").

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the cited testimony does not support the proposed fact that the Board of Directors represented to the public that it would immediately initiate shutdown of Rancho Seco if the public voted to shut down the plant.

70. The second election regarding the future of Rancho Seco was held in June 1989. By a vote of approximately 53% to 47%, the voters elected to close Rancho Seco. Tr. at 128 (Shetler); Tr. at 893 (Ferreira).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, Mr. Shetler's cited testimony does not support SMUD's proposed finding of fact.

71. The Board of Directors initiated shutdown of the Rancho Seco nuclear power plant on June 7, 1989. Tr. at 129 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

72. There are no current plans for reuse of the Rancho Seco plant. Tr. at 136 (Shetler).

RESPONSE: The Government objects to the extent this proposed finding of fact is incomplete. Although Mr. Shetler testified that, "at this stage," there were no plans for reuse of the Rancho Seco site, Mr. Shetler also explained that SMUD is in the process of building a new power plant to the south of Rancho Seco and is using Rancho Seco's switch yard and water supply. Tr.136:2-15 (Shetler).

73. At the time of shutdown, SMUD had 493 spent nuclear fuel assemblies. Tr. at 133 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

74. The most recent estimate for the total cost of decommissioning Rancho Seco, projected through the end of 2008 in present year dollars, is $524 million. Tr. at 698 (Redeker).

RESPONSE: The Government objects because the record does not support SMUD's proposed finding of fact. Mr. Redeker testified that, although projections for future years' expenditures through 2008 are in present year dollars, amounts spent on decommissioning up until the estimate were measured "in dollars of the year spent up to this point." Tr.698:3-9 (Redeker).

75. SMUD has incurred approximately $300 million in decommissioning costs. Tr. at 698 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

76. Decommissioning involves the dismantlement and decontamination of the plant and site in a manner that satisfies the NRC's requirements.

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is not supported by any citation to the record in this case.

77. Total decommissioning of a nuclear power plant cannot be accomplished until all of the spent nuclear fuel and high-level radioactive waste is removed from the site. Tr. at 2624 (Burford).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, SMUD's only support for this proposed finding is the testimony of the Government's expert, Jerry Burford. However, as we explained in the course of our objection to this line of questioning at trial, we are not offering Mr. Burford as an expert on decommissioning, and this questioning fell outside the scope of the opinions Mr. Burford offered at trial. Tr.2623:5-23 (Burford). Second, it is unclear what SMUD means by "total decommissioning." The question before Mr. Burford was whether SMUD could "fully decommission its site before DOE picks up all its spent fuel." Tr.2624:6-7 (Burford). Third, Mr. Burford testified that SMUD could decommission its nuclear power block even if it continued to possess SNF, which is referred to as a Part 50 license, but that it would have to maintain its Part 72 license until SMUD's SNF was off-site. Tr.2624:9-18 (Burford); Tr.140:10-23; Tr.142:21-143:5 (Shetler) (explaining the distinction between Part 50 license issued for the nuclear power plant, and Part 71 and 72 licenses issued for dual-purpose dry storage).

78. During its operation and through 2002, Rancho Seco utilized a wet pool for the storage of its spent nuclear fuel. Tr. at 137, 140-41 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding, the cited testimony by Mr. Shetler does not support the fact that SMUD's SNF was stored in its wet pool through 2002.

79. A crane is used to move the fuel assemblies from the reactor vessel into the spent fuel pool, to move assemblies around within the pool, and to load the assemblies into a canister. Tr. at 133 (Shetler); 508-510 (Redeker).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we would note that the crane Mr. Shetler and Mr. Redeker were referring to at trial was the gantry crane. SMUD's damages claim also improperly includes the costs associated with the refurbishment of its Polar crane, which is located inside SMUD's Reactor Building, and is not utilized in the movement of SNF. Direct Testimony of Jerry Burford, at ¶110 (citing DX 1151 & DX 1363).

80. At the time of shutdown, all of the spent fuel was stored in SMUD's spent fuel pool, DOE already had begun announcing delays in its repository program, and SMUD began

studying its options for managing the spent fuel at Rancho Seco in light of the likelihood that DOE would not begin performance in 1998. *See* PFF ¶¶ 117-132.

RESPONSE: The Government does not object to SMUD's proposed finding of fact concerning the fact that, at the time of the premature shutdown of Rancho Seco, SMUD had stored all of its SNF in its wet pool. However, the Government does object to SMUD's proposed finding of fact to the extent SMUD suggests its "studying" of options was made "in light of the likelihood that DOE would not begin performance in 1998." In fact, SMUD decided to pursue dual-purpose dry storage as early as 1990 because of its belief that it would facilitate DOE's timely, and perhaps even early acceptance of SNF. See DPFOF ¶¶ 20-64. Indeed, SMUD believed at least into 1995 that DOE could perform in a timely manner. See DPFOF ¶ 73. Simply put, SMUD's 1990 decision to pursue dual-purpose dry storage was wholly independent of the Government's breach of the Standard Contract. DPFOF ¶¶ 20-64.

81. SMUD's pursuit of a dry storage system was closely coupled with a demonstration project involving DOE as suggested by the 1990 study by SMUD's consultant, S. Levy Incorporated. *See* PFF ¶¶ 128-130.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD did not enter into a demonstration program with DOE until December 1994, almost five years after DOE decided to pursue dry storage (DPFOF ¶ 176), and more than 2 years after SMUD had signed its contract with Pacific Nuclear for the development of its dual-purpose system. DX 1328. Therefore, SMUD's pursuit of a dry storage system could not, as a matter of fact, have been "closely coupled" with a DOE demonstration program. Further, the demonstration program that SMUD and DOE entered into included not just the demonstration of dual-purpose dry storage, but also the development of a dry transfer system. DPFOF ¶¶ 170, 173, 176. Indeed, DOE viewed the dry transfer system as being the primary purpose of the demonstration program. DPFOF ¶ 176. Further, DOE was responsible under the cooperative agreement for the "full cost" of the dry transfer system. DPFOF ¶ 178. SMUD ultimately decided not to pursue the dry transfer system.

82. The demonstration project was spurred on in part by Fiscal Year 1991 appropriations in which Congress directed DOE to pursue a cooperative research and demonstration project to demonstrate dual-purpose casks. Tr. at 187 (Shetler); Tr. at 2234-43 (Williams).

RESPONSE: The Government objects to SMUD's proposed finding of fact. On March 30, 1990, having decided to pursue a strategy to place its SNF in a dual-purpose cask,

SMUD sought DOE's assistance in licensing its dual-purpose casks by proposing to DOE a joint demonstration project. DPFOF ¶ 166. In addition to seeking assistance from DOE, SMUD lobbied Congress as well. After SMUD officials met with Congressman Fazio, the House Appropriations Committee recommended an appropriation of $3 million for DOE to engage in a demonstration project "in cooperation with a west coast utility which has a nuclear reactor permanently shut down due to a citizen's initiative [and which] has an immediate need for development of dual-purpose cask storage . . . ." DPFOF ¶ 167. Rather than simply appropriating funds, as SMUD had requested, the Conference Committee directed DOE to "develop a plan" to implement a cooperative research, development, and demonstration project. DPFOF ¶ 168. Simply put, the demonstration program was in fact spurred by SMUD's desire to obtain financial support for its dry storage project from the Government. DPFOF ¶ 166. Finally, Mr. Shetler's testimony does not support this proposed finding of fact.

83. In 1991, SMUD began negotiations with DOE for a demonstration project and began developing potential specifications for a dry storage system. PX 220, 224, 229, 233, 236, 245, 246, 253, 258; *see also* PFF ¶¶ 296, 573.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

84. In December 1991, SMUD issued a Solicitation for Dual Purpose Casks and Request for Proposal, seeking proposals from vendors for casks that could be used for an on-site dry storage facility. *See* Memorandum Regarding Solicitation for Dual Purpose Cask and Proposers Site Visit (Dec. 5, 1991) (PX 233); Request for Proposal (Jan. 15, 1992) (Defendant's Exhibit ("DX") 308).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, SMUD's Request for Proposal was issued on January 15, 1992, rather than December 1991, as SMUD's proposed finding of fact suggests. DX 308.

85. SMUD shared its solicitation and specification for the dual purpose casks with DOE officials. PX 229, 236; *see also* Tr. at 980-81 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, neither of the documents SMUD refers to supports its statement that SMUD shared its solicitation and specification for the dual purpose casks with DOE officials. The first document referenced, PX 229, reflects that SMUD shared a draft of its specifications with DOE officials, but in no way reflects that SMUD shared its final solicitation or specifications for its dual

purpose casks with DOE officials. The second document, PX 236, simply reflects the fact that SMUD held a pre-meeting for prospective vendors to discuss the request for proposal, and that a DOE employee was in attendance. Again, this document does not support SMUD's statement that SMUD shared its solicitation and specification for the dual purpose casks with DOE officials. Second, Mr. Field's testimony does not support SMUD's proposed finding of fact. All Mr. Field testified to at trial was that DOE officials reviewed and commented upon the technical portion of the specification. Tr.980:10-14 (Field). This testimony does not support SMUD's proposed finding of fact that SMUD shared the solicitation and specification for the dual purpose dry storage project with DOE officials.

86. SMUD received five bids from different storage vendors for the cask and canister portion of the storage facility, ranging from approximately $12 million to $72 million. *See* Staffing Summary Sheet (DX 35) (listing five bidders and total bids); Tr. at 981-82 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

87. The proposed bids did not include the necessary costs of SMUD engineering activities, oversight, management, nor the costs of loading and transferring the fuel to the ISFSI. Tr. at 982 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact because the cited testimony does not support its proposed finding of fact. Mr. Field testified that SMUD's solicitation for its dry storage project did not include "the pad that the storage containers would rest on and any on-site work," SMUD's oversight of the dry storage project, or the cost of training or procedure development for the project. Tr.982:13-983:3 (Field). Mr. Field did not testify about engineering activities, management, or the costs of loading and transferring the fuel to the ISFSI. Consequently, SMUD's proposed finding of fact is not supported by the testimony cited.

88. SMUD's dry fuel canisters are large metal containers that hold a total of twenty-four spent nuclear fuel assemblies. Tr. at 142 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the relied upon testimony does not support SMUD's assertion that the canisters were large or made of metal.

89. SMUD's canisters were designed for two purposes: 1) dry storage of the fuel in a storage facility, and 2) ultimate transport on highways in a cask. Tr. at 143 (Shetler) ("The cask

provides the shielding necessary to handle the device out of the water or the canister out of the water and also provides the support structure for shipping and protecting the fuel during transportation.”).

RESPONSE: The Government does not object to SMUD’s proposed finding of fact. However, SMUD presented no evidence that SMUD’s canisters were designed for disposal of SMUD’s SNF at a Federal facility.

90. At the time SMUD contracted for its system, no company had a cask or canister that was licensed for both storage *and* transportation of SNF—a “dual-purpose” system. Tr. at 190 (Shetler); Tr. at 2249 (Williams).

RESPONSE: The Government objects to SMUD’s proposed finding of fact. Although, in 1991, no company had a cask or canister that was licensed for both storage under Part 72 and transportation under Part 71, Mr. Shetler explained that “there were some licensing efforts that were started on the part of some of the vendors” during that time period. Tr.190:14-16 (Shetler). Further, SMUD’s own expert, Ivan Stuart, a former vice president at NAC International, a company that had already gone through the initial “pain and suffering” of NRC licensing review for its dual purpose system. Tr.1383:1-5 (Stuart). Mr. Stuart sought to sell its NAC-STC dual-purpose dry storage system to SMUD and, when SMUD rejected NAC’s bid, Mr. Stuart warned SMUD that there were higher risks in terms of receiving a license for the NUHOMS system that SMUD ultimately pursued than had it pursued the NAC-STC system. DPFOF ¶ 188. Indeed, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system because the NUHOMS system was unlicensed. DPFOF ¶ 189. In 1992, when SMUD signed its contract with Pacific Nuclear, Mr. Stuart believed that SMUD did not make the right decision in choosing the NUHOMS system. DPFOF ¶ 190. The NAC-STC ultimately received its certificate for compliance for a Part 71 transportation license in 1994. DPFOF ¶ 191. In fact, Mr. Stuart testified that, had NAC had any customers for its NAC-STC, it could have been fully licensed as early as October 1994. DPFOF ¶ 192.

91. SMUD signed a contract with Pacific Nuclear, the lowest bidder, for a dual-purpose dry storage system in October 1992 after a thorough and complete evaluation. *See* SMUD Contract E-776 (Sept. 25, 1992) (PX 267); DX 315.

RESPONSE: The Government does not object to SMUD’s proposed finding of fact to the extent that SMUD signed a contract with Pacific Nuclear in October 1992. However, neither document relied upon by SMUD suggest that Pacific Nuclear was the “lowest bidder.” Further, neither of the documents relied upon by SMUD support its statement that a “thorough and

complete evaluation" was conducted. In fact, DX 315 simply outlines the guidelines that SMUD intended on utilizing to evaluate bids that it received. The documents cited by SMUD in support of this proposed finding of fact do not concern any actual evaluation that SMUD conducted on prospective bidders. Further, John Stobbs, the president of NAC, and Ivan Stuart's former supervisor, wrote a letter to SMUD shortly after SMUD awarded its bid to Pacific Nuclear and expressed his concerns about the apparent improprieties in SMUD's evaluation process. DPFOF ¶ 197.

92. Pacific Nuclear's original cost and schedule estimate for the dry-storage project assumed that the majority of the design work was completed because Pacific Nuclear already had a licensed storage-only canister system, the NUHOMS system, and a licensed transport-only cask, the 125-B cask, that it believed it could convert to a dual-purpose (storage and transport) system with modest technical changes. Tr. at 537-38 (Redeker); 985-87 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. The Government would note, however, that at the time SMUD signed its contract with Pacific Nuclear, SMUD believed that it could have its SNF completely loaded into dry storage by 1995. See DX 372, at SMUD 0004192; DX 384, at SMUD 0002740-42; PX 646, at Direct Testimony of John McGrath, at ¶ 36 & Ex. B. Eileen Supko, whom SMUD has presented as an expert in this case, believes that SMUD's assumption that it could have completed the licensing process in three years was unreasonable. DPFOF ¶ 235.

93. In early 1993, within months of SMUD and Pacific Nuclear signing the contract, the NRC advised Pacific Nuclear that additional testing would be required for the design of the casks and canisters to insure that the system was sufficient for safe transport of SNF. PX 267, 295; Tr. at 537-38 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

94. Pacific Nuclear and SMUD initially expected two or three rounds of questioning from the NRC, but received at least seven. PX 845.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

95. Pacific Nuclear changed its name to Vectra Technologies after acquiring ABB

Impell in 1993. DX 442.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

96. Because the contract changed in scope over the course of the project, SMUD and Vectra signed 11 different change orders formally memorializing these changes. *See* SMUD Contract E-776 and accompanying change orders (PX 267); *see, e.g.*, Tr. at 225 (Shetler) (noting contract change to accommodate NRC requirement of impact limiter testing); PFF ¶¶ 294.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

97. Vectra had contracts with a number of other utilities to develop dry storage systems. Tr. at 997-99 (Field). The Vectra dry storage systems were named the "NUHOMS" system. Tr. at 1003-04 (Field).

RESPONSE: The Government objects to first sentence of SMUD's proposed finding of fact. Mr. Field identified four nuclear power plants who were customers of Vectra: Oconee Nuclear Power Plant, Davis Besse Power Plant, Oyster Creek, and Susquehanna. Tr.997:22-23 (Field). However, Mr. Field never identified these nuclear power plants as customers of Vectra for the purpose of developing dry storage systems, and this statement is unsupported by the record. The Government does not object to the second sentence of SMUD's proposed finding of fact.

98. These utilities, including SMUD, often collaborated in their interaction with Vectra and formed a working group called the NUHOMS Owners Group. Tr. at 1003-04 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

99. After three years of meetings and negotiations, SMUD and DOE officially signed a Cooperative Agreement in December 1994. Notice of Financial Assistance Award (Sept. 30, 1994) (PX 371).

RESPONSE: Although the Government does not object to the fact that SMUD and DOE officially signed a Cooperative Agreement in December 1994, the Government does object to SMUD's statement that the Cooperative Agreement was signed "[a]fter three years of meetings and negotiations," because PX 371 does not support this statement.

100. In 1996, as a result of additional NRC-required testing, SMUD informed DOE that there likely would be additional costs for the dual-purpose cask as part of the DOE / SMUD Cooperative Agreement. PX 449.

RESPONSE: The Government objects to SMUD's proposed finding of fact to the extent that it suggests that SMUD informed DOE that there would likely be additional costs "as a result of additional NRC-required testing." As indicated in PX 449, SMUD represented to DOE that, "[i]f the NRC accepts VECTRA's analysis, cask transportation licensing can proceed pretty much on its current schedule. However, preliminary discussions with NRC have indicated that they are not necessarily convinced that the gap exists, much less its thickness and uniformity." PX 449, at SMUD 0018321. Further, SMUD explained to DOE in this letter that, "[b]ecause SMUD is not convinced that the NRC will accept the proposed analysis, taking credit for the gap, we have ordered XM-19 sufficient to rework both casks (~$150,000)." PX 449, at SMUD 0018322. Consequently, at the time SMUD authored PX 449 and requested additional funding from DOE, the NRC had not yet required any additional testing, and SMUD's proposed finding is not supported by the document cited.

101. In January 1997, NRC issued a "Demand for Information" ("DFI") to Vectra asking why the NRC should not halt Vectra's fabrication activities based on quality assurance concerns. PX 509.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

102. In the late 1990s, many vendors of dry storage systems were experiencing similar technical and financial difficulties as Vectra in developing their own dry storage systems. Tr. at 997-1000 (Field); Tr. at 578-79 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is not supported by the cited testimony. Mr. Redeker testified that, when the Trojan and Dresden power plants were considering dry storage, they received over 100 questions from the NRC on their applications. Tr.578:11-14 (Redeker). Mr. Redeker further testified that the Point Beach nuclear power plant had an explosion when it attempted to load its casks, and that "rightfully" caused the NRC serious concern. Tr.578:19-24 (Redeker). Finally, Mr. Redeker testified that a utility in Michigan discovered, after it loaded its ISFSI, that the walls of one of its canisters were too thin. Tr.579:8-14 (Redeker). However, Mr. Redeker never testified that any of these utilities that he mentioned incurred financial difficulties similar to Vectra. Nor did Mr. Redeker explain how the utilities he referenced had "similar" technical difficulties to Vectra. Additionally, Mr.

Redeker never testified that each of these utilities experienced such difficulties "in the late 1990s."

Further, Mr. Field testified about only four of Vectra's customers. Tr.997:19-23 (Field). Consequently, Mr. Field's testimony does not support SMUD's proposed finding of fact that "many vendors of dry storage systems were experiencing similar technical and financial difficulties as Vectra in developing their own dry storage systems." Finally, any technical or financial difficulties of other vendors is irrelevant to the delays of SMUD's vendor in this case.

103. Vectra declared bankruptcy in October 1997. Tr. at 237 (Shetler); Tr. at 997 (Field).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, neither Mr. Shetler nor Mr. Field's testimony supports the statement that Vectra declared bankruptcy in October 1997. Rather, Mr. Shetler simply testified that Vectra declared bankruptcy in 1997, without reference to a particular month. Tr.237:16-17 (Shetler). Similarly, Mr. Field testified that Vectra declared bankruptcy "at the end of 1997," without reference to a particular month. Tr.997:17-18 (Field).

104. In November 1997, Transnuclear West, Inc. ("TNW") purchased Vectra's assets out of the bankruptcy estate. Tr. at 238 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, Mr. Shetler's cited testimony does not support the date upon which Transnuclear West, Inc. took ownership of the Vectra product line. Tr.238:21-25 (Shetler) ("Ultimately another vendor did, through the bankruptcy court, take ownership of the Vectra product line. That was TransNuclear West.").

105. By order of the bankruptcy court, TNW agreed to complete the SMUD project without profit. Tr. at 634 (Redeker); PX 585.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

106. In May 1998, NRC gave TNW approval to begin limited fabrication of NUHOMS components. PX 580. TNW and its subcontractors began fabrication for SMUD's project in late 1998, early 1999. Tr. at 1141 (Field); Plaintiff's Demonstrative Exhibit ("PX Dem.") 75.

RESPONSE: The Government does not object to the first sentence of SMUD's proposed finding of fact. The Government does however object to the second sentence in SMUD's

proposed finding because it is not supported by the cited testimony. Mr. Field testified that TNW's subcontractor began canister fabrication "sometime in 1999," although he could not remember when in 1999 fabrication began. Tr.1141:7-13 (Field). Further, the Government objects to SMUD's reliance upon one of its demonstrative exhibits as support for its proposed findings of fact. SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon them to support its proposed findings of fact.

107. In September 1998, the NRC issued a transportation license to TNW under 10 C.F.R. Part 71 concluding that the design for the cask and canisters would be sufficient for off-site transportation of SNF. PX 596.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

108. In September 2000, the NRC issued a storage license to SMUD under 10 C.F.R. Part 72 concluding that SMUD could store SNF in its ISFSI using the licensed canister design. PX 962.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

109. In September 2000, SMUD received the first completed canister. *See* Rancho Seco Weekly Updates at SMUD 0010102 (PX 640).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

110. SMUD loaded the first canister with spent nuclear fuel in April 2001. Tr. at 665 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

111. SMUD ultimately received 21 dual-purpose canisters and loaded each of them with 24 separate fuel assemblies (except for one canister that holds only 13 assemblies). Tr. at 144-46 (Shetler); Tr. at 496-522 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Shetler

stated at trial that SMUD received 22 dual-purpose canisters rather than 21. Tr.145:11-13 (Shetler). Mr. Shetler testified that the 22nd dual-purpose canister would be used to store Greater Than Class C low level radioactive waste. Tr.145:15-20 (Shetler). Further, the canister that contains 13 assemblies was built specifically for failed fuel. Tr. at 505:18-25 (Redeker).

112. Each of the 21 dual-purpose canisters, loaded with SMUD's spent nuclear fuel, have been placed in SMUD's Independent Spent Fuel Storage Installation ("ISFSI") for storage. Tr. at 665-68 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

113. The ISFSI is composed of twenty-two horizontal storage modules located on a concrete pad. Tr. at 144-45 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

114. The horizontal storage modules are made of concrete, which provides shielding for the spent nuclear fuel, and includes vents for the circulation of air for cooling purposes. Tr. at 145 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

115. SMUD used the single transportation cask to move each of the canisters from the wet pool to the ISFSI. Tr. at 144-46 (Shetler), 496-00 (Redeker).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the reference to Mr. Shetler's testimony does not support SMUD's proposed finding of fact.

116. SMUD finished loading the fuel into the ISFSI in August 2002. Tr. at 668 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

## III. The Government's Failure To Begin Acceptance Of Spent Nuclear Fuel and SMUD's Response.

### A. Eleven Years Of Announced Delay And DOE's Ultimate

**Failure to Begin Acceptance in 1998**.

117. Beginning in 1987, DOE made periodic announcements indicating that it would not meet the July 31, 1998 starting date for spent fuel acceptance under the Standard Contract and that its acceptance of such fuel from SMUD and other utilities would be delayed until 2010 or later.

a. In its January 1987 Draft Mission Plan Amendment DOE announced that it would not begin accepting spent fuel at the permanent repository until 2003, and his announcement was repeated in its March 1987 Monitored Retrievable Storage Submission to Congress and its June 1987 Final Mission Plan Amendment PX 109 at 5; PX 113 at 2; PX 118 at 6.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the referenced document does not support the assertion that DOE made periodic announcements indicating that it would not meet the July 31, 1998 starting date for spent fuel acceptance under the Standard Contract and that its acceptance of such fuel from SMUD and other utilities would be delayed until 2010 or later. In addition, this proposed finding ignores that as late as 1994, DOE repeatedly informed the nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to

1994. Id. at *5.

b. In its June 1988 Draft Mission Plan Amendment and 1988 Annual Capacity Report, DOE similarly projected that waste acceptance would not begin at the permanent repository until 2003. PX 143 at 15; PX 142 at 5.

RESPONSE: See response to a. above.

c. In its November 1989 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program ("Reassessment Report"), DOE announced that the repository would not begin operations until at least 2010. PX 169 at vii.

RESPONSE: See response to a. above.

d. In its May 1994 Notice of Inquiry in the Federal Register ("Notice of Inquiry"), DOE stated that "[t]hus far, neither the efforts of the Department nor any other organization . . . have achieved the level of success needed to realize significant success in developing a site by 1998" and expressed its "preliminary view" that it had "no obligation to accept spent nuclear fuel in 1998." PX 351 at 3, 4.

RESPONSE: See response to a. above.

e. In its May 1995 Final Interpretation of Nuclear Waste Acceptance Issues in the Federal Register ("Final Interpretation"), DOE stated its conclusion that its obligation to commence fuel acceptance by January 1998 was conditional upon the existence of an operating repository or interim storage facility constructed under the NWPA, reiterated its belief that "the earliest possible date for acceptance of waste for disposal at a repository is 2010," and acknowledged that utilities would have to plan for the long-term storage of spent fuel in light of this delay. PX 410 at 3, 9.

RESPONSE: See response to a. above.

118. In mid-1988, DOE sent SMUD a letter stating that its projected waste acceptance would not begin until 2003, a 5-year delay in performance. PX 144.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, SMUD's proposed finding ignores that, as late as 1994, DOE repeatedly informed the nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

119. Although DOE suggested in the late 1980s and early 1990s that it might still meet the 1998 start date by accepting fuel on an interim basis at a monitored retrievable storage facility ("MRS"), it also recognized that this would not only require that the federal government identify a host site, but also that Congress amend the NWPA and abolish the statutory linkages between an MRS and the repository. These linkages prohibit development of an MRS until after the NRC authorizes construction of the repository, 42 U.S.C. § 10168(d)(1), and effectively preclude operation of an MRS until three years before the repository opens. PX 169 at 19; Designations Appendix (Dckt. #310) at 20-21 (Milner); Designations Appendix (Dckt. #310) at

775 (Barrett).

a. In its June 1988 Draft Mission Plan Amendment, DOE recognized that because of the statutory linkages between an MRS and the repository, it was unlikely to begin accepting fuel at an MRS in 1998. PX 143 at 15.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, this proposed finding ignores that as 1991, DOE informed all Standard Contract holders, including SMUD that DOE planned to work with Congress to remove the statutory linkages between the MRS and the Repository PX 188 at 4-5; and that SMUD recognized that DOE was attempting to remove those linkages. DPFOF ¶ 57.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

b. In its November 1989 Reassessment Report, DOE stated that "the current linkages between the repository and the MRS program make it impossible for DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository," and that if the current statutory linkages were maintained, then an MRS could not open before 2007. PX 169 at x, 17.

RESPONSE: See response to a. above.

c. In its 1990, 1991, and 1992 Annual Capacity Reports, DOE similarly

recognized that "[i]f the current linkages to the repository are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF/HLW by the DOE would not start until 2007." PX 188 at 5; PX 231 at 4; PX 294 at 3.

RESPONSE: The Government objects to this SMUD's proposed finding of fact as misleading. In each of the documents cited DOE expressly indicated that DOE assumed that the congressional linkages between the MRS and the repository would be removed. PX 188 at 4-5; PX 231 at 4; PX 294 at 3. See also response to a. above.

d. In 1992, DOE publicly announced that it would not be able to open an MRS by 1998. *DOE Acknowledged Last Week That It Will Not Be Able to Build a Monitored Retrievable Storage (MRS) Facility by 1998*, Inside Energy With Federal Lands at 14 (Dec. 21, 1992) (PX 973).

RESPONSE: See response to a. above. In addition, to the extent SMUD relies upon this article, it is not admissible evidence.

120. In the 1989 to 1991 time frame, the head of DOE's Office of Civilian Radioactive Waste Management, John Bartlett, and his deputy, Ron Milner, verbally advised SMUD that there were delays in the development of the permanent repository. Designations Appendix (Dckt. #310) at 2237, 2339-40 (Bowser).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, this proposed finding ignores that as late as 1994, DOE repeatedly informed the Nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely

perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

121. Other actions during the early 1990s confirmed that the receipt of spent fuel by DOE before at least 2010 was unlikely.

a. The General Accounting Office found in 1991 that an MRS was unlikely to open by 1998. PX 217 at 3-4, 19-23, 30-31.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact ignores that, as late as 1994, DOE repeatedly informed the nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

b. Efforts to locate a voluntary host for an MRS were unsuccessful and were legislatively terminated in the early 1990s. PX 265 (trade press article discussing opposition to siting MRS in Wyoming); PX 363 (Environmental Assessment) at 7

(discussing lack of siting success and legislative termination; PX 283 at 2 ("letter from then-Secretary of Energy Watkins stating that "[t]he Office of the Nuclear Waste Negotiator . . . has spent more than two years seeking a voluntary host and site for an MRS facility. That office has not been able to identify a viable candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel receipt by January 1998 as planned. Thus, alternative actions are required.").

RESPONSE: The Government objects to SMUD's proposed finding of fact as misleading. This proposed finding ignores that as late as 1994, DOE repeatedly informed the Nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

c. DOE did not meet any siting, engineering, permitting, or construction milestones for the development of an MRS. Tr. at 2170-73 (Kouts).

RESPONSE: See response to a. above.

d. DOE officials testified and DOE documents confirm that an MRS was unlikely by 1993 and not viable by 1994 and 1995. *See* Designations Appendix

(Dckt. #310) at 43-44, 205-08 (Barrett) (testifying that by Oct. 1993, when the funding for the MRS was cut by Congress, an MRS was "unlikely"); *id.* at 223, 273 (testifying that by late 1994 and early 1995, the MRS concept was "not viable"); Designations Appendix (Dckt. #310) at 419-22 (Milner) (testifying that DOE had given up plans for an MRS by 1994); Designations Appendix (Dckt. #310) at 649 (Brownstein); *see also* PX 380 at 1 (DOE December 1994 Program Plan concluding that "by 1993, it had become clear that continuation of the Program with then current approach was no longer a viable option").

RESPONSE: See response to a. above.

e. DOE's program to develop transportation cask designs for collecting and transporting spent fuel from utilities, known as the Cask Systems Development Program ("CSDP") "experienced long delays and was cancelled by 1993." I. Stuart Written Direct at 3 (PX 1001) (noting that "[w]hen cancelled, the program had not produced a functioning cask, notwithstanding the fact that the Government had spent approximately $100,000,000 on the project according to the GAO"); *see also* Tr. at 1403-04 (Stuart).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact ignores that, as late as 1994, DOE repeatedly informed the nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely

perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

f. DOE failed to make progress on the development of a repository. Dep. Des. at 44-45 (Freeman); Dep. Des. 52, 57, 62-63, 151-53 (Bowser).

RESPONSE: See response to a. above.

122. In December 1996, DOE advised SMUD by letter "that DOE anticipates it will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." PX 500. This letter further reinforced SMUD's decision to develop dry storage because it indicated that DOE would not accept fuel on a timely basis. Tr. at 593 (Redeker).

RESPONSE: Although the Government does not dispute the existence of the document cited, the document does not support the suggestion that SMUD's decision to continue to develop dry storage was motivated by a delay in DOE's performance of the Standard Contract. In addition, this proposed finding ignores that: (1) SMUD's revaluations of its dry storage project were motivated by the massive delays and significant cost overruns SMUD's dry storage projected suffered almost from its inception DPFOF ¶ 82; (2) SMUD conducted the 1997 reevaluation because its dry storage vendor, Vectra, stopped work on the dry storage project and that after SMUD's analysis Mr. Redeker made a presentation to the SMUD Board of Directors, and then to other entities outside SMUD in which he represented that the annual cost savings from going from wet storage to dry storage would be $10-$12 million, meaning that the cost of going to dual purpose dry storage would have paid for itself by 2001 – the year that SMUD would have had its first acceptance of SNF from DOE under the terms of the Standard Contract. DPFOF ¶¶ 87, 88, 89. This finding also ignores that in March 1997, SMUD's General Manager, Jan Schori indicated to DOE that SMUD was building dry storage "in an effort to enhance safety at the site and to reduce substantially the interim annual costs of wet storage." DPFOF ¶ 92. This proposed finding also ignores that in 1998, SMUD again examined its dry storage decision and again concluded that "there is a significant cost savings to have fuel in dry storage (between 10 to 12 million dollars per year) primarily due to decreased staff costs to maintain the fuel in dry storage." DPFOF ¶ 98; and that after SMUD filed its lawsuit in this case in 1998, SMUD

continued to examine the dry storage project because of the costs of the project and concluded that it made economic sense to continue with its dry storage project regardless of the delay in DOE's performance. DPFOF ¶¶ 100-109.

123. These DOE announcements, statements, and actions led SMUD to believe that DOE would probably not begin accepting spent fuel until sometime well after 1998, and that SMUD would probably have to continue to store spent fuel at Rancho Seco until well after 2010. This belief initially arose in the late 1980's and became more certain throughout the 1990s.

a. In the 1989 to 1990 period, it was apparent to SMUD that DOE probably would not begin accepting spent fuel in 1998, and SMUD retained S. Levy, Incorporated ("Levy") to evaluate its options for managing the spent fuel at Rancho Seco in light of this probability. Tr. at 154-55, 158 (Shetler).

RESPONSE: The Government objects to this SMUD's proposed finding. The referenced document does not support the assertion that in the 1989 to 1990 period, it was apparent to SMUD that DOE probably would not begin accepting spent fuel in 1998. In addition, this proposed finding ignores that as late as 1994, DOE repeatedly informed the Nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

In addition, this proposed finding ignores that: (1) Levy's report recommended that SMUD pursue dry storage and load all SNF into transportable casks "primarily because it could lead to DOE facility by 1998 . . . ." DPFOF ¶ 31; (2) after the Levy recommendation, SMUD saw dry storage as a "cheaper way" of dealing with fuel storage that could facilitate transport to DOE perhaps even sooner than to a Federal repository DPFOF ¶ 33; and (3) immediately after the March 1990 Board of Directors meeting, SMUD's general manager, David Boggs, drafted a letter to the Secretary of Energy indicating that, "[a]s a result of the [Levy] study, it was decided that the District pursue dual purpose (storage and transportation) casks or storage only casks that could be effectively interfaced with the early receipt by the DOE of Rancho Seco's spent fuel and subsequent use of the casks by DOE." DPFOF ¶ 34.

b. In 1990, Levy reported to SMUD that the "schedule for DOE pickup is currently highly uncertain with the earliest conceivable pickup date being 1998 and a much more likely pickup date well after 2010." PX 176 at 59.

RESPONSE: See response to a. above.

c. By late 1990, SMUD had a "pretty firmly held belief that . . . we shouldn't count on DOE picking up the fuel . . . in the next decade" based on statements at industry meetings, trade journal coverage, and the lack of congressional and physical activity. Designations Appendix (Dckt. #310) at 2251-52 (Bowser).

RESPONSE: The Government objects to SMUD's proposed finding as misleading. During her deposition, Ms. Bowser testified that she did not have the authority to make the decision to pursue dry storage. DPFOF ¶ 39. In addition, counsel for SMUD repeatedly represented that "Miss. Bowser did not speak on behalf of SMUD." DPFOF ¶ 40. In addition, in 1991, Ms. Bowser expressly told the SMUD Board of Directors that "it is likely that an MRS could be sited by 1998 . . . ." DPFOF ¶ 57. See also response to a above.

d. SMUD's General Manager from 1990 to 1994, David Freeman, testified that, based on his prior experience as Chairman of the Tennessee Valley Authority, the prospect for an MRS was a "dream" and that he "didn't think the above-ground storage option was going to happen." Designations Appendix (Dckt. #310) at 2310-13 (Freeman).

RESPONSE: Although the Government does not dispute that Mr. Freeman gave this testimony during his deposition in 2004, this proposed finding ignores that as late as 1994, DOE repeatedly informed the Nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

e. Although SMUD was hopeful that an MRS could be developed, it recognized that this would require legislative action and considered this unlikely to occur. Designations Appendix (Dckt. #310) at 2313 (Freeman) (testifying that his view regarding the MRS was "that that dog wasn't going to hunt"); Tr. at 254, 440-441, 466-468 (Shetler); Tr. at 534-35 (Redeker). SMUD understood that DOE abandoned the MRS process sometime in the mid-1990s. Tr. at 441 (Shetler).

RESPONSE: Although the Government does not dispute that Mr. Freeman provided the above-referenced testimony during his 2004 deposition and that Mr. Shetler provided the above-referenced testimony during trial, this proposed finding ignores that as of 1991, DOE informed all Standard Contract holders, including SMUD, that DOE planned to work with Congress to remove the statutory linkages between the MRS and the Repository, PX 188 at 4-5; and that SMUD recognized that DOE was attempting to remove those linkages. DPFOF ¶ 57.

In addition, this proposed finding ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish

an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition."), DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public, DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995, DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry, DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

f. By 1992, SMUD was projecting that DOE's acceptance of spent fuel would be delayed by 12 years from 1998 until 2010. PX 259 at 2; PX 269A; Designations Appendix (Dckt. #310) at 2290 (Freeman) (explaining that "my recollection is more the date when you, the government, in plain English, told us that it would be 2010 before you would pick it up"); Tr. at 209 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding. This proposed finding ignores that as late as 1994, DOE repeatedly informed the Nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition."), DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public, DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995, DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry, DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL

2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

g. In a March 1993 Environmental Assessment on decommissioning Rancho Seco, SMUD stated that a federal repository for spent fuel is "not currently available and no such repository is expected to be in place until approximately 2010" and that interim storage by DOE "is also not currently an option." PX 297 at 7.

RESPONSE: Although the Government does not dispute that the existence of the referenced document, the document is irrelevant to the disputes in this case because there never was an obligation for DOE to begin accepting fuel in 1993. In addition, this proposed finding ignores that as late as 1994, DOE repeatedly informed the Nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition."), DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public, DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995, DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry, DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

Finally, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. Id. at *5.

h. DOE's May 1994 Notice of Inquiry and May 1995 Fuel Interpretation provided additional evidence to SMUD that DOE would not begin accepting fuel in 1998 and raised questions about DOE's ability to begin fuel acceptance in 2010. Tr. at 556, 566-67, 573 (Redeker). Tr. at 253, 258 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding. This proposed finding ignores that as late as 1994, DOE repeatedly informed the Nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition."), DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public, DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995, DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry, DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

i. In its March 1997 response to DOE's December 1996 delay letter, SMUD noted that DOE's anticipated failure to begin accepting spent fuel in 1998 meant that "continued, long-term on-site storage at Rancho Seco will be necessary for the foreseeable future." PX 528 at 2.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, this proposed finding ignores that: in 1997 SMUD reevaluated its dry storage project because its dry storage vendor, Vectra, stopped work on the dry storage project and that after SMUD's analysis Mr. Redeker made a presentation to the SMUD Board of Directors, and then to other entities outside SMUD in which he represented that the annual cost savings from going from wet storage to dry storage would be \$10-\$12 million, meaning that the cost of going to dual purpose dry storage would have paid for itself by 2001 – the year that SMUD would have had its <u>first</u> acceptance of SNF from DOE under the terms of the Standard Contract. DPFOF ¶¶ 87, 88, 89. This finding also ignores that in its March 1997, SMUD's General Manager, Jan Schori indicated to DOE that SMUD was building dry storage "<u>in an effort to enhance safety at the site and to reduce substantially the interim annual costs of wet storage.</u>" DPFOF ¶ 92. This proposed finding also ignores that in 1998, SMUD again examined its dry storage decision and again concluded that "there is a significant cost savings to have fuel in dry storage (between \$10 to \$12 million per year) primarily due to decreased staff costs to maintain the fuel in dry storage." DPFOF ¶ 98; and that after SMUD filed its lawsuit in this case in 1998, SMUD continued to examine the dry storage project because of the costs of the project and concluded that it made economic sense to continue with its dry storage project regardless of the delay in DOE's performance. DPFOF ¶¶ 100-109.

124. DOE's expected and actual failure to begin accepting fuel in 1998 was a "basic premise" behind SMUD's efforts to develop the dry storage system. Tr. at 463-64 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although Mr. Shetler claimed at trial that DOE's failure to accept fuel in 1998 was a "basic premise behind SMUD's 1990 decision to pursue dry storage, Mr. Shetler's litigation inspired testimony is belied by the fact that SMUD repeatedly indicated both internally and to others including DOE and the NRC that it planned to complete its dry storage project by 1998 in anticipation of DOE's acceptance of SMUD's SNF as early as 1998. DPFOF ¶¶ 31, 34, 35, 49. In addition, this proposed finding ignores that as late as 1994, DOE repeatedly informed the Nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition."), DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public, DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995, DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry, DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

In addition, in <u>Indiana Michigan Power Co. v. United States</u>, No. 04-5122, 2005 WL 2173563 (Sept. 9, 2005), the United States Court of Appeals For The Federal Circuit expressly rejected the assertion that Spent Nuclear Fuel plaintiffs could recover costs incurred prior to 1994. <u>Id.</u> at *5.

### B. <u>SMUD's Initial Decision To Pursue Dry Storage</u>

.

125. By the time that SMUD's Rancho Seco reactor prematurely shut-down in June 1989, DOE was already projecting that it would probably not begin accepting spent fuel in 1998. PFF ¶¶ 117-120.

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although DOE announced in 1987 that a permanent Federal repository would be delayed until 2003, DOE also announced that it anticipated the development of a monitored retrievable storage ("MRS") system that would be available for the acceptance of commercial SNF by 1998. In fact, SMUD

believed that dual-purpose dry storage presented the best chance of having DOE accept its SNF under the Standard Contract through the use of an ("MRS") system by 1998. Id., Tr.254:21-25 (Shetler) ("[I]f there was a potential for any kind of an interim storage facility that could take the fuel earlier, having fuel in a dual-purpose system would hopefully expedite the ability to get fuel moved there."); Tr.278:15-19 (Shetler). SMUD believed that, if it had its SNF in dual purpose dry storage by 1998, DOE could accept SMUD's SNF at an MRS on a schedule as good as, if not better than, the schedule for acceptance at a Federal geologic repository. Tr.704:22-705:1 (Redeker) (explaining that although SMUD's first acceptance in non-breach world would have been 2001, SMUD believed its SNF could be accepted earlier at an MRS); DX 202, at Attachment at SMUD 0019251 ("Storage in transportable casks offers the best opportunity explored to keep open the possibility of early off-site shipment, possibly as early as 1998 should DOE develop a . . . MRS."); DX 217, at SMUD 0025576 (stating that "the District believes that by storing spent fuel in dual purpose storage and transport casks that early acceptance by DOE would be possible").

Mr. Shetler testified at trial that, both before and after a July 7, 1992 Board of Directors meeting, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF. Tr.400:21-24 (Shetler). Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition." Tr.440:25-441:2 (Shetler) (emphasis added). Indeed, as late as December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public. DX 481, at SMUD 0033398; Tr.383:17-24, Tr.388:19-21 (Shetler) ("I think we still had an expectation there was a possibility it could happen, yes."); Tr.705:2-5 (Redeker). Therefore, not only did DOE expressly state that it believed it could begin the acceptance of SNF by 1998 through the use of an MRS, SMUD clearly believed this to be the case, and pursued dual-purpose dry storage as a result of that belief.

126. During the remainder of 1989 and early 1990, SMUD sought to evaluate its options for managing the spent fuel at Rancho Seco in light of the probability that DOE would not begin accepting fuel in 1998. Tr. at 155 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although Mr. Shetler claimed at trial that, "[b]y the late '80s, early '90s, it was becoming apparent that the 1998 receipt date from DOE was not going to be met," Tr.154:22-25 (Shetler), Mr. Shetler also admitted that SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF. Tr.400:21-24 (Shetler). Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition." Tr.440:25-441:2 (Shetler) (emphasis added). Indeed, as late as December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public. DX 481, at SMUD 0033398; Tr.383:17-24, Tr.388:19-21 (Shetler) ("I think we still had an expectation there was a possibility it could happen, yes."); Tr.705:2-5 (Redeker).

Further, SMUD's contemporaneous documents unequivocally reflect that SMUD was evaluating its options for dry storage in light of its belief that DOE would perform by 1998. For example, David Boggs, the General Manager of SMUD at the time SMUD made its dry storage decision, drafted a letter to the Secretary of Energy indicating that, "[a]s a result of the [Levy] study, it was decided that the District pursue dual purpose (storage and transportation) casks or storage only casks <u>that could be effectively interfaced with the early receipt by the DOE of Rancho Seco's spent fuel and subsequent use of the casks by DOE.</u>" See DX 164 (emphasis added). Mr. Boggs' letter also assumed that DOE could identify an SNF storage site by 1998. See id. SMUD's proposed finding of fact is unsupported by the record in this case.

127. This forced SMUD to consider how to manage spent fuel at a non-operating reactor for up to several decades in a manner that would be safe, and cost-effective and would allow for the anticipated loss of experienced staff over time. Tr. at 160 (Shetler).

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact. First, SMUD's decision to pursue dual-purpose dry storage was based upon its belief that DOE could perform in a timely, and perhaps early, manner. DPFOF ¶¶ 26-35, 49. Second, SMUD's decision to pursue dual-purpose dry storage also was based upon its belief that dry storage would pay for itself in two-to-three years – years before its last acceptance of SNF by DOE in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. SMUD's proposed finding of fact is unsupported by the record in this case.

128. SMUD retained Levy to analyze its fuel storage options given that DOE's fuel acceptance was likely to be delayed. Tr. at 158 (Shetler); PX 176.

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact. Although the Government does not object to the fact that SMUD retained Mr. Levy to analyze its fuel storage options, the record does not support that SMUD hired Mr. Levy "given that DOE's fuel acceptance was likely to be delayed." Mr. Levy recommended to the SMUD Board of Directors that:

> SMUD pursue alternative of having all of its spent fuel in transportable storage casks before 1998 <u>primarily because it could lead to shipment to DOE facility by 1998</u> or to DOE interim acceptance of spent fuel at site by 1998.

DPFOF ¶ 31. (emphasis added). In explaining the rationale for recommending transportable storage casks, Levy reiterated that it "provides [the] earliest opportunity to ship fuel off-site." <u>Id.</u> Further, Mr. Shetler explained at trial that:

> What dry storage offered was a cheaper way of dealing with storage of fuel, so less impact from a cost standpoint. And at least in looking at what Mr. Levy was

> pulling together, based on potential options, a possibility that it would be in a form that could facilitate transport to the DOE in the long term and perhaps even sooner than the repository, if another mechanism were to come up.

Tr. 172:17-24 (Shetler).

David Boggs, the General Manager of SMUD at the time SMUD made its dry storage decision, drafted a letter to the Secretary of Energy indicating that, "[a]s a result of the [Levy] study, it was decided that the District pursue dual purpose (storage and transportation) casks or storage only casks that could be effectively interfaced with the early receipt by the DOE of Rancho Seco's spent fuel and subsequent use of the casks by DOE." See DX 164 (emphasis added). Mr. Boggs' letter also assumed that DOE could identify an SNF storage site by 1998. See id. Consequently SMUD's proposed finding of fact is unsupported by the record in this case.

129. The Levy study evaluated 15 fuel storage options for Rancho Seco, including both wet and dry storage, and suggested that SMUD pursue dry storage. PX 176 *passim*.

> a. It noted that the DOE pickup schedule was "highly uncertain" and that pickup would likely occur "well after 2010." PX 176 at 59; *see* Motion for Leave to File Testimony of S. Levy & R. Powers, dated March 7, 2005 ("Levy Motion") (Dckt. #300) at 143 (Levy Dep.) ("The key assumption in that report was that DOE would not be able to receive spent fuel in the permanent repository until 2010.").

RESPONSE: The Government does not object to the first sentence of SMUD's proposed finding of fact.

> a. Although the Government does not object to SMUD's proposed finding of fact to the extent it correctly quotes PX 176, Mr. Levy recommended to the SMUD Board of Directors that SMUD pursue transportable casks before 1998 "primarily because it could lead to shipment to DOE facility by 1998." PX 159, at SMUD 085624 (emphasis added), DPFOF ¶ 31. Further, Mr. Levy noted in his analysis that one of the "central issues involved in assessing the probability of success is to what extent DOE may be receptive to this approach," and that DOE may be receptive because "the DOE mission is being refocused on achieving some kind of interim storage capability at a DOE facility as early as 1998." PX 176, at SMUD 0031607. Indeed, Mr. Levy specifically noted:

> 2. DOE Refocus on 1998

> In addition to the quote just mentioned, Mr. Duffy, in the same presentation to the Commissioners, reported that the Secretary of the Department of Energy has recently completed an extensive review of the Civilian Radioactive Waste Management program and has initiated a management action plan consisting of five elements. One of these top-level elements is "an initiative for establishing integrated monitored retrievable storage (MRS) with a target for spent fuel acceptance by 1998."

PX 176, at SMUD 0031608.

b. It determined that the most certain storage approach would be continued wet storage until disposal at the DOE repository in 2010 or later, but that dry storage in transportable casks offered the best opportunity for early offsite shipment to an interim DOE storage facility or for interim acceptance by DOE onsite at the Rancho Seco facility. PX 176 at ii, 56-65.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we refer the Court to our response to a. above.

c. Under these circumstances, the Levy study "strongly recommended" that SMUD pursue the transportable cask option, particularly if coupled with a joint SMUD/DOE demonstration program to resolve any technical or regulatory requirements for such casks. *Id.*

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we refer the Court to our response to a. above.

130. Based upon the Levy study, SMUD decided in 1990 and 1991 to pursue a dual purpose dry storage system to address the uncertainties and prospective delay associated with DOE acceptance, while continuing to consider further wet storage as an option. Tr. at 193, 209-10 (Shetler); Designations Appendix (Dckt. #310) at 2251-53 (Bowser).

RESPONSE: The Government objects in part to SMUD's proposed finding of fact. The Government does not object to the proposed finding to the extent that, based upon the Levy study, SMUD decided in 1990 to pursue a dual-purpose dry storage system. However, the Government objects to the extent it is suggested SMUD pursued dual purpose dry storage "to

address the uncertainties and prospective delay associated with DOE acceptance, while continuing to consider further wet storage as an option." First, SMUD's contemporaneous documents unequivocally reflect that, by May 1990, SMUD had eliminated consideration of leaving its SNF in the wet pool. For example, in a presentation concerning Rancho Seco's decommissioning cost study, SMUD indicated that seven different storage options were evaluated – four involving dry storage and three involving wet storage. DPFOF ¶ 36. The evaluation indicated that SMUD had rejected each of the wet storage options because "wet [storage is] more expensive than dry." Id. Second, SMUD decided to pursue dual-purpose dry storage because it believed it would result in timely, or perhaps early, acceptance by DOE, and that the cost of pursuing dual-purpose dry storage made economic sense regardless of the timing of DOE's performance. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. Finally, Ms. Bowser's testimony does not support SMUD's proposed finding of fact. Ms. Bowser characterized herself as a "junior engineer" who did not speak on SMUD's behalf. DPFOF ¶ 39-40; Tr.177:7-19 (Shetler) (noting that Ms. Bowser lacked the authority to make decisions concerning dry storage for SMUD). To the extent that SMUD is now attempting to utilize Ms. Bowser to explain SMUD's motivations in pursuing dry storage, such an attempt is inappropriate.

131. SMUD believed that the development of a dual purpose dry storage system would help address the uncertainties and prospective delay associated with DOE fuel acceptance by encouraging prompt DOE acceptance of SMUD's spent fuel whenever it began performance and by reducing annual operation and maintenance costs over the long-term if DOE did not begin accepting fuel until 2010 or later. Tr. at 172-73, 345-46 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

132. In deciding to negotiate and execute the contract with Pacific Nuclear in 1992 for the design and development of the dry storage casks and canisters, SMUD assumed that the opening of the federal repository would be delayed by 12 years and projected that dry storage would yield substantial savings during this period. PX 259 at 2; PX 269A; Tr. at 209 (Shetler).

RESPONSE: The Government objects in part to SMUD's proposed finding of fact. Although the Government does not object to the extent that SMUD projected that dry storage would yield substantial savings – and in fact would pay for itself in two-to-three years – SMUD continued to assume through the end of 1994 that DOE could potentially accept SNF on a timely and perhaps even early basis through an MRS. DX 481, at SMUD 0033398; Tr.383:17-24, Tr.388:19-21 (Shetler) ("I think we still had an expectation there was a possibility [an MRS by

1998] could happen, yes."); Tr.705:2-5 (Redeker). In a presentation as part of a public workshop – which General Manager Schori was aware of and did not make changes to its contents – SMUD management indicated that SMUD assumed performance from DOE between 1998 and 2013, and that all of SMUD's SNF would be accepted within a 14-year queue. See DX 481, at SMUD 0033398; Tr.386:15-387:11 (Shetler). SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued into 1995. Tr.710:16-20 (Redeker), DPFOF ¶ 71-75.

133. SMUD was not driven by the date of DOE's performance obligation under the Contract, but rather by DOE's announcements that it would not begin performance until at least 2010. Dep. Des. at 42-43 (Freeman).

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact. The evidence at trial unequivocally demonstrated that SMUD's decision to pursue dual-purpose dry storage was driven by: (1) SMUD's belief that dual-purpose dry storage would facilitate timely, and perhaps even early, acceptance by DOE; and (2) that the cost of dual-purpose dry storage would pay for itself well before DOE's last acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. In fact, SMUD continued to believe that DOE could perform on a timely basis even after Mr. Freeman, whom SMUD decided not to call at trial, left SMUD. DPFOF ¶¶ 71-72.

134. If SMUD had assurance that DOE would begin accepting fuel in 1998, then SMUD would have kept its spent fuel in wet storage and not contracted for the development of a dry storage system in 1992.

a. Tr. at 194 (Shetler) ("I think our first alternative and our preference would have been to keep it in the pool and have DOE receive the fuel on the original schedule, such that it would be offsite in a timely manner. Based on the schedule delays that were known in the early 1990s, what we're facing is a significant cost associated with delays in that performance and then having to store that for a long period of time.").

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact. As demonstrated at trial, SMUD believed that the use of dual-purpose dry storage would potentially facilitate early acceptance of SMUD's SNF, and that the cost of going to dry storage paid for itself well before DOE's last acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. Mr. Shetler's litigation-inspired

testimony is contradicted by the overwhelming contemporaneous evidence that demonstrates SMUD's 1990 decision to pursue dry storage was wholly unrelated to the Government's 1998 breach of the Standard Contract.

b. Tr. at 360 (Shetler) ("Q…you had testified that had you had assurances from DOE that it would have begun acceptance in 1998, you would have kept your spent fuel in the pool, correct? A. Correct. Q. And that's based on your concern that the risks of pursuing a first of its kind technology, correct? A. That and any risks associated with DOE not accepting the fuel as standard form in accordance with the original schedule.").

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Shetler's litigation-inspired testimony is flatly contradicted by the contemporaneous documents in this case. Indeed, SMUD decided that the financial cost savings in abandoning its wet pool outweighed any potential risks in the pursuit of a first-of-its-kind technology. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. In a June 11, 1992 memorandum from Mr. Shelter to both his boss, Mr. Fassler, and his boss' boss, Mr. Freeman, he stated:

> The bottom line is that we are focused upon getting the spent fuel into dry storage as soon as possible with a system that will not require returning fuel to the spent fuel pool and is acceptable to DOE for ultimate fuel receipt. At this time, we are leading the industry in trying to define this type of system. Though there are risks associated with being the leader in this arena, we also believe the benefits (6 million/year in SAFSTOR savings) outweigh these risks.

DX 251; Tr.364:2-4 (Shetler) (admitting that this statement was accurate when written).

c. Designations Appendix (Dckt. #310) at 2288-89 (Freeman) (SMUD's actions "were driven by the fact that the federal government had taken our money, hadn't come to take our [spent fuel], and was telling us they weren't going to come until at least 2010, which put us in a horrible financial situation….").

RESPONSE: The Government objects to SMUD's proposed finding of fact. The overwhelming evidence in this case demonstrates that SMUD's 1990 decision to pursue dual-purpose dry storage was not motivated by the Government's 1998 breach of the Standard Contract, but rather was motivated by the belief that dual-purpose dry storage could facilitate

timely, and perhaps even early, acceptance by DOE, and that dual-purpose dry storage would pay for itself well before the Government's last acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

d. Levy Motion (Dckt. #300) at 111 (Levy Dep.) ("If a repository was available by 1998 and DOE actually said they're going to do that, that it will be available, it would have changed my recommendation. Q. How? A. I would have stayed in the pool. Q. So it's your testimony that had you believed that the Department of Energy could have had a federal repository by 1998, your recommendation would have been for SMUD spent nuclear fuel to stay in the wet pool? A. To stay in the pool, yes.")

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Levy's views on the timing of DOE's performance under the Standard Contract are irrelevant to the determination of any issue before the Court. Certainly, Mr. Levy's views cannot support SMUD's proposed finding that "[i]f SMUD had assurances that DOE would begin accepting fuel in 1998, then SMUD would have kept its spent fuel in wet storage and not contracted for the development of dry storage in 1992." Indeed, SMUD provided no evidence that Mr. Levy was aware of SMUD's repeated analyses that concluded that the dry storage project made economic sense regardless of DOE's delay. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

135. In August 1994, the NRC issued an Environmental Assessment on the Rancho Seco ISFSI. PX 363 (Att. 2). The Environmental Assessment states that shipping spent fuel to a permanent repository "is SMUD's primary solution to the storage of spent fuel at Rancho Seco; however, no permanent Federal repository is available." *Id*. at 7. Accordingly, [t]he absence of a Federal repository makes storage of spent fuel in dry [storage] SMUD's primary alternative." *Id.* at 8.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the NRC's views on SMUD's actions are irrelevant. What is relevant in this litigation is SMUD's motivations for the pursuit of dual-purpose dry storage. Second, regardless of the NRC's view on the availability of a permanent Federal repository, this proposed finding ignores that as late as 1994, DOE repeatedly informed the Nuclear industry that it planned to commence performance of the Standard Contract in 1998 through the use of a Monitored Retrievable Storage facility ("MRS"). PX 231 at HQ0003592; PX 189 at 3, 9-10, A-1.

This proposed finding also ignores that: (1) both before and after SMUD's 1990 decision to pursue dry storage, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF (and indeed, Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "50/50 proposition.") DPFOF ¶ 71; (2) in December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998, and was representing this assumption to members of the general public DPFOF ¶ 72; (3) SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995 DPFOF ¶ 73; (4) SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry DPFOF ¶ 74; and (5) as late as 1995, SMUD's own expert, Ivan Stuart was engaged in discussions with individuals from DOE regarding the possibility of an MRS. DPFOF ¶ 75.

136. DOE's May 1994 Notice of Inquiry and May 1995 Final Interpretation reinforced SMUD's decision to develop dry storage because they indicated that DOE would neither accept spent fuel on a timely basis nor provide interim assistance. Tr. at 253, 258 (Shetler); Tr. at 556-57, 567 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the evidence in this case unequivocally shows that SMUD believed that DOE could perform on a timely basis into 1995. DX 481, at SMUD 0033398 (December 1994 presentation to the public representing view that acceptance of SNF in an MRS by 1998 was a possibility); Tr.383:17-24, Tr.388:19-21 (Shetler) ("I think we still had an expectation there was a possibility it could happen, yes."); Tr.705:2-5 (Redeker). In a presentation as part of a public workshop – which General Manager Schori was aware of and did not make changes to its contents – SMUD management indicated that SMUD assumed performance from DOE between 1998 and 2013, and that all of SMUD's SNF would be accepted within a 14-year queue. See DX 481, at SMUD 0033398; Tr.386:15-387:11 (Shetler). SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued into 1995. Tr.710:16-20 (Redeker), DPFOF ¶¶ 71-75. Further, the evidence unequivocally demonstrates that, based upon SMUD's multiple cost analyses, it made reasonable economic sense to pursue dual-purpose dry storage regardless of the timing of DOE's performance. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

137. The dry storage project was part of SMUD's decommissioning plan for Rancho Seco, and was expected to facilitate decommissioning. However, it was not a prerequisite for decommissioning. Decommissioning was not initially projected to begin until 2008 due to funding limitations, continued operation of the spent fuel pool would not have precluded SMUD from decommissioning the remainder of Rancho Seco, and SMUD eventually began active

decommissioning of the site in the 1990s while the pool was in operation. Tr. at 215-18 (Shetler); 696-97 (Redeker).

RESPONSE: The Government objects in part to SMUD's proposed finding of fact. Although the Government agrees that the dry storage project was part of SMUD's decommissioning plan for Rancho Seco, and was expected to facilitate decommissioning, we object to the statement that dry storage was not a prerequisite for decommissioning. Although SMUD could begin decommissioning activities with an operational wet pool, it could not terminate its Part 50 operating license so long as it had an operational wet pool. Tr.2624:6-18 (Burford) (explaining that SMUD could terminate Part 50 license once SNF is out of pool, but would retain its Part 72 license until SNF is off-site); DX 222, at SMUD 0033381 (indicating that one of the goals of SNF disposition was to "[m]inimize decommissioning costs, including the need to maintain the spent fuel pool."). In addition, Mr. Redeker recognized at trial that that SMUD believed there was a significant cost savings in going to dual-purpose dry storage, because it would facilitate the elimination of its wet pool and, consequently, SMUD's Part 50 operating license. DPFOF ¶ 270.

138. SMUD consistently projected that dry storage would reduce annual savings operating and maintenance costs of fuel storage, but the estimated amount of these savings varied over time due to changes in assumptions and new information. Tr. at 265, 476-77 (Shetler); *see also, e.g.*, PX 176 at 58 ($.5 - $1 million); PX 269A (less than $3 million); PX 272 at 2 ($6 million); DX 280 at SMUD-0029434 ($8 million); *see* PFF ¶¶ 341-344, 347-48.

RESPONSE: Although the Government does not object to SMUD's proposed finding, we would note that SMUD consistently believed that dual-purpose dry storage would result in $8-12 million in annual savings, and had consistently projected that the cost of dual-purpose dry storage would pay for itself well before the Government's last acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. Further, SMUD's reliance upon PX 176, which was a generic cost estimate prepared by SMUD's outside contractor, Saul Levy, does not support SMUD's projection of a cost savings for its dual-purpose dry storage project of $.5-$1 million in annual savings. Indeed, Mr. Redeker testified that operating a wet pool would require 50-to-80 employees. Tr.528:3-6 (Redeker). Simply put, SMUD actual number of employees utilized for the operation and maintenance of its wet pool do not correspond in any logical way to Mr. Levy's projected estimate. Further, SMUD never called Mr. Levy at trial, so there was no testimony as to the basis for Mr. Levy's estimates. In fact, there was no testimony at trial that the projected cost savings suggested in Mr. Levy's report were ever presented to the Board of Directors.

Further, SMUD's assumption of less than $3 million in annual savings is not supported

by its reliance upon PX 269A. All PX 269A states is "[s]avings estimated at approximately $33 million by dry storage of spent nuclear fuel from 1998 (planned closure of Spent Fuel Pool) and 2010 (proposed opening of Federal Geologic Repository). It does not state how this $33 million dollar was derived, or what the number represents. Indeed, no SMUD witness could explain what the source of this figure was, or how this figure compared to the consistent $8-12 million in annual savings that is contained in dozens of contemporaneous documents. DPFOF ¶ 97. For example, Mr. Shetler did not know whether the $33 million number represented net savings over the course of the project or gross savings, or even whether the figure represents a net change to a prior decommissioning cost estimate. Tr. 405:7-11, Tr. 485:13-23 (Shetler). Nor could Mr. Shetler explain whether the $33 million in savings included the amount of capital costs associated with the dry storage project. Tr. 405:17-20 (Shetler). In fact, other than stating that the $33 million figure represented a comparison between wet and dry storage options, Mr. Shetler could not explain what this $33 million figure represented. Tr. 405:21-406:3 (Shetler). The Government's expert economist, Cliff Hamal, provided unrefuted testimony that, in light of Mr. Shetler's testimony, it was unreasonable to interpret the $33 million figure as an indication of operating savings from 1998 through 2010, particularly because that number would be inconsistent with other contemporaneous documents. Direct Testimony of Cliff Hamal, at ¶ 70.

139. Thus, DOE's announcements and other actions during the late 1980s and early 1990s created significant uncertainty about its future spent fuel acceptance and led SMUD to believe that it would probably have to continue to store fuel at Rancho Seco pool for an extended period and that any opportunity for earlier fuel receipt by DOE would require dry storage. This uncertainty and belief caused SMUD to decide to contract for dry storage in 1992 and to continue with the dry storage project from 1992 until the work was suspended in 1996. PFF ¶¶ 125-138.

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact. SMUD's pursuit of dual-purpose dry storage was motivated by its belief that it offered the best chance for timely, and perhaps even early, acceptance by DOE, as well as the fact that dual-purpose dry storage paid for itself well before the Government's last acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

140. In 1994, the Chairman of the NRC, Ivan Selin, recognized that "[t]he history of spent fuel management in this country has taken several turns, with a final resolution still out of reach. Several repository programs have started, stalled, and stopped. The latest effort at Yucca

Mountain is progressing but, at best, is years from the early phases of licensing, much less the actual underground disposal of spent fuel." PX 357 at 1.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, there is no basis for the admission of PX 357 in this case. SMUD did not attempt to use this document at trial, and cannot establish the requisite foundation necessary to admit this document in this case. No SMUD witness testified to the authenticity of PX 357. Indeed, no SMUD witness testified that they were even aware of Mr. Selin's speech. Therefore, there is no basis for the introduction of PX 357 in this case. Second, Chairman Selin's views on the status of the Federal waste acceptance program are irrelevant to any issue in this case. Indeed, regardless of what Chairman Selin's views may have been in 1994, SMUD clearly believed as late as 1995 that DOE could perform in a timely manner through the use of an MRS. DPFOF ¶ 71-75.

141. The NRC Chairman also concluded with respect to a Monitored Retrievable Storage facility that "no such facility is clearly on the horizon." PX 357 at 1.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, there is no basis for the admission of PX 357 in this case. SMUD did not attempt to use this document at trial, and cannot establish the requisite foundation necessary to admit this document in this case. No SMUD witness testified to the authenticity of PX 357. Indeed, no SMUD witness testified that they were even aware of Mr. Selin's speech. Therefore, there is no basis for the introduction of PX 357 in this case. Second, Chairman Selin's views on the status of an MRS are irrelevant to any issue in this case. Indeed, regardless of what Chairman Selin's views were, SMUD clearly believed as late as 1995 that DOE could perform in a timely manner through the use of an MRS. DPFOF ¶ 71-75. In fact, SMUD's belief in the 1994-95 timeframe that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry. Tr.1377:3-19 (Stuart) (acknowledging that there was a general belief in the industry that the government was spending money on the MRS, and that an MRS might break the logjam regarding the acceptance of SNF under the standard contract). Even after 1995, Mr. Stuart, as an employee of NAC International, was having discussions with individuals from DOE regarding the possibility of an MRS. Tr.1381:1-5 (Stuart).

142. Because of these facts, the NRC Chairman explained that "[a]ll of these recent developments have changed the circumstances that we face in spent fuel management. The obvious conclusion is that an increasing number of plants, both operating and permanently shut-down reactors, will have to provide for additional spent fuel storage on-site for a longer period than originally planned, and even after plant decommissionings, prudence requires that provision

be made for continual, stand-alone on-site storage." PX 357 at 1.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, there is no basis for the admission of PX 357 in this case. SMUD did not attempt to use this document at trial, and cannot establish the requisite foundation necessary to admit this document in this case. No SMUD witness testified to the authenticity of PX 357. Indeed, no SMUD witness testified that they were even aware of Mr. Selin's speech. Therefore, there is no basis for the introduction of PX 357 in this case. Second, Chairman Selin's views on spent fuel storage management are irrelevant to any issue in this case.

143. The NRC Chairman further noted that "[a]n operational high-level waste repository remains years away in a program that has suffered substantial delays in the past. The future of the MRC is uncertain. Most plants have expanded their pool storage by re-racking to the extent possible. Clearly, the use of a dry cask storage system at reactor sites is increasingly becoming the only available option for continued operation of many of our nation's nuclear plants." PX 357 at 3.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, there is no basis for the admission of PX 357 in this case. SMUD did not attempt to use this document at trial, and cannot establish the requisite foundation necessary to admit this document in this case. No SMUD witness testified to the authenticity of PX 357. Indeed, no SMUD witness testified that they were even aware of Mr. Selin's speech. Therefore, there is no basis for the introduction of PX 357 in this case. Second, Chairman Selin's views on the status of a permanent Federal repository or MRS are irrelevant to any issue in this case. Indeed, regardless of what Chairman Selin's views were, SMUD clearly believed as late as 1995 that DOE could perform in a timely manner through the use of an MRS. DPFOF ¶ 71-75. In fact, SMUD's belief in the 1994-95 timeframe that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry. Tr.1377:3-19 (Stuart) (acknowledging that there was a general belief in the industry that the government was spending money on the MRS, and that an MRS might break the logjam regarding the acceptance of SNF under the standard contract). Even after 1995, Mr. Stuart, as an employee of NAC International, was having discussions with individuals from DOE regarding the possibility of an MRS. Tr.1381:1-5 (Stuart).

144. Mr. Ivan Stuart, who had extensive interactions with both DOE and the utilities, explained that "it is clear to me that they [the utilities] felt, because of the extensive delay in DOE program, that they needed to consider options, and one of their, the options that they

almost all considered was the utilization of dual-purpose containers or casks." Tr. at 1458.

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Stuart's opinion as to why utilities generally may have chosen to pursue dual-purpose dry storage is irrelevant to any issue in this case. The only relevant inquiry in this case is the reasons why SMUD chose to pursue dual-purpose dry storage. In fact, Mr. Stuart did not testify as to the reasons why SMUD chose dual-purpose dry storage. Consequently, Mr. Stuart's views concerning the industry are irrelevant. Further, SMUD's reasons for pursuing and continuing to pursue dual-purpose dry storage were not dependent upon DOE's performance under the Standard Contract. See Gov't Resp. to PFOF ¶ 139.

### C. SMUD's Continued Reevaluation Of The Project And Commitment To Proceed In Light Of Breach.

145. By 1997, SMUD believed that an MRS would not be developed, that DOE would not begin accepting spent fuel until at least 2010, and that SMUD would have to continue to store fuel at Rancho Seco for an extended and unknown period. PX 500; *see* PFF ¶¶ 121-124.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD relies upon PX 500 for this proposed finding of fact. However, PX 500 in no way reflects what SMUD believed, as this is simply a letter to SMUD from DOE, in which DOE indicates that "DOE anticipates that it will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." PX 500, at SMUD 0019348. This letter does not reflect what SMUD's beliefs were in terms of when DOE would begin acceptance of SNF or that SMUD "would have to continue to store fuel at Rancho Seco for an extended and unknown period."

Further, SMUD's proposed finding of fact is not supported by its reference to PFF ¶¶ 121-124. As we demonstrated at trial, at least into 1995, SMUD believed that DOE could timely perform under the Standard Contract. DPFOF ¶ 71-75. Further, even after 1995, SMUD believed that the cost of going to dry storage paid for itself prior to DOE's first acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. SMUD's decision to pursue dry storage was made independent of the Government's breach of the Standard Contract.

146. At that time, almost all work on the dry storage system had stopped due to technical issues between Vectra and the NRC, the NRC's issuance of a demand for information to Vectra, and Vectra's bankruptcy. PX 509, 511; PFF ¶¶ 101-06; 293-94.

RESPONSE: Although the Government does not dispute that the NRC issued a Demand

For Information ("DFI") to Vectra and that Vectra declared bankruptcy, the Government objects to the implication that the NRC was responsible for Vectra's "technical issues." The DFI issued by the NRC in January 1997 resulted from quality concerns raised by the NRC from June 1995 to November 1996. DX 707, at SMUD 0004537-42. Vectra voluntarily placed a quality assurance stop work on fabrication activities on January 24, 1997. DX 712.

147. When work on the dry storage system stopped, the project was behind its initial schedule and the costs exceeded its initial budget. The NRC had not yet issued a transportation or storage license, neither the cask nor any canisters had yet been fabricated, and a variety of licensing, design, and manufacturing issues remained open. Although SMUD expected that these issues would be resolved, it recognized that they posed obstacles that could further complicate and delay completion of the project. Tr. at 628-29 (Redeker) ("This was a troubled project, costs are going up, schedule is moving out. And quite frankly, I was extremely nervous. This was my job and it wasn't working out very well"). PFF ¶¶ 297-304.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we would note that, by 1997, SMUD had already invested $20 million into the dry storage project, and believed that the project could be completed for anywhere from $19 million to $6 million dollars. DPFOF ¶ 109. In fact, Mr. Ferreira, SMUD's then-general manager, explained at trial that SMUD's payback analysis did not consider sunk costs, but only considered the capital costs remaining to complete the project. Tr.914:16-915:6 (Ferreira); Tr.766:25-767:3 (Redeker). Based upon SMUD's own analysis, SMUD projected in 1997 that the dry storage project would pay for itself by 1999 – two years prior to DOE's first acceptance of SMUD's SNF in the non-breach world, and many years before DOE's final acceptance of SMUD's SNF. See DX 729, at SMUD 006101-02; Tr.740:3-6 (Redeker); DX 755, at SMUD 061109; DX 760, at SMUD 0028714; DX 794, at SMUD 062405; DX 794, at SMUD 062422; Tr.761:4-11 (Redeker) (stating that he put the best information he could in these presentations and believe the information was accurate); DX 749, at SMUD 062342. DPFOF ¶ 89.

148. SMUD also recognized that there was a risk that DOE might later declare canistered fuel to be "non-standard" fuel under the Standard Contract and attempt to move such fuel to the end of the fuel acceptance queue. If this occurred, it would further delay the acceptance of SMUD's fuel. PX 286 at SMUD-0009332; PX 319 at 1-2; PX 320; PX 325; Tr. at

173, 218 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact in part. Although the Government does not object to SMUD's proposed finding of fact to the extent that SMUD plainly recognized that there was a risk that DOE might declare SMUD's SNF contained in MESCs to be unacceptable because MESCs were not covered by the Standard Contract, the evidence at trial demonstrated that, rather than be deemed "non-standard," DOE simply would not accept MESCs absent a contract modification and appropriate compensation. DPFOF ¶ 148; DX 425, at SMUD 0027391 (indicating that 1993 reevaluation was to "quantity [the] risk" of placing its SNF into canisters and potentially making its fuel nonstandard or unacceptable) (emphasis added); Tr.367:4-17 (Shetler) (explaining reason for 1993 reevaluation was based upon concerns about DOE's acceptance of canistered fuel and the ability to license its first-of-a-kind dual purpose dry storage system).

149. Under these circumstances, SMUD comprehensively reevaluated and reanalyzed its spent fuel storage strategy during the period from December 1996 through May 1997 (the "1997 Reevaluation"). This reevaluation went through multiple iterations and involved consideration of nine alternatives, including other dry storage systems and leaving the spent fuel in the spent fuel pool. PX 502 at 1; PX 503; PX 519 at 18-20.

RESPONSE: The Government objects to SMUD's proposed finding of fact. In 1993, SMUD did engage in a 1993 reevaluation of its dry storage decision based upon its concerns that DOE would not accept SMUD's SNF contained in MESCs. See DX 425, at SMUD 0027391 (indicating that 1993 reevaluation was to "quantity [the] risk" of placing its SNF into canisters and potentially making its fuel nonstandard or unacceptable); Tr.367:4-17 (Shetler) (explaining reason for 1993 reevaluation was based upon concerns about DOE's acceptance of canistered fuel and the ability to license its first-of-a-kind dual purpose dry storage system). However, the reason SMUD conducted the 1997 reevaluation was because its dry storage vendor, Vectra, stopped work on the dry storage project. Tr.723:20-724:12 (Redeker); PX 512. As Mr. Redeker explained at trial:

> We were doing re-evaluations because the project started getting into trouble. There started being cost overruns and started being issues and we said if there are problems with this, with this project, why don't we leave the fuel in the spent fuel pool.

Tr. 535:12-27 (Redeker), Tr. 628:25-629:1 (Redeker) ("This is a troubled project, costs are going up, schedule is moving out."). Yet, based upon its 1997 reevaluation, SMUD concluded that the dry storage project would pay for itself well before the Government's final acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 86-89.

150. The 1997 Reevaluation was driven by SMUD's expectation that DOE would not begin accepting spent fuel for many years and SMUD's assumption that fuel would remain at Rancho Seco until approximately 2027. Tr. at 238 (Shetler); PX 519 at 19.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's 1997 reevaluation was not "driven by SMUD's expectation that DOE would not begin accepting spent fuel for many years," but rather was driven by SMUD's concerns about the massive delays and cost increases because its dry storage vendor, Vectra, stopped work on the dry storage project. Tr.723:20-724:12 (Redeker); PX 512. Further, SMUD concluded that the dry storage project paid for itself well before the Government's final acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

151. The 1997 Reevaluation sought to assure that SMUD pursued the most cost-effective, yet safe fuel storage strategy, while recognizing that the longer the fuel remained in wet storage the higher the costs would be. PX 512 at 2; Tr. 596:22-598:12 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

152. The 1997 Reevaluation ultimately concluded that continuing with the current dry storage project was the best fuel storage option available under the circumstances because SMUD would have to store the Rancho Seco fuel for at least another 20 or 30 years and dry storage would minimize the costs over the long period of DOE's delay in performance. PX 524; PX 538 at 9, 12; Tr. at 604, 610, 620 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although the Government agrees that the 1997 reevaluation concluded that continuing with the dry storage project was a cost-effective option, that conclusion was made independent of the timing of DOE's performance under the Standard Contract. In fact, Mr. Miller expressly stated in his letter to Mr. Redeker that the continued pursuit of the dry storage project "is potentially the most cost effective option for SMUD because of reduced staff and the use of contractors." PX 524, at SMUD 061480. SMUD would realize substantial cost savings regardless of the timing of the Government's performance under the Standard Contract. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

153. In March 1997, in response to the DOE's December 1996 delay letter (PX 500),

SMUD submitted a letter to DOE requesting that DOE take title to SMUD's spent fuel, as DOE had done at the Fort St. Vrain reactor in Colorado, and pay the costs of "continued on-site storage of spent fuel . . . at the Rancho Seco site." PX 528 at 3. SMUD concluded that "[i]t is now time for DOE to honor its contractual obligation by accepting spent fuel as soon as possible and to reimburse utilities such as SMUD for their interim storage costs in the meantime." *Id.* at 3.

RESPONSE: Although the Government does not dispute that SMUD has accurately quoted portions of PX 528, the Government objects to the extent that SMUD suggests that the "Fort St. Vrain" option was a viable option. Ft. St. Vrain involved fuel that was owned by the Department of Energy, which was leased to Public Service of Colorado, and which the Government later agreed to take back for reprocessing. Tr.1947:15-24 (Zabransky). Ultimately, as a result of litigation in the 1980s, DOE agreed to settle with Public Service of Colorado, and agreed to take title and possession to that facility. Tr.1947:25-1948:6 (Zabransky). Further, the fuel involved is different than standard SNF possessed by commercial utilities. Tr.1948:16-21 (Zabransky); see generally State of Idaho v. U.S. Dep't of Energy, 945 F.2d 295 (9th Cir. 1991).

Further, Ms. Schori's March 1997 letter reflects that SMUD believed the dry storage project would pay for itself by 2002 - well before DOE would have accepted all of SMUD's SNF in the non-breach world. Ms. Schori, wrote in her March 1997 letter to DOE that, "SMUD is spending $20 million in capital for the dry storage and transportation system in an effort to enhance safety at the site and to reduce substantially the interim annual costs of wet storage." DX 729, at RS 006102 (emphasis added); TR.738:17-20 (Redeker) (explaining that he prepared this letter and wanted the information contained therein to be the best it could be). Ms. Schori also indicated in her letter that SMUD was incurring approximately $800,000 a month in wet storage costs, and that it anticipated incurring approximately $125,000 a month once SMUD placed its SNF into dual purpose dry storage. DX 729, at RS 006101. In other words, SMUD represented to DOE that it anticipated an annual savings of $8 million based upon moving its SNF from wet storage to dry storage. Tr.741:13-17 (Redeker). SMUD further indicated to DOE that all of SMUD's SNF would be in dry storage by December 1999. DX 729, at RS 006101; Tr.740:3-6 (Redeker). Consequently, as of March 1997, SMUD anticipated that the cost of going to dry storage would pay for itself in two-and-a-half years, or by mid-2002, well before DOE would have accepted all of SMUD's SNF in the non-breach world. DPFOF ¶¶ 109.

154. DOE's announced failure to live up to its contractual obligations caused SMUD to proceed with the dry storage project in 1997. Tr. at 593, 619-22 (Redeker); Tr. at 905-07

(Ferreira) (explaining that "had DOE responded favorably and was willing to assume responsibilities, then we would not have continued with the dry fuel storage program").

RESPONSE: The Government objects to SMUD's proposed finding of fact. As we demonstrated at trial, SMUD's dry storage project paid for itself well before the Government would have accepted all of SMUD's SNF in the non-breach world. DPFOF ¶ 109. As Mr. Hamal explained at trial, "[a]s long as SMUD concluded that the capital cost of its dry storage program could be recovered from operating cost savings in just a few years, the project will pay for itself before all of SMUD's fuel would be accepted by DOE in a non-breach world. Thus, the program would be economically justified and not properly included as damages." Direct Testimony of Cliff Hamal, at ¶ 75. Further, SMUD presented absolutely no contemporaneous documents suggesting it would have abandoned its dry storage project in 1997 had DOE begun accepting SMUD's SNF in 2001. In fact, under cross-examination, Mr. Redeker admitted that, in conjunction with the 1997 reevaluation, he never did any analysis – either on paper or in his head – to reach the conclusion that SMUD would have abandoned the dry storage project had it believed DOE would perform by 1998. Tr. 728:7-13 (Redeker) (explaining that "the thought never entered my mind."). Indeed, the only time Mr. Redeker ever performed such an abandonment analysis was after SMUD filed the lawsuit in this case. Tr. 728:14-25 (Redeker). Even then, Mr. Redeker did not memorialize this abandonment analysis in writing. Tr. 729:1-3 (Redeker). The Court should reject this unsupported, litigation-inspired contention by Mr. Redeker.

155. If SMUD had assurance that DOE would begin accepting spent fuel in 1998, then SMUD would have abandoned the dry storage project at that time and left its fuel in wet storage. Tr. at 619-22 (Redeker) (timely performance by DOE "would have changed the outcome of this entirely. It would have made the spent fuel pool an absolute certainty. They are coming, they are going to take it out of our pool, the risk will be gone").

a. This would have allowed SMUD to avoid the licensing and manufacturing risks associated with dry storage. Tr. at 620-21 (Redeker); *see also* PFF ¶¶ 287-304.

b. It would also have allowed SMUD to avoid the risk of DOE subsequently attempting to defer acceptance of the fuel because it had been canistered. Tr. at 621-22 (Redeker); *see also* PFF ¶ 512-518.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First,

SMUD's contention is not supported by any contemporaneous documents. Second, Mr. Redeker's litigation-inspired testimony is simply not credible. In fact, under cross-examination, Mr. Redeker admitted that, in conjunction with the 1997 reevaluation, he never did any analysis – either on paper or in his head – to reach this conclusion that SMUD would have abandoned the dry storage project had it believed DOE would perform by 1998. Tr. 728:7-13 (Redeker) (explaining that "the thought never entered my mind."). Indeed, the only time Mr. Redeker ever performed such an abandonment analysis was after SMUD filed the lawsuit in this case. Tr. 728:14-25 (Redeker). Even then, Mr. Redeker did not memorialize this abandonment analysis in writing. Tr. 729:1-3 (Redeker). The Court should reject this unsupported, litigation-inspired contention by Mr. Redeker. Finally, SMUD recognized that the dry storage project paid for itself well before the Government would have accepted all of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

156. In mid-1997, SMUD requested that DOE take title to SMUD's SNF at Rancho Seco and stated that SMUD would seek reimbursement of its dry storage costs if DOE failed to perform its obligations. PX 528 at 3.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

157. DOE's failure to begin accepting fuel in January 1998 reinforced SMUD's belief that it had made the right decision in pursuing dry storage. Tr. at 242-44 (Shetler). SMUD would not have continued with the dry storage project had DOE begun performance. Tr. at 907, 926 (Ferreira); Tr. at 628, 29, 633-34 (Redeker).

RESPONSE: The Government does not object to the first sentence of SMUD's proposed finding of fact. The Government does object to the second sentence of SMUD's proposed finding of fact.

Of course, the fact that DOE's failure to begin acceptance reinforced SMUD's belief hardly demonstrates that DOE's delay caused SMUD to pursue dry storage. Simply put, SMUD failed to meet its burden in this case. First, the testimony of Mr. Ferreira and Mr. Redeker cited by SMUD does not support the statement that "SMUD would not have continued with the dry storage project had DOE begun performance." Further, as we established at trial, under cross-examination, Mr. Redeker admitted that, in conjunction with the 1997 reevaluation, he never did any analysis – either on paper or in his head – to reach this conclusion that SMUD would have abandoned the dry storage project had it believed DOE would perform by 1998. Tr. 728:7-13 (Redeker) (explaining that "the thought never entered my mind."). Indeed, the only time Mr. Redeker ever performed such an abandonment analysis was after SMUD filed the lawsuit in this case. Tr. 728:14-25 (Redeker). Even then, Mr. Redeker did not memorialize this abandonment

analysis in writing. Tr. 729:1-3 (Redeker). The Court should reject this unsupported, litigation-inspired contention by Mr. Redeker. Finally, SMUD recognized that the dry storage project paid for itself well before the Government would have accepted all of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

158. Vectra's bankruptcy precipitated yet another reevaluation and reconsideration of the project by SMUD during 1998. PX 585; Tr. at 620-21 (Redeker); Tr. at 905-07 (Ferreira).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we would note that SMUD concluded that the results of the reevaluation indicated that it made economic sense to continue with its dry storage project. Tr.652:21-23 (Redeker) ("I concluded that there was still a significant net present value" of continuing with the dual purpose dry storage project). In fact, Mr. Redeker testified at trial that these reevaluations occurred, not because of the Government's breach, but because "our project was continuing to cost a lot." Tr.651:19-20 (Redeker).

Further, SMUD continued to believe in 1998 that the dry storage project would pay for itself well before DOE's last acceptance of SMUD's SNF in the nonbreach world. DPFOF ¶ 109. In a September 1998 presentation to Board Integrated Resources and Customer Services Committee, Mr. Redeker indicated $10-$12 million in annual savings by pursuing dual-purpose dry storage. DX 871, at SMUD 062619; DX 819, at SMUD 0085312; Tr.768:24-769:10 (Redeker). DPFOF ¶ 103. Mr. Redeker indicated that SMUD had already invested $24 million into its dry storage project, and projected that the project could be completed for an additional $13 million. DX 871, at SMUD 062627; TR.773:13-23 (Redeker). Mr. Redeker testified at trial that these figures represented SMUD's best estimate at the time. Tr.775:6-7 (Redeker); DPFOF ¶¶ 54, 55, 61, 66, 76, 78-81, 86-89, 92, 103-109.

159. TNW, which acquired the Vectra assets out of the bankruptcy estate, was not willing to continue the SMUD project unless it was assured that it would have its costs reimbursed. Tr. at 921 (Ferreira).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

160. During 1998, following the bankruptcy of Vectra, SMUD continued to consider other options for spent fuel storage, including a wet storage contingency plan to minimize the cost of long-term wet storage and negotiations with TNW for a new contract to restart and complete the project. PX 570; PX 685. Because of the knowledge of DOE's breach, the

expectation that SMUD would have to continue to store Rancho Seco fuel for several decades, and the cost savings afforded by dry storage during DOE's delay in performance, SMUD concluded in 1998 (the "1998 Decision") that the "appropriate plan" was to continue with the current dry storage project while also continuing to consider other options. PX 570 at 4-5; Tr. at 626-29 (Redeker).

RESPONSE: The Government objects in part to SMUD's proposed finding of fact. Although the Government does not object to the first sentence of SMUD's proposed finding of fact, we would note that another option SMUD considered at this time was to "[m]onitor the status of the proposed Federal interim spent fuel storage facility, and if approved, pursue early acceptance of Rancho Seco's fuel." PX 570, at SMUD 0023329 (emphasis added).

The Government objects to the second sentence of SMUD's proposed finding of fact. As we demonstrated at trial, SMUD's dry storage project paid for itself well before DOE's final acceptance of SMUD's SNF in the non-breach world and, consequently, SMUD's decision to pursue dry storage would have been made regardless of the timing of DOE's performance. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

161. SMUD's 1998 Decision to enter into a new contract with TNW for completion of the dry storage project was driven by DOE's failure to begin accepting fuel in January 1998 and SMUD's belief that dry storage would best address the additional costs and uncertainty associated with the long-term storage of spent fuel at Rancho Seco. Tr. at 633-34 (Redeker); Tr. at 926 (Ferreira); PX 585.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, SMUD's reliance upon PX 585 does not support its proposed finding that SMUD's decision to enter into a new contract with TNW was "driven by DOE's failure to begin accepting fuel in January 1998." Rather, SMUD's decision to enter into a new contract with TNW was driven solely by SMUD's belief that "[d]ry spent fuel storage has long been proven to be the most cost effective method of fuel storage." PX 585, at SMP047 0332. SMUD believed at this time that there was $9.5 million in remaining costs for the dry storage project, and that the annual savings by abandoning the wet pool was approximately $10 million. Id. In other words, as of 1998, SMUD assumed the dry storage project would pay for itself in less than a year – well before DOE would have accepted all of SMUD's SNF in the non-breach world. DPFOF ¶¶ 103-104, 109.

Second, SMUD's reliance upon Mr. Ferreira's testimony does not support SMUD's proposed finding of fact. In response to a question from the Court asking why the Government should be responsible for the costs associated with the delays in SMUD's dry storage project, Mr. Ferreira responded that "[t]he Department had a contract to take the fuel," and "had the Department taken that fuel, then that would have addressed our risk and liabilities and costs." Tr.926:12-25 (Ferreira). However, Mr. Ferreria's testimony does not support the conclusion that SMUD's decision to enter into a new contract with TNW "was driven by DOE's failure to begin accepting fuel in January 1998."

162. Had DOE been accepting fuel, SMUD would not have entered into a new contract to complete the project with all of its associated risks and uncertainties; SMUD would have taken the more certain, less risky approach and left the fuel in the pool. Tr. at 628-29 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The testimony cited by SMUD does not support SMUD's proposed finding of fact. Further, any suggestion by Mr. Redeker that SMUD would have abandoned its dry storage project had it believed that DOE would perform by 1998 is at best a litigation-inspired position. For example, under cross-examination, Mr. Redeker admitted that, in conjunction with the 1997 reevaluation, he never did any analysis – either on paper or in his head – to reach the conclusion that SMUD would have abandoned the dry storage project had it assurance that DOE would perform by 1998. Tr.728:7-13 (Redeker) (explaining that "the thought never entered my mind."). Indeed, the only time Mr. Redeker ever performed such an analysis was after SMUD filed the lawsuit in this case. Tr.728:14-25 (Redeker). Even then, Mr. Redeker did not memorialize this analysis in writing. Tr.729:1-3 (Redeker). The Court should reject this unsupported, litigation-inspired contention by Mr. Redeker.

163. During the period from December 1999 through February 2000, SMUD undertook a further reevaluation and reanalysis of wet and dry storage (the "2000 Reevaluation"). PX 642. It was undertaken to determine whether to stop the dry storage project. Tr. at 652 (Redeker). At that time, SMUD had still not received a transfer cask or any storage canisters, and the project continued to face licensing obstacles and manufacturing delays. PFF ¶ 109, 314-322.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

164. Because DOE was not projected to pick up all of the spent fuel from Rancho Seco

until at least 2024, the 2000 reevaluation indicated that it would be beneficial to continue with the dry storage project. Tr. at 653 (Redeker) (noting "the significant factor . . . is how long is the fuel going to be there? At this point, I'm looking at . . . the late 2020s time frame. So DOE is not performing[.]"); Tr. at 656, 658 (Redeker) (same); Tr. at 930-31 (Ferreira); PX 642 at 1 and SMUD-062828; PX 672.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's December 1999 reevaluation indicated that it would be beneficial to continue with the dry storage project because the dry storage project would pay for itself by 2002 – well before DOE would accept all of SMUD's SNF in the non-breach world. DPFOF ¶¶106-107. Further, the referenced testimony of Mr. Ferreira does not support SMUD's proposed finding of fact. Additionally, SMUD's reference to PX 642 and PX 672 does not support SMUD's proposed finding that SMUD's 2000 reevaluation was predicated upon the assumption that DOE would not accept SMUD's all of SMUD's SNF "until at least 2024."

165. If DOE had begun accepting spent fuel under the Standard Contract in 1998, then SMUD would not have continued with the dry storage project in 2000 to avoid further potential licensing, manufacturing, and acceptance queue problems. Tr. at 653 (Redeker); Tr. at 930-31 (Ferreira); *see* PFF ¶ 318.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the cited testimony of Mr. Ferreria does not support SMUD's proposed finding of fact. In fact, Mr. Ferreira did not state that, had DOE performed by 1998, SMUD would have left its SNF in its wet pool. Rather, Mr. Ferreira stated at trial:

> Well, again, the alternatives were to suspend or stop the project and just maintain the fuel in wet storage, looking at possibly switching to another vendor, but the risk of moving in that direction, I think, as the Judge indicated earlier, didn't have too many options, Transnuclear was probably in a strong negotiating position. So we attempted to maintain the relationship with Transnuclear, tried, intended to try to move to fixing certain prices of the services or products they would provide, doing everything we could to try to manage and control the costs.

Tr.930:25-931:11 (Ferreira). This testimony plainly does not support SMUD's statement that, "[i]f DOE had begun accepting spent fuel under the Standard Contract in 1998, then SMUD

would not have continued with the dry storage project in 2000 to avoid further potential licensing, manufacturing, and acceptance queue problems."

Second, Mr. Redeker's litigation-inspired suggestion that SMUD would have left its SNF in the wet pool had DOE performed in 1998 is not credible. For example, under cross-examination, Mr. Redeker admitted that, in conjunction with the 1997 reevaluation, he never did any analysis – either on paper or in his head – to reach the conclusion that SMUD would have abandoned the dry storage project had it assurance that DOE would perform by 1998. Tr.728:7-13 (Redeker) (explaining that "the thought never entered my mind."). Indeed, the only time Mr. Redeker ever performed such an analysis was after SMUD filed the lawsuit in this case. Tr.728:14-25 (Redeker). Even then, Mr. Redeker did not memorialize this analysis in writing. Tr.729:1-3 (Redeker). The Court should reject this unsupported, litigation-inspired contention by Mr. Redeker.

Third, the suggestion that SMUD would have left its SNF in its wet pool had DOE begun SNF acceptance by 1998 is belied by the numerous contemporaneous documents indicating that the cost of going to dry storage paid for itself well before DOE's final acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

166. In June 2001, because of continuing fabrication and delivery issues, SMUD undertook another reevaluation of alternatives to the dry storage system (the "2001 Reevaluation"). PX 689. At that time, SMUD had already begun transferring fuel to the ISFSI, but SMUD wished to confirm that the dry storage project remained appropriate. PX 689; Tr. at 667-68 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

167. The 2001 Reevaluation focused on alternative dry storage systems and concluded again that dry storage would provide savings compared to wet storage because of the anticipated length of the time that SMUD would have to store fuel at Rancho Seco. PX 689 at 1-2.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The document SMUD relies upon, PX 689, does not support the statement that the "2001 Reevaluation" concluded that dry storage would provide savings "because of the anticipated length of time that SMUD would have to store fuel at Rancho Seco." Indeed, this draft, unsigned June 13, 2001 memorandum does not indicate what assumptions were utilized in deriving the cost savings indicated.

168. Thus, DOE's failure to begin accepting spent fuel in 1998 created significant uncertainty about its future fuel acceptance and led SMUD to believe that it would have to continue to store fuel at Rancho Seco until sometime in the 2020s or later. This uncertainty and belief caused SMUD to re-start the dry storage project in 1998, continue with the dry storage project in 2000, and transfer its fuel from wet storage to the ISFSI in 2001 and 2002. *See* PFF ¶¶ 145-167.

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact. As we demonstrated at trial, SMUD continued to believe into 1995 that the Government could perform on a timely basis. DPFOF ¶¶ 71-75. Further, even after SMUD believed that DOE would not begin accepting SNF by 1998, its cost-benefit analyses reflected that the cost of pursuing dry storage paid for itself well before the Government would have accepted the last of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. Consequently, SMUD decided to pursue dual-purpose dry storage for business reasons wholly unrelated to the Government's breach of the Standard Contract. Further, the Government objects to SMUD's suggestion that the dry storage project was restarted, as it never actually stopped. Indeed, SMUD has claimed costs against the Government for every year since 1992 through 2003. See PX 1000.

## IV. <u>SMUD's Damages As A Result of Breach</u>.

169. SMUD utilizes an automated accounting system to record accounting transactions. Tr. at 1046 (Field), 1233 (Holst).

a. Prior to October 31, 1999, SMUD used the Financial Management Information Systems, Ltd. ("FMIS") accounting system.

b. As of November 1, 1999, SMUD converted its accounting records to the Systems Applications and Processes ("SAP") accounting software.

<u>RESPONSE</u>: Although the Government does not object to SMUD's proposed finding of fact, the trial testimony cited by SMUD does not support this proposed finding. Mrs. Holst's cited testimony does not mention the automated accounting system to record accounting transactions at Rancho Seco. Mr. Field's testimony provided a general description and time frame for the two systems, FMIS and SAP.

170. Both the FMIS and SAP accounting systems utilize a work order system to track both internal and external costs. Tr. at 1046 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

171. A work order number is created for each new project undertaken at SMUD; a large project may have numerous work order numbers associated with it, each corresponding to various segments of the project. Tr. at 1233-34 (Holst); PX 1000 at 2.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we note that the work order system at SMUD merely accounted for internal and external project-related costs. The work order system was not designed to account for and/or segregate costs incurred by SMUD that were "incremental" to the Government's breach of contract. See Kiraly Direct Testimony at ¶¶ 48, 53, 104.

172. As invoices for external costs are received, charges are assigned to the appropriate corresponding work order number. Tr. at 1048 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

173. SMUD also tracks its internal costs through the work order system. Tr. at 1233-34 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

174. SMUD employees record their hours and the activity to which they devoted those hours based on the appropriate work order number to which their work corresponds. PX 943 (example timesheets). The time is then charged through the accounting system to the appropriate work order number. Tr. at 1234 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

175. In addition to the designated work order number, costs are assigned to particular cost categories for general tracking, including outside services (outside vendor contracts), labor,

indirect labor, materials, materials surcharge and other. B. Brinig Written Direct at 5 (PX 1000).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the testimony cited for the proposed finding simply reflects Mr. Brinig's testing of SMUD's incurred costs. The testimony does not provide any direct support for the internal SMUD methods and procedures used for segregating costs into particular cost categories.

176. Reports can be generated grouping the costs by a particular cost category or a particular work order for a particular period of time. Tr. at 1233; B. Brinig Written Direct at 4 (PX 1000).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the testimony cited does not provide full support for this proposed finding. The testimony cited fails to define the time period during which such reports were generated, or could have been generated, from the Rancho Seco automated accounting systems.

177. Because all expenses—internal and external—are tracked through this accounting software, the total cost of a project can be determined by identifying the work order numbers that correspond to that project and running a report that lists the total costs associated with the work orders identified. Tr. at 1233 (Holst).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we note that "running a report that lists the total costs associated with the work orders identified" simply tracks costs for a project. There is no testimony that the SMUD accounting system was able to identify or segregate incremental costs for inclusion in a damages claim.

178. SMUD's accounting system allows one to track the exact costs that were incurred for a particular project, just as if it were contracted out to another company. Tr. at 1233 (Holst).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mrs. Holst's cited testimony does not support the proposed finding. Further, there is no evidence to suggest that the cost accounting system at SMUD is structured or used to track and account for costs "incremental" to any breach of contract.

179. SMUD's accounting system "has a variety of internal control policies and procedures designed to insure that all transactions are timely and accurately recorded." PX 291

at 5.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The January 27, 1993 document cited as support for this proposed finding (a memorandum regarding the DOE/SMUD demonstration project) does not include the language quoted in the proposed finding.

180. Timecards are reviewed by supervisors and submitted to the time keeping department for review. Any issues are raised directly with the plant manager, Steve Redeker. Tr. at 674-75 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

181. A summary of the time for the entire plant is produced weekly and reviewed by Mr. Redeker. Tr. at 674-75 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

182. The process of timecard review has been in place since before the inception of the dry storage project. Tr. at 674-75 (Redeker).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, Mr. Redeker's testimony does not identify when the "process of timecard review" actually began at Rancho Seco.

183. Monthly invoices, including documentation such as timesheets, purchase orders, and travel claims, are reviewed to determine the appropriateness of the charges and concerns are identified by the accounting department. Tr. at 676-77 (Redeker), 1046-48 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

184. The project manager independently reviews all invoices, as well as any concerns raised, and signs off on the work billed and all charges. Tr. at 676-77 (Redeker), 1046-48 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

185. Any issues raised are then resolved with the contractor, through revision or denial of charges. Tr. at 676-77 (Redeker), 1046-48 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

186. Reconciliations between the budget and the actual costs incurred, including running summary cost reports on the project, comparing actual costs to the budget, and investigating the budget, are made on a monthly basis. Tr. at 1234-35 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

187. Concerns raised during reconciliations are noted and the reports and any concerns are forwarded to the project manager. Tr. at 1234-35 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

188. A final reconciliation is reviewed by the plant manager, Steve Redeker. Reconciliations also are forwarded up through SMUD's organization to SMUD's budget office. Tr. at 677 (Redeker), 1234-35 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

189. SMUD's books and records are audited annually by independent accountants. Annual financial statements audit reports were conducted by PricewaterhouseCoopers LLP from 1996 to 2003 and Macias, Gini & Company LLP from 1996-2000. *See, e.g.*, PX 510.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD failed to establish the relevance of annual financial statement audits to its damages claim against the Government.

190. During these audits, no material audit qualifications or weaknesses with respect to SMUD's system were noted. *See* B. Brinig Written Direct at 3 (PX 1000).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD failed to establish the relevance of annual financial statement audits to its damages claim against

the Government. The 1996 Single Audit Report conducted by Price Waterhouse LLP, the report discussed in detail by Mr. Brinig, "appears to have been conducted specifically in relation to the Cooperative Agreement between DOE and SMUD." Brinig Written Direct at 3 (PX 1000). Mr. Brinig's testimony failed to establish the relevance of these annual financial statement audit reports to SMUD's damages claim.

191. The audit process in this litigation was rigorous and comprehensive. *See* PPF ¶¶ 192-198.

RESPONSE: The Government objects to SMUD's proposed finding of fact. It is unclear from the proposed finding what "audit process" in referenced in this proposed finding. Gov't Resp. to PFOF ¶¶ 192-198 merely reference SMUD's compilation of costs alleged against the Government as damages. The audits referenced in this proposed finding of fact appear to relate to audits conducted by SMUD's own independent accounts. The Government had no involvement in any audits conducted at SMUD between 1996 to 2003. SMUD failed to establish the relevance of annual financial statement audits to its damages claim against the Government.

192. SMUD's expert, Brian Brinig, "reviewed the annual audit reports prepared by SMUD's independent accountants, discussed the accounting system with client personnel, and tested the application of the accounting and internal controls procedures as they relate to cost accumulation for the dry storage project." B. Brinig Written Direct at 2-3 (1000).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we note that Mr. Brinig's testimony was almost entirely limited to testing for actual incurred costs for Rancho Seco. With two exceptions, Mr. Brinig did not offer any expert opinion as to whether certain incurred costs were appropriately included as damages by SMUD. See Direct Testimony of Brian Brinig, at ¶¶ 12-14.

193. SMUD's damages claim was prepared using the same work order system and accounting software SMUD uses on a daily basis as part of its general accounting system in order to track all of the company's costs. Tr. at 1232-34 (Holst).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact – that SMUD's accounting system used as basis to prepare its damages claim – the Government submits that the system was not established for or structured to account for incurred costs that were incremental to the Government's breach, if any.

194. Nineteen specific work order numbers were created for the various aspects of the

spent fuel project. Tr. at 1050 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

195. SMUD's total costs related to the dry storage project were identified by gathering the related work orders and totaling the costs incurred for each work order by year. Tr. at 1236-42 (Holst); *see* PX Dem. 43.

RESPONSE: The Government does not object SMUD's proposed finding of fact. The Government notes that Mr. Field, not Mrs. Holst, initially identified the work orders that related to the dry storage project, and that Mrs. Holst simply compiled costs from the FMIS and SAP data. Tr. at 1234-1242.

196. In order to compile the total costs SMUD incurred related to the dry storage project, the project manager, Jim Field, reviewed SMUD's work order numbers to identify those that were appropriately considered part of the overall dry storage project. Tr. at 1239 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. The Government, however, does not concede that Mr. Field's identification of work orders "appropriately considered part of the overall dry storage project" establishes that the costs for these work orders were appropriate to include in SMUD's damages claim against the Government. We note that Mr. Field replaced Ken Miller as project manager for the Rancho Seco dry storage project in 1999. Tr. at 954 (Field). SMUD did not call Mr. Miller as a witness at trial.

197. Mr. Field identified the work orders based on his "knowledge of the work that [SMUD] has done over the last 10, 15 years." Tr. at 1050 (Field).

RESPONSE: Although the Government does not dispute SMUD's proposed finding of fact, we note that Mr. Field replaced Ken Miller as project manager for the Rancho Seco dry storage project in 1999. Tr. at 954 (Field). SMUD did not call Mr. Miller as a witness at trial.

198. Luana Holst reviewed the work order list to ascertain if any additional work orders should be included and verified that all the work orders selected were part of the dry storage project. Tr. at 1239-41 (Holst).

RESPONSE: Although the Government does not dispute SMUD's proposed finding of

fact, we note that Ms. Holst was not involved in substantive decision making regarding the dry storage project. Tr. at 1269-1270 (Holst). The Government submits that many of the costs that "were part of the dry storage project" are not appropriate as damages against the Government.

**B.** **SMUD's Damages from 1992 to 1997**.

199. SMUD has proven it has incurred $22,308,342 in costs related to the dry storage project from 1992 to 1997. *See* B. Brinig Written Direct at Ex. C (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies costs incurred by SMUD between 1992 - 1997 for the dry storage project. However, the Government asserts that SMUD's compilation of costs related to the dry storage project from 1992 to 1997 does not establish or prove the causation required for SMUD to recover these costs as damages against the Government. The costs incurred between 1992 - 1997 does not take into account offsets and/or deductions identified by testimony deduced at trial, including expert opinion testimony offered by Mr. Kiraly, Mr. Burford, Mr. Hamal and Mr. McGrath.

200. SMUD has agreed to offsets totaling $754,880 during this period, including $667,880 in costs for the gantry crane refurbishment and $87,000 for the fuel inspection. *See* PFF ¶¶ 249-253, 265-269.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact that, at a minimum, these"agreed to offsets" must be deducted from SMUD's damages claim, this proposed finding fails to account for additional deductions and/or offsets that the Government established a trial. DPFOF ¶¶ 247-316.

201. Thus, SMUD has proven it has incurred and is entitled to recover $21,553,462 in damages from 1992 to 1997. *See* PFF ¶¶ 199-200.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's compilation of costs related to the dry storage project from 1992 to 1997 does not establish or prove the causation required for SMUD to recover these costs as damages against the Government. To the extent that the court finds a causal link between the Government's partial breach and costs incurred between 1992 to 1997, this proposed finding fails to take into account offsets and/or deductions identified by testimony deduced at trial, including expert opinion testimony offered by Mr. Kiraly, Mr. Burford, Mr. Hamal and Mr. McGrath.

202. Of SMUD's total damages from 1992 to 1997, $12,112,865 are attributable to

outside services, or vendor contracts. *See* B. Brinig Written Direct at 5 (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies "outside services" costs incurred by SMUD between 1992-1997 for the dry storage project. However, the Government does object to SMUD's characterization of its incurred costs as "damages," as SMUD incurred these costs independent of the Government's breach of the Standard Contract. DPFOF ¶¶ 19-112.

203. Almost all of the costs for outside services during the 1992 to 1997 period were attributable to Vectra. Tr. at 962 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

204. Vectra was responsible for designing, licensing, and fabricating the cask and canisters from 1992 until Vectra's bankruptcy in 1997. The total cost attributable to Vectra under this contract was $11.7 million. Tr. at 962 (Field); PX Dem. 77.

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total cost attributed to Vectra contract for the 1992-1997 time period. The Government objects to SMUD's reliance upon one of its demonstrative exhibits as support for its proposed findings of fact. SMUD's demonstrative exhibits are not evidence. See Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon them to support its proposed findings of fact.

205. $3,737,099 of SMUD's costs from 1992 to 1997 were costs attributable to internal labor. *See* B. Brinig Written Direct at 8 (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies "internal labor" costs incurred by SMUD between 1992 - 1997 for the dry storage project.

206. $3,399,284 of SMUD's costs from 1992 to 1997 were costs attributable to materials. *See* B. Brinig Written Direct at 10 (PX 1000). The remaining costs for 1992 to 1997 are set forth in detail in B. Brinig Written Direct at Ex. C (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies "materials" and other costs incurred by SMUD between

1992 - 1997 for the dry storage project.

207. SMUD's costs can also be broken down by Work Order number, as opposed to the above categories. Work Order 604026 is entitled Spent Fuel Disposition. The total cost for this work order from 1992 to 1997 is $14,797,972. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order encompasses the costs for the design and development of the cask and canister, including costs associated with the major vendors, such as Vectra and Pacific Nuclear. Tr. at 1054-55 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 604026 for the 1992-1997 period.

208. The design, fabrication, testing, delivery and documentation of cask, canisters and all rental equipment fall within this category. Tr. at 213 (Shetler); Tr. at 955 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

209. Work Order 604025 is entitled Construct ISFSI. The total cost for this work order from 1992 to 1997 is $2,928,321. *See* B. Brinig Written Direct at Ex. C (PX 1000). Work captured under this work order includes the design and construction costs of the ISFSI project, including building the on-site facility, which is composed of a concrete pad, fencing, lighting, security system, roadways. Tr. at 1055-56 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 604025 for the 1992-1997 period. The Government objects to the extent that the total cost for this work order does not account for costs that would have been incurred in the non-breach world.

210. Work Order 701804 is entitled Site Improvement/Fuel. The total cost for this work order from 1992 to 1997 is $2,151,656. *See* B. Brinig Written Direct at Ex. C (PX 1000). Work captured under this work order includes improvements to the spent fuel building to

accommodate casking, building modifications to create a training facility, roadway work, and cask drop evaluations.

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 701804 for the 1992-1997 period. The Government objects to the extent that the total cost for this work order does not account for costs that would have been incurred in the non-breach world.

211. Modifications to the gantry crane were made in the period 1992 to 1997.

a. Work Order 702035 is entitled Gantry Crane Refurbishment, and $7,095 in costs were incurred for this work order from 1992 to 1997. Tr. at 1043 (Field); *see* B. Brinig Written Direct at Ex. C (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 702035 for the 1992-1997 period. The Government submits that an additional $158,043 in costs associated with upgrade work after 1997 was included in SMUD's damages claim and should also be deducted from the claim. DPFOF ¶¶ 278-284. The Government objects to the extent that the total cost for this work order does not account for costs that would have been incurred in the non-breach world.

b. Work Order 702036 is entitled Gantry Crane Upgrade, and $660,734 in costs were incurred for this work order from 1992 to 1997. These work orders include the costs of modifications to the gantry crane. Tr. at 1043 (Field); *see* B. Brinig Written Direct at Ex. C (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 702036 for the 1992-1997 period. The Government submits that an additional $158,043 in costs associated with upgrade work after 1997 was included in SMUD's damages claim and should also be deducted from the claim. DPFOF ¶¶ 278-284. The Government objects to the extent that the total cost for this work order does not account for costs that would have been incurred in the non-breach world.

### A. SMUD's Damages From 1998 To 2003.

212. SMUD has proven it has incurred a total of $56,249,870 in costs related to the dry storage project from 1998 to 2003. *See* B. Brinig Written Direct at Ex. C (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies costs incurred by SMUD between 1998 - 2003 for the dry storage project. However, the Government asserts that SMUD's compilation of costs related to the dry storage project from 1998 to 2003 does not establish or prove the causation required for SMUD to recover these costs as damages against the Government. The costs incurred between 1998-2003 does not take into account offsets and/or deductions identified by testimony deduced at trial, including expert opinion testimony offered by Messrs. Kiraly, Burford, Hamal and McGrath.

213. SMUD has agreed to offsets totaling $1.2 million during this period, including offsets for spent fuel building upgrades ($450,000), onsite drop mitigation costs ($250,000), and loan workout credit ($500,000). PFF ¶ 248.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact that, at a minimum, these "agreed to offsets" must be deducted from SMUD's damages claim, this proposed finding fails to account for additional deductions and/or offsets that the Government established a trial. See DPFOF ¶¶ 248-320.

214. Thus, SMUD has proven that it has incurred and is entitled to recover total damages of $55,049,870 from 1998 to 2003.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's compilation of costs related to the dry storage project from 1998 to 2003 does not establish or prove the causation required for SMUD to recover these costs as damages against the Government. To the extent that the court finds a causal link between the Government's partial breach and costs incurred between 1998 - 2003, this proposed finding fails to take into account offsets and/or deductions identified by testimony deduced at trial, including expert opinion testimony offered by Messrs. Kiraly, Burford, Hamal and McGrath. See DPFOF ¶¶ 248-320.

215. Of this total amount, SMUD incurred $42,260,138 in costs attributable to outside services, or vendors. *See* B. Brinig Written Direct at 5-6 (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies "outside services" costs incurred by SMUD between 1998 - 2003 for the dry storage project.

216. SMUD's main contractors from 1998 to 2003 were Transnuclear West, Inc., PCC, Bigge, Numanco, PacTech, and Hartford Steam. Tr. at 957-63 (Field); PX Dem. 77.

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies SMUD's "main contractors" between 1998 - 2003. The Government objects to SMUD's reliance upon one of its demonstrative exhibits as support for its proposed findings of fact. SMUD's demonstrative exhibits are not evidence. See Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon them to support its proposed findings of fact.

217. Transnuclear West was responsible for designing, licensing, and fabricating the casks and canisters following Vectra's bankruptcy in 1997 until the completion of the project.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

218. The total cost attributable to the contract with TNW was $25.8 million. Tr. at 962-63 (Field); PX Dem. 77.

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies the "total cost attributable to the contract with TNW." The Government objects to SMUD's reliance upon one of its demonstrative exhibits as support for its proposed findings of fact. SMUD's demonstrative exhibits are not evidence. See Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon them to support its proposed findings of fact.

219. PCC was the fabricator of the cask and canisters. The majority of work by PCC was contracted for by Vectra and TNW through a subcontract. Tr. at 960-61 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

220. In 2000 and 2001, however, SMUD entered into a separate contract directly with PCC, and payments were made directly to PCC as part of this arrangement. Tr. at 960 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

221. The total cost of these direct payments to PCC was $5.5 million. Tr. at 960 (Field); PX Dem. 77.

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies the "total cost of these direct payments to PCC." The Government

objects to SMUD's reliance upon one of its demonstrative exhibits as support for its proposed findings of fact. SMUD's demonstrative exhibits are not evidence. See Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon them to support its proposed findings of fact.

222. At the time of the fuel transfer, SMUD contracted with Bigge to provide additional staff necessary to complete the transfer. This contract spanned from approximately 1999 to 2002. Tr. at 957 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD failed to establish that Bigge personnel were necessary to conduct the fuel off-loading campaign at Rancho Seco beginning in 1999. Mr. Burford offered expert testimony that the premature mobilization of Bigge personnel for the fuel off-load campaign was inappropriate. Direct Testimony of Jerry Burford Direct Testimony, at ¶¶ 257-262. Mr. Kiraly quantified the costs of premature mobilization of Bigge at $2,501,916. Direct Testimony of Stephan Kiraly, at Att. 8.

223. The total cost attributable to the contract with Bigge was $5.5 million. Tr. at 957 (Field); PX Dem. 77.

RESPONSE: The Government does not object to this proposed finding of fact, to the extent it simply identifies the "total cost attributable to the contract with Bigge." The Government objects to SMUD's reliance upon one of its demonstrative exhibits as support for its proposed findings of fact. SMUD's demonstrative exhibits are not evidence. See Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon them to support its proposed findings of fact.

224. Following shutdown, SMUD reduced its radiation protection staff such that additional staff was necessary to support the dry storage project. Radiation protection technicians set work standards and practices to ensure radiation protection and provide oversight. Tr. at 957-58 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD failed to establish that Numanco personnel were necessary to conduct the fuel off-loading campaign at Rancho Seco beginning in 1999. Mr. Burford offered expert testimony that the premature mobilization of Numanco personnel for the fuel off-load campaign was inappropriate. Direct Testimony Jerry Burford, at ¶¶ 257 - 262. Mr. Kiraly quantified the costs of premature

mobilization of Bigge at $48,214. Direct Testimony of Stephan Kiraly, at Att. 8.

225. SMUD contracted with Numanco in order to augment its staff. The total cost attributable to this contract was $1.5 million. Tr. at 957-58 (Field); PX Dem. 77.

RESPONSE: The Government objects to SMUD's proposed finding of fact, except to the extent that it identifies the total incurred costs for the Numanco contract. The costs for the Numanco contract are not properly included as damages because these contractor costs were not established as incremental during the loading period. Direct Testimony of Stephan Kiraly, at ¶¶ 74-75, and Att. 9. Further, the Government objects to SMUD's reliance upon one of its demonstrative exhibits as support for its proposed findings of fact. SMUD's demonstrative exhibits are not evidence. See Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon them to support its proposed findings of fact.

226. PacTech assisted in evaluating issues regarding the potential for dropping the

cask

on-site. As a result of this assistance, cushioning impact limiters were placed in selective areas in order to limit the impact of any cask drop. Tr. at 959 (Field).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact describing PacTech's work scope at Rancho Seco, the Government submits that costs attributable to cask impact limiter work performed at SMUD are not appropriate to include as damages against the Government. Direct Testimony of Stephan Kiraly, at ¶¶ 63-65, and Att. 8.

227. The total for the PacTech contract was $925,000. Tr. at 959 (Field); PX Dem. 77.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies the "total for the PacTech contract," the exact total of the PacTech contract was $924,571, and the total deduction from damages for the impact limiter tests is $1,940,040. Direct Testimony of Stephan Kiraly, at Att. 4. The Government objects to SMUD's reliance upon one of its demonstrative exhibits as support for its proposed findings of fact. SMUD's demonstrative exhibits are not evidence. See Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon them to support its proposed findings of fact.

228. An independent third-party overseer was included in the project planning to ensure quality of the project. Tr. at 960 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

229. SMUD contracted with Hartford Steam for this third-party assistance, with a total of $754,000 in total costs under the contract. Tr. at 960 (Field); PX Dem. 77.

RESPONSE: The Government does not dispute that Mr. Field testified regarding SMUD's contract with Hartford Steam. However, the Government objects to SMUD's proposed reliance upon one of its demonstrative exhibits as support for its proposed findings of fact. SMUD's demonstrative exhibits are not evidence. See Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon them to support its proposed findings of fact.

230. Although SMUD contracted out large portions of the work associated with the dry storage project, SMUD also had employees devoting substantial time to the project.

a. SMUD engineers reviewed all the technical work that was done by Vectra, PCC, and Transnuclear, including between 3,000 and 4,000 design drawings, calculations, reports, and licensing documents. Tr. at 966-67 (Field). SMUD engineers reviewed 470 designs in 1999 alone. Tr. at 964-66 (Field).

> "[F]or example, Demonstrative 56, there's some typical Pacific Nuclear drawings, and so for any aspect of the project, they would do drawings, and they would, before they were finalized, they would be submitted to, to us formally. And I would have an engineer take the drawing, review it against our design specification, review it against the applicable industry standards, and comment on the drawing, either by marking it up or providing a typewritten list of comments. And then it was submitted to me for concurrence, and I would do my own review, if comments were extensive. Frequently, a[n] engineer would sit down with me, and we'd sit for a period of time and go over the drawings and the comments, and once we'd agreed on the comments, they were provided back to our document control center, who then formally transmitted the drawings and comments back to whoever the design organization was. . . . And so over the course of the project, there was somewhere between . . . 3 and 4000 document submittals to us, where we would . . . go through that process."

Tr. at 966-67 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent that it described activities undertaken by SMUD employees related to the dry storage project. The Government submits that certain costs incurred for the dry storage project should be deducted from the damages claim as a result of the delays in completing the project. DPFOF ¶¶ 232 - 247; Direct Testimony of Stephan Kiraly, at ¶¶ 84 - 86, and Att.13. Further, costs related to training for the loading and transferring of the SNF to the ISFSI are costs that SMUD would have incurred in loading SNF to DOE casks upon acceptance and are not properly included as damages.

b. SMUD employees were also heavily involved in overseeing the fabrication and ensuring compliance with NRC requirements. Tr. at 965 (Field); PFF ¶¶ 318-19.

RESPONSE: See a above.

c. A quality assurance engineer was placed full-time at PCC's manufacturing facility during the course of the fabrication. Tr. at 965 (Field).

RESPONSE: See a above.

d. Quality engineers engaged in periodic audits of the various contractors. As part of this audit, engineers would evaluate the technical work. Tr. at 965 (Field).

RESPONSE: See a above.

e. A resident expediter was also placed at PCC to expedite fabrication. Tr. at 965 (Field).

RESPONSE: See a above.

f. SMUD employees developed and engaged in classroom and hand-on training with regard to all aspects of loading and transferring the fuel to the ISFSI. Tr. at 639-40 (Redeker).

RESPONSE: See a above.

231. $10,074,941 of SMUD's costs from 1998 to 2003 were costs attributable to internal labor. *See* B. Brinig Written Direct at 9 (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies "internal labor" costs incurred by SMUD between 1998 - 2003 for the dry storage project.

232. SMUD also incurred total costs of $1,123,960 attributable to materials from 1998 to 2003. *See* B. Brinig Written Direct at 11 (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it simply identifies "materials" costs incurred by SMUD between 1998 - 2003 for the dry storage project.

233. SMUD's costs can also be grouped by the various segments of the dry storage project, each categorized by work order number. *See* B. Brinig Written Direct at Ex. C (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

234. Work order numbers reflect the total costs of the segment of the project, combining all internal and external costs. Tr. at 1233 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

235. Work Order 604026 is entitled Spent Fuel Disposition. The total cost for this work order from 1998 to 2003 is $44,729,800. *See* B. Brinig Written Direct at Ex. C (PX 1000).

a. This work order encompasses the costs for the design and development of the cask and canister, including costs associated with the major vendors, such as Transnuclear West. Tr. at 1054-55 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 604026 for the 1998-2003 period.

b. The design, fabrication, testing, delivery and documentation of cask, canisters and all rental equipment fall within this category. Tr. at 213 (Shetler); Tr. at 955 (Field).

RESPONSE: See a above.

c. SMUD internal labor associated with managing these large contracts is also included. Tr. at 1054-55 (Field).

RESPONSE: See a above.

236. Work Order 4000372 is entitled Spent Fuel Offload & Storage. All costs charted to this work order, totaling $3,826,290 were incurred between 1998 and 2003. Tr. at 1056-57 (Field). This work order was set up to capture the actual cost of transfer of the fuel to the ISFSI. Tr. at 1056-57 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 400372 for the 1998-2003 period.

237. Work Order 705184 is entitled Fuel Off-Load Training. All costs charged to this work order, totaling $1,804,016 were incurred between 1998 and 2003. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order represents the development of the training materials and the actual training of SMUD personnel. Tr. at 1059-60 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 705184 for the 1998-2003 period.

238. Work Order 4000371 is entitled General Support Spent Fuel. All costs charged to this work order, totaling $1,532,133, were incurred between 1998 and 2003. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order includes activities associated with the dry storage project, including planning and procedure development. It also encompasses support

activities for spent fuel storage, including equipment maintenance and DOE reporting until the fuel is moved to the ISFSI. Tr. at 1057-58 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 4000371 for the 1998-2003 period.

239. Work Order 701804 is entitled Site Improvement/Fuel. The total cost for this work order from 1998 to 2003 is $1,242,043. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order includes improvements needed to prepare the site for fuel transfer, including improvements to the spent fuel building to prepare the site for transfer, upgrades to the roadway and buildings for training, and onsite cask drop evaluations and mitigation actions. Tr. at 1058-59 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 701804 for the 1998-2003 period.

240. Work Order 4002862 is entitled Nuclear Fuel Storage. The total cost for this work order from 1998 to 2003 is $1,220,672. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order represents SMUD's costs of managing the fuel once it was placed in the ISFSI, including ongoing operation, maintenance, and monitoring of the fuel and support activities such as equipment maintenance. Tr. at 1056 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 4002862 for the 1998-2003 period. The Government objects to the proposed finding to the extent it includes incremental costs for storage of failed fuel and GTCC, which are not properly included as damages against the Government.

241. Work Order 702468 is entitled Computer Project—ISFSI Security. A total of $1,040,837 was charged to this work order number between 1998 and 2003. *See* B. Brinig Written Direct at Ex. C (PX 1000). This work order includes the costs of designing and

installing the ISFSI security system for both on and off site monitoring. Tr. at 1059 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent it identifies the total costs attributed to Work Order 702468 for the 1998-2003 period.

**B. SMUD's Total Damages.**

242. SMUD has established that it is entitled to recover total damages from 1992 to 2003 of $76,603,332. SMUD is entitled to this amount based on the evidence presented at trial, as adjusted by offsets agreed to by SMUD. *See* B. Brinig Written Direct at Ex. C (PX 1000); *see also infra* § V (specifying offsets).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, as a matter of law, SMUD is not entitled to recover any costs incurred before 1994. See Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563, at *4 (Fed. Cir. Sept. 9, 2005). Second, SMUD's compilation of costs related to the dry storage project from 1992 to 2003 does not establish or prove the causation required for SMUD to recover these costs as damages against the Government. Finally, to the extent the Court finds a causal link between DOE's partial breach of the Standard Contract and SMUD's incurred costs, SMUD's actual costs incurred between 1992 to 2003 does not take into account offsets and/or deductions identified by testimony deduced at trial, including expert opinion testimony offered by Messrs. Kiraly, Burford, Hamal and McGrath. DPFOF ¶¶ 248-320.

243. SMUD's total damages of $76,603,332 are derived as follows:

a. $78,558,212 in costs SMUD incurred related to the development and operation of SMUD's dual-purpose dry storage system from 1992 to 2003, *see* Brinig Written Direct at Ex. C;

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's compilation of costs related to the dry storage project from 1998 to 2003 does not establish or prove the causation required for SMUD to recover these costs as damages against the Government. The costs incurred between 1992 to 2003 does not take into account offsets and/or deductions identified by testimony deduced at trial, including expert opinion testimony offered by Messrs. Kiraly, Burford, Hamal and McGrath. See Gov't Resp. to PFOF ¶ 242.

b. Minus offsets totaling $1,954,880 agreed to prior to trial. *See generally* PFF ¶¶ 248-282.

RESPONSE: The Government does not dispute that SMUD agreed to the offset described in SMUD's proposed finding. However, for the reasons discussed in the Government's response to SMUD's proposed finding of fact 242a, the Government objects to SMUD's proposed finding. See Gov't Resp. to PFOF ¶ 242a.

244. SMUD has proven total costs, grouped by cost category, as follows:

a. Outside services, or vendor invoices, total $54,373,003.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's compilation of costs related to the dry storage project from 1998 to 2003 does not establish or prove the causation required for SMUD to recover these costs as damages against the Government. The costs incurred between 1992 to 2003 does not take into account offsets and/or deductions identified by testimony deduced at trial, including expert opinion testimony offered by Messrs. Kiraly, Burford, Hamal and McGrath. See Gov't Resp. to PFOF ¶ 242.

b. SMUD's internal labor for the project totals $13,812,040. Indirect labor totals $4,548,851.

RESPONSE: See a above.

c. Materials costs total $4,523,244.

RESPONSE: See a above.

d. The category of materials surcharge totals $391,314 and "other" totals $164,254.

RESPONSE: See a above.

e. A total of $676,922 falls under corporate allocation.

RESPONSE: See a above.

f. A credit of $1,220,964 is included under the category "non cash."

RESPONSE: The Government does not dispute that SMUD's damages claim included the credit cited. However, the Government objects to SMUD's proposed finding of fact for the reasons stated in subparagraph a.

g. A total of $1,289,547 falls under the category of miscellaneous work

orders. *See* B. Brinig Written Direct at 4-5 (PX 1000).

RESPONSE: See a above.

245. SMUD's expert Brian Brinig confirmed, "based on [his] evaluation, analysis and testing of SMUD's claims and supporting documentation," that SMUD accurately accounted for its costs and did in fact incur a total of $78,558,212 related to the dry storage project. B. Brinig Written Direct at 12 (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent that it simply identifies actual costs incurred related to the dry storage project. Mr. Brinig did not opine upon the appropriateness of including certain work orders, cost categories and/or costs in SMUD's damages claim. Mr. Brinig never offered an opinion regarding what costs could be considered incremental to the Government's partial breach.

246. The government's expert witness, Stephen J. Kiraly, conducted a detailed review of the invoices, time sheets, and accounting data supporting SMUD's claim, in both electronic and hard copy form. Kiraly Written Direct at 12-13; Tr. at 2795 (Kiraly). Mr. Kiraly independently confirmed that SMUD incurred $78,558,212 related to the dry storage project. Kiraly Written Direct at 17, Att. 1; Tr. at 2797 (Kiraly).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, to the extent that it simply identifies actual costs incurred by SMUD. The Government objects to the extent that the proposed finding asserts that all of the incurred costs were "related to the dry storage project," including such categories as fixed Rancho Seco labor costs, indirect labor markups, and costs related to the transportation features of the dry storage system. The proposed finding fails to account for the numerous deductions and offsets set forth in detail in Mr. Kiraly's direct testimony, and supported by extensive fact and expert testimony deduced at trial.

247. The government has stipulated that these costs were actually expended by SMUD related to the development and operation of SMUD's dual-purpose dry storage system. Tr. at 2796.

RESPONSE: The Government objects to SMUD's proposed finding of fact, to the extent that it mischaracterizes the stipulation. Government counsel stated that "we have actually

entered into an agreement that we are not challenging the amount that was actually expended by SMUD, not whether those costs are appropriate." Counsel further stated that "the [SMUD] paid those bills." The stipulation does not establish that the total costs claimed by SMUD were appropriately included as part of the dry storage project and whether any of the costs were incremental to the Government's breach.

**V. Acknowledged Offsets To Damages.**

248. SMUD agreed prior to trial to various offsets to SMUD's total costs incurred in development and operation of its dry storage project. *See* SMUD's Memorandum of Contentions of Fact and Law at 4.

a. Gantry Crane Upgrade: $667,880

b. Spent Fuel Building Upgrades: $450,000

c. Spent Fuel Inspection: $87,000

d. Onsite Drop Mitigation: $250,000

e. Loan Workout Credit: $500,000

f. Double-Counting: $2,500,000 (previously deducted)

RESPONSE: The Government's response to this proposed finding is detailed below.

**A. Gantry Crane Upgrade.**

249. SMUD's gantry crane was originally intended to service the turbine generator, but it also was used for handling the cask during transfer in and out of the spent fuel building. Tr. at 1043 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

250. SMUD's original gantry crane was a 100-ton hook weight capacity crane. Tr. at 2594 (Burford).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

251. SMUD determined in the mid-1990s that it was necessary to refurbish the gantry crane. Tr. at 1044 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Field testified that SMUD determined in the 1994, 1995 time frame it was prudent to refurbish the gantry crane "because of the importance of the load it was carrying." Tr. 1043:25 - 1044:3 (Field). However, that testimony is contradicted by contemporaneous documents. For example, in 1992, when SMUD submitted its delivery commitment schedules, it represented to DOE that it would utilize a 130 ton crane. DX 381, at COF0042422. In response to SMUD's submission of its DCSs, DOE asked SMUD to confirm that it was in fact planning on utilizing a 130 ton gantry crane, as the information DOE had indicated that SMUD was then currently capable of utilizing a 97.5 ton crane. DX 381, COF0042420. In response to DOE's letter, Mr. Shetler wrote in a December 7, 1992 letter that, "you questioned the crane capacity and spent fuel shipping methods. Your data should be updated to reflect a recent increase in capacity of the maximum lifting weight of the cask to 130 tons." DX 389, at SMUD 0019613. Plainly, SMUD made the decision to refurbish its gantry crane as early as 1992.

252. The costs for the gantry crane refurbishment were tracked under work orders 702035 (Gantry Crane Refurbishment) and 702036 (Gantry Crane Upgrade). The cost of refurbishing the gantry crane was $667,880 and was incurred between 1992 and 1997. Tr. at 1043-44 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although Mr. Field cited work orders 702035 and 702036 and he estimated that the cost was approximately $667,000, he did not state when those repairs were incurred. Further, the costs incurred under work order 702035 related to the gantry crane totaled $7,095, and the costs incurred under work order 702036 totaled $660,734, for a collective total of $667,829, rather than the $667,000 claimed by SMUD. Further, Mr. Burford explained that this $667,829 figure only encompassed work on this crane through 1997, and that $158,043 in costs associated with upgrade work after 1997 was included in SMUD's damages claim. Direct Testimony of Jerry Burford, at ¶92, at ¶102. Consequently, a proper deduction for the crane upgrade is $825,871, rather than $667,829. Direct Testimony of Stephen Kiraly, at ¶ 64-65 & Att. 4; Tr.2724:16-2725:10 (Kiraly).

253. It is appropriate to offset the costs of refurbishing the crane, as SMUD may have had to refurbish and make operational improvements to the crane even if DOE had performed as required under the Contract. Tr. at 1044 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the amount of the offset for the refurbishment of the gantry crane should be $825,871, rather than the $667,829 suggested by SMUD. See Gov't Resp. to PFOF ¶ 279.

### B. Spent Fuel Building Upgrades.

254. The Contract requires that DOE "arrange for, and provide, a cask(s)," that "[s]uch cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries," and that "[s]uch cask(s) shall be suitable for use at the Purchaser's site." Contract Art. IV.B.2.

RESPONSE: The proposed finding is not a proposed finding of fact, but a conclusion of law. Defendant further responds to SMUD's assertion of law by asserting that the SMUD has correctly quoted portions of the contract cited.

255. Rancho Seco as initially constructed included a 100-ton hook weight capacity crane. Tr. at 2594 (Burford).

RESPONSE: The Government objects to SMUD's proposed finding to the extent that it suggests Mr. Burford testified that he had any knowledge regarding Rancho Seco's initial construction. Otherwise, the Government does not dispute that SMUD once had a crane at Rancho Seco with a 100-ton weight capacity.

256. DOE's expert, Jerry Burford, agreed that "[a] 100-ton cask would constitute a cask suitable for SMUD, for Rancho Seco." Tr. at 2602-03 (Burford).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the Government notes that, in 1992, SMUD represented to DOE that it had made the decision to upgrade its facilities to handle a 130 ton cask. See Gov't Resp. to PFOF ¶¶ 281 - 283.

257. In the late 1980s, DOE engaged in the Facility Interface Capability Assessment (FICA) Project, the object of which was to "access the capability of each of the relevant commercial facilities to handle spent-fuel shipping casks." Facility Interface Capability Assessment (FICA) Project Report at 1 (June 2001) (PX 207).

RESPONSE: The Government does not object to SMUD's proposed finding of fact, although the Government notes that the FICA Project began in 1986 and the report is dated June

1991. PX 207, at 2-2.

258. After reviewing data and engaging in visits to the various nuclear power plant facilities, DOE published the FICA Report in June 1991. PX 207. This report included information on the capacity of various utilities to accept a legal weight truck cask, an overweight truck cask, a 100-ton rail/barge cask, and a 125-ton rail/barge cask. PX 207.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

259. In the original FICA, SMUD was listed as having the capacity to handle an overweight truck cask and a 100-ton rail/barge cask upon implementation of administrative changes. PX 207 at 7-17, 7-18.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the Government notes that SMUD represented to DOE as early as 1992 that it intended on upgrading its gantry crane to accept 130-ton casks. See Gov't Resp. to PFOF ¶¶281 - 283.

260. When DOE resumed the aborted DCS process for a short period in 2004, DOE began the process of updating its information from the FICA study in order to have all the information available to provide equipment suitable for each utility upon performance. PX 812.

RESPONSE: The Government objects to the term "aborted DCS process." The document cited is a letter from DOE to SMUD seeking updated information to support transportation planning activities and to aid DOE in the acquisition of spent nuclear fuel transportation equipment. Moreover, the Government disputes the contention that this began the process of updating DOE's information, because the letter itself refers to RW-859 data that SMUD submitted after the FICA study had been completed. PX 812. Further, SMUD's proposed finding is not relevant to any issue in this case.

261. SMUD was required to undertake many modifications to the spent fuel building, many of which were "attributable to the fact that we're dealing with a welded canister, as opposed to a cask with just a bolted lid." Tr. at 1029-31 (Field) (noting numerous design changes required due to dual-purpose nature of system).

RESPONSE: Although the Government does not dispute that Mr. Field provided the cited testimony, Mr. Field did not testify that changes were required due to the dual-purpose nature of the canister. He testified that changes were made to SMUD's spent fuel pool building because the type of canister that SMUD chose to use required a welded lid. Tr.1029-31 (Field).

262. If a transportation cask suitable for SMUD's originally designed facility was provided by DOE, many of the modifications made by SMUD for the dual-purpose canister based system would not have been required. Tr. at 1031 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. In the testimony cited, Mr. Field does not mention the term "transportation cask." Even if he had, any such testimony would have been speculative. Further, Mr. Field testified that changes were made to SMUD's spent fuel pool building because of the type of canister that SMUD chose to use required a welded lid. Further, the Government would note that, in 1992, SMUD chose not to purchase the NAC-STC, which had gone through the initial "pain and suffering" of NRC licensing, and which had both storage and transportation features, utilized a bolted lid rather than a welded lid. Tr.1390:8-16 (Stuart); DPFOF ¶¶ 186-197.

263. In the mid-1990s, if a suitable transportation cask was provided by DOE, only a small number of modifications to the facility would be required, including additional piping; lighting, power, and communication improvements; and modifications for cask decontamination. Tr. at 1034, 1038 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact because the evidence cited does not support the proposed finding. When asked whether the modifications to the spent fuel building would have been necessary if SMUD were loading a cask with a bolted lid, Mr. Field testified:

> A lot of that depends on the size of the cask, if a cask was brought that was suitable for our plant as originally designed, then the only modifications that I would envision would be to pipe in whatever purge gases are required for inerting the inside of the canister, and I would think that we would look at lighting improvements, power improvements, communications improvements, the things that would make the job go more expeditiously."

Tr.1034:2-10 (Field). Thus, Mr. Field did not refer to a transportation cask, he referred to changes to the spent fuel building if it were loading a canister with a bolted lid. Mr. Field then listed a host of changes that would have been made anyway. However, as suggested by Mr. Field's comment that "[a] lot depends on the size of the cask," the Government properly objected

that this testimony is speculative. Tr.1034:13-18. Further, SMUD's suggestion that it would have used smaller casks also is in conflict with its own expert, Ivan Stuart. Mr. Stuart testified that a utility such as SMUD may legitimately decide to upgrade its facility to accept larger casks because it would allow for the faster removal of SNF. Direct Testimony of Ivan Stuart, at ¶ 31.

264. A conservative estimate of the modifications that would have been required to accommodate a cask in the non-breach world is $450,000. Tr. at 1039 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. In the testimony cited, Mr. Field does not address the type of cask needed "in the non-breach world." Even if he had, any such testimony would have been speculative. Mr. Field testified that changes were made to SMUD's spent fuel pool building because of the type of canister that SMUD chose to use required a welded lid. Mr. Field's "conservative estimate" is speculative. Further, it is undisputed that SMUD made its decision to pursue dual-purpose dry storage, and consequently the modifications to its Spent Fuel Building, as early as 1990, which plainly constitutes the non-breach world. DPFOF ¶¶ 5-137. To the degree that SMUD is allowed any claim for these costs, it should be reduced by at least $450,000.

### C. **Fuel Inspection Offset.**

265. The Contract requires purchasers to classify their SNF and/or HLW prior to delivery in accordance with the descriptions in the Appendix. Contract Art. VI.A.1.b.

RESPONSE: The proposed finding is not a proposed finding of fact, but a conclusion of law. Defendant further responds to SMUD's assertion of law by asserting that the SMUD has correctly paraphrased portions of the contract cited.

266. In the mid-1990s, SMUD conducted a visual fuel inspection wherein a videotape of the fuel was made and reviewed to determine the condition of each fuel assembly. Tr. at 1041-42 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

267. SMUD employed the videotape to classify the fuel in accordance with the Contract. Tr. at 685 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the Government notes that Mr. Redeker admitted under cross-examination that, based upon SMUD's review of the videotape, SMUD concluded that it was in possession of ten failed

fuel assemblies classified as F-2 failed fuel. Tr.796:9-799:21 (Redeker).

268. In conducting this visual fuel inspection, SMUD incurred $87,000 in labor and materials costs, all charged prior to 1998. Tr. at 1041-42 (Field).

RESPONSE: The Government does not dispute that Mr. Field testified that he estimated that it cost $87,000 to perform the inspection. Tr. 1042:11-23 (Field).

269. It is appropriate to offset the costs of the fuel inspection, as it would have been necessary if the government had performed as required under the Contract. Tr. at 1041-42 (Field).

RESPONSE: The Government does not dispute that an offset for the cost of the fuel inspection is appropriate.

**D. On-Site Drop Mitigation Offset.**

270. Rancho Seco was originally designed to accommodate a 100-ton cask, including the ability to withstand the drop of a 100-ton cask. Tr. at 1040 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

271. Because the original on-site drop mitigation analysis was done in the 1970s, it might not meet current standards. Therefore, if DOE had properly performed under the Contract, SMUD likely would have had to reevaluate its earlier analysis and potentially undertake certain modifications, including: (1) an impact limiter, or foam cushion, where the cask would impact, and (2) a raised platform to limit the distance that it would fall. Tr. at 1040, 1205-06 (Field).

RESPONSE: Although the Government does not dispute that SMUD's on-site drop mitigation test would have occurred in the but-for world, the Government does object to the second sentence of SMUD's proposed finding of fact, as the statement "if DOE had properly performed under the Standard Contract," is vague.

272. Jim Field estimated that the cost of this analysis and the resulting modifications would be $250,000. Therefore, an off-set in this amount is appropriate. Tr. at 1040, 1191-92

(Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Field "hypothesized" that SMUD would spend $250,000. Tr. 1206:7-15(Field). In fact, that amount should be $2.14 million. See DPFOF ¶¶ 287-290.

273. SMUD also undertook additional mitigation analysis and modifications that were required solely because of the increased weight of the dual-purpose canister; such modifications would not have been required had DOE provided a suitable cask upon performance. Tr. at 1191-92, 1196-97 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact insofar as SMUD is suggesting that it would have utilized smaller casks had DOE performed in the non-breach world. Moreover, any testimony to the contrary is contradicted by SMUD's contemporaneous documents. See DPFOF ¶¶ 280-283.

**E. Loan Workout Offset.**

274. As part of a Loan and Workout Agreement between SMUD and Precision Components Corp. ("PCC"), SMUD made a payment to PCC of $1.5 million. Loan and Workout Agreement (May 2001) PX 683. This cost was charged to work order 604026. *See* Contract E776A Change Order No. 9 (PX 598).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

275. As part of this agreement, SMUD's contractor, Transnuclear West, Inc., made a $1.1 million payment to SMUD in May, 2001. *See* Contract E776A Change Order No. 9 (PX 598). While $600,000 was credited to work order 604026, the remainder of this payment, $500,000, was credited to SMUD's general account number, work order 14249. DX1156.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

276. Because work order 14249 is not associated with the dry storage project, it was not included when formulating SMUD's damages claim. *See* Memorandum of Contentions of

Fact and Law at 5 (Dckt. #286).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact to the extent that SMUD's suggests it is improper for SMUD to include work orders not associated with the dry storage project in its damages claim, SMUD's Memorandum of Contentions of Fact and Law is not evidence.

277. Because this work order, and therefore this $500,000 credit, was not accounted

for

in SMUD's damages claim, an offset of $500,000 is appropriate in the period 1998 to 2003. *See*

B. Brinig Written Direct at 12 (PX 1000).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the Government would note that despite his review of SMUD's damages claim, SMUD's expert accountant, Mr. Brinig, overlooked this $500,000 credited back to SMUD. Tr.1297:9-21, Tr.1308:12-1313:1 (Brinig). When asked about this oversight at trial, Mr. Brinig explained that, "the simple answer is I missed it." Tr.1297:13-16 (Brinig).

**F. $2 Million In "Double Counting."**

278. SMUD's initial damages disclosure for 1992 through 1996 was prepared from FMIS summary printouts rather than an electronic system, as the FMIS system had been replaced at SMUD by the SAP accounting system in 1999. Tr. at 1240 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

279. The summary printout for 1994 erroneously included the totals for 1992 and

1993,

resulting in a double-count of these costs in SMUD's initial claim of approximately $2 million. Tr. at 1241-42 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

280. Upon review of the detailed backup information for the accounting system for the period 1992 to 1996, Ms. Holst discovered the double counting error and notified counsel. Tr. at

1241 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

281. SMUD notified the government of this error at Ms. Holst's deposition and by correspondence dated November 5, 2004. Tr. at 2790; Kiraly Written Direct at Att. 1, n.3.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the Government would note that Mr. Kiraly testified that he and his colleagues identified SMUD's double-counting error independent of SMUD's disclosure. Tr.2787:22-2788:9 (Kiraly).

282. The $2 million double counting was addressed prior to the trial and was deducted from SMUD's claim prior to SMUD's submission of its Memorandum of Contentions of Fact and Law (Dckt. #286). The government agreed at trial that this issue has been "resolved." Tr. at 1049-50.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the Government would note that SMUD's expert accountant, Mr. Brinig, overlooked this $2 million double-counting error, which accounted for 10% of SMUD's $20 million in claimed damages from 1992 to 1996. Tr.1297:9-21, Tr.1308:12-1313:1 (Brinig).

## VI. SMUD's Commercially Reasonable Management Of The Project.

283. SMUD's decisions to start and then continue with the procurement of a dual purpose dry storage system were reasonable and prudent in light of the long delays projected by DOE for its waste acceptance program and DOE's support for the development of such a system. *See* I. Stuart Written Direct at 2-6 (PX 1001); E. Supko Written Direct at 10 (PX 1002).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, Ms. Supko and Mr. Stuart claimed that they were offering testimony concerning the reasonableness of SMUD's dry storage decision in rebuttal to the expert testimony of Jerry Burford. Tr.1521:9-25 (Supko); Direct Testimony of Ivan Stuart, at ¶ 3. However, as SMUD itself established at trial, and as the Government certainly agrees, Mr. Burford is not offering an opinion as to whether SMUD's decision to pursue dual-purpose dry storage was reasonable. Tr.2558:11-18 (Burford). Consequently, because Ms. Supko and Mr. Stuart's testimony are not proper rebuttal, as well as for the other reasons stated in the Government's motion in limine regarding Ms.

Supko, the Court should strike the testimony of Mr. Stuart and Ms. Supko concerning the reasonableness of SMUD's decision to pursue dual-purpose dry storage. Rodriguez v. Olin Corp., 780 F.2d 491, 496 (5th Cir. 1986); see also United States v. Posey, 647 F.2d 1048, 1052 (10th Cir. 1981); Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (holding that rebuttal "is not 'an opportunity for the correction of any oversights in the plaintiff's case in chief").

Second, Ms. Supko lacks the requisite qualifications to opine upon whether the costs associated with a dual-purpose dry storage system are appropriate for inclusion in SMUD's damages claim. Ms. Supko has never provided testimony at trial in which she has estimated the dollar value of a plaintiff's damages claim, and has never been qualified as an expert in economic analysis or damages estimation. Tr.1545:14-21 (Supko). Further, Ms. Supko admitted that she drew no distinction between the reasonableness of SMUD's decision to pursue dual-purpose dry storage and the appropriateness of the inclusion of the costs associated with dual-purpose dry storage in SMUD's damages claim. Tr.1540:14-20 (Supko). Indeed, Ms. Supko conceded that she did not endeavor to conduct any sort of "but for" analysis in determining what costs are appropriate for inclusion in SMUD's damages claim. Tr.1541:21-25 (Supko). Ms. Supko's conclusion regarding the reasonableness of SMUD's decision was not even based upon SMUD's own decision making; rather, she based her conclusion upon "what was going on in the industry." Tr.1543:12-18 (Supko). Ms. Supko agreed that what SMUD believed at the time it made its decision to pursue dual-purpose dry storage was irrelevant to her conclusion that transportation costs are appropriate for inclusion in SMUD's damages claim. Tr.1547:9-15 (Supko). Of course, Ms. Supko also conceded that a utility's decision with respect to the storage of SNF is highly dependent upon that individual utility's particular facts and circumstances. Tr.1548:16-21 (Supko). In short, Ms. Supko has presented no legitimate methodology for the conclusions she has offered in this case. Consequently, Ms. Supko has failed to meet the requirements necessary to be deemed an expert with respect to the reasonableness of inclusion of costs in a damages claim. See Kumho Tire, 526 U.S. at 153.

Finally, regardless of whether SMUD's 1990 decision to pursue dual-purpose dry storage was reasonable, as we demonstrated at trial, its decision was not caused by the Government's breach of the Standard Contract. DPFOF ¶¶ 19-64. Further, SMUD's decision to continue with the dry storage project was motivated by the significant cost savings it would realize by eliminating its wet pool, and would have been made regardless of the timing of DOE's performance. DPFOF ¶¶ 54-55, 61, 66, 76, 78, 81, 86-89, 92, 103-109.

284. Since 1987, the DOE's announcements and actions increasingly indicated that its acceptance of spent fuel would probably be delayed for a significant period and that is in fact what has happened. *See* PFF ¶¶ 117-124.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The evidence in this case unequivocally reflects that, as late as 1995, SMUD believed that DOE could timely accept SMUD's SNF. DPFOF ¶¶ 71-74. Further, SMUD's 1990 decision to pursue

dual-purpose dry storage was made independent of the Government's delay in SNF acceptance. DPFOF ¶¶ 19-64. See also Gov't Resp. to PFOF ¶¶ 117-124.

285. During the 1990s, the DOE supported and encouraged the development of dual-purpose dry storage systems. This encouragement included the Cooperative Agreement between DOE and SMUD, DOE interest in and support for multi-purpose canister systems, and DOE statements indicating that it planned to accept dual-purpose systems at the permanent repository. *See* I. Stuart Written Direct at 4-6 (PX 1001); E. Supko Written Direct at 49-52 (PX 1002); PX 591; PFF ¶¶ 523-550.

RESPONSE: The Government objects to SMUD's proposed finding of fact. None of the actions cited by SMUD represent that DOE "supported and encouraged the development of dual-purpose dry storage." First, SMUD has misconstrued the history and purpose behind the cooperative agreement. In 1990, having made the decision to pursue dual-purpose dry storage, SMUD lobbied Congress for money to develop its system. DPFOF ¶ 167. Rather than simply appropriate money, as SMUD requested, Congress directed DOE to "develop a plan" to implement a cooperative research, development, and demonstration project. DPFOF ¶ 168. DOE and SMUD ultimately entered into a cooperative agreement in December 1994. DPFOF ¶ 176. Notably, the first objective of the cooperative agreement, "in order of precedence," was to facilitate the demonstration of a dry transfer system. Id.

Second, DOE's interest in a multi-purpose canister ("MPC") system has no bearing upon SMUD's pursuit of a dual-purpose system. An MPC would allow for the storage, transport, and disposal of SNF, whereas a dual-purpose system would allow for only the storage and transport of SNF. Tr.1636:9-13, Tr.1702:23-1703:7 (Zabransky); Tr.2059:2-9 (Pollog).

Finally, DOE has unequivocally stated that dual-purpose canisters are not covered by the Standard Contract and, absent a contract modification and appropriate compensation, SMUD's SNF will not be accepted by DOE until it removes its SNF from its dual-purpose canisters. DPFOF ¶ 198.

286. After DOE failed to begin performance in 1998, SMUD used its best efforts to restart and then complete the development of a dual-purpose dry storage system for the on-site interim storage of SNF. Tr. at 634 (Redeker) ("The fact that they had officially breached at this time, it had an impact in that how long would the fuel be in dry storage. It is going to be a long

time. This is the best course of action to mitigate the damage that is now occurring, because the fuel isn't going to be gone when we had expected it to.").

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the testimony cited by Mr. Redeker does not support the statement that "SMUD used its best efforts to restart and then complete the development" of its dual-purpose dry storage system. Second, SMUD's proposed finding ignores the fact that SMUD incurred significant delays and cost overruns to its dry storage development effort for several years prior to 1998, and that these delays and cost overruns were primarily due to performance factors solely in the control of SMUD and its vendors. By the end of 1997, SMUD had incurred over four years of delay to its schedule for dry storage. Direct Testimony of John McGrath, at ¶¶ 19-29 & Ex. D-F.

Finally, as we demonstrated at trial, because of the significant cost savings SMUD would realize by eliminating its wet pool, SMUD would have pursued dual-purpose dry storage regardless of the timing of DOE's performance. DPFOF ¶¶ 54-55, 61, 66, 76, 78, 81, 86-89, 92, 103-109.

287. The delays that SMUD experienced in completing the dry-storage project resulted from a myriad of factors, including the many years taken by the NCR to complete its reviews, the bankruptcy of SMUD's primary contractor (Vectra), the complexity of the project, and the fact that safety is paramount when designing a system for the handling, storage, and transport of SNF. *See* PFF ¶¶ 288-329.

RESPONSE: Although the Government does not dispute that SMUD experienced extensive delay in completing the dry-storage project, this proposed finding is incomplete in its delineation of the factors causing delay and mischaracterizes the importance of the NRC review process as a factor in that delay. Although achieving the NRC license was an overall end-requirement for the project, the prosecution of the work to develop the dry-storage system was mostly independent of the NRC license process. DX 0384 at 22740-42; Tr.2519-22 (McGrath) (concluding that "…the licensing activity itself, the NRC review of the application and the back and forth Q&A was in itself noncritical activity, with the exception of the design work up front that was necessary to submit the application." and "The (NRC review) activity itself did not determine the eventual project duration. It wasn't responsible for the duration of the project."). Indeed, the vast majority of delay is attributed to factors entirely within the control of SMUD and its vendors, such as re-analysis, re-design, re-fabrication, and various vendor quality and manufacturing delays. Direct Testimony of John McGrath, at ¶¶ 18-35 & Ex. D-H; Tr.2519-2523, 2527, 2530-31 (McGrath). Further, several years of work and more than two and one-half years of delay were incurred by SMUD after the NRC license was issued. Tr.2523 (McGrath); Direct Testimony of John McGrath, at ¶¶ 30-32.

288. SMUD's project was a first-of-a-kind effort because it sought to develop a dual-purpose dry storage system. Designations Appendix (Dckt. #310) at 1060 (Stewart).

RESPONSE: The Government does not dispute SMUD's proposed finding of fact. Of course, SMUD could have avoided the risk and significant costs associated with the pursuit of its first-of-a-kind dry storage system simply by leaving its SNF in its wet pool or by placing its SNF into storage-only dry storage. DPFOF ¶¶ 154-164.

289. During the development of its dry storage system, SMUD and its vendors responded to at least seven rounds of detailed questions from the NRC. PX 845 at 36395 ("TNW submitted their response to a seventh round of questions from the NRC").

RESPONSE: The Government does not dispute SMUD's proposed finding of fact.

290. NRC comments and questions led to further study of and significant changes to the canister and cask designs on many occasions. PX 404, 423, 425, 434, 444 at 9657, 845; DX 483, 619, 683; Tr. at 537-39, 546-47, 569-71 (Redeker) (describing NRC-required changes); Tr. at 990-94 (Field) (same).

RESPONSE: Although the Government does not dispute that SMUD experienced significant changes to the canister and cask designs during its development of the dry-storage system, the implication that these changes were solely the result of NRC comments and questions is incorrect. Many design changes resulted from nonconformance reports ("NCRs"), corrective action reports ("CARs"), engineering change notices ("ECNs"), and various issues encountered during failed attempts at fabrication of system components at SMUD vendors Vectra, PCC, and Ranor. Direct Testimony of John McGrath, at p.7, n.10; p.10, nn.22, 23; p.11 n.25; DX 0524, 0525, 0529, 0539, 0541, 0552, 0555, 0972, 0976, 0979, 1056, 1059, 1060, 1064, 1066, 1067, 1068, 1069, 1079, 1085, 1086, 1088, 1089, 1094, 1096, 1106, 1110, 1115, 1125, 1147, 1158, 1170, 1171, 1184, 1185, 1191, 1355, 1362. Indeed, to the extent that SMUD initiated changes based upon NRC comments or questions, this simply highlights SMUD's inability to provide a proper license application that met appropriate NRC technical and safety standards.

291. The design changes resulted in significant additional expense to the project and

NRC review often delayed the schedule. Tr. at 225 (Shetler) (describing NRC-required changes that "added material cost and schedule impacts"); Tr. at 575-76 (Redeker) (describing NRC's "intrusive oversight" and explaining that such action made the project "more costly" and created "more delays"); PX 425 (NRC official Charles Haughney explaining in 1995 that NRC schedules for review of dry storage projects "often disappear in the fog"); PX 453; DX 593.

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is irrelevant to any issue in the above-captioned case. First, with the exception of early design work necessary to develop the license application, the licensing process with the NRC was not critical to the prosecution of the work. Tr.2519-20 (McGrath). SMUD performed the work in parallel with the NRC licensing activity, and actually received the Part 71 license four years prior to completing the project. Direct Testimony of John McGrath, at Exhibit C (illustrating receipt of Part 71 license in September 1998 and completion of fuel loading in September 2002)). Approximately 30 months of delay was incurred following the granting of the license in September 1998, and the vast majority of total project delay is attributed to factors entirely within the control of SMUD and its vendors such as re-analysis, re-design, re-fabrication, and various vendor quality and manufacturing delays. Tr.2523 (McGrath); Direct Testimony of John McGrath, at ¶¶ 18-29 & Ex. D-H.

Second, SMUD has not claimed that DOE was responsible for any of the delays associated with SMUD's dry storage project. Third, SMUD itself was responsible for at least some of the delay that it experienced over the course of the project. DPFOF ¶¶ 240-43. Indeed, Mr. Burford provided unrefuted testimony that, as a nuclear licensee under 10 C.F.R. Part 50, by assuming the substantial risk of pursuing dual-purpose dry storage, SMUD bore the responsibility for any resulting delays in the dry storage project. DPFOF ¶¶ 237-239. Finally, just as a contractor is responsible for the performance of its subcontractor, see Johnson Management Group CFC, Inc. v. Martinez, 308 F.3d 1245, 1252-53 (Fed. Cir. 2002), SMUD is responsible for the costs associated with the delays in the dry storage project either due to its own fault or based upon its contractors' untimely performance. Wilner v. United States, 23 Cl. Ct. 241, 244 (1991) (holding that Government may not be held responsible for delays in contractor project that Government did not cause).

292. Because SMUD was applying for both a storage license and a transportation license, SMUD initially had to work with two different branches of the NRC, one for storage and one for transportation. Each of these NRC branches had its own set of requirements and this led to inefficiencies and delays in NRC review of license applications. E. Supko Written Direct at

57-58 (PX 1002) (noting "NRC review of applications for dual purpose casks were performed by two separate staffs, which could result in reviews that were not efficient or timely, as experienced by Vectra"); Tr. at 382 (Shetler) (discussing conflicting regulatory requirements between two different regulatory branches of the NRC).

RESPONSE: The Government objects in part to SMUD's proposed finding of fact. The Government does not object to the first sentence of SMUD's proposed finding of fact. However, there is no basis for the second sentence of SMUD's proposed finding. Ms. Supko testified at trial as to the NRC's review of license applications generally during the mid-1990s. Tr.1535:21-1536:18 (Supko). However, she admitted under cross-examination that she could not identify a specific amount of delay that was the result of the NRC's actions or inactions. Tr.1536:19-22 (Supko). In fact, Ms. Supko conceded that SMUD initially anticipated that its dry storage project would be completed by 1995, and the changes in the NRC's review process began in 1995. Tr.1537:9-22 (Supko). Simply put, Ms. Supko's opinion that the NRC caused delays in SMUD's dry storage project is based upon pure speculation.

Further, even if the NRC's review of SMUD's first-of-its-kind dry storage project resulted in delays, SMUD is responsible for the costs associated with the delays in the dry storage project either due to its own fault or based upon its contractors' untimely performance. Wilner v. United States, 23 Cl. Ct. 241, 244 (1991) (holding that Government may not be held responsible for delays in contractor project that Government did not cause).

293. In early 1996, the NRC determined that there were substantial quality assurance issues with Vectra Technologies, SMUD's primary contractor on the project. In response, the NUHOMS Owners Group, including SMUD, started an extensive audit of Vectra's design and engineering work to insure compliance with NRC regulations and guidance. Tr. at 236-37 (Shetler); PX 451 (NUHOMS Joint QA Audit); PX 452 ("Vectra and SMUD have worked diligently to resolve the issue in the most expedient and cost-effective manner possible."); PX 449 (discussing licensing hurdles and cost impacts).

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is irrelevant to any issue in the above-captioned case. Further, the documents and testimony cited by SMUD do not support the fact that the NUHOMS Owners Group conducted an "extensive" audit of Vectra's design and engineering work. Finally, the NRC issued a Confirmatory Action Letter ("CAL") to Vectra as early as July 1995 as a result of an inspection at Ranor. DX 0526.

294. Also in 1996, Vectra requested a significant contract change order for costs that resulted from many of the technical changes to the project. PX 453. SMUD vigorously challenged and tested Vectra's requests. DX 593. The initial contract with Pacific Nuclear, and then Vectra, went through 11 contract change orders from 1992 through 1997. PX 267; *see also* DX 53, 406, 415, 434, 483, 490, 561, 590, 615, 643, 683, 762, 792, 797. Many of these change orders were directly or indirectly attributable to NRC comments and questions. *Id.*

RESPONSE: Although the Government does not dispute that 11 change orders were executed between SMUD and Pacific Nuclear/Vectra from 1992 through 1997, the proposed finding mischaracterizes the scope of the change orders as attributable to NRC comments and questions. Change order number 1 was related to NRC questions on the addition of impact limiter testing to the project. DX 0406. Change order numbers 2, 3, and 4 were implemented to account for delays and cost overruns during the impact limiter testing program that were solely under the control and responsibility of SMUD, Vectra, and Vectra's vendor, Alcore. DX 376, 453, 459; DX 283, at SMUD 009311-12, 009327, 009333-34; 009381, 009384, 009400-01, 009408, 009414, 009423, 009430, 009438, 009446. Change order numbers 6-10 were implemented to address a design change in the structural shell of the cask due to structural design inadequacies uncovered during a cask drop analysis, which resulted in a re-work of the cask structure. Direct Testimony of John McGrath, at ¶¶ 23-29 & n.11.

Further, the Government objects to SMUD's reliance upon DX 593, because it does not support the finding that SMUD "vigorously challenged and tested" Vectra's requested contract change. Finally, regardless of whether the change orders were "directly or indirectly" attributable to NRC comments and questions, SMUD is responsible for the costs associated with the delays in the dry storage project either due to its own fault or based upon its contractors' untimely performance. Wilner v. United States, 23 Cl. Ct. 241, 244 (1991) (holding that Government may not be held responsible for delays in contractor project that Government did not cause).

295. Each contract change order required a thorough evaluation by SMUD staff and concurrence by senior management. PX 267.

RESPONSE: The Government does object to SMUD's proposed finding of fact.

296. As part of the DOE/SMUD Cooperative Agreement, SMUD updated DOE regularly regarding all aspects of the project.

a. SMUD provided DOE with regular monthly reports on the status of the project from 1995 through September 1998. PX 845.

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact because it is irrelevant to any issue in the above-captioned case.

b. DOE officials had many meetings with SMUD throughout the life of the Cooperative Agreement and would contact SMUD managers if they had any questions. Designations Appendix (Dckt. #310) at 1059 (Stewart) (agreeing that SMUD officials were "always available to discuss your concerns or any issues that you had about the cooperative agreement and the fabrication process"); *id* at 1060 (acknowledging meetings at both Rancho Seco and Washington, D.C.); *id*. at 1053 (initially estimating 50, 60, or 70 meetings with SMUD and then stating that he had "no idea" how many meetings he had).

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact because it is irrelevant to any issue in the above-captioned case.

c. DOE analyzed the data, prepared test reports, and diligently oversaw the Cooperative Agreement. Designations Appendix (Dckt. #310) at 1061, 1065 (Stewart). SMUD provided DOE with quarterly financial reports with detailed cost data for the dry storage project from 1995 through 1999. *See, e.g.*, PX 399, 411, 424, 434, 448, 459, 476, 492, 514, 571, 611 (quarterly financial reports forwarded to DOE); Tr. 562-65 (Redeker) (discussing financial reporting to DOE).

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact because it is irrelevant to any issue in the above-captioned case.

297. On January 13, 1997, the NRC issued a "Demand for Information" to Vectra that required Vectra to show cause why the NRC should not halt all of Vectra's

fabrication activities based on quality assurance concerns. PX 509. The Demand for Information required Vectra to conduct a comprehensive review of its design control and design changes, identify the root cause of previously identified problems, and explain why the NRC should not suspend Vectra from all fabrication activities until the problems were resolved. PX 509, 513; Tr. at 594-96 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the demand for information issued by the NRC in January 1997 resulted from quality concerns raised by the NRC from June 1995 through November 1996. DX 707, at SMUD 004537-4542. Vectra voluntarily placed a quality assurance stop work order upon fabrication activities on January 24, 1997. DX 0712.

298. From late 1996 through 1998, SMUD conducted several comprehensive reevaluations of its storage options, analyzing each alternative and carefully considering all of the viable options. PX 502, 503, 513, 519.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, SMUD concluded after each evaluation that the cost of moving to dry storage paid for itself well before DOE would have accepted the last of SMUD's SNF in the non-breach world. DPFOF ¶¶ 77-112.

299. As a result of the NRC's Demand for Information and Vectra's technical problems, there was little to no progress made on SMUD's project from 1996 through the end of 1998. Tr. at 236-37 (Shetler); Tr. at 595 (Redeker) (explaining that the Demand for Information "essentially shut down progress on the project" and that "without an adequate quality assurance program, you can't design, you can't fabricate, you can't do very much of anything").

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

300. Throughout 1997, however, SMUD officials met regularly with Vectra, other utilities in the NUHOMS Owners Group, NRC officials, and DOE officials to determine how to address Vectra's quality assurance problems. Tr. at 236-37 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's reliance upon Mr. Shetler's testimony does not support the contention that SMUD officials "met regularly" with Vectra, other utilities in the NUHOMS owners group, NRC officials, and DOE officials to determine how to address Vectra's quality assurance problems. Instead, Mr. Shetler testified that "there was an owners group that was concerned about where Vectra was going. We were also monitoring and auditing what was going on with Vectra."
Tr. at 237 (Shetler).

301. In October 1997, Vectra filed for federal bankruptcy protection in the Western District of Washington. PX 598; PX 598A.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

302. Transnuclear Inc. purchased Vectra's assets and intellectual property out of the bankruptcy estate. *Id.*; PX 585.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

303. Transnuclear Inc. then formed Transnuclear West, Inc. for the purpose of taking over the Vectra operations. PX 585.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

304. One of the problems that led to Vectra's bankruptcy was that it had a fixed price contract for the SMUD project and assumed the risk for most of the cost overruns. Tr. at 921 (Ferreira).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. The Government notes, however, that Vectra was developing the NUHOMS dry storage system for SMUD and SMUD's own expert, Mr. Stuart, testified that in 1992, he concluded that SMUD did not make the right decision in pursuing the NUHOMS dry storage system, which was not licensed for transportation by the NRC. DPFOF ¶¶ 189-190. Consequently, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system. Id.

305. Before signing a contract with TNW to complete the dry storage project, SMUD had extensive negotiations with TNW. Tr. at 237-38 (Shetler); Tr. at 919 (Ferreira); PX 585.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

306. SMUD officials met with officials of TNW's French parent company, COGEMA, to insure that TNW would provide sufficient resources for the restart and completion of SMUD's project. Tr. at 631-32 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

307. SMUD signed a contract with TNW in September 1998 to complete the dry storage project. PX 598, 598A. By order of the Bankruptcy Court, TNW agreed to complete the SMUD project at "cost-without-profit," on a time and materials basis. Tr. at 634 (Redeker); PX 585.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

308. The TNW contract went through 11 contract change orders of its own from 1998 to 2003. PX 598; *see also* DX 950, 915, 947, 963, 978A, 1039, 1054, 1099, 1142, 1149, 1144, 1279. As with the Pacific Nuclear/Vectra contract, many of these change orders were directly or indirectly attributable to NRC comments and questions. *Id.*

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although the Government does not dispute that 11 change orders were executed between SMUD and TNW from 1998 through 2003, the proposed finding mischaracterizes the scope of the change orders attributable to NRC comments and questions. The original TNW contract was signed in September 1998, the same month the NRC issued the Part 71 license to SMUD. DX 873. The original contract amount with TNW was $6 million, and contained a performance period through December 2000. DX 879. The actual period of performance was delayed through September 2002 and the change orders added more than $20 million to the original contract amount following the issuance of the Part 71 license. By dollar amount, the largest change orders were numbers 3-7 and number 10. Change orders 3 and 6, for $5.905 million, were executed due to SMUD qualifying and establishing a secondary manufacturer for the canister (PCC), due to scheduling delays at the primary manufacturer, Ranor, and the transfer of cask manufacturing materials to PCC. DX 963, DX 1039. Change orders 4 and 5, for $4.6 million, were executed due to increases in TNW's cost estimates because of schedule delays and a design deficiency related to the compatibility of materials used for the neutron absorber jacket in the transportation cask. DX 978A. Change order 7, for $6.7 million, was executed to extend the performance period to July 2001, for a fixed price canister purchase order with PCC, and to settle outstanding

claims between PCC and TNW. DX 1054. Change order 10 extended the performance period to September 2002 and provided for delays in the supply of the dry storage canisters. DX 1144.

309. TNW agreed to abide by the Defense Contract Audit Agency procedures to distribute its indirect costs uniformly among its customers. PX 585. DOE was one of TNW's customers at the time. PX 585; Tr. at 999-1002 (Field) (noting Idaho National Lab was also a customer of TNW and a member of the NUHOMS owners' group).

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is irrelevant to any issue in the above-captioned case.

310. SMUD exchanged information regarding SMUD's experiences with TNW and the progress of its program with DOE employees at Idaho National Lab. Tr. at 1002 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. As the Government noted at trial, the individuals with whom SMUD exchanged information were not DOE employees, but rather DOE contractors. Tr.1002:15-1003:6. (Field) (acknowledging that he spoke with "an employee of the contractor," rather than a DOE employee).

311. Before the NRC would allow TNW to resume any fabrication activities, it was required to demonstrate to the NRC that TNW had sufficient quality control and assurance so that it could resume design and fabrication activities for the dry storage systems. PX 580; PX 845 at 36381-95. In late 1998 and 1999, TNW restarted fabrication on SMUD's cask and canisters. PX 580.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's proposed finding incorrectly implies that the NRC was responsible for the 33.5 months of delay between the time Vectra voluntarily stopped work on the dry storage project in January 1997 and the time when canister fabrication restarted in November 1999. For more than nine months, no work was accomplished while Vectra self-identified and attempted to correct quality assurance issues in response to the NRC's demand for information. Direct Testimony of John McGrath, at ¶ 29; DX 708; DX 712; DX 721; DX 742; DX 739; DX 740; DX 743; DX 779; DX 8, at SMUD 0006371-72; DX 788. This period ended with the Vectra bankruptcy filing and an NRC restart audit in October/November 1997. DX 1342; DX 822. Although the NRC noted that Vectra/TNW was almost ready for a "limited restart" of fabrication at that time, it highlighted four areas that TNW had to satisfactorily address prior to restart. DX 283, at SMUD 0009768;

DX 822. For more than 12 months following the NRC restart audit in November 1997, SMUD and its vendors attempted to implement corrective actions and design modifications in preparation for the restart of fabrication, while accomplishing no work on the project's critical path. Direct Testimony of John McGrath, at ¶ 29 & n.16-18.

In November 1998, the NRC gave TNW the "green light" to resume full fabrication activity. DX 283, at SMUD 009877. Still, more than 11 months passed before TNW began to fabricate the canisters due to continuing re-design issues and the transfer of the fabrication activity from Ranor to PCC, including the transfer of materials and the qualification of PCC to begin work. Direct Testimony of John McGrath, at ¶ 32 & n.19-21; DX 891A; DX 918; DX 919; DX 283, at SMUD 0009938; DX 940; DX 951; DX 283 at SMUD 0009962; DX 954; DX 957; DX 960; DX 962.

312. TNW, however, had many other utility clients that it acquired from the Vectra bankruptcy for whom it was developing casks and canisters. Tr. at 641-43 (Redeker). As with SMUD's project, the other utilities' projects also had been on hold for the last two years, and there was a significant backlog for fabrication at the primary fabricator, Ranor. PX 918; DX 962; DX 918; Tr. at 641-43 (Redeker) ("There were 72 canisters in the backlog at the factory.").

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although the Government does not dispute that SMUD's dry storage project was on hold from early 1997 through late 1998, this finding ignores two important facts relating to the project. First, SMUD and its vendor's initial plan for development of the dry-storage system was to complete the entire project by 1995. DX 372, at SMUD 004193; DX 384 at SMUD 002740-42. Had SMUD performed the project as planned, with Pacific Nuclear/Vectra, the project would have been completed prior to the problems and delays associated with TNW and the backlog at Ranor. In November 1994, with Ranor under contract to Vectra to produce SMUD's canisters, all 21 canister deliveries were then scheduled to be completed by September 1996, prior to the two year delay discussed above. DX 476, at SMUD 002092. Second, following the two year delay, SMUD did not re-start the fabrication of the canisters until late October 1999, nearly 12 months after the NRC gave TNW the "green light" to resume fabrication. DX 283, at SMUD 009877, 009995; DX 976 (noting that historical schedules for canister restart had ". . . no provision to recover when there are delays caused by late delivery of materials, tooling or parts; manufacturing mistakes; problems in developing manufacturing processes; or manufacturing methodology assumptions that turn out to be too optimistic," and "[w]e are continually slipping the schedule with no path available to recover.").

313. SMUD actively managed and audited TNW's work on the dry storage project, and sought to keep costs down, while insuring a quality product. DX 976; DX 985A; DX 999;

DX 1003; Tr. at 662-63 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD was frequently disturbed by TNW's lack of commitment to the SMUD dry storage project, TNW's flawed engineering designs, and TNW's control over its vendor's progress of work and rising costs. DX 954; DX 979 (noting "… the District is very concerned about Transnuclear's performance under Contract No. E776A during the past year. There has been a repeated pattern of both unexpected cost increases over Transnuclear's detailed cost estimates and time schedules that have been allowed to slip … it is our view that Transnuclear has definitely been responsible for a significant part of the increased Project costs and some of the Project delays."). In January 2000, SMUD communicated to TNW that "Transnuclear seems to believe that it has no financial responsibility for cost increases and project delays caused by its own flawed engineering designs or failures to follow the District's Project management direction." DX 979, at SMUD 008352. Regarding TNW's engineering problems, SMUD noted:

> Due to a Transnuclear engineering design error resulting in incompatible materials, corrosion of metal has occurred inside the annulus between the cask and the surrounding neutron absorbing jacket. . . . Transnuclear takes the attitude that Contract No. E776A is a time and materials contract under which the District should be financially responsible for all of Transnuclear's engineering design mistakes. . . . We are now told that this Transnuclear engineering design mistake will cost about $1 Million to remedy.

DX 979, at 8352-53.

314. When TNW resumed work in 1999, many operating utilities had a significant need for dry storage systems because DOE's failure to begin accepting fuel was causing the operating utilities' SNF discharges to approach the capacity of their wet pools. E. Supko Written Direct at 71 (PX 1002); Tr. at 641-43 (Redeker); *see also* Tr. at 467 (Shetler) ("[S]ince the Department was not performing on taking fuel under the original schedule, those plants that were operating were now being forced to deal with increased spent fuel storage. And it was having impacts on their operating costs because they were having to either build dry storage or rerack their pools."); DX 960 (describing that "[a] failure to deliver three canisters before the end of 1999 would have dire consequences on the upcoming outage for Oconee Unite 3," a Duke

Energy plant).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The reasons behind other utilities' decisions to pursue dry storage are not relevant to the issues in this matter. What is relevant is that SMUD's decision to pursue, and continue with, its dry storage efforts were independent of DOE's performance under the Standard Contract. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

315. Because of the needs of operating plants, TNW moved SMUD's project to the back of the line at Ranor. Tr. at 644 (Redeker); Tr. at 1007-08 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD was unhappy with TNW's management of the workload for its clients by not acting on SMUD's direction to place the order with Ranor earlier and the subsequent movement of SMUD's scope of work to the back of the line at Ranor. DX 979, at SMUD 008352.

316. As a result, SMUD and TNW transferred the canister fabrication work to a new subcontractor, Precision Components Company ("PCC"). PX 624, 631; Tr. at 644-45 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD was concerned about TNW's transfer of canister fabrication work from Ranor to PCC, and TNW did so without the permission of SMUD. Further, the transfer of work resulted in an almost doubling of the cost estimate to manufacture the canisters and the loss of money already spent to qualify Ranor to do the work. Tr.649:1-6 (Redeker); DX 979, at SMUD 008352.

317. PCC was regarded as a credible and competent fabricator of dry storage systems. Tr. at 1442 (Stuart) (explaining his opinion of PCC that "they were a highly reputable fabricator with many years of experience fabricating nuclear equipment for the Navy, which [PCC] felt was under much more stringent conditions to provide equipment to the Navy than for the civilian program").

RESPONSE: Although the Government does not dispute that Mr. Stuart provided the cited testimony, the Government notes that SMUD was concerned about TNW's transfer of canister fabrication work from Ranor to PCC, and TNW did so without the permission of SMUD. Further, the transfer of work resulted in an almost doubling of the cost estimate to manufacture the canisters and the loss of money already spent to qualify Ranor to do the work. Tr.649:1-6 (Redeker); DX 979, at SMUD 008352.

In addition, Mr. Stuart testified that in 1992, he concluded that SMUD did not make the right decision in pursuing the NUHOMS dry storage system because it was not licensed for transportation by the NRC and that, as a result, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system. DPFOF ¶¶ 189-190.

318. SMUD, along with TNW, actively participated in overseeing and managing PCC's work on SMUD's project. DX 988; DX 1018; DX 1065; DX 1086; DX 1136; DX 1213; DX 1242; Tr. at 239-40 (Shetler) ("Because of the concerns, we actually put an individual on the PCC manufacturing site to monitor their performance and to help expedite issues and concerns between PCC and Transnuclear West to try to act on the schedule and monitor any of the cost concerns that might be out there."); Tr. at 646 (Redeker) (same).

RESPONSE: Although the Government does not dispute that Mr. Shetler and Mr. Redeker provided the cited testimony, the Government notes that SMUD's own expert, Mr. Stuart, testified that in 1992, he concluded that SMUD did not make the right decision in pursuing the NUHOMS dry storage system because it was not licensed for transportation by the NRC and that, as a result, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system. DPFOF ¶¶ 189-190.

a. PCC, however, experienced technical and financial difficulties in its fabrication of SMUD's dry storage system. Tr. at 645 (Redeker); Tr. at 239-40 (Shetler); *see also* DX 1139 (describing PCC financial problems); DX 1066 (dropped canister); DX 1068 (strike); DX 1190 (storm); DX 1127; DX 1191.

RESPONSE: See Gov't Resp. to PFOF ¶ 318 above.

b. Other utilities experienced similar, if not more serious, problems with their dry storage projects. Tr. at 578-80 (Redeker); PX 444 at 9603 ("[many] of the attendees voiced similar complaints about their vendors"), 9613 (discussing "hydrogen gas explosion" during canister welding at another utility), 9657 (noting that problems at other plants had led to "get tough attitude" by NRC), 9669 ("other utilities and their

storage systems are experiencing NRC licensing and system design issues similar or greater than" SMUD's) 9672 ("each utility is experiencing similar problems with their vendors as we are with Vectra"); PX 555, 590, 619; E. Supko Written Direct at 71-72 (PX 1002).

RESPONSE: See Gov't Resp. to PFOF ¶ 318 above.

319. As a result of NRC's close scrutiny, SMUD actively managed the project and sought to contain the costs and keep it on schedule as much as possible. Tr. at 554-55 (Redeker) ("We found that we had to have what the NRC came to call intrusive oversight. We were at the manufacturers or at the design—at the vendors' offices frequently. They were meeting with us. We became much more involved in this process to help keep the costs down and to make sure that things were being done properly as well, so our involvement level in the project rose over what we had initially done in order to help keep costs down."); *see also* Tr. at 576-79, 588-91 (Redeker) (same); Designations Appendix (Dckt. #310) at 1060 (Stewart) (SMUD kept a careful watch on how fabrication was going on the project); PX 444 at 9657, 9663, 9672.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The NRC's "close scrutiny" was the result of inadequate findings and assurances resulting from NRC audits of SMUD's vendors fabricating materials for the dry-storage project, and began following the failure of Vectra to complete the project at cost and on schedule. Further, this finding ignores that SMUD's initial contracts with Pacific Nuclear, Vectra, PCC, and other vendors operated for several years without much progress and ever increasing cost, without the oversight by SMUD that was incorporated later on. Tr.554 (Redeker)

320. In an effort to contain costs for the fabrication of the canisters, SMUD directed TNW to negotiate a fixed-price contract with PCC, which had previously been operating on a time and materials basis as a subcontractor to TNW. Tr. at 649-50 (Redeker); DX 979 at 2; DX 1013.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's efforts to contain costs by having TNW negotiate a fixed-price contract with PCC began after the TNW contract had already been modified five times, increasing the value by more than $8 million, including increases to cover PCC's costs, which were higher than Ranor's costs. DX 915; DX 950; DX 963; DX 978A; DX 977.

321. PCC subsequently suffered additional financial and technical problems that required additional negotiations and another contract change. DX 1163; DX 1149.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. The Government notes, however, that Mr. Stuart testified that in 1992, he concluded that SMUD did not make the right decision in pursuing the NUHOMS dry storage system, which was not licensed for transportation by the NRC, and that, as a result, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system. DPFOF ¶¶ 189-190.

322. Because of SMUD's close oversight of the fabrication process, the 21 canisters and the cask were completed and delivered to SMUD from 2000 through 2002. Tr. at 665-68 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The original contract schedule SMUD signed with Pacific Nuclear required the 21 canisters and the cask to be completed and delivered between June and December 1994. DX 384 at SMUD 002741. The actual deliveries occurred after a delay of more than seven years. Direct Testimony of John McGrath, at ¶¶ 36-38.

323. Given the significant public health and safety issues involved with the transfer of nuclear fuel, extensive training and preparations were necessary prior to actual transfer in order to ensure that the actual transfer occurs without incident. Tr. at 1027-28 (Field) (noting the nuclear environment requires "very exhaustive training").

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

324. SMUD engaged in extensive training from 1999 to 2001 to prepare for the fuel transfer. Tr. at 640 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

a. The initial training included a classroom period where employees and contractors were educated about the system, the technical specifications, transfer procedures, safety limits, and requirements on temperatures, pressures, and time. Tr. at 1028 (Field).

RESPONSE: See Gov't Resp. to PFOF ¶ 324 above.

b. Classroom training was followed by hands-on training with the equipment, a training cask, and the actual cask and canister. Tr. at 639-40 (Redeker), 1028 (Field).

RESPONSE: See Gov't Resp. to PFOF ¶ 324 above.

325. By engaging in extensive training and test runs prior to actual loading, SMUD was able to locate and address any problems with the equipment and procedures. By beginning training early, SMUD had the time to address any problems that arose. Tr. at 641 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, SMUD has failed to demonstrate any causal link between the amount of time it spent mobilizing its work force for loading SMUD's canisters and the fact that there were no serious problems that occurred during fuel loading. Second, as the Government's expert, Mr. Burford, explained a three month mobilization would have sufficiently trained SMUD for fuel loading. DPFOF ¶ 304.

326. Because of its careful preparation SMUD did not experience any incidents during the actual transfer of spent nuclear fuel. Tr. At 641 (Redeker) ("The most positive indicator to me that we didn't start too early is that the fuel off-load went extremely well. The crews were very proficient. And it paid off. . . . We trained very hard for very long and it paid off in spades as the actual project went very smoothly.").

RESPONSE: See Gov't Resp to PFOF ¶ 325.

327. Other utilities did experience problems during their fuel transfers. *See, e.g.*,

"Transtor Coating Problem Prompts PGE To Halt Cask Loading at Trojan" (Aug. 9, 1999) (PX 619) (noting cask began dissolving in borated water during initial load).

RESPONSE: The Government objects to SMUD's proposed finding of fact. PX First, 619 appears to be an excerpt from a publication entitled "Nuclear Fuel." Consequently, PX 619 constitutes inadmissible hearsay. Second, the fact that other utilities experienced problems during their fuel transfer does not establish that SMUD's premature mobilization resulted in no problems with SMUD's fuel loading. Finally, the Government notes the Government's expert, Mr. Burford, explained that a three month mobilization would have sufficiently trained SMUD for fuel loading. DPFOF ¶ 304.

328. SMUD's pursuit of a dual-purpose system has proven reasonable, as 25 other utilities have developed or are developing similar systems across the United States. E. Supko Written Direct at 48 & Table 9 (PX 1002).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, Ms. Supko claimed that she was offering testimony concerning the reasonableness of SMUD's dry storage decision in rebuttal to the expert testimony of Jerry Burford. Tr.1521:9-25 (Supko). However, as SMUD itself established at trial, and as the Government certainly agrees, Mr. Burford is not offering an opinion as to whether SMUD's decision to pursue dual-purpose dry storage was reasonable. Tr.2558:11-18 (Burford). Consequently, because Ms. Supko's testimony is not proper rebuttal, as well as for the other reasons stated in the Government's motion in limine regarding Ms. Supko, the Court should strike the testimony of Ms. Supko concerning the reasonableness of SMUD's decision to pursue dual-purpose dry storage. Rodriguez v. Olin Corp., 780 F.2d 491, 496 (5th Cir. 1986); see also United States v. Posey, 647 F.2d 1048, 1052 (10th Cir. 1981); Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (holding that rebuttal "is not 'an opportunity for the correction of any oversights in the plaintiff's case in chief").

Second, had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159. Further, SMUD could have pursued a dry transfer system that would have allowed SMUD to abandon its wet pool and pursue store-only dry storage. DPFOF ¶¶ 166-185. Finally, as Mr. Stuart testified, SMUD could have pursued the NAC-STC system rather than the unlicensed NUHOMS system. Instead, SMUD pursued a risky unproven and unlicensed dry storage technology because SMUD believed it would result in timely, or perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49.

329. Most utilities who were seeking dry storage systems spent more than they had originally planned because of the complexity of the projects. PX 444 at 9672 ("most of the

utilities have dedicated considerable resources, more than they had originally planned to the oversight of their vendors and cask fabricators."); Designations Appendix (Dckt. #310) at 1055 (Stewart) (agreeing that a new construction, design, and licensing project was more likely to have cost overruns and be over budget because there are more unknowns).

RESPONSE: The Government objects to SMUD's proposed finding of fact because other utilities' costs are irrelevant to the issues in this case. Further, the cited proposed facts are not evidence of SMUD's reasonableness because, had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159. Further, SMUD could have pursued a dry transfer system that would have allowed SMUD to abandon its wet pool and pursue store-only dry storage. DPFOF ¶¶ 166-185. Finally, as Mr. Stuart testified, SMUD could have pursued the NAC-STC system rather than the unlicensed NUHOMS system. Instead, SMUD pursued a risky unproven and unlicensed dry storage technology because SMUD believed it would result in timely, or perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49.

330. SMUD used its best efforts to manage the dry-storage project in a commercially reasonable manner during its duration. *See* PFF ¶¶ 286-329.

RESPONSE: The Government objects to SMUD's proposed finding because it is simply a recitation of a string of SMUD's proposed findings. See Gov't Resp. to PFOF ¶¶ 286-329. Further, this is not evidence of SMUD's reasonableness because, had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159. Further, SMUD could have pursued a dry transfer system that would have allowed SMUD to abandon its wet pool and pursue store-only dry storage. DPFOF ¶¶ 166-185. Finally, as Mr. Stuart testified, SMUD could have pursued the NAC-STC system rather than the unlicensed NUHOMS system. Instead, SMUD pursued a risky unproven and unlicensed dry storage technology because SMUD believed it would result in timely, and perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49.

331. After restarting the dry storage project in 1998 following the bankruptcy of its primary dry storage contractor, SMUD spent approximately $42.3 million in outside services on the project, which included the additional costs for loading and transferring the fuel to the ISFSI by the contractors at Bigge with a cost of approximately $5.5 million. *See* PFF ¶¶ 215, 222-223. Accordingly, SMUD paid approximately $36.8 million to outside vendors from 1998 to 2003 for

the final design, licensing, and fabrication of its cask and canisters. *Id.*

RESPONSE: Although the Government does not dispute that SMUD spent the money claimed in its proposed finding of fact, the Government would note that, had SMUD adhered to its original schedule with Vectra, SMUD's dry storage project would have been completed by 1995. Tr.1537:9-22 (Supko).

332. In 1999, in a series of briefings, DOE was estimating the annual operating and maintenance cost for a dry storage facility at $5 million per year. PX 625 at 21; PX 626 at 14; PX 633 at 25.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, each of the documents cited are drafts. Second, this proposed finding is irrelevant to the issues to be resolved in this matter. What is relevant is that throughout the development of its dry storage effort, SMUD repeatedly concluded that the cost of dual-purpose dry storage would pay for itself well before DOE's last acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. Finally, SMUD's own estimates in 1999 was that it would realize $10-12 million in annual savings by placing its SNF into dry storage. DPFOF ¶¶ 105, 106, 109.

333. In the same briefings, DOE estimated that the fixed component of startup costs for a dry storage facility were $10 million and that the variable costs for procuring storage casks were $100 per kilogram of fuel. *Id.*

RESPONSE: See Gov't Resp. to PFOF ¶ 332.

334. SMUD has 228 metric tons of spent fuel, which equates to 228,000 kilograms (one metric ton = 1000 kilograms). *See* http://www.metric-conversions.org/weight/tonne-conversion.htm. Using DOE's variable cost estimate of $100/kg for storage casks and the 228,000 kilograms of SMUD's fuel produces a variable cost estimate of $22.8 million for storage casks, plus a fixed component estimate of $10 million in startup costs, for a total of approximately $33 million. PX 625 at 21; PX 626 at 14; PX 633 at 25.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the documents upon which SMUD relies are drafts. Second, this proposed finding is irrelevant to

the issues to be resolved in this matter. What is relevant is that throughout the development of its dry storage effort, SMUD repeatedly concluded that the cost of dual-purpose dry storage would pay for itself well before DOE's last acceptance of SMUD's SNF in the non-breach world. DPFOF ¶¶ 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109. Indeed, SMUD's own estimates in 1999 was that it would realize $10-12 million in annual savings by placing its SNF into dry storage. DPFOF ¶¶ 105, 106, 109.

Further, to the extent that SMUD is attempting to use this proposed finding as support for its assertion in its PFOF ¶137 that at some point SMUD estimated that the annual savings of dry storage would be less than "less than $3 million," the Government objects. PX 269A, the document SMUD relies upon for its claim of $3 million in annual savings, simply states "[s]avings estimated at approximately $33 million by dry storage of spent nuclear fuel from 1998 (planned closure of Spent Fuel Pool) and 2010 (proposed opening of Federal Geologic Repository). It does not state how this $33 million dollar was derived, or what the number represents. Indeed, no SMUD witness could explain what the source of this figure was, or how this figure compared to the consistent $8-12 million in annual savings that is contained in dozens of contemporaneous documents. DPFOF ¶ 97. For example, Mr. Shetler did not know whether the $33 million number represented net savings over the course of the project or gross savings, or even whether the figure represents a net change to a prior decommissioning cost estimate. Tr. 405:7-11, Tr. 485:13-23 (Shetler). Nor could Mr. Shetler explain whether the $33 million in savings included the amount of capital costs associated with the dry storage project. Tr. 405:17-20 (Shetler). In fact, other than stating that the $33 million figure represented a comparison between wet and dry storage options, Mr. Shetler could not explain what this $33 million figure represented. Tr. 405:21-406:3 (Shetler). The Government's expert economist, Cliff Hamal, provided unrefuted testimony that, in light of Mr. Shetler's testimony, it was unreasonable to interpret the $33 million figure as an indication of operating savings from 1998 through 2010, particularly because that number would be inconsistent with other contemporaneous documents. Direct Testimony of Cliff Hamal, at ¶ 70. See Gov't Resp. to PFOF ¶ 137.

### A. Wet Pool Storage.

335. SMUD could have left its SNF in the wet pool at Rancho Seco during the extended period of DOE's delay. Tr. at 1539-42 (Supko) (explaining that SMUD had only two realistic options: keeping the fuel in the pool or moving to dual-purpose dry storage); I. Stuart Written Direct at 7-8 (PX 1001) (explaining that some non-operating plants continue to store SNF in their wet pool and that all operating plants continue to store SNF in their pool); DX 978A (stating that the alternative to contract change was "Leave the fuel in the spent fuel pool"); DX 1032 (same).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

a. The Zion nuclear power plant owned by Exelon, which is a shutdown reactor, and the GE-owned Morris facility in Illinois, which does not operate because it was originally designed as a reprocessing plant, have continued to store SNF in their wet pools waiting for DOE's eventual performance. I. Stuart Written Direct at 7-8 (PX 1001).

RESPONSE: The Government objects to SMUD's proposed finding because it is irrelevant to the issues to resolved in this matter. What is relevant is that, among other things, SMUD could have left simply left its SNF in its wet pool and it would have avoided substantial capital costs in pursuing dry storage. Instead, SMUD pursued a risky, unproven, and unlicensed dry storage technology because SMUD believed it would result in timely, and perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49.

b. The GE Morris facility has approximately 700 metric tons of SNF in its wet pool and has been storing its fuel in the wet pool for several decades; the NRC recently extended the license for the Morris wet pool for another 20 years. *Id.*

RESPONSE: See Gov't Resp. to PFOF ¶ 335a.

c. Most shutdown utilities, however, have opted to transfer their fuel to a dual-purpose dry storage system because of the long-term cost savings and improved safety compared to indefinite storage in a pool. *Id.* at 8.

RESPONSE: See Gov't Resp. to PFOF ¶ 335a.

336. SMUD considered leaving its fuel in the wet pool with nearly every significant contract change, price increase, and reevaluation. Tr. at 194 (Shetler); Tr. at 360 (Shetler); Tr. at 620-21 (Redeker); Tr. at 628-29 (Redeker); PX 503, 519, 524, 538, 978A, 1031.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, by May 1990, SMUD had eliminated consideration of leaving its SNF in the wet pool. DPFOF ¶ 36. Second, had SMUD simply left its SNF in its wet pool, it would have avoided substantial

capital costs in pursuing dry storage. Instead, SMUD pursued a risky unproven and unlicensed dry storage technology because SMUD believed it would result in timely, and perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49.

337. The government's present delay (already 7½ years) causes a corresponding delay in every utility's acceptance. *See Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 375 (2005) (holding that any delay in the start of DOE's SNF acceptance as of January 31, 1998, negatively impacted the acceptance dates of every contract holder down the line"); *System Fuels, Inc. v. United States*, No. 03-2642C, 2005 WL 1804314, at *12 n.12 (Fed Cl. July 19, 2005) ("DOE's suggestion that it might accelerate acceptance immediately after it commences performance is unconvincing, in light of DOE's inability to complete a storage facility after more than 15 years of planning and commencement of construction.").

RESPONSE: The Government objects to SMUD's proposed finding of fact. The effect of DOE's delay in SNF acceptance upon other utilities is not relevant to the issues to be resolved in this matter. What is relevant is that SMUD decided to pursue dual-purpose dry storage because it believed it would result in timely, and perhaps early, acceptance by DOE, and that the cost of pursuing dual-purpose dry storage made economic sense regardless of the timing of DOE's performance. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

338. The NRC announced in 1994 that "[b]oth pool storage and dry storage are safe technologies. But there are significant differences; pool storage requires a greater and more consistent operational vigilance and the satisfactory performance of a larger number of active systems, while dry storage is almost passive." PX 357 at 1.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

339. The NRC described the "substantial delay" in the repository program and concluded that it "increasingly views dry storage as the preferred method of interim storage of spent fuel for plants in permanent shutdown, as well as for supplementary storage in many operating plants." PX 357 at 2-3.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that SMUD decided to pursue dual-purpose dry storage because it believed it would result in timely, and perhaps early, acceptance by DOE, and that the cost of pursuing dual-purpose dry storage made economic sense regardless of the timing of DOE's performance. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109

340. Leaving the SNF in the wet pool would have increased SMUD's damages during the 12 to 14-year period of DOE's delay because of the increased costs of operating and maintaining the wet pool during that period. Tr. at 1540 (Supko) (explaining that SMUD would have had to maintain the pool with all of the associated expense).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, SMUD is responsible for its operation and maintenance costs associated with its storage of SNF until DOE accepts the last of SMUD's fuel assemblies in the non-breach world. DPFOF ¶¶ 228-229. As we demonstrated at trial, under a 900 MTU steady-state rate of acceptance, DOE would have accepted the last of SMUD's assemblies in 2019. DPFOF ¶ 137. Consequently, SMUD could not claim as damages the operation and maintenance costs associated with its storage of SNF until some time after 2019. Second, had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159.

341. SMUD estimated the annual costs for operating and maintaining the wet pool at Rancho Seco at different times:

a. DX 934 (estimating $450,000 per month or $5.4 million per year delay in project).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that, had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159. Instead, SMUD pursued a risky, unproven, and unlicensed dry storage technology because SMUD believed it would result in timely, and perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49. Further, SMUD repeatedly represented to its managers, Board of Directors, and the general public that SMUD would save $8-12 million annually by eliminating its wet pool and placing its SNF into dry storage. DPFOF ¶¶ 54, 61, 66, 76b, 79, 87, 109.

b. PX 363 at 29043 (estimating wet storage costs at $6 to $8 million per year).

RESPONSE: See Gov't Resp. to PFOF ¶ 341a.

c. PX 642 at 62828; DX 978A (estimating wet storage costs at $2.25 per year prior to 2008, and $7.5 million per year thereafter, when basic decommissioning would be complete); DX 986 (estimating wet storage costs at $7.5 million per year).

RESPONSE: See Gov't Resp. to PFOF ¶ 341a.

d. PX 519 at 4, 19 (estimating pool costs prior to 2008 at $9.6 million per year and $4.8 million per year thereafter); PX 528 at 3 (estimating the wet storage costs at approximately $800,000 per month or $9.6 million per year).

RESPONSE: See Gov't Resp. to PFOF ¶ 341a.

e. PX 319 (estimating wet storage costs at $10.6 million per year).

RESPONSE: See Gov't Resp. to PFOF ¶ 341a.

f. *See also* PFF ¶¶ 138.

RESPONSE: See Gov't Resp. to PFOF ¶ 341a.

342. The primary cost component in operating and maintaining a wet pool is the labor cost, Tr. at 1056 (Field), and approximately 50 to 80 employees would be necessary to support a stand-alone wet pool at Rancho Seco depending on the assumptions used for staffing. Tr. at 527-28 (Redeker).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159. Instead, SMUD pursued a risky, unproven, and unlicensed dry storage technology because SMUD believed it would result in timely, or perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49.

343. There are several reasons that there were different estimates for the operating and maintenance ("O&M") costs for the wet pool at different times, including that:

a. SMUD, like most utilities, did not have a separate work order number to segregate the O&M costs for the pool.

b. SMUD was never in the position of operating a stand-alone pool and there were other jobs and tasks occurring at the site during operation of the pool (*i.e.*, employees performed multiple tasks or job functions).

c. The O&M costs for a pool could be different depending on whether the plant is operating, permanently shutdown, actively decommissioning, or in a mothball state.

d. Different assumptions can be used regarding potential staff reductions and there were a number of unknowns related to licensing changes and staff requirements.

e. Estimates varied based whether it accounted for only those employees who worked solely on the pool or if it included all of the ancillary employees who would be necessary to support a "stand-alone" pool.

Tr. at 526-32 (Redeker); Tr. at 332-33, 476-77 (Shetler); Tr. at 948-49 (Ferreira); Tr. at 973-74, 977-78 (Field) ("[W]hen we were still [in] wet storage, it was very difficult to, to get a grasp on what positions would actually be eliminated, and so it was—we didn't feel that we could really do a[n] extremely accurate job. So we had to wait until after, and a period of time after, where we actually achieved the staffing reductions, before we could actually go back and take a look. . . .").

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159. Instead, SMUD pursued a risky, unproven, and unlicensed dry storage technology because SMUD believed it would result in timely, or perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49.

344. DOE officials agree that the annual O&M costs for a wet pool are significantly more than those for dry storage. Tr. at 2255 (Williams); Designations Appendix (Dckt. #310) at 1046 (Stewart).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The opinions of DOE officials regarding annual O&M costs for wet pool storage are not relevant to the issues to be resolved in this matter. What is relevant is that had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159. Instead, SMUD pursued a risky, unproven, and unlicensed dry storage technology because SMUD believed it would result in timely, and perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49. In addition, notwithstanding these facts, throughout the development of its dry storage facility, SMUD repeatedly concluded that the cost of pursuing dual-purpose dry storage made economic sense regardless of the timing of DOE's performance. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

345. SMUD completed its transfer of SNF from the wet pool to dry storage in August 2002. Tr. at 668 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

346. If SMUD had left its SNF in the wet pool during the 12 to 14 year delay in DOE's performance, SMUD would have incurred the higher operating and maintenance costs of wet storage during those 12 to 14 years.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, SMUD is responsible for its operation and maintenance costs associated with its storage of SNF until DOE accepts the last of SMUD's fuel assemblies in the non-breach world. DPFOF ¶¶ 228-229. As we demonstrated at trial, under a 900 MTU steady-state rate of acceptance, DOE would have accepted the last of SMUD's assemblies in 2019. DPFOF ¶ 137. Consequently, SMUD could not claim as damages the operation and maintenance costs associated with its storage of SNF until some time after 2019. Second, had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159.

347. After completing the transfer of its SNF to dry storage in 2002, SMUD was able to lay off approximately 30 employees whose jobs had been associated principally with operating and maintaining the wet pool. Tr. at 1170-71 (Field); PX Dem. 72.

RESPONSE: Although the Government does not object that SMUD's proposed finding is supported by the testimony of Mr. Field, SMUD's reliance upon PX Dem. 72 to support its proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstrative to support its proposed findings of fact.

348. By transferring its fuel from wet to dry storage and terminating approximately 30 employees, SMUD was able to save approximately $4.2 million in annual labor costs in 2003 that had previously been required to operate and maintain the wet pool. Tr. at 1170-71 (Field); PX. Dem. 72; *see also* DX 976A, 977, 978A (estimating in 2000 that cost savings would be at least $4 million per year).

RESPONSE: Although the Government does not object that SMUD's proposed finding is supported by the testimony of Mr. Field, SMUD's reliance upon PX Dem. 72 to support its proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstrative to support its proposed findings of fact.

Further, the Government objects to SMUD's reliance upon a 2000 estimate of cost savings to establish its actual savings in 2003. Finally, the Government notes that throughout the development of its dry storage system, SMUD repeatedly estimated that the annual savings of dry versus wet storage was as much as $10-12 million per year. DPFOF ¶ 109.

349. In 2003, SMUD incurred and billed approximately $700,000 dollars for operating and maintaining the dry storage facility at Rancho Seco. B. Brinig Written Direct at Ex. C (PX 1000); Tr. at 1056 (Field) (explaining that the $616,000 in costs for work order "Nuclear Fuel Storage" in 2003 was for ISFSI security and technicians).

RESPONSE: The Government does not object to SMUD's proposed finding if fact. However, the Government would note that these costs are not damages, as they are costs that SMUD would have incurred in the non-breach world. DPFOF ¶¶ 137, 228, 230.

350. With the exception of the decommissioning of the ISFSI and its associated materials, which cannot be done until DOE removes all of the fuel, the remaining

decommissioning activities at the Rancho Seco are expected to be complete in approximately 2008. Tr. at 698 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the Government would note that SMUD could not terminate its Part 50 operating license unless it abandoned its wet pool, and SMUD could not abandon its wet pool unless it removed its SNF from its pool. DPFOF ¶ 315. SMUD's elimination of its wet pool and, consequently, its Part 50 operating license, represents a cost savings to SMUD that SMUD has not considered in presenting its damages claim or provided as a credit to the Government in this case. DPFOF ¶ 316.

351. SMUD's decision not to simply leave its SNF in the wet pool while waiting for DOE to perform was commercially reasonable and has effectively mitigated SMUD's damages. Tr. at 194 (Shetler) ("[W]e did not consider that [pool storage] to be the [solution], though it was probably the preferred from the standpoint of assuring acceptance, it was not from the standpoint of cost of storage in the long term."); Tr. at 573, 597-98 (Redeker) (discussing possibility of leaving fuel in the pool and noting that "[t]he highest cost option generally was to leave the fuel in the pool. That was certainly an option for us."); Designations Appendix (Dckt. #310) at 1061 (Stewart) (stating that neither he nor anyone else at DOE recommended that SMUD leave its fuel in the pool).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, none of the testimony cited supports SMUD's proposed finding that SMUD's decision to place its SNF into dry storage was "commercially reasonable and has effectively mitigated SMUD's damages." Second, had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159. Instead, SMUD pursued a risky, unproven, and unlicensed dry storage technology because SMUD believed it would result in timely, and perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49. In addition, notwithstanding these facts, throughout the development of its dry storage facility, SMUD repeatedly concluded that the cost of pursuing dual-purpose dry storage made economic sense regardless of the timing of DOE's performance. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

**B. Store-Only Dry Storage Systems.**

352. More than 90% of ISFSIs commissioned since 2000 have loaded spent fuel into dual-purpose systems, rather than store-only systems. E. Supko Written Direct at 48-49 & Table 9 (PX 1002).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, Ms. Supko claimed that they were offering testimony concerning the reasonableness of SMUD's dry storage decision in rebuttal to the expert testimony of Jerry Burford. Tr.1521:9-25 (Supko). However, as SMUD itself established at trial, and as the Government certainly agrees, Mr. Burford is not offering an opinion as to whether SMUD's decision to pursue dual-purpose dry storage was reasonable. Tr.2558:11-18 (Burford). Consequently, because Ms. Supko's testimony is not proper rebuttal, as well as for the other reasons stated in the Government's motion in limine regarding Ms. Supko, the Court should strike the testimony of Ms. Supko concerning the reasonableness of SMUD's decision to pursue dual-purpose dry storage. Rodriguez v. Olin Corp., 780 F.2d 491, 496 (5th Cir. 1986); see also United States v. Posey, 647 F.2d 1048, 1052 (10th Cir. 1981); Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (holding that rebuttal "is not 'an opportunity for the correction of any oversights in the plaintiff's case in chief").

Second, the Government notes that SMUD began considering dry storage as early as 1989, and that although SMUD could have pursued a store-only dry storage system, SMUD pursued a risky, unproven, and unlicensed dry storage technology because SMUD believed it would result in timely, and perhaps early, acceptance by DOE. DPFOF ¶¶ 25, 26-35, 49.

353. Dry storage vendors no longer even market store-only systems in the United States. *Id*. at 48.

RESPONSE: The Government objects to SMUD's proposed finding of fact. Regardless of whether dry storage vendors are currently marketing store-only systems, at the time SMUD made its decision to pursue dual-purpose dry storage, storage only casks were being used by other utilities in the early 1990s. DPFOF ¶ 161. See also Gov't Resp. to PFOF ¶ 52.

354. All operating nuclear plants that are storing spent fuel in dry storage have either chosen dual-purpose systems at the outset or are now transitioning to dual purpose systems. Tr. at 1548 (Supko); E. Supko Written Direct at 48 (PX 1002).

RESPONSE: See Gov't Resp. to PFOF ¶ 52.

355. All shutdown nuclear power plants that have developed dry storage facilities have

chosen to utilize dual-purpose systems, including Big Rock Point, Dresden 1, Haddam Neck, Maine Yankee, San Onofre 1, Trojan, and Yankee Rowe. E. Supko Written Direct at 54 (PX 1002); Tr. at 1548 (Supko).

RESPONSE: See Gov't Resp. to PFOF ¶ 52.

356. One of the benefits of spent fuel storage in a dual purpose system is that the fuel does not have to be handled multiple times for the eventual transfer to DOE repository, thereby reducing worker exposure to radiation. E. Supko Written Direct at 48, 53 (PX 1002).

RESPONSE: Although the Government does not object to SMUD's proposed finding, the Government notes that because SMUD has placed its SNF in MESCs, which are not acceptable under the Standard Contract, SMUD may have to handle its SNF before transferring it to DOE. DPFOF ¶ 198.

357. If SMUD had chosen a store-only system, it would have resulted in spent fuel having to be handled and moved multiple times, including: (1) transfer of the spent fuel from the wet pool into the storage-only system for at-reactor storage in an ISFSI; (2) return of the spent fuel from the storage-only system to the wet pool for subsequent loading to DOE; and (3) loading of the spent fuel into a DOE transportation cask for shipment off-site. *Id.*; Tr. at 195-96 (Shetler) ("The concern we had with storage-only systems was that it did mean there would have to be a rehandling of the fuel."). In addition, there may have been additional fuel handling steps to perform fuel inspection at the time the spent fuel was returned from the store-only system to the spent fuel pool. E. Supko Written Direct at 53 (PX 1002).

RESPONSE: See Gov't Resp. to PFOF ¶ 356.

358. Each of these fuel and cask handling activities would result in increasing the radiation exposure to workers as well as increasing the risk associated with handling fuel assemblies and spent fuel casks. E. Supko Written Direct at 53 (PX 1002); PX 357 (NRC

Chairman explaining that "[t]he dual-purpose and MPC concepts will further reduce fuel handling, packaging, and occupational exposure"); DX 427 at 1 (Acting Director of OCRWM stating that DOE and SMUD "share mutual goals of minimizing spent fuel handling and repackaging").

RESPONSE: See Gov't Resp. to PFOF ¶ 356.

359. Minimizing spent fuel handling results in safety benefits as well as cost savings because of the risks associated with handling spent fuel. E. Supko Written Direct at 48 (PX 1002); Tr. at 197 (Shetler) (explaining that there is "risk associated with that [rehandling fuel] as well as cost.").

RESPONSE: See Gov't Resp. to PFOF ¶ 356.

360. The NRC license for a "store-only" system does not permit transport of SNF off a reactor site. I. Stuart Written Direct at 7 (PX 1001).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. The Government notes, however, that by placing it SNF into a transportation system, SMUD usurped a DOE responsibility under the Standard Contract. DPFOF ¶¶ 160-165.

361. If SMUD had used a store-only dry storage system to store its spent fuel on site, SMUD would have needed to maintain its spent fuel pool in an operational status for the entire time of DOE's delay. I. Stuart Written Direct at 7 (PX 1001); E. Supko Written Direct at 48, 53-54 (PX 1002); Tr. at 1540 (Supko) (explaining that SMUD would have had to maintain the pool with all of the associated expense); Tr. at 1393 (Stuart) (agreeing that a store-only system would be costly compared to a dual-purpose system because the wet pool would have to remain open); Tr. at 195-96 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD could have pursued a dry transfer system that it contracted for with DOE that would have

permitted SMUD to abandon its wet pool while utilizing a store-only dry storage system. DPFOF ¶ 166-185.

362. Maintaining the wet pool during DOE's indefinite delay would have created significant additional damages for the operating and maintenance expenses. I. Stuart Written Direct at 7 (PX 1001); E. Supko Written Direct at 48, 53 (PX 1002).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Had SMUD simply left its SNF in its wet pool, it would have avoided substantial capital costs in pursuing dry storage. DPFOF ¶¶ 154-159. Instead, SMUD pursued a risky, unproven, and unlicensed dry storage technology because SMUD believed it would result in timely, and perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49. In addition, notwithstanding these facts, throughout the development of its dry storage facility, SMUD repeatedly concluded that the cost of pursuing dual-purpose dry storage made economic sense regardless of the timing of DOE's performance. DPFOF ¶¶ 26-35, 49, 54, 55, 61, 66, 76, 79,-81, 86-89, 92, 103-109.

Further, because SMUD is responsible for the costs associated with storing its SNF until DOE accepts SMUD's last assembly in the non-breach world, SMUD could not claim the costs associated with maintaining its wet pool as damages until some time after 2019. DPFOF ¶¶ 137, 228-230.

363. A store-only system was not a viable option for a shutdown utility like SMUD because of the additional cost of maintaining the wet pool would make it a more expensive and risky alternative. Tr. at 1539-42 (Supko) (explaining that SMUD had only two realistic options: keeping the fuel in the pool or moving to dual-purpose dry storage); E. Supko Written Direct at 48, 52-54 (PX 1002); I. Stuart Written Direct at 11-12 (PX 1001).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, Ms. Supko claimed that she was offering testimony concerning the reasonableness of SMUD's dry storage decision in rebuttal to the expert testimony of Jerry Burford. Tr.1521:9-25 (Supko). However, as SMUD itself established at trial, and as the Government certainly agrees, Mr. Burford is not offering an opinion as to whether SMUD's decision to pursue dual-purpose dry storage was reasonable. Tr.2558:11-18 (Burford). Consequently, because Ms. Supko's testimony is not proper rebuttal, as well as for the other reasons stated in the Government's motion in limine regarding Ms. Supko, the Court should strike the testimony of Ms. Supko concerning the reasonableness of SMUD's decision to pursue dual-purpose dry storage. Rodriguez v. Olin Corp., 780 F.2d 491, 496 (5th Cir. 1986); see also United States v. Posey, 647 F.2d 1048, 1052 (10th Cir. 1981); Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D.N.J. 2004)

(holding that rebuttal "is not 'an opportunity for the correction of any oversights in the plaintiff's case in chief").

Second, SMUD could have pursued a dry transfer system that would have permitted SMUD to abandon its wet pool while placing its SNF into store-only dry storage. DPFOF ¶¶ 166-185.

364. If SMUD had a store-only dry storage system, the only alternative to maintaining the wet pool would be for SMUD to design, seek an NRC license for, and fabricate a "dry transfer" system that does not presently exist. I. Stuart Written Direct at 7 (PX 1001); Tr. at 195-96 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD entered into a cooperative agreement with DOE for the development of a dry transfer system. DPFOF ¶ 176. Indeed, DOE was responsible under the cooperative agreement for the "full cost" of the dry transfer system. DPFOF ¶ 178. SMUD simply decided to disregard the cooperative agreement and pursue dual-purpose dry storage instead of a dry transfer system.

365. No "dry transfer" system has ever been licensed for use in the United States. I. Stuart Written Direct at 7 (PX 1001); Tr. at 2296 (Williams) (confirming that the dry transfer system has never been licensed by the NRC at any reactor or DOE facility in the United States); Tr. at 2291-92 (Williams) (confirming that DOE never performed a test of a dry transfer system using actual spent fuel assemblies).

RESPONSE: See Gov't Resp. to PFOF ¶ 364.

366. Such a transfer system would need to be developed commercially, and NRC approval would not be guaranteed. I. Stuart Written Direct at 7 (PX 1001) DX 1095 at vi, App. A (detailing extensive list of information that would be required for a site-specific application).

RESPONSE: See Gov't Resp. to PFOF ¶ 364.

367. DOE submitted a Topical Safety Analysis Report ("TSAR") application to the

NRC in 1996 describing a possible design for a "dry transfer" system. DX 653.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

368. In November 2000, in response to DOE's TSAR, the NRC responded that "because the TSAR has inherent limitations such as no site-specific parameters, limited to one B&W fuel assembly design, no damaged fuel handling capabilities and limitations on the types of transfer casks and receiver casks that can be used, the NRC staff decided there was not enough information provided to allow a user to implement the DTS [Dry Transfer System] without a significant supplemental application." DX 1095 at vi; Tr. at 2303-04 (Williams).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we note that SMUD entered into a cooperative agreement with DOE for the development of a dry transfer system, and DOE was responsible for the "full cost" of the dry transfer system. DPFOF ¶¶ 176, 178.

369. With respect to DOE's submittal regarding the dry transfer system, the NRC concluded that "a complete review addressing all the requirements of 10 CFR Parts 20 and 72 is not possible." DX 1095 at vi. It identified approximately 200 items of additional information that would be required. *Id.* at App. A; Tr. at 2305-06 (Williams).

RESPONSE: See Gov't Resp. to PFOF ¶ 368.

370. No utility in the United States has ever utilized a dry transfer system. I. Stuart Written Direct at 7 (PX 1001); Tr. at 1457 (Stuart); Tr. at 2297 (Williams).

RESPONSE: Although the Government does not object to SMUD's proposed finding, we note that SMUD could have pursued a demonstrative project with DOE to develop a dry storage system but in response to DOE's request for proposals for such a project, SMUD submitted a non-responsive proposal which focused more upon the development of MESCs than a dry transfer facility. DPFOF ¶ 173-174.

371. The costs to develop a "dry transfer" system would be substantial and the development financially risky. I. Stuart Written Direct at 7 (PX 1001); Tr. at 1393-94 (Stuart)

(discussing dry transfer).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Stuart opined that there would be financial risk associated with a dry transfer system to the extent that the NRC required utilities to keep their wet pools open despite having a dry transfer system. Tr.1394:11-14. However, under cross-examination, Mr. Stuart admitted that the NRC does not require that utilities with a dry transfer system also maintain a wet pool. Id. Thus, Mr. Stuart's estimate of financial risk associated with a dry transfer system is overstated. Indeed, pursuant to the cooperative agreement between SMUD and DOE, there was no financial risk for SMUD in the development of a dry transfer system because DOE was responsible for the "full cost" of such a system. DPFOF ¶¶ 176, 178.

372. The development of such a system would have been more complicated than the dry storage project that SMUD undertook. I. Stuart Written Direct at 7 (PX 1001).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Stuart opined that there would be risks associated with a dry transfer system to the extent that the NRC required utilities to keep their wet pools open despite having a dry transfer system. Tr.1394: 11-14. However, under cross examination, Mr. Stuart admitted that the NRC does not require utilities with a dry transfer system also maintain a wet pool. Id. Thus, Mr. Stuart's estimate of risk associated with a dry transfer system is overstated. Indeed, pursuant to the cooperative agreement between SMUD and DOE, there was no financial risk for SMUD in the development of a dry transfer system because DOE was responsible for the "full cost" of such a system. DPFOF ¶¶ 176, 178.

373. SMUD's decision not to procure and utilize a store-only dry storage system during the long period of DOE's delay in performance was commercially reasonable. Tr. at 1393-94, 1458 (Stuart); Tr. at 194-97 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. As stated above, Mr. Stuart's analysis of risk associated with a dry transfer system to be used with a store only dry storage system was based upon the flawed assumption that the NRC would require a utility with a store-only dry storage system to also maintain a wet pool. Because this assumption is false, Mr. Stuart's analysis is not valid. Thus, his opinion is not evidence of the reasonableness of SMUD's decision not to pursue store-only dry storage and a transfer system. In addition, Mr. Shelter testified that SMUD did not pursue store only dry storage and a dry transfer system because dry transfer was not proven or licensed. Tr.196-197:22-5. This logic is flawed because the option SMUD did pursue, the NUHOMS dual purpose storage system was also unproven and unlicensed. Indeed, based upon this logic, the only reasonable option for SMUD was to choose the NAC system, which had been through the "pain and suffering" of NRC licensing review. Tr.1383:2-24.

**C. <u>The "NAC" System</u>.**

374. When SMUD initially considered its storage options in 1992, it considered, among other options, a possible dual-purpose cask that was under development by the Nuclear Assurance Corporation ("NAC") called the NAC STC cask. Tr. at 197-203 (Shetler); Tr. at 1436 (Stuart); PX 991. When SMUD comprehensively reconsidered its storage options in late 1996 and early 1997, it reconsidered, among other options, the NAC STC cask. Tr. at 608-10 (Redeker); PX 519 at 8.

RESPONSE: The Government objects in part to SMUD's proposed finding of fact. Contrary to SMUD's suggestion that it "initially considered its storage options in 1992," SMUD initially considered its dry storage options in 1989 and, in March 1990, the SMUD Board of Directors approved of the Rancho Seco general manager's pursuit of dual-purpose dry storage. DPFOF ¶¶ 19, 25, 32.

Further, we note that SMUD's own expert, Mr. Stuart, testified that in 1992, he concluded that SMUD did not make the right decision in pursuing the NUHOMS dry storage system because it was not licensed for transportation by the NRC and that, as a result, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system. DPFOF ¶¶ 189-190. Mr. Stuart also testified that unlike the NUHOMS system that SMUD chose, the NAC system had been through the pain and suffering of NRC licensing review. Tr.1384: 2-24 (Stuart).

375. The NAC STC design was for a bolted lid cask that was a very expensive product relative to the canister-based systems that were available to the utilities. Tr. at 1437-38 (Stuart).

RESPONSE: The Government objects to SMUD's proposed finding. Despite Mr. Stuart's cited testimony, Mr. Stuart admitted under cross-examination that NAC's bid to SMUD was a fixed price bid for $38 million that did not contain provisions for additional funding and, unlike the NUHOMS system that SMUD chose and which ultimately cost SMUD nearly $80 million to develop, the NAC system had been through the "pain and suffering" of NRC licensing review by 1992. Tr.1384: 2-24 (Stuart), DPFOF ¶ 195. In addition, Mr. Stuart also admitted that, unlike the NUHOMS system, the NAC-STC system is designed to stores bare fuel in a cask rather than a sealed canister. Tr.1390:8-16. Indeed, at the time of SMUD's decision to pursue the NUHOMS system, which was a canister-based system, NAC warned SMUD that, unlike bare fuel, MESCs were not acceptable under the Standard Contract. DPFOF ¶ 197.

376. The difference between a cask and a canister is that the cask is a more robust

design, has thicker metal walls, includes substantial impact limiters in case of potential drops, and is significantly more expensive to design and construct. Tr. at 499-00, 504-09 (Redeker); Tr. at 458 (Shetler); Tr. at 984 (Field).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, we would note that another significant difference between casks and canisters is that canisters are not currently acceptable under the Standard Contract. DPFOF ¶ 198.

377. NAC provided a bid to SMUD in 1992 for a fleet of dual-purpose casks at a cost of $38 million. Tr. at 1381, 1388 (Stuart); DX 35 (showing "Base Case" costs for all five bidders). This cost did not include any costs that SMUD would have had for the project, including internal SMUD engineering, design, and review costs, costs associated with training to use and load the casks, or the actual loading and transfer costs for the ISFSI. Tr. at 1389 (Stuart); Tr. at 207 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that, unlike the NUHOMS system, the NAC system had been through the "pain and suffering" of NRC review as of 1992 and did not have the uncertainty of being a being deemed unacceptable under the Standard Contract because it was not a canister-based storage system. See Gov't Resp. to PFOF ¶ 376. In addition, SMUD does not assert that the NAC system would have cost $80 million to develop.

378. NAC was not a fabricator of casks and would have used an outside subcontractor to do the fabrication. Tr. at 1441 (Stuart). NAC typically anticipated that 85% of the cost of its bid was attributable to the fabrication. Tr. at 1443 (Stuart).

RESPONSE: See Gov't Resp. to PFOF ¶ 377 above.

379. The $38 million bid proposal to SMUD did not take into account any potential contract changes that would have been necessary during design and fabrication. Tr. at 1446 (Stuart). It was Mr. Stuart's opinion at the time, as well as currently, that "because of the experience in the nuclear industry, that many, many contracts overran their initial cost

estimating, that it was very likely that if we had won the order with SMUD, that we would be facing those same kind of issues. We had faced them before in other project with other fabricators." Tr. at 1446 (Stuart).

RESPONSE: See Gov't Resp. to PFOF ¶ 377 above.

380. In 1992, the NRC review process for the NAC STC cask design was underway but NAC did not have a storage or transportation license from the NRC. Tr. at 1382, 1384 (Stuart); Tr. at 202 (Shetler).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that Mr. Stuart testified that although the NAC system had not yet received its certificate of compliance for a part 71 transportation license as of 1992, NAC had been through the "pain and suffering" of NRC review by 1992. Tr.1384:2-24 (Stuart). Further, Mr. Stuart testified that if NAC had customers, it could have received its Part 71 license as early as October 1994. DPFOF ¶ 192.

381. SMUD officials concluded that the dimensions of the NAC cask design would not fit SMUD's fuel length and that significant modifications would have been required. PX 519 at 16; Tr. at 197-98 (Shetler) (explaining that the NAC cask "would not accept our fuel without modification to either the fuel or the cask in order to work for our system"); Tr. at 609 (Redeker) (stating that "you would have to modify the design of the cask and lengthen it and then license the longer cask or cut the 'tops or the bottoms off of our fuel assembly so they would fit"); Tr. at 1387-88 (Stuart) (noting that he told SMUD that NAC essentially had the license "but there were issues with the cask that could easily have caused the NRC to conclude otherwise"); *id.* (noting that SMUD "had other concerns about the cask" and that "[t]hey didn't actually agree with me that it would be quite easy to get the NRC to approve the use of the cask for the SMUD fuel").

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that Mr. Stuart recognized that he believed it would be "quite easy" to have the NRC approve the NAC cask for SMUD's fuel, and he did not testify that he ever

changed that position. Tr.1388:1-8 (Stuart). Further, as Mr. Zabransky testified, SMUD is currently storing its SNF horizontally, which may not be compatible with DOE's acceptance techniques. Tr.1640: 24-1641:12(Zabransky).

382. The NAC cask would have required modification to fit SMUD's fuel, which would have resulted in further NRC review. Tr. at 608 (Redeker) (stating that there would be a need to "go through the licensing process relative to that"); Tr. at 1080 (Field) ("[W]e recognized that it had to be re-reviewed because the product that was proposed did not fit the SMUD fuel, that either it would have to be completely redesigned to be large enough to accept the SMUD fuel, or we would have to go in and somehow cut up the spent fuel and make it small enough to fit into their cask.").

RESPONSE: See Gov't Resp. to PFOF ¶ 382.

383. NAC ultimately received storage and transportation licenses from the NRC for its STC cask design in October 1994. Tr. at 1385 (Stuart).

RESPONSE: Although the Government does not object to SMUD's proposed finding, the Government notes that Mr. Stuart testified that although the NAC system had received its certificate of compliance for a Part 71 transportation license as of 1992, NAC had been through the "pain and suffering" of NRC review by 1992. Tr.1384:2-24 (Stuart). Further, Mr. Stuart testified that if NAC had customers, it could have received its Part 71 license as early as October 1994. DPFOF ¶ 192.

384. Shortly after NAC received the licenses from the NRC, NAC effectively abandoned its dual-purpose cask system. Tr. at 1431-32, 1438 (Stuart). Instead, NAC decided to develop a *canister*-based dry storage system, similar to the one that SMUD purchased from TNW, because "the impression was very, very clear to the industry that DOE would use that concept as the acceptable package for picking up spent fuel." Tr. at 1435 (Stuart); *id.* at 1431-32 (Stuart) ("I use the word 'endorse' purposefully because the effect of that [MPC] program was that every cask vendor in the industry started to develop an MPC, so the attitude of the industry

was the handwriting is on the wall, DOE wants to have a dual-purpose canistered system."); Tr. at 989 (Field) (NAC "never sold the [STC] to anyone, and they subsequently then developed a canister-based system to remain competitive on the market").

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that Mr. Stuart did not testify that NAC would have stopped pursuing the NAC-STC system had SMUD purchased the NAC-STC system rather than the NUHOMS system.

385. DOE's actions encouraged the dry storage vendors to develop canister-based dry storage systems. Tr. at 1432 (Stuart) ("[E]ven NAC, who had spent so much time and money to develop a dual-purpose cask, basically abandoned that cask concept and started spending money to develop a dual-purpose canister system. So that's what I mean when I say DOE adopted, they certainly sent out the message that they were going to utilize that concept. They spent a significant amount of money to do so, and the industry started developing them, and the utilities started buying them." ).

RESPONSE: The Government objects to SMUD's proposed finding of fact. DOE has not encouraged vendors to develop canister based systems and, indeed, repeatedly has informed utilities that MESCs are not an acceptable waste form under the Standard Contract. DPFOF ¶ 198.

386. The NAC STC dual-purpose cask became the "white elephant" of the industry because all of the other vendors, including NAC, were turning to the dual-purpose canister based systems. Tr. at 1437-38 (Stuart).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that Mr. Stuart did not testify that NAC would have stopped pursuing the NAC-STC system had SMUD purchased the NAC-STC system rather than the NUHOMS system.

387. No U.S. utility ever purchased the NAC STC dual-purpose cask. Tr. at 1436 (Stuart); Tr. at 608-09 (Redeker); PX 519 at 16 ("NAC has never sold nor fabricated an STC

cask.").

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

388. SMUD thoroughly evaluated the potential vendors in 1992 and in subsequent reevaluations and acted in a commercially reasonable fashion in making its selections of a canister-based dual-purpose system. Tr. at 1430 (Stuart) (explaining that SMUD's decision to pursue dual-purpose dry storage systems "was a very prudent decision on their part. And in fact, as time went by, I feel their decision was validated more and more with time because of what the Department of Energy was doing, namely adopting a dual-purpose canister system, and what the cask vendors such as NAC was doing, and because more and more utilities were opting to purchase dual-purpose systems."); *see also* Tr. at 199-212 (Shetler); Tr. at 608-610 (Redeker) (discussing reasons for rejecting the NAC cask); PX 991, 512, 503, 519, 524, 689.

RESPONSE: Although the Government does not dispute that Mr. Stuart provided the cited testimony, the Government notes that in 1992, Mr. Stuart concluded that SMUD did not make the right decision in pursuing the NUHOMS dry storage system because it was not licensed for transportation by the NRC and that, as a result, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system. DPFOF ¶¶ 189-190. Mr. Stuart also testified that, unlike the NUHOMS system that SMUD chose, the NAC system had been through the "pain and suffering" of NRC licensing review. Tr.1384:2-24. (Stuart). Finally, instead of heeding Mr. Stuart's concerns, SMUD pursued a risky, unproven, and unlicensed dry storage technology because SMUD believed it would result in timely, and perhaps early, acceptance by DOE. DPFOF ¶¶ 26-35, 49.

## VII. Disputed Offsets Raised At Trial.

### A. Wet Storage Costs.

389. After completing the transfer of its SNF to dry storage in 2002, SMUD was able to lay off approximately thirty employees whose jobs related primarily to operating the spent fuel pool. Tr. at 1170-71 (Field); PX Dem. 76; *see also* Tr. at 332-33 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding. First, although Mr.

Field testified that approximately 30 employees were laid off after the transfer of SNF to dry storage in 2002, Mr. Shetler testified that "the number we have seen over the years could be as low as the 30/50 range and as high as the 50/80 range for staffing levels." Tr.333:9-12 (Shetler). Second, the testimony cited does not support SMUD's proposed finding of fact that the employees that it laid off had "jobs related primarily to operating the spent fuel pool." Finally, the Government objects to SMUD's reliance upon PX Dem. 76 to support its proposed finding of fact, because SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstrative to support its proposed findings of fact.

390. In addition to labor, several different systems were necessary to support the operation of the wet pool at Rancho Seco.

a. Cooling systems were required to maintain the water temperature. Tr. at 139-40 (Shetler).

b. Cleanup systems were necessary to filer and demineralize the water. *Id.*

c. These systems utilized various filters, pumps, valves, piping, demineralizers, heat exchangers, and cooling equipment. *Id.*; Tr. at 524 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

391. The ISFSI is a passive system, requiring less system support and fewer personnel for oversight, monitoring, and security. Tr. at 146 (Shetler) (noting that the ISFSI is designed so that a proper fuel temperature can be maintained through natural air flow); Tr. at 523 (Redeker) (noting that, "[t]o safely store the fuel, there are no active support systems required").

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

392. There is a significant savings in annual operating costs between wet and dry storage. Tr. at 1070-71 (Field); *see also* PFF ¶ 344.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, Mr. Field's testimony does not support this proposed finding. Mr. Field testified that "considerable system reductions are possible with dry storage." Tr.1071:2-3 (Field). The

testimony cited by SMUD does not support SMUD's statement that there is "a significant cost savings in annual operating costs between wet and dry storage." However, numerous contemporaneous documents support SMUD's proposed finding of fact, and reflect that SMUD represented to its Board of Directors that SMUD could save anywhere from $8-12 million annually by abandoning its wet pool and placing its SNF into dry storage. DX 287, at SMUD 0018294 (estimating $8 million in annual savings); DX 255, at SMUD 0029454 (same); DX 274 at SMUD 0027419, SMUD 0027433-34, SMUD 0027436 (same); DX 280, at SMUD 0029434 (same); DX 291, at SMUD 0029418, SMUD 0029411 (same); DX 425 at SMUD 0027393 (same); DX 657, at MOF 023696 (same); PX 519 (assuming $10-12 million in annual savings); DX 755, at SMUD 061109 (same); DX 760, at SMUD 0028714 (same); DX 794, at SMUD 062405 (same).

393. The source of the majority of the savings results from the number of necessary employees, as the costs of running a wet pool are primarily staffing costs. Tr. at 332 (Shetler), 608 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

394. The total overall annual labor savings, calculated now that all of the reductions in staff have occurred, is $4,146,360. PX Dem. 72; Tr. at 1170-71 (Field); *see also* DX 976A, 977, 978A (estimating in 2000 that cost savings would be at least $4 million).

RESPONSE: Although the Government does not dispute SMUD's proposed finding of fact, the Government notes that throughout the development of its dry storage system SMUD repeatedly estimated that the annual savings of dry as compared to wet storage was as much as $10-12 million per year. DPFOF ¶ 109. Further, SMUD's reliance upon PX Dem. 72 to support its proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstrative to support its proposed findings of fact.

395. The elimination of the spent nuclear fuel pool also results in savings on materials and electrical consumption. These non-labor savings result in a total savings of less than $50,000 annually. Tr. at 976 (Field).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact to the extent that Mr. Field testified that the savings associated with spare parts and other associated materials was less than $50,000 annually, we do object to the extent SMUD's

proposed finding of fact suggests that this figure represents all non-labor savings. The cited testimony of Mr. Field does not support SMUD's finding of fact that the total amount of annual non-labor savings by abandoning its wet pool was less than $50,000.

396. The primary costs for operating and maintenance the ISFSI in 2003 were approximately $600,000 to $700,000. Tr. at 1056 (Field); PFF ¶ 349.

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Field testified that the operation and maintenance costs for the ISFSI for 2003 was approximately $600,000, and not "approximately $600,000 to $700,000." Tr.1056:9-21 (Field). Further, SMUD's citation to a spreadsheet associated with Mr. Brinig's direct testimony does not support SMUD's proposed finding of fact because Mr. Brinig never explained what portion of the $746,384 he determined were incurred by SMUD in 2003 were associated with the operation and maintenance of the ISFSI.

397. The first year after completion of the ISFSI and final loading of the fuel, the total cost for management of the ISFSI was $616,344. *See* B. Brinig Written Direct at Ex. C (PX 1000) (noting costs of $616,344 incurred under work order 4002862).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

398. These costs are primarily SMUD labor costs, including security and ISFSI technician costs. Tr. at 1056 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

399. SMUD finished loading its fuel into the ISFSI in August 2002. Tr. at 668 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

400. Following final loading of the last spent fuel into the ISFSI, labor in support of the spent fuel pool and the transfer of the fuel to the ISFSI continued for a period while SMUD wrapped up its activities associated with the transfer of the fuel. SMUD experienced savings gradually, as staff was reduced. Tr. at 1170-71 (Field).

RESPONSE: The Government objects to the first sentence of SMUD's proposed finding of fact because it is unsupported by any citation to the record in this case. The Government does not object to the second sentence of SMUD's proposed finding of fact.

401. SMUD reduced its staff as it was feasible. *See* PFF ¶¶ 414-424.

RESPONSE: The Government objects to SMUD's proposed finding of fact because none of the documents or testimony referred to in its proposed findings of fact ¶¶ 414-424 support the statement that "SMUD reduced its staff as it was feasible." Further, SMUD's proposed finding of fact is irrelevant to any issue that the Court needs to decide in this case. Even if it were assumed that SMUD did reduce its staff as it was feasible, that does not establish that the costs associated with SMUD's internal labor concerning the dry storage project were incremental to the Government's breach of the Standard Contract.

402. SMUD did not begin to see the monetary benefits of the transfer of fuel from wet to dry until 2003. Tr. at 1170-71 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is not supported by the testimony cited. Mr. Field testified that the savings by going to dry storage "would have gradually accrued from 2002. It was not a step change, but it was a gradual reduction in staff." Tr.1170:23-1171:1 (Field). Mr. Field never testified that SMUD did not begin to see the monetary benefits of transferring its SNF from wet to dry storage until 2003, and this proposed finding is unsupported by the referenced testimony.

**B. Costs to Transfer Fuel From Wet to Dry Storage.**

403. The Contract provides that the Purchaser, in this case SMUD, "shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility." Contract Art. IV.A.2.

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. Defendant further responds to the plaintiff's assertion of law by admitting the assertion, to the extent supported by the Standard Contract, which is the best evidence of its content; otherwise, the Government denies plaintiff's assertion of law.

404. Upon DOE performance, SMUD will still be responsible under the Contract for the loading activities necessary for transportation of the fuel. *Id*. SMUD will have to remove the canister from the ISFSI and load it into the transportation cask for transport to the repository.

*Id.*

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. Although Defendant agrees that SMUD is responsible under the Standard Contract for the loading activities necessary for the transportation of its SNF to a DOE facility, nothing in the Standard Contract provides that such a responsibility is contingent upon "DOE performance." Further, the second sentence of SMUD's proposed finding is entirely unsupported by any documentary evidence, as the Standard Contract does not even contemplate canisters or ISFSIs. DPFOF ¶ 198.

405. SMUD's loading, transport, and unloading of the spent nuclear fuel at the ISFSI constituted activities *in addition to* the load that SMUD is responsible for under the Contract.

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. Further, SMUD has provided no record support for its proposed legal finding. In addition, SMUD's proposed finding of law necessarily suggests that SMUD's transportation cask will not be utilized for the transportation of its SNF to a DOE facility, which is in direct contradiction to the arguments SMUD has made throughout this litigation. See Gov't Post-trial Brief at 107-108; DPFOF ¶¶ 291-92.

406. Loading the fuel into SMUD's dual-purpose canisters is much more labor intensive than transferring the fuel to a bolted lid transportation cask.

RESPONSE: The Government objects to SMUD's proposed finding of fact for several reasons. First, the use of the "much more" to compare the alleged relative difference in labor between bolted and welded canisters is vague. Second, there is no admissible testimony concerning the specific amount of labor necessary to load a bolted canister. Finally, SMUD's proposed finding is irrelevant to the issues in this case. Even assuming that the loading of SNF into dual-purpose canisters is more labor intensive than transferring fuel to a bolted lid transportation cask, there is no contemporaneous documentation indicating that SMUD would have chosen such a transportation cask in the non-breach, "but for" world. In fact, the evidence demonstrates that SMUD chose a dual-purpose welded canister system in 1990, which plainly constitutes the non-breach world.

a. After fuel is loaded into the dual-purpose canister, after the water is removed "two cover plates "are welded in place so that there are two welded seals between the fuel and the outside world." Tr. at 502-03, 511 (Redeker); PX Dem. 8.

RESPONSE: Although the Government does not object that SMUD's proposed finding is supported by the testimony of Mr. Redeker, SMUD's reliance upon PX Dem. 8 to support its

proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstrative to support its proposed findings of fact.

b. Welding was done remotely using an automatic programmed welding machine over several shifts. Tr. at 514-16 (Redeker); PX Dem. 21, 23, 24.

RESPONSE: Although the Government does not object that SMUD's proposed finding is supported by the testimony of Mr. Redeker, SMUD's reliance upon PX Dem. 21, 23, and 24 to support its proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstratives to support its proposed findings of fact.

c. In order to prevent corrosion over time, water is blown out, a vacuum is run on the canister, and then helium is back-filled into the canister. Tr. at 502-03, 516-517 (Redeker); PX Dem 25.

RESPONSE: Although the Government does not object that SMUD's proposed finding is supported by the testimony of Mr. Redeker, SMUD's reliance upon PX Dem. 25 to support its proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstrative to support its proposed findings of fact.

d. The cask, with the loaded canister, has to be transported to the ISFSI on a modified tractor. Tr. at 518 (Redeker); PX Dem. 27, 28.

RESPONSE: Although the Government does not object that SMUD's proposed finding is supported by the testimony of Mr. Redeker, SMUD's reliance upon PX Dem. 27 and 28 to support its proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstratives to support its proposed findings of fact.

e. The cask is backed up to the ISFSI, the canister is transferred to a horizontal storage module, and concrete lids are welded over the horizontal storage modules. Tr. at 518-

520 (Redeker); PX Dem. 29, 30.

RESPONSE: Although the Government does not object that SMUD's proposed finding is supported by the testimony of Mr. Redeker, SMUD's reliance upon PX Dem. 29 and 30 to support its proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstratives to support its proposed findings of fact.

407. If DOE would have performed and provided a bolted lid transportation cask, SMUD would have merely loaded the fuel into the cask, bolted the lid rather than welded it, and sent it off by rail. Tr. at 521-22 (Redeker)

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is unsupported by the trial record in this case. At trial, Mr. Redeker was asked whether "the process of picking up and enclosing the spent fuel assemblies [would] have been different if the Department of Energy had picked up the fuel from SMUD, say, in 1998." Tr.521:9-13 (Redeker). Over the Government's objection that the question was an improper hypothetical, Mr. Redeker stated that the process of picking up SMUD's SNF would have been different. Tr.521:14-16 (Redeker). Mr. Redeker went on to testify that "[t]he DOE was providing its own transportation cask and we would have loaded the fuel into that instead of this with whatever procedures which I don't know what they would be in detail, but we would load their cask in our pool, put the fuel in, and then send it off on a railcar instead of putting it in this system." Tr.521:24-522:5 (Redeker).

First, Mr. Redeker does not state in the testimony referenced by SMUD that he assumed that DOE would provide a bolted cask (or any specific type of cask for that matter), and does not discuss the relative differences between bolted and welded casks. Second, the question presented to Mr. Redeker presumed that DOE would accept SNF from SMUD in 1998. Yet, there was no evidence presented at trial that, in the non-breach world, DOE would have accepted SMUD's SNF beginning in 1998. Rather, SMUD admits that its first acceptance in the non-breach world would have occurred in 2001. Tr.702:1-8 (Redeker). SMUD's proposed finding of fact is unsupported by the record in this case.

408. Loading spent fuel into a bolted lid transportation cask would have been "significantly easier" than loading the same fuel into SMUD's dual-purpose canister based system. Tr. at 1031-32 (Field).

RESPONSE: The Government objects to SMUD's proposed finding of fact because there is no basis for Mr. Field's testimony that a bolted lid cask would be "significantly easier"

to load. These was no evidence that Mr. Field had ever loaded a bolted cask, or that he was sufficiently familiar with the mechanics of a bolted cask, to conclude that the loading of a bolted cask would be "significantly easier" than a welded cask. Further, as the Government made clear at trial, Mr. Field's testimony is inadmissible speculation. Finally, SMUD's proposed finding is irrelevant to any issue that the Court needs to decide in this case. Whether loading spent fuel into a bolted lid transportation cask would have been "significantly easier" than loading that fuel into dual-purpose canisters, there is no credible evidence that SMUD would have chosen bolted lid transportation casks in the"but for" world. Indeed, the evidence unequivocally demonstrates that in 1990, which plainly constitutes the but for world, SMUD made the business decision to load its SNF into dual-purpose dry storage. DPFOF ¶¶ 19-64.

409. The loading and transfer costs include approximately $5.5 million paid to Bigge, which provided additional contract labor for the fuel transfer teams. Tr. at 957 (Field); PX Dem. 77.

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is not supported by the testimony cited. Although Mr. Field testified that SMUD hired Bigge to provide additional labor for loading SMUD's SNF into its ISFSI, Mr. Field never testified concerning the cost of the Bigge contract. Tr.957:7-15 (Field). Further, SMUD's reliance upon PX Dem. 77 to support its proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not admissible evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstrative to support its proposed findings of fact.

410. Because SMUD incurred expense in loading and transferring the fuel to the ISFSI in mitigation of the government's breach and in addition to the later loading costs SMUD will incur upon eventual performance, SMUD has appropriately included these costs in its damages claim. *See* PFF ¶¶ 403-409.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, SMUD's proposed finding is legal argument, and is inappropriate for inclusion as a proposed finding of fact. Second, as discussed in the Government's post-trial brief and proposed findings of fact, because SMUD made the decision to pursue dual-purpose dry storage almost a decade before the Government breached the Standard Contract, the costs that SMUD has allegedly incurred cannot be considered as mitigation. Indeed, this conclusion was recently reaffirmed by the decision of the United States Court of Appeals for the Federal Circuit in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563, *4 (Fed. Cir. Sept. 9, 2005), in which the court held that plaintiffs in SNF cases are not entitled to recover as mitigation

damages costs incurred before 1994. Consequently, SMUD's 1990 decision to pursue dual-purpose dry storage and subsequent incurrence of costs may not be recovered as mitigation damages as a matter of law.

Further, SMUD has taken the entirely inconsistent position that it pursued a dry storage system with transportation features to minimize the amount of handling, on the one hand, but that it will have to reload the SNF into DOE-provided transportation casks (presumably because the MESCs SMUD is using are an unacceptable waste form), on the other. The inconsistent positions highlight the weakness in SMUD's argument.

C. SMUD Labor Costs.

411. SMUD's claimed labor costs are incremental to the project because only those employee labor hours spent on the dry storage project have been included. Tr. at 1324 (Brinig) ("Speaking from an accounting perspective, I would say if I have a cost accounting system that charges direct labor to this project here, by definition, I'm telling you it's incremental."). *See* PFF ¶¶ 173-174.

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Kiraly concluded that SMUD's damages claim improperly included labor hours for SMUD personnel who were typically charging few hours to the dry storage project, or who were charging to the project on a sporadic basis. Direct Testimony of Stephen Kiraly, at ¶ 59. Mr. Kiraly explained at trial that a cost that would have been incurred regardless of the breach is not a proper element of damages. Id., at ¶53. SMUD's own expert, Mr. Brinig, agreed with this conclusion. Tr.1298:3-13 (Brinig) (stating that had SMUD incurred costs in the breach world that it otherwise would have incurred in the non-breach world, then it would be inappropriate to include those costs in a damages claim).

Mr. Kiraly testified that, of the 256 employees that SMUD included in its damages claim as labor costs, only 16 of the employees should be considered as an incremental cost because these employees charged a majority of their time to the dry storage project. Tr.2737:7-20 (Kiraly). Mr. Kiraly explained that these remaining 240 employees likely were charging the majority of their time to other projects, such as decommissioning, and, therefore, such labor costs were fixed from a damages perspective. Direct Testimony of Stephen Kiraly, at ¶ 59.

Further, the Government's expert, Jerry Burford, explained that certain classes of labor charges included in SMUD's damages claim could be attributed to other ongoing work at Rancho Seco, and the time sheets and invoices produced by SMUD in this litigation lacked sufficient detail to determine if these types of labor activities were incremental to the breach. Direct Testimony of Jerry Burford, at ¶ 111-113. Mr. Kiraly explained the fatal flaw in SMUD's

damages claim as follows:

> Well, what I would have expected to see is starting with the baseline of the incurred costs and then identifying those costs that were either incurred specifically and only for this cost – the spent fuel, or deductions of costs that were basically fixed, and deduction of the costs of the, essentially, would have been world. There's been no accounting for that in these costs.

Tr.2802:15-22 (Kiraly). Mr. Brinig's simplistic equation of direct labor with incremental labor was soundly rebutted by Mr. Kiraly.

Mr. Brinig conceded that his assumption that the cost of SMUD's labor was an incremental cost rested upon the assumption that SMUD's employees had other productive work to do at the time the employees were charging to the dry storage project. Tr.1328:10-14 (Brinig). Yet, Mr. Brinig admitted that he conducted absolutely no analysis to determine whether any of the 240 SMUD employees identified by Mr. Kiraly as being non-incremental were otherwise unavailable for other task, whether there was work that had to be performed by others as a result of these 240 employees work on the dry storage project, or whether there was work that was delayed or not performed at all as a result of the dry storage project. Tr.1321:16-1322:5 (Brinig).

Further, Mr. Brinig conceded that if an employee spent a few hours on a project, that work would not be an incremental cost to that project. Tr.1325:4-8 (Brinig). Mr. Brinig's concession is directly at odds with his statement that, "from an accounting perspective, I would say if I have a cost accounting system that charges direct labor to this project here, by definition, I'm telling you it's incremental . . ." Tr.1324:9-12 (Brinig).

412. Many of the SMUD employees who worked on the dry storage project also billed time to other projects at Rancho Seco. *See* Kiraly Written Direct at Att. 3 (noting hours worked on claimed work orders versus non-claimed work orders).

<u>RESPONSE</u>: Although the Government does not object to SMUD's proposed finding of fact, the testimony cited by SMUD does not support this proposed finding of fact. Attachment 3 to Mr. Kiraly's Direct Testimony includes a summary spreadsheet detailing the net reductions to SMUD's damages claim for SMUD personnel (fixed labor costs) not considered incremental to the breach. The reductions identified by Mr. Kiraly for fixed labor costs not considered incremental to the breach totaled $10,303,193. However, Mr. Kiraly reduced this amount by $923,128 because these costs were already included in work orders that Mr. Kiraly deducted from the damage claim for other reasons, such as to the need to store failed fuel or GTCC low level radioactive waste. The net reduction identified by Mr. Kiraly for labor costs was $9,380,065. The additional fourteen pages of detailed spreadsheets attached to summary

spreadsheet set forth Mr. Kiraly's detailed analysis and review of SMUD's fixed labor costs.

Further, SMUD's proposed finding of fact is irrelevant to any issue in this case. The fact that an employee who worked on the dry storage project also worked on other projects at Rancho Seco does not transform the cost associated with that employee's time to an incremental cost to the Government's breach of the Standard Contract. Simply put, SMUD failed to meet its burden of demonstrating that the costs associated with its employee's time were incremental to the Government's breach.

413. Only labor charges for employee time specifically attributable to work orders for the dry storage project are included in the total cost of the project. Tr. at 673 (Redeker).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, this proposed finding is irrelevant to any issue in this case. See Gov't Responses to PFOF ¶¶ 411-412.

414. SMUD is an efficient company that makes every effort to productively use its employees' time, combine positions, and reduce staff whenever possible. Tr. 678-79 (Redeker) ("We look for, and I drive my staff to look for every opportunity to combine work forces, to combine jobs, to be more efficient. . . . There is continuing pressure to reduce staff at Rancho Seco."); Tr. at 953 (Field) ("since the time we shut the plant down, we strive to reduce staff as workload is decreased"); PX 1172.

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Redeker testified that Rancho Seco's labor force has reduced since 1993 from approximately 150 employees to 80 employees, and "[t]hat [reduction] has occurred as we have continued our ongoing effort to make sure that we are being as cost-effective as possible. We look for – and I drive my staff to look for every opportunity to combine work forces, to combine jobs, to be more efficient." Tr.677:23-678:11 (Redeker). However, rather than explain that the reduction in labor was the result of the end of the dry storage project, Mr. Redeker admitted that the reduction in the labor force also "reflects the decreasing staff requirements because we are decommissioning the facility." Tr.678:12-14 (Redeker).

Mr. Redeker also testified that the dry storage project resulted in SMUD not being able to decrease staff as quickly as it otherwise would have had it not pursued the dry storage project, and that after the dry storage project was completed, the Rancho Seco staff was reduced by 30 full-time employees. Tr.680:13-681:2 (Redeker).

Finally, the Government objects to SMUD's proposed finding of fact because it is irrelevant to any issue in this case. See Gov't Responses to PFOF ¶¶ 411-412.

415. The diversion of an employee's time to the dry storage project was a loss of productive time that could have been devoted to another activity at Rancho Seco or elsewhere at SMUD that would have resulted in a benefit to SMUD. Tr. at 1324-28 (Brinig); *see also* PFF ¶¶ 414, 425.

RESPONSE: The Government objects to SMUD's proposed finding of fact. See Gov't Resp. to PFOF ¶ 411. SMUD failed to meet its burden of proof to establish that "the diversion of an employee's time to the dry storage project was a loss of productive time" to SMUD. Mr. Kiraly concluded that SMUD's damages claim improperly included labor hours for SMUD personnel who were typically charging few hours to the dry storage project, or who were charging to the project on a sporadic basis. Direct Testimony of Stephen Kiraly, at ¶ 59. Mr. Kiraly explained at trial that a cost that would have been incurred regardless of the breach is not a proper element of damages. Direct Testimony of Stephen Kiraly, at ¶ 53. SMUD's own expert, Mr. Brinig, agreed with this conclusion. Tr.1298:3-13 (Brinig) (stating that had SMUD incurred costs in the breach world that it otherwise would have incurred in the non-breach world, then it would be inappropriate to include those costs in a damages claim).

Mr. Kiraly testified that, of the 256 employees that SMUD included in its damages claim as labor costs, only 16 of the employees should be considered as an incremental cost because these employees charged a majority of their time to the dry storage project. Tr.2737:7-20 (Kiraly). Mr. Kiraly explained that these remaining 240 employees likely were charging the majority of their time to other projects, such as decommissioning, and, therefore, such labor costs were fixed from a damages perspective. Direct Testimony of Stephen Kiraly, at ¶ 59.

Finally, regardless of whether SMUD employees who were used for the dry storage project "could have been devoted to another activity at Rancho Seco or elsewhere at SMUD that would have resulted in a benefit to SMUD," SMUD presented absolutely no evidence that SMUD would have devoted these employees to other activities at Rancho Seco or elsewhere. Simply put, SMUD failed to meet its burden of proof with respect to the incremental nature of its direct labor costs.

416. Positions could have also been combined and jobs eliminated if employees were not devoting a portion of their time to the dry storage project. *See* B. Brinig Written Direct at 13 (PX 1000).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First,

nowhere in Mr. Brinig's written direct testimony does he state that positions could have been combined and jobs eliminated if employees were not devoting a portion of their time to the dry storage project. The record simply does not support this proposed finding of fact.

Second, Mr. Brinig admitted that he conducted absolutely no analysis to determine whether any of the 240 SMUD employees identified by Mr. Kiraly as being non-incremental were otherwise unavailable for other task, whether there was work that had to be performed by others as a result of these 240 employees work on the dry storage project, or whether there was work that was delayed or not performed at all as a result of the dry storage project. Tr.1321:16-1322:5 (Brinig).

Therefore, even if Mr. Brinig had made the statement that is the subject of the proposed finding of fact, it would be pure speculation, as Mr. Brinig has done no analysis on this issue. The Government objects to SMUD's proposed finding of fact. See Gov't Responses to Plaintiff's PFF ¶¶ 411-415.

417. SMUD has continually reduced its labor force as part of its "ongoing effort to make sure that [it is] being as cost-effective as possible." Tr. at 678 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Redeker testified that Rancho Seco's labor force has reduced since 1993 from approximately 150 employees to 80 employees, and "[t]hat [reduction] has occurred as we have continued our ongoing effort to make sure that we are being as cost-effective as possible. We look for – and I drive my staff to look for every opportunity to combine work forces, to combine jobs, to be more efficient." Tr.677:23-678:11 (Redeker). However, rather than explain that the reduction in labor was the result of the end of the dry storage project, Mr. Redeker admitted that the reduction in the labor force also "reflects the decreasing staff requirements because we are decommissioning the facility." Tr.678:12-14 (Redeker).

Mr. Redeker also testified that the dry storage project resulted in SMUD not being able to decrease staff as quickly as it otherwise would have had it not pursued the dry storage project, and that after the dry storage project was completed, the Rancho Seco staff was reduced by 30 full-time employees. Tr.680:13-681:2 (Redeker).

Finally, SMUD's proposed finding is irrelevant to any issue in this case. The fact that SMUD may have "continually reduced its labor force" in no way bears upon the issue of whether SMUD's claimed costs associated with its direct labor force are incremental to the Government's breach of the Standard Contract.

418. SMUD downsized its workforce following shutdown and has continued to reduce the number of employees as the workload is reduced. Tr. at 953-54 (Field), 2766-72 (Kiraly).

RESPONSE: The Government does not object to SMUD's proposed finding of fact to the extent it is supported by the testimony of Mr. Field. However, the referenced testimony of Mr. Kiraly does not support this proposed finding of fact. In the testimony of Mr. Kiraly cited by SMUD, Mr. Kiraly did not testify that SMUD downsized its workforce following shutdown. Nor did Mr. Kiraly testify that SMUD has continued to reduce the number of employees as the workload is reduced. See Gov't Response to PFOF ¶ 417.

Further, SMUD's proposed finding is irrelevant to any issue in this case. The fact that SMUD may have made efforts to reduce the size of its labor force in no way bears upon the issue of whether SMUD's claimed costs associated with its direct labor force are incremental to the Government's breach of the Standard Contract.

419. In 1990, SMUD employed 397 employees at Rancho Seco. Rancho Seco 1992 Budget at 4 (PX 838).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that the 397 employees included 84 contract security personnel. The majority of the work activities at Rancho Seco involved placing the plant into protective layup and placing and maintaining the plant in SAFSTOR mode until decommissioning. Rancho Seco 1992 Budget at 4, 7-8 (PX 838). Further, SMUD's proposed finding is irrelevant to any issue in this case.

420. By the end of 1992 that number had been reduced to 186. *Id.*; *see also* 1993 Budget at 6 (PX 274) (noting reduction in staff).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that 1993 Budget anticipates that the decrease from 186 positions in 1992 to 163 positions by the end of 1993 was"due to decommissioning (Preparation for Custodial Safstor) which caused a reduction in requirements." 1993 Budget for Rancho Seco Nuclear Department at 6 (PX 274). The 163 positions include "10 positions for use in retraining and transitioning displaced Rancho Seco employees and 4 positions (1 full-time, 3 part-time) to support Rancho Seco Park. Id. Further, SMUD's proposed finding is irrelevant to any issue in this case.

421. By 1997, the number of permanent positions had decreased to 128. *See* Rancho Seco 1997 Budget at 6 (PX 505).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that as permanent positions became vacant at Rancho Seco, they were converted to limited term or temporary position filled with SMUD personnel, where possible, or with contractors when SMUD personnel were unavailable. In fact, during the same

time period, the number of limited term and temporary positions increased from 30 to 36. Rancho Seco 1997 Budget at 6 (PX 505). Also, activities at Rancho Seco included decommissioning activities such as asbestos abatement (a multi-year activity started in 1996) and the operations and maintenance of the photovaltaic units and electric switchyard at the plant site, as well as Rancho Seco Park. These activities were not related to the dry storage project. Id. at 4. Further, SMUD's proposed finding is irrelevant to any issue in this case.

422. Today, SMUD employs approximately 80 employees at Rancho Seco. Tr. at 677-678 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact because Mr. Redeker's trial testimony fails to provide any details regarding whether the "80 employees" cited in this proposed finding are full-time, part-time and/or temporary employees, and whether the number of employees cited includes contract employees. The proposed finding is irrelevant because it fails to identify how many employees and which employees are engaged in decommissioning activities versus dry storage project-related activities.

423. As permanent positions become vacant, SMUD fills the positions with current SMUD personnel or contractors. Rancho Seco 1997 Budget (PX 505).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the cited support for this proposed finding of fact, a 1997 budget, does not provide current support for this proposed finding. Second, as noted in the Government's Response to PFOF ¶ 421, as permanent positions became vacant at Rancho Seco, they were converted to limited term or temporary position filled with SMUD personnel, where possible, or with contractors when SMUD personnel were unavailable. In fact, during the same time period, the number of limited term and temporary positions increased from 30 to 36. Rancho Seco 1997 Budget at 6 (PX 505).

424. SMUD constantly sought for ways to reduce staff. PX 1172 (2001 email from Redeker directing staff to "[t]hink outside of the box, be aggressive, recommend the hard things" to reduce staff and increase efficiency).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The sole support offered for this proposed finding, a 2001 e-mail from Mr. Redeker to Rancho Seco staff, does not support the proposed finding. There is no evidence to support the assertion that Rancho Seco staff ever responded to or took action as a result of Mr. Redeker's e-mail. Further, SMUD's proposed finding is irrelevant to any issue in this case.

425. SMUD was prohibited from decreasing its staff below a certain level because of

the need for staff to support the dry storage project. Tr. at 680 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Redeker's trial testimony does not reflect any "prohibition" at Rancho Seco that limited decreasing staff below a certain level due to the dry storage project.

426. Following the completion of fuel loading and the closure of the spent fuel pool, there was a "significant reduction" in the labor force at Rancho Seco, resulting in the elimination of thirty full-time SMUD employees. Tr. at 680-81 (Redeker); PX Dem. 76.

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Redeker's trial testimony fails to support the proposed finding. Mr. Redeker's testimony did not provide a "causal link" between the completion of fuel loading and closure of the pool, and the elimination of 30 full-time SMUD employees from the Rancho Seco labor force. See Gov't Response to PFOF ¶ 411. We also object to SMUD's proposed finding of fact to the extent it is supported by PX Dem. 76. SMUD's reliance upon PX Dem. 76 to support its proposed finding of fact is inappropriate, as SMUD's demonstrative exhibits are not evidence. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing the distinction between demonstrative exhibits and evidence). Consequently, SMUD may not rely upon its demonstrative to support its proposed findings of fact.

**D. Labor Burden.**

427. SMUD's indirect labor costs are incremental to the project and properly included in SMUD's claim. *See* PFF ¶¶ 173-174; 428-436.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD has failed to demonstrate that its claimed labor overhead markups were incremental to the partial breach. SMUD has included $2,497,724 related to the cost of labor overhead markups in its damages claim. Mr. Kiraly explained at trial that he and his team reviewed SMUD's labor overhead markups, and concluded that the markups included fixed costs that were not incremental to the Government's breach. Direct Testimony of Stephen Kiraly, at ¶ 57. These labor overhead markup costs included such items as human resource costs, office space, vehicles, the license for SMUD's accounting software, personal computers, software, and telephones, among other items. Id.

Mr. Kiraly concluded that the costs associated with these items would not have increased as a result of the hours SMUD personnel spent on the dry storage project and, consequently, such costs should be excluded from SMUD's damages claim. Id. Mr. Kiraly explained that:

> [B]y definition, with SMUD including them as indirect expenses and indirect expense is when you cannot tie directly to the project. They may have been used on it, they may not have been, but these costs are then allocated over all of the labor within SMUD, of which the spent fuel project was only a small portion.

Tr.2775:23-2776:4 (Kiraly). At trial, SMUD claimed that its labor overhead markup costs were variable rather than fixed. Specifically, Mr. Redeker claimed that, when SMUD reduced its labor force, the overhead associated with that labor force decreased as well. Tr.681:6-10 (Redeker). As an example, Mr. Redeker testified that, "[y]ou know, we have got a guy sitting at a desk with a computer. When he leaves, that computer leaves." Tr.681:10-12 (Redeker).

In response to Mr. Redeker's testimony, Mr. Kiraly explained that "even if overhead is variable, if you apply it to the base and the base is excluded, included in the excluded cost would also be that portion of overhead that is allocated to that excluded cost." Tr.2801:3-6 (Kiraly). For example, with respect to SMUD's SAP license, Mr. Kiraly explained that, if SMUD had laid off an employee, he would not expect SMUD's SAP license costs to decrease. Tr.2800:9-12 (Kiraly).

428. Employee labor charged to a work order is "loaded" by the accounting system. PX 291 at 5.

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the sole document cited by SMUD does not provide support for the proposed finding. The citation to PX 291, a January 27, 1993 memorandum from Wanda Wells to Neal Vandenriesche regarding the DOE demonstration project, does not explain or support the fact that Rancho Seco employee labor charged to a particular work order is "loaded" by the accounting system. Second, the proposed finding does not address whether benefit and overhead leading were recorded differently under the FMIS and SAP accounting systems.

429. First, the labor is burdened using a predetermined benefit loading percentage, with dollars that reflect the cost of employer-provided benefits. Tr. at 1244 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

430. The benefit rate includes such costs as paid leave, pension contributions, employer FICA contributions, health insurance premiums, workers' compensation costs, and unemployment insurance costs. *See* PX 536, 566; Tr. at 1244 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

431. The labor also is burdened with overhead costs, including costs for human resources, office space, vehicles, SAP licenses, personal computers, software, and phones. PX 822; Tr. at 1244 (Holst).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

432. Benefit and overhead loading were recorded differently during the two different accounting periods. *See* S. Kiraly Written Direct at 19 (DX 2003).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

433. During the SAP period, from 1999 to 2003, the benefit loading percentage was charged directly as part of SMUD labor. The government has not objected to the inclusion of these costs. *See id.* 19-20.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the testimony cited by SMUD does not fully support its proposed finding.

434. During the SAP period, the overhead loading was charged as indirect labor. *See* S. Kiraly Written Direct at 19-20. The government proposes a deduction of $1,932,750 for the loading during this period. *Id.* at 19-20, Att. 2.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that Mr. Kiraly identified $ 2,497,724 as the total indirect labor overhead markups to be deducted from SMUD's claim. DPFOF ¶ 269.

435. During the FMIS period, from 1992 to 1999, multiple markups were applied directly to SMUD labor, including both benefits and corporate overhead. *See id.* at 20. The government has only proposed a deduction of the overhead markups during this period, totaling $563,974. *Id.* at 20, Att. 2.

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the Government notes that Mr. Kiraly identified $ 2,497,724 as the total indirect labor overhead markups to be deducted from SMUD's claim. DPFOF ¶ 269.

436. SMUD's overhead burdening is incremental, as SMUD reallocates or eliminates supplies, equipment, software, and licenses as the labor force is reduced. Tr. at 681 (Redeker) (through the accounting system, the project is "charged for every telephone, every computer monitor, every beeper that we have. . . . So when somebody goes, we find his beeper, his telephone, everything and get rid of it because we don't want to pay for it").

RESPONSE: The Government objects to SMUD's proposed finding of fact. See Gov't Resp. to PFOF ¶ 427.

**E. Decommissioning Costs.**

437. The government's breach has not resulted in savings to SMUD with regard to its decommissioning. *See* Designations Appendix (Dckt. #310) at 2322 (Freeman) ("There weren't any savings at all. It was a question of trying to mitigate the extra money that we would have to spend in keeping this power plant under a—kind of an operating license until we can get rid of the spent fuel in the tanks and mitigating the cost."); *see also* PFF ¶¶ 438-459.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD had two primary goals after Rancho Seco's premature shutdown in 1989. DPFOF ¶ 20. First, SMUD sought to reduce its nuclear footprint as quickly as possible. DPFOF ¶ 20a. To achieve this goal, SMUD had to decommission its Rancho Seco facility. Id. The Rancho Seco site could not be decommissioned until its pool was eliminated. Id. By placing its SNF into dry storage, SMUD gained the ability to decommission its wet pool. Id. By decommissioning its wet pool, SMUD in turn had the ability to decrease the amount of staff and ultimately reduce its costs associated with Rancho Seco. Id. The decommissioning of Rancho Seco was undisputedly an important element in SMUD pursuing dry storage. Id. Indeed, Mr. Redeker admitted under cross-examination that SMUD could not eliminate its Part 50 license until it decommissioned its pool, and that there is a cost associated with continuing to carry a Part 50 license. Tr.735:12-14. Tr.736:3-9 (Redeker); DPFOF ¶ 315.

Indeed, at the October 1991 SMUD Board of Directors meeting, Mr. Shetler told the Board of Directors that SMUD's fuel disposition project was "tied very strongly" to its decommissioning program. DX 274, at SMUD 0027409; see Tr.772:3-8 (Redeker) (acknowledging that there is a "direct link" between SMUD's dry fuel storage options and its decommissioning efforts). Further, Rancho Seco staff believed that, regardless of the timing of DOE's performance in accepting SNF, placing SMUD's SNF into dry storage would ensure that

it could timely decommission the rest of Rancho Seco. DX 274, at SMUD 0027466-67.

438. The transfer of spent nuclear fuel to dry storage has not accelerated the ultimate decommissioning of the plant, as the site cannot be completely decommissioned until all the fuel is removed from the site, including the fuel from the ISFSI. Tr. at 617 (Redeker, noting that "[y]ou can't decommission totally until the fuel is gone, no matter where it is, even if it is in [the] ISFSI, the dry storage, you are still not finished with decommissioning until the fuel is gone"), 735-37 (Redeker) (same); 2624 (Burford) (agreeing total decommissioning is not possible until all the fuel is picked up by DOE).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although the Government agrees that SMUD cannot terminate its Part 71 and Part 72 licenses associated with the storage of SNF in SMUD's ISFSI until that SNF is removed from Rancho Seco, the removal of SMUD's SNF from its wet pool will facilitate the termination of SMUD's Part 50 operating license. Tr.2624:6-18 (Burford); Tr.735:12-14, Tr.736:3-9 (Redeker); DPFOF ¶¶ 314-315.

439. SMUD must continue to maintain its NRC license and pay all required NRC fees. *See* Tr. at 2624 (Burford) (recognizing that SMUD will have to maintain its licensing until all the fuel is gone).

RESPONSE: The Government objects to SMUD's proposed finding of fact, as the cited testimony of Mr. Burford does not support SMUD's proposed finding. Mr. Burford testified that SMUD will have to maintain its Part 72 license until its SNF is offsite. Tr.2624:16-18. Mr. Burford also testified, however, the SMUD could decommission its "nuclear power block"; or, in other words, its Part 50 operating license, even with the SNF onsite, if SMUD's SNF is placed into dry storage licensed under Part 72. Tr.2624:9-13 (Burford). Mr. Burford did not testify as to SMUD's obligation to pay fees to the NRC. Consequently, SMUD's proposed finding is unsupported by the testimony cited.

440. Because SMUD must maintain its licensing while spent nuclear fuel remains onsite, SMUD will have to maintain its licensing for at least an additional twelve to fourteen years due to the government's breach. *See* PFF ¶¶ 438-39.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD did not present any evidence that it would have to maintain its licensing "for at least an additional twelve to fourteen years", or that it would have to maintain its license "due to the government's breach." Further, Mr. Redeker admitted under cross-examination that SMUD could not eliminate its Part 50 license until it decommissioned its pool, and that there is a cost associated with continuing to carry a Part 50 license. Tr.735:12-14, Tr.736:3-9 (Redeker); DPFOF ¶ 315. In other words, SMUD was able to eliminate its Part 50 license as a result of placing its SNF into dry storage, and SMUD consequently realized a cost savings.

441. Because Rancho Seco was shut down prematurely and unexpectedly, SMUD did not have the funds set aside in 1989 for decommissioning. Tr. at 213-14 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

442. Although prompt decommissioning is strongly encouraged, SMUD was able to develop a plan with the NRC that allowed for a delayed decommissioning plan. Designations Appendix (Dckt. #310) at 2281, 2297-98 (Freeman) (noting "I was successful in persuading the NRC to allow us to postpone the decommissioning of the reactor and all the expense involved there until a later date").

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

443. SMUD's original decommissioning plan provided for the stabilization of the existing facilities at the Rancho Seco plant through 2008 to allow adequate decommissioning funds to accumulate. Tr. at 212 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

444. Active decommissioning was to be deferred until after 2008. Rancho Seco Proposed Decommissioning Plan at 1-1, 1-18 (PX 945); Tr. at 214, 285 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

445. The decommissioning plan called for a period of initial decommissioning, called Custodial-SAFSTOR, followed by a period of Hardened-SAFSTOR, during which the plant

decommissioning would be delayed and the plant would be left dormant. Rancho Seco Proposed Decommissioning Plan at 1-18 (PX 945); Tr. at 270 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

446. The final period, called Deferred-DECON, was to be implemented beginning in 2009, wherein the plant would be decommissioned, including dismantlement and decontamination. Rancho Seco Decommissioning Plan at 2-5 (PX 945).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

447. SMUD's initial decommissioning plan was not developed based on where the fuel was stored. Tr. at 216 (Shetler) ("The decommissioning plan itself was somewhat independent of where the fuel was stored. . . . Decommissioning could have been accomplished whether the fuel was in dry storage or wet storage, depending on the performance of the DOE.").

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, the removal of SMUD's SNF from its wet pool will facilitate the termination of SMUD's Part 50 operating license. Gov't Resp. to PFOF ¶¶ 339-340.

448. If the government had performed its obligations under the contract and removed all of SMUD's fuel by 2006, SMUD's fuel would have been removed by the time SMUD began decommissioning in 2008. Tr. at 216 (Shetler) ("The decommissioning plan envisioned that we would place the plant in some sort of safe storage mode, mothball mode. It could be done whether the fuel was in wet storage or not. And come back in 2008. If the DOE had performed under the original schedule, the fuel would have been gone by then.").

RESPONSE: The Government objects to SMUD's proposed finding of fact. As we demonstrated at trial, SMUD was not contractually obligated under the Standard Contract to accept all of SMUD's SNF by 2006. See DPFOF ¶¶ 113-137. Further, in response to DOE's Notice of Inquiry, SMUD submitted a letter on September 21, 1994 and explained to DOE its belief that SMUD began its dry storage project believing that DOE would perform the Standard Contract in a timely manner, and that DOE would accept SMUD's SNF not through 2008, but

through 2010:

> After a referendum of SMUD's electorate on June 6, 1989, Rancho Seco ceased operating on June 7, 1989. Since then, SMUD has been proceeding with activities to begin the decommissioning of Rancho Seco and to provide required assurances to the NRC that the District will have sufficient funds available to pay for the decommissioning. However, SMUD has not provided funds in its Decommissioning Trust for spent fuel storage after 2010. When funded in 1991, the Trust assumed that DOE would accept all of Rancho Seco's fuel starting in 1998, including the queue, by 2010.

DX 462, at SMUD 0019624 (emphasis added). In fact, in 1993, Mr. Shelter told Mr. Ferreira that, under DOE's then-current acceptance schedule, SMUD's SNF would be accepted over the course of 15 years. DX 425; see also DX481, at SMUD 0033398 (assuming 14-year acceptance queue); Tr.630:17-18 (Redeker) (assuming that SMUD's SNF would be accepted over a 14-year queue). Simply put, Mr. Shetler's litigation-inspired testimony that he believed that DOE would accept all of SMUD's SNF by 2006 under the Standard Contract is completely contradicted by his contemporaneous correspondence both to SMUD management and to DOE.

449. Storage of the fuel in the pool until removal by DOE would not have affected SMUD's decommissioning plans. Tr. at 216, 285 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Redeker admitted that, absent the placement of SMUD's SNF into dry storage, SMUD would have had to maintain its wet pool. DPFOF ¶ 315. Had SMUD maintained its wet pool, it would have been unable to eliminate its Part 50 operating license. Id. Consequently, SMUD's storage of SNF in its pool until removal by DOE would have had a significant impact upon its ability to decommission its facilities.

450. DOE's announcements that it would not begin acceptance under the Contract at any utility until at least 2010 impacted SMUD's plans to decommission the plant, as SMUD initially contemplated that its fuel would be removed prior to the start of decommissioning. Tr. at 315 (Shetler) (noting that "depending on . . . when the fuel would be taken, it would impact decommissioning").

RESPONSE: The Government objects to SMUD's proposed finding of fact. The testimony of Mr. Shetler cited by SMUD does not support SMUD's proposed finding that "DOE's announcements that it would not begin acceptance under the Standard Contract until at

least 2010 impacted SMUD's plans to decommission the plant." In fact, Mr. Redeker explained that the reason SMUD changed its decommissioning strategy was because "[l]ow level rad waste disposal became available to us at a very attractive cost, and allowed us to start doing some decommissioning early, without increasing the decommissioning cost estimate. So we could start earlier because the rad waste cost was down." Tr.687:14-19 (Redeker). Obviously, the decision to transition to incremental decommission was not driven by SMUD's beliefs about the timing of DOE's performance, but rather was driven solely by business considerations. Indeed, SMUD's proposed finding is in conflict with its Proposed Finding of Fact ¶ 454.

451. Because of DOE's announcements that it would not begin removal until at least 2010, SMUD was forced to consider the impact of the government's delay on its decommissioning plans. Tr. at 447 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. See Gov't Resp. to PFOF ¶ 450.

452. In March 1993, SMUD's environmental report for the decommissioning of Rancho Seco noted that DOE would not be able to begin disposing of fuel until 2010, that interim storage by DOE was currently not an option, and that dual-purpose dry storage was accordingly "the most prudent alternative available." PX 297 at 7; Tr. at 216 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD misstates its March 1993 environmental report for the decommissioning of Rancho Seco. In the report, SMUD did not state that DOE would not be able to begin disposing of fuel until 2010. Rather, SMUD stated that "Federal permanent repositories for disposal of radioactive spent fuel are not currently available and no such repository is expected to be in place until approximately 2010." PX 297, at SMUD 0018875. Further, SMUD plainly believed that DOE could begin accepting SNF at a monitored retrievable storage ("MRS") facility by 1998 as late as 1995. DX 481, at SMUD 0033398; Tr.383:17-24, Tr.388:19-21 (Shetler) ("I think we still had an expectation there was a possibility it could happen, yes."); Tr.705:2-5 (Redeker); DX 481, at SMUD 0033398; Tr.386:15-387:11 (Shetler); Tr.710:16-20 (Redeker). Finally, SMUD indicated in its March 1993 report that its decision to pursue dual-purpose dry storage was "[b]ased upon" the Saul Levy study. PX 297, at SMUD 0018875; DPFOF ¶¶ 71-75. Yet, Mr. Levy's recommendation to pursue dual-purpose dry storage was predicated upon his believe that it provided the best chance of timely performance under the Standard Contract. DX 159, at SMUD 085624 (stating that SMUD should pursue dry storage "primarily because it could lead to shipment to a DOE facility by 1998"). SMUD's proposed finding simply is unsupported.

453. SMUD subsequently transitioned to incremental decommissioning in late 1996,

early 1997. Tr. at 697 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

454. SMUD began incremental decommissioning because it had accumulated some decommissioning trust fund balances, it had knowledgeable staff onsite at the time, and it was able to dispose of low level radioactive waste at a facility in Utah relatively inexpensively. Tr. at 217-18 (Shetler); Tr. at 697 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

455. Under the revised incremental decommissioning plan, SMUD began a two year process of decommissioning particular segments of the plant as they became available. Tr. at 217 (Shetler), 697 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

456. SMUD engaged in incremental decommissioning of the plant while the fuel was still in the spent fuel pool. Thus, SMUD decommissioned around a partially islanded spent nuclear fuel pool. Tr. at 218 (Shetler); 697 (Redeker) (noting SMUD "decommissioned around the pool").

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, Mr. Redeker admitted under cross-examination that SMUD could not eliminate its Part 50 license until it decommissioned its pool, and that there is a cost associated with continuing to carry a Part 50 license. DPFOF ¶ 315. In other words, SMUD was able to eliminate its Part 50 license as a result of placing its SNF into dry storage, and SMUD consequently realized a cost savings that it has not considered in presenting its damages claim. DPFOF ¶ 316.

457. SMUD currently is in the process of decommissioning the pool. Tr. at 1031 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

458. If SMUD would have left the fuel in the pool and awaited DOE's performance, SMUD would have simply waited to decommission the pool. Tr. at 315 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the testimony of Mr. Shetler cited by SMUD does not support its proposed finding. Mr. Shetler simply stated that, "depending on timing of fuel, when the fuel would be taken, it would ultimately impact decommissioning." Tr.315:5-7 (Shetler). Mr. Shetler did not testify that, if SMUD would have left the fuel in the pool and awaited DOE's performance, SMUD would have simply waited to decommission the pool. Further, Mr. Redeker admitted under cross-examination that SMUD could not eliminate its Part 50 license until it decommissioned its pool, and that there is a cost associated with continuing to carry a Part 50 license. DPFOF ¶ 315. In other words, SMUD was able to eliminate its Part 50 license as a result of placing its SNF into dry storage, and SMUD consequently realized a cost savings that it has not considered in presenting its damages claim. DPFOF ¶ 316.

459. SMUD would have had to complete the same decommissioning activities no matter when SMUD decommissioned the pool. *See* Tr. at 617, 735-37 (Redeker); Designations Appendix (Dckt. #310) at 2333-34 (Freeman) (noting that with regard to a notation regarding reducing "decommissioning costs," "there is no thought given to what the words decommissioning costs meant and it certainly is not going to reduce the cost of tearing down a reactor or entombing it. The reactor and the other buildings in the decommissioning was a separate concern and item from the spent fuel and we—the staff uses this word decommissioning to cover both, and it can be kind of confusing.").

RESPONSE: Although the Government does not object to the fact that SMUD would have had to complete the same decommissioning activities no matter when SMUD decommissioned the pool, SMUD could not eliminate its Part 50 license until it decommissioned its pool, and there is a cost associated with continuing to carry a Part 50 license. DPFOF ¶ 315. In other words, SMUD was able to eliminate its Part 50 license as a result of placing its SNF into dry storage, and SMUD consequently realized a cost savings that it has not considered in presenting its damages claim. DPFOF ¶ 316.

## VIII. Additional Issues Raised By Government.

460. Greater Than Class C ("GTCC") waste is radioactive waste that contains

concentrations of certain radioactive nuclides, such as Cesium-137 or Carbon-14, that exceed the concentration limits established by the NRC for Class C waste. *See* 10 C.F.R. § 61.55.

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. Defendant further responds to the plaintiff's assertion of law by asserting that the Government agrees that SMUD has correctly paraphrased the portion of the Code of Federal Regulations cited.

461. GTCC waste from nuclear reactors comes primarily from metal components in the reactor that absorb neutrons during the reactor's operation and become irradiated, such as the inside of the core shroud that surrounds the nuclear core, control rods, and the support plates that hold the reactor core in place. 66 Fed. Reg. 51823, 51824 (Oct. 11, 2001).

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law. Defendant further responds to the plaintiff's assertion of law by asserting that the Government agrees that SMUD has correctly paraphrased a portion of the Federal Register cited. However, SMUD's reference to the Federal Register final rule is incomplete, as the notice indicates that GTCC low level radioactive waste also results from decommissioning activities, as well as other activities associated with the operation of the reactor, such as reactor start-up sources. 66 Fed. Reg. 51823, 51824 (Oct. 11, 2001).

462. SMUD has irradiated steel within Rancho Seco's reactor vessel that constitutes Greater Than Class C ("GTCC") waste. Tr. at 690-91 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

463. SMUD's irradiated steel is located near the reactor core and is part of the basket that held the fuel assemblies in place within the reactor vessel. *Id.*

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

464. Counsel for the government admitted at trial that SMUD only has a "relatively small amount" of GTCC and that this amount is "de minims" in the government's opinion. Tr. at 54.

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is not supported by any admissible evidence. Attorney argument is not evidence. Amgen v. Hoechst Marion Rousel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing distinction between attorney statements and evidence); see 1 Wigmore On Evidence, § 1(b), at p. 7 (Tillers rev. 1983). In fact, SMUD is in possession of 25,000 pounds of Greater Than Class C radioactive waste ("GTCC"). DPFOF ¶ 203.

465. Counsel for the government represented at trial that it "simply is irrelevant" how "GTCC will ultimately be treated and/or how it is regulated." Tr. at 2614.

RESPONSE: The Government objects to this proposed finding of fact because attorney argument is not evidence. Amgen v. Hoechst Marion Rousel, Inc., 314 F.3d 1313, 1323 (Fed. Cir. 2003) (recognizing distinction between attorney statements and evidence); see 1 Wigmore On Evidence, § 1(b), at p. 7 (Tillers rev. 1983). In response to plaintiff's counsel's questions to Mr. Burford, the Government's technical expert, concerning the regulations and methods for storing GTCC low level radioactive waste, the Government objected, and stated that how "GTCC will ultimately be treated and/or how it is regulated" was "irrelevant for purposes of Mr. Burford's ultimate opinions." Tr 2614:3-9. The Government did not offer Mr. Burford as an expert in the storage or disposition of GTCC low level radioactive waste. Tr.2611:11-16. SMUD has misstated the Government's objection to SMUD's questioning. Indeed, as discussed in the Government's post-trial brief and proposed findings of fact, because GTCC low level radioactive waste is not covered under the Standard Contract, many of the costs SMUD has incurred for the storage of SNF would have been incurred regardless of the Government's breach due to SMUD's possession of GTCC radioactive waste. See DPFOF ¶¶ 203-207; Def. Post-trial Br. at 80-85.

466. SMUD plans to remove the irradiated steel from the reactor in segments and place it all into one canister to be stored in the twenty-second horizontal storage module at the ISFSI. Tr. at 693 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

467. SMUD has not yet removed its GTCC from the reactor vessel. Tr. at 800 (Redeker). Thus, SMUD has not yet incurred the costs of removal of the GTCC, loading, or fabrication of the GTCC canister.

RESPONSE: The Government does not dispute that SMUD has not yet removed its GTCC from the reactor vessel. However, SMUD's damages claim includes its entire ISFSI pad, which includes the 22nd HSM. DPFOF ¶ 207. Because SMUD is responsible for the indefinite

storage of its GTCC low level radioactive waste, it cannot pass to the Government those costs that it would have incurred regardless of DOE's delay in standard SNF acceptance. DPFOF ¶ 207. Consequently, $3,146,520 for the design and construction of the ISFSI should be deducted from SMUD's damages claim. Id.

468. The GTCC waste container will "contain solid reactor-related waste only, consisting of activated reactor vessel internals and core instrumentation." Application to NRC for ISFSI (July 29, 2004) (DX 1365).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

469. SMUD obtained a license from the NRC allowing SMUD to store its GTCC at the dry fuel storage facility. The costs of obtaining this license were not included in SMUD's damages claim. *Id.*

RESPONSE: The Government does not object to SMUD's proposed finding of fact. Although SMUD's damages claim does not including the costs for licensing its GTCC low level radioactive waste canister, SMUD's damages claim does include its entire ISFSI pad, which includes the 22nd HSM in which it intends to store its GTCC radioactive waste. DPFOF ¶ 206. Because SMUD is responsible for the indefinite storage of GTCC, it cannot pass to the Government those costs that it would have incurred regardless of DOE's delay in standard SNF acceptance. DPFOF ¶ 207. Consequently, $3,146,520 for the design and construction of the ISFSI should be deducted from SMUD's damages claim. Id.

470. SMUD has included the cost of the twenty-second horizontal storage module ("HSM") in its damages claim. The total cost of this module is $95,000. Tr. at 2609-10 (Burford).

RESPONSE: The Government objects to this proposed finding of fact because it is not supported by the evidence in this case. Mr. Burford's specific testimony on this issue was that he "did not know the purchase price" of the twenty-second HSM, but that he "knew the contract price, which was $95,000" for the HSM associated with the future storage of GTCC. Tr. 2609-10 (Burford).

471. GTCC is not subject to the same stringent requirements of storage and security as spent nuclear fuel.

a. GTCC is not subject to any security requirements. Tr. at 693-94 (Redeker).

b. Because GTCC does not have an elevated temperature, it does not require cooling. Tr. at 694 (Redeker).

c. The only requirement for storage of GTCC is that it is properly shielded, due to its highly radioactive nature. Tr. at 694 (Redeker).

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law about which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). Indeed, at trial, the Government objected to Mr. Redeker's testimony concerning the NRC's requirements for the storage of GTCC low level radioactive waste, and the Court sustained the Government's objection. Tr. 694:8-12.

472. SMUD has several other options for the storage of GTCC besides placement in the ISFSI. Tr. at 695 (Redeker).

a. SMUD could have stored the GTCC in its radioactive waste storage building without a license from the NRC. Tr. at 694-95 (Redeker).

RESPONSE: The Government does not dispute SMUD's proposed finding of fact to the extent it states that SMUD has other options for the storage of its GTCC low level radioactive waste besides the ISFSI. However, SMUD's reliance upon Mr. Burford's testimony is unfounded, as Mr. Burford was not offered as an expert in the storage or disposition of GTCC low level radioactive waste. Tr.2611:11-17.

b. SMUD could have left the fuel in the reactor building under its current Part 50 license until it was removed for final disposal by DOE. Tr. at 2610-11 (Burford).

RESPONSE: See a above.

**B. Failed Fuel.**

473. DOE is obligated under the Contract to "accept title to all SNF and/or HLW, of domestic origin, generated by civilian nuclear power reactor(s), . . . provide subsequent transportation of such material to the DOE facility, and dispose of such material." Contract Art. IV.B.1 (emphasis added).

RESPONSE: The Government objects to this proposed finding because the allegation is a conclusion of law to which no response is required. To the extent it may be deemed an allegation of fact, the Government does not dispute the finding to the extent supported by the contract, which is the best evidence of its contents.

474. DOE is obligated to accept SNF and/or HLW that "meets the General Specifications for such fuel and waste as set forth in Appendix E," including Standard Fuel, Nonstandard Fuel, and Failed Fuel. *Id.* Art. VI.A.1.a., App. E.A.

RESPONSE: The Government objects to this proposed finding because the allegation is a conclusion of law to which no response is required. To the extent it may be deemed an allegation of fact, the Government does not dispute the finding to the extent supported by the contract, which is the best evidence of its contents.

475. Thus, "DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel." *Id.* Art. VI.A.2.b.

RESPONSE: The Government objects to this proposed finding because the allegation is a conclusion of law to which no response is required. To the extent it may be deemed an allegation of fact, the Government does not dispute the finding to the extent supported by the contract, which is the best evidence of its contents.

476. "[F]or any SNF which has been designated by Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days of receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services." Contract Art. VI.A.2.b.

RESPONSE: The Government objects to this proposed finding because the allegation is a conclusion of law to which no response is required. To the extent it may be deemed an allegation of fact, the Government does not dispute the finding to the extent supported by the contract, which is the best evidence of its contents.

477. Failed fuel placed in a canister for containment of that fuel, like that at Rancho

Seco, can be handled like any other SNF assembly, so that "technical feasibility" of disposing of SMUD's fuel would not have been an issue. *See* PFF ¶¶ 478-502.

RESPONSE: The Government objects to this proposed finding because the allegation is a conclusion of law to which no response is required. To the extent it may be deemed an allegation of fact, the Government objects. SMUD appears to rely upon the testimony of Mr. Stuart for this proposed finding of fact. Yet, Mr. Stuart's conclusion that SMUD's failed fuel could be handled like standard fuel was predicated upon his belief that SMUD's SNF did not require "special handling." Direct Testimony of Ivan Stuart, at ¶ 42; Tr.1395:24-1396:5 (Stuart) (agreeing that the definitions of failed fuel under the Standard Contract hinge upon the concept of special handling). However, Mr. Stuart conceded under cross-examination that the special handing requirement did not appear in the definition of F-2 failed fuel, but rather only referenced the definition for F-1 failed fuel. Tr.1398:21-23 (Stuart). Mr. Stuart agreed that he did not know what criteria DOE applies in making the determination with respect to the technical feasibility of accepting failed SNF. Tr.1459:11-14 (Stuart). Consequently, Mr. Stuart never offered an opinion as to whether DOE's acceptance of SMUD's failed SNF was "technically feasible;" rather, he simply concluded that SMUD's failed SNF would not require special handling. Simply put, Mr. Stuart's opinion does not bear upon DOE's acceptance of SMUD's F-2 failed SNF. Further, Mr. Zabransky explained at trial the reasons why SMUD's F-2 failed SNF may be accepted at a date later than SMUD's standard SNF and that DOE has not yet determined the technical feasibility of accepting SMUD's failed fuel. See DPFOF ¶¶ 216-220. Mr. Zabransky's testimony was unrebuted at trial.

478. The same tools that are used to pick up a spent fuel assembly can be used to pick up a failed assembly in a canister. I. Stuart Written Direct at 12 (PX 1001).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Stuart's testimony concerned his opinion that no "special handling" was required to accept SMUD's SNF. Direct Testimony of Ivan Stuart, at ¶ 42; Tr.1395:24-1396:5 (Stuart) (agreeing that the definitions of failed fuel under the Standard Contract hinge upon the concept of special handling). However, as explained at trial, "special handling" only applies to F-1 failed fuel. See DX 88, at SMUD 0020700; Tr.1665:21-1666:6, Tr.1667:17-1668:14 (Zabransky); Tr.1398:21-23 (Stuart). SMUD possesses F-2 failed fuel under the Standard Contract. DPFOF ¶ 212. Consequently, DOE will not accept SMUD's failed SNF on the same schedule as SMUD's standard SNF unless it is otherwise "technically feasible." Tr.1665:21-1666:6 (Zabransky). Mr. Zabransky explained that, unlike F-1 failed fuel, if a utility had F-2 failed fuel, DOE would have to ensure that it had the technical capabilities of disposing of it at DOE's facilities, that DOE's license would allow for such disposal, and that there were no health and safety issues associated with that particular F-2 failed fuel. Tr.1668:23-1669:4 (Zabransky). Before DOE could make a determination that particular F-2 failed fuel would be accepted, DOE would have to know the specific type or amount of leakage the fuel exhibits. Tr.1669:7-8 (Zabransky). In addition, DOE would have to have a licensed facility so that it would know what types of SNF DOE would be

permitted to accept. Tr.1669:8-10 (Zabransky). Consequently, whether the same tools would be used for SMUD's F-2 failed fuel and its standard SNF is irrelevant.

479. Failed fuel has been transported throughout the United States and the world. *Id.*

RESPONSE: The Government objects to SMUD's proposed finding of fact, as Mr. Stuart's testimony is irrelevant to any issue in this case. The fact that failed fuel has been transported "throughout the United States and the world" does not address the issue of whether it is "technically feasible" for DOE to accept SMUD's F-2 failed SNF on the same schedule as SMUD's standard SNF at a Federal disposal facility.

480. DOE has frequently shipped failed fuel, including severely damaged fuel far in excess of the level of damage SMUD has encountered. Tr. at 1447-1448 (Stuart); I. Stuart Written Direct at 12 (PX 1001) (stating that as part of DOE's Research Reactor Return program, he was involved with the shipment of spent fuel that was so severely damaged that it "in one case had to be vacuumed into the can," and that this fuel "was handled without special treatment in a standard licensed transport cask").

RESPONSE: The Government objects to SMUD's proposed finding of fact, as Mr. Stuart's testimony is irrelevant to any issue in this case. The fact that "DOE has frequently shipped failed fuel, including severely damaged fuel far in excess of the level of damage SMUD has encountered," does not address the issue of whether it is "technically feasible" for DOE to accept SMUD's F-2 failed SNF on the same schedule as SMUD's standard SNF at a Federal disposal facility.

481. Even severely damaged fuel is able to be handled without special treatment once it is placed in a standard licensed transport cask. I. Stuart Written Direct at 12 (PX 1001).

RESPONSE: The Government objects to this proposed finding because the allegation is a conclusion of law to which no response is required. Further, Mr. Stuart's testimony does not support SMUD's proposed finding of fact. As discussed above, the fact that SMUD's SNF may not require "special handling" is irrelevant to any issue in this case. See Gov't Resp. To PFOF ¶ 478.

482. Damaged and failed fuel have been moved safely under NRC guidelines on many occasions. "It was standard practice if there were any concern about the integrity of a particular

assembly of fuel to insert it in a 'look-a-like' can" that could then be placed in a cask and moved just like regular fuel. *Id.*

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, this proposed finding is irrelevant to any issue in this case. The issue in this case is whether it is "technically feasible" for DOE to accept SMUD's failed SNF on the same schedule as SMUD's standard SNF. The fact that damaged and failed fuel have been moved safely "on many occasions" simply has no relevance to any issue in this case.

483. If DOE had timely performed under the contract, it could and would have accepted SMUD's damaged fuel on the same schedule as the rest of SMUD's fuel. *Id.*

RESPONSE: This proposed finding is not a proposed finding of fact, but a conclusion of law about which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). Defendant further responds to the plaintiff's assertion of law by asserting that, contrary to SMUD's assertion, the Standard Contract does not require DOE to accept SMUD's F-2 failed fuel on the same schedule as SMUD's standard fuel. Instead, DOE is entitled to remove other than standard fuel (including failed fuel) from the "oldest fuel first" priority ranking for acceptance of SNF and, at its discretion, to place it at the end of the acceptance queue for all contract holders' SNF. DX 88, Art. VI.A.2(b).

Mr. Zabransky explained at trial the consequence if the disposal of a utility's SNF is determined to be not technically feasible. He stated that DOE would contact the contract holder as to what schedule change is needed to give DOE time to make disposal of the fuel technically feasible. Tr.1670:15-20 (Zabransky). Mr. Zabransky explained, "[i]n other words, if it wasn't technically possible, we'd have to take some more time and do what was necessary to make it technically safe, technically regulatory, to be approved to bring them in." Tr.1663:13-17 (Zabransky).

Finally, Mr. Stuart's entire opinion regarding failed fuel hinges upon his understanding that SMUD's SNF would not require "special handling." Direct Testimony of Ivan Stuart, at ¶ 42; Tr.1395:24-1396:5 (Stuart) (agreeing that his understanding of definitions of failed fuel under the Standard Contract hinge upon the concept of special handling). Yet, SMUD is in possession of F-2 failed fuel, which requires that the acceptance of the failed SNF be "technically feasible" before DOE can accept the SNF on the same schedule as standard SNF. Direct Testimony of Jerry Burford, at ¶27; Tr.796:9-799:21 (Redeker); Tr.1398:21-23 (Stuart); Tr.1665:21-1666:6, Tr.1667:17-1668:14, Tr.1668:23-1669:4 (Zabransky). Indeed, Mr. Stuart agreed that he did not know what criteria DOE applies in making the determination with respect to the technical feasibility of accepting failed SNF. Tr.1459:11-14 (Stuart). Consequently, Mr. Stuart's opinions concerning failed fuel are irrelevant to any issue in this case. See Gov't Resp. to PFOF ¶ 478.

484. In 1984, DOE represented to utilities that "[f]ailed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel." PX 989 (emphasis added).

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is not supported by the document cited. The document SMUD refers to, PX 989, appears to be a May 1994 memorandum from Daniel A. Dreyfus, the Director of the Office of Civilian Radioactive Waste Management, in which Mr. Dreyfus seeks the approval for publication of DOE's Notice of Inquiry concerning DOE's view that: (1) DOE did not have an obligation to begin the acceptance of SNF absent an operational repository or other Federal facility; (2) the need for interim, off-site storage prior to the operation of a Federal repository; and (3) options, through the Nuclear Waste Fund, to offset a portion of the burden to commercial utilities of onsite storage beyond 1998. PX 989, at HQR-029-0615. This May 1994 memorandum does not mention failed fuel, much less support SMUD's proposed finding of fact.

485. Lake Barrett stated his belief that "[w]hen all is said and done, my expectation, what I really think will happen is when it moves along it will move together—contemporary, it will all move contemporary, that's the failed fuel and standard fuel." Designations Appendix (Dckt. #310) at 392 (Barrett).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, the quote referenced by SMUD appears at page 395 of Mr. Barrett's testimony, not page 392. Second, the Government objected to the question presented to Mr. Barrett based upon a lack of foundation and speculation. Deposition of Mr. Barrett, at p.394-95 (May 15, 2002). Indeed, Mr. Barrett explained at his deposition that, "I don't know what the plans were [for the acceptance of failed fuel]. I don't know what the intentions were because that wasn't the – failed fuel was not standard fuel, and I don't know what the plans were." Counter-designation of Mr. Barrett, Tr.90:3-15 (May 14, 2002).

Mr. Zabransky, the contracting officer of the Standard Contract, explained at trial the consequence if disposal of a utility's SNF is determined not to be technically feasible. He stated that DOE would contact the contract holder as to what schedule change is needed to give DOE time to make the fuel technically feasible. Tr.1670:15-20 (Zabransky). Mr. Zabransky explained, "[i]n other words, if it wasn't technically possible, we'd have to take some more time and do what was necessary to make it technically safe, technically regulatory, to be approved to bring them in." Tr.1663:13-17 (Zabransky).

Similarly, Ronald Milner, the acting deputy director and chief operating officer for OCRWM, previously has explained the rationale for the potential delay in acceptance of failed

fuel:

> And I guess just to use a hypothetical example, if you have some very, very badly failed fuel, and out of all the assemblies that we will accept, ultimately, if that's the only one that requires that type of handling, do you stop everything and try to deal with that one assembly or do you put if further back in the queue.
>
> You know, for example, if the requirement was that you had to physically put this in a hot cell and deal with it, that's a different matter than unloading a standard fuel assembly.

Def. Counter-Designation R. Milner, Tr.52:19-25; Tr.53:15-19 (5/8/02). SMUD's proposed finding of fact simply is not supported by the evidence in this case.

486. At the time of contract formation, placing failed fuel in canisters, if needed, was not unusual, but rather part of the normal operating procedures of maintaining a spent fuel pool. Final Rule, 48 Fed. Reg. 16,590, 16,597 (Apr. 18, 1983) (DOE comments accompanying the publication of the standard contract in the Federal Register) ("the furnishing of such containers [for failed fuel] is part of the normal utility cost for the operation of its spent fuel storage basin").

RESPONSE: The Government objects to SMUD's proposed finding. SMUD has completely misconstrued the portion of the Federal Register to which it has cited. One commenter to the proposed standard contract requested that DOE provide the containers for failed fuel at no cost to the utilities. 48 Fed. Reg. 16,590, 16,597 (Apr. 18, 1983). DOE specifically rejected this request, noting that "the furnishing of a failed fuel container is part of the normal utility cost for the operation of its spent fuel storage basin." Id. The Federal Register notice does not reference "canisters" or that, "at the time of contract formation, placing failed fuel in canisters, if needed, was not unusual, but rather part of the normal operating procedures of maintaining a spent fuel pool." Consequently, SMUD's proposed finding of fact is not supported by the document cited.

487. SMUD engaged in a detailed visual inspection of its fuel to determine the condition of each fuel assembly. Tr. at 685, 791 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

488. The visual inspection consisted of videotaping the fuel while it was underwater in

the spent fuel pool with underwater radiation hardened cameras. Tr. at 1041 (Field).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

489. Videotapes of each of the fuel assemblies were made and reviewed by senior SMUD personnel to determine the classification of the fuel. *Id*.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

490. Based on the results of the visual inspection, SMUD has no fuel assemblies that require special handling. Memorandum from R. Colombo at 1 (July 16, 1996) (PX 470).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, SMUD has cited to only selected portions of PX 470. In Mr. Columbo's July 16, 1996 memorandum, he stated that:

> 5) A fuel assembly is classified F2 if it has a gross cladding failure such as localized loss or peeling of cladding material of a fuel pin that represents a credible potential loss of fuel material or catastrophic failure of a pin. Such breeches would be greater than 25% of the circumference of the pin and at least the length of a fuel pellet. Pinhole leaks and cracks would be excluded.
>
> The conservative inspection by the SNMM indicated 9 assemblies to be category F2. These 9 assemblies were described in PDQ 96-0047.
>
> . . . .
>
> The Category F2 assemblies were videotape copied and forwarded to EPRI for an independent verification. They should apply our "F2" procedure definition for their inspection and also apply the DOE contract definition for F2 assemblies to determine if they come to the same conclusion as I stated above.

PX 470, at 1-2. That same day, SMUD personnel completed a "Potential Deviation From Quality Form," in which it indicated that it had nine failed fuel assemblies classified as F-2. DX 605, at SMP 0840106-07. EPRI subsequently reviewed SMUD's videotapes of its failed fuel, and stated that, "we agree that the nine assemblies classified as F2 have been classified appropriately, and in some cases (e.g., 2G8, 16S) possibly with some degree of conservatism." DX 629, at SMP 1010002. In addition, ERPI concluded that SMUD failed to identify one additional assembly as F-2 failed fuel. Id.

Finally, as we demonstrated at trial, the "special handling" requirement contained in the Standard Contract expressly only applies to F-1 failed fuel, and does not apply to SMUD's F-2 failed fuel. DX 88, at SMUD 0020700; Tr.1398:21-23 (Stuart) (conceding that special handling requirement did not appear in definition of F-2 failed fuel, but only referenced F-1 failed fuel). Rather, pursuant to the Standard Contract, DOE must determine that it is"technically feasible" for DOE to accept SMUD's F-2 on the same schedule as SMUD's standard SNF. DX 88, at SMUD 0020670.

491. The visual inspection revealed that SMUD has "0 failed assemblies." *Id.* at 2.

RESPONSE: The Government objects to SMUD's proposed finding of fact. See Gov't Resp. to PFOF ¶490.

492. SMUD did determine that it had nine damaged fuel assemblies that it classified as F2, meaning it had gross cladding failure but no pinhole leaks or cracks requiring special handling. *Id*. at 1.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The issue of whether SMUD's failed fuel requires special handling is not the relevant issue in this case. Rather, the relevant issue in this case is whether acceptance of SMUD's F-2 failed fuel is technically feasible. In addition, SMUD's expert, Mr. Stuart, testified that he did not know what criteria DOE uses in determining the technical feasability of failed fuel. Further, Mr. Zabransky testified that DOE has not determined the technical feasibility of disposing of SMUD's failed fuel. See Gov't Resp. to PFOF ¶ 477.

493. SMUD had an independent company, Electric Power Research Institute ("EPRI"), review the videotapes and make an independent determination with regard to categorization of SMUD's fuel. *Id*. at 2; Tr. at 794-95 (Redeker).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

494. EPRI concurred that SMUD has no failed fuel assemblies that requires special handling. Letter from EPRI at 2 (Aug. 27, 1996) (PX 489).

RESPONSE: The Government objects to SMUD's proposed finding of fact, as the cited document does not support SMUD's proposed finding. The EPRI letter referenced by SMUD makes no conclusion as to whether SMUD's F-2 failed fuel would require special handling. Rather, EPRI concluded that, not only did SMUD properly conclude that it was in possession of nine F-2 failed fuel assemblies, but in fact SMUD failed to properly characterize one additional

assembly as F-2 failed fuel. DX 629, at SMP 1010002; Gov't Resp. to PFOF ¶ 490.

495. EPRI agreed that the nine assemblies were correctly categorized, if not somewhat "conservatively," and also suggested one additional assembly should be classified F2. *Id.* at 2.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

496. SMUD's expert, Ivan Stuart, reviewed the videotapes and determined that "[n]one of the fuel assemblies exhibit any features that would require special handling as noted in the Standard Contract." I. Stuart Written Direct at 12 (PX 1001); Tr. 1399, 1454-55 (Stuart).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Mr. Stuart's conclusion that SMUD's failed SNF would not require special handling is irrelevant to any issue in this case. Rather, what is relevant is whether it is "technically feasible" for DOE to accept SMUD's F-2 failed SNF on the same schedule as SMUD's standard SNF. Mr. Stuart agreed at trial that he did not know what criteria DOE applies in making the determination with respect to the technical feasibility of accepting failed SNF. Tr.1459:11-14 (Stuart). Consequently, this proposed finding of fact is irrelevant to any issue in this case.

497. SMUD's twenty-first canister was designed with "slight internal differences" to accommodate storage of SMUD's damaged fuel. Tr. at 505-06 (Redeker).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact to the extent that SMUD's twenty-first canister was designed with "slight internal differences," the Government objects to SMUD's use of the term "damaged fuel." It is undisputed that SMUD is in possession of F-2 failed fuel under the Standard Contract. DPFOF ¶ 212.

498. Rather than being open at the top and bottom for a fuel assembly to slide in and out, the canister contains individual sleeves for the assemblies "[s]o that should there be fuel that has loose fuel pellets that fall out, or broken and damaged fuel rods, . . . those pellets don't go all over the place inside the can and they are held inside." *Id.*

RESPONSE: The Government objects to SMUD's proposed finding of fact, as Mr. Stuart's testimony concerned his belief that SMUD's F-2 failed fuel did not require special handling. However, as demonstrated at trial, the issue of whether SMUD's failed fuel would require special handling is irrelevant to any issue in this case. Rather, the issue in this case is

whether it is "technically feasible" for DOE to accept SMUD's F-2 failed fuel on the same schedule as SMUD's standard fuel. Mr. Stuart conceded on cross-examination that the special handing requirement did not appear in the definition of F-2 failed fuel, but rather only referenced the definition for F-1 failed fuel. Tr.1398:21-23 (Stuart). In fact, Mr. Stuart agreed that he did not know what criteria DOE applies in making the determination with respect to the technical feasibility of accepting failed SNF. Tr.1459:11-14 (Stuart). Therefore, Mr. Stuart's views concerning whether SMUD's SNF will require special handling by DOE simply are irrelevant to any issue in this case.

499. The individual sleeves can be removed using a crane and any debris would remain in the can, but the outside of the canister is no different than any of the other twenty canisters. Tr. at 506 (Redeker).

RESPONSE: The Government object to SMUD's proposed finding of fact because it is irrelevant to any issue in the above-captioned case.

500. SMUD notified DOE of the condition of its fuel. Tr. at 689 (Redeker).

RESPONSE: The Government objects to SMUD's proposed finding of fact. In a letter dated January 22, 2001, Mr. Redeker wrote David Zabransky, the contracting officer for the Standard Contract, and stated that:

> Based upon a visual inspection of Rancho Seco spent fuel assemblies, we have determined that we have no failed fuel, as defined in Appendix E to the Standard Contract. We do have some 'damaged' fuel assemblies, which we defined as fuel assemblies with known or suspected cladding defects greater than hairline cracks or pinhole leaks. These fuel assemblies will be loaded in a canister specifically designated for damaged fuel. We will load these assemblies using our normal fuel handling equipment and no special handling equipment will be required.
> DX 1108.

Yet, Mr. Redeker conceded at trial that SMUD classified ten of its fuel assemblies as F-2 failed fuel, and his conclusion was confirmed by the expert testimony of Jerry Burford. DPFOF ¶ 212. Indeed, SMUD is currently storing failed SNF in its standard fuel canisters, in violation of its NRC Certificate of Compliance. DPFOF ¶ 224. Consequently, Mr. Redeker's January 22, 2001 letter to Mr. Zabransky failed to properly notify DOE of the condition of SMUD's SNF.

501. SMUD followed approved NRC procedures when transferring and loading its damaged fuel into the appropriate canister. I. Stuart Written Direct at 12 (PX 1001).

RESPONSE: This proposed finding is not a finding of fact, but a conclusion of law about which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). Defendant also disputes this proposed finding because Mr. Stuart incorrectly testified that SMUD followed approved NRC procedures when it loaded its failed SNF into "the appropriate canister." As Mr. Burford explained at trial, SMUD failed to properly characterize two of its fuel assemblies as F-2 failed fuel and, consequently, SMUD is currently storing two F-2 failed fuel assemblies in a standard canisters, in violation of SMUD's NRC Certificate. Direct Testimony of Jerry Burford, at ¶¶ 57-62.

502. SMUD loaded all of the fuel into the canisters using normal equipment and without any special handling. Tr. at 687 (Redeker); I. Stuart Written Direct at 12 (PX 1001); s*ee also* Tr. at 1455 (Stuart) (stating that it would have been "technically simple" for DOE to take the fuel just like SMUD's remaining spent nuclear fuel).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Whether SMUD's failed fuel would require special handling is irrelevant. Rather, the issue is whether DOE will deem it technically feasible to accept SMUD's F-2 failed fuel on the same schedule as SMUD's standard fuel. Mr. Stuart conceded on cross-examination that the special handing requirement did not appear in the definition of F-2 failed fuel, but only referenced the definition for F-1 failed fuel. Tr.1398:21-23 (Stuart). In fact, Mr. Stuart agreed that he did not know what criteria DOE would apply in making a determination with respect to the technical feasibility of accepting failed SNF. Tr.1459:11-14 (Stuart). Therefore, Mr. Stuart's views concerning whether SMUD's SNF will require special handling or whether it would be "technically simple" for DOE to accept SMUD's SNF are irrelevant.

**C. Canisters.**

503. SMUD has placed its spent nuclear fuel in dual-purpose canisters, which were designed and licensed for the temporary storage of spent nuclear fuel at SMUD's dry storage facility and for subsequent transport of the fuel on public highways. PX 596 (Part 71 license for transportation issued Sept. 10, 1998); PX 962 (Part 72 license for storage issued June 30, 2000).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The certificate of compliance, PX 596, provides the NRC's authority to use the NUHOMS MP 187 cask for the shipment of radioactive material in accordance with the provisions of 49 C.F.R. § 173.471. PX 596. The license for SMUD's ISFSI, PX 962, authorizes SMUD to receive, possess, store, and transfer SMUD's SNF into an ISFSI. PX 962. Neither document establishes that SMUD has placed its SNF into dual-purpose containers.

504. SMUD did not transfer its fuel from the wet pool into dual-purpose canisters until 2001 to 2002, Tr. at 665-68 (Redeker), three years after the government was obligated to begin performance under the Contract. Contract Art. II.

RESPONSE: This proposed finding is a contention of law, not a finding of fact. Also, the Government was not required to begin acceptance of SMUD's SNF until 2001. However, the Government does not dispute that SMUD actually began to transfer its SNF from its wet pool in April 2001 and was completed in August 2002. Tr.665:7-10, Tr.668:20-23 (Redeker).

505. DOE is obligated under the Contract to "arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility." Contract Art. IV.B.2 (PX 44).

RESPONSE: This proposed finding is a contention of law, not a finding of fact. However, SMUD has accurately quoted a portion of the Standard Contract.

506. DOE is obligated under the Contract to provide transportation casks that are "suitable for use at the Purchaser's site." Contract Art. IV.B.2 (PX 44).

RESPONSE: This proposed finding is a contention of law, not a finding of fact. However, SMUD has accurately quoted a portion of the Standard Contract.

507. DOE is obligated under the Contract to accept "SNF and/or HLW which meets the General Specifications for such fuel and waste as set forth in Appendix E," which includes standard, nonstandard, and failed fuel. *Id.* at Art. VI(A)(1)(a), App. E (PX 44).

RESPONSE: This proposed finding is a contention of law, not a finding of fact. However, SMUD has accurately quoted a portion of the Standard Contract.

508. The Standard Contract explicitly states that "DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel." *Id.* at Art. VI(A)(2)(b).

RESPONSE: This proposed finding is a contention of law, not a finding of fact. Although SMUD has accurately quoted a portion of the Standard Contract, the remainder of that section states:

> [H]owever, for any SNF which has been designated by the Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the <u>currently agreed to schedule and any schedule adjustment for such services.</u>

PX 44, at SMUD00119690, Art. VI(A)(2)(b) (emphasis added).

509. DOE has an obligation to accept SMUD's spent nuclear fuel under the Contract, regardless of how it is currently stored. Tr. at 1943-44 (Zabransky) (agreeing that the fuel is still covered by the contract, regardless of how it is currently stored).

<u>RESPONSE</u>: This proposed finding is a contention of law, not a finding of fact. Moreover, the Government objects to SMUD's proposed finding of fact, which mischaracterizes Mr. Zabransky's testimony. Mr. Zabransky testified:

> BY MR. CAYNE:
>
> Q. Do you see under number six, do you see that it says, "The current DOE position is only bare SNF [is] covered by the contract." What does that mean?
>
> A. I think that means that same thing that I wrote to Mr. Redeker in my letter, saying that canistered spent fuel and dual-purpose casks were not covered by the contract.
>
> Q. So, does that mean, as we discussed yesterday, none of the fuel in the spent fuel facilities, of all the utilities on the demonstrative that we looked at yesterday, dual-purpose dry storage facilities in the U.S., none of that fuel is covered by the contract?
>
> A. No, it doesn't mean that. All the fuel is covered by the contract, but not to be delivered in those containers.
>
> Q. Say that again?
>
> A. All -

Q. I just didn't hear you, sir.

A. All the fuel is covered by the contracts, but not for delivery within those containers.

Q. But this document here says the current DOE position is only bare SNF is covered by the contract, correct?

A. I think that's the same thing, sir. Take the fuel out of those containers, DOE will pick up the fuel.

Tr.1943:12-1944:14 (Zabransky). Thus, Mr. Zabransky did not state that DOE would accept SNF regardless of how it was stored. Rather, he stated that the standard contract is based upon the acceptance of bare fuel, not fuel that is placed in a dual-purpose container and that acceptance was contingent upon the SNF being removed from those containers.

510. The NWPA contemplated that some utilities may develop dry storage and required DOE to establish, by January 1984, a demonstration program with utilities "for the *dry storage* of spent nuclear fuel . . . with the objective of establishing one or more technologies that [the NRC] may, by rule, approve for use at the sites of civilian nuclear power reactors." 42 U.S.C.§ 10198(a) (emphasis added).

RESPONSE: This proposed finding is a contention of law, not a finding of fact. However, SMUD has accurately quoted portion of the Nuclear Waste Policy Act.

511. DOE has been on notice that SMUD and other utilities were pursuing the development of dry storage since the early 1990s. *See* PFF ¶¶ 99, 100, 285, 296, 523-550, 573.

RESPONSE: The Government objects to SMUD's proposed finding of fact, which merely cites other proposed findings. See Defendant's Resp. to PFF ¶¶ 99, 100, 286, 296, 523-550, 573. To the degree that DOE's being "on notice" has legal significance, this is not a proposed finding of fact, but a contention of law.

512. When SMUD was weighing its options regarding long term storage of its fuel, SMUD recognized risk and uncertainty regarding how DOE would interpret the Contract with regard to canistered fuel in a dry storage facility. Tr. at 173-74 (Shetler).

<u>RESPONSE</u>: The Government does not object to SMUD's proposed finding of fact. However, on direct examination, Mr. Shetler specifically stated:

> Q. You said that a pool would provide the most assurance that the Department would take it, take the fuel in that form. What do you mean by that?
>
> A. It was clear at that time that at least bare fuel is what would be considered a standard fuel form and under the contract would be accepted by DOE. What was less clear at that time is whether a canistered system would be considered a form by which DOE would take the fuel. So that was an open question that was part of what we would have to answer in looking at this option.

Tr.173:15-25 (Shetler). Therefore, SMUD accepted the risk that putting its SNF in dual-purpose canisters might make it unacceptable under the Standard Contract.

513. In order to alleviate the perceived risks with regard to acceptance of canistered fuel, SMUD "reach[ed] out to DOE to try to get some kind of a determination as to how DOE would treat [] dry canister fuel in terms of receipt schedule and receipt." Tr. at 218 (Shetler); *accord* Tr. at 777-778 (Redeker).

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact. Although SMUD sought to gain a commitment from DOE to accept SMUD's canistered SNF, the Government disputes the suggestion that DOE provided such a commitment. Moreover, Mr. Redeker admitted that SMUD knew that it would have to negotiate a contract modification in order to have its canistered fuel accepted by DOE. Tr.780:12-23 (Redeker).

514. DOE assured SMUD that, as long as the system was NRC certified, DOE would accept such canisters for transportation at the time it developed a facility. Tr. at 434, 438 (Shetler).

<u>RESPONSE</u>: The Government objects to SMUD's proposed finding of fact. Mr. Shetler testified that it was his "understanding" that once SMUD had an NRC licensed transportation system, DOE "would be willing to initiate whatever actions were appropriate to classify that as acceptable." Tr.438:1-7 (Shetler). Thus, Mr. Shetler did not state that DOE had assured SMUD

it would accept SMUD's canisters as long as they were licensed by the NRC for transportation, but that DOE would address that issue at the appropriate time. Also, Mr. Shetler admitted that, "the open issue was whether [DOE] would treat [SMUD's SNF] as a standard or nonstandard fuel form." Tr.434:20-21 (Shetler). Therefore, Mr. Shetler acknowledged that DOE had cautioned him about the risk that SMUD took when it placed its SNF in dual-purpose canisters.

515. Following a meeting with acting OCRWM Director Lake Barrett, Jim Shetler memorialized his understanding of these assurances in a letter to Mr. Barrett:

> I understand the Secretary may not be in a position to ensure future acceptance of canistered fuel as "standard" fuel. However, should canistered fuel *not* be accepted as "standard" fuel, our position in the 1991 Acceptance Priority Ranking could be seriously impacted. Conversely, as you indicated, should canistered fuel be accepted as "standard" fuel, DOE would accept SMUD's spent fuel in licensed transportable canisters in accordance with the Acceptance Priority Ranking. However, *either way it is my understanding that DOE would be required to accept the fuel,* transport it to its disposal facility, and repackage as required for disposal as long the canistered system was NRC licensed for storage and transportation.

Letter from J. Shetler to L. Barrett at 1 (June 22, 1983) (PX 311) (emphasis added).

RESPONSE: The Government does not dispute that SMUD has accurately quoted from part of a letter written by Mr. Shetler. However, the Government dispute's SMUD's characterization of DOE's position. As discussed above, DOE informed SMUD that it would address acceptance issues at the appropriate time. Thus, whether SMUD's SNF was a standard or nonstandard fuel form was a risk that SMUD took when it placed its SNF in dual-purpose canisters. See Gov't Resp. to PFOF ¶¶ 513-514.

516. In a response letter from Lake Barrett to Jim Shetler in September 1993, Mr. Barrett assured SMUD that the Department would be "willing to initiate the appropriate actions to include such a system as an acceptable waste form under the terms of the Standard Contract." PX 320.

RESPONSE: Although the Government does not dispute that SMUD has quoted a portion of the document accurately, Mr. Barrett's "assurance" was that DOE would address acceptance issues at the appropriate time. PX 320. Thus, whether SMUD's SNF was a standard or nonstandard fuel form was a risk that SMUD took when it placed its SNF in dual-purpose canisters. See Gov't Resp. to PFOF ¶¶ 513-514.

517. Mr. Barrett also shared such assurances with Congressman Dicks. Letter from L. Barrett to N. Dicks (Oct. 4, 1993) (PX 327).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Again, Mr. Barrett's "assurance" was that DOE would address acceptance issues at the appropriate time. PX 327. Thus, whether SMUD's SNF was a standard or nonstandard fuel form was a risk that SMUD took when it placed its SNF in dual-purpose canisters. See Gov't Resp. to PFOF ¶¶ 513-514.

518. Mr. Shetler confirmed such assurances at trial, stating "[b]ased on my discussions with Mr. Barrett, [which] I had documented here, it was my understanding that DOE, as long as the fuel was licensed by NRC, would be willing to take the fuel. The open question was whether it would be standard fuel or not." Tr. at 220; *see also* 220 (Shetler) (noting that "at least we had, as I understand it, an assurance that they would be taking our fuel either way"), 353 (noting with regard to the risk of new technology, "part of that was gaining some assurances from DOE that they would receive the fuel in the canisters, which we felt we did get"), 429-30, 434-35 (Shetler) (noting the issue was "when would they accept it," not whether they would accept it).

RESPONSE: The Government objects to SMUD's proposed finding of fact, which repeats several of SMUD's previous proposed findings. See Gov't Resp. to PFOF ¶¶ 514-517. Mr. Shetler testified that it was his "understanding" that once SMUD had an NRC licensed transportation system, DOE "would be willing to initiate whatever actions were appropriate to classify that as acceptable." Tr.438:1-7 (Shetler). Thus, Mr. Shetler did not state that DOE had assured SMUD it would accept their canisters as long as they were licensed by the NRC for transportation, but that DOE would address that issue at the appropriate time. Also, Mr. Shetler admitted that, "the open issue was whether [DOE] would treat [SMUD's SNF] as a standard or nonstandard fuel form." Tr.434:20-21 (Shetler). Therefore, Mr. Shetler acknowledged that DOE had cautioned him about the risk that SMUD took when it placed its SNF in dual-purpose canisters. See Gov't Resp. to PFOF ¶¶ 513-514.

519. Given DOE's assurances, SMUD believed the risk with regard to acceptance was a matter of when DOE would pickup the fuel in the queue rather than whether DOE would accept the canistered fuel. Tr. at 219-21 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The evidence shows that DOE did not provide "assurances" but that DOE informed SMUD that it would address acceptance issues relating to canistered SNF at the appropriate time. See Gov't Resp. to PFOF ¶¶ 513-519. Also, Mr. Shetler admitted that whether DOE would treat SMUD's SNF as a standard or nonstandard fuel form was an "open question." Tr.421:14-20 (Shetler). Therefore, Mr. Shetler acknowledged that DOE had cautioned him about the risk that SMUD took when it placed its SNF in dual-purpose canisters.

520. DOE maintained throughout the 1990s that as long as the NRC licensed SMUD's system, DOE would accept the fuel. *See* PX 320, 327, 678.

RESPONSE: The Government objects to SMUD's proposed finding of fact. See Gov't Resp. to PFOF ¶¶ 516-517. Moreover, the evidence shows that DOE maintained the position that it would address acceptance issues at the appropriate time. Indeed, in the April 6, 2001 letter to Mr. Redeker, DOE stated:

> As requested in your letter, and in accordance with the commitment made in our previous correspondence, the Department will initiate actions to include storage systems certified by the [NRC] for both transportation and storage (dual-purpose systems) as acceptable waste forms under the disposal contract with SMUD. We are in the process of identifying the extent of and methods for effecting such contract modifications, including the development of specifications that may be placed on "Standard" dual-purpose systems, where "Standard" refers to canistered spent nuclear fuel that could be accepted as if it were standard spent nuclear fuel under the contract.

PX 678. Thus, whether SMUD's SNF would be considered a standard or nonstandard fuel form pursuant to the Standard Contract was a risk that SMUD took when it placed its SNF in dual-purpose canisters.

521. DOE's current position marks a change in its position throughout the 1990s that DOE would accept canistered fuel, and the only issue would be the classification of the fuel under the Contract. *Compare* PX 320, 327, 678 *with* DX 1298.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The Government's position has not changed. DOE has always stated that it would address acceptance issues at the appropriate time. In the letter dated September 25, 2003, DOE unequivocally informed SMUD as follows:

> As we have discussed previously, it remains the Department's position that multi-assembly storage and transport systems for spent fuel are not covered by the Standard Contract between the Department and Sacramento Municipal Utility District (SMUD). As a result, absent a contract modification, spent fuel stored in such a canister is not presently an acceptable waste form. As your letter states, the Department has indicated in the past its willingness to initiate the actions to include such systems under the terms of the Standard Contract. The Department believes that the best approach is to pursue an overall modification of the Standard Contract, which would include several issues, including acceptance of multi-assembly systems.

DX 1298. Thus, whether SMUD's SNF would be considered a standard or nonstandard fuel form was a risk that SMUD took when it placed its SNF in dual-purpose canisters. See Gov't Resp. to PFOF ¶¶ 513-517, 520.

522. DOE endorsed the use of dual-purpose canisters by commercial utilities for temporary storage of spent nuclear fuel at reactor sites during the period of DOE's delay. Tr. at 1431-32 (Levy); *see also* PFF ¶¶ 384, 527-31.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The cited testimony is by SMUD's expert, Ivan Stuart (not Mr. Levy), whose opinion cannot bind the Government. Furthermore, Mr. Stuart testified that the effect of DOE's program to develop a multi-purpose canister, which was cancelled, was to induce the industry to develop a canister-based system. Tr.1431:8-1432:14 (Stuart). However, in response to the Court's question as to whether DOE actually endorsed dual-purpose systems, Mr. Stuart testified that his conclusion was based upon "the handwriting . . . on the wall." Tr.1432:2-3 (Stuart). Thus, Mr. Stuart could not point to anything substantive to support this claim. The Government also objects to the degree that SMUD repeats other proposed findings. See Gov't Resp. to PFOF ¶¶ 384, 527-31.

523. In the early 1990s, DOE conducted feasibility studies on the concept of a multi-purpose canister ("MPC") system that would include on-site storage, eventual transportation, and eventual disposal. Multi-Purpose Canister System Evaluation, A Systems Engineering Approach (Sept. 1994) (PX 368); E. Supko Written Direct at 50-51 (PX 1002).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, it is not relevant to any issue that is before the Court.

524. DOE released a request for proposals for the design and certification of an MPC

system in 1994. *See* 1994 Annual Report to Congress at 37 (May 1995) (PX 409). A contract was subsequently awarded to Westinghouse Electric Corporation.

RESPONSE: The Government objects to SMUD's proposed finding of fact because the evidence cited does not support the fact asserted. The 1994 report from DOE's Office of Civilian Radioactive Waste states that, on June 3, 1994, DOE had released a request for proposals and it was anticipated that contracts would be awarded in 1995. PX 409, at FOI0021315. The 1994 report does not indicate whether or to whom a contract was awarded.

525. The MPC program was later terminated due to funding restraints. 1995 Annual Report to Congress at 22 (May 1996) (PX 461).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, this fact is irrelevant to any issue that is before the Court. DOE's attempt to develop the MPC program has no bearing upon whether the Standard Contract obligates DOE to accept SMUD's SNF contained in multi-element sealed canisters ("MESC"). Indeed, the dry storage system SMUD ultimately developed was a dual-purpose system, which is licensed for storage and transportation, rather that an MPC, which would be utilized for storage, transportation, and disposal. Tr.1636:9-13 (Zabransky); Tr.2059:6-9, 2199:15-23 (Pollog)

526. Congress stopped funding the MPC program because it believed that, given the proliferation of commercial systems, "the industry had enough technology to do whatever DOE needed to do." Tr. at 1432-34 (Stuart).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The cited testimony by SMUD's expert, Ivan Stuart, regarding DOE's Multi-Purpose Canister ("MPC") program, represents Mr. Stuart's opinion regarding DOE's reasons for beginning, and then cancelling, the MPC program. Mr. Stuart's testimony regarding the reason that Congress cancelled the MPC program is purely speculative. Further, Mr. Stuart does not cite any evidence to support his claim that the cancellation of the MPC program was an endorsement of any utility's efforts to develop dual-purpose canisters. Indeed, there is none. See Gov't Resp. to PFOF ¶ 522.

527. In a letter to the entire utility community, Mr. Barrett made it clear that DOE "continue[d] to support the [MPC] concept and believe[d] that it is in the nation's best interest to encourage the utilization of canisters for at-reactor storage." PX 597 at 2.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The full

passage from that document actually states:

> Additionally, although the OCRWM no longer funds the development of multi-purpose canister designs, we continue to support the concept and believe that it is in the nation's best interest to encourage the utilization of canisters for at-reactor storage that can subsequently be utilized by the federal waste management system for transportation, storage, and disposal.

PX 597 at 2. (emphasis added) Thus, DOE was referring to canisters which could be used for disposal at the repository, unlike the dual-purpose canisters currently being used by SMUD which are only licensed for storage and transportation.

528. DOE has stated that the commercial systems being developed "have the improved efficiencies the Department desires for its waste acceptance and transportation needs." PX 669 at 7.

RESPONSE: The Government does not dispute SMUD's proposed finding of fact.

529. DOE supported the development of a transportable storage system through the cooperative agreement it signed with SMUD in 1994. Notice of Assistance Award (PX 381).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The cooperative agreement between DOE and SMUD was part of a demonstration project approved by Congress with the primary objective of developing a dry transfer system. See DPFOF ¶¶ 170, 172, 176. Development of a transportable storage system was a secondary goal for which DOE could pay no more than $2 million. See DPFOF ¶ 178.

530. The joint objectives of the cooperative agreement included sharing in the licensing process, demonstrating an NRC-licensed store-now/transport later system (i.e., a dual-purpose storage and transport system), and gaining insight into the regulatory process for licensing a storage facility. (PX 381); Tr. at 560-62 (Redeker) (noting DOE was "looking forward to having to license systems for transportation relative to the repository, . . . [a]nd they needed to get [] benefit from our licensing experience working with the Nuclear Regulatory Commission because they didn't have a lot of experience in licensing with and interfacing with

the NRC.").

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although one of the secondary objectives of the cooperative agreement was to share in the licensing experience, the primary objective, as explicitly stated in the cooperative agreement, was to facilitate the demonstration of a dry transfer system. PX 381, at DER00110055. Additionally, Mr. Redeker is a SMUD employee with no authority to speak for DOE, and his statement regarding DOE's need to gain licensing experience from SMUD should be considered in light of SMUD's poor licensing performance. See DPFOF ¶¶ 241-43.

531. DOE recognized it would benefit from SMUD's development of a dual-purpose system. PX 381 at 3-4 (stating objectives of cooperative agreement); Tr. at 465 (Shetler) (DOE "acknowledged that there were benefits to them and the industry from investigating a dual-purpose system. It was along the lines of some of the concepts they had with the multi-purpose canisters."); Tr. at 465-66 (Shetler) (noting with DOE's "interest in multi-purpose canisters at that time, they thought the design, procurement, licensing process for that would have a benefit for them as well); Tr. at 2320, 2324-25 (Williams) (agreeing that DOE believed that the transportable storage system aspect of the cooperative agreement would potentially provide important contributions to DOE's MPC initiative).

RESPONSE: The Government objects to SMUD's proposed finding of fact. DOE was required by Congress to work with SMUD on a demonstration program that had the primary goal of developing a dry transfer system. See DPFOF ¶¶ 166 - 172. Mr. Williams testified that, while the demonstration program could "potentially" provide benefits to DOE's MPC program, it was of greater benefit to the utility industry, especially since an MPC was "quite a bit different" than was the dual-purpose system being developed by SMUD. Tr.2322:19-2323:1, 2324:18-2325:1 (Williams).

532. DOE was actively involved in the development of SMUD's dual-purpose system. Tr. at 183-84 (Shetler) (noting that SMUD had several cooperative agreement meetings with DOE wherein they sent many attendees); Tr. at 980 (Field) (noting DOE had an opportunity to review the bid specification and comment on it); PX 246 (example cooperative meeting

minutes); Tr. 562-63 (Redeker) (noting SMUD submitted quarterly financial reports to DOE, including a detailed breakdown of the costs of the project); PX 514 (example quarterly report). *See* PFF ¶¶ 129, 296, 573.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The terms of the cooperative agreement required that a technical management committee composed of SMUD and DOE officials meet on a regular basis and that SMUD provide DOE with quarterly financial reports, both of which were reasonable since DOE was required to pay SMUD up to $2 million for the cost of developing a dual-purpose cask. PX 381, at DER 0110137-41; PX 318, at DER 0110059. See also DPFOF ¶ 178. Moreover, the Government disputes that DOE was "actively involved" in the development of SMUD's dual-purpose system. David Langstaff, a DOE employee who worked with SMUD on the cooperative agreement, testified that SMUD chose to ignore his suggestions which resulted in delays and other costly problems. See DPFOF ¶¶ 241-43. See also Gov't Resp. to PFOF ¶¶ 129, 296, 573.

533. In May 1997, DOE sent a letter to SMUD regarding the Contract's requirement that the description of spent nuclear fuel be subject to verification by DOE prior to shipment. PX 540; Contract Art. VI.B.2. This letter stated that:

> The Department of Energy (DOE) is aware that contract holders are loading or are planning to load spent fuel into canisters and/or casks. Several of these contract holders have requested guidance regarding DOE's plans for verification. The purpose of this letter is to provide additional information and to clarify the verification requirement under this article in the Standard Contract.

PX 540 at 1.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

534. DOE adopted a Verification Plan that enumerated DOE's requirements for verification and identification of the fuel under the Contract. *Id.* This Verification Plan does not "require the actual witnessing of canister loadings by DOE personnel or its contractors to accomplish verification." Rather, DOE stated its belief that "it is appropriate to rely upon the Purchasers' records to adequately describe the spent fuel which will be accepted by DOE." *Id.*

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

535. Such verification is necessary because, as DOE made clear in its letter to SMUD in 1997, DOE has "no intent to reopen the canisters prior to DOE's acceptance." Verification Plan at 1 (Mar. 1997) (PX 521).

RESPONSE: The Government objects to SMUD's proposed finding of fact. Although the passage is quoted accurately, SMUD implies that SNF in dual-purpose canisters is currently acceptable by DOE. However, the document states:

> This plan presents the verification process the Department intends to use for purposes of the Standard Contract, and identifies areas where the requirements outlined in the Standard Contract must be slightly modified to allow for the implementation of the verification process described in this plan. These modifications may require amendment of the Standard Contract. These modifications will allow the Purchasers to use various types of sealed multi-element canisters within the framework of the verification process.

PX 521, at 1. Thus, the current plans to deal with canistered SNF assume there will be modifications to the Standard Contract to deal with that issue.

536. SMUD notified DOE of its intent to load its fuel into the dual-purpose system in January 2001 and invited DOE to observe the loading activities and review SMUD's fuel inspection records prior to the transfer. PX 670 at 1.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

537. In response to SMUD's notice that it was planning to load its fuel into the canisters, DOE stated "in accordance with the commitment made in our previous correspondence, the Department will initiate actions to include storage systems certified by the Commission for both transportation and storage (dual-purpose systems) as acceptable waste forms under the disposal contract with SMUD." PX 678 at 1.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The letter from DOE goes on to state:

> We are in the process of identifying the extent of and methods for effecting such contract modifications, including the development of specifications that may be placed on "Standard" dual-purpose systems, where "Standard" refers to canistered spent nuclear fuel that could be accepted as if it were standard spent nuclear fuel under the contract.
>
> . . . .
>
> It is our current expectation that after receipt at the repository, dual-purpose systems will be opened and the spent nuclear fuel removed for placement in a waste disposal package unless the internal canister can be demonstrated, and Nuclear Regulatory Commission licensed, as part of the final waste disposal package assembly. Therefore, in order for a dual-purpose system to be classified as "Standard," we anticipate that, at a minimum, it must provide that the spent nuclear fuel stored allows for its unloading and handling like an intact fuel assembly. Dual-purpose systems that can not be unloaded and handled in the same manner as an intact assembly will be classified as "Non-standard" under the terms of the contract.

PX 678. Therefore, DOE stated that it would deal with acceptance of dual-purpose canisters at the appropriate time and whether SMUD's SNF became a nonstandard fuel form was a risk that SMUD took when it placed its SNF in dual-purpose canisters.

538. DOE assured utilities and the public that DOE would accept such canisters for transportation at the time it developed a facility. *See* PFF ¶¶ 513-520.

RESPONSE: The Government objects to SMUD's proposed finding of fact, which merely cites other proposed findings. See Gov't Resp. to PFOF ¶¶ 513-520.

539. In DOE's transportation plan, accompanying a January 2001 letter from then Director of OCRWM Ivan Itkin, DOE recognized that the dual-purpose systems developed by the private industry have "improved efficiencies the Department desires for its waste acceptance and transportation needs." PX 669.

RESPONSE: The Government objects to SMUD's proposed finding of fact, which is misleading. The document referenced is DOE's report to the House Committee on Appropriations which directed DOE to issue a report entitled, "Plan for Transportation Cask Fabrication and the Deployment of Waste Acceptance Capabilities." PX 669, at 1. That plan

provides DOE's strategy for the timely fabrication of transportation casks and deployment of waste acceptance capabilities. Id. Thus, the plan did not describe DOE's thinking with regard to the acceptance of commercial SNF in dual-purpose canisters. Rather, the report dealt with issues relating to the capability of fabricating a sufficient number of transportation casks when DOE begins acceptance.

540. DOE has been planning to and anticipates accepting and transporting spent fuel in canistered form from the utility sites. *See* PFF ¶¶ 541-550.

RESPONSE: The Government objects to SMUD's proposed finding of fact, which merely cites other proposed findings for support. See Gov't Resp. to PFOF ¶¶ 541-550.

541. DOE stated in its December 2000 Plan for Transportation submitted to Congress that "[m]any of the dual-purpose cask systems currently being licensed or manufactured and deployed would potentially be used for the transport of the spent nuclear fuel to a Federal repository under the Department's transportation plan." PX 665; *see also* Tr. at 2188-89 (Kouts).

RESPONSE: The Government objects to SMUD's proposed finding of fact, which is misleading. The passage actually states that "[m]any of the dual-purpose cask systems currently being licensed or manufactured and deployed would potentially be used for the transport of the spent nuclear fuel to a Federal repository under the Department's transportation plan as contained in the RFP." PX 665, at 13. (emphasis added). That "RFP" refers to the market-based approach that DOE adopted for acquiring transportation services based upon the determination "that current industry performance has shown that manufacturing capacity is available to meet present and future cask fabrication needs and that private industry can ensure the timely provision of the necessary services and equipment required to fulfill [DOE's] waste acceptance mission objectives at competitive fixed prices and fixed rates." PX 665, at 1. Thus, the document addresses DOE's capability for acquiring the necessary equipment and services for transportation and waste acceptance capabilities and is not an endorsement of any utility's dual-purpose canister nor does it suggest that DOE plans to accept SMUD's SNF in its dual-purpose canister. Similarly, Mr. Kouts testified that the report contemplates that, when DOE begins accepting SNF, some dual-purpose canisters could "potentially" be used to transport SNF to the repository. Tr.2189:13-20 (Kouts). Indeed, Mr. Kouts specifically stated that DOE was not obligated to accept canistered fuel pursuant to the standard contract. Tr.2210:22-2211:12 (Kouts).

542. In this Plan, DOE presented its strategy for transportation of spent nuclear fuel to

the repository, which included the acceptance and use of dual-purpose canisters in order to "make maximum use of private industry capabilities." PX 665 at 1.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The document does not directly address DOE's transportation plan, but is an assessment of capabilities. Thus, the desire to "make maximum use of private industry capabilities" is not an endorsement of any utility's dual-purpose canister nor does it suggest that DOE plans to accept SMUD's SNF in its dual-purpose canister. See Gov't Resp. to PFOF ¶ 541.

543. OCRWM's Civilian Radioactive Waste Management System Requirements Document requires that DOE be capable of accepting and transporting a range of dual-purpose canisters in addition to bare spent nuclear fuel assemblies. PX 981 at 9.

RESPONSE: The Government objects to SMUD's proposed finding of fact. The Civilian Radioactive Waste Management System Requirements Document ("Requirements Document") establishes requirements for the design, development, and operation of the Civilian Radioactive Waste Management System. PX 981, at HQR3220013. The Requirements Document is a tool that DOE uses to incorporate contingencies into the Civilian Radioactive Waste Management System. Id. Mr. Zabransky testified that, by making changes to the Requirements Document, DOE has asked the contractor responsible for designing the repository to incorporate into its designs the capability of accepting dual-purpose systems. Tr.1766:8-1767:2 (Zabransky). Therefore, the Requirements Document addresses potential capabilities, not legal requirements. Consequently, Mr. Zabransky testified that a change to the Requirements Document assumed that DOE could also achieve the necessary modifications to the Standard Contract. Tr.1766:8-12 (Zabransky).

544. DOE's 2001 Draft Waste Input Report recognizes that "[d]ual-purpose canisters (DPCs) will be used for required dry storage at most sites," and that the transportation cask assumptions for ultimate transport to Yucca Mountain "reflect current licensing actions and plans, and current cask designs, including DPC systems being ordered or planned by the utilities." PX 722 at 4.

RESPONSE: The Government objects to SMUD's proposed finding of fact, which is misleading. The two quoted passages do not appear on the same page, let alone the same paragraph, of the Draft 2001 Waste Input Report. PX 722, at HQR2920692-93. Thus, any suggestion that the two quoted passages were written in the same context are incorrect. Further, the Draft 2001 Waste Input Report estimates the waste stream characteristics and quantities in

order for system design to proceed. PX 722, at HQR2920690. To perform those estimates, the authors were required to make assumptions regarding that waste stream. PX 722, at HQR2920692. Thus, the quoted passages deal with assumptions that were made for planning purposes and do not imply any legal requirements.

545. In determining whether the 1 mill/kwh fee was adequate to support the costs of DOE's current program, DOE has assumed that it will accept dual-purpose canisters for transportation from the utility site to the repository. PX 680 at 3-2; *see also* Tr. at 2196-97 (Kouts, confirming that such assumptions were the basis for DOE's fee analysis).

RESPONSE: The Government objects to SMUD's proposed finding of fact, which is misleading. The Total System Life Cycle Cost Estimate requires that assumptions be made to assess the potential cost of the waste management system. PX 680, at PA224109. Thus, this document speaks to potentials and assumptions, not to bare legal requirements. Indeed, Mr. Kouts specifically stated that this document does not suggest DOE was obligated to accept canistered fuel pursuant to the Standard Contract. Tr.2210:22-2211:12 (Kouts).

546. In a paper presented to the public in 2000 to 2001, DOE employees represented that "DOE will endeavor to make the repository system compatible with existing and pending transport/storage systems." PX 820 at 2-3; Tr. at 2075-2079 (Pollog).

RESPONSE: The Government does not dispute that SMUD has accurately quoted a portion of the document cited, but the conclusion to that document states:

> The management practices for SNF are changing to meet shifting utility needs. In some cases, the changes are not consistent with the specific requirements of the contract the utilities have with the Department of Energy for SNF disposal services. The individual utility contracts may need modification in order to accommodate changing SNF management techniques. The Department of Energy is starting to review what modifications, if any, may be needed to the contracts that it has with the utilities to accommodate the changing utility SNF management practices.

PX 820, at HQR1080006. Thus, the document recognizes that acceptance of dual-purpose systems may require modification of the Standard Contract.

547. "DOE has surveyed components and features of the population of existing and

pending canister and cask transport/storage systems for commercial spent fuel and concluded that generally the system features and characteristics that meet NRC requirements for storage and transport should be compatible with the current repository design." PX 820 at 3.

RESPONSE: The Government does not dispute that SMUD has accurately quoted a portion of the document cited. However, the conclusion to that document states:

> The management practices for SNF are changing to meet shifting utility needs. In some cases, the changes are not consistent with the specific requirements of the contract the utilities have with the Department of Energy for SNF disposal services. The individual utility contracts may need modification in order to accommodate changing SNF management techniques. The Department of Energy is starting to review what modifications, if any, may be needed to the contracts that it has with the utilities to accommodate the changing utility SNF management practices.

PX 820 at HQR1080006. Thus, the document recognizes that acceptance of dual-purpose systems may require modification of the Standard Contract.

548. DOE has been planning to and anticipates receiving spent fuel in canistered form at the repository. PX 717 at vii. Tr. at 2185-86, 2193, 2209 (Kouts); Tr. at 2078-79 (Pollog).

RESPONSE: The Government objects to SMUD's proposed finding of fact. PX 717 is a Requirements Document. The Requirements Document is one of the tools that DOE uses to incorporate contingencies into the Civilian Radioactive Waste Management System. Although DOE has changed the Requirements Document to incorporate the capability of accepting dual-purpose systems into the system, Mr. Zabransky clearly testified that change was made based upon the assumption that DOE could also achieve the necessary modifications to the Standard Contract. Tr.1766:8-1767:2 (Zabransky). Therefore, the Requirements Document addresses potential capabilities, not legal requirements. See Gov't Resp. to PFOF ¶ 543. Indeed, Mr. Kouts specifically stated that this document does not suggest DOE was obligated to accept canistered fuel pursuant to the standard contract. Tr.2210:22-2211:12 (Kouts).

549. DOE plans include receipt of various waste forms at Yucca Mountain, including dual purpose canisters. PX 997 at 10; PX 998 at 2-34 to -35 (stating that "[c]ommercial spent nuclear fuel would arrive as individual fuel assemblies placed directly into transportation casks, or in dual-purpose canisters").

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, SMUD has failed to provide a complete copy of PX 998, the Yucca Mountain Science and Engineering Report, and has failed to provide copies of the cited pages. PX 997 is missing altogether. Furthermore, as discussed previously, DOE plans and capabilities are different from legal obligations.

550. One of the scenarios included in the EIS for Yucca Mountain assumes acceptance of 80% of commercial spent fuel in dual-purpose canisters. PX 721 at 2-7 to 2-8; Tr. at 2193 (Kouts); Tr. at 1936-37 (Zabransky) (noting Yucca Mountain expects to receive different types of waste forms, as outlined in the EIS).

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is misleading. The assumptions made for the Environmental Impact Statement ("EIS") for Yucca Mountain addresses plans, not legal requirements. PX 721, at v (The purpose of this environmental impact statement (EIS) is to provide information on potential environmental impacts that could result from a Proposed Action to construct, operate and monitor, and eventually close a geologic repository . . . .) (emphasis added). Although he was not discussing any statement made in the EIS, Mr. Kouts testified that any plans that DOE was making to receive dual-purpose canisters "assum[ed] that the contractual issues were resolved." Tr.2193:2-10 (Kouts). Moreover, Mr. Zabransky's cited testimony addresses the acceptance of failed fuel, not dual-purpose canisters.

551. Thus, DOE's current plans include acceptance of dual-purpose canisters at Yucca Mountain. *See* PFF ¶¶ 541-550.

RESPONSE: The Government objects to SMUD's proposed finding of fact, which merely cites other proposed findings. See Gov't Resp. to PFOF ¶¶ 541-550.

552. Twenty-six spent fuel dry storage facilities have been developed at utilities across the United States, E. Supko Written Direct at 49 (PX 1002), and approximately 36 spent fuel dry storage sites are projected for 2006. Tr. at 1794 (Zabransky).

RESPONSE: The Government objects to SMUD's proposed finding of fact, as it is not relevant to any issue that is before the Court. The number of dry storage facilities developed at utilities has no bearing upon whether DOE is contractually obligated to accept SNF contained in MESCs.

553. As DOE continues to delay performance, and more and more utilities are forced

to transfer fuel to canisters, the likelihood of DOE accepting fuel in canistered form will only increase and "the significance of 'standard' v. 'nonstandard' [will be] dissipated." I. Stuart Written Direct at 9 (PX 1001).

RESPONSE: This is not a proposed finding of fact, but a contention of law. Further, Mr. Stuart testified as one of SMUD's experts, and his opinion on this subject has no relevance to the issue of DOE's obligation, or lack thereof, to accept canistered fuel under the terms of the Standard Contract. Moreover, Mr. Stuart is not a DOE employee authorized to speak for or bind DOE.

**IX. Rate.**

554. A 3,000-ton receipt rate is the rate that DOE has consistently used to calculate utility fees and system costs under the Standard Contract, is used in nearly all DOE program documents, and was affirmed by the trial and deposition testimony of numerous DOE officials. *See generally* Plaintiff's Proposed Findings of Uncontroverted Fact Regarding the Acceptance Rate of Spent Nuclear Fuel dated December 16, 2002 (Dckt. #167), incorporated herein by reference.[1]

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, it does not support the assertion that "3,000-ton receipt rate is the rate that DOE has consistently used to calculate utility fees and system costs under the Standard Contract . . . ." In fact, for the period that DOE was anticipating commencement of performance of the Standard Contract through the use of an MRS, DOE repeatedly set fee and calculated system costs based upon an acceptance rate 900 MTU for the first 10 years of the program then ramping up to 3000 MTU in 2015. PX 189, at A-1. The Fees and system costs did not change because of the rate. PX 189.

555. "[I]f DOE had begun acceptance of spent nuclear fuel by January 31, 1998, at an overall spent fuel acceptance rate of 3,000 MTU per year, all of the spent nuclear fuel from the Rancho Seco nuclear power plant would have been accepted by DOE for disposal and

---

[1] SMUD has included as Attachment 1 to these Proposed Findings a chart ("Conversion of Acceptance Rate Appendix To Exhibits At Trial") that provides the trial exhibit number of the documents cited in the Acceptance Rate briefing and proposed findings.

transported off-site by 2006, *at the latest*, assuming an oldest-fuel-first acceptance priority and that SMUD does not utilize either the 'exchange' provision in the Standard Contract or the shutdown priority provision." *See* E. Supko Written Direct at 9 (PX 1002) (emphasis added).

RESPONSE: The Government objects to SMUD's proposed finding of fact. DOE has repeatedly informed SMUD that the containers into which SMUD placed its failed fuel are not acceptable under the Standard Contract. DPFOF ¶ 198. In addition, Mr. Redeker acknowledged at trial that SMUD by its own admission is in possession of 10 F-2 failed fuel assemblies Tr.796-799 (Redeker); DX 608, DX 629. The Standard Contract makes clear that DOE is not obligated to accept failed fuel under the same schedule as standard fuel and indeed may remove such fuel from the "oldest fuel first" priority ranking and, at DOE's discretion place it as the end of the acceptance queue for all contract holder's SNF. DPFOF ¶ 211. In addition, the Government's technical expert, Jerry Burford provided unrefuted testimony that among the failed fuel assemblies in SMUD's possession, two are improperly stored in non-failed fuel canisters and, consequently, SMUD is not in compliance with its storage license and cannot ship that failed fuel under its current Certificate of Compliance with the NRC. DPFOF ¶¶ 224-225. In addition, during the DCS process whereby DOE established its contractual acceptance commitments under the Standard Contract, DOE projected industry-wide acceptance rates of 900 MTU for the first 10 years of the program and SMUD never requested that DOE accept from SMUD more than what was established in the 1991 ACR. Finally, Mr. Redeker acknowledged at trial that a 3000 MTU steady-state rate of acceptance "was not consistent with the DCS submittals." DPFOF ¶ 136.

556. DOE would likely have removed the fuel even earlier if SMUD had utilized either the exchange provision or the shutdown priority provision of the Contract. E. Supko Written Direct at 9-10 (PX 1002) ("[I]f SMUD were to take advantage of the 'exchange' provision or the shutdown reactor priority provision, the DOE would likely have accepted SMUD's SNF earlier than 2006.").

RESPONSE: The Government objects to SMUD's proposed finding of fact. At trial, SMUD failed to provide any witness or contemporaneous documents concerning SMUD's desire to engage in exchanges with other utilities in the DOE acceptance queue. Further, Ivan Stuart, one of SMUD's purported experts regarding exchanges, admitted that he has never previously modeled a world where exchanges of SNF acceptance rights would occur, and did not endeavor to provide such a model in this case. DPFOF ¶ 148-49. In addition, Eileen Supko, SMUD's other purported expert on exchanges acknowledged that she did not perform any analysis regarding the effect of exchanges on SMUD's fuel outdates, and that in modeling her "non-breach" acceptance scenario, she did not endeavor to model a "non-breach" exchanges market.

DPFOF ¶ 150.

Further, SMUD failed to present any testimony or evidence concerning what impact the grant of priority in SNF acceptance would have in terms of DOE's acceptance of SMUD's SNF. DPFOF ¶ 144. In addition, SMUD has repeatedly recognized that priority for shutdown reactors is solely within the discretion of DOE, and concluded well before 1998, that it was very unlikely that DOE would have agreed to accept SMUD's SNF under a priority schedule because of SMUD's shutdown status. DPFOF ¶ 139. Further, the nuclear utility industry has repeatedly lodged its objections to priority for shutdown reactors generally, and SMUD specifically. DPFOF ¶ 140. SMUD's own expert, Ms. Supko has publicly objected to priority for shutdown reactors. DPFOF ¶ 143.

Finally, as stated above, SMUD is in possession of: fuel currently placed in unacceptable containers; failed fuel subject to being removed from the standard contract acceptance queue; and fuel for which SMUD lacks a license to ship. Accordingly, even if SMUD were able to invoke the exchange provision of the Standard Contract or gained priority as a shutdown reactor, there is no evidence that SMUD's SNF would have been removed by 2006, let alone earlier had DOE begun accepting fuel from SMUD under the Standard Contract in 2001.

557. The Contract provides that, "[n]otwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." Contract Art. VI.B.1.b.

<u>RESPONSE</u>: Although the Government does not object to SMUD's proposed finding of fact, SMUD failed to present any testimony or evidence concerning what impact the grant of priority in SNF acceptance would have in terms of DOE's acceptance of SMUD's SNF. DPFOF ¶ 144. In addition, SMUD has repeatedly recognized that priority for shutdown reactors is solely within the discretion of DOE, and concluded well before 1998, that it was very unlikely that DOE would have agreed to accept SMUD's SNF under a priority schedule because of SMUD's shutdown status. DPFOF ¶ 139. Further, the nuclear utility industry has repeatedly lodged its objections to priority for shutdown reactors generally, and SMUD specifically. DPFOF ¶ 140, and SMUD's own expert, Ms. Supko has publicly objected to priority for shutdown reactors. DPFOF ¶ 143.

558. At the time of Contract formation, the parties understood and expected that DOE would implement priority acceptance of spent fuel and high-level radioactive waste from shutdown reactors, as provided in Article VI.B.1.b, if and as necessary to prevent shutdown

utilities from waiting a substantial period of time to complete their decommissioning. 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983).

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD failed to present any testimony or evidence concerning what impact the grant of priority in SNF acceptance would have in terms of DOE's acceptance of SMUD's SNF. DPFOF ¶ 144. In addition, SMUD has repeatedly recognized that priority for shutdown reactors is solely within the discretion of DOE, and concluded well before 1998, that it was very unlikely that DOE would have agreed to accept SMUD's SNF under a priority schedule because of SMUD's shutdown status. DPFOF ¶ 139. Further, the nuclear utility industry has repeatedly lodged its objections to priority for shutdown reactors generally, and SMUD specifically. DPFOF ¶ 140, and SMUD's own expert, Ms. Supko has publicly objected to priority for shutdown reactors. DPFOF ¶ 143.

559. During the process of developing the Standard Contracts, DOE rejected requests by certain utilities to omit the Article VI.B.1.b. priority acceptance provision, explaining that "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." 48 Fed. Reg. 16,590, 16, 593 (Apr. 18, 1983). The first Director of the DOE spent fuel program, Robert Morgan, testified he agreed with this statement in 1983, explaining that DOE "didn't want to hold up" decommissioning and this was one of DOE's objectives. Designations Appendix (Dckt. #310) at 2011-12 (Morgan).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, SMUD failed to present any testimony or evidence concerning what impact the grant of priority in SNF acceptance would have in terms of DOE's acceptance of SMUD's SNF. DPFOF ¶ 144. In addition, SMUD has repeatedly recognized that priority for shutdown reactors is solely within the discretion of DOE, and concluded well before 1998, that it was very unlikely that DOE would have agreed to accept SMUD's SNF under a priority schedule because of SMUD's shutdown status. DPFOF ¶ 139. Further, the nuclear utility industry has repeatedly lodged its objections to priority for shutdown reactors generally, and SMUD specifically. DPFOF ¶ 140, and SMUD's own expert, Ms. Supko has publicly objected to priority for shutdown reactors. DPFOF ¶ 143.

560. SMUD's expert, Mr. Stuart, opined that if there were a functioning DOE program, "it is very likely that exchanges of acceptance rights between utilities would happen."

I. Stuart Written Direct at 10 (PX 1001).

RESPONSE: Although Mr. Stuart provided the opinion set forth in this proposed finding, Mr. Stuart admitted at trial that he has never previously modeled a world where exchanges of SNF acceptance rights would occur, and did not endeavor to provide such a model in this case. DPFOF ¶ 148. In addition, Mr. Stuart admitted at trial that, although he testified that he believed exchanges would work in a manner similar to the exchange of uranium, he has never been qualified as an expert with respect to the propriety of uranium exchanges; he did not perform any written analysis in reaching this conclusion; and the basis for his conclusion were statements others at his former company, NAC, made, and he did not consult with those individuals when he prepared his direct testimony in this case. DPFOF ¶ 149.

561. DOE has maintained the position that "[i]f the Department had the unconstrained capability to provide for the storage or disposal of spent nuclear fuel, and if the rate of spent fuel acceptance exceeds the acceptance rates published in the Annual Capacity Report (400, 600, 900 MTU/year), the Department would have the flexibility to address the issue of priority acceptance of spent nuclear fuel from permanently shutdown reactors." PX 418; *see also* Designations Appendix (Dckt #310) at 1861-62 (S. Klein) (explaining that DOE "could have given" acceptance priority to shutdown reactors if the system were operating at 3,000 tons).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, SMUD failed to present any testimony or evidence concerning what impact the grant of priority in SNF acceptance would have in terms of DOE's acceptance of SMUD's SNF. DPFOF ¶ 144. In addition, SMUD has repeatedly recognized that priority for shutdown reactors is solely within the discretion of DOE, and concluded well before 1998, that it was very unlikely that DOE would have agreed to accept SMUD's SNF under a priority schedule because of SMUD's shutdown status. DPFOF ¶ 139. Further, the nuclear utility industry has repeatedly lodged its objections to priority for shutdown reactors generally, and SMUD specifically, DPFOF ¶ 140-41, and SMUD's own expert, Ms. Supko has publicly objected to priority for shutdown reactors. DPFOF ¶ 143.

562. Lake Barrett testified that he believed "it was in the nation's interests to support [shutdown utilities] who were trying to clean up their sites and return that real estate to useful societal purpose in that we should try to move the fuel off as quickly as we practically could, consistent with sound national policies." Designations Appendix (Dckt. #310) at 386-87

(Barrett).

RESPONSE: See Gov't Resp. to PFOF ¶ 561.

563. In 1989, the government commissioned a study entitled, "Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis," which analyzed "a class of acceptance schemes in which the acceptance capacity of the federal radioactive waste management system is allocated principally to shutdown commercial reactors. PX 168 at iii. That study concluded that significant program cost efficiencies could be realized by giving priority to spent fuel located at shutdown plants and at operating reactors with fuel pools.

RESPONSE: See Gov't Resp. to PFOF ¶ 561.

564. The Contract provides that "Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW, provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges." Contract Art. V.E (PX 44).

RESPONSE: Although the Government does not object to SMUD's proposed finding, the finding ignores that at trial, SMUD failed to provide any witness or contemporaneous documents concerning SMUD's desire to engage in exchanges with other utilities in the DOE acceptance queue. Further, Ivan Stuart, one of SMUD's purported experts regarding exchanges, admitted that he has never previously modeled a world where exchanges of SNF acceptance rights would occur, and did not endeavor to provide such a model in this case. DPFOF ¶ 148. In addition, Eileen Supko, SMUD's other purported expert on exchanges acknowledged that she did not perform any analysis regarding the effect of exchanges on SMUD's fuel outdates, and that in modeling her "non-breach" acceptance scenario, she did not endeavor to model a "non-breach" exchanges market. DPFOF ¶ 150.

565. DOE officials have testified that DOE would have been liberal in approving exchanges. *See, e.g.*, Designations Appendix (Dckt #310) at 1991 (Morgan) (explaining that DOE would have approved exchanges "if at all possible").

RESPONSE: The Government objects to SMUD's proposed finding of fact because it is

misleading. The testimony cited does not include an assertion that "DOE would have been liberal in approving exchanges." Further, the finding ignores that at trial, SMUD failed to provide any witness or contemporaneous documents concerning SMUD's desire to engage in exchanges with other utilities in the DOE acceptance queue. Further, Ivan Stuart, one of SMUD's purported experts regarding exchanges, admitted that he has never previously modeled a world where exchanges of SNF acceptance rights would occur, and did not endeavor to provide such a model in this case. DPFOF ¶ 148. In addition, Eileen Supko, SMUD's other purported expert on exchanges acknowledged that she did not perform any analysis regarding the effect of exchanges on SMUD's fuel outdates, and that in modeling her "non-breach" acceptance scenario, she did not endeavor to model a "non-breach" exchanges market. DPFOF ¶ 150. See Gov't Resp. to PFOF ¶ 564.

566. As Daniel Dreyfus, former Director of OCRWM, has stated, the exchange provision "was included in the Standard Contract in response to comments received during the Standard Contract rulemaking, in order to allow Purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department." PX 433.

RESPONSE: See Gov't Resp. to PFOF ¶ 564.

567. Had DOE been performing, transportation campaigns likely would have occurred and would have benefitted DOE. *See* I. Stuart Written Direct at 10 (PX 1001).

RESPONSE: The Government objects to SMUD's proposed finding of fact. The Standard Contract does not contain any provision for transportation campaigns and Ivan Stuart, SMUD's purported expert regarding campaigns conceded at trial that he did not analyze the order in which transportation campaigns would have occurred in the non-breach world. DPFOF ¶ 153. Mr. Stuart also conceded at trial that under his concept of a transportation campaign, if DOE accepted all of a utility's SNF in a single campaign, then another utility would not have its oldest fuel accepted by DOE. In addition, Mr. Zabransky testified that no utility wanted to be placed later in the acceptance queue as a result of campaigns. DPFOF ¶ 153.

Finally, as stated above, SMUD is in possession of: fuel currently placed in unacceptable containers; failed fuel subject to being removed from the standard contract acceptance queue; and fuel for which SMUD lacks a license to ship. Accordingly, even if DOE had acted outside the Standard Contract and engaged in transportation campaigns, there is no evidence that SMUD's SNF would have been removed by 2006, let alone earlier had DOE begun accepting

fuel from SMUD under the Standard Contract in 2001.

568. DOE was interested in pursuing transportation campaigns because they would have been more efficient for DOE and utilities. The 1990 ACR explained that "using annual allocations could result in DOE accepting less than full cask loads of SNF. Summing allocations over a longer period could result in a reduction in the frequency of deliveries (*larger shipping campaigns*) when serving each Purchaser. DOE will keep Purchasers apprised of the results of this analysis." PX 188 at 10. The ACR further noted that "[t]he exact chronological order of deliveries within each year is not specified in the Appendix A tables because the dates in the Final Delivery Schedules to be submitted to DOE for approval will be arranged to accommodate, to the extent possible, both the Purchasers' and DOE's operational requirements." PX 188 at 9.

RESPONSE: The Government objects to SMUD's proposed finding of fact. SMUD's proposed finding ignores that the Standard Contract does not contain any provision for transportation campaigns and Ivan Stuart, SMUD's purported expert regarding campaigns, conceded at trial that he did not analyze the order in which transportation campaigns would have occurred in the non-breach world. DPFOF ¶ 153. Mr. Stuart also conceded at trial that under his concept of a transportation campaign, if DOE accepted all of a utility's SNF in a single campaign, then another utility would not have its oldest fuel accepted by DOE. In addition, Mr. Zabransky testified that no utility wanted to be placed later in the acceptance queue as a result of campaigns. DPFOF ¶ 153.

Finally, as stated above, SMUD is in possession of: fuel currently placed in unacceptable containers; failed fuel subject to being removed from the standard contract acceptance queue; and fuel for which SMUD lacks a license to ship. Accordingly, even if DOE had acted outside the Standard Contract and engaged in transportation campaigns, there is no evidence that SMUD's SNF would have been removed by 2006, let alone earlier had DOE begun accepting fuel from SMUD under the Standard Contract in 2001.

569. DOE witnesses have testified that DOE is unlikely to adhere strictly to the oldest fuel first prioritization because of the attendant costs and inefficiencies. *See, e.g.*, Designations Appendix (Dckt #310) at 1930-32 (Burgoyne); *see also* I. Stuart Written Direct at 10 (PX 1001) (noting there "would be some flexibility or 'slack' in the system" making campaigning possible).

RESPONSE: The Government objects to SMUD's proposed finding of fact. First, neither Mr. Burgoyne nor Mr. Stuart are "DOE witnesses." Mr. Burgoyne is a DOE contractor. Tr.1706:17-18 (Zabransky). Mr. Kouts explained that "[v]erbal statements by contractors have no binding influence on the department. It's just their views on the world as they see it." Tr.2112:13-15 (Kouts). Further, Mr. Stuart does not work for DOE. Tr.1459:8-10 (Stuart). Consequently, these statements from non-DOE employees cannot establish what DOE may or may not do regarding the acceptance of SNF.

Further, the testimony cited does not include an assertion that "DOE is unlikely to adhere strictly to the oldest fuel first prioritization." The finding also ignores that at trial, SMUD failed to provide any witness or contemporaneous documents concerning SMUD's desire to engage in exchanges with other utilities in the DOE acceptance queue. Further, Ivan Stuart, one of SMUD's purported experts regarding exchanges, admitted that he has never previously modeled a world where exchanges of SNF acceptance rights would occur, and did not endeavor to provide such a model in this case. DPFOF ¶ 148. In addition, Eileen Supko, SMUD's other purported expert on exchanges acknowledged that she did not perform any analysis regarding the effect of exchanges on SMUD's fuel outdates, and that in modeling her "non-breach" acceptance scenario, she did not endeavor to model a "non-breach" exchanges market. DPFOF ¶ 150.

570. DOE has insisted on the use of campaigns in the transport of its own fuel. Tr. at 1455-56 (Stuart).

RESPONSE: See Gov't Resp. to PFOF ¶ 568.

571. Delivery of multiple rail casks in campaigns would allow for early removal of all of SMUD's spent nuclear fuel. I. Stuart Written Direct at 9-10 (PX 1001).

RESPONSE: See Gov't Resp. to PFOF ¶ 567.

## X. Notice.

572. DOE met with SMUD in the early 1990s regarding SMUD's pursuit of a dual-purpose dry storage system and the potential for a cooperative agreement between SMUD and DOE. *See, e.g.*, PX 220, 224, 229, 233, 236, 245, 246, 253, 258.

RESPONSE: The Government objects to SMUD's proposed finding of fact, which is misleading. Having decided to pursue a strategy of placing its SNF in dual-purpose casks, SMUD sought to obtain DOE's assistance in the form of a demonstration project funded by Congress. DPFOF ¶ 166-67.

573. DOE was actively involved in the development of SMUD's dual-purpose system.

RESPONSE: See Gov't Resp. to PFOF ¶ 532.

a. As part of the cooperative agreement negotiations, DOE reviewed and commented on SMUD's technical specifications for the dry storage system. Letter from J. Bell to DOE (Oct. 23, 1991) (PX 224) (attaching copy of technical specification for DOE's review); Letter from J. Williams to J. Bell (Nov. 27, 1991) (including comments from DOE regarding SMUD's technical specification); Memorandum Regarding Solicitation (Dec . 5, 1991) (PX 233) (including multiple DOE personnel on distribution list).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. See Gov't Resp. to PFOF ¶ 532.

b. DOE officials visited SMUD's site for a meeting regarding the demonstration project. *See* Facsimile from R. Bowser to J. Williams (Sept. 14, 1991) (PX 220) (noting Sept. 19, 1991 meeting with DOE was held at the Rancho Seco plant).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, the facsimile from R. Bowser to J. Williams cited by SMUD is dated September 24, 1991, not September 14th. See also Gov't Resp. to PFOF ¶ 532.

c. SMUD forwarded monthly progress reports to DOE. PX 845.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. See Gov't Resp. to PFOF ¶ 532.

d. DOE officials met with SMUD employees on multiple occasions to discuss the progress of SMUD's project. *See* Meeting Minutes PX 246, 255, 258, 431.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. See Gov't Resp. to PFOF ¶ 532.

e. Throughout the project, SMUD "kept DOE informed of what was going on." Tr. at 234 (Shetler).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, despite site visits, reports, and meetings, SMUD was unable to deliver a licensed, dual-purpose cask to DOE for the $2 million that the parties had upon. DPFOF ¶ 181. See also Gov't Resp. to PFOF ¶ 532.

574. Jim Shetler met with then-Director Lake Barrett in 1993 to discuss SMUD's plans for transfer of its fuel to dual-purpose canisters and the acceptability of such canistered fuel under the Contract. *See* Letter from J. Shetler (Sept. 28, 1993) (PX 325); Letter from J. Shetler (June 22, 1993) (PX 311).

RESPONSE: Although the Government does not object to SMUD's proposed finding of fact, DOE has repeatedly informed SMUD that its canistered fuel was not acceptable pursuant to the Standard Contract. DPFOF ¶ 198.

575. In 1994, in a briefing to the Director of the Program, Dan Dreyfus, DOE recognized that if there was no performance in 1998 "[s]hutdown reactors must maintain their spent fuel pools or dry storage facilities for a longer time—causing utility costs to increase." PX 334 at 23. DOE also acknowledged that "Utilities may sue DOE for failure to perform according to Standard Contract (no waste acceptance in 1998)." PX 334 at 22.

RESPONSE: The Government objects to SMUD's proposed finding of fact, which is misleading. The briefing being cited refers to the potential consequences of not having an MRS available and states that "[c]ongressional action is necessary to site a Federal interim storage facility as soon as possible." PX 334, at 4, 22. Defendant further notes that the briefing cited by SMUD also states that "[u]tilities having to deploy at-reactor storage of spent nuclear fuel will incur significant non-reimbursable costs while still being burdened with the responsibility of maintaining this storage." PX 334, at 4 (emphasis added).

576. In the same briefing, DOE stated that "[a]lthough safe, at-reactor dry storage of spent nuclear fuel will increase significantly and be required in 31 states by 2010, the year the repository is currently planned to start operation." PX 334 at 4.

RESPONSE: Although the Government does not dispute that the cited document is accurately quoted, it also states that "[v]endors provide and continue to develop at-reactor dry storage technologies that may prove incompatible with the repository." PX 334, at 22.

577. In 1994, Steve Cohn, General Counsel for SMUD, sent DOE comments in response to its Notice of Inquiry, making it clear that SMUD expected reimbursement for its costs associated with its on-site storage of spent fuel during the period of SMUD's delay:

> [I]f DOE cannot develop [an interim storage facility to accept waste by 1998], DOE should use portions of the Nuclear Waste Fund, supplemented as needed by additional federal funds, to reimburse SMUD and other utilities for their reasonable costs incurred to store spent fuel at their respective sites beyond January 31, 1998. SMUD should be reimbursed at a pre-negotiated rate for on-site storage of spent fuel based on DOE's inability to meet schedules set forth in the 1991 Acceptance Priority Ranking. Additionally, this funding could take the form of DOE's reimbursing utilities for the purchase and maintenance of multi-purpose canisters and storage modules for temporary storage of spent fuel.

Letter from S. Cohn at 7 (Sept. 21, 1994) (PX 369); Tr. at 255-56 (Shetler).

RESPONSE: The Government objects to SMUD's proposed finding of fact. In 1994, SMUD did not make it clear to DOE that SMUD expected reimbursement for its costs associated with its on-site storage of spent nuclear fuel during the period of DOE's delay. The evidence in this case unequivocally shows that SMUD believed that DOE could perform on a timely basis into 1995. DX 481, at SMUD 0033398 (December 1994 presentation to the public representing view that acceptance of SNF in an MRS by 1998 was a possibility); Tr.383:17-24, Tr.388:19-21 (Shetler) ("I think we still had an expectation there was a possibility it could happen, yes."); Tr.705:2-5, Tr. 710:16-20 (Redeker); DPFOF ¶¶ 71-75. In a public presentation, SMUD management indicated that SMUD assumed performance between 1998 and 2013, and that all of SMUD's SNF would be accepted within a 14-year queue. See DX 481 at SMUD 0033398; Tr.386:15-387:11 (Shetler). Furthermore, SMUD explained to DOE, in its September 21, 1994 letter, that SMUD began its dry storage project believing that DOE would perform the Standard Contract in a timely manner. Specifically, SMUD stated that:

> After a referendum of SMUD's electorate on June 6, 1989, Rancho Seco ceased operating on June 7, 1989. Since then, SMUD has been proceeding with activities to begin the decommissioning of Rancho Seco and to provide required assurances to the NRC that the District will have sufficient funds available to pay for the decommissioning. However, SMUD has not provided funds in its Decommissioning Trust for spent fuel storage after 2010. When funded in 1991, the Trust assumed that DOE would accept all of Rancho Seco's fuel starting in 1998, including the queue, by 2010.

DX 462, at SMUD 0019624 (emphasis added). Thus, SMUD's response to DOE's notice of inquiry ("NOI") did not give notice to DOE that it expected reimbursement for its costs

associated with its on-site storage of spent nuclear fuel because SMUD was still anticipating performance by DOE.

578. SMUD received quarterly financial reports that included a detailed breakdown of the costs of the project from 1995 to 1998. *See* Tr. at 562-63 (Redeker); *see, e.g.*, PX 399, 411, 424, 434, 448, 459, 476, 492, 514, 571, 611 (quarterly financial reports forwarded to DOE).

RESPONSE: See Gov't Resp. to PFOF ¶ 532.

579. In February 1996, SMUD sent a letter to DOE to "make [DOE] aware of this licensing hurdle, and the impact it may have on the cost of the casks." PX 449.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. See Gov't Resp. to PFOF ¶ 532.

580. On March 5, 1996, Bob Jones from SMUD sent a letter to David Langstaff informing DOE of the increasing costs of the project. PX 452.

RESPONSE: The Government does not dispute this proposed finding. See also Gov't Resp. to PFOF ¶ 532.

581. In April 1996, SMUD sent D. Langstaff the invoices to date on the project for his review. PX 456.

RESPONSE: The Government does not dispute this proposed finding. Indeed, the Government does not dispute that SMUD sought additional funds from DOE because it was unable to deliver a licensed, dual-purpose cask for the $2 million that the parties had agreed upon. DPFOF ¶¶ 179-181. See Gov't Resp. to PFOF ¶ 532.

582. On July 17, 1996, Steve Redeker wrote a letter informing DOE of the continued difficulties incurred during the design and fabrication process, and the resultant cost overruns on the project, noting that "[t]he additional costs to rework the cask's inner shell are far in excess of anything we could have anticipated" and requesting DOE to contribute additional funds toward the project. Letter from S. Redeker at 1 (July 17, 1996) (PX 471).

RESPONSE: The Government does not dispute this proposed finding. Indeed, the Government does not dispute that SMUD sought additional funds from DOE because it was unable to deliver a licensed, dual-purpose cask for the $2 million that the parties had agreed upon. DPFOF ¶¶ 179-181. See Gov't Resp. to PFOF ¶ 532.

583. On March 14, 1997, SMUD's General Manager Jan Schori wrote a letter to DOE stating that SMUD believes that if DOE cannot dispose of the Rancho Seco spent fuel on the schedule set forth in the DOE-SMUD Standard Contract, DOE should follow the precedent established at Fort St. Vrain with respect to Public Service of Colorado, i.e., reimbursing SMUD for the on-going costs of on-site spent fuel storage at Rancho Seco from January 31, 1998, until such time as DOE can fulfill its contractual obligation to off-load and transport the spent fuel to an interim or permanent DOE storage facility. Letter from J. Schori at 1 (Mar. 14, 1997) (PX 527).

RESPONSE: The Government does not dispute that SMUD has accurately quoted from part of a letter written by Ms. Schori. The Government would note that, unlike SMUD's SNF, which is owned by SMUD, the Government previously owned the overwhelming majority of the fuel located at Ft. St. Vrain prior to agreeing to take title to the fuel at Ft. St. Vrain pursuant to a settlement agreement unrelated to the Standard Contract. See generally State of Idaho v. U.S. Dep't of Energy, 945 F.2d 295 (9th Cir. 1991); Tr.1734:16-20, 1947:15-1948:6 (Zabransky).

584. In her 1997 letter to DOE, Ms. Schori stated that DOE should reimburse SMUD for its storage and transportation costs, including the following categories: "Ongoing operating costs of storage," "Capital cost of the dry storage and transportation system," "Cost of loading the canisters from the wet storage pool to the ISFSI," and "Cost of off-loading and transport of the interim or permanent storage facility, whenever that occurs." Letter from J. Schori at 3-4 (Mar. 14, 1997) (PX 527).

RESPONSE: The Government does not dispute that SMUD has accurately quoted from part of a letter written by Ms. Schori. The Government notes that, notwithstanding Ms. Schori's letter, SMUD repeatedly determined that, even in the but for world, SMUD's dry storage effort would pay for itself well before DOE's last acceptance of SMUD's SNF. DPFOF ¶¶ 54-55, 61,

7, 79-81, 92, 103-109.

585. In April 1997, Acting Director of the Program, Lake Barrett, testified before Congress and explained that Secretary of Energy Pena met with representatives of the utility industry "to discuss ways of mitigating the impacts of the delay." PX 537 at 5; *see also* PX 545. Mr. Barrett noted in his testimony that DOE was "proceeding with the following dual-track approach to address the delay in the acceptance of spent fuel," and that "[o]ptions that have been suggested for consideration include financial compensation and the Department taking title to some fuel at the reactor sites." PX 537 at 5.

RESPONSE: The Government does not dispute that SMUD has accurately quoted from part of a statement given by Mr. Barrett before Congress. Defendant further responds to plaintiff's assertion by stating that, Secretary Pena also met with representatives of "environmental organizations, and state public utility commissions to discuss ways of mitigating the impacts of the delay." PX 537, at 5. DOE's approach to addressing the delay in acceptance of spent fuel included a commitment to explore different options in order to find "mutually-agreeable solutions to the delay." Id. Further, the Government notes that SMUD repeatedly determined that, even in the but for world, SMUD's dry storage effort would pay for itself well before DOE's last acceptance of SMUD's SNF. DPFOF ¶¶ 54-55, 61, 7, 79-81, 92, 103-109.

586. In August 1997, Steve Redeker wrote DOE that "SMUD remains willing to discuss DOE's assumption of costs and responsibility for continued storage of spent fuel at Rancho Seco Nuclear Generating Station ("Rancho Seco"), as outlined in SMUD's letter to DOE dated March 14, 1997." Letter from S. Redeker to B. Tomasoni (Aug. 4, 1997) (PX 1012).

RESPONSE: The Government does not dispute that SMUD has accurately quoted from part of a letter written by Mr. Redeker. However, the Government notes that SMUD repeatedly determined that, even in the but for world, SMUD's dry storage effort would pay for itself well before DOE's last acceptance of SMUD's SNF. DPFOF ¶¶ 54-55, 61, 7, 79-81, 92, 103-109.

587. SMUD's plant manager, Steve Redeker, met with DOE's Director of the Program, Lake Barrett, in late 1997 to discuss the status of the dry fuel storage project. PX 845 at 36381.

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

a. SMUD also explored with DOE the possibility for additional funding for the cask. PX 845 at 36381.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. DPFOF ¶¶ 179-182.

b. SMUD informed DOE that it expected the cost of the cask to increase due to the Vectra bankruptcy and the Transnuclear takeover. PX 845 at 36381.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. DPFOF ¶¶ 179-182.

c. At the meeting between Mr. Redeker and Mr. Barrett, "DOE stated that OCRWM could not provide additional money through the waste fund, but perhaps something could be worked out through the DOE Environmental Management branch." PX 845 at 36381.

RESPONSE: The Government objects to SMUD's proposed finding of fact, which is misleading. DOE ultimately decided to negotiate a mutual termination of the cooperative agreement because SMUD was unable to deliver a licensed, dual-purpose cask to DOE for the $2 million agreed upon. DPFOF ¶¶ 181-82.

588. In July 1998, SMUD sent a letter to then-Director Lake Barrett notifying him that "[a]s we were unable to obtain relief, SMUD has reluctantly filed a claim with the U.S. Court of Federal Claims on June 9, 1998." Letter from J. Schori to L. Barrett (July 14, 1998) (DX 861).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

589. Steve Redeker sent a letter in March 1998 again informing DOE of the progress of the project, including Vectra's bankruptcy, and the increased costs anticipated by SMUD. PX 575.

RESPONSE: The Government does not object to SMUD's proposed finding of fact. Indeed, the Government does not dispute that SMUD sought additional funds from DOE because it was unable to deliver a licensed, dual-purpose cask for the $2 million that the parties had agreed upon. DPFOF ¶¶ 179-181. See Gov't Resp. to PFOF ¶ 532.

590. SMUD notified the Secretary of Energy in April 1999 that it was interested in negotiating with DOE "the federal government's taking title to SMUD's spent nuclear fuel at Rancho Seco." Letter from J. Schori to B. Richardson (Apr. 19, 1999) (PX 1012).

RESPONSE: The Government does not object to SMUD's proposed finding of fact. However, SMUD does not quote the exact language from the April 19, 1999 letter, which states the following - "the federal government's taking title to the District's spent nuclear fuel at Rancho Seco." PX 1012.

591. In 2000, DOE general counsel, Mary Anne Sullivan, explained that "[t]he Department has acknowledged for some considerable period of time that we are responsible for the costs associated with the delay in beginning spent fuel acceptance." PX 660 at 1.

RESPONSE: The Government objects to SMUD's proposed finding of fact because the quoted statement is a conclusion of law about which testimony is inadmissible. Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994). Further, the Government notes that Ms. Sullivan also stated during the September 20, 2000 press conference that "[s]ome of the numbers that I have seen, that the utilities suggest, are very high and they don't represent what we believe to be a reasonable estimate." PX 660, at HQR-0381940.

592. In January 2001, SMUD informed DOE of its intent to begin loading its fuel into canisters beginning in the spring of 2001, and "invite[d] DOE to observe our fuel load activities and review our fuel inspection records." Letter from S. Redeker to D. Zabransky at 1 (Jan. 22, 2001) (PX 670).

RESPONSE: The Government does not object to SMUD's proposed finding of fact.

593. In June 2003, Steve Redeker sent a letter to David Zabransky requesting an update on the status of DOE's efforts regarding inclusion of SMUD's dual purpose system as a standard waste form.

> As you are aware, SMUD was forced to store its fuel in the dual-purpose system as a result of DOE's failure to begin fuel acceptance as required by the standard contract. . . . DOE must recognize that, as a result of DOE's extended delay of performance

> under the contract, SMUD and other utilities were forced to take certain actions, store their fuel, and attempt to minimize storage costs."

Letter from S. Redeker to D. Zabransky at 1 (June 16, 2003) (DX 1295).

RESPONSE: The Government does not dispute that SMUD has accurately quoted from part of a letter written by Mr. Redeker, but the 2003 letter cites to a previous letter written by Mr. Zabransky in which he stated that "[w]hile the Department continues to believe in the overall benefits that may accrue to a multi-purpose storage/transport/disposal system, we [DOE] are unable at this time to complete final design and acceptance criteria for the disposability aspects of such a system for commercial spent nuclear fuel." DX 1295, and PX 678.

594. DOE has closely followed the development and utilization of dry storage by the utility industry, including SMUD. PX 675. For purposes of its Spent Fuel Storage Projections, one of DOE's assumptions was that: "Without specific information to the contrary, all 'Additional Storage Requirements' are accommodated through on-site dry storage." PX 675 at HQR249-0183.

RESPONSE: The Government objects to SMUD's proposed finding of fact because the exhibit cited does not support the proposed finding of fact. The exhibit is merely a tool which DOE uses to incorporate contingencies into its policies and statements and does not indicate that DOE "closely followed the development and utilization of dry storage by the utility industry, including SMUD." The Government also objects because PX 675 is a contractor generated document. The Government's request for work (i.e. spent fuel storage projections) from a contractor is not the same as authorization to make binding admissions on behalf of DOE. See Fed. R. Evid. 801(d)(2). The assumptions and scenarios included in the dry storage projections were not authorized positions of DOE, rather, only input requisite to DOE's formulation of its policies and statements. Therefore, the exhibit does not represent a position taken by DOE. Defendant further responds that the document includes, not only on-site dry storage projections, but also "pool storage capacity expansions through installation of additional storage racks or re-racking . . .." PX 675 at HQR249-0183.

a. DOE assumed that if it never picked up fuel that all utilities would have to utilize dry storage. PX 675 at HQR249-0180 (describing the "No Pickup" scenario).

RESPONSE: See Gov't Resp. to DPFOF ¶ 594.

b. DOE further assumed that all shutdown reactors would transfer fuel to dry

storage five years after shutdown. PX 675 at HQR249-0183 ("In the absence of information to the contrary, all SNF at sites with all reactors shutdown is assumed to be placed in dry storage five years after shutdown of the last reactor at that site.").

RESPONSE: See Gov't Resp. to DPFOF ¶ 594.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell Shultis
RUSSELL A. SHULTIS
Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7561
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

JOSHUA E. GARDNER
SCOTT R. DAMELIN
TODD J. COCHRAN
ELIZABETH THOMAS
Trial Counsel

October 4, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that, on this 4th day of October 2005, a copy of foregoing "DEFENDANT'S PROPOSED FINDINGS OF FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner