No. 98-488C
(Judge Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO THE GOVERNMENT'S POST-TRIAL BRIEF**

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

October 18, 2005

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....... 1

ARGUMENT ....... 3

I. SMUD's Development Of Dry Storage Was Caused By The Government's Anticipated And Actual Failure To Begin Accepting Spent Fuel. ....... 3

A. SMUD Is Not Precluded As A Matter Of Law From Recovering Costs Prior To 1994. ....... 4

B. The Evidence Establishes That The Government's Announced Delays Caused SMUD To Pursue Dry Storage During The Period From 1992 Through 1996. ....... 5

1. The Government Confuses The Real World With A Hypothetical Non-Breach World That Did Not Exist After 1987. ....... 7

2. SMUD's Desire To Facilitate Rancho Seco Decommissioning And Encourage Prompt Fuel Receipt By DOE Cannot Be Divorced From The DOE's Anticipated Delay In Performance. ....... 14

3. SMUD's Recognition That DOE Might Be Able To Site An MRS Does Not Negate Causation. ....... 17

4. The Government's Economic Argument Is Misguided And Unrealistic. ....... 19

C. The Evidence Establishes That The Government's Actual Delay Caused SMUD To Restart And Continue With The Dry Storage Project During The Period From 1997 Through 2002. ....... 21

1. The Government Relies Upon An Oversimplified Non-Breach World That Ignores Disincentives To Continuing With The Dry Storage Project. ....... 24

2. The Fact That SMUD's Reassessments Were Precipitated By Delays In The Dry Storage Project Is Irrelevant. ....... 30

3. The Government's Economic Argument Fails for Multiple Reasons. ....... 31

II. In The Non-Breach World, The Government Would Have Operated At A Reasonable Rate Of Acceptance. ....37

A. The Evidence Demonstrates That DOE Would Have Performed At A 3000 Ton Rate. ....39

B. The Evidence Demonstrates That DOE Shared The Intent of Preventing Utilities From Having To Build Additional At-Reactor Storage And Reducing The Backlog Of SNF Located At Reactors. ....48

C. The Government's Only Argument On The Acceptance Rate Is The DCS Theory That Has Been Rejected By Every Court To Consider It. ....53

III. The Potential For Early Acceptance Through Exchanges And Shutdown Priority, As Well As The Possibility Of Campaigns, Would Have Factored Into SMUD's Decision Making In The Non-Breach World. ....58

IV. SMUD's Mitigation Efforts Were Reasonable. ....64

A. The Government's Argument Regarding Wet Storage Is Wrong And Fails To Show That SMUD Was Unreasonable In Pursuing Dry Storage. ....67

B. The Government's Argument Regarding Transportation Casks Misunderstands The Facts And Fails To Show That SMUD Was Unreasonable In Pursuing Dry Storage. ....71

C. The Government's Argument Regarding "Dry Transfer" Is Incomplete, Fails To Address The Facts, And Fails To Show That SMUD Was Unreasonable In Pursuing Dry Storage. ....75

D. The Government's Argument Regarding The NAC Cask Ignores The Facts And Fails To Show That SMUD Was Unreasonable In Pursuing Dry Storage. ....79

V. It is Undisputed That SMUD's Damages Were Foreseeable. ....82

VI. SMUD Has Met Its Burden of Proving the Certainty Of Its Damages. ....83

A. SMUD Has Claimed Only Those Labor Costs Directly Attributable To The Dry Storage Project. ....85

B. The Evidence Establishes That The SMUD's Indirect Labor Burden Costs Are Incremental To The Government's Breach. ....88

C. SMUD Would Not Have Incurred The Costs Of Loading and Transferring Its Fuel To The ISFSI In The Non-Breach World And Therefore SMUD Is Entitled To Recover Such Costs. ....90

D. The Evidence Supports SMUD's Offsets As Proposed. ....92

VII. The Government's Remaining Attempts To Undermine SMUD's Damages Have No Factual Basis And Should Be Rejected. ....93

A. The Government Cannot Use The Result Of Its Own Breach − The Transfer Of Fuel To Dual Purpose Canisters − To Argue It No Longer Has Any Obligations Under The Contract. ....94

B. The Court Need Not Address Whether GTCC Waste Is Covered Under the Contract Because SMUD Has Not Claimed Damages For The Storage Of Such Waste. ....96

C. The Government's Proposed Deduction For SMUD's Damaged Fuel Is Based On Speculation. ....101

D. The Government's Proposed Deduction For The "88-Month Delay" Is Overly Simplistic And Unsupported By The Law And The Evidence. ....105

E. The Government Offers No Factual Support For Its Argument That SMUD Should And Could Have Mobilized Its Labor Force Only Three Months Prior To The Start Of The Project. ....110

F. SMUD's Fuel Was Still In The Pool In 2002, And Thus SMUD Did Not Realize Any Wet Storage "Savings" In 2002. ....111

G. The Government Has Offered No Factual Basis To Support Its Alleged Decommissioning "Savings." ....112

H. SMUD's ISFSI Operation And Maintenance Costs Are A Direct Result Of The Breach And Would Not Have Been Incurred In The Non-Breach World. ....113

I. There Is No Basis For The Government's "Unavoidable Costs" Deduction ....114

VIII. The Government Does Not Dispute That SMUD Gave DOE Adequate Notice Of Its Pursuit Of And The Costs Associated With Dry Storage. ....115

CONCLUSION ....115

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AES Tech. Sys., Inc. v. Coherent Radiation*,
583 F.2d 933 (7th Cir. 1979) ....................86

*Am. Capital Corp. v. United States*,
66 Fed. Cl. 315 (2005) ....................3

*Am. Dredging Co. v. United States*,
No. 58633, 1951 WL. 5376 (Ct. Cl. July 9, 1951)....................110

*Augustine Med., Inc. v. Progressive Dynamics, Inc.*,
194 F.3d 1367 (Fed. Cir. 1999)....................39

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)....................95, 103

*Bluebonnet Sav. Bank, FSB v. United States*,
266 F.3d 1348 (Fed. Cir. 2001)....................81

*Bonjorno v. Kaiser Aluminum & Chemical Corp.*,
752 F.2d 802 (3d Cir. 1984)....................19

*Boston Edison Co. v. United States*,
64 Fed. Cl. 167 (2005) ....................53

*Boyajian v. United States*,
423 F.2d 1231 (Ct. Cl. 1970) ....................88

*Cal. Fed. Bank v. United States*,
395 F.3d 1263 (Fed. Cir. 2005)....................3, 9

*Commonwealth Edison Co. v. United States*,
56 Fed. Cl. 652 (2003) ....................38, 39, 53, 57

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ....................20

*Consumers Energy Co. v. United States*,
65 Fed. Cl. 364 (2005) ....................40, 53, 56

*Convoy Co. v. Sperry Rand Corp.*,
672 F.2d 781 (9th Cir. 1982) ....................................................................................86

*Danzig v. AEC Corp.*,
224 F.3d 1333 (Fed. Cir. 2000)....................................................................................13

*David Nassif Assocs. v. United States*,
557 F.2d 249 (1977)....................................................................................39

*David Nassif Assocs. v. United States*,
644 F.2d 4 (Ct. Cl. 1981) ....................................................................................39

*De Graffenried v. United States*,
2 Ct. Cl. 640 (1983) ....................................................................................84

*Dunn Appraisal Co. v. Honeywell Info. System Inc.*,
687 F.2d 877 (6th Cir. 1982) ....................................................................................86

*ECDC Envtl., L.C. v. N.Y. Marine & General Ins. Co.*,
No. 96-Civ-6033, 1999 WL 777883 (S.D.N.Y. Sept. 29, 1999) ....................................86

*Energy Capital Corp. v. United States*,
302 F.3d 1314 (Fed. Cir. 2002)....................................................................................60

*Entergy Nuclear Generation Co. v. United States*,
64 Fed. Cl. 336 (2005) ....................................................................................40, 53

*Entergy Nuclear Indian Point 2, LLC v. United States*,
64 Fed. Cl. 515 (2005) ....................................................................................53

*Essex Electro Eng'rs, Inc. v. Danzing*,
224 F.3d 1283 (Fed. Cir. 2000)....................................................................................39

*First Heights Bank, FSB v. United States*,
422 F.3d 1311 (Fed. Cir. 2005)....................................................................................94

*Florida Power & Light Co. v. United States*,
64 Fed. Cl. 37 (2005) ....................................................................................38

*Florida Power & Light Co. v. United States*,
66 Fed. Cl. 93 (2005) ....................................................................................38

*Forest Envtl. Servs. v. United States*,
5 Cl. Ct. 774 (1984) ....................................................................................64

*Freeport Sulphur Co. v. S/S Hermosa*,
526 F.2d 300 (5th Cir. 1976) ....................................................................85, 86, 89

*Genmoora Corp. v. Verdesca*,
939 F.2d 1149 (5th Cir. 1991) ..................................................................87, 88, 110

*Haynes v. United States*,
61 Fed. Cl. 788 (2004) ..............................................................................................114

*Home Sav. of Am., FSB v. United States*,
399 F.3d 1341 (Fed. Cir. 2005)...........................................................63, 66, 70, 81

*Home Sav. of Am. v. United States*,
57 Fed. Cl. 694 (2003) ................................................................................................66

*Honorable v. Easy Life Real Estate System*,
100 F. Supp. 2d 885 (N.D. Ill. 2000) ..........................................................................36

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977).....................................................................................................36

*In re Aluminum Phosphide Antitrust Litig.*,
893 F. Supp. 1497 (D. Kan. 1995)..............................................................................20

*In re Cambridge Biotech Corp.*,
186 F.3d 1356 (Fed. Cir. 1999)....................................................................................39

*Indiana Michigan Power Co. v. United States*,
57 Fed. Cl. 88 (2003) ..................................................................37, 39, 40, 52, 53

*Indiana Michigan Power Co. v. United States*,
60 Fed. Cl. 639 (Fed. Cl. 2004), *aff'd* 422 F.3d 1369 (2005) ....................................2, 3, 68

*Indiana Michigan Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005)............................................................................. passim

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981)...............................................................................................60, 103

*Johnson Mgmt. Group CFC, Inc. v. Martinez*,
308 F.3d 1245 (Fed. Cir. 2002)............................................................................... 105

*Joy Mfg. Co. v. Sola Basic Indus., Inc.*,
697 F.2d 104 (3d Cir. 1982).........................................................................................84

*In re Kellett Aircraft Corp.*,
186 F.2d 197 (3d Cir. 1950), *aff'd in part*, 399 F.3d 1341 (Fed. Cir. 2005) .....................66

*Koby v. United States*,
53 Fed. Cl. 493 (2002) ................................................................................77, 79

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)........................................................................................106

*Lepage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003).............................................................................19

*Locke v. United States*,
283 F.2d 521 (Ct. Cl. 1960) ..........................................................60, 82, 84, 103

*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000)........................................................................54

*McAbee Const. Inc. v. United States*,
97 F.3d 1431 (Fed. Cir. 1996)...........................................................................39

*Northern Helex Co. v. United States*,
524 F.2d 707 (Ct. Cl. 1975) ..............................................................................64

*Omni Corp. v. United States*,
41 Fed. Cl. 585 (1998) .....................................................................................52

*Phillips v. United States*,
230 Ct. Cl. 805 (1982) ......................................................................................64

*Robinson v. United States*,
305 F.3d 1330 (Fed. Cir. 2002)..........................................................................63

*S.W. Eng'r Co. v. Cajun Elec. Power Coop., Inc.*,
915 F.2d 972 (5th Cir. 1990) ............................................................................86

*Sacramento Municipal Utility District v. United States*,
63 Fed. Cl. 495 (2005) ......................................................................................53

*Southern Nuclear Operating Co. v. United States*,
No. 98-614 (Fed. Cl. Apr. 7, 2004)....................................................................38

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555, 563 (1931)................................................................................103

*System Fuels, Inc. v. United States*,
No. 03-2642C, 2005 WL 1804314 (Fed. Cl. July 29, 2005) ............................................69

*T.C. Bateson Const. Co. v. United States*,
319 F.2d 135 (Ct. Cl. 1963) ........................................................................................64

*Tennessee Valley Auth. v. United States*,
60 Fed. Cl. 665 (2004) ............................................................................................53, 82

*The Long Island Sav. Bank, FSB v. United States*,
No. 92-517-C, 2005 WL. 2249742 (Fed. Cl. Sept. 15, 2005)..........................................94

*United States v. Ins. Co. of N. Am.*,
131 F.3d 1037 (D.C. Cir. 1997) ....................................................................................39

*United States v. The John R. Williams*,
144 F.2d 451 (2d Cir. 1944).....................................................................................85, 86

*Washington v. Armstrong World Indus., Inc.*,
839 F.2d 1121 (5th Cir. 1988) ......................................................................................88

*Westfed Holdings, Inc. v. United States*,
55 Fed. Cl. 544 (2003) ................................................................................................ 64

*Wilner v. United States*,
23 Cl. Ct. 241 (1991) .........................................................................................104, 105

*Willred Co. v. Westmoreland Metal Mfg. Co.*,
200 F. Supp. 59 (E.D. Penn. 1961) ...............................................................................86

*Wilson v. Marquette Elecs., Inc.*,
630 F.2d 575 (8th Cir. 1980) ........................................................................................86

*Yankee Atomic Elec. Co. v. United States*,
No. 98-126C, 2004 WL 1535686 (Fed. Cl. 2004) ............................................................59

*Yankee Atomic Elec. Co. v. United States*,
No. 98-126C (Fed. Cl. June 26, 2003).............................................................................38

## STATUTES

42 U.S.C. § 10101(12) ....98

42 U.S.C. § 10131(a)(2)(A) ....52

42 U.S.C. § 10134(b) ....76

42 U.S.C. § 10156(a)(1)....82

42 U.S.C. § 2021c(b)(1)....100

## OTHER AUTHORITIES

10 C.F.R. § 51.44(a)(2)(iv) ....99

10 C.F.R. § 60.2 ....98

10 C.F.R. §§ 61.55-61.59....29

10 C.F.R. § 72 ....10, 11

48 Fed. Reg. 16,590 (Apr. 18, 1983) .... passim

48 Fed. Reg. 54,391 (Dec. 2, 1983) ....82

52 Fed. Reg. 5992 (Feb. 27, 1987) .... 99

54 Fed. Reg. 22,578 (May 25, 1989) ....99

60 Fed. Reg. 13,424 (Mar. 13, 1995)....100, 101

66 Fed. Reg. 51,823 (Oct. 11, 2003)....100

H.R. 3809, 97th Cong. (1982)....98

Restatement (Second) of Contracts § 204 (1981) ....38, 39

Restatement (Second) of Contracts § 251 (1981) ....13

Restatement (Second) of Contracts § 350 (1981) ....64, 65, 70, 76

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 98-488 C |
| THE UNITED STATES OF AMERICA, | ) | (Judge Braden) |
| Defendant. | ) | |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO THE GOVERNMENT'S POST-TRIAL BRIEF**

## INTRODUCTION

After SMUD filed its opening Post-Trial Brief ("Pl. Br.") in this case, the Federal Circuit issued its decision in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005). That decision supports SMUD's claims in this case. In *Indiana Michigan*, the Federal Circuit rejected the government's argument that utilities in the spent fuel cases were not entitled to recover "pre-breach" damages. *Id.* at 1374-75. The Court held that "[i]t is beyond debate that because the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998, the *utilities were in fact obligated to take mitigatory steps*." *Id.* at 1375 (emphasis added). The Court further found that:

> It would have been improvident for [the utility] to have waited until January 1998 before deciding what to do with its nuclear waste. Indeed, the losses which the utilities are obligated to

> mitigate are not merely pecuniary unto themselves, e.g., the increased cost of obtaining storage for SNF on short notice.

*Id.* In addition, the Court explained that "[h]aving been placed in a position *where they are required to find alternate storage for SNF*, the utilities must *de facto* accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF, *a situation which the NWPA was enacted to avoid*." *Id.* at 1375 (emphasis added).

The Federal Circuit reaffirmed the principle that "mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage," and that the "[the utility] is 'not precluded from recovery . . . to the extent that [it] has made reasonable but unsuccessful efforts to avoid loss.'" *Id.* (quoting Restatement (Second) of Contracts ("Restatement") § 350 (1981) (alteration in original). The Court also concluded that, on the facts of that case, the trial court's finding of no damages was supportable and that the plaintiff was not entitled to recover future damages at present, but could return to court and "obtain recovery for post-breach damages as they are incurred." *Id.* at 1375-77.[1]

Here, SMUD seeks no future damages. It seeks only the costs that it incurred in a reasonable effort to "to find alternate storage for SNF" in light of DOE's many announcements

---

[1] In that case, the utility had not built an on-site dry storage facility and primarily sought to recover future damages that it might incur to purchase casks and build an Independent Spent Fuel Storage Installation ("ISFSI") in the future. 422 F.3d at 1376. The actual past costs that the utility sought were for a "re-racking" of its spent fuel pool (to expand the capacity), an aborted investment in the Private Fuel Storage initiative that was being considered for an Indian reservation in Utah, and an Advanced Purchase Agreement that was considered an equity investment in future casks that the utility did not pursue. *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 655-59 (Fed. Cl. 2004), *aff'd* 422 F.3d 1369 (2005). SMUD is not seeking any costs related to the re-rackings of its spent fuel pool, SMUD never made any investment toward the Private Fuel Storage initiative in Utah, and SMUD never entered into any type of equity investment for casks. Furthermore, unlike Indiana Michigan, SMUD has actually

Footnote continued on next page

of failure and delay. The Federal Circuit's decision demonstrates that SMUD would have been "improvident" had it done nothing in response to the government's delays. SMUD, in the exigencies of the real world, was "placed in a position where [it was] required to find alternate storage for SNF," *id.*, and it responsibly did so at a reasonable cost it is now entitled to recover. The litany of defenses and deductions urged by the Government all fail for the reasons set forth below.

## ARGUMENT

### I. SMUD's Development Of Dry Storage Was Caused By The Government's Anticipated And Actual Failure To Begin Accepting Spent Fuel.

Whether the causation standard employed here is the "definitely established" standard endorsed in *California Federal Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005), or the "substantial factor" standard articulated in *Indiana Michigan*, 422 F.3d at 1373, or the "direct result" standard urged by the government, Defendant's Post-Trial Brief ("Gov. Br.") at 5-6,[2] the evidence establishes that the government's long anticipated and then actual failure to begin accepting spent fuel in January 1998 caused SMUD: (1) to initiate and proceed with its dry storage project during the period from 1992 through 1996; and then (2) to continue with that

---

Footnote continued from previous page

purchased its dry storage canisters, completed its ISFSI, and transferred all of its fuel to the ISFSI.

[2] This Court rejected the government's "direct result" standard earlier this year, noting that the Federal Circuit's *California Federal* decision endorsed "a different standard, *i.e.*, the causal connection between breach and the loss . . . must be definitely established." *Am. Capital Corp. v. United States*, 66 Fed. Cl. 315, 395 n.55 (2005) (quotation omitted).

project through multiple reevaluations during the period from 1997 through 2002. The government's arguments to the contrary fail for the reasons set forth below.

### A. SMUD Is Not Precluded As A Matter Of Law From Recovering Costs Prior To 1994.

At the outset, the government argues that the Federal Circuit's decision in *Indiana Michigan* "held that plaintiffs in spent nuclear fuel cases are not entitled to recover damages arising before 1994." Gov. Br. at 7. The Federal Circuit, however, made no such ruling. The Federal Circuit's actual holding was that the particular plaintiff there, Indiana Michigan, had authorized the reracking projects at issue "in the normal course of business" and that such reracking "was not affected by 1987 and 1989 DOE announcements projecting delays." 422 F.3d at 1376. The government's argument also ignores the Federal Circuit's direction that "[m]itigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." *Id.* at 1375. Although the Federal Circuit found it "beyond debate" that the government's 1994 announcement of delay had such effect and that in fact utilities had a legal obligation to begin mitigating in 1994, *id.*, the Court did not, contrary to the government's assertion, issue an industry-wide ruling that mitigation efforts were only reasonable after that date. Thus, SMUD is not foreclosed by *Indiana Michigan* from recovering mitigation costs incurred prior to 1994.

**B. The Evidence Establishes That The Government's Announced Delays Caused SMUD To Pursue Dry Storage During The Period From 1992 Through 1996.**

The documentary evidence in this case establishes:

(i) that in 1987, 1988, and 1989, the government made multiple announcements that the opening of the federal repository would be delayed substantially, *see*, *e.g.*, PX 109 at 5; PX 118 at 6; PX 113 at 2, 10, 22; PX 142 at 4-5; PX 143 at 15; PX 144; PX 169 at vii;

(ii) that, although DOE hoped to be able to develop an interim facility, referred to as a Monitored Retrievable Storage ("MRS") facility, DOE recognized that doing so would necessitate the identification of a state that was willing to host the site and the elimination of statutory restrictions that required the repository be close behind the opening of an MRS, *see, e.g.*, PX 143 at 15; PX 169 at x, 11-12; PX 188 at 5; PX 217 at 3-4, 19-23, 30-31; PX 231 at 4; PX 294 at 3;

(iii) that those government statements led SMUD to reasonably conclude that it would have to store spent fuel at Rancho Seco for an uncertain and extended period of time, *see, e.g.*, PX 176 at 59; PX 297 at 7; and PX 528 at 2; and

(iv) that this belief drove SMUD to develop the dry storage project, *see, e.g.*, PX 259 at 2; PX 269A; PX 363 at 7, 8.

This documentary evidence was corroborated by the testimony of various witnesses, including: SMUD's former General Manager, David Freeman, *see* Designations Appendix (Dckt. #310) at 2288-89, 2290-91, 2310-13; SMUD's Assistant General Manager, Jim Shetler,

*see* Tr. at 154, 160, 172, 194, 360; SMUD's former Fuel Disposition Manager, Rita Bowser, *see* Designations Appendix (Dckt. #310) at 2237-40, 2251-52; and SMUD's former fuel management consultant, Saul Levy, *see* Motion For Leave to File Testimony of S. Levy & R. Powers, dated March 7, 2005 ("Levy Motion") (Dckt. #300) at 111, 143.

The government largely ignores the documents and testimony upon which SMUD relies.[3] Instead, the government argues that causation is negated because SMUD's initial decisions to pursue dry storage: were made in 1990-1992 in the non-breach world; were made for business reasons unrelated to the DOE's anticipated delay in performance; acknowledged that DOE had the technical capability of building an MRS; and were driven by projections that the project would pay for itself by 1998. Each of these arguments must fail, however, as they are all founded upon SMUD documents that were influenced by and predicated on the DOE's announcements that it would not open a fuel repository until 2010 at the earliest, and DOE's lack

---

[3] The government quibbles with SMUD's citation of PX 297 in support of its statement that Mr. Levy prepared his report in light of DOE's announcements of likely delay in performance. Gov. Br. at 14, n.7. The Levy report itself, however, confirms the accuracy of the statement in question. *See infra* § I.B.1 (quoting relevant portions of report).

The government also disputes SMUD's reliance on PX 363, the Nuclear Regulatory Commission's ("NRC's") 1994 Environmental Assessment on the Rancho Seco ISFSI ("EA") on the ground that the EA's discussion of the possibility of an MRS by 1998 is inconsistent with SMUD's contemporaneous documents. Gov. Br. at 26, n.16. In fact, however, the NRC's discussion of the obstacles and uncertainty facing an MRS is entirely consistent with SMUD's contemporaneous documents, which consistently characterize the MRS as a possibility. *Compare* PX 363 at 7 *with*, *e.g.*, PX 176 at ii, 65; DX 202 at 0019251 (describing shipment of fuel to MRS as a "possibility"). In addition, the government ignores the fact that the EA was a contemporaneous document that formed the basis of SMUD being able to proceed with its ISFSI development. Moreover, the government ignores SMUD's primary use of the EA, which was to corroborate that shipping fuel to a permanent repository was SMUD's preferred solution and that the absence of such a repository made dry storage SMUD's primary alternative. *See* Pl. Br. at 25-26.

of progress confirms this fact. These breach world documents do not support the government's conjectures as to what SMUD would have done in the non-breach world.

### 1. The Government Confuses The Real World With A Hypothetical Non-Breach World That Did Not Exist After 1987.

The government contends that causation is negated because SMUD's initial consideration of and decisions regarding dry storage occurred during the period of late 1989 through 1992, which was many years before the government was required to begin accepting spent nuclear fuel from utilities and was, according to the government, "by definition the 'but for' [or non-breach] world." Gov. Br. at 12, 15, 27 & n.17. This erroneous contention ignores the fact that during the period from late 1989 through 1992 SMUD was living in the real world, where it was already known that DOE was not developing the necessary transportation system to accept fuel, that DOE was missing the milestones for developing the repository, that DOE's acceptance of spent fuel would probably be delayed substantially, and that SMUD's need to store such fuel at Rancho Seco would be extended accordingly. As SMUD's Assistant General Manager Jim Shetler testified at trial, "we had knowledge that DOE was not going to perform on time" and "that was one of the basic premises on which we went forward in looking at how do we handle a shutdown plant at Rancho Seco and then dealing with the fuel." Tr. at 464 (Shetler).

This knowledge colored all of SMUD's actions during the period in question and drove its initial decisions regarding dry storage, as evidenced by the very documents on which the government relies. For example, the government quotes several excerpts from the March 1990 Levy report, which recommended a transportable dry storage system (in particular, a fleet of

dual-purpose casks) "to keep open the possibility" of off-site shipment to an MRS in 1998. Gov. Br. at 13-14 (citing PX 176). A transportable system was thought necessary to keep open the possibility of shipment precisely because the government was not developing the transportation casks and infrastructure necessary and required by the Contract. PX 44, Art. IV.B.2. Furthermore, the government's selective quotations ignore other statements in the Report which specifically discuss the likelihood of delayed fuel acceptance by DOE and the corresponding increase in fuel storage costs and complication of decommissioning for SMUD:

> If the ultimate disposal of [spent] fuel is in the contemplated federal repository, the costs will extend over a long period of time, especially if the federal repository gets delayed. In that sense, *shutdown plants and, in particular, Rancho Seco with its forced shutdown will incur greater costs than operating plants for storage of their spent fuel and that differential will rise if the federal repository is postponed*. Originally, the Department of Energy (DOE) had planned to accept spent fuel by 1998. Recently DOE has delayed the repository date to 2010 and there is a good chance that further schedule slippages may occur.
>
> * * *
>
> It is concluded that the only *certain* path for rancho Seco spent fuel disposition is to continue the present secured, monitored storage in the cooled plant fuel pool until DOE pick-up under the NWPA as Amended (1987) and DOE disposal in the permanent geologic repository contemplated in that Act. The schedule for DOE pickup is currently highly uncertain with the earliest conceivable pickup date beginning in 1998 and a much more likely pickup date well after 2010. As long as the fuel remains in the fuel pool, the costs associated with security, cooling, and monitoring will continue; and furthermore, options for plant decommissioning and other uses of the site will be limited or precluded.

PX 176 at 3, 59 (emphasis in original).

Other portions of the Levy report repeatedly acknowledge the uncertainties surrounding DOE's spent fuel program and the possibility of an MRS. *See id.* at 14 (referencing "schedule delays in the civilian waste repository program"), 39 (noting that an MRS "has not received final authorization by Congress" and that "if approved, shipment preference, in the eyes of the DOE management, would remain with operating plant spent fuel"), 56-57 (referring to the "uncertain climate" of DOE's spent fuel program), 64 (mentioning "widely publicized discussions about delays in spent fuel pickup and priority in pickup for spent fuel from operating reactors"), 65 (describing DOE performance in 1998 as "[t]he most uncertain element" and stating that the transportable dry storage recommendation "only assumes that it is possible that this could happen").

Nor does the government respond to Mr. Levy's testimony that the anticipated delay in DOE performance was "the key assumption" in his report and that if he had assurance that DOE would begin accepting fuel in 1998 he would have recommended that SMUD leave its fuel in wet storage. Levy Motion (Dckt. #300) at 111, 143.[4] Thus, considered in context, Mr. Levy's dual purpose dry storage recommendation, which SMUD largely pursued (albeit with less-costly dual-purpose canisters instead of a fleet of casks), was an attempt to respond to the uncertainties and anticipated delay in DOE's fuel acceptance.[5]

---

[4] Mr. Levy is a particularly credible witness as he was an independent consultant and has performed no work for SMUD since 1990. *See* Levy Motion (Dckt. #300) at 23-29. SMUD did not subpoena Mr. Levy to testify live at trial because his 79 years old and lives in Campbell, California. *Id.* at 3.

[5] Even if other factors operated in confluence with the uncertainties and delays in DOE's program, the Federal Circuit has directed that the breach need not "be the sole cause" of the loss, and that the "existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *California Federal*, 395 F.3d at 1268.

The same is true of the October 3, 1991 Board meeting, which considered SMUD's dry storage strategy. The government selectively quotes several excerpts from the meeting transcript regarding decommissioning, dry storage costs, and the possibility of an MRS. Gov. Br. at 19-23. These excerpts, however, often precede or follow other statements indicating that the dry storage strategy was driven by the desire to reduce costs and facilitate decommissioning in the event of a substantial delay in fuel removal by DOE. For example, immediately after Fuel Disposition Manager Rita Bowser discussed the possibility of an MRS, which the government quotes extensively on pages 21-22 of its brief, she concluded as follows:

> Our particular ISFSI strategy and our procurement of the 10 CFR 72 license and our use of dual purpose casks, which don't require a spent fuel pool, *provide the District some assurance that even without a repository, long-term dry storage will not preclude the decommissioning of the remainder of Rancho Seco.*

DX 274 at 62-63 (emphasis added).

Similarly, immediately before General Manager David Freeman discussed the prudency of developing dry storage "in case" DOE could receive the casks, which the government quotes on page 22 of its brief, he stated the following after a question about the implications of DOE "not moving ahead":

> *I think its important to realize that it's entirely possible to keep this spent fuel in dry casks or in a building that we could build at Rancho Seco indefinitely.*
>
> But the decommissioning of the reactor could take place or not take place. And, indeed, there are a number of people which believe that on-site storage and not moving the fuel all over the country in any kind of vehicles – whatever they are, no matter how strong they are – that that's not the wisest thing to do.
>
> But we don't have to cross that bridge at the moment.

*Id.* at 67 (emphasis added).

And at the same meeting, SMUD Director Frank Bounaiuto emphasized the uncertainties surrounding DOE's performance and raised the possibility that DOE might never accept SMUD's fuel:

> You know, the initial issue of – that there's going to be some sort of a DOE repository is so far from being a reality. I've been subscribing by mail to both the Nevada papers and the New Mexico papers for over a year now . . . . But to think that there's going to be a DOE repository in either one of those States is at best a dream.
>
> And if it gets to be any more than just an idea, you're going to see on a national scale NIMBY issues you can't even imagine.
>
> Given that, I think it's unrealistic for this Board to think that fuel is ever going to leave Sacramento County.

*Id.* at 70-71. Thus, the evidence indicates that, even in 1991, SMUD anticipated a potentially lengthy delay in DOE performance and reasonably and prudently sought through dry storage to mitigate the resulting effects.[6]

The same is also true of the testimony by Mr. Shetler that the government quotes on page 15 of its brief to suggest that SMUD pursued dry storage to reduce storage costs and

6 The government also quotes a brief colloquy between Board President Smeloff, Assistant General Manager Shetler, and General Counsel Schori to argue that SMUD had not contemplated that dry storage would respond to the DOE's anticipated delay. Gov. Br. at 22-23. However, the quoted language does not involve the question of whether SMUD was taking action because of DOE's projected delay, but the separate issue of whether SMUD was entitled to compensation. As the Court is well aware, until rejected by both the D.C. Circuit and Federal Circuit, the government argued throughout the 1990s that it had no obligation to compensate utilities for the delays in performance. In addition, other language from the same meeting, discussed above, confirms that the dry storage project was specifically intended to respond to the DOE's anticipated delay, and Mr. Shetler specifically disagreed with the government's contention at trial. *See* Tr. at 341, 463-64 (Shetler).

facilitate fuel acceptance by DOE irrespective of DOE's anticipated delay. When read in its entirety, Mr. Shetler's testimony proves just the opposite, that DOE's anticipated delay increased the importance of the storage cost and fuel acceptance considerations:

> A. *Well, I think obviously with wet storage, the benefit was it probably had the most assurance DOE was going to take it in its current form. The downside of that was we were becoming increasingly unsure when that might be and what the overall cost of continuing to store that might be.* What dry storage offered was a cheaper way of dealing with storage of the fuel, so less impact from a cost standpoint. And at least in looking at what Mr. Levy was pulling together, based on potential options, a possibility that it would also be in a form that could facilitate transport to the DOE in the long term and perhaps even sooner than the repository, if another mechanism were to come up.
>
> * * *
>
> Q. *And you also mentioned that it was uncertain as to when DOE might take title to the fuel.*
>
> A. *That's correct. At this point in time, the information in the industry and the DOE was putting out was by 2010 at the earliest.*

Tr. at 172, 174 (emphasis added to identify testimony not quoted by government).

Indeed, virtually all of the evidence relied upon by the government from the early 1990s references the uncertainties and potentially significant delays associated with the DOE's receipt of spent fuel, which is understandable as those uncertainties and potential delays influenced virtually all of SMUD's actions regarding fuel storage during the period. *See, e.g.*, DX 164 at 1 (stating that dry storage "would allow shipment of the fuel by 1998 *if* a storage site is identified by DOE by that date") (emphasis added); DX 194 at 1-12 to 1-13 (noting that "spent fuel disposition is outside the District's control due to the uncertain timing of DOE's" permanent

repository); DX 202 at 0019251 (stating that the permanent DOE repository is "now scheduled at the earliest for 2010" and describing earlier shipment to an MRS as a "possibility"); DX 280 at 0029423 (depicting fuel being transferred to DOE in or after 2010); DX 291 at 0029409 (same); DX 348/PX 259 at 0027248 (projecting dry storage savings "from 1998 through 2010 (the proposed opening of the Federal Geologic Repository)"); DX 481 at 0033398 (noting that DOE may start accepting spent fuel between 1998 and 2013 and that SMUD was prepared to store spent fuel until 2027 and beyond).[7]

Thus, the record confirms that when SMUD made its initial decision to pursue dry storage it was aware of and motivated by the substantial uncertainty and likelihood of delay associated with DOE's performance, that is, it was already living in and its actions were driven by the breach world. Because of this uncertainty and potential delay, SMUD's Fuel Disposition Manager, Rita Bowser, sought adequate assurances of due performance from DOE during the 1990-1991 period, but her requests were uniformly unsuccessful. *See* Designation Appendix (Dckt. #310) at 2238-40 (Bowser); *id.* at 64-65, 74 (Langstaff).[8] Under these circumstances,

---

[7] Even the government's expert witness on causation, Mr. Hamal, conceded that SMUD knew about the DOE's announcements of delay when it entered into its initial dry storage contract in 1992. *See* Tr. at 2891 (Hamal) (stating, with regard to the announced delay of the repository until 2010, "that it had been announced, and I believe that the board knew that as well"). Mr. Hamal testified that "at this time frame, the board recognized the potential for DOE starting to pick up fuel could be 2010, you know, which wouldn't be from SMUD necessarily, but from the industry." *Id*. at 2927. Mr. Hamal agreed that in the early 1990s, "they [had] in their mind that DOE would not be picking up the spent fuel." *Id*. at 2926-27; *see also id*. at 2936.

[8] Under Restatement § 251, a party to a contract has the right to demand "adequate assurance of due performance" where "reasonable grounds arise to believe that the obligor will commit a breach of non-performance that would of itself give the obligee a claim for damages for total breach." As the relevant comment explains, this rule rests "on the principle that the parties to a contract look to actual performance 'and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain.'" *Id*. at cmt a (citing UCC § 2-609, cmt. 1); *see also Danzig v. AEC Corp.*, 224 F.3d 1333, 1337-38

Footnote continued on next page

SMUD reasonably responded to the uncertainty and anticipated delay by pursuing dry storage, and DOE's actions thereby caused SMUD to incur the damages at issue.

**2. SMUD's Desire To Facilitate Rancho Seco Decommissioning And Encourage Prompt Fuel Receipt By DOE Cannot Be Divorced From The DOE's Anticipated Delay In Performance.**

The government next argues that SMUD's pursuit of dry storage to facilitate the decommissioning of Rancho Seco and encourage prompt fuel receipt by DOE was not "in any way related to the government's post-1998 delay in the acceptance of [spent fuel]." Gov. Br. at 11; *see also id.* at 9-10. This argument is mistaken as SMUD's desire to facilitate its decommissioning and encourage receipt of its fuel were intertwined with and driven by DOE's anticipated delay. That delay magnified the importance of those considerations because it meant that SMUD might have to store its spent fuel for several decades and such storage could complicate SMUD's decommissioning and increase its costs. This relationship is well-documented by the record in this case.[9]

---

Footnote continued from previous page

(Fed. Cir. 2000) (adopting Restatement § 251 and citing principle that parties need a sense of reliance and security that performance will be forthcoming). This provision is instructive in that it underscores the importance of having reasonable assurance of future performance, which SMUD lacked throughout the period in question.

[9] The fundamental relationship between fuel acceptance and decommissioning was recognized by the DOE in developing the Standard Contract, which authorizes DOE to give priority to spent fuel from permanently shutdown reactors like Rancho Seco. *See* PX 44, Art. VI.B.1(b). In adopting this provision, the DOE explained that "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." Final Rule, 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983).

For example, as noted above, the March 1990 Levy report explains, in connection with the likelihood of DOE fuel receipt after 2010, that continued wet storage of the fuel would extend SMUD's security, cooling, and monitoring costs, as well as limit or preclude SMUD's decommissioning options. PX 176 at 59. At the October 3, 1991 Board meeting, General Manager David Freeman and Fuel Disposition Manager Rita Bowser both pointed out that dry storage at an ISFSI would provide assurance that long-term fuel storage at the site in the absence of a repository would not preclude the decommissioning of Rancho Seco. DX 274 at 63 (Bowser), 67 (Freeman).

Other SMUD documents similarly relate the anticipated delay in DOE performance to the need to reduce storage costs and facilitate decommissioning. The 1992 staffing summary sheets that recommended authorizing contract negotiations and then approving the contract with Pacific Nuclear both specifically reference the savings that will result from the transfer of fuel to dry storage during the period of the government's delay, from 1998 to 2010. *See* PX 259 at 2; PX 269A. The EA, issued by the NRC in 1994, states that the "absence of a Federal repository makes storage of spent fuel in dry shielded canisters above ground SMUD's primary alternative." PX 363 at 8. Although the option of leaving the fuel in the pool was discussed, it was considered "undesirable" because of the continued costs to maintain the pool and the delay in decommissioning that would result. *Id.*

This relationship is further illustrated by the testimony of SMUD's Assistant General Manager, Jim Shetler, who explained the effect of the uncertainty and potential delay in DOE's performance as follows:

> Well, I think the issue that we were looking at was we were now talking rather than maybe eight or ten years of storage, a couple of decades of potential storage.
>
> * * *
>
> So what we were looking at is how do we deal with storing this fuel for the long haul. How do we do it safely? How do we do it with the potential of losing experienced people? And how do we do it in a method that is cost-effective? And also how do we do it in a method that would hopefully allow for DOE receipt? Ultimately.

Tr. at 160 (Shetler).

Mr. Shetler also explained that while SMUD's decommissioning strategy was not dependent upon dry storage, the two were related, particularly as DOE's delay was anticipated to extend well beyond 2008:

> Well, the driver to go to [dual purpose dry storage] was really where we were with DOE acceptance. The decommissioning plan itself was somewhat independent of where the fuel was stored. We ultimately, because we elected to go to dry storage based on the DOE's failure to perform, did wrap in the dry storage as a piece of the decommissioning plan.
>
> The decommissioning plan envisioned that we would place the plant in some sort of safe storage mode, mothball mode. It could be done whether the fuel was in wet storage or not. And come back in 2008. If the DOE had performed under the original schedule, the fuel would have been gone by then.
>
> What we were faced with was the fact that the fuel would not be gone. Also the fact that obviously the DOE wasn't going to be performing in that timeframe, so the decision to go to dry storage was one around having to deal with the cost of storing fuel for the long-term. Decommissioning could have been accomplished whether the fuel was in dry storage or wet storage, depending on the performance of the DOE.
>
> If that continued to drag out, then ultimately we would have to do something with getting access to the spent fuel.

*Id.* at 216-17.

Thus, SMUD's pursuit of dry storage to facilitate decommissioning and encourage DOE receipt of its fuel was directly related to and caused by the substantial anticipated delay in DOE performance. If DOE had been planning to perform in 1998 and SMUD had adequate assurance that it would do so, SMUD could have pursued its decommissioning strategy and planned for the certainty of DOE removal of its fuel.[10]

### 3. SMUD's Recognition That DOE Might Be Able To Site An MRS Does Not Negate Causation.

The government attempts to make much of the fact that SMUD documents from the early 1990s acknowledged that DOE "could" begin accepting spent fuel in 1998 through an MRS, and that, if DOE did so, the use of dual purpose dry storage could encourage prompt acceptance of SMUD's fuel. *See* Gov. Br. at 15-16, 22-25. However, the documents in question merely recognize that an MRS could be sited by 1998, that is, that such siting was technically possible, not that it was likely or that it could be done without changing the Nuclear Waste Policy Act ("NWPA"). *See* DX 164 at 1 (noting that dry storage would allow fuel shipment by 1998 if DOE storage were available); DX 274 at 62 (explaining that the likelihood of an MRS opening in 1998 would depend upon the passage of legislation delinking the repository and MRS); DX 280

---

[10] The government also argues that causation is disproven by SMUD's assumption for decommissioning funding purposes that all of its fuel would be removed by 2010. Gov. Br. at 23-24 n.15. Mr. Shetler explained, however, that this was simply a planning assumption that "allowed [SMUD] to come in with a decommissioning estimate that met our targets from a rate standpoint" and that "would be review[ed] and adjust[ed] . . . on an annual basis, once we had better information." Tr. at 474; *accord id.* at 478-79.

at 0029434 (assuming either operation of MRS in 1998 or repository in 2010); DX 291 at 29418 (same).

Other documents similarly reflect SMUD's recognition that the opening of an MRS in 1998 was highly speculative. *See, e.g.*, PX 176 at 65 (describing 1998 fuel acceptance as "[t]he most uncertain element" and explaining that Levy's transportable dry storage recommendation "only assumes that it is possible that this could happen"); DX 202 at 001925 (describing shipment of fuel to MRS as a "possibility"); PX 297 at 7 (noting interim storage is "not currently an option").

This was also confirmed by the testimony of Assistant General Manager Shetler:

> A. [I]f there was a potential for any kind of interim storage facility that could take the fuel earlier, having fuel in a dual purpose system would hopefully expedite the ability to get fuel moved there.
>
> So we recognized that was a possibility. We also recognized that the probability was up in the air.
>
> Q. Excuse me, sir?
>
> A. Was up in the air, that the probability was obviously not certain.

Tr. at 254-55; *accord id.* at 278, 295, 350, 400-01 (Shetler); *see also* Designations Appendix (Dckt. #310) at 2310-13 (Freeman) (testifying that his view in the early 1990s was that an MRS "wasn't going to work"); Tr. 534-35 (Redeker) (testifying that his view in 1993-1994 was that an MRS "was unlikely" to "open any time substantially before the repository").

Moreover, SMUD's hope that a dual purpose dry storage system could encourage prompt DOE acceptance of its fuel if an MRS were developed was itself driven by DOE's

announcements of delay and the fact that DOE was not developing the necessary transportation casks or system that would allow it fully to perform its obligation. *See* Tr. at 1371-72, 1376, 1458 (Stuart). Those announcements indicated that SMUD faced a delay of at least 12 years in the removal of its spent fuel. According to the Levy report, SMUD's only hope of avoiding such an extended and costly delay was through a dual purpose dry storage system. *See* PX 176 at ii (discussing DOE repository delay until 2010 and explaining that transportable dry storage offered "the best opportunity" for early offsite shipment to DOE or interim onsite acceptance by DOE). As Mr. Shetler succinctly explained at trial, "we weren't going to get fuel moved any other way." Tr. at 349 (Shetler).

#### 4. The Government's Economic Argument Is Misguided And Unrealistic.

Finally, the government argues that causation is negated because SMUD believed that "the cost savings by moving to dry storage were so great that the dry storage project would pay for itself by approximately 1998." Gov. Br. at 17, 20, 23, 27. This economic argument is misguided for several reasons.

First, its use of economic calculations prepared in the actual breach world to speculate about what SMUD would have done in the hypothetical non-breach world is inappropriate. These calculations were not self-implementing or treated as dispositive, but were developed and considered as only one of several factors in SMUD's decision-making. As discussed above, the other factors all reflected or were driven by the anticipated delay in DOE's performance. There is no persuasive evidence that SMUD would have made the same decisions regarding dry storage in the absence of such delay. *See supra* § I.B.1-3.

The inappropriateness of the government's approach is confirmed by case law holding that, for purposes of "measuring what hypothetically would have happened," the but for world must be "offense-free." *Lepage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003); *see also, e.g., Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 312 (3d Cir. 1984) (hypothetical world should be "free of the defendants' exclusionary activities"); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1501 (D. Kan. 1995) (comparison should reflect what would have happened "absent illegal conduct"). The government's approach is inconsistent with this fundamental concept as the calculations were prepared in the breach world and their development and use were colored by the DOE's anticipated delay. Thus, the government has failed to demonstrate "a 'but for' market, free of the restraints and conduct alleged." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000).

Second, SMUD's cost projections during this period were not uniform as the government suggests and its model assumes. Although many documents used an $8 million savings figure as the government contends, a number of others used lower figures. *See, e.g.*, DX 159 at 085630 ($.5 to $1 million savings); PX 176 at 58 (same); DX 251 at 2 ($6 million); PX 991 at 0330410 ($33 million over 12 years); PX 363 at 8 ($6 to $8 million); *see also* Tr. at 265 (Shetler) ("There were various estimates that were generated over the course of that period, anywhere from a million dollar savings to 8 to 10 million dollars worth of savings."); *id.* at 476-77 (Shetler) ("We're not dealing with absolute knowledge. We're dealing with best guesses and assumptions").

Notably, the staffing summary sheets presented to SMUD's Board of Directors in June and September 1992 requesting authorization to negotiate and sign the initial dry storage contract with Pacific Nuclear projected that the total savings over DOE's anticipated 12 year delay would be only $33 million, or less than $3 million per year. *See* PX 259 at 2; PX 269A.[11] The government does not account for these different numbers, which reflect the difficulty of making estimates and the uncertainty regarding the savings to be achieved in the real world.

Third, the government's approach fails to account for the effects of non-economic factors on SMUD's decision-making. SMUD's considerations were never limited to a straight economic analysis, but encompassed various other considerations, such as the risk of losing its place in the DOE fuel queue and thereby further delaying fuel acceptance and the risk of cost increases and delays in completing a first-of-a-kind project. These risks are discussed *infra* in Section I.C.3, and would have led SMUD not to pursue dry storage in a true non-breach world where SMUD had reasonable certainty that DOE would begin performance in 1998.

### C. The Evidence Establishes That The Government's Actual Delay Caused SMUD To Restart And Continue With The Dry Storage Project During The Period From 1997 Through 2002.

By the mid-1990s, substantial DOE delay in accepting spent fuel had become a certainty. In May 1994, the DOE "unequivocally announced . . . that it would not meet its contractual

---

[11] The government contends that the $33 million figure is unreliable because Mr. Shetler could not confirm whether it included the dry storage capital costs. *See* Gov. Br. at 41. Although Mr. Shetler acknowledged that he could not definitively answer that question, he stated his belief that the figure reflected the difference in operating savings and that an adjustment for capital costs would be inappropriate. Tr. at 209, 405-07, 485. Even if the capital costs were added the annual savings would increase to only about $4 million per year.

obligations beginning in 1998." *Indiana Michigan*, 422 F.3d at 1375; *see also* PX 351. In May 1995, the DOE made a similar announcement, *see* PX 410, and in December 1996, the DOE again formally notified utilities of the delay, *see* PX 500. As the Federal Circuit recently recognized, SMUD and the other utilities "were in fact obligated to take mitigating steps" under these circumstances. *Indiana Michigan*, 422 F.3d at 1375. Thus, DOE's actual failure to begin accepting fuel from utilities in January 1998 simply confirmed what was already known: that its performance would be delayed by many years.

Against this backdrop, SMUD decided in 1997 to restart and continue with the dry storage project, which was then suspended due to the stop-work order that its vendor Vectra Technologies, Inc. ("Vectra") had received from the NRC and which was well behind the initial schedule and over the initial budget. *See* PFF ¶¶ 146-52, 288-93; PX 502, 503, 519, 524. SMUD also reconsidered the project and decided to continue: in 1998, following Vectra's bankruptcy and its replacement by Trans Nuclear West ("TNW"), *see* PFF ¶¶ 158-62; in late 1999 and early 2000, after further project delays and cost increases were experienced, *see* PFF ¶¶ 163-65; PX 642, 672; and in 2001, in the wake of continuing cost, fabrication, and delivery issues, *see* PFF ¶¶ 166-67; PX 689.[12]

The testimony at trial established that SMUD's decisions to continue with the dry storage project in 1997, 1998, 1999-2000, and 2001 were caused by the DOE's announced 12-year minimum delay in its waste acceptance program and then-actual failure to accept spent fuel in

---

[12] Numerous other utilities made similar decisions during this period to develop transportable dry storage systems due to DOE's failure to perform. *See* E. Supko Written Direct at ¶¶ 113, 122, Table 9 (PX 1002); Tr. at 1458 (Stuart).

1998. This included testimony by SMUD's Rancho Seco Plant Manager, Steve Redeker, *see* Tr. at 593, 604, 620-21, 628-29, 633-34, 653, 668, and SMUD's Assistant General Manager, Richard Ferreira, *see* Tr. at 905-07, 926, 930-31. In other words, the DOE's failure to perform led SMUD to continue to incur costs on dry storage, which expenditures would have been unnecessary and ceased had the government timely performed.

The testimony by Messrs. Redeker and Ferreira on this issue is only logical. There would have been no reason for SMUD to continue with a troubled, first-of-its-kind, dual-purpose dry storage project that could, in that non-breach world, further delay the DOE's acceptance of its spent fuel and necessitate an additional fuel move, if the DOE would have been shortly beginning to accept SMUD's fuel using a different (and, according to the government, inconsistent) type of transportation cask that DOE would provide under the Contract. After all, SMUD's ultimate goal was not simply to reduce its costs, but to have DOE remove or accept responsibility for its spent fuel as soon as possible. *See, e.g.*, Tr. at 152 (Shetler) (stating that SMUD's "primary objective" was "to get the fuel off site, as soon as we could in the DOE's hands"); *id.* at 263 (Shetler) (agreeing that "one of SMUD's ultimate goals was to reduce its nuclear footprint as quickly as possible"); PX 176 at 5-6 (March 1990 Levy Report) (explaining that the study objectives included identifying "the spent fuel storage option which removes the spent fuel from the Ranch Seco site as early as possible").

The government largely ignores the testimony on which SMUD relies and the logic that undergirds it.[13] Instead, the government disputes causation on the narrow grounds that the reevaluations of the project were precipitated by project delays and that they indicate that the project would have been economically beneficial in the non-breach world. The fact that project delays precipitated continuing reevaluations is irrelevant to the question of whether DOE's delay in performance caused SMUD to continue and then complete its dry storage project. In the non-breach world, even assuming that SMUD had initiated the project in 1992, SMUD would not have stopped work on dry storage because it would have provided no economic benefit and would have frustrated SMUD's non-economic goals of certain fuel removal by DOE and risk reduction.

#### 1. The Government Relies Upon An Oversimplified Non-Breach World That Ignores Disincentives To Continuing With The Dry Storage Project.

The government assumes that the non-breach world would have been identical to the actual breach world, with the only exception being that, in the non-breach world, DOE would simply have shown up at Rancho Seco in 2001 to begin accepting spent fuel from SMUD. *See* Gov. Br. at 33-40. This is a gross oversimplification, however, which ignores significant disincentives to continuing with the dry storage project if DOE were actually performing.

---

[13] The government criticizes Mr. Redeker on the ground that he did not prepare a specific analysis in 1997 of DOE's performance in the non-breach world. Gov. Br. at 33 n.21. The reason for this, however, is self-evident: by 1997, it had been known for several years that the DOE would not timely perform, and so an analysis of DOE's performance in the non-breach world would have served no real-world purpose.

To begin with, if DOE were actually performing, then it would have been providing transportation casks to SMUD and other utilities "sufficiently in advance to accommodate scheduled deliveries." PX 44, Art. IV.B.2. With the casks, DOE would have been providing SMUD and the other utilities with detailed information, including "written procedures for cask handling and loading," "training," "technical information," and other "documentation." *Id.* This would have required DOE to design, select vendors, contract for, secure NRC certification of, and arrange for the fabrication of many dozens of transportation casks and the preparation of the accompanying documentation and planning long before January 1998. *See* PX 380 at 12-14 (planning for such activities to begin more than 10 years before projected performance in 2010); PX 669 at 9-12 (planning for transportation procurement activities to begin at least 8 years before performance). As SMUD's experience makes clear, the development of safe and secure containers for transporting nuclear waste on the public highways takes many years to accomplish.

Thus, in the non-breach world, when work on the dry storage project was suspended in 1996, SMUD would not just have known that DOE would perform, but would have had detailed information on the type, size, and specifications of the casks and transportation plan that DOE would use to accept SMUD's spent fuel. DOE in fact began the initial process of cask design in the late 1980s with four different vendors, but abandoned that project in the early 1990s when its delay made any cask development irrelevant. *See* I. Stuart Written Direct at ¶ 7 (PX 1001); Tr. at 1391-92 (Stuart). Given that the DOE would be providing its own casks for accepting

SMUD's fuel, there would have been no reason for SMUD to restart or continue with the dry storage project in the non-breach world.

Because DOE did not come close to performing, there is no way of knowing precisely what kind of transportation cask it would have provided. According to the government, however, the DOE casks would have required bare fuel assemblies and would not have accommodated transportable storage canisters like those developed by SMUD and other utilities in the real world. *See, e.g.*, Gov. Br. at 79-80.[14] Indeed, the government has argued in this case that DOE will not accept canistered fuel. *See, e.g.*, Tr. at 84 (statement by counsel that DOE will accept only "bare fuel assemblies"); Tr. at 1943-44, 2185 (Zabransky) ("take the fuel out of those containers, DOE will pick up the fuel"); PX 696 at HQR 2480412 ("The current DOE position is only bare SNF is covered by the contract.").

Therefore, completing the dry storage project would have put SMUD at risk of DOE not accepting its spent fuel. This would have been directly contrary to SMUD's primary objective of securing prompt removal of the fuel by DOE. To avoid such a result, SMUD would have had to retain its spent fuel pool so that the fuel assemblies could be safely transferred from its dual

---

[14] Many utilities developed transportable dry storage systems because DOE's failure to perform caused utilities' wet pools to begin approaching their designed capacity. *See infra* § IV and note 37; *see also* Langstaff Designations (Dckt #289) at 112-14, 150-53. Therefore, in the non-breach world, few if any such systems would have been developed, and there would have been little or no need for DOE to accommodate them. DOE's own interest in multi-purpose canisters was a direct result of its announced delays and was considered as a possible method of offsetting some of the financial burden to utilities resulting from its delayed performance. *See, e.g.*, PX 380 at 9; PX 351; PX 369.

purpose canisters into DOE's transportable casks.[15] This, in turn, would have eliminated virtually all cost savings associated with dry storage. *See, e.g.*, PX 269A (indicating that savings result from closure of pool); PX 519 at 4 (same); Tr. at 332-33 (Shetler) (same). Thus, SMUD would have derived no economic benefit from continuing with the dry storage project in the non-breach world.

Another significant disincentive to continuing with the dry storage project in the non-breach world is that, even assuming that TNW was willing to assume a contract for the completion of a first-of-a-kind dry storage system, SMUD would have been required to enter an open-ended, "cost-without profit" contract with TNW to finish the project because TNW was not willing to enter into a fixed price or fixed schedule contract. Tr. at 929 (Ferreira). This obviously left SMUD in a very difficult position in the real world, and would have presented an even larger hurdle in the non-breach world, where SMUD would have had the alternative of simply waiting for DOE to accept its fuel from the pool. In addition, TNW undertook this first-of-its-kind project in an effort to enter the dry storage market and secure additional business from the many utilities that are and will be needing dual-purpose dry storage as a result of DOE's delay. *See, e.g.*, Tr. at 921-24 (Ferreira); E. Supko Written Direct at ¶¶ 113, 122, Table 9 (PX 1002); Tr. at 1458 (Stuart). If DOE were performing, then there would have been little or no market for transportable dry storage systems, and there is no reason to think that TNW would

---

[15] The evidence at trial demonstrated that, even today, a fuel pool would be necessary to transfer fuel assemblies between two different storage containers because no dry transfer system has been developed, tested with fuel, licensed, or used. *See infra* § IV.C.

have been willing to commit significant resources to a first-of-its-kind project, particularly on a "cost-without-profit" basis as it did in the real world. *See* PX 585.

Yet another disincentive is that if DOE was actually performing, then it would be providing SMUD with "written procedures" and "training" on cask loading as well as "technical information, special tools, equipment, lifting trunnions, spare parts and consumables" for the casks. *See* PX 44, Art. IV.B.2.a.-c. As demonstrated by SMUD's training efforts in the real world, it would have required substantial time and effort by Rancho Seco management and staff to train, prepare for and undertake the actual loading of the DOE casks in the non-breach world.[16] Continuation of the dry storage project under these circumstances would have prevented Rancho Seco management and staff from conducting the necessary training for loading and transferring fuel to the DOE casks. Furthermore, it would have required SMUD to significantly augment its personnel to accomplish the disparate goals of loading the DOE casks for acceptance by DOE while simultaneously loading its own canisters for temporary storage at the ISFSI, efforts that would have contravened SMUD's primary objective to have fuel removed from the site, as well as its efforts to reduce staffing at Rancho Seco. *See, e.g.*, Tr. at 678-79 (Redeker); Tr. at 953 (Field); PX 505 at 1603 (1997 Rancho Seco budget indicating that full-time staff would decrease from 142 to 128 between 1995 and 1997); DX 1172.

---

[16] For example, because of the health and safety issues involved, SMUD undertook substantial training over several years for the real-world transfer of the spent fuel from the pool to the ISFSI, including classroom training, field work, and practice work with a dummy canister and cask. *See* Tr. at 1027-29 (Field); PX Dem. 75B, 75C.

A final disincentive to continuing with the dry storage project in the non-breach world is that it would have unnecessarily expanded SMUD's decommissioning obligations. Although the horizontal storage modules and concrete pad for the ISFSI had been completed by 1997, *see* PX Dem. 32, they did not yet require decommissioning because they were as-yet uncontaminated by radiation. Once the dry storage project was completed, however, and the modules were loaded with the canisters, then the modules and pad became subject to decommissioning. PX 962 (2000 letter from NRC with attached Materials License for ISFSI, which requires decommissioning of facility at the end of its useful life). SMUD will also be required to decommission the 21 canisters themselves, assuming, as the government contends, that DOE does not accept and agree to dispose of them. *See* 10 CFR §§ 61.55-61.59 (addressing classification of radioactive waste and requirements for disposal). Thus, SMUD's continuation of the dry storage project in the non-breach world would have unnecessarily expanded its decommissioning obligations to encompass the approximately 1-acre ISFSI and the 21 canisters, which would have been inconsistent with its desire to reduce its nuclear footprint. *See* Tr. at 263 (Shetler).

In short, SMUD would have faced significant disincentives to continuing the dry storage project during the period from 1997 through 2002 in the non-breach world, including the elimination of any economic benefit from the project, difficulty in finding a replacement vendor, a need to augment Rancho Seco personnel, and the unnecessary expansion of SMUD's decommissioning obligations. For these reasons, the evidence demonstrates that, even assuming that SMUD would have begun the dry storage project in 1992 in the non-breach world, each of

SMUD's multiple reassessments and reconsiderations of the project during the 1997 to 2001 period would have led it to abandon the project in the non-breach world.

### 2. The Fact That SMUD's Reassessments Were Precipitated By Delays In The Dry Storage Project Is Irrelevant.

The government argues that SMUD cannot prove that, in the non-breach world, it would have stopped work on the dry storage project in connection with its 1997, 1998, 1999-2000, or 2001 reassessments because these reassessments were precipitated by project delays, rather than the breach. Gov. Br. at 29-30. Although SMUD has freely acknowledged that the reassessments were precipitated by project delays (and Vectra's bankruptcy), this point does not negate or even bear on causation. The government's failure to begin actual acceptance and removal of fuel in the real world on January 30, 1998, was not an event that would have precipitated any specific action by SMUD because DOE had announced with virtual certainty many years before that it would not remove fuel by that date or any date likely before 2010. Thus, DOE's January 30, 1998 breach was simply a date passing on the calendar.

The important point for demonstrating causation is that the reevaluations show that SMUD repeatedly and explicitly considered abandoning the dry storage project during this period and leaving its spent fuel in wet storage, even in the breach world, and that such consideration was not just a theoretic possibility but an actual fact. *See, e.g.*, PX 502, 503, 519, 524, 642, 672, 689. Therefore, in the hypothetical non-breach world with DOE actually performing, in light of all of the disincentives to pursuing the first-of-a-kind dry storage project,

SMUD would have concluded not to continue the project for the reasons set forth above. *See supra* § I.C.1.

In the real world, however, DOE's breach caused SMUD to continue to pursue an alternative means of storing its fuel for the indefinite future. After all, by 1997, in the real world, there was no longer any possibility of an MRS, it was certain that DOE's performance would be delayed by at least 12 years, and various other utilities were developing similar dry storage systems, while in the non-breach world DOE would already have been coordinating with SMUD and other utilities regarding the casks, training, and equipment that it would be providing.

### 3. The Government's Economic Argument Fails for Multiple Reasons.

The government argues that causation is negated because "every time SMUD performed a reevaluation, it concluded that the project paid for itself so quickly that DOE's breach of the Standard Contract was immaterial." Gov. Br. at 32-40. In fact, SMUD never made such a conclusion, and the government's speculation that SMUD's economic calculations would have led it to this result is without merit.

First, like the similar contention that the government makes for the period from 1992 through 1996, this argument inappropriately uses economic calculations prepared in the actual breach world to speculate about what SMUD would have done in the hypothetical non-breach world. As explained above, these calculations were not self-implementing, were colored by DOE's delay, and do not reflect an appropriate, offense-free, but-for world. *See supra* § I.B.4.

This problem is exacerbated during the period from 1997 through 2002 because of the significant differences between the actual breach world and the hypothetical non-breach world.

As explained above, in the non-breach world, SMUD's continued pursuit of the dry storage project would have required it: to maintain its spent fuel pool until DOE performed so that it could transfer the fuel from its dual purpose canisters into DOE's transportation casks; to enter into an open-ended, full-cost recovery contract with a new vendor (TNW) that was just entering the market; to augment its Rancho Seco management and staff to handle two simultaneous fuel training and loading programs; and to increase its decommissioning costs and obligations to encompass new and additional contamination and radioactive waste in the form of the horizontal storage modules, pad, and canisters. *See supra* § I.C.1. These differences between the actual breach world and the hypothetical non-breach world would have involved potentially significant out-of-pocket and delay costs, which are not reflected in the breach world cost projections on which the government relies. Therefore, these cost projections cannot be used to predict what SMUD would have done in the non-breach world.

Second, the government's approach fails to account for the effects of SMUD's non-economic objectives on its decision-making. As previously noted, SMUD's ultimate goal was not just to reduce costs, but to have the DOE remove or accept responsibility for its spent fuel as soon as possible. *See, e.g.*, Tr. at 152, 263 (Shetler); PX 176 at 5-6. SMUD's other goals included minimizing its risks and assuring the success of its strategy. *See, e.g.*, Tr. at 906 (Ferreira) (stating that "the objective was to try to minimize the risk and the cost"); PX 176 at 5 (stating that the District "plans to 'select and implement the option with the least risk, highest certainty of achievement, and lowest overall cost'").

Notably, completion of the dry storage project in the non-breach world would have contravened SMUD's goals of assuring prompt DOE removal of its spent fuel and minimizing its risks. This is because DOE had already taken the position that it might shift canistered fuel to the end of its fuel queue, *see* DX 425 at 1-2; PX 320 at 1; PX 325 at 1; Tr. at 364-65 (Shetler); and the government now takes the position that transfer of fuel to dry storage precludes acceptance altogether. Gov. Br. at 79-80. Thus, by completing the dry storage project in the non-breach world, SMUD would have subjected itself to a potentially lengthy delay in the removal of its spent fuel. In addition, completion of the dry storage project in the non-breach world would have subjected SMUD to the risk of additional regulatory, design, and manufacturing problems, which in fact occurred and resulted in further project delays and cost increases. *See, e.g.*, Tr. at 620-21, 628-29 (Redeker); Tr. at 902, 914-15 (Ferreira). These risks increased in 1998 because, following Vectra's bankruptcy, SMUD was unable to secure completion of the project at a fixed price or a fixed schedule. *See* PX 585; Tr. at 921 (Ferreira).

Indeed, the witnesses with actual knowledge of SMUD's decision-making during this period testified that SMUD would not have continued with dry storage if DOE were performing under the Contract. For example, Rancho Seco Plant Manager Steve Redeker, the point person for the 1997 reassessment, testified that:

> Had [DOE] been performing and saying, yes, we're coming in 1998 and the fuel will be gone in 2006, that would have changed the outcome of this entirely. It would have made the spent fuel pool an absolute certainty. They are coming and they are going to take it out of our pool, the risk will be gone. And I wouldn't have to worry about that, I wouldn't have to worry about whether they could manufacture the thing, if they had said I'm coming, we're going to perform.

Tr. at 620-21; *see also id.* at 628-29 (Redeker); SMUD's Assistant General Manager Richard Ferreira similarly confirmed that in 1997 "had DOE responded favorably and was willing to assume responsibilities, then we would not have continued with the dry fuel storage program." *Id.* at 907; *see also id.* at 905-06 (Ferreira). And SMUD's Assistant General Manager Jim Shetler testified that if SMUD had assurance that DOE would begin fuel acceptance in 1998, it would have kept the fuel in wet storage to avoid the risk of pursuing a first-of-its-kind technology and DOE characterizing the canistered fuel as non-standard and delaying its acceptance. *Id.* at 360; *see also id.* at 194 (Shetler).[17]

Third, the government misapplies some of the cost projections on which it relies. For example, the government contends that SMUD's 1997 cost projections assumed an annual cost saving of $10 to $12 million and indicate that "the cost of going to dual-purpose dry storage would have paid for itself by 2001." Gov. Br. at 33. It is true that a presentation to the Board used the $10 to $12 million number; the underlying staff analysis, however, indicated that, if SMUD left its fuel in the pool for the long period of DOE's delay, it could reduce the Rancho Seco staff from 148 people to 80, and that, at this lower staffing level, the projected cost

---

[17] The government argues that a 1993 memorandum by Mr. Shetler disproves causation for that period because it indicated that wet storage would cost more than dry storage even if DOE acceptance of dry stored fuel were delayed for twenty years. Gov. Br. at 29 n.18 (citing DX 425). The memorandum describes this information, however, as just "order of magnitude" comparisons that were intended to look at "possible options." DX 425 at 0027391; *see also* Tr. at 472 (Shetler) (stating that he was "trying to get some boundaries around what might be some of the potential parameters on cost"). The comparisons do not attempt to model the non-breach world or to address all of SMUD's objectives and concerns. And the government omits the principal conclusion drawn in the memorandum, which was that "it is obvious that the cheapest [approach] for the District is to get the spent fuel out of our hands and into DOE's as soon as possible." DX 425 at 0027391.

differential between long-term wet and dry storage would be reduced to about $257,000 per month or a little more than $3 million per year:

> *For the purpose of staffing during extended periods of delay, a level of 80 is provided. This staff level is considered, for the purpose of this evaluation to be the absolute "minimum" level necessary to operate the plant, including the spent fuel pool.* Further evaluation may be necessary, should a specific option be considered for implementation, and for regulatory compliance.
>
> To derive the actual cost of the delay in getting into Hardened-SAFSTOR [*i.e.*, mothball status], it is necessary to subtract the TLG estimated cost for a given period from the same overlapping period and the associated cost associated with the delay.
>
> For example, the gross cost of one month of delay due to spent fuel offload for the current staff of 148 is about $800,000. For a staff of 80, 80% of the cost [to reflect the percentage attributable to the fuel pool] is about $449,000. TLG estimates the staff cost of one month of Hardened-SAFSTOR [which includes dry storage] is $192,000 (the amount already forecast for the same time period if integrated into the trust fund annual contribution). *Therefore, the monthly net increase or differential for the current staff is $608,000. For the staff of 80, the difference per month is $257,000.*

PX 519 at 4 (emphasis added); *see also id.* at 18-19 (stating that if fuel were kept in the spent fuel pool staffing would be reduced to 80 and SMUD would face "[a]dditional costs after 2008 of $4.8 million per year, primarily for additional staff to keep the spent fuel pool open").

This lower savings cost estimate predates by more than a year the filing of SMUD's complaint, and is similar to SMUD's actual savings in 2003 following closure of the spent fuel pool. *See* PFF ¶¶ 394-95. Under these circumstances, after the bankruptcy of Vectra, the uncertain going-forward costs from TNW's cost-without-profit contract, and the continuing

regulatory risks, the minimal economic benefits to be derived from dry storage would not have driven SMUD to continue the project had DOE been accepting and removing spent fuel.

Similarly, the government argues that SMUD's December 1999 cost projections indicate that "SMUD's dry storage project paid for itself prior to its first scheduled acceptance by the government [in 2001]." Gov. Br. at 39. This argument is apparently based on the government's use of additional capital costs of $15.3 million and annual cost savings of $10 to $12 million. *Id.* at 39, 40. The documents in question, however, project that the annual cost savings through 2008, when decommissioning was projected to be complete, would be only about $2.25 million per year because the staff would also be working on decommissioning during that period. *See* PX 642 at 062828 (stating that wet fuel storage costs before 2008 would be "$2.25M/yr"); *accord* PX 672 at 062795-98 (depicting dry storage cost savings of $2.25 million annually through 2008).

At this lower rate of savings, even the $15.3 million figure would not have been recovered until 2007 or 2008,[18] *id.*, and the government's analysis does not even consider the economic effect of its own argument that transfer of the fuel to dry storage would result in an indefinite number of additional years of storage costs. Thus, even if the government's misguided and simplistic approach to this issue were followed, and SMUD's substantial internal costs and non-economic risks were ignored, these documents indicate that SMUD still would have abandoned the project in late 1999 or early 2000 in the non-breach world, if not long before,

---

[18] In the non-breach world, at a 3000 ton rate, SMUD's last scheduled delivery of SNF would have been, at the latest, in 2006. *See* E. Supko Written Direct at ¶ 13.

because the cost projections undertaken at this time would have indicated that the additional capital costs would have exceeded the monetary benefits. As SMUD explained above, however, the government's theoretical economic model is flawed and should be rejected. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 742 (1977) ("[I]n the real economic world rather than an economist's hypothetical world, the latter's drastic simplifications generally must be abandoned") (quotation omitted); *Honorable v. Easy Life Real Estate Sys.*, 100 F. Supp. 2d 885, 888-89 (N.D. Ill. 2000) ("to produce theoretical equilibrium, neoclassical economics in fact assumes *perfect* information, *perfect* competition and *no* transaction costs, among other realizations. But these assumptions must be relaxed, and perhaps, ultimately replaced, if economic theory is to have any application to what happens in actual markets.") (italics in original).[19]

## II. In The Non-Breach World, The Government Would Have Operated At A Reasonable Rate Of Acceptance.

For the reasons stated above, the Court need not determine the spent fuel acceptance rate that DOE would have used in the non-breach world to conclude that DOE's announced and actual failure to perform caused SMUD to incur the damages at issue.[20] Determining the non-breach world acceptance rate is, in any event, complicated by the fact that the government never

---

[19] The government's economic expert, Mr. Hamel, created a hypothetical and flawed model that improperly assumed that SMUD had perfect information about its future costs and the length of time it would take to complete the dry storage project, and also that failed to consider the significant non-economic factors that would effect SMUD's decision-making in the non-breach world. It should be rejected for the reasons outlined above.

[20] The government concedes that determination of the acceptance rate is "unnecessary to the Court's resolution of this case." Gov. Br. at 42.

came close to performance and "unequivocally announced in 1994 that it would not meet its contractual obligations." *Indiana Michigan*, 422 F.3d at 1375.

Nonetheless, if the Court chooses to determine the non-breach world acceptance rate, the overwhelming evidence supports the conclusion that DOE would have performed at the 3000 ton rate. This evidence includes the testimony of numerous DOE officials and DOE documents, and is confirmed by the analysis performed by Eileen Supko. The evidence in support of a 3000 ton rate was so extensive that this Court in *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003), explained that "the record contains uniform support" for the 3000 ton rate and that:

> Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials. We have not attempted to discuss here the entire record support for DOE's intended 3,000-ton annual rate of delivery, but the evidence shows clearly that such a rate was the minimum needed to meet those objectives.

In *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662, 667 (2003), the Court found that "DOE's proposed interpretations of the Standard Contract are unreasonable" and explained that "[t]he deposition testimony of several DOE officials involved with the SNF program supports plaintiff's assertion that the intent of the NWPA and the parties was to avoid construction by utilities of additional at-reactor storage." The Court further found that "DOE officials testified that the 3,000 MTU rate was determined to be the acceptance rate necessary to both prevent additional at-reactor storage and reduce the backlog of SNF." *Id.* The decision in *Commonwealth Edison* was adopted in both *Yankee Atomic Electric Co. v. United States*, No.

98-126C (Fed. Cl. June 26, 2003), and *Southern Nuclear Operating Co. v. United States*, No. 98-614 (Fed. Cl. Apr. 7, 2004).[21] As explained below, the evidence demonstrates that DOE likely would have performed at an annual steady-state rate of approximately 3000 tons both because 3000 tons is the undisputed reasonable rate and because it satisfies the intent of the parties. Because the acceptance rate is a missing or open term in the Contract, this Court is required to supply that reasonable rate in this case. Restatement § 204.

### A. The Evidence Demonstrates That DOE Would Have Performed At A 3000 Ton Rate.

The government concedes that the Contract does not contain an acceptance rate term. Gov. Br. at 42; *see also Indiana Michigan*, 57 Fed. Cl. at 96 ("Here, the contract term is missing entirely."); *Commonwealth Edison*, 56 Fed. Cl. at 662 ("The court's analysis begins with the question of whether the Standard Contract on its face contains an acceptance rate. It does not."). "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement § 204. "A court is obliged to supply missing terms consistent with community standards of fairness and policy." *Indiana Michigan*, 57 Fed. Cl. at 97; *see also Commonwealth Edison*, 56 Fed. Cl. at 662 ("The task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific

---

[21] The government's brief does not mention these decisions, and cites only the decision in *Florida Power & Light Co. v. United States*, 64 Fed. Cl. 37 (2005), which was subsequently vacated by the Court on other grounds. *See Florida Power & Light Co. v. United States*, 66 Fed. Cl. 93 (2005).

to be enforceable) is the function of the court.") (quoting *David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (1977)).[22]

The government argues that because the acceptance rate is missing from the Contract, it should be defined by the twice aborted DCS process. Gov. Br. at 54. The government relies on requests made by several utilities that DOE include specific language in the Standard Contract addressing the acceptance rate and the fact that DOE did not include that language in the Contract. Gov. Br. at 43. The government, however, draws the wrong conclusion from these facts. The operative point is that DOE did not put any acceptance rate term in the Contract – in other words, the acceptance rate is, in every sense, an open term.[23] DOE appeared to recognize

[22] *See also David Nassif Assocs. v. United States*, 644 F.2d 4, 5-9 (Ct. Cl. 1981) (including court's analysis of the appropriate size of the cafeteria at issue – an important, but missing, term of the contract); *Essex Electro Eng'rs, Inc. v. Danzing*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("When the contract does not specify the period in which the government must [perform], the law imposes an obligation to act within a reasonable period of time. That period is determined by the reasonable expectations of the parties in the special circumstances in which they contracted.").

The fact that the Contract has an integration clause does not alter the fact that there is a missing term and that the Court must supply a term reasonable in the circumstances. An integration clause applies only when the language of the document resolves the dispute. *See, e.g. United States v. Ins. Co. of N. Am.*, 131 F.3d 1037, 1044 (D.C. Cir. 1997); *Augustine Med., Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1374 (Fed. Cir. 1999). In *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996), the court explained that when a contract document's provision is ambiguous, the court may "resort to extrinsic evidence to inform its interpretation of that provision, regardless of whether the contract was fully integrated." *Accord In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1375 (Fed. Cir. 1999). In addition, "[t]he fact that an essential term is omitted may indicate that the agreement is not integrated or that there is partial rather than complete integration." Restatement § 204, cmt. e.

[23] The government's DCS argument (as well as the testimony it cites from Mr. Morgan on page 45 of its brief) is simply another variant of the argument that, because the acceptance rate term is omitted from the Contract, DOE has unfettered discretion to accept fuel (or not to accept fuel) at whatever rate it sees fit. This is not the law, as noted above. In addition, because this argument "would render the government's duties under the Standard Contract illusory," it should be rejected. *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 371 (2005); *see also Indiana Michigan*, 57 Fed. Cl. at 97 (holding that the government's argument "does not comply with congressional expectations or the parties' intentions" and "tends to render the Standard

Footnote continued on next page

this fact when it published the Standard Contract in April 1983, noting only that: "The 1998 date is called for in the Act, and we believe it to be a realistic date. *Our performance will be judged by meeting this date*." 48 Fed. Reg. 16,590, 16,598 (Apr. 18, 1983) (emphasis added); *see also* Designations Appendix (Dckt. #310) at 1712 (Lawrence) (Deputy Director of SNF program in 1983 and Second Acting Director of program) (explaining that at the time of Contract formation, DOE understood that utilities would have liked the Contract to include a specific rate term, but DOE lacked the means of specifying a rate at that time). Thus, contrary to the government's assertion, SMUD does not seek to obtain anything improperly through the "back door" – the Contract does not contain an acceptance rate, and black letter law therefore requires that a reasonable term be supplied by the Court.

The actual language of the Contract confirms that there is no limitation on the acceptance rate or the amount of fuel that SMUD may seek to deliver to DOE in any particular year. PX 44, Art. V.B.1. The "Term" of the Contract is "from the date of execution until such time as DOE has accepted, transported from the Purchaser's site(s) and disposed of all SNF and/or HLW of domestic origin." *Id.*, Art. III (emphasis added). The "Scope" of the Contract provides that "[t]he services to be provided by DOE under the contract shall begin, after commencement of facility operations, not later than January 31, 1998 *and shall continue until such time as all SNF*

---

Footnote continued from previous page

Contract illusory"); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343-45 & n.8 (2005) (rejecting argument that "DOE has virtually unfettered discretion to determine its obligations under the contract, through the DCS process or otherwise, especially where no repository is available").

*and/or HLW . . . has been disposed of*." *Id.*, Art. II (emphasis added). The "Delivery" provision states that "the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three months thereafter." *Id.*, Art. V.B.1 (emphasis added). Finally, the provision on "Acceptance Procedures" explains that "[d]elivery commitment schedules for SNF and/or HLW *may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate*" and, if necessary, an "acceptance priority ranking will be utilized." *Id.*, Art. VI.B.1 (emphasis added).[24]

DOE's own officials have confirmed that 3000 tons is the reasonable rate in the circumstances. DOE official Lake Barrett, the Director or Deputy Director of the entire program from 1993 to 2002, explained that the 3000 ton rate was looked at as the

> proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have – you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3000, based on [studies from the] early 1980s, seemed like a reasonable number to use.

Designations Appendix (Dckt. #310) at 318. Former Director Barrett further testified that the 3000 ton rate has been DOE's plan for achieving the objective of reducing the existing SNF backlog since he joined the program in 1985. *Id.* at 26-36, 53-59.

---

[24] DOE witness Tom Pollog confirmed at trial that DOE both planned and still plans to allocate the entire capacity of its waste acceptance facilities to the utilities, whatever that capacity is, and that the repository is being designed for a steady state acceptance rate of 3000 tons. Tr. at 2048-49.

At trial, DOE witness Tom Pollog confirmed that, to his knowledge, nobody at DOE disagreed with or objected to the use of 3000 tons as the appropriate steady state acceptance rate. Tr. at 2026, 2027. Susan Klein, DOE's official Rule 30(b)(6) witness on the issue of "what rate DOE is planning to use once [SNF] acceptance begins," testified that DOE plans to use the 3000 ton rate when it begins accepting SNF and that the rate will ramp up to 3000 tons by the fifth year after DOE begins removing fuel. Designations Appendix (Dckt. #310) at 1798-99, 1824. Billy Cole, the principal contractor liaison with DOE from 1982 until 1989, and who continued to work on the SNF program until 1999, testified that DOE began using the 3000 ton rate from the outset of the SNF program and that the 3000 ton rate was "required to work off what utilities were discharging as well as attacking a backlog. . . . Not only did they want to help utilities so they wouldn't have to add additional capacity, they wanted to make sure that you had to work off the backlog." *Id.* at 2141-42.

Furthermore, DOE has always, from 1983 until today, calculated the ongoing fees paid by the utilities into the Nuclear Waste Fund based on a program that would remove waste at a 3000 ton rate – *i.e.*, the utilities have paid for a system that operates at a 3000 ton rate. *Id.* at 106-07 (Barrett); *id.* at 1824-26 (S. Klein); *id.* at 2021-22 (Morgan); PX 71 at 2-4; PX 78 at 3; PX 86 at 3; PX 89 at 2-3; PX 97 at 3-4; PX 98 at 14, 22; PX 429 at 8; PX 752. Similarly, DOE has used the 3000 ton rate to determine the total cost of the program, the total system life-cycle cost ("TSLCC"), which is used to insure that DOE will have sufficient resources to carry out performance. PX 98 at 14, 22; PX 394 at 3, 13-15; PX 429 at 8; PX 680 at 4-14; *see also* Designations Appendix (Dckt. #310) at 319-20 (Barrett) (agreeing that most of the TSLCC

documents use a 3000 ton rate because that was DOE's intended rate "for whatever facility [it] would have been running when [it] began to accept spent nuclear fuel"). Former Director Barrett testified that a system that operated at a 900 metric ton rate likely would have required the utilities to have paid smaller fees. *Id.* at 102-07.

Indeed, the one constant throughout all the announcements of delay is that DOE planned to operate its program at a steady-state acceptance rate of 3000 tons and still plans to do so today:

- 1983 Draft Mission Plan – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period as the rate "set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998." PX 59 at 2-2 to 2-3.
- 1984 Draft Mission Plan – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period. PX 68 at 2-2.
- 1985 Mission Plan – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period. PX 91 at 26.
- 1986 TSLCC – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period. PX 98 at 14, 22.
- 1987 Mission Plan Amendments – Identified a 2,640 ton acceptance rate after a six year ramp up period, leading to a 3000 ton steady state acceptance rate after ten years. PX 118 at 61.
- 1987 Annual Capacity Report ("ACR") – Identified a 2,650 ton annual acceptance rate after a six year ramp up period. PX 119 at 7.
- 1988 ACR – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period. PX 142 at 5.
- 1995 TSLCC Assumptions Package – Identified an acceptance rate of 3000 tons by the fifth year of operation beginning in 2010. PX 394 at 3, 13-15.
- 1995 TSLCC – Identified a steady state acceptance rate of 3000 tons after a four year ramp up period. PX 419 at 8.

- 1996 OCRWM's System Requirements Document, Rev. 03 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 495 at 11.

- 1997 Total System Description Report – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 542 at 14.

- 1998 OCRWM's System Requirements Document, Rev. 04 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 579 at 10.

- 1998 Total System Description Report, Rev. 01 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 600 at 13.

- 1998 Viability Assessment of a Repository at Yucca Mountain – Identified a 3000 ton annual steady state acceptance rate after a four year ramp up period. PX 604B at 3-2.

- 2000 Settlement Agreement Between DOE and Peco Energy Company – Identified a 3000 ton annual steady state acceptance rate after a four year ramp up period. PX 653 at 13.

- 2001 Total System Description Report, Rev. 02 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 699 at 24.

- 2001 TSLCC Analysis - Identified a steady state acceptance rate of 3000 tons after a four year ramp up period. PX 680 at 4-14; *see also* DD 322-323.

- 2002 OCRWM's System Requirements Document, Rev. 04 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 717 at 46.

- 2004 Acceptance Priority Ranking & ACR - Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 772.

- 2004 OCRWM's System Requirements Document, Rev. 06 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 981 at 8.

Finally, Ms. Supko's testimony provides additional support demonstrating why the 3000 ton rate is reasonable under the circumstances. Ms. Supko's expert testimony included a detailed and thorough analysis of the effect that different acceptance rates would have on utility storage needs and the effect those rates would have on the utilization of DOE's waste program over

time.[25] E. Supko Written Direct at ¶¶ 49-81. Ms. Supko's analysis demonstrated that an acceptance rate of 900 tons, upon which the government's DCS argument rests, would result in (i) DOE not completing spent fuel acceptance for more than a century after it began performance; (ii) utilities having to store fuel, and therefore delay decommissioning, for an average of 64 years after they shut down; and (iii) utilities having to add approximately 12,000 tons of additional on-site storage while awaiting DOE acceptance. *Id.* at ¶ 56 & Table 2, ¶ 77 & Table 5.[26] In contrast, with a steady-state acceptance rate of 3000 tons, Ms. Supko determined that DOE would complete acceptance of all utilities' fuel in approximately 28 years after it began performance, utilities would wait an average of 9 years after shutdown for all their fuel to

---

25 Contrary to the government's assertion on page 44 of its brief, Ms. Supko is not being offered to explain DOE's intent, but to provide information to the Court regarding what a reasonable acceptance rate would be. For this purpose, Ms. Supko completed a sophisticated model and analyzed what the actual effects of different potential rates would have been in the non-breach world, including sensitivities for different ramp-ups and intra-utility use of acceptance slots. In particular, Ms. Supko analyzed the effects of different acceptance rates on (i) how long utilities would have had to wait to decommission their reactors under the various rates, (ii) whether the utilities would have had to add additional on-site storage; and (iii) how long DOE would utilize the system under the various assumptions. E. Supko Written Direct at ¶¶ 49-81. As former Director Barrett's testimony makes clear, this is precisely the type of analysis that DOE performed to reach its conclusion that 3000 was the proper rate for the program. Designations Appendix (Dckt. #310) at 318 (explaining that the 3000 ton rate was seen as the "proper balance for total life-cycle costs as well as near-term cash flow requirements and performance").

26 Although the government criticizes Ms. Supko's conclusion that the 900 ton rate is not reasonable under the circumstances, the government itself does not claim that a 900 ton rate is reasonable and makes no effort to explain what objectives would be served by a waste program that required more than 100 years of acceptance and 12,000 tons of additional on-site utility storage. Gov. Br. at 44; *cf. Indiana Michigan*, 422 F.3d at 1375 (noting that the NWPA was "enacted to avoid" putting utilities "in a position where they are required to find alternate storage for SNF" and "guard against the environmental impact of improperly disposed and maintained SNF"). DOE's use of a temporary rate of 900 tons in the 1991, 1992 and 1995 ACRs was tied to the MRS that DOE never came close to building and was based on assumptions that were prohibited by the restrictions in the NWPA. PX 231 at 4; PX 294 at 3-4.

be removed, and the industry would need to add between 340 and 600 tons of additional on-site storage. *Id.* at ¶¶ 55, 76.[27]

Ms. Supko concluded that:

> a 3000 MTU steady-state acceptance rate will result in minimizing the amount of additional spent fuel storage capacity needed at reactor sites and the amount of time that spent fuel will remain on site following shutdown for decommissioning, while ensuring that the waste management system capacity has not been overbuilt and underutilized. These factors demonstrate that 3000 MTU is the most reasonable acceptance rate and confirm why DOE has used 3000 MTU as its designed steady-state rate since the outset of the program.

*Id*. at ¶ 65.[28]

Ms. Supko's testimony on the actual effects of different acceptance rates stands un-rebutted; the government made no effort at trial (or in its brief) to challenge these conclusions. Instead, the government's only criticism (other than disputing the objectives of the program) is

---

[27] These conclusions were based on an "oldest fuel first" priority for deliveries. If utilities or DOE used the exchange or shutdown priority provisions, this could have eliminated the small amount of additional on-site storage needed and decreased the wait for decommissioning. E. Supko Written Direct at ¶ 64.

[28] Contrary to the government's implication, Ms. Supko did not simply conclude that the highest rate projected by DOE over the years would be the most reasonable (even though a higher rate would be better for the utilities in terms of storage and decommissioning needs). E. Supko Written Direct at ¶¶ 57-60. Ms. Supko analyzed steady-state acceptance rates of both 4000 and 6000 tons, but concluded that, although these rates could speed up decommissioning and reduce storage requirements, they would not be efficient rates because they would cause the system to be overbuilt and underutilized over time. *Id*. at ¶¶ 57-60. DOE itself contemplated acceptance rates as high as 6000 tons per year based on the operation of two repositories, *see* PX 91 at 17-18 & 25-29; PX 59 at 2-3; Designations Appendix (Dckt. #310) at 106-07 (Barrett); *see also* PX 7, 94, 192, but deferred plans for the second repository after the nuclear industry failed to grow. Thereafter, DOE returned the anticipated acceptance rate to 3000 tons. PX 118 at 13.

that Ms. Supko did not analyze rates between 2000 and 3000 tons. Gov. Br. at 49.[29] Although the government asserts that "an acceptance rate anywhere from 2,001 MTUs or above would seem to satisfy SMUD's alleged requirement," *Id.* at 49, the government offered no such evidence to this Court.

The government does not dispute or even address the facts demonstrating that 3000 tons is the reasonable steady-rate under the circumstances. If the Court chooses to reach the issue of the non-breach world acceptance rate, it should supply the 3000 ton rate that the DOE witnesses have confirmed is reasonable under the circumstances.

### B. The Evidence Demonstrates That DOE Shared The Intent of Preventing Utilities From Having To Build Additional At-Reactor Storage And Reducing The Backlog Of SNF Located At Reactors.

Instead of addressing the facts outlined in section II.A., the government assails a straw man – the assertion that SMUD's "entire rate argument" is premised on the "notion" that DOE was "somehow obligated to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF and/or HLW already stored by utilities up until that date." Gov. Br. at 42-43. While the evidence *does* demonstrate that DOE's own officials believed that these were the two objectives

---

[29] When asked about a 2000 ton rate, former Director Barrett testified that he "would think that's low" and would not achieve the objectives of the Contract "[b]ecause that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 – if we steady state at 2010, all the fuel that's in dry storage and lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings." Depositions Designations (Dckt. #310) at 333; *Id*. at 2143 (Cole) ("If you only handle a 2,000 ton per year acceptance rate, you would have to operate probably a 60, 70-year repository to finally work off the backlog. Utilities, that's not what they were paying for.").

of the Contract, as well as the intent of the NWPA, these facts are not the "entire" basis of SMUD's rate argument. As noted above, vast amounts of evidence indicate that DOE was planning to and would have accepted approximately 3000 tons of fuel per year and that DOE required the utilities to pay for a system that operated at 3000 tons per year. For these reasons alone, the evidence demonstrates that 3000 tons is the reasonable rate in the circumstances and should be supplied by the Court for measuring performance in the non-breach world.

In addition, if the Court looks to the intent of the parties, there is extensive evidence that DOE shared the objectives of preventing utilities from adding additional on-site storage and working off the backlog so that they could timely decommission their reactors and that it chose the 3000 ton rate to satisfy those objectives. Former Director Barrett testified that the 3000 ton rate was consistent with the intent of the NWPA, which was to work off the backlog of waste at utility sites:

> Q. [Y]ou believe that there is, in fact, a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?
>
> A. Yes.
>
> Q. And could you explain to me that rationale that you believe has been clearly documented by the department?
>
> A. There was one in the old mission plans. It basically was that the rate of 3,000 tons per year exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of a thousand tons per year delta. And for where the program was at that time that was sufficient, and I felt that was sufficient at that time.
>
> * * *
>
> Q. Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?

A. Because I believe that's the intent of the act.

Q. By "the act" you're referring to the Nuclear Waste Policy Act of 1982?

A. That's correct.

Designations Appendix (Dckt. #310) at 301-04 (objections omitted); *see also id.* at 26-36, 53-59, 275-78.

A DOE memorandum prepared in July 1984 by the DOE Richland Operations Office plainly set forth its interpretation of the NWPA:

> Based on our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.

PX 80, Encl. 1 at 1.

Additional evidence that DOE shared the objectives of solving the nuclear waste problem at utility sites includes both contemporaneous statements and deposition testimony by a number of former directors of the SNF program, as well as numerous DOE program documents issued at or about the time the Standard Contract was executed:

- Robert Morgan, the first director of the SNF program, in a speech delivered in December 1983, summarized the program strategy as follows: "[B]eginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location." PX 61 at 11.

- Mr. Morgan testified in his deposition that the intent and goal of DOE's program and the NWPA was to avoid having the utilities provide additional storage on-site. Designations Appendix (Dckt. #310) at 1979-80, 1989-90.

- Michael Lawrence, the second acting director of the SNF program, by then known as OCRWM, testified in his deposition that the intent of the NWPA and DOE's

intent was to prevent the utilities from having to build additional SNF storage facilities after 1998 and to reduce the backlog of accumulated SNF. *Id*. at 1735.

- Mr. Lawrence also testified before Congress in 1984 that achieving the "fundamental objective" of the NWPA would "initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and, ultimately, remove all eligible waste from at-reactor storage." PX 62 at 2; *see also* Designations Appendix (Dckt. #310) at 1724-25, 1735-36.

- Ben Rusche, the first politically-appointed director of OCRWM, testified that there was a "strategy" or "objective" of preventing additional storage on site. *Id.* at 2048-49, and that this goal was "consistent" with the NWPA, *id.* at 2053, 2057-60.

- Robert Roselli, one of the three drafters of the Standard Contract, testified that he understood that the DOE was responsible for eliminating the need for additional at-reactor storage after 1998. *Id.* at 1462-72.

- The DOE, in its December 1983 draft Mission Plan, explained the SNF program objective as follows: "The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." PX 59 at 2-1.

- A FY 1984 Program Guidance for Nuclear Waste Fund Evaluations, which was prepared in December 1983, concluded that "the underlying premise is that DOE will accept waste in 1998 at a sufficient rate so no additional utility owned storage capacity is required during the first five years. Thereafter, the acceptance rate will at least equal the utility spent fuel discharge rate." PX 56 at PNL-021-0235.

- Victor Trebules, the DOE official responsible for preparing the DOE Mission Plan, testified that the DOE's objective was "reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage." Designations Appendix (Dckt. #310) at 1633, 1642-46.

- Billy Cole, who worked in the SNF program from 1985 until 1989, testified that the basic purpose of the NWPA was to prevent utilities from "having to add more storage." *Id.* at 2113. He further testified that the intent of the DOE at the time of contracting was to accept waste at a rate sufficient to prevent the utilities from having to add additional storage and to reduce the backlog of SNF. *Id.* at 2113, 2153.

Finally, as former Director Barrett has confirmed, having forced utilities to pay billions of dollars in fees in exchange for the DOE's obligation to remove spent nuclear fuel, Congress did not intend to require the utilities to pay again for the cost of building additional storage after the congressionally-mandated deadline for the DOE to begin acceptance:

> Q. The problem of the utilities having to pay twice for storage arose because under the Nuclear Waste Policy Act it was the intention of Congress that the utilities pay once into the nuclear waste fund, and the payments into the nuclear waste fund would be used to pay for the storage and disposal of spent fuel and the utilities would not have to pay again directly out of their own pockets to provide for such storage and disposal during the period that the department failed to comply with its statutory contractual obligations to pick up the fuel, correct?
>
> A. Yes.
>
> Q. My statement is correct?
>
> A. I believe so.

Designations Appendix (Dckt. #310) at 277-78. Indeed, DOE understood from the outset that, if repository operations were delayed, it would still be obligated to carry out the purpose of the NWPA by taking other necessary steps to help utilities avoid additional onsite storage costs after 1998. *See* Pl. Br. at 35-36.

As demonstrated by the documentary and testimonial evidence discussed above, the parties' behavior "before the advent of the controversy," *Omni Corp. v. United States*, 41 Fed. Cl. 585, 591 (1998), demonstrates that DOE intended to and would have used the 3000 ton rate to carry out the intent of the parties and the intent of the NWPA to solve the "national problem [that] had been created by the accumulation of spent nuclear fuel from nuclear reactors." 42

U.S.C. § 10131(a)(2)(A); *see also* PPF ¶¶ 18-35. As this Court concluded in *Indiana Michigan*, "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." 57 Fed. Cl. at 99. "[T]he evidence shows clearly that such a rate [3000 tons] was the minimum needed to meet those objectives." *Id.*

### C. The Government's Only Argument On The Acceptance Rate Is The DCS Theory That Has Been Rejected By Every Court To Consider It.

Finally, the government asks the Court to reverse its rulings and conclude that the acceptance rate is defined by the DCSs submittals made by SMUD and other utilities in the early to mid-1990s. Gov. Br. at 54. This Court previously rejected the government's DCS argument, both in this case, *see Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 503-06 (2005), and in *System Fuels, Inc. v. United States*, No. 03-2652C, 2005 WL 1804314, *9 (Fed. Cl. July 29, 2005).[30] At trial, this Court emphasized a number of times that it had rejected

---

[30] The government does not mention these decisions or any of the many other decisions of this Court that have rejected its DCS argument. *See, e.g.*, *Commonwealth Edison*, 56 Fed. Cl. at 662-67 (rejecting the government rate arguments and concluding that DOE manipulated the DCS process in a manner that likely violated the duty of good faith and fair dealing); *Yankee Atomic*, No. 98-126C (Fed. Cl. June 26, 2003) (adopting the decision in *Commonwealth Edison*); *Southern Nuclear*, No. 98-614 (Fed. Cl. Apr. 7, 2004) (same); *Indiana Michigan*, 57 Fed. Cl. at 97-98 (holding that the DCS process did not establish an acceptance rate, and that the rate published by DOE in the ACR documents from 1991 through 1995 was artificially low); *Consumers Energy*, 65 Fed. Cl. at 370-72 (rejecting the government's attempt "to avoid its contractual obligation indefinitely as a consequence of DOE's abandonment of the DCS process"); *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 186-87 & n.21 (2005) (concluding that utility stated a claim for breach of duty of good faith and fair dealing based on DOE's manipulation of the DCS process); *see also Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515, 524-25 & n.14 (2005) (concluding that DOE's unconditional obligation "has not been overridden by DOE's efforts to adjust requirements via the DCS process"); *Entergy Nuclear Generation*, 64 Fed. Cl. at 343-45 & n.8 (rejecting the government's alternative contract argument and noting that the DCS argument has not been successful in other courts); *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 671-73 & n.7 (2004)

Footnote continued on next page

the government's DCS argument. *See, e.g.*, Tr. at 1617 ("Now, I've already ruled as a matter of law that this chart didn't change the contract, unless you want me to take that back."); Tr. at 1923-24 ("Well – but I've ruled that they don't amend the contract. They don't enter the standard contract."); Tr. at 1925 ("They can argue all they want. I have ruled against them."); Tr. at 1926 ("And all of that is interesting, but irrelevant. You've won. You want to win again?"); *see also id.* at 410, 2036.

The Court's ruling is consistent with that of every other decision where the DCS issue has been squarely addressed and decided, as well as the undisputed evidence from DOE officials and the plain language of the Contract. In light of the Court's unequivocal rulings, and the extensive prior briefing by the parties on this issue, SMUD will not re-assert all of its arguments here, but will simply respond to a few of the government's arguments.

The government suggests at page 47 of its brief that the Court should not or cannot supply a 3000 ton rate because SMUD did not "protest" its allocations in the 1991 ACR or DOE's requirement that SMUD use those allocations for filling in the DCS forms that SMUD submitted in late 1992 and 1993. PX 281. This suggestion has no legal or factual basis. *First*, as noted, this Court, and every other Court to decide the issue, has rejected the argument that the DCS forms or ACR reports were binding commitments establishing the acceptance rate. *Second*, the suggestion that SMUD's actions in 1992 and 1993 were "before the advent of the

---

Footnote continued from previous page

(concluding that the government's reliance on the lack of approved DCS forms was legally insufficient because DOE hindered the DCS process).

controversy" is incorrect. *See supra* § I.B.1. Mr. Shetler testified that, in 1992, "[i]t was pretty much common knowledge that the earliest delivery would now be 2010 or later." Tr. at 249.

*Third*, the suggestion that SMUD was required to protest its allocations in the 1991 ACR through the "Disputes Clause" is unfounded as a matter of both fact and law. As a matter of law, the Federal Circuit has conclusively rejected the argument that the Disputes Clause applies to this dispute. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1340-43 (Fed. Cir. 2000). As a matter of fact, there was no reason to invoke the Disputes Clause regarding the DCS submittals or ACR reports and no purpose would have been served in doing so. The 1991 ACR explicitly stated that it was for "planning purposes only, and thus, is not contractually binding," PX 231 at 3-4, which was consistent with the Contract, PX 44, Art. IV.B.5.b (stating that ACR reports were to be reissued every year and were for "planning purposes" The DCS Instructions further stated that DOE and the purchasers could "reevaluate" the submissions if DOE did not remove SNF at the rate provided in the non-binding ACR. PX 322 at ¶ 7(c). Mr. Shetler explained at trial that "[t]hey weren't contractual commitments between any of the parties, and to be blunt, it was more or less on our part considered to be somewhat of an idle act and administrative data we had to submit as far as the contract requirements." Tr. at 249-50.[31]

---

[31] The government also attempts to rely on the fact that SMUD documents in the real world reflected numerous different acceptance rate scenarios as a basis for determining what the rate would have been in the non-breach world. Gov. Br. at 48. SMUD's documents simply reflected the different acceptance rates that DOE published in its various documents. There would be no reason for SMUD engineers to "analyze" what the rate of acceptance would have been in the non-breach world. *Cf. id*. at 47 n.32.

DOE official Lake Barrett reached the same conclusion with respect to the significance of the DCS submittals, explaining that "[t]hese were all part of the administrative details of the contract that I did not pay much management policy attention to," and referring to the DCSs as "administrivia" and "just another kind of bureaucratic piece of paper." Designations Appendix (Dckt. #310) at 79-80. Ms. Nancy Slater-Thompson, the Technical Representative for DOE's Contracting Officer when the DCS process began, confirmed that DCSs were not intended or understood to be binding, and that she "recall[ed] sitting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS." *Id.* at 1603-04 (objections omitted.) Other DOE officials provided similar testimony.[32]

DOE also suggests that the DCS submittals that SMUD made in 1992 and 1993, even if not "contractually binding," should somehow still be used by the Court to limit the amount of damages that SMUD can recover in this case. Gov. Br. at 54-55. The government offers no legal citation for this proposition. It further does not address the fact that even its own witnesses disavow any significance to the DCSs that were submitted in the early 1990s, a time when DOE's impending breach was becoming ever more clear. The government also fails to acknowledge that even DOE considers the prior DCSs meaningless and that in July 2004, DOE requested that SMUD and other utilities submit new DCS forms with completely new

---

[32] For example, Ron Milner, the current Chief Operating Officer of OCRWM, testified as follows: "my understanding of the process of the contract is that, no, if a final delivery schedule had not been approved, then nothing in the DCS binds either party to accept or deliver waste on a specified date." Designations Appendix (Dckt. #310) at 529-30; *see also id.* 656-59 & 717 (Brownstein); *id.* at 1719 (Lawrence); *id.* at 2015 (Morgan).

information, PX 780, a process that was quickly aborted in December 2004. PX 812. In *Consumers Energy*, the Court rejected the use of the DCSs because "it would render the government's duties under the Standard Contract illusory" and explained that "DOE's letter to [the utility] clearly signifies that resumption of the DCS process is in the hands of the government; its on-again/off-again status continues to effect postponement of the DCS and FDS timetables for SNF delivery." 65 Fed. Cl. at 371-72.[33]

Finally, the government claims that reference to acceptance rates that relate to a repository are "meaningless" because, in its 1991 ACR, "DOE made clear that it intended to initiate acceptance of SNF through an MRS." Gov. Br. at 49-50. In support of this assertion, the government quotes a portion of a sentence from the 1991 ACR stating that "a site for a [MRS] facility will be obtained and the facility will initiate operation in 1998." *Id.* at 50. The government, however, fails to quote the entire sentence, which provides a very different conclusion than the one advanced by the government's brief. The complete sentence actually states as follows:

> The projected waste acceptance rates for SNF presented in Table 2.1 assume: *a site for a [MRS] facility will be obtained and the facility will initiate operations in 1998;* and the statutory schedule linkages between the MRS facility and the repository set forth in the [NWPA] will be modified.

---

[33] One of DOE's long-serving contractors on "waste acceptance" planning, Billy Cole, testified, with respect to the DCSs, that "this process has been interrupted for a lot of reasons, so it has to restart. So, anything that had been done prior, in my opinion, . . . is null and void. The DCSs that were submitted to me, they are worthless. They should be redone now because we don't have a 1998 date anymore . . . . *Right now it should all be thrown in the trash. It's worthless.*" *Id.* at 2187-88 (emphasis added); *accord id.* at 501-02 (Milner).

PX 281 at v (emphasis added).[34]

Referring to the hypothetical MRS facility, the Court in *Commonwealth Edison* explained that DOE was not "entitled to limit its damages based upon an optional disposal method of which it did not avail itself." 56 Fed. Cl. at 662-63, 666-67. This Court should reach the same conclusion. See generally SMUD Rate Brief at 45-57 for a complete discussion of the MRS argument. *See also* PFF ¶¶ 119-24; Tr. at 2038 (Pollog) (agreeing that DOE never planned for an MRS to become a long-term substitute for the repository). When asked repeatedly at his deposition why the DOE continued to use the 900 ton rate in the 1995 APR/ACR document when the MRS proposal upon which it was based was dead, former Director Barrett could provide no explanation. Designations Appendix (Dckt. #310) at 234-35 (objections omitted).

## III. The Potential For Early Acceptance Through Exchanges And Shutdown Priority, As Well As The Possibility Of Campaigns, Would Have Factored Into SMUD's Decision Making In The Non-Breach World.

In the non-breach world, the possibility of early acceptance through use of the shutdown priority or exchange provisions of the Contract would have played a role SMUD's decision making and supported leaving the fuel in the pool. PX 44, Art. V.E. & VI.B.1.b. These provisions would have provided the possibility for movement up in the queue, and, had DOE

---

[34] DOE also stated in the 1991 ACR (as well as all subsequent ACRs) that "[i]f the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007." PX 281 at 4. The 1991 ACR noted that "DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time." *Id.* The government stopped issuing ACRs in 1995 and did not "resume" doing so until 2004. PX 396; PX 780. Mr. Pollog testified at trial that "it would serve no purpose" to publish ACRs when DOE was not coming to pick up waste. Tr. at 2051-53.

actually been performing, SMUD would have sought to use these provisions to have its fuel removed from Rancho Seco as soon as possible.

There is extensive evidence that such provisions would have been utilized had the program been progressing as intended under the Contract and the NWPA. Regarding exchanges, DOE's intent was that the exchange provision would "allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department." *See* PX 433. The exchange provision was adopted upon request by several utilities, and was one of the few changes to the draft contract prepared by DOE. *See* 48 Fed. Reg. 16,590, 16,592 (Apr. 18, 1983) (noting the new provision "allows Purchasers to exchange DOE-approved delivery commitments with one another," thereby allowing Purchasers "greater flexibility").

Furthermore, DOE would have been reasonable in its approval of exchange requests. Robert Morgan, the first Director of the SNF program, commented at the time of Contract formation that "this poses no great problem" and "we intend to be reasonable." PX 29 at Tab D; *see also* Designations Appendix (Dckt. #310) at 2032-33 (Morgan). As Daniel Dreyfus, another former Director of OCRWM, has stated, the exchange provision was included "to allow Purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department." PX 433. Had DOE performed, it is likely that utilities would have utilized the exchange provision in order to

effectively reallocate acceptance allocations in accordance with industry needs. *See* E. Supko Written Direct at ¶¶ 47, 107 (PX 1002); I. Stuart Written Direct at ¶¶ 33-36 (PX 1001).

SMUD would have sought to utilize this salutory provision of the Contract to achieve as early acceptance as possible. The exchange provision would have provided additional incentive for SMUD to leave its fuel in the pool and concentrate on its primary goal – DOE removal of its fuel. The reason that SMUD's documents do not reflect actual exchanges among utilities is that there was (and still is) nothing to exchange. DOE's breach has prevented the development of any market in exchanges. The fact that the exchange market never evolved is irrelevant, given that the evidence is drawn from the breach world. This provision was never utilized because of the government's breach. As Judge Merow concluded in *Yankee Atomic*, "The breach prevented the very market the government assails as speculative − the lack of real market data on the sale of allocation slots for the storage of spent nuclear fuel. . . . There is no market data because the government's breach thwarted this possibility." *Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686, at *4 (Fed. Cl. 2004)

"Where the defendant itself has wrongfully prevented the [market] from coming into existence and generating a track record," to the extent there exists uncertainty in the but-for model, "the risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002) (internal quotations omitted); *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 466-67 (1981) (recognizing that the "vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been"). Thus, "[t]he defendant who has

wrongfully broken a contract should not be permitted to reap advantage for his own wrong by insisting on proof which by reason of his breach is unobtainable." *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960).

Similarly, the potential for application of the shutdown priority provision of the Contract also would have factored into SMUD's decision making in the non-breach world and provided additional incentive to leave the fuel in the pool. PX 44, Art. VI.B.1.b. The evidence establishes that, at the time of formation of the Standard Contracts DOE specifically included the shutdown priority provision to prevent shutdown utilities, like Rancho Seco, from waiting a substantial period of time to complete their decommissioning. 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983). In fact, during the process of developing the Contract, DOE rejected requests by certain utilities to omit the priority acceptance provision, explaining "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." *Id.*

Throughout the program, DOE has recognized that if it were performing at the 3000 ton rate for which it had planned, *see supra* § II.A., instead of the artificially constrained 900 ton rate, "the Department would have had the flexibility to address the issue of priority acceptance of spent nuclear fuel from permanently shutdown reactors." PX 418. Statements by DOE officials confirm that the shutdown priority provision was supported and would have been an option absent the breach. Susan Klein, the government's Rule 30(b)(6) witness on the role and purpose of the shutdown priority provision, testified that DOE "could have given" acceptance priority to

shutdown reactors if the system were operating at 3000 tons. Designations Appendix (Dckt. #310) at 1861-62 (S. Klein); *see also id.* at 2031-32 (Morgan).

Former Director Barrett similarly testified that he believed "it was in the nation's interests to support [shutdown utilities] who were trying to clean up their sites and return that real estate to useful societal purpose in that we should try to move the fuel off as quickly as we practically could, consistent with sound national policies." *Id.* at 386-87 (Barrett). A 1989 government commissioned study confirmed that significant program efficiencies could be realized by giving priority to spent fuel located at shutdown plants. PX 168 at iii. SMUD's interest in the priority provision is reflected in several documents whereupon SMUD requested that DOE provide such a priority to SMUD. PX 211 at 1; PX 527 at 2 n.1; *see also* PX 670 at 2. DOE obviously has not utilized the shutdown priority in the real world because it has never approached performance.

In addition to exchanges and the shutdown priority, it is likely that transportation campaigns would have played a role in DOE's program in the non-breach world. A transportation campaign is the acceptance of multiple casks from a utility during one visit. Tr. at 1404, 1409-10 (Stuart). Had DOE been performing, both DOE and utilities would have likely sought transportation campaigns, as they would have been efficient and beneficial for both DOE and utilities. *See* I. Stuart Written Direct at ¶ 35 (PX 1001); Tr. at 1941 (Zabransky). Such campaigns would be more efficient than applying an oldest fuel first methodology which, if

applied literally, would result in DOE accepting less than full cask loads of SNF.[35] Tr. at 1416-17 (Stuart). The 1990 ACR explained that "DOE is currently examining how expanding the allocations period (e.g. to 18-36) would affect [the Waste Management System] operating efficiencies. . . . Summing allocations over a longer period could result in a reduction in the frequency of deliveries (*larger shipping campaigns*) when serving each Purchaser. DOE will keep Purchasers apprised of the results of this analysis." PX 188 at 10 (emphasis added). In the breach world, DOE has continued to examine campaigns and tout their benefits. PX 869 at 4-5 (describing how campaigns would function using actual allocations and noting that "[t]he net result is a tremendous savings of time and labor not only for the DOE but for each individual purchaser"). Mr. Zabransky agreed at trial that "campaigning does have an attraction both to the utilities and potentially to the Department" and that "it would be nice to be able to do that." Tr. at 1941.

In the non-breach world, SMUD would have sought to use both the exchange and shutdown priority provisions, as well as transportation campaigns, to have its fuel removed as early as possible. These opportunities would have provided additional incentives for SMUD to leave its fuel in the pool and seek acceptance as soon after January 1998 as practicable. SMUD's

[35] Furthermore, the Contract does not dictate that a strict oldest fuel first methodology be applied. PX 44, Art. VI.B.1. Rather, the Contract provides that delivery commitment schedules "may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate," and in that event, the acceptance priority ranking (based on age of fuel) will be utilized. *Id.* The 1990 ACR noted that "[t]he exact chronological order of deliveries within each year is not specified" because the dates "will be arranged to accommodate, to the extent possible, both the Purchasers' and DOE's operational requirements." PX 188 at 9. DOE officials have admitted that DOE is unlikely to adhere strictly to an oldest fuel first prioritization. *See, e.g.*, Tr. at 2046-47 (Pollog) (agreeing that DOE has looked at the concept of campaigns in the last five years and that it may be an efficient method of acceptance); PFF ¶ 569.

claim in this case, however, is not dependent upon proving that it would have, without doubt, received priority, completed exchanges, or utilized campaigns in the non-breach world, and thus the government's arguments regarding exchanges and priorities are inapposite. Rather, such provisions are important because they would have been meaningful in the non-breach world and would have been yet been another reason why SMUD would neither have initially pursued the dry storage project during the period from 1992 through 1996 nor restarted and continued the project during the period from 1997 through 2002.

## IV. SMUD's Mitigation Efforts Were Reasonable.

There is no dispute that the test for evaluating mitigation efforts is whether the actions taken were "reasonable under the circumstances." *Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (quoting *Robinson v. United States*, 305 F.3d 1330, 1333 (Fed. Cir. 2002)); Gov. Br. at 66. Where, as here, the plaintiff has shown that it sought to minimize its losses and "made a good faith effort to do so," *Phillips v. United States*, 230 Ct. Cl. 805 (1982), the party in breach has the "burden of showing that the losses could have been avoided." *Forest Envtl. Servs. v. United States*, 5 Cl. Ct. 774, 780 (1984). "The burden is on the breaching party to show that reasonable possibilities for mitigation existed and were ignored." *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 561 (2003); *see also T.C. Bateson Const. Co. v. United States*, 319 F.2d 135, 158 (Ct. Cl. 1963) (noting "the burden of proof with respect to the plaintiff's asserted failure to mitigate damages rests upon the defendant who asserts it").

Rather than address the evidence demonstrating what most utilities have actually done under the circumstances – i.e., developed on-site dual-purpose dry storage systems similar to

SMUD – the government simply asserts that SMUD's dry storage efforts should be considered "failed" mitigation. Gov. Br. at 65. The relevant legal standard, however, is not whether the mitigation efforts were either "successful" or "failed." *See Northern Helex Co. v. United States*, 524 F.2d 707, 718 (Ct. Cl. 1975) (noting the "guiding principle" is whether, "in the individual circumstances," the party exercised reasonable judgment in its efforts to mitigate its damages). Even so-called "failed" mitigation efforts are recoverable, so long as their pursuit was reasonable. *Westfed*, 55 Fed. Cl. at 561 ("An injured party who takes reasonable steps to avoid loss is protected even if his efforts fail."); Restatement § 350(2) ("The injured party is not precluded from recovery . . . to the extent that he has made reasonable but unsuccessful efforts to avoid loss."). The Restatement explains that this rule "reflects the policy underlying these Code provisions, one encouraging the injured party to make reasonable efforts to avoid loss by protecting him even when his efforts fail." Restatement § 350, cmt. h.

In any event, the facts demonstrate that SMUD's mitigation efforts were indeed successful and reasonable under the circumstances. The Federal Circuit recently confirmed that "[m]itigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." *Indiana Michigan*, 422 F.3d at 1375. The evidence at trial, ignored by the government entirely, shows that 26 utilities have developed or are developing dual-purpose dry-storage systems. E. Supko Written Direct at ¶ 112, Table 9 (PX 1002); *see also* I. Stuart Written Direct at ¶¶ 17-18 (PX 1001); Order to Show Cause dated April 21, 2005 (Dckt. #315) at 2 (noting "[a]s of December 9, 2002, there were 27 spent fuel dry storage sites projected for 2003 and 36 projected for 2006"); PX Dem. 38. This evidence shows

what reasonable people actually did in light of the known facts and circumstances. Furthermore, every other permanently shutdown reactor, with the exception of Commonwealth Edison's Zion 1 reactor,[36] has transferred its fuel to dual-purpose dry storage, rather than leave its fuel in the pool for decades to come. *See* E. Supko Written Direct at ¶ 122 (PX 1002).

Instead of addressing these facts, the government comes up with a litany of claimed alternatives that it contends SMUD should have chosen: (1) that SMUD should have left its SNF in the wet pool to incur the significant costs of operating and maintaining the pool during the entirety of the government's delay, along with the risks in doing so, Gov. Br. at 66; (2) that SMUD should have used storage-only canisters that are incapable of being transported to the eventual DOE facility and would have required the costly and indefinite maintenance of the wet pool, *id.* at 69; (3) that SMUD should have used an as-yet undeveloped, untested and unlicensed dry transfer system, *id.* at 70; and (4) that SMUD should have chosen a different type of dual-purpose dry storage that was never purchased by any U.S. utility, was abandoned by its manufacturer, was bid at a cost more than triple the bid SMUD accepted in 1992, and did not fit SMUD's fuel. Each of these arguments fails the relevant legal test for challenging mitigation, and thus the government does not carry its burden of proving that SMUD failed to reasonably mitigate. Moreover, the government's arguments run directly afoul of the principle that "the person whose wrong forced the choice cannot complain that one rather than the other was

---

[36] In its opening brief, SMUD explained the circumstances that led to leaving the fuel in the pool at the Zion 1 plant, namely the fact that Zion has 5 times the amount of fuel that SMUD has and would have had to purchase 5 times the number of dry storage casks or canisters. *See generally* I. Stuart Written Direct at ¶ 22 (PX 1001). The government's brief does not address these facts.

chosen." *Home Sav. of Am. v. United States*, 57 Fed. Cl. 694, 729 (2003) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950)), *aff'd in part*, 399 F.3d 1341 (Fed. Cir. 2005).

SMUD's efforts to mitigate its damages were reasonable under the circumstances, both at the time they were made (which is the standard under the law) and with the benefit of hindsight (the standard the government seeks to impose). The government's mitigation arguments simply emphasize that SMUD faced an extremely difficult task, brought about by the government's breach, in pursuing an alternative method for the safe and secure long-term on-site storage of its fuel, and that had SMUD had the option and certainty of DOE accepting fuel in 1998, it would not have proceeded with the difficulty associated with developing a first-of-its-kind technology. *See supra* § I.

### A. The Government's Argument Regarding Wet Storage Is Wrong And Fails To Show That SMUD Was Unreasonable In Pursuing Dry Storage.

In making its argument about wet pool storage, the government avoids making the one argument it would have to establish to prevail: that the *only* reasonable response to the government's breach would be to leave the spent fuel in the pool until whenever DOE finally performs all of its obligations under the Contract. The government presumably does not make this argument because there is no factual or legal support for it. Nearly every shutdown and operating facility has pursued the same path as SMUD.[37] This transfer of fuel to dry storage will

---

[37] Portland General Electric's shutdown Trojan facility transferred its fuel to dry storage in 2002. *See* E. Supko Written Direct at Table 9 (PX 1002). Yankee Atomic, Connecticut Yankee, and Maine Yankee each transferred their fuel to dry storage at their shutdown facilities in 2002, 2004, and 2001 respectively. *Id.* Colorado Public Service transferred its fuel to dry storage at its shutdown Fort St. Vrain facility and, as established at trial, DOE both paid for and accepted

Footnote continued on next page

likely result in smaller damages during the lengthy period of the government's delayed performance because the operating and maintenance costs for dry storage are significantly smaller than for wet storage. *See* Tr. at 1170-71 (Field) (testifying that the total annual savings in 2003 – including labor, materials, and electrical consumption – is $4,196,360); *id.* at 1056 (Field) (noting the primary costs for operating and maintaining the ISFSI in 2003 were approximately $600,000 to $700,000); PFF ¶¶ 340-50, 392-97. In addition, it was SMUD's judgment that the transfer of spent fuel to dry storage in 2001 and 2002 would best safeguard the waste in light of the fact that DOE can offer no projection as to when, if ever, it will be removed. *See Indiana Michigan*, 422 F.3d at 1375 (holding that as a result of DOE's breach "utilities must *de facto* accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF, a situation which the NWPA was enacted to avoid").

SMUD could, of course, have simply left its spent fuel in the pool and sought to recover all resulting damages from DOE's delay. In fact, SMUD did consider leaving its fuel in the pool many times after 1992, and did so as late as 1997, 1999, 2000 and 2001, contrary to the government's repeated assertions that SMUD "abandoned" this option in the early 1990s. *Compare* Gov. Br. at 16 n.9 *with* PX 502 at 12, PX 585 at 2; PX 642; PX 689; DX 978A; DX 986; DX 1013; Tr. at 619-22, 628-29 (Redeker); *id.* at 917-18 (Ferreira); Designations Appendix (Dckt. #310) at 2303 (Freeman). These facts indicate that SMUD was behaving in a reasonable

---

Footnote continued from previous page

responsibility for the fuel at the ISFSI. *See* Tr. at 1948 (Zabransky); 64 Fed. Reg. 32,069, 32,070 (June 15, 1999).

and prudent manner, reevaluating its storage options as facts and circumstances changed. Because of the government's breach and its continued inability to state when, if ever, it would begin performance, SMUD concluded, like other utilities with shutdown reactors, that leaving its fuel in the pool was not the best option. Despite the government's current argument, no one at DOE ever suggested that SMUD should simply leave its fuel in the pool. Langstaff Designations (Dckt. # 289) at 101; Designations Appendix (Dckt. #310) at 1061 (Stewart).

The government, however, now suggests that SMUD would not have incurred any damages if it had simply left its fuel in the pool. This argument is disingenuous and flatly contradicted by the facts. Today, the government has already delayed performance by more than 7 years and cannot reliably project when it might first begin accepting spent fuel.[38] The government has, however, conceded publicly that it will not begin accepting spent fuel until 2012 at the earliest, which would reflect another 7 years of delay. PX 812; PX 972. Accordingly, DOE's acceptance of SMUD's spent fuel will be delayed by at least 14 years under any scenario or acceptance rate. Whether SMUD would have, in the hypothetical "non-breach world," had all of its fuel removed by 2002, 2006, or some other date, does not alter the fact that SMUD will be forced to store fuel at its Rancho Seco facility for at least 14 years longer than it would have had DOE satisfied its obligations under the Contract.[39]

---

[38] At trial in *Indiana Michigan*, the government maintained that DOE would begin performance in 2010. *Indiana Michigan*, 60 Fed. Cl. at 643-44. In contrast, in this case, the government has offered no evidence as to when it might begin or complete acceptance of SMUD's spent fuel in the real world. The government attempted to "resume" the failed DCS process in 2004, but quickly abandoned that process after recognizing that it could not meet even the 2010 date. *See* PX 780; PX 812.

[39] *Cf. System Fuels, Inc. v. United States*, No. 03-2642C, 2005 WL 1804314, at *12 n.12 (Fed. Cl. July 29, 2005) ("DOE's suggestion that it might accelerate acceptance immediately after it

Footnote continued on next page

The government never responds to this point. Contrary to the government's contention (Gov. Br. at 67), SMUD is not claiming that, had it continued with wet pool storage, it necessarily would have been entitled to all operating costs beginning in 1998. Rather, SMUD is suggesting (and the facts show) that DOE has already delayed performance by 7 years, has announced delays of at least 7 more years, and that these combined delays will result in SMUD storing fuel for at least 14 more years in the "real world" than if DOE had performed its obligations in the "non-breach world." Thus, if SMUD had done nothing, it would have incurred 14 years of damages for the costs of operating and maintaining the wet pool.

The government does not dispute that the annual cost to operate and maintain a wet pool is significantly greater than the costs for dry storage. The evidence demonstrates that, had SMUD done nothing, its wet pool storage costs during the government's minimum 14-year delay would likely have approached, if not far exceeded, $100 million dollars. Pl. Br. at 53. SMUD has now effectively mitigated those damages by expending capital costs up front to develop the dry storage facility, thereby bringing the annual operating and maintenance costs for dry storage down to approximately $600,000 in 2003. *See* PFF ¶¶ 396-97. This was, in every respect, a successful mitigation.

Even if it could be shown that leaving the fuel in the pool during the entirety of DOE's delay would produce equivalent, or even lower, damages than those incurred by SMUD in

---

Footnote continued from previous page

commences performance is unconvincing, in light of DOE's inability to complete a storage facility after more than 15 years of planning and commencement of construction.").

developing dry storage (a task that DOE made no effort to prove and for which DOE introduced no evidence), this would not defeat SMUD's claim. The Restatement clearly establishes that "[t]he injured party is not precluded from recovery . . . to the extent that he has made reasonable but unsuccessful efforts to avoid loss." Restatement § 350(2); *see also Indiana Michigan*, 422 F.3d at 1375. [40]

### B. The Government's Argument Regarding Transportation Casks Misunderstands The Facts And Fails To Show That SMUD Was Unreasonable In Pursuing Dry Storage.

The government also asserts, without reference to any facts, that it is "unreasonable" mitigation for a utility to pursue dry storage that has "transportation features." Gov. Br. at 68. In making this argument, the government offers no evidence as to the type of dry storage that it believes SMUD (and every other utility) should have pursued. Moreover, the government makes no effort to explain how its unstated alternative storage system would have been developed, by whom, at what cost, how it would have been implemented at Rancho Seco, or what effects implementation of this unspecified system would have had (*e.g.*, whether it would have required the wet pool to be maintained indefinitely). Although at trial the government attempted to push the claim that SMUD should have pursued "storage-only" dry storage as an alternative, none of

---

[40] The government asserts that SMUD has "misstated" the Federal Circuit's *Home Savings* decision, 399 F.3d 1341. Gov. Br. at 67 & n.41. In its appellate brief in *Home Savings*, the government argued that there was a principle requiring "least cost" mitigation and that the trial court's decision violated this principle in awarding damages. *See* Brief for Defendant-Appellant, No. 04-5020, -5032, at 28, 30, 33, 34, 35 (Fed. Cir. Jan. 30, 2004). The Federal Circuit rejected this argument and made clear that the test for evaluating mitigation efforts is whether such actions were "reasonable" under the circumstances. 399 F.3d at 1352-53. The Restatement also explains that, even "failed" mitigation, which is obviously not the "least cost" to the defendant in hindsight, is recoverable so long as it was reasonable. *See* Restatement § 350.

its witnesses supported the claim, and the government's post-trial brief largely fails to discuss this discredited notion.[41]

In fact, the government actually concedes that Jerry Burford, its only proffered nuclear expert, "is not offering an opinion as to whether SMUD's decision to pursue dual-purpose dry storage was reasonable." Gov. Br. at 68 n.43. With this concession, there are no facts that support the government's claim that the development of dual-purpose dry storage is "unreasonable."[42] Notably, the government fails to address the fact that 26 utilities have

---

41 The government claims that $17 million should be reduced from SMUD's claim because "the Government determined that the total costs associated with the transportation-related aspects of SMUD's dry storage system totaled $17,038,533." Gov. Br. at 69. There is no competent evidence to support this assertion. Mr. Kiraly, an accountant, is unqualified to offer an opinion about what it would have cost for SMUD to have pursued some unstated alternate means of dry storage. Mr. Burford, the government's only technical nuclear expert witness, disclaimed all knowledge of the derivation of this number at trial. Tr. at 2570-71 (Burford). Furthermore, in contrast to the vast and detailed experience that SMUD's technical experts (Mr. Stuart and Ms. Supko) had with dry storage, Mr. Burford revealed at trial that he had no knowledge or experience with the development of dry storage of any kind. Tr. at 2554-55, 2587 (Burford). Finally, even if the government had competent evidence for determining "the costs associated with the transportation-related aspects" of SMUD's dry storage system, those costs would be more than offset by the costs that SMUD would have incurred to maintain wet storage, which would have been required had SMUD not implemented a dual-purpose system (a fact that the government does not even address in its brief). *See* PX 519 at 1, 11; PX 524 at 5.

42 Nearly 7 months after the close of trial, the government now seeks to strike extensive portions of the written testimony of Mr. Stuart and Ms. Supko. Gov. Br. at 69-70 n.43. The government apparently seeks to expand the written and oral motions it made at trial. *See* Tr. at 1352 (motioning the Court to strike ¶ 34 of Mr. Stuart's written direct). The government's stated ground is that the testimony – which demonstrates the reasonableness of the actions taken by SMUD in developing a dual-purpose dry storage system – "are not proper rebuttal." Gov. Br. at 69-70 n.43. The sole basis for the claim that this written testimony provided before trial is improper rebuttal is that the government has now abandoned any claim that its only technical expert, Mr. Burford, believes that SMUD was unreasonable. *Id.* The government acknowledges that *it* is claiming that SMUD's pursuit of dual-purpose dry storage is unreasonable, but contends that its only expert on this issue, Mr. Burford, is not. The claim that SMUD should not be entitled to put in evidence contrary to the government's assertion is hollow; the fact that its only witness on the issue has abandoned any claim of unreasonableness does not make SMUD's evidence improper rebuttal. All of the facts the government now seeks to strike were contained in Mr. Stuart's and Ms. Supko's expert reports, which the government has had for more than nine months, or were explored at their depositions.

Footnote continued on next page

developed or are developing dual-purpose dry storage systems, and ignores the fact that the government has consistently supported those efforts. *See* E. Supko Written Direct at ¶ 112, Table 9 (PX 1002); PX 368; PX 381; PX 597 at 2; PX 669.

Mr. Langstaff, the DOE official who oversaw the DOE-SMUD Cooperative Agreement explained as follows:

> Q. I believe you testified just a minute ago that one of the reasons that DOE was interested in a Cooperative Agreement is that the hope was that a dual-licensed storage and transport cask would result, correct?
>
> A. Correct.
>
> Q. And you said that there was a need for – an industry need for such a duly licensed cask, correct?
>
> A. Correct.
>
> Q. And that DOE was interested in seeing that type of cask be developed, correct?
>
> A. Correct.

---

Footnote continued from previous page

Finally, the government's attack on the qualifications of Ms. Supko, Gov. Br. at 69-70 n.43, is misplaced. Ms. Supko, unlike Mr. Burford, has extensive experience counseling utilities and working with DOE officials regarding dry storage systems and their alternatives. E. Supko Written Direct at ¶¶ 3-9 (PX 1002); Tr. at 1471-77 (Supko). This experience more than qualifies Ms. Supko to address the reasonableness of SMUD's pursuit of dry storage – the relevant test for evaluating SMUD's actions under Federal Circuit law. SMUD established the cost of its efforts and described the actions actually taken in implementing the project, as well as why they were commercially reasonable, through its own employees, including the project manager, Jim Field, and the plant manager, Steve Redeker.

Langstaff Designations (Dckt. #289) at 111; *see also id.* at 112-14 (testifying that having dual-purpose dry storage "would be a large advantage" because "you could transport it without having to handle it again" and that it "provided more flexibility in the overall system").

Finally, SMUD does not understand the assertion that it has somehow assumed the government's contractual obligations because it has stored its fuel in a system that can be transported. Gov. Br. at 70. The government still has the obligation to transport SMUD's fuel from the Rancho Seco site to the eventual DOE facility (perhaps Yucca Mountain), *see Indiana Michigan*, 422 F.3d at 1374, and to deliver to SMUD a transport cask that is "suitable" for SMUD's facility. PX 44, Art. IV.B.2. This has not changed and SMUD has not "usurped" anything; it has simply stored its fuel in the most sensible manner possible in light of the government's long delay in performance. The sensibility of such storage is confirmed by the actions of other utilities, which have followed SMUD's example.

Lastly, the government's "cask" argument suggests a misunderstanding of SMUD's dry storage project. The government appears to believe, incorrectly, that SMUD purchased and is now storing its spent fuel in a fleet of 22 dual-purpose *casks*. Gov. Br. at 68-69. As was made clear at trial, SMUD has only one transportation cask, and this cask was necessary to transfer each of the canisters from the pool to the ISFSI. SMUD's fuel is stored at the ISFSI in less expensive dual-purpose *canisters*. These canisters are then stored within still less expensive concrete horizontal storage modules (sometimes referred to as concrete casks), which are very

different than actual metal transportation casks that DOE is required to provide under the Contract.[43]

### C. The Government's Argument Regarding "Dry Transfer" Is Incomplete, Fails To Address The Facts, And Fails To Show That SMUD Was Unreasonable In Pursuing Dry Storage.

The government's "dry transfer" discussion, Gov. Br. at 70-75, suffers from the same fatal flaws as its other mitigation arguments – it does not contain a coherent explanation of what the government contends SMUD should have done with its spent fuel during the government's delay. Notably, the government does not explain how the hypothetical dry transfer system would have assisted SMUD in its long term storage of spent fuel, or how or by what amount such a system would have reduced SMUD's damages. Instead, the government's brief reverts to rhetoric claiming that the "simple truth" is that "DOE would have paid for the cost of constructing a fully-licensed dry transfer system." *Id*. at 75.[44]

---

[43] As discussed in its opening brief, SMUD did consider pursuing an entire fleet of dual-purpose casks in the early 1990s in connection with the recommendations of Mr. Levy, but rejected the option at that time because it was too costly. Pl. Br. at 23. Ms. Bowser, whom the government quotes on page 69 of its brief, was discussing the option of purchasing an entire fleet of dual-purpose casks, which was rejected after she left SMUD in 1991. The government's suggestion that Ms. Bowser "explained why SMUD decided to pursue casks" (Gov. Br. at 69) – a decision she did not make and that SMUD rejected after she left – is mistaken. In addition, the quote itself demonstrates that, even in 1991, SMUD was considering a storage plan that was premised on DOE failing to meet its obligation to provide transport casks and that SMUD was focused on DOE not fulfilling its obligation to remove fuel. *See* Designations Appendix (Dckt. #310) at 2238, 2240 (Bowser) (recalling meetings in early 1990s wherein she sought, and failed to receive, assurances from DOE that it would perform its disposal obligations under the Contract).

[44] The government does not state how much money it was willing to pay for "constructing a fully-licensed dry transfer system" at Rancho Seco or where this money would have come from.

Even accepting the assertion in the government's brief as true (despite the lack of facts supporting it), the government makes no effort to explain when or how the NRC would have issued a license for such a dry transfer system, how such a system would have been implemented at Rancho Seco, what additional modifications or costs would have been required at Rancho Seco for the system to operate effectively, or what health risks SMUD employees would have faced in actually using the hypothetical system to make a "dry" transfer of 498 spent fuel assemblies from one container to another. The significance of this final point cannot be understated; it is precisely because of the potential risks and danger to workers from handling fuel "dry" (as opposed to underwater in the wet pool where it is typically handled because of the shielding provided by the water, Tr. at 138 (Shelter)) that no utility (and not even DOE) has used the "dry transfer" system to actually move spent nuclear fuel. *See* Tr. at 2293, 2296-97 (Williams); PFF ¶¶ 365, 370; *see also* Langstaff Designations (Dckt. #289) at 103-05 (agreeing that a dry transfer system would be costly to design and build and that DOE was not seeking to perform a "hot" demonstration at SMUD).[45] Just as the non-breaching party need not incur "inconvenience or disrupt his business" to mitigate a breach, Restatement § 350 cmt. g, or "run the risk of increasing his loss," 11 Corbin on Contracts § 1042, it is equally true that the non-breaching party need not endanger its workers to mitigate a breach. *See* Restatement § 350

[45] In its post-trial brief, the government states that "DOE built a dry transfer system and performed a demonstration of that system at its Idaho facility in 1998-1999." Gov. Br. at 74. However, this "demonstration" was not an actual demonstration using real spent nuclear fuel; it was a "cold" demonstration using "dummy" assemblies. Tr. at 2291 (Williams). This type of cold demonstration is what SMUD suggested be done as part of the Cooperative Agreement, *see* DX 399 at 13, and what the government criticizes in its brief. *See* Gov. Br. at 73. The government made no effort to explain at trial or in its brief why DOE did not perform a "hot demonstration" or use actual spent nuclear fuel assemblies in its own demonstration.

(stating rule that damages are not recoverable for loss that the injured party could have avoided "without undue risk").

In addition, the government's assertion that SMUD, a small municipal utility, somehow prevented or hindered the United States government from completing, testing, and licensing a dry transfer system on its own is without foundation and difficult to credit. Gov. Br. at 75. The government has spent fuel at sites around the country and could have sought a license from the NRC (just as it will be seeking NRC licenses for construction and operation of the repository, *see* 42 U.S.C. § 10134(b), and performed an actual hot demonstration at any of them. Furthermore, the government makes no effort to explain why it did not seek to demonstrate a dry transfer at any of the other 100 plus commercial reactors in the United States. The fact that neither DOE nor any other utility has sought to use a dry transfer system should end any argument that SMUD should be denied some portion of its mitigation costs because of the hypothetical possibility that SMUD could have used such a system. Even if such a choice were reasonable, which the evidence illustrates it was not, "[w]here a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen." *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002)

The government's long discussion of the DOE-SMUD Cooperative Agreement and its assertion that "SMUD failed to fulfill its obligations" under the Agreement, Gov. Br. at 71, does not add to its argument, and does not, in any event, accord with the facts. The Cooperative Agreement was to be conducted in two phases. DX 1328, HQR3100008. Phase I was to consist of "activities associated with the procurement and demonstration of a TSS" – a transportable

storage system licensed for long-term storage followed by transportation. *Id.* Phase II was to consist of "activities associated with the procurement and demonstration of a Dry Transfer System." Significantly, the Cooperative Agreement provided that "Phase II will be initiated at the discretion of DOE." *Id.*

The government's brief fails to mention that DOE never exercised its discretion to initiate Phase II of the Cooperative Agreement. Tr. at 2295 (Williams). Indeed, Phase II did not proceed because DOE refused to make sufficient funds available to even complete Phase I, after SMUD invoked the "Limitation of Funds" provision in the Cooperative Agreement. PX 655, 648.[46] Thus, because DOE would not provide necessary funds to complete the second transportable cask under development, DOE and SMUD "agreed that close out of the Cooperative Agreement was the most prudent course of action." PX 655 at 3. The parties negotiated a termination of the Cooperative Agreement "under mutually acceptable terms." PX 602; *see also* PX 655, 648. In terminating the Cooperative Agreement, DOE recognized that SMUD's licensing of the transportation cask "was a key deliverable from SMUD per the Cooperative Agreement." PX 655 at 3. Accordingly, there is simply no support for the government's assertion that SMUD failed to comply with its obligations under the Cooperative Agreement.

[46] The "Limitation of Funds" provision of the Cooperative Agreement provided that "The Participant [SMUD] is not obligated to continue performance under this Cooperative Agreement . . . or otherwise incur costs in excess of (i) the amount then allotted to the Cooperative Agreement by the Government or, (ii) if this is a cost-sharing cooperative agreement, the amount then allotted by the Government to the Cooperative Agreement plus the Participant's corresponding share . . . ." DX 1028 at HQR310-0062 (paragraph F(2)).

Finally, the government places undue emphasis on the fact that the first listed objective in the Cooperative Agreement was "to facilitate the demonstration of an NRC-licensable system for the dry transfer of spent fuel between two TSSs (systems licensed for long term storage followed by transportation." DX 1328 at HQR3100004. This objective necessarily requires that two transportable storage casks be *completed* before a dry transfer between them can be demonstrated. When DOE refused to fund the additional cost of the second cask and failed to initiate Phase II of the Cooperative Agreement, this objective necessarily ended.

### D. The Government's Argument Regarding The NAC Cask Ignores The Facts And Fails To Show That SMUD Was Unreasonable In Pursuing Dry Storage.

The government's NAC argument also suffers from several fatal legal and factual flaws. The government does not dispute that no utility ever purchased the NAC STC cask or that NAC itself abandoned the cask design in 1994 in favor of a canister-based system similar to the NUHOMS system that SMUD purchased. Tr. at 1431-32, 1438 (Stuart). Nor does the government dispute that NAC's $38 million bid in 1992 was more than three times the bid of Pacific Nuclear and would likely have been subject to increases resulting in a comparable total cost. *See* PFF ¶ 377. Finally, the government does not allege that SMUD would have spent less money or suffered smaller damages had it pursued the NAC system. As such, there is no competent evidence to suggest that SMUD did not act reasonably in 1992, and again in 1997 and 1998, in rejecting the NAC-STC cask.

The government offers no evidence that SMUD officials were acting irrationally in choosing the NUHOMS system instead of the NAC system. Its use of sound bites from

Mr. Stuart's testimony ignores the fact that SMUD officials were seeking to implement the best storage alternative possible for Rancho Seco. *See* Tr. at 1430 (Stuart) (testifying that SMUD's decision "was a very prudent decision on their part"). "The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." *Koby*, 53 Fed. Cl. at 497 (quoting *In re Kellett Aircraft*, 186 F.2d at 198-99).

In an effort to nonetheless persuade the Court to deny SMUD some unspecified amount of its mitigation costs for choosing one type of storage system instead of another, the government ignores contrary evidence. The government suggests that, while it now considers SMUD's use of dual-purpose canisters "unacceptable" under the Standard Contract, it would have deemed use of the dual-purpose NAC-STC cask "acceptable" under the Contract. Gov. Br. at 77. The government offers no evidence to support its claimed distinction. As Mr. Stuart testified, he specifically asked the government to consider fuel in the NAC cask as standard fuel under the Contract, "but as I pointed out to you, when I went to the Department of Energy to ask that question, they said no." Tr. at 1392 (Stuart); *see also* PX 212 at 8-9 (noting that DOE held an identical position regarding both dual-purpose casks and dual-purpose canisters).[47]

---

[47] The government misstates Mr. Stuart's testimony on several occasions. The government asserts that "Mr. Stuart testified that, had NAC had any customers for its NAC-STC, it could have been fully licensed as early as October 1994." Gov. Br. at 76. Mr. Stuart's actual testimony was that: "Well, based on what the NRC had told me, I thought if I had a customer, at least I would have an argument for proceeding." Tr. at 1386. The government also asserts that "Mr. Stuart believed that it would be quite easy to have the NRC approve the NAC-STC for use with SMUD's SNF." Gov. Br. at 76. Mr. Stuart's actual testimony was that: "At the time, I was telling SMUD that we essentially had the license, we could proceed, but there were issues with

Footnote continued on next page

In fact, the evidence supports the reasonableness of SMUD's choice. DOE official David Langstaff described the significant benefit of the NUHOMS system that SMUD chose and specifically recognized that the government's delay "increased the need" for that type of system:

> A. . . . . Having these – the new designs, especially the NUHOMS system, definitely had the potential to eventually reduce the cost and simplify handling of the spent fuel at the nuclear power plants. If you could have the dual-purpose cask, the canistered fuel, and the storage modules, be able to load the storage modules with – and only have one cask on site, that definitely is – the potential is there to reduce costs if you needed that additional storage.
>
> Q. And one of the national problems that increased the need for a dual-purpose transport and storage cask system was DOE's schedule slippage for the repository; is that right?
>
> A. Yeah, that could add to an existing problem.

Langstaff Designations (Dckt. #289) at 151-52.

* * *

In sum, SMUD transferred its fuel to a storage system that will likely result in millions of dollars in savings over the lifetime of the government's breach. The longer the government's delay, the greater the savings the government will see from SMUD's mitigation efforts. The

---

Footnote continued from previous page

the cask that could easily have caused the NRC to conclude otherwise." Tr. at 1387. The government further asserts that "Mr. Stuart agreed that, had SMUD purchased the NAC-STC system and fully loaded its SNF by 1998, the NAC-STC system would have paid for itself in five to seven years after loading was completed." Gov. Br. at 76. Mr. Stuart actually testified that the estimate "did not include any costs that SMUD might have" and that "it certainly wasn't a complete analysis, and I thought we agreed at the time it was off the top of my head. [Q. I understand.] As you requested." Tr. at 1389.

nuclear industry has followed SMUD's example and similarly pursued dual-purpose dry storage systems. Thus, the evidence establishes that SMUD's mitigation efforts were successful and "reasonable under the circumstances." *Home Sav.*, 399 F.3d at 1353. The government fails to meet its burden of establishing otherwise.

**V. It is Undisputed That SMUD's Damages Were Foreseeable.**

As the government implicitly concedes by failing to offer any counter argument, the evidence in this case establishes that the damages incurred as a result of the government's breach were "actually foreseen" and "reasonably foreseeable" at the time the parties entered into the contract. *See Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001). The Federal Circuit has recognized that "DOE should have foreseen that its breach would force [the utility] to find alternative storage for its SNF." *Indiana Michigan*, 422 F.3d at 1376. Judge Lettow similarly concluded that "DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, *i.e.*, the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants throughout the United States." *Tennessee Valley Auth.*, 60 Fed. Cl. at 674 n.10. Thus, it was directly foreseeable at the time the parties entered into the Contract that, if the government delayed its performance, SMUD would be forced to "find alternative storage for its SNF" at considerable expense. 422 F.3d at 1376.[48]

---

[48] With respect to the expense, even the substantial *magnitude* of cost for "interim" SNF storage was actually foreseen by DOE in 1983. The NWPA as initially passed included authority for a "Federal Interim Storage" program. 42 U.S.C. § 10156(a)(1). Although authority for this program expired in 1990, the fee schedules established for the storage that DOE developed in 1983 are relevant to the foreseeability of the costs of dry storage. The fee schedules established a "full cost recovery" fee of $665 per kg of uranium/fuel. *See* 48 Fed. Reg. 54,391 (Dec. 2,

Footnote continued on next page

## VI. SMUD Has Met Its Burden of Proving the Certainty Of Its Damages.

The evidence further confirms the conclusion that SMUD has established its damages with reasonable certainty. SMUD has set forth sufficient evidence to enable this Court to "make a fair and reasonable approximation of the damages." *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960). The government's arguments to the contrary are speculative and unsupported by the evidence in this case.

Contrary to the government's assertions, SMUD has set forth an analysis of what would have happened in the non-breach world. SMUD has proven with sufficient certainty that, absent the government's long-announced breach, SMUD would have left its fuel in the pool until DOE performed its disposal obligations under the Contract. In the non-breach world, SMUD would have incurred the costs of wet storage until all the fuel was removed from Rancho Seco, which would have been 2006 at the latest, with the reasonable likelihood of earlier acceptance. *See* E. Supko Written Direct at ¶ 13 (PX 1002); *see* PFF ¶¶ 555-56; *see infra* § III.

In the real world, SMUD, faced with an extended delay in DOE's removal of the fuel, pursued dry storage in order to mitigate its damages over the course of the government's delay, now estimated to be at least 14 years. *See* Doug Abrahms, *Yucca Mountain Opening Pushed Back 2 Years*, 2005 WL 62548304, Gannett News Serv. (Feb. 8, 2005). In order to reduce its costs of storage over this extended delay, SMUD transferred the fuel to a dry storage facility. In so doing, SMUD incurred the costs of designing, licensing, and fabricating its on-site storage

---

Footnote continued from previous page

1983). At that rate, storage for SMUD's 228.4 metric tons of uranium/fuel (each MTU is equal to 1000 kg) would cost more than $152 million.

facility, as well as the costs of loading and transferring the fuel from the pool to the ISFSI, including labor costs. The government has stipulated that such costs were incurred and accurately recorded. *See* PFF ¶ 247. SMUD has proven that it incurred $21,553,462 in damages from 1992 to 1997 and $55,049,870 in damages from 1998 to 2003. *See* PFF ¶¶ 199-206, 212-41.

Based on its analysis of what likely would have happened in the non-breach world, SMUD has offset its costs where appropriate, so that only those costs that are attributable to the government's breach have been claimed as damages in this case. These offsets are based on the analysis of Jim Field, who is SMUD's dry storage project manager and the most knowledgeable person with regard to the details of the project. Tr. at 954-55 (Field). Mr. Field has direct knowledge regarding the costs that were incurred and how the costs correspond to the various aspects of the project. *Id.* at 1045-61 (Field). Based on his analysis of the work that was done and the government's responsibilities upon performance, Mr. Field testified that certain costs associated with the project likely would have been incurred even if DOE had performed. *Id.* at 1031-45 (Field). It is appropriate to rely on Mr. Field's testimony for these deductions, given his extensive personal knowledge of the dry storage project and the facts at issue in this case. *See De Graffenried v. United States*, 2 Ct. Cl. 640, 643 (1983); *see also Joy Mfg. Co. v. Sola Basic Indus., Inc.*, 697 F.2d 104, 111-12 (3d Cir. 1982) (recognizing admissibility and helpfulness of lay witness testimony by plant supervisor regarding the amount of downtime experienced).

SMUD has deducted these costs from its damages claim. Thus, contrary to the government's assertions, SMUD's damages claim is properly composed of only those costs that

are directly attributable to the government's breach. SMUD has proven these costs with certainty sufficient to enable this Court to make a fair and reasonable approximation of SMUD's damages. *See Locke*, 283 F.2d at 524.

As set forth below, contrary to the government's arguments (1) SMUD has claimed only those labor costs directly attributable to the dry storage project, (2) SMUD's indirect labor burden costs are incremental to the government's breach, (3) SMUD's loading and transfer costs would not have been incurred in the non-breach world, and (4) SMUD's offsets are appropriate.

### A. SMUD Has Claimed Only Those Labor Costs Directly Attributable To The Dry Storage Project.

There is no legal basis for the government's assertion that the Court should reduce SMUD's incurred damages by $9,380,065 simply because the government's expert asserts that certain of SMUD's claimed labor costs are not incremental. Gov. Br. at 102. It is a well-settled damages principle that an injured party can recover the reasonable costs of in-house labor and materials expended to remedy the consequences of a defendant's wrongful conduct. *See Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 303 (5th Cir. 1976); *United States v. The John R. Williams*, 144 F.2d 451, 452-53 (2d Cir. 1944). Were the law otherwise, injured parties often would find themselves in the anomalous position of responding to a breach by seeking out the most cost effective solution (in this case diverting SMUD's own resources to a project necessitated by Defendant's breach) only to find that doing so precludes recovery of their damages, damages that would have been available had the work been performed by a third party at higher costs. *See, e.g., The John R. Williams*, 144 F.2d at 452-54 (noting that had the party not been able to incur the expenses internally, it would have had to employ an outside contractor).

The government points out that SMUD cites several tort cases and argues that these are inapt in this context. *See* Gov. Br. at 101 n.55. Such cases are relevant, however, because the issue here is SMUD's mitigation efforts, which seek to reduce the harm caused by the government's breach. Just as in the cited cases, the harm caused by the breach includes the company's internal labor costs. In responding to the government's breach, there are no contractual restrictions requiring SMUD to mitigate its damages by outsourcing the work to a third party.

In addition, the government did not contract for services from SMUD; rather, SMUD contracted for services from the government. When the government failed to deliver such services, thus breaching the contract, SMUD was harmed and mitigated its damages, among other things, by diverting its work force to the dry storage project. Thus, SMUD's labor costs are recoverable in this case. *See Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*, 687 F.2d 877, 884 (6th Cir. 1982); *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785-86 (9th Cir. 1982); *Freeport Sulphur Co.*, 526 F.2d at 303; *The John R. Williams*, 144 F.2d at 452-53.

A closer analysis of the government's cited cases illustrate that they are inapplicable in this situation; with one exception; none of the cases involved a non-breaching parties efforts to mitigate its damages. *See Wilson v. Marquette Elecs., Inc.*, 630 F.2d 575, 577 (8th Cir. 1980) (addressing whether costs were included under warranty); *ECDC Envtl., L.C. v. N.Y. Marine & General Ins. Co.*, No. 96-Civ-6033, 1999 WL 777883, at *6 (S.D.N.Y. Sept. 29, 1999) (addressing whether costs were included under terms of contract); *S.W. Eng'r Co. v. Cajun Elec. Power Coop., Inc.*, 915 F.2d 972, 977-79 (5th Cir. 1990) (same); *AES Tech. Sys., Inc. v.*

*Coherent Radiation*, 583 F.2d 933, 942 (7th Cir. 1979) (addressing whether costs were included under warranty). Given that SMUD incurred these costs in mitigation of the government's breach, the government's cited cases are inapposite. To the extent the government does cite a case addressing mitigation costs, it supports awarding SMUD its labor costs in this case. *See Willred Co. v. Westmoreland Metal Mfg. Co.*, 200 F. Supp. 59, 66 (E.D. Penn. 1961). Although the court in that case did not award profit on top of the labor claimed (something SMUD does not seek), the court did award "the plaintiff's payroll cost for labor employed in making repairs" necessitated by the breach. *Id.*

The assertions of the government's experts are similarly baseless. Mr. Burford's opinion that certain classes of labor charges "*could be attributed* to other ongoing work," J. Burford Written Direct at ¶ 111, is mere speculation. As such it should be rejected. *See Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991) (rejecting testimony that is "based merely on speculation and conjecture without basis in fact"). SMUD employees record their time on an hourly basis and the time is tracked through the accounting system based on the applicable project. SMUD has only claimed those employee hours that are specifically attributable to the dry storage project. *See* PFF ¶¶ 174-82. The certainty of these hours was confirmed by Steve Redeker, Jim Field, and Luana Holst, who each testified regarding the process by which employees bill their time and the extensive review of the timecards at all levels. Tr. at 674-77 (Redeker); *id.* at 1046-48 (Field); *id.* at 1234 (Holst).

Mr. Kiraly's opinions are equally without factual support. Mr. Kiraly asserts that the labor costs of all employees who charged less than 50% of his time to the dry storage project

should be considered "fixed" from a "damages perspective." Mr. Kiraly provides no evidence or support for such a conclusion. Tr. at 2745 (Kiraly) (referring to 50% criterion as a "judgment call"). Mr. Kiraly also testified that if the individuals in question had been contract employees then their time would have constituted incremental costs. *Id.* at 2781-82 (Kiraly). SMUD, on the other hand, has presented evidence that it continually reduced its workforce and made a concerted effort to "combine work forces, to combine jobs, to be more efficient." Tr. at 678-79 (Redeker). In the non-breach world, SMUD would have been able to make more significant reductions to its work force, or to engage in other beneficial projects, because labor for the dry storage project would not have been necessary. *See* PFF ¶¶ 415-26. SMUD has presented sufficient evidence to establish that its labor costs are attributable to the government's breach. Thus, the Court should reject the government's requested $9.4 million deduction because "acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach." *Boyajian v. United States*, 423 F.2d 1231, 1235 (Ct. Cl. 1970).

### B. The Evidence Establishes That The SMUD's Indirect Labor Burden Costs Are Incremental To The Government's Breach.

The evidence establishes that SMUD's claimed labor burden, totaling $2,497,724, is incremental to the breach, and thus is properly included in SMUD's damages claim. Mr. Kiraly's statements to the contrary and the government's requested deduction are unsupported by any evidence in this case. Gov. Br. at 104. Mr. Kiraly has not independently investigated whether or not these costs are in fact incremental and has merely speculated regarding how costs are managed within SMUD. *See* Tr. at 2778-79 (Kiraly) (stating he did not investigate or have any knowledge regarding how SMUD treated computers, licenses, or vehicles

upon an employees departure). For example, Mr. Kiraly agreed that if SMUD laid off an employee, he "*would not expect* their SAP license cost to decrease." *See* Tr. at 2800 (Kiraly) (emphasis added). Mr. Kiraly provides no basis in fact for this conclusion. In *Washington v. Armstrong World Industries, Inc.*, 839 F.2d 1121, 1123-24 (5th Cir. 1988), the court rejected such speculation by an expert, finding a statement that cancer could not be ruled out as a cause, without independent factual support, speculative. Where an expert's testimony is "based merely on speculation and conjecture without basis in fact," it should be rejected. *Genmoora Corp.*, 939 F.2d at 1163.

The testimony in this case demonstrates that such costs are incremental and properly attributable to the breach. Mr. Redeker testified that the project is "charged for every telephone, every computer monitor, every beeper that we have. . . . So when somebody goes, we find his beeper, his telephone, everything and get rid of it because we don't want to pay for it." Tr. at 681 (Redeker). Besides the speculation of its expert, the government has offered no evidence in rebuttal.

Finally, the government's reference to Mr. Kiraly's statement that "these costs are then allocated over all of the labor within SMUD, of which the spent fuel project was only a small portion," Tr. at 2776 (Kiraly), is misleading. SMUD has claimed only the overhead burdening related to the hours worked on the dry storage project. Such labor burdening is recoverable in this case. *See Freeport Sulphur Co.*, 526 F.2d at 304 (noting the "costs of repairs incurred internally by the injured party, including overhead," are recoverable).

### C. SMUD Would Not Have Incurred The Costs Of Loading and Transferring Its Fuel To The ISFSI In The Non-Breach World And Therefore SMUD Is Entitled To Recover Such Costs.

The government argues that SMUD's damages should be reduced by $4,274,856 because that amount is related to SMUD's loading and transfer costs for moving fuel to the ISFSI. Gov. Br. at 107. The government's argument, however, misunderstands the facts and the reasons that such costs are recoverable. SMUD has loaded its fuel into dual-purpose canisters and transferred these canisters, via a cask, to the ISFSI for storage during the extended period of DOE's delay in acceptance. Had DOE been performing, SMUD would have left the fuel in the pool, and these activities would not have been necessary. *See* PFF ¶¶ 134, 155, 165. Because these loading and transfer activities would not have been required had DOE performed its obligations under the Contract, SMUD has appropriately included these costs in its damages claim. Thus, the government's purported deduction has no basis.

When DOE finally performs its obligations under the Contract, SMUD still will be required to "arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility." PX 44, Art. IV.A.2. Thus, SMUD still will be responsible for the removal of the canisters from the ISFSI and the loading of the canisters into a transportation cask for transfer to the DOE facility (*i.e.*, the transfer from ISFSI to DOE) – in other words, SMUD has not "saved" the costs of preparing and transferring the fuel to DOE.[49] Unless the government concedes that all of these

---

[49] Given that DOE acceptance of the fuel will be many years in the future, SMUD will have to ensure that its equipment meets future standards for loading and transport of fuel. Future employees and/or contract laborers likely will have to be hired and fully trained.

future loading and transfer costs are recoverable as damages, then SMUD is entitled to recover its current transfer costs because it has been forced into an *additional* transfer of fuel (from pool to ISFSI) as a result of the government's breach. Accordingly, SMUD does not seek to have it "both ways" and its position is not "sophistry." Gov. Br. at 108.

The government's reference to "MESCs" (the government's name for SMUD's canisters) misunderstands the facts of this case. As SMUD has made clear in its prior briefing, dual-purpose canisters can only be transported in a separate, more robust transport cask, which is why SMUD was required to purchase and utilize a cask for transfer of each canister to the ISFSI. The benefit of the dual-purpose canister is that, so long as the canister is not required to be opened, it will not require that the actual fuel assemblies be handled a second time. *See* Tr. at 1070-71 (Field) (noting significant savings in annual operating costs between wet and dry storage); E. Supko Written Direct at ¶¶ 113, 119-20 (PX 1002); *see also* PFF ¶¶ 344, 356, 392. The canister-based system is designed to allow transfer of the canister within a transportation cask to the ISFSI, interim storage of the canister in the ISFSI, and eventual loading of the canister back into a cask for shipment to a DOE disposal site. Tr. at 497-99 (Redeker). The need to reload the canister into a transportation cask for ultimate shipment is a necessary part of the system design, *id.* at 500 (Redeker), and has nothing to do with the acceptability of canistered fuel under the Contract.

As a result of the government's breach, SMUD will have to make two separate transfers: (1) from the pool to the ISFSI in SMUD's canisters, and (2) from the ISFSI to DOE transport casks. In the non-breach world, SMUD would have had only one transfer, from the pool directly

to DOE transport casks. Accordingly, SMUD is entitled to the cost of the additional fuel move that it incurred from transferring fuel from its pool to the ISFSI.

**D. The Evidence Supports SMUD's Offsets As Proposed.**

In addition to establishing the total costs incurred related to the dry storage project, SMUD also identified offsets that were appropriate based on its analysis of the non-breach world. Mr. Field testified, based on his extensive knowledge as project manager of the dry storage project and his review of the supporting documents, as to the various costs that were incurred and the appropriate offsets based on what would have happened in the non-breach world. *See* Tr. at 1030-45 (Field). He explained his methodology for determining the various offsets and his support for the amount. *Id.* SMUD offset its damages claim accordingly by $1,454,880. *See* Pl. Br. at 44.

The government relies on the testimony of its expert, Mr. Burford, to support its claim that SMUD's offsets are understated. Gov. Br. at 105-07. Mr. Burford, however, did not personally quantify what offsets would be appropriate. Rather, he purported to rely on the figures put forth by Mr. Kiraly, the government's accounting witness, who has no expertise in the nuclear industry and no ability to determine proper offsets to the nuclear waste storage project. *See* S. Kiraly Written Direct at ¶¶ 3-35. With regard to the government's proposed additional gantry crane offset of $158,043, Mr. Burford stated he did not know if the amount was proper and did not know what work was done related to that amount. Tr. at 2593-94 (Burford). Likewise, Mr. Burford did not make an independent effort to estimate the costs for the fuel inspection or the upgrades to the spent fuel building. Tr. at 2608 (Burford). Regarding on-site

drop mitigation and impact limiter costs, Mr. Burford only concludes that "there *could be* as much as $2.14 million in costs that should be excluded." J. Burford Written Direct at ¶ 103. At trial, Mr. Burford stated, however, that he did not "have an opinion" regarding whether the costs would have been incurred in a non-breach world scenario wherein DOE brought a cask suitable for SMUD's facilities, as the Contract requires. Tr. at 2606 (Burford). Thus, the government's experts offer no basis for disputing SMUD's proposed offsets.

**VII. The Government's Remaining Attempts To Undermine SMUD's Damages Have No Factual Basis And Should Be Rejected.**

As SMUD demonstrated in its initial Post-Trial Brief, there is no evidentiary basis for the laundry list of additional offsets claimed by the government. *First*, the government asserts that it is not liable for SMUD's damages because SMUD has placed the fuel in canisters during the period of the government's delay. Gov. Br. at 79-80. *Second*, the government asserts that SMUD would have had to store its GTCC waste regardless of the government's performance, and thus SMUD would have incurred the costs of the entire concrete ISFSI as a result. Gov. Br. at 78, 80. *Third*, the government makes the same argument with regard to failed fuel, asserting that the costs of the ISFSI and the damaged fuel canister should be deducted. *Id.* at 78, 85. *Fourth*, the government also argues that a deduction should be made for the purported costs of an "88 month delay" in SMUD's project. *Id.* at 92. *Fifth*, the government argues that SMUD prematurely mobilized its work force and asserts that SMUD's damages should be limited to a hypothetical "three month mobilization" period. *Id.* at 109. *Sixth*, DOE asserts that this Court should deduct the costs of the pool during 2002, as SMUD has recognized a savings from transfer of the fuel out of the pool (despite the fact the fuel was still stored in the pool during this

period). *Id.* at 110. *Seventh*, DOE argues SMUD has recognized decommissioning "savings" as a result of decommissioning the pool. *Id.* at 111. *Eighth*, DOE also asserts that this Court should deduct the costs of operating the ISFSI. *Id.* at 91. *Ninth*, DOE asserts that there is a general category of "unavoidable costs" that should be deducted. *Id.* at 109. The facts do not support the government's proposed offsets and this Court should reject the government's efforts to minimize the actual damages SMUD has incurred.

### A. The Government Cannot Use The Result Of Its Own Breach – The Transfer Of Fuel To Dual Purpose Canisters – To Argue It No Longer Has Any Obligations Under The Contract.

In order to mitigate the costs of the government's delay in performance of its obligations under the Contract, SMUD transferred its fuel to canisters for interim storage. *See supra* § I. SMUD did so with the assurance from DOE that such canisters would eventually be accepted by DOE. *See* Tr. at 434, 438 (Shetler); PX 311, 320; PFF ¶¶ 513-20. The risk and uncertainty SMUD faced were not whether canistered fuel would be accepted by DOE under the Contract, but how the fuel would be classified for acceptance, that is, whether the canisters would be classified by DOE as non-standard fuel and moved to the end of DOE's fuel queue. *See* Tr. at 220, 429-30, 434-35 (Shetler) (noting DOE assured SMUD it would accept the fuel under the Contract, and that the "open question was whether it would be standard fuel or not").

DOE now claims that canisters are not acceptable at all under the Contract. Gov. Br. at 79. In addition, the government asserts that, because the fuel is in canisters, "DOE is no longer in breach of the Standard Contract." *Id.* at 80. The government's argument on canisters is, in essence, an argument that SMUD failed to reasonably mitigate its damages. "'[T]he clear import

of the government characterizing its argument as one of causation [here, liability] is to avoid the reasonability element of the mitigation doctrine,' because the breaching party bears the burden of proving that the actions taken by the injured party are unreasonable . . . ." *The Long Island Sav. Bank, FSB v. United States*, No. 92-517-C, 2005 WL 2249742, at *22 (Fed. Cl. Sept. 15, 2005) (quoting *First Heights Bank, FSB v. United States*, 422 F.3d 1311 (Fed. Cir. 2005)) (internal citation omitted).

The Federal Circuit in *Indiana Michigan* recognized that, as a result of the government's announcements, utilities were "placed in a position where they [were] required to find alternate storage for SNF." 422 F.3d at 1375. SMUD was thus under an obligation to mitigate its damages, and to do so through alternate storage, such as dry storage, to the extent reasonable. This fact does not mean that "DOE is no longer in breach." As SMUD has demonstrated above, its transfer of fuel to a dual-purpose dry storage system was reasonable. *See infra* § IV.

The government cannot use the result of its own breach – the fact that SMUD and the entire industry is required to seek alternative storage – to argue it no longer has any obligation to perform under the Contract. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

> Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery . . . . Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

*Id.* at 264-65. Such words carry even more weight in this case, where the government had notice that SMUD intended to transfer the fuel to canisters and encouraged such transfer. *See* PFF ¶¶ 522-39.

Moreover, SMUD has presented extensive evidence that DOE has planned for and intends to accept fuel in canistered form.[50] *See* PFF ¶¶ 540-53. Thus, as discussed at length in SMUD's Response to the Court's Show Cause Order dated April 21, 2005 (Dckt. # 326 & 329), SMUD's placement of fuel in canisters has no effect on the government's liability in this case.

### B. The Court Need Not Address Whether GTCC Waste Is Covered Under the Contract Because SMUD Has Not Claimed Damages For The Storage Of Such Waste.

SMUD has not claimed any costs related to the storage of its GTCC waste, and thus this Court need not decide whether GTCC waste constitutes high level radioactive waste under the Contract. PX 44, Art. I.12. DOE asserts that, because SMUD would have to store the GTCC waste on-site in the non-breach world, SMUD would be "required to incur significant costs for that storage that are duplicative of the costs that SMUD would have to incur to store SNF" equal

---

[50] The government asserts that "no utility has sought a contract amendment to permit the acceptance of MESCs." Def. Post-Trial Brief at 79-80. In fact, SMUD contacted DOE to provide notification that SMUD was loading its fuel in January of 2001. In that letter, SMUD stated, "Based on previous correspondence . . . and *our timely request herein*, we understand that DOE will initiate actions to include the NUHOMS MP187 canisters as an acceptable waste form under the terms of the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR 961)." PX 670 (emphasis added). At that time, DOE responded that "the Department will initiate actions to include storage systems certified by the Commission for both transportation and storage (dual-purpose systems) as acceptable waste forms under the disposal contract with SMUD." PX 678; *see also* Tr. at 370 (Shetler) (noting SMUD has "sought repeatedly" to have DOE take actions necessary to accept fuel). Despite such representations, DOE has done nothing except to argue in this Court that it no longer has any obligation to dispose of SMUD's fuel.

to $3,146,520, or the government's estimated cost of the concrete ISFSI. Gov. Br. at 78, 85. This argument is contradicted by the evidence in this case. Although SMUD plans eventually to store its GTCC waste in the empty twenty-second horizontal storage module, the module and the concrete pad are features of the ISFSI design that are necessary for storage of spent nuclear fuel. Such costs, which equal $95,000, would have been incurred regardless of SMUD's decision to store GTCC waste at the ISFSI. *See* PFF ¶ 470.

Moreover, in the non-breach world, SMUD would have multiple options for the storage of GTCC waste that are unrelated to the ISFSI. *See* PFF ¶ 472. For example, SMUD could leave the GTCC waste in the reactor vessel until DOE came to dispose of the fuel. *See* Tr. at 2610-11 (Burford). SMUD also could store the GTCC waste in its radioactive waste storage building without a license from the NRC. *See id.* at 694-95 (Redeker). Had DOE been performing its obligations under the Contract, yet refusing to take GTCC waste, SMUD could have implemented either of these options. There is no reason and the government offers no evidence demonstrating that SMUD would have built its dry storage facility for the storage of a small amount of GTCC waste that it could have otherwise stored at no additional cost. Thus, the government's lengthy GTCC argument is beside the point.

In any event, SMUD disputes this argument. As discussed fully in Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater Than Class C Radioactive Waste Arguments dated Dec. 16, 2002 (Dckt. # 162), the government's argument that GTCC waste is not covered under the Contract is incorrect. Because GTCC waste

constitutes high-level radioactive waste as defined in the Contract, it is covered by the Contract provisions, just like SNF.[51]

Consistent with the NWPA, and pursuant to its Contract with SMUD, DOE is obligated to dispose of both SMUD's spent nuclear fuel and high level radioactive waste, and to begin such services by January 31, 1998. PX 44, Art. III.B. The NWPA and the Contract both define "high-level radioactive waste" as

> (a) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and
>
> (b) *other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.*

42 U.S.C. § 10101(12); PX 44, Art. I.12 (emphasis added).

Although the NRC regulations include a definition of "high-level radioactive waste," this definite is *separate and distinct* from the definition in the NWPA and the Standard Contract. *See* 10 C.F.R. § 60.2. In fact, the legislative history of the NWPA demonstrates that Congress deliberately chose not to adopt the definition advocated by the government in this case. In an earlier version of the NWPA, the definition of "high-level radioactive waste" would have

---

[51] The government cites the testimony of Mr. Shetler to support its statement that "[a]t trial, SMUD admitted that it had not paid any money pursuant to the Standard Contract for its GTCC." Gov. Br. at 81. Whether or not SMUD's payments under the Contact include disposal of GTCC is directly dependent on whether the definition of high-level radioactive waste includes GTCC. This is a question of law, and SMUD has never asserted that it made a separate payment for GTCC waste. Because such waste constitutes HLW under the Contract, payment for disposal is included in the 1 mil/Kwh fee.

delegated the determination of which wastes constitute "high-level radioactive waste" to the NRC. H.R. 3809, 97th Cong. (1982) (basing definition on what "the Commission designates as high-level radioactive waste"). The final version of the NWPA, however, did not include that delegation, and instead includes an independent definition of high-level radioactive waste. DOE has recognized that "[t]he narrower definition of high-level radioactive waste in the Rule [10 C.F.R. Part 60] does not invalidate or override the broader use of the term in the NWPA statute." PX 586. Thus, it is the definition of high-level radioactive waste in the Contract that governs in this case.

GTCC waste is "high-level radioactive waste" within the scope of the definition in the Contract, as GTCC waste is "highly radioactive material." Steve Redeker testified that GTCC waste is highly radioactive material, and in some instances, is even more radioactive than spent nuclear fuel. Tr. at 690. Robert Campbell, Program Manager responsible for GTCC waste for the DOE Office of Environmental Management, confirmed this fact. Designations Appendix (Dckt. #310) at 1535. In addition, in 1987 the NRC opined that GTCC waste should be considered "highly radioactive" because it is sufficient to produce "significant radiation levels to generate substantial amounts of heat." 52 Fed. Reg. 5992, 5995 (Feb. 27, 1987).

GTCC waste also satisfies the second prong of the definition of high level radioactive waste in the Contract because current law requires permanent isolation of GTCC waste. The NRC enacted a rule in 1989, which still governs today, that unambiguously requires permanent isolation of GTCC waste "unless" there is an NRC-approved alternative. 54 Fed. Reg. 22,578, 22,583 (May 25, 1989); 10 C.F.R. § 51.44(a)(2)(iv) (noting waste must "be disposed of in a

geologic repository . . . unless proposals for disposal of such waste in a disposal site licensed pursuant to this part are approved by the Commission"). The NRC has not approved of an alternative method for disposal of GTCC waste, Designations Appendix (Dckt. #310) at 1841-42 (Klein), and DOE is not considering proposing an alternative disposal path. *Id.* at 1036 (Huizenga); *id.* at 1841 (Klein). Accordingly, "consistent with existing law," the NRC has determined by rule [that GTCC waste] requires permanent isolation." PX 44, Art. I.12. This evidence thus establishes that GTCC waste is covered under the Contract definition of high-level radioactive waste.[52]

The government's reference to the NRC's final rule in October 2001 regarding the interim storage of GTCC waste is inapposite. *See* 66 Fed. Reg. 51,823 (Oct. 11, 2003). This rule provides for the *interim* storage of GTCC waste at an ISFSI or MRS pending ultimate disposal. *Id.* at 51,825. The rule does not address the disposal requirements of GTCC waste, except to reiterate that "GTCC waste is generally unsuitable for near-surface disposal." *Id.* at 51,823.[53]

---

52 The testimony of DOE officials supports the conclusion that current regulations require permanent isolation of GTCC waste. Susan Klein, the Rule 30(b)(6) witness for the DOE on GTCC waste issues, and a senior policy advisor to the Director and Deputy Director of OCRWM, testified that "disposal in a deep geologic repository constitutes permanent isolation." Designations Appendix (Dckt. #310) at 1839 (Klein). Robert Campbell has testified that "permanent isolation would be the equivalent to deep geologic disposal." *Id.* at 1538 (Campbell). In 1987, the NRC itself stated that "'permanent isolation' clearly implies the degree of isolation afforded by a deep geologic repository." 52 Fed. Reg. 5992, 5995 (Feb. 27, 1987).

53 The Rule was passed to address the acceptability of co-location of GTCC waste along with SNF at an ISFSI "pending development of a suitable permanent disposal facility." 66 Fed. Reg. 51,823 (Oct. 11, 2003). By extending 10 CFR Part 72 to cover reactor-related GTCC waste, NRC eliminated "the need for multiple licenses for the storage of spent fuel and GTCC waste" together at an interim storage site. *Id.* at 51,826.

Furthermore, apart from the Contract, DOE has an acknowledged statutory duty to accept and dispose of SMUD's GTCC waste, 42 U.S.C. § 2021c(b)(1), and DOE has planned and intends to dispose of utilities' GTCC waste along with the utilities' spent fuel in the repository. Former Director Rusche stated in his comments to the 1987 GTCC Waste Report to Congress that "It is our present intent that reactor hardware [such as SMUD's GTCC waste] would be disposed of in the repository." PX 111 at HQR-077-0671. In March 1995, DOE announced in the Federal Register its "tentative selection of a strategy for GTCC LLW management and disposal" as "co-disposal of GTCC LLW with spent nuclear fuel and high-level waste in a geologic repository as the preferred co-disposal option." 60 Fed. Reg. 13,424, 13,425 (Mar. 13, 1995). Finally, former Director Barrett testified that "[w]hen the extraneous legal matters are finally resolved my expectation is the greater-than-Class C waste will go into the repository at the same time, contemporaneously, at the same time [as spent fuel]." Designations Appendix (Dckt. #310) at 392-93 (Barrett); *accord id.* at 394 (Barrett).

Given that SMUD has not claimed costs associated with the storage of GTCC waste, this Court need not rule on this issue. However, if the Court does find the issue of GTCC waste relevant to its damages determination, the evidence demonstrates that the government's proposed reduction in SMUD's damages fails for the reasons described above.

### C. The Government's Proposed Deduction For SMUD's Damaged Fuel Is Based On Speculation.

The government's assertions regarding failed fuel, like its arguments about GTCC waste, constitute another attempt to limit SMUD's actually incurred damages based on unsupported speculation. The government asserts that, even if DOE had performed as required under the

Contract, SMUD may have incurred the costs associated with the entire concrete ISFSI – a total of $3,146,520 – because there is a possibility that SMUD would have to store indefinitely its one canister of damaged fuel.[54] The government also seeks a deduction for the design and fabrication of the damaged fuel canister, totaling $1,574,138. *See* Gov. Br. at 78, 85.

DOE is obligated under the Contract to "accept title to *all* SNF and/or HLW," PX 44 at Art. IV.B.1 (emphasis added), and the government does not dispute that its disposal obligations extend to damaged and failed fuel. *See* Gov. Br. at 89. There is a provision in the Contract that requires the utility to "obtain delivery and procedure confirmation" prior to delivery as to the "technical feasibility of disposing of such fuel on the currently agreed schedule." PX 44, Art. VI.A.2.b. There is no evidence to suggest that this provision was designed to allow DOE to delay pickup indefinitely as the government suggests, as opposed to simply insure communication between the parties to facilitate acceptance, as the provision provides.

Stripped down to its basic elements, the government's argument for an offset is that, in the non-breach world, DOE may have stranded small amounts of failed fuel at utilities all across the country for an indefinite and protracted period of time. The government asserts that "*if* DOE determines" special handling is required and "*if* a utility's SNF is determined not to be technically feasible," then acceptance "*may* be delayed." Gov. Br. at 89 (emphasis added). This argument is purely speculative. The government relies solely on the testimony of Mr. Zabransky to raise a theoretical issue regarding the technical capabilities of disposing of failed fuel at

---

[54] Putting everything else aside, there is no basis for deducting the entire $3.1 million in ISFSI costs for 22 horizontal storage modules based on the government's assertion that SMUD might have had to store one canister of damaged fuel in one module.

DOE's eventual repository facilities, which have not yet been licensed and do not yet exist, *see* Gov. Br. at 88-89; Tr. at 1665-68 (Zabransky), yet the government points to no documents or other evidence to support the assertion that failed fuel may be indefinitely stranded at all utility sites. Furthermore, Mr. Zabransky's statements are all hypothetical and vague, stating that "technical feasibility would still have to get looked at." Tr. at 1668.

In response to cross-examination, counsel for DOE objected that it is "pure speculation as to what's technically feasible and what's not" given that "the license application has not even been submitted yet." Tr. at 2062. To the extent the government's breach has created uncertainty regarding the technical details of fuel acceptance, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow*, 327 U.S. at 265. As previously noted, the wrongdoer would otherwise "profit by his wrongdoing at the expense of his victim." *Id*. at 264; *accord, e.g.*, *Locke*, 283 F.2d 524; *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 466 (1981); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

Furthermore, the government has presented no evidence that DOE would have left damaged and failed fuel at utilities for lengthy periods beyond final SNF disposal. Every utility has some level of damaged or failed fuel. In 1990, Oak Ridge National Laboratory did a study for DOE on the acceptance of failed fuel. PX 175. That study concluded that, as of March 1990, 5654 fuel assemblies at utilities around the country could be classified as damaged or failed. *Id.* at 4-6; *see also* Tr. at 1447-48 (Stuart) (noting approximately a third of the fuel he shipped for DOE was failed). Because damaged or failed fuel is commonplace, it was specifically covered

in the Contract and there was no provision stating that its acceptance would be long delayed.[55]

In 1985, Robert Bauer, Associate Director for Resource Management for DOE stated that

> With regard to "other than standard fuel" – it is the Department's intent that all currently designed nuclear fuel, including that falling outside the maximum physical dimensions specified in Appendix E, will be subject to the same scheduling procedures. . . . Failed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel.

PX 93. In the non-breach world, DOE would have been required to handle such fuel upon because it must accept "all" fuel. The notice provision in the Contract is included to allow DOE to make such arrangements prior to disposal. PX 44, Art. VI.A.2.b.

On this issue, the government's reliance on the testimony of former Acting Director Milner, is instructive. Gov. Br. at 90. Mr. Milner points out that it is only the "very, very badly failed fuel" that might be pushed later in the queue. Def. Counter-Designation of R. Milner at Tr. 52-53 (5/8/02). As Mr. Stuart testified, SMUD's fuel can be handled without difficulty.[56] Tr.

---

55 The shutdown priority provision in the Contract was included to prevent utilities from waiting indefinitely to decommission. *See* 48 Fed. Reg. at 16,593 (noting the shutdown priority provision was "necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity"); *see also* Designations Appendix (Dckt. #310) at 386-87 (Barrett). It would be inconsistent with the goals of the NWPA to leave failed fuel at utilities long after their remaining spent nuclear fuel was picked up for disposal. *See supra* § II.

56 Contrary to the government's assertion, Mr. Burford did not present "unrefuted testimony" that two assemblies are improperly stored. SMUD employee Ron Colombo reviewed the visual inspection of SMUD's fuel and concluded that SMUD had no fuel assemblies that require special handling, or "0 failed assemblies." PX 470 at 1. This determination was reviewed by an independent company, Electric Power Research Institute ("EPRI"), which affirmed that SMUD had no failed fuel assemblies that require special handling. EPRI agreed that the nine assemblies were correctly categorized as F2, if not somewhat "conservatively," and also suggested one additional assembly should be classified F2. PX 489 at 2. Mr. Stuart also reviewed the videotapes and determined that "[n]one of the fuel assemblies exhibit any features that would require special handling as noted in the Standard Contract." I. Stuart Written Direct at ¶ 42

Footnote continued on next page

at 1447-48; I. Stuart Written Direct at ¶¶ 42-44 (PX 1001). Thus, not only are the government's arguments speculative, they are also irrelevant in relation to SMUD's fuel.

### D. The Government's Proposed Deduction For The "88-Month Delay" Is Overly Simplistic And Unsupported By The Law And The Evidence.

The government asks this Court to reduce SMUD's damages by approximately $13.5 million, not by identifying any reasons that SMUD was unreasonable in pursuing mitigation or in overseeing its dry-storage project, but on the assertion that SMUD's project was "delayed by a total of 88 months." Gov. Br. at 93. Even putting aside the factual problems with this assertion, there is no legal theory to support it.

The government's theory appears to be that the non-breaching party should be denied mitigation damages unless it completed all of its mitigation efforts on a schedule prescribed by the breaching party's expert witness as part of the litigation. Not surprisingly, no cases support such a theory. Other than citing cases for the general rule of mitigation, the government relies solely on *Wilner v. United States*, 23 Cl. Ct. 241 (1991) and *Johnson Management Group CFC, Inc. v. Martinez*, 308 F.3d 1245 (Fed. Cir. 2002). These cases stand for the proposition that when a contractor breaches its obligations under a contract, its breach is not excused because of the failures of its subcontractors. *Johnson*, 308 F.3d at 1252-53; *Wilner*, 23 Cl. Ct. at 245. The analogy that the government uses – that a contractor is responsible for the performance of its

---

Footnote continued from previous page

(PX 1001). Thus, three independent sources have agreed regarding the extent and nature of SMUD's damaged fuel assemblies.

subcontractor – has no bearing on the question in this case. SMUD was not performing work for DOE as a contractor. Rather, SMUD was mitigating its damages through implementation of the dry storage system. The rule in *Johnson* and *Wilner* is irrelevant.

In addition, in making its "88-month delay" argument, the government fails to even assert that SMUD could have completed the project in some lesser amount of time or how doing so would have affected its costs. Gov. Br. at 92-96. Indeed, the government ignores entirely the fact that the project concerned the development of a system for the long-term storage and subsequent transport of highly-dangerous radioactive nuclear waste. The issue of safety is paramount when dealing with nuclear waste, as demonstrated by the actions of the NRC in reviewing the project over time and by the work of the SMUD team in overseeing it. *See* Tr. at 538, 568-70, 590-92 (Redeker). Although the government attempts to rely on the testimony of Mr. Burford to support its delay argument, Mr. Burford acknowledged at trial that he has no experience with dry storage. Tr. at 2554-55, 2587 (Burford). He has never supervised such a project, been responsible for transferring fuel to an ISFSI, prepared procedures for such a move, or conducted the necessary training. *Id.* at 2587. Mr. Burford did not make "an independent estimation to quantify the causes of the delay," *id.* at 2586, and thus, Mr. Burford did not even attempt to identify any basis for concluding that SMUD's actual efforts were unreasonable. This fundamental deficiency undermines the value of his testimony.

And although the government repeatedly acknowledges that Mr. Burford was not offering an opinion that SMUD was unreasonable in its pursuit of dry storage, Gov. Br. at 69 n.43; Tr. at 2558, 2575 (Burford), the government nonetheless claims at the same time that Mr. Burford is

competent to make the legal conclusion that "SMUD bore the responsibility for any resulting delays" and that "SMUD bore the risk associated with the delays in the pursuit of this technology." Gov. Br. at 93. Mr. Burford identifies no methodology to support this conclusion and it should be rejected for that reason alone. *See* J. Burford Written Direct at ¶¶ 76-88; Tr. at 2587-90 (Burford); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999). Even if it were proper for Mr. Burford to offer expert testimony on this legal conclusion (which it is not), his concession that SMUD was not unreasonable in pursuing dry storage defeats the government's argument. Had SMUD chosen a different method of storage, the government would no doubt be claiming that SMUD "bore the risk" of doing so and that it should have pursued a system like that of nearly every other utility. Finally, Mr. Burford notably does not offer any testimony as to "the risks SMUD would bear" if it had chosen a different method for long-term storage of its fuel.

The government's reliance on the deposition testimony of David Langstaff is similarly misguided. First, the government fails to mention that Mr. Langstaff has no knowledge of the SMUD project after 1996 because he had no responsibility for the Cooperative Agreement and no interaction with SMUD after this period. Langstaff Designations (Dckt. #289) at 31; Def. Cross-Designation Appendix (Dckt. #335), D. Langstaff Dep. at 135 (11/4/2004). Second, the government offers not a single exhibit or written suggestion that it made to SMUD during the course of the Cooperative Agreement criticizing the direction of the project. Gov. Br. at 92-96. Instead, it relies on two general statements made by Mr. Langstaff at his deposition, 10 years after the fact, that do not support the government's claim that SMUD's management was

unreasonable or that its damages should be reduced by $13.5 million because of delays. *Id.* at 94. In fact, the government omits Mr. Langstaff's testimony on this precise issue:

> Q. In your view, did SMUD do a reasonable job in managing the project, the dry storage project.
>
> A. I think they showed increasing maturity with regard to understanding the spent fuel transport and storage systems as we went forward and their understanding evolved over time.

Langstaff Designations (Dckt. #289) at 129.

Although the government cites Mr. Langstaff for the assertion that "SMUD did not understand the NRC's process for licensing casks for transport or storage," one of the primary objectives for DOE entering into the Cooperative Agreement with SMUD was "to share in and benefit from the licensing experience for the TSS," or transportable storage system. *Id.* Mr. Langstaff actually recognized that getting a license from the NRC for both storage and transport was a difficult and complex process:

> In this case, you had a design of a single piece of hardware that was going through that process and the storage requirements were slightly different than transport, and there [were] two different organizations that NRC involved when we started this, and so you combine those two parallel tracks and depending on where you have the crossover within NRC, I mean, that results in a complex process.

*Id.* at 125-26.[57]

---

[57] The government also criticizes SMUD for believing at the outset of the project in 1992 that the project could be completed within a few years. Gov. Br. at 93 n.51 & 94 n.52. This criticism ignores the fact that the original schedule estimate was based on the assumption that Pacific Nuclear's existing licensed canister and cask could be expeditiously converted to a dual purpose system. This turned out to be incorrect due in part to rigorous NRC oversight, and the schedule

Footnote continued on next page

Finally, the $13.5 million that the government puts forward as its claimed "reduction" to SMUD's damages is a fictional number. Mr. Kiraly states that Mr. McGrath of Contract Solutions "concluded that the project would have taken 31 months instead of 119 months, i.e. 88 months of delay were encountered." S. Kiraly Written Direct at ¶ 84. Mr. McGrath, who has no experience in the area of nuclear project management, Tr. at 2429-35 (McGrath), did not conclude that the project should or could have taken 31 months. *Id.* at 2436, 2457. He merely determined how many months the project extended beyond an initial, non-binding, planning schedule that was subsequently modified as the project changed in scope and direction. *Id.* at 2442-44, 2459. Thus, Mr. McGrath did not offer any opinion regarding whether SMUD's damages should be reduced based upon his schedule analysis. *Id.* at 2486. Mr. Kiraly, who similarly has no experience in the nuclear field, determined an "average monthly cost" based on his own opinion of which project costs were time-related. *See* S. Kiraly Written Direct at ¶¶ 84-85, Att. 13. Mr. Kiraly offered no independent factual support for such a deduction.

Given the speculative nature of Mr. Kiraly's proposed deduction, and the complete lack of evidentiary support for the proposition that SMUD should have completed the spent fuel project in 31 months, the government's proposed deduction should be rejected.

---

Footnote continued from previous page

estimates were repeatedly modified as the project's complexity increased. *See* PFF ¶¶ 92, 289-91.

### E. The Government Offers No Factual Support For Its Argument That SMUD Should And Could Have Mobilized Its Labor Force Only Three Months Prior To The Start Of The Project.

The government's argument that SMUD prematurely mobilized its labor force is equally without support. Gov. Br. at 109. The government asserts that all mobilization costs prior to November 1, 2000 should be deducted – an offset totaling $2,550,131. *Id.* at 110. The government relies solely on Mr. Burford's opinion that "a three month mobilization time frame for this project would have been sufficient." J. Burford Written Direct at ¶ 86. Mr. Burford's analysis is speculative, however, as he offers no support for his opinion. Mr. Burford admitted at trial that he has never "supervised a canister/cask loading project of the magnitude carried out at SMUD," he has never "been responsible for transferring fuel from a wet pool to an ISFSI," he has never "prepared written procedures for a fuel move from a wet pool to an ISFSI," and he has "never conducted training for a fuel move from a wet pool to an ISFSI." Tr. at 2587. He offered no estimate of what costs should have been incurred for the mobilization efforts and he did not investigate the mobilization period experienced by other utilities. *Id.* at 2690.

Mr. Burford offered no opinion on what size staff would have been required to conduct such a mobilization in a three-month period. *Id.* Finally, he testified he has "no opinion" regarding whether the amount of the government's proposed offset for early mobilization − $2.55 million − is proper. *Id.* at 2592. An opinion, without any basis in fact, is the definition of speculative testimony. *Genmoora*, 939 F.2d at 1163 ("An expert's testimony is not substantial if it is based merely on speculation and conjecture without basis in fact."); *Am. Dredging Co. v. United States*, No. 58633, 1951 WL 5376, at *3 (Ct. Cl. July 9, 1951) (rejecting the expert's testimony as speculative because there was no evidence in the record to support the expert's conclusions).

SMUD, on the other hand, presented evidence that its actions were necessary and appropriate under the circumstances. *See* PFF ¶¶ 323-27. By engaging in extensive training and test runs prior to actual loading, SMUD was able to locate and address any problems with the equipment and procedures prior to actual transfer. Tr. at 641 (Redeker). Because of this careful preparation, SMUD did not experience any incidents during the actual transfer of spent nuclear fuel. As Mr. Redeker testified, "The most positive indicator to me that we didn't start too early is that the fuel off-load went extremely well. The crews were very proficient. And it paid off. . . . We trained very hard for very long and it paid off in spades as the actual project went very smoothly." *Id.* at 641 (Redeker); *cf.* PX 619 (noting that casks at Trojan began dissolving in borated water during initial load). Although the government objects to Mr. Redeker's testimony, it offers no rebuttal evidence in response.

### F. SMUD's Fuel Was Still In The Pool In 2002, And Thus SMUD Did Not Realize Any Wet Storage "Savings" In 2002.

The government's assertion that "SMUD's damages claim should be offset by the $4,146,360 in annual savings beginning in 2002" is refuted by the facts. *See* Gov. Br. at 111.[58] It is undisputed that SMUD did not finish loading its fuel into the ISFSI until August of 2002. *See* PFF ¶ 399 and Response. Following final loading of the fuel into the ISFSI, costs associated with the spent fuel pool continued for a period while SMUD wrapped up its activities associated with the final transfer of the fuel and began decommissioning the pool. *See* PFF ¶ 400-02. The

[58] The government does not object to Mr. Field's analysis of the total cost savings attributed to shut down of the spent fuel pool or to the fact that the actual savings were $4,146,360. *See* Gov. Br. at 111.

government does not dispute that SMUD only realized savings "gradually, as staff was reduced." *See* Def's Resp. to PFF ¶ 400. Furthermore, at the time of trial, SMUD was still in the process of decommissioning the pool. *See* PFF ¶ 457; Def's Resp. to PFF ¶ 457. Given that the fuel was in the pool through August 2002, and that pool costs continued during the remainder of the year as staff was gradually reduced, there is no basis for the government's assertion that the annual wet pool savings should be deducted in 2002.

### G. The Government Has Offered No Factual Basis To Support Its Alleged Decommissioning "Savings."

The government asserts that SMUD's damages should be reduced by some unspecified amount because of unspecified decommissioning savings it hypothesizes SMUD will achieve. SMUD, however, has not quantified a decommissioning cost "savings" because there is no such "savings" from the government's breach. The government's main assertion appears to be that "a proper damages claim would have considered the cost savings associated with decommissioning its wet pool." *See* Gov. Br. at 112. In fact, SMUD has analyzed and accounted for the cost savings associated with the removal of fuel from and closure of the wet pool. After a thorough study of the costs and personnel that were eliminated following removal of the fuel from the pool, Jim Field concluded that the total annual savings from closing the wet pool was $4,196,360. *See* Tr. at 972-76 (Field); PFF¶¶ 394-95. The government does not dispute this figure. *See* Def. Resp. to PFF ¶ 394-95. Thus, SMUD has considered and quantified the savings that result from decommissioning the wet pool. While SMUD has not deducted these savings for 2003 − the first year such savings were realized − because of the likelihood that DOE may have

removed the fuel by this date in the non-breach world, SMUD has nevertheless quantified this amount for the Court.

SMUD has not realized any other savings as a result of transferring the fuel from wet to dry storage. Had DOE begun performance in 1998 as required under the Contract, SMUD would have left its fuel in the pool for removal by DOE. *See supra* § I; PFF ¶ 555-56. Had SMUD left the fuel in the pool and awaited DOE's performance, SMUD would have simply waited to decommission the pool. Tr. at 315 (Shetler). In fact, SMUD did have to wait to decommission the pool until 2003, engaging in incremental decommissioning around a partially islanded spent fuel pool. *See* PFF ¶¶ 455-59. Finally, there is no basis for asserting SMUD has realized a benefit regarding the elimination of its Part 50 operating license. SMUD continues to maintain its Part 50 operating license, and must do so at least until the pool is decommissioned. Tr. at 735-36 (Redeker). Thus, SMUD has realized no related "savings" as a result of the government's breach.

### H. SMUD's ISFSI Operation And Maintenance Costs Are A Direct Result Of The Breach And Would Not Have Been Incurred In The Non-Breach World.

The government asserts that SMUD has improperly included in its damages claim its operation and maintenance costs for the ISFSI for 2003 – $695,715. *See* Gov. Br. at 91. The government apparently argues that such an offset is appropriate in addition to the offset for the costs of wet storage that the government claims for 2003. The government's efforts to seek this double deduction should be rejected.

In the non-breach world, SMUD would have left its fuel in the pool and would have continued to incur wet pool costs annually until the fuel was completely removed. SMUD has presented evidence that the fuel would have been removed in the non-breach world by at least 2006, with the possibility that it could have been removed earlier through use of transportation campaigns and the shutdown priority and exchange provisions of the Contract. *See* PFF ¶¶ 554-71. As SMUD has noted in this brief and in its initial Post-Trial Brief, if the Court concludes that the fuel would not have been picked up by 2003, it is appropriate to deduct from SMUD's damages claim a total of $4,196,360 because these are costs SMUD would have incurred in the non-breach world in 2003. *See* Pl. Br. at 61. Such a deduction would account for SMUD's "would-have-been" costs of wet storage in the non-breach world.

The government now also argues for an additional offset that would force SMUD to pay for storing its fuel in *both* wet storage and dry storage during the same period. In the non-breach world, SMUD would not have transferred its fuel to dry storage. Thus, the costs for operating and maintaining the ISFSI in 2003 are directly attributable to the government's breach. The government has no basis for arguing that the operating and maintenance costs of the ISFSI would have been incurred in the non-breach world. Thus, there is no basis for such a deduction.

### I. There Is No Basis For The Government's "Unavoidable Costs" Deduction.

The government asserts that SMUD's damages claim should be reduced by an additional $11,607,819 because of the possibility that there are "unavoidable costs potentially included in SMUD's damages claim." Gov. Br. at 109. The government offers no evidence to support this assertion other than the speculation of Mr. Kiraly. His $11.6 million deduction was simply a

"miscellaneous" adjustment to reach a number that Mr. Burford calculated, despite his lack of experience, for a store-only system. Gov. Br. at 109 & n.61 (noting "the $11 million miscellaneous adjustment represents the difference between the $20 million arrived at by Mr. Kiraly and the $9 million arrived at by Mr. Burford"); Tr. at 2580, 2583-84 (Burford) (noting his lack of experience and agreeing that the $9.2 million does not include all the costs necessary and that he did not contact any vendors to determine the cost of such a system); Tr. at 2709 (Kiraly) (recognizing that this number is a deduction to reach Mr. Burford's number, based on costs which "we could not identify with any specificity"). This deduction is hypothetical and speculative in nature, and should be rejected by this Court. *See Haynes v. United States,* 61 Fed. Cl. 788, 793 (2004).

### VIII. The Government Does Not Dispute That SMUD Gave DOE Adequate Notice Of Its Pursuit Of And The Costs Associated With Dry Storage.

At trial, this Court raised the issue of notice and its application in this case. *See* Tr. at 1106. Although SMUD explained in its Post-Trial Brief that such notice is not required in this case, SMUD also presented substantial evidence that DOE nevertheless did receive notice regarding SMUD's mitigation of its damages, the costs that were being incurred, and SMUD's intent to hold DOE accountable for such costs. *See* Pl. Br. at 76. The government offered no response to such arguments and evidence.

## CONCLUSION

For the reasons presented above and in SMUD's Post-Trial Brief and its Proposed Findings, SMUD respectfully requests that the Court enter judgment awarding SMUD damages in the amount of $21,553,462 for 1992 to 1997 and $55,049,870 for 1998 to 2003.

DATED this 18th day of October, 2005.

Respectfully submitted,

/s/ Howard N. Cayne
Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

Of Counsel:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Response To The Government's Post-Trial Legal Brief to be filed electronically through the Court of Federal Claims Case Management/ Electronic Case Filing System on October 18, 2005. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Alan Lo Re
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

/s/ Timothy R. Macdonald