No. 98-488C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT**

---

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

November 1, 2005

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, Plaintiff, | ) | |
| v. | ) | No. 98-488 C |
| THE UNITED STATES OF AMERICA, Defendant. | ) | (Judge Braden) |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT**

## I. The Nuclear Waste Policy Act And The Promulgation Of The Standard Contract

1. On January 7, 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

2. The NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF and HLW]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures." *Id.*

RESPONSE: Although SMUD does not object to the government's proposed finding of fact, SMUD notes that the NWPA provides that the "Secretary shall annually review the amount of fees . . . to evaluate whether collection of the fee will provide sufficient revenues to offset the costs" of the program. 42 U.S.C. § 10222(4).

From 1983 to the present, DOE has prepared periodic "Fee Adequacy Reports" to analyze whether the billions in fees being paid by the utilities will be sufficient to cover the life cycle costs of the program. *See* PX 97; PX 185; PX 681 (Fee Adequacy Reports); 42 U.S.C. § 10222(a)(4). DOE also has prepared detailed "Total System Life Cycle Cost" ("TSLCC")

reports to analyze what the full costs of the life of the program will be. *See* PX 429; PX 603; PX 680 (TSLCC Reports). In every one of the Fee Adequacy and TSLCC Reports, including the most recent reports prepared in 2001 and updated in 2003, DOE has concluded that the fees paid by the utilities will be sufficient to cover the life cycle costs of the program. The government today holds approximately $16 billion in unspent utility fees reserved solely for DOE's eventual performance. *See* Statement by T. Garrish at 6 (March 10, 2005) (Att. A to SMUD's Response to Memorandum Opinion and Order to Show Cause Dated April 21, 2005 (Dckt. # 326)).

SMUD paid DOE all fees required under the Contract, amounting to more than $40 million dollars. *See Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 498 (2005) (noting "SMUD has paid all applicable fees required by the DOE Standard Contract"); Gov. Answer at ¶ 22 (noting payment of fees is undisputed).

3. On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. *See* 48 Fed. Reg. 5458 (Feb. 4, 1983).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

4. Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> *DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.*
>
> Beginning on April 1, 1991, DOE shall issue an annual acceptance ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. *The oldest fuel or waste will have the highest priority for acceptance*, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6) (emphasis added).

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). SMUD agrees that the Standard Contract did not identify a specific rate by which DOE would accept contract holder's SNF and that DOE has accurately quoted portions of the proposed Contract. DOE did not put any acceptance rate term in the Contract, and thus, the acceptance rate is, in every sense, an open term.

SMUD objects to the government's representation that the Contract "provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal." The "Delivery" provision states that "the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three months thereafter." *Id.*, Art. V.B.1. This Court has held that the ACR, and thus the DCSs, were only "for planning purposes." *Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 505 (2005) (quoting 10 C.F.R. § 961.11 at Art. IV.B.5.b). Final Delivery Schedules ("FDSs") were to be submitted to DOE "not less than twelve (12) months" prior to the actual delivery date. PX 44, Art. IV.C. FDSs were never submitted or approved, however, because DOE has never come close to performance under the Contract.

Furthermore, the contract provides that Purchasers "shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser *wishes to deliver* to DOE." PX 44, Art. V.B.1. The referenced process for ranking fuel was included to provide a means of ordering if Purchasers included more SNF in their DCSs than the total annual capacity for the facility. The provision on "Acceptance Procedures" explains that "[d]elivery commitment schedules for SNF and/or HLW *may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate*." PX 44, Art. VI.B.1 (emphasis added). In that circumstance, an "acceptance priority ranking will be utilized." *Id.* Thus the priority ranking, based on the date of discharge, was included to address this circumstance, rather than to create a "definitization" of the order of SNF acceptance and disposal under the Contract.

5. The proposed rule requested that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

6. Certain utilities and nuclear industry groups requested that DOE insert into the Standard Contract a specific rate of acceptance. DX 0076.063 at ADM002.0482, DX 64, at SMUD 0011731.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD agrees that certain utilities and nuclear industry groups commented on the Contract as noted. The operative point, however, is that DOE did not put any acceptance rate term in the Contract –

in other words, the acceptance rate is, in every sense, an open term. DOE appeared to recognize this fact when it published the Standard Contract in April 1983, noting only that: "The 1998 date is called for in the Act, and we believe it to be a realistic date. *Our performance will be judged by meeting this date*." 48 Fed. Reg. 16,590, 16,598 (Apr. 18, 1983) (emphasis added).

7. On April 18, 1983, DOE issued the terms of the Standard Contract as a final rule. 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983). In the final Standard Contract terms, DOE expressly chose not to include a minimum rate obligation in the Standard Contract because, as of 1983, DOE did not know what DOE's capabilities would be in 1998 and was unwilling to commit to the minimum rate obligations that the utilities proposed. Def. Counter-Designation of R. Morgan, at Tr. 57:20-23, Tr. 129:11-17, Tr. 203:16-19 (3/21-22/02).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government's citation of Mr. Morgan's testimony is simply another variant of the argument that, because the acceptance rate term is omitted from the Contract, DOE has unfettered discretion to accept fuel (or not to accept fuel) at whatever rate it sees fit. This is not the law, as noted in SMUD's response to Defendant's Proposed Finding of Fact ("DPFOF") ¶¶ 114-16. In addition, because this argument "would render the government's duties under the Standard Contract illusory," it should be rejected. *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 371 (2005); *see also Indiana Michigan Power Co. v. United State*, 57 Fed. Cl. 88, 97 (2003) (holding that the government's argument "does not comply with congressional expectations or the parties' intentions" and "tends to render the Standard Contract illusory"); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343-45 & n.8 (2005) (rejecting argument that "DOE has virtually unfettered discretion to determine its obligations under the contract, through the DCS process or otherwise, especially where no repository is available").

8. In the final rule, DOE also modified the definition of the "facility" to which SNF could be delivered beginning in 1998. Although the proposed rule would have required delivery to a repository in 1998, the final rule provided that DOE could deliver SNF in 1998 either to a repository or to "such other facility(ies) to which [SNF and/or HLW] may be shipped by DOE prior to its transportation to a" permanent repository. 10 C.F.R. § 961.11, Art. I.10.

RESPONSE: SMUD agrees that the final version of the Contract made the specific change referenced above. SMUD objects, however, to the government's characterization of the effect of this change. As this Court has recognized, DOE had an obligation to begin accepting fuel in January 1998. *See Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 505 (2005). Furthermore, Congress and DOE expected that DOE would have a repository in operation by January 1998. *See Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.2d

1272, 1276-77 (D.C. Cir. 1996); *see also* H.R. Rep. No. 97-785, pt. 1, at 44 (1982) (instructing the "Secretary [of Energy] that the repository program is paramount and no other radioactive waste or spent fuel program of the Secretary shall interfere with, delay, obstruct or deflect from the establishment of a repository development program as provided in this Act.")

9. The final rule also included provisions providing DOE with the sole discretion to approve exchanges by utilities of approved delivery commitment schedules, and to grant utilities that had shutdown priority in the acceptance queue. 10 C.F.R. § 961.11, Art. V.E, VI.B.1(b).

RESPONSE: SMUD object to the government's proposed finding of fact. The exchange provision was adopted upon request by several utilities, and was one of the few changes to the draft Contract prepared by DOE. *See* 48 Fed. Reg. 16,590, 16,592 (Apr. 18, 1983). The final rule noted the new provision "allows Purchasers to exchange DOE-approved delivery commitments with one another," thereby allowing Purchasers "greater flexibility." *Id.* Robert Morgan, the first Director of the SNF program, commented at the time of Contract formation that "this poses no great problem" and "we intend to be reasonable." PX 29 at Tab D; *see also* Corrected Appendix to Accompany SMUD's Motion to File Designated Deposition And Trial Testimony, dated Feb. 24, 2005 (hereinafter "Designations Appendix") (Dckt. #310) at 2032-33 (Morgan). As Daniel Dreyfus, another former Director of OCRWM, has stated, the exchange provision was included "to allow Purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department." PX 433.

Similarly, DOE would have been reasonable in granting shutdown priority. Statements by DOE officials confirm that the shutdown priority provision was supported and would have been an option absent the breach. Susan Klein, the government's Rule 30(b)(6) witness on the role and purpose of the shutdown priority provision, testified that DOE "could have given" acceptance priority to shutdown reactors if the system were operating at 3000 tons. Designations Appendix (Dckt. #310) at 1861-62 (S. Klein); *see also id.* at 2031-32 (Morgan). In fact, during the process of developing the Contract, DOE rejected requests by certain utilities to omit the priority acceptance provision, explaining "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983).

10. The final rule did not provide any provision allowing transportation campaigns, but instead generally required that DOE accept SNF under oldest-fuel-first principles. 10 C.F.R. § 961.11, Art. IV.B.5(a).

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). While the Contract does not reference transportation campaigns

specifically, it also does not disallow use of such campaigns. As Mr. Stuart testified, the provision of the Contract that references priority for "oldest fuel" does not necessarily require a strict "oldest fuel first" acceptance. Tr. at 1412-16 (Stuart). As discussed in SMUD's response to DPFOF ¶ 4 above, the referenced process for ranking fuel based on date of discharge was included to provide a means of ordering disposal if Purchasers included more SNF in their DCSs than the total annual capacity for the facility. *See* PX 44, Art. VI.B.1.

Furthermore, had DOE been performing, both DOE and utilities likely would have sought transportation campaigns, as they would have been efficient and beneficial for both DOE and utilities. *See* I. Stuart Written Direct at ¶ 35 (PX 1001); Tr. at 1941 (Zabransky). Such campaigns would be more efficient than applying an oldest fuel first methodology, which, if applied literally, would result in DOE accepting less than full cask loads of SNF. Tr. at 1416-17 (Stuart). Mr. Zabransky agreed at trial that "campaigning does have an attraction both to the utilities and potentially to the Department" and that "it would be nice to be able to do that." Tr. at 1941 (Zabransky).

11. The final rule expressly granted DOE the discretion to defer the acceptance of failed fuel if DOE determined that the disposal of such fuel was not technically feasible. 10 C.F.R. § 961.11, Art. VI.A.2.b.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). The Contract does not give DOE discretion to defer acceptance of failed fuel. The Contract merely provides that,

> for any SNF which has been designated by Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days of receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

*Id*. at Art. VI.A.2.b.

Furthermore, there is extensive evidence that DOE would have accepted failed fuel on the same schedule as standard fuel. See PX 93 (noting representation by DOE that "[f]ailed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel"). OCRWM Director Lake Barrett stated his belief that "[w]hen all is said and done, my expectation, what I really think will happen is when it moves along it will move together – contemporary, it will all move contemporary, that's the failed fuel and standard fuel." Designations Appendix (Dckt. #310) at 392 (Barrett). SMUD's expert, Ivan Stuart, also testified that "DOE could have and would have accepted these

assemblies [SMUD's damaged fuel] on the same schedule as the rest of SMUD's fuel." I. Stuart Written Direct at ¶ 42 (PX 1001).

12. SMUD and DOE signed the Standard Contract on June 14, 1983. DX 88.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

## II. Overview Of The Rancho Seco Nuclear Facility

13. SMUD's Rancho Seco facility began operating in 1975. Tr. 114:20-21 (Shetler). From the outset, Rancho Seco was plagued by a poor performance history, including multiple extended outages and placement upon a watch list by the Nuclear Regulatory Commission ("NRC") of reactors constituting the "greatest safety significance." DX 10; Tr. 120:17-121:14 (Shetler); Direct Testimony of Cliff Hamal, at ¶ 30.

RESPONSE: SMUD objects to the government's proposed finding of fact. With regard to Rancho Seco, SMUD's Assistant General Manager Jim Shetler testified that "the actual Rancho Seco facility went on-line in about 1975, 1976." Tr. at 114. SMUD also objects to the government's characterization of SMUD's operating history. SMUD did face several operating issues during the period SMUD was on-line. Such operational issues were not uncommon during this period, however, and "[t]o some extent, all nuclear plants had to do some upgrades and changeouts as a result of Three Mile Island." Tr. at 121 (Shetler).

14. During the mid-1980s, Rancho Seco suffered a 27-month outage, from December 1985 though early 1988. Tr. 155:13-16, Tr. 156:1-3 (Shetler). During the 14-year life span of the Rancho Seco plant, the plant was non-operational more than it was operational. Direct Testimony of Cliff Hamal, at ¶ 29.

RESPONSE: SMUD does not object to the accuracy of the government's finding of fact, but objects to the relevance of the proposed finding to the issues in this case.

15. S. David Freeman, SMUD's general manager characterized SMUD's operating history as follows:

> . . . [SMUD was] a very troubled utility at the time. They had raised the electric rate seven or eight times. They had a nuclear power plant, that if it were an employee, you would have fired it because it operated half the time . . . .

Def. Counter-Designation D. Freeman, Tr. 24:14-18 (7/16/04).

RESPONSE: SMUD does not object to the proposed finding to the extent it correctly quotes Mr. Freeman's testimony. SMUD does object to the proposed finding based on its relevance to the issues in this case.

16. As a result of the extended outages at the Rancho Seco facility, SMUD had to pay for replacement power, which accounted for half of Rancho Seco's overall generation of electricity. Tr. 127:6-16 (Shetler). Consequently, SMUD had to raise rates for its ratepayers significantly during the mid-to-late 1980s. Tr. 127:17-18 (Shetler). Rancho Seco's extended outages, coupled with the significant rate increases, resulted in the placement on the local ballot two separate voter initiatives to close Rancho Seco, the second of which, dated June 6, 1989, passed. Tr. 127:22-23, Tr. 155:21-22 (Shetler); Tr. 876:1-4 (Ferreira).

RESPONSE: SMUD objects to the government's proposed finding because it misstates the evidence. Mr. Shetler testified that the power from Rancho Seco at that time generated well over half of SMUD's overall needs as a utility district. Tr. at 127 (Shetler). SMUD replaced the power from Rancho Seco with power purchased on the open market. *Id.* SMUD has always purchased power both to supplement its current needs and in the form of backup contracts in the event such power is needed. *Id.* at 106, 113.

SMUD further objects to the government's characterization of SMUD's management of Rancho Seco. SMUD did face several operating issues during the period SMUD was on-line. Such operational issues were not uncommon in the industry during this period because all nuclear plants, to some extent, faced such issues. Tr. at 121 (Shetler). In fact, the average availability of nuclear power plants for the industry during this period was only approximately 75 percent. *Id.* at 891 (Ferreira).

Given the ability to obtain inexpensive replacement power at that time in California, it made economic sense to shutdown the plant because SMUD could purchase power more cheaply on the open market than it could produce the power. As a result, Mr. Ferreira recommended to the general manager that the facility be closed for this reason. As he testified, "As a result of successfully negotiating contracts that would either replace the output of the nuclear plant or, as I said, would provide the operating reserves necessary to meet the WCC reliability standards and requirements, . . . comparing the cost of continued operation over the next 10 years, to converting the contracts to replacement power, the nuclear power plant would have had to operate at least 75 percent of the time in order to beat the replacement cost of power." *Id.* Even if SMUD operated at then-industry standard, from a "risk standpoint," Mr. Ferreira concluded that "it didn't make sense to continue to own the plant and assume the risk." *Id.* Based on Mr. Ferreira's recommendation and others, prior to the vote, at a public Board Meeting, the general manager recommended to the Board that the plant be shutdown. *Id.* at 891-93.

17. The following day, SMUD's Board of Directors immediately agreed to abide the June 6, 1989 referendum to close Rancho Seco. Tr. 129:1-12 (Shetler); Tr. 895:1-10 (Ferreira). At the time of the shutdown, Rancho Seco was licensed by the NRC to operate through 2008. DX 248, at SMUD 0029716.

RESPONSE: SMUD objects to the first sentence of the government's proposed finding because it is misleading. "[T]he board had conveyed to the community that . . . they would allow the customers to vote on the outcome of the future of the nuclear power facility." Tr. at 895 (Ferreira). Thus, the Board of Directors decided prior to the vote that "if the owners of SMUD [the electorate] determined that the plant should be shut down, that they would abide by that decision." *Id*. at 129 (Shetler). The Board of Directors stood by its representations to the community, and "as a result of the board's direction," shutdown of the plant was initiated on June 7, 1989. *Id.* at 129.

SMUD does not object to the remainder of the government's finding of fact.

18. SMUD's shutdown of its Rancho Seco facility occurred nine years before DOE was obligated to begin the acceptance of SNF from the industry generally, and 12 years before DOE was obligated to begin the acceptance of SMUD's SNF.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). SMUD also objects to the government's proposed finding of fact because the government fails to support its finding with any record evidence.

SMUD disputes that DOE had no legal obligation to begin acceptance from SMUD until 2001. No such provision is included in the Contract. Rather, the Contract between DOE and SMUD provides that disposal "services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors . . . has been disposed of." PX 44, Art. II; *see also Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 505 (2005) (recognizing the government's obligation under Contract to begin disposal by January 31, 1998). In addition to the provisions that govern development of a schedule for such disposal, the Contract also includes various provisions that would affect the actual schedule, including shutdown priority and exchange. *See* PX 44, Art. V.E, VI.B.1.b. SMUD's final disposal schedule would have been subject to these provisions.

Presumably the government relies on the 1991 ACR and SMUD's submitted DCSs to support its assertion that it had no obligation to begin acceptance of SMUD's SNF until 2001. *See* PX 231. This Court has already held, however, that the ACRs "were only 'for planning purposes.'" *Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 505 (2005).

Thus, "the DCSs imposed no legal obligation on either party to the DOE Standard Contract." *Id.*; *see also Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 666 (2003) ("The parties could not have expected that planning documents would create binding contractual obligations.").

## III. SMUD Pursued Dry Storage In 1990 For Reasons Wholly Unrelated To The Government's 1998 Breach Of The Standard Contract

### A. As A Result Of Rancho Seco's Premature Shutdown In 1989, SMUD's Focus Was To Decrease The Size Of Its Nuclear Footprint

19. Upon the decision to shut down Rancho Seco, SMUD personnel placed their focus upon decommissioning the plant. DX 122; DX 125; DX 131; DX 133; DX 134; DX 139. On December 8, 1989, following the shutdown of Rancho Seco, SMUD completed the defueling of the Rancho Seco nuclear reactor. DX 135, at SMUD 0000501. SMUD stored all 493 of its SNF assemblies in the wet storage pool within its spent fuel building. DX 141, at SMUD 0019082. Shortly after its decision to shutdown Rancho Seco, SMUD created a Decommissioning Task Force to initiate planning for decommissioning and to place the plant into a "protective lay-up" condition. DX 122; DX 125.

<u>RESPONSE</u>: SMUD does not object to the government's proposed finding of fact. SMUD notes, however, that once Rancho Seco was shutdown, it immediately was transferred from operating to decommissioning status. *See* Tr. at 1255 (Holst) (noting that "everything we do at Rancho Seco after the plant closed was decommissioning"); Designations Appendix (Dckt. #310) at 2334 (Freeman) (noting that the word "decommissioning" is confusing because the staff uses the word generally to cover everything).

20. SMUD had two primary goals after Rancho Seco's premature shutdown in 1989.

a. First, SMUD sought to reduce its nuclear footprint as quickly as possible. Tr. 263:11-15 (Shetler). To achieve this goal, SMUD had to decommission its Rancho Seco facility. Tr. 263:16-18 (Shetler). The Rancho Seco site could not be decommissioned until its pool was eliminated. Tr. 617:2-4 (Redeker). SMUD believed that, by placing its SNF into dry storage, SMUD gained the ability to decommission its wet pool. Tr. 263:25-264:1-3 (Shetler). By decommissioning its wet pool, SMUD in turn gained the ability to decrease the amount of

staff and ultimately reduce its costs associated with Rancho Seco. Tr. 264:4-10 (Shetler); Tr. 833:2-12 (Redeker). SMUD recognized that its desire to decommission Rancho Seco was an important element in SMUD's decision to pursue dry storage. Def. Counter-Designation of R. Bowser, at Tr. 229:24-230:5 (9/16/04).

b. Second, SMUD sought the removal of its SNF from the site as quickly as possible. SMUD hoped that dry storage would lead DOE to accept SMUD's fuel earlier than it was otherwise entitled under the Standard Contract and as soon as possible. Tr. 264:11-15 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD agrees that since shutdown it has had the goals of reducing its nuclear footprint and achieving disposal of its fuel as quickly as possible. However, SMUD objects to the government's portrayal of these goals as completely divorced from the government's announced delays and subsequent breach of the Contract. SMUD's desire to facilitate its decommissioning and encourage receipt of its fuel were intertwined with and driven by DOE's anticipated delay. That delay magnified the importance of SMUD's goals because it meant that SMUD might have to store its spent fuel for several decades and such storage could complicate SMUD's decommissioning and increase its costs. *See* Tr. at 464 (Shetler) ("[W]e had knowledge that DOE was not going to perform on time. That was one of the basic premises on which we went forward in looking at how do we handle a shutdown plant at Rancho Seco and then dealing with the fuel.").

This relationship is well-documented by the record in this case. For example, the March 1990 Levy report explains, in connection with the likelihood of DOE fuel receipt after 2010, that continued wet storage of the fuel would extend SMUD's security, cooling, and monitoring costs, as well as limit or preclude SMUD's decommissioning options. PX 176 at 59. At the October 3, 1991 SMUD Board of Directors meeting, General Manager David Freeman and Fuel Disposition Manager Rita Bowser both pointed out that dry storage at an ISFSI would provide assurance that long-term fuel storage at the site in the absence of a repository would not preclude the decommissioning of Rancho Seco. DX 274 at 63 (Bowser), 67 (Freeman).

Other SMUD documents similarly relate the anticipated delay in DOE performance to the need to reduce storage costs and facilitate decommissioning. The 1992 staffing summary sheets that recommended authorizing contract negotiations and then approving the contract with Pacific Nuclear both specifically reference the savings that will result from the transfer of fuel to dry storage during the period of the government's delay, from 1998 to 2010. *See* PX 259 at 2; PX 269A. The EA, issued by the NRC in 1994, states that the "absence of a Federal repository makes storage of spent fuel in dry shielded canisters above ground SMUD's primary alternative." PX 363 at 8. Although the option of leaving the fuel in the pool was discussed, it was considered "undesirable" because of the continued costs to maintain the pool and the delay

in decommissioning that would result. *Id.* The government's attempts to focus on these goals, to the exclusion of the government's impending breach, should be rejected.

With regard to decommissioning, SMUD objects to the government's statement that Rancho Seco cannot be decommissioned until the pool is eliminated. In actuality, no matter how the fuel is stored, Rancho Seco cannot be completely decommissioned until all the fuel is removed by DOE. Tr. at 617 (Redeker, noting that "[y]ou can't decommission totally until the fuel is gone, no matter where it is, even if it is in [the] ISFSI, the dry storage, you are still not finished with decommissioning until the fuel is gone"), 735-37 (Redeker) (same); 2624 (Burford) (agreeing total decommissioning is not possible until all the fuel is picked up by DOE).

21. SMUD believed that dry storage could help it achieve both of these goals. First, dual-purpose dry storage represented the quickest and cheapest way to decommission the Rancho Seco facility, because SMUD could not decommission its wet pool as long as any radioactive materials, including SNF, remained in the pool. DX 721, at SMUD 061592; Tr. 734:21-735:8; 736:7-737:9 (Redeker) (acknowledging cost in maintaining Part 50 license, and inability to eliminate Part 50 license until wet pool is decommissioned). In the early 1990s, SMUD estimated that ceasing wet pool operations would result in an annual savings of as much as $8 million. DX 287, at SMUD 0018294. Second, SMUD believed that dual-purpose dry storage presented the best chance of having DOE accept its SNF under the Standard Contract through the use of a Monitored Retrievable Storage ("MRS") system by 1998. *Id.*; Tr. 254:21-25 (Shetler) ("[I]f there was a potential for any kind of an interim storage facility that could take the fuel earlier, having fuel in a dual-purpose system would hopefully expedite the ability to get fuel moved there."); Tr. 278:15-19 (Shetler). SMUD believed that, although its first acceptance in the non-breach world would have been 2001, its SNF could be accepted earlier at an MRS if it had its SNF in dual-purpose dry storage by 1998. Tr. 704:22-705:1 (Redeker); DX 202, at Attachment at SMUD 0019251 ("Storage in transportable casks offers the best opportunity explored to keep open the possibility of early off-site shipment, possibly as early as 1998 should DOE develop a . . . MRS."); DX 217, at SMUD 0025576 (stating that "the District believes that

by storing spent fuel in dual purpose storage and transport casks that early acceptance by DOE would be possible").

RESPONSE: SMUD objects to the government's proposed finding. Mr. Shetler explained the relation between SMUD's decommissioning strategy and SMUD's pursuit of dry storage, particularly as DOE's delay was anticipated to extend well beyond 2008:

> Well, the driver to go to [dual purpose dry storage] was really where we were with DOE acceptance. The decommissioning plan itself was somewhat independent of where the fuel was stored. We ultimately, because we elected to go to dry storage based on the DOE's failure to perform, did wrap in the dry storage as a piece of the decommissioning plan.
>
> The decommissioning plan envisioned that we would place the plant in some sort of safe storage mode, mothball mode. It could be done whether the fuel was in wet storage or not. And come back in 2008. If the DOE had performed under the original schedule, the fuel would have been gone by then.
>
> What we were faced with was the fact that the fuel would not be gone. Also the fact that obviously the DOE wasn't going to be performing in that timeframe, so the decision to go to dry storage was one around having to deal with the cost of storing fuel for the long-term. Decommissioning could have been accomplished whether the fuel was in dry storage or wet storage, depending on the performance of the DOE.
>
> If that continued to drag out, then ultimately we would have to do something with getting access to the spent fuel.

Tr. at 216-17 (Shetler). Thus, SMUD's pursuit of dry storage to facilitate decommissioning and encourage DOE receipt of its fuel was directly related to and caused by the substantial anticipated delay in DOE performance. If DOE had been planning to perform in 1998 and SMUD had adequate assurance that it would do so, SMUD could have pursued its decommissioning strategy and planned for the certainty of DOE removal of its fuel.

The government attempts to make much of the fact that SMUD documents from the early 1990s acknowledged that DOE "could" begin accepting spent fuel in 1998 through an MRS, and that, if DOE did so, the use of dual purpose dry storage could encourage prompt acceptance of SMUD's fuel. However, SMUD documents merely recognize that an MRS could be sited by 1998, that is, that such siting was technically possible, not that it was likely or that it could be done without changing the NWPA. *See* DX 164 at 1 (noting that dry storage would allow fuel shipment by 1998 if DOE storage were available); *see also, e.g.*, DX 202 at 001925 (describing shipment of fuel to MRS as a "possibility"); DX 274 at 62 (explaining that the likelihood of an

MRS opening in 1998 would depend upon the passage of legislation delinking the repository and MRS).

Moreover, SMUD's hope that a dual-purpose dry storage system could encourage prompt DOE acceptance of its fuel if an MRS were developed was itself driven by DOE's announcements of delay and the fact that DOE was not developing the necessary transportation casks or system that would allow it fully to perform its obligation. *See* Tr. at 1371-72, 1376, 1458 (Stuart). Those announcements indicated that SMUD faced a delay of at least 12 years in the removal of its spent fuel. According to the Levy report, SMUD's only hope of avoiding such an extended and costly delay was through a dual purpose dry storage system. *See* PX 176 at ii (discussing DOE repository delay until 2010 and explaining that transportable dry storage offered "the best opportunity" for early offsite shipment to DOE or interim onsite acceptance by DOE); *id.* at 65 (describing 1998 fuel acceptance as "[t]he most uncertain element" and explaining that Levy's transportable dry storage recommendation "only assumes that it is possible that this could happen"). As Mr. Shetler explained at trial, "we weren't going to get fuel moved any other way." Tr. at 349 (Shetler). Thus, as the documents cited by the government reflect, a dual purpose dry storage system allowed SMUD to keep its options open *in case* disposal at an MRS was possible. *See* DX 202 (noting such storage "offers the best opportunity explored to keep open the possibility").

22. SMUD's own expert, Ivan Stuart, believed that SMUD's placement of its SNF into dual-purpose dry storage increased the chances that DOE could timely accept SMUD's SNF. Tr. 1374:15-25 (Stuart).

<u>RESPONSE</u>: SMUD does not object to the government's proposed finding of fact. SMUD notes that implicit in this comment is the likelihood that DOE *would not* perform its obligations under the Contract. In fact, by 1989, DOE had already announced that the repository would be delayed until at least 2010. PX 169 at vii (noting a "significant slip for the expected start of repository operations – from the year 2003 to approximately 2010").

23. SMUD's pursuit of its two stated goals were wholly independent of the Government's delay in the acceptance of SNF. Neither of these two goals, which were discussed in the early 1990s, were in any way related to the Government's post-1998 delay in the acceptance of SNF. *See* DPFOF ¶¶ 20-22.

<u>RESPONSE</u>: SMUD objects to the government's finding of fact. As SMUD elaborated in its responses to DPFOF ¶ 20-22, both of these goals were intertwined with and driven by DOE's anticipated delay. That delay magnified the importance of these goals because it meant that SMUD would have to store its spent fuel for several decades, complicating SMUD's decommissioning and increasing SMUD's costs.

24. Mr. Shetler testified that, in the early 1990 time frame, SMUD's "primary goal" was "to try and get the fuel in the safest mode, low cost mode and ultimately in the DOE's hands as soon as possible." Tr. 150:22-151:1, Tr. 152:12-14 (Shetler). Mr. Shetler explained that "SMUD was no longer in the nuclear business, if you will. They are not going to be generating electricity from nuclear power from our perspective, it was in our ratepayer's best interest to minimize the cost and get the fuel in a position where DOE could take it." Tr. 152:16-21 (Shetler).

RESPONSE: SMUD does not object to the government's proposed finding of fact. SMUD does object, however, to the use of this fact to imply that SMUD would have pursued dry storage in the non-breach world. In fact, this testimony indicates the opposite – that SMUD would have left its fuel in wet storage in the non-breach world to ensure prompt receipt.

25. As early as September 1989, SMUD was considering placing its SNF into dry storage. DX 125, at SMUD 0020872 (noting that "spent fuel will be placed in wet storage in the existing spent fuel pool initially and then dry cask storage following the appropriate fuel decay period."); Tr. 268:10-23 (Shetler) (acknowledging that dry storage was an option SMUD was considering at the time and it was the option SMUD ultimately pursued); Tr. 1064:8-13 (Field) (admitting that SMUD began considering dry storage option within months after the June 1989 shutdown of Rancho Seco). In October and December 1989, SMUD assumed, for purposes of its proposed decommissioning plan, that it would place its SNF into dry storage beginning in 1995. DX 134, at SMUD 0027908; Tr. 271:22-272:1 (Shetler) (explaining that dry storage was one of the planning assumptions SMUD was considering as of December 1989); Tr. 1070:3-5, Tr. 1071:1-3 (Field) (acknowledging that, as of October 1989, dry storage was "certainly" an option, that cost studies regarding dry storage were being conducted, and that "considerable system reductions" were possible with dry storage).

RESPONSE: SMUD objects to the government's proposed finding of fact. As early as 1987, the DOE began announcing delays in the expected opening of the repository. *See* PX 118

at 6. In a 1989 report to Congress on the status of the program, DOE announced a "significant slip for the expected start of repository operations—from the year 2003 to approximately 2010." PX 169 at vii. The 1989 Reassessment confirmed that there would be at least a 12-year delay in DOE's ability to begin the disposal of spent nuclear fuel. *See also, e.g.*, PX 109 at 5, PX 113 at 2, 10, 22; PX 142 at 4-5; PX 143 at 15; PX 144 (additional documents from 1987 through 1989 reflecting that the federal repository would be substantially delayed). Although DOE hoped to develop an MRS as an interim facility, it recognized that this would necessitate the identification of a host state and the elimination of statutory linkages between an MRS and the repository. *See, e.g.*, PX 143 at 15; PX 169 at x, 11-12; PX 188 at 5; PX 217 at 3-4, 19-23, 30-31; PX 231 at 4.

These announcements were critical to SMUD's evaluation of its decommissioning plan and plans for storage of fuel following shutdown. DOE had already announced that the repository would be delayed by at least 12 years, and, thus, SMUD was facing delayed disposal of its fuel. SMUD investigated the option of dry storage following shutdown, and hired Saul Levy in February 1990 to conduct a formal study of SMUD's options. *See* PX 176. SMUD did not enter into a contract for a dual-purpose dry storage system until October 1992. *See* SMUD Contract E-776 (Sept. 25, 1992) (PX 267); DX 315.

**B. SMUD's Board Of Directors Made The Decision In 1990 That SMUD Place Its SNF Into Dry Storage**

26. In February 1990, SMUD retained Saul Levy, Inc. ("Levy") as a consultant to evaluate SMUD's storage options for its SNF. DX 144. On March 31, 1990, Levy provided SMUD a report with its ultimate conclusions. DX 165.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

27. Levy considered 15 different storage options for SMUD's SNF and reached the following conclusion:

> The option that offered the best opportunity to keep open the possibility of early off-site shipment, potentially as early as 1998 under a Monitored Retrievable Storage facility ("MRS"), was storage of SMUD's SNF in transportable casks.

DX 165, at SMP 0680004.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is misleading. Mr. Levy undertook a detailed analysis and submitted to SMUD a ninety-two page report summarizing his various conclusions. In summarizing what his study revealed, he stated as follows:

- The *most certain approach* is continued storage in the spent fuel pool at Rancho Seco until disposal in the permanent DOE repository now scheduled at the earliest for 2010.

- Storage in the spent fuel pool with a simplified cooling system or in concrete storage-only casks are the lowest cost option *if the Rancho Seco fuel must wait for the permanent repository*.

- Storage in transportable casks offers the best opportunity for early offsite shipment, *possibly* as early as 1998, to an interim DOE storage facility. Another possibility is interim acceptance by DOE by 1998 of the spent fuel in transportable storage casks *at the Rancho Seco site*. Under such circumstances, transportable storage casks become the least cost and the preferred option.

PX 176 at ii (emphasis added). This summary reveals that (1) keeping the fuel in the pool was the most certain approach; (2) DOE's anticipated delay in performance was a "key assumption" in Levy's recommendations, Motion For Leave to File Testimony of S. Levy & R. Powers, dated March 7, 2005 ("Levy Motion") (Dckt. #300) at 111, 143; and (3) storage in transportable casks allowed SMUD to keep its options open for the *possibility* of DOE performance.

28. Levy "strongly recommended" that SMUD pursue this option in conjunction with a demonstration program with DOE to develop the dual-purpose cask system. DX 165, at SMP 0680004. Levy explained that, to accomplish this objective, SMUD should "[e]nter into discussions with the DOE aimed at DOE acceptance of the Rancho Seco spent fuel in 1998." *Id.*, at SMP 0680067. Notably, Levy acknowledged that:

> . . . the only way to be prepared for DOE success in establishing a site by 1998 is to proceed towards storage in transportable casks. No other alternative that could accomplish this objective was found in the course of this study.

*Id.*, at SMP 0680070.

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. SMUD agrees that Mr. Levy recommended that SMUD pursue a demonstration program with DOE. The government's selective quoting from Mr. Levy's report, however, fails to accurately portray his recommendations.

A transportable system was thought necessary to keep open the possibility of shipment precisely because the government was not developing the transportation casks and infrastructure

necessary and required by the Contract. PX 44, Art. IV.B.2. Furthermore, the government's selective quotations ignore other statements in the report which specifically discuss the likelihood of delayed fuel acceptance by DOE and the corresponding increase in fuel storage costs and complication of decommissioning for SMUD:

> If the ultimate disposal of [spent] fuel is in the contemplated federal repository, the costs will extend over a long period of time, especially if the federal repository gets delayed. In that sense, *shutdown plants and, in particular, Rancho Seco with its forced shutdown will incur greater costs than operating plants for storage of their spent fuel and that differential will rise if the federal repository is postponed*. Originally, the Department of Energy (DOE) had planned to accept spent fuel by 1998. Recently DOE has delayed the repository date to 2010 and there is a good chance that further schedule slippages may occur.
>
> * * *
>
> It is concluded that the only *certain* path for rancho Seco spent fuel disposition is to continue the present secured, monitored storage in the cooled plant fuel pool until DOE pick-up under the NWPA as Amended (1987) and DOE disposal in the permanent geologic repository contemplated in that Act. The schedule for DOE pickup is currently highly uncertain with the earliest conceivable pickup date beginning in 1998 and a much more likely pickup date well after 2010. As long as the fuel remains in the fuel pool, the costs associated with security, cooling, and monitoring will continue; and furthermore, options for plant decommissioning and other uses of the site will be limited or precluded.

PX 176 at 3, 59 (emphasis in original). Other portions of the Levy report repeatedly acknowledge the uncertainties surrounding DOE's spent fuel program and the possibility of an MRS. *See id.* at 14, 39, 55-56, 64, 65.

29. SMUD did not submit Saul Levy's report to DOE. Tr. 184:24-185:2 (Shetler).

<u>RESPONSE</u>: SMUD does not object to the government's proposed finding of fact. SMUD notes, however, that DOE was actively involved in the development of SMUD's dual-purpose system. Tr. at 183-88 (Shetler) (noting that SMUD had several cooperative agreement meetings with DOE wherein they sent many attendees); Tr. at 980 (Field) (noting DOE had an opportunity to review the bid specification and comment on it); PX 246 (example cooperative meeting minutes); Tr. 562-63 (Redeker) (noting SMUD submitted quarterly financial reports to DOE, including a detailed breakdown of the costs of the project); PX 514 (example quarterly report). *See* PFF ¶¶ 129, 296, 573.

30. S. David Freeman, SMUD's general manager at the time, could not recall Saul Levy or the report that Mr. Levy issued. Def. Counter-Designation D. Freeman, at Tr. 38:16-22 (5/16/02). Mr. Freeman explained his managerial philosophy as follows:

> Let me just state for the record that a general manager of a utility can do one of two things; they can either manage the utility or read all the paper. There is not enough time to do both, and I chose to manage the utility. So I initialed a lot of routine things without reading them and [am] proud of it.

Def. Counter-Designation D. Freeman, at Tr. 48:13-22 (5/16/02).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Freeman became SMUD's General Manager in June of 1990, and thus was not the General Manager at the time Mr. Levy prepared and presented his report to SMUD. *See* PX 896 at 5; Designations Appendix (Dckt. #310) at 2277 (Freeman).

Furthermore, the government presents Mr. Freeman's comments about his so-called "managerial philosophy" out of context. When Mr. Freeman was handed a staffing summary sheet (of which there would have been hundreds during his period as general manager) by government counsel and asked if he recalled the particular document, Mr. Freeman made the comments cited above. Neither the comments nor the discussion at that point in the deposition had anything to do with Mr. Levy. Thus, the government's proposed finding of fact is misleading and irrelevant.

To the extent the government calls into question Mr. Freeman's competence, SMUD notes Mr. Freeman had extensive experience prior to his employment at SMUD, including eight years on the Board of the Tennessee Valley Authority (five of which he served as the chairman) and five years as general manager of the Lower Colorado River Authority. Designations Appendix (Dckt. #310) at 2277-78 (Freeman).

31. Saul Levy presented his recommendations for the disposition of SMUD's SNF at the March 21, 1990 meeting of the Rancho Seco Committee of the SMUD Board of Directors. DX 159. Levy recommended that:

> SMUD pursue alternative of having all of its spent fuel in transportable storage casks before 1998 *primarily because it could lead to shipment to DOE facility by 1998* or to DOE interim acceptance of spent fuel at site by 1998.

*Id.*, at SMUD 085624 (emphasis added). In explaining the rationale for recommending transportable storage casks, Levy reiterated that it "provides [the] earliest opportunity to ship fuel off-site." *Id.* at SMUD 085632.

RESPONSE: SMUD objects to the government's proposed finding of fact. Once again, the government selectively quotes excerpts regarding the possibility of an MRS. Mr. Levy noted in his presentation that "continued storage in spent fuel pool offers the least risk and highest certainty of achievement." DX 159 at 2. The government emphasizes shipment to a DOE facility, but fails to note that an *equally* important option was "DOE interim acceptance of spent fuel at site by 1998." *Id.* Furthermore, Mr. Levy's statements with regard to DOE acceptance made clear that such acceptance was only a *possibility*.

Mr. Levy testified that the anticipated delay in DOE performance was "the key assumption" in his report and that if he had assurances that DOE would begin accepting fuel in 1998 he would have recommended that SMUD leave its fuel in wet storage. Levy Motion (Dckt. #300) at 111, 143. Mr. Levy noted as follows:

> Importantly, it is concluded that selection for implementation of "the option with least risk, highest certainty of achievement and lowest overall cost," the District[']s stated objective, is dependent on Department of Energy (DOE) policies and programs. The DOE has current programs addressing unresolved issues, both political and technical, whose resolution will impact decisions for spent fuel disposal at shutdown plants in general and Rancho Seco in particular. It is concluded, however, that SMUD can proceed in ways that keep longer term options open in this uncertain climate.

DX 165 at 56-57. Thus, considered in context, Mr. Levy's dual purpose dry storage recommendation, which SMUD largely pursued (albeit with less-costly dual-purpose canisters instead of a fleet of casks), was an attempt to respond to the uncertainties and anticipated delay in DOE's fuel acceptance.

32. SMUD relied upon the recommendations made by Mr. Levy in planning for the disposition of its SNF. Tr. 273:16-20 (Shetler). SMUD management agreed with Levy's recommendation to pursue dual-purpose dry storage, and, consequently, in March 1990, SMUD's Board of Directors approved of the Rancho Seco general manager's pursuit of the purchase of a dual-purpose storage system. Tr. 172:2-7, Tr. 193:1-8 (Shetler) ("As a result of our review of the Saul Levy report and his recommendation, our recommendation to our board was that we pursue that option and go and look at dual purpose transportable system.").

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD did rely upon the recommendations of Mr. Levy in planning for the disposition of its fuel and SMUD did pursue a dual-purpose dry storage system, as Mr. Levy had recommended. SMUD did not, however, purchase a fleet of metal dual-purpose casks as recommended by Mr. Levy. Rather, SMUD chose to pursue less costly concrete storage-only casks. Mr. Levy discussed this option in his report, concluding that storage in concrete storage-only casks (or a modified pool) is the lowest cost option if

> Congressional and/or DOE policies and programs delay pick-up of the spent fuel well beyond 1998. . . . The longer the predicted storage time (after the first 2 to 5 years the fuel must remain in the pool in any event), the more economically attractive is dry storage in concrete casks relative to storage in the modified pool.

DX 165 at 57.

33. After the Levy recommendation, SMUD saw dry storage as a "cheaper way" of dealing with fuel storage that could facilitate transport to DOE perhaps even sooner than to a Federal repository. Tr. 172:17-24 (Shetler).

RESPONSE: SMUD objects to the governments proposed finding of fact as misleading. Mr. Shetler noted that, in pursuing the dual-purpose system, there was a "possibility that it would also be in a form that could facilitate transport to the DOE in the long term and perhaps even sooner than the repository, if another mechanism were to come up." At the time Mr. Levy made his recommendations, DOE had already announced that the repository would be delayed until at least 2010. PX 169 at vii (noting a "significant slip for the expected start of repository operations – from the year 2003 to approximately 2010"); *see also* PX 176 at 3, 14, 56-57, 59, 64, 65; SMUD's Response to DPFOF ¶¶ 21, 25. Thus, SMUD sought to keep its options open for the possibility of acceptance earlier than *2010* – long after DOE was obligated to begin performance under the Contract.

34. Immediately after the March 1990 Board of Directors meeting, SMUD's general manager, David Boggs, drafted a letter to the Secretary of Energy indicating that, "[a]s a result of the [Levy] study, it was decided that the District pursue dual purpose (storage and transportation) casks or storage only casks *that could be effectively interfaced with the early receipt by the DOE of Rancho Seco's spent fuel* and subsequent use of the casks by DOE." DX 164 (emphasis added). Mr. Boggs' letter also assumed that DOE could identify an SNF storage site by 1998. *Id.*

RESPONSE: SMUD objects to the government's finding of fact. In actuality, this letter reflects the uncertainties and potentially significant delays associated with DOE's receipt of spent fuel. Mr. Boggs informed DOE that transfer of SMUD's fuel to dry storage "would allow shipment of the fuel by 1998 *if* a storage site is identified by DOE by that date." DX 164 (emphasis added). However, "*[i]f no site is available by 1998*, it would still be possible for DOE to meet its original 1998 contractual obligation through interim acceptance of the spent fuel in the storage/transportation casks at the Rancho Seco site." *Id.* (emphasis added).

35. Consistent with this decision to place its SNF into dry storage, Dan Keuter, the Chief Nuclear Officer of Rancho Seco at the time, presented the results of the Levy report at the April 25, 1990 meeting of SMUD's Rancho Seco Committee. DX 174. Mr. Keuter explained SMUD's strategy as follows:

> [S]et up a demonstration program and construct three dual purpose casks by 1993. At that time, 72 fuel assemblies would be loaded into the three casks and monitored *until the DOE takes possession of them in 1998*. The remaining 493 assemblies will be maintained in wet storage until 1993. *At that time, we should have a commitment from DOE regarding fuel acceptance in 1998. Our decision point regarding concrete casks or dual purpose casks is in 1993. If the DOE will not take our fuel in 1998, or if the dual purpose casks do not prove feasible, we will award a contract to build concrete casks and load the fuel in them by 1995*.
>
> * * *
>
> *If a commitment can be obtained from DOE to take possession of the spent fuel by 1998, whether onsite or offsite, then dual purpose casks should be pursued*. If a commitment cannot be obtained, onsite concrete cask/canister storage by 1995 should be pursued. This is the earliest that we can put our spent fuel in concrete casks, since it must decay for approximately five years before it is put in cask storage.

*Id.* at SMUD 0018522 (emphasis added).

RESPONSE: SMUD does not object to the government's proposed finding of fact insofar as it has quoted Mr. Keuter accurately. SMUD notes that Mr. Keuter stated that "[i]f a commitment cannot be obtained, onsite concrete cask/canister storage by 1995 should be pursued." In fact, SMUD did pursue on-site concrete casks/canisters for the storage of its fuel. SMUD developed concrete horizontal storage modules, which are analogous to concrete casks, and dual purpose canisters, which were projected to be less expensive than the dual purpose casks that Mr. Keuter recommended if DOE was able to take possession of the fuel, whether on-site or off-site, in 1998, and which would also allow SMUD to eliminate the wet pool and

thereby reduce its costs during the period of DOE's delay. *See* Tr. at 142-45, 205-09 (Shetler); *id.* at 982-84 (Field). As indicated by Mr. Keuter's statement, SMUD always sought to have DOE take possession of its spent fuel, either on-site or off-site, as soon as possible. This was the original concept behind the demonstration project, *see* PX 176 at 33-35, and it was also the subject of subsequent requests by SMUD, *see, e.g.*, PX 527; PX 1012.

36. By May 1990, SMUD had eliminated consideration of leaving its SNF in the wet pool. In a presentation concerning Rancho Seco's decommissioning cost study, SMUD indicated that seven different storage options were evaluated – four involving dry storage and three involving wet storage. DX 179, at SMUD 0000392. The evaluation indicated that SMUD had rejected each of the wet storage options because "wet [storage is] more expensive than dry." *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact. From the early 1990s up until SMUD actually began transferring the fuel to dry storage, *at every juncture* SMUD considered and evaluated the option of leaving the fuel in the pool and abandoning the dry storage project. PX 259; PX 502 at 1; PX 503; PX 519 at 18-20; PX 642; PX 689.

**C. SMUD's Early Implementation Of Its Dry Storage Project**

37. On June 7, 1990, Rita Bowser, the Rancho Seco Nuclear Fuel Disposition Project Manager who had the day-to-day project management oversight for implementing SMUD's dry storage project, submitted to Mr. Keuter a copy of SMUD's independent spent fuel storage installation ("ISFSI") licensing and engineering strategies. DX 188; Tr. 311:20-25 (Shetler).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

38. In the memorandum transmitting the strategies, Ms. Bowser explained that she was "working with both Licensing and Engineering *to immediately implement the generic licensing and design activities necessary for the establishment of the Rancho Seco [ISFSI]*." DX 188, at SMUD 0019288 (emphasis added).

RESPONSE: SMUD does not object to the government's proposed finding of fact. SMUD notes, however, that as early as 1987, DOE began announcing delays in the expected opening of the repository. *See* PX 118 at 6. In a 1989 report to Congress on the status of the program, DOE announced a "significant slip for the expected start of repository operations—from the year 2003 to approximately 2010." PX 169 at vii. The 1989 Reassessment confirmed that there would be at least a 12-year delay in DOE's ability to begin the disposal of spent

nuclear fuel. Other documents from the 1987 through 1989 time period report or reflect that DOE's acceptance of spent fuel would be substantially delayed. *See* SMUD's Response to DPFOF ¶ 25.

These announcements were critical to SMUD's evaluation of its decommissioning plan and plans for storage of fuel following shutdown. DOE had already announced that the repository would be delayed by at least 12 years, and SMUD was therefore facing delayed disposal of its fuel. SMUD investigated the option of dry storage following shutdown, and hired Saul Levy in February 1990 to conduct a formal study of SMUD's options. The DOE's anticipated delay in performing was a key assumption in Mr. Levy's work, and his report repeatedly noted the uncertainties surrounding the DOE's spent fuel program. *See* SMUD's Responses to DPFOF ¶¶ 27, 28. SMUD did not enter into a contract for a dual-purpose dry storage system until October 1992. *See* SMUD Contract E-776 (Sept. 25, 1992) (PX 267); DX 315.

39. Although Ms. Bowser and Ken Miller were project managers for the implementation of the dry storage project, they did not have the authority to make the decision to pursue dry storage. Tr. 177:7-19 (Shetler). Ms. Bowser considered herself a "fairly junior" Rancho Seco staff member. Def. Counter-Designation of R, Bowser at Tr. 65:4-9, Tr. 96:6-10, Tr. 121:2-8, Tr. 201:6-16, Tr. 208:8-20 (9/16/04).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

40. During Ms. Bowser's deposition, counsel for SMUD objected to questions from Government counsel on the basis that "Miss Bowser does not speak on behalf of SMUD." Def. Counter-Designation of R. Bowser, at Tr. 108:15-22, Tr. 154:17-18, Tr. 150:20-21 (9/16/04) (objecting to questions on grounds that it calls for speculation as to what were SMUD's intentions).

RESPONSE: SMUD objects to the government's proposed finding of fact. First of all, counsel's objections are an inappropriate basis for a finding of fact. Secondly, Ms. Bowser was *not an employee of SMUD* at the time of her deposition, and thus counsel's objections were entirely appropriate. *See* Designations Appendix (Dckt. #310) at 2230 (Bowser). Furthermore, the government's proposed finding is irrelevant to the issues in this case.

41. The decision to pursue dry storage was made at a higher level of management than Ms. Bowser and Mr. Miller. Tr. 177:12-14 (Shetler). However, Mr. Shetler relied upon the

work of Ms. Bowser and Mr. Miller as part of the development of SMUD's overall dry storage planning strategy. Tr. 312:1-5 (Shetler).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

42. Jim Field, the chief engineer at Rancho Seco who worked on the specification for SMUD's dry storage project, recognized that no one ever told him SMUD was pursuing dry storage because DOE was not going to perform. Tr. 1071:13-20 (Field).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Field testified as follows:

> Q. Now, Mr. Field, you testified on direct examination that you worked on the specifications for the dual-purpose dry storage system back in 1992, correct?
>
> A. Yes.
>
> Q. Now, while you were working on that, no one ever told you that DOE wasn't going to show up to pick up the fuel, and as a result of that, SMUD was pursuing the dry storage option, did they?
>
> A. *Are you asking if someone came up to me and made that statement?*
>
> Q. Yes, I am.
>
> A. Not that I recall.

Tr. at 1071-72 (Field). Mr. Field merely testified that he does not recall anyone coming up to him and making the exact statement made by counsel.

43. At the time that Mr. Field became involved in implementing SMUD's dry storage plan, SMUD was not considering store-only dry storage, but was only pursuing dual-purpose dry storage. Tr. 1072:8-19 (Field).

RESPONSE: SMUD objects to the government's proposed finding of fact. Although Mr. Field testified that, to his knowledge, SMUD was not considering store-only dry storage, Mr. Field also stated that

> I probably need to clarify that, in the evaluation that preceded the generation of the bid specification that you referred to, I was not a

> decision-maker and, to my recollection, was not involved in that whole study determination. That was done by a different part of the organization, and my responsibility was to implement the direction, rather than develop the direction.

Tr. at 1071-72 (Field).

44. In June 1990, Ms. Bowser requested that a work order be opened for "licensing and engineering activities related to dry storage disposition." DX 187; Tr. 174:18-24 (Shetler) (explaining that it was SMUD standard practice to open up a work order to start collecting costs once a new project is initiated).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

45. SMUD requested charges of at least $4 million dollars to this work order *prior to* 1992. DX 258; DX 187. Similarly, Luana Holst, SMUD's supervisor of nuclear records and documents, who along with Jim Field was responsible for the collection of work orders to be included in SMUD's damages claim, admitted at trial that this work order related to SMUD's dry storage project, but that this work order was not included in SMUD's damages claim.

Tr. 1231:19-22, Tr. 1236:12-20, Tr. 1269:7-12 (Holst).

RESPONSE: SMUD objects to the government's proposed finding of fact because it is not supported by the cited evidence. Exhibit DX 187 includes two separate documents: a June 7, 1990 memorandum requesting that licensing and engineering activities directly related to dry storage be charged to work order number 490091; and a December 11, 1991 Contract Service Request seeking authorization for a Request for Proposal to select a cask supplier. Mr. Shetler testified with regard to the Contract Service Request at issue:

> A. This is a contract service request and this is a document that our procurement department at that time requested that the line organizations fill out to seek support. And this is seeking support for an RFP to be developed for the procurement of dual purpose fuel casks.
>
> * * *
>
> Q. Let me ask this: Did this authorize the expenditure of money by SMUD, this document?

A. The contract service request?

Q. Yes.

THE COURT: Is that what a contract service request does?

THE WITNESS: No.

THE COURT: What does it do?

THE WITNESS: All this does is request the support from our procurement department to help us prepare the specification for if – or the RFP for the specification to go out on the street. It identifies what the dollar limit would be for the contract and the fact that it is budgeted and there is a work order against it, but it doesn't authorize expenditure of the funds.

Tr. at 175-76 (Shetler). Thus, SMUD was requesting assistance in preparation of an RFP for the project; the evidence does not indicate that SMUD actually requested any charges to the work order prior to 1992. The same is true of DX 258. Although the government points to a work order related to the dry storage project that was not included in SMUD's damages claim, there is no evidence that any costs were ever charged to this work order number.

46. Ms. Bowser recognized that SMUD was incurring costs associated with its dry storage project before June 1990. Def. Counter-Designation of R. Bowser, at Tr. 134:2-6 (9/16/04).

RESPONSE: SMUD objects to the government's proposed finding of fact as irrelevant. Ms. Bowser testified that there would have been costs incurred associated with the investigation of the dry storage project, including the Levy Report and her personal time "investigating alternatives." Def. Counter-Designations of R. Bowser, at 134 (9/16/04). SMUD has not included these costs in its claim.

47. In July 1990, SMUD filed with the NRC a document entitled "Plan For Ultimate Disposition of Rancho Seco Nuclear Generating Station." DX 194. The document, which is a regulatory requirement, served to "provide the NRC with a status report in the form of advance and preliminary District plans for the ultimate disposition of [Rancho Seco], prior to the filing of the District's [decommissioning plan]." *Id.* at SMUD 0025395; Tr. 280:5-9 (Shetler).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

48. Consistent with its prior discussion of its intentions, SMUD's "Plan For Ultimate Disposition of Rancho Seco Nuclear Generating Station" reiterated SMUD's plan to place its SNF into dry storage. DX 194, at SMUD 0025406. Additionally, this document stated that "[i]t is expected that spent fuel will be accepted by DOE before decommissioning is initiated." *Id.*, at SMUD 0025406. As of July 1990, SMUD planned upon initiating decommissioning in the 2008 or 2009 time frame. Tr. 285:16-19 (Shetler). Further, similar to its previous statements, SMUD once again expressed its belief that an MRS was expected to be in operation in "about 1998." DX 194, at SMUD 0025438.

RESPONSE: SMUD objects to the government's proposed finding of fact. In its decommissioning plan, SMUD specifically noted that "[t]he U.S. Department of Energy (DOE) program for start-up of a high-level waste repository has been delayed until 2010." DX 194 at 3-12. With regard to an MRS, SMUD stated that "DOE is *attempting* to site and construct a Monitored Retrievable Storage (MRS) system." *Id.*

Other SMUD documents during this period reflect SMUD's recognition that the opening of an MRS in 1998 was highly speculative. *See, e.g.*, PX 176 at 65 (describing 1998 fuel acceptance as "[t]he most uncertain element" and explaining that Levy's transportable dry storage recommendation "only assumes that it is possible that this could happen"); DX 202 at 001925 (describing shipment of fuel to MRS as a "possibility"); PX 297 at 7 (noting interim storage is "not currently an option"). This was also confirmed by the testimony of Mr. Shetler:

> A. [I]f there was a potential for any kind of interim storage facility that could take the fuel earlier, having fuel in a dual purpose system would hopefully expedite the ability to get fuel moved there.
>
> So we recognized that was a possibility. We also recognized that the probability was up in the air.
>
> Q. Excuse me, sir?
>
> A. Was up in the air, that the probability was obviously not certain.

Tr. at 254-55; *accord id.* at 278, 295, 350, 400-01 (Shetler); *see also* Designations Appendix (Dckt. #310) at 2310-13 (Freeman) (testifying that his view in the early 1990s was that an MRS "wasn't going to work"); Tr. 534-35 (Redeker) (testifying that his view in 1993-1994 was that an MRS "was unlikely" to "open any time substantially before the repository").

49. On May 20, 1991, SMUD submitted its proposed decommissioning plan to the NRC, which reflected SMUD's then-current intentions. DX 248; Tr. 287:1-3, Tr. 288:1-2 (Shetler). In its plan, SMUD reiterated its intention to place its SNF into dry storage, to have its ISFSI licensed and constructed by 1993, and to transfer its SNF to dry storage by 1998. DX 248, at SMUD 0029733. Further, consistent with SMUD's March 1990 draft decommissioning cost study, SMUD's April 1991 decommissioning cost study that it submitted to the NRC as part of its proposed decommissioning plan again "presumes the availability of [an MRS] facility *such that DOE can meet its obligation to begin receiving fuel by 1998*." *Id.* at SMUD 0030074 (emphasis added).

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD's assumption in its submission to the NRC was simply that DOE could satisfy its contractual obligations. This was merely an assumption of the plan, and is not reflective of SMUD's beliefs regarding the likelihood that DOE would actually perform as required under the Contract. *See* Tr. at 474, 478-79 (Shetler) (stating that this assumption "allowed us to come in with a decommissioning estimate that met our targets from a rate standpoint" and "would be review[ed] and adjust[ed] . . . on an annual basis, once we had better information"). SMUD understood that the repository was delayed until 2010 and that development of an MRS would require a sea-change in political climate, as well as a change in the NWPA.

50. In a June 28, 1991 briefing to the Nuclear Regulatory Commission concerning its decommissioning plan, SMUD represented that it would save $8 million a year from moving its SNF from wet storage to dry storage. DX 255, at SMUD 0029454.

RESPONSE: SMUD objects to the government's proposed finding of fact. The government focuses solely on SMUD documents that contain an $8 million savings. SMUD's cost projections during this period were not uniform as the government suggests. Although many documents used an $8 million savings figure as the government contends, a number of others used lower figures. *See, e.g.*, DX 159 at 085630 ($.5 to $1 million savings); PX 176 at 58 (same); DX 251 at 2 ($6 million); PX 991 at 0330410 ($33 million over 12 years); PX 363 at 8 ($6 to $8 million); *see also* Tr. at 265 (Shetler) ("There were various estimates that were generated over the course of that period, anywhere from a million dollar savings to 8 to 10 million dollars worth of savings."); *id.* at 476-77 (Shetler) ("We're not dealing with absolute knowledge. We're dealing with best guesses and assumptions.").

51. On October 3, 1991, Rancho Seco management presented its decommissioning plan, including its dry storage strategy, to the SMUD Board of Directors. DX 274. At this meeting, SMUD staff presented its best information to the Board with respect to its dry storage plans. Tr. 357:10-13 (Shetler). Although much of the presentation was made by Rancho Seco staff members Ms. Bowser and Mr. Miller, SMUD chose not to present those witnesses at trial and instead relied upon the trial testimony of Mr. Shetler, who explained at trial that he ultimately would have reviewed and approved of whatever was presented to the Board of Directors at this meeting. Tr. 313:9-13 (Shetler). General Manager S. David Freeman did not object to the proposal that Mr. Shetler and his staff made to the Board of Directors. Tr. 357:14-16 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD does not dispute that it presented its decommissioning plan to the Board in October 1991. However, commentary on SMUD's choice of witnesses, which in part was based on availability, is not an appropriate basis for a finding of fact. Ms. Bowser lives in England, Tr. at 1356, and Mr. Miller has serious health problems – including a failing pacemaker, a significantly below normal heart rate, and the need for imminent surgery – leaving him unable to fly across the country to appear at trial. Mr. Shetler had overall management responsibility for the entire nuclear program and he testified extensively at trial regarding SMUD's decision to pursue dry storage. *See* Tr. at 178 (Shetler).

52. As of October 1991, the SMUD Board of Directors was composed of Ed Smeloff, President; Peter Keat, Vice President; Joe Bounaiuto; Dave Cox; and Wendy B. Reid. DX 274, at SMUD 0027402. None of these Board members had a background working in the nuclear industry. Tr. 322:2-323:25 (Shetler). At the time, Mr. Smeloff was a consultant advising the California State Legislature. Tr. 321:17-20 (Shetler). Mr. Keats owned a book store in Sacramento. Tr. 322:6-10 (Shetler). Mr. Bounaiuto was a high school teacher. Tr. 322:14-23 (Shetler). Mr. Cox worked as an insurance broker at an insurance agency. Tr. 323:2-5 (Shetler). Ms. Reid worked as an employee of the California Energy Commission. Tr. 323:10-13 (Shetler).

RESPONSE: While SMUD agrees that the above facts are true, SMUD objects to the government's proposed finding to the extent the government is suggesting that SMUD's Board members were not knowledgeable with regard to nuclear issues or governing Rancho Seco. Elected officials, from the President to members of Congress to members of city governments, make important decisions on countless issues by relying on the advise of experts. Here, the Board members relied on the extensive experience and knowledge of Mr. Freeman, Mr. Shetler, Mr. Redeker, Mr. Ferreira, and others at Rancho Seco. *See* Designations Appendix (Dckt. #310) at 2277-79 (Freeman); Tr. at 106-10 (Shetler); *id.* at 491-94 (Redeker); *id*. at 865-74 (Ferreira).

53. Mr. Shetler told the Board of Directors at this meeting that SMUD's fuel disposition project was "tied very strongly" to its decommissioning program. DX 274, at SMUD 0027409; Tr. 772:3-8 (Redeker) (acknowledging that there is a "direct link" between SMUD's dry fuel storage options and its decommissioning efforts).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Shelter explained at trial that while SMUD's decommissioning strategy was not dependent upon dry storage, the two were related, particularly as DOE's delay was anticipated to extend well beyond 2008:

> Well, the driver to go to [dual purpose dry storage] was really where we were with DOE acceptance. The decommissioning plan itself was somewhat independent of where the fuel was stored. We ultimately, because we elected to go to dry storage based on the DOE's failure to perform, did wrap in the dry storage as a piece of the decommissioning plan.
>
> The decommissioning plan envisioned that we would place the plant in some sort of safe storage mode, mothball mode. It could be done whether the fuel was in wet storage or not. And come back in 2008. If the DOE had performed under the original schedule, the fuel would have been gone by then.
>
> What we were faced with was the fact that the fuel would not be gone. Also the fact that obviously the DOE wasn't going to be performing in that timeframe, so the decision to go to dry storage was one around having to deal with the cost of storing fuel for the long-term. Decommissioning could have been accomplished whether the fuel was in dry storage or wet storage, depending on the performance of the DOE.
>
> If that continued to drag out, then ultimately we would have to do something with getting access to the spent fuel.

Tr. at 216-17 (Shelter).

Furthermore, dry storage was not necessary for SMUD to pursue its initial decommissioning strategy, which anticipated active decommissioning commencing in 2008, or its revised strategy, which involved incremental decommissioning around the pool. *See* PFF ¶¶ 442-47, 453-57; *see also* Tr. at 216-18 (Shetler); Tr. at 696-97 (Redeker).

54. Both Mr. Miller and Ms. Bowser repeatedly told the Board at the October 1991 meeting that SMUD expected to achieve an $8 million annual savings by transferring its SNF from wet storage to dry storage, or $80 million over a ten-year period. DX 274, at SMUD 0027419, SMUD 0027433-34, SMUD 0027436. Mr. Miller told the Board that SMUD staff recommended going to dry storage "because we can prudently save the District a great deal of money over the storage period." *Id.* Indeed, at trial, Mr. Shetler agreed that the $8 million in annual savings was a factor in SMUD's decision to place its spent fuel into dry storage. Tr. 266:7-10 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Shetler testified as follows:

> Q. And in the early 1990s, SMUD estimated that the cost savings of abandoning the wet pool would be approximately 8 million a year, isn't that correct?
>
> A. There were various estimates that were generated over the course of that period, anywhere from a million dollar savings to 8 to 10 million dollars worth of savings.
>
> Q. And I appreciate that answer. I want to make sure we have a clear record. One of the estimates in the early 1990s of the cost savings of abandoning the wet pool was approximately $8 million a year, correct?
>
> A. I don't recall exactly when in the 1990s but, yes, that was an estimate.
>
> Q. Okay. And this $8 million in annual savings was a factor in SMUD's decision to place its spent fuel in the dry storage, correct?
>
> A. It played a factor, yes.

Tr. at 265-66 (Shetler). SMUD's documents reflect the varied estimates throughout the duration of the project. *See, e.g.*, DX 159 at 085630 ($.5 to $1 million savings); PX 176 at 58 (same);

DX 251 at 2 ($6 million); PX 991 at 0330410 ($33 million over 12 years); PX 363 at 8 ($6 to $8 million); *see also* Tr. at 265 (Shetler) ("There were various estimates that were generated over the course of that period, anywhere from a million dollar savings to 8 to 10 million dollars worth of savings."); *id.* at 476-77 (Shetler) ("We're not dealing with absolute knowledge. We're dealing with best guesses and assumptions").

55. During the October 1991 meeting, Ms. Bowser emphasized to the Board the significant cost savings that SMUD could achieve by transferring its SNF into dry storage, explaining:

> If you look at the fact that a repository isn't projected until 1998, *or an MRS until 1998*, with a repository in 2010, and it will take DOE approximately 10 years to accept all of SMUD's fuel, the cost savings can range somewhere between $60 to $156 million over the lifetime of decommissioning.

DX 274, at SMUD 0027436 (emphasis added).

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. The government's attempt to separate the savings of dry storage from DOE's breach is contrary to the evidence in this case. SMUD's desire to cut costs was intertwined with and driven by DOE's anticipated delay. That delay magnified the importance of the cost of dry storage because it meant that SMUD might have to store its spent fuel for several decades. *See* SMUD's Response to DPFOF ¶¶ 20-23. Ms. Bowser's comments illustrate the importance of the cost savings, as the $156 million she references is the savings resulting from DOE's delay in performance until 2010.

56. Mr. Shetler explained at trial that this difference between $60 million and $156 million in savings reflected the difference in assumptions between DOE acceptance at an MRS beginning in 1998 compared to DOE acceptance at a Federal repository beginning in 2010. Tr. 327:20-24 (Shetler).

<u>RESPONSE</u>: SMUD does not object to the government's proposed finding of fact.

57. In response to a question regarding the estimated timing for DOE's acceptance of SNF, Ms. Bowser told the Board:

> MS. BOWSER: As a best case, without any negotiations with other utilities which are permitted to improve your place in the queue, they accept it in a policy that's called OFF, oldest fuel first. The first assemblies from Rancho Seco

would be scheduled to be received three years after a facility opens, be that a monitored retrievable storage facility or a final repository. That's in the best case.

And it would take approximately ten years from the opening of the facility or an additional seven years from the receipt of our first fuel for them to take the remainder of our assembly.

In a worst case, it would be considerably longer, perhaps up to 20, 25 years.

PRESIDENT SMELOFF: So, it's three years after the Federal Government develops an MRS that they would be required to begin to take spent fuel.

MS. BOWSER: Yes. They may take our first assembly in the best case.

* * *

PRESIDENT SMELOFF: And is that likely to be 1998 or is that –

MS. BOWSER: *At this time, it is likely that an MRS could be sited by 1998*; however, there needs to be some congressional action that would delink the final repository from the MRS. Right now, the two are linked so that you can't actually start to operate an MRS until you've sited a final repository.

With the situation at Yucca Mountain, that seems like it will be tied up in litigation for a while. *So, there is actually legislation in the Congress to delink the facilities which would make an MRS likely in 1998.*

DX 274, at SMUD 0027465-66 (emphasis added).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government selectively quotes the above excerpt, but fails to include other statements indicating that the dry storage strategy was driven by the desire to reduce costs and facilitate decommissioning in the event of a substantial delay in fuel removal by DOE. After Ms. Bowser discussed the possibility of an MRS, she concluded as follows:

> Our particular ISFSI strategy and our procurement of the 10 CFR 72 license and our use of dual purpose casks, which don't require a spent fuel pool, *provide the District some assurance that even without a repository, long-term dry storage will not preclude the decommissioning of the remainder of Rancho Seco.*

DX 274 at 62-63 (emphasis added); *see also id.* at 67 (Freeman), 70-71 (Bouniauto).

58. General Manager Freeman expressed his agreement with Rancho Seco staff's proposal to place its SNF into dry storage, stating, "I think getting the fuel into casks and having them transportable in case the Department of Energy has a really good place to take them, it's a prudent thing to do." DX 274, at SMUD 0027471-72. Rancho Seco staff believed that, regardless of the timing of DOE's performance in accepting SNF, placing SMUD's SNF into dry storage would ensure that it could timely decommission the rest of Rancho Seco. *Id.* at SMUD 0027466-67.

RESPONSE: SMUD objects to the government's proposed finding of fact. Again, the government inaccurately represents the 1991 meeting by selectively quoting Mr. Freeman's statements. Immediately before Mr. Freeman discussed the prudency of developing dry storage "in case" DOE could receive the casks, he stated the following after a question about the implications of DOE "not moving ahead":

> *I think its important to realize that it's entirely possible to keep this spent fuel in dry casks or in a building that we could build at Rancho Seco indefinitely.*
>
> But the decommissioning of the reactor could take place or not take place. And, indeed, there are a number of people which believe that on-site storage and not moving the fuel all over the country in any kind of vehicles – whatever they are, no matter how strong they are – that that's not the wisest thing to do.
>
> But we don't have to cross that bridge at the moment.

*Id.* at 67 (emphasis added).

59. When Rancho Seco staff made its proposal that the Board pursue dual purpose dry storage in October 1991, the notion that dry storage was in response to the Government's potential inability to begin SNF acceptance in 1998 had not even been contemplated. The following discussion took place at the October 3, 1991 meeting:

> PRESIDENT SMELOFF: What is the legal responsibility of the Department of Energy to take the fuel beginning in 1998. Suppose, for whatever reason – lack of authorization of Congress,

> failure to characterize the Yucca Mountain site – they are simply unable to take the fuel? Do they have any legal responsibility to compensate us for the storage of this fuel?
>
> ASSISTANT GENERAL MANAGER SHETLER: *We might want to do a review on that.*
>
> MS. SCHORI: *Yes, I suspect we should review that.* I think their obligation is a contract obligation. And the question you're asking is whether or not they're in breach of contract if they fail to take the fuel. *And I think probably I should look at that –*

DX 274, at SMUD 0027468-69 (emphasis added).

RESPONSE: SMUD objects to the government's proposed finding of fact. The quoted language does not involve the question of whether SMUD was taking action because of DOE's projected delay, but the separate issue of whether SMUD was entitled to compensation. As the Court is well aware, until rejected by both the D.C. Circuit and Federal Circuit, the government argued throughout the 1990s that it had no obligation to compensate utilities for the delays in performance. In addition, other language from the same meeting, *see* responses to DPFOF ¶¶ 57-58, confirms that the dry storage project was specifically intended to respond to DOE's anticipated delay, and Mr. Shetler specifically disagreed with the government's contention at trial. *See* Tr. at 341, 463-64 (Shetler).

60. The following day, October 4, 1991, SMUD submitted to the NRC its application to construct and operate an ISFSI. DX 276.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

61. On October 17, 1991, Mr. Shetler presented to the SMUD Board of Directors a presentation similar to the one presented at the October 3, 1991 meeting. DX 280. This presentation indicated that there was an $8 million annual savings from transferring SMUD's fuel from wet storage to dry storage, and an estimated capital cost of $20 million. *Id.* at SMUD 0029434. Mr. Shetler agreed that, based upon these numbers, which were provided to the Board, the dry storage project would pay for itself in two-and-a-half years. Tr. 329:10-14 (Shetler). Further, Mr. Shetler agreed that these figures represented SMUD's best estimates at the time and that SMUD utilized these numbers for its planning assumptions concerning the storage of its SNF. Tr. 329:21-330:1-4 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Shetler testified that there were many estimates and that the $8 million figure was just one of these estimates. Tr. at 265-66 (Shetler). SMUD's documents reflect the varied estimates throughout the duration of the project. *See, e.g.*, DX 159 at 085630 ($.5 to $1 million savings); PX 176 at 58 (same); DX 251 at 2 ($6 million); PX 991 at 0330410 ($33 million over 12 years); PX 363 at 8 ($6 to $8 million); *see also* Tr. at 265 (Shetler) ("There were various estimates that were generated over the course of that period, anywhere from a million dollar savings to 8 to 10 million dollars worth of savings."); *id.* at 476-77 (Shetler) ("We're not dealing with absolute knowledge. We're dealing with best guesses and assumptions.").

62. Mr. Shetler's October 17, 1991, presentation assumed either an MRS by 1998 (with final acceptance of SMUD's fuel in 2008) or a Federal repository in 2010 (with final acceptance of SMUD's fuel in 2020). DX 280, at SMUD 0029434.

RESPONSE: SMUD objects to the government's proposed finding of fact. Contrary to the government's assertions, this evidence merely reflects the uncertainties and potentially significant delays associated with DOE's receipt of spent fuel. Other documents from this period also reflect the uncertainty and delays SMUD faced, which is understandable as those uncertainties and potential delays influenced virtually all of SMUD's actions regarding fuel storage during the period. *See, e.g.*, DX 164 at 1 (stating that dry storage "would allow shipment of the fuel by 1998 *if* a storage site is identified by DOE by that date") (emphasis added); DX 194 at 1-12 to 1-13 (noting that "spent fuel disposition is outside the District's control due to the uncertain timing of DOE's" permanent repository); DX 202 at 0019251 (stating that the permanent DOE repository is "now scheduled at the earliest for 2010" and describing earlier shipment to an MRS as a "possibility"); DX 280 at 0029423 (depicting fuel being transferred to DOE in or after 2010); DX 291 at 0029409 (same); DX 348/PX 259 at 0027248 (projecting dry storage savings "from 1998 through 2010 (the proposed opening of the Federal Geologic Repository)"); DX 481 at 0033398 (noting that DOE may start accepting spent fuel between 1998 and 2013 and that SMUD was prepared to store spent fuel until 2027 and beyond).

63. The SMUD Board of Directors issued a resolution that same day approving "the proposal to construct a spent fuel storage facility." DX 282.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

64. In 1994, SMUD represented to DOE that, when it made the decision to pursue dual-purpose dry storage, it assumed DOE would timely perform under the Standard Contract.

a. On May 25, 1994, DOE published a Notice of Inquiry ("NOI") regarding its responsibility to accept SNF after January 31, 1998, and sought comments from the nuclear industry. PX 351; 59 Fed. Reg. 27007 (May 25, 1994). Specifically, DOE requested industry

comments upon: (1) whether it had a statutory obligation to accept SNF beginning in 1998 in the absence of an operational repository; (2) the need for interim offsite storage prior to the opening of a permanent repository; and (3) the potential option of offsetting some of the financial burden to the industry through the use of the Nuclear Waste Fund. *Id.*

b. In response to DOE's NOI, SMUD submitted a letter on September 21, 1994 and explained to DOE its belief that SMUD began its dry storage project believing that DOE would perform the Standard Contract in a timely manner. Specifically, SMUD stated that:

> After a referendum of SMUD's electorate on June 6, 1989, Rancho Seco ceased operating on June 7, 1989. Since then, SMUD has been proceeding with activities to begin the decommissioning of Rancho Seco and to provide required assurances to the NRC that the District will have sufficient funds available to pay for the decommissioning. *However, SMUD has not provided funds in its Decommissioning Trust for spent fuel storage after 2010. When funded in 1991, the Trust assumed that DOE would accept all of Rancho Seco's fuel starting in 1998, including the queue, by 2010*.

DX 462, at SMUD 0019624 (emphasis added).

RESPONSE: SMUD objects to the government's proposed finding of fact. Recognizing that it could not meet the 1998 date in any manner, DOE announced in the Notice of Inquiry its "preliminary view is that it has no statutory obligation to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the Act." Notice of Inquiry, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994). In response to this Notice, SMUD stated that DOE should "reimburse SMUD and other utilities for their costs reasonably incurred to continue to package and store spent nuclear fuel at their respective reactor sites beyond 1998, until such time as an interim federal storage facility or a permanent federal repository is ready to accept such fuel." DX 462 at 2.

The fact that SMUD did not include funds in its Decommissioning Trust for the government's breach is not significant. Mr. Shetler explained that this was simply a planning assumption that "allowed [SMUD] to come in with a decommissioning estimate that met our targets from a rate standpoint" and that "would be review[ed] and adjust[ed] . . . on an annual basis, once we had better information." Tr. at 474; *accord id.* at 478-79.

**D. SMUD Awards Dry Storage Contract To Pacific Nuclear**

65. In December 1991, SMUD issued requests for proposals ("RFPs") for the design and fabrication of the dual-purpose casks. DX 293.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

66. Also in December 1991, Mr. Shetler made a presentation, which had the approval of General Manager Freeman, concerning SMUD's decommissioning and spent fuel disposition plans to the California Senate Committee on Energy and Public Utilities. DX 291; Tr. 358:2-359:8 (Shetler). This presentation contained a slide identical to the one utilized with the Board of Directors in the October 17, 1991 meeting, indicating an $8 million in annual savings and the possibility of an MRS by 1998. DX 291, at SMUD 0029418, SMUD 0029411. These assumptions were the best that SMUD had at the time. Tr. 332:2-4 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government has repeatedly chosen to cite only those documents that represent the $8 million figure upon which its expert, Mr. Hamal, relies. SMUD's cost projections during this period were not uniform as the government suggests, however. A number of other documents reflect that lower figures were also used by SMUD. *See* SMUD's Response to DPFOF ¶ 61.

67. On April 2, 1992, the SMUD Board of Directors approved the evaluation process and criteria proposed by Rancho Seco management to be used in the selection of a vendor for the dual-purpose casks. DX 348.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

68. On July 7, 1992, Rancho Seco management requested that the Board authorize SMUD's general manager to negotiate and execute a contract with Pacific Nuclear Services, Inc., to purchase dual-purpose casks. The staffing summary sheet presented to the Board of Directors containing the request explained:

> *In 1990, the Board of Directors, as a result of a District study performed by S. Levy, Inc., concurred the General Manager should pursue the purchase of a dual purpose casking method.* The purpose of this activity was to enable the District to dry store Rancho Seco spent nuclear fuel at an onsite location, shutdown the Spent Fuel Building, and further reduce decommissioning costs.

DX 344, at SMUD 0027221 (emphasis added).

RESPONSE: SMUD does not object to the government's proposed finding of fact. SMUD notes, however, that in 1990 the Board of Directors concurred that the General Manager should *pursue* the purchase of a dual purpose casking method. SMUD did not enter into a contract for the purchase of the dual-purpose dry storage system until October 1992. *See* SMUD Contract E-776 (Sept. 25, 1992) (PX 267); DX 315. SMUD further notes that this staffing summary sheet specifically references the savings resulting from the transfer of fuel to dry storage during the period of the government's announced delay, from 1998 to 2010.

69. Two days later, on July 9, 1992, the SMUD Board of Directors had a meeting that was attended by Ivan Stuart, a vice president at Nuclear Assurance Corporation and currently one of SMUD's expert witnesses in this case. DX 353, at SMP 0310940. NAC was one of the bidders on the dry storage project. *Id.* Mr. Stuart asked the SMUD Board of Directors why the performance schedule changed between the request for proposal and the time that SMUD evaluated the bids. *Id.* Mr. Stuart also expressed concern to the Board of Directors that the NRC had not licensed Pacific Nuclear's NUHOMS system for transportation. *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Stuart was in charge of selling the NAC-STC system; thus, it is not surprising that he believed at the time that his product was superior. However, Mr. Stuart testified at trial that he now believes SMUD made the right decision in choosing the NUHOMS system.

> Q. Now, in 1992, you warned SMUD that they shouldn't purchase the NUHOMS system that they actually did purchase, correct?
>
> A. What I warned them, after they had advised me that they were not going to select the NAC system, was that there were higher risks, in my view, of the, being successful in getting the license for the system that they had selected, the NUHOMS system over the NAC system. It wasn't a case of zero risk in the one case and risk in another case. It was risk on both sides. But I felt that it was less risk if they had gone with the NAC cask.
>
> * * *
>
> Q. Now, you were of the belief, sir, that because the licensing issues associated with the NUHOMS system were so great, that in the long run, the NUHOMS system might actually cost more than the NAC STC system, correct?

A. I don't believe it's correct to say that the, the risks were so great, it's just I knew the risks, or I thought I knew at the time the risks that Pacific Nuclear was going to face because we had just faced them, and that they would incur extra costs because of that.

Q. And in fact, you were right about that, correct?

A. Well, they did incur extra costs. I don't know the details of all of the contributions to that cost. Some of it may have been licensing. Some of it may be others. *However, as I look back on the decision, in my admonition to SMUD, I have to say they probably made the right decision actually.*

Tr. at 1382-84 (Stuart) (emphasis added).

70. On August 21, 1992, NAC's president, John Stobbs, sent a letter to Mr. Freeman indicating that SMUD has "so unfairly treated our company [NAC], that I am compelled to write directly to you and request your intervention and reversal of plans apparently underway at SMUD." DX 365. Mr. Stobbs referred to Mr. Stuart's unsuccessful efforts to persuade the SMUD Board of Directors and noted that SMUD's request for proposal clearly requested bids on dual-purpose casks that had already been approved by the NRC, or that where close to NRC approval, so that SMUD could receive the casks by mid-1993. *Id.* Mr. Stobbs noted that NAC was currently the only vendor that had a cask in the NRC review process. *Id.* Mr. Stobbs also wrote that SMUD had changed the terms of the proposal without allowing NAC the opportunity to re-bid. *Id.* Mr. Stuart further warned SMUD that the multi-element sealed canister ("MESC") concept that SMUD had selected was neither licensed by the NRC nor acceptable to DOE for transportation off-site to a DOE facility. *Id.* at RS 005062. Mr. Stobbs concluded his letter by indicating that, "[i]n view of all the above facts, I must conclude that [SMUD's] bidding process has not followed the customary propriety of equal treatment of all bidders." *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Stobbs was the President of NAC. It is not surprising that he believed at the time that SMUD should have chosen the NAC system. However, Mr. Stuart, who was the salesman for the NAC-STC

system, testified that he now believes SMUD made the correct decision in choosing the NUHOMS system. Tr. at 1382-84 (Stuart).

SMUD also objects to the government's proposed finding of fact to the extent it suggests that the government would take a different position with regard to the acceptability of fuel in dual purpose casks versus dual purpose canisters. Mr. Stuart, who worked for NAC during this period and was in charge of licensing and selling the NAC system, testified he specifically asked the government to consider fuel in the NAC cask as standard fuel under the Contract, "but as I pointed out to you, when I went to the Department of Energy to ask that question, *they said no*." Tr. at 1392 (Stuart) (emphasis added). Furthermore, DOE documents summing up DOE's position on acceptance of casks and canisters during this period make clear that DOE held an identical position regarding both dual-purpose casks and dual-purpose canisters. *See* PX 212 at 8-9.

71. Both before and after the July 7, 1992 meeting, SMUD believed there was a possibility that DOE could establish an MRS by 1998 to begin the acceptance of SNF. Tr. 400:21-24 (Shetler). Mr. Shetler characterized SMUD's belief as to the chances of an MRS as a "*50/50 proposition*." Tr. 440:25-441:2 (Shetler) (emphasis added).

<u>RESPONSE</u>: SMUD objects to the government's proposed finding. The government relies on only a few words of Mr. Shetler's testimony. In fact, Mr. Shetler testified at greater length about the possibility of an MRS:

> A. [I]f there was a potential for any kind of interim storage facility that could take the fuel earlier, having fuel in a dual purpose system would hopefully expedite the ability to get fuel moved there.
>
> So we recognized that was a possibility. We also recognized that the probability was up in the air.
>
> Q. Excuse me, sir?
>
> A. Was up in the air, that the probability was obviously not certain.

Tr. at 254-55; *accord id.* at 278, 295, 350, 400-01 (Shetler); *see also* Designations Appendix (Dckt. #310) at 2310-13 (Freeman) (testifying that his view in the early 1990s was that an MRS "wasn't going to work"); Tr. 534-35 (Redeker) (testifying that his view in 1993-1994 was that an MRS "was unlikely" to "open any time substantially before the repository").

Mr. Shetler also testified that as time wore on the possibility of an MRS diminished even further: "[N]o real progress was being made. No legislation came out of Congress for moving MRS quicker than were currently in place. There were attempts to locate facility sites and they did not become overly successful. And eventually DOE abandoned the process." Tr. at 441.

Documents from throughout this period also reflect SMUD's recognition that the opening of an MRS in 1998 was highly speculative. *See, e.g.*, PX 176 at 65 (describing 1998 fuel acceptance as "[t]he most uncertain element" and explaining that Levy's transportable dry storage recommendation "only assumes that it is possible that this could happen"); DX 202 at 001925 (describing shipment of fuel to MRS as a "possibility"); PX 297 at 7 (noting interim storage is "not currently an option").

The testimony and documents in question merely recognize that an MRS could be sited by 1998, that is, that such siting was technically possible, not that it was likely or that it could be done without changing the Nuclear Waste Policy Act ("NWPA"). *See* DX 164 at 1 (noting that dry storage would allow fuel shipment by 1998 if DOE storage were available); DX 274 at 62 (explaining that the likelihood of an MRS opening in 1998 would depend upon the passage of legislation delinking the repository and MRS).

72. In December 1994, SMUD believed there was a possibility that DOE could begin accepting SNF in an MRS by 1998 and was representing this assumption to members of the general public. DX 481, at SMUD 0033398; Tr. 383:17-24, Tr. 388:19-21 (Shetler) ("I think we still had an expectation there was a possibility it could happen, yes."); Tr. 705:2-5 (Redeker). In a presentation as part of a public workshop – of which General Manager Jan Schori was aware and the contents to which she did not make changes – SMUD management indicated that SMUD assumed performance from DOE between 1998 and 2013 and that all of SMUD's SNF would be accepted within a 14-year queue. DX 481, at SMUD 0033398; Tr. 386:15-387:11 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact. In fact, the presentation states that "DOE *may start* accepting fuel between 1998 and 2013." DX 481 at SMUD 0033398. The slide also states that "SMUD prepared to store spent fuel until 2027/Beyond." *Id*. Thus, SMUD was representing to the public that the start date for DOE acceptance was not certain and that SMUD was making the preparations so that it could store spent fuel during the period of DOE's delay.

73. SMUD's belief that there was a possibility that DOE would begin acceptance of SNF in 1998 continued through 1995. Tr. 710:16-20 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Redeker testified as follows:

> Q. In fact, Mr. Redeker, you wanted to keep the lines of communication open between SMUD and DOE because of

the possibility that DOE would pick up the fuel as early as 1998 from SMUD; isn't that right?

A. Yes. May I elaborate? I wanted to keep the lines of communication open between SMUD and DOE at all times, so that we would be fully aware of what DOE's plans were and what we could do to make the fuel go away. So those lines of communication were always open with the hope of seeing what could be done with the fuel.

Q. And just so the record is clear, those lines of communication that you wanted to leave open, you were leaving open because of the possibility . . . that DOE would come and accept, begin accepting SMUD's fuel in 1998; isn't that right?

A. Yes, that would be one of the reasons. DOE was obligated to take the fuel, so I was obligated to keep the lines of communication open to – with the DOE, who was responsible to take the fuel.

Q. . . . But, in fact, just so we're clear on the record, you were keeping the lines of communication open into 1995 because of the possibility that DOE would begin acceptance in 1998; isn't that right?

A. That was certainly a factor, yes.

Tr. at 709-10 (Redeker). Thus, SMUD believed it was critical to keep the lines of communication open at all times so that, in the unlikely event that DOE was able to perform, SMUD would be aware of DOE's plans and would be ready for such performance.

Mr. Redeker also testified that while it was possible that DOE could begin accepting SNF in 1998 through an MRS, he considered this unlikely and expected that DOE would not begin performing until approximately 2010. *Id.* at 532, 534-35.

74. SMUD's belief in 1994 that DOE could timely perform through the use of an MRS is consistent with the general belief in the industry. Tr. 1377:3-19 (Stuart) (acknowledging that there was a general belief in the industry that the Government was spending money on the MRS and that an MRS might break the logjam regarding the acceptance of SNF under the Standard Contract).

RESPONSE: SMUD objects to the government's proposed finding of fact because it misstates the evidence. Mr. Stuart agreed with government counsel's statement that "there was a

general belief in the industry that the government was spending money on the MRS, and that an MRS might break the logjam regarding the acceptance of spent nuclear fuel under the standard contract." Tr. at 1377. Mr. Stuart *did not* testify that he believed DOE could *timely* perform through the use of an MRS.

75. Even after 1995, Mr. Stuart, as an employee of NAC International, was having discussions with individuals from DOE regarding the possibility of an MRS. Tr. 1381:1-5 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Stuart testified as follows:

> Q. Now, Mr. Stuart, you continued discussions after 1995 with individuals from DOE and other entities regarding the possibility of an MRS, correct?
>
> A. Yes, discussions were still going on.
>
> Q. In fact, those discussions went on all the way until 1988 – excuse me, 1998 – or 1998?
>
> A. Well, when you get closer to that time frame, the discussions were more related to the private MRS, as opposed to the government MRS.

Tr. at 1381 (Stuart). Thus, discussions shifted from a government sponsored MRS to the possibility of a private MRS. Such private measures were necessary because DOE was not meeting its obligation under the NWPA and the Standard Contract to provide for such disposal.

76. In 1993, SMUD reevaluated its decision to pursue dual-purpose dry storage. This reevaluation was motivated solely by its concern that, by placing its SNF into canisters, SMUD would render its packaged fuel as either non-standard or unacceptable. DX 425, at SMUD 0027391 (indicating that 1993 reevaluation was to "quantify [the] risk" of placing its SNF into canisters and potentially making its fuel nonstandard or unacceptable); Tr. 367:4-17 (Shetler) (explaining reason for 1993 reevaluation was based upon concerns about DOE's acceptance of canistered fuel and the ability to license its first-of-a-kind dual purpose dry storage system).

RESPONSE: SMUD objects to the government's proposed finding of fact. As Mr. Shetler explains in the memorandum cited by the government,

> The uncertainty rests with the acceptance of the spent fuel by DOE for ultimate disposal. The issue does not appear to be one of "will the DOE accept our canistered spent fuel," but rather one of "when will they accept it." Under our current contract with DOE for spent fuel disposal, they will only accept "standard" fuel in accordance with their planned receipt schedule. Presently, the definition of "standard fuel" is bare assemblies. Thus, even though DOE is moving toward a canistered fuel concept similar to ours, fuel in canisters is not currently considered "standard" fuel. . . . This is not as bad as it may first appear since DOE acknowledges that they will still have to take the fuel some day, just not necessarily in accordance with the current planned receipt schedule.

DX 425 at 1-2. SMUD proceeded with the dry storage project in part because DOE assured SMUD that, as long as the system was NRC certified, DOE would eventually accept such canisters for transportation. Tr. at 434, 438 (Shetler); *see also* PX 311; PX 320; PX 327. Had DOE been planning to perform, given the risk of having SMUD's fuel acceptance delayed, SMUD would have left the fuel in the pool. Tr. at 194 (Shetler) ("I think our first alternative and our preference would have been to keep it in the pool and have DOE receive the fuel on the original schedule, such that it would be offsite in a timely manner.").

a. The 1993 evaluation included a "base case" which assumed that SMUD would place its SNF into dry storage, assumed a 2000 start date for DOE acceptance of SNF, and assumed that all fuel would be accepted under DOE's then-planned receipt schedule of 15 years. DX 425, at SMUD 0027393, SMUD 0027390; Tr. 374:1-14 (Shetler) (explaining that the "base case" was the plan with which SMUD was moving forward at the time, that it assumed an MRS by 1998, and that it was the reference point against which all other options were compared).

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD evaluated the base case and seven other options. The various options reflect a myriad of estimates for DOE performance, illustrating (1) the uncertainty of DOE's performance, and (2) that DOE's lack of performance was the key factor in SMUD's analysis. DX 425 at 4-5 (noting possibly scenarios including DOE beginning performance in 2000, 2010, and 2020).

With regard to the comparable costs of wet and dry storage, the memorandum cited by the government describes this information as just "order of magnitude" comparisons that were intended to look at "possible options." DX 425 at 0027391; *see also* Tr. at 472 (Shetler) (stating that he was "trying to get some boundaries around what might be some of the potential parameters on cost"). The comparisons do not attempt to model the non-breach world or to address all of SMUD's objectives and concerns. And the government omits the principal conclusion drawn in the memorandum, which was that "it is obvious that the cheapest [approach]

for the District is to get the spent fuel out of our hands and into DOE's as soon as possible." DX 425 at 0027391.

b. Consistent with previous estimates, this 1993 evaluation of SMUD's storage options included, as an assumption, an $8 million in annual savings from transferring its SNF from wet storage to dry storage. DX 425, at SMUD 0027393. In 1993, SMUD also assumed $15.8 million in capital costs, which reflected all of the costs related to the construction of the dual-purpose dry storage system at that time. Tr. 471:16-22 (Shetler). SMUD's 1993 evaluation assumed that SMUD would begin loading SNF into dry storage beginning in mid-1995 and that the dry storage project would pay for itself in less than two years. DX 425, at SMUD 0027393; Tr. 372:25-373:3 (Shetler) (explaining that the numbers utilized in the evaluation were accurate at the time).

RESPONSE: SMUD objects to the government's proposed finding of fact. As noted previously, the government focuses solely on SMUD documents that contain an $8 million savings. There are also documents that used lower figures. *See* SMUD's Response to DPFOF ¶ 61.

c. Mr. Shetler, the author of the 1993 reevaluation, ultimately recommended that SMUD continue with the licensing and construction of the dry storage project. DX 425, at SMUD 0027382.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

d. Then-General Manager Freeman concurred with this recommendation. Tr. 370:7-10, Tr. 374:15:23 (Shetler).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

**E. SMUD's Reevaluation Of Its Decision To Place Its SNF Into Dry Storage Was Unrelated To The Government's January 31, 1998 Delay In SNF Acceptance**

77. When Mr. Field initially assembled SMUD's damages claim, dated April 16, 2004, he collected costs beginning in 1997 at the direction of counsel. Tr. 1172:5-11 (Field);

PX 762, at SMUD 044014. These post-1996 costs totaled $60.1 million. Tr. 1174:6-8 (Field); PX 762, at SMUD 044014. Mr. Field acknowledged at trial that SMUD's initial plan was to have its SNF loaded into dry storage by 1998 and that, had it loaded its SNF by that date, there would not be costs associated with most of the work order numbers contained in SMUD's April 2004 damages claim. Tr. 1178:3-6, Tr. 1180:12-15 (Field). In other words, SMUD would have had virtually no costs associated with its dry storage project after 1998 had SMUD adhered to its initial plan.

RESPONSE: SMUD objects to the government's proposed finding as misleading. If SMUD had loaded its fuel earlier, SMUD still would have incurred its costs related to the dry storage project – the difference would be that the costs would have been incurred earlier. The reason the majority of SMUD's costs were incurred post 1998 was that the majority of the work on the project was completed post 1998. SMUD back-loaded the costs of the project in order to keep its options open. As Mr. Shetler testified,

> Basically, it was part of trying to manage the risk of this project. What we were looking at is trying to continue to go forward with licensing, design, and working with DOE, but that we wanted to leave ourselves some flexibility that if for any reason it did not look like it was going to be feasible to go forward, that most of the dollars were in the later years. So if we uncovered that concern earlier, we could have minimized our expenditures.

Tr. at 469 (Shetler). Whether the costs were incurred before or after 1998 is irrelevant to whether they constitute recoverable damages in this case.

78. It was only after Mr. Field's deposition in this case that SMUD submitted a revised damages claim, asserting $20 million in damages for the period extending from 1992-1996. Tr. 1183:20-1184:25 (Field).

RESPONSE: SMUD objects to the government's proposed finding of fact because the timing of SMUD's damages submissions are not an appropriate basis for a finding of fact. SMUD also notes that these damages were added to SMUD's claim because Mr. Field's deposition testimony, as well as testimony by numerous other deponents, supported the conclusion that such damages were attributable to the government's breach. *See* PX 791 (explaining that SMUD was adding its 1992 to 1996 costs following the government's deposition of numerous SMUD employees, "all of whom testified that the Department of Energy's anticipated breach of the Standard Contract caused SMUD to begin developing dry storage in the early 1990s").

79. Even after SMUD concluded that DOE would breach the Standard Contract, SMUD recognized that, regardless of the breach, the pursuit of dry storage project was the best option financially because it paid for itself quickly. Specifically, in October 1996, Mr. Shelter presented a paper at the TLG Conference, in which he stated:

> [t]he economic aspects of keeping spent fuel in the spent fuel pool as opposed to dry storage indicate that the capital costs associated with dry storage can be recovered *in less than two years* and a substantial amount can be recovered over the period the plant is in SAFSTOR.

DX 657, at MOF 023696 (emphasis added). Mr. Shetler projected an annual cost of operating the wet pool of $15.1 million dollars, an annual cost of operating dry storage of $3.8 million, and the total capital costs of dual-purpose storage of $18 million. This estimate was SMUD's best at the time. Tr. 390:16-19 (Shetler). General Manager Schori was aware of the general substance of this presentation, and Mr. Shetler would not have made this presentation if Ms. Schori disagreed with any of the general substance contained in the presentation. Tr. 389:20-390:2 (Shetler).

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact.

The cost projections were not as uniform and certain as the government suggests. Rather, "[t]here were various estimates that were generated over the course of that period, anywhere from a million dollar savings to 8 to 10 million dollars worth of savings." Tr. at 265 (Shetler). As Mr. Shetler noted, "We're not dealing with absolute knowledge. We're dealing with best guesses and assumptions." *Id.* at 476-77. This is true because SMUD did not know the costs of wet storage alone, as SMUD did not track the wet pool costs separately from the rest of the plant. SMUD also did not know with any certainty the cost of a stand-alone dry storage system, as this was a first-of-a-kind project. While SMUD attempted to adjust the numbers as more information was gained, it was also known that the numbers were merely "best guesses and assumptions." *Id.*

Furthermore, the government inappropriately uses economic calculations prepared in the actual breach world to speculate about what SMUD would have done in the non-breach world. In the non-breach world, SMUD's continued pursuit of the dry storage project would have required it: to maintain its spent fuel pool until DOE performed so that it could transfer the fuel from its dual purpose canisters into DOE's transportation casks; to enter into an open-ended, full-cost recovery contract with a new vendor (TNW) that was just entering the market; to

augment its Rancho Seco management and staff to handle two simultaneous fuel training and loading programs; and to increase its decommissioning costs and obligations to encompass new and additional contamination and radioactive waste in the form of the horizontal storage modules, pad, and canisters. In the non-breach world, SMUD would have incurred potentially significant out-of-pocket and delay costs, which are not reflected in SMUD's breach world cost projections. Therefore, these cost projections cannot be used to predict what SMUD would have done in the non-breach world.

80. On July 25, 1996, Mr. Miller authored a study in which he estimated that the total cost for the dry storage project would total approximately $21.3 million. DX 613; Tr. 722:8-14 (Redeker).

RESPONSE: SMUD does not object to the fact that Mr. Miller authored this study. However, SMUD reasserts its response to DPFOF ¶ 79 herein.

81. Similar to Mr. Shetler's paper, Mr. Field authored a paper in 1996 in which he stated that, "[r]ecovery of the investment in such a [dry] storage system and facility would be realized in less than three years." DX 682; Tr. 1078:7-21 (Field) (explaining that the 1996 paper contained "the best information available at the time I wrote the paper").

RESPONSE: SMUD does not object to the fact that Mr. Field authored this paper. However, SMUD reasserts its response to DPFOF ¶ 79 herein.

82. SMUD's revisiting of its decision to pursue dual-purpose dry storage was due solely to the fact that, almost from its inception, SMUD's dry storage project suffered from massive delays and significant cost overruns. As Mr. Redeker explained at trial:

> We were doing re-evaluations because the project started getting into trouble. There started being cost overruns and started being issues and we said if there are problems with this, with this project, why don't we leave the fuel in the spent fuel pool.

Tr. 535:12-27, Tr. 628:25-629:1 (Redeker) ("This is a troubled project, costs are going up, schedule is moving out.").

RESPONSE: SMUD does not object to the government's proposed finding of fact. SMUD has freely acknowledged that the reassessments were precipitated by project delays (and Vectra's bankruptcy). This point does not negate or even bear on causation, however. The important point for demonstrating causation is that the reevaluations show that SMUD repeatedly

and explicitly considered abandoning the dry storage project during this period and leaving its spent fuel in wet storage, even in the breach world, and that such consideration was not just a theoretic possibility but an actual fact. *See, e.g.*, PX 502, 503, 519, 524, 642, 672, 689. Therefore, in the hypothetical non-breach world with DOE actually performing, in light of all of the disincentives to pursuing the first-of-its-kind dry storage project, SMUD would have concluded not to continue the project.

83. Every time that SMUD performed a reevaluation, it concluded that the project paid for itself so quickly that DOE's breach of the Standard Contract was immaterial to its consideration as to whether to continue with the dry storage project. DPFOF ¶¶ 79-81, 85-87, 89-90, 103, 105, 109.

RESPONSE: SMUD objects to the government's proposed finding of fact. In fact, SMUD never made such a conclusion, and the government's speculation that SMUD's economic calculations would have led it to this result is without merit.

First, this argument inappropriately uses economic calculations prepared in the actual breach world to speculate about what SMUD would have done in the non-breach world. In the non-breach world, SMUD's continued pursuit of the dry storage project would have required it: to maintain its spent fuel pool until DOE performed so that it could transfer the fuel from its dual purpose canisters into DOE's transportation casks; to enter into an open-ended, full-cost recovery contract with a new vendor (TNW) that was just entering the market; to augment its Rancho Seco management and staff to handle two simultaneous fuel training and loading programs; and to increase its decommissioning costs and obligations to encompass new and additional contamination and radioactive waste in the form of the horizontal storage modules, pad, and canisters. In the non-breach world, SMUD would have incurred potentially significant out-of-pocket and delay costs, which are not reflected in SMUD's breach world cost projections.

Second, the government's approach fails to account for the effects of SMUD's non-economic objectives on its decision-making. As previously noted, SMUD's ultimate goal was not just to reduce costs, but to have DOE remove or accept responsibility for its spent fuel as soon as possible. *See, e.g.*, Tr. at 152, 263 (Shetler); PX 176 at 5-6. SMUD's other goals included minimizing its risks and assuring the success of its strategy. *See, e.g.*, Tr. at 906 (Ferreira) (stating that "the objective was to try to minimize the risk and the cost"); PX 176 at 5 (stating that the District "plans to 'select and implement the option with the least risk, highest certainty of achievement, and lowest overall cost'").

Third, the government's approach ignores the variations in SMUD's cost and savings projections and misapplies some of the cost projections on which it relies. *See* SMUD's Responses to DPFOF ¶¶ 61, 87, 105.

Completion of the dry storage project in the non-breach world would have needlessly contravened SMUD's goals of assuring prompt DOE removal of its spent fuel and minimizing its risks. DOE had already taken the position that it might shift canistered fuel to the end of its fuel

queue. *See* DX 425 at 1-2; PX 320 at 1; PX 325 at 1; Tr. at 364-65 (Shetler). Thus, by completing the dry storage project in the non-breach world, SMUD would have subjected itself to a potentially lengthy delay in the removal of its spent fuel. Moreover, the government has argued that the DOE transport casks would have required bare fuel assemblies and would not have accommodated the transportable storage canisters developed by SMUD and other utilities. *See* Gov. Br. at 79-80. Therefore, completing the dry storage project would have put SMUD at risk of DOE not accepting its fuel. To avoid such a result, SMUD would have had to retain its spent fuel pool so that the fuel assemblies could be safely transferred from its dual purpose canisters to DOE's transportable casks. This, in turn, would have eliminated virtually all cost savings associated with dry storage. *See, e.g.*, PX 269A (indicating that savings result from closure of pool); Tr. at 332-33 (Shetler) (same).

In addition, completion of the dry storage project in the non-breach world would have subjected SMUD to the risk of additional regulatory, design, and manufacturing problems, which in fact occurred and resulted in further project delays and cost increases. *See, e.g.*, Tr. at 620-21, 628-29 (Redeker); Tr. at 902, 914-15 (Ferreira). These risks increased in 1998 because, following Vectra's bankruptcy, SMUD was unable to secure completion of the project at a fixed price or a fixed schedule. *See* PX 585; Tr. at 921 (Ferreira).

84. SMUD reevaluated its dry storage project on several occasions throughout the mid-to-late 1990s and early 2000 time frame. These evaluations were performed by Rancho Seco staff under the direction of Mr. Redeker. Tr. 712:22-25 (Redeker). Mr. Redeker testified at trial that he would report the result of these analyses to the Board of Directors and that he endeavored to provide the Board with the most accurate and best information that he could. Tr. 716:25-717:9 (Redeker).

<u>RESPONSE</u>: SMUD does not object to the government's proposed finding of fact.

85. SMUD conducted a reevaluation of its 1990 dry storage decision on March 3, 1997. DX 721. By this point, the dry storage project was "well underway." Tr. 910:7-9 (Ferreira). SMUD conducted the 1997 reevaluation because its dry storage vendor, Vectra, stopped work on the dry storage project. Tr. 723:20-724:12 (Redeker). Mr. Redeker acknowledged that, as of the 1997 reevaluation, the dry storage project was floundering, and it was somewhat unclear as to whether the project would even continue. Tr. 725:22-726:2 (Redeker).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

86. The 1997 reevaluation concluded that SMUD's most cost-effective option was to continue with the current dual-purpose dry storage concept on an unexpedited schedule because of "reduced staff and the use of contractors." DX 721, at SMUD 061590. This option assumed that SMUD's SNF would be loaded into dry storage by August 31, 1999. DX 721, at SMUD 061600. The 1997 evaluation also concluded that store-only dry storage was not a preferred option, because it would delay SMUD's ability to decommission its wet pool, resulting in additional costs in maintaining its Part 50 operating license. DX 721, at SMUD 061592; Tr. 734:21-735:8, Tr. 736:7-17 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding of fact because it misstates the evidence. SMUD determined that the current dual-purpose dry storage concept was "potentially the most cost effective option for SMUD because of reduced staff and the use of contractors." DX 721 at 1. These are the reasons the option was the most cost effective, not the *cause* of SMUD's decision to pursue or continue dry storage.

SMUD agrees that the store-only option was not preferred because it would have required maintaining the wet pool, along with the costs associated with pool. The store-only option was rejected for these reasons.

SMUD notes that the results would have been different in the non-breach world. In the non-breach world, continuation of the dual-purpose dry storage concept would have required SMUD to maintain the wet pool, along with the costs associated with the wet pool, because it would have needed to transfer the fuel from its own dual purpose canisters to the DOE's transportation casks. It would also have subjected SMUD to additional costs and risks that are not reflected in SMUD's breach world cost projections. *See* SMUD's Response to DPFOF ¶ 83. In addition, SMUD's considerations were never limited to a straight economic analysis, but encompassed various other considerations, such as the risk of losing its place in the DOE fuel queue and thereby further delaying fuel acceptance and the risk of cost increases and delays in completing a first-of-its-kind project. These risks would have led SMUD not to pursue dry storage in a true non-breach world. *See id.*

87. In conjunction with the 1997 reevaluation, Mr. Redeker made a presentation to the Board of Directors in which he represented that the annual cost savings from going from wet storage to dry storage would be $10-$12 million. PX 519. Similar to the 1993 reevaluation, Rancho Seco management recommended to the SMUD Board of Directors that it continue

pursuing the existing dual-purpose dry storage project, and the Board concurred with that recommendation. Tr. 612:10-11, Tr. 619:23-24 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Redeker explained his inclusion of the $10-$12 million figure as follows:

> Q. Exhibit 519 referred to an additional cost for wet storage of $4.8 million a year. Why does this document use or refer to a 10 to 12 million dollar decrease from wet to dry?
>
> A. As I indicated, this is a drawing that I had used numerous times. And in preparing this, I just pulled out the previous one we had used, put it down. I should have revised that number, but didn't. I consistently used this number. It was an earlier number that we had. It didn't reflect the number in the cost analysis. Again, that was stylized and we probably just went maybe a few seconds on this and you will remember this, this, that there is a savings in dry storage and move on.

Tr. at 612-14 (Redeker); *see also* Responses to DPFOF ¶¶ 83, 86.

It is true that a presentation to the Board used the $10 to $12 million number; the underlying staff analysis, however, indicated that, if SMUD left its fuel in the pool for the long period of DOE's delay, it could reduce the Rancho Seco staff from 148 people to 80, and that, at this lower staffing level, the projected cost differential between long-term wet and dry storage would be reduced to about $257,000 per month or a little more than $3 million per year:

> *For the purpose of staffing during extended periods of delay, a level of 80 is provided. This staff level is considered, for the purpose of this evaluation to be the absolute "minimum" level necessary to operate the plant, including the spent fuel pool.* Further evaluation may be necessary, should a specific option be considered for implementation, and for regulatory compliance.
>
> To derive the actual cost of the delay in getting into Hardened-SAFSTOR [*i.e.*, mothball status], it is necessary to subtract the TLG estimated cost for a given period from the same overlapping period and the associated cost associated with the delay.
>
> For example, the gross cost of one month of delay due to spent fuel offload for the current staff of 148 is about $800,000. For a staff of 80, 80% of the cost [to reflect the percentage attributable to the fuel pool] is about $449,000. TLG estimates the staff cost of one month of Hardened-SAFSTOR [which includes dry storage] is $192,000 (the amount already forecast for the same time period if

> integrated into the trust fund annual contribution). *Therefore, the monthly net increase or differential for the current staff is $608,000. For the staff of 80, the difference per month is $257,000.*

PX 519 at 4 (emphasis added); *see also id.* at 18-19 (stating that if fuel were kept in the spent fuel pool staffing would be reduced to 80 and SMUD would face "[a]dditional costs after 2008 of $4.8 million per year, primarily for additional staff to keep the spent fuel pool open").

In addition, Mr. Redeker testified that in the non-breach world, his recommendation would have been different – he would have recommended that the fuel be left in the pool.

> And at this point in 1997, it was a fact that they weren't starting up in '98. The 2010 date was in my mind very optimistic because I hadn't seen the kinds of progress that would need to be made. DOE had some specific milestones they had to reach, weren't being made. And that the 2010 was in jeopardy as well. And that some date out in the late 2020s was my best estimate of when the fuel would be gone. So that played an important part in this. *Had they been performing and saying, yes, we're coming in 1998 and that fuel will be gone by 2006, that would have changed the outcome of this entirely. It would have made the spent fuel pool an absolute certainty*. They are coming, they are going to take it out of our pool, the risk will be gone. And I wouldn't have to worry about that, licensing of a transportation system, I wouldn't have to worry about whether they could manufacture the thing, if they had said I'm coming, we're going to perform.

Tr. at 620-21 (Redeker) (emphasis added).

88. Under SMUD's 1997 analysis, the cost of going to dual-purpose dry storage would have paid for itself by 2001 – the year that SMUD would have had its *first* acceptance of SNF from DOE under the terms of the Standard Contract. DPFOF ¶¶ 86, 87, 109.

RESPONSE: SMUD objects to the government's proposed finding of fact. In the non-breach world, SMUD's continued pursuit of the dry storage project would have subjected it to potentially significant out-of-pocket and delay costs, which are not reflected in SMUD's breach world cost projections. Therefore, these cost projections cannot be used to predict what SMUD would have done in the non-breach world. *See* SMUD's Responses to DPFOF ¶¶ 83, 86. In addition, SMUD's considerations were never limited to a straight economic analysis, but encompassed various other considerations, such as the risk of losing its place in the DOE fuel queue and the risk of cost increases and delays in completing a first-of-its-kind project. These risks would have led SMUD not to pursue dry storage in a true non-breach world. *See id.*

Moreover, even if the foregoing problems with this finding of fact were ignored, the government has misapplied the cost projections on which it relies. The underlying staff analysis indicates that if SMUD left its fuel in the pool for the long period of DOE's delay, it could substantially reduce Rancho Seco's staffing and that this would have significantly reduced the projected savings associated with dry storage, such that the cost of going to dual purpose dry storage would not have paid for itself by 2001. *See* SMUD's Response to DPFOF ¶ 87. Nor would SMUD's first acceptance of SNF from DOE have been delayed until 2001 in the non-breach world. *See* SMUD's Responses to DPFOF ¶¶ 140, 144-46, 152.

89. Throughout this time period, SMUD management repeatedly represented that it would save $10-to-$12 million annually by placing its SNF into dual-purpose dry storage.

a. In May 1997, Mr. Redeker made a presentation to the SMUD Board of Directors in which he presented the 1997 study of SNF storage options and represented that there would be annual savings of $10-$12 million by placing its SNF into dual-purpose dry storage. DX 755, at SMUD 061109.

b. Similarly, in a May 2, 1997 letter from SMUD's external lobbyist to SMUD's in-house lobbyist discussing a meeting that SMUD management had with staff members of its congressional delegation, SMUD management indicated that it would save "approximately $10 to $12 million dollars annually in labor, maintenance, safety, and security expenses," after the SNF was transferred from the wet pool to dry storage in mid-1999. DX 749, at SMUD 062342.

c. On June 3, 1997, Mr. Redeker made a presentation to the SMUD Board Finance Committee, indicating identical annual cost savings by going to dry storage. DX 760, at SMUD 0028714.

d. Four months later, in October 1997, Mr. Redeker made a presentation to a subcommittee of the SMUD Board of Directors, the Board Integrated Resources and Customer Service Committee, in which he again represented an annual savings of $10-$12 million. DX 794, at SMUD 062405. In this October 1997 presentation, Mr. Redeker indicated that the

capital costs associated with completion of the dual-purpose dry storage were $23 million. DX 794, at SMUD 062422; Tr. 761:4-11 (Redeker) (stating that he put the best information he could in these presentations and believed the information was accurate).

e. By October 1997, SMUD had expended $17 million on capital expenses associated with the dry storage project. DX 794, at SMUD 062422; Tr. 766:21-24 (Redeker). However, for purposes of its payback analysis, SMUD looked at capital costs that were expected in the future, rather than costs already incurred. Tr. 766:25-767:3 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding of fact and restates its responses to DPFOF ¶ 83, 86-88.

90. The Government's expert economist, Cliff Hamal, conducted an analysis of SMUD's 1997 reevaluation and concluded that SMUD would not have rationally abandoned its dry storage project given the substantial annual savings that SMUD assumed at the time. Direct Testimony of Cliff Hamal, at ¶ 78. Mr. Hamal explained that SMUD's own 1997 analysis demonstrates that it would achieve payback of its investment from the savings achieved from moving from wet to dry storage by 2002 and that this payback analysis does not include consideration of other cost benefits to SMUD's decommissioning program. *Id.* Even assuming the acceptance rate schedule that SMUD has argued in this litigation, Mr. Hamal concluded that the net present value of the savings achieved from the dry storage program would be $13 million (and that the savings would be as much as $30 million under a slower acceptance schedule). *Id.* Based upon SMUD's own study, Mr. Hamal concluded at trial that there was no basis for concluding that SMUD would have cancelled the dry storage project at the time of the 1997 study. *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Hamal's analysis inappropriately uses economic calculations prepared in the actual breach world to speculate about what SMUD would have done in the hypothetical non-breach world. As previously explained, in the non-breach world, SMUD's continued pursuit of the dry storage

project would have subjected it to potentially significant out-of-pocket and delay costs, which are not reflected in SMUD's breach world cost projections. Therefore, these cost projections cannot be used to predict what SMUD would have done in the non-breach world. *See* SMUD's Responses to DPFOF ¶¶ 83, 86.

Mr. Hamal's analysis also fails to account for the effects of SMUD's non-economic objectives on its decision-making. As previously noted, SMUD's ultimate goal was not just to reduce costs, but to have DOE remove or accept responsibility for its spent fuel as soon as possible. SMUD's other goals included minimizing its risks and assuring the success of its strategy. Completion of the dry storage project in the non-breach world would have contravened these goals. *See id.* Mr. Hamal's analysis fails to consider these non-economic factors in his analysis.

Mr. Hamal's analysis also overstates the savings that SMUD would have realized from dry storage only, as he did not address SMUD's ability to reduce its Rancho Seco staff during the long period of the government's delay. *See* SMUD's Responses to DPFOF ¶¶ 87-88.

Witnesses with actual knowledge of SMUD's decision-making during this period testified that SMUD would not have continued with dry storage if DOE were performing under the Contract. Mr. Redeker testified as follows:

> Had [DOE] been performing and saying, yes, we're coming in 1998 and the fuel will be gone in 2006, that would have changed the outcome of this entirely. It would have made the spent fuel pool an absolute certainty. They are coming and they are going to take it out of our pool, the risk will be gone. And I wouldn't have to worry about that, I wouldn't have to worry about whether they could manufacture the thing, if they had said I'm coming, we're going to perform.

Tr. at 620-21 (Redeker); *see also id.* at 628-29 (Redeker); SMUD's Assistant General Manager Richard Ferreira similarly confirmed that in 1997 "had DOE responded favorably and was willing to assume responsibilities, then we would not have continued with the dry fuel storage program." *Id.* at 907; *see also id.* at 905-06 (Ferreira). And SMUD's Assistant General Manager Jim Shetler testified that if SMUD had assurance that DOE would begin fuel acceptance in 1998, it would have kept the fuel in wet storage to avoid the risk of pursuing a first-of-its-kind technology and DOE characterizing the canistered fuel as non-standard and delaying its acceptance. *Id.* at 360; *see also id.* at 194 (Shetler).

91. Mr. Hamal also explained that, even if SMUD had demonstrated that it would have abandoned its dry storage project had DOE not breached the Standard Contract, SMUD would not be entitled to any costs prior to the date of abandonment, nor would it be entitled to any of the termination costs, as these would have been costs incurred in the non-breach world.

*Id.* at ¶ 80. SMUD has never identified or quantified the costs associated with contract termination.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Hamal merely raises the costs of contract termination as a possibility. Because there is no record evidence to support such opinions, they should be rejected. *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

92. SMUD made the conclusion to continue with its dual-purpose dry storage project not just internally, but also announced its decision to the general public, including DOE. On March 14, 1997, SMUD's General Manager, Jan Schori, wrote a letter to DOE in which she indicated that "SMUD is spending $20 million in capital for the dry storage and transportation system *in an effort to enhance safety at the site and to reduce substantially the interim annual costs of wet storage*." DX 729, at RS 006102 (emphasis added); Tr. 738:17-20 (Redeker) (explaining that he prepared this letter and wanted the information contained therein to be the best it could be). Ms. Schori also indicated in her letter that SMUD was incurring approximately $800,000 a month in wet storage costs and that it anticipated incurring approximately $125,000 a month once SMUD placed its SNF into dual-purpose dry storage. DX 729, at RS 006101. SMUD represented to DOE that it anticipated an annual savings of $8 million based upon moving its SNF from wet storage to dry storage. Tr. 741:13-17 (Redeker). SMUD further indicated to DOE that all of SMUD's SNF would be in dry storage by December 1999. DX 729, at RS 006101; Tr. 740:3-6 (Redeker). Consequently, as of March 1997, SMUD anticipated that the cost of going to dry storage would pay for itself in two-and-a-half years, or by mid-2002.

RESPONSE: SMUD objects to the government's proposed finding of fact because it mischaracterizes the evidence. In fact, Ms. Schori's letter was written in response to DOE's "request for comments on the appropriate remedies that the Department of Energy ("DOE") should offer to the Sacramento Municipal Utility District ("SMUD" or "the District") to address DOE's anticipated failure to meet the January 31, 1998 deadline for accepting spent nuclear fuel ("spent fuel") from SMUD's Rancho Seco Nuclear Generating Station ("Rancho Seco"). DX 729 at 1. In her response, Ms. Schori requested that DOE reimburse SMUD for its costs of the dry storage project. Ms. Schori stated as follows:

> SMUD believes that if DOE cannot dispose of the Rancho Seco spent fuel on the schedule set forth in the DOE-SMUD Standard Contract, DOE should follow the precedent established at Fort St. Vrain with respect to Public Service of Colorado, i.e., reimbursing SMUD for the on-going costs of on-site spent fuel storage at Rancho Seco from January 31, 1998, until such time as DOE can fulfill its contractual obligation to off-load and transport the spent fuel to an interim or permanent DOE storage facility.

DX 729 at 1. Mr. Schori stated that DOE should reimburse SMUD for its storage and transportation costs, including the following categories: "Ongoing operating costs of storage," "Capital cost of the dry storage and transportation system," "Cost of loading the canisters from the wet storage pool to the ISFSI," and "Cost of off-loading and transport of the interim or permanent storage facility, whenever that occurs." *Id.* at 3-4. To the extent SMUD was spending capital "to reduce substantially the interim annual costs of wet storage," SMUD's efforts were an attempt to reduce the costs of DOE's delay.

93. According to Mr. Shetler, SMUD officials believed that one of the major impetuses for revisiting SMUD's dry storage decision during the mid-to-late 1990s and early 2000 was the increased costs that SMUD was experiencing with the dry storage project. Tr. 375:6-13 (Shetler); Tr. 597:3-15 (Redeker) (explaining that SMUD conducted 1997 analysis of storage options "in anticipation that things might not go well" with its dry storage vendors).

<ins>RESPONSE</ins>: SMUD does not object to the government's proposed finding of fact.

94. Specifically, one of the primary drivers for SMUD revisiting its decision during this time period was the manufacturing issues related to SMUD's vendors. Tr. 375:17-25 (Shetler).

<ins>RESPONSE</ins>: SMUD does not object to the government's proposed finding of fact. SMUD has freely acknowledged that the reassessments were precipitated by project delays (and Vectra's bankruptcy). This point does not negate or even bear on causation, however. *See* SMUD's Responses to DPFOF ¶ 82.

95. SMUD's then-general manager, Mr. Ferreira, believed at that time that, because of the relative cost-benefit of dry storage, it was in SMUD's best interest to move forward with the dry storage project as of 1997. Tr. 910:22-911:6 (Ferreira).

RESPONSE: SMUD objects to the government's finding of fact as misleading. The cost savings cannot be divorced from the fact of the government's delay. The period over which the savings would be attained was central to SMUD's analysis. Because the government had announced that it would not accept fuel prior to 2010 at a repository, and that the program would be delayed at least 12 years, SMUD knew that it would recognize the cost savings of dry storage for at least 12 years. If the government was performing, the cost analysis would have been very different, as the savings would have been much less and other factors would have supported leaving the fuel in the pool. *See* SMUD's Responses to DPFOF ¶¶ 20-21, 83, 90.

96. Mr. Ferreira believed that, in assessing the risks associated with continuing with the pursuit of the dual-purpose dry storage system, SMUD focused not upon "sunk" costs, but the so-called "going forward" costs to complete the project. Tr. 914:16-915:6 (Ferreira). Mr. Ferreira further believed that, if SMUD could move its fuel to dry storage at the costs projected in 1997, dry storage would lower SMUD's costs and reduce the risks associated with maintaining fuel in SMUD's wet pool. *Id.*; Tr. 913:25-914:12 (Ferreira).

RESPONSE: SMUD does not object to the first sentence of the government's proposed finding of fact. SMUD objects to the second sentence as misleading. Mr. Ferreira actually testified that the government's delay in performance played a key role in SMUD's reevaluation of the dry storage project:

> Q. And what role did [the government's expected failure to perform] have with respect to your decision in 1997 to continue with the project?
>
> A. Well, that was part of our continued evaluation of the costs and risks of continuing to maintain fuel in wet storage versus dry storage, and if you're going to be holding fuel in wet storage for an indefinite period of time, then the estimated cost to complete the dry storage program, recognizing there are many challenges and risks and complexities involved, it still made sense to continue to make that investment to move fuel to dry storage because it would reduce the cost over the long term.

Tr. at 913-14. In addition, SMUD's cost analysis from the breach world cannot be applied directly to the non-breach world because the latter would have involved additional costs and risks. *See* SMUD's Responses to DPFOF ¶¶ 83, 88, 90. Nor were SMUD's considerations limited to a straight economic analysis. *Id.*

97. Mr. Ferreira acknowledged that ultimately it is SMUD's customers, rather than DOE, that bears the financial risk of SMUD's pursuit a first-of-its kind storage technology. Tr. 928:13-16 (Ferreira). Similarly, Mr. Shetler believed that the substantial costs and schedule delays that SMUD faced in its dry storage project were "the risk one takes when you become the first person out the door." Tr. 383:11-16 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Ferreira's testimony merely reflects that the ratepayers are the ones who ultimately are financially impacted by the decisions of the utility. Tr. at 927-928 (Ferreira). SMUD, as a municipal utility, is responsible to its ratepayers just as a corporation is responsible to its shareholders. Similarly, like shareholders, ratepayers are impacted financially as a result of the choices of the company. In SMUD's case, the ratepayers are the ones who ultimately must pay for any expenditures, as rates are the only source of funding. To alleviate such risks, SMUD entered into a contract with the government and paid more than $40 million in exchange for the government's obligation to dispose of its nuclear waste and to begin such services by January 31, 1998. By entering into this Contract, the government assumed an obligation to perform and assumed the potential liability of any failure to perform. *See* Tr. at 926 (Ferreira) (explaining that "[t]he Department had a contract to take the fuel . . . [a]nd had the Department taken that fuel, that would have addressed our risk and liabilities and costs."). Mr. Shetler similarly testified that if DOE had timely performed SMUD would not have taken the risks associated with pursuing a dual-purpose dry storage system. *See* Tr. at 194, 360 (Shetler).

98. On February 3, 1998, Mr. Redeker made a presentation to SMUD's Board Finance Committee in which, consistent with other contemporaneous presentations, he stated: "there is a significant cost savings to have fuel in dry storage (between 10 to 12 million dollars per year) primarily due to decreased staff costs to maintain the fuel in dry storage." DX 819, at SMUD 0085312; Tr. 768:24-769:10 (Redeker) (stating that he received this document in normal course of business and made no changes to document).

RESPONSE: SMUD objects to the government's proposed finding of fact and reasserts its responses to DPFOF ¶¶ 83, 86, 87, 89.

99. On June 9, 1998, SMUD filed its complaint in the United States Court of Federal Claims.

RESPONSE: SMUD does not object to the government's proposed finding of fact. This Court can take judicial notice of the date upon which SMUD filed its Complaint. *See* Fed. R. Evid. 201.

100. After SMUD filed its lawsuit in this case, SMUD revisited its dry storage decision several more times, and, as in previous evaluations, concluded that it made economic sense to continue with its dry storage project. Tr. 652:21-23 (Redeker) ("I concluded that there was still a significant positive net present value" of continuing with the dual purpose dry storage project).

RESPONSE: SMUD objects to the government's proposed finding of fact to the extent that it suggests the filing of this lawsuit influenced SMUD's reconsideration of the dry storage project. SMUD further objects to the government's proposed finding of fact to the extent it suggests SMUD's only consideration was whether it made *economic* sense to proceed. As SMUD notes in its responses to DPFOF ¶ 83, 86, 90, which it restates herein, SMUD's decision making was informed by many non-economic factors. Finally, SMUD objects to this finding of fact on the ground that SMUD's breach world cost projections cannot be used to predict what SMUD would have done in the non-breach world. *See* SMUD's Responses to DPFOF ¶¶ 83, 86, 88.

101. According to Mr. Redeker, these reevaluations occurred, not because of the Government's breach, but because "our project was continuing to cost a lot." Tr. 651:19-20 (Redeker).

RESPONSE: SMUD does not object to the government's proposed finding of fact. SMUD has freely acknowledged that the reassessments were precipitated by project delays (and Vectra's bankruptcy). This point does not negate or even bear on causation, however. *See* SMUD's Response to DPFOF ¶ 82.

102. Rather than explain that DOE's partial breach of the Standard Contract caused SMUD somehow to change or modify its dry storage plans, Mr. Shetler explained that DOE's partial breach simply "reinforced our decision that we were making the right decision in putting the fuel in dry storage based on what we were seeing from the lack of performance." Tr. 242:25-243:1-3 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government's failure to begin actual acceptance and removal of fuel in the real world on January 30, 1998, was not an event that would have precipitated any specific action by SMUD because DOE had announced with virtual certainty many years before that it would not remove fuel by

that date or any date likely before 2010. SMUD had already decided to pursue a dry storage system because of the government's announcements that it would not meet its performance obligations. As Mr. Shetler testified, the government's breach merely confirmed SMUD's decision.

> Q. Mr. Shelter, what effect did the government's failure to begin performing under its contracts with the utility industry in January of 1998 have upon the re-evaluations of the dry storage project that you mentioned that occurred after, I think, 2000?
>
> A. Well, what occurred by that point in time, it was very clear DOE was not coming – it was post-1998, and actually about the time they would probably be coming to start accepting SMUD fuel if they were honoring their original schedule. So it was clear that was not going to happen. And as I mentioned, the indications were that we were starting to hear rumblings of later than 2010. So from my perspective, it reinforced our decision that we were making the right decision in putting the fuel in dry storage based on what we were seeing from the lack of performance.

Tr. at 242-43 (Shetler); *see also, e.g., id.* at 170, 172, 464 (Shetler) (testifying that as of approximately 1990 SMUD believed that DOE would not perform on time and that this "was one of the basic premises on which we went forward in looking at how do we handle a shutdown plant at Rancho Seco and then dealing with the fuel").

103. In a September 1998 presentation to Board Integrated Resources and Customer Services Committee, Mr. Redeker indicated \$10-\$12 million in annual savings by moving to dual-purpose dry storage. DX 871, at SMUD 062619. Mr. Redeker indicated that SMUD had already invested \$24 million into its dry storage project and that it was projected that the project could be completed for an additional \$13 million. DX 871, at SMUD 062627; Tr. 773:13-23 (Redeker). Mr. Redeker testified at trial that these figures represented SMUD's best estimate at the time. Tr. 775:6-7 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding of fact and reasserts its responses to DPFOF ¶¶ 83, 86, 87, 88.

104. Based upon SMUD's own payback analysis performed in September 1998, in which SMUD only looked at capital costs that had yet to be incurred, SMUD's dry storage

project would have paid for itself by some time in late 1999 – two years before its first scheduled acceptance by the Government. DPFOF ¶¶ 103, 109.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD did not perform a "payback analysis" in September 1998, and the presentation in question was not undertaken for the purpose of determining whether to continue with the dry storage project. In addition, SMUD's cost and savings projections from the breach world cannot be used to determine its behavior in the non-breach world because SMUD's considerations were never limited to a straight economic analysis, but encompassed various other considerations, such as the risk of losing its place in the DOE fuel queue and delaying fuel acceptance, and the risks of costs incurred and delays in completing the dry storage project. In addition, in the non-breach world, SMUD would have incurred potentially significant out-of-pocket and delay costs, which are not reflected in SMUD's breach world cost projections. *See* SMUD's Responses to DPFOF ¶¶ 83, 86, 88, 90.

105. In December 1999, SMUD conducted a net present value analysis comparing the cost of wet storage versus dry storage. PX 642, at SMUD 062826. This analysis concluded that SMUD could complete the dry storage project for $15.3 million. *Id.*; Tr. 847:13-848:16 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding of fact. The documents in question project that the annual cost savings through 2008, when decommissioning was projected to be complete, would be only about $2.25 million per year because the staff would also be working on decommissioning during that period. *See* PX 642 at 062828 (stating that wet fuel storage costs before 2008 would be "$2.25M/yr"); *accord* PX 672 at 062795-98 (depicting dry storage cost savings of $2.25 million annually through 2008).

At this lower rate of savings, even the $15.3 million figure would not have been recovered until 2007 or 2008, *id.*, and the government's analysis does not even consider the economic effect of its own argument that transfer of the fuel to dry storage would result in an indefinite number of additional years of storage costs. Thus, even if the government's misguided and simplistic approach to this issue were followed, *see* SMUD's Responses to DPFOF ¶¶ 83, 86, and SMUD's substantial internal costs and non-economic risks were ignored, these documents indicate that SMUD still would have abandoned the project in late 1999 or early 2000 in the non-breach world, if not long before, because the cost projections undertaken at this time would have indicated that the additional capital costs would have exceeded the monetary benefits.

106. As in previous analyses, under this analysis, SMUD's dry storage project paid for itself prior to SMUD's first scheduled acceptance in 2001 by the Government under the Standard Contract. DPFOF ¶¶ 105, 109.

RESPONSE: SMUD objects to the government's proposed finding of fact and reasserts its response to DPFOF ¶ 105. *See also* SMUD's Responses to DPFOF ¶¶ 83, 86, 90, 104.

107. In a February 2000 update to this study, SMUD estimated that the project could pay for itself prior to 2008. PX 672, at SMUD 062797; Tr. 851:1-12 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding of fact and reasserts its response to DPFOF ¶ 105. *See also* SMUD's Responses to DPFOF ¶¶ 83, 86, 90, 104.

108. As late as June 2003, SMUD's General Counsel, Steve Cohn, was unsure whether SMUD's decision to place its SNF into dry storage was caused by the Government's delay in the acceptance of SNF. In a June 2003 e-mail to SMUD's accounting expert in this case, Brian Brinig, Mr. Cohn explained that, "[i]n addition, SMUD spent over 60 million in capital funds to transfer our spent fuel to a new dry storage facility," and "*[t]he purpose of that was to reduce our ongoing operating costs (and/or mitigate the government's damages) from about 10 to 12 million a year to 2 million a year*." PX 950, at SMUD 090279 (emphasis added); Tr. 1299:6-1302:23 (Brinig) (acknowledging receipt of e-mail and his understanding that e-mail described what the case was about).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Cohn is SMUD's Deputy General Counsel, and the quoted statement merely reflects that the dry storage project reduced SMUD's operating costs, thereby mitigating SMUD's damages during the period of the government's delay. It does not reflect any uncertainty on the part of Mr. Cohn or SMUD regarding the causal relationship between the government's delay and SMUD's decision to pursue dry storage.

109. Under SMUD's own payback analysis, which it conducted multiple times over nearly a decade, the cost of pursuing dry storage paid for itself long before DOE's final acceptance of SMUD's SNF – even under SMUD's litigation-driven position regarding the acceptance rate. The following chart represents SMUD's payback analysis:

| | Oct 1991 | Aug 1993 | Oct 1996 | May 1997 | Oct 1997 | Sep 1998 | Dec 1999 | Feb 2000 |
|---|---|---|---|---|---|---|---|---|
| Capital Cost of Project | $16-$20 M | $15.8 M | $18 M | $19 M | $6 M [1] | $13 M [2] | $15.3 M [3] | $15.3 M [4] |
| Annual Cost Savings | $8 M/Yr | $8 M/Yr | $11.3 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr | $10 - 12 M/Yr |
| Completion of Fuel Loading | By 1998 | By 1998 | Early 1998 | Mid-1999 | March 1999 | By 2001 | Mid 2001 | Mid 2001 |
| Years to Pay-Back | 2 to 2 1/2 Yrs | < 2 Yrs | < 2 Yrs | < 2 Yrs | < 1/2 Yrs | < 1 1/3 Yrs | 1 1/4 to 1 1/2 Yrs | 1 1/4 to 1 1/2 Yrs |
| Date of Pay-Back | By Mid 2000 | By 2000 | By Early 2000 | Mid 2001 | Late 1999 | Early 2002 | Late 2002 | Late 2002 |
| Final Acceptance of SMUD Spent Fuel per Supko | 2006 | 2006 | 2006 | 2006 | 2006 | 2006 | 2006 | 2006 |

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. The cost projections in question did not constitute "payback analyses," were not self-implementing, and were colored by DOE's anticipated and then actual delay. In the non-breach world, SMUD would have faced potentially significant out-of-pocket and delay costs in initiating and then continuing with the dry storage project, which are not reflected in the breach world cost projections on which the government relies; therefore, those cost projections cannot be used to predict what SMUD would have done in the non-breach world. *See* SMUD's Responses to DPFOF ¶¶ 83, 88, 90.

In addition, the government's approach fails to account for the effect of SMUD's non-economic objectives on its decision making. SMUD's considerations were never limited to a straight economic analysis, but encompassed various other considerations, such as the cost of losing its place in the fuel queue and the risk of costs incurred and delays in completing a first-of-its-kind project. These risks would have led SMUD not to pursue dry storage if it had certainty that DOE would begin performance in 1998. *See* SMUD's Responses to DPFOF ¶¶ 83, 86, 90.

Nor were SMUD's savings projections uniformly at or above $8 million per year, as the government suggests. Although there are documents projecting savings of $8 million or more, a number of other documents used lower figures. *See* SMUD's Responses to DPFOF ¶¶ 61. For example, the government's chart omits the staffing summary sheets that were presented to SMUD's Board of Directors in seeking authorization to negotiate and sign the initial dry storage contract in June and September 1992, with projected savings of less than $3 million per year. *See* PX 259 at 2; PX 269A.

Finally, the government has misapplied some of the cost projections on which it relies. For example, the staff analysis underlying the re-evaluation on which the government relies for its 1997 figures indicates that SMUD's wet storage costs could be reduced with decreased staffing to $3 million to $4 million per year, not $10 to $12 million per year as the government contends. Similarly, the documents on which the government relies for the 1999 and 2000 figures indicate that the annual savings through 2008 would be only about $2.25 million per year, not $10 to $12 million per year as the government contends. *See* SMUD's Responses to DPFOF ¶¶ 105, 107.

110. SMUD's several payback analyses unequivocally demonstrate that SMUD believed its dry storage project would pay for itself prior to the final shipment of its SNF. As Mr. Hamal explained at trial, "[a]s long as SMUD concluded that the capital cost of its dry storage program could be recovered from operating cost savings in just a few years, the project will pay for itself before all of SMUD's fuel would be accepted by DOE in a non-breach world. Thus, the program would be economically justified and not properly included as damages." Direct Testimony of Cliff Hamal, at ¶ 75. Further, Mr. Hamal explained that the cost savings calculations that SMUD performed in the 1990s did not consider how Rancho Seco's overall decommissioning is facilitated by closing its pool and that, had the pool not be closed, SMUD's decommissioning efforts to date could not have been accomplished. *Id.*, at ¶ 76.

RESPONSE: SMUD objects to the government's proposed finding of fact and restates in full its response to DPFOF ¶ 109. Because Mr. Hamal's analysis reflects the same flaws, deficiencies, and mistakes as the government's approach to this issue, it should be rejected for the same reasons. Mr. Hamal's contention that SMUD could not have accomplished its decommissioning efforts to date without closure of the fuel pool is likewise incorrect. *See* Tr. at 218 (Shetler); 697 (Redeker) (noting SMUD "decommissioned around the pool"). If SMUD would have left the fuel in the pool and awaited DOE's performance, SMUD would have simply decommissioned around the pool until it was available, just as it did in the breach world. *See id.* at 315 (Shetler).

111. Although SMUD's July 1992 staffing summary sheet indicates that SMUD would realize "an estimated savings of approximately $33 Million by dry storing spent nuclear fuel," DX 344, at SMUD 0027222, no SMUD witness could explain the source of this figure, or how this figure compared to the consistent $8-12 million in annual savings that is identified in dozens of contemporaneous documents and to which multiple witnesses testified at trial.

a. Mr. Shetler did not know whether the $33 million number represented net savings over the course of the project or gross savings, or even whether the figure represents a net change to a prior decommissioning cost estimate. Tr. 405:7-11, Tr. 485:13-23 (Shetler).

b. Mr. Shetler could not explain whether the $33 million in savings included the amount of capital costs associated with the dry storage project. Tr. 405:17-20 (Shetler). Other than stating that the $33 million figure represented a comparison between wet and dry storage options, Mr. Shetler could not explain what this $33 million figure represented. Tr. 405:21-406:3 (Shetler).

c. In a presentation given by Mr. Shetler concerning the approval of the Pacific Nuclear contract, Mr. Shetler indicated that the dry storage proposal "mitigates potential decommissioning cost increases of $21 million, based on SAR/suggested design." PX 991, at SMP 0330404. Mr. Shetler did not know whether this $21 million would be added to the $33 million to determine actual annual cost savings. Tr. 481:14-25 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact. Although Mr. Shetler acknowledged that he could not definitively state the basis for the $33 million, he stated his belief that the figure reflected the difference in operating savings and that an adjustment for capital costs would be inappropriate. Tr. at 209, 405-07, 485. Even if the capital costs were added, the annual savings would increase to only about $4 million per year. Moreover, what was presented and considered by the Board was the following statement: "Staff has calculated, the District will realize an estimated savings of approximately $33 Million by dry storing spent nuclear fuel from 1998 through 2010 (the proposed opening of the Federal Geologic Repository)." PX 259. A plain reading of this document reflects a savings of $33 million over 12 years.

112. The Government's expert economist, Cliff Hamal, provided unrefuted testimony that, in light of Mr. Shetler's testimony, it was unreasonable to interpret the $33 million figure as an indication of operating savings from 1998 through 2010, particularly because that number would be inconsistent with other contemporaneous documents. Direct Testimony of Cliff Hamal, at ¶ 70.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Hamal engaged in a strained and illogical analysis to try to make the $33 million figure comport with his $8 million figure. *See* Tr. at 2986-90 (Hamal). When pressed with regard to the $33 million figure, however, Mr. Hamal recognized that he "did not know what that number means" and that it was ambiguous. *Id.* at 2916-17.

## IV. SMUD Failed To Prove That Doe Was Contractually Obligated To Accept SNF At An Annual Rate Of 3,000 MTUs

113. There is no rate of acceptance specified in either the NWPA or the Standard Contract. DX 88; Tr. 1481:15-20 (Supko).

RESPONSE: SMUD does not object to the government's proposed finding.

114. The administrative record unequivocally reflects that DOE *rejected* for inclusion in the Standard Contract both the two-part test relied upon by Ms. Supko and the 3,000 MTU steady state rate.

a. DOE published the Standard Contract at issue here as a "proposed rule" in the Federal Register. *See* 48 Fed Reg. 5458 (Feb. 4, 1983).

b. In response to that proposed rule, several nuclear utilities and industry groups submitted comments, requesting, among other things, that DOE place into the Standard Contract an obligation requiring DOE to accept SNF at some pre-determined minimum rate or to adopt as contractual obligations the acceptance rates that would be identified in the statutorily-required Mission Plan.

c. For example, the Tennessee Valley Authority ("TVA") stated that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance with corresponds to the purposes of the Act." DX 0076.063, at ADM002.0482. TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." *Id.* TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or

HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." *Id.*

d. Similarly, on January 20, 1983, the American Public Power Association ("APPA"), of which SMUD was a member, submitted the following comments on DOE's proposed Standard Contract:

> 1. DOE's Obligation To Dispose Of SNF and HLW
>
> a. DOE should be required to start accepting SNF and HLW by a date certain (the 1998 date in the Act is appropriate) at not less than the rate SNF and HLW are produced from individual nuclear power plants.
>
> b. DOE should have the further obligation to accept delivery of each Purchaser's backlog of SNF and HLW during the remaining projected life of such Purchaser's power plants.

DX 64, at SMUD 0011731; Tr. 1489:3-5 (Supko) (acknowledging that SMUD was a member of the APPA).

e. In its written comments, Consolidated Edison Company of New York suggested that the Mission Plan might provide a basis for defining DOE's performance, but requested that, in any event, DOE keep contract holders informed of DOE's views, "as they develop," of a schedule of performance under the Standard Contract:

> As this contract provides for considerable pre-payments over a period of nearly two decades, it would be most helpful if DOE's performance was as precisely defined as possible. Presentation by DOE of the "Mission Plan", in the Spring of next year, may provide such an opportunity. In any event, the Purchasers should be kept informed of DOE's views, as they develop, concerning the detailed schedule of its performance under the contract.

DX 0076.072, at ADM002.0587.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD agrees that utilities and nuclear industry groups commented as noted above. The government, however, draws the wrong conclusion from these facts. The operative point is that DOE did not put any

acceptance rate term in the Contract – in other words, the acceptance rate is, in every sense, an open term. DOE appeared to recognize this fact when it published the Standard Contract in April 1983, noting only that: "The 1998 date is called for in the Act, and we believe it to be a realistic date. *Our performance will be judged by meeting this date*." 48 Fed. Reg. 16,590, 16,598 (Apr. 18, 1983) (emphasis added); *see also* Designations Appendix (Dckt. #310) at 1712 (Lawrence) (Deputy Director of SNF program in 1983 and Second Acting Director of program) (explaining that at the time of Contract formation, DOE understood that utilities would have liked the Contract to include a specific rate term, but DOE lacked the means of specifying a rate at that time).

115. Although "[a]ll comments received by DOE in response to its proposed rule of February 4, 1983, both at the public hearing and the written comments received thereafter, were carefully reviewed and fully considered in the formulation of this final rule," 48 Fed. Reg. 16590, 16590 (Apr. 18, 1983), DOE expressly declined to agree to such requests.

RESPONSE: SMUD objects to the government's proposed finding of fact. As noted in SMUD's response to DPFOF ¶ 114, the government draws the wrong conclusion from the facts. DOE could have included an acceptance rate in the Contract, and this would have constituted an express term. DOE did not put any acceptance rate term in the Contract, however, and thus the acceptance rate is an open term of the Contract. In addition, DOE chose not to address the comments of the utilities. Instead, DOE officials began making public statements that DOE would accept fuel at a rate sufficient to prevent utilities from having to add additional storage, to reduce the backlog of spent nuclear fuel. *See* SMUD's Response to the Government's Post-Trial Brief ("Pl. Response Br.") at 50-52.

116. In the final Standard Contract that it promulgated in the Federal Register, DOE intentionally excluded the creation of any contractual *obligations* to meet any pre-determined acceptance rate. 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983).

RESPONSE: SMUD objects to the government's proposed finding of fact. The fundamental tenet of contract law requires that parties implement contracts in good faith so that the parties receive the full benefit of their bargain. *King v. Navy*, 130 F.3d 1031, 1033-34 (Fed. Cir. 1997). Where a contract contains a missing but essential term, black letter law requires that a reasonable term by supplied by the Court. Restatement § 204 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."). "A court is obliged to supply missing terms consistent with community standards of fairness and policy." *Indiana Michigan*, 57 Fed. Cl. at 97; *see also Commonwealth Edison*, 56 Fed. Cl. at 662 ("The task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court.") (quoting *David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (1977)).

Where such a term is missing, as here, the contracting party has a contractual obligation to meet a reasonable rate. *Essex Electro Eng'rs, Inc. v. Danzing*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("When the contract does not specify the period in which the government must [perform], the law imposes an obligation to act within a reasonable period of time. That period is determined by the reasonable expectations of the parties in the special circumstances in which they contracted.").

117. Although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report *for planning purposes*. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years, following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b (emphasis added).

RESPONSE: SMUD does not object to the government's proposed finding of fact. As the government emphasizes, the annual capacity report was "for planning purposes," was included in the Contract at the request of the utilities, and thus *does not* define the parties obligations under the Contract. *See Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 505 (2005) (noting annual capacity reports were "for planning purposes" and that "[t]he parties could not have expected that planning documents would create binding contractual obligations") (internal citations omitted).

118. In the final Standard Contract, DOE did not adopt TVA's request that DOE add a provision to require DOE to "start accepting delivery of SNF or HLW not later than January 31,

1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . ." 10 C.F.R. § 961.11.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD agrees that TVA made the comment noted. SMUD disagrees that DOE's failure to include the language in the Contract means that DOE has unfettered discretion to accept fuel at whatever rate it chooses or no rate at all. As SMUD notes in its responses to DPFOF ¶¶ 114-16, DOE's failure to put a rate in the Contract left an open term that must be supplied by this Court. Where such a term is missing, the contracting party has a contractual obligation to meet a reasonable rate. *Essex Electro Eng'rs, Inc. v. Danzing*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("When the contract does not specify the period in which the government must [perform], the law imposes an obligation to act within a reasonable period of time. That period is determined by the reasonable expectations of the parties in the special circumstances in which they contracted.").

119. Similarly, DOE did not adopt the APPA's request to add a contract clause to require DOE to accept SNF and/or HLW "at not less than the rate SNF and HLW are produced from individual nuclear power plant," and to "accept delivery of each Purchaser's backlog of SNF and HLW during the remaining projected life of such purchaser's power plants." 10 C.F.R. § 961.11.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD agrees that the APPA made the comment noted. SMUD disagrees that DOE's failure to include the language in the Contract means that DOE has unfettered discretion to accept fuel at whatever rate it chooses or no rate at all. As SMUD notes in its responses to DPFOF ¶¶ 114-16, DOE's failure to put a rate in the Contract left an open term that must be supplied by this Court. Where such a term is missing, the contracting party has a contractual obligation to meet a reasonable rate. *Essex Electro Eng'rs, Inc. v. Danzing*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("When the contract does not specify the period in which the government must [perform], the law imposes an obligation to act within a reasonable period of time. That period is determined by the reasonable expectations of the parties in the special circumstances in which they contracted.").

120. Mr. Morgan explained that the reason that DOE expressly rejected the inclusion of a specific acceptance rate into the Standard Contract was because, based upon "the uncertainties and the optimistic schedule that we were looking at, we felt it was inappropriate to commit to a rate at this time in the contract." Def. Counter-Designation of R. Morgan, at Tr. 57:20-23, Tr. 203:16-19 (3/21-22/02) (stating that DOE considered every comment and addressed those comments as to whether we accepted or rejected the comments).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government's citation of Mr. Morgan's testimony is simply another variant of the argument that, because the acceptance rate term is omitted from the Contract, DOE has unfettered discretion to accept fuel (or not to accept fuel) at whatever rate it sees fit. This is not the law, as noted in SMUD's responses to DPFOF ¶¶ 114-16. In addition, because this argument "would render the government's duties under the Standard Contract illusory," it should be rejected. *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 371 (2005); *see also Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 97 (2003) (holding that the government's argument "does not comply with congressional expectations or the parties' intentions" and "tends to render the Standard Contract illusory"); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343-45 & n.8 (2005) (rejecting argument that "DOE has virtually unfettered discretion to determine its obligations under the contract, through the DCS process or otherwise, especially where no repository is available").

121. Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two phase process.

a. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b).

b. Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." *Id.*, Art. IV.B.5(a).

c. Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder]

*wishes to deliver* to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1. If DOE approved the DCS, the parties had effectively agreed and defined the amount of SNF that DOE would accept from that contract holder 63 months later. *Id.* If DOE disapproved the first DCS submission, the contract holder was entitled to make a second DCS submission, again for DOE's approval or disapproval. *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact. The government asks the Court to reverse its rulings and conclude that the acceptance rate is defined by the DCS submittals made by SMUD and other utilities in the early to mid-1990s. This Court previously rejected the government's DCS argument, both in this case, *see Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 503-06 (2005), and in *System Fuels, Inc. v. United States*, No. 03-2652C, 2005 WL 1804314, at *9 (Fed. Cl. July 29, 2005). At trial, this Court emphasized a number of times that it had rejected the government's DCS argument. *See, e.g.*, Tr. at 1617 ("Now, I've already ruled as a matter of law that this chart didn't change the contract, unless you want me to take that back."); Tr. at 1923-24 ("Well – but I've ruled that they don't amend the contract. They don't enter the standard contract."); Tr. at 1925 ("They can argue all they want. I have ruled against them."); Tr. at 1926 ("And all of that is interesting, but irrelevant. You've won. You want to win again?"); *see also id.* at 410, 2036.

This Court's decision is in line with the many other decisions of this Court that have rejected the government's DCS argument. *See, e.g.*, *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662-67 (2003) (rejecting the government rate arguments and concluding that DOE manipulated the DCS process in a manner that likely violated the duty of good faith and fair dealing); *Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. June 26, 2003) (adopting the decision in *Commonwealth Edison*); *Southern Nuclear Operating Co. v. United States*, No. 98-614 (Fed. Cl. Apr. 7, 2004) (same); *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 97-98 (2003) (holding that the DCS process did not establish an acceptance rate, and that the rate published by DOE in the ACR documents from 1991 through 1995 was artificially low); *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 370-72 (2005) (rejecting the government's attempt "to avoid its contractual obligation indefinitely as a consequence of DOE's abandonment of the DCS process"); *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 186-87 & n.21 (2005) (concluding that utility stated a claim for breach of duty of good faith and fair dealing based on DOE's manipulation of the DCS process); *see also Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515, 524-25 & n.14 (2005) (concluding that DOE's unconditional obligation "has not been overridden by DOE's efforts to adjust requirements via the DCS process"); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343-45 & n.8 (2005) (rejecting the government's alternative contract argument and noting that the DCS argument has not been successful in other courts); *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 671-73 & n.7 (2004) (concluding that the government's reliance on the lack of approved DCS forms was legally insufficient because DOE hindered the DCS process).

122. Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an Annual Capacity Report ("ACR"). Each of the ACRs expressly stated that, "[a]s specified in the Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the purchaser." DX 105, at HQ0002712; DX 111, at HQ0002616; DX 218, at HQ0002493.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

123. Each ACR issued between 1987 and 1990 advised contract holders that, beginning in 1991, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers, containing the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 105, at HQ0002712; DX 218, at HQ0002493; Tr. 1976:2-6, Tr. 1978:4-7 (Pollog) (stating that these statements comported with his understanding of the role of the 1991 ACR).

RESPONSE: SMUD objects to the governments proposed finding of fact. The Contract does not state that DOE's contractual obligations would be defined by the ACR, the APR, or the DCS process. As this Court has recognized, these documents were "for planning purposes" and "[t]he parties could not have expected that planning documents would create binding contractual obligations." *See Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 505 (2005) (quoting *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 666 (2003)).

124. At the time DOE issued the 1991 ACR, DOE was planning on accepting SNF at an MRS that had a capacity limit of 10,000 MTU. Def. Counter-Designation of R. Milner, at Tr. 4742:2-11 (8/11/04).

RESPONSE: SMUD objects to the government's proposed finding of fact. The 1991 ACR expressly recognized that an MRS could only be established if the "the statutory linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy of 1982" were modified. PX 231 at v.

> The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

PX 231 at 4. Thus, under existing law, DOE understood it could not accept fuel at an MRS until 2007 at the earliest.

125. As DOE made clear in the 1991 ACR, pursuant to the 1987 amendments to the NWPA, DOE planned to commence performance of the Standard Contract through the use of an MRS. In that document, which DOE provided to all Standard Contract holders, DOE made clear that it intended to initiate acceptance of SNF through an MRS. "[A] site for a Monitored Retrievable Storage (MRS) facility will be obtained and the facility will initiate operations in 1998 . . . ." PX 231, at HQ0003592.

RESPONSE: SMUD objects to the government's proposed finding of fact because the government misstates the evidence. As support for its argument that DOE planned to initiate acceptance of SNF through an MRS, the government quotes a portion of a sentence from the 1991 ACR. The government fails to quote the entire sentence, which provides a very different conclusion than the one advanced by the government. The complete sentence actually states as follows:

> The projected waste acceptance rates for SNF presented in Table 2.1 assume: *a site for a [MRS] facility will be obtained and the facility will initiate operations in 1998;* and the statutory schedule linkages between the MRS facility and the repository set forth in the [NWPA] will be modified.

PX 281 at v (emphasis added). Thus, the establishment of an MRS facility was only used as an assumption for the projected waste acceptance rates. DOE never "made clear that it intended to initiate acceptance of SNF through an MRS." In fact, it did the opposite, repeatedly advising

utilities that it could not begin acceptance until 2007. *See, e.g.*, SMUD's response to DPFOF ¶ 124. Moreover, DOE officials testified that the prospect of an MRS died entirely by 1994. *See* Designations Appendix (Dckt. #310) at 217-23 (Barrett) (noting MRS no longer a "viable" option); 419-22 (Milner) (noting that DOE had essentially given up on plans to site an MRS by 1994).

126. DOE also made clear to all Standard Contract holders in the 1991 ACR that the acceptance rates set forth by the ACR assumed that:

> During the first 10 years following projected commencement of the Federal Waste Management System (FWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU. This is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA.

PX 231, at HQ0003592.

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. DOE also noted in the 1991 ACR that the acceptance rates assumed that "the statutory schedule linkages between the MRS facility and the repository set forth in the [NWPA] will be modified." PX 281 at v. Thus, the MRS and the acceptance rates contained in the 1991 ACR could not be implemented without a change in the law. In addition, the government fails to explain why it assumed in the 1991 ACR that the statutory restrictions requiring the repository be open within a few years of an MRS could be changed, while assuming that the capacity limitations limiting an MRS to 10,000 tons of fuel until the opening of the repository would not be changed.

127. Accordingly, the rates of acceptance in the 1991 ACR were: 400 MTU in 1998, 600 MTU in 1999, then 900 MTU each year until 2007. PX 231, at HQ0003598. These amounts totaled 8200 MTU for the first 10 years of performance of the Standard Contract. *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact. While SMUD agrees that these are the rates contained in the 1991 ACR, SMUD objects to the use of the acceptance rates as defining the rate of acceptance under the Contract. The 1991 ACR acceptance rates were based on the establishment of an MRS, which required a change in law to be implemented (and a selective change at that, as described in SMUD's response to DPFOF ¶ 126).

Furthermore, there is evidence that DOE's decision to use the 900 ton rate in the 1991 ACR was based on DOE's efforts to limit its damages to utilities. DOE official Lake Barrett admitted in his deposition that he spoke with DOE lawyers regarding the possibility that DOE could reduce utility damages claims against it by maintaining a low "obligation" rate compared with the higher 3000-ton rate at which DOE ultimately expected to perform. Designations Appendix (Dckt. #310) at 348-49 (Barrett).

128. Neither the NWPA nor the Standard Contract contains reference to the two "primary requirements" relied upon by Eileen Supko in this case, namely, that the rate: (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF and/or HLW already stored by utilities up until that date. Tr. 1484:1-10, Tr. 1490:21-1491:1 (Supko).

RESPONSE: SMUD objects to the government's proposed finding of fact. While SMUD agrees that neither the NWPA nor the Standard Contract references these two goals, there is extensive evidence that DOE shared the objectives of preventing utilities from adding additional on-site storage and working off the backlog so that they could timely decommission their reactors, and that it chose the 3000 ton rate to satisfy those objectives. Former Director Barrett testified that the 3000 ton rate was consistent with the intent of the NWPA, which was to work off the backlog of waste at utility sites:

> Q. [Y]ou believe that there is, in fact, a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?
>
> A. Yes.
>
> Q. And could you explain to me that rationale that you believe has been clearly documented by the department?
>
> A. There was one in the old mission plans. It basically was that the rate of 3,000 tons per year exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of a thousand tons per year delta. And for where the program was at that time that was sufficient, and I felt that was sufficient at that time.
>
> * * *
>
> Q. Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?
>
> A. Because I believe that's the intent of the act.
>
> Q. By "the act" you're referring to the Nuclear Waste Policy Act of 1982?
>
> A. That's correct.

Designations Appendix (Dckt. #310) at 301-04 (Barrett) (objections omitted); *see also id.* at 26-36, 53-59, 275-78.

A DOE memorandum prepared in July 1984 by the DOE Richland Operations Office plainly set forth its interpretation of the NWPA:

> Based on our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.

PX 80, Encl. 1 at 1; *see also* Pl. Response Br. at 50-52.

129. Ms. Supko is an industry advocate who was not involved in the negotiations leading to the formation of the Standard Contract.

RESPONSE: SMUD objects to the government's proposed finding of fact. Ms. Supko was not involved with the negotiations dealing with the Standard Contract, but neither were any of the government witnesses at trial. With regard to the time of Contract formation, SMUD introduced extensive testimony from senior DOE officials as part of its Deposition Designations (Dckt. #310).

In addition, SMUD presented the testimony of Ms. Supko, who has 20 years of experience working in the nuclear industry, with primary expertise in the storage and disposal of nuclear waste and DOE's plans regarding that storage and disposal. Ms. Supko has a Bachelor of Science in Nuclear Engineering from Pennsylvania State University. After graduation, Ms. Supko began working in the nuclear industry on issues related to nuclear fuel, beginning as Nuclear Fuel Projects Engineer at the Carolina Power and Light Company. Since 1990, Ms. Supko has worked as a consultant at Energy Resources International, consulting in the area of SNF, nuclear waste management, and radioactive materials transport. *See* E. Supko Written Direct at ¶ 3, App. B (PX 1002).

In her work, Ms. Supko has assisted and advised commercial utilities, members of the U.S. Congress, Congressional staff, state and local officials, and the Nuclear Energy Institute ("NEI") on a variety of nuclear fuel issues, including analysis of DOE's civilian waste management program, nuclear fuel storage, transport and disposal issues, and nuclear fuel cycle issues. She has authored over 35 reports, presentations, and publications in leading nuclear energy journals and has been an invited speaker at over a dozen conferences sponsored by leaders in the nuclear industry. *Id.* at App. B, C.

Ms. Supko's experience has given her expertise not only in the broad subject matter of the nuclear industry, but also more specifically on matters highly relevant to the present case. In her role as an expert, she offers her opinions, based on this experience, to assist the trier of fact in understanding the evidence and determining facts at issue. *See Selvidge v. United States*, 160 F.R.D. 153, 154 (D. Kan. 1995).

130. Ms. Supko testified at trial that the two "primary requirements" she identified were contained in DOE's 1983 draft mission plan. Tr. 1502:2-7 (Supko); PX 59.

a. Ms. Supko was not involved in the promulgation of the 1983 draft Mission Plan. Tr. 1503:22-25 (Supko).

b. Ms. Supko recognized that the final version of the Mission Plan submitted to Congress was not published until 1985, and, when it was published, did not contain a reference to Ms. Supko's two "primary requirements." Tr. 1507:21-1508:7 (Supko).

c. The 1983 draft Mission Plan expressly states that, "[t]he disposal contracts with the utilities specify that priority will be given to the oldest spent nuclear fuel or high-level wastes. *In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations*." PX 59, at CTR 0421071 (emphasis added).

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. There is extensive evidence that DOE shared the objectives of preventing utilities from adding additional on-site storage and working off the backlog so that they could timely decommission their reactors and that it chose the 3000 ton rate to satisfy those objectives. Former Director Barrett and other DOE officials testified that the 3000 ton rate was consistent with the intent of the NWPA, which was to work off the backlog of waste at utility sites. *See* Designations Appendix (Dckt. #310) at 301-04 (objections omitted); *see also id.* at 26-36, 53-59, 275-78; SMUD's Response to DPFOF ¶ 128; *see also* Pl. Response Br. at 48-53.

As demonstrated by the evidence cited above and in SMUD's Response Brief at 49-52, the parties' behavior "before the advent of the controversy," *Omni Corp. v. United States*, 41 Fed. Cl. 585, 591 (1998), demonstrates that DOE intended to solve, rather than perpetuate, the "national problem [that] had been created by the accumulation of spent nuclear fuel from nuclear reactors." 42 U.S.C. § 10131(a)(2)(A); *see also* PFF ¶¶ 18-35.

131. Ms. Supko understood the 1991 date references in the 1983 draft Mission Plan to relate to the 1991 Annual Capacity Report that DOE published. Tr. 1506:7-9 (Supko). The 1991 Annual Capacity Report projects the first ten years of SNF acceptance at a 900 MTU rate. DX 290, at HQ0002369. Notwithstanding her admission, Ms. Supko does not rely upon the

1991 Annual Capacity Report and, instead, concluded that "I don't believe that the rate of acceptance in the 1991 Annual Capacity Report was reasonable." Tr. 1506:10-15 (Supko). Ms. Supko admits that, based upon her purported experience, she is simply making a judgment that the 1991 Annual Capacity Report is invalid. Tr. 1507:18-20 (Supko).

RESPONSE: SMUD objects to the government's proposed finding of fact. Ms. Supko completed a sophisticated model and analyzed what the actual effects of different potential rates would have been in the non-breach world, including sensitivities for different ramp-ups and intra-utility use of acceptance slots. In particular, Ms. Supko analyzed the effects of different acceptance rates on (i) how long utilities would have had to wait to decommission their reactors under the various rates, (ii) whether the utilities would have had to add additional on-site storage; and (iii) how long DOE would utilize the system under the various assumptions. E. Supko Written Direct at ¶¶ 49-81 (PX 1002). As former Director Barrett's testimony makes clear, this is precisely the type of analysis that DOE performed to reach its conclusion that 3000 was the proper rate for the program. Designations Appendix (Dckt. #310) at 318 (explaining that the 3000 ton rate was seen as the "proper balance for total life-cycle costs as well as near-term cash flow requirements and performance"). Ms. Supko's analysis supports her conclusion that the rate of acceptance in the 1991 Annual Capacity Report would not satisfy any of the objectives and goals of the parties and the program. The government offered no contrary evidence in support of the 900 ton rate.

132. Ms. Supko's views of the draft Mission Plan and its role in determining an appropriate rate of acceptance are flatly rejected by the testimony of Robert Morgan, the former director of the Office of Civilian Radioactive Waste Management, who expressly rejected the view that the Mission Plan's articulation of two program goals somehow contractually obligated DOE to accept SNF at a particular rate of acceptance:

> You are trying desperately to get me to say that we had an obligation under the contract to accept fuel at a given rate. *We did not.*
>
> And what's in the mission plan is not what's in the contract. We set the mission plan as an ideal goal that we wanted to meet.

Def. Counter-Designation R. Morgan, at Tr. 129:11-17 (3/21-22/02) (emphasis added).

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD agrees that there is not a specific rate of acceptance included in the Contract. When such a term is missing from a contract, it is up to the Court to determine a reasonable rate. "A court is obliged to supply missing terms consistent with community standards of fairness and policy."

*Indiana Michigan*, 57 Fed. Cl. at 97; *see also Commonwealth Edison*, 56 Fed. Cl. at 662 ("The task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court.") (quoting *David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (1977)).

Where such a term is missing, as here, the contracting party has a contractual *obligation* to meet a reasonable rate. *Essex Electro Eng'rs, Inc. v. Danzing*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("When the contract does not specify the period in which the government must [perform], the law imposes an obligation to act within a reasonable period of time. That period is determined by the reasonable expectations of the parties in the special circumstances in which they contracted."). The program's goals at the time of contracting are directly relevant to determining a reasonable rate. *See* Pl. Response Br. at 48-53.

The Court in *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003), explained that "the record contains uniform support" for the 3000 ton rate and based this determination on the goals of the program.

> Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials. We have not attempted to discuss here the entire record support for DOE's intended 3,000-ton annual rate of delivery, but the evidence shows clearly that such a rate was the minimum needed to meet those objectives.

133. Mr. Morgan has unequivocally stated that the information contained in the Mission Plan simply represented the goals of the program and what DOE would like to accomplish, but that it clearly did not represent a contractual obligation or requirement. Def. Counter-Designation R. Morgan, at Tr. 3644:9-20 (8/2/04). In particular, Mr. Morgan explained that the discussion in the Mission Plan concerning DOE's intent to accept SNF at a rate that precluded additional at-reactor storage did not reflect contractual intent, and that, even under a 3,000 MTU rate of acceptance, some utilities still would have to have added additional at-reactor storage. Def. Counter-Designation R. Morgan, at Tr. 3644:4-3646:2, Tr. 3648:22-3649:16 (8/2/04); *see* Def. Counter-Designation B. Rusche, at Tr. 162:22-163:5 (5/16/02) (agreeing that DOE's strategy was to help utilities avoid some amount of additional, at-reactor storage by commencing operations in 1998, but that there was possibility that some utilities would have to

add on-site storage after 1998); Def. Counter-Designation A. Brownstein, Tr. 412:5-14 (4/10/02) (distinguishing between DOE program goals and objectives in eliminating the need to add additional at-reactor storage and contractual commitments).

RESPONSE: SMUD objects to the government's proposed finding of fact. As SMUD noted in SMUD's response to DPFOF ¶ 132, the goals of the program are highly relevant to the determination of a reasonable rate. With regard to the efficiency of the 3000 ton rate, the overwhelming evidence supports the conclusion that DOE would have performed at the 3000 ton rate. This evidence includes the testimony of numerous DOE officials and DOE documents, and is confirmed by the analysis performed by Eileen Supko. DOE official Lake Barrett, the Director or Deputy Director of the entire program from 1993 to 2002, explained that the 3000 ton rate was looked at as the

> proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have – you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3000, based on [studies from the] early 1980s, seemed like a reasonable number to use.

Designations Appendix (Dckt. #310) at 318. Former Director Barrett further testified that the 3000 ton rate has been DOE's plan for achieving the objective of reducing the existing SNF backlog since he joined the program in 1985. *Id.* at 26-36, 53-59.

Ms. Supko analyzed the effects of a range of acceptance rates and confirmed that the 3000 ton rate was the most reasonable rate. E. Supko Written Direct at ¶ 65 (PX 1002) (noting "it is clear that a 3,000 MTU steady-state acceptance rate will result in minimizing the amount of additional spent fuel storage capacity needed at reactor sites and the amount of time that spent fuel will remain on site following shutdown for decommissioning, while ensuring that the waste management system capacity has not been overbuilt and underutilized").

134. In June 1985, DOE issued a Mission Plan, DX 101, pursuant to the requirements of 42 U.S.C. § 10221 for "submission to the appropriate committees of the Congress." 42 U.S.C. § 10221(b)(3). Although the Mission Plan contained potential acceptance rates based upon various assumptions regarding the availability of two repositories and a Monitored Retrievable Storage ("MRS") facility, these rates were not intended to be contractually binding or to create some obligation upon DOE to satisfy some particular acceptance rate, regardless of whether the assumptions in the Plan proved accurate:

a. In his cover letter providing the Mission Plan to Congress, Mr. Ben Rusche, Director of OCRWM, stated that the purpose of this plan was to "provide an informational basis sufficient to permit informed decisions to be made *in carrying out the repository program* and the research, development, and demonstration programs required under this Act." DX 101, at HQ0005266 (emphasis added); *see* 42 U.S.C. § 10221 (1982). In the Mission Plan, DOE projected, for informational purposes, that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 101, at HQ0005305 ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); *id.* ("Table 22 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"). The 1985 Mission Plan also described an improved performance system that would include a Monitored Retrievable Storage ("MRS") facility that could start receiving SNF in 1996, two years ahead of the first repository (although DOE recognized that it lacked statutory authority to pursue this approach absent congressional approval of the MRS proposal to be submitted pursuant to section 10161), which would "service[] the first repository." DX 101, at HQ0005304, HQ0005308-09.

b. In the Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses." DX 101, at HQ0005309. Further, in the Mission Plan, DOE advised Congress that it would not begin to publish firm waste acceptance schedules until 1991, as follows:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity

> report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

DX 101, at HQ0005309. Accordingly, in the Mission Plan, DOE pointed to the 1991 ACR as the document by which firm acceptance schedules would be established.

c. In section 2.7 of the 1985 Mission Plan, DOE expressly represented that the estimated schedule contained in it, based upon particular assumptions, was only an approximation of the how the system "*may* operate," that it was subject to considerable variation, and that actual acceptance rates had not yet been determined as follows:

> These schedules are *for illustrative purposes only* at this time. The amount of Defense waste to be disposed of in the repository, and *the actual acceptance rates, have not yet been determined by the DOE*.
>
> * * *
>
> It should be emphasized that *this schedule is only an approximation of how the system may operate and is subject to considerable variation*. The DOE will further define and specify the system acceptance parameters as the program progresses.

DX 101, at HQ0005308-09 (emphasis added).

d. In section 2.4 of the 1985 Mission Plan, DOE explained that, although the baseline assumption of the Mission Plan was that the repository would be built on schedule, a substantial delay in the repository would require DOE to pursue contingency approaches, with potentially significant effects upon DOE's SNF acceptance capabilities:

> [A]ll those involved in, and concerned about, these activities recognize that this program is highly controversial; involved in it are a number of important constituencies with widely varying views of how, when, and whether elements of the program should be carried out. . . .
>
> * * *

> The baseline program assumption, of course, is that the repository is built on schedule. Should the repository be substantially delayed, one of two contingency approaches would be pursued. If the MRS facility is authorized by Congress and constructed, it can begin to accept spent fuel in a timely manner and package and store it (up to the authorized storage-capacity limit) until a repository becomes operational. . . .
>
> If site characterization shows that none of the candidate sites for the first repository are suitable or should successive notices of disapproval be made and upheld, the DOE has two main contingency plans. If an MRS facility has been authorized and constructed, it can accept spent fuel on or ahead of schedule, packaging and storing it (up to the authorized storage-capacity limit) until the "second" repository is authorized (which, of course, would then become the first repository) and becomes operational. *If an MRS facility has not been authorized, spent fuel will continue to be stored at reactor sites in spent-fuel pools and possibly in dry storage*.

DX 101, at HQ0005299-300 (emphasis added); *see* DX 101, at HQ0005300 ("Should no repository be constructed and an MRS facility no be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.").

e. Earlier drafts of the Mission Plan contained similar waste acceptance schedules based upon DOE's then-current program plans, including the development of two repositories. PX 59, at CTR0421069 ("The Mission Plan . . . defin[es] the program objective, strategy, and current program plans . . . .") (emphasis added) and CTR0421072. In Section II, Program Strategy, of the December 1983 draft Mission Plan, DOE stated that it would not begin publishing firm acceptance schedules until 1991:

> A. Waste Acceptance Schedule
>
> *This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. The schedule will eventually be further developed* to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element. Under the terms of the utility contracts for disposal services, an annual capacity report with projected annual receiving

> capacities and rankings will be issued by the Department for planning purposes, beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level waste. *In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations*.
>
> * * *
>
> While the Department's aggregate acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. The *planning basis* assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date.

PX 59, at CTR0421071-73 (emphasis added). DOE did not intend this schedule to reflect contractual obligations or intent.

RESPONSE: SMUD objects to the government's proposed finding of fact except to the extent it accurately quotes portions of certain documents. *See* SMUD's Response to DPFOF ¶ 116. The Contract does not state that DOE's contractual obligations would be defined by the ACR, the APR, or the DCS process. As this Court has recognized, these documents were "for planning purposes" and "[t]he parties could not have expected that planning documents would create binding contractual obligations." *See Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495, 505 (2005) (quoting *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 666 (2003)).

Furthermore, the one constant throughout all the announcements of delay is that DOE planned to operate its program at a steady-state acceptance rate of 3000 tons and still plans to do so today:

- 1983 Draft Mission Plan – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period as the rate "set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998." PX 59 at 2-2 to 2-3.
- 1984 Draft Mission Plan – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period. PX 68 at 2-2.

- 1985 Mission Plan – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period. PX 91 at 26.

- 1986 TSLCC – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period. PX 98 at 14, 22.

- 1987 Mission Plan Amendments – Identified a 2,640 ton acceptance rate after a six year ramp up period, leading to a 3000 ton steady state acceptance rate after ten years. PX 118 at 61.

- 1987 Annual Capacity Report ("ACR") – Identified a 2,650 ton annual acceptance rate after a six year ramp up period. PX 119 at 7.

- 1988 ACR – Identified a 3000 ton annual steady state acceptance rate after a five year ramp up period. PX 142 at 5.

- 1995 TSLCC Assumptions Package – Identified an acceptance rate of 3000 tons by the fifth year of operation beginning in 2010. PX 394 at 3, 13-15.

- 1995 TSLCC – Identified a steady state acceptance rate of 3000 tons after a four year ramp up period. PX 419 at 8.

- 1996 OCRWM's System Requirements Document, Rev. 03 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 495 at 11.

- 1997 Total System Description Report – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 542 at 14.

- 1998 OCRWM's System Requirements Document, Rev. 04 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 579 at 10.

- 1998 Total System Description Report, Rev. 01 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 600 at 13.

- 1998 Viability Assessment of a Repository at Yucca Mountain – Identified a 3000 ton annual steady state acceptance rate after a four year ramp up period. PX 604B at 3-2.

- 2000 Settlement Agreement Between DOE and Peco Energy Company – Identified a 3000 ton annual steady state acceptance rate after a four year ramp up period. PX 653 at 13.

- 2001 Total System Description Report, Rev. 02 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 699 at 24.

- 2001 TSLCC Analysis - Identified a steady state acceptance rate of 3000 tons after a four year ramp up period. PX 680 at 4-14; *see also* DD 322-323.

- 2002 OCRWM's System Requirements Document, Rev. 04 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 717 at 46.

- 2004 Acceptance Priority Ranking & ACR - Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 772.

- 2004 OCRWM's System Requirements Document, Rev. 06 – Identified a 3000 ton steady state acceptance rate after a four year ramp up period. PX 981 at 8.

In 1983, the parties anticipated and intended that if a repository was not operational in time for DOE to begin acceptance of SNF by January 31, 1998, DOE would take title to the fuel at the utility site and pay for its dry storage. *See* PX 50 at 2 (noting "the lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel" and stating one possibility in the event of non-performance would be for DOE to "take title to the spent fuel, have it placed in dry storage casks and pay a rental fee to the utility to store the casks on-site at the reactor"). DOE assured utilities that it would take responsibility for "additional storage" if the repository was delayed, even if that meant providing for storage "at reactor sites." PX 69, Vol. II at 9-6. Designations Appendix (Dckt. #310) at 1137-38 (Klein) (noting at the time the Contract was signed, DOE's plans in the event of delay in repository were that DOE "would take title or—or potentially at the reactor sites and provide dry storage casks.").

135. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023:

> As already mentioned, several important milestones have been achieved. However, the experience gained in achieving those milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (*see* Table 1). The new schedule shows a 5-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. (As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility).

DX 106, at HQR0031634. Further, in the 1987 Mission Plan Amendment, DOE stated that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is *only an approximation* of how the system may operate and is *subject to considerable variation*."

DX 106, at HQR0031687 (emphasis added). Again, these acceptance rates were not intended or understood to be contractually binding. DOE also represented in the 1987 Mission Plan Amendment the importance of the Annual Capacity Report that would be issued in 1991:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.

DX 106, at HQR0031687.

RESPONSE: SMUD objects to the government's proposed finding of fact. Because the acceptance rate is a missing or open term in the Contract, this Court is required to supply that reasonable rate in this case. Restatement § 204. As noted in SMUD's response to DPFOF ¶ 134, there is no basis for concluding that the 1991 ACR defines the obligations of the parties.

136. SMUD's actions and contemporaneous documents reflect that it did not believe that DOE was contractually obligated to accept SNF at an annual 3,000 MTU steady-state rate.

a. In submitting DCSs to DOE in the early 1990s, SMUD never complained that the acceptance rates upon which DOE had requested the contract holders base their DCSs were somehow inappropriate or in conflict with the requirements of the Standard Contract. DX 389. Mr. Shetler admitted at trial that SMUD neither protested its allocations set forth in the 1991 ACR or DOE's direction to use the allocations set forth therein the preparation of its DCSs. Tr. 394:24-395:4, Tr. 396:1-3 (Shetler).

b. SMUD never requested that DOE accept more SNF from SMUD than what was established in the 1991 ACR. Tr. 395:5-8 (Shetler).

c. Mr. Redeker conceded at trial that the 3,000 MTU steady-state rate upon which Ms. Supko opines, and upon which SMUD now relies in this litigation, "was not consistent with the DCS submittals." Tr. 729:22-730:4 (Redeker). Mr. Redeker also testified that he was unaware of anyone at SMUD ever performing an analysis with respect to a rate of acceptance by DOE in the non-breach world under the Standard Contract. Tr. 730:12-23 (Redeker).

d. SMUD never sought to utilize the Disputes Clause contained in the Standard Contract to object to the rates contained in the 1991 ACR. Tr. 397:23-398:2 (Shetler).

e. At the October 1991 SMUD Board of Directors meeting, Ms. Bowser informed the Board that SMUD's SNF would be accepted over the course of ten years. DX 274, at SMUD 0027465 (stating that "[t]he first assemblies from Rancho Seco would be scheduled to be received three years after a facility opens . . . [a]nd it would take approximately ten years from the opening of the facility . . . for them to take the remainder of our assembly"); *see also* DX 280, at SMUD 0029434 (assumes 10 year acceptance queue); DX 291, at SMUD 0029418 (same).

f. Two years later, in 1993, Mr. Shelter told Mr. Ferreira that, under DOE's then-current acceptance schedule, SMUD's SNF would be accepted over the course of 15 years. DX 425; *see also* DX481, at SMUD 0033398 (assuming 14-year acceptance queue); Tr. 630:17-18 (Redeker) (assuming that SMUD's SNF would be accepted over a 14-year queue).

RESPONSE: SMUD objects to the government's proposed finding of fact. All of the documents cited by the government are from after the government began announcing that the opening of the repository would be delayed by at least 12 years, until 2010. SMUD was merely reflecting in its own documents the current representations of DOE. Thus, SMUD's documents reflect the delays and program failures that DOE was experiencing. Tr. at 466 (Shetler).

The suggestion that SMUD was required to protest its allocations in the 1991 ACR through the "Disputes Clause" is unfounded as a matter of both fact and law. The Federal Circuit has conclusively rejected the argument that the Disputes Clause applies to this action.

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1340-43 (Fed. Cir. 2000). Furthermore, as a factual matter, there was no reason to invoke the Disputes Clause regarding the DCS submittals or ACR reports and no purpose would have been served in doing so. The 1991 ACR explicitly stated that it was for "planning purposes only, and thus, is not contractually binding," PX 231 at 3-4, which was consistent with the Contract, PX 44, Art. IV.B.5.b (stating that ACR reports were to be reissued every year and were for "planning purposes" The DCS Instructions further stated that DOE and the purchasers could "reevaluate" the submissions if DOE did not remove SNF at the rate provided in the non-binding ACR. PX 322 at ¶ 7(c).

Mr. Shetler explained that filling out the DCS forms in 1992 was a futile or idle act, Tr. at 249-50, a conclusion shared by every senior DOE official. *See* Designations Appendix (Dckt. #310) at 79-80 (Barrett) (referring to the DCSs as "administrivia" and "just another kind of bureaucratic piece of paper"); *id.* at 529-30 (Milner) (noting "my understanding of the process of the contract is that, no, if a final delivery schedule had not been approved, then nothing in the DCS binds either party to accept or deliver waste on a specified date"); *id.* at 656-59 & 717 (Brownstein); *id.* at 1603-04 (Slater-Thompson) (confirmed that DCSs were not intended or understood to be binding, and that she "recall[ed] sitting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS") (objections omitted); *id.* at 1719 (Lawrence); *id.* at 2015 (Morgan).

137. Under the 900 MTU rate of acceptance contained in the DCSs submitted by SMUD, DOE's last acceptance of SMUD's standard SNF, had it begun accepting SNF from utilities in 1998, would have been in 2019. Tr. 2006:2-5 (Pollog).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government offers not a single piece of evidence indicating that it planned to have a steady-state acceptance rate of 900 tons. At trial, Mr. Pollog could not even remember what acceptance rate might follow after the 10 years set forth in the 1991 ACR. *See* Tr. at 2028-29 (Pollog). Even assuming a 900 ton MTU steady state rate of acceptance, the exchange and shutdown priority provisions still would have been available under the Contract. SMUD would have taken advantage of these provisions in order to obtain early acceptance by DOE to avoid "waiting 20 or 30 years to be decommissioned after [it] finish[ed] generating electricity." Final Rule, 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983).

**V. SMUD's Claim That It Would Have Had Early Acceptance Dates Because DOE Would Have Granted It Priority As A Shutdown Reactor And/Or Because SMUD Would Have Engaged In Exchanges Or Transportation Campaigns Is Unsupported By Any Evidence**

**A. SMUD Failed To Meet Its Burden Of Establishing That It Would Have Obtained Priority As A Shutdown Reactor**

138. Article VI.B.1 of the Standard Contract provides DOE with the *discretion*, not the *obligation*, to provide a contract holder with a shutdown reactor priority in the SNF acceptance queue:

> Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

DX 88, Art. VI.B.1.b (emphasis added), Def. Counter-Designation of R. Milner, at Tr. 137:2-8 (5/8/02) (explaining that priority for shutdown reactor provision provided DOE with discretion to grant priority, but did not require DOE to grant priority).

RESPONSE: SMUD objects to the government's proposed finding of fact. While SMUD agrees that the government cited the Contract provision correctly, and agrees that such provision gives DOE discretion in granting shutdown reactors with priority, SMUD disagrees that this provision created no obligation on DOE's part. It is a fundamental tenet of contract law that the parties must abide by the contract terms in good faith. *City of Tacoma v. United States*, 31 F.3d 1130, 1132 (Fed. Cir. 1994) (noting "that a contract term which allows for future negotiation impliedly places an obligation on the parties to negotiate *in good faith*") (internal citations omitted); *King v. Navy*, 130 F.3d 1031, 1033-34 (Fed. Cir. 1997) (holding good faith required the agency to implement the provisions of the agreement in good faith so the petitioner could receive the full "benefit of her agreement"); *see also* Restatement § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). The Federal Circuit has held that this obligation "is no less required in contracts to which the Government is a party, than in any other commercial arrangement." *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988). Thus, DOE is under an obligation to exercise its discretion in good faith, such that the utilities would receive the benefit of their bargain.

139. SMUD recognized that DOE is entitled to exercise its discretion in granting priority for shutdown reactors.

a. In a 1991 memorandum from Ms. Bowser to Mr. Shetler, Ms. Bowser projected DOE's acceptance of SMUD's SNF, and assumed that "no preferential treatment is given SMUD regarding their position in the acceptance queue." DX 249.

b. Similarly, in August 1993, Mr. Shetler wrote a letter to Mr. Ferreira stating that "the likelihood of DOE agreeing to [the request for shutdown priority] is very doubtful," in part because "the pressure will be on DOE to move spent fuel out of operating plants before they deal with prematurely shutdown plants on any kind of expedited basis." DX 425, at SMUD 0027391.

c. When SMUD ultimately requested that DOE grant it priority acceptance in 1991, SMUD recognized that "DOE has not determined whether or not such priority will be accorded to shutdown reactors, or if priority is granted, under what circumstances." PX 211.

RESPONSE: SMUD objects to the government's proposed finding of fact.

In the 1991 Memorandum referenced above, Ms. Bowser included a projected DOE acceptance schedule based on DOE's representations at the time. Ms. Bowser included both a best case scenario (final pickup by 2006) and a worst case scenario (delayed pickup until 2025). *See* DX 249. The memorandum was based on the data in the Annual Capacity Report, which laid out DOE's current acceptance schedule as of 1991. This data did not include an adjustment for shutdown priority, and thus Ms. Bowser's report likewise did not include this factor in her analysis. There is no basis for construing the assumption in her analysis as a representation of SMUD's belief or intent regarding the shutdown priority provision.

This memorandum, and the other documents referenced above, reflect what was happening in the breach world, and thus reflect the possibility of using the shutdown priority provision *in the breach world*. In his 1993 memorandum to Mr. Fassler, Mr. Shetler stated

> In looking at these scenarios it is obvious that the cheapest for the District is to get the spent fuel out of our hands and into DOE's as soon as possible. Some other prematurely shutdown plants are pushing DOE on this very point. However, the likelihood of DOE agreeing to this request is very doubtful. *First, there probably will not be any facility to which the spent fuel can be sent in the near future.* Second, even if there was a facility, the pressure will be on DOE to move spent fuel out of operating plants before they deal with prematurely shutdown plants on any kind of expedited basis.

DX 425 at 2. These documents need to be considered in light of the circumstances when they were created. DOE had already announced that the repository would be delayed until at least 2010. PX 169 at vii (noting a "significant slip for the expected start of repository operations – from the year 2003 to approximately 2010"). Given the delays in the program, it is not surprising that shutdown priority, just like many other provisions in the Contract, was not being implemented.

Throughout the program, DOE has recognized that if it were performing at the 3000 ton rate for which it had planned, instead of the artificially constrained 900 ton rate, "the Department would have had the flexibility to address the issue of priority acceptance of spent nuclear fuel from permanently shutdown reactors." PX 418. Statements by DOE officials confirm that the shutdown priority provision was supported and would have been an option absent the breach. Susan Klein, the government's Rule 30(b)(6) witness on the role and purpose of the shutdown priority provision, testified that DOE "could have given" acceptance priority to shutdown reactors if the system were operating at 3000 tons. Designations Appendix (Dckt. #310) at 1861-62 (S. Klein); *see also id.* at 2031-32 (Morgan). Furthermore, former Director Barrett testified that he believed "it was in the nation's interests to support [shutdown utilities] who were trying to clean up their sites and return that real estate to useful societal purpose in that we should try to move the fuel off as quickly as we practically could, consistent with sound national policies." *Id.* at 386-87 (Barrett).

140. A large number of utilities have been opposed to priority for shutdown reactors, DX 215; PX 849, and DOE's contracting officer for the Standard Contract, Mr. Zabransky, explained at trial the reason for such opposition:

> [Priority for shutdown reactors] was being raised because, under the contract, DOE was permitted to grant priority to shutdown reactors, and amongst the utilities, there was a lot of discussion and concern about that because, for operating reactors, there was a concern that the only way for DOE to grant priority to the shutdown reactors was to short the operating reactors, since there's a finite amount of capacity and that since the contract also contained provisions that allowed utilities to exchange places in line with DOE approval, that if DOE started allocating capacity to shutdown reactors, that would render that part of the process not meaningful.
>
> So the shutdown, the operating reactors had an opinion, the shutdown reactors had an opinion that differed from them, and it was an issue that the group thought about.

Tr. 1625:12-1626:3 (Zabransky); Def. Counter-Designation of R. Milner, at Tr. 73:15-24 (5/8/02) (explaining that outcome of discussions between DOE and members of the industry was

that oldest fuel first priority should be utilized instead of priority for shutdown reactors); Def. Counter-Designation of R. Milner, at Tr. 206:10-13, Tr. 208:16-19 (5/8/02) ("Well, I think that the view held by a large number of utilities were that any priority afforded a shutdown reactor would aversely affect them," and this was true regardless of what the rate of acceptance was); Def. Counter-Designation of N. Slater, at Tr. 55:6-12 (4/21/99) (explaining that "[t]o afford priority to a shutdown reactor was to impede the ability of another utility to deliver. And the group was very divided in terms of whether a shutdown priority should be provided."); Def. Counter-Designation of L. Barrett, at Tr. 364:11-19 (5/15/02) (explaining that granting priority to a shutdown reactor would necessarily result in schedule impact to other utilities).

RESPONSE: SMUD objects to the government's proposed finding of fact. As in DPFOF ¶ 139, the government takes evidence from the breach world to argue that shutdown priority would not have been granted in the non-breach world. In the breach world, the reactions of utilities were influenced by the government's announced delay. If DOE were performing at the 3000 ton rate for which it had planned, instead of the artificially constrained 900 ton rate, "the Department would have had the flexibility to address the issue of priority acceptance of spent nuclear fuel from permanently shutdown reactors." PX 418. Such flexibility would have allowed DOE to address the needs of operating facilities while also accommodating shutdown reactors.

Ms. Supko commented on this flexibility at trial:

> There was no agreement between shutdown plants and operating plants regarding shutdown priority. However, if the system were up operating at a reasonable rate of acceptance, such that the operating plants were not having to add additional storage capacity at their sites, and given the flexibilities in the standard contract, if the operating utilities felt that the system was going to work, and it was working efficiently, there may have been the ability to have some efficiency such that there could have been, either through exchanges or shutdown priority, fuel moving from shutdown plants.

Tr. at 1510-11 (Supko).

Furthermore, to the extent some utilities did not believe shutdown facilities should get priority, this issue was resolved at the time of contracting. During the process of developing the Contract, DOE rejected requests by certain utilities to omit the priority acceptance provision, explaining "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to

be decommissioned after they finish generating electricity." 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983).

141. In May 1990 – eight years before the Government was obligated to begin the acceptance of SNF on an industry-wide basis – the Edison Electric Institute ("EEI"), a nuclear industry organization, expressed its disagreement with SMUD's view regarding the use of the priority provision. DX 1366. In a May 30, 1990 letter to the EEI/UWASTE steering committee, Steven Kraft, the director of Nuclear Waste and Transportation Activities for EEI stated:

> On March 30, the General Manager of the Sacramento Municipal Utility District wrote to Secretary Watkins. Since Rancho Seco has been shut down, SMUD has been investigating possible ways to reduce their expenditures and operations at the site. They are currently considering placing the fuel in dual purpose casks, and they are interested in DOE cooperation in a demonstration project. SMUD has also been working with their Representatives in Congress to obtain direction from DOE to carry out such a project.
>
> *EEI/UWASTE is very concerned about these efforts to gain special treatment for one reactor, and to provide priority to a shutdown reactor; the ACR Response Team reviewed the SMUD position and had no sympathy whatsoever for it. We will continue to express our position to DOE.*

DX 1366, at SMUD 0036648 (emphasis added).

RESPONSE: SMUD objects to the government's proposed finding of fact, and reasserts its response to DPFOF ¶ 140. The circumstances discussed in the above letter merely emphasize the impact of the government's announced delays and the overall failures of the program. In the non-breach world, SMUD and the rest of the industry would have left the fuel in the pools and awaited DOE's performance. The provisions of the contract, including the shutdown priority provision, would have governed and would have been utilized in a reasonable manner.

142. Ms. Supko admitted that the May 30, 1990 EEI/UWASTE letter was consistent with her recollection as to the view of operating utilities with respect to the priority provision of the Standard Contract in the early 1990s. Tr. 1513:22-25 (Supko).

RESPONSE: SMUD objects to the government's proposed finding based on completeness. Ms. Supko testified as follows:

> Q. Ms. Supko, is this consistent with your recollection as to the view of operating utilities with respect to the view of operating utilities with respect to priority in the 1990 time frame?
>
> A. It is, and in fact, within the next year or so, I did some analysis that looked at the issue of shutdown priority versus the use of a more reasonable acceptance rate, such as the 3000 metric ton acceptance rate, and found that, with a reasonable rate, everybody was helped, the shutdown plants and the operating plants.

Tr. at 1513-14 (Supko). If DOE were performing at the 3000 ton rate for which it had planned, instead of the artificially constrained 900 ton rate, "the Department would have had the flexibility to address the issue of priority acceptance of spent nuclear fuel from permanently shutdown reactors." PX 418. Such flexibility would have allowed DOE to address the needs of operating facilities while also accommodating shutdown reactors.

143. Ms. Supko expressed this identical view in a memorandum she wrote to the head of UWASTE in May 1992, in which she stated, "[i]t should be noted that while priority for decommissioned reactors would benefit those plants that have shutdown in the early 1990s . . ., by removing spent fuel from those sites at a faster rate than if no priority were granted, such a priority would increase the average time following decommissioning that spent fuel would remain stored at other plant sites on an industry-wide basis." DX 336, at NET0010333.

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. Ms. Supko testified at trial that if the system was operating at a 3000 MTU rate, there would be efficiencies in the system that could allow movement of fuel from shutdown plants:

> [I]f the system were up operating at reasonable rate of acceptance, such that the operating plants were not having to add additional storage capacity at their sites, and given the flexibilities in the standard contract, if the operating utilities felt that the system was going to work, and it was working efficiently, there may have been the ability to have some efficiency such that there could have been, either through exchanges or shutdown priority, fuel moving from shutdown plants.

Tr. at 1510-11 (Supko). Furthermore, at the time of contracting, DOE explained that "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." 48 Fed. Reg. 16,590, 16,593 (Apr. 18, 1983). DOE

expressly chose to include such a priority in order to prevent long periods of fuel storage at shutdown reactors.

144. SMUD failed to present any testimony or evidence concerning what effect the grant of priority in SNF acceptance would have in terms of DOE's acceptance of SMUD's SNF. Ms. Supko admitted at trial that she did not conduct any analysis to determine how much earlier SMUD would have had its SNF accepted by DOE had DOE granted such a request for priority. Tr. 1510:2-10 (Supko).

RESPONSE: SMUD objects to the government's proposed finding of fact. Contrary to the government's assertions, Ms. Supko testified regarding the ability of the industry to utilize the shutdown priority provision in the non-breach world and the impact on SMUD directly. Ms. Supko testified that

> If SMUD chose to utilize . . . the shutdown reactor priority provision, it is likely that spent fuel could have been removed from the Rancho Seco site earlier than the 2006 date determined using OFF acceptance priority. Had the DOE performed in 1998, there was a relatively small community of shutdown plants. The amount of spent fuel at those plants could potentially have been accommodated through the exchange and shutdown priority provisions of the Standard Contract in order to accommodate a timely decommissioning of the shutdown plants.
>
> If DOE had started acceptance of SNF in 1998 at the 3,000 MTU overall acceptance rate and if the industry had confidence that DOE would continue to perform, it is my opinion the system would have operated in an efficient manner, similar to how the uranium market behaves – when there is ample supply of uranium, uranium trading occurs regularly. . . . This additional flexibility could have accommodated the needs of plants that required a modest amount of additional storage after 1998 or the needs of shutdown nuclear power plants such as Rancho Seco.

E. Supko Written Direct at ¶ 107-08 (PX 1002). Ms. Supko further concluded that "[i]f SMUD were to take advantage of the 'exchange' provision or the shutdown reactor priority provision, the DOE would likely have accepted SMUD's SNF earlier than 2006." *Id.* at ¶ 13.

Ms. Supko did not determine when exactly SMUD would have had its fuel picked up, assuming application of the shutdown priority provision, because such information is not necessary to SMUD's claim. SMUD has presented evidence regarding the shutdown priority provision because, had DOE been performing, the provision would have provided additional incentive for

SMUD to leave its fuel in the pool and push for expedited acceptance from DOE pursuant to this provision.

### B. SMUD Failed To Establish That It Would Have Engaged In Exchanges Or How Such Exchanges Would Have Affected Its Acceptance Rights

145. SMUD failed to present at trial any witness or contemporaneous documents concerning SMUD's desire to engage in exchanges with other utilities in the DOE acceptance queue.

RESPONSE: SMUD objects to the government's proposed finding of fact. The fact that the exchange market never evolved is irrelevant, given that the evidence is drawn from the breach world. The reason that SMUD's documents do not reflect actual exchanges among utilities is that there was (and still is) nothing to exchange. DOE's breach has prevented the development of any market in exchanges. As Judge Merow concluded in *Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686, at *4 (Fed. Cl. June 28, 2004), "The breach prevented the very market the government assails as speculative – the lack of real market data on the sale of allocation slots for the storage of spent nuclear fuel. . . . There is no market data because the government's breach thwarted this possibility." As Ms. Supko testified, "[B]ecause no one has confidence in DOE performing, there's no need for anyone at this juncture to even talk about trading. It's premature." Tr. at 1518 (Supko).

In addition, in the non-breach world, the exchange provision would have provided additional incentive for SMUD to leave its fuel in the pool and push for expedited acceptance from DOE through the use of exchanges.

146. Although exchanges of approved delivery commitment schedules are permitted under the Standard Contract, such exchanges are expressly subject to DOE's approval:

> Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; *provided*, *however*, that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange *approved delivery commitment schedules* with parties to other contracts with DOE for disposal of SNF and/or HLW; *provided, however*, that DOE shall, in advance, *have the right to approve or disapprove, in its sole discretion, any such exchanges*. Not less than six (6) months prior to the delivery date specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after

> receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

DX 88, Art. V.E (emphasis in original and emphasis added).

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). Furthermore, while SMUD agrees that the government has correctly quoted the above provision of the Contract, SMUD objects to the government's suggestion that DOE had no obligation under the exchange provision. It is a fundamental tenet of contract law that the parties must abide by the contract terms in good faith. *City of Tacoma v. United States*, 31 F.3d 1130, 1132 (Fed. Cir. 1994) (noting "that a contract term which allows for future negotiation impliedly places an obligation on the parties to negotiate *in good faith*") (internal citations omitted); *King v. Navy*, 130 F.3d 1031, 1033-34 (Fed. Cir. 1997) (holding good faith required the agency to implement the provisions of the agreement in good faith so the petitioner could receive the full "benefit of her agreement"); *see also* Restatement § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). The Federal Circuit has held that this obligation "is no less required in contracts to which the Government is a party, than in any other commercial arrangement." *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988). Thus, DOE is under an obligation to exercise its discretion in good faith, such that the utilities would receive the benefit of their bargain.

Furthermore, the evidence establishes that DOE would have been reasonable in its approval of exchange requests in the non-breach world. Robert Morgan, the first Director of the SNF program, commented at the time of Contract formation that "this poses no great problem" and "we intend to be reasonable." PX 29 at Tab D; *see also* Designations Appendix (Dckt. #310) at 2032-33 (Morgan). As Daniel Dreyfus, another former Director of OCRWM, has stated, the exchange provision was included "to allow Purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department." PX 433. Had DOE performed, it is likely that utilities would have utilized the exchange provision in order to effectively reallocate acceptance allocations in accordance with industry needs. *See* E. Supko Written Direct at ¶¶ 47, 107 (PX 1002); I. Stuart Written Direct at ¶¶ 33-36 (PX 1001).

147. DOE does not have to approve exchanges of approved delivery commitment schedules, and may reject such proposed exchanges for many reasons. *See* Def. Counter-Designation R. Milner, at Tr. 435:16-436:5 (5/3/02) (explaining that, based upon DOE's preference to take older, cooler fuel, DOE potentially could reject request by utility in possession of 20-year-old fuel to exchange an approved DCS with a utility in possession of five-year-old

fuel); Def. Counter-Designation N. Slater, at Tr. 196:1-197:19 (4/21/99) (discussing factors for considering exchanges, including available acceptance capacity, the location of the two utilities who wish to engage in exchange, and transportation-related issues).

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). While the Contract gives DOE discretion to disapprove exchanges, DOE has an obligation under the Contract to execute the contract terms in a reasonable manner. *City of Tacoma v. United States*, 31 F.3d 1130, 1132 (Fed. Cir. 1994) (noting "that a contract term which allows for future negotiation impliedly places an obligation on the parties to negotiate *in good faith*") (internal citations omitted); *King v. Navy*, 130 F.3d 1031, 1033-34 (Fed. Cir. 1997) (holding good faith required the agency to implement the provisions of the agreement in good faith so the petitioner could receive the full "benefit of her agreement"); *see also* Restatement § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). Furthermore, as discussed in SMUD's response to DPFOF ¶ 146, DOE intended "to be reasonable" in its approval of exchanger. PX 29 at Tab D.

148. Although SMUD presented expert testimony from Ivan Stuart concerning exchanges, he admitted during cross-examination that he has never previously testified as an expert with respect to exchanges of SNF acceptance dates. Tr. 1419:8-13 (Stuart). Mr. Stuart acknowledged that he has never previously modeled a world where exchanges of SNF acceptance rights would occur, and did not endeavor to provide such a model in this case. Tr. 1420:4-11 (Stuart). Mr. Stuart testified that, although he reviewed depositions from SMUD employees in preparing his expert report, he found no mention or discussion of exchanges by any of these deponents. Tr. 1424:8-11 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Stuart has "more than 35 years of experience in the nuclear industry." I. Stuart Written Direct at ¶ 2 (PX 1001). Mr. Stuart worked at General Electric for over twenty-five years, where he managed two large nuclear facilities. *Id.* at Ex. A. He also spent ten years at NAC, where he was vice president of engineering and design, which included responsibility for design, testing and licensing casks and responsibility for a fleet of transportation casks. *Id.*; Tr. at 1366-67 (Stuart). Mr. Stuart's knowledge of and extensive experience in the industry qualify him to speak regarding exchanges. "The purpose of an expert witness is to assist the trier of fact to understand the evidence or to determine facts in issue. Such witnesses, due to their special skills,

knowledge, education and training, may testify in the form of opinion or otherwise." *Selvidge v. United States*, 160 F.R.D. 153, 154 (D. Kan. 1995).

Furthermore, to the extent the government points to a lack of reference to exchanges in SMUD's documents, the government's argument should be rejected. The reason that SMUD's documents do not reflect actual exchanges among utilities is that there was (and still is) nothing to exchange. DOE's breach has prevented the development of any market in exchanges. The fact that the exchange market never evolved is irrelevant, given that the evidence is drawn from the breach world. As Judge Merow concluded in *Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686, at *4 (Fed. Cl. June 28, 2004), "The breach prevented the very market the government assails as speculative − the lack of real market data on the sale of allocation slots for the storage of spent nuclear fuel. . . . There is no market data because the government's breach thwarted this possibility."

149. Although Mr. Stuart testified that he believed exchanges would work in a manner similar to the exchange of uranium, Mr. Stuart also admitted that: (1) he has never been qualified as an expert with respect to the propriety of uranium exchanges; (2) he did not perform any written analysis in reaching this conclusion; and (3) the basis for his conclusion were statements others at his former company, NAC, made, and he did not consult with those individuals when he prepared his direct testimony. Tr. 1420:25-1422:9 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Stuart is a nuclear expert who has expansive knowledge of and experience in the nuclear industry. I. Stuart Written Direct at ¶ 2, Ex. A. (PX 1001). Mr. Stuart has been actively involved in the industry for more than 35 years, during which he has worked closely with utilities and DOE. Tr. at 1447-48 (Stuart) His experience and knowledge provides the basis for his opinions in this case. Thus, his testimony is useful to the trier of fact and should be admitted. *See, e.g.*, *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1270 (Fed. Cir. 2005) (allowing consideration of government expert's testimony because it "shed light on the economics of finance and banking and thus helped explain why CalFed sold the ARMs following FIRREA's enactment").

150. Ms. Supko admitted at trial that she did not perform any analysis regarding the effect of exchanges on SMUD's fuel outdates. Tr. 1515:3-6 (Supko). Ms. Supko acknowledged that in modeling her "non-breach" acceptance scenario, she did not endeavor to model a "non-breach" exchanges market. Tr. 1521:5-8 (Supko). Ms. Supko admitted at trial that she did not endeavor to identify which utility would move down in the acceptance queue had SMUD engaged in exchanges. Tr. 1518:16-22 (Supko). Ms. Supko also acknowledged that she

conducted no written analysis in reaching her conclusion that the exchanges market for SNF would function in a similar manner to the uranium market. Tr. 1517:12-16 (Supko). Ms. Supko conceded at trial that she has never endeavored to perform an analysis to compare how the SNF and uranium exchanges markets would be similar or dissimilar. Tr. 1518:9-15 (Supko). Ms. Supko does not have a degree in economics and has never been qualified as an expert in market theory or market development. Tr. 1519:3-10 (Supko).

RESPONSE: SMUD objects to the government's proposed finding as misleading. Ms. Supko did not model an exchange market because such information is not a necessary component of SMUD's claim. SMUD has presented evidence regarding the exchange provision because, had DOE been performing, the provision would have played a role in SMUD's decision making in the non-breach world. The provision provides the opportunity for early disposal of fuel; thus, it would have provided additional incentive for SMUD to leave its fuel in the pool and push for expedited acceptance from DOE through the use of exchanges.

To the extent the government cites the fact Ms. Supko does not have a degree in economics, this fact is not determinative.[1] As she herself testified,

> Q. And just to be clear, you don't have a degree in economics, correct?
>
> A. I don't, but over my 20-year career in the nuclear industry, a significant amount of my work has involved economic analysis.
>
> * * *
>
> Q. And you agree that you have no experience in or expertise in predicting the economics of a particular market?
>
> A. No, I don't agree with that. My company, one of our primary products is nuclear fuel supply market projections, and that includes the front-end of the nuclear fuel cycle, as well as looking at the back-end of the nuclear fuel cycle in terms of spent fuel, storage casks, and what that market will look like.

[1] In fact, Mr. Hamal, the government's own proffered "damages expert," does not have a degree in economics. Tr. at 2831 (Hamal).

Q. Now, you said your company. Have you had specific involvement in that modeling?

A. Yes.

Tr. at 1519 (Supko). As Ms. Supko explained herself, she has extensive knowledge in the nuclear industry generally and specifically in the area of market analysis. Her opinions are based on this knowledge, and they should be considered by this Court.

**C. SMUD Failed To Establish That It Would Have Engaged In Transportation Campaigns**

151. The Standard Contract requires DOE to assign allocations to utilities based upon an oldest-fuel-first ("OFF") priority. DX 88, Art. IV.B.5(a). Oldest-fuel-first priority means that DOE will accept SNF from utilities based upon "the date of discharge of [SNF and/or HLW] from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance," subject to certain limited exceptions. *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). The Contract does not dictate that a strict oldest fuel first methodology be applied. PX 44, Art. VI.B.1. Rather, the Contract provides that the purchaser shall identify all of the SNF it "wishes to deliver to DOE." PX 44, Art. V.B.1. In the event that the delivery commitment schedules "require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate," then "the acceptance priority ranking will be utilized." *Id.*, Art. VI.B.1.

> Except as may be provided for in subparagraph (b) below [shutdown priority provision] and Article V.D [Emergency Deliveries] of this contract, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B [Delivery Commitment Schedules] and D [Emergency Deliveries] and E [Exchanges] of Article V.

*Id.*, Art. VI.B.1.a.

The 1990 ACR noted that "[t]he exact chronological order of deliveries within each year is not specified" because the dates "will be arranged to accommodate, to the extent possible, both the Purchasers' and DOE's operational requirements." PX 188 at 9. The 1990 ACR explained

that "DOE is currently examining how expanding the allocations period (e.g. to 18-36) would affect [the Waste Management System] operating efficiencies. . . . Summing allocations over a longer period could result in a reduction in the frequency of deliveries (*larger shipping campaigns*) when serving each Purchaser. DOE will keep Purchasers apprised of the results of this analysis." PX 188 at 10 (emphasis added). DOE officials have admitted that DOE is unlikely to adhere strictly to an oldest fuel first prioritization. *See, e.g.*, Tr. at 2046-47 (Pollog) (agreeing that DOE has looked at the concept of campaigns in the last five years and that it may be an efficient method of acceptance); PFF ¶ 569.

152. Transportation campaigns are not currently contemplated by the Standard Contract, and, in fact, are in contradiction to OFF principles contained in the Standard Contract. DX 88, Art. IV.B.5(a).

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). The Contract does not require "OFF principles." As Mr. Stuart testified, "the contract, as I understand it, doesn't specifically say Oldest Fuel First as we now talk about it, OFF . . . I mean, it doesn't say, 'OFF,' in there, . . . it says they're going to do it on an Oldest Fuel First concept." *Id.* at 1416 (Stuart).

While the Contract does not reference transportation campaigns specifically, it also does not disallow use of such campaigns. As Mr. Stuart testified, the provision of the Contract that references priority to "oldest fuel" does not necessarily require a strict "oldest fuel first" acceptance. Tr. at 1412-16 (Stuart). As discussed in SMUD's response to DPFOF ¶ 4 above, the process for ranking fuel based on date of discharge was included to provide a means of ordering disposal if Purchasers included more SNF in their DCSs than the total annual capacity for the facility. *See* PX 44, Art. VI.B.1.

Had DOE been performing, both DOE and utilities likely would have sought transportation campaigns, as they would have been efficient and beneficial for both DOE and utilities. *See* I. Stuart Written Direct at ¶ 35 (PX 1001); Tr. at 1941 (Zabransky). Such campaigns would be more efficient than applying an oldest fuel first methodology which, if applied literally, would result in DOE accepting less than full cask loads of SNF. Tr. at 1416-17 (Stuart). The 1990 ACR explained that "DOE is currently examining how expanding the allocations period (e.g. to 18-36) would affect [the Waste Management System] operating efficiencies. . . . Summing allocations over a longer period could result in a reduction in the frequency of deliveries (*larger shipping campaigns*) when serving each Purchaser. DOE will keep Purchasers apprised of the results of this analysis." PX 188 at 10 (emphasis added).

153. Mr. Stuart conceded at trial that he did not analyze the order in which transportation campaigns would have occurred in the non-breach world. Tr. 1401:11-25 (Stuart).

Further, the Standard Contract does not contain any provision related to transportation campaigns. Tr. 1400:3-18 (Stuart); Tr. 1676:4-7 (Zabransky).

a. Mr. Stuart agreed that acceptance rights under the Standard Contract are dictated by the oldest fuel first principle. Tr. 1411:22-1412:1 (Stuart). Yet Mr. Stuart conceded that, under his concept of a transportation campaign, if DOE accepted all of a utility's SNF in a single campaign, another utility would not have its oldest fuel accepted by DOE. Tr. 1418:23-1419:4 (Stuart).

b. Mr. Zabransky explained at trial that, although transportation campaigns potentially could be more efficient than accepting SNF on a strict oldest fuel first basis, no utility wanted to be placed later in the acceptance queue as a result of campaigns. Tr. 1677:20-1678:17 (Zabransky).

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). While the Contract does not reference transportation campaigns specifically, it also does not disallow use of such campaigns. As Mr. Stuart testified, the provision of the Contract that references priority to "oldest fuel" does not necessarily require a strict "oldest fuel first" acceptance. Tr. at 1412-16 (Stuart).

SMUD also objects to the government's characterization of Mr. Stuart's testimony. Mr. Stuart merely agreed that there is a provision in the Contract that is "referred to as OFF." *Id.* at 1411-12. He did *not* agree that acceptance rights under the Contract are *dictated* by the oldest fuel first principle, as the government contends. In fact, Mr. Stuart went on to state "the contract, as I understand it, doesn't specifically say Oldest Fuel First as we now talk about it, OFF . . . I mean, it doesn't say, 'OFF,' in there, . . . it says they're going to do it on an Oldest Fuel First concept." *Id.* at 1416.

Furthermore, the government misrepresents Mr. Stuart's testimony regarding the effect of a transportation campaign on other utilities. Mr. Stuart testified as follows:

> Q. So if you did a campaign at a single utility and took all of SMUD's fuel over the course of several years, you would not be taking another utility's oldest fuel?
>
> A. In that –

THE COURT: I think, under your question, it's not a campaign.

Mr. LO RE: It wouldn't be a campaign.

THE WITNESS: I'm loosing track of the question. Would you either say it again or rephrase it, please?

BY MR. LO RE:

Q. Sure, yeah. If you performed a campaign once you were [at] a single utility, and you took all of that utility's fuel?

A. Yes.

Q. There would be another utility that didn't have its oldest fuel taken?

A. That's very likely.

*Id*. at 1418-19. Mr. Stuart did not testify "under his concept of a transportation campaign," as the government states. Rather, in response to a hypothetical presented to him and the representation that it "wouldn't be a campaign," Mr. Stuart agreed that if DOE took all of a utility's fuel at one time, other utilities may not have their oldest fuel picked up.

Finally, the government cites Mr. Zabransky's testimony regarding utilities in the breach world. Given DOE's announced delays, the uncertainty of actual disposal, and the critical need for dry storage, it follows that utilities would not be willing to adjust their own schedules for the efficiency of the entire system. In the non-breach world, however, where disposal was certain, such a system would be desirable for both utilities and DOE. *See* PX 869 at 4-5 (describing how campaigns would function using actual allocations and noting that "[t]he net result is a tremendous savings of time and labor not only for the DOE but for each individual purchaser"); Tr. at 1941 (Zabransky) (noting that "campaigning does have an attraction both to the utilities and potentially to the Department" and that "it would be nice to be able to do that").

## VI. SMUD's Damages Claim Is Fatally Flawed

### A. SMUD Has Failed To Properly Mitigate Its Alleged Damages

#### 1. Had SMUD Left Its SNF In Its Wet Pool, It Would Have Incurred No Costs That Are Attributable To The Government's Breach

154. SMUD had other, significantly less costly options than the pursuit of dual-purpose dry storage. DPFOF ¶¶ 155-197.

RESPONSE: SMUD objects to the government's proposed finding of fact. Contrary to the government's arguments, the various alternatives that the government points to were not "significantly less costly."

Over the entire period of DOE's delay, wet pool storage likely would have been more expensive than dry storage. *See* Tr. at 1170-71 (Field) (noting savings of $4.2 million in wet pool costs in 2003 as a result of transfer to dry storage).

With regard to store-only, SMUD would not have been able to shut down the spent fuel pool, and thus SMUD would have faced the costs of a dry storage system *in addition to* the costs of wet storage. Tr. at 1540 (Supko) (explaining that SMUD would have had to maintain the pool with all of the associated expense); Tr. at 1393 (Stuart) (agreeing that a store-only system would be costly compared to a dual-purpose system because the wet pool would have to remain open); Tr. at 195-96 (Shetler).

As for dual-purpose systems, SMUD choose the cheapest bid when it selected Pacific Nuclear. The NAC cask was bid considerably higher than the Pacific Nuclear system. *See* DX 35. Furthermore, like the Pacific Nuclear bid, the NAC bid only included the cost of designing and licensing the transportation casks. SMUD would still have incurred additional costs, including internal labor costs and the costs of building the ISFSI, to name a few. *See* Tr. at 1389 (Stuart).

The dry transfer system is speculative as far as function and cost, given that no "dry transfer" system has ever been licensed for use in the United States. I. Stuart Written Direct at 7 (PX 1001).

Finally, SMUD notes that it need not pursue the least cost option. The Federal Circuit in *Home Savings of America v. United States*, 399 F.3d 1341, 1352-53 (Fed. Cir. 2005), rejected the argument that mitigation must be at the least cost and made clear that the test for evaluating mitigation efforts is whether such actions were "reasonable" under the circumstances. The Restatement also explains that even "failed" mitigation, which is obviously not the "least cost" to the defendant in hindsight, is recoverable so long as it was reasonable. *See* Restatement § 350.

155. Mr. Shetler testified at trial that, from a technical basis, SMUD could have left its SNF in its wet pool. Tr. 265:7-10 (Shetler).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

156. SMUD's own expert, Ivan Stuart, agreed that SNF can be stored safely in wet storage over extended periods of time. Direct Testimony of Ivan Stuart, at ¶ 22.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

157. Mr. Shetler admitted at trial that the number of fuel assemblies in the pool does not dictate the amount of operations and maintenance costs. Tr. 333:13-20 (Shetler). That is,

because the amount of necessary operation and maintenance work does not vary depending upon the amount of SNF being stored, SMUD would incur the same operation and maintenance costs regardless of whether it possesses one fuel assembly or 500 fuel assemblies.

RESPONSE: SMUD objects to the government's proposed finding of fact. While SMUD does not disagree that the amount of fuel does not necessarily dictate the amount of operation and maintenance costs, DOE has presented no evidence of what it would cost for a pool with one fuel assembly.

158. SMUD is responsible for its operation and maintenance costs until the last acceptance by DOE in the non-breach world. DX 88, Art. VII ("DOE shall be solely responsible for control of all materials upon passage of title.")

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). In the non-breach world, SMUD would have left its fuel in the pool and sought prompt acceptance by DOE. SMUD agrees that, in the non-breach world, it would have been responsible for the operation and maintenance costs *of its wet pool* until the fuel was removed from Rancho Seco.

159. Had SMUD left its SNF in its wet pool, it would have avoided the substantial capital costs it incurred in pursuing dual-purpose dry storage, and it would have maintained the same level of operation and maintenance through the last acceptance of its SNF by DOE. Tr. 333:13-20 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. Had SMUD left the fuel in the pool, it would have avoided the capital costs it incurred in pursuing dual-purpose dry storage, but it would have incurred the higher operation and maintenance costs for wet storage during the lengthy period of DOE's delay.

### 2. Because The Government Is Obligated To Provide Transportation Casks Under The Standard Contract, SMUD's Pursuit Of Casks That Contain Transportation Features Cannot Constitute Proper Mitigation

160. The Standard Contract provides that DOE is responsible for providing transportation casks to the utilities for the acceptance of SNF:

> DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility.

DX 88, Art. IV.B.2.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

161. In the early 1990s, storage-only casks were being used by other utilities.

Tr. 265:11-14 (Shetler).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

162. SMUD was one of the first utilities to pursue dual-purpose dry storage.

Tr. 265:15-17 (Shetler).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

163. SMUD's own expert, Ms. Supko, agreed at trial that, in both the non-breach and breach worlds, DOE is obligated to provide transportation casks to utilities. Tr. 1540:5-13 (Supko).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

164. At her deposition, Ms. Bowser explained why SMUD decided to pursue casks that had transportation features despite the fact that DOE was obligated under the Standard Contract to provide transportation casks:

> The reason that we were . . . pursuing the investigation of alternatives on transportable systems was to eliminate as many road blocks as possible towards DOE not fulfilling its obligation to remove fuel.
>
> Certainly through the demonstration program we saw earlier, we though that would be a useful contribution to DOE's ability to move forward.

Def. Counter-Designation of R. Bowser, at Tr. 228:10-22 (916/2004).

RESPONSE: SMUD agrees that the government has accurately quoted a portion of Ms. Bowser's deposition. SMUD notes, however, that it did not pursue a fleet of dual-purpose casks.

It *was* considering doing so in 1991, when Ms. Bowser left her employment with SMUD. However, SMUD ultimately chose not to purchase an entire fleet of dual-purpose casks. Rather, SMUD pursed development of dual-purpose canisters and a single cask to move the fuel from the pool to the ISFSI. SMUD then utilized less expensive concrete storage modules to store the canisters during the period of DOE's delay.

SMUD also notes that Ms. Bowser's testimony supports SMUD's case. The government's announced delays and program failures were the reason SMUD decided to pursue a dual purpose dry storage system. By utilizing dual-purpose canisters rather than store-only canisters, SMUD was able to shut down the spent fuel pool and recognize significant cost savings associated with wet pool storage for the period of DOE's lengthy delay. SMUD was also able to keep its options open with regard to possible acceptance by DOE. *See* PX 176 at 64-65. DOE did not have a transportation program in place, *see* PX 380, making acceptance of fuel difficult even if an alternative storage site was located prior to 2010. As Ms. Bowser testified, SMUD believed that including a transportation element in its dry storage program would keep its options open for the possibility of DOE performance and potentially assist in getting DOE to accept SMUD's fuel earlier than 2010. Ms. Bowser's statements merely reflect the impact of DOE's delay on SMUD's decision making and the importance to SMUD of having its fuel accepted by DOE as soon as possible.

165. Jerry Burford, the Government's technical expert, developed a methodology for extracting transportation-related costs from SMUD's damages claim. Direct Testimony of Jerry Burford, at ¶¶ 64-75. In conjunction with the Government's damages expert and accountant, Stephen Kiraly, the Government determined that the total costs associated with the transportation-related aspects of SMUD's dry storage system totaled $17,038,533. Direct Testimony of Stephen Kiraly, at ¶¶ 76-81 & Att. 10.

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact because it is unsupported by the evidence in this case.

Mr. Burford states that he "identified the transportation related cost categories," J. Burford Written Direct at ¶ 71, yet Mr. Burford admitted he has "never been involved in designing a dual-purpose cask or canister" or "purchasing a dual-purpose cask or canister." Tr. at 2554-55 (Burford). Furthermore, Mr. Burford agreed that he "didn't actually calculate the costs that [he believes] ought to be removed from SMUD's damages claim as related to part 71 transportation." *Id.* at 2564.

Mr. Kiraly, who has no experience in the nuclear field, calculated the government's deduction for the transportation aspect of the dual-purpose system. *See* S. Kiraly Written Direct at ¶¶ 76-81. Mr. Burford, the only government expert with any nuclear background, stated he "played no role in compiling the number" for the transportation-related deduction and has no

opinion regarding "whether this is the right number or wrong number" as to the costs necessary to build the transportation component of SMUD's system. Tr. at 2571 (Burford).

The government's analysis provides no basis for concluding that the government's deduction for the transportation component is accurate, or that such an amount should be deducted from SMUD's claim at all.

### 3. SMUD Could Have Pursued A Dry Transfer System, Which Would Have Allowed SMUD To Abandon Its Wet Pool And Pursue Store-Only Dry Storage

166. On March 30, 1990, having decided to pursue a strategy to place its SNF in a dual-purpose cask, SMUD sought DOE's assistance in licensing its dual-purpose casks by proposing a joint demonstration project. DX 164, at SMUD 0029491; DX 165, at SMP 0680004; DX 160, at SMUD 085618.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD did not decide to "place its SNF in a dual-purpose cask," and in fact, did not do so. Although SMUD considered using dual-purpose casks, ultimately SMUD chose not to purchase an entire fleet of dual-purpose casks. Rather, SMUD pursued development of dual-purpose canisters and a single cask to move the fuel from the pool to the ISFSI. SMUD did seek DOE's assistance in development of its dual-purpose system and proposed a joint demonstration project with DOE that eventually culminated in the signing of the Cooperative Agreement in 1994.

167. In addition to seeking assistance from DOE, SMUD lobbied Congress as well. After SMUD officials met with Congressman Fazio, the House Appropriations Committee recommended an appropriation of $3 million for DOE to engage in a demonstration project "in cooperation with a west coast utility which has a nuclear reactor permanently shut down due to a citizen's initiative." DX 254, at SMUD 0018606; DX 175, at SMUD 0018539; H.R. Rep. No. 101-536, at 78 (1990).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

168. Rather than simply appropriating funds, as SMUD had requested, the Conference Committee directed DOE to "develop a plan" to implement a cooperative research, development,

and demonstration project. H.R. Conf. Rep. No. 101-889, at 54 (1990); Tr. 2238:18-2239:16, Tr. 2241:5-2242:19, Tr. 2243:6-2244:25 (Williams).

RESPONSE: SMUD objects to the proposed finding of fact. SMUD sought to enter into a cooperative agreement with DOE wherein SMUD and DOE would jointly sponsor the development of a dual purpose transportation system. Congress directed DOE to "develop a plan" for the previously described project and appropriated the necessary funds for the program. A plan was developed that included the development of a transportable storage system. *See* PX 371.

169. In its efforts to develop a plan, DOE invited representatives from the National Academy of Sciences, the Electric Power Research Institute ("EPRI"), the National Association of Regulatory Utility Commissioners, and the Edison Electric Institute, as well as SMUD, to provide input. DX 254; Tr. 2245:4-2246:22 (Williams).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

170. SMUD proposed a project in which three casks would be purchased by DOE, loaded with SMUD's SNF, and stored until DOE assumed responsibility for the casks as well at the SNF within them. DX 254, at SMUD 0018610. The proposal that DOE submitted to Congress was considerably different from the one that SMUD advocated. The primary feature of DOE's proposal was the construction of a dry transfer system "capable of transferring fuel assemblies from the [spent fuel] pool to a [transportable storage cask] or other storage cask and from one [transportable storage cask] to another or from a storage-only cask to a transport-only cask . . . ." DX 254, at SMUD 0018613; Tr. 2246:24-2252:6 (Williams). While the successful vendor of the dry transfer system would provide the necessary documentation to "facilitate NRC approval of its use at the Rancho Seco site," DOE was to provide funding for the dry transfer system which, upon completion of the demonstration program, would be placed in safe storage for use at Rancho Seco. DX 254, at SMUD 0018613.

RESPONSE: SMUD objects to the government's proposed finding of fact. In fact, the proposal DOE submitted to Congress summarized the project as follows: "This plan, prepared in

response to a congressional request, presents information on a possible cooperative research, development and demonstration project of *spent nuclear fuel dual purpose (storage and transportation) casks* and a dry transfer system." DX 254. Despite the government's attempts to focus solely on the dry transfer system, an equally important goal of the plan submitted to Congress was the development of a dual-purpose system. *Id.*

171. It was noted that EPRI had already obtained a conceptual design for the dry transfer system. DX 254, at SMUD 0018612.

RESPONSE: SMUD objects to the government's finding of fact because it misstates the evidence. The exhibit cited by the government actually states EPRI has provided funding to Transnuclear, Inc. "*to develop* a conceptual dry transfer system design." DX 254 at SMUD 0018612 (emphasis added).

172. Congress funded DOE's plan beginning with fiscal year 1992 appropriations. S. Rep. No. 102-80, at 99 (1991); H.R. Rep. No. 102-75, at 79, 80 (1991); H.R. Rep. No. 102-177, at 67 (1991); Tr. 2258:25-2262:10 (Williams).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

173. While developing the design for dry transfer system in conjunction with EPRI, DOE sent SMUD a solicitation on December 3, 1992. DX 1351; Tr. 2262:14-2263:25 (Williams). The solicitation expressly stated that the first objective of the demonstration project, "in order of importance" was:

> To demonstrate an NRC-licensed system for the dry transfer of spent nuclear fuel between 1) the pool and a dry spent fuel [transportable storage system] and 2) between two dry spent fuel [transportable storage system] transport units (licensed for long term storage followed by transportation). Meeting this objective will demonstrate the ability to recover from an off-normal occurrence at an ISFSI with and without the use of a reactor's spent fuel storage pool, may eliminate the need to maintain a reactor pool for recovery from off-normal occurrences at an ISFSI, and will allow the use of a [dry transfer system] to transfer fuel from dry storage casks to transportation casks without the use of a reactor pool.

DX 1351, at HQR3100767.

RESPONSE: SMUD objects to the government's proposed finding of fact. The program objective of the demonstration program quoted above explains that the goal was to demonstrate a dry transfer of SNF between the pool and a transportable storage system and between two dry spent fuel transportable storage systems. This object necessarily requires that two transportable storage casks be *completed* before a dry transfer between them can be demonstrated. *See* DX 1351, at HQR3100767. Thus, the design, licensing, and completion of the dual purpose storage system was necessary before any demonstration of the dry transfer system could be accomplished.

174. SMUD submitted a nonresponsive proposal to the solicitation suggesting, among other things, that the demonstration use dummy fuel assemblies instead of SNF and that the project deal with issues related to DOE's acceptance of failed fuel and multi-element sealed canisters ("MESCs"). DX 399; Tr. 2268:1-2273:6 (Williams).

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD submitted a seventy-five page response to DOE's solicitation. *See* DX 399. As DOE itself noted, "SMUD was generally responsive to elements of the Congressional Plan and SCAP which will benefit the District." DX 414. To the extent SMUD proposed the use of a cold demonstration, rather than a hot demonstration using actual spent nuclear fuel, SMUD's position has been justified by subsequent events. *See* Tr. at 2293, 2296-97 (Williams).

SMUD proposed the use of a cold demonstration because of the dangers associated with the dry transfer of spent nuclear fuel. The significance of this point cannot be understated; it is precisely because of the potential risks and danger to workers from handling fuel "dry" – as opposed to underwater in the wet pool where it is typically handled because of the shielding provided by the water, Tr. at 138 (Shelter) – that no utility (and not even DOE) has used the "dry transfer" system to actually move spent nuclear fuel. *See* Tr. at 2293, 2296-97 (Williams); PFF ¶¶ 365, 370. Although DOE has submitted a topical safety report for developing a dry transfer system, DX 653, neither DOE or any other utility has volunteered to demonstrate such a system. In fact, DOE official David Langstaff testified that, to the extent DOE wanted to do a "hot" demonstration, it was "very early in the discussions before anybody really understood what comprised a dry transfer system and what costs were associated with constructing one." Langstaff Designations (Dckt. #289) at 103-05.

175. DOE agreed to perform a demonstration of the dry transfer system using dummy fuel assemblies, but refused to change the scope of the project to deal with the failed fuel and MESC issues. DX 414.

RESPONSE: SMUD objects to the government's proposed finding of fact. DOE never performed a demonstration of a dry transfer system under the Cooperative Agreement because DOE refused to provide the necessary funding, and the parties agreed to mutually terminate the Cooperative Agreement. The fact that the parties did not expand the Cooperative Agreement

beyond its original parameters, especially given the congressional funding available and the ultimate termination of the Cooperative Agreement, is irrelevant.

176. In the cooperative agreement signed at the end of 1994, SMUD agreed that the first objective of the demonstration project "in order of precedence" was:

> A. to facilitate the demonstration of an NRC-licensable system for the dry transfer of spent fuel between two TSSs (systems licensed for long term storage followed by transportation). Meeting this objective will provide a demonstration of the ability to recover from an off-normal occurrence at an ISFSI without the use of a reactor's spent fuel storage pool and associated fuel handling system. The demonstration may eliminate the need to maintain a reactor pool for recovery from off-normal occurrences at an ISFSI and will allow the use of a DTS to transfer fuel from dry storage systems to transportation casks without the use of a reactor pool.

DX 1328, at HQR3100004-05; Tr. 2275:4-2278:1 (Williams).

RESPONSE: SMUD agrees that the government has accurately quoted a portion of the Cooperative Agreement. The government has, however, omitted additional objects of the Cooperative Agreement:

> B. to share in and benefit from the licensing experience for the [transportable storage system]. It is especially important to identify license-related requirements for maintaining the capability to ship loaded spent fuel after long-term spent fuel storage.
>
> C. to demonstrate an NRC-licensed store-now/transport-later system.
>
> D. to gain insight into the regulatory process for licensing a spent fuel dry storage facility including preparation of National Environmental Policy Act (NEPA) documentation and NRC License Application for the Rancho Seco Independent Spent Fuel Storage Installation (ISFSI).
>
> E. to obtain pricing information for a [transportable storage system] and a [dry transfer system].

DX 1328 at 3-4. In addition, when DOE refused to fund the additional cost of the second cask and failed to initiate Phase II of the Cooperative Agreement, the parties agreed to mutually terminate the Cooperative Agreement.

177. The project was to proceed in two phases, with Phase I consisting of activities associated with the procurement of two dual-purpose casks and Phase II involving the procurement of a dry transfer system and using that system to demonstrate the transfer of spent fuel from one cask to another. DX 1328, at HQR31000004.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

178. Although DOE's commitment for the acquisition of dual-purpose casks in Phase I was limited to $2 million, DOE was responsible for the "full cost" of the dry transfer system in Phase II. DX 1328, at HQR3100008, HQR3100091; Tr. 2353:21-25 (Williams).

RESPONSE: SMUD objects to the government's proposed finding of fact. The first phase of the Cooperative Agreement was to be the development of two transportation casks – one to be paid for by DOE, and one to be paid for by SMUD. SMUD would use its cask to transport its fuel from the pool to the ISFSI. DOE's funding ability was set at $2 million, but SMUD was not obligated to pay more than $2 million for completion of DOE's cask. *See* "Limitation of Funds" Provision, PX 371 at 61 (paragraph F(2)). DOE refused to make sufficient funds available to even complete its cask, after SMUD invoked the "Limitation of Funds" provision in the Cooperative Agreement. *See* PX 655, 648.

In addition, SMUD notes that Phase II was to be "initiated at the discretion of the DOE" and was "contingent on the availability of funds." DX 1328, at HQR3100008. DOE never exercised its discretion to initiate Phase II of the Cooperative Agreement. Tr. at 2295 (Williams). *See* PX 655, 648.

179. On September 25, 1996, after experiencing delays in the fabrication of the dual-purpose casks that were to be used for the demonstration project, SMUD requested that DOE amend the cooperative agreement to commit an additional $500,000 to complete the fabrication of the second dual-purpose cask. DX 647. SMUD claimed it was under no obligation to continue work without additional funds, and SMUD threatened that "the delivery of the DOE cask [was] at risk." DX 647; DX 650. DOE denied SMUD's request for additional funds. DX 650.

RESPONSE: SMUD objects to the government's proposed finding of fact. The Cooperative Agreement included a "Limitation of Funds" provision, which provided that

> The Participant [SMUD] is not obligated to continue performance under this Cooperative Agreement . . . or otherwise incur costs in excess of (i) the amount then allotted to the Cooperative Agreement by the Government or, (ii) if this is a cost-sharing cooperative agreement, the amount then allotted by the Government to the Cooperative Agreement plus the Participant's corresponding share . . . .

PX 371 at 61 (paragraph F(2)). In accordance with this provision, SMUD notified DOE that fabrication of the cask would exceed the original $2 million appropriated for the DOE cask. PX 471. Because DOE would not provide the necessary funds to complete the second transportable cask under development, DOE and SMUD "agreed that close out of the Cooperative Agreement was the most prudent course of action." PX 655 at 3. The parties negotiated a termination of the Cooperative Agreement "under mutually acceptable terms." PX 602; *see also* PX 655, 648. DOE agreed that SMUD's licensing of the transportation cask was "a key deliverable" of the Cooperative Agreement. PX 655 at 3.

180. Through 1997, SMUD continued to experience delays in fabricating its dual-purpose casks, particularly after its cask vendor declared bankruptcy. DX 719; DX 815; DX 820.

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. SMUD was only developing one cask for itself and 21 dual-purpose canisters. SMUD does not dispute that its primary vendor filed for bankruptcy or that its project experienced delays.

181. In the spring of 1998, SMUD admitted that it could not deliver a licensed, dual-purpose cask to DOE for the $2 million upon which the parties had agreed. DX 833.

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. SMUD did agree to deliver a licensed, transportable cask to DOE for $2 million. However, the Cooperative Agreement expressly provided that SMUD was not obligated to incur more than $2 million to complete DOE's cask. The "Limitation of Funds" provision provided as follows:

> The Participant [SMUD] is not obligated to continue performance under this Cooperative Agreement . . . or otherwise incur costs in excess of (i) the amount then allotted to the Cooperative Agreement by the Government or, (ii) if this is a cost-sharing cooperative agreement, the amount then allotted by the Government to the Cooperative Agreement plus the Participant's corresponding share . . . .

PX 371 at 61 (paragraph F(2)). When the cost of DOE's cask exceeded $2 million, SMUD notified DOE and requested additional funds. PX 471. DOE declined to contribute additional

funds, and the parties negotiated a termination of the Cooperative Agreement "under mutually acceptable terms." PX 602; *see also* PX 655, 648.

182. On September 30, 1998, DOE decided to negotiate a mutual termination of the cooperative agreement with SMUD. DX 882; Tr. 2286:10-2289:7 (Williams).

RESPONSE: SMUD does not object to the government's proposed finding of fact, but notes that it was the parties, not just DOE, that decided to negotiate a *mutual* termination.

183. In the meantime, DOE was proceeding with the process of developing the dry transfer system. DOE submitted a topical safety report, the initial submission in the licensing process, to the NRC on September 30, 1996. DX 653, at PNL1811319; Tr. 2280:16-2281:7 (Williams).

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. DOE itself has made only a tentative step toward the "development" of a "dry transfer" system by submitting a Topical Safety Analysis Report to the NRC in 1996. Tr. at 2280 (Williams), DX 653. In response to DOE's submission, however, the NRC noted the "inherent limitations such as no site-specific parameters, limited to one B&W fuel assembly design, no damaged fuel handling capabilities and limitations on the types of transfer casks and receiver casks that can be used," and concluded that "there was not enough information provided to allow a user to implement the DTS [Dry Transfer System] without a significant supplemental application." DX 1095 at vi; *accord id.* at App. A (listing some 200 items of additional information that would be required).

184. Because it was unable to do so at Rancho Seco, DOE built a dry transfer system and performed a demonstration of that system at its Idaho facility in 1998-1999. Tr. 2284:21-2285:19 (Williams).

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. To date, no "dry transfer" system has even been "hot tested" with actual spent nuclear fuel in the United States, let alone licensed by the NRC or used by a commercial utility or DOE. *See* Tr. at 2293, 2296-97 (Williams); PFF ¶¶ 365, 370. DOE conducted a demonstration of a dry transfer system using dummy fuel assemblies.

Furthermore, SMUD objects to the suggestion that SMUD prevented DOE from demonstrating a dry transfer at its site. DOE refused to contribute additional money to the project and never exercised its discretion to initiate Phase II (dry transfer) of the Cooperative Agreement. Tr. at 2295 (Williams). Indeed, Phase II did not proceed because DOE refused to make sufficient funds available to even complete Phase I. PX 655, 648.

185. On November 13, 2000, the NRC issued an assessment report in response to DOE's topical safety report and concluded that, although the dry transfer system had merit, it could not be licensed without information regarding the specific site where the dry transfer system would be used. DX 1095; Tr. 2280:10-15, Tr. 2354:4-2355:19 (Williams). DOE responded in September 2002 admitting that some information "can only be supplied by the applicant for a site-specific license." DX 1332, at 1.1-1.

RESPONSE: SMUD objects to the government's proposed finding of fact. The government has spent fuel at sites around the country and could have sought a license from the NRC (just as it will be seeking NRC licenses for construction and operation of the repository, *see* 42 U.S.C. § 10134(b)) and performed an actual hot demonstration at any of them. Furthermore, the government makes no effort to explain why it did not seek to demonstrate a dry transfer at any of the other 100 plus commercial reactors in the United States.

#### 4. Even If The Court Concludes That SMUD Acted Reasonably In The Pursuit Of Dual-Purpose Dry Storage, SMUD Chose A More Expensive Dual-Purpose System

186. Another less expensive dual-purpose dry storage option was available to SMUD when it sought bids to construct its dual-purpose dry storage system.

RESPONSE: SMUD objects to the government's finding of fact because it is unsupported by any evidence. In fact, the evidence illustrates that SMUD chose the least expensive of the five bids it received in 1992. *See* DX 35. Furthermore, SMUD repeatedly reevaluated and reanalyzed its long term options and always sought to pursue the most prudent option. *See* PFF ¶¶ 145-68.

187. SMUD's own expert, Ivan Stuart, worked for NAC International, a company that had already gone through the time and effort necessary for NRC review for its dual-purpose system. Tr. 1383:1-5 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. The NAC dual-purpose cask system was not licensed at the time it submitted its bid to SMUD. Tr. at 1383 (Stuart).

188. Mr. Stuart sought to sell its NAC-STC dual-purpose dry storage system to SMUD and, when SMUD rejected NAC's bid, he warned SMUD that there were higher risks in terms of

receiving a license for the NUHOMS system that SMUD ultimately pursued than had it pursued the NAC-STC system. Tr. 1382:2-13 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Stuart testified as follows:

> Q. Now, in 1992, you warned SMUD that they shouldn't purchase the NUHOMS system that they actually did purchase, correct?
>
> A. What I warned them, after they had advised me that they were not going to select the NAC system, was that there were higher risks, in my view, of the, being successful in getting the license for the system that they had selected, the NUHOMS system over the NAC system. It wasn't a case of zero risk in the one case and risk in another case. It was risk on both sides. But I felt that it was less risk if they had gone with the NAC cask.
>
> * * *
>
> Q. Now, you were of the belief, sir, that because the licensing issues associated with the NUHOMS system were so great, that in the long run, the NUHOMS system might actually cost more than the NAC STC system, correct?
>
> A. I don't believe it's correct to say that the, the risks were so great, it's just I knew the risks, or I thought I knew at the time the risks that Pacific Nuclear was going to face because we had just faced them, and that they would incur extra costs because of that.
>
> Q. And in fact, you were right about that, correct?
>
> A. Well, they did incur extra costs. I don't know the details of all of the contributions to that cost. Some of it may have been licensing. Some of it may be others. *However, as I look back on the decision, in my admonition to SMUD, I have to say they probably made the right decision actually*.

Tr. at 1382-84 (Stuart) (emphasis added). Mr. Stuart testified to the risks on both sides, and most importantly, stated he believed SMUD made the right decision in the end.

189. At the time of SMUD's award of the dry storage contract to Pacific Nuclear in 1992, Mr. Stuart believed that SMUD would incur extra costs in the pursuit of the NUHOMS system because the NUHOMS system was unlicensed. Tr. 1383:6-16 (Stuart).

RESPONSE: SMUD does not object to the government's proposed finding of fact. However, SMUD notes that Mr. Stuart did not state that he believed the NUHOMS system would become *as expensive or more expensive* than the NAC system. Mr. Stuart also recognized that the NAC system likely would have faced "those same kind of issues" as far as overrunning the initial cost estimates. Tr. at 1446 (Stuart).

190. In 1992 when SMUD was seeking bids for its dual-purpose dry storage system, Mr. Stuart believed that SMUD did not make the right decision in pursuing the NUHOMS system. Tr. 1383:17-1384:13 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. Mr. Stuart stated that he now, given hindsight, believes that SMUD "*probably made the right decision*." Tr. at 1383 (Stuart) (emphasis added). Regarding whether he believed that *in 1992*, Mr. Stuart stated he did not hold the same belief. *Id.* at 1383-84. Mr. Stuart explained, "I had spent several years designing and licensing that product, and I was responsible for selling it, and I was very much of the belief that in order to get through the NRC's pain and suffering, as I called it, you had to do certain things, and that the NUHOMS system would have to do it just like the NAC system had to do it." *Id*. at 1384.

191. The NAC-STC ultimately received its certificate for compliance for a Part 71 transportation license in 1994. Tr. 1385:1-4 (Stuart).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

192. Mr. Stuart testified that, had NAC had any customers for its NAC-STC, it could have been fully licensed as early as October 1994. Tr. 1386:13-22 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact because it misstates the evidence. Mr. Stuart actually testified as follows:

> Q. And, Mr. Stuart, you mentioned a moment ago to Judge Braden that the NRC had said to you, you're going to have to wait a little longer because you don't have customers. You were of the opinion that had NAC had customers, it would have actually received its certificate of compliance for a Part 71 license earlier than October of 1994, correct?

> A. Well, based on what the NRC had told me, I thought *if I had a customer*, at least *I would have an argument for proceeding*.

Tr. at 1386 (Stuart) (emphasis added). Mr. Stuart *did not* testify that the NAC-STC could have been fully licensed as early as October 1994.

193. Although Mr. Shetler and Mr. Redeker testified at trial that the NAC-STC would have had to have been relicensed or redesigned to hold SMUD's SNF, Tr. 198:3-8 (Shetler); Tr. 609:2-9 (Redeker), Mr. Stuart believed that it would be quite easy to have the NRC approve the NAC-STC for use with SMUD's SNF. Tr. 1388:2-8 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact because it misstates the evidence. Mr. Stuart's testimony only addresses the ease of getting NRC approval of the cask for SMUD's fuel. Tr. at 1388. Mr. Stuart's testimony did not address the difficulty SMUD would have incurred in redesigning the NAC cask to fit SMUD's fuel.

194. Mr. Stuart believed that, had SMUD chosen the NAC-STC, SMUD could have had all of its SNF fully loaded into dual-purpose dry storage by 1998. Tr. 1386:23-1387:6 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact because it misstates the evidence. Mr. Stuart actually testified as follows:

> Q. Now, if SMUD had chosen the NAC STC system, Mr. Stuart, it could have had all of its fuel loaded by 1998, correct?
>
> A. As we discussed at the deposition, yes, that's what I believed at the time because I thought the licensing issues for application of the cask to the SMUD fuel were not very weighty, and therefore, we could get the license and could load the fuel in a fairly short period of time.
>
> Q. Now, has that opinion changed, sir?
>
> A. No, the opinion hasn't, hasn't changed of what I thought at the time, but as I look back on it, some of the issues could have resulted in delays. At the time, I was telling SMUD that we essentially had the license, we could proceed, *but there were issues with the cask that could easily have caused the NRC to conclude otherwise.*

Tr. at 1386-87 (Stuart) (emphasis added).

195. NAC's fixed-price bid was for $38 million that did not contain any provisions for additional funding. Tr. 1388:19-24, Tr. 1459:24-1460:16 (Stuart). Mr. Stuart agreed that, had SMUD purchased the NAC-STC system and fully loaded its SNF by 1998, the NAC-STC system would have paid for itself in five to seven years after loading was completed. Tr. 1388:25-1389:25 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact because it misstates the evidence. Mr. Stuart testified as follows:

> Q. And if SMUD had purchased that system and loaded the fuel in 1998, you believe that the system could have paid for itself within five to seven years after loading, correct?
>
> A. As we discussed at the deposition, at your request, off the top of my head, I made an analysis that came to the conclusion you just said. It was not a very complete analysis, but it was a quick off the top of the head analysis. I didn't account for all of the costs, for example.
>
> Q. Do you have any reason to disagree with that analysis now, today, sir?
>
> A. *I know, for example, that it did not include any costs that SMUD might have.* It was just the question of the 38 million – we actually used the number 40 in the discussion, as I recall, and the estimate of time that it would take to pay that much money back, considering SMUD's estimate of their costs to continue to operate a pool and the cost if they were able to shut down the pool, and so I made the calculation that came to the results that you just stated.
>
> So I'm not disagreeing with it. *I'm only pointing out to you that it certainly wasn't a complete analysis*, and I thought we agreed at the time it was off the top of my head.

Tr. at 1388-89 (Stuart) (emphasis added). Thus, Mr. Stuart did not testify that the NAC-STC system would have paid for itself in five to seven years after loading was completed.

196. The NAC-STC system provided an additional significant benefit to SMUD. The NAC-STC system did not involve the use of canisters, but rather utilized a bolted cask system. Tr. 1390:8-16 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact. The fact that the NAC-STC system used a bolted cask system rather than canisters did not provide any "additional significant benefit" to SMUD. SMUD would have had to purchase 21 bolted lid casks, rather than the *one* cask SMUD purchased with the NUHOMS system. This difference is what made the NAC system much more expensive than the NUHOMS system. DOE official David Langstaff described the significant benefit of the NUHOMS system that SMUD chose:

> Having these – the new designs, especially the NUHOMS system, definitely had the potential to eventually reduce the cost and simplify handling of the spent fuel at the nuclear power plants. If you could have the dual-purpose cask, the canistered fuel, and the storage modules, be able to load the storage modules with – and only have one cask on site, that definitely is – the potential is there to reduce costs if you needed that additional storage.

Langstaff Designations (Dckt. #289) at 151-52.

To the extent the government suggests in this finding that the NAC-STC system would provide a significant benefit because it didn't involve the use of canisters, for which the government now asserts it has no responsibility, the government's argument is disingenuous, as discussed in detail in SMUD's response to DPFOF ¶ 197.

197. In fact, John Stobbs, the president of NAC, and Mr. Stuart's former boss, wrote a letter to General Manager Freeman shortly after SMUD awarded its contract to Pacific Nuclear, warning:

> Clearly the concept selected [by SMUD] is neither an accepted nor licensed technology. The DOE letter discusses the acceptability to DOE of the storage canister, known as MESC, of the type the Districts' staff has selected for its so-called dual purpose cask system. As you will note, the MESC is not acceptable to DOE for transportation off-site to the DOE spent fuel storage facility.

DX 365, at RS 005062.

RESPONSE: SMUD objects to the government's proposed finding of fact to the extent it suggests that the government would take a different position with regard to the acceptability of fuel in dual purpose casks versus dual purpose canisters. Mr. Stuart, who worked for NAC during this period and was in charge of licensing and selling the NAC system, testified he

specifically asked the government to consider fuel in the NAC cask as standard fuel under the Contract, "but as I pointed out to you, when I went to the Department of Energy to ask that question, *they said no*." Tr. at 1392 (Stuart) (emphasis added). Furthermore, DOE documents summing up DOE's position on acceptance of casks and canisters during this period make clear that DOE held an identical position regarding both dual-purpose casks and dual-purpose canisters. *See* PX 212 at 8-9.

**B. SMUD's Damages Claim Fails To Consider The Effect Of Multi-Element Sealed Canisters, Greater Than Class C Low Level Radioactive Waste, And Failed Fuel**

**1. Because SMUD Has Placed Its SNF Into MESCs, Which Currently Are Unacceptable Under The Standard Contract, The Costs That SMUD Has Incurred For Dry Storage Would Have Been Incurred Regardless Of The Timing Of The Government's Acceptance Of SMUD's SNF**

198. DOE repeatedly has informed SMUD that MESCs are unacceptable under the Standard Contract and that, consequently, absent a contract modification, SNF will have to be removed from SMUD's MESCs before DOE will accept SMUD's SNF. DX 1298; Tr. 1699:17-1700:9 (Zabransky); Def. Counter-Designation of N. Slater Thompson, at Tr. 153:15-21 (6/13/02) (explaining her understanding that, when she worked in DOE's waste acceptance division, MESCs were not considered a standard waste form).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government's current position that it has no obligation to dispose of SMUD's fuel given how it is currently stored is unsupported and results solely from DOE's attempt to avoid liability in this case. In fact, DOE endorsed the development of a dual-purpose dry storage system throughout the 1990s. *See* PFF ¶ 520,523-31; *see also* PX 591 (encouraging the use of dual-purpose canisters). SMUD placed its fuel in dual-purpose canisters only after receiving verbal and written assurance from the Acting Director of OCRWM, Lake Barrett, that DOE would accept its canistered fuel if the canisters were licensed by NRC. *See, e.g.*, PX 319 at 1-2; PX 320 at 1; PX 325 at 1; Tr. at 353, 438 (Shetler), PFF ¶¶ 512-19. DOE reiterated this position in a letter to SMUD in 2001, stating "the Department will initiate actions to include storage systems certified by the Commission for both transportation and storage (dual-purpose systems) as acceptable waste forms under the disposal contract with SMUD." PX 678. DOE's current position marks a change from its position throughout the 1990s that DOE would accept the fuel, and the only issue would be the classification of the fuel under the Contract. Finally, despite DOE's current litigation position, DOE has continuously anticipated the acceptance of such fuel in its transportation and repository planning. PX 665; PX 717 at vii; PX 722 at 4; PX 820 at 2-3; *see also* Tr. at 2075-2079 (Pollog); Tr. at 2185-86, 2188-89, 2193, 2209 (Kouts); *see also* PFF ¶¶ 538-51.

Finally, the government references Ms. Slater-Thompson's testimony regarding the acceptability of canistered fuel under the Contract. Ms. Slater-Thompson testified that, based on her recollection, canistered fuel was not "considered a *standard* waste form." Def. Counter-Designation of N. Slater-Thompson at Tr. 153 (6/13/02) (emphasis added). Ms. Slater-Thompson's testimony merely highlights the fact that the issue was not whether canistered fuel would be accepted under the Contract, but rather whether it would be classified as standard or non-standard fuel, such that the timing of acceptance would be impacted.

199. To date, no utility has sought a contract amendment to permit the acceptance of MESCs. Tr. 1736:5-1737:2 (Zabransky).

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD contacted DOE to provide notification that SMUD was transferring its fuel from the pool into dual-purpose canisters in January of 2001. In that letter, SMUD stated, "Based on previous correspondence . . . and *our timely request herein*, we understand that DOE will initiate actions to include the NUHOMS MP187 canisters as an acceptable waste form under the terms of the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR 961)." PX 670 (emphasis added). At that time, DOE responded that "the Department will initiate actions to include storage systems certified by the Commission for both transportation and storage (dual-purpose systems) as acceptable waste forms under the disposal contract with SMUD." PX 678; *see also* Tr. at 370 (Shetler) (noting SMUD has "sought repeatedly" to have DOE take actions necessary to accept fuel). Despite such representations, DOE has done nothing except to argue in this Court that it no longer has any obligation to dispose of SMUD's fuel.

200. Mr. Kiraly explained at trial that the cost of designing and building its ISFSI generally was a fixed cost that was not dependent upon the amount of SNF stored. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83. SMUD's own expert, Ms. Supko, agrees with this conclusion. Direct Testimony of Eileen Supko, at ¶ 125 (acknowledging that dry storage fixed costs include design, engineering, construction, licensing, quality assurance, operations, and equipment).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Kiraly is an accountant with no experience in the nuclear industry. He has no factual basis for such an opinion, and thus it is wholly speculative on his part. An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact." *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

To the extent the government relies on Ms. Supko's testimony, the government misrepresents her testimony. In Table 10, Ms. Supko included the dry storage cost estimates of

various other shutdown nuclear power plants. With regard to the costs included in this table, Ms. Supko stated:

> Dry storage facility costs include fixed costs associated with design, engineering, construction, licensing, quality assurance, operations, and equipment – these costs are typically independent of the amount of spent fuel stored. Costs for the dry storage canisters and overpacks, fabrication costs, and loading costs are variable costs that are dependent upon the amount of spent fuel stored. In addition, construction costs can vary by facility depending upon site conditions. Equipment costs and equipment upgrades will be dependent upon plant design and cask handling capability.

E. Supko Written Direct Testimony at ¶ 125 (PX 1002). She *did not* testify that the cost of designing and constructing an ISFSI is a fixed cost. Rather, she stated that while some costs are fixed, others are variable. Ms. Supko noted that the cost of the "overpacks," or modules, is dependent on the amount of spent fuel stored. *Id.* The size of the concrete pad and the fencing would also be variable costs.

201. Because SMUD's SNF is currently contained in unacceptable MESCs, SMUD would have incurred the cost of storage of its SNF regardless of the timing of the Government's performance. Therefore, the costs associated with designing and constructing SMUD's ISFSI should be removed from its damages claim.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence.").

Furthermore, the suggestion that SMUD would have transferred its fuel to "unacceptable MESCs" in 2001 and 2002 had DOE already been picking up fuel from utilities' spent fuel pools since 1998 is contradicted by all of the evidence in this case. SMUD transferred its fuel into canisters *because of* the government's announced delays and program failures. The Federal Circuit in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1375 (Fed. Cir. 2005) recognized that, as a result of the government's announcements, utilities were "placed in a position where they [were] required to find alternate storage for SNF." SMUD was thus under an obligation to mitigate its damages, and to do so through alternate storage, such as dry storage, to the extent reasonable. The government cannot use the result of its own breach – the fact that SMUD and the entire industry is required to seek alternative storage – to argue it no longer has any obligation to perform under the Contract. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

202. Consequently, Mr. Kiraly concluded that the cost associated with the design and construction of the ISFSI pad, $3,146,520, should be removed from SMUD's damages claim, because these costs would have been incurred regardless of the breach because of the presence of MESCs. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83 & Att. 11, 12.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence.").

While SMUD does not dispute that Mr. Kiraly reached this conclusion, SMUD does dispute Mr. Kiraly's basis for such an opinion. He is an accountant with no experience in the nuclear industry; thus, he is unqualified to form such an opinion. Furthermore, he offers no factual basis for such a conclusion, and thus such an opinion is wholly speculative and should be rejected by this Court. An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact." *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

Finally, as discussed in SMUD's response to DPFOF ¶ 201, such costs were incurred directly because of the breach, and thus they are appropriately included in SMUD's damages.

**2. Because DOE Is Not Responsible For The Acceptance Of GTCC Under The Standard Contract, The Cost SMUD Has Incurred For The Storage Of SNF Would Have Been Incurred Regardless Of The Timing Of DOE's Performance**

203. SMUD is in possession of 25,000 pounds of Greater Than Class C low level radioactive waste ("GTCC"). Tr. 145:17-20 (Shetler); Tr. 800:7-12 Tr. 803:12-21 (Redeker); DX 1365, at 3-1.1.

RESPONSE: SMUD objects to the government's proposed finding of fact. GTCC is high-level radioactive waste as defined in the Contract. *See* Pl. Response Br. at 96-101. SMUD agrees that it has activated metal on the inside of its reactor vessel that would constitute GTCC. That amount of GTCC, when removed, will fit into one canister that is being designed to store the GTCC.

204. SMUD has not paid any money to DOE pursuant to the Standard Contract for SMUD's GTCC. Tr. 299:3-7 (Shetler).

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982)

("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). Furthermore, SMUD objects to the government's proposed finding of fact to the extent it cites the testimony of Mr. Shetler to support its conclusion of law. Testimony is inadmissible with regard to legal conclusions. *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Mr. Shetler's testimony simply indicates that SMUD has not made separate payments for GTCC. SMUD has, however, made all payments required under the Contract.

Because GTCC constitutes HLW under the Contract, as discussed more fully in Pl. Response Br. at 96-101, payment for disposal is included in the 1 mil/kwh fee.

205. Mr. Redeker explained that he was unaware of any schedule for DOE to accept GTCC with SNF. Tr. 805:10-13 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. Mr. Redeker agreed that there "is no schedule for DOE to pick up GTCC with spent nuclear fuel." Tr. at 805 (Redeker). However, there is also no schedule for DOE to pick up *spent nuclear fuel*. At trial in *Indiana Michigan*, the government maintained that DOE would begin performance in 2010. *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 643-44 (2004). In contrast, in this case, the government has offered no evidence as to when it might begin or complete acceptance of SMUD's spent fuel in the real world. The government attempted to "resume" the failed DCS process in 2004, but quickly abandoned that process after recognizing that it could not meet even the 2010 date. *See* PX 780; PX 812.

Under the Contract, with regard to high-level radioactive waste, "[d]etailed acceptance criteria and general specifications for such waste will be issued by the DOE no later than the date on which DOE submits its license application to the Nuclear Regulatory Commission for the first disposal facility." PX 44, App. E. Given that DOE has not yet completed such a license, it follows that such a schedule for HLW disposal also has not been issued.

The fact that DOE has no schedule for disposal does not dictate whether DOE has such an obligation. "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery . . . ." Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264-65 (1946).

206. At trial, both Mr. Shetler and Mr. Redeker testified that SMUD intended to store its GTCC in SMUD's twenty-second HSM. Tr. 145:11-20 (Shetler); 693:17-22, Tr. 800:7-12 (Redeker). SMUD plans to place its GTCC low level radioactive waste into a single canister. Tr. 802:16-22 (Redeker); DX 1365. In addition, SMUD asserted at trial that its claim includes its entire ISFSI pad, which includes the 22nd HSM. Tr. 801:10-12 (Redeker).

RESPONSE: SMUD does not object to the government's proposed finding of fact. SMUD notes for clarification, however, that SMUD has not yet removed its GTCC from the reactor vessel, Tr. at 800 (Redeker), and thus has not yet incurred the costs of removal of the GTCC, loading, or fabrication of the GTCC canister. SMUD has included the cost of the twenty-second horizontal storage module, totaling $95,000, as this cost is not GTCC-related. *See* PFF ¶ 470. The twenty-second module is a necessary part of the ISFSI design that would have been included regardless of the future use of the module.

207. Because SMUD is responsible for the indefinite storage of its GTCC low level radioactive waste, it cannot pass to the Government those costs that it would have incurred regardless of DOE's delay in standard SNF acceptance. Direct Testimony of Stephen Kiraly, at ¶ 82. The $3,146,520 identified above for the design and construction of the ISFSI includes the deduction based upon the presence of GTCC low level radioactive waste. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83 & Att. 11, 12.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). As SMUD has argued extensively in its Response to the Government's Post-Trial Brief at 96-101, the definition of HLW in the Contract includes GTCC because GTCC constitutes "highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation." PX 44, Art. I.12 (emphasis added). In addition, it is undisputed that DOE has a statutory obligation to dispose of GTCC. *See* Low-Level Radioactive Waste Policy Amendments Act of 1985, Pub. L. No. 99-250, 99 Stat. 1842 (Jan. 15, 1986).

This issue of whether the Contract definition of HLW covers GTCC need not be addressed by the Court, however, because SMUD has not yet incurred GTCC-related damages for purposes of this case. Although SMUD plans to store its GTCC in its ISFSI to take advantage of the space, GTCC does not require storage in an ISFSI or special canister. Tr. at 693-95 (Redeker) (GTCC does not require security or cooling and can be stored on a long-term, interim basis "in some kind of shielded concrete container"); PFF ¶¶ 471-72. SMUD has several other options for disposal of GTCC, including storage in its radioactive waste storage building without a license from the NRC, Tr. at 694-95 (Redeker), or leaving the fuel in the reactor building under its current Part 50 license until it is removed for final disposal by DOE. *Id.* at 2610-11 (Burford). In the non-breach world, SMUD could have utilized any of these alternatives at a minimal cost had DOE refused to comply with its statutory and contractual obligations to dispose of GTCC.

Furthermore, the evidence establishes that DOE would have accepted and disposed of SMUD's GTCC waste along with the SMUD's spent fuel. Former Director Barrett testified that "[w]hen the extraneous legal matters are finally resolved my expectation is the greater-than-

Class C waste will go into the repository at the same time, contemporaneously, at the same time [as spent fuel]." Designations Appendix (Dckt. #310) at 392-93 (Barrett); *accord id.* at 394.

Finally, to the extent Mr. Kiraly asserts SMUD's ISFSI damages should be removed from SMUD's claim, Mr. Kiraly has no basis for such a conclusion. Mr. Kiraly is an accountant with no experience in the nuclear industry. He has no factual basis for such an opinion, and thus it is wholly speculative on his part. An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact." *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

### 3. Because SMUD Possesses Failed Fuel, Which It May Possess Indefinitely, SMUD Would Have Incurred The Cost Of SNF Storage Regardless Of The Timing Of The Government's Acceptance Of SMUD's Standard SNF

208. Article VI of the Standard Contract sets forth the criteria and acceptance procedures for different types of SNF, including providing the classification criteria that utilities are to use prior to shipping their SNF. DX 88, at SMUD 0020669; Tr. 1659:16-25 (Zabransky).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

209. The Standard Contract provides three broad classifications of fuel: (1) Standard Fuel; (2) Nonstandard Fuel; and (3) Failed Fuel. 10 C.F.R. § 961.11, App. E, ¶ A. The term "failed fuel" is defined as "SNF that meets the specifications set forth in subparagraphs 1 through 3 or paragraph B below, and which is classified as Failed Fuel Class F-1 through F-3 pursuant to subparagraph 6 of paragraph B below." *Id.* Class F-1 through F-3 are defined as follows:

Class F-1: Visual Failure or Damage
Class F-2: Radioactive "Leakage"
Class F-3: Encapsulated

DX 88, at SMUD 0020701.

RESPONSE: SMUD does not object to the government's proposed finding of fact. SMUD notes that the Contract contains definitions of Class F-1 and Class F-3 failed fuel, but does not contain a definition of Class F-2 failed fuel. *See* PX 44, App. E.

210. Further, the Standard Contract provides:

> Visual Inspection
>
> Assemblies shall be visually inspected for evidence of structural deformity or damage to cladding or spacers which may require special handling. Assemblies which [i] are structurally deformed or have damaged cladding to the extent that special handling may be required or [ii] for any reason cannot be handled with normal fuel handling equipment shall be classified as Failed Fuel – Class F-1.

DX 88, at SMUD 0020700.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

211. DOE's obligation to accept SNF extends to standard, nonstandard, and failed fuel, but the Standard Contract permits DOE to adjust the schedule for acceptance of both nonstandard and failed fuel if it sees issues with the "technical feasibility" of accepting such fuel on the schedule for acceptance of standard fuel:

> DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel; however, for any SNF which has been designated by the Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

DX 88, at Art. VI.A.2(b).

RESPONSE: SMUD agrees that the government correctly quotes the provisions of the Contract, but objects to the government's proposed finding of fact. There is no evidence to suggest that this provision was designed to allow DOE to delay pickup indefinitely as the government suggests, as opposed to simply insure communication between the parties to facilitate acceptance, as the provision provides. The Federal Circuit "has recognized that a contract term which allows for future negotiation impliedly places an obligation on the parties to negotiate *in good faith*." *City of Tacoma, Dept. of Public Utilities v. United States*, 31 F.3d 1130, 1132 (Fed. Cir. 1994) (internal citations omitted).

212. SMUD is in possession of F-2 failed fuel under the Standard Contract. Direct Testimony of Jerry Burford, at ¶ 27; Tr. 796:9-799:21 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding. Unlike F-1 and F-3 failed fuel, the Contract does not contain a definition of F-2 failed fuel. *See* PX 44, App. E. at B.6. F-2 failed fuel under the Contract is merely followed by the phrase "Radioactive 'Leakage.'" *Id.* at C.3. SMUD engaged in a detailed visual inspection of its fuel in 1996 and concluded that SMUD had no fuel assemblies that require special handling, or "0 failed assemblies." PX 470 at 1. This determination was reviewed by an independent company, Electric Power Research Institute ("EPRI"), which affirmed that SMUD had no fuel assemblies that require special handling. EPRI agreed that the nine assemblies were correctly categorized as F2, if not somewhat "conservatively," and also suggested one additional assembly should be classified F2. PX 489 at 2. Mr. Stuart also reviewed the videotapes and determined that "[n]one of the fuel assemblies exhibit any features that would require special handling as noted in the Standard Contract." I. Stuart Written Direct at ¶ 42 (PX 1001). Thus, three independent sources have agreed regarding the extent and nature of SMUD's damaged fuel assemblies.

213. At trial, SMUD presented the testimony of Ms. Supko and Mr. Stuart in an attempt to demonstrate that SMUD's failed fuel would be accepted on the same schedule as SMUD's standard fuel. Direct Testimony of Eileen Supko, at ¶¶ 21-22, 146-149; Direct Testimony of Ivan Stuart, at ¶ 42. Both Ms. Supko and Mr. Stuart concluded that, because SMUD's SNF does not require special handling, there is no basis to believe that DOE would not accept SMUD's failed fuel on the same schedule as SMUD's standard fuel. Direct Testimony of Eileen Supko, at ¶ 67; Direct Testimony of Ivan Stuart, at ¶ 42; Tr. 1395:24-1396:5 (Stuart) (stating that his definition of failed fuel under the Standard Contract hinge upon the concept of special handling).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

214. Ms. Supko testified that, based upon her reading of the Standard Contract, "technically feasible" should be equated with the concept that special handling of the SNF is not required. Tr. 1523:5-16, Tr. 1524:20-24 (Supko). However, Ms. Supko conceded at trial that there is no definition of the term "technical feasibility" contained in the Standard Contract. Tr. 1524:16-19 (Supko).

RESPONSE: SMUD objects to the government's proposed finding of fact. Ms. Supko testified as follows:

> [W]hat I state is that technical feasibility is that special handling isn't required, that the assembly can be handled like an individual fuel assembly, and that's based on many years of exchange between the industry and DOE, and in fact, the Nuclear Regulatory Commission allows spent fuel that is packaged similarly to an individual fuel assembly to be stored and transported just like regular intact spent fuel.
>
> * * *
>
> I consider some of these things to be technical issues. The issue of accepting other than standard fuel is a technical issue. It's a matter of understanding what the requirements might be to can the fuel, which is something SMUD has done. It's understanding the Nuclear Regulatory Commission's technical requirements for what they refer to as damaged fuel, failed fuel. I'm not making a legal interpretation of the contract, but I have worked with the Department of Energy over the years, and we actually developed draft language of what changes might be made to the contract.

Tr. at 1523-26 (Supko).

Ms. Supko has extensive experience regarding the technical issues of fuel disposal and the industry's treatment of failed fuel. As she states, these are technical issues where her knowledge as an expert will assist the trier of fact. Ms. Supko also has extensive knowledge on the issue gained from her role as a participant in technical exchanges between the nuclear industry and DOE starting in 1990 as part of the issue resolution process. Her knowledge and expertise will assist the Court in its determination of this matter, and thus her testimony is admissible under Federal Rule of Evidence 702.

215. Mr. Stuart conceded under cross-examination that the special handing requirement did not appear in the definition of F-2 failed fuel, but rather only referenced the definition for F-1 failed fuel. Tr. 1398:21-23 (Stuart). Mr. Stuart agreed that he did not know what criteria DOE applies in making the determination with respect to the technical feasibility of accepting failed SNF. Tr. 1459:11-14 (Stuart).

RESPONSE: SMUD objects to the government's proposed finding of fact. As noted in SMUD's response to DPFOF ¶ 212, unlike for F-1 and F-3 failed fuel, the Contract does not contain a definition of F-2 failed fuel. Thus, it is appropriate to look to other language in the Contract to evidence how F-2 failed fuel will be handled upon disposal.

Furthermore, Mr. Stuart testified regarding his extensive experience transporting shipments of DOE fuel. It is from this experience that he draws his opinions as an expert regarding how DOE may deal with the technical feasibility of accepting failed SNF in the future. Mr. Stuart's knowledge and expertise will assist the Court in its determination of this matter and is admissible under Federal Rule of Evidence 702.

216. Mr. Zabransky, the contracting officer of the Standard Contract, explained at trial the distinction between F-1 failed fuel and F-2 failed fuel:

> Well, F-1 fuels are fuels, again, where the idea is really more of a physically size or structural capability. F-2 fuels are leakage, so they may have no physical special handling, as far as needing a different tool, but they may have no structural deformities or structural integrity issues, but they may have holes in the cladding.

Tr. 1665:21-1666:6 (Zabransky).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Zabransky's testimony is irrelevant given the condition of SMUD's fuel. SMUD's fuel has been evaluated by three independent sources who have agreed that SMUD has "0 failed fuel" assemblies that require special handling. PX 470 at 1; PX 489 at 2; I. Stuart Written Direct at ¶ 42 (PX 1001). "The inspections showed that [n]one of the fuel pins examined has Gross Cladding Failures" and that "all the fuel pins are intact and the pellets are locked . . . in place." PX 470 at 2.

217. Mr. Zabransky further explained the distinction between technical feasibility and special handling under the Standard Contract:

> In my mind, they're related, but they're not the same. We often sometimes get sloppy and use them interchangeably, but in reality, special handling just sort of tells you, you need a special procedure or a special tool. Having known that, you would then have to look to see if you have the technical feasibility to do that. For instance, even though you may need a special tool, and you can get the special tool, you may not have the licensing room, the approval to use that tool in your facility without changing your license. So the technical feasibility would still have to get looked at. The special handling really is a discriminator, so when you do you do your visual inspection, you can classify it as F-1 or not, if it didn't require special handling, even though it may have certain damage to it, you could see a tear in the grid strap, you would never classify it as F-1.

Tr. 1667:17-1668:14 (Zabransky).

RESPONSE: SMUD objects to the government's proposed finding of fact. In fact, SMUD loaded all of the fuel into the canisters using normal equipment and without special handling. Tr. at 687 (Redeker); *see also* I. Stuart Written Direct at ¶ 42 (PX 1001) (noting no "special handling was required to move the assemblies from the pool into the canister"). All of SMUD's fuel assemblies "have been loaded into canisters, in each case occupying a cell in the canister basket like any other fuel assembly." *Id*. SMUD has illustrated that no special handling was required and that it was technically feasible to handle and transfer its fuel.

218. Mr. Zabransky explained that, unlike F-1 failed fuel, if a utility had F-2 failed fuel, DOE would have to ensure that it had the technical capabilities of disposing of it at DOE's facilities, that DOE's license would allow for such disposal, and that there were no health and safety issues associated with that particular F-2 failed fuel. Tr. 1668:23-1669:4 (Zabransky).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government relies solely on the testimony of Mr. Zabransky to raise a theoretical issue regarding the technical capabilities of disposing of failed fuel at DOE's eventual repository facilities, which have not yet been licensed and do not yet exist, *see* Tr. at 1665-68 (Zabransky), yet the government points to no documents or other evidence to support the assertion that failed fuel may be indefinitely stranded at all utility sites. Furthermore, Mr. Zabransky's statements are all hypothetical and vague, stating that "technical feasibility would still have to get looked at." Tr. at 1668.

In response to cross-examination, counsel for DOE objected that it is "pure speculation as to what's technically feasible and what's not" given that "the license application has not even been submitted yet." Tr. at 2062. To the extent the government's breach has created uncertainty regarding the technical details of fuel acceptance, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow*, 327 U.S. at 265.

219. Before DOE could make a determination that particular F-2 failed fuel would be accepted on the same schedule as standard SNF, DOE would have to know the specific type or amount of leakage that the fuel exhibits. Tr. 1669:7-8 (Zabransky). In addition, DOE would have to have a licensed facility so that it would know what conditions would exhibit. Tr. 1669:8-10 (Zabransky).

RESPONSE: SMUD objects to the government's proposed finding of fact. As SMUD notes in its response to DPFOF ¶ 218, the government relies solely on the testimony of Mr. Zabransky to raise a theoretical issue regarding the technical capabilities of disposing of failed fuel at DOE's eventual repository facilities, which have not yet been licensed and do not yet exist. The government points to no documents or other evidence to support the assertion that

failed fuel may be indefinitely stranded at all utility sites. What is not speculative is that DOE is obligated under the Contract to "accept title to *all* SNF and/or HLW," PX 44 at Art. IV.B.1 (emphasis added), and the government does not dispute that its disposal obligations extend to damaged and failed fuel. *See* Gov. Br. at 89.

220. If DOE determines that failed fuel requires special handling or for some other reasons is not technically feasible, its acceptance by DOE may be delayed, as permitted by the Standard Contract. Mr. Zabransky also explained at trial the consequence if the disposal of a utility's SNF is determined to be not technically feasible. He stated that DOE would contact the contract holder as to what schedule change is needed to give DOE time to make disposal of the fuel technically feasible. Tr. 1670:15-20 (Zabransky). Mr. Zabransky explained, "[i]n other words, if it wasn't technically possible, we'd have to take some more time and do what was necessary to make it technically safe, technically regulatory, to be approved to bring them in." Tr. 1663:13-17 (Zabransky).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government has presented no evidence that DOE would have left damaged and failed fuel at utilities for lengthy periods beyond final SNF disposal. Every utility has some level of damaged or failed fuel. In 1990, Oak Ridge National Laboratory did a study for DOE on the acceptance of failed fuel. PX 175. That study concluded that, as of March 1990, 5654 fuel assemblies at utilities around the country could be classified as damaged or failed. *Id.* at 4-6; *see also* Tr. at 1447-48 (Stuart) (noting approximately a third of the fuel he shipped for DOE was failed). Because damaged or failed fuel is commonplace, it was specifically covered in the Contract and there was no provision stating that its acceptance would be long delayed. In 1985, Robert Bauer, Associate Director for Resource Management for DOE, stated that

> With regard to "other than standard fuel" – it is the Department's intent that all currently designed nuclear fuel, including that falling outside the maximum physical dimensions specified in Appendix E, will be subject to the same scheduling procedures. . . . *Failed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel.*

PX 93 (emphasis added). In the non-breach world, DOE would have been required to handle such fuel upon disposal because it must accept "all" fuel. The notice provision in the Contract is included to allow DOE to make such arrangements prior to disposal. PX 44, Art. VI.A.2.b.

221. Similarly, Ronald Milner, the acting deputy director and chief operating officer for OCRWM, previously has explained the rationale for the potential delay in acceptance of failed fuel:

> And I guess just to use a hypothetical example, if you have some very, very badly failed fuel, and out of all the assemblies that we will accept, ultimately, if that's the only one that requires that type of handling, do you stop everything and try to deal with that one assembly or do you put if further back in the queue.
>
> You know, for example, if the requirement was that you had to physically put this in a hot cell and deal with it, that's a different matter than unloading a standard fuel assembly.

Def. Counter-Designation R. Milner, at Tr. 52:19-25, Tr. 53:15-19 (5/8/02).

RESPONSE: SMUD does not object to the government's proposed finding of fact. In fact, on this issue, the government's reliance on the testimony of former Acting Director Milner, is instructive. Mr. Milner points out that it is only the "very, very badly failed fuel" that might hypothetically be pushed later in the queue. Def. Counter-Designation of R. Milner at Tr. 52-53 (5/8/02). As Mr. Stuart testified, SMUD's fuel can be handled without difficulty. Tr. at 1447-48 (Stuart); I. Stuart Written Direct at ¶¶ 42-44 (PX 1001). Thus, not only are the government's arguments speculative, they are also irrelevant in relation to SMUD's fuel.

222. Because SMUD has F-2 failed fuel, SMUD may have SNF onsite after the acceptance of its standard fuel. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83 & Att. 11, 12. In other words, even if DOE had begun accepting SMUD's standard SNF in 2001, SMUD potentially would have incurred many of the ISFSI pad design and construction costs for the storage of its failed fuel.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Kiraly has no experience in the nuclear industry, and thus he has no basis to form an opinion regarding whether SMUD's damaged fuel would be left on site after acceptance of the rest of SMUD's SNF.

On the other hand, SMUD has presented extensive evidence that DOE would have accepted failed fuel on the same schedule as standard fuel. See PX 989 (noting representation by DOE that "[f]ailed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel"). OCRWM Director Lake Barrett stated his belief that "[w]hen all is said and done, my expectation, what I really think will happen is when it moves along it will move together – contemporary, it will all move

contemporary, that's the failed fuel and standard fuel." Designations Appendix (Dckt. #310) at 392 (Barrett). SMUD's expert, Ivan Stuart, also testified that "DOE could have and would have accepted these assemblies [SMUD's damaged fuel] on the same schedule as the rest of SMUD's fuel." I. Stuart Written Direct at ¶ 42 (PX 1001).

223. Mr. Kiraly explained that the cost of designing and fabricating the failed fuel canister should be removed from SMUD's damages claim because it is a cost that SMUD would have incurred regardless of the Government's breach of the Standard Contract. Mr. Kiraly determined that the cost of designing and fabricating the failed fuel canister was $1,574,138. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83 & Att. 11, 12.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Kiraly has no experience in the nuclear industry, and thus he has no basis to form an opinion regarding how SMUD's damaged fuel would be treated in the non-breach world. Furthermore, Mr. Kiraly's opinion is not based on any record evidence, and therefore it is speculative and should be rejected by this Court. An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact." *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

224. Further, Mr. Burford provided unrefuted testimony at trial that, of the 12 failed SNF assemblies in SMUD's possession that exhibit radioactive leakage, two are improperly stored in non-failed fuel canisters and, consequently, SMUD is not in compliance with its storage license and cannot ship that failed fuel under its current Certificate of Compliance with the NRC. Testimony of Jerry Burford, at ¶¶ 60, 61, 62.

RESPONSE: SMUD objects to the government's finding of fact. Mr. Burford did not present "unrefuted testimony" that two assemblies are improperly stored. SMUD employee Ron Colombo reviewed the visual inspection of SMUD's fuel and concluded that SMUD had no fuel assemblies that require special handling, or "0 failed assemblies." PX 470 at 1. This determination was reviewed by an independent company, Electric Power Research Institute ("EPRI"), which affirmed that SMUD had no failed fuel assemblies that require special handling. EPRI agreed that the nine assemblies were correctly categorized as F2, if not somewhat "conservatively," and also suggested one additional assembly should be classified F2. PX 489 at 2. Mr. Stuart also reviewed the videotapes and determined that "[n]one of the fuel assemblies exhibit any features that would require special handling as noted in the Standard Contract." I. Stuart Written Direct at ¶ 42 (PX 1001). Thus, three independent sources have agreed regarding the extent and nature of SMUD's damaged fuel assemblies.

225. Consequently, even if DOE had taken most of SMUD's failed SNF on the same or similar schedule as SMUD's standard SNF, SMUD would have been unable to ship at least two of its failed fuel assemblies. Direct Testimony of Jerry Burford, at ¶ 62.

RESPONSE: SMUD objects to the government's finding of fact. As explained in SMUD's response to DPFOF ¶ 224, three independent sources have agreed regarding the extent and nature of SMUD's damaged fuel assemblies. Given that DOE's verification procedures are dependent upon the individual review of each utility, under DOE's own procedures, SMUD's fuel is properly stored and ready for shipment. *See* Letter from B. Tomasoni (May 19, 1997) (PX 540) (providing SMUD verification procedures and noting that DOE will rely "upon the Purchasers' records to adequately describe the spent fuel which will be accepted by DOE").

226. The costs that SMUD has or will incur as a result of the storage of these two failed fuel assemblies is not dependent upon the timing of the Government's performance, but rather is dependent upon SMUD coming into compliance with its Certificate of Compliance and DOE determining that the handling of such fuel is technically feasible.

RESPONSE: SMUD objects to the government's proposed finding because it is not based on any record evidence. Furthermore, SMUD reasserts its responses to DPFOF ¶ 224-25 above.

**C. SMUD May Not Recover The 2003 Operation & Maintenance Cost For Its ISFSI**

227. SMUD has improperly included in its damages claims $695,715 for the operation and maintenance costs associated with its ISFSI for 2003. Pl. Br. 54, n.22.

RESPONSE: SMUD objects to the government's proposed finding of fact. The government offers no evidentiary support for arguing that the operation and maintenance costs of the ISFSI would have been incurred in the non-breach world. In the non-breach world, SMUD would not have transferred its fuel to dry storage. Tr. at 194 (Shetler) ("[O]ur first alternative and our preference would have been to keep it in the pool and have the DOE receive it if there were an ability on the part of DOE to accept the fuel on the original schedule . . . ."). Thus, SMUD would not have incurred the costs of operating and maintaining the ISFSI in 2003. Because such costs would not have been incurred in the non-breach world, and because the dry fuel storage project was caused by the government's breach, SMUD has appropriately included such costs in its damages claim.

228. SMUD is responsible for its operation and maintenance costs associated with the storage of its SNF until DOE would have accepted the last of SMUD's SNF in the non-breach

world. DX 88, Art. VII ("DOE shall be solely responsible for control of all materials *upon passage of title*").

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence.").

In the non-breach world, SMUD would have left its fuel in the pool and continued to incur wet pool costs annually until the fuel was removed by DOE. SMUD would have sought prompt acceptance by DOE in the non-breach world. Thus, SMUD agrees that it would have been responsible for the operation and maintenance costs of *its wet pool* until the fuel was removed from Rancho Seco. Such a deduction would account for SMUD's "would-have-been" costs of storage in the non-breach world.

229. Regardless of the rate of acceptance, had DOE performed in accordance with oldest fuel first principles as provided for in the Standard Contract, and begun acceptance of SMUD's SNF beginning in 2001, SMUD would still be responsible for its operation and maintenance costs at least through 2003. DX 88, Art. VII ("DOE shall be solely responsible for control of all materials upon passage of title").

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence.").

SMUD has presented evidence that SMUD's fuel would have sought early acceptance through exchanges, shutdown priority, or a transportation campaign. *See* E. Supko Written Direct at ¶¶ 13, 44-46, 152 (PX 1002); I. Stuart Written Direct at ¶ 32-40 (PX 1001). As SMUD has noted in its initial Post-Trial Brief and its Response, if the Court concludes that the fuel would not have been picked up by 2003, it is appropriate to deduct from SMUD's damages claim a total of $4,196,360 – the annual wet storage savings – for 2003 because these are costs SMUD would have incurred in the non-breach world. *See* Pl. Br. at 61; Pl. Resp. at 113-14. Such a deduction would account for SMUD's "would-have-been" costs of storage in the non-breach world. To the extent that the government is asserting SMUD is *also* responsible for the operation and maintenance costs of the ISFSI, SMUD objects to this finding.

230. Consequently, SMUD is currently responsible for the operation and maintenance costs associated with the storage of its SNF in its ISFSI. DPFOF ¶¶ 228-229.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). Furthermore, SMUD objects to the government's findings for the reasons articulated in SMUD's responses to DPFOF ¶¶ 227-29.

231. In addition to being a categorically improper claim, Mr. Kiraly questioned the $695,715 figure for three independent reasons.

a. First, this $695,715 figure for operation and maintenance costs includes labor overhead in the amount of $162,438. EXX 0050019.

b. Second, $526,682 of the $695,715 total represents fixed labor that is not incremental to the breach. EXX 0050019.

c. Third, $6,594 of the $695,715 included the amounts incurred after loading was completed in 2002, and encompasses costs incurred for the monitoring of GTCC radioactive waste and failed fuel. Direct Testimony of Stephen Kiraly, at ¶¶ 82-83, Att. 12, & EXX 0050019.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD disagrees with the various independent reasons for questioning the figure presented by Mr. Kiraly. In response, SMUD reasserts its responses to DPFOF ¶¶ 256-75, wherein SMUD disputes the government's labor and labor burden arguments.

With regard to Mr. Kiraly's assertion that costs after 2002 encompassed costs "incurred for the monitoring of GTCC radioactive waste and failed fuel," Mr. Kiraly has no basis for such a claim. In fact, this assertion is flatly contradicted by the record evidence in this case. SMUD's GTCC has not yet been removed from the reactor vessel, Tr. at 800 (Redeker), and thus no costs related to ISFSI monitoring can be attributed to monitoring GTCC waste. With regard to failed fuel, DOE has an obligation to dispose of this fuel, PX 44, Art. IV.B.1, and thus the ISFSI costs are recoverable.

### D. SMUD Is Responsible For The Costs Associated With The 88-Month Delay In Its Dry Storage Project

232. The majority of the costs that SMUD is claiming as damages in this case were incurred after January 31, 1998 and many of these costs were incurred as a result of delays in its dry storage project. Direct Testimony of Stephen Kiraly, at ¶¶ 84-86 & Att. 1 & 13.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD agrees that the majority of its damages were incurred after the date of the government's breach, January 31, 1998, but disputes that "many of these costs were incurred as a result of delays in its dry storage project." SMUD incurred significant costs because the process of developing a dual-purpose on-site storage facility to indefinitely store its SNF into the future is complicated and expensive. SMUD purposefully back-loaded the costs of the project in order to keep its options open. As Mr. Shetler testified,

> Basically, it was part of trying to manage the risk of this project. What we were looking at is trying to continue to go forward with licensing, design, and working with DOE, but that we wanted to leave ourselves some flexibility that if for any reason it did not look like it was going to be feasible to go forward, that most of the dollars were in the later years. So if we uncovered that concern earlier, we could have minimized our expenditures.

Tr. at 469 (Shetler). SMUD's contemporaneous documents also reflect SMUD's efforts to back-load the costs. In a letter to Mr. Ferreira in August of 1993, Mr. Shetler stated,

> As we proceed with this project I am continuing to monitor the status of the licensing by the NRC of the dry fuel system, its acceptance by DOE and our planned expenditures. My goal is to assure that we continue to stay on our schedule to have spent fuel in dry storage by 1998 (or preferably earlier), while at the same time assuring that we do not expend funds any sooner than necessary. In addition, I am trying to assure maximum acceptance by NRC and DOE before we outlay any significant funds. As a result, you will notice that Nuclear capital expenditures are significantly underrunning projections for 1993.
>
> Based upon our discussions to date with the NRC and DOE, I have asked the Nuclear team to reassess the project schedule with the intent of backloading expenditures as much as possible.

PX 319 at 1.

233. SMUD was one of the first utilities to consider pursuing dual-purpose dry storage technology. Tr. 190:6-12, Tr. 265:15-17 (Shetler). Despite the pursuit of this novel technology, SMUD assumed that it would take two to three years to obtain completed, licensed casks. DX 160, at SMUD 085619.

RESPONSE: SMUD objects to the government's proposed finding of fact. While SMUD agrees that it was one of the first utilities to pursue a dual-purpose dry storage technology, SMUD objects to the government's implications regarding its initial assumptions.

Pacific Nuclear's original cost and schedule estimates were based on the assumption that the majority of the design work was already completed. Pacific Nuclear already had a licensed "storage-only" canister and a licensed "transport-only" cask that it believed it could convert to a dual-purpose system (storage *and* transport) with modest technical changes. *See* Tr. at 537-39 (Redeker); Tr. at 986 (Field); *see also* PFF ¶ 92. The original cost estimate and time frame for the project was based on these assumptions. As a result of NRC comments, the design of the canister was changed dramatically and the original cost and schedule estimates were modified repeatedly as a result of the change in complexity and scope of the contract. *See* PFF ¶¶ 289-91.

234. When SMUD signed the contract to fabricate its casks and canisters in 1992, SMUD represented to the NRC that it did not anticipate any delays in placing its SNF in dry storage. DX 322, at SMUD 0035200 ("Based on discussions with the NRC and the prospective cask vendor, the District does not anticipate any delays in placing the fuel in dry storage at the Rancho Seco ISFSI.").

RESPONSE: SMUD objects to the government's proposed finding of fact. As the government itself notes, SMUD stated that, "[b]ased on discussions with the NRC and the prospective cask vendor," SMUD did not anticipate any delays. DX 322 at SMUD 0035200. SMUD went on to say, however, that "if an extended delay is encountered, the District has explored two contingency options." *Id.* These contingency options included the use of a store-only system (while maintaining the wet pool in an "available" state until DOE acceptance), or continued storage of the fuel in the pool. *Id.* In the end, despite NRCs representations to SMUD, SMUD did encounter delays in the licensing process. *See* Tr. at 225 (Shetler) (describing NRC-required changes that "added material cost and schedule impacts"); PX 453; DX 593; PX 425 (NRC official Charles Haughney explaining in 1995 that NRC schedules for review of dry storage projects "often disappear in the fog").

235. Eileen Supko believes that SMUD's assumption that it could have completed the licensing process in three years was unreasonable:

> As I said, the thought that a company proceeding with a new technology and having just signed the contact in 1992 would have licensed and loaded 21 packages within three years was just unreasonable . . . .

Tr. 1538:23-1539:2 (Supko).

RESPONSE: SMUD agrees that the government correctly quotes a portion of Ms. Supko's testimony. SMUD notes Ms. Supko continued her testimony as follows:

> [A]nd in fact, their schedule slipped right from the beginning, when the cask designer, Pacific Nuclear, learned that there were

> going to be additional Nuclear Regulatory Commission requirements for drop testing.
>
> Their schedule was adjusted immediately to factor that in, so while they may have thought that they could finish by 1995, when they first started the project, it was immediately clear that that was not going to happen.

Tr. at 1359 (Supko).

236. SMUD's dry storage project was delayed by a total of 88 months, largely because of the inability of SMUD's vendors to obtain the proper licensing for the construction of SMUD's "first-of-a-kind" dry storage facility. Direct Testimony of John McGrath, at ¶ 17.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD disputes the government's assertion that its project was "delayed by a total of 88 months." Mr. McGrath, who has no experience in the area of nuclear project management, Tr. at 2429-35 (McGrath), did not conclude that the project should or could have taken 31 months. *Id.* at 2436, 2457. He merely determined how many months the project extended beyond an initial, non-binding, planning schedule that was subsequently modified as the project changed in scope and direction. *Id.* at 2442-44, 2459. The scope and direction of SMUD's project was changed as a result of NRC comments and the schedule was modified accordingly. The government offers no support for using an initial planning schedule, prior to a change in project scope, as a basis for determining that the project suffered unrecoverable "delays."

SMUD also objects to the government's characterization of any delay in the project as caused by "the inability of SMUD's vendors to obtain the proper licensing for the construction" of the project. As part of the licensing process, the NRC engaged in several rounds of questions and comments, which resulted in changes to SMUD's design. *See* PX 404; PX 425; PX 434; PX 483; PX 845; Tr. at 537-38, 546-47, 569-71 (Redeker) (describing NRC-required changes). Because such a project had never been licensed before, SMUD experienced additional rounds of questions prior to licensing. PX 845 ("TNW submitted their response to a seventh round of questions from the NRC"). Although NRC staff began developing guidelines for licensing of dry-storage systems in 1996, this was well after SMUD had begun the process. *See* E. Supko Written Direct at ¶ 129 (PX 1002). Furthermore, these guidelines "were not finalized until well after many of the dual-purpose storage and transport systems designs that are being utilized today were submitted to the NRC staff for review and certification, including the system utilized by SMUD at Rancho Seco." *Id.* at ¶ 130.

237. Mr. Burford, the Government's technical expert who has over 30 years in the nuclear energy field specializing in project management and regulatory compliance, explained that, by assuming the risk of the first-of-a-kind licensing and development of a dual-purpose

system for its SNF, SMUD bore the responsibility for any resulting delays. Direct Testimony of Jerry Burford, at ¶ 76.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence.").

SMUD notes that Mr. Burford has no experience in the area of dry storage or dual-purpose dry storage systems. Tr. at 2554-55, 2587 (Burford). Furthermore, Mr. Burford did not believe that SMUD's pursuit of dual-purpose dry storage was unreasonable. Tr. at 2558 (Burford). Thus, Mr. Burford's testimony that SMUD "bore the responsibility" is without foundation.

238. Specifically, Mr. Burford explained that, as a nuclear licensee under 10 C.F.R. Part 50, SMUD was responsible for the safe storage of its SNF, and was obligated to store its SNF in a cost-effective manner that was in the best financial interests of its ratepayers. Direct Testimony of Jerry Burford, at ¶ 80.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Burford has no experience in the area of dry storage or dual-purpose dry storage systems. Tr. at 2554-55, 2587 (Burford). He has never supervised such a project, been responsible for transferring fuel to an ISFSI, prepared procedures for such a move, or conducted the necessary training. *Id.* at 2587. He has no experience regarding the costs of a store-only system and did not contact vendors to determine what such a storage system would cost. *Id*. at 2580, 2583-84.

Furthermore, the Federal Circuit has explained, because of the government's breach, SMUD and the other utilities "were in fact obligated to take mitigating steps" under these circumstances. *Indiana Michigan*, 422 F.3d at 1375. SMUD notes that this is exactly why SMUD, when faced with DOE's delays of at least 14 years, developed an on-site storage facility for the period of DOE's lengthy delay.

239. Mr. Burford stated that SMUD assumed substantial risk with its decision to abandon its wet pool and pursue a first-of-its-kind dry storage technology, and, consequently, SMUD bore the risk associated with the delays in the pursuit of this technology. Direct Testimony of Jerry Burford, at ¶¶ 81, 89-90.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are

inadmissible in evidence."). Mr. Burford is not qualified to opine regarding whether SMUD acted reasonably in pursuing dry storage. Furthermore, SMUD did not abandon its wet pool until 2002, when it completed transfer of its fuel to the ISFSI.

SMUD managed the risks of the project by continually reevaluating the project and taking an active role in project oversight. Tr. at 554-55 (Redeker) ("We found that we had to have what the NRC came to call intrusive oversight. . . . We became much move involved in this process to help keep the costs down and to make sure that things were being done properly as well, so our involvement level in the project rose over what we had initially done in order to help keep costs down."); Tr. at 576-79, 588-91 (Redeker); PX 444 at 9657, 9663, 9672.

The Federal Circuit recognized in *Indiana Michigan* that utilities were obligated to mitigate and develop alternative storage:

> It would have been improvident for Indiana Michigan to have waited until January 1998 before deciding what to do with its nuclear waste. Indeed, the losses which the utilities are obligated to mitigate are not pecuniary unto themselves, e.g., the increased cost of obtaining storage for SNF on short notice. Having been placed in a position where they are required to find alternative storage for SNF, the utilities must *de facto* accept responsibility to guard against the environmental impact of improperly disposed and maintained SNF, a situation which the NWPA was enacted to avoid.

422 F.3d at 1375.

240. David Langstaff, a DOE employee responsible for oversight of the cooperative agreement, explained at his deposition some of SMUD's shortcomings in managing its dry storage project. DPFOF ¶¶ 241-243.

RESPONSE: SMUD objects to the government's proposed finding of fact. The government's reliance on the deposition testimony of David Langstaff is misguided. First, the government fails to mention that Mr. Langstaff has no knowledge of the SMUD project after 1996 because he had no responsibility for the Cooperative Agreement and no interaction with SMUD after this period. Langstaff Designations (Dckt. #289) at 31; Def. Cross-Designation Appendix (Dckt. #335), D. Langstaff Dep. at 135 (11/4/2004). Second, the government offers not a single exhibit or written suggestion that it made to SMUD during the course of the Cooperative Agreement criticizing the direction of the project. Instead, the government relies on a general statement made by Mr. Langstaff at his deposition, 10 years after the fact, that does not support the government's claim that SMUD's management was unreasonable or that its damages should be reduced by $13.5 million because of delays. *Id.* at 94. In fact, the government omits Mr. Langstaff's testimony on this precise issue:

Q. In your view, did SMUD do a reasonable job in managing the project, the dry storage project.

A. I think they showed increasing maturity with regard to understanding the spent fuel transport and storage systems as we went forward and their understanding evolved over time.

Langstaff Designations (Dckt. #289) at 129.

241. Mr. Langstaff explained that SMUD did not understand the NRC's process for licensing casks for transport or storage. Def. Counter-Designation of D. Langstaff, at Tr. 129:22-130:2 (11/4/04). Mr. Langstaff testified that, although SMUD appeared to have a better understanding of the licensing process as the dry storage project progressed, SMUD ignored some of Mr. Langstaff's key comments regarding licensing, particularly with regard to the NRC's shift from one-dimensional modeling to two-dimensional modeling. Def. Counter-Designation of D. Langstaff, at Tr. 130:16-131:12 (11/4/04).

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. Mr. Langstaff has no knowledge of the SMUD project after 1996 because he had no responsibility for the Cooperative Agreement and no interaction with SMUD after this period. Langstaff Designations (Dckt. #289) at 31; Def. Cross-Designation Appendix (Dckt. #335), D. Langstaff Dep. at 135 (11/4/2004). Thus, he is no position to comment with regard to SMUD's full interactions with the NRC.

Furthermore, the government fails to note that *no one* in the industry had a strong understanding of the NRC licensing process for dual-purpose dry storage systems because the NRC's approach was evolving during this period. The NRC staff did not begin developing guidelines for licensing of dry-storage systems until 1996. *See* E. Supko Written Direct at ¶ 129 (PX 1002). Furthermore, these guidelines "were not finalized until well after many of the dual-purpose storage and transport systems designs that are being utilized today were submitted to the NRC staff for review and certification, including the system utilized by SMUD at Rancho Seco." *Id.* at ¶ 130.

242. Further, Mr. Langstaff criticized SMUD's direction to its vendor, VECTRA, indicating that SMUD's direction caused problems in the storage project. Def. Counter-Designation of D. Langstaff, at Tr. 133:11-19 (11/4/04). Mr. Langstaff explained:

> Well, as a result of the buckling analysis and when SMUD decided that one of the – the option they would pursue was cutting out a section of the cask that had already been fabricated or that was in fabrication, that was a major decision, and I asked SMUD, you know . . . have you done a change analysis on that, and they said no, and they decided to go ahead because I said you're responding to one person's comments on a deficiency and I said be careful about making changes to the design without fully analyzing that.

Def. Counter-Designation of D. Langstaff, at Tr. 133:22-134:10 (11/4/04).

RESPONSE: SMUD objects to the government's proposed finding of fact.

To the extent the government is suggesting that SMUD caused problems for Vectra, the record evidence establishes otherwise. Vectra's problems were not limited to SMUD's project. In 1996, the NRC concluded that there were substantial quality assurance issues with Vectra Technologies across the board. In response, the NUHOMS Owners Group, including SMUD, started an extensive audit of Vectra's design and engineering work to insure compliance with NRC regulations and guidance. Tr. at 236-37 (Shetler); PX 451 (NUHOMS Joint QA Audit); PX 452 ("Vectra and SMUD have worked diligently to resolve the issue in the most expedient and cost-effective manner possible."); PX 449 (discussing licensing hurdles and cost impacts). Despite SMUD's efforts, Vectra was issued a "Demand for Information" by the NRC in January 1997 and subsequently filed for bankruptcy in October 1997. PX 509; PX 598; PX 598A.

Furthermore, to the extent SMUD made design changes in response to NRC comments (despite Mr. Langstaff's comments), such a response is appropriate and reasonable given that SMUD was seeking a license from the NRC for its system.

243. Mr. Langstaff further explained that the delays SMUD experienced on its dry storage project were not attributable to the NRC, but rather related to SMUD's actions in rushing into the dry storage project without spending the time up front to prepare proper designs:

> I mean, you either do an outstanding job up front – it's kind of like the oilman, pay me now or pay me later. You try to rush in something that's not really well done and it takes time then until it is well done, because the design will be well done by the time it's approved by the NRC.

Def. Counter-Designation of D. Langstaff, at Tr. 155:6-11 (11/4/04).

RESPONSE: SMUD objects to the government's proposed finding. Mr. Langstaff's testimony does not even support the government's assertion. Rather, his testimony indicates his view that a project will be done at the same level, whether done at the outset or the backend.

Furthermore, prior to the NRC's establishment of application guidelines in the later half of the 1990s, NRC "allowed applicants to submit partial or incomplete applications that were later amended by the applicant. There were numerous instances when applications were amended several times resulting in a much longer review time as experienced by SMUD for both the transport review of the NUHOMS MP-187 transport cask and its Rancho Seco ISFSI license application." E. Supko Written Direct at ¶ 137 (PX 1002). Although the NRC changed its policy at the end of the 1990s as part of its shift in the way it reviewed and approved applications for dry storage systems and facilities, the amendment of applications was a common part of the regulatory environment prior to this policy change.

244. Ms. Supko admitted that she did not endeavor to determine whether SMUD's implementation and management of the dry storage project was imprudent. Tr. 1532:15-20 (Supko). In fact, Ms. Supko conceded that she did not review the costs specifically to determine what the causes were for the delays in SMUD's dry storage project. Tr. 1532:15-20 (Supko). Nor did Ms. Supko ever conduct any analysis regarding the amount of delays that SMUD incurred in the course of the dry storage project. Tr. 1535:4-8 (Supko). When asked how much of the delay was attributable to the NRC's oversight of dry storage projects, all she could do was reference the fact that other utilities faced some delays in their dry storage projects. Tr. 1535:9-16 (Supko). She could not identify the specific amount of delay attributable to the NRC's oversight. Tr. 1536:19-22 (Supko). Ms. Supko admitted under cross-examination that SMUD's dry storage project was initially scheduled to be completed in 1995, and the NRC actions that she considered as having an impact upon SMUD's dry storage project did not occur until 1995. Tr. 1537:9-22 (Supko). Further, although she relies heavily upon the NRC's oversight as a cause for the delays, she admitted upon cross-examination that there were other delays associated with the fabrication of the dry storage project. Tr. 1534:17-22 (Supko).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government mischaracterizes Ms. Supko's role as an expert in this case. Ms. Supko has extensive experience in the nuclear industry. Ms. Supko offers her specialized knowledge to provide a context for and assist the Court in determining the reasonableness of SMUD's actions during the relevant time period. Ms. Supko reviewed extensive literature from DOE, NRC, and the nuclear industry over the relevant time period and supplemented this review with her own

professional experience from that time period. She was not retained to provide a hypothetical "delay analysis" for the Court, and such analysis would not be relevant to this case in any event.

245. Ms. Supko simply concluded that, because the industry as a whole was experiencing delays as a result of the NRC's oversight, SMUD must have experienced these delays as well. Tr. 1535:17-1536:22 (Supko).

RESPONSE: SMUD objects to the government's proposed finding of fact. Ms. Supko testified at length in her written direct testimony regarding the changing regulatory landscape. E. Supko Written Direct at ¶¶ 126-45 (PX 1002). Ms. Supko's testimony is based on her expansive knowledge of the development of the dry storage market and the NRC's regulatory guidance for spent fuel storage and transport. This testimony is directly relevant and helpful because it illustrates what the entire industry was experiencing in the 1990s. Ms. Supko also addresses these regulatory changes with regard to SMUD's experience. *Id.* at ¶¶ 130, 135, 137, 138, 140, 141, 142 (discussing impacts on SMUD). Her knowledge and expertise will assist the Court in its determination of this matter and is admissible under Federal Rule of Evidence 702.

246. Ms. Supko has offered no testable methodology or reasoned analysis for her conclusion that all costs associated with the delays are appropriate for inclusion in SMUD's damages claims.

RESPONSE: SMUD objects to the government's proposed finding of fact. Ms. Supko has extensive experience in the nuclear industry and this knowledge will provide a context for and assist the Court in determining the reasonableness of SMUD's actions during the relevant time period. Ms. Supko reviewed extensive literature from DOE, NRC, and the nuclear industry over the relevant time period and supplemented this review with her own professional experience from that time period. *See* E. Supko Written Direct at ¶¶ 126-45 (PX 1002). Next, Ms. Supko compared SMUD's actions and experience against those of the industry in general and expressed opinions about the reasonableness of those actions. Ms. Supko's testimony follows the accepted approach of applying specialized knowledge to the facts of the case in a principled manner and is therefore reliable. *United States v. Cruz,* 363 F.3d 187, 192-93 (2d Cir. 2004) (noting that an expert can offer an interpretation of evidence before the court).

247. The cost associated with SMUD's 88-month delay in its dry storage project totaled $13,527,736. Direct Testimony of Stephen Kiraly, at ¶¶ 84-85 & Att. 13.

RESPONSE: SMUD objects to the government's proposed finding of fact. The $13.5 million that the government puts forward as its claimed "reduction" to SMUD's damages is a fictional number. Mr. Kiraly states that Mr. McGrath of Contract Solutions "concluded that the project would have taken 31 months instead of 119 months, i.e. 88 months of delay were encountered." S. Kiraly Written Direct at ¶ 84. Mr. McGrath, who has no experience in the area of nuclear project management, Tr. at 2429-35 (McGrath), did not in any event conclude that the

project should or could have taken 31 months. *Id.* at 2436, 2457. He merely determined how many months the project extended beyond an initial, non-binding, planning schedule that was subsequently modified as the project changed in scope and direction. *Id.* at 2442-44, 2459. Thus, Mr. McGrath did not offer any opinion regarding whether SMUD's damages should be reduced based upon his schedule analysis. *Id.* at 2486.

Mr. Kiraly, who similarly has no experience in the nuclear field, determined an "average monthly cost" based on his own opinion of which project costs were time-related. See S. Kiraly Written Direct at ¶¶ 84-85, Att. 13. Mr. Kiraly offered no independent factual support for such a deduction. An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact." *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

**E. SMUD's Damages Claim Includes Other Significant Flaws**

248. SMUD's damages claim is simply an accounting of incurred costs. Tr. 2693:7-8 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact. Contrary to the government's assertions, SMUD has set forth an analysis of what likely would have happened in the non-breach world and has reduced its damages accordingly. SMUD has proven with sufficient certainty that, absent the government's long-announced breach, SMUD would have left its fuel in the pool and sought prompt DOE acceptance of its fuel under the Contract. Instead, SMUD was forced to develop its own long-term dry storage facility and retain its wet pool until the end of 2002, when transfer of fuel to the ISFSI was complete.

In so doing, SMUD incurred the costs of designing, licensing, and fabricating its on-site storage facility, as well as the costs of loading and transferring the fuel from the pool to the ISFSI, including labor costs. SMUD has proven that it incurred $21,553,462 in damages from 1992 to 1997 and $55,049,870 in damages from 1998 to 2003. *See* PFF ¶¶ 199-206, 212-41.

Based on its analysis of what likely would have happened in the non-breach world, SMUD has offset its costs where appropriate, so that only those costs that are attributable to the government's breach have been claimed as damages in this case. These offsets are based on the analysis of Jim Field, who is SMUD's dry storage project manager and the most knowledgeable person with regard to the details of the project. Tr. at 954-55 (Field).

249. SMUD's damages claim contains absolutely "no analysis done about what deductions should have been made from those incurred costs in a variety of matters." Tr. 2693:11-12 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact. As discussed more extensively in SMUD's response to DPFOF ¶ 248, SMUD has set forth what likely would have happened in the non-breach world. Mr. Field, SMUD's dry storage project manager and

the most knowledgeable person with regard to the details of the project, analyzed SMUD's costs and concluded that several offsets were appropriate based on costs that likely would have been incurred in the non-breach world. Tr. at 954-55 (Field). Mr. Field has direct knowledge regarding the costs that were incurred and how the costs correspond to the various aspects of the project. *Id.* at 1045-61 (Field). Based on his analysis of the work that was done and the government's responsibilities upon performance, Mr. Field testified that certain costs associated with the project likely would have been incurred even if DOE had performed. *Id.* at 1031-45 (Field). As Mr. Field testified,

> [F]or each case, I took a look at what we did in order to accomplish our fuel movement, and then I took a hypothetical case, in my mind, of a cask that was suitable for our site, and a cask that was a bolted closure cask, as opposed to a welded canister, and looked at the differences in work scope between the effort that was required to load our canisters, as opposed to the effort that would, in this hypothetical case, I would think would be necessary in order to load a suitable cask provided by DOE.
>
> And so then I took a look at what portion of the costs that we had incurred would still be applicable to the hypothetical case of the DOE, in which the DOE performed with a suitable cask, and came up with these numbers.

*Id.* at 1200 (Field). It is appropriate to rely on Mr. Field's testimony for these deductions, given his extensive personal knowledge of the dry storage project and the facts at issue in this case. *See De Graffenried v. United States*, 2 Ct. Cl. 640, 643 (1983); *see also Joy Mfg. Co. v. Sola Basic Indus., Inc.*, 697 F.2d 104, 111-12 (3d Cir. 1982) (recognizing admissibility and helpfulness of lay witness testimony by plant supervisor regarding the amount of downtime experienced).

SMUD has deducted these costs from its damages claim. Thus, contrary to the government's assertions, SMUD's damages claim is properly composed of only those costs that are directly attributable to the government's breach.

250. At trial, SMUD presented the testimony of Brian Brinig, who counsel asserted was "an expert in connection with the confirmation of SMUD's costs that were incurred in connection with this project . . ." Tr. 1277:6-12. Mr. Brinig acknowledged at trial that, had SMUD incurred costs in the breach world that it otherwise would have incurred in the non-breach world, it would be inappropriate to include those costs in a damages claim. Tr. 1298:3-13 (Brinig). Yet Mr. Brinig did not offer any analysis regarding a comparison of costs incurred in both the breach and non-breach worlds. Tr. 1298:14-17 (Brinig). In fact, Mr. Brinig expressly

stated that he is offering no opinion about costs that SMUD would have incurred but for the Government's breach. Tr. 1297:22-1298:2 (Brinig). Rather, Mr. Brinig relied upon SMUD employees, specifically Mr. Field and Luana Holst, to identify those charges that SMUD believed were related to its dry storage project.

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. SMUD did not retain Mr. Brinig to set forth a model non-breach world or to determine which costs should be included in SMUD's damages claim based on such a model. Mr. Brinig is an accountant who was retained to review SMUD's records, confirm that SMUD incurred its claimed costs, and confirm that the costs were accurately recorded and tracked through SMUD's accounting system. B. Brinig Written Direct at ¶ 2 (PX 1000).

251. Although Mr. Field was responsible for collecting the work orders that he believed were associated with SMUD's dry storage project, Tr. 1045:13-22 (Field); Tr. 1239:7-19 (Holst), Mr. Field was not a decision-maker with respect to SMUD's decision to pursue dry storage. Tr. 1072:2-17 (Field) (explaining that "I was not a decision-maker and, to my recollection, was not involved in that whole study determination. That was done by a different part of the organization, and my responsibility was to implement the direction, rather than develop the direction").

RESPONSE: SMUD objects to the government's proposed finding because it misstates the evidence. Mr. Field testified as follows:

> Q. Now, Mr. Field, you testified on direct examination that you worked on the specifications for the dual-purpose dry storage system back in 1992, correct?
>
> A. Yes.
>
> Q. Now, while you were working on that, no one ever told you that DOE wasn't going to show up to pick up the fuel, and as a result of that, SMUD was pursuing the dry storage option, did they?
>
> A. *Are you asking if someone came up to me and made that statement?*
>
> Q. Yes, I am.

A. Not that I recall.

Q. In this time frame, when you began working on the project, sir, SMUD was not evaluating between a dry storage store-only system and a dry storage transportable system, was it?

A. I probably need to clarify that, *in the evaluation that preceded the generation of the bid specification that you referred to*, I was not a decision-maker and, to my recollection, was not involved in that whole study determination. That was done by a different part of the organization, and my responsibility was to implement the direction, rather than develop the direction.

Tr. at 1071-72 (Field). Thus, Mr. Field was clarifying that during this early period, prior to the generation of the bid specification, he was not a decision-maker with regard to going forth with the project. However, as the dry storage project manager, Mr. Field was intimately involved with *implementing* the dry storage project and is the most knowledgeable person with regard to the costs that were incurred in carrying out the project. *Id.* at 1045-61 (Field). It is appropriate to rely on Mr. Field's testimony for these deductions, given his extensive personal knowledge of the dry storage project and the facts at issue in this case. *See De Graffenried v. United States*, 2 Ct. Cl. 640, 643 (1983); *see also Joy Mfg. Co. v. Sola Basic Indus., Inc.*, 697 F.2d 104, 111-12 (3d Cir. 1982) (recognizing admissibility and helpfulness of lay witness testimony by plant supervisor regarding the amount of downtime experienced).

252. Mr. Field has no basis for explaining why SMUD decided to pursue dry storage.

RESPONSE: SMUD objects to the government's proposed finding of fact because the government fails to cite any evidence for such a proposition. *See* SMUD's Response to DPFOF ¶ 251.

253. Similarly, Ms. Holst testified at trial that she did not specifically segregate costs that SMUD incurred as a result of the breach, but rather she segregated costs that "had to do with the spent fuel storage project." Tr. 1254:8-12 (Holst). She made no independent determination as to which costs were related to or were otherwise incremental to the Government's partial breach. Tr. 1269:21-24 (Holst).

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. The government mischaracterizes Ms. Holst's role in the preparation of SMUD's damages claim. Ms. Holst testified that Mr. Field initially identified the work order numbers related to the dry storage project so that all of the costs associated with the dry storage project could be compiled. Tr. at 1239 (Holst). At Mr. Field's direction, Ms. Holst verified that the work order numbers corresponded to the dry storage system and identified one remaining work order that related to

the project. *Id.* at 1239. Ms. Holst, who has an intimate knowledge of the accounting software, then compiled the costs from the accounting system related to the identified work order numbers. *Id.* at 1239-40. Ms. Holst did so at the direction of Mr. Field and was not tasked with the job of determining which costs were a result of the government's breach. Thus, the government's arguments merely represent a misguided attempt to undermine SMUD's claim.

254. Consequently, no one involved in the preparation or analysis of SMUD's damages claim can establish that the costs allegedly incurred as a result of its dry storage project were a direct result of the Government's breach.

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. As SMUD has explained at length in its briefing before this Court, SMUD undertook the dry storage project as a result of the government's breach. The costs of developing its own on-site long-term storage facility would not have been incurred or necessary had the government not breached the Contract, and thus the costs are appropriately attributable to the government. As SMUD discussed in its responses to DPFOF ¶¶ 249-52, Mr. Field undertook an analysis to determine if any of the incurred costs would likely have been incurred in the non-breach world. Tr. at 1031-45 (Field). Mr. Field testified regarding his analysis and the offsets he believed were appropriate based on his knowledge and experience. *Id.* These costs were deducted from SMUD's total incurred costs such that the claimed costs are only those costs directly attributable to the government's breach.

255. The Government's expert economist, Cliff Hamal, explained the significant flaws in SMUD's damages claims as follows:

> SMUD's simple summation of costs associated with the dry storage program and its failure to consider other cost implications of the dry storage strategy does not result in a valid calculation of damages. SMUD has not detailed how it would have managed its SNF and the rest of its operations at Rancho Seco absent the breach. Such an explanation would include specifying what decisions might have been made, stating when they might have been made, and detailing how such hypothetical decisions would be consistent with SMUD's contemporaneous objectives. This information would allow one to consider the reasonableness of the assumed SMUD decisions. By addressing the non-breach world in only the vaguest of terms, SMUD's damages claim diverts attention from its Achilles Heel: The claimed costs are not damages because similar actions would have been taken regardless of the breach. I expect a proper damages analysis would show that SMUD has not suffered material damages due to the breach.

Direct Testimony of Cliff Hamal, at ¶ 19.

RESPONSE: SMUD objects to the government's proposed finding of fact. Contrary to Mr. Hamal's comments, SMUD has properly set forth its damages claim and has proven its damages with reasonable certainty. SMUD has presented its analysis to this Court on multiple occasions. SMUD reasserts its responses to DPFOF ¶¶ 248-254 above.

**1. SMUD Has Failed To Establish That Its Claimed Labor Costs Were Incremental To The Partial Breach**

256. SMUD has included in its damages claim approximately $14 million associated with labor costs that it claims were incurred as a direct result of the Government's breach. Direct Testimony of Stephen Kiraly, at ¶¶ 55-62 & Att. 2.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

257. Mr. Kiraly concluded that SMUD's damages claim improperly included labor hours for SMUD personnel who were typically charging few hours to the dry storage project, or who were charging to the project on a sporadic basis. Direct Testimony of Stephen Kiraly, at ¶ 59.

RESPONSE: SMUD objects to the government's proposed finding of fact. In calculating its damages, SMUD has included only those employee labor hours billed directly to the dry storage project.

SMUD employees record their hours and the appropriate work order number to which their time is devoted. This time is then charged to the appropriate work order through the accounting system. *See* PFF ¶¶ 174, 413. Because SMUD has only included those costs associated with the work orders for SMUD's dry storage project, only those employee hours specifically spent on the dry storage project are included in SMUD's costs. *See* PFF ¶¶ 411-413. Based on SMUD's system of charging labor, these direct labor costs are, by their nature, incremental to the dry storage project. Tr. at 1324 (Brinig) ("by virtue of the fact that they charged it to the job, it is incremental").

While some of the hours were recorded by SMUD employees who do not spend a majority of their time working on the dry storage project, *only those hours that were actually spent on the dry storage project* were included in SMUD's damages claim.

258. Mr. Kiraly explained at trial that a cost that would have been incurred regardless of the breach is not a proper element of damages. Direct Testimony of Stephen Kiraly, at ¶ 53. SMUD's own expert, Mr. Brinig, agreed with this conclusion. Tr. 1298:3-13 (Brinig) (stating

that had SMUD incurred costs in the breach world that it otherwise would have incurred in the non-breach world, it would be inappropriate to include those costs in a damages claim).

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). Testimony is inadmissible with regard to such legal conclusions. *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

259. Mr. Kiraly testified that, of the 256 employees that SMUD included in its damages claim as labor costs, only 16 of the employees should be considered as an incremental cost because these employees charged a majority of their time to the dry storage project. Tr. 2737:7-20 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact. The government is essentially proposing that the time for 240 of the 256 employees, or ninety-four percent of the total employees who charged labor to the dry storage project, should be deducted. The government has presented no support for the proposition that 16 employees working part time, or four full-time employees, could have completed a project of this magnitude. The government also has failed to produce any evidence that the labor hours charged were not appropriate for a project of this magnitude.

Under the government's theory, had SMUD designated a set number of employees to work on the dry storage project full time, or if SMUD had hired contractors to complete the work, Tr. at 2781-82 (Kiraly), such labor costs would have been recoverable. SMUD chose to utilize those employees who were best qualified to meet the varied needs of the project rather than dedicate a specific number of employees to the project. SMUD should not be penalized for such efficiency.

260. Mr. Kiraly explained that these remaining 240 employees likely were charging the majority of their time to other projects, such as decommissioning, and, therefore, such labor costs were fixed from a damages perspective. Direct Testimony of Stephen Kiraly, at ¶ 59.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). Mr. Kiraly's argument is based on the assertion that these employees would not have been contributing in any productive way to SMUD if they had not been spending time on the dry storage project. Tr. at 2741 (Kiraly) (noting employee may have been "idle" during these periods). There is no basis for such a conclusion in fact or law.

There is extensive evidence that SMUD is an efficient company that maximizes its employees' time and eliminates positions whenever possible. As Mr. Redeker explained, "We look for, and I drive my staff to look for every opportunity to combine work forces, to combine jobs, to be more efficient. . . . There is continuing pressure to reduce staff at Rancho Seco." Tr. at 678-79 (Redeker); *accord id.* at 953 (Field). Numerous exhibits support this testimony. *See, e.g.*, PX 838 at 4 (1992 Rancho Seco budget indicating that staff would decrease from 397 to 186 between 1990 and 1992); PX 274 at 10 (1993 Rancho Seco budget indicating that staff would decrease from 224 to 163 between 1991 and 1993); PX 505 at 1603 (1997 Rancho Seco budget indicating that full-time staff would decrease from 142 to 128 between 1995 and 1997); PX 1172 (2001 Redeker e-mail directing staff to "[t]hink out of the box, be aggressive, recommend the hard things" to reduce staff and increase efficiency).

Mr. Brinig testified that "[i]t is not reasonable to assume that the employee, were he not working on the project in question, would be unproductive and not performing valuable tasks for the employer. Consequently, the employer suffers a loss when the employee directly works on the project." B. Brinig Written Direct at ¶ 27.a.ii.1. (PX 1000); *see also* Tr. at 1322-24 (Brinig).

The courts have agreed with this analysis. It is a well-settled damages principle that an injured party can recover the reasonable costs of in-house labor and materials expended to remedy the consequences of a defendant's wrongful conduct. *See Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 303 (5th Cir. 1976); *United States v. The John R. Williams*, 144 F.2d 451, 452-53 (2d Cir. 1944).

261. Mr. Kiraly explained at trial that 47 percent of all the employees that charged to the spent fuel project spent less than 30 percent of their total time to the project, and 55 percent of the employees that charged to the spent fuel project charged less than 40 percent of their total time. Direct Testimony of Stephen Kiraly, at Fig. 16.

RESPONSE: SMUD objects to the government's proposed finding of fact. The government misquotes its own expert's findings. Figure 16 in Mr. Kiraly's direct written testimony illustrates a further breakdown of people who charged less than 50 percent of their time to the dry storage project. Of those employees who charged less than 50 percent of their time to the dry storage project, 47 percent of this subgroup charged less than 30 percent of their total time to the project. 72 percent of this subgroup charged less than 40 percent of their total time to the project. *Id.* This analysis is irrelevant, however, as "[e]laborate calculations which are at war with realities are of no avail." *Lindheimer v. Illinois Bell Telephone Co.*, 292 U.S. 151, 164 (1934).

At most, this analysis reflects the arbitrariness of Mr. Kiraly's opinion. Mr. Kiraly did not rely on any treatises, texts, articles, or case law as a basis for his 50 percent cut-off. Tr. at 2745-47 (Kiraly). As Mr. Kiraly testified, "I didn't conduct investigation into each individual. What I did is I looked at the total of all employees who charged . . . to the claimed work orders, and made a judgment call identifying at what point they would be considered nonincremental to

the project." *Id.* at 2744. Such a "judgment call," without basis in fact or methodology, cannot form the basis of an expert opinion.

262. Further, the Government's expert, Jerry Burford, explained that certain classes of labor charges included in SMUD's damages claim could be attributed to other continuing work at Rancho Seco, and the time sheets and invoices produced by SMUD in this litigation lacked sufficient detail to determine if these types of labor activities were incremental to the breach. Direct Testimony of Jerry Burford, at ¶¶ 111-113.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Burford's opinion that certain classes of labor charges "*could be attributed* to other ongoing work," J. Burford Written Direct at ¶ 111, is mere speculation. As such it should be rejected. *See Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991) (rejecting testimony that is "based merely on speculation and conjecture without basis in fact").

SMUD employees record their time on an hourly basis and the time is tracked through the accounting system based on the applicable project. SMUD has only claimed those employee hours that are specifically attributable to the dry storage project. *See* PFF ¶¶ 174-82. The certainty of these hours was confirmed by Steve Redeker, Jim Field, and Luana Holst, who each testified regarding the process by which employees bill their time and the extensive review of the timecards at all levels. Tr. at 674-77 (Redeker); *id.* at 1046-48 (Field); *id.* at 1234 (Holst).

263. Mr. Kiraly concluded that $9,380,065 should be excluded from SMUD's damages claim as fixed labor costs because those costs were not incurred as a direct result of the Government's breach. Direct Testimony of Stephen Kiraly, at ¶¶ 62, 70-71 & Figure 16.

RESPONSE: SMUD objects to the government's proposed finding of fact because it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trus`t Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). Furthermore, SMUD reiterates its responses to DPFOF ¶¶ 257-62.

264. Mr. Redeker testified that Rancho Seco's labor force has reduced since 1993 from approximately 150 employees to 80 employees, and "[t]hat [reduction] has occurred as we have continued our ongoing effort to make sure that we are being as cost-effective as possible. We look for, and I drive my staff to look for every opportunity to combine work forces, to combine jobs, to be more efficient." Tr. 677:23-678:11 (Redeker).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

265. However, rather than explain that the reduction in labor was the result of the end of the dry storage project, Mr. Redeker admitted that the reduction in the labor force also "reflects the decreasing staff requirements because we are decommissioning the facility." Tr. 678:12-14 (Redeker).

RESPONSE: SMUD objects to the government's proposed finding of fact. Contrary to the government's proposed finding, Mr. Redeker testified that there was a "significant reduction" in staff at the end of the dry storage project. Tr. at 680-81 (Redeker). The government also takes Mr. Redeker's comments out of context. Mr. Redeker testified as follows:

> Q. And why has that change occurred?
>
> A. That has occurred as we have continued our ongoing effort to make sure that we are being as cost-effective as possible. We look for, and I drive my staff to look for every opportunity to combine work forces, to combine jobs, to be more efficient. And it also reflects the decreasing staff requirements because we are decommissioning the facility. For example, last year we reduced our water and radioactive water inventory onsite to zero essentially. Our chemistry requirements are decreased, so we laid off one of our plant chemists. As the work load decreases, we look to reduce that. That is a significant pressure for me. The rest of the District is looking for positions to use for globalization and things like that. And they are looking to the Ranch to be the source of positions, as it were, so we don't increase the overall number for the District. So I get calls: Hey, Steve, is there a position out there you can cut? What are you doing? So there is a continuing pressure to reduce staff at Rancho Seco. And that is a reflection of that.

Tr. at 678-79 (Redeker). Thus, the reduction in work force is part of SMUD's overall effort to decrease the ongoing costs at Rancho Seco, of which the dry storage project is a part.

SMUD agrees that Rancho Seco has attempted to decrease its labor force as much as possible as a result of decommissioning. This would have been true in the non-breach world as well. Had DOE performed, SMUD would not have had to commit a substantial number of labor hours to the additional transfer of fuel to the dry storage project, thus allowing SMUD to make even more substantial reductions in its labor force.

266. Mr. Redeker also testified that the dry storage project resulted in SMUD not being able to decrease staff as quickly as it otherwise would have had it not pursued the dry storage project, and that after the dry storage project was completed, the Rancho Seco staff was reduced by 30 full-time employees. Tr. 680:13-681:2 (Redeker).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

267. After considering Mr. Redeker's testimony, Mr. Kiraly explained that it did not change his conclusion that SMUD's labor costs were fixed, stating:

> Well, for one, it's not specific enough as to what is the actual impact that is associated with these people. There's no demonstration there that the costs are directly related to this project and not to the overall SMUD cost base. So without a more detailed analysis that would lay out for me who we're talking about when they say, we are reducing, or we planned to reduce from a certain number to a certain number, I can't make a judgment any different than the one I've made based upon my own analysis.

Tr. 2801:24-2802:8 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact to the extent it is a conclusion of law. *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The duty to issue [legal conclusions] devolve[s] on the courts and lay legal conclusions are inadmissible in evidence."). SMUD has set forth ample evidence to prove that SMUD is an efficient company that makes a point of combining jobs and cutting its workforce whenever possible. Tr. at 678-79 (Redeker).

268. Mr. Kiraly explained the fatal flaw in SMUD's damages claim as follows:

> Well, what I would have expected to see is starting with the baseline of the incurred costs and then identifying those costs that were either incurred specifically and only for this cost – the spent fuel, or deductions of costs that were basically fixed, and deduction of the costs of the, essentially, would have been world. There's been no accounting for that in these costs.

Tr. 2802:15-22 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact. As discussed more extensively in SMUD's response to DPFOF ¶ 248, SMUD has set forth what would have happened in the non-breach world. Mr. Field, SMUD's dry storage project manager and the

most knowledgeable person with regard to the details of the project, analyzed SMUD's costs and concluded that several offsets were appropriate based on costs that would have been incurred in the non-breach world. Tr. at 954-55 (Field). Mr. Field has direct knowledge regarding the costs that were incurred and how the costs correspond to the various aspects of the project. *Id.* at 1045-61 (Field). Based on his analysis of the work that was done and the government's responsibilities upon performance, Mr. Field testified that certain costs associated with the project likely would have been incurred even if DOE had performed. *Id.* at 1031-45 (Field). SMUD has offset its total costs to reflect what would have been in the non-breach world, resulting in a claim for only those costs directly attributable to the government's breach.

**2. SMUD Has Failed To Demonstrate That Its Claimed Labor Overhead Markups Were Incremental To The Partial Breach**

269. SMUD has improperly included $2,497,724 related to the cost of labor overhead markups in its damages claim. Direct Testimony of Stephen Kiraly, at ¶¶ 55-58 & Att. 2.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Kiraly has no factual basis for such a deduction, and thus his opinion should be rejected by this Court. An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact." *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991). SMUD also reasserts its responses to DPFOF ¶¶ 270-75.

270. Mr. Kiraly explained at trial that he and his team reviewed SMUD's labor overhead markups, and concluded that the markups included fixed costs that were not incremental to the Government's breach. Direct Testimony of Stephen Kiraly, at ¶ 57. These labor overhead markup costs included such items as human resource costs, office space, vehicles, the license for SMUD's accounting software, personal computers, software, and telephones, among other items. *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Kiraly has no basis for concluding that such costs are fixed, given that he did not investigate how SMUD actually handles such expenses at Rancho Seco. Mr. Kiraly acknowledged he did not investigate how SMUD actually handled such items. Tr. at 2776-79 (Kiraly). Mr. Redeker, on the other hand, testified as follows:

> Q. When you reduce your labor force, what happens to your overhead?
>
> A. The overhead associated with that is included in the labor costs, so that decreases as well. You know, we have got a

> guy sitting at a desk with a computer. When he leaves, that computer leaves.
>
> They have got an accounting system when we put [in] SAP, if you are familiar with that system, that we get charged for every telephone, every computer monitor, every beeper that we have and comes out of the budget. So when somebody goes, we find his beeper, his telephone, everything and get rid of it because we don't want to pay for it.
>
> Q. What is the effect on departmental administration?
>
> A. The actual burden for that decreases. There are fewer people or fewer personnel issues to deal with.

Tr. at 681-82 (Redeker). Thus, SMUD has presented unrefuted testimony that such costs are incremental.

271. Mr. Kiraly concluded that the costs associated with these items would not have increased as a result of the hours that SMUD personnel spent on the dry storage project and, consequently, such costs should be excluded from SMUD's damages claim. *Id.*

RESPONSE: SMUD objects to the government's finding of fact. Mr. Kiraly has no factual basis for such a conclusion, and has admitted he did no investigation to determine how such items are treated at SMUD. *See* Tr. at 2776-79 (Kiraly).

272. Mr. Kiraly explained that,

> [B]y definition, with SMUD including them as indirect expenses and indirect expense is when you cannot tie directly to the project. They may have been used on it, they may not have been, but these costs are then allocated over all of the labor within SMUD, of which the spent fuel project was only a small portion.

Tr. 2775:23-2776:4 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD has presented evidence that such costs are incremental at SMUD. The government offers no evidence to rebut Mr. Redeker's testimony.

Furthermore, the government's reference to Mr. Kiraly's statement that "these costs are then allocated over all of the labor within SMUD, of which the spent fuel project was only a small portion," Tr. at 2776 (Kiraly), is misleading. SMUD has claimed only the overhead burdening related to the hours worked on the dry storage project. Such labor burdening is recoverable in this case. *See Freeport Sulphur Co.*, 526 F.2d at 304 (noting the "costs of repairs incurred internally by the injured party, including overhead," are recoverable).

273. At trial, SMUD claimed that its labor overhead markup costs were variable rather than fixed. Specifically, Mr. Redeker claimed that, when SMUD reduced its labor force, the overhead associated with that labor force decreased as well. Tr. 681:6-10 (Redeker). As an example, Mr. Redeker testified that, "[y]ou know, we have got a guy sitting at a desk with a computer. When he leaves, that computer leaves." Tr. 681:10-12 (Redeker).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

274. In response to Mr. Redeker's testimony, Mr. Kiraly explained that, "[e]ven if overhead is variable, if you apply it to the base and the base is excluded, included in the excluded cost would also be that portion of overhead that is allocated to that excluded cost." Tr. 2801:3-6 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD has established that its labor costs are appropriately attributable to the government's breach and are recoverable in this case. Because there is no reason for excluding the underlying labor costs, DOE's argument must fail.

275. For example, with respect to SMUD's SAP license, Mr. Kiraly explained that, if SMUD had laid off an employee, he would not expect SMUD's SAP license costs to decrease. Tr. 2800:9-12 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Kiraly has no factual basis for such a statement. Mr. Kiraly admitted he did not investigate how such costs are internally managed. Tr. at 2776-79 (Kiraly). Mr. Kiraly's commentary is hypothetical and speculative in nature and should be rejected. *See Haynes v. United States*, 61 Fed. Cl. 788, 793 (2004).

### 3. Although SMUD Concedes That It Would Have Incurred Costs Associated With Its Dry Storage Project In The Non-Breach World, SMUD's Calculation Of The Proposed Offsets Is Understated

276. SMUD's damages claim improperly included $2 million that was the result of a double-counting error, and $500,000 related to a loan work-out that one of its vendors repaid to SMUD. Direct Testimony of Stephen Kiraly, at ¶¶ 66-68; *see* Pl. Br. 44-45.

RESPONSE: SMUD objects to the government's proposed finding of fact as irrelevant and misleading. In 2004, prior to her deposition and prior to pre-trial briefing in this case, Rancho Seco employee Ms. Holst recognized a double counting error and brought this to the attention of counsel. Tr. at 1242 (Holst). SMUD promptly notified opposing counsel and adjusted SMUD's damages claim. *See* PX 791. The same is true regarding the $500,000 loan work-out figure. SMUD has *not included* either of these amounts in its damages calculations before this Court, and as such, the government's finding of fact is misleading.

277. SMUD's expert accountant, Mr. Brinig, overlooked both this $2 million double-counting error, which accounted for 10 percent of SMUD's $20 million in claimed damages from 1992 to 1996, and the $500,000 credited back to SMUD. Tr. 1297:9-21, Tr. 1308:12-1313:1 (Brinig). When asked about this oversight at trial, Mr. Brinig explained that, "the simple answer is I missed it." Tr. 1297:13-16 (Brinig).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Brinig explained why he did not find the $500,000 error, stating "I was testing the costs that were charged to the group of work orders, and I didn't look outside the group of work orders at credits, so that's how I missed it." Tr. at 1297 (Brinig). Furthermore, given that the government has stipulated that SMUD has incurred the costs it claims, Tr. at 2796, such a finding is simply irrelevant.

**a. Gantry Crane**

278. SMUD proposes a $667,800 offset associated with the refurbishment of its gantry crane. Pl. Br. 44.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

279. Mr. Burford explained that this figure only encompassed work on this crane through 1997, and that $158,043 in costs associated with upgrade work after 1997 was included in SMUD's damages claim. Direct Testimony of Jerry Burford, at ¶ 92 & ¶ 102. Consequently, a proper deduction for the crane upgrade is $825,871, rather than $667,880. Direct Testimony of Stephen Kiraly, at ¶ 64-65 & Att. 4; Tr. 2724:16-2725:10 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Burford's direct testimony actually states as follows:

> SMUD agreed to offset " . . . $557,880 for the gantry crane upgrade . . ." This cost figure for the gantry crane only encompasses the work conducted on this crane through 1997. *It was later determined by SMUD that additional work was required on the gantry crane, which per NCI's analysis was $158,043.*

J. Burford Written Direct at ¶ 102 (emphasis added). Mr. Burford stated that, with regard to "Navigant's analysis that there was additional work required on the gantry crane of . . . $158,043," he did not know if the amount was proper and did not know what work was done related to that amount. Tr. at 2593-94 (Burford). Mr. Kiraly has no experience in the nuclear industry, and thus he has no basis to form an opinion regarding what gantry crane costs likely would have been incurred in the non-breach world.

280. At trial, SMUD appeared to claim that, although it would have modified its crane, it would have utilized smaller casks had DOE performed in the non-breach world and, therefore, that any modifications to the crane over 100 tons are properly claimed as damages. Tr. 1043:10-1044:24 (Field).

RESPONSE: SMUD does not object to the government's proposed finding of fact.

281. Mr. Field's testimony is contradicted by its contemporaneous documents. For example, in 1992, when SMUD submitted its delivery commitment schedules, it represented to DOE that it would utilize a 130-ton crane. DX 381, at COF0042422.

RESPONSE: SMUD objects to the government's proposed finding of fact. The government takes evidence from the breach world to argue that SMUD would have upgraded the crane to the same extent in the non-breach world. By 1992, DOE had announced that the repository would be delayed until at least 2010. *See* PX 169 at vii (noting in 1989 a "significant slip for the expected start of repository operations – from the year 2003 to approximately 2010"). SMUD made the decision to pursue dry storage in order to mitigate the damages it would incur as a result of the government's lengthy delay. Mr. Levy suggested in his report that SMUD should increase Rancho Seco's crane capacity as part of its dry storage program. DX 165 at iii. Thus, the increase in crane capacity was a part of SMUD's dry storage program. Had DOE been performing, although SMUD would have engaged in some crane upgrades (for which SMUD has already offset its claim), SMUD would not have increased its crane capacity as it did in the breach world.

282. In response to SMUD's submission of its DCSs, DOE asked SMUD to confirm that it was in fact planning to utilize a 130-ton gantry crane, as the information that DOE had

indicated that SMUD was then currently capable of utilizing a 97.5 ton crane. DX 381, COF0042420.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

283. In response to DOE's letter, Mr. Shetler wrote in a December 7, 1992 letter that, "you questioned the crane capacity and spent fuel shipping methods. Your data should be updated to reflect a recent increase in capacity of the maximum lifting weight of the cask to 130 tons." DX 389, at SMUD 0019613.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

284. SMUD's contention that it would have used smaller casks also is in conflict with its own expert, Ivan Stuart. Mr. Stuart testified that a utility such as SMUD may legitimately decide to upgrade its facility to accept larger casks because it would allow for the faster removal of SNF. Direct Testimony of Ivan Stuart, at ¶ 31.

RESPONSE: SMUD objects to the government's proposed finding of fact because it misstates the evidence. Mr. Stuart's complete testimony is as follows:

> The only reason that a utility would perform facility upgrades and incur the additional costs would be if there were a demonstrable benefit to the utility. One such benefit could be upgrading the crane if DOE agreed to bring a large rail cask to the site that would allow faster and more efficient SNF removal. Extending this utility benefit concept, delivery of multiple rail casks in campaigns would allow very early removal of all of a shutdown plant's SNF.

I. Stuart Written Direct at ¶ 31. As Mr. Stuart noted, SMUD would not have upgraded its crane unless "there was a demonstrable benefit to the utility." *Id.*

285. In addition, Mr. Burford concluded that SMUD included in its damages claim $45,600 for the refurbishing its Polar Crane. Direct Testimony of Jerry Burford, at ¶ 110.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Field testified regarding his analysis of the proper deductions based on his analysis of what SMUD likely would have done had DOE begun performance as obligated in 1998. Tr. at 1045-61 (Field). The government raised no issue with Mr. Field's deductions at trial. Unlike Mr. Field, Mr. Burford has no personal knowledge of the various facility upgrades that were necessary for

the dry storage project. Furthermore, Mr. Burford cites no record evidence to support his assertions. An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact." *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

286. Mr. Burford explained that the Polar Crane is located inside the reactor building and, therefore, cannot be used in or around the Spent Fuel Building. *Id.* Consequently, Mr. Burford concluded that the refurbishment of the Polar Crane likely was done to support other decommissioning work and, therefore, is inappropriately included in SMUD's damages claim. *Id.* This testimony was unrefuted.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD reasserts its response to DPFOF ¶ 185. Mr. Burford's analysis is speculative and should be rejected. An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact." *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

**b. On-Site Drop Mitigation Test**

287. Similarly, although SMUD contends that $250,000 should be offset from its damages claim for its on-site drop mitigation testing that would have been conducted in the non-breach world, Pl. Br. 44, Mr. Burford explained at trial that this number was grossly understated. Direct Testimony of Jerry Burford, at ¶ 103.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Burford did not state that SMUD's number was "grossly understated." Rather, he testified that "there *could be as much as* $2.14 million that should be excluded from the damages claim." J. Burford Written Direct at ¶ 103 (emphasis added). This opinion is merely speculation on Mr. Burford's part. Furthermore, as explained more thoroughly in SMUD's responses to DPFOF ¶¶ 288-90, the factual evidence in this case supports SMUD's offset as claimed.

288. SMUD's own records reflect that one of its outside contractors, Packaging Technologies, charged SMUD $924,571 for an analysis of cask drops and design, fabrication, and delivery of cask drop impact limiters, and SMUD itself estimated that it would spend $419,000 of its own resources to install the impact limiters. DX 1359.

RESPONSE: SMUD objects to the government's proposed finding of fact to the extent the government suggests such costs should be offset from SMUD's damages claim. Mr. Field testified with regard to the various impact limiter testing and installation:

> Q. Now, Mr. Field, you would have had to incur the cost associated with the drop test, the pool drop test, regardless of what cask DOE provided, correct?
>
> A. We did not do any drop testing, impact limiter drop testing associated with the pool.
>
> Q. You did work on impact limiters though in the pool, correct?
>
> A. Yes, we did.
>
> Q. And it certainly was a possibility that you would have had to perform that work even with a DOE furnished cask, correct?
>
> A. No, I don't think that is correct. Rancho Seco, when it was originally designed, was designed for a 99-ton cask, which is a large cask. It's in a class of casks called a railroad cask, as opposed to a truck cask, which would be suitable for roadway transportation. So we were already designed and analyzed for a 99-ton cask, so anything that size or smaller would be bounded by the original plant design and not require impact limiters.

Tr. at 1191-92 (Field). Thus, Mr. Field testified that such costs were incurred as part of the dry storage project and would not have been incurred in the non-breach world. As such, they are properly included in SMUD's claim.

289. Further, another outside contractor, Vectra, charged SMUD $799,888 for impact limiter related services.

RESPONSE: SMUD objects to the government's proposed finding of fact because the finding is not supported by any record evidence. SMUD also reasserts its response to DPFOF ¶ 288.

290. Consequently, rather than a deduction of $250,000, as SMUD suggests, Mr. Burford concluded that costs related to onsite drop mitigation totaled approximately $2.14 million. *Id.* This testimony was unrefuted at trial.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Burford actually testified that "there *could be as much as* $2.14 million." J. Burford Written Direct at ¶ 103 (emphasis added). Mr. Burford had no factual support for such a deduction beyond his identification of the costs. An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact." *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991). SMUD, on the other hand, has presented testimony that such costs were appropriately included in SMUD's claim because they resulted from the government's breach and would not have been incurred in the non-breach world.

**4. SMUD's Inclusion Of The Cost Of Loading SNF Into Its ISFSI Should be Offset From Its Damages Claim**

291. SMUD has included in its damages claim $4,274,856 for the costs associated with the preparation, packaging, inspection and loading of its SNF into its ISFSI. Direct Testimony of Stephen Kiraly, at ¶ 74-75 & Att. 9.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

292. Mr. Burford explained at trial that these costs would have been incurred in the non-breach world. Direct Testimony of Jerry Burford, at ¶ 94.

RESPONSE: SMUD objects to the government's proposed finding of fact as the cited evidence does not support the finding. Mr. Burford stated in his written report that

> I have concluded and have been advised by DOJ that under the Standard Contract, SMUD is responsible for preparations, packaging, inspections, and loading of spent nuclear fuel into a shipping cask. SMUD is also responsible for proper description of the spent nuclear fuel and incidental maintenance, protection, and preservation of the shipping cask.

J. Burford Written Direct at ¶ 94. Mr. Burford merely has concluded that SMUD is responsible for certain tasks upon performance under the Contract, based on the representations of counsel. Mr. Burford has not provided any analysis regarding whether the specific costs incurred by SMUD would have been incurred in the non-breach world.

When DOE finally performs its obligations under the Contract, SMUD still will be required to "arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility." PX 44, Art. IV.A.2. Thus, SMUD still will be responsible for the removal of the canisters from the ISFSI and the loading of the canisters into a transportation cask for transfer to the DOE facility (*i.e.*, the transfer from ISFSI to DOE) – in other words, SMUD has not "saved" the costs of preparing and transferring the fuel to DOE. Unless the government concedes that all of these future loading and transfer costs are recoverable as damages, then SMUD is entitled to recover

its current transfer costs because it has been forced into an *additional* transfer of fuel (from pool to ISFSI) as a result of the government's breach.

### 5. SMUD's Damages Claim Fails To Consider Unavoidable Costs

293. SMUD's damages claim fails to provide any evidence that it has appropriately accounted for costs that were otherwise unavoidable. Direct Testimony of Stephen Kiraly, at ¶ 93.

RESPONSE: SMUD objects to the government's proposed finding of fact. As discussed more extensively in SMUD's response to DPFOF ¶ 248, SMUD has set forth what likely would have happened in the non-breach world. Mr. Field, SMUD's dry storage project manager and the most knowledgeable person with regard to the details of the project, analyzed SMUD's costs and concluded that several offsets were appropriate based on costs that would have been incurred in the non-breach world. Tr. at 954-55 (Field). Mr. Field has direct knowledge regarding the costs that were incurred and how the costs correspond to the various aspects of the project. *Id.* at 1045-61. Based on his analysis of the work that was done and the government's responsibilities upon performance, Mr. Field testified that certain costs associated with the project likely would have been incurred even if DOE had performed. *Id.* at 1031-45.

It is appropriate to rely on Mr. Field's testimony for these deductions, given his extensive personal knowledge of the dry storage project and the facts at issue in this case. *See De Graffenried v. United States*, 2 Ct. Cl. 640, 643 (1983); *see also Joy Mfg. Co. v. Sola Basic Indus., Inc.*, 697 F.2d 104, 111-12 (3d Cir. 1982) (recognizing admissibility and helpfulness of lay witness testimony by plant supervisor regarding the amount of downtime experienced).

SMUD has deducted these costs from its damages claim. Thus, contrary to the government's assertions, SMUD's damages claim is properly composed of only those costs that are directly attributable to the government's breach.

294. Mr. Kiraly stated that any obligations into which SMUD entered prior to the Government's breach, but which could not be avoided even absent the breach, should not be included in a damages claim. *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Kiraly offers no such "obligations" and merely raises the deduction as a possibility. Because there is no record evidence to support such opinions, they should be rejected. *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

295. Examples of unavoidable costs potentially included in SMUD's damages claim includes labor severance costs, contract termination costs, and lease and/or rental obligations. *Id.*, at ¶¶ 95-100.

RESPONSE: SMUD objects to the government's finding of fact. Mr. Kiraly cites no factual support for his assertions that "some claimed costs *may have been* unavoidable regardless of any alleged breach." S. Kiraly Written Direct at VII.C. Because there is no record evidence to support such opinions, they should be rejected. *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

296. Mr. Kiraly determined that these unavoidable costs would have been included in the $11,607,819 adjustment for miscellaneous questioned amounts. Direct Testimony of Stephen Kiraly, at ¶ 93.

RESPONSE: SMUD objects to the government's proposed finding of fact. The government offers no evidence to support this assertion other than the speculation of Mr. Kiraly. His $11.6 million deduction was simply a "miscellaneous" adjustment to reach a number that Mr. Burford calculated, despite his lack of experience, for a store-only system. Tr. at 2580, 2583-84 (Burford) (noting his lack of experience and agreeing that the $9.2 million does not include all the costs necessary and that he did not contact any vendors to determine the cost of such a system); Tr. at 2709 (Kiraly) (recognizing that this number is a deduction to reach Mr. Burford's number, based on costs which "we could not identify with any specificity"). This deduction is hypothetical and speculative in nature, and should be rejected by this Court. *See Haynes v. United States*, 61 Fed. Cl. 788, 793 (2004).

297. The miscellaneous adjustment made by Mr. Kiraly represented "the various adjustments that are indeterminable with the information available." Direct Testimony of Mr. Kiraly, at Att. 1.

RESPONSE: SMUD objects to the government's finding of fact. The fact that the adjustment is "indeterminable" merely supports SMUD's assertions that the deduction has no basis in fact and is merely speculative.

298. Specifically, at trial, Mr. Kiraly explained that this miscellaneous adjustment was the result of Mr. Kiraly's top down analysis looking at the total costs incurred, and Mr. Burford's conclusions regarding the maximum that a store-only dry storage system should cost. Tr. 2703:17-21 (Kiraly).

RESPONSE: SMUD objects to the government's proposed finding of fact. While SMUD objects to the adjustment, SMUD agrees that the $11,702,819 miscellaneous adjustment is merely the result of the difference between Mr. Kiraly's final "Remaining Costs Not Questioned" ($20,870,819) and Mr. Burford's purported total for a store-only system ($9,168,000). *See* J. Burford Written Direct at ¶ 124. Neither of these assertions is supported by the facts. *See* SMUD's Responses to DPFOF ¶¶ 293-97.

299. Mr. Kiraly explained that Mr. Burford indicated that a store-only system would cost no more than $9 million, and that Mr. Kiraly was able to identify with specificity all but $20 million. Tr. 2707:8-17 (Kiraly). In other words, the $11 million miscellaneous adjustment represents the difference between the $20 million arrived at by Mr. Kiraly and the $9 million arrived at by Mr. Burford for the costs associated with the major components for a store-only system.

RESPONSE: SMUD objects to the government's finding of fact. For all the reasons stated in SMUD's responses to DPFOF ¶¶ 293-99, SMUD objects to a deduction of the government's baseless "$11 million miscellaneous adjustment."

Further, Mr. Burford's $9 million estimate is not based on any testable methodology and is unreliable because he has no experience in the area of dry storage or dual-purpose dry storage systems. Tr. at 2554-55, 2587 (Burford); *see also id.* at 2580, 2583-84 (Burford) (noting his lack of experience and agreeing that the $9.2 million does not include all the costs necessary and that he did not contact any vendors to determine the cost of such a system)

300. For example, Mr. Kiraly identified the types of costs included in the $11 million, such as the bonuses paid to PCC, and some of the fixed plant costs associated with having an ISFSI. Tr. 2707:18-2708:7 (Kiraly).

RESPONSE: SMUD objects to the government's finding of fact. Mr. Kiraly has no factual support for such speculations. Because Mr. Kiraly has presented no record evidence to support his opinions, they should be rejected. *Genmoora Corp. v. Verdesca*, 939 F.2d 1149, 1163 (5th Cir. 1991).

### 6. SMUD's Damages Claim Improperly Includes Costs Related To Premature Mobilization Of Its Labor Force Associated With The Loading Of Its ISFSI

301. SMUD's damages claim includes all labor costs associated with the loading of SNF into dry storage. Direct Testimony of Stephen Kiraly, at ¶¶ 72-75 & Att. 8 & 9.

RESPONSE: SMUD does not object to the government's proposed finding of fact.

302. SMUD brought on site contractor mechanics, welders, and fuel team specialists as early as July 1999, despite the fact that SMUD did not receive the MP187 cask until July 2000, or the first canister until September 2000. DX 956, DX 1027, DX 936, DX 1069, DX 1081.

RESPONSE: SMUD objects to the government's finding of fact to the extent it suggests that SMUD's actions in training and preparing to transfer highly radioactive spent nuclear fuel from the wet pool to canisters, and the canisters to the ISFSI, were unwarranted. SMUD has presented evidence that its actions were necessary and appropriate under the circumstances. *See* PFF ¶¶ 323-27. By engaging in training and test runs prior to actual loading, SMUD was able to locate and address any problems with the equipment and procedures prior to actual transfer of the spent nuclear fuel. Tr. at 641 (Redeker). Because of this careful preparation, SMUD did not experience any incidents during the actual transfer of spent nuclear fuel. As Mr. Redeker testified, "The most positive indicator to me that we didn't start too early is that the fuel off-load went extremely well. The crews were very proficient. And it paid off. . . . We trained very hard for very long and it paid off in spades as the actual project went very smoothly." *Id.* at 641 (Redeker); *cf.* PX 619 (noting that casks at Trojan began dissolving in borated water during initial load).

303. Mr. Burford explained at trial that, based upon his significant project management experience at nuclear utilities, "a three month mobilization time frame for this project would have been sufficient to support training, readiness reviews, and other onsite preparation activities related to loading and transferring the fuel." Direct Testimony of Jerry Burford, at ¶ 86.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Burford's analysis is speculative, as he offers no support for his opinion. Furthermore, Mr. Burford admitted at trial that he has never "supervised a canister/cask loading project of the magnitude carried out at SMUD," he has never "been responsible for transferring fuel from a wet pool to an ISFSI," he has never "prepared written procedures for a fuel move from a wet pool to an ISFSI," and he has "never conducted training for a fuel move from a wet pool to an ISFSI." Tr. at 2587 (Burford).

Mr. Burford offered no estimate of what costs should have been incurred for the mobilization efforts and he did not investigate the mobilization period experienced by other utilities. *Id.* at 2690. Mr. Burford offered no opinion on what size staff would have been required to conduct such a mobilization in a three-month period. *Id.* Finally, he testified he has "no opinion" regarding whether the amount of the government's proposed offset for early mobilization – $2.55 million – is proper. *Id.* at 2592. An opinion, without any basis in fact, is the definition of speculative testimony. *Genmoora*, 939 F.2d at 1163 (An expert's testimony should be rejected "if it is based merely on speculation and conjecture without basis in fact."); *Am. Dredging Co. v. United States*, No. 58633, 1951 WL 5376, at *3 (Ct. Cl. July 9, 1951)

(rejecting the expert's testimony as speculative because there was no evidence in the record to support the expert's conclusions).

304. Further, Mr. Burford explained that February 1, 2001 was the proper date for labor and equipment mobilization, because that was the date that a fuel loading "dry run" was conducted with the cask. *Id.* at ¶ 87.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Burford offers no basis for his conclusion that the "dry run" was the significant date for purposes of mobilizing labor. Mr. Burford admitted at trial that he has never "supervised a canister/cask loading project of the magnitude carried out at SMUD," he has never "been responsible for transferring fuel from a wet pool to an ISFSI," he has never "prepared written procedures for a fuel move from a wet pool to an ISFSI," and he has "never conducted training for a fuel move from a wet pool to an ISFSI." Tr. at 2587. Thus Mr. Burford has no basis for his selection of the "dry run" date as a basis for limiting SMUD's damages.

305. Consequently, Mr. Burford stated that costs associated with mobilization of support labor and equipment rentals that occurred prior to November 1, 2000 should be excluded from SMUD's damages claim. *Id.* at ¶ 88.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Burford did not investigate the time that other utilities have put into training and readiness reviews for a fuel move. Tr. at 2590 (Burford). He also offered no opinion regarding the size of staff that would be required to effectively mobilize in a period of three months. *Id.* Mr. Burford also did not know what tasks SMUD actually performed during the period he proposes should be excluded. *Id.* at 2590. Thus, Mr. Burford's testimony does not provide a basis for offsetting the costs that SMUD has proven with reasonable certainty.

306. Mr. Kiraly testified that the costs associated with this premature mobilization totaled $2,550,131. Direct Testimony of Stephen Kiraly, at ¶¶ 72-73, at Att. 8. Additionally, Mr. Kiraly questioned $4,274,856 due to SMUD's failure to demonstrate that these costs were incremental during the loading period for the ISFSI. Direct Testimony of Stephen Kiraly, at ¶¶ 74-75 & Att. 9.

RESPONSE: SMUD objects to the government's proposed finding of fact. Mr. Kiraly has no experience in the nuclear industry, and is not qualified to propose such a deduction. To the extent he relies on Mr. Burford, Mr. Burford testified that he does not know what work is included in the $2.55 million figure calculated by Mr. Kiraly. Tr. at 2592 (Burford). Mr.

Burford also testified that he has no opinion as to whether the $2.5 million is an appropriate offset. *Id.*

With regard to the $4,274,856 deduction proposed by Mr. Kiraly, SMUD reasserts its responses to DPFOF ¶¶ 291-92, wherein SMUD addressed this argument specifically.

**7. SMUD's Damages Claim Fails To Provide A Proper Offset For The Substantial Cost Savings That SMUD Realized By Placing Its SNF Into Dry Storage**

307. One of the primary reasons that SMUD decided to pursue dual-purpose dry storage was the substantial cost savings it would realize by abandoning its wet pool. DPFOF ¶¶ 20-22, 109. SMUD claimed at trial that the actual, realized savings from abandoning its wet pool and placing its SNF into dry storage was $4,146,360, and that such savings began to accrue in 2002. Tr. 1170:19-25 (Field).

RESPONSE: SMUD objects to the government's proposed finding of fact as misleading. The government's focus on cost savings while ignoring the impact of DOE's breach is mistaken, as SMUD's desire to lower its storage costs is precisely what is required under its obligation to mitigation damages. DOE's delay magnified the importance of the potential cost savings because it meant that SMUD might have to store its spent fuel for several decades. This relationship is well-documented by the record in this case.

The 1992 staffing summary sheets that recommended authorizing contract negotiations and then approving the contract with Pacific Nuclear both specifically reference the savings that will result from the transfer of fuel to dry storage during the period of the government's delay, from 1998 to 2010. *See* PX 259 at 2; PX 269A. The EA, issued by the NRC in 1994, states that the "absence of a Federal repository makes storage of spent fuel in dry shielded canisters above ground SMUD's primary alternative." PX 363 at 8.

This relationship is further illustrated by the testimony of SMUD's Assistant General Manager, Jim Shetler, who explained the effect of the uncertainty and potential delay in DOE's performance as follows:

> Well, I think the issue that we were looking at was we were now talking rather than maybe eight or ten years of storage, a couple of decades of potential storage.
>
> * * *
>
> So what we were looking at is how do we deal with storing this fuel for the long haul. How do we do it safely? How do we do it with the potential of losing experienced people? And how do we do it in a method that is cost-effective? And also how do we do it

in a method that would hopefully allow for DOE receipt?
Ultimately.

Tr. at 160 (Shetler).

Finally, SMUD also objects to the government's assertion that SMUD's wet pool costs began to accrue in 2002. As elaborated on more fully in SMUD's responses to DPFOF ¶¶ 308-09, SMUD did not recognize the estimated wet pool savings in 2002, and thus there is no basis for such a deduction in 2002.

308. SMUD has failed to account for this substantial cost savings in its damages claim.

Tr. 1171:12-14 (Field).

RESPONSE: SMUD objects to the government's proposed finding of fact. In the non-breach world, SMUD would have incurred the costs of wet pool storage until DOE removed the last of SMUD's fuel. Given the possibility of exchanges, shutdown priority, and campaigns, had DOE begun accepting spent fuel in 1998, SMUD could have had its fuel removed by 2003. *See* PX 44, Arts. V.E., VI.B.1.b.; I. Stuart Written Direct at ¶¶ 32-40 (PX 1001); E. Supko Written Direct at ¶¶ 47, 107-109, 152 (PX 1002); PFF ¶¶ 556-71. SMUD did not begin to realize the monetary benefits of the transfer of fuel from wet to dry until 2003. *See* PFF ¶ 402. Thus, SMUD has not deducted the cost savings it accrued in 2003 from transferring the fuel to dry storage. If this Court concludes that SMUD likely would not have had all of its fuel removed prior to 2003, however, a deduction of $4,196,360 for 2003 would be appropriate.

309. SMUD's damages claim should be offset by $4,146,360 in annual savings beginning in 2002.

RESPONSE: SMUD objects to the government's proposed finding of fact. The government's assertion that SMUD's damage claim should be offset for the year 2002 is refuted by the facts.

It is undisputed that SMUD did not finish loading its fuel into the ISFSI until August of 2002. *See* PFF ¶ 399 and Response. Following final loading of the fuel into the ISFSI, costs associated with the spent fuel pool continued for a period while SMUD wrapped up its activities associated with the final transfer of the fuel and began decommissioning the pool. *See* PFF ¶ 400-02. The government does not dispute that SMUD only realized savings "gradually, as staff was reduced." *See* Def's Resp. to PFF ¶ 400. Furthermore, at the time of trial, SMUD was still in the process of decommissioning the pool. *See* PFF ¶ 457; Def's Resp. to PFF ¶ 457. Given that the fuel was in the pool through August 2002, and that pool costs continued during the remainder of the year as staff was gradually reduced, there is no basis for the government's assertion that the annual wet pool savings should be deducted in 2002.

**8. SMUD's Damages Claim Fails To Account For The Savings Associated With Decommissioning Its Wet Pool**

310. Mr. Hamal testified at trial that SMUD's damages claim fails to consider the benefits that SMUD received as a result of decommissioning its wet pool. Direct Testimony of Cliff Hamal, at ¶¶ 95-96.

RESPONSE: SMUD objects to the government's proposed finding of fact. The benefit that SMUD has received as a result of decommissioning its wet pool is that SMUD was able to gradually eliminate the personnel responsible for overseeing the pool at a savings of approximately $4,146,360. As discussed above in SMUD's responses to DPFOF ¶¶ 307-09, SMUD did not recognize such savings until 2003. Because this Court may conclude that SMUD's fuel could have been removed by 2003, SMUD has not deducted the cost savings for 2003. If this Court concludes that SMUD would not have had all of its fuel removed prior to 2003, SMUD has recognized that a deduction of $4,196,360 for 2003 would be appropriate. SMUD has realized no additional decommissioning "savings."

311. As Mr. Hamal explained:

> The decommissioning of the Rancho Seco site is an enormous task that has been planned and executed since the unit was shut down. It is my understanding significant progress has been made on this effort, and Mr. Redeker testified that approximately $300 million of the $524 million project has been completed. Decommissioning is directly affected by the method of storing the SNF because nuclear safety concerns impose significant restrictions on what can be done at the site when the fuel is in the pool. This not only affects decommissioning of the pool, but the continued need for systems used to maintain the safety of the SNF in the pool would have restricted decommissioning activities elsewhere at the station unless further modifications were made at the station.

Direct Testimony of Cliff Hamal, at ¶ 95; *see* DX 41.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD has not realized any decommissioning "savings" as a result of the government's breach and delay in performance of at least twelve years in the disposal of SMUD's fuel. In fact, SMUD's decommissioning costs will increase because of the need to decommission the ISFSI site and pad. *See* Pl. Response Br. at 29.

Regardless of when various aspects of decommissioning are completed, SMUD has to complete the same activities and incur the same costs. See PFF ¶ 459. The reduced costs from the closure of the spent fuel pool (stemming from terminating employees) are already reflected in the difference between wet and dry storage costs discussed in SMUD's response to DPFOF ¶ 310. The transfer of spent nuclear fuel to the ISFSI has not accelerated the final

decommissioning of the plant because that requires that all fuel is removed from the site. See PFF ¶ 438. Thus, SMUD must continue to maintain its NRC license and pay all required NRC fees. See PFF ¶¶ 439-40. Nor was dry storage necessary for SMUD to pursue its initial decommissioning strategy, which anticipated active decommissioning commencing in 2008, or its revised strategy, which involved incremental decommissioning around the pool. See PFF ¶¶ 442-47, 453-57; see also Tr. at 216-18 (Shetler); Tr. at 696-97 (Redeker). Thus, there is no evidence that DOE's breach has "saved" SMUD any costs regarding decommissioning.

312. Mr. Hamal explained that, had SMUD left its SNF in its wet pool, it would have had to have made material changes to its decommissioning plan. Direct Testimony of Cliff Hamal, at ¶ 96.

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. SMUD's original decommissioning plan provided for the stabilization of the existing facilities at the Rancho Seco plant through 2008 to allow adequate decommissioning funds to accumulate. Tr. at 212 (Shetler). If the government had performed its obligations under the Contract, SMUD could have carried out its decommissioning as planned. Tr. at 216 (Shetler) ("The decommissioning plan envisioned that we would place the plant in some sort of safe storage mode, mothball mode. It could be done whether the fuel was in wet storage or not. And come back in 2008. If the DOE had performed under the original schedule, the fuel would have been gone by then.").

SMUD subsequently transitioned to incremental decommissioning in late 1996, early 1997, when DOE's breach was absolutely certain. Tr. at 697 (Redeker). Under the revised incremental decommissioning plan, SMUD began a two year process of decommissioning particular segments of the plant as they became available. Tr. at 217 (Shetler); *id.* at 697 (Redeker). SMUD engaged in incremental decommissioning of the plant while the fuel was still in the spent fuel pool. Thus, SMUD decommissioned around a partially islanded spent nuclear fuel pool. *Id.* at 218 (Shetler); 697 (Redeker) (noting SMUD "decommissioned around the pool"). If SMUD would have left the fuel in the pool and awaited DOE's performance, SMUD would have simply decommissioned around the pool until it was available, just as it did in the breach world. *Id.* at 315 (Shetler). Thus, SMUD would not have had to make material changes to its decommissioning plan.

313. Consequently, Mr. Hamal concluded that a proper damages claim would have considered the cost savings associated with decommissioning its wet pool. Direct Testimony of Cliff Hamal, at ¶ 96. This testimony went unrebutted at trial.

<u>RESPONSE</u>: SMUD objects to the government's proposed finding of fact. For the reasons articulated in SMUD's responses to DPFOF ¶ 312-13, SMUD's decommissioning activities in the breach world did not result in any "cost savings" to SMUD. To the extent any savings were realized associated with the wet pool, such costs are properly addressed by SMUD's analysis of the wet storage cost savings.

314. SMUD's contemporaneous documents unequivocally reflect that SMUD believed there was a significant cost savings in going to dual-purpose dry storage, because it would facilitate the elimination of its wet pool and, consequently, SMUD's Part 50 operating license. DX 721, at SMUD 061592 (1997 evaluation concluding that store-only dry storage was not a preferred option, because it would delay SMUD's ability to decommission its wet pool, thereby resulting in additional costs in maintaining its Part 50 operating license); Tr. 734:21-735:8, Tr. 736:7-17, Tr. 772:3-8 (Redeker) (acknowledging that there is a "direct link" between SMUD's dry fuel storage options and its decommissioning efforts).

RESPONSE: SMUD objects to the government's proposed finding as misleading. SMUD has sought to mitigate its damages resulting from the government's breach. So long as SMUD stores SNF at its site, it must have an NRC license to be do so. SMUD is required to have a license for storing fuel under its ISFSI under 10 C.F.R. Part 72. SMUD also still has a license under 10 CFR Part 50, which it will not be able to eliminate until the pool is decommissioned. *See* Tr. at 736 (Redeker) (noting Part 50 license must be maintained until the pool is decommissioned); Tr. at 1031 (Field) (noting SMUD is in the process of decommissioning its pool).

315. Absent the placement of SMUD's SNF into dry storage, SMUD would have had to maintain its wet pool. Tr. 736:10-737:3 (Redeker). Had it maintained its wet pool, SMUD would be unable to eliminate its Part 50 operating license. *Id.*

RESPONSE: SMUD objects to the government's proposed finding of fact. *See* SMUD's Response to DPFOF ¶ 314.

316. The elimination of its wet pool and, consequently, its Part 50 operating license represents a cost savings to SMUD that SMUD has not considered in presenting its damages claim or provided as a credit to the Government in that claim.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD is in the process of decommissioning its wet pool. Tr. at 315 (Shetler). Because SMUD has not finished decommissioning the pool, SMUD has not yet eliminated its Part 50 operating license. *See* Tr. at 736 (Redeker). Thus, SMUD has not realized any cost savings related to its Part 50 license.

### 9. Many Of SMUD's Claimed Incurred Costs Are Not Proper Damages For Multiple Reasons

317. Mr. Kiraly explained that, in some cases, more than one reason may exist for questioning a claimed cost. Direct Testimony of Stephen Kiraly, at ¶ 101.

RESPONSE: SMUD does not object to the government's proposed finding of fact, to the extent that Mr. Kiraly's testimony addresses the theoretical possibility and includes no conclusion regarding whether any costs should *actually* be questioned.

318. For example, the overhead markups on a labor expense may be questioned: (1) because of the nature of the overhead pool; (2) because of questions regarding the underlying work; and (3) because of questions regarding the incremental nature of the labor costs. Direct Testimony of Stephen Kiraly, at ¶ 101.

RESPONSE: SMUD objects to the government's proposed finding of fact. As noted in SMUD's responses to DPFOF ¶¶ 256-75, SMUD disagrees with the government's arguments regarding SMUD's labor burdening and labor costs.

319. Although Mr. Kiraly made adjustments to the claim only once, Mr. Kiraly explained that "there often are still secondary or tertiary reasons for questioning particular costs." Direct Testimony of Stephen Kiraly, at ¶ 102.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD disagrees that there are any valid reasons for questioning the costs claimed.

320. Mr. Kiraly concluded that, if SMUD is able to establish a causal link between its claimed cost and the Government's breach, SMUD's damages claim should be reduced to no more than $9.263 million and as little as $3.08 million. Direct Testimony of Stephen Kiraly, at ¶ 102.

a. Most of the reductions identified by Mr. Kiraly were computed from specific questions regarding the claimed damages. Direct Testimony of Stephen Kiraly, at ¶ 102.

b. The remaining reduction was computed using the "should have been" estimate determined by Mr. Burford. Direct Testimony of Stephen Kiraly, at ¶ 102.

RESPONSE: SMUD objects to the government's proposed finding of fact. SMUD has established that DOE's breach caused it to incur damages in the amount of $21,553,462 for 1992 to 1997 and $55,049,870 for 1998 to 2003. This represents SMUD's total costs minus appropriate offsets.

Mr. Kiraly relies on the analysis of Mr. Burford for the conclusion that SMUD's damages should be limited to no more than $9.263 million and as little as $3.08 million. S. Kiraly Written Direct at ¶ 102. Mr. Burford testified, however, that the $9.263 million for a store-only system does not include all of the costs that SMUD would have incurred, including the costs of engineering oversight, ISFSI security infrastructure, licensing under Part 72, auxiliary equipment, and developing the ISFSI pad. Tr. at 2583-84 (Burford). Furthermore, Mr. Burford's cost estimate is flawed because he has no experience in developing a dry storage system. Mr. Burford did not talk with any venders of store-only systems to determine the cost of such a system. *Id*. at 2584. Finally, Mr. Burford states he does not know how much utilities were paying for such a system in 1992. *Id*. at 2580. Thus, the government offers no factual basis for reducing SMUD's damages as proposed.

## VII. SMUD HAS FAILED TO MEET ITS BURDEN OF DEMONSTRATING THAT THE GOVERNMENT HAS BREACHED IT DUTY OF GOOD FAITH AND FAIR DEALING

321. Mr. Zabransky and Mr. Pollog both testified at trial that the reason the 900 MTU rate of acceptance was carried over from the 1991 ACR was that there simply was no basis for the use of a different rate of acceptance. Tr. 1674:2-5 (Zabransky); Tr. 1992:10-15 (Pollog).

RESPONSE: SMUD objects to the proposed finding of fact, but agrees that Mr. Zabransky and Mr. Pollog made such assertions.

SMUD notes that Mr. Zabransky didn't work at DOE until 1995. In addition, the testimony discussed above only addresses why the 900 MTU rate was used again in 1993 and 1995. As to why the 900 MTU rate was *initially* included in DOE's planning documents, DOE official Lake Barrett admitted in his deposition that that he spoke with DOE lawyers regarding the possibility that DOE could reduce utility damages claims against it by maintaining a low "obligation" rate compared with the higher 3000-ton rate at which DOE ultimately expected to perform. Designations Appendix (Dckt. #310) at 348-49 (Barrett).

Furthermore, with regard to the use of the 900 ton rate in 1995, when asked repeatedly at his deposition why DOE continued to use the 900 ton rate in the 1995 APR/ACR when the MRS proposal upon which it was based was dead, Lake Barrett, the longtime acting and deputy director of the program, could provide no explanation:

> Q. In light of the sworn testimony you have just provided, sir, why did the Department of Energy choose to use an acceptance rate that reflected capacity limits applicable to and only applicable to an MRS facility when all the

governing plans at that point in time did not envision the use of any such facility?

A. I don't know.

Q. Can you give any reason sitting here today to justify why Exhibit 39 [the 1995 APR/ACR] contains capacity limitations applicable only in the context of an MRS facility but no such facility was envisioned at the time Exhibit 39 was prepared?

A. I don't know.

Q. Can you come up with any, sir?

A. No.

Designations Appendix (Dckt. #310) at 234-35 (objections omitted).

322. Susan Klein unequivocally stated that the use of the 900 MTU rate was not for purposes of litigation, and that DOE had always viewed the approved DCS as its legal obligation even before the litigation. Def. Counter-Designation of S. Klein, at Tr. 354:17-355:13 (4/25/02).

RESPONSE: SMUD objects to the government's finding of fact because it misstates the evidence. Ms. Klein actually testified as follows:

Q. Wouldn't it be fair to say, Ms. Klein, that the lower rate that DOE is using, that is, the rate that goes up to 900 MTU and stops there, is being used for one purpose and that is for this litigation?

A. That seems to be a legal conclusion, but I'm thinking, though, whether this is *only* for this litigation. I would say no.

Def. Counter-Designation of S. Klein, at Tr. 354-55 (4/25/02) (emphasis added) (objections omitted). Thus, Ms. Klein does not state "unequivocally" that the rate was not for purposes of litigation. Rather, she says it was not "only" for this litigation. *See id.* at 355. Ms. Klein also testified that DOE intended to use the 3000 ton rate when it began performance, a conclusion supported by all of the evidence in this case. Designations Appendix (Dckt. #310) at 1798-99, 1824 (Klein).

DATED this 1st day of November, 2005.

Respectfully submitted,

/s/ Howard N. Cayne

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

Counsel of Record for
Plaintiff Sacramento Municipal Utility District

Of Counsel:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Response To Defendant's Proposed Findings Of Fact to be filed electronically through the Court of Federal Claims Case Management/ Electronic Case Filing System on November 1, 2005. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Alan Lo Re
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

/s/ Timothy R. Macdonald