IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | No. 98-488 C<br>(Judge Braden) |

# Written Direct Testimony of James Field Supporting Table B

## I. INTRODUCTION

(1) My name is James Field. I am the Engineering Superintendent for the Sacramento Municipal Utility District at the Rancho Seco Nuclear Power Plant (“Rancho Seco”). As Engineering Superintendent, I provide, through a staff of engineers, technical support and oversight to the decommissioning of Rancho Seco, a 900 megawatt nuclear power plant.

(2) I received a Bachelors of Science degree in Mechanical Engineering from California State University at Sacramento in 1975. I am a Registered Professional Mechanical Engineer and Registered Professional Fire Protection Engineer in the State of California. I hold a Certificate in Hazardous Materials Management from the University of California at Davis.

(3) I have been employed by the Sacramento Municipal Utility District for thirty-one years, holding a variety of engineering and management positions, primarily involving the operation, modification and decommissioning of Rancho Seco Nuclear Power Plant. At the time of the initiation of the Spent Fuel Dry Storage Project, I was the site Mechanical Engineering Supervisor. By November of 1992, I had assumed overall responsibility for the Rancho Seco engineering group. From November of 1999 until the completion of the project, I served as Dry Fuel Storage Project Manager, while continuing my duties as Engineering Superintendent. I was continuously involved in the project and directly supervised the District’s engineers throughout the project. Staffing levels varied over the course of the project, based on project needs. The maximum staffing level during the project was fourteen engineers. I previously testified at the hearing in March 2005, and additional information regarding my background can be found in the transcript of that hearing at pages 951-956.

## II. SUMMARY

(4) In the Order Requesting Supplemental Expert Testimony, dated March 31, 2006, the Court directed that a Table B be submitted that quantified "any costs attributable to the dual purpose, transportable features of the dry storage system." This testimony lists those costs and describes the methodology that I used to identify them. I conclude, through my review of project records, as detailed below, that $2,655,146 of project costs incurred before May 15, 1997 and $1,440,109 of project costs incurred after May 15, 1997 are attributable to transportable features of the dry storage system.[1]

(5) As part of my work, I prepared five Excel spreadsheets, which set forth the costs attributed to the dual purpose transportable features of the dry storage system by vendor and by time period. Specifically, I have attached the following tables:

- Exhibit 1 is a spreadsheet that lists all PacNuc/Vectra attributable costs incurred prior to May 15, 1997, totaling $2,606,763.91.
- Exhibit 2 is a spreadsheet that lists all other attributable costs incurred prior to May 15, 1997, totaling $48,381.86.
- Exhibit 3 is a spreadsheet that lists all Vectra attributable costs incurred after May 15, 1997, totaling $156,607.00.
- Exhibit 4 is spreadsheet that lists all TNW attributable costs incurred after May 15, 1997, totaling $1,250,633.86.
- Exhibit 5 is a spreadsheet that lists all other attributable costs incurred after May 15, 1997, totaling $32,868.43.

## III. METHODOLOGY

(6) District costs for a given project are tracked using one or more Work Order Numbers (accounting codes). The Dry Fuel Storage Project utilized nineteen Work Order Numbers. I initially reviewed the nineteen Work Order Numbers to determine which, if any, were specific to transportable features. I determined that one Work Order, 604028, fit this criterion. This Work Order was established to capture costs associated with Scale Model Cask Impact Limiter Drop Testing, an activity that was required by the 10 C.F.R. 71 (transportation) licensing effort. Records show that charging to this Work Order ended in late 1995. These charges should be deducted pursuant to the Court's order, and I have included these charges in the pre-5/15/97 table attached as Exhibit 2.

[1] I note that if SMUD had developed a storage-only system without the transportation features, SMUD would not have been able to decommission its wet storage pool. As a result, SMUD would not have realized the $4,146,360.00 in wet storage costs it saved in 2003 as a result of decommissioning the pool in 2003.

(7) I then reviewed various working papers of Brian Brinig that were produced in support of his expert reports. Specifically, I reviewed lists from the SAP and FMIS periods that included all materials and outside services charges included in SMUD's claims. The complete list is provided as Exhibit 6.

(8) These tables contained vendor names and summary purchase order text. Drawing on my experience on the project, knowledge of the types of material and services that these vendors typically provided, and knowledge of how a given material or service might fit into the project, I identified charges that were attributable to the transportable features and compiled them in an Excel spreadsheets, attached as Exhibits 1-5. In many cases, I reviewed detailed information such as invoices, purchase orders and contracts before reaching a conclusion.

(9) I next reviewed all invoices and supporting documentation from the primary project vendors, Pacific Nuclear, Vectra and Transnuclear West ("TNW"). This involved a page-by-page review of several boxes of invoices from those vendors, which had previously been produced to the government during discovery in this case. Again, drawing on my detailed understanding of the system design, licensing bases and project history, I identified charges that were attributable to the transportable features and compiled them in the attached as Exhibits 1, 3 and 4.

(10) As a means of checking for missed charges, I reviewed listings of all vendors prepared by the District's document control group. These tables provided a listing of all vendors whose material and services were charged to one of the Dry Fuel Storage Work Order numbers.

(11) As a final step in assembling the tables of charges, I reviewed the Direct Testimony of the government's accounting expert, Stephen Kiraly of Navigant Consulting, on this issue.[2] I have addressed Mr. Kiraly's conclusions below.

## IV. ANALYSIS

(12) In performing my review, I identified those costs that are attributable to the dual purpose, transportable features of the dry storage system. The focal pieces of hardware for the system—the canisters and cask—served four purposes: onsite storage in the concrete modules, onsite (backup) storage in the cask, onsite transfer (from the Spent Fuel Building to the ISFSI concrete modules), and eventual offsite transportation for final disposal. In performing my review, I identified those project requirements that are attributable to transportability. They are the neutron-absorbing material in the canister along with features to secure it, special material for the cask body (XM-19), cask rupture discs, cask closure bolting testing, Nuclear Regulatory Commission reviews of the Part 71 Safety Analysis Report, Thermal Performance Testing and some canister spacer disc fabrication. The special material for the cask body, the additional spacer disks and the cask closure bolt testing ensured an additional degree of robustness for transportation. The neutron-absorbing material and cask rupture discs addressed hypothetical transportation accidents.

[2] *See* Written Direct Testimony of Stephen Kiraly, DX 2003.

(13) The canister spacer discs presented a unique situation, in that the number of spacer discs increase from eight to twenty-six during the NRC's review of the Transportation Safety Analysis Report ("SAR"). To account for this "transportable feature," I ratioed expenditures that I could attribute to spacer disc fabrication by a factor of (26-8)/26 or 69.2%. To be conservative, I attributed all spacer disc material qualification costs to transportable features.

(14) In the course of my review, the vast majority of the costs related to transportable features of the dry storage system were contained in the Vectra and TNW invoices. This is logical, in that Vectra/TNW were responsible for the system design and fabrication and for obtaining the Part 71 (transportation) License. The exceptions that I encountered were charges from AAR Cargo Systems for the delivery of neutron poison Quality Assurance samples to Rancho Seco, charges from New World Technologies for tooling to help verify the adequacy of cask lid attaching bolts and various District internal labor and outside supplier charges resulting from hosting scale model impact limiter testing at Rancho Seco (pre 5/1997).

(15) TNW engineering hours and engineering hours billed by their subcontractors were included in the table whenever, based on my review, they could be attributed to transportable features.

(16) TNW's nominal markup of 12% and sales tax of 7.75% were applied. Note that TNW would perform annual retroactive reviews of this G&A markup and calculate an actual G&A markup which was typically about 9.8%, the value that Mr. Kiraly, the government's accounting expert, uses in his analyses. To be conservative, I used the higher 12% markup and did not reduce the markup to reflect TNW's correction.

(17) The absence of internal labor hours and materials in the transportation offset, other than those I attributed under Work Order 604028, also appears reasonable in that the focus at Rancho Seco, particularly after May of 1997, was preparations for successfully loading fuel into the canisters and insertion of the canisters into the ISFSI. Eventual offsite transport by DOE was viewed as such a distant concern that preparation for such transportation by District personnel was unnecessary. I note that Mr. Kiraly did not include in his transportation analysis any offset for SMUD internal labor.

## VI. <u>REVIEW OF THE DIRECT TESTIMONY OF STEPHEN KIRALY (NAVIGANT)</u>

(18) As a final check of the work that I performed, I reviewed the Written Direct Testimony of Stephen Kiraly, the government's accounting expert, presented during trial, focusing on Section D4 and Attachments 10 and 11.[3] In this section, Kiraly develops a value for what he describes as the "transportation features" of the system, using an approach that is quite different than the one described above.

[3] *See* Written Direct Testimony of Stephen Kiraly, DX 2003.

(19) Mr. Kiraly's analysis relies on various TNW "cost accounting codes," which were compiled from various project documents, to attempt to identify the transportation features of the system. Mr. Kiraly relied on individuals at Watkins Consulting, Inc. to make a determination as to those codes that, in their opinion, were attributable to "transportation." However, these accounting codes by their terms do not reference transportation features and were not developed or used for the purpose of segregating transportation costs. Instead, they were internal accounting codes used and developed by the vendor, TNW, for its own internal accounting. Furthermore, multiple different work descriptions were attributed to these cost codes by TNW employees. Thus, Mr. Kiraly's reliance on these accounting codes as a basis for his proposed transportation deduction is improper and unreliable. Furthermore, Watkins Consulting and/or Mr. Kiraly erroneously concluded that all design, licensing and fabrication costs for the cask are attributable to transportable features. As noted above, however, this is incorrect. The NRC required that SMUD have the cask for transfer of the fuel from the pool to the ISFSI and as a backup storage device in order to recover from, among other things, an off-normal event involving the fuel or canister.

(20) In contrast to Mr. Kiraly's efforts, I reviewed the material and outside service charges for the project and identified those costs that are attributable to the dual purpose, transportable features of the dry storage system. I have deducted those costs that are attributable to transportable features by examining all features of the entire project, including costs associated with the cask and with the canisters, as various features of the canisters can also be attributed to transportation as I described above. I note that Mr. Kiraly did not deduct costs from SMUD's damages for the FO/FC canisters because he attributed those costs to "storage-only." In contrast, I examined the features of the canisters that were attributable to the transportable features and deducted them as appropriate.