IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 98-488 C<br>(Judge Braden) |

# Written Direct Testimony of Brian P. Brinig Supporting Table C [1]

## I. INTRODUCTION

1) My name is Brian P. Brinig. I have been a Certified Public Accountant in the State of California since 1977. A copy of my resume is attached as Exhibit 1, and a copy of the cases in which I have provided expert testimony since 2002 is attached as Exhibit 2.

2) I have been asked to create "Table C" pursuant to the Court's March 31, 2006 Memorandum and Order that requests preparation of "Table C – including cost data from Table B, minus any costs attributable to a contract, lease, or other legal obligations executed by Plaintiff prior to May 15, 1997."[2] Ultimately, if a particular cost is included in Table C, it is subtracted from claimed damages.

3) The Court's March 31, 2006 Order Requesting Supplemental Expert Testimony specifies the time periods prior to and after May 15, 1997 for various calculations. In the SMUD accounting system, all data before November 1, 1999 was accounted for under the FMIS software program. The present, retrievable data from that program includes the month and year of each charge, but it does not include the specific day of the charge. Consequently, I cannot specifically determine the amount of charges that were incurred during the first half of May or the second half of May. Under these circumstances, I used a cut off date of June 1, 1997 (instead of May 15, 1997), a longer period of time for the offset, for the Court's required exclusion of costs from SMUD's overall damages claim.

---

[1] The March 31, 2006 Memorandum and Order requests preparation of "Table C – including cost data from Table B, minus any costs attributable to a contract, lease, or other legal obligations executed by Plaintiff prior to May 15, 1997."

[2] March 31, 2006 Order Requesting Supplemental Expert Testimony; page 1.

4) Since the retrievable accounting system data requires me to use a cut off date (June 1, 1997) slightly different from the date specified by the Court (May 15, 1997), I must use the selected date (June 1, 1997) for all calculations set forth below.

## II. OPINION

5) **"Table C Costs."** In my opinion**,** the total costs incurred after June 1, 1997 that are related to contracts, leases and/or other legal obligations executed by Plaintiff prior to May 15, 1997 are $179,235 (see Table C at Exhibit 3). My opinion is based upon the methodology undertaken in my analysis of "Table C Costs" and it is described in the following paragraphs of this report.

## III. METHODOLOGY

6) In order to analyze possible "Table C Costs" – those costs that are attributable to contracts, leases or legal obligations executed by Plaintiff prior to May 15, 1997 – it is necessary to focus on both the categories of costs that SMUD has claimed as damages and the timing of the charges of the costs. Only costs charged after May 15, 1997 can be "Table C Costs."

7) The total categories of costs presented in PX 1000 ¶ 20 are as follows. These cost categories were incurred both before and after May 15, 1997:

Outside Services
Labor
Indirect Labor
Materials
Materials Surcharge
Other
Non Cash
Corporate Allocation

8) In my opinion, the only categories of costs that could logically be included as "Table C Costs" are Outside Services and Materials. All of the other cost categories are internal SMUD cost allocations that are not incurred pursuant to contracts, leases or other legal obligations.

9) ***Materials.*** With respect to my analysis of Materials charges made after May 15, 1997, I reviewed all charges to materials from May 1997 to May 1998, a one year time period selected to consider the possibility that the charge could be related to a previous contract or legal obligation. During that period, there were a total of 80 Materials charges amounting to $57,122, the largest of which was $13,654, with no other charge over $10,000. (The $13,654 was incurred in July 1997 and was not related to a previous obligation). The median amount of all the Materials charges in the May 1997 to May 1998 year is $104, an amount that is below any

investigatory scope amount for specific identification. In summary, I understand from SMUD that the Materials charges are generally small amounts of materials purchases that are made on a "pay as you go" basis and they are not incurred pursuant to contracts, leases or other legal obligations. Based on: 1) my specific analysis, and; 2) my judgment of the overall Materials charges accounting, it is my opinion that no Materials charges should be included in "Table C Costs."

10) ***Outside Services.*** Outside Services is the cost category used by SMUD to account for direct purchases from vendors. Outside Services is the most significant cost category listed in PX 1000 ¶ 20, totaling approximately $53.1 million, or 67.6% of the $78.6 million in total claimed costs.

11) Recognizing that only charges after June 1, 1997 can be "Table C Costs,"[3] I obtained the individual line item detail for each invoice charged to outside services and sorted the list by vendor and date (see Exhibits 4 and 5). The results of my analysis identified three primary categories of vendor charges:

a) Vendors whose charges were incurred in their totality ***before*** June 1, 1997,[4]
b) Vendors whose charges were incurred in their totality ***after*** June 1, 1997,
c) Vendors whose charges span the time period ***before and after*** June 1, 1997.

12) The following table presents a summary of Outside Services invoices by the three time periods identified above:

| | All Outside Services Invoices: | | | |
|---|---|---|---|---|
| | **Vendors Paid for All Work Before 6/1/97** | **Vendors Paid for All Work After 6/1/97** | **Vendors Paid for Work Before & After 6/1/97** | **Total** |
| Outside Services Invoices | $ 1,426,037.44 | $ 41,563,847.43 | $ 10,124,442.92 | $ 53,114,327.79 |

13) Vendors' charges that were incurred in their totality before June 1, 1997 were considered not applicable to the Table C Analysis.

14) In order to include any vendors' charges that were made in totality after June 1, 1997 that may have been made pursuant to a contract, lease or other legal obligation incurred prior to May 15, 1997, I reviewed the payment dates and/or invoice dates of all outside services charges incurred after June 1, 1997. The only charges to outside services incurred in 1997 after June 1, 1997 were payments to WW Grainger in the amount of $508.79 (these are included as Table C costs, discussed later). With the exception of the WW Grainger payments, I noted

[3] Because the Court has identified Table C Costs as costs attributable to obligations prior to May 15, 1997, the only costs that can possibly be "Table C Costs" are costs that were incurred ***after*** May 15, 1997 that relate to obligations from before May 15, 1997. As explained in paragraphs 3 and 4, I actually used June 1, 1997 for all of my calculations.
[4] See footnote 3 for discussion of the Court's May 15, 1997 date.

during my analysis that the next outside services charge after June 1, 1997 was incurred nine months later in March 1998 for an invoice from February 1998. Based on these facts, I conclude that charges in March 1998 and later are not related to obligations incurred prior to May 15, 1997. Therefore, with the exception of WW Grainger, vendors' charges that were incurred in their totality after June 1, 1997 were considered not applicable to the Table C Analysis.

15) Vendors' charges that span both "before and after" June 1, 1997 (plus WW Grainger) are the only vendors' charges considered relevant to the Table C analysis. The following table presents a summary of the vendors (and charges) who provided services "before and after" June 1, 1997:

| | Before 6/1/97 | After 6/1/97 | Total |
|---|---|---|---|
| Harriet Anderson Painting | $ 10,218.00 | $ 4,253.00 | $ 14,471.00 |
| CA Surveying & Drafting | 325.00 | 266.00 | 591.00 |
| CTR Tech | 68,000.00 | 6,000.00 | 74,000.00 |
| David Engineering | 34,000.00 | 106,152.66 | 140,152.66 |
| WW Grainger | 0 | 2,432.12 | 2,432.12 |
| Lehigh Lab | 3,621.84 | 2,232.50 | 5,854.34 |
| National Concrete | 2,764.80 | 12,100.00 | 14,864.80 |
| Packaging Technology | 166,166.17 | 768,095.19 | 934,261.36 |
| Vectra | 7,619,342.94 | 1,318,472.70 | 8,937,815.64 |
| | **$ 7,904,438.75** | **$ 2,220,004.17** | **$ 10,124,442.92** |

16) As the preceding table shows, $10,124,443 of charges from vendors spanning June 1, 1997 is related to the following nine vendors: Harriet Anderson Painting, CA Surveying and Drafting, CTR Technical, David Engineering, WW Grainger, Lehigh Laboratories, National Concrete, Packaging Technology and Vectra. Furthermore, $7,904,439 of the charges were incurred before June 1, 1997 and $2,220,004 were incurred after June 1, 1997. As previously discussed, only charges after June 1, 1997 can be "Table C Costs," so the universe of potential "Table C Costs" is $2,220,004.

17) Exhibit 6 presents the individual line item invoice detail for each of the nine vendors whose charges span June 1, 1997. The payment dates and invoice dates for each invoice from the nine vendors were reviewed. For all vendors, charges before June 1, 1997 were considered not applicable to the Table C Analysis. Vendor contracts, purchase orders and other documentation were also reviewed when applicable. I also discussed the scope of each vendor's services with Mr. Jim Field, Engineering Superintendent for the Sacramento Municipal Utility District at the Rancho Seco Nuclear Power Plant. A summary by vendor of the rationale is presented below.

18) *Harriet Anderson Painting:* Each of the individual charges comprising the $4,253 of costs incurred after June 1, 1997 was reviewed in detail. During my

review, I noted that the charges were incurred well after June 1, 1997; specifically, in November 1997 and May 2001. I also noted that the magnitude of the charges was relatively small. Finally, I discussed the services provided by Harriet Anderson Painting with Jim Field. Mr. Field informed me that Harriet Anderson provided painting services and was used by SMUD on an as-needed basis. Therefore, based on the amount, timing and nature of the charges, the costs are excluded from Table C because these charges were not attributable to a contract, lease or legal obligation executed by Plaintiff prior to May 15, 1997.[5]

19) *CA Surveying and Drafting:* The $266 of costs incurred after June 1, 1997 were reviewed. The single charge for $266 from CA Surveying and Drafting was made in April 2001 (significantly after June 1, 1997). Based upon my conversation with Jim Field, I learned that CA Surveying and Drafting provided calibration equipment, calibration and instruments for alignment. Mr. Field informed me that this vendor was used by SMUD on an as-needed basis and the $266 charge was not made pursuant to an ongoing obligation. Therefore, based on the amount, timing and nature of the charges, the costs were excluded from Table C because these charges were not attributable to a contract, lease or legal obligation executed by Plaintiff prior to May 15, 1997.

20) *CTR Tech:* The $6,000 of costs incurred after June 1, 1997 were reviewed in conjunction with various documents and invoices related to contract #H672 dated October 21, 1998 between CTR Technical Services and SMUD.[6] Based upon my review, the $6,000 of costs incurred after June 1, 1997 are excluded from Table C because they are attributable to Contract #H672 which was executed October 21, 1998 (after May 15, 1997).

21) *David Engineering:* The $106,153 of costs incurred after June 1, 1997 were reviewed in conjunction with various documents and invoices related to contracts #G437 and #4500014241 between David Engineering and SMUD dated February 23, 1996 and June 5, 2002, respectively.[7] Based upon my review, the $106,153 of costs incurred after June 1, 1997 are excluded from Table C because they are attributable to Contract #4500014241 which was executed June 5, 2002 (after May 15, 1997).

22) *WW Grainger:* The total charges from WW Grainger ($2,432) were incurred after June 1, 1997. Five of the WW Grainger charges, totaling $508.79, were incurred during the month of June 1997. These costs are included as Table C Costs due to the proximity of the payment date to May 15, 1997, under the assumption that if an invoice is being paid in June 1997, it may be for services or

---

[5] During this review, Mr. Field determined that $4,139 in charges from Harriet Anderson were not, in fact, attributable to the dry storage project. Therefore, SMUD has voluntarily subtracted this figure from its claimed damages and this amount is set forth in a separate table entitled "Additional Stipulated Adjustments."

[6] Bates SMP054 1011 – 1023, attached as Exhibit 7.

[7] Bates SMUD_101145-101168, attached as Exhibit 8.

product received prior to June 1997. The remainder of charges from WW Grainger were reviewed and I noted that the next charge from WW Grainger is not incurred until June 2000. I also learned from Jim Field that WW Grainger is a mail order parts supplier and SMUD orders supplies from WW Grainger on an as-needed basis. Therefore, the remainder of the WW Grainger costs are excluded from Table C because these charges were not attributable to a contract, lease or legal obligation executed by Plaintiff prior to May 15, 1997.

23) *Lehigh Lab:* Per discussion with Jim Field, steel samples were sent to Lehigh Lab on a case-by-case basis for strength testing. The $2,233 of costs incurred after June 1, 1997 were reviewed in conjunction with various documents and invoices related to Purchase Order #RQ37014.[8] Based upon my review, the $1,025 charge in October 1997 was included in Table C because it appears to be made pursuant to Purchase Order #RQ37014 which was executed prior to May 15, 1997. The remainder of costs incurred (in 1999, 2001 and 2002) were excluded from Table C because they appear not to be attributable to a contract, lease or legal obligation executed by Plaintiff prior to May 15, 1997.

24) *National Concrete:* The $12,100 of costs incurred in 1999 were reviewed in conjunction with Service Order SN36000 dated September 13, 1994.[9] The 1994 Service Order related to costs that were incurred January 1995. Consequently, the 1999 costs ($12,100) are excluded from Table C because these charges do not appear to be attributable to a contract, lease or legal obligation executed by Plaintiff prior to May 15, 1997. I also confirmed with Jim Field that the 1995 costs and 1999 costs were two separate, unrelated tasks.

25) *Packaging Technology:* The $768,095 of costs incurred after June 1, 1997 were reviewed in detail in conjunction with Contract #G703[10] dated August 27, 1996 between Packaging Technologies and SMUD.

a) Contract G703 included a "Termination" clause that provides as follows:

> "The District may terminate Contractor's services under this agreement by giving the Contractor ten (10) days prior written notice of such termination. In the event of such termination, the District shall pay to the Contractor all personnel costs and recoverable costs incurred in the performance of such services, plus all reasonable costs incurred as a result of such termination. However, the Contractor agrees to waive any claim for damage, including loss of anticipated profit, resulting from contract termination."[11]

---

[8] Bates SMP055 112-143, attached as Exhibit 9.
[9] Bates SMP087 2498 – 2513, attached as Exhibit 10.
[10] SMUD_101068-101092, attached as Exhibit 11.
[11] *Id.* at Section 17.

It appears that SMUD had the ability to terminate its contact by giving the Contractor ten days prior written notice of such termination.

b) Assuming SMUD decided not to continue the dry storage project on May 15, 1997, it is reasonable to conclude that SMUD would have terminated the contract with Packaging Technology shortly after this date pursuant to the above clause.

c) Based on the assumption that SMUD would have terminated the contract on May 15, 1997, I have included the five charges incurred during June and July 1997 totaling $9,866 in Table C because of the proximity of the payment date to the assumed date of contract termination. The remainder of the costs were excluded from Table C. It should also be noted that 98% ($754,057) of the total Packaging Technology charges incurred after June 1, 1997 ($768,095) are removed from claimed damages pursuant to Table E, so the importance of the Packaging Technology charges addressed in Table C is minimal.

26) *Vectra:* The $1,318,473 of costs incurred after June 1, 1997 were reviewed in detail in conjunction with Contract #E-776[12] dated September 25, 1992 between Pacific Nuclear Systems, Inc. (predecessor to Vectra) and SMUD.

a) Contract E-776 included a "Termination for Convenience" clause that provides as follows:

"The District may terminate Contractor's services under this agreement by giving the Contractor thirty (30) days prior written notice of such termination. In the event of such termination, the District shall pay to the Contractor all personnel costs and recoverable costs incurred in the performance of such services, plus all reasonable costs incurred as a result of such termination. However, the Contractor agrees to waive any claim for damage, including loss of anticipated profit, resulting from contract termination."[13]

It appears that SMUD had the ability to terminate its contact by giving the Contractor thirty days prior written notice of such termination.

b) Assuming SMUD decided not to continue the dry storage project on May 15, 1997, it is reasonable to conclude that SMUD would have terminated the contract with Vectra shortly after this date pursuant to the above clause.

c) Assuming termination, it is reasonable to conclude that SMUD and Vectra would not have executed Change Order 10 which was approved by SMUD

---

[12] PX 267, excerpts attached as Exhibit 12.
[13] *Id.* at Section III.4

on June 5, 1997 or Change Order 11 which was executed on October 6, 1997. Both were executed after May 15, 1997 in furtherance of continuing the contract with Vectra.[14] Based on the assumption that neither Change Order would have been executed had the contract been terminated, those charges that were paid pursuant to Change Orders 10 and 11, totaling $1,150,638, have not been included in Table C.

d) Although some of the charges paid pursuant to these Change Orders relate to work completed prior to the cut off date, I have not included these charges in Table C. Based on my discussions with Mr. Jim Field and my review of SMUD documents, it appears that these charges were not incurred within the scope of the existing contract and a Change Order was necessary prior to SMUD having any obligation to pay such costs.[15] Consequently, I have excluded the charges paid pursuant to Change Orders 10 and 11 regardless of the invoice date or description of work.

e) The remaining Vectra Charges, totaling $167,835, have been included in Table C and should be deducted as costs attributable to a contract, lease or legal obligation executed prior to May 15, 1997. These charges are unrelated to the above referenced Change Orders and have been included in Table C because the invoice dates are prior to May 15, 1997 or because of the proximity of the invoices to the assumed date of termination.

## IV. CONCLUSION (AND OPINION)

27) **"Table C Costs."** In my opinion**,** the total costs incurred after June 1, 1997 that are related to contracts, leases and/or other legal obligations executed by Plaintiff prior to May 15, 1997 are $179,235 (see Table C at Exhibit 3).

---

[14] See *id.* SMUD_102117-102121; SMP031 0932.
[15] See *id.* SMUD_102117-102121; see also PX 453, attached as Exhibit 13.