# Exhibit 12

Written Direct Testimony of Brian P. Brinig Supporting Table C

*SMUD v. USA* 98-488c

SMUD

SACRAMENTO MUNICIPAL UTILITY DISTRICT ☐ 6201 S Street, P.O. Box 15830, Sacramento CA 95852-1830, (916) 452-3211
AN ELECTRIC SYSTEM SERVING THE HEART OF CALIFORNIA

CAD 92-2332C

September 25, 1992

Basic Contract E776

PACIFIC NUCLEAR SYSTEMS, INC
1010 SOUTH 336TH STREET
FEDERAL WAY, WA 98003

SMUD CONTRACT E-776

This contract by and between the Sacrament... "District"), and Pacific Nuclear Systems, Inc., (hereinafter "Contractor"), ...hereinafter the terms and conditions under which the Contractor will provide the products and services described herein. **The District and the Contractor agree as follows:**

SCOPE OF SERVICES

1. General

The Contractor agrees to design, license, fabricate, test and deliver two dual purpose spent nuclear fuel transport cask bodies, Multi-Element Sealed Canisters (MESC), horizontal storage modules (HSM) and various auxiliary equipment and provide other engineering professional services in support of the District's Nuclear Fuel Storage program and the SMUD/DOE cask demonstration project as described in the attached scope of supply and the project technical specifications and requirements.

The Contractor shall furnish the additional quantity of similarly designed canisters and horizontal storage modules, upon the successful completion of the demonstration project, and at the District's option as exercised by separate notice and other documentation.

The District may require the assistance of qualified engineering and technical personnel during the fuel transfer campaign and in the licensing of the Independent Spent Fuel Storage Installation (ISFSI). The Contractor shall furnish these as-required field support and licensing services upon written authorization from the District and in accordance with the Contractor's time and materials fee schedule in effect at the time the work is performed. A copy of the current time and materials fee schedule submitted in response to the District's Request for Proposal No. 3449 is included as Appendix F to this Contract.

2. Term of Agreement

The term of this agreement shall be from date of signature by the parties, to December 31, 1995, unless changed by mutual written agreement of the contracting parties.



Plaintiff's Exhibit 267
SMUD vs. United States
98-488

SMUD
SACRAMENTO MUNICIPAL UTILITY DISTRICT ☐ 6201 S Street, P.O. Box 15830, Sacramento CA 95852-1830, (916) 452-3211
AN ELECTRIC SYSTEM SERVING THE HEART OF CALIFORNIA

CAD 92-2332C

Basic Contract E776

September 25, 1992

PACIFIC NUCLEAR SYSTEMS, INC
1010 SOUTH 336TH STREET
FEDERAL WAY, WA 98003

SMUD CONTRACT E-776

This contract by and between the Sacramentc ... ıereinafter "District"), and Pacific Nuclear Systems, Inc., (hereinafter "Contractor"), sets forth the terms and conditions under which the Contractor will provide the products and services described herein. **The District and the Contractor agree as follows:**

SCOPE OF SERVICES

1. General

The Contractor agrees to design, license, fabricate, test and deliver two dual purpose spent nuclear fuel transport cask bodies, Multi-Element Sealed Canisters (MESC), horizontal storage modules (HSM) and various auxiliary equipment and provide other engineering professional services in support of the District's Nuclear Fuel Storage program and the SMUD/DOE cask demonstration project as described in the attached scope of supply and the project technical specifications and requirements.

The Contractor shall furnish the additional quantity of similarly designed canisters and horizontal storage modules, upon the successful completion of the demonstration project, and at the District's option as exercised by separate notice and other documentation.

The District may require the assistance of qualified engineering and technical personnel during the fuel transfer campaign and in the licensing of the Independent Spent Fuel Storage Installation (ISFSI). The Contractor shall furnish these as-required field support and licensing services upon written authorization from the District and in accordance with the Contractor's time and materials fee schedule in effect at the time the work is performed. A copy of the current time and materials fee schedule submitted in response to the District's Request for Proposal No. 3449 is included as Appendix F to this Contract.

2. Term of Agreement

The term of this agreement shall be from date of signature by the parties, to December 31, 1995, unless changed by mutual written agreement of the contracting parties.

Case 1:98-cv-00488-SGB Document 366-14 Filed 07/21/2006 Page 4 of 34

3. Scope of Supply and Services

The Contractor shall provide labor, material, equipment and subcontract services required to design, engineer, license, fabricate, test, to verify conformance, deliver, install and/or employ the spent nuclear fuel cask system described in the attached Scope of Supply and detailed technical specifications (Appendix C and E).

4. Control of Work

The Contractor shall receive technical direction for the performance of services from the Fuel Disposition Project Manager or his/ her designated representative.

5. Personnel

Any Contractor personnel assigned to provide site implementation engineering services under this contract shall be approved in writing by the District prior to their assignment to contract activities. Such approval will not be unreasonably withheld. The Contractor shall confirm that the technical qualifications of such personnel meet the applicable industry standards. Certification of said standards and procedures used to provide this control shall also be made available for District review upon request. The Contractor shall ensure that to the extent within its control, the personnel assigned for cask implementation and demonstration will remain on the project for the full term of the project.

6. Performance Standards

Services shall be performed in accordance with the terms of this contract, applicable laws and regulations, existing licenses, District procedures and quality assurance standards, and industry technical guidelines. Work in progress, deliverables, and finished products will be reviewed by the District Project Manager and other applicable managers for completeness, compliance with required standards, and responsiveness to contract requirements.

7. Quality Assurance/Quality Control Requirements

The Contractor shall maintain an effective Quality Assurance Program in accordance with 10CFR Part 72, Subpart G; 10CFR Part 71, Subpart H; 10CFR 21; and acceptable to the District. The Quality Assurance program, as outlined in the proposal response, shall be reviewed and approved by the District prior to contract award. A summary of the Contractor's QA/QC plan for fabrication of important to safety components is included in Appendix G to this contract. The QA requirements of this contract shall be imposed on all lower tier suppliers and manufacturers. A controlled copy of the Quality Assurance manual shall be furnished to the District within 30 days of contract award.

The District shall have the right to perform inspection of the cask system supplier's facility and those of its proposed major lower tier suppliers/manufacturers prior to final selection and award. The cask system supplier shall submit controlled copies of their top tier Quality Assurance Procedures Manual for the District's ongoing usage within 30 days of contract award. A summary of the Contractors QA/QC plan for fabrication of important to safety components is included in Appendix G to the Contract. The District shall have the authority to stop work or hold shipment if the



SMUD-0004194

specification requirements, including those for documentation, have not been fulfilled. The District shall not be liable to Contractor, Contractor's vendors, suppliers, manufacturers, for subcontractors, for claims, losses, debts, liabilities resulting from such stop work. 10 CFR 21 on reporting of defects and noncompliance applies to this activity. The District shall be provided with complete documentation of any production nonconformances which are judged acceptable as is or with corrective action short of complete replacement or reaccomplishment.

8. Delivery:

The Contractor shall furnish two complete NUHOMS*-24P Dual Purpose (Storage and Transport) cask bodies and MESC's, nineteen additional MESCs, twenty-one horizontal storage modules (HSMs), and various auxiliary equipment in accordance with the project Technical Specifications. Subject to Article 9 below, the Contractor shall submit their NRC approved Safety Analysis Report-Packaging (SARP) and Certificate of Compliance (10 CFR Part 71) prior to acceptance of the cask delivery.

The cask system supplier shall provide to the District the cask system and storage system Q-list and other documentation in accordance with the project Technical Specifications.

9. Engineering and Licensing Services for the NUHOMS-24P Transportation Cask Body and Multi-Element Sealed Canister:

The total contract price in Article 3, Commercial Terms, includes up to $1,145,000 for design and licensing activities. The Contractor shall furnish evidence of NRC Licensing under 10 CFR Part 71 (Certificate of Compliance) prior to the District taking delivery of the cask system. The regulating approval activity shall be governed by Section 2.1.5 of the Technical Specifications. During this phase of cask system development the Contractor shall not be caused to order subsystems, hardware or materials directly or through subcontract for fabrication of the designated deliverable cask system components. At a mutually agreeable point in the licensing and design period the parties, upon mutually agreed confidence of license approval by the Nuclear Regulatory Commission, shall order cask system component manufacturing to commence and establish a first article delivery schedule. No delivery of the dual purpose cask system shall be accepted by the District until the Part 71 and 72 license or Certificate of Compliance is granted by the NRC. Should NRC license approval be determined unlikely, or to involve exceptional requirements such as a 10 CFR 71 Subpart F test series, the parties shall mutually determine if the project should be cancelled, suspended or continued. Under these circumstances the District and Contractor shall approach third party entities (i.e., U.S. Department of Energy, nuclear utilities, nuclear fuel industry representatives) for participatory funding of such additional tests. The District and the Contractor shall renegotiate the scope of work, extent of effort, schedule and cost reimbursement arrangements for continued pursuit of the Part 71 license.

Payments: The District shall compensate the Contractor for Part 71 design and licensing costs in accordance with a project milestone and payment shedule developed between the parties to reflect project effort to secure Part 71 license under the initially anticipated scenario. The Contractor shall be compensated only for completed milestone accomplishments. There shall be no advance payment for planned design or licensing effort. The District's total obligation for this phase of developmental activity is limited to $1,145,000, unless modified/increased by formal written Change Order. Any expenditure in excess of this limit is the Contractor's sole responsibility.

COMMERCIAL TERMS

1. Compensation

All contract costs shall be compensated in accordance with the established firm prices for the NUHOMS dual purpose storage and transportation system, Multi-Element Sealed Cannister, Horizontal Storage Module and other components, and the applicable hourly billing rates for reimbursable engineering and licensing support as contained in the pricing schedules attached as Appendix C and F. Progress payments for project performance shall be made in accordance with the project deliverable milestone and payment schedule attached as Appendix D to this Contract, reflecting any applicable retention, pending District acceptance of deliverable. Engineering and Licensing support services shall be reimbursed without retention. Approved travel and living expenses incurred in the performance of such ISFSI engineering and licensing support services shall be reimbursed in accordance with the Appendix F fee schedule current at the time work is performed. Price escalation shall be in accordance with the items of supply identified in Appendix C and the factors and formula included in Appendix D.

2. Excluded Costs

The District shall not reimburse the Contractor for the following costs:

- The Contractor's costs for work performed or subcontract services supplied without the District's authorization.
- The Contractor's costs for warranty work.
- Other costs not specifically authorized in paragraph 1 above.

3. Contract Price

The total authorized amount is $12,387,000.00 for all the work performed pursuant to the terms and conditions of this agreement, which will constitute the District's maximum financial obligation under this agreement. Any expenditures in excess of this limit will not be reimbursed by the District and will be the Contractor's sole responsibility.

The Contractor shall provide timely written notice to the Contract Manager and Contract Administrator when total expenditures under this agreement reach 70% of the authorized maximum contract ceiling.

4. Manner and Time of Payment

a. The Contractor shall submit invoices in duplicate to the District. Each copy of the invoice shall include a description of each project deliverable/milestone completed during the invoice period. All reimbursable engineering or licensing support labor hours shall be supported by a labor abstract or approved time sheets and other reimbursable expenses shall be supported by appropriate documentation. All invoices should be mailed to:

Accounting Department
Sacramento Municipal Utility District
PO Box 15830
Sacramento, CA 95852-1830

b. The District shall process all uncontested invoices for payment within thirty (30) days following the receipt thereof.

c. The Contractor shall maintain books and accounts of personnel and other recoverable costs in accordance with generally accepted accounting principles and practices.

5. Administrative Data

The following administrative data pertains to this contract:

Contract Manager: Ken Miller (916) 452-3211, Ext. 4513

Contract Administrator: John Bell (916) 732-6514

Charge Costs To: Area 100, Work Order 104026, Cost Element G

GENERAL TERMS AND CONDITIONS

1. Insurance Requirements

Without limiting any of the other obligations or liabilities of the Contractor, the Contractor shall provide and maintain until the work is completed and accepted by the District, insurance coverage in accordance with requirements established in Form X-2 which is included as Appendix A to this contract and by this reference made a part hereof.

The Contractor shall submit to the District an insurance certificate to establish evidence of adequate insurance coverage until the service is completed. If the Contractor establishes policies with more than one insurer for different kinds of coverages required, the Contractor may provide separate certificates for each insurer. Language contained in Form X-2 shall be included in the insurance certificate.

Unemployment compensation and disability insurance shall be provided in the amounts required by statute.

2. Indemnity

The Contractor and SMUD, respectively, as indemnitor, will indemnify the other, as indemnitee, and save it harmless from any and all loss, damage, expense and liability resulting from injuries to or death of persons, including but not limited to employees of either party hereto, and damage to or destruction of property, including but not limited to the property of either party hereto, arising out of or in any way connected with the performance of this Agreement of any operations hereunder by indemnitor, its agents or employees, excepting only such injury, death, damage or destruction as may be caused by the sole negligence or willful misconduct of the indemnitee, its agents or employees. Indemnitor shall, upon indemnitee's request, defend at its sole cost any suit asserting a claim covered by this indemnity.

It is the intent of the parties hereto that, where negligence is determined to have been contributory, principles of comparative negligence will be followed and each party shall bear the proportionate cost of any loss, damage, expense and liability attributable to that party's negligence.

3. Force Majeure

Neither party hereto shall be considered in breach or default in the performance of its obligations hereunder to the extent that the performance of any such obligation is prevented or delayed by any cause, existing or future, which is beyond the reasonable control of the affected party.

4. Termination for Convenience

The District may terminate Contractor's services under this agreement by giving the Contractor thirty (30) days prior written notice of such termination. In the event of such termination, the District shall pay to the Contractor all personnel costs and recoverable costs incurred in the performance of such services, plus all reasonable costs incurred as a result of such termination. However, the Contractor agrees to waive any claim for damage, including loss of anticipated profit, resulting from contract termination.

5. Discharge and Cancellation of Tasks and Services

(This provision shall apply if the District issues tasks for ISFSI engineering or licensing assistance.) The District may, at its sole discretion, discharge Contractor from performing any particular task or service to be provided or performed under the terms of this agreement, in whole or in part, upon giving Contractor written notice of such discharge. The District may also, at its sole discretion, cancel any task or service, in whole or in part, that has been assigned to Contractor to be performed under the terms of this Agreement upon giving Contractor written notice of such cancellation. The District agrees to pay the Contractor all personnel costs and other similar recoverable costs incurred in the

performance of such services prior to the notice of discharge or cancellation as set forth herein. The Contractor agrees to waive all claims for damage, including but not limited to incidental and consequential damages such as loss of anticipated profit resulting from such discharge, discontinuance and/or modification as provided herein.

6. Service Warranty

The Contractor warrants that the technical and engineering services provided hereunder shall conform with the accepted industry standards of care and practice appropriate to the nature of the technical and professional services rendered, that the personnel furnishing said services shall be qualified and competent to perform the services assigned to them, and that the recommendations, guidance, and performance of such personnel shall reflect their best professional knowledge and judgment, but makes no other warranty, express or implied. The Contractor shall be required to correct, at no expense to the District, all deficiencies in the performance of the contract service that result from the Contractor's failure to observe and adhere to the above warranty and which are detected within one year from the date of completion of the services. Work performed under this warranty shall also be warranted for a one-year period from the date of completion of such work.

7. Equipment Warranty

Unless otherwise provided elsewhere in this contract, all materials and equipment incorporated into any work covered by the contract shall be new and the most suitable grade of their respective kinds for their intended use, and all workmanship shall be in accordance with acceptable construction practices and in compliance with the approved Safety Analysis Report-Packaging (SARP) and ISFSI Safety Analysis Report (SAR). Contractor warrants all equipment, products, and workmanship furnished or performed under this contract shall conform to the Technical Specifications and shall be free of defective (unless furnished by the District or other District Contractors) materials or workmanship for a period of two (2) years from and after delivery, receipt and acceptance in a timely manner by the District regardless of whether the same were furnished or performed by the Contractor or his selected Contractor. Upon receipt of written notice from the District of any defects in any such material or workmanship, the affected part or parts thereof shall be redesigned, repaired or replaced by the Contractor, who shall perform such tests as the District may require to verify that such redesign, repairs and replacements comply with the requirements of this contract. Costs for such redesign, repair, replacement and testing, including the removal, replacement and reinstallation of equipment and materials shall be borne by the Contractor. As to any defects in the work which are so redesigned, repaired or replaced, Contractor warrants such redesigned, repaired or replaced work against defective materials and workmanship for a period of two (2) years from and after the date of receipt thereof. Should Contractor fail to promptly make the necessary redesign, repair, replacement and test, District may perform or cause to be performed the same at Contractor's expense. Contractor and its surety or sureties, if any, shall be liable for the satisfaction and full performance of the warranties as set forth herein up to the value of the contract.

8. Assigned Personnel

The District reserves the right to request to suspend, dismiss or otherwise discontinue and terminate the services, in whole or in part, provided by any individual assigned by the Contractor, notwithstanding any other provision of this contract, to perform services under this contract. Such a request shall be accompanied by written explanation of the reason for the request. The District and the Contractor shall mutually agree on the final disposition of this request.

9. Applicable Law

It is agreed that in the event of any litigation arising hereunder, the Contractor at the request of the District shall submit to the jurisdiction of any court of competent jurisdiction within the State of California and will comply with all requirements necessary to give such Court jurisdiction, and that all matters arising hereunder shall be determined in accordance with the law and practice of such court. It is further agreed that service of process in any such litigation may be made in the manner provided for in Section 415.40 of the California Code of Civil Procedure or in any other manner provided for in said code for service upon a person outside the State of California.

10. Changes to the Contract

The District, without invalidating the contract and without notice to the sureties, if any, reserves the right to order changes to the contract or the contract work. The contract may be changed only by duly executed change orders issued by the District.

If, in the opinion of the District or the Contractor, any event or action by the other party justifies a change in the contract, either party shall initiate with the other party, within seven (7) calendar days after such event or action, a request for a change in the contract. All documentation required to substantiate the proposed change shall be submitted within a reasonable time after initiating the request for change. Upon the parties reaching agreement regarding the proposed change, the District will issue a written change order.

11. Nuclear Indemnity

The District agrees that the material, equipment and services to be furnished hereunder shall not be installed, used or operated in connection with, or in any manner associated with a nuclear or atomic energy activity or facility unless and until (a) the District shall have entered into an agreement of indemnification with the United States Nuclear Regulatory Commission, as provided under Section 170 of the Atomic Energy Act of 1954, as amended, and (b) the District shall have obtained such policy or policies of insurance, or shall have provided financial protection of such type and in such amounts as the United States Nuclear Regulatory Commission shall require as a condition of its entering into the indemnity agreement referred to in (a) above. The District agrees that the Contractor, its suppliers and subcontractors, shall be included and/among the persons indemnified under (a) above, andamong the named insured or persons protected under (b) above. The District agrees to maintain such indemnification agreement, and insurance or other financial protection in full force and effect so long as the materials, equipment and/or services to be furnished hereunder shall be used.

12. Audits

In the event any portion of the contract is cost reimbursable, the District shall have the right, during the Contractor's normal business hours for the duration of this Contract and for a period of three (3) years thereafter, to conduct the following audits on the cost reimbursement portion only, either on District property or at the Contractor's offices, as the District may deem necessary:

- Audits of the Contractor's performance of services under this contract.
- Audits of books and accounts maintained to accumulate, record, and segregate personnel and other recoverable costs billed under this contract.

However, the Contractor will not be required to relocate records from their normal location.

Such audits shall be performed either by District personnel or by an independent third party whom the District may employ for the purpose of making such audits. The District and the Contractor shall establish procedures for performing such audits and shall preserve the confidential and proprietary status of audited documents and information.

13. Assignment

The Contractor shall not assign this contract or any monies due or to become due to him hereunder without the written consent of the District.

14. Entire Agreement

This contract constitutes the entire agreement between the parties hereto and supercedes and merges any prior understandings or agreements, and no changes, alterations, or modifications hereof shall be effective unless made in writing and signed by duly authorized representatives of both parties to the contract.

15. Termination for Default

Subject to the exceptions stated in Article 9, Scope of Services, herein, should the Contractor fail to obtain approval of their SARP from the NRC for the dual purose casks licensed to 10 CFR Part 71 or the District fail to obtain approval of their ISFSI SAR licensed to 10 CFR 72 due to deficiencies in the NUHOMS dual purpose cask system and storage system design, the District may, in writing, terminate the contract in its entirety. The Contractor shall reimburse to the District any monies paid to the Contractor for services rendered prior to the termination for default. The Contractor's liability as a result of termination for default shall be limited to monies paid for services rendered prior to the termination.

16. Delays

Time is of the essence. However, Contractor shall not be liable, nor shall the contract be subject to termination, for delays in delivery or failure to complete the project, or to obtain the approvals described in Article 9 of the Scope of Services or Article 15 of the General Terms and Conditions hereof due to causes not reasonably foreseeable which are beyond its reasonable control, such as acts of God, acts of civil or military authorities, governmental priorities, fires, strikes, floods, epidemics, war or riot. In the event of any such delay, the date of delivery shall be extended for the period equal to the time actually lost by reason of the delay. The failure of any subcontractor or supplier to complete work or make deliveries to contractor on time shall not relieve contractor from liability for delay unless such failures are due to one of the causes set forth herein.

17. Patent Indemnity

Contractor shall indemnify, defend and save harmless the District and its representatives respectively from and against all claims, losses, costs, damages, and expenses, including attorney's fees, incurred by the District as a result of or in connection with any claims or actions wherein the use of the dual purpose casks designed by the Contractor infringe on any other patent holder. The Contractor at its own sole expense shall promptly defend against any such claims or actions. The Contractor, in a timely manner and at its own expense shall, if necessary, substitute noninfringing equipment, material, processes or modify the equipment to meet the requirements of this contract and his approved Safety Analysis Report-Packaging (SARP). Such substitution of noninfringing equipment, material, processes or modification of equipment to meet the requirements of this contract and Contractor's approved SARP shall not relieve Contractor of the obligation to meet the project schedule and milestones.

18. Equal Employment Opportunity (EEO)

The Contractor shall not discriminate against any employee or applicant for employment on account of race, religion, sex, color or national origin, handicap or age. The Contractor shall ensure that this requirement is applied to applicants and employees in actions including, but not limited to, employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation and selection for training, including apprenticeship.

19. Minority/Women Business Enterprise (MWBE)

It is the policy of the District that minority and women business enterprises shall have the maximum opportunity to participate in SMUD contracts. In this regard District Contractors shall take all necessary and reasonable steps in accordance with solicitation to ensure that minority and women business enterprises have the maximum opportunity to participate in this Contract. The Contractor shall not discriminate on the basis of race, religion, sex, color or national origin, handicap or age in the award or performance of any contract or subcontract resulting from or relating to this Contract.

Failure to adhere to the EEO/MWBE requirements described in these General Terms and Conditions shall constitute a material breach of contract and may result in termination of this Contract. The Contractor shall use its best efforts to carry out the MWBE policy consistent with efficient performance of the Contract.

20. Limitation of Liability

Except as provided under Articles 6 and 7, Service Warranty and Equipment Warranty, respectively, the Contractor's overall aggregate maximum liability arising out of or in connection with this Contract from any and all causes, irrespective of fault or negligence at contract or at law (other than that compensated by the proceeds of insurance provided for in Article 1 of this section of the contract) shall not exceed a maximum of the total contract price. The Contractor shall not be liable for any consequential damages.

21. Products and Ownership of Documents

Upon completion or termination of the Contract or upon request from the District, the Contractor shall be obligated forthwith to deliver to the District all drawings, plans, specifications, records, letters, documents or information arising out of performance of the contract together with any products or other material pertaining thereto (except as otherwise provided in Article 23 of this section). The District hereby grants the Contractor an irrevocable royalty free and unconditional right to retain copies and use the Products in any subsequent business activities, except for 10 CFR Part 71, Subpart F testing in accordance with Article 9, Scope of Services. The Contractor assumes no responsibility for retention of such products and documents after a period of six (6) months after the above written request for disposition. The District agrees to limit its use of any products or intellectual properties developed by the Contractor under this Contract, to their intended use only at the District's facilities, except as may occur under Article 15, Special Conditions titled: Buy Back/Lease Back Provision.

22. Nondisclosure and Proprietary Information

The Contractor agrees not to divulge to third parties, without written consent from the District, any information obtained from or through the District in connection with the performance of this contract unless (a) the information is in the public domain at the time of disclosure by the Contractor, (b) the information is known to the Contractor prior to obtaining same from the District, or (c) the information is obtained by the Contractor from a third party who did not receive same, whether directly or indirectly from the District.

The District understands that special techniques in the arts and sciences, developed or accumulated by the Contractor at its own time and expense, will be employed to benefit the District under this contract and agrees that such special techniques are proprietary and shall not be disclosed to any third party during or subsequent to the term of this contract without the prior written consent of the Contractor; provided, however, that nothing herein shall limit the right of the District to disclose any data provided by the Contractor hereunder which (a) was furnished by the Contractor prior to this contract without restriction, (b) is



SMUD-0004203

furnished to the District without notice, written or oral, as to its proprietary nature or (c) is otherwise known by the District. The District further agrees that in the event the Contractor independently develops any new techniques, processes or other intellectual properties including, but not limited to drawings, licenses, procedures, reports, analysis, etc., in the course of performing services hereunder, the sole right and title to such techniques, other intellectual properties or processes shall remain with the Contractor, except that the District shall be entitled to a continuing non-exclusive royalty free license thereof.

23. Government Requirements

The District and Contractor agree that additional administrative requirements and/or contractual terms and conditions relating to the potential demonstration of the dual purpose spent nuclear fuel transport casks for the U.S Department of Energy, may be required as an outgrowth of a separate District/DOE Cooperative Agreement for such demonstration program. Any Federal government requirements, terms and conditions imposed in that document which must flow down from the District to the cask system supplier shall be reviewed mutually by the District and Contractor for impact on cost, performance, schedule, warranties and other significant elements contained in this contract. The parties to this contract shall negotiate equitable adjustment to this current agreement necessitated by the adoption of such flow-down requirements, terms and conditions and make necessary changes to the contract under the provisions of Article 10, General Terms and Conditions.

24. Resolution of Claims

A. This Article shall apply to all claims arising under this contract pursuant to Articles 4 and 5 of these General Terms and Conditions, or other applicable provisions.

B. Claim means a separate demand by contractor for (1) a time extension, (2) payment of money or damages arising from work done by or on behalf of the contractor pursuant to this contract and payment of which is not otherwise expressly provided for or the claimant is not otherwise entitled to, (3) an amount the payment of which is disputed by the District.

C. For any claim subject to this agreement, the following requirements apply:

(1) The claim shall be in writing and include the documents necessary to substantiate the claim. Claims must be filed on or before the date of District's receipt and acceptance of the final deliverable under the contract. Nothing in this subdivision is intended to extend the time limit or supersedes notice requirements otherwise provided by contract for the filing of claims.

(2) (a) For claims of less than fifty thousand ($50,000), the District will respond in writing to any written claim within 45 days or receipt of the claim, or may request, in writing, within 30 days of receipt of the claim, any additional documentation supporting the claim or relating to defenses or claims the District may have against the claimant.

(b) If additional information is thereafter required, it shall be requested and provided pursuant to this subdivision, upon mutual agreement of the District and the claimant.

(c) The District's written response to the claim, as further documented, shall be submitted to the claimant within 15 days after receipt of the further documentation, or within a period of time no greater than that taken by the claimant in producing the additional information, whichever is greater.

(3) (a) For claims of over fifty thousand dollars ($50,000) and less than or equal to three hundred seventy-five thousand ($375,000), the District will respond in writing to all written claims within 60 days of receipt of the claim, or may request, in writing, within 30 days of receipt of the claim, any additional documentation supporting the claim or relating to defenses or claims the District may have against the claimant.

(b) If additional information is thereafter required, it shall be requested and provided pursuant to this subdivision, upon mutual agreement of the District and the claimant.

(c) The District's written response to the claim, as further documented, shall be submitted to the claimant within 30 days after receipt of further documentation or within a period of time no greater than that taken by the claimant in producing the additional information or requested documentation, whichever is greater.

(4) If the claimant disputes the District's written response, or the District fails to respond within the time prescribed, the claimant may so notify the District, in writing, either within 15 days of receipt of the District's response or with 15 days of the District's failure to respond within the time prescribed, respectively, and demand an informal conference to meet and confer for settlement of the issues in dispute. Upon a demand, the District will schedule a meet and confer conference within 30 days for settlement of the dispute.

(5) If following the meet and confer conference the claim or any portion remains in dispute, the claimant may file a claim pursuant to Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) of Part 3 of Division 3.6 of Title 1 of the California Government Code. For purposes of those provisions, the running of the period of time within which a claim must be filed shall be tolled from the time the claimant submits his or her written claim pursuant to subdivision (a) until the time the claim is denied, including any period of time utilized by the meet and confer conference.

D. The following procedures are established for all civil actions filed to resolve claims subject to this provision:

(1) Within 60 days, but no earlier than 30 days, following the filing or responsive pleadings, the court shall submit the matter to nonbinding mediation unless waived by mutual stipulation of both parties. The mediation process shall provide for the selection within 15 days by both parties of a disinterested third person as mediator, shall be commenced within 30 days from the submittal, and shall be concluded within 15 days from the commencement of the mediation mediation unless a time requirement is extended upon a good cause showing to the court.

(2) (a) If the matter remains in dispute, the case shall be submitted to judicial arbitration pursuant to Chapter 2.5 (commencing with Section 1141.10) of Title 3 of Part 3 of the Code of Civil Procedure, notwithstanding Section 141.11 of that code. The Civil Discovery Act of 1986 (Article 3 [commencing with Section 2016] of Chapter 3 of Title 3 of Part 4 of the Code of Civil Procedure) shall apply to any proceeding brought under this subdivision consistent with the rules pertaining to judicial arbitration.

(b) In addition to Chapter 2.5 (commencing with Section 1141.10) of Title 3 of Part 3 of the Code of Civil Procedure, (A) arbitrators shall, when possible, be experienced in construction law, and (B) any party appealing an arbitration award who does not obtain a more favorable judgment shall, in addition to payment of costs and fees under that chapter, also pay the attorney's fees on appeal of the other party.

E. The District shall not fail to pay money as to any portion of a claim which is undisputed except as otherwise provided elsewhere in this agreement.

F. In any suit filed pursuant to Section D above, the District shall pay interest at the legal rate on any arbitration award or judgment. Interest begins to accrue on the date suit is filed in a court of competent jurisdiction.

SPECIAL TERMS AND CONDITIONS

1. Fitness for Duty Program

The Contractor shall comply with the District's Fitness for Duty Program. This program is defined in the District's Fitness for Duty Handbook for Contractors.

Failure to comply with this program may, at the District's option, result in the termination of this Contract.

2. Security

Access to District facilities is controlled in accordance with specific site requirements. The Contractor's personnel requiring unescorted site access must comply with the District's security requirements and guidelines.

3. Site Conditions - Rancho Seco

A. All employees of the Contractor requiring unescorted access to Rancho Seco must be issued a security photo identification badge. Employees must complete required Fitness for Duty testing, General Employee Training requirements, and the following security screenings:

- Employment history for five years
- Education check
- Military history check
- Credit check
- Psychological testing (MMPI)
- Criminal history check
- Character reference checks

Unescorted access may not be granted until completion of the required security screening, Fitness for Duty, and Site training. Personnel information forms are attached at Appendix B.

B. Violations of the security program will be documented, and counseling of the violator will be required for each violation. Violations of the security program may be grounds for denial of site access.

4. Rancho Seco Working Conditions

Rancho Seco is a nuclear power plant and individuals considering work there should be aware of the following facts:

A. All workers at Rancho Seco are classified as radiation workers as defined in the Code of Federal Regulations, Title 10. Workers may be required to work in areas in which they could receive a radiation dose equivalent of up to three rems per calendar quarter.

B. Strict controls are maintained over radioactive external exposure and airborne contamination. Workers can be required to wear special protective clothing and equipment, such as respirators. The Contractor's employees may be required to perform their work assignments while wearing respiratory protective equipment. For those employees who require corrective lenses to perform their assigned work accurately and expeditiously, it is necessary that their lenses be fitted into a MSA Spectacle Kit #454819 in order for the respiratory equipment to fit properly. It is the Contractor's obligation, at no expense to the District, to ensure that its employees assigned to work at Rancho Seco who require corrective lenses to properly perform their work assignments will report to work with a MSA Spectacle Kit #454819 fitted with the appropriate corrective lenses. Contact lenses shall not be worn inside respirators. Also, the use of respirators requires that the user be clean shaven to prevent leakage through the face-to-respirator seal. Many types of mustaches and sideburns are allowable, but beards are not. All workers must be prepared to remove any facial hair which could interfere with the protection afforded by respirators.

C. The District has a very strict security program which is required by the Nuclear Regulatory Commission, a regulatory agency of the United Stated Federal government. Rancho Seco's security force will conduct background investigations of personnel assigned to work at the site. Criminal records do not necessarily exclude one from work, but some abnormal behavior records may. Each individual must submit to an extensive search of his or her person and belongings whenever entering or leaving the site.

D. Rancho Seco is a complex facility. Most work is strictly controlled by written procedures. All hazardous areas and much of the equipment used there have written instructions which must be followed. For these reasons, all workers must be able to read. A high school diploma is not necessarily required.

E. An extensive safety policy concerning all aspects of radiation and industrial safety is mandated by the NRC and strictly enforced at Rancho Seco. Contractor personnel will be expected to comply with the Rancho Seco safety program and all applicable state and federal occupational safety and health standards. Hard hats and safety glasses will be furnished by the Contractor to all Contractor personnel working in required areas.

F. The Contractor and all of the Contractor's employees assigned to this Contract must comply with the reporting requirements of 10 CFR Part 21.

G. The above requirements are strictly enforced, and refusal to comply may result in the denial of site access.

5. <u>Inspection</u>

The District shall have the right to inspect the work performed and to witness any of the contractor's regularly scheduled work, and to perform final inspection within a reasonable time after completion. The work shall not be deemed accepted until after said final inspection. The making or failure to make any inspection of, or payment for, or acceptance of the work, shall in no way impair the District's right to reject nonconforming work, or to avail itself of any other remedies to which the District may be entitled, notwithstanding the District's knowledge of the nonconformity, its substantiality or the ease of its discovery.

6. <u>Expediting</u>

The goods furnished under this contract shall be subject to expediting by the District or its representatives, either of whom shall be allowed reasonable access to Contractor's plants, and those of his subsuppliers, for expediting purposes.

7. <u>Progress Reports</u>

Regular periodic detailed forecasts and progress reports, including unpriced copies of purchase orders to subsuppliers, may, at the option of the District, be required from Contractor for materials covered by this contract.

8. Passing of Title

a. If the manufacture and shipment of materials and supplies herein described is from within the Continental United States of America, the terms of sale shall be f.o.b. the destination as designated by the District, and title to the materials and supplies herein described shall pass to the District upon delivery to and acceptance by the District.

b. If the manufacture and shipment of materials and supplies herein described is from the Dominion of Canada, the terms of sale shall be f.o.b. the destination as designated by the District, and title to the materials and supplies herein described shall pass to the District upon delivery to and acceptance by the District. The entire responsibility for all loss or damage to said materials and supplies shall rest with the contractor until delivery and acceptance by the District at destination.

9. Packing Slips

Packing slips must be included in all shipments. Contract number must appear on all packing slips, whether covering partial or complete shipments.

10. Prime Contractor Responsibility

If any Contractor's bid includes equipment or services marketed by other firms, it will be mandatory for such Contractor to act as prime Contractor for the procurement and setting up of corrective maintenance for the items offered. The Contractor shall be the sole point of contact with regard to contractual matters and corrective maintenance services.

11. Permits and Licenses

Unless the specifications provide otherwise, all permits and licenses necessary to the prosecution of the work shall be secured by the Contractor, at his own expense, and he shall give all notices necessary and incident to the due and lawful prosecution of the work, excepting that right-of-way encroachment permits will be obtained by the District.

12. Certificate of Compliance

Certification of Compliance shall be issued by a responsible officer of the Contractor's company clearly delineating that the cask is designed, fabricated, inspected and tested in compliance with the latest revision of the NRC approved 10 CFR 72 site license and 10 CFR 71 Cerficate of Compliance and meets all the requirements delineated therein.

13. Quality Assurance/Quality Control Program

This portion of the Special Conditions defines the general requirements of Quality Assurance/Quality Control and describes inspections, tests, records systems, and documentation required in order to ensure all delivered items or services meet the requirements of this Contract.

a. Quality Assurance/Quality Control Program

The Contractor shall have in effect at all times a QA/QC program that clearly establishes the authority and responsibility for the work and for the QA/QC program. Persons performing QA/QC functions shall have sufficient authority to enforce quality requirements; to identify, initiate, recommend, and provide solutions to quality problems; and to verify the effectiveness of the solutions. The Contractor shall be responsible for documented descriptions of activities affecting quality and will provide for the performance of those activities in accordance with the descriptions. **The Contractor shall submit to the District for approval all proposed QA/QC procedures included in the program with its response to the solicitation.** The District reserves the right to reject these procedures as inadequate and request augmentation to the QA/QC program prior to contract award.

b. Contractor's Responsibility for Suppliers and Subcontractors

The Contractor shall have a documented method for approving its suppliers and subcontractors, and only those approved shall be used.

The Contractor shall identify in its purchase/contract documents to its suppliers and subcontractors all applicable QA/QC requirements imposed by this specification on the Contractor and shall ensure and be responsible for their compliance.

c. District/Contractor/Supplier Quality Interface

The Contractor and its suppliers/subcontractors shall, at any time, be subject to audits, inspections, and witnessing by District personnel, or their designated representatives, to ensure compliance with the requirements of this Contract. The Contractor shall, at any time, grant District personnel, or their designated representatives, free access to QA/QC documentation and any construction, manufacturing, fabricating, assembly, or testing facility where District work is being performed. The Contractor shall also provide workspace for District personnel, or their designated representatives, to conduct independent inspections in the Contractor's/supplier's/subcontractor's facilities as required. The exercise of, or failure to exercise the right to inspect, witness, or audit and any subsequent approval by the District shall not relieve the Contractor of its obligation to comply with the terms, conditions and requirements of this Contract.

The Contractor shall fully cooperate during the performance of such audits, inspections, and witnessing and shall not be entitled to additional compensation for the same.

d. Design Control

When applicable, the Contractor shall be responsible for the translation of design requirements into design documents (specs, drawings, etc.). Design changes shall be subject to the same controls as the original design.

The Contractor shall provide for review of materials and processes for suitability and for independent verification of design accuracy.

e. Material Identification and Control

The Contractor shall provide for the establishment of measures for the identification, control and traceability of materials, parts and components.

Materials, parts and components shall be identified to indicate their current fabrication, inspection and test status.

f. Special Processes

When applicable, the Contractor shall ensure that special processes (welding, heat treating, NDT, etc.) are controlled. Qualifications of personnel, procedures and equipment used in special processes shall be documented.

g. Notification and Hold Points

The District or its designated representative shall have the right to establish notification and hold points for which the Contractor shall give prior notification. In addition, the District or its representative may establish temporary notification and hold points to ensure resolution of temporary quality problems. Hold points are considered to be those operations, inspections and tests which require witnessing by the District or its representative and beyond which operations shall not proceed without written consent of the District or its representative. The Contractor's failure to stop at a hold point will be cause for rejection of those items for which notification was not provided. Hold points require receipt of notification at least five (5) working days in advance of the scheduled time of performance, unless otherwise stated in particular sections of this Contract or the technical specifications. The District or its representative may require that activities performed without proper notification be repeated for the District's or its representative's observation at the Contractor's expense.

h. Control of Measuring and Test Equipment

The Contractor shall be responsible for calibration traceable to recognized standards (NBS or equivalent) on all measuring and test equipment (both production and inspection) that is used on District equipment.

i. Inspections

Inspections to be performed by the District, Contractor, or by others are defined in the specifications. Other inspections may be performed by the District solely at its discretion.

All inspections (in-process or final) to be performed by the Contractor shall be conducted by personnel independent of the work being performed and shall follow documented inspection plans which include specific acceptance criteria. Inspection results shall be evaluated or verified.

j. <u>Tests and Test Control</u>

Tests to be performed by the District, Contractor, or by others are defined in the specifications.

All tests performed by the Contractor must have documented test requirements and conditions and acceptance criteria in the test procedure. The Contractor is responsible for the documentation and evaluation of their test results.

k. <u>Deviations and Nonconformances</u>

Deviations are considered to be departures from any requirements of this specification. Nonconformances are considered to be conditions which cannot be corrected within the specification by rework or replacement. All nonconforming material must be identified, documented and segregated to prevent further processing or use prior to correction. All deviations and nonconformances shall be communicated in writing to the District for resolution.

l. <u>Stop Work Action</u>

The District shall notify the Contractor both orally and in writing, of any situation where, in the judgement of the District or its representative, the Contractor or its suppliers or subcontractors are performing work contrary to the terms, conditions and requirements of this specification or where continued operations could cause damage, preclude further inspection, cause injury or loss of life, or render remedial actions ineffective for any product or service provided by the Contractor or its suppliers or subcontractors. The Contractor shall be provided reasonable opportunity to remedy the defect prior to work stoppage.

m. <u>Handling, Shipping and Storage</u>

The Contractor shall be responsible for the control of handling, storage and shipping in order to prevent damage or deterioration to District equipment.

n. <u>Documentation</u>

(1) Records

The Contractor shall establish and maintain a records system that provides for the identification of materials and provides for records of tests, inspections and certifications.

This specification requires that specific documentation be formally submitted to the District for information, approval, or approval with subsequent certification. When required by the specification, those documents generated by the Contractor's suppliers or subcontractors shall also be submitted. Prior to submittal to the District, the Contractor shall review such documents for conformance to the specification requirements and shall note its approval on the face of the documents. Revision to documents after the District's approval of same shall require that the revised documents be resubmitted for approval.

(2) Final Inspection and Check of Records

The Contractor shall be responsible for inspecting item(s) and checking the applicable records, prior to shipment to the District or on receipt of shipment from its suppliers, to verify that all specification requirements have been complied with. Complete sets of documents, as required by this specification, shall be submitted to the District, acceptance of which shall not relieve the Contractor of the responsibility for compliance with the specification requirements.

14. Franchise Tax

The District shall withhold an amount equal to seven percent (7%) from payments made pursuant to the terms and conditions of this contract as set forth herein, to all independent contractors who are not residents of the State of California and who have not received an exemption from this requirement from the California Franchise Tax Board. This requirement applies to all contractors performing personal services in California, for which the District pays in excess of fifteen hundred dollars ($1,500.00) annually.

(Ref. Cal. Rev. and Tax. Code Sec. 26131, California Code of Regulations, Title 18, Sec. 18805, 18805-3)

15. Buy Back/Lease Back Provision

The District may determine that certain items of supply or equipment are not required to support the long range storage or transfer of spent nuclear fuel following the completion of specific phases of the cask system/cask transfer system demonstration project or the Cask/MESC loading campaign. Such items of supply or equipment may be declared surplus and made available for sale or disposal. Pacific Nuclear Systems, Inc., shall be afforded first right of purchase or lease of such items before offering these items on the open market or negotiating with other entities. Sale or lease to Pacific Nuclear shall be consumated in a separate written agreement.

16. Notice

Any notice provided pursuant to this Agreement, if specified to be in writing shall be deemed given (a) if by hand delivery, upon receipt thereof; (b) if mailed, three (3) days after deposit in the U.S. mails, postage prepaid, certified mail return receipt requested. All notices shall be addressed to the parties at the respective addresses as indicated below:

CONTRACTOR

Pacific Nuclear Systems, Inc.
Fuel Services Group
Attention: Moses Taylor
145 Martinvale Lane
San Jose, CA 95119

DISTRICT

Sacramento Municipal Utility District
Rancho Seco Nuclear Generating Station
Attention: Ken Miller
14440 Twin Cities Road
Herald, CA 95638-9799

17. Resolution of Issues

District and Contractor recognize that issues may arise during the Project that will require joint discussion and agreement on actions to be taken to resolve the issue. Therefore, without affecting any remedies available under the Agreement, District and Contractor agree to make best efforts to resolve any such issues through direct negotiations. It is recognized by District and Contractor that resolution of some issues may require the use of written Change Orders described in paragraph 10. The following steps describe the process by which these negotiations will progress.

a. The District Project Manager and Contractor Project Manager will be primarily responsible for identifying, defining, clarifying and attempting to resolve issues related to any area of the Project.

b. Issues which affect technical specifications, delivery or cost shall be formalized in written bilateral Change Orders.

c. Issues not negotiable between the two Project Managers will be referred to the District Deputy Assistant General Manager, Operations and Contractor's Fuel Services Group Vice President for resolution.

18. Contractor Reports and Meetings

The Contractor shall provide the District written monthly technical progress reports, including a summary report of cost milestone accomplishment. The Contractor shall provide overall project status to the District at ongoing quarterly progress meetings.

ACCEPTED FOR
SACRAMENTO MUNICIPAL UTILITY DISTRICT

By: S. David Freeman

Title: General Manager

Date: 

ACCEPTED FOR
PACIFIC NUCLEAR SYSTEMS, INC.

By:

Title: President

Date: September 29, 1992

Attachments:

Appendix A - Insurance Forms
Appendix B - Security Forms
Appendix C - Scope of Supply
Appendix D - Project Deliverable Milestone and Payment Schedule
Appendix E - Technical Specifications and Requirements
Appendix F - Contractor's Time and Materials Fee Schedule
Appendix G - Summary of Contractor's QA/QC Plan

**SMUD**

SACRAMENTO MUNICIPAL UTILITY DISTRICT □ P. O. Box 15830, Sacramento CA 95852-1830, (916) 452-3211
AN ELECTRIC SYSTEM SERVING THE HEART OF CALIFORNIA



# CONTRACT CHANGE

CONTRACT NO. E776 CHANGE NO. 10

Rancho Seco Nuclear Station
*Contract Title*

Design, Licensing & Fabrication of Spent Nuclear Fuel Cask System
*Contract Scope*

**FOR INTERNAL USE ONLY**

W.O. DIST. NO. 604026
PROJECT
COST CENTER 624
RESOURCE 713

THIS AGREEMENT made by and between SACRAMENTO MUNICIPAL UTILITY DISTRICT, hereinafter called the District, and VECTRA Technologies, Inc., 6203 San Ignacio Avenue, Suite 100, San Jose, CA 95119, hereinafter designated as Contractor, WITNESSETH: That the parties hereto mutually agree to the following changes in the above numbered contract between the parties, hereinafter called the "original contract":

A. SCOPE OF SERVICES, Paragraph 3, Scope Of Supply And Services (Scope of Supply and detailed technical specifications, Appendices C and E, respectively.)

Add the following items originally negotiated as part of draft Change Order No. 8:

1. The Contractor shall convert cask unit DP-187 to cask MP-187 configuration and rework the inner shell with XM-19 stainless steel. Cost: $187,718.
2. The Contractor shall provide XM-19 weld wire and complete weld procedure qualification for inner shell rework of both cask MP-187 and DP-187. Cost: $33,414.
3. The Contractor shall cause the Subcontractor, Precision Components Corporation (PCC), to perform additional liquid penetrant, ultrasonic and radiographic examinations of cask trunnion sleeves and trunnions on both Units 1 and 2 of cask MP-187. Cost: $12,500. (The District reserves the option to perform additional examination at its expense.)
4. The District and the Contractor agree that the Contractor shall be assessed liquidated damages in the amount of $100,000 for failure of the Contractor and Subcontractor to meet the December 13, 1996 delivery of the DP-187 cask included in item A.2 of Change Order No. 7.
5. Summary of Costs:

| | |
|---|---|
| Conversion of DP-187 to MP-187 | $187,718 |
| XM-19 Weld Wire and Weld procedure | 33,414 |
| Additional NDE to PCC | 12,500 |
| Liquidated damages for missed delivery date | <100,000> |
| Total | $133,632 |

201066

B. SCOPE OF SERVICES

The following items resolve various contract issues raised by VECTRA Letter No. 2069-96-267, VF 96-015 dated March 28, 1996 and responded to by the District in a letter dated May 7, 1996.

# CONTRACT CHANGE *Continuation*

Contract No. E776 Change No. 10

1. **Additional Canister Spacer Disks**

   The Contractor shall furnish and install additional spacer disks in the MP187 canister to separate spent fuel guide sleeves from each other and provide support for neutron poison material needed to prevent fuel criticality during transportation. The Contractor shall bear all cost for such additional spacer disks over $200,000. The District shall compensate up to $200,000 for this work.

2. **Cancellation of Offshore Canister Fabrication**

   The Contractor, having canceled canister fabrication arrangements with an off-shore sub-supplier for two spent fuel canisters shall bear one half the cost of such termination/cancellation charges of $105,000 and the District shall bear the second half of such changes, or $52,500.

3. **Responses to NRC Questions**

   The Contractor shall respond to all 10 CFR Part 71 questions posed by the Nuclear Regulatory Commission. The cost of responses for Round 1 and Round 2 questions shall be borne by the Contractor. The District shall compensate the Contractor for NRC questions beyond Round 2, which are not related to Round 1 or Round 2 issues, and new "Code" Changes on a time and materials invoiced basis up to a maximum of $122,500.

4. **Contractor Overhead Costs**

   The original term of Contract E776 was October 9, 1992, to December 31, 1995. Because of unanticipated and extensive questions by the Nuclear Regulatory Commission (NRC), the project will be delayed at least three years. Contractor and the District mutually agreed to a contract extension through December 31, 1998 (Change Order No. 9). By Contractor's acceptance of the contract extension, additional costs will be incurred for such overhead activities as Project Management, Quality Assurance and Administrative staff expenses. Therefore, compensation is provided to assist Contractor in funding overhead costs for the length of the existing contract extension. Compensation is provided on a Time and Material invoiced basis over a three year period, retroactive to 1996, not to exceed the following amounts:

| | | |
|---|---|---|
| • | Overhead for 1996: | $150,000 |
| • | Overhead for 1997: | $150,000 |
| • | Overhead for 1998: | $125,000 |
| | Total | $425,000 |

5. **Horizontal Storage Modules**

   The 22 Horizontal Storage Modules have been completed and installed at the Rancho Seco site. Twenty-one (21) of the 22 modules have been paid for by the District. Those 21 modules are now owned by the District, and the District holds free and clear title to them. The District shall make final payment for the last module upon Contractor's completion of certain quality assurance requirements. Title to the last module will transfer to the District upon final payment. The last module will then be owned by the District and the District will then obtain free and clear title to it.

6. **Summary of Costs:**

201067

| | | | |
|---|---|---|---|
| • | Item No. 1: | Additional Canister Spacer Disks | $200,000 |
| • | Item No. 2: | Cancellation of Offshore Canister Fabrication | $ 52,500 |
| • | Item No. 3: | Additional rounds of NRC Questions | $122,500 |
| • | Item No. 4: | Overhead Compensation for 1996 | $150,000 |

SACRAMENTO MUNICIPAL UTILITY DISTRICT Init. Contractor Init.

# CONTRACT CHANGE *Continuation*

Contract No. E776 Change No. 10

| | | | |
|---|---|---|---|
| • Item No. 4: | Overhead Compensation for 1997 | | $150,000 |
| • Item No. 4 | Overhead Compensation for 1998 | | $125,500 |
| | | Total | $800,000 |

C. TERMS AND CONDITIONS FOR RESUMPTION OF CANISTER FABRICATION

1. **Conditions for Restart of Cask Fabrication and Shared Risk:**

The condition for restart of cask fabrication will be based on feedback from the NRC on Contractor's 10 CFR Part 71, responses to Round 3 questions. The responses will be transmitted to the NRC in the revised Safety Analysis Report (SAR) (currently scheduled for June, 1997). A meeting is proposed about eight (8) weeks after the SAR submittal, at NRC headquarters in Silver Springs, Maryland. At that meeting, the NRC will provide feedback to the District and Contractor regarding the acceptability of the cask design and/or identify any other outstanding issues. The NRC will also advise if there is to be a fourth round of questions. After that meeting the District and Contractor will review the content of the NRC feedback and decide if restart of cask fabrication is warranted. Concurrently, in the event of restart of cask fabrication, both parties will decide what share of the risk each will assume in the event the cask becomes unlicensable as a result of unanticipated future NRC actions. The purpose of this item is to establish the intent on the part of both the District and Contractor to share risk once the results of the NRC 10 CFR Part 71 SAR comments are reviewed.

2. **Conditions for Start of Fabrication of the Canisters:** The District and Contractor shall evaluate the non-compatible materials issue in the canister as related specifically to the current design incorporating flame sprayed aluminum which reacts with the Boric Acid of the Spent Fuel Pool and evolves hydrogen, and combustible gas. An additional problem relates to the drying time of the BORAL poison material. The various options to resolve material incompatibility and results of BORAL drying time tests shall be evaluated and the respective costs negotiated before fabrication resumes. The District and Contractor shall meet after the NRC Headquarters meeting referenced in Section C.1 above to determine if the NRC raises concerns regarding spacer disks, BORAL drying time, material incompatibility, or other issues. At that time, the parties shall mutually determine the appropriate risk and cost sharing between them once fabrication of canisters begins.

3. **Technical Specification Review:**

The Contractor shall conduct an interim review of the spent fuel storage and transportation system technical specifications to determine if design specific conditions may have been exceeded (e.g. thermal limits and weight) and if contractual obligations have been, or are going to be met. Once the results of this interim review are known, the District and Contractor shall jointly determine what form of compensation, if any, is appropriate for any design conditions or contractual obligation which will not be met.

D. COMMERCIAL TERMS

1. Add the following two sentences at the end of Article 1, Compensation to read as follows:

"The District shall advance $100,000 payment to Contractor for raw materials for canisters which payment otherwise would not be due until start of fabrication. The $100,000 payment shall be credited towards the amount the District owes for Project Deliverables under Appendix D.

2. Revise the first paragraph of Article 3, Contract Price, to read as follows:

201068

SACRAMENTO MUNICIPAL UTILITY DISTRICT Init. Contractor Init.

# CONTRACT CHANGE *Continuation*

Contract No. E776 Change No. 10

"The total authorized amount is increased $1,140,782.00 to $16,157,117.00 (including price escalation through May 16, 1996) with this Change Order No. 10, for all the work performed pursuant to the terms and conditions of this agreement which will constitute the District's maximum financial obligation under this agreement. Any expenditures in excess of this limit will not be reimbursed by the District and will be the Contractor's sole responsibility. (This allows for $142,850 in uncommitted funds resulting from equipment cancellations associated with Change Order No. 7.)

E. GENERAL TERMS AND CONDITIONS

1. Add the following new paragraph to Article 4, Termination for Convenience, to read as follows:

"The District and Contractor are entering into a License Agreement and a Security Agreement concurrently with this Contract Change. If the District exercises its rights to use the Licensed Technology to complete the project under said License Agreement, then the District shall terminate the Contract pursuant to this Article and shall not terminate for default. Upon termination of this Contract by either party, Contractor's warranties under this Contract shall survive termination.

The District shall have the option (the "Call Option") to require the Contractor to transfer and convey to the District immediate possession, title and ownership of all raw materials and work in progress relating to the Dual Purpose NUHOMS System, including but not limited to the items specified in Exhibit A of the Security Agreement. In order to exercise the Call Option, the District must terminate the Contract pursuant to this paragraph, and shall not terminate the Contract for default pursuant to Article 15 of the Contract. The costs of labor and materials incurred by Contractor in acquiring, manufacturing, assembling, or constructing the raw materials, work in progress and other material pledged as collateral under the Security Agreement shall be compensable personnel costs and recoverable costs under this Article. To the extent that the District has not yet paid for labor or materials work in progress or other material pledged as collateral under the Security Agreement, the District shall pay the balance due (less any offsets, recoupments, or other reductions on account of claims, liens, or security interests in favor of third parties) with respect to such raw materials, work in progress, etc., upon delivery of possession, title, and ownership of the material pledged as collateral under the Security Agreement to the District, whether voluntarily or otherwise."

2. Amend Paragraph 13, Assignment, to read as follows:

"The Contractor shall not assign this contract or any monies due or to become due to him hereunder without the written consent of the District, which consent shall not be unreasonably withheld."

3. Add the following new paragraph at the end of Article 15, Termination for Default, to read as follows:

"If the District elects to exercise its rights to use the Licensed Technology to complete the project pursuant to the License Agreement, then upon such exercise, the District shall waive its right to reimbursement by the Contractor for monies paid to the Contractor for services rendered in the event of termination for default.

The License Agreement shall automatically terminate if the District terminates the Contract for default pursuant to this Article of the Contract."

4. Add the following new Article 25:

"25. Royalty Agreement

201069

## CONTRACT CHANGE *Continuation*

Contract No. E776 Change No. 10

The Term of the Royalty Agreement will be five (5) years from the date of NRC approval of the Rancho Seco storage and transportable system with an automatic five (5) year extension unless mutually canceled within sixty (60) days of renewal date. The total maximum royalty payments to the District under the Royalty Schedule at items 1 and 2 will not exceed $200,000.00. There will be no limits on royalties under Royalty Schedule item 3.

The Royalties apply to the future sale and delivery to users others than the District of NUHOMS systems based on the Rancho Seco design ("spacer disc" canisters) including enhancements of the design. Contracts which are bid and awarded after this Royalty Agreement is signed, but prior to License approval by the NRC will be covered by this Agreement.

The following Royalty Schedule will apply:

| | | |
|---|---|---|
| 1. | Transportable Canisters: | $5,000 per canister delivered |
| 2. | MP 187 Transportation Casks: | $20,000 per cask delivered |
| 3. | Impact Limiters: | $10,000 per set of limiters delivered |

Royalty fees will be escalated each year using the same escalation index currently applied to the contract between Contractor and SMUD."

5. Add the following new Article 26:

"26. Purchase of Welder

The District agrees to purchase a welder, owned by the Contractor, which is currently being used by one of the Contractor's customers. The welder is described in further detail in Exhibit A to this Contract Change. The agreed purchase price is $350,000, inclusive of any applicable sales tax, payable upon delivery of the welder, along with transfer of title."

This Contract Change is subject to all provisions of the original contract and all provisions of any previous Contract Changes previously approved by the District which are not expressly superseded in this Contract Change. This Contract Change is entered into concurrently with a separate Security Agreement and a separate Licensing Agreement between the parties.

| SACRAMENTO MUNICIPAL UTILITY DISTRICT | VECTRA Technologies, Inc. |
|---|---|
| By [signature] | By [signature] |
| Type Name Jan Schori | Type Name Ray Fortney |
| Title General Manager | Title Chief Executive Officer |

201070

# CONTRACT CHANGE

SMUD
SACRAMENTO MUNICIPAL UTILITY DISTRICT ☐ 6201 S Street, P. O. Box 15830, Sacramento, CA 95852-1830 (916) 452-3211

CONTRACT NO. E776 CHANGE NO. 11

Rancho Seco Nuclear Station
*Contract Title*

Design, Licensing and Fabrication of Spent Nuclear Fuel Cask System
*Contract Scope*

**FOR INTERNAL USE ONLY**

W.O./DIST. NO. 604026

PROJECT

COST CENTER 624

RESOURCE 713

**THIS AGREEMENT made by and between SACRAMENTO MUNICIPAL UTILITY DISTRICT, hereinafter called the District, and VECTRA TECHNOLOGIES, INC. 6203 SAN IGNACIO AVENUE, SUITE 100, SAN JOSE, CA 95119**

**hereinafter designated as Contractor, WITNESSETH: That the parties hereto mutually agree to the following changes in the above numbered contract between the parties; hereinafter called the "original contract":**

A. SCOPE OF SERVICES, Paragraph 3, Scope of Supply and Services ----

Add the following agreement:

"The District and Contractor agree that the completion of the Safety Analysis Report (SAR) associated with nuclear fuel storage as required by Title 10 United States Code of Federal Regulations, Section 72 is essential to the project and submission can be accelerated by the addition of contract staff to the Contractor's workforce. The Contractor shall acquire sufficient qualified engineers and provide technical guidance to ensure completion of the 10 CFR 72 storage Safety Analysis Report (SAR) and respond to questions from the Nuclear Regulatory Commission. The District shall compensate the Contractor for this augmentation of its staff on a time and materials basis in accordance with approved time sheets and other documentation furnished with the invoice. The amount of this staff augmentation shall not exceed $85,000.00."

B. COMMERCIAL TERMS ----

Revise the first paragraph of Article 3, Contract Price, to read as follows:

"The total authorized amount is increased $148,335.00 to $16,305,452.00 (including $85,000.00 as authorized for additional staff support and $63,335.00 for price escalation through December 31, 1996) with this Change Order No. 11, for all the work performed pursuant to the terms and conditions of this agreement which will constitute the District's maximum financial obligation under this agreement. Any expenditures in excess of this limit will not be reimbursed by the District and will be the Contractor's sole responsibility"

**This Contract Change is subject to all provisions of the original contract and all provisions of any previous Contract Changes which are not expressly superseded in this Contract Change.**

| SACRAMENTO MUNICIPAL UTILITY DISTRICT | VECTRA TECHNOLOGIES, INC. *Contractor* |
|---|---|
| By R.A. Little 10/2/97 *Date* | By Vincent Franceschi 10/6/97 *Date* |
| Type Name ROBERT A. LITTLE | Type Name Vincent Franceschi |
| Title MANAGER, MATERIAL & CONTRACT SERVICES | Title President & COO |

SMUD-0245 5/93 (CC.DOT)

Approved: 6/5/97

Resolution: 97-06-06

# BOARD AGENDA ITEM

## STAFFING SUMMARY SHEET

SSS No. MPC&D 97-092

☒ Board Agenda 06/05/97 Meeting Date

☒ Finance Committee Agenda

*Please use separate sheet if you have any comments

| | TO | MAIL STOP | ACTION | INITIAL* | DATE | | TO | MAIL STOP | ACTION | INITIAL* | DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Steve Redeker (DM) | N504 | CONC | SYR | 5/29/97 | 6. | | | | | |
| 2. | John Di Stasio (DM) | E101 | CONC | [illegible] | 5/29/97 | 7. | | | | | |
| 3. | Colin Taylor (DM) | A352 | CONC | [illegible] | 5/29/97 | 8. | | | | | |
| 4. | Dick Ferreira (AGM) | B408 | APPR | [illegible] RF | 5/29/97 | 9. | Legal | 42 | CONC | [illegible] | 5/30/97 |
| 5. | Gail Hullibarger (AGM) | B408 | CONC | [illegible] | 5/30/97 | 10. | General Manager | 41 | APPR | [illegible] | 5/30 |

Consent Calendar ☒ Yes ☐ No

*If No, schedule a dry run presentation*

Budgeted *(If not, explain in Costs/Budgeted section)* ☒ Yes ☐ No

Does Item have Committee Review ☒ Yes ☐ No

*If Yes:* Finance Committee Meeting Date 06/03/97

| FROM (IPR) | DEPARTMENT | MAIL STOP | EXTENSION | DATE SENT |
|---|---|---|---|---|
| Ken Miller | Rancho Seco | N505 | 4513 | 05/22/97 |

NARRATIVE: *(please type - include the following sections: Requested Action; Summary; Benefits; Costs/Budgeted; Alternatives; Affected Parties; Coordination, Presenter)*

Requested Action: Authorize the General Manager, or her designee, to: (1) execute Change Order No. 10 to SMUD Contract E-776 with VECTRA Technologies Inc.; (2) execute a licensing agreement to allow the District the present right to use VECTRA's design, engineering, intellectual property, trade secrets, know how, etc., to complete the transportable dry fuel storage system on its own or through a third party; (3) execute a security agreement to give the District a secured interest in work in progress and raw materials in the event of default by VECTRA or termination of the contract; and (4) pay up to $100,000 to Duke Engineering Services Inc. as SMUD's portion of the VECTRA utility owners group oversite activities at VECTRA. The staff presentation will also present to the Board information on the availability and costs of other spent fuel dry storage systems.

Summary: The attached agreements have been developed as a package by staff in negotiations with VECTRA. Collectively, these agreements establish an option for SMUD to complete the fabrication and NRC licensing of the current transportable dry nuclear fuel storage system in the event VECTRA defaults on the existing E-776 contract or is otherwise unable to expeditiously complete the contract. The package encourages VECTRA to obtain the NRC license by March, 1998 but lays out an alternative option for SMUD to proceed with either the VECTRA system or another vendor. By preserving the VECTRA system option regardless of VECTRA's performance, the District is afforded time to consider alternate vendors fuel systems and assess VECTRA's progress, thus allowing a decision to continue with VECTRA or change vendors to be made at an appropriate time.

Since early 1996, staff and VECTRA have attempted to resolve a disputed claim by VECTRA for approximately $2 million in additional funds under Contract E-776. A resolution of the claim has been negotiated which revises the contract ceiling upward by $800,000, in return for goods and services with up to $200,000 returned to SMUD from royalties on future VECTRA product sales. VECTRA has agreed to absorb about $1.2 million of project costs. Change Order No. 10 also resolves other issues involving licensing, fabrication and project delay costs. Change Order No. 10 raises the total contract ceiling price by $1,140,782 to $16,157,117, which is about $500,000 under the Board's currently authorized ceiling for this contract.

The District will also purchase for $150,000 a license from VECTRA which gives the District the option to fabricate and complete NRC licensing for the Rancho Seco dry fuel storage transportation system. Should the District exercise the option, the District would terminate Contract E-776 and instead make royalty payments to VECTRA for cask and canister fabrication ranging from $465,000 to $620,000, depending on NRC licensing status.

Regarding VECTRA's effort to resolve their NRC QA issues, the utilities who own the VECTRA

| SUBJECT | ITEM NO. |
|---|---|
| AUTHORIZE CHANGES TO NUCLEAR FUEL DRY STORAGE SYSTEM CONTRACT, AND ADDITIONAL AGREEMENTS | 13 |

**ITEMS SUBMITTED AFTER DEADLINE WILL BE POSTPONED UNTIL NEXT MEETING**

SSS No. MPC&D 97-092

product (the VECTRA Owner's Group) are going to conduct joint oversite efforts of VECTRA through Duke Engineering Services Inc. SMUD's portion of this project will be less than $100,000.

inally, staff has begun drafting an RFP to solicit formal bids from other spent fuel system suppliers, should SMUD decide to change vendors and an RFP to find a contractor to complete the licensing and fabrication of the MP 187 cask and canister, should the licensing agreement be exercised.

**Benefits:** An option is created which would allow SMUD to complete the current VECTRA system regardless of VECTRA's performance or default and defines a future path if a default were to occur.

**Costs/Budgeted:** The funds for the current VECTRA contract are in the 1997 budget and the 1995 Decommissioning Cost Estimate. The fabrication license will be a separate agreement and the cost is not included in contract change 10. Approximately $500,000 in contract contingency will remain after accounting for all additional obligations in this change.

**Alternatives:** 1)Make no changes to the current contract. Not recommended, due to loss of the flexibility and advantages of this proposal. 2) Cancel the VECTRA contract and pursue another vendors system. Not recommended now, because insufficient cost and schedule information is presently available to make an informed decision.

**Affected Parties:** Rancho Seco, Legal, Contract Administration

**Coordination:** Rancho Seco

**Presenter:** Steve Redeker

# STAFFING SUMMARY SHEET

Material and Contract Services

MCS 97-897

| TO | MAIL STOP | ACTION | INITIAL | DATE | TO | MAIL STOP | ACTION | INITIAL | DATE |
|---|---|---|---|---|---|---|---|---|---|
| 1. John Slingerland | E101 | CONCUR | J.S. | 9-30-97 | 5. Legal | B406 | CONCUR | [illegible] | 9/30/97 |
| 2. Robert Little | E101 | CONCUR | [illegible] | 9/30/97 | 6. Colin Taylor | A352 | CONCUR | [illegible] | 9/30/97 |
| 3.Steve Redeker | N505 | CONCUR | signed per telecon. | 9/30/97 | 7. Dick Ferreira | B408 | CONCUR | [illegible] | 9/30/97 |
| 4. Risk Management | B354 | CONCUR | PM | 9/30/97 | 8. Jan Schori | B408 | APPROVE | [illegible] | 10/1/97 |

| FROM (IPR) | DEPARTMENT | MAIL STOP | EXTENSION | DATE SENT |
|---|---|---|---|---|
| John Bell/Ken Miller | Material and Contract Services | E101 | 6514 | 9/30/97 |

| SUBJECT | RETURN BY |
|---|---|
| CHANGE ORDER NO. 11 to CONTRACT E776 with VECTRA TECHNOLOGIES, INC. | 9/30/97 |

**REQUESTED ACTION:** Approve Contract Change No.11 to Contract No. E776 with VECTRA TECHNOLOGIES, INC. to authorize the use of staff augmentation support for completion of the 10 CFR 72 Safety Analysis Report and increase the contract amount from $16, 157,117 to $16,305,452 to provide $85,000 for compensation of the contract support and adjust the contract by $63,335 for cost escalation.

**SUMMARY:** Contract E776 for design, licensing and fabrication of the Rancho Seco Spent Nuclear Fuel Dry Cask Storage and Transportation System needs to be revised to provide for VECTRA Technologies, Inc. augmentation of their engineering staff . This Change order increases the contract by $85,000 to provide for payment of the added workforce. The increase is believed warranted on the basis that the Safety Analysis Report required in compliance with 10 CFR 72 will be accomplished at great savings to the District when compared to the costs of extended operation at Rancho Seco ($85,000 for additional limited term contractor staff vs. $2,000,000 of normal plant cost). This cost difference is realized because the contractor has stopped work on all projects to perform corrective action and training dictated by a recent Demand for Information letter from the Nuclear Regulatory Commission. The contractor will be reimbursed on a time and material basis. This Change Order also adjusts the contract amount for price escalation for the casks and auxiliary equipment through December 1996.

Delegation of Authority: The Manager, Material & Contract Services has delegated authority to sign contract changes to Service contracts up to Unlimited amount after receipt of a properly approved CSR and other approval. The CSR was approved by Manager, Rancho Seco Decommissioning as required by the District's Delegations of Authority.

**BENEFITS:** Complete Safety Analysis Report on the spent fuel cask system in accordance with 10 CFR 72 at less ultimate cost than waiting for VECTRA Technologies to sequence this activity following resolution of their response to the NRC.

**COSTS/BUDGETED:** Increase contract amount $148,335 ($85,000 for contractor staff augmentation and $63,335 for cost escalation). Budgeted by Nuclear Department / Fuel Disposition Project for 1997. Cost Center 624, Activity/Work Order 604026, Resource 713. The $85,000 for time and materials reimbursement of VECTRA staff augmentation is provided from the contingency funds and the cost escalation is in accordance with the terms of the contract.

| | |
|---|---|
| Current Contract Amount Through Change Order No. 10 | $16,157,117 |
| Amount This Change Order No. 11 | 148,335 |
| Revised Contract Amount | $16,305,452 |

Contingency Summary

| | | |
|---|---|---|
| Initial Contingency (15% of $12,387,000) | | $1,858,050 |
| Added Contingency Funds (Board Resolution No. 96-09-02) | | $1,709,000 |
| | Total Contingency | $3,567,050 |
| Contingency Used Thru Change Order No. 9 | | $1,688,417 |
| Contingency Used in Change Order No. 10 | | $1,140,782 |
| Contingency Used in This Change Order No. 11 | | 148,335 |
| | Total Contingency Used | $2,977,534 |

**ALTERNATIVES:** Allow Contractor to complete the SAR when their engineers are able to schedule the work. This alternative would result in much greater cost to the District due to mounting plant operation costs during the period of delay.

**AFFECTED PARTIES:** Nuclear Fuel Disposition Project Manager, Material and Contract Services, and Contractor.

**COORDINATION:** Nuclear Fuel Disposition Project Manager.

E776c11sss SSSCC.dot