# Exhibit 13

Written Direct Testimony of Brian P. Brinig Supporting Table C

*SMUD v. USA* 98-488c

AF 0007130019

VECTRA

Vince Franceschi
Vice President

March 28, 1996
2069-96-267
VF-96-015

Mr. Jim Shetler
Deputy Assistant General Manager - Operations
Sacramento Municipal Utility District
Rancho Seco Nuclear Plant
14440 Twin Cities Road
Herald, CA 95638-9799

Subject: SMUD Rancho Seco NUHOMS® Project - Contract E-776
Project Scope Increase

Dear Mr. Shetler:

This letter documents VECTRA's request and basis for increased compensation under Contract E-776. Since late December 1995, VECTRA has communicated to SMUD on several occasions that certain activities and associated costs incurred and/or anticipated by VECTRA are considered beyond the scope defined in SMUD Contract E-776. These costs fall into three main areas. The first area includes costs incurred by VECTRA associated with the cancellation of a contract with ATEA for procurement of 2 canisters for the SMUD contract. The second is increased analysis and possible hardware costs incurred as a result of the second round of NRC questions. The third area is the increased cost of the SMUD DSCs due to the addition of spacer disks to support the installation of poison in the canisters. A detailed description of each scope and cost change issue follows. Attachment 1 summarizes this change request.

**ATEA Contract Cancellation**

The ATEA contract cancellation costs were incurred as a result of a request by SMUD to cancel the contract with ATEA for procurement of 2 of the 21 canisters. SMUD expressed concern that recent NRC scrutiny of canister vendors may be complicated by the need to address any such concerns for two vendors rather than limiting any potential exposure to one vendor which has significant experience in the fabrication of canisters (this vendor being RANOR which was to fabricate the remaining 19 canisters). The order to ATEA had been

FAXED

VECTRA Technologies, Inc. • 6203 San Ignacio Ave., Suite 100 • San Jose, CA 95119 • Tel: (408) 629-9800
Fax: (408) 281-6184 Engineering • Fax: (408) 281-6202 Fuel Serv.

SMUD-0032074

Plaintiff's Exhibit 453
SMUD v. United States

VECTRA



placed by VECTRA to enable VECTRA and its customers to realize a commercial benefit by developing multiple qualified vendors. VECTRA's contract with SMUD does not limit the number of suppliers or specify the use of specific suppliers, therefore VECTRA's use of ATEA was fully compliant with the SMUD contract. It should be noted that VECTRA expended considerable effort in negotiating a reasonable termination cost on SMUD's behalf. Cancellation of this contract was initiated at SMUD's direction to preclude the potential for complications associated with evaluation of two vendors in the event of future NRC issues related to canister fabrication. SMUD also expected that limiting the canister suppliers to one supplier would reduce the manpower and cost required for utility oversight of the fabrication process. Cancellation of this contract has no comparable benefit to VECTRA. Costs associated with VECTRA oversight of ATEA were to be paid by ATEA. Therefore, the cancellation of this contract provides a benefit only to SMUD and the cost of this cancellation should be borne by SMUD alone. The cost of this contract cancellation, with credit for materials procured, is $105,000. The back-up documentation for this cost will be documented in the VECTRA invoice for this item.

**Second Round of NRC Questions**

The second issue for which an increased scope of work has been identified is related to the cask drop analyses required by the NRC in the second round of questions. The contract states in Section 2.1.5.2 of the Technical Specifications and Requirements (Contract Appendix E), "The SARP and application for Certificate of Compliance shall be based on qualification of the design by analysis and scale up of the drop and fire test data from the certified NUPAC-125B transportation cask with no drop or fire testing of the dual purpose cask. The supplier is responsible for the SARP and Certificate of Compliance application on the above basis, including the NRC review, through two rounds of NRC questions and responses."

The second round of NRC questions caused the MP187 application to significantly deviate from the qualification of the certified NUPAC-125B cask, when the NRC requested a finite element analysis of the cask in Question 1 of the NRC's Structural, Cask Questions section which states:

> "The impact analysis represented the cask as a simple beam, and the inner and outer shells were represented as a composite section. This representation does not accurately consider the loads acting on each shell or the distribution of stresses and loads in the circumferential and radial directions. Provide a finite element analysis of the cask for each impact orientation."

The 125B cask drop analyses, which were to be the basis for the licensing of the MP187 (as discussed above), were based on an energy balance beam model analysis. The level of analytical complexity and sophistication required by the finite element analysis greatly exceeds

that associated with the 125B analysis. Therefore, the effort required to perform the finite element analysis of the cask drops is well beyond the scope of the MP187 contract. The costs associated with modeling, analyzing, verifying and documenting these analyses are therefore additional scope. The additional cost of this effort to date is $700,000.

One example of the limitations imposed by currently accepted methods is the cask buckling analysis. Previous SAR analyses had followed ASME Code Case N284 acceptance criteria for simplified analysis methods. The same Code Case methods are now being applied to the more rigorous finite element analyses. Consequently, localized stress patterns predicted by the more rigorous analyses are showing potential buckling concerns when the conservative Code Case criteria is applied. These concerns do not correlate with drop tests done for the NUPAC-125B, which showed no buckling for drops more severe than the SAR scenarios. VECTRA therefore believes that the Code Case acceptance criteria when used in conjunction with the more rigorous finite element methods, does not accurately reflect the physical performance of the cask when dropped. VECTRA believes that there are several more appropriate options including non-linear buckling acceptance criteria, time history analyses and consideration of gap effects.

In recent discussions, SMUD has directed VECTRA (and VECTRA has in turn directed PCC) to procure XM-19 material for replacement of the cask inner shell end sections to expedite cask fabrication. This material has been ordered, and the 3 week cancellation clause (at 10% of material cost) has expired. The cost is $147,000 for the material required for modification of both casks. We have received an order of magnitude estimate from PCC of $690,000 for modification of both casks (this includes the above material cost). We recently received a formal estimate of $995,000 for modification of the two casks. We are currently negotiating this price with PCC and will keep you informed of developments.

In addition, due to the potential unavailability of the VECTRA OS-197 transfer cask, SMUD has express interest in pursuing fabrication of separate transfer and transportation casks. The transfer and on-site storage cask would be an MP187 without XM-19. The transportation cask would incorporate the XM-19 modification. The current schedule for modification of both casks to incorporate XM-19 reflects a 7/29/97 shipment date.

Estimates from PCC indicate that the cost/schedule for cask fabrication for two of the options are as follows:

| | |
|---|---|
| 1 - Two casks with XM-19 | Deliver 7/29/97 at a cost of $597,242 (improved to 2/28/97 and 4/22/97 with a $500,000 premium) |

VECTRA



| | |
|---|---|
| 2 - One cask without XM-19 | Deliver 12/15/96 (with a proposed, yet to be negotiated, incentive/liquidated damages clause of $25,000/week up to a maximum incentive/penalty of $100,000) |

A potential additional cost of $128,000 for lead pour and $110,000 for replacement NS-3 (neutron shield material) have also been identified by PCC. These costs are due to schedule impact on the lead pour and the potential impact on PCC subsupplier cost estimates and the potential for NS-3 (neutron shielding material) shelf life expiration for a pour after the end of 1996. VECTRA believes that a significant part of these costs, if not all of this cost, can be eliminated in further negotiations with PCC. The final cost of these items is, however, uncertain as of this date.

VECTRA proposes the following approach to expediting fabrication of a transfer and storage only cask. Authorization should be provided to VECTRA (and in turn to PCC) to continue fabrication of one (1) cask without XM-19. All costs associated with the incorporation of XM-19 and associated with splitting the fabrication process into two separate efforts would be expected to be reimbursed to VECTRA by SMUD (without markup). In addition, the costs which VECTRA will incur to support this activity will also need to be reimbursed. The estimated cost for VECTRA support is $50,000.

We request that you authorize VECTRA to continue fabrication of the transfer/storage cask and your concurrence that costs associated with XM-19 procurement, cask modification to incorporate XM-19 and costs due to separation of the fabrication of the two casks will be paid by SMUD. Your authorization is required by 3/29/96 in order to support the above schedules.

**Additional DSC Poison Costs**

The addition of spacer disks to the SMUD canister design has been necessitated by the analytical methods imposed by the NRC on the analysis of the loading of the canister guide sleeves by the fuel assemblies. The NRC has required that this loading be imposed onto the guide sleeves at the location of the fuel grid spacers for the normal condition analyses and uniformly over the length of the guide sleeve only for the hypothetical accident analyses. This requirement has been imposed to ensure the structural adequacy of the poison plates mounted on the guide sleeves. The original canister design depicted in the SMUD contract reflects an eight spacer disk canister configuration. The first round of comments required that fourteen additional spacer disks be provided while the second round of comments required that an additional four spacer disks be provided. The addition of eighteen spacer disks to the canister design as a means for ensuring adequacy of the poison installation method reflects an

VECTRA



increased complexity, and associated cost increase, for installation of poison in the canisters. Appendix C of the contract (item 3) indicates that:

> "Pacific Nuclear shall prepare poison MESC Safety Analysis Report. Pacific Nuclear and the District shall share the cost of licensing and fabricating the poisoned MESCs. The cost sharing arrangement is:
>
> Pacific Nuclear: All labor cost for engineering, design, procurement, Quality Assurance, and licensing of poison MESC.
>
> District: Actual cost (exclusive of any markup) for materials, per invoice and cost of manufacturing and boron plate installation in accordance with bills of material, factory subcontracts, purchase orders, etc., as furnished by Pacific Nuclear"

The cost of the spacer disks added to meet NRC analysis requirements for support of the poison plates constitutes a fabrication cost for the poisoned MESCs (canisters) and should therefore be billable to the District at actual cost (exclusive of any markup) per the contract. All costs associated with analysis of the poisoned canisters (labor cost for engineering, design, procurement, QA and licensing) are VECTRA's responsibility. The cost to VECTRA of the additional spacer disks based on subcontractor quotations is estimated at $900,600. Only actual costs incurred for this activity will be invoiced to SMUD.

**Summary**

The total contract change requested by VECTRA is $3,022,772. This request is fully supported by the terms of the contract and the justifications discussed herein. VECTRA has diligently performed in good faith throughout the term of this contract. We have also continued to apply considerable resources toward the timely completion of this project on behalf of SMUD at our commercial risk pending approval of this change request.

VECTRA recognizes that the contract change requested is significant. In the spirit of teamwork, VECTRA's change request reflects a cost reimbursement only, without fee or mark-up. VECTRA has also absorbed considerable costs during the course of this project and has looked at ways to mitigate some of the impact on SMUD's fuel transfer schedule.

VECTRA considers SMUD a valued client and itself a partner in the Rancho Seco fuel storage effort. A successful fuel load campaign and transition to the decommissioning of Ranch Seco is a mutual goal.

VECTRA



Should you have any questions regarding this issue, please contact me at 408-281-6007.

Sincerely,

Ted T. Witting

for Vincent Franceschi
Vice President and General Manager
Fuel Services

FAX: 916-732-6562

cc: S. Redeker
K. Miller
J. Field

VECTRA

Sacramento Municipal Utility District
2069-96-267/ VF-96-015
March 28, 1996


**ATTACHMENT 1**
**SUMMARY OF CONTRACT E-776 PROPOSED CHANGES**

| Issue | Contract Impact: Reference | Contract Impact: Quote | Change: Description | Cost: Base Bid | Cost: Delta $s |
|---|---|---|---|---|---|
| Base Scope | Contract and Change Orders, through C/O 5 | $13,321,800 ($12,153,615 allocated) | N/A | $12,153,615 | N/A |
| Escalation | - Change Order 1, Commercial Terms, Para. 3, Contract Price<br>- Appendix C, Scope of Supply | - $13,321,800 (1992 dollars)<br>- Cask, Canister, HSM, Aux. Equip., Weld Mock-ups (subject to escalation) | Estimated escalation based on current schedule to be added to contract value | 1992 dollars | +$951,014 (estimate to be adjusted based on final delivery dates) |
| Poison Installation Cost (Boral Plates) | Appendix C, Item 3 | ...Pacific Nuclear and the District shall share in the cost of licensing and fabricating the poisoned MESCs.... District: Actual cost (exclusive of any markup) for materials...and cost of manufacturing and boron plate installation... | Current estimate of poison (Boral Plate) installation cost | $540,000 | +$779,788 |
| Poison Installation Cost (Spacer Disks) | Appendix C, Item 3 | Same as for Boral Plates above | Cost of addition of spacer disks (18) to meet NRC requirements for Boral Structural support | $540,000 (same as for Boral Plates above) | +$900,607 |
| ATEA cancellation cost | Special Terms and Conditions, Item 13.b | The Contractor shall have a documented method for approving its suppliers and subcontractors, and only those approved shall be used. | SMUD request for cancellation of ATEA contract for 2 DSCs | N/A | +$105,000 |
| Cask Drop 3D analysis cost | Appendix E, Technical Specifications and Requirements, Section 2.1.5.2 | The SARP and application for Certificate of Compliance shall be based on qualification of the design by analysis and scale up of the drop and fire test data from the certified NUPAC-125B transportation cask with no drop or fire testing of the dual purpose cask. The supplier is responsible for the SARP and Certificate of Compliance application on the above basis.... | Second round of NRC questions has required a 3D finite element analysis of the cask for drop scenarios. The NUPAC-125B analysis for drops was based on a beam and energy balance analysis. | N/A | +$700,000 |
| Cask buckling analysis modification costs | SMUD request | N/A - verbal request for modification of cask to facilitate licensing | Replacement of 40" section of cask inner shell at top and bottom with XM-19 | N/A | +$487,377 (subsupplier cost, excluding 100K incentive for 11/14 delivery and excluding the $238,000 of potential cost which is still being negotiated)<br>+$50,000 (VECTRA cost) |
| TOTAL | | | | | $3,022,772 (excluding escalation) |

- Poison installation cost is an estimated value. Actual costs, based on documented vendor cost, will be the basis for invoicing of the poison cost. The final cost may be more or less than the above estimate.