No.98-488C
(Judge Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

# DEFENDANT'S POST-TRIAL EVIDENTIARY HEARING BRIEF

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

JOSHUA E. GARDNER
SCOTT R. DAMELIN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

October 10, 2006

# TABLE OF CONTENTS


ARGUMENT .......... 1

I. THE GOVERNMENT RENEWS ITS OBJECTIONS TO SMUD'S PRESENTATION OF ANY EVIDENCE FOLLOWING THE ORIGINAL 2005 TRIAL .......... 1

II. SMUD FAILED TO MEET ITS BURDEN OF PROOF AT TRIAL .......... 3

III. SMUD FAILED TO ESTABLISH ANY BASIS FOR THE RECOVERY OF POST-MAY 15, 1997 COSTS INCURRED UNDER THE VECTRA/TRANSNUCLEAR CONTRACT FOR THE RANCHO SECO DUAL-PURPOSE DRY CASK STORAGE SYSTEM .......... 5

A. SMUD's Claimed Post-May 1997 Costs Are Attributable To Contracts And Legal Obligations That Pre-Date May 1997 .......... 5

B. SMUD Failed To Include Costs Associated With Change Orders 10 and 11 To The Vectra Contract .......... 7

C. SMUD's Amended and Supplemental Contract With Transnuclear West Relates To A Contract and Legal Obligations Into Which SMUD Entered Prior To May 1997 .......... 14

IV. SMUD FAILED PROPERLY TO IDENTIFY AND ACCOUNT FOR ACTIVITIES AND COSTS RELATED TO THE TRANSPORTABLE FEATURES OF THE DUAL-PURPOSE DRY CASK STORAGE SYSTEM IMPLEMENTED AT RANCHO SECO .......... 17

A. SMUD Failed to Meet Its Burden Of Identifying The Costs Associated With A Storage-Only Dry Storage System .......... 17

B. Mr. Field Failed Properly To Answer The Court's Question Regarding The Cost Of A Non-Dual Purpose Dry Storage System .......... 19

C. The Analysis That SMUD Commissioned In 1990 Establishes that A Store-Only System Would Have Cost SMUD Between $10.5 and $15.5 Million .......... 20

D. Mr. Burford's Estimate Is Consistent With The Levy Study .......... 22

E. Mr. Kiraly's Estimate Also Is Consistent With The Levy Report .......... 24

**TABLE OF CONTENTS (Cont.)**

V. SMUD IS ONLY ENTITLED TO RECOVER CERTAIN INTERNAL LABOR COSTS FOR 16 EMPLOYEES IDENTIFIED BY THE GOVERNMENT AND INCLUDED IN THE COURT'S MEMORANDUM OPINION AND ORDER 25

CONCLUSION ........................................................................................................................ 28

# TABLE OF AUTHORITIES

## CASES

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) ........................................................................................ 3

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) ........................................................................ 12

Bluebonnet Sav. Bank, v. United States,
67 Fed. Cl. 231 (2005) .................................................................................... 3, 4

California Fed. Bank v. United States,
395 F.3d 1263 (2005) ........................................................................................ 3

Cedar Creek Oil & Gas Co. v. Fid. Gas Co.,
249 F.2d 277 (9th Cir. 1957) ............................................................................ 2

Coast Fed. Bank v. United States,
49 Fed. Cl. 53 (2001) ........................................................................................ 4

Downey v. Denton County, Tex.,
119 F.3d 381 (5th Cir. 1997) ............................................................................ 2

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) ...................................................................................... 3

Gathright v. St. Louis Teacher's Credit Union,
97 F.3d 266 (8th Cir. 1996) .............................................................................. 2

Hartford Accident & Indem. Co. v. Gulf Ins. Co.,
837 F.2d 767 (7th Cir. 1988) ............................................................................ 2

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (2005) .................................................................................. 3, 12

In re Acceptance Ins. Co. Sec. Litig.,
423 F.3d 899 (8th Cir. 2005) ........................................................................ 6, 16

Leonetti v. Leonetti,
28 B.R. 1003 (E.D. Pa. 1983) .......................................................................... 2

Locklin v. Switzer Bros., Inc.,
299 F.2d 160 (9th Cir. 1961) ............................................................................ 2

**TABLE OF AUTHORITIES (Cont.)**

Rochez Brothers, Inc. v. Rhoades,
527 F.2d 891 (3d Cir. 1975) .......... 4

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006) .......... *passim*

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .......... 3

Skehan v. Board of Trs. of Bloomsburg State Coll.,
590 F.2d 470 (3rd Cir. 1978) .......... 2

Southern Nat. Corp. v. United States,
57 Fed. Cl. 294 (2003) .......... 3

United States v. Stewart,
433 F.3d 273 (2d Cir. 2006) .......... 6, 16

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) .......... 12

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 98-488C |
| | ) | (Judge Braden) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL EVIDENTIARY HEARING BRIEF**

Pursuant to the Court's Memorandum Opinion and Order, and Order Requesting Supplemental Expert Testimony, dated March 31, 2006, and following the Court's post-trial evidentiary hearing, held August 23 and 24, 2006, defendant, the United States, respectfully submits this post-trial evidentiary hearing brief regarding the damages claim of plaintiff, Sacramento Municipal Utility District ("SMUD"), in the above-captioned matter.

ARGUMENT

I. THE GOVERNMENT RENEWS ITS OBJECTIONS TO SMUD'S PRESENTATION OF ANY EVIDENCE FOLLOWING THE ORIGINAL 2005 TRIAL

The Court previously held that SMUD is entitled to damages for the Government's partial breach, but only for certain costs incurred from May 15, 1997, to December 31, 2003. Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 365 (2006). The Court ordered that the parties submit certain tables to the Court containing cost data separated into discrete categories for costs incurred from May 15, 1997 through November 1, 2003, id. at 334, because the Court "cannot ascertain with reasonable certainty the costs incurred" during that time period. Id. at 366. Further, the Court concluded that it "cannot ascertain with reasonable certainty costs

that SMUD incurred for storage-only components of the dry storage system, i.e. excluding dual-purpose transportable feature, for the period May 15, 1997 through December 31, 2003." Id.

As an initial matter, notwithstanding the Court's post-trial orders, the Government objects to SMUD's submission of post-trial testimony and the conduct of the post-trial evidentiary hearing. All of the post-trial testimony ordered by the Court constitutes an improper re-opening of the record after SMUD failed to meet its burden of proof in its case-in-chief at trial. Downey v. Denton County, Tex., 119 F.3d 381, 387 (5th Cir. 1997); see also Gathright v. St. Louis Teacher's Credit Union, 97 F.3d 266, 268 (8th Cir. 1996) (failure to call witnesses or produce evidence is not ordinarily grounds for reopening a case); Leonetti v. Leonetti, 28 B.R. 1003, 1010 (E.D. Pa. 1983) (courts do not allow a party to relitigate a case by presenting evidence that party previously ignored). Parties are not permitted a second chance to meet their burden of proof, if they have not met it the first time during trial. Cedar Creek Oil & Gas Co. v. Fid. Gas Co., 249 F.2d 277, 285 (9th Cir. 1957); see Hartford Accident & Indem. Co. v. Gulf Ins. Co., 837 F.2d 767, 773-74 (7th Cir. 1988) (upholding district court's refusal to reopen record because plaintiff had the opportunity to present its evidence during trial); Locklin v. Switzer Bros., Inc., 299 F.2d 160, 169 (9th Cir. 1961) (court should not reopen record, because evidence should be submitted during trial and the rights of the parties should not be held in abeyance for months or years after the trial); Skehan v. Board of Trs. of Bloomsburg State Coll., 590 F.2d 470, 478-79 (3rd Cir. 1978) (court should not reopen the record to allow plaintiff to present new evidence because plaintiff had full opportunity to present evidence and any inadequacies in the evidence were his own responsibility).

Leading up to and during the Court's 2005 trial in this matter, SMUD made a strategic decision not to present any evidence associated with the costs concerning the transportation-related features of its dry cask storage system, even in the face of the Government's presentation of such evidence. Under these circumstances, we object to what amounts to a relitigation of an issue in which SMUD plainly failed to meet its burden of proof. Accordingly, the Government requests that the Court deny SMUD's claim for any damages in addition to the damages previously determined by the Court in its March 31, 2006 Memorandum Opinion and Order.

## II. SMUD FAILED TO MEET ITS BURDEN OF PROOF AT TRIAL

At trial, SMUD had the burden of demonstrating, by a preponderance of the evidence, each element of its damages claim, including causation, foreseeability, and reasonable certainty. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005); Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). SMUD also bore the burden of demonstrating that its claimed losses were ones that, "but for" the breach of contract, would not have been suffered. California Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (2005); Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)). Indeed, the burden of proving the "but for" world fell squarely upon SMUD in this case. See Bluebonnet Sav. Bank, v. United States, 67 Fed. Cl. 231, 238 (2005) (holding that, "because plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but for' world"), appeal docketed, No. 06-5024 (Fed. Cir. docketed Nov. 10, 2005); Southern Nat. Corp. v. United States, 57 Fed. Cl. 294, 306 (2003) (rejecting plaintiffs' argument

in Winstar case that they were not required to provide detailed evidence of the but-for world to recover expectancy damages); Coast Fed. Bank v. United States, 49 Fed. Cl. 53, 55 (2001) (holding that "[w]ith respect to explaining its expectancy damages . . . plaintiff bears the burden of propounding a realistic but-for scenario . . ."), aff'd, 323 F.3d 1035 (Fed. Cir. 2003) (en banc).[1]

SMUD has failed to meet its burden, not once, but twice. As this Court noted in its opinion, it could not determine with reasonable certainty either the costs incurred from May 15, 1997, through December 31, 2003, or the costs that SMUD incurred for a storage-only dry storage system. SMUD, 77 Fed. Cl. at 366. Consequently, SMUD failed to meet its burden of demonstrating reasonable certainty for each aspect of its damages claim. "Failure to put into evidence all the proof necessary for sustaining a judgment is generally fatal." Rochez Brothers, Inc. v. Rhoades, 527 F.2d 891, 894 (3d Cir. 1975) (explaining that plaintiff failed to place into evidence all the necessary elements for an accurate determination of damages). Further, as discussed below, SMUD has again failed to meet its burden of proof, despite receiving a second bite at the apple. SMUD's damages claim should be rejected.

At the outset, we would note that, if the Court agrees with the Government's position regarding Table C – namely, that both the Vectra and Transnuclear West contracts relate to pre-May 1997 obligations – it need not resolve the dispute between the parties regarding Table B. Because the Government's accounting for Table C incorporates all of the costs associated with

---

[1] It is beyond dispute that SMUD seeks expectation damages in this matter. Tr.49:4-5 (counsel for SMUD stating that "SMUD is entitled to its dry storage costs as expectation damages"). Under an expectation damages theory, as opposed to reliance damages, the plaintiff bears the burden of proving each aspect of its damages claim, including a reasonable depiction of the "but for" world. See Bluebonnet Sav., 67 Fed. Cl. at 236-38.

the transportation features related to the dual-purpose system, to the extent that the Court agrees with our conclusion concerning Table C, the parties' adjustments under Table B are rendered moot.[2]

III. SMUD FAILED TO ESTABLISH ANY BASIS FOR THE RECOVERY OF POST-MAY 15, 1997 COSTS INCURRED UNDER THE VECTRA/TRANSNUCLEAR CONTRACT FOR THE RANCHO SECO DUAL-PURPOSE DRY CASK STORAGE SYSTEM

A. SMUD's Claimed Post-May 1997 Costs Are Attributable To Contracts And Legal Obligations That Pre-Date May 1997

SMUD failed to meet its burden, both at trial and at the post-trial evidentiary hearing, to establish its costs with reasonable certainty. Specifically, SMUD failed to demonstrate that the post-May 1997 costs it incurred regarding Vectra and Transnuclear West ("TNW") were not attributable to contracts and legal obligations that pre-date May 1997. Furthermore, SMUD failed to meet its burden of demonstrating that it would have canceled its contract with Vectra/TNW in 1997 if SMUD personnel knew that the Department of Energy ("DOE") was going to perform under the Standard Contract and begin acceptance of SNF from the nuclear industry in 1998, and failed to account for any costs SMUD would have incurred had it terminated its contracts. As explained above, it is inappropriate for the Court to allow SMUD to present additional evidence at the post-trial evidentiary hearing that it failed to present at trial. Consequently, SMUD failed to meet its burden of proof and is not entitled to recover its post-May 15, 1997 costs attributable to SMUD's contract for a dual-purpose dry cask storage system.

[2] In the Table C that we presented at trial, we excluded costs that we had previously included in Table B to avoid double counting. To the extent that the Court addresses Table C first and agrees with our conclusions concerning Table C, the Court would need to add the $13,821,203 that we excluded because it was accounted for in Table B.

In its Memorandum Opinion and Order, the Court requested that SMUD provide the Court with "Table C – including cost data from Table B, minus any costs attributable to a contract, lease, or other legal obligations executed by Plaintiff prior to May 15, 1997." SMUD, 77 Fed. Cl. at 334. As we demonstrated during the post-trial evidentiary hearing, SMUD entered into its obligations under Contract E776 with Vectra Technologies, Inc. ("Vectra") prior to May 15, 1997, and Contract E776A with TNW is simply an amendment to the previously executed Contract E776 with Vectra for the design, licensing, fabrication, testing, and delivery of a dual-purpose dry cask storage system for Rancho Seco's spent nuclear fuel ("SNF"). Therefore, all costs incurred and paid pursuant to Contract E776 and the supplemental amended Contract E776A were based upon contractual obligations entered into and effective prior to May 15, 1997.[3]

As an initial matter, the Court should disregard the testimony of Brian Brinig, SMUD's accounting expert, concerning the costs "attributable to a contract, lease, or other legal obligations executed by plaintiff prior to May 15, 1997," as Mr. Brinig admits that his testimony calls for a legal conclusion. Hrg.329:25-330:25 (Brinig).[4] It is axiomatic that an expert may not offer legal opinions, as that is the province of the Court. United States v. Stewart, 433 F.3d 273, 311 (2d Cir. 2006) (stating that expert opinion that seeks to explain the law "trespasses on the trial judge's exclusive territory"); In re Acceptance Ins. Co. Sec. Litig., 423 F.3d 899, 905 (8th Cir. 2005) (affirming exclusion of expert testimony that sought to provide legal conclusions).

---

[3] The Government prepared Table C containing costs that it believed related to legal obligations executed prior to May 15, 1997. The Table includes costs for two primary vendors: Vectra and Transnuclear West.

[4] "Hrg." refers to the transcript of the Court's post-trial hearing held August 23-24, 2006.

Here, Mr. Brinig had conceded that the determination of "attribution" is a legal conclusion about which he is not qualified to opine. In fact, Mr. Brinig admits that he is simply making a judgment call with respect to items that should be included on Table C, and that another reasonable person could interpret things differently and reach a different judgement. Hrg.339:15-22 (Brinig). Consequently, the Court should reject Mr. Brinig's conclusions regarding Table C.[5] Further, even if the Court were to accept Mr. Brinig's conclusions regarding Table C, as discussed below, Mr. Brinig's analysis is both incorrect and incomplete.[6]

### B. SMUD Failed To Include Costs Associated With Change Orders 10 and 11 To The Vectra Contract

Although Change Orders 10 and 11 to the Vectra contract plainly relate to obligations that SMUD incurred prior to May 1997, SMUD has failed to include these costs in its Table C submission. On October 9, 1992, SMUD executed a contract with Pacific Nuclear Systems, Inc. ("Pacific Nuclear") for the design, licensing, fabrication, testing, and delivery of a dual-purpose dry cask storage system for SMUD's SNF. DX 372; Hrg.381:12-20 (Brinig). The deliverables included under this contract included dual-purpose transportation casks, dual-purpose canisters, concrete horizontal storage modules, auxiliary equipment, and engineering services. DX 372. In 1993, Pacific Nuclear changed its name to Vectra Technologies, Inc. ("Vectra") after acquiring ABB Impell Corporation. DX 442; Hrg.381:21-382:1 (Brinig).

---

[5] Notably, although Mr. Brinig admits that the determination of "attribution" is a legal conclusion, he never asked counsel for SMUD for his definition of "attribution." Hrg.331:1-6 (Brinig).

[6] With respect to Table C, Mr. Brinig did not look at any costs incurred for vendors after June 1998 to determine whether there were costs related to pre-May 1997 obligations. Hrg.340:19-24 (Brinig).

From 1992 until September 1997, SMUD paid $11,893,860 to Vectra for work performed under Contract E776. Of the total costs paid to Vectra, $10,576,080 was paid before May 15, 1997, and $1,317,780 was paid after May 15, 1997. Pursuant to the Court's orders, the parties only addressed $1,317,780 on Table C because the first $10,576,080 paid to Vectra under Contract E776 occurred before May 15, 1997, and, therefore, was already included in Table A. Through its analysis of transportable features of the dual-purpose dry storage system quantified on Table B, the Government identified $168,414 of the $1,317,780 related to transportable features. Therefore, the Government only included an adjustment for the remaining $1,149,366 ($1,317,780 - $168,414) on Table C.[7] The entire amount ($1,317,780) paid to Vectra after May 15, 1997, under Contract E776 should be removed from SMUD's damages claim because these costs plainly are attributable to a contract or other legal obligations executed by SMUD prior to May 15, 1997.

In contrast to the Government's identification of costs that are properly included on Table C, SMUD only identified $167,835 in costs paid to Vectra under Contract E776 as costs incurred because of obligations dated prior to May 15, 1997. See Written Direct Testimony of Brian P. Brinig Supporting Table C, at ¶26(e). SMUD explained that "[t]hese charges were incurred after June 1, 1997. These charges are included in Table C for the following reasons: the invoice dates are prior to May 15, 1997 and/or the charges appear to be related to Contract

---

[7] See Footnote 1 of Table C of Defendant's Filing of Tables A, B and C, dated July 21, 2006.

E776 (as opposed to change orders 10 and 11)."[8] SMUD stated the reason for excluding the remaining Vectra costs as follows:

> These charges were incurred after June 1, 1997. Contract #E776 includes a termination clause by which SMUD may terminate the contractor's services without penalty by giving the contractor thirty days prior written notice of such termination. These costs are excluded from Table C based on the assumption that SMUD would have terminated the contract on 5/15/97. These costs are also excluded from Table C because they are attributable to Change Order #10 which was approved by SMUD 6/5/97 (after 5/15/97).

See SMUD's Filing of Table C; Exhibit 6 to Table C – Outside Services – Vendor Charges Incurred Before and After 6/1/97; Page 7, n.14.

SMUD has incorrectly excluded the costs associated with the Vectra contract in its Table C submission. First, with respect to Change Orders 10 and 11, Mr. Brinig opined that these change orders are outside the scope of the Vectra contract because both change orders were approved by SMUD after May 15, 1997. Written Direct Testimony of Brian P. Brinig Supporting Table C at ¶26(c).[9] This conclusion is incorrect for several reasons. First, change orders to Contract E776 relate to obligations anticipated and agreed to in the original contract dated October 9, 1992. The specific scope of work may or may not change, but the underlying contractual obligation for the design, licensing, fabrication, testing, and delivery of a dual-purpose dry cask storage system to SMUD remained the same. See DX 372, at SMUD 0004200

---

[8] See SMUD's Filing of Table C; Exhibit 6 to Table C – Outside Services – Vendor Charges Incurred Before and After 6/1/97; Page 7, Footnote 16.

[9] Mr. Brinig was unwilling to say whether Change Orders 10 and 11 were "attributable" to the Vectra contract because he believed that it was far beyond the scope of his expertise to determine the connection between the Vectra contract and the change orders. Hrg.358:16-24 (Brinig).

(stating that SMUD, without invalidating the original contract, reserves its right to order changes to the contract); DX 797 (change order 11, which states that "This Contract Change is subject to all provisions of the original contract and all provisions of any previous Contract Changes which are not expressly superceded in this Contract Change"). Therefore, any costs associated with a change order to a contractual obligation predating May 15, 1997, should be considered part of Contract E776, regardless of the date of the change order itself.

Indeed, Mr. Brinig could not and, in fact, did not conduct any independent analysis to determine what was within the scope of the Vectra contract. Hrg. 365:18-21 (Brinig). Rather, Mr. Brinig had to rely upon Mr. Redeker and Mr. Field to determine what was within the scope of the Vectra contract. Hrg.365:22-24 (Brinig). Yet, Mr. Brinig completely ignored Mr. Redeker's statements that some items contained in Change Order 10 – such as the radiographic exam and the offshore canister fabrication – may be within the scope of the Vectra. Hrg.364:7-19 (Brinig).

Second, Mr. Brinig conceded that Change Order 10 references some activities and items that took place before May 1997. Hrg.367:24-368:3 (Brinig). Indeed, Change Order 10 expressly states that "the following items resolve various contract issues raised by Vectra letter dated March 28, 1996 and responded to by the District in a letter dated May 7, 1996." SMUD 102117; Hrg.370:4-17 (Brinig) ("change order 10 talks about things back in 1996"). For example, Change Order 10 includes overhead costs from 1996-1998 as a result of increasing the term of the Vectra contract from 1995 to 1998. Hrg.371:14-372:17 (Brinig). Despite this explicit reference to pre-May 1997 obligations, Mr. Brinig has excluded the entirety of Change Order 10 from SMUD's Table C. Simply put, Contract E776 was executed prior to May 15,

1997, and any subsequent change orders to Contract E776 are contractual obligations incurred prior to May 15, 1997.

In apparent recognition that these change orders are attributable to the 1992 Pacific Nuclear contract, SMUD advances a second argument for excluding the Vectra costs from its Table C submission. Specifically, Mr. Brinig opines that, had SMUD terminated its contracts with vendors on or shortly after May 15, 1997, it would not have been obligated to make payments under those contracts after that date. Hrg.342:3-8 (Brinig); Written Direct Testimony of Brian Brinig, at ¶¶25-26.[10] Mr. Brinig's analysis is significantly flawed.

Mr. Brinig's interpretation of the contract between Vectra and SMUD is not accurate. The actual language of the contract reads:

> The District may terminate Contractor's services under this agreement by giving the Contractor thirty (30) days prior written notice of such termination. In the event of such termination, <u>the District shall pay to the Contractor all personnel costs and recoverable costs Incurred in the performance of such services, plus all reasonable costs Incurred as a result of such termination.</u> However, the Contractor agrees to waive any claim for damage, including loss of anticipated profit, resulting from contract termination.

DX 372, at SMUD 0004198 (emphasis added).

SMUD failed to consider the costs that would have been incurred in the event that it terminated the contract with Vectra, including any avoided costs that it would have paid but for

[10] Mr. Brinig did not offer any independent opinion that SMUD would have terminated its contracts had DOE performed. Hrg.346:16-19 (Brinig). Rather, the basis for Mr. Brinig's assumption is direction from counsel and his reading of the Court's order. Hrg.346:5-15 (Brinig). Mr. Brinig did not know whether SMUD ever conducted a cost-benefit analysis about continuing with the dry storage project or whether SMUD concluded that it made economic sense to continue with the dry storage project regardless of the breach. Hrg.346:24-347:8 (Brinig).

termination of the contract. Hrg.350:11-12 (Brinig). Mr. Brinig agreed that the definition of an "incremental cost" is the difference between costs incurred in the world in which there is performance as compared to the world in which there is a breach. Hrg.350:11-16 (Brinig). Yet, by assuming that SMUD would terminate its contracts in May 1997 in the "but for" non-breach world, without any consideration of the termination costs, Mr. Brinig's incomplete analysis would result in a windfall for SMUD. However, such a result is contrary to the law in this circuit. See Indiana Michigan, 422 F.3d at 1373 ("[t]he remedy for breach of contract is damages sufficient to place the injured party in as a good a position as it would have been had the breaching party fully performed"). Consequently, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). In other words, "the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir. 1994)). Examples of costs that SMUD failed to consider, and which will result in a windfall if unaccounted for, include unbilled costs incurred prior to termination; any costs caused by the termination; any contract or project close-out costs Vectra had incurred, or would incur to sell materials, re-tool machinery; and other types of costs that would only be incurred in a termination scenario, and not during normal operations.

For example, SMUD failed to consider Vectra's responsibility for termination charges with its subcontractors. The terms of such subcontracts could mean that Vectra is responsible for

many costs that would be passed on to SMUD.[11] By using only the actual invoices in its analysis, SMUD understated the effects of subcontractor termination costs that Vectra would have been responsible for paying, which in turn would be borne by SMUD. Mr. Brinig did not analyze what personnel costs and recoverable costs would be incurred had SMUD cancelled the Vectra contract. Hrg.350:11-14 (Brinig). Mr. Brinig admitted that he never discussed any potential reasonable termination costs with SMUD personnel. Hrg.350:15-18 (Brinig).[12] However, Mr. Brinig conceded that the responsibility associated with paying the cost related to Change Orders 10 and 11 would be "up in the air" had SMUD terminated the Vectra contract, and it was not unreasonable to assume that SMUD would be responsible for some of the cancellation costs. Hrg.365:25-367:14 (Brinig). Mr. Brinig never conducted any analysis to monetize those costs to SMUD had it terminated its contracts in May 1997. Hrg.367:16-23 (Brinig). Consequently, SMUD failed to account for these additional costs, related to contract termination, in its presentation of Table C.

Indeed, there is overwhelming evidence in the record that SMUD actually considered the costs associated with terminating the Vectra contract when it recommended to the Board of Directors that it continue with the dry storage project. A February 20, 1997 internal SMUD office memorandum, from Ken Miller to Steve Redeker, evaluated and analyzed nine options "that form the basis of an analytical study to determine if the current concept of the Ranch Seco

---

[11] In fact, Change Order 10 expressly references subcontractor termination costs incurred by Vectra prior to May 15, 1997, and which were passed on to SMUD. See Pl. Table C Filing Dated July 21, 2006, at Ex. 12, SMUD 102118.

[12] Mr. Brinig has never worked on a construction termination case or prepared a termination claim for a contractor. Hrg.353:11-20 (Brinig).

Spent Fuel Program needed to be changed and if so, what other option would be the most cost effective for SMUD." DX 718, at SMUD 061378. The ninth option that SMUD analyzed was to retain the SNF in the spent fuel pool and terminate its pursuit of dry cask storage. Id. at SMUD 061395. As Mr. Field testified in the evidentiary hearing, the ninth option is exactly the scenario that Mr. Brinig assumed when he addressed the termination clause of the Vectra contract. Hrg.226:21-227:9 (Field). Mr. Miller assumed that "[t]he Vectra contract would be cancelled in mid 1997 and liquidated damages would be paid." DX 718, at SMUD 061395. Mr. Miller also quantified the liquidated damages as $3.5 million, with an additional $1.5 million in costs to modify the spent fuel pool. Id., at SMUD 061396. This is an example of termination costs that SMUD anticipated in a contemporaneous document, yet that Mr. Brinig failed to consider when performing his analysis and calculations.[13]

C. SMUD's Amended and Supplemental Contract With Transnuclear West Relates To A Contract and Legal Obligations Into Which SMUD Entered Prior To May 1997

SMUD improperly failed to include the costs recorded against Contract E776A with TNW as costs attributable to contractual obligations that predate May 15, 1997. On October 3, 1997, Vectra filed for bankruptcy and requested an order to sell all of its nuclear fuel storage

[13] This document is further evidence of the fact that SMUD decided to continue with the dry storage project regardless of DOE's delay in performance. As we demonstrated at trial, in 1997, SMUD assumed that its SNF would be loaded into dry storage by August 31, 1999; that SMUD would obtain a $10-$12 million dollar savings by abandoning its wet pool; and that the dry storage project would pay for itself by 2001 – years before SMUD would have had the last of its SNF accepted, under any assumed rate of acceptance. See DX 721, at SMUD 061600 (1997 evaluation assuming dry storage by August 31, 1999); DX 755, at SMUD 061109 (May 1997 presentation by Redeker to the SMUD Board identifying $10-$12 million in savings). To the extent that SMUD would have made the same decision to pursue dry storage in both the breach and "but for" worlds, SMUD has failed to meet its burden of establishing causation for the costs associated with its dry storage project.

assets and business, including Contract E776. DX 879, at SMUD 0028140; Hrg.382:5-20; 385:6-386:16 (Brinig); DX 815 (letter to SMUD Board of Directors indicating that "TNW was formed to reorganize and continue to operate Vectra's ongoing business" and that, until a new contract is negotiated, the "spent fuel project continues on a day-to-day basis under the terms and conditions of the old Vectra contract"). On November 4, 1997, the bankruptcy court issued a final order approving the sale of Vectra's SNF storage assets and intellectual properties, including Contract E776 to TNW. DX 879, at SMUD 0028140. On October 1, 1998, SMUD executed the Superseding Agreement Amending Contract E776 (SMUD Contract No. E776A) with TNW, which continued the original contractual obligations into which SMUD had entered with Pacific Nuclear/Vectra, specifically the design, licensing, fabrication, testing, and delivery of a dual-purpose dry cask storage system. The Superseding Agreement, which specifically characterized Contract E776A as a "superceding agreement amending SMUD contract number E-776 (SMUD contract E-776A)," id., included the following terms:

> This Superseding Agreement Amending Contract E-776 (hereinafter designated as "Contract E-776A"), is intended to carry out the deliverables originally agreed to in Contract E-776, but with TNW [Transnuclear] in place of Vectra, and under the amended terms and conditions contained herein. For the most part, the terms and conditions of Contract E-776 remain unchanged, except that as a condition of the Bankruptcy Court and Utility negotiated Transnuclear West takeover of Vectra's assets, the contract reverts from a fixed price contract to a cost reimbursable contract, in accordance with Defense Contract Audit Agency (DCAA) accounting standards, rules and regulation with a District right to audit applicable cost records. By implementing this Amendment the District retains force in rights stipulated in Change Order 10 to Contract No. E776 executed with Vectra Technologies, Inc., with respect to those provisions entitled Royalty Agreement, License Agreement and Security Agreement. Change Order No. 10 to Contract No. E776 is included herein as Appendix C. The parties agree that this Contract

> E-776A does not amend or supersede the License Agreement, the Security Agreement, or the Royalty Agreement.

Id. at SMUD 0028141.

Because Contract E776A was merely an amendment to Contract E776 into which SMUD and Pacific Nuclear entered on October 8, 1992 – well before the May 15, 1997 date identified by the Court – all costs recorded to Contract E776A (all of which post-date May 15, 1997) should be excluded from the damages claim.

Although Mr. Brinig did not include the costs associated with TNW in Table C because he believed that it was a different contract than the 1992 Pacific Nuclear contract, Hrg.377:24-378:11 (Brinig), Mr. Brinig conceded that the determination of whether the Vectra and TNW contracts are the same or different is "clearly a legal conclusion." Hrg.378:12-17 (Brinig). For this reason alone, Mr. Brinig's testimony concerning the supplemental and amended TNW contract should be disregarded. See Stewart, 433 F.3d at 311; In re Acceptance Ins. Co. Sec. Litig., 423 F.3d at 905. Indeed, Mr. Brinig's post-trial treatment of the TNW contract stands in stark contrast to his trial views concerning the relationship between the Vectra and TNW contracts. At trial, Mr. Brinig conducted a review of outside services and characterized the Vectra and TNW contracts as a single contract with a single contract number – 4500000386. PX 1000, ¶21(e); Hrg.379:6-381:11 (Brinig) (identifying five contracts for outside services, and treating TNW/Vectra as a single contract with a single contract number). In fact, Mr. Brinig acknowledged that TNW charged SMUD for costs under the original E-776 contract with Vectra. Hrg.386:17-24 (Brinig); DX 5001 ($684,000 invoice for costs charged by TNW to the E-776 contract). Further, Mr. Brinig conceded that TNW performed work for SMUD prior to the execution of the supplemental agreement in May 1998, but did not include these costs in

Table C. Hrg.394:1-19 (Brinig); DX 863 (stating that TNW was working at risk on SMUD contract).

According to SMUD's own accounting records, a total of $25,068,134 was paid to TNW under Contract E776A. Of the total $25,068,134 paid to TNW, Stephen Kiraly, the Government's damages expert, quantified $13,652,789 as costs related to transportable features, which were included on the Government's Table B submission. See Def. Filing Of Tables B, dated July 21, 2006. The remaining costs recorded to Contract E776A, which did not otherwise relate to transportable features of the dry cask system, totaled $11,415,345. See Def. Filing of Table C & n.2, dated July 21, 2006. However, for the reasons stated above, the entire $25,068,134 paid to TNW under Contract E776A, which was paid after May 15, 1997, should be excluded from SMUD's damages claim.

## IV. SMUD FAILED PROPERLY TO IDENTIFY AND ACCOUNT FOR ACTIVITIES AND COSTS RELATED TO THE TRANSPORTABLE FEATURES OF THE DUAL-PURPOSE DRY CASK STORAGE SYSTEM IMPLEMENTED AT RANCHO SECO

### A. SMUD Failed to Meet Its Burden Of Identifying The Costs Associated With A Storage-Only Dry Storage System

SMUD failed to establish with reasonable certainty the costs related to the transportable features of the dual-purpose dry cask storage system and failed to meet its burden of proof at trial and the post-trial evidentiary hearing. The Court's post-trial order requested that the parties submit "Table B – including cost data from Table A, minus any costs attributable to the 'dual-purpose' transportable features of the dry storage system." SMUD, 70 Fed. Cl. at 334. James

Field, SMUD's dry cask project manager, attempted to undertake this analysis for SMUD.[14] Mr. Field reviewed the relevant work orders from the accounting system in an effort to determine whether SMUD had maintained a work order to capture the transportable features costs. PX 2001, at ¶6 (Written Direct Testimony of James Field); Hrg.165:6-10 (Field). Mr. Field determined that the only work order that met this criteria contained costs recorded prior to May 15, 1997. Id. Mr. Field then reviewed Mr. Brinig's work papers, which summarized the costs from SMUD's accounting system, to determine if the invoices and contract documents provided assistance in determining the transportable features costs. Id. at ¶7. Mr. Field only included costs that he could specifically identify as relating solely to the transportation aspect of the dual-purpose dry cask storage system, as opposed to conducting an analysis of the costs associated with a storage-only system. Id. at ¶12.

Mr. Field's approach failed accurately to identify and account for the transportable features and related costs as requested by the Court. As the Government previously argued, at trial and the post-trial evidentiary hearing, the Court should consider the costs that SMUD would have paid for a store-only dry cask storage system in lieu of an attempted (and failed)

---

[14] Despite the Court's request that SMUD provide testimony from Mr. Brinig regarding Table B, SMUD, 70 Fed. Cl. at 334, Mr. Brinig conceded that he lacked the expertise to opine upon the aspects of SMUD's dry storage project that relate to transportation features. Hrg.406:7-17 (Brinig). Mr. Brinig admitted that the only "expertise" he was using with respect to Table B was copying the numbers identified by Mr. Field onto another sheet of paper. Hrg.409:19-23 (Brinig). Mr. Brinig did not conduct any analysis to confirm Mr. Field's conclusions as to what aspects of SMUD's dry storage project relate to transportation features. Hrg.407:15-19 (Brinig). Notably, Mr. Brinig does not possess the expertise to determine whether Mr. Field or Jerry Burford, the Government's technical expert, correctly identified dual-purpose dry storage features and costs. Hrg.407:7-10 (Brinig).

categorization of transportable feature costs actually paid by SMUD as part of its dual-purpose dry storage system.

By order dated March 31, 2006, the Court requested that the parties submit "Table B – including cost data from Table A, minus any costs attributable to the 'dual-purpose' transportable features of the dry storage system." SMUD, 70 Fed. Cl. at 323. As stated above, although, at trial, the Government presented two separate expert opinions on this issue, SMUD chose not to present any affirmative evidence on this matter. In light of the Court's March 31, 2006 order, however, SMUD submitted Table B, which had been prepared by Mr. James Field, SMUD's dry cask project manager.

As we established during the Court's post-trial hearing, Mr. Field's analysis is fatally flawed in that it fails to calculate for the Court the cost of a storage-only dry storage system. Further, Mr. Field's analysis ignores the analysis that SMUD commissioned in the early 1990s to determine the very question that the Court now seeks to answer: specifically, the cost of a store-only dry storage system had SMUD pursued that system instead of the dual-purpose dry storage system that it chose to pursue. Further, as we established at the post-trial hearing, Mr. Field's post hoc analysis is further flawed because it does not properly account for the analyses presented by the Government's experts at trial, Mr. Burford and Mr. Kiraly.

### B. Mr. Field Failed Properly To Answer The Court's Question Regarding The Cost Of A Non-Dual Purpose Dry Storage System

During the Court's post-trial hearing, Mr. Field testified that he did not examine any analyses that SMUD developed to determine what it would cost to implement a storage-only system at the Rancho Seco facility. Hrg. 152: 4-11 (Field). Mr. Field also admitted that, in performing his post hoc analysis, he did not discuss the costs of store-only systems with other

utilities that had developed such systems. Hrg.152:1-5 (Field). These admissions are critical because they show that, at bottom, Mr. Field did not perform the analysis that the Court requested: specifically, the cost to SMUD of developing a store-only rather than a dual-purpose dry storage system. As we established at trial, and as we discuss below, Mr. Field failed even to consider the analysis that SMUD commissioned to consider its storage options for its SNF, including the costs associated with storage-only dry storage. Consequently, Mr. Field's analysis is an unreliable reference point for the Court to determine the costs that SMUD would have incurred had it pursued a storage-only system rather than a dual purpose dry storage system.

### C. The Analysis That SMUD Commissioned In 1990 Establishes that A Store-Only System Would Have Cost SMUD Between $10.5 and $15.5 Million

In 1990, as part of its efforts to determine how best to proceed with the shut down and decommissioning of the Rancho Seco nuclear power plant, SMUD retained the services of S. Levy Inc. ("Levy"), which prepared a detailed analysis of SMUD's nuclear fuel storage options at Rancho Seco. PX 176.[15] As part of its analysis, Levy examined the cost of various storage options available to SMUD. Id. In addition to examining the costs of dual-purpose storage, Levy expressly examined the estimated cost of a storage-only system at SMUD and concluded that the cost of the "total deployment" of such a system would be "$10.5M - 15.5M." Id. at SMUD 0031568.

During the Court's post-trial hearing, however, Mr. Field testified that, despite his knowledge of the Levy Report, he did not rely upon, refer to, or even review the Levy report in

[15] As established at trial, SMUD relied upon the conclusion of the Levy report in making its decision to pursue dry storage. Tr.273:16-20 (Shetler).

performing his analysis of what the SMUD system minus its dual-purpose features would cost. Hrg.153:1-11 (Field).[16] Instead of using the Levy report as a starting point or frame of reference for his own analysis, Mr. Field chose to perform his post hoc analysis without the benefit of the Levy analysis whatsoever. The result of Mr. Field's decision to proceed without the guidance of the Levy report is that his estimate of SMUD's non-dual purpose costs diverges wildly from the Levy estimate. Indeed, whereas the Levy estimate calculates SMUD's storage-only costs to be between $10.5 and $15.5 million, Mr. Field acknowledged during the Court's post-trial hearing that his post-1997 cost estimate for non-dual purpose aspects of SMUD's dry storage system is nearly $54 million. Hrg.149:13-151:16 (Field).[17] During the Court's post-trial hearing, Mr. Field was unable to explain the huge variation between the contemporaneous Levy estimate and his own post hoc litigation estimate other than to attempt to dismiss the Levy estimate as "grossly underestimating" SMUD's requirements. Hrg.158:18-24 (Field). This eleventh hour critique rings hollow considering Mr. Field's admission that he had not even reviewed the Levy report prior to the Court's post-trial hearing. Hrg.154:2-7 (Field). In addition, Mr. Field admitted that SMUD's "unique requirements" arose because of SMUD's decision to

---

[16] Indeed, Mr. Field testified that, in preparing his analysis, he did not consult with Ken Miller, SMUD's original dry storage project manager, who acted in that capacity from the inception of SMUD's dry storage project in the early 1990s until his retirement in 1999, and who Mr. Field recognized "was more knowledgeable about dry storage costs because he was the project manager for the lion's share of the project and [because] he involved himself in performing cost benefit evaluations in comparison of SMUD's [storage] options." Hrg.163:9-15 (Field).

[17] Mr. Field acknowledged that SMUD's post-1997 costs for dry storage were approximately $56 million and that his analysis removed approximately $2.168 million as relating to dual purpose aspects of the system. Hrg.151:12-16 (Field). Accordingly, Mr. Field's analysis concludes that SMUD's post-1997, non-dual purpose costs are $53.8 million.

decommission the Ranch Seco facility in the early 1990s. Hrg.62:3-16; 159:14-22 (Field). Notably, DOE was not a party to SMUD's decision to engage in early decommissioning of the Rancho Seco plant, and it was certainly not foreseeable when DOE entered into the Standard Contract with SMUD. See SMUD, 70 Fed. Cl. at 360 (citing Indiana Michigan, 422 F.3d at 1373) (holding that foreseeability is measured from the time of contract formation).

In short, the Court should dismiss Mr. Field's post-trial analysis as a litigation-driven attempt by SMUD to increase its recovery against the Government rather than to provide the Court with an accurate estimate of the costs that SMUD would have incurred had it pursued a storage-only dry storage system. By contrast, the Levy report provides a contemporaneous estimate of the costs that SMUD was told it should expect to pay for a storage-only system. This analysis shows a far more realistic estimate of the costs that SMUD would have incurred had it not pursued a dual-purpose system. Accordingly, the Levy report should provide guidance to the Court in determining SMUD's non-dual-purpose costs for dry storage.

As we show below, in stark contrast to the outlier nature of Mr. Field's analysis, the reasonableness of the analyses that the Government's experts provided to the Court at trial becomes clear when those analyses are compared to the results of the Levy report.

### D. Mr. Burford's Estimate Is Consistent With The Levy Study

Despite Mr. Field's flawed analysis, the Government's expert witnesses, Jerry Burford and Stephen Kiraly, provided an analysis to the Court during the trial that met the Court's request for an analysis to identify the costs for a store-only dry storage system. At trial, Mr. Burford testified that he prepared a "bottoms-up" estimate of what a store-only dry storage system would cost at the time that SMUD decided to pursue dry cask storage for Rancho Seco,

approximately 1992. DX 2001, at ¶¶64-75. In addition, Mr. Kiraly, in a "top-down" analysis, identified the transportable features and related costs that SMUD actually paid to Vectra, TNW, and other vendors as part of the dual-purpose dry storage system that it pursued for Rancho Seco. DX 2003, at ¶¶76-81 & Att. 10. Mr. Kiraly's "top-down" approach was performed to clarify and narrow the gap between the cost of Mr. Burford's store-only system and what SMUD actually paid for its dual-purpose system. Id.

In his direct testimony, as recognized by the Court in its Memorandum Opinion and Order, Mr. Burford concluded that the major components of a licensed dry storage-only system should cost $13.6 million. See SMUD, 70 Fed. Cl. 366, n.34 (citing DX 2001 ¶123 n.58). Mr. Burford's estimate was, in fact, very similar to the estimate for a storage-only system that was included in the report prepared by Levy in 1990. DX 165. The Levy report, prepared contemporaneously with SMUD's decision to pursue dry cask storage for the Rancho Seco SNF, identified several store-only options that SMUD could have pursued, one of which, the NUHOMS-24P, was, in fact, the store-only version of the system that SMUD eventually purchased. Id. at SMP0680024-0028. The Levy report estimated the cost for a complete storage-only system as within the range of $10.5 to $15.5 million. Id. at SMP0680028. Mr. Burford's cost estimate of $13.6 million would fall in the mid-range of the Levy report's estimate, further demonstrating the reasonableness of Mr. Burford's analysis.

E. Mr. Kiraly's Estimate Also Is Consistent With The Levy Report

SMUD claimed $78.558 million in pursuit of its dual-purpose dry storage system. Mr. Kiraly's expert report quantified costs that SMUD did not incur as a result of the breach, which included the calculation to identify the transportation aspects of the dual-purpose storage system.

Based upon the opinions of Mr. Burford, and working in conjunction with personnel from Watkins Consulting, Mr. Kiraly identified those costs associated with transportation features. DX 2003, at ¶¶79-81 & Att. 10. The first step was to identify how the vendors categorized their costs. The primary vendor analysis was performed on the TNW invoices. Mr. Kiraly identified the internal accounting codes that TNW used to organize its costs. The TNW internal accounting codes provided similar detail as the SMUD internal work orders, upon which Mr. Field relied to form his opinions of transportable features as they related to SMUD costs. Once Mr. Kiraly identified all possible internal accounting codes, Mr. Burford and personnel at Watkins Consulting identified which codes, in their opinion, represented transportable features. Mr. Kiraly then tallied all costs recorded to the internal orders identified as transportation features. For the remaining costs that could not be readily identifiable based upon the documentation provided, Mr. Kiraly allocated the costs by using the transportable features costs previously quantified.

The total cost that Mr. Kiraly quantified for the transportable features of the dual-purpose dry storage system, based upon the opinions of Mr. Burford, totaled $17,038,533. DX 2003, at Att. 10. The entire amount was charged to SMUD under Contract E776 and the Superseding Agreement Amending Contract E776A. Of the $17,038,533, Mr. Kiraly identified $3,217,330 in costs paid before May 15, 1997.[18] Therefore, the Government only included the remaining $13,821,203 ($17,038,533 - $3,217,330) on Table B. However, the total $13,821,203 related to Contract E776.[19] Regardless of the Court's opinion regarding the costs of the transportable

---

[18] Defendant's Filing of Tables A, B, and C filed on July 21, 2006, Table B, Footnote 1.

[19] This amount also includes costs recorded to Contract E776A.

features, the entire $13,821,203 should be excluded from SMUD's damages claim based upon the Court's opinion governing the Table C adjustments.

V. SMUD IS ONLY ENTITLED TO RECOVER CERTAIN INTERNAL LABOR COSTS FOR 16 EMPLOYEES IDENTIFIED BY THE GOVERNMENT AND INCLUDED IN THE COURT'S MEMORANDUM OPINION AND ORDER

SMUD's post-trial attempt to increase the internal labor costs included in its damages claim is effectively an improper motion for reconsideration prior to the Court's final order and violates the Court's finding that SMUD is only entitled to labor costs for those employees who spent a majority of their time on SMUD's dry storage project. As the Court concluded in its Memorandum Opinion and Order, "[t]he evidence in this case, however, fails to establish that SMUD would have reduced the Rancho Seco personnel or reassigned these employees to other responsibilities, but for the labor requirements of the dual-purpose dry storage project – particularly since SMUD also was engaged during this time in executing the incremental decommissioning of the Rancho Seco site." SMUD, 70 Fed. Cl. at 376. Relying upon the direct testimony of Mr. Kiraly, the Court concluded that, "of the 256 employees that charged time to the dual-purpose dry storage project, only 16 employees spent the majority of the their time to that project," and the Court "determined that SMUD may not recover any internal labor costs claimed, except for the costs incurred for the 16 employees to the extent they worked on any portion of the dry storage project." Id. at 376, n.41; DX 2003 at EXS0050082-86 (Written Direct Testimony of Stephen Kiraly).

The Court requested "Table A - a Summary of Costs by the categories listed in PX 1000 ¶20, for each of the following periods: January 1, 1992 through May 14, 1997; May 15, 1997 through May 31, 1997; June 1, 1997 through October 31, 1999; and November 1, 1999 through

December 31, 2003." SMUD, 70 Fed. Cl. at 334. The Court also included a footnote stating that "[t]he 'Labor' category may include costs attributable to the 16 employees who charged the majority of their time to the 'dual-purpose' dry storage project." Id. at 334 n.1. Consistent with this Court's order, SMUD and the Government jointly filed Table A, which calculated the costs associated with the 16 SMUD employees identified in footnote 41 of the Court's opinion. Hrg.311:21-312:6 (Brinig).[20]

However, despite the Court's opinion that SMUD may not recover any internal labor costs except for the costs incurred for the previously identified 16 employees (to the extent that they worked on the dry storage project), on July 21, 2006, SMUD filed a proposed modification to the labor costs included in Table A. This proposed modification increased the number of SMUD employees from the 16 identified by the Court to 37 employees and increased the costs associated with the internal labor hours for these employees by approximately $2.6 million.

After the parties' joint filing, and at the direction of SMUD's counsel, Mr. Brinig prepared a revised Table A, in which he applied Mr. Kiraly's analysis over the period of time that the Court allowed as damages, rather than over the dry storage project period as allowed by the Court. Hrg.306:9-10; 313:15-20 (Brinig) (admitting that idea to apply Kiraly analysis to damages period came from counsel for SMUD). In this revision, Mr. Brinig erroneously identified 37 employees as having spent a majority of their time on the dry storage project from May 1997 through 2003, the period in which the Court allowed damages. Hrg.318:11-21 (Brinig). On July 28, 2006, Mr. Kiraly offered supplemental written direct testimony in response

[20] Because there was no dispute at trial regarding inclusion of SMUD's indirect labor costs for the period before November 1, 1999, Table A includes an indirect labor category, but limits any such costs to the 16 employees identified by the Court.

to Mr. Brinig's conclusion that the labor costs for 37 SMUD employees should be included in the damages claim. In his testimony, Mr. Kiraly demonstrated that the calculation which Mr. Brinig performed was fundamentally flawed and contained numerous errors that improperly inflated damages related to the internal labor contained in SMUD's Modified Table A. The reason for Mr. Brinig's error of over 50 percent was his failure to consider the hours claimed by employees to work orders outside of the dry fuel storage project. Hrg.319:11-323:13 (Brinig). Upon Mr. Kiraly's critique of Mr. Biring's revised analysis, Mr. Brinig again adjusted his labor number to a revised 16 employees. Hrg.321:25-323:13 (Brinig). This "revised" 16 employees includes five new employees that were not previously included in the 16 employees the Court allowed as damages. Hrg.304:18-305:23 (Brinig).

As we stated during the post-trial evidentiary hearing, the Court has already identified the SMUD employee labor costs that it believes are properly included in damages. In fact, at the post-trial hearing, the Court elaborated on the language contained in its March 31, 2006 order by stating, "I put the names of the individuals, so we didn't have a fight about that." Hrg.26:12-14. SMUD's post-trial efforts to modify and increase its damages should be denied.

Further, Mr. Brinig has conducted absolutely no analysis to determine whether these additional five employees that he identified were incremental to DOE's delay in SNF acceptance. First, Mr. Brinig acknowledged that none of the five employees were terminated after SMUD completed the dry storage project. Hrg.324:13-21 (Brinig). Second, Mr. Brinig conceded that he did not know whether any of these five employees' time were diverted from

other SMUD projects from 1997 through 2003. Hrg.325:1-4 (Brinig).[21] Consequently, even if the Court were to allow SMUD to reargue its claim regarding incremental labor, SMUD has once again failed to meet its burden.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court enter judgment on behalf of the Government and only allow for the recoverability of damages consistent with the Government's submissions of Tables A, B, and C.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

[21] Further, Mr. Brinig did not conduct any analysis to determine whether these additional five employees spent time working on the dual-purpose features of SMUD's dry storage project or whether they spent time working on impact limiter issues – both of which the Court expressly disallowed as damages. Hrg.325:5-327:15 (Brinig).

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Russell Shultis by Joshua E. Gardner
RUSSELL A. SHULTIS
Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn. Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7561
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

JOSHUA E. GARDNER
SCOTT R. DAMELIN
Trial Counsel

October 10, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 10th day of October, 2006, a copy of foregoing "DEFENDANT'S POST-TRIAL EVIDENTIARY HEARING BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner