No. 98-488C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S POST-HEARING LEGAL BRIEF**

---

OF COUNSEL:

David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

October 10, 2006

*Counsel of Record for Plaintiff Sacramento Municipal Utility District*

# TABLE OF CONTENTS

PAGE

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................4

I. The TVA and Yankee Decisions and the Record in this Case Demonstrate that SMUD's Damages are Appropriate in Magnitude..............................4

A. The Magnitude of SMUD's Damages Are Appropriate and Were Foreseeable ........................................................................ 5

B. Transportable Dry Storage Was Foreseeable and Reasonable .................... 8

II. The Court Properly Received Additional Evidence at the 2006 Evidentiary Hearing..........................................................................................10

III. The Evidence Substantiates SMUD's Proposed Offsets for Certain Internal Labor, Dual Purpose Transportable Features, and Pre-May 15, 1997 Obligations..........................................................................................14

A. The Offset for Certain Internal Labor Should be Based on Application of the Court's Fifty Percent Rule to the Damages Period.................... 14

B. The Costs Attributable to the Dual Purpose Transportable Features of the Dry Storage System During the Damages Period Total $2,168,321 .............. 17

1. Mr. Field Identified the Project's Dual Purpose Transportable Features and Determined that the Costs Attributable to Them During the Damages period Total $2,168,321..............................................................19

2. The Government's Arguments Are Not Supported by Probative Evidence ..........................................................25

C. The TNW Contract and Vectra Change Orders are Post-May 15, 1997 Obligations and Should be Included in SMUD's Damages................................. 34

1. The TNW Contract is a Post-May 15, 1997 Legal Obligation ...........................................................35

2. Vectra Change Orders 10 and 11 are Post-May 15, 1997 Legal Obligations...........................................................37

CONCLUSION.....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Binzler v. Marriott International, Inc.*, 81 F.3d 1148 (1st Cir. 1996) ................................12

*Blanke v. Alexander*, 152 F.3d 1224 (10th Cir. 1998) ....................................................12

*Calage v. University of Tennessee*, 544 F.2d 297 (6th Cir. 1976) ....................................12

*Capital Marine Supply, Inc. v. M/V Roland Thomas, II*, 719 F.2d 104 (5th Cir. 1983) ..........................................................................................................12

*Earl Realty Inc. v. Leonetti* (In re Leonetti), 28 B.R. 1003 (E.D. Pa. 1983) .....................12

*Downey v. Denton County, Texas*, 119 F.3d 381 (5th Cir. 1997) ......................................12

*Garcia v. Women's Hospital of Texas*, 97 F.3d 810 (5th Cir. 1996)..................................12

*Gathright v. St. Louis Teacher's Credit Union*, 97 F.3d 266 (8th Cir. 1996) .....................12

*Lasalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) ...........................13

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987) ........................13

*Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521 (Ct. Cl. 1961)..............................13

*MacMillan Bloedel Ltd. v. The Flintkote Co.*, 760 F.2d 580 (5th Cir. 1985) .......................6

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)..............................................................6

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971).......................11, 12

## DOCKETED CASES

*Sacramento Municipal Util. Dist. v. United States*, 70 Fed. Cl. 332 (2006) ............. passim

*Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006) ..................................3, 5, 6, 8

*Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl.) (Dckt. #923) ..4, 5, 6

## FEDERAL STATUTES

Pub. L. No. 97-425, 96 Stat. 2201, § 136(a)(1), 42 U.S.C. § 10156(a) ..............................7

## MISCELLANEOUS

Notice, 48 Fed.Reg. 54,391 (Dec. 2, 1983) ....................................................................7, 8

CHARLES ALLEN WRIGHT ET AL., 28 Federal Practice and Procedure § 6164 (1993) ..........................................................................................................11

12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 59.13[3][c] (3d ed. 1997) ..........................................................................................11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, Plaintiff, | ) | |
| v. | ) | No. 98-488 C |
| THE UNITED STATES OF AMERICA, Defendant. | ) | (Judge Braden) |

**SACRAMENTO MUNICIPAL UTILITY DISTRICT'S POST-HEARING LEGAL BRIEF**

**INTRODUCTION**

In March 2006, this Court issued an order and opinion finding that Sacramento Municipal Utility District ("SMUD") is entitled to recover as mitigation damages its dry storage costs incurred from May 15, 1997 through December 31, 2003 (the "damages period") subject to certain offsets; the Court also issued an accompanying order directing SMUD to consult with the government and provide additional testimony calculating several of these offset amounts.[1] *Sacramento Municipal Util. Dist. v. United States,* 70 Fed. Cl. 332 (2006).

The parties have agreed that SMUD incurred total dry storage costs of $78,558,211 from January 1, 1992 through December 31, 2003 (the "claim period"), that $19,347,430 of these costs were incurred before the damages period, that the offset for one twenty-second of the Independent

[1] The Court's order and opinion specified the offset amounts for the spent fuel building upgrade ($450,000), the Precision Components Corporation loan workout agreement ($500,000), and the wet pool cost savings ($4,196,360). *See* 70 Fed. Cl. at 358, 374-75.

Spent Fuel Storage Installation ("ISFSI") totals $4,618, and that the offset for costs involving onsite drop testing total $754,057. *See* Summary Table, PX 2008 (Attachment 1).[2]

The parties disagree, however, over the magnitude of three of the offsets: (1) the internal labor by SMUD employees who devoted less than fifty percent of their time to the dry storage project; (2) the dual purpose transportable features of the project; and (3) the legal obligations incurred by SMUD before May 15, 1997 that resulted in costs after that date. As to internal labor, SMUD submits that the correct application of the Court's fifty-percent rule produces an offset of $8,009,699, while the government claims that the offset should be $9,489,022. As to dual-purpose transportable features, SMUD submits that the cost attributable to such features is $2,168,321, while the government contends that the offset should be $13,854,071. As to pre-May 15, 1997 legal obligations, SMUD submits that the offset should be $167,835, while the government asserts that it should be $26,217,500 (of which $25,068,134 was paid to TransNuclear West ("TNW") and $1,149,366 was paid to VECTRA Technologies, Inc. ("Vectra")).[3] Using SMUD's proposed offsets, its recoverable mitigation damages under the Court's order total $42,958,357; using the government's proposed offsets, this amount decreases to $17,396,409. *Id.*

[2] By responding to the Court-ordered offsets, SMUD does not concede that such offsets are appropriate. SMUD maintains the positions set forth in its prior briefs that the offsets are inappropriate under the facts of this case.

[3] The government's position is that all $25,068,134 paid to TNW should be deducted as part of the offset for the pre-May 15, 1997 obligations, but it proposes to remove a significant portion of these costs as part of its offset for dual purpose transportable features. Accordingly, the government's proposed deduction for pre-May 15, 1997 obligations contains the balance of the TNW costs, which are $11,415,344. See Defendant's Filing of Tables A, B, and C (Dckt. #362), at Table C n.2.

This Court properly received additional evidence on these offset issues at the August 2006 evidentiary hearing. At the close of the prior evidentiary hearing in March 2005, the Court expressly reserved its ability to accept additional evidence to assist it in fairly resolving this matter, and the Court has directed SMUD to provide additional evidence on the amount of the offsets. Even if the record had been closed, the Court properly exercised its discretion to reopen the record for this purpose. All of the additional evidence substantiates SMUD's proposed offsets:

- SMUD's accounting expert, Brian Brinig, testified that SMUD's proposed offset for internal labor is properly based on application of the Court's fifty percent rule to the damages period rather than the claim period. This approach more precisely identifies those employees whose labor should be included as damages if the Court is going to apply a fifty-percent rule, and it accounts for changes in employment over the life of the project.

- SMUD's longtime Rancho Seco Engineering Superintendent and former Dry Fuel Storage Project Manager, Jim Field, testified that SMUD's proposed offset for dual purpose transportable features properly accounts for the limited project features that are necessary for later transportation of the fuel offsite. Mr. Field identified these features and costs based on his extensive knowledge of the project and his page-by-page review of the invoices and other documentation. He also provided undisputed testimony that the government's use of vendor accounting codes for this purpose is unreliable and incorrect, and he demonstrated that the generic cost estimates referenced by the government would not have met SMUD's foreseeable needs as a shutdown utility.

- Mr. Brinig also testified that SMUD's proposed offset for pre-May 15, 1997 legal obligations properly reflects those obligations that existed as of that date based upon SMUD's accounting records. Mr. Brinig further provided undisputed testimony that the contract between SMUD and TNW, for which the government seeks an offset of approximately $25 million, was not executed until September 1998, and change orders 10 and 11 to the prior contract between SMUD and Vectra, for which the government seeks an offset of approximately $1.1 million, were not executed until June and October 1997.

A damage award of $42,958,357 is fully consistent with the damages recently awarded by this Court in the Tennessee Valley Authority ("TVA") and the Yankee Atomic, Connecticut Yankee, and Maine Yankee spent nuclear fuel cases. *Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006) (Lettow, J.); *Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. issued Sept. 30, 2006) (Merow, S.J.).[4] In the TVA case, TVA recovered dry storage costs of approximately $35 million for a dual-purpose dry storage system involving only about half as many canisters as SMUD's system. In the Yankee cases, the utilities recovered dual-purpose dry storage costs of approximately $25 million, $33 million, and $65 million for dual-purpose dry storage systems that were only about forty, forty-five, and eighty percent complete, respectively. Damages of this magnitude were also foreseeable based on the fee structure that the Department of Energy ("DOE") adopted for the Federal Interim Storage Program in 1983, the same year that DOE and SMUD entered into the Standard Contract. Under that Program, DOE would have charged SMUD $67.4 million in 1984 dollars to dry store SMUD's spent nuclear fuel on an interim basis prior to the opening of the permanent repository in 1998.

Thus, based on the Court's prior order and opinion, SMUD respectfully requests that the Court enter judgment awarding SMUD mitigation damages in the amount of $42,958,357.

## ARGUMENT

### I. The TVA and Yankee Decisions and the Record in this Case Demonstrate that SMUD's Damages are Appropriate in Magnitude

[4] The Yankee decision is available on Westlaw at 2006 WL 2848615, but the Westlaw version has not yet been paginated. Consequently, citations to the decision will reference the slip opinion.

This Court's recent decisions awarding substantial damages for transportable dry storage systems in the TVA and Yankee cases, as well as the fee structure previously adopted by the DOE for Federal Interim Storage under the Nuclear Waste Policy Act ("NWPA") indicate that the magnitude of SMUD's damages is appropriate and was foreseeable by the government. These decisions and evidence in the record also demonstrate that dual-purpose transportable dry storage systems were foreseen by DOE and are reasonable.

**A. The Magnitude of SMUD's Damages Are Appropriate and Were Foreseeable**

This Court has recently awarded dry storage costs in the spent fuel cases brought by TVA, Yankee Atomic, Connecticut Yankee, and Maine Yankee. *See Tenn. Valley Auth.*, 69 Fed. Cl. 515; *Yankee Atomic Elec. Co.*, No. 98-126C (Fed. Cl. issued Sept. 30, 2006). Like SMUD, those plaintiffs sought to recover the cost of their dry storage systems as mitigation damages for the government's breach of the Standard Contract. Also like SMUD, those plaintiffs implemented transportable, canister-based, dry storage systems, in which the fuel assemblies are stored in canisters which, in turn, are transferred to and stored in concrete storage structures on the ISFSI pad. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 524; *Yankee Atomic Elec. Co.*, slip op. at 45, 47-48.[5]

The damages period in those cases is also comparable to the damages period in the present case. TVA began planning for dry storage in 1998, 69 Fed. Cl. at 522 & 526, while Yankee

[5] Both decisions refer to "multi-purpose canisters," *Tenn. Valley Auth.*, 69 Fed. Cl. at 524; *Yankee Atomic Elec. Co.*, slip op. at 47. The government specifically confirmed that TVA's canisters are transportable. *See* Tr. 140 (statement by government counsel that "TVA purchased a different system, but it is a dual purpose system"). The Yankee decision likewise specifically states that the Yankee canisters are transportable. *See Yankee Atomic Elec. Co.*, slip op. at 47 (stating that the Yankee canisters "could be used for both storage and transportation," and are "sometimes referred to as dual purpose containers, or multipurpose canisters"). Thus, although the TVA and Yankee dry storage systems were purchased from other vendors, they are comparable to SMUD's system.

Atomic, Maine Yankee, and Connecticut Yankee recovered for mitigation costs starting in the early to mid-1990's and signed dry storage contracts in 1996, 1998, and 1999, respectively. Slip op. at 40, 47, 55, & 64. The TVA damage claims included dry storage costs through September 2004 (the end of TVA's fiscal year prior to trial), 69 Fed. Cl. at 523-24, while the Yankee Atomic and Connecticut Yankee damage claims included costs only through December 2001 and Maine Yankee only through December 2002 (these dates were agreed upon by the parties), slip op. at 102. Unlike SMUD, however, TVA and the Yankee plaintiffs were still working on their dry storage projects, so that significant additional damages for the completion of their projects would be expected. *See, e.g.*, *Tenn. Valley Auth.*, 69 Fed. Cl. at 522; *Yankee Atomic Elec. Co.*, slip op. at 47, 56-57.

TVA was awarded $34,893,207 for its partial dry storage costs. *See* 69 Fed. Cl. at 519. Those costs, however, covered the purchase of only eleven canisters with accompanying concrete storage structures, and the loading of only three of these canisters. For their partial dry storage costs, Yankee Atomic was awarded $32,863,366, Connecticut Yankee was awarded $25,803,986, and Maine Yankee was awarded $65,705,536. *See* slip op. at 102. Those costs, however, reflected the completion of only about forty percent of the Yankee Atomic dry storage system, about forty-five percent of the Connecticut Yankee dry storage system, and about eighty percent of the Maine Yankee dry storage system. *See* Pl. Supp. Br. Addressing Impact of *Indiana Michigan*, App., Exhs. A4, A5, & A6, in *Yankee Atomic Elec. Co.*, No. 98-126C (Fed. Cl.) (Dckt. #923).[6]

---

[6] A court may take judicial notice of documents filed in the same or another court. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d. Cir. 2000) (taking judicial notice of the complaint in a

*[Footnote continued on next page]*

When adjusted for the status of the dry storage projects, these damage awards by Judge Lettow and Senior Judge Merow are fully consistent with the magnitude of SMUD's damages, which are only about $43 million with all of the offsets ordered by the Court.[7] SMUD purchased approximately twice as many canisters and concrete storage structures as TVA, which will be continuing to purchase canisters and incur damages. SMUD also completed its dry storage system during the damages period, unlike the Yankee plaintiffs, who will incur substantial additional damages for the purchase of canisters, storage structures, and loading.[8]

The magnitude and foreseeability of SMUD's damages after the court-ordered offsets is also supported by the dry storage fee that DOE adopted for Federal Interim Storage at approximately the same time that it entered into the Standard Contract with SMUD in July 1983. *See* Notice, 48 Fed. Reg. 54,391 (Dec. 2, 1983). As initially enacted, the NWPA authorized a Federal Interim Storage Program under which DOE would provide utilities with interim fuel storage prior to 1998 in return for the payment of an additional fee sufficient to offset the cost of such storage. *See* Pub. L. No. 97-425, 96 Stat. 2201, § 136(a)(1), 42 U.S.C. § 10156(a)(1). In

---

*[Footnote continued from previous page]*
related cases as a public record); *MacMillan Bloedel Ltd. v. The Flintkote Co.*, 760 F.2d 580, 587 (5th Cir. 1985) ("A court may take judicial notice of related proceedings and records in cases before the same court.").

[7] Although it is difficult to make an exact comparison between the dry storage projects of TVA, the Yankee plaintiffs, and SMUD because they purchased different systems, store different amount of spent nuclear fuel, and face different site conditions, *see* E. Supko, Written Direct ¶ 125 (PX 1002), there are sufficient similarities to support the magnitude of SMUD's damages, even if such damages were not reduced as ordered by the Court.

[8] By way of further comparison, in the pending *System Fuels* case, System Fuels is seeking $12.18 million in dry storage costs, which does not include the purchase or loading of any canisters. *See* Plaintiff's Pre-Trial Memorandum of Law at 7, *System Fuels, Inc*. v. *United States*, No. 03-02624 (Fed. Cl.) (Dckt. #77).

1983, the Department of Energy formally adopted a sliding fee scale for such storage, with the costs ranging up to $665 per kilogram of fuel depending on the storage facility's capacity. *See* 48 Fed. Reg. at 54,391. This storage was anticipated to consist of dry storage modules in the form of "storage casks, drywells, or silos" and to operate between 1987 and 2000. *Id*. As Senior Judge Merow recently recognized, this fee "illustrat[es] the magnitude of costs contemplated at the time of contracting." *Yankee Atomic Elec. Co.*, slip op. at 23.

Using this DOE fee scale, the interim dry storage cost for all of SMUD's spent fuel would have been approximately $67.4 million in 1984 dollars.[9] Even without accounting for subsequent inflation, this exceeds by more than fifty percent SMUD's damages of approximately $43 million after giving effect to the Court-ordered offsets. Inasmuch as DOE decided in 1983 to charge utilities for interim dry storage at a rate equal to more than $67 million for the volume of SMUD's spent fuel, it was foreseeable that if SMUD had to develop such storage itself, it would spend an equivalent amount.

**B. Transportable Dry Storage Was Foreseeable and Reasonable**

As previously noted, the TVA and Yankee decisions both awarded as mitigation damages the cost of dual purpose transportable dry storage systems. Both decisions found that the development of such systems was foreseeable and reasonable. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 528-29; *Yankee Atomic Elec. Co.*, slip op. at 47-52.

---

[9] SMUD has 228.4 metric tons of fuel, *see, e.g.*, E. Supko, Written Direct ¶ 104 & Table 7 (PX 1002), and each metric ton of uranium is equal to 1000 kilograms. Because the fee for 100 to 300 metric tons was set at $295 per kilogram, *see* 48 Fed. Reg. at 54,391, the interim storage cost would have been approximately $67.4 million in 1984 dollars. Adjusted for inflation, the storage costs would be significantly greater today.

Although the TVA decision does not specifically address the foreseeability or commercial reasonability of transportable dry storage per se, the Yankee decision does. It cites various DOE documents beginning in 1983 which reflect that DOE contemplated developing transportable dry storage itself and specifically considered such storage in planning for the Federal Interim Storage Program and for at-reactor site storage if the repository were delayed. Slip. op. at 47-52. These documents include a December 30, 1983 draft of the DOE's statutorily-mandated Mission Plan for the program, which states that:

> [a]s a further contingency, the Department will continue to explore the feasibility of a multipurpose storage cask that could be used for the [Federal Interim Storage] either at commercial reactors or at a Federal site. If feasible, such a cask would be designed so that it could later be used in the repository program, the MRS program, or in the transportation of spent fuel.
>
> * * *
>
> [I]t may be more practical to have a standard waste canister which is then stored and shipped in reusable 'dual purpose' casks.

PX 59 at 2-15, 3-E-2. They also include other DOE plans, memoranda, and correspondence issued by senior DOE and Nuclear Regulatory Commission ("NRC") officials from 1984 through 1994. *See Yankee Atomic Elec. Co.*, slip op. at 49-50.[10]

---

[10] The Yankee decision also cites to: a February 1984 draft DOE memorandum stating that casks will be designed for storage as well as transportation; a March 1984 DOE memorandum predicting that transportable storage systems would be available in 1986-87; another March 1984 DOE memorandum discussing contingent planning for federal storage in transportable storage containers at the reactor site and stating that such systems are already used in Europe; an April 1984 draft of the DOE's Mission Plan, which states that in the event that the opening of the repository is delayed, a feasible solution could be to use transportable storage casks; a July 1984 DOE letter, which predicts that transportable storage casks would be available and licensable by 1986-87; and a July 1994 speech by the NRC Chairman stating a preference for dry storage for shutdown plants and speaking favorably of dual containers. Slip op. at 49-50.

SMUD's prior briefing in this case did not highlight these DOE documents for the Court because SMUD did not understand the government to be contesting the foreseeability of dual purpose dry storage (the government instead argued about whether canisters are a standard waste form under the Contract). All of the documents relied upon for this purpose by Judge Merow, however, are part of the record in this case, except for two documents that were listed by SMUD as exhibits but inadvertently withdrawn after the evidentiary hearing in 2005.[11] For the convenience of the Court, SMUD has included, as Attachment 2, a chart identifying the exhibit numbers of the DOE documents identified in the Yankee decision.

## II. The Court Properly Received Additional Evidence at the 2006 Evidentiary Hearing

The government claims that the Court lacked discretion to take evidence at the August 2006 evidentiary hearing. Tr. at 20-21, 33-37.[12] This contention is without merit. The government simply asserts that the record in the case was closed after the evidentiary hearing in March 2005, but the record belies this assertion. Even if the record had been closed, Supreme Court precedent and the great weight of the case law demonstrate that the Court properly exercised its discretion to accept additional evidence. Indeed, many of the government's own cases support the Court's discretion; the balance of the government's cases are inapposite.

[11] Those two exhibits, PX 64 & PX 67, are the subject of a separate motion seeking to add them back into the record. This will ensure that the record is complete when the Court issues its final judgment.

[12] Unless otherwise stated, transcript citations are to the transcript of the August 2006 evidentiary hearing.

Contrary to the government's assertion, the evidentiary record was not closed after the March evidentiary hearing. Indeed, at the conclusion of that hearing, the Court specifically stated that it would leave the record open:

> [W]e can conclude today's proceedings. *I don't ever close the record out until I write a decision. So, you know, as you go through things, something may pop up that you're dying to get into the record, and there's no point in basically standing on ceremony in this type of situation.* . . . And I might candidly want to see, bring back one of the, one or two of the DOE people as I start writing, it occurred to me that that might be, they may be helpful to me. . . . [T]he other thing I've done is I have e-mailed the parties as I'm writing briefs and let them go out and get the answers or find a reference to something if it's not there.

2005 Tr. at 2999-3000 (emphasis added); *see also* Order Regarding Final Evidentiary Exhibits (Dckt. #353) (stating that designated exhibits "comprise the record, to date, in this case"). Further, when the Court issued its opinion and order, in March of this year, it simultaneously ordered SMUD to submit supplemental testimony regarding the offset amounts. *See* 70 Fed. Cl. at 334. Thus, in the words of the Court, "[t]he trial is over when I say it is over," and the Court has not said that the trial is over or the record closed. Tr. at 36.

Even assuming that the Court had closed the record after the March 2005 hearing, the Court properly exercised its discretion to reopen the record and accept additional evidence. More than thirty years ago, the Supreme Court recognized that a trial court has discretion to reopen the record to take additional evidence. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331-32 (1971) ("The trial judge here might have permitted reopening [of the record]. Like a motion under Rule 15(a) to amend the pleadings, a motion to reopen to submit additional proof is addressed to his sound discretion."). Commentary and more recent case law are in accord with the

Supreme Court, holding that a trial court has broad discretion to reopen the record, either on motion or *sua sponte*. 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 59.13[3][c] ("Like a Rule 59 motion, a motion to reopen may be granted or denied in the district court's discretion.") (3d. ed. 1997); CHARLES ALLEN WRIGHT ET AL., 28 FEDERAL PRACTICE AND PROCEDURE § 6164 (1993) (recognizing that trial courts have "broad discretion" in deciding whether to reopen the record and that they abuse such discretion by refusing a request "where the request was timely and the evidence to be offered was important").[13]

The cases previously cited by the government on this issue, *see* Dckt. #368; Tr. at 34, either support the Court's discretion or are distinguishable. *Gathright v. St. Louis Teacher's Credit Union*, 97 F.3d 266, 268 (8th Cir. 1996), cites *Zenith Radio* and expressly recognizes that a motion to reopen "is entrusted to the court's sound discretion." *Downey v. Denton County, Texas*, 119 F.3d 381, 387 (5th Cir. 1997), similarly recognizes that the Court has discretion to reopen, but held that where counsel failed to disclose witnesses before trial, the Court properly exercised its discretion in refusing to let the witnesses testify at trial and to reopen the record to permit their

13 *See also, e.g., Blanke v. Alexander*, 152 F.3d 1224, 1238 (10th Cir. 1998) (stating that "[r]eopening a case for additional evidence is within the discretion of the trial court"); *Binzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1159-60 (1st Cir. 1996) (affirming trial court's decision to reopen the record where plaintiff "attempted to streamline her case in chief and offered the incremental evidence only after the judge expressed reservations about the state of proof"); *Garcia v. Women's Hospital of Texas*, 97 F.3d 810, 814 (5th Cir. 1996) (holding that trial court abused its discretion in refusing to reopen record where evidence sought to be admitted was probative, party had good reason for not introducing the evidence during her case in chief, and presentation of additional evidence would have caused little delay or prejudice to other side); *Capital Marine Supply, Inc. v. M/V Roland Thomas, II*, 719 F.2d 104, 106-07 (5th Cir. 1983) (upholding trial court's *sua sponte* reopening of record); *Calage v. University of Tennessee*, 544 F.2d 297, 301 (6th Cir. 1976) (upholding court's *sua sponte* reopening of case where the information sought was readily available and the judge "conceived that the justice of the case required that he have it").

testimony after the trial. Like *Downey*, *Earl Realty Inc. v. Leonetti* (*In re Leonetti*), 28 B.R. 1003, 1008 (E.D. Pa. 1983), *aff'd*, 725 F.2d 667 (3d. Cir. 1983), is distinguishable. In *Leonetti*, the plaintiff failed to secure the attendance of a critical witness at trial, and the court dismissed his claim. *Id.* at 1008. Later, as part of a motion for reconsideration, plaintiff asked the bankruptcy court to accept the deposition of the missing witness into evidence; the court declined. *Id.* In a one paragraph discussion, the district court affirmed the bankruptcy court's ruling. Nowhere does *Leonetti* state that the bankruptcy court lacked discretion to admit the deposition transcript if it saw fit to do so.

In this case, it is plain that the Court properly exercised its discretion in admitting additional evidence. SMUD's evidence was non-cumulative and highly probative of SMUD's damages during the damages period. SMUD sought to introduce the evidence upon direction of the Court after the Court recognized that the record should be augmented with respect to the offsets ordered by the Court. As the Court pointed out, at the time of the March 2005 evidentiary hearing, no one anticipated the damages period that the Court adopted. Tr. at 36. Neither side presented evidence about the cost of "dual purpose transportable features" after May 15, 1997. Without such evidence, it is impossible to calculate the appropriate offset as directed by the Court.[14] Consequently, a further hearing was necessary to apportion damages incurred during the damages period, not because SMUD failed its burden of proving damages.

---

[14] As the breaching party, the government has the burden of proving offsets from SMUD's damages. *See, e.g.*, *Yankee Atomic Elec. Co.*, slip op. at 97 (rejecting the government's proposed offset for funds received in settlement from a contractor, citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 769 (Fed. Cir. 1987) ("The burden was on the government to prove the amount [of the claimed offset]. . . .")); *see also Lasalle Talman Bank v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003) ("[W]hen damages are hard to estimate, the burden of imprecision

*[Footnote continued on next page]*

The government was not prejudiced by the introduction of the supplemental evidence. The government was on notice of the additional information far in advance of the hearing, *see* Dckt. ##361-66, 371-73 (pre-hearing filings of SMUD's proposed offsets and supporting written direct testimony), conducted both informal interviews and depositions of SMUD's two witnesses before the hearing, and cross examined them over two days during the hearing.

Not only was the government not surprised by SMUD's witnesses, but it had an opportunity to present evidence of its own. And although the government claimed that it did not introduce any additional evidence, the government's proposed offset amount for dual purpose transportable features is new information that was not in the prior record.

## III. The Evidence Substantiates SMUD's Proposed Offsets for Certain Internal Labor, Dual Purpose Transportable Features, and Pre-May 15, 1997 Obligations

### A. The Offset for Certain Internal Labor Should be Based on Application of the Court's Fifty Percent Rule to the Damages Period

The Court directed SMUD to limit its internal labor damages to "the costs attributable to the 16 employees who charged the majority of their time to the 'dual purpose' dry storage project." *Sacramento Municipal Util. Dist.*, 70 Fed. Cl. at 334 n.1. In response, Mr. Brinig has identified those SMUD employees who actually charged more than fifty percent of their time to the dry storage project during the damages period adopted by the Court, May 15, 1997 through December 31, 2003 (the "New 16 Employees"). B. Brinig Supplemental Written Direct at ¶ 3 (PX

*[Footnote continued from previous page]*
does not fall on the innocent party."); *Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521, 524 (Ct. Cl. 1961) ("The defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable.").

2005); Tr. at 300-06 (Brinig). Eleven of the New 16 Employees were part of the 16 employees who charged more than fifty percent of their time to the dry storage project during the entire claim period period of January 1, 1992 through December 31, 2003 (the "Old 16 Employees"), and five are different.[15] Tr. at 304-05 (Brinig); PX 2011. It is undisputed that limiting SMUD's labor costs to the New 16 Employees results in a net offset of $8,009,699. *See* Tr. at 306-07 (Brinig).

In contrast, the government continues to rely for this purpose upon the Old 16 Employees, even though five of those employees did not charge more than fifty percent of their time to the dry storage project during the damages period, and even though the Old 16 Employees excludes employees who devoted thousands of hours to the project during the damages period. *See* Tr. at 26-29 (statement of government counsel).

Basing SMUD's labor damages upon the New 16 Employees rather than the Old 16 Employees best reflects SMUD's incremental labor costs during the damages period using the Court's fifty percent rule.[16] Messers. Brinig and Field testified during the August 2006 evidentiary hearing that the nature of work on the dry storage project changed over time. At the

---

[15] At the 2005 evidentiary hearing, the government presented evidence identifying the Old 16 Employees as having spent a majority of their time on the dry storage project during the claim period. *See* 2005 Tr. at 2737 (Kiraly); DX 2003 at EX50050082-86. Based upon this evidence, the Court identified the Old 16 Employees.

[16] The Table A deduction is calculated as follows: Labor costs (sum of labor, indirect labor, and corporate allocation for period between 6/1/97 and 12/31/03) represent $13,548,608 of SMUD's total claimed damages of $78 million. See Summary of Total Costs by Category and Dates (Dckt. #373). Summing the same labor cost numbers from Table A from the Joint Filing of Tables A, D, and E (Dckt. #361), which includes labor costs for only the 16 employees identified in the Court's March 31, 2006 Order, produces labor costs of $4,066,100, *i.e.*, $9,482,508 less than SMUD's claimed labor costs. Stipulated adjustment of $6,514 to these costs increases the offset to $9,489,022. To reflect the labor costs for the 16 New Employees, this figure is decreased by $1,479,323 to $8,009,699, which is the amount of SMUD's proposed labor offset. *See* PX 2003; PX 2005; PX 2008.

beginning of the project, a substantial amount of time was devoted to engineering, planning, and similar activity. Tr. at 302-03 (Brinig). Later in the project, most of the work was devoted to training, preparing to move fuel into the ISFSI, and actually loading and storing the fuel. *Id.* at 133-37 (Field) & 302-03 (Brinig); PX Dem. 75.

The five employees who are part of the New 16 Employees but not part of the Old 16 Employees put a sharp point on this issue. For much of the dry storage project, these five people were assigned to general duties at Rancho Seco, and they each billed only about 300 hours total to the project prior to June 1997. Tr. at 134-35 (Field) & 304-06 (Brinig). However, during the damages period, they were assigned full time to supervise or serve on fuel loading teams, and worked approximately 6,000 hours *each* on dry storage from June 1997 through 2003. *Id.* These employees were plainly incremental during the damages period.

Since the Court's purpose in ordering this adjustment is to measure SMUD's labor costs during the damages period, it only makes sense to include those employees who were incremental during that period, rather than those who were incremental during other periods. Doing otherwise would exclude the five "new" employees who worked full time on dry storage during much of the damages period, while including the labor of others who worked intensively on the project before the damages period, but who charged less than half of their time to the project during the damages period. Consequently, Mr. Brinig opined that, if a fifty percent rule is to be used for this purpose, it should be applied to the damages period and not the claim period, and the internal labor damages should be based on the New 16 Employees and not the Old 16 Employees. Tr. at 300-04.

By contrast, there is little to recommend the government's approach of using the Old 16 Employees. During the August 2006 evidentiary hearing, the government offered no evidence or argument that their approach was superior. They offered no testimony to rebut Mr. Brinig or to endorse the government's approach. Rather, the government's only substantive response to this issue was its suggestion that the New 16 employees were not really incremental, because they are still employed by SMUD today. *See*, *e.g.*, Tr. at 324-25. This is simply irrelevant. Members of both the Old 16 and the New 16 are still employed by SMUD today, so this criteria does not suggest one set of employees over the other. Further, Mr. Field testified that the New five employees are employed in different positions today than they were during the damages period. Dave Koontz, who formerly supervised a fuel loading team, today supervises the ISFSI. *Id*. 249. Russ Rider, who was formerly a member of a fuel loading team, now works in SMUD's hydroelectric division and has nothing to do with Rancho Seco or spent nuclear fuel. *Id.* The final three "New Employees" are still employed at Rancho Seco, but they have left their positions as members of the fuel loading team and returned to general duties as plant mechanics. *Id.*

**B. The Costs Attributable to the Dual Purpose Transportable Features of the Dry Storage System During the Damages Period Total $2,168,321**

The Court directed SMUD to deduct from its dry storage costs those "costs attributable to the 'dual purpose' transportable features of the dry storage system." *Sacramento Municipal Util. Dist.*, 70 Fed. Cl. at 334; *accord* Tr. at 76 (Court) ("what I was trying to do is take what [SMUD] paid for and segregate out [dual purpose transportable features] so that we could replicate what a dry storage-only system would be at SMUD"). In response, SMUD provided detailed testimony by Jim Field, the longtime Rancho Seco Engineering Superintendent and Dry Fuel Storage Project

Manager. *See* J. Field Written Direct (PX 2001); J. Field Supplemental Written Direct (PX 2006).[17] Based upon his day-to-day oversight of the dry storage project and a painstaking review of thousands of pages of invoices and other documentation, Mr. Field determined that the costs attributable to the dual purpose transportable features of the dry storage project from May 15, 1997 through December 31, 2003 total $2,168,321. *Id.*[18] These costs were limited because all of the major project features were necessary for the dry storage of spent nuclear fuel; they were not added for the future transportation of the fuel off site:

> The cask is necessary for dry storage. Canisters are necessary for dry storage. The [Independent Spent Fuel Storage Installation] concrete modules, and the truck and trailer are exclusively used for dry storage and not associated with transportation. So only some limited features of the cask and canister would be associated with transportation.

Tr. at 52-53 (Field).

The government presented no additional evidence on this issue. Instead, it seeks an offset of $13,854,071 based upon the prior 2005 testimony of Stephen Kiraly, an accountant, and Jerry Burford, a nuclear engineer without any dry storage experience. Messrs. Kiraly and Burford, however, relied for this purpose upon a mechanical application of vendor accounting codes that, it is undisputed, was unreliable and incorrect. The government also attempted to rely upon generic

---

[17] SMUD's accounting expert, Brian Brinig, asked that someone at SMUD with appropriate expertise determine these costs because he could not do so from SMUD's accounting records: "The accounting records aren't going to capture the cost of this little feature or that little feature. They might capture the cost of a cask or something like that, but they won't do it to the degree that the subtlety of the request required." Tr. at 289-92 (Brinig).

[18] Mr. Field also determined that the costs attributable to the dual purpose transportable features of the dry storage project from January 1, 1992 through May 15, 1997 total $2,655,146. *See* J. Field Written Direct at ¶ 4 (PX 2001). Because the Court has not awarded damages for that period, the dual purpose transportable feature costs incurred during that period are not at issue.

cost estimates for store-only systems by Mr. Burford and S. Levy Incorporated ("Levy"), a former SMUD consultant. Those estimates, however, were based on limited information, did not address costs as of 1997, and would not meet SMUD's foreseeable needs as a shutdown utility. Therefore, if an offset for the dual purpose transportable features of the dry storage system is imposed, it should be in the amount of $2,168,321 as determined by Mr. Field.[19]

### 1. Mr. Field Identified the Project's Dual Purpose Transportable Features and Determined that the Costs Attributable to Them During the Damages period Total $2,168,321

Mr. Field's experience makes him particularly well-qualified to determine the costs attributable to the dual purpose transportable features of the dry storage project. As the Rancho Seco Engineering Superintendent throughout the period at issue, he "understood which technical work was contracted for, what the scope of supply was for various contractors and how that fit with the overall project." Tr. at 46 (Field). As the Dry Storage Project Manager from November 1999 through 2003, he oversaw the project, interfaced with contractors, and approved invoices. *Id.*; *see also id.* at 92 (Field); J. Field Written Direct at ¶ 3 (summarizing background) (PX 2001); 2005 Tr. at 951-56 (Field) (describing work). Thus, he directed or helped to direct the dry storage project throughout the damages period, including the design, licensing, fabrication, and assembly of its various features and all work done by contractors and SMUD staff.[20]

[19] Without this offset, SMUD's damages would total $45,126,678.

[20] The prior Project Manager, Ken Miller, retired from SMUD in 1999 due to health problems, and would therefore have no knowledge of most of the project costs during the damage period. Tr. at 163 (Field). In addition, even when Mr. Miller was the Project Manager, Mr. Field as Engineering Superintendent "was dealing with all the day-to-day decisions that the technical people were making, all the purchases that were being made. I was reviewing all the invoices, so I saw a lot more detail on the project than Ken did." *Id.* at 161.

Mr. Field spent approximately 150 hours reviewing the dry storage project costs, utilizing Mr. Brinig's work papers from the 2005 hearing which had compiled all material and outside service charges for the work orders for the project,[21] as well as detailed supporting documentation such as invoices, purchase orders, and contracts. J. Field Written Direct at ¶¶ 7-8 & Ex. 6 (PX 2001); Tr. at 47 (Field). For the primary project vendors, Pacific Nuclear, Vectra, and TNW, Mr. Field conducted a methodical, page-by-page review of their invoices and supporting documentation. *Id.* at ¶ 9. In Mr. Field's words, his work "was a very specific evaluation. And it was very in depth." Tr. at 92.

Drawing upon his project experience and review of the documentation, Mr. Field identified "those costs that are attributable to the dual purpose, transportable features of the dry storage system." J. Field Written Direct at ¶ 12 (PX 2001).[22] The canisters and casks do not constitute dual purpose transportable features because they serve multiple onsite storage purposes,

[21] Because Mr. Field used Mr. Brinig's work papers from the 2005 hearing, his review was properly limited to the dry storage project costs and did not include any decommissioning costs. *See* B. Brinig Written Direct at ¶¶ 7-19 & Exh. 1 (explaining that SMUD's automated accounting system used a unique set of work order numbers to compile costs for the dry storage system and that these costs totaled $78,558,212 for the period from January 1, 1992 through December 31, 2003.) (PX 1000); 2005 Tr. at 673 (Rancho Seco Plant Manager Steve Redeker) ("Q. To your knowledge, do any of these work orders [used by Mr. Brinig in calculating SMUD's dry storage costs] encompass time or charges incurred for purposes of other than the dry storage projects. A. No, they do not."); Tr. at 439-40 (statement by government counsel agreeing that because Mr. Field began with Mr. Brinig's work papers from the 2005 hearing, and those work papers were limited to costs for the dry storage project, Mr. Field's analysis was necessarily limited to those costs as well).

[22] Mr. Field's written direct testimony refers both to "dual purpose transportable features," J. Field Written Direct at ¶¶ 4, 5, 12, 20, & Exhs. 1-5 (PX 2001), and to "transportable features," *id.* at ¶¶ 5, 8, 9, 13, 14, 15, 19. The latter is merely a shorthand reference to the former, and Mr. Field specifically confirmed that the references to "transportable features" mean "dual purpose transportable features." Tr. at 76-77, 121-22; *see also id.* at 50-51 (Field) (defining transportable features as "those features that were necessary in order to transport the spent fuel off site").

including "onsite storage in the concrete modules, onsite storage in the cask, [and] onsite transfer (from the Spent Fuel Building to the ISFSI concrete modules)." *Id.*; *see also*, *e.g.*, Tr. at 52 & 70-71 (Field) (stating that a canister and cask would be needed for a dry storage-only system); 2005 Tr. at 142-43 (SMUD Assistant General Manager Jim Shetler) (stating that the canisters "hold the spent fuel for storage in a dry facility" and the cask "provides the shielding necessary to handle . . . the canister out of the water"); *id.* at 496-500 & 509 (Redeker) (explaining that canisters store the fuel and the cask transfers the canisters from the spent fuel pool to the storage modules); PX Dem. 17-20 & 27-31 (photographs depicting onsite use of canisters and cask for storage).

The ISFSI concrete modules and the primary support equipment, such as the truck, trailer, welder, vacuum drying machine, and hydraulic ram, would likewise be needed for a dry storage-only system. Tr. at 60-61, 70-71 (Field); *see also* 2005 Tr. at 144-45 (Shetler) (explaining that concrete modules "provide shielding for the canisters when they are stored in a dry mode" and that this protects "public health and safety"); *id.* at 498-99 & 511-19 (Redeker) (discussing storage of fuel in concrete modules and use of support equipment to load, seal, and transfer canisters to modules); PX Dem. 2, 21, 23-25, 27-31, & 60 (photographs depicting onsite use of concrete modules, truck, trailer, welder, drying machine, and ram). Nor would the Rancho Seco site preparation, training, and fuel loading costs be affected by the transportable nature of the system. Tr. at 82-83 (Field); J. Field Written Direct ¶ 17 (PX 2001).

Mr. Field explained that the only dual purpose transportable features are impact limiter testing and:

> the neutron-absorbing material in the canister along with features to secure it, special material for the cask body (XM-19), cask rupture disks, cask closure bolting testing, Nuclear Regulatory Commission reviews of the Part 71 Safety Analysis Report, Thermal Performance Testing and some canister spacer disk fabrication. The special material for the cask body, the additional spacer disks and the cask closure bolt testing ensured an additional degree of robustness for transportation. The neutron-absorbing material and cask rupture disks addressed hypothetical transportation accidents.

J. Field Written Direct at ¶¶ 6, 12; *accord* Tr. at 72-73 (Field).[23] If these features were eliminated, then the remaining features of the system "would be the same" as those for a dry storage-only system. Tr. at 71 (Field).

Several of these dual purpose transportable features also facilitate onsite storage of the spent fuel. These overlapping features include the cask rupture disks, which are also "useful in addressing evaluation of a fire on the ISFSI pad," the Thermal Performance Testing, which is "also useful in demonstrating that the cask can be used to store fuel on the ISFSI pad as a backup to the concrete modules," and the Part 71 transportation licensing process, which "resolved and bounded" many of the Part 72 storage licensing issues. *Id.* at 72-73 & 260-61 (Field). To "be very conservative" and account for any "minor features that [he] didn't specially address," Mr. Field did not reduce the costs attributable to these features to account for their overlapping

---

[23] Mr. Burford, the government's technical expert at the 2005 hearing, identified many of the same features (although fewer than Mr. Field) as required for offsite transportation. *See* J. Burford Written Direct ¶ 70 n.32 ("[a]s an example, there was scale model and impact limiter testing that was required for offsite transportation of the cask . . . . There was specialized material that needed to be incorporated in the MP187 cask, *e.g.*, XM-19 stainless steel. Additional spacer disks, and borated neutron absorption materials here added to the canisters to provide additional strength and neutron absorption") (DX 2001).

nature. *Id.* at 74 & 260-61. This effectively increased the amount of the costs, and the potential offset, that he determined are attributable to the dual purpose transportable features. *Id.*

Mr. Field also included TNW's nominal markup of 12% rather than its lower actual markup of about 9.8%, which Mr. Kiraly, the government's accounting expert at the 2005 hearing, had used. J. Field Written Direct at ¶ 16 (PX 2001); Tr. at 89-90 (Field). Use of the higher TNW markup rate further increased the amount of the costs determined by Mr. Field to be attributable to dual purpose transportable features, and compensated for any such costs that Mr. Field may have unintentionally omitted. Tr. at 89.

Based upon his extensive knowledge of the project and his methodical review of the documentation, Mr. Field initially concluded that the costs attributable to the dual purpose transportable features during the damages period total $1,440,109. *See* J. Field Written Direct at ¶¶ 4-5 & Exhs. 3-5 (PX 2001). Mr. Field continued to consider this issue, however, and he subsequently identified another $728,212 in such costs involving the fabrication and installation of the additional canister spacer disks and neutron-absorbing material. *See* J. Field Supplemental Written Direct at ¶¶ 1-4 & Exh. 1 (PX 2006); Tr. at 91 (Field). This increased the total costs attributable to dual purpose transportable features during the damages period to $2,168,321. *See* J. Field Supplemental Written Direct at ¶ 3 (PX 2006).

Thus, Mr. Field comprehensively identified all costs that are attributable to the dual purpose transportable features of the dry storage project as requested by the Court. These costs are modest because there were relatively few dual purpose transportable features, *i.e.*, features needed to transport the fuel offsite, and much of the work and costs for them were incurred before

the damages period. For example, some of the neutron-absorbing material in the canisters and features to secure it were paid for in 1995 and 1996. *See* J. Field Written Direct, Exh. 1 at 2 (listing canister poison milestone payment in May 1995, canister basket material payment of $670,200 in September 1995, and canister poison milestone payment of $534,150 in March 1996). The special material for the cask body (XM-19) was paid for in December 1996 and January 1997. *Id*. (listing XM-19 material cost of $147,700 in December 1996 and XM-19 fabrication cost of $339,677 in January 1997). Thermal testing was paid for in January and February 1997, *id*. (listing payments of $10,318 and $14,553 for thermal analysis in January and February 1997), and the Part 71 transportation license was issued in September 1998, *see* PX 596.

Moreover, had SMUD been developing a store-only dry storage system after May 15, 1997, SMUD would still have required canisters to store the fuel and a cask to transfer the fuel from the pool to the ISFSI.[24] *See, e.g.*, Tr. at 52 & 70-71 (Field); 2005 Tr. at 142-43 (Shetler) & 496-500 & 509 (Redeker). SMUD also would have required the ISFSI concrete storage modules to store the canisters as well as various support equipment, such as a truck and trailer, to haul the cask and canisters from the spent fuel building to the concrete storage modules, a welder to seal the canisters, a vacuum drying machine to remove water from the canisters, and a hydraulic ram to load the canisters from the trailer into the concrete storage modules. *See, e.g.*, Tr. at 60-61 & 70-71 (Field); 2005 Tr. at 144-45 (Shetler) & 498-99 & 511-19 (Redeker).

---

[24] The canisters and cask are complex and substantial components. *See* PX Dem. 8 & 11 (diagrams depicting canister and cask). The canisters are approximately 17 feet long and 5 feet in diameter, are made of stainless steel and filled with helium, hold 24 fuel assemblies, and weigh about 20 tons when loaded. 2005 Tr. at 502 & 504-05 (Redeker). The cask holds a single canister and contains multiple layers of stainless steel, carbon steel, lead, and neutron-absorbing material. *Id*. at 506-07.

SMUD also would have been required to prepare the site, train the staff, and transfer the fuel from wet to dry storage. *See, e.g.* Tr. at 82-83 (Field). This site preparation, training, and fuel transfer work involved substantial costs after May 15, 1997, including $5.5 million paid to Bigge to assist with the fuel transfer, and $1.5 million paid to Numanco to assist with on-site radiation protection. S*ee* 2005 Tr. at 957-58 (Field); PX Dem. 77. This work also accounts for most of the $5,545,423 in SMUD labor costs that remain as part of SMUD's damages after deducting the Court-ordered offsets. *See* PX 2005. As Mr. Field explained:

> The focus at Rancho Seco, particularly after May 15, 1997, was preparations for successfully loading fuel into the canisters and insertion of the canisters into the ISFSI. Eventual offsite transport by DOE was viewed as such a distant concern that preparation for such transportation by District personnel was unnecessary.

J. Field Written Direct ¶ 17 (PX 2001); *see also* Tr. at 134-36 (Field) (describing work by SMUD employees to prepare site for, train for, and conduct fuel transfer from wet to dry storage); 2005 Tr. at 639-41 (Redeker) (discussing training).

**2. The Government's Arguments Are Not Supported by Probative Evidence**

As previously noted, the government has presented no additional evidence on this issue, but has relied upon the prior 2005 testimony of Messrs. Kiraly and Burford attempting to use vender accounting codes to classify the storage and transportation costs of the system, and upon generic cost estimates prepared by Mr. Burford and Levy. These arguments are without merit.

**a. The Government's Proposed $13,854,071 Offset Lacks Support and Relies Upon a Classification of Costs That is Unreliable and Incorrect**

The government has argued that this offset should total $13,854,071. *See* [Defendant's] Table B (Dkt. #370); Tr. at 32-33 (argument of government counsel). That number is based solely upon the 2005 testimony of Stephen Kiraly, an accountant, *see* 2005 Tr. at 2655-58 (Kiraly), and Jerry Burford, a nuclear engineer without any dry storage experience, *see id.* at 2554-55 & 2587 (Burford). The government's reliance on this testimony fails for two reasons.

First, the testimony does not support the government's current number. In 2005, Mr. Kiraly testified that the costs to "Design and Build Transportation Ability" totaled $17,038,533 for the entire claim period from January 1, 1992 through December 31, 2003. *See* S. Kiraly Written Direct ¶ 49 & Fig. 2, ¶¶ 79-81, & Attach. 10 (DX 2003). That testimony, however, did not reference the government's current figure of $13,854,071 or specify the amount of such costs for the damages period. Moreover, while Mr. Kiraly based this number upon an analysis prepared by Mr. Burford, Mr. Burford disclaimed any knowledge of the number:

> Q. Sir, you played no role in compiling the $17 million figure; is that correct?
>
> A. I played no role.
>
> * * *
>
> Q. Let me ask a more simple question. You have no opinion as to whether this is the right number, or wrong number as the costs related to design and build transportation ability?
>
> A. No, I don't.

2005 Tr. at 2570-71 (Burford).[25]

Second, and more important, Mr. Field provided uncontested and unrebutted testimony demonstrating that the novel approach, *see* 2005 Tr. at 2558-59 (Burford), used by Messrs. Kiraly and Burford to classify transportation costs and storage costs is overly simplistic, unreliable, and incorrect. As Mr. Field explained,

> Mr. Kiraly's analysis relies on various TNW 'cost accounting codes,' which were compiled from various project documents, to attempt to identify the transportation features of the system. . . . Mr. Kiraly relied on individuals at Watkins Consulting, Inc. to make a determination as to those codes, that in their opinion, were attributable to "transportation." However, those accounting codes by their terms do not reference transportation features and were not developed or used for the purpose of segregating transportation costs. Instead, they were internal accounting codes used by the vendor, TNW, for its own internal accounting. Furthermore, multiple different work descriptions were attributed to these cost codes by TNW employees. Thus, Mr. Kiraly's reliance on these accounting codes as a basis for his proposed transportation deduction is improper and unreliable.

[25] At the August 2006 hearing, the government argued that its current figure of $13,854,071 reflects Mr. Kiraly's prior figure of $17,038,533 minus those costs attributable to dual purpose transportable features that were incurred (by Vectra) prior to May 15, 1997. *See* Tr. at 32-33. However, the government submitted no testimony or other evidence in support of this argument. The government also argued that Mr. Burford, of Watkins Consulting, Inc., was unfamiliar with the $17,038,533 figure because he only classified individual costs and activities. *Id*. at 34-35. But Mr. Burford was the government's only technical expert witness, and Mr. Kiraly attributed this figure to his work. *See* S. Kiraly Written Direct ¶¶ 79-80 (DX 2003). Therefore, Mr. Burford's inability to even address this figure discredits it, particularly as Mr. Kiraly is unqualified to opine about the costs attributable to transportable features. In addition, more than half of the TNW costs were not classified by Mr. Burford at all, but were allocated by Mr. Kiraly using a ratio that he developed. *See id*., Attach. 10, Exhs. E-1-i-3 & E-1-i-3-a; Tr. at 34-35 (statement of government counsel). Thus, of the original $17,038,533 figure that the government used at the 2005 hearing for "transportation ability" during the entire claim period of 1992-2003, $8,674,163, or more than half, was not in fact classified by Mr. Burford as attributable to transportation ability. *See* S. Kiraly Written Direct, Attach. 10 at E-1-i & E-1-i-3. Indeed, of the TNW costs included in the $17,038,533 figure, only $4,978,626 was actually classified by Mr. Burford as attributable to transportation ability. *Id*.

J. Field Written Direct ¶ 19 (PX 2001); Tr. at 92-93 (Field) (stating that Messrs. Kiraly and Burford "drew some erroneous and very broad conclusions about which of those accounting codes would be attributable to transportation" and that you have to "understand the details of the construction and draw your conclusions based on those details. And their approach does not look at the details"); *id*. at 102 (same).

For example, based upon the TNW accounting codes, Messrs. Kiraly and Burford broadly classified all TNW labor for the cask, project licensing, and project design as attributable to transportation. *See* S. Kiraly Written Direct, Attach. 10, at Exh. E-1-i-2-b-1 (DX 2003). Mr. Field specifically refuted these classifications:

> Q. And is all of the [cask] work attributable to transportation?
>
> A. No, because as I stated a few minutes ago, we needed the cask[] for a multitude of reasons including transfer of the fuel from the spent fuel building or pool to the ISFSI, and as backup storage in the event of a failed canister, which were both storage functions.
>
> * * *
>
> Q. And how is the [licensing] work classified by Mr. Kiraly?
>
> A. He classifies it all as related to transportation. . . . . [But] any effort that [TNW] had in helping us generate the information for the storage license, they would charge to this number. And because the whole transportation license effort was started with the idea that a lot of what was discussed in the licensing process for transportation would bound the storage license, and therefore, not have to be repeated, so a lot of storage costs were incurred by TNW and charged to that [licensing] number.
>
> * * *
>
> Q. Is all of that [design] work attributable to dual purpose transportation features?

A. Clearly not, because there was a lot of design work that had to go into the storage aspects of the project.

Tr. at 97-99 (Field).

Mr. Field also identified various inaccuracies in the classification by Messrs. Kiraly and Burford of individual accounting codes. For example,

- Messrs. Kiraly and Burford classified licensing support as attributable to transportation, but "there was an extensive amount of work required to support the storage license and we [SMUD] depended on Transnuclear to do that."

- Messrs. Kiraly and Burford classified shielding calculations as attributable to transportation, but "[t]he vast majority of shielding analysis was in support of the storage license."

- Messrs. Kiraly and Burford classified structural work on the cask as attributable to transportation, but "the cask serves a multitude of purposes" including "on-site fuel transfer" and "backup storage."

- Messrs. Kiraly and Burford classified certain trailer costs as attributable to transportation, but "the truck/trailer is strictly for onsite [fuel] transfer."

- Messrs. Kiraly and Burford classified lifting yoke repairs as attributable to transportation, but the yoke is "only used . . . in handling the cask in and out of the spent fuel pool."

*Id*. at 114-21 (Field). Notably, the government did not even attempt to cross-examine or rebut Mr. Field's criticism of the approach used by Messrs. Kiraly and Burford.

**b. The Generic Cost Estimates Are Based Upon Limited Information, Do Not Address Costs as of 1997, and Would Not Meet SMUD's Foreseeable Needs as a Shut Down Utility**

The government also suggested that the Court should look to generic cost estimates prepared by Mr. Burford and Levy. *See* Tr. at 37, 83-84, & 152-59 (statements of government counsel). Mr. Burford estimated that if SMUD had purchased a dry storage-only system in 1992, it would have spent at least $9,263,000 on a cask, canisters, and concrete storage modules, $3.6 million for the ISFSI and related security costs, and $.75 million for auxiliary equipment. *See* J. Burford Written Direct ¶ 123 & n.58 (DX 2001). Levy had estimated in 1990 that a dry storage system using metal store-only casks[26] would cost SMUD $16.4 million to $23.4 million, while a system using transportable casks would cost about $5 million to $8 million more. *See* PX 176 at 18, 31, & 32. The government's use of these estimates is misplaced for several reasons.

First, the estimates rely on very limited information. Mr. Burford testified that he had never previously estimated the cost of such a system, 2005 Tr. at 2572, had not contacted any dry storage vendors, *id.* at 2576, 2584, did not know what utilities actually paid for storage-only systems, *id.* at 2580, 2584, and relied on only three sources of information, one of which was SMUD's original 1992 dry storage contact, *id*. at 2580. The Levy report cautions that Levy had been retained only seven weeks earlier and "[b]ecause of the short time available, [Levy] was unable to always carry out definitive evaluations and SMUD needs to apply appropriate and cautious judgment in application of some of the results contained in the report." PX 176 at 1.

[26] At the August 2006 hearing, the government referenced a portion of the Levy report that estimates the 1990 cost of concrete store-only casks at $10.5 million to $15.5 million. *See* Tr. at 156. However, casks are more expensive than canisters because they are larger and sturdier. Therefore, to reduce its costs, SMUD does not store its fuel in casks, but in less expensive canisters, which are stored within still less expensive concrete storage modules. *See*, *e.g.*, 2005 Tr. at 457-59 (Shetler). The "concrete casks" identified by Levy thus effectively became the concrete storage modules at Rancho Seco.

Second, Mr. Burford and Levy do not address costs for the damages period. Mr. Burford estimated the dry storage costs as of 1992. *See* J. Burford Written Direct ¶¶ 123, 125 (DX 2001). Levy prepared its estimate in early 1990. *See* PX 176. Thus, these estimates do not address the real world dry storage market and regulatory conditions that SMUD faced throughout the 1990s, and certainly not after May 15, 1997.[27] As the record in this case demonstrates, the dry storage market and regulatory environment changed significantly during the 1990s. *See, e.g.*, Tr. at 79 (Field) (explaining that "the state of the art changed over the course of the project. The NRC heightened their expectation of storage system vendors, and so the price escalated rather rapidly through the '90s"); *id*. at 253-54 (Field) (same); 2005 Tr. at 575-90 (Redeker) (stating that by late 1996 the NRC was "taking a much tougher attitude relative to compliance" resulting in more "intrusive oversight or tougher design reviews of the cask and canister design" and making the dry storage project "more costly" and "more difficult"); PX 444 at 9657, 9669 and 9672 (SMUD weekly reports from late 1996 noting new "get tough attitude" by NRC and resulting problems faced by utilities); E. Supko Written Direct ¶ 126 (explaining that the "dry storage regulatory environment experienced significant changes from 1995 through 2000" which caused utilities to experience "delays," "increased costs," and "uncertainty") (PX 1002); *id*. at ¶¶ 127-45 (discussing specific regulatory changes).[28] Because of these changes, the estimates by Mr. Burford and Levy do not reflect the real world costs that SMUD faced during the damages period.

---

[27] The estimates also are incomplete. Mr. Burford and Levy do not address real-world costs associated with a complete dry storage project, such as engineering oversight costs and substantial staff training costs, while the costs of transferring fuel from the wet pool to the ISFSI are ignored entirely by Mr. Burford and significantly understated by Levy.

[28] The record also reflects that DOE had long understood that the licensing of fuel containers could be a difficult and time-consuming process. *See, e.g.*, PX 59 at 3-C-2 (December 1983 draft

*[Footnote continued on next page]*

Third, Mr. Burford and Levy do not address SMUD's foreseeable needs as a shutdown utility. To decrease its spent nuclear fuel storage costs over the lengthy period of the government's delayed performance, SMUD chose to close down its fuel pool. *See* Tr. at 68, 123, & 138 (Field).[29] As Mr. Field explained, this required SMUD to transfer into dry storage all the non-fuel components from the fuel assemblies, such as control rods and neutron sources. *Id*. at 62, 65. Such components had not previously been put into dry storage by other utilities, so the standard dry storage systems required significant modifications to the canister. *Id.* at 62, 122. SMUD also had to transfer all of its fuel assemblies to dry storage, including those that were damaged. *Id*. at 138-39. This required the development of a special damaged or failed fuel canister. *See, e.g.*, 2005 Tr. at 505-06 (Redeker). And to obtain its Part 72 storage license, SMUD had to "incorporate a significant amount of additional analysis and features into the cask and storage pad" to satisfy NRC that the cask could be used as back-up storage in the event of a failed storage canister. Tr. at 62-63 (Field).[30]

---

*[Footnote continued from previous page]*
DOE Mission Plan) (stating that "[c]onsiderable time and effort is required to develop, test, and license a new cask" and that "the regulations governing cask design have continued to evolve and become more stringent over the years"); PX 154 at I-21 (February 1989 DOE dry cask storage study) (explaining that "[l]icensing considerations are important because licensing can be a protracted process").

[29] Closure of the pool was not required for the incremental decommissioning of Rancho Seco, as decommissioning can and has proceeded around the pool. *See, e.g.*, 2005 Tr. at 215-18 (Shetler) & 696-97 (Redeker). Moreover, final decommissioning cannot be completed until all fuel is removed from Rancho Seco whether the fuel is stored wet or dry. *See, e.g.*, *id*. at 617, 735 (Redeker). Operating and maintaining wet storage is, however, more labor intensive and expensive than dry storage, *see, e.g.*, *id*. at 194 & 332-33 (Shetler), and closure of the pool allowed SMUD to decrease its annual fuel storage costs and mitigate its damages.

[30] Operating utilities with pools need not design their dry storage systems to address these requirements. They can retain their non-fuel components and damaged assemblies in their pool, rather than transfer them into dry storage. They can also use their pool to respond to a failed canister by returning the canister and assemblies to the pool.

By addressing these needs with its dry storage system, SMUD was able to close its pool and reduce its annual fuel storage costs by $4,196,360. *See* 2005 Tr. at 1170-71 (Field); PX Dem. 72. The government has already benefited from this reduction through an offset ordered by the Court. *See Sacramento Municipal Util. Dist.*, 70 Fed. Cl. at 374-75. However, as Mr. Field explained regarding the Levy estimate:

> having gone through what we had to do on our project to address unique needs like storage of control components, dealing with damaged fuel assemblies and responding to emergent regulatory guidance regarding response to a failed canister, this clearly underestimates what was required.

*Id.* at 158.

These needs were foreseen when SMUD and DOE entered into the June 14, 1983 Standard Contract, PX 44. That contract contemplates that shutdown utilities, like SMUD, will seek to decommission their facilities promptly, and it allows for DOE to prioritize their spent fuel deliveries for this purpose. *Id.* at Art. IV.B.1.b. As the government explained in adopting this provision, "[t]his type of priority is necessary to prevent reactors from waiting 20 to 30 years to be decommissioned after they finish generating electricity." 48 Fed. Reg. 16,590, 16,593 (April 19, 1983). Thus, it was foreseeable and foreseen that utilities would seek to close down their facilities, including their pool, and try to decommission their reactors.

The Standard Contract also requires DOE to accept non-fuel components like control rods and neutron-sources as well as damaged fuel assemblies. Appendix E to the contract states that "[n]on fuel components including, but not limited to . . . control rod elements . . . and neutron sources . . . may be included as part of the spent fuel delivered for disposal pursuant to this

contract." PX 44, App. E at § B.2. The contract also requires the DOE to accept "other than standard fuel," including damaged or failed fuel. *Id*. at Art. VI.A.2.b & App. E at A.1. Numerous documents in the record confirm that the government has long planned to receive non-fuel components and damaged fuel under the Standard Contract. *See* PX 93 (1985 letter from DOE stating that it will accept "non-fuel components" and "[f]ailed fuel" on the same schedule as standard fuel assemblies); *see also, e.g.*, PX 188 at 15; PX 541 at 5; PX 989.

Insofar as the Court wishes to consider generic cost estimates in place of the real world costs that SMUD faced, SMUD notes that in 1989 the DOE itself concluded that the "unit costs of dual-purpose casks are expected to be slightly higher than those of the metal casks" and that the cost difference would be only "about $7 per kilogram of heavy metal [*i.e.*, uranium/fuel]." PX 154 at I-6. Based upon this $7 per kilogram cost differential, the additional cost of using dual purpose casks rather than metal store-only casks for SMUD's 228,400 kilograms of fuel would be only $1,598,800. This amount is less than the $2,168,321 that Mr. Field determined is the additional cost attributable to the dual purpose transportable features of SMUD's dry storage system during the damages period, and it is only about a third of the $4,823,467 that Mr. Field determined is the additional total cost attributable to such features during the entire claim period.

### C. The TNW Contract and Vectra Change Orders are Post-May 15, 1997 Obligations and Should be Included in SMUD's Damages

The Court directed SMUD to deduct from its dry storage costs any "costs attributable to a contract, lease, or other legal obligations executed by Plaintiff prior to May 15, 1997." *Sacramento Municipal Util. Dist.*, 70 Fed. Cl. at 334; *accord* Tr. at 332 (Court) (the issue is whether "SMUD would have a legal obligation, somebody could come into Court, basically, and

say pay me for these services or these items"). In calculating this deduction, SMUD's accounting expert, Mr. Brinig, excluded $25,068,134 paid to TNW pursuant to a contract executed in October 1998,[31] and approximately $1.1 million paid to Vectra pursuant to contract change orders executed in June and October 1997. Mr. Brinig excluded these costs from the deduction because SMUD incurred these obligations after May 15, 1997. Tr. at 294, 299-300, 365, 378, & 383 (Brinig). The government has taken the position that the TNW contract and Vectra change orders are pre-May 15 obligations, but does not dispute that they were executed after that date.

**1. The TNW Contract is a Post-May 15, 1997 Legal Obligation**

Most of the disputed costs are attributable to the TNW contract. Based upon his review of SMUD's accounting records, Mr. Brinig excluded the TNW costs from the offset for pre-May 15, 1997 obligations because they: "relate to a document, a contract that is 17 months after the [May 15, 1997] date. . . . As an accountant I traced them to what they resulted from, and they resulted from 1998 contracts." Tr. at 383 (Brinig); *accord id*. at 295.

The Court previously found that the TNW contract was executed in September 1998, more than a year after the Court's May 15, 1997 cut-off date for damages, and indeed described SMUD's obligation to TNW as a "new contract" executed after "extensive negotiations." *Sacramento Municipal Util. Dist.*, 70 Fed. Cl. at 353.[32] Nonetheless, the government has asserted that the TNW contract is a pre-May 15, 1997 legal obligation, apparently on the theory that the

[31] $95,000 of the TNW costs are attributable to a contract executed in May 1998. *See* Tr. at 295, 387 (Brinig). The government has included a significant portion of the TNW costs in its proposed offset for transportable dual purpose features, and its proposed deduction for pre-May 15, 1997 obligations includes the balance of the TNW costs. *See supra* n.3.

[32] The TNW contract was executed in early October, but was dated September 28, 1998. *See* DX 0879 at SMUD-0028165 (TNW contract signature page).

TNW contract is the same as SMUD's earlier contract with Vectra. This assertion does not withstand scrutiny.

The record evidence is that SMUD's contract with TNW is a new, post-May 15, 1997 legal obligation. TNW and SMUD never behaved as if they could proceed under the old Vectra contract or were otherwise subject to a pre-existing agreement. Instead, in May of 1998, SMUD and TNW executed a limited "bridge agreement" so that TNW could proceed with work while the parties negotiated the September 1998 agreement; SMUD paid TNW approximately $95,000 pursuant to the bridge agreement. *See* Tr. at 295 (Brinig). If the parties believed that they were bound by the Vectra agreement, there would have been no need for a bridge agreement, since they could simply continue under the terms of the Vectra deal. Indeed, there would not have been a need for a new contract at all.

In September 1998, SMUD and TNW entered into a new contract for the project. *See* DX 879. As Mr. Brinig testified, the balance of SMUD's $25 million in payments to TNW were made pursuant to this contract. Tr. at 295 (Brinig).[33] A number of factors demonstrate that this TNW agreement is a post-May 15, 1997 obligation. Most importantly, the contract is between new parties; before it signed the bridge agreement and the September 1998 agreement, SMUD had no contractual obligations to TNW. Indeed, before executing the September 1998 agreement, TNW had complained to SMUD that it was "tired of working at risk on the SMUD project without a contract" and that it was "concern[ed] about [TNW's] inability to invoice [SMUD] for

---

[33] TNW erroneously submitted one invoice for $684,000 that referenced SMUD's agreement with Vectra. However, SMUD corrected this error and paid the invoice pursuant to the TNW contract. Tr. 386-88, 411-14 (Brinig); PX 2015 (SMUD payment authorization package).

work done because there was no signed contract." DX 863 (internal SMUD e-mail discussing phone call from TNW). Perhaps due to TNW's concern that it had worked without a contract, the TNW agreement is retroactive to November 27, 1997. The retroactivity further demonstrates that the parties did not believe themselves to be contractually bound before the agreement was signed.

In addition to their different start and end dates, *see* DX 879 at SMUD-0028142; PX 267, the Vectra and TNW contracts have materially different terms, including different payment terms (fixed price for Vectra, cost recovery for TNW), *see* DX 879 at SMUD-0028144-45 and PX 267 at SMUD-0004196, different payment schedules (progress payments for Vectra, monthly payments for TNW), *see id*, and different contract prices, *see* PX 2009 at SMUD 102120 (Change Order 10); DX 879 at SMUD-0228145 (TNW contract). Plainly, the TNW contract is a new, post-May 15 1997 obligation of SMUD, regardless of how it is characterized.

**2. Vectra Change Orders 10 and 11 are Post-May 15, 1997 Legal Obligations**

The second set of disputed costs were incurred pursuant to two charge orders to the Vectra contract, change order 10, approved by SMUD on June 5, 1997, and change order 11, executed on October 6, 1997. PX 2009; PX 2010. As Mr. Brinig testified, approximately $1.1 million in costs were paid to Vectra pursuant to these change orders. *See* B. Brinig Written Direct at ¶ 26(c) (PX 2002); Tr. at 299 (Brinig). The government asserts that these two change orders, like the TNW contract, are pre-May 15, 1997 obligations, but, again, does not dispute that they were approved and executed after that date.

As Mr. Brinig testified, the $1.1 million in costs paid pursuant to change orders 10 and 11 costs should be excluded from the offset for pre-May 15, 1997 obligations because the change

orders were "executed after" that date. Tr. at 299-300; *accord id*. at 365 & 373. The change orders are structured as new contracts,[34] executed by both parties, and modify the terms of the Vectra agreement. *See* PX 2009; PX 2010. By definition, the change orders are changes to SMUD's obligations to Vectra (and vice versa). Indeed, Mr. Field, who was intimately involved with change orders 10, and 11, testified that the work listed in the change orders was outside the original Vectra contract, so that prior to the change orders, Vectra was not obligated to perform the work and SMUD was not required to pay for it. Tr. at 125-131:

> Q: [After discussing a list of items in change order 10] And what obligation did SMUD have regarding these items prior to the execution of change order 10?
>
> A: Prior to the issuance of this change order, there was no obligation for Vectra to perform this work.
>
> [discussion of another list of items in change order 10]
>
> Q: And what obligations did SMUD have for these items prior to change order 10?
>
> A: None

Tr. at 127-129.

Mr. Field gave substantially the same testimony with respect to change order 11:

> Q: And did you discuss this document [change order 11] with Mr. Brinig?
>
> A: I did.

[34] The Court should not be misled by an argument that the change orders were already somehow embedded in the Vectra contract, not freestanding contracts, and thus somehow are really pre-May 15 obligations. Whether the change orders are new contracts or amendments to the prior contract, the change orders impose new, post-May 15, 1997 obligations on SMUD.

> Q: And what did you discuss with him?
>
> A: I discussed what the scope of the contract change was, and whether this was covered by the existing E-776 contract.
>
> Q: What did you tell him?
>
> A: I told him that it was not covered.
>
> Q: Did SMUD have an obligation for the payment set forth in this change order [number 11] prior to execution of the change order?
>
> A: No, we did not have any obligation prior to the approval of this change order.

Although some work attributable to the change orders was performed before May 15, 1997, Mr. Brinig determined through conversations with Mr. Field that this work was not within the scope of the Vectra contract. *See* Brinig Written Direct at ¶ 26(d) (2002).[35] This is confirmed by a letter from Vectra to SMUD, which is referenced in change order 10 and acknowledges that this work was "beyond the scope" of the Vectra contract. *See id*. at Tab 13; Tr. at 420-21 (Brinig). Consequently, SMUD was not obligated to pay for that work until it executed the post-May 15, 1997 change orders, and amounts paid on account of that work are attributable to post-May 15, 1997 obligations. Thus, change orders 10 and 11 are new, post-May 15 obligations of SMUD.

[35] For example, change order 10 provided for SMUD's retroactive payment of Vectra's overhead for 1996 through 1998. *See* PX 2009, at SMUD 102118. Because the Vectra contract had a fixed price, SMUD was not obligated to pay for overhead absent the contract change.

## CONCLUSION

Based on the Court's order and opinion, SMUD respectfully requests that the Court enter judgment awarding SMUD mitigation damages for the damages period in the amount of $42,958,357 after giving full effect to all of the Court-ordered offsets.

DATED this 10th day of October, 2006.

Respectfully submitted,

/s/ Howard N. Cayne

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5899

*Counsel of Record for*
*Plaintiff Sacramento Municipal Utility District*

*Of Counsel*:
David S. Neslin
Timothy R. Macdonald
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
(303) 863-1000

CERTIFICATE OF FILING

I certify that I caused a copy of the foregoing Sacramento Municipal Utility District's Post-Hearing Legal Brief to be filed electronically through the Court of Federal Claims Case Management/ Electronic Case Filing System on October 10, 2006. I understand that all parties may access the filing through the Court's CM/ECF System, including:

Alan Lo Re
Russell A. Shultis
Commercial Litigation Branch, Civil Division
Attention: Classification Unit, 8th Floor
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

/s/ Timothy R. Macdonald