# In the United States Court of Federal Claims

No. 98-488C
Filed December 1, 2006
**TO BE PUBLISHED**

************************************

| | | |
|---|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | * | |
| Plaintiff, | * | Damages; |
| v. | * | Motion For Reconsideration, RCFC 59. |
| THE UNITED STATES, | * | |
| Defendant. | * | |

************************************

**Howard N. Cayne**, Arnold & Porter, LLP, Washington, D.C.; **David S. Neslin** and **Timothy R. Macdonald**, Arnold & Porter, LLP, Denver, Colorado, counsel for Plaintiff.

**Russell Alan Shultis**, **Alan J. Lo Re**, **Scott R. Damelin**, **Joshua E. Garnder**, **Todd J. Cochran**, and **Elizabeth Thomas**, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., counsel for Defendant.

## MEMORANDUM OPINION ON RECONSIDERATION AND FINAL JUDGMENT REGARDING DAMAGES

**BRADEN,** *Judge.*

## I. The Court's Resolution On Reconsideration.

Plaintiff ("SMUD") has requested reconsideration of the court's prior ruling that it was not foreseeable, on June 14, 1983, when the Standard Contract was executed, that any breach thereof would require the Defendant ("Government") to be responsible for the costs of SMUD's decision to utilize a "dual-purpose" dry storage system. *See* Pl. PH Br. at 8-10; *see also Sacramento Mun. Util. Dist.* v. *United States*, 70 Fed. Cl. 332, 360-62 and n.27, 373-74 (2006).[1]

[1] The United States Court of Federal Claims Rule 59 provides that "reconsideration may be granted . . . for any of the reasons established by the rules of common law or equity applicable as

On reconsideration, SMUD reasons that, because another judge of the United States Court of Federal Claims in a spent nuclear fuel case held that the use of "dual purpose" dry storage was reasonably foreseeable when another plaintiff entered into the Standard Contract with the Government, *ipso facto,* in this case Plaintiff's decision to utilize "dual purpose" dry storage was foreseeable and reasonable. *See* Pl. PH Br. at 8-10 (citing *Yankee Atomic Elec. Co.*, v. *United States*, 2006 WL 2848615 (Fed. Cl.)). In support, SMUD argues that the *Yankee* decision "cites various DOE documents beginning in 1983, reflecting that DOE contemplated developing transportable dry storage itself and specifically considered such storage in planning for the Federal Interim Storage Program and for at-reactor site storage if the repository were delayed." Pl. PH Br. at 9 (citing *Yankee Atomic Elec. Co.*, slip. op. at 40-42 and *Yankee* Exhibits: PX 636, PX 643, PX 641, PX 683, PX 647, PX 95, PX 1457YA). SMUD advises that the *Yankee* Exhibits include: "a December 20, 1983 draft of the DOE's statutorily-mandated Mission Plan for the program," as well as "other DOE plans, memoranda, and correspondence issued by senior DOE and Nuclear Regulatory Commission ("NRC") officials from 1984 through 1994." Pl. PH Br. at 9 (citing *Yankee Atomic Elec. Co.*, at 40-41). On reconsideration, SMUD also informed the court that the aforementioned documents were not cited in prior briefings in this case, only because SMUD "did not understand the [G]overnment to be contesting the foreseeability of dual purpose dry storage." Pl. PH Br. at 10. In light of the pleadings, briefs, and arguments of Government counsel to the contrary, no further comment is warranted by the court.

In any event, although all of the documents relied upon or cited in the *Yankee* decision are now part of the record in this case, the court has determined that none are dispositive of causation in this case. *See* RESTATEMENT (SECOND) OF CONTRACTS § 351(1) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."). All of the *Yankee* exhibits were created after the parties in this case entered into the Standard Contract on June 14, 1983. Therefore, none are relevant evidence of foreseeability as of that date or the reasonableness of SMUD's subsequent choice. Second, each of these exhibits are either drafts or are highly speculative or contingent in nature:

- The December 20, 1983 Civilian Radioactive Waste Management Program Mission Plan is marked as a "Draft" and Section II therein is rank speculation. *See* PX 59 at 2-15 ("[T]he Department will continue to *explore the feasibility* of a multipurpose storage cask that *could* be used for the FIS either at commercial reactors or at a Federal site. *If feasible*, such a cask

---

between private parties in the courts of the United States." RCFC 59(a)(1). The decision to grant a motion for reconsideration is within the court's discretion. *See Yuba Natural Res. Inc*. v. *United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990) (holding that "the decision whether to grant reconsideration lies largely within the discretion of the [trial] court"). To prevail, the moving party must identify a manifest error of law or mistake of fact. *See Coconut Grove Entm't, Inc*. v. *United States*, 46 Fed. Cl. 249, 255 (2000) (holding that a movant must "point to a manifest error of law or mistake of fact").

would be designed so that it could later be used in the repository program, the MRS program, or in the transportation of spent fuel."(emphasis added)).

- The February 29, 1984 Program Strategy, is also a "Draft," and was never authenticated, but nevertheless, was admitted into the record in the interest of providing a complete record for the United States Court of Appeals for the Federal Circuit. *See* PX 64. This "Draft" is also largely speculative. *Id* at 2-3. ("The casks *will be* designed to meet federal regulations for spent fuel storage as well as transportation . . ." and "DOE *will propose* that safe, high efficiency, low cost transport casks that comply with Federal transport and storage regulations be used as the initial storage modules[.]" (emphasis added)).

- Likewise, the March 30, 1984 Memorandum from M. Lawrence, Acting Office of Civilian Radioactive Waste Management Program ("OCRWM") Director, to R. Williamson and Others, regarding "Mission Plan for the Civilian Radioactive Waste Management Program," was never authenticated and is largely speculative. *See* PX 67 at 2-1 ("To provide this federal storage, the Department *will consider the possibility* of taking title to spent fuel according to the waste acceptance schedule, but arranging for continued storage at the utilities. This federal storage *could be* in dry storage casks or, alternatively, in transportable storage casks or containers[.]"); *see also id.* at 2-19 ("As a further contingency, [DOE] will continue to *explore the feasibility* of a multipurpose storage cask that could be used for Federal Interim Storage either at commercial reactors or at a Federal site. *If feasible*, such a cask would be designed so that it could later be used in the repository program, the Monitored Retrievable Storage Program, or in the transportation of spent fuel." (emphasis added)).

- The April 1984 Mission Plan for the Civilian Radioactive Waste Management Program was also marked "Draft" and is speculative. *See* PX 68 at 2-9-2-12 ("[A] potential solution that *appears feasible* could be to use transportable storage casks."; "*If such casks are feasible*, they *could* be supplied[.]"; "The Department is developing these concepts as part of its spent fuel storage research and development program. *Results should be available* by the late 1980's [.]"; "As an example of advanced systems that appear to have considerable promise in this regard, the Department *will investigate* in-depth concepts such as 'all purpose' nuclear waste canisters and disposable self-shielded casks that could be loaded at the source, sealed, stored at the reactor site or transported and stored[.]" (emphasis added)).

- The April 1984 letter from M. Lawrence, Richland Manager, to B. Rusche, OCRWM Director, regarding "RL Comments on the Mission Plan," is in response to a draft Mission Plan and also is speculative. *See* PX 80 at 3-C-5 ( "[A] system of transportable storage casks *may be feasible*." (emphasis added)).

- The 1985 Mission Plan for the Civilian Radioactive Waste Management Program was not final until June 1985 and only referred to dry storage, not "dual purpose" dry storage. *See* PX 91 at 19 ("[If the MRS facility is significantly delayed], the pools for storing the fuel will

continue to be filled, and additional onsite storage capacity through the use of dry storage in casks or similar technologies will have to be employed."). Moreover, the Mission Plan is rank speculation. *Id.* ("[T]he contingencies identified below and shown in Figure 2-3 are limited to major areas of *uncertainty* and *will be* more fully defined *as the evolving situation requires*." (emphasis added)).

- The July 19, 1994 Remarks by I. Selin, Nuclear Regulatory Commission Chairman, before the Annual Meeting of Institute of Nuclear Materials Management, were made ten years after the parties entered into the Standard Contract, and discusses only future plans and is speculative. *See* PX 357 at 3 ("In the *very near future we expect* to certify the nation's first dual-purpose cask that is designed for both storage and transportation, a design developed by the Nuclear Assurance Corporation (NAC) . . . we are actively reviewing a second dual-purpose design developed by VECTRA Technologies, Inc., for use at the Rancho Seco Nuclear Station." (emphasis added)).

Accordingly, the court has determined that no "error of law or mistake of fact" has been made. *See Coconut Grove Entm't, Inc.*, 46 Fed. Cl. 249 at 255. SMUD's decision to utilize 'dual-purpose' dry storage was "not reasonably foreseeable by the Government on June 14, 1983." *See Sacramento Mun. Util. Dist.* 70 Fed. Cl. at 374. In addition, "SMUD's decision to utilize 'dual purpose' dry storage was unreasonable." *Id.* at 374-75.

## II. The Court's Resolution Regarding Damages.

Initially, SMUD claimed $78,558,211 in damages from January 1, 1992 to December 31, 2003. *See Sacramento Mun. Util. Dist.* v. *United States*, 70 Fed. Cl. at 362. In the March 31, 2006 Memorandum Opinion and Order, the court determined that there was no legal basis on which SMUD could recover: $450,000 for Spent Fuel Building Upgrade; $500,000 for PCC Loan Workout Agreement; and $4,196,360 for Wet Pool Cost Savings, because those amounts were unforeseeable and/or an unreasonable mitigation. *Id.* at 373-78. Accordingly, the court requested direct expert testimony summarized in five tables ("A-E"), itemizing the offset amounts to be subtracted from SMUD's gross damage claim. *Id*. at 334.[2] Subsequently, the parties agreed on: $4,618 for Table D – costs related to 1/22 of Independent Spent Fuel Storage Installation ("IFSI") during the relevant time period; and an offset amount of $754,057 for Table E -- costs related to on-site drop testing during the relevant time period. *See* PX 2000 (July 7, 2006 Joint Filing of Tables A, D, & E). The

[2] The Government argued that "all of the post-trial testimony ordered by the Court constitutes an improper re-opening of the record after SMUD failed to meet its burden of proof in its case-in-chief at trial." *See* Gov't PH Br. at 1-3. On the contrary, the record was not closed after the March 2006 evidentiary hearing, since the court advised the parties: "[W]e can conclude today's proceedings [but] . . . I don't ever close the record out until I write a decision." August 2006 Hearing Transcript ("HTR") 2999-3000; *see also Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 401 U.S. 321, 331-32 (1971) (decision to reopen record "to submit additional proof is addressed to [the trial court's] sound discretion").

offset amounts, based on tables A-C, however, remained in dispute and were subject to an evidentiary hearing on August 23-24, 2006. The court's determination regarding the appropriate offset for Tables A, B, and C follows.

**A. Table A.**

In the March 31, 2006 Order Requesting Supplemental Expert Testimony, the court requested expert testimony in the form of Table A, a summary of costs by the categories listed in PX 1000 ¶ 20, including outside services, labor,[3] materials, materials surcharge, other, non cash, corporate allocation, and miscellaneous work orders, "for each of the following time periods: January 1, 1992 through May 14, 1997; May 15, 1997 through May 31, 1997; June 1, 1997 through October 31, 1999; and November 1, 1999 through December 31, 2003." *Sacramento Mun. Util. Dist.* , 70 Fed. Cl. at 334; *see also* PX 2000. From Table A, the court was to determine offsets for costs incurred before the damages period, from January 1, 1992 through May 15, 1997. In a Joint Filing, the parties agreed on an offset of $19,347,430 for non-labor costs and other offsets of $6,514. *See* PX 2000; *see also* J. Filing, *Sacramento Mun. Util. Dist.*, No. 98-488 (Fed. Cl. July 21, 2006) (Joint Filing of Stipulated Adjustments to Table A). At the August 2006 evidentiary hearing, however, a dispute arose regarding the offset amount for the "labor" category.

The court previously held that the evidence "fail[ed] to establish that SMUD would have reduced the Rancho Seco personnel or reassigned these employees to other responsibilities, but for the labor requirements of the 'dual-purpose' dry storage project - particularly since SMUD also was engaged during this time in executing the incremental decommissioning of the Rancho Seco Site." *See Sacramento Mun. Util. Dist.* , 70 Fed. Cl. at 376 (citing DX 122; DX 247; DX 274; DX 248; DX 481; DX 521; March 21-25, 2005 and March 28-April 1, 2005 evidentiary hearing transcript ("TR") 218, 697). The court concluded that "[o]f the 256 employees that charged time to the 'dual-purpose' dry storage project, only 16 employees spent the majority of their time [on] that project." *Id.* (citing TR 2737; DX 2003 at EXS0050082-86). Accordingly, the court determined that "SMUD may not recover any internal labor costs claimed, except for the costs incurred for the 16 employees to the extent they worked on any portion of the dry storage project." *Id.* The court requested expert testimony on an offset amount that excluded "the 16 employees that charged a majority of their time to the 'dual-purpose' dry storage project." *Id.* at 334*; see also id.* n.41 (citing DX 2003 at EXS0050083-86 ("Employee No. 2149; Employee No. 2281; Employee No. 2799; Employee No. 3155; Employee No. 3505; Employee No. 3663; Employee No. 4318; Employee No. 5512; Employee No. 5801; Employee No. 6073; Employee No. 6730; Employee No. 7911; Employee No. 8790; Employee No. 9436; Employee No. 9647; Employee No. 9850")). Undertaking the court's suggested analysis, the Government has proposed a labor offset of $9,482,508. *See* PX 2000.

[3] The "'[l]abor' category may include costs attributable to the 16 employees who charged the majority of their time to the 'dual-purpose' dry storage project." *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 334, n.1.

At the August 2006 evidentiary hearing, SMUD proposed a revised analysis regarding the labor offset, identifying a new and different set of 16 employees that "actually charged more than fifty percent of their time to the dry storage project during the damages period adopted by the Court, May 15, 1997 through December 31, 2003." Pl. PH Br. at 14 (citing PX 2005 (B. Brinig Supplemental Written Direct at ¶ 3); HTR 300-306). This revised expert analysis resulted in a labor offset of $8,003,185 or $1,479,323 less than the initial estimate. *See* PX 2008 (SMUD August 22, 2006 Revised Table A); *see also* HTR 306-07.

In addition to providing the court with an analysis other than that requested, the court is not persuaded that SMUD's revised analysis is reliable. Although five of SMUD's new set of 16 employees were not in the original group, SMUD did not proffer evidence to show that they were incremental to the DOE's delay in the acceptance of spent nuclear fuel. Moreover, at the August 2006 evidentiary hearing, SMUD's accounting expert, Mr. Brian Brinig, acknowledged that none of these five employees were terminated after SMUD completed the dry storage project. *See* HTR 324. In fact, SMUD's expert did not know whether any these five employees' time was diverted from other SMUD projects during the period of 1997 to 2003. *See* HTR 325. For these reasons, the court has determined that SMUD did not rebut by clear and convincing evidence the Government's claim that the proper offset is $9,482,508.

**B. Table B.**

In addition, the court previously held "that SMUD's decision to utilize 'dual-purpose' dry storage was unreasonable." *Sacramento Mun. Util. Dist.,* 70 Fed. Cl. at 374. In the March 31, 2006 Order Requesting Supplemental Expert Testimony, the court requested that the parties propose itemized offsets in a Table B, representing "any costs attributable to the 'dual-purpose' transportable features of the dry storage system." *Id.* at 334.

The Government proposes an offset of $13,821,203,[4] based on expert estimates of the costs of transportable features using internal vendor accounting codes believed to represent transportable features.[5] *Id.* at 24-25; *see also* Gov't Resp. to Sch. Order, *Sacramento Mun. Util. Dist.*, No. 98-488 (Fed. Cl. July 21, 2006) (filing of Tables A, B, and C). For costs that could not be identified using these accounting documents, the Government's experts estimated allocated costs using transportable feature costs previously quantified. *See* Gov't PH Br. at 24.

---

[4] Mr. Kiraly calculated the total cost of "dual purpose" transportable features to be $17,038,533, but identified $3,217,330 in costs paid before May 15, 1997. *See* Gov't PH Br. at 24.

[5] The Government argues that the entire cost of transportable features was charged to SMUD under the Vectra and TNW contracts and, therefore, should be excluded from SMUD's damages award as Table C legal obligations executed prior to May 15, 1997. *See* Gov't PH Br. at 8, 24-25.

SMUD's proposed offset of $2,168,321 is based on the analysis of Mr. Jim Field, Rancho Seco's long-standing Engineering Superintendent and Dry Fuel Storage Project Manager. *See* PX 2001 (J. Field Written Direct); PX 2006 (J. Field Supplemental Written Direct). Mr. Field based his analysis on personal experience with the dry storage project and a review of invoices and other documentation. *Id.* Therefore, SMUD insists that any offsets should be limited, because most of the major project features of the "dual-purpose" system were necessary for both transportation and dry storage. *See* Pl. PH Br. at 18.[6] As Mr. Field explained, the only dual purpose transportable features are impact limiter testing and:

> the neutron-absorbing material in the canister along with features to secure it, special material for the cask body (XM-19), cask rupture disks, cask closure bolting testing, Nuclear Regulatory Commission reviews of the Part 71 Safety Analysis Report, Thermal Performance Testing and some canister spacer disk fabrication. The special material for the cask body, the additional spacer disks and the cask closure bolt testing ensured an additional degree of robustness for transportation. The neutron-absorbing material and cask rupture disks addressed hypothetical transportation accidents.

*Id.* at 21-22 (citing PX 2001 (J. Field Written Direct at ¶¶ 6, 12); HTR 72-73).

In the court's judgment, SMUD's methodology for calculating the Table B offset was more reliable. The Government's use of vendor accounting codes does not consider the purposes for which the features actually were used. On the other hand, SMUD's proposed offset, does not account for decommissioning costs that SMUD incurred when it began decommissioning, prior to the Government's breach of the Standard Contract on January 31, 1998.

MR. FIELD: That there were *unique requirements at SMUD, since we were decommissioning, we had more components to put into dry storage than had ever been put into dry storage* using one of the standard systems. And also we had to demonstrate to the Nuclear Regulatory Commission that we had a strategy and the equipment to respond to an off-normal-condition, once the

---

[6] At the August 2006 hearing, Mr. Field testified:

> The cask is necessary for dry storage. Canisters are necessary for dry storage. The [Independent Spent Fuel Storage Installation] concrete modules, and the truck and trailer are exclusively used for dry storage and not associated with transportation. So only some limited features of the cask and canister would be associated with transportation.

HTR 52-53; *see also* HTR 60-61, 70-71 (Mr. Field testified that primary support equipment, such as the truck, trailer, welder, vacuum drying machine, and hydraulic ram would be needed for a dry-storage only system).

fuel was stored, because we would no longer have a pool. So we had to incorporate a significant amount of additional analysis and features into the cask and the storage pad in order to address that issue.

THE COURT: Here is what I'm trying to get at, though. You referred – the first reason you said they were unique is you were . . . decommissioning. But that had nothing to do with the contract being breached. You made a decision to decommission, totally independent of this, the breach of contract. So whatever those components are, in my judgment were not caused by the breach and, therefore you are not entitled to those unique features.

HTR 61-63 (emphasis added).

* * *

THE COURT: I have the problem of what [is] decommissioning, you have got decommissioning costs that you are including: is that not correct? And how do I back those out? Do you see where I am having the problem?

MR. FIELD: Right. We did not consider those as decommissioning costs.

THE COURT: Well, you just told me that when you made your value judgments, you - and the reason that your numbers are different than Mr. Burford's is that you had . . . decommissioning costs. Well, that may be, but . . . the decommissioning had nothing to do with the breach. So to the extent that you have decommissioning costs in here, how can we back those out easily?

HTR 64; *see also* Gov't PH Br. at 21-22 ("Mr. Field admitted that SMUD's 'unique requirements' arose, because of SMUD's decision to decommission the Rancho Seco facility in the early 1990's." (citing HTR 62, 159)).

Because SMUD was decommissioning the Rancho Seco facility, nonfuel components were put into dry storage that otherwise would not have been stored. *See* HTR 61. These nonfuel components included: control rod assemblies; burnable poison rod assemblies; power shaping rod assemblies, orifice rod assemblies, and storage cans containing cut-up incore detectors and control rods. *See* PX 598A at SMUD 0028244; *see also* HTR 65-68. Therefore, to arrive at the correct offset, the costs of the nonfuel components must be added to SMUD's proposed offset.

On November 27 and 28, 2006, the court convened a status conference to discuss how to identify the decommissioning costs contained in SMUD's proposed Table B offset. Subsequently, the parties filed a joint stipulation that the costs attributable to storing the nonfuel components should be $1,712,800. *See* J. Stip., *Sacramento Mun. Util. Dist.*, No. 98-488 (Fed. Cl. Nov. 30, 2006).

**C. Table C.**

The court also previously determined that SMUD could not recover for any contract, lease, or other legal obligation incurred prior to the Government's breach, because these costs were avoidable, and therefore were not reasonable mitigation. *See Sacramento Mun. Util. Dist.,* 70 Fed. Cl. at 374. The court requested that the parties itemize the offsets in a Table C**,** representing "any costs attributable to a contract, lease, or other legal obligations executed by Plaintiff prior to May 15, 1997." *Id.* at 334.

**1. TNW Contract.**

The Government argues entitlement to an offset of $11,415,344 for SMUD's contractual payments to TNW, because SMUD's October 1, 1998 Superseding Agreement Amending Contract E776 with TNW "was simply an amendment to the previously executed October 9, 1992 Contract E776" with Pacific Nuclear Systems, Inc. ("Pacific Nuclear") and its successor Vectra Technologies, Inc. (Vectra). *See* Gov't PH Br. at 6, 15; Gov't Resp. to Sch. Order, *Sacramento Mun. Util. Dist.*, No. 98-488 (Fed. Cl. July 21, 2006) ( filing of Tables A, B, and C); *see also* DX 879 at SMUD 0028141.

SMUD insists that no offset is warranted, because the October 1998 contract, was "executed . . . more than a year after the Court's May 15, 1997 cut-off date for damages." Pl. PH Br. at 35. First, SMUD contends that the October 1998 contract is between new parties, because "before it signed the bridge agreement and the September 1998 [sic] agreement, SMUD had no contractual obligations to TNW." *Id.* Second, SMUD points out that "TNW and SMUD never behaved as if they could proceed under the old Vectra contract or were otherwise subject to a pre-existing agreement." *Id.* at 36. SMUD states that "before executing the [October 1998] agreement TNW had complained to SMUD that it was 'tired of working at risk on the SMUD project without a contract' and that it was 'concern[ed] about [TNW's] inability to invoice [SMUD] for work done because there was no signed contract.'" *Id.* at 36-37 (citing DX 863). SMUD also notes that the Vectra and TNW contracts have: different start and end dates, *see* DX 879 at SMUD 0028142; PX 267; materially different payment terms, *see* DX 879 at SMUD 0028144-45; PX 267 at SMUD 0004196); payment schedules, *see i.d.*; and contract prices, *see* PX 2009 at SMUD 102120; DX 879 at SMUD 0228145. *See* SMUD PH Br. at 37.

For the purposes of itemizing Table C offsets, the court requested "legal obligations *executed* by Plaintiff prior to May 15, 1997." *Sacramento Mun. Util. Dist.,* 70 Fed. Cl. at 334 (emphasis added). The court previously held that, "On September 28, 1998, after extensive negotiations, SMUD and TNW entered into a new contract, Contract E-776A, for the completion of the design, licensing, and fabrication of the dry storage system, converting the 'fixed-price' contract, Contract E-776, to a 'cost-without-profit' contract." *Id.* at 353 (citing DX 879; PX 598; TR 237-39, 633-34, 919-21). Therefore, in addition to including materially different terms, TNW would not have been able to enforce any right to payment against SMUD until a new contract was executed. Accordingly, the court has determined that SMUD's contract with TNW was a legal obligation *executed* after May

15, 1997. Therefore, the Government is not entitled to an offset of $11,415,344 for payments that SMUD made to TNW.

**2. Vectra Change Orders.**

The Government also argues entitlement to an offset of $1,149,366 for SMUD's payments to Vectra for Contract Change Orders 10 and 11, because SMUD incurred the legal obligation for those Change Orders on October 9, 1992**,** when it entered into the original contract with Vectra. *See* Gov't PH Br. at 6.

The Government contends that Change Orders 10 and 11 "relate to obligations anticipated and agreed to in the original contract dated October 9, 1992 . . .[because] the specific scope of work may or may not change, but the underlying contractual obligation for the design, licensing, fabrication, testing, and delivery of dual-purpose dry cask storage system to SMUD remained the same." Gov't PH Br. at 9-10 (citing DX 372 at SMUD 0004200 (stating that SMUD, without invalidating the original contract, reserves its right to order changes to the contract); DX 797 (Change Order 11, reflecting that "This Contract Change is subject to all provisions of the original contract and all provisions of any previous Contract Changes which are not expressly superceded in this Contract Change")). Moreover, Change Order 10 references overhead costs from 1996-1998. *See* Gov't PH Brief at 10 (citing HTR 371-72 (admission by Mr. Brinig); SMUD 102117 (change order 10 states that "the following items resolve various contract issues raised by Vectra letter dated March 28, 1996 and responded to by the District in a letter dated May 7, 1996.")).

SMUD counters that the Government is entitled only to an offset of $167,835 for costs incurred under the Vectra contract, prior to May 15, 1997, because Change Order 10 "was approved by SMUD on June 5, 1997" and Change Order 11 "was executed on October 6, 1997." *See* Pl. PH Br. at 37 (citing PX 2009; PX 20010). SMUD contends that "[t]he change orders are structured as new contracts, executed by both parties, and modify the terms of the Vectra agreement." *Id.* at 38. SMUD insists that the work listed in the change orders is outside the scope of the original contract and therefore, that neither party was obligated to perform. *Id.* SMUD also responds that the terms relating to overhead costs incurred from 1996-1998 were outside the original contract terms (that included only fixed prices), and therefore, needed to be addressed in a subsequent change order. *Id.* at 39 (citing PX 2009 at SMUD 102117; HTR 420-21; PX 2005 at tab 13 (letter from Vectra to SMUD, referenced in Change Order 10, acknowledging that work was beyond the scope of E776 contract)).

The court has determined that the change orders did not cancel the original agreement between SMUD and Vectra, but added new obligations. After the Government breached the Standard Contract on January 31, 1998, SMUD was required to make business decisions to mitigate damages. Although the Government is correct that Vectra was obligated to supply SMUD's change orders, SMUD could have made business decisions that avoided the need for change orders, thereby preventing a breach of the Vectra contract. Indeed, if Vectra had provided additional services without a change order, SMUD would not have been obligated to pay for them. For this reason,

SMUD's costs relating to Change Orders 10 and 11 were avoidable. Additionally, SMUD includes a miscellaneous offset of $1,534 for packaging technology. Accordingly, Table C should include offsets of $167,835 for change orders executed prior to May 15, 1997 and miscellaneous costs of $1,534. *See* PX 2002 (B. Brinig Written Direct Testimony Supporting Table C at ¶ 26(e)).

## III. CONCLUSION.

For these reasons, the court holds that Plaintiff has established entitlement to a damages award of $39,796,234, for the period of May 15, 1997 through December 31, 2003 calculated as follows:

| | | |
|---|---|---|
| SMUD Claimed Damages | | $ 78,558,211 |
| Offsets Determined in March 31, 2006 Memorandum Opinion and Order | | |
| Spent Fuel Building Upgrade | | ($ 450,000) |
| PCC Loan Workout Agreement | | ($ 500,000) |
| Wet Pool Cost Savings | | ($ 4,196,360) |
| Table A Offsets | | |
| Costs Incurred From January 1, 1992 Through May 31, 1997 | | ($ 19,347,430) |
| Other Adjustments (Stipulated) | | ($ 6,514) |
| Internal Labor, Excluding 16 Named Employees | | ($ 9,482,508) |
| Table B Offsets | | |
| Costs Attributable to "Transportable Features" | | ($ 2,168,321) |
| Stipulated Costs Attributable to Nonfuel Components | | ($ 1,712,800) |
| Table C Offsets | | |
| Costs Attributable to pre-May 15, 1997 Legal Obligations | | |
| | TNW | ($ 0) |
| | Vectra | ($ 167,835) |
| | Misc. | ($ 1,534) |
| Table D Offsets | | |
| Costs Attributable to 1/22 of Cost for ISFSI (Stipulated) | | ($ 4,618) |
| Table E Offsets | | |
| Costs Attributable to On-site Drop Testing (Stipulated) | | ($ 754,057) |
| | | $ 39,796,234 |

Accordingly, the Clerk of the United States Court of Federal Claims is directed to enter a final judgment in favor of Plaintiff consistent with this opinion in the amount of $39,796,234.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**