# In the United States Court of Federal Claims

No. 98-488C
Filed: December 30, 2009
**TO BE PUBLISHED**

****************************************

| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | |
| Plaintiff, | Acceptance Rate Under The Standard Contract; |
| v. | Causation; |
| | Greater Than Class C Waste, |
| | 10 C.F.R. § 61.55(a)(2); |
| | Spent Nuclear Fuel Case. |
| THE UNITED STATES, | |
| Defendant. | |

****************************************

**Howard N. Cayne**, Arnold & Porter, LLP, Washington, D.C., **David S. Neslin** and **Timothy R. Macdonald**, Arnold & Porter, LLP, Denver, Colorado, Counsel for Plaintiff.

**Harold D. Lester, Jr.**, **Alan J. Lo Re**, **Scott R. Damelin**, and **Christopher J. Carney**, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., Counsel for Defendant.

**Jane K. Taylor**, Office of General Counsel, United States Department of Energy, Washington, D.C., Of Counsel.

### MEMORANDUM OPINION AND ORDER ON REMAND

**I.   BACKGROUND.**

To date, the court has issued three Memorandum Opinions and Orders in this case. On January 19, 2005, the court held that the Government was liable for the January 31, 1998 partial breach by the Department of Energy ("DOE") of the June 14, 1983 Standard Contract ("Standard Contract") with the Sacramento Municipal Utility District ("SMUD"). *Sacramento Mun. Util. Dist.* v. *United States*, 63 Fed. Cl. 495 (Fed. Cl. 2005) ("*SMUD I*").

On March 31, 2006, the court held that DOE's January 31, 1998 partial breach of the June 14, 1983 Standard Contract entitled SMUD to mitigation damages, but only for certain costs incurred from May 15, 1997 to December 31, 2003. *Sacramento Mun. Util. Dist.* v. *United States*, 70 Fed. Cl. 332, 367-78 (Fed. Cl. 2006) ("*SMUD II*").

On December 1, 2006, the court issued a Memorandum Opinion on Reconsideration and Final Judgment that held SMUD established entitlement to a damages award of $39,796,234, for the period of May 15, 1997 through December 31, 2003, calculated as follows.

| | |
|---|---:|
| SMUD Claimed Damages | $ 78,558,211 |
| | |
| Offsets Determined in March 31, 2006 Memorandum Opinion and Order | |
|     Spent Fuel Building Upgrade | ($ 450,000) |
|     PCC Loan Workout Agreement | ($ 500,000) |
|     Wet Pool Cost Savings | ($ 4,196,360) |
| | |
| Table A Offsets | |
|     Costs Incurred From January 1, 1992 Through May 31, 1997 | ($ 19,347,430) |
|     Other Adjustments (Stipulated) | ($ 6,514) |
|     Internal Labor, Excluding 16 Named Employees | ($ 9,482,508) |
| | |
| Table B Offsets | |
|     Costs Attributable to "Transportable Features" | ($ 2,168,321) |
|     Stipulated Costs Attributable to Nonfuel Components | ($ 1,712,800) |
| | |
| Table C Offsets | |
|     Costs Attributable to pre-May 15, 1997 Legal Obligations | |
|         TNW | ($ 0) |
|         Vectra | ($ 167,835) |
|         Misc. | ($ 1,534) |
| | |
| Table D Offsets | |
|     Costs Attributable to 1/22 of Cost for ISFSI (Stipulated) | ($ 4,618) |
| | |
| Table E Offsets | |
|     Costs Attributable to On-Site Drop Testing (Stipulated) | ($ 754,057) |
| | |
| | $ 39,796,234 |

*Sacramento Mun. Util. Dist.* v. *United States*, 74 Fed. Cl. 727, 735 (Fed. Cl. 2006) ("*SMUD III*").[1]

On August 7, 2008, the United States Court of Appeals for the Federal Circuit held that the court in *SMUD II* and *III* "did not assess damages according to the rate at which the Government was contractually obligated to accept the utility's waste, and . . . the court erred in allowing the Government to deduct a number of offsets from the amount owed to SMUD." *Sacramento Mun. Util. Dist.* v. *United States*, 293 Fed. Appx. 766, 768 (Fed. Cir. 2008) ("*SMUD IV*"). For these reasons, *SMUD II* and *SMUD III* were reversed-in-part and remanded. *Id*.

---

[1] On December 29, 2006, the court also issued a Memorandum Opinion and Order Clarifying that the December 1, 2006 Final Judgment did not affect the Fifth Amendment Takings Clause claims alleged in Count IV of SMUD's August 30, 2004 Amended Complaint. *Sacramento Mun. Util. Dist.* v. *United States*, 74 Fed. Cl. at 735, 36 (Fed. Cl. 2006).

## II. SCOPE OF THE REMAND.

On remand, the court was instructed to "apply the Standard Contract acceptance rate identified in [*Pac. Gas & Elec. Co.* v. *United States* ("*Pac. Gas & Elec. II*"), 536 F.3d 1282, 1291-92 (Fed. Cir. 2008)] to assess causation . . . in evaluating the Government's partial breach of contract as a substantial factor in causing SMUD to pursue dual-purpose storage." *Id*. at 771-72.

Although the United States Court of Appeals for the Federal Circuit did not reverse the court for utilizing the "substantial factor test," instead of the "but for" test, to determine causation, the appellate court held that SMUD "had the burden to prove the contractual acceptance rate *and* apply that rate *before suggesting* that the Government's breach was a substantial factor in causing [SMUD's] claimed expenses." *SMUD IV*, 293 Fed. Appx. at 770 (quoting *Yankee Atomic Elec. Co.* v. *United States*, 536 F.3d 1268, 1273 (Fed. Cir. 2008) ("*Yankee II*")). In so holding, the appellate court emphasized: "The trial court had the obligation to hold [SMUD] to that burden." *Id*.

## III. PROCEDURAL HISTORY ON REMAND.

On March 27, 2009, SMUD filed a Motion To Recalculate Damages, In Light of Federal Circuit's [Remand] Ruling ("Pl. Rem. Mot."), together with Exhibit PX 3000 ("Pl. Rem. PX 3000"). On April 13, 2009, the Government filed a Response ("Gov't Rem. Resp."). On April 27, 2009, Plaintiff filed a Reply ("Pl. Rem. Reply"). On July 2, 2009, the Government filed a Supplemental Response. On July 17, 2009, SMUD filed a Supplemental Reply.

On July 29, 2009, at the Government's request, the court convened an evidentiary hearing regarding the merits of SMUD's March 27, 2009 Motion ("Rem. TR 1-202"). At that hearing, the court heard argument, the supplemental testimony of Steve J. Redeker, Plant Manager of Rancho Seco from 1993 to his retirement at the end of 2008 (Pl. Rem. PX 3000), and also admitted SMUD Remand Exhibits PX 3001-3005. Rem. TR 75, 82, 199. In addition, the court admitted the Government's Remand Exhibit DX 5002. Rem. TR 185-86.

On August 20, 2009, the Government proffered counter-designations of the testimony of David K. Zabransky, DOE's Office of Civilian Radioactive Waste Management, "Concerning Greater-Than-Class-C ("GTCC") radioactive waste," from other SNF proceedings in the United States Court of Federal Claims as DX 3001-3006. On August 21, 2009, SMUD filed a Motion to Strike DX 3006 and lodged objections to the Government's counter designations. On September 17, 2009, the Government filed a Response to SMUD's August 31, 2009 Motion to Strike. On October 1, 2009, SMUD filed a Reply.[2]

---

[2] Since the Government's counter-designations are a matter of public record, the court denies SMUD's August 21, 2009 Motion to Strike. As the court discusses herein, adjudication of the relevance of GTCC waste is, at best, premature in this case, since disposal of that waste at Rancho Seco did not occur prior to December 31, 2003.

On September 9, 2009, the Government filed a Post-Remand Hearing Brief ("Gov't PR Br."). On September 24, 2009, SMUD filed a Response ("Pl. PR Resp."). On October 7, 2009, the Government filed a Post-Remand Reply ("Gov't PR Reply").

**IV.     PLAINTIFF'S ASSIGNED ACCEPTANCE RATE AND ALLOCATIONS UNDER THE STANDARD CONTRACT.**

Although the 1983 Standard Contract did not include nor reference any acceptance rate, the United States Court of Appeals for the Federal Circuit has held, as a matter of law, that the acceptance rate determined by the June 14, 1987 Annual Capacity Report and the associated 1987 Annual Capacity Scheduling ("ACS") process must be utilized in assessing causation. *SMUD IV*, 293 Fed. Appx. at 768, 771-72 (citing *Pac. Gas & Elec. II*, 536 F.3d at 1291-92).

Table 2.1 of the United States Department of Energy, Office of Civilian Radioactive Waste Management, Mission Plan Amendment, sets forth an:

Illustrative Waste Acceptance Schedule for the First 10
Years of Facility Operation

| Year | System Receipt Rate Metric Tons Uranium (MTU) |
|---|---|
| 1998 | 1,200 |
| 1999 | 1,200 |
| 2000 | 1,200 |
| 2001 | 1,200 |
| 2002 | 1,200 |
| 2003 | 2,000 |
| 2004 | 2,650 |
| 2005 | 2,650 |
| 2006 | 2,650 |
| 2007 | 2,650 |
|  | 18,600 |

Source:   OCRWM Mission Plan Amendment (DOE/RW-0128), June 1987 (extracted from Appendix F, Table F-1).

PX 119 at PA-103077.

Utilizing that schedule to determine the rate of SNF acceptance applicable to the Standard Contract, requires the court to refer to Table F-1 of the Office of Civilian Radioactive Waste Management Mission Plan Amendment that sets forth an:

**Illustrative waste acceptance schedule**
**(All quantities in metric tons of uranium)**

| Year | MRS facility | | | First repository | | Second repository | | Total system acceptance | |
|---|---|---|---|---|---|---|---|---|---|
| | Spent fuel received | In storage | Spent fuel shipped | Spent fuel | MLW | Spent fuel | MLW | Spent fuel | MLW and spent fuel |
| 1998 | 1200 | 1200 | | | | | | 1200 | 1200 |
| 1999 | 1200 | 2400 | | | | | | 1200 | 1200 |
| 2000 | 1200 | 3600 | | | | | | 1200 | 1200 |
| 2001 | 1200 | 4800 | | | | | | 1200 | 1200 |
| 2002 | 1200 | 6000 | | | | | | 1200 | 1200 |
| 2003 | 2000 | 7600 | 400 | 400 | | | | 2000 | 2000 |
| 2004 | 2650 | 9850 | 400 | 400 | | | | 2650 | 2650 |
| 2005 | 2650 | 12100 | 400 | 400 | | | | 2650 | 2650 |
| 2006 | 2650 | 13850 | 900 | 900 | | | | 2650 | 2650 |
| 2007 | 2650 | 14700^ | 1800 | 1800 | | | | 2650 | 2650 |
| 2008 | 2650 | 14700 | 2650 | 3000* | 400 | | | 3000 | 3400 |
| 2009 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2010 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2011 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2012 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2013 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2014 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2015 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2016 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2017 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2018 | 2650 | 14700 | 2650 | 3000 | 400 | | | 3000 | 3400 |
| 2019 | 2650 | 14700 | 2650 | 3000 | 240 | | | 3000 | 3240 |
| 2020 | 2650 | 14700 | 2650 | 3000 | | | | 3000 | 3000 |
| 2021 | 2650 | 14700 | 2650 | 3000 | | | | 3000 | 3000 |
| 2022 | 2650 | 14700 | 2650 | 3000 | | | | 3000 | 3000 |
| 2023 | 1410 | 13460 | 2650 | 3000 | | 900 | | 2660 | 2660 |
| 2024 | | 10460 | 3000 | 3000 | | 1800 | | 1800 | 1800 |
| 2025 | | 7460 | 3000 | 3000 | | 3000 | | 3000 | 3400 |
| 2026 | | 4460 | 3000 | 3000 | | 3000 | 400 | 3000 | 3400 |
| 2027 | | 1460 | 3000 | 3000 | | 3000 | 400 | 3000 | 3400 |
| 2028 | | 0 | 1460 | 1460 | | 3000 | 400 | 3000 | 3400 |
| 2029 | | | | | | 3000 | 400 | 3000 | 3400 |
| 2030 | | | | | | 3000 | 400 | 3000 | 3400 |
| 2031 | | | | | | 3000 | 400 | 3000 | 3400 |
| 2032 | | | | | | 3000 | 400 | 3000 | 3400 |
| 2033 | | | | | | 3000 | 400 | 3000 | 3400 |
| 2034 | | | | | | 3000 | 400 | 3000 | 3400 |
| 2035 | | | | | | 3000 | 400 | 3000 | 3400 |
| 2036 | | | | | | 3000 | | 3000 | 3000 |
| 2037 | | | | | | 3000 | | 3000 | 3000 |
| 2038 | | | | | | 1940 | | 1940 | 1940 |
| Total | 59,760 | | 59,760 | 65,360 | 4640 | 40,951 | 4000 | 106,311 | 114,951 |

^ Maximum quantity stored at the MRS facility is 14,700 MTU.
* In years when the repository acceptance does not match MRS facility shipments, the difference is attributable to shipments from nearby reactors directly to the repository.

PX 188 at HQ0005864.

Utilizing the 1987 Annual Capacity Report and 1987 Mission Plan Amendment, the parties have agreed, and the court has determined, that SMUD would have been allocated an acceptance rate for each of the years from 2000 to 2005, assuming the Oldest Fuel First ("OFF") priority, with a final allocation in 2008 as set forth below:

| SNF Acceptance Rates Under 1987 Annual Capacity Report (PX 119) and 1987 Mission Plan Amendment (PX 188) | | | SMUD's Allocations Based on OFF Priority (in MTU) (PX 554) |
| --- | --- | --- | --- |
| Year | Annual MTU Received | Cumulative MTU Received | SMUD Discharges / Industry-Wide Discharges |
| 1998 | 1200 | 1200 | |
| 1999 | 1200 | 2400 | |
| 2000 | 1200 | 3600 | 9.3 / 2789.4 |
| 2001 | 1200 | 4800 | 26 / 4177.7 |
| 2002 | 1200 | 6000 | 30.2 / 5587.8 |
| 2003 | 2000 | 8000 | 19 / 6790.8 |
| 2004 | 2650 | 10650 | 32 / 9089.2 |
| 2005 | 2650 | 13300 | 30.2 / 11750.8 |
| 2006 | 2650 | 15950 | |
| 2007 | 2650 | 18600 | |
| 2008 | 3000* | 21600 | 82.1 / 18826.5 |

* Whether DOE accepted 3000 MTU in 2008 as provided in the 1987 MPA (PX 188) or only accepted 2650 MTU for another year would not change SMUD's final allocation. SMUD's final allocation had an OFF priority of 16,825.5 total MTU. Therefore, even if DOE only accepted 300 MTU in 2008, SMUD still would have received an allocation in 2008 because DOE already would have accepted 18,600 MTU through the end of 2007.

Pl. Rem. Mot. at 5-6; Gov't PR Br. at 5-6.

**V.    PARTIES' ARGUMENTS ON REMAND.**

   **A.    Plaintiff's Argument.**

On March 27, 2009, SMUD filed a motion to require the court on remand to re-affirm the amount of the prior damage award of $39,796,234, despite the fact that the United States Court of Appeals for the Federal Circuit rejected the analysis by which the court determined that DOE's January 31, 1998 partial breach of the June 14, 1983 Standard Contract was a substantial causal factor in requiring SMUD to incur certain mitigation costs. Pl. Rem. Mot. at 12 & n.5. In addition, SMUD requested restoration of the offsets addressed by the appellate court in *SMUD IV*, 293 Fed. Appx. at 772-74.

6

### B. The Government's Response.

The Government's response insists that the remand requires the court to conduct anew an "affirmative causation analysis under guidelines mandated by the Federal Circuit," instead of "recalculating" the prior damage award. Gov't Rem. Resp. at 1. To comply with the remand, the court first "must identify the costs that SMUD would have incurred absent any breach by DOE and then . . . compare these costs to those that SMUD actually incurred." *Id*. at 3 (citing *Yankee II*, 536 F.3d at 1273). In effect, the Government's position is that SMUD "failed to conduct the required analysis comparing the non-breach and breach worlds, as required by the [Federal Circuit's] *Yankee* decision, and the costs associated with implementing dry storage versus maintaining the SNF in wet storage at Rancho Seco." Gov't Rem. Resp. at 4.

### C. Plaintiff's Reply.

SMUD replies that the remand directed the court only to "apply the Standard Contract acceptance rate identified in [*Pac. Gas & Elec. II.*] to 'assess causation,' and . . . make offset corrections." Pl. Rem. Reply at 1 (quoting *SMUD IV*, 293 Fed. App. at 772-75). The existing record evidences the allocations SMUD would have received under the 1987 ACR rates and "how those allocations would have affected its decision making in the non-breach world." *Id*. at 3.

Importantly, the Government has not "challenge[d] SMUD's calculation of its acceptance allocations under the 1987 ACR rates." *Id*. Nor has the Government challenged evidence that SMUD cited from the prior trial record, demonstrating "that the application of the 1987 ACR rates is consistent with and confirms [the court's] prior ruling on causation . . . that SMUD had satisfied its burden of proving that the Government's breach was a substantial factor in SMUD's decision to proceed with the development of the dry storage facility after May 15, 1997." *Id*. Therefore, SMUD interprets the Federal Circuit's August 7, 2008 decision to "adopt . . . what amounts to SMUD's . . . position on the acceptance rate [and] demonstrates that [the court's] prior causation conclusion was correct." *Id*.

\* \* \*

A few weeks before the court convened the evidentiary hearing requested by the Government, the Government initiated another round of briefing by filing a July 2, 2009 Supplemental Response ("Gov't Supp. Rem. Resp.") that asserted five substantive arguments all of which, but the first, were not directly raised during the appeal of *SMUD II* or *SMUD III* nor initially in response to SMUD's March 27, 2009 Motion To Re-Calculate Damages. Gov't Supp. Rem. Resp. at 2-29.

### D. The Government's Supplemental Response On Remand.

The Government's Supplemental Response first argues that SMUD misconstrued the Federal Circuit's "Decisions" and failed to perform the "necessary causation analysis and quantification of damages." Gov't Supp. Rem. Resp. at 2-7.

7

Second, the Government contends that SMUD's analysis of the 1987 ACR rate establishes that the "Fuel Out Date" is 2008, not 2006, as SMUD asserted at trial. *Id*. at 7-11.

Third, a "proper analysis of causation and damages" requires the court to account for the savings SMUD realized through 2008, by closing the wet pool earlier than it would have in the "non-breach" world. *Id*. at 11-16.

Fourth, SMUD's assertion that DOE would have removed all SNF prior to 2008 is "unsupported and speculative and should be rejected on remand." *Id*. at 16-24.

Fifth, SMUD failed to account for "or even address DOE['s] acceptance of GTCC Waste[3] under the Standard Contract." *Id*. at 26-29.

Nevertheless, assuming *arguendo*, that the court determines that DOE partially breached the Standard Contract,[4] the Government urges the court to award SMUD damages in an amount "no greater than $32,178,063," *i.e.*, the prior award of $39,796,234, plus restoration of the three offsets denied by the Federal Circuit in the amount of $13,363,629, but offset by all the savings SMUD realized by having the wet pool closed from 2004 through 2008 when all of the SNF at Rancho Seco would have been removed by DOE. *Id*. at 29.

### E.     Plaintiff's Reply To The Government's Supplemental Response On Remand.

SMUD replies that it properly analyzed and applied the acceptance rates listed in the 1987 Annual Capacity Report to establish causation. Pl. Reply to Gov't Rem. Resp. at 3-5. As for the Government's "new offset theory" regarding "forward-looking [spent fuel pool] 'savings'" that SMUD may have realized during 2004-2008, consideration of any such offset is not authorized by the specific and limited nature of the Federal Circuit's August 7, 2008 remand. *Id*. at 6. Likewise, the Government's "Exchange Theory" argument should be rejected, because the Government never raised this argument prior to the remand. *Id*. at 7-9. SMUD also re-states that it is not seeking damages for GTCC Waste in this case, because such waste remained "on site" after 2003, and, therefore, the Government's argument in this regard is premature and not relevant. *Id*. at 9-11.

\* \* \*

Following the July 29, 2009 Post-Remand Evidentiary Hearing, a third round of briefing ensued.

---

[3] GTCC waste is an acronym for Greater Than Class C Waste, a radioactive product of nuclear power generation. 10 C.F.R. § 61.55(a)(2).

[4] The Government's continued reluctance to accept the fact that the United States Court of Appeals for the Federal Circuit has held that the June 14, 1983 Standard Contract was breached by DOE on January 13, 1998, is an issue appropriate for the appellate court to address, if the Government continues its penchant to reargue settled law in this case.

8

    **F.**    **The Government's Post-Remand Hearing Brief.**

The Government's post-remand hearing brief again re-argues that SMUD failed to perform the "necessary causation analysis and quantification of damages." Gov't PR Br. at 2-4. In addition, the Government asserts that SMUD's SNF would not have been removed by DOE until at least 2008, two years later than 2006, the date SMUD asserted at trial. *Id*. at 4-6. The Government emphasizes that its "contractual obligations are defined by the 1987 ACR," and that SMUD "has disclaimed any reliance on other mechanisms to advance its full acceptance date earlier than 2008." *Id*. at 6-8. The Government also repeats the argument that the court "must account for the wet storage costs SMUD avoided by constructing its ISFI, in order to accurately determine causation and calculate damages." *Id*. at 8-18. Further, the Government avers that SMUD failed to "account for DOE acceptance of [GTCC] Waste under the 1987 ACR rate, and therefore, SMUD's damage claim fails to meet the Federal Circuit's decisions." *Id*. at 19-28.

    **G.**    **Plaintiff's Response To The Government's Post-Remand Hearing Brief.**

SMUD responds that it has complied with the August 7, 2008 mandate by establishing causation under the 1987 acceptance rate. Pl. Resp. PR Br. at 2-5. Moreover, the Government does not dispute SMUD's entitlement to the cost of the three offsets, addressed by the Federal Circuit. *Id*. at 5-6. As for the Government's "new requested offset" for potential wet pool savings from 2004-2008, that issue is precluded by the mandate, is inconsistent with the law, and unsupported by the facts. *Id*. at 6-18. Similarly, the court should not consider the Government's argument that SMUD would have had fuel on-site until at least 2008, because "that issue is beyond the scope of the mandate and has no factual support as it will be litigated in the next phase of this case." *Id*. at 18-21. And, once again SMUD re-asserts that the issue of GTCC Waste is not relevant to the remand. *Id*. at 21-25.

    **H.**    **The Government's Post-Remand Reply.**

The Government replies that its causation and damages analysis "complies with" and is "within the scope of the [Federal Circuit's] remand." Gov't PR Reply at 1-3. The Government further contends that the Federal Circuit's decision does not preclude "an appropriate reduction of an offset [*i.e.*, for wet pool closure cost savings] against SMUD's damages claim" in this case. *Id*. at 3-6. Specifically, the Government's proposed $21 million offset is "consistent with the law and supported by evidence in the existing record." *Id*. at 6-8. And, for the third time, the Government insists that "consideration of [GTCC] Radioactive Waste Under the 1987 ACR rate and the impact of SMUD's acceptance allocations is necessary and relevant to this case." *Id*. at 8-10.

## VI.   THE COURT'S CAUSATION DETERMINATION ON REMAND.

The United States Court of Appeals for the Federal Circuit held in *Ind. Mich. Power Co.* v. *United States*, 422 F.3d 1369 (2005) that the utility-parties seeking damages for partial breach of the June 14, 1983 Standard Contract:

> can only sustain their . . . claim if: (1) the damages were *reasonably foreseeable* by the breaching party at the time of *contracting*; (2) the breach is a *substantial causal factor* in the damages; *and* (3) the damages are shown with *reasonable certainty*."

*Id*. at 1372 (emphasis added); *see also Yankee II*, 536 F.3d at 1273.

### A.   On June 14, 1983, It Was Reasonably Foreseeable To The Department Of Energy That Plaintiff Would Be Required To Incur Costs To Dispose Or Store Spent Nuclear Fuel, If The Standard Contract Was Breached.

As to the first causation element in this case, the appellate court held that "the law does not require that the specific method of mitigation be foreseeable.  Rather, the foreseeablility prong applies to the *type of loss*, not to the means of mitigation."  *SMUD IV*, 293 Fed. Appx. at 771 (emphasis added).  Accordingly, the appellate court implicitly has ruled that it was reasonably foreseeable to DOE that on June 14, 1983 removal and storage costs may be incurred by all utility-parties to the June 14, 1983 Standard Contract, if the DOE subsequently caused a breach.  *Id*.  The record in this case supports that ruling.  *SMUD II*, 70 Fed. Cl. at 361-62 ("On June 14, 1983, when DOE executed the Standard Contract with SMUD, it was a matter of public record the nuclear utilities in the United States had growing SNF inventory.  In addition, by that time, dry storage was considered a viable alternative to wet storage."); *see also id*. at 361 nn.26-27 (discussing the contemporaneous public record in detail).

### B.   The January 31, 1998 Partial Breach By The Department Of Energy Was A Substantial Factor In Costs Incurred By Plaintiff.

In *Indiana Michigan*, the United States Court of Appeals for the Federal Circuit affirmed the trial court's decision that a utility's "pre-breach costs were not caused by any anticipated DOE delay in performance. [The utility] authorized the expenditures for its reracking projects in 1989, in the normal course of business, six years before the 1994 Notice of Inquiry announced DOE's inability to begin timely SNF collection . . . [The utility's] decision to perform a full, instead of partial, reracking was purely a business judgment, which it would have had to pursue irrespective of DOE's partial breach."  422 F.3d at 1376.

In this case, the court previously made detailed findings of fact from June 6, 1989, the date when the voters of the Sacramento Municipal Utility District decided to close the Rancho Seco Nuclear Generating Station ("Rancho Seco"), to May 14, 1997, the date when SMUD's Board of Directors decided to continue to decommission Rancho Seco and implement a dry storage project.  *SMUD II,* 70 Fed. Cl. at 339-52, 363-65.  None of these findings were challenged by the parties, nor reversed on appeal, including the court's determination, citing

*Indiana Michigan*, that DOE's January 31, 1998 partial breach of the June 14, 1983 Standard Contract was not a substantial factor in causing SMUD to incur costs to decommission Rancho Seco and implement the dry storage project prior to May 14, 1987. *SMUD II*, 70 Fed. Cl. at 365.

In *SMUD II* and *SMUD III*, the court's inquiry also focused on whether DOE's January 31, 1998 partial breach was a substantial factor in SMUD's May 15, 1997 decision to continue to incur costs to decommission Rancho Seco and pursue the dry storage project. The evidence adduced at trial by SMUD established that, in a non-breach world, SMUD would have abandoned the dry storage project and maintained SNF in wet pool if DOE was to commence performance in 1998. *SMUD II*, 70 Fed. Cl. at 364-65. The Federal Circuit, however, reversed and remanded, requiring the court, in determining causation, to utilize the 1987 acceptance rate and allowance to demark January 1, 2000 as the first date on which DOE was obligated to accept SNF from Rancho Seco or assume responsibility for any mitigation costs incurred by SMUD.

In effect, the Federal Circuit ruled that the court made the wrong inquiry. Instead, the court should have determined whether, in the non-breach world, SMUD would have continued or abandoned decommissioning Rancho Seco and implementing the dry storage project *in light of the 1987 acceptance rate and allowance, i.e.* by January 1, 2000. *SMUD IV*, 293 Fed. Appx. at 770 ("The difficulty with the distinction drawn by the Court of Federal Claims . . . is that the court made its determination without explicitly discerning the rate at which the Department would have accepted SMUD's waste in a non-breach world."); *see also id.* at 771 (holding that the court *first* must determine the "SNF and HLW acceptance rate under the Standard Contract" and *then* apply that rate "in determining the *substantial cause* of [SMUD's] costs.") (emphasis added). At the Post-Remand Evidentiary Hearing, Mr. Redeker, the former Plant Manager of Rancho Seco, testified that on May 15, 1997, SMUD would have made the decision to abandon decommissioning Rancho Seco and implementing the dry storage project, if the January 1, 2000 acceptance date was on track:

> SMUD would not have spent 18 months trying to transfer 493 fuel assemblies to the on-site dry storage facility only to turn around and retransfer them to DOE within a few years
>
> \* \* \*
>
> In summary, in light of the volume of work DOE would have been performing to prepare for accepting SNF in 1998 in accordance with the 1987 ACR rates and the risks that SMUD faced in proceeding with its own separate dry storage project, SMUD would not have proceeded with the dry storage project after May 1997. Instead, we would have left the SNF in the wet pool and worked with the government to have the fuel removed as expeditiously as possible.

Rem. PX 3000 at ¶¶ 16, 18

SMUD's decision in the breach-world to continue decommissioning Rancho Seco and the dry storage project, however, was prudent from both an economic and safety perspective, because DOE's actual performance on May 15, 1997 was not anticipated to commence until 2017-2027, as Mr. Redeker testified. Rem. PX 3000 at ¶¶ 11-18. Recognizing this, the Government does not contest that SMUD established the damages alleged with reasonable

11

certainty and is entitled to the court's prior damage award of $39,796,234, plus restoring the $13,363,629 in offsets allowed by the appellate court,[5] but instead demands that the court account for SMUD's wet storage savings for 2004-2008 in this proceeding. Rem. TR at 14, 140-51; *see also* Gov't PR. Br. at 10. ("Specifically, to properly complete the causation analysis mandated by the Federal Circuit, the [c]ourt should adjust SMUD's damages claim by reducing the claim by a total of $20,981,800.").

In sum, on January 1, 2000, DOE was obligated to accept SNF from SMUD. PX 119 at PA-103077; PX 188 at HQ0005864; *see also* Pl. Rem. Mot. at 5-6. The court is persuaded, based on Mr. Redeker's Post-Remand Evidentiary Hearing testimony, that SMUD would not have continued to pursue dual-purpose dry storage in light of the January 1, 2000 acceptance date. Rem. PX 3000 at ¶¶ 16, 18. Therefore, in accordance with the appellate court's instructions on remand "to apply the Standard Contract acceptance rate in evaluating the Government's partial breach of contract as a substantial factor in causing SMUD to pursue dual-purpose storage[,]" *SMUD IV*, 293 Fed. Appx. at 772, the court has determined that even in light of the January 1, 2000 acceptance date, DOE's January 31, 1998 partial breach of the June 14, 1983 Standard Contract, continued to be a substantial factor in causing SMUD to incur costs to decommission Rancho Seco and implement the dry storage project from May 15, 1997 to December 31, 2003. Accordingly, the court has determined SMUD is entitled to damages in the amount of $53,159, 863 for mitigation costs.

On the other hand, the court previously has determined that the $4,196,360 in savings SMUD realized in 2003 from decommissioning the wet pool should be offset against the costs SMUD incurred that year. *SMUD II*, 70 Fed. Cl. at 375 (citing 3/21/05 TR at 170-71, 972-76); *see also Bluebonnet Savings Bank* v. *United States*, 339 F.3d 1341, 1344 (Fed. Cir. 2003) ("To derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that plaintiffs would have experienced absent a breach."). That ruling was not reversed on appeal.

The Government now also insists that the court also must account in this proceeding for the additional savings that SMUD realized from 2004 through 2008, by closing the SNF wet pool. Gov't Reply and Resp. at 12. As a threshold matter, the parties stipulated and the court entered an Order limiting the scope of this proceeding only through December 31, 2003. Sept. 27, 2004 Joint Stip. and Order (Docket No. 254, 257). In addition, the Government did not argue entitlement to this offset at trial, on appeal, nor did the Federal Circuit's remand direct the court to do so. Rem. TR at 188-89; *see also Tronzo* v. *Biomet, Inc.*, 236 F.3d 1342, 1349 (Fed. Cir. 2001) (holding where a party "failed to raise [an] issue, clearly implicated in the initial decision of the [trial] court, our mandate . . . acted to prevent [that party] from raising this issue on remand[.]"); *see also Engel Indus. Inc.* v. *Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999) (holding "all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication."). Moreover, the Government has

---

[5] In addition, the appellate court implicitly has ruled that, SMUD is entitled to $9,482,508 for internal labor, $2,168,321 for dual-purpose components, and $1,712,800 for non-fuel components that the court previously determined should be treated as offsets. *SMUD IV*, 293 Fed. Appx. at 773.

12

requested that the court prospectively apply the $4,196,260 savings SMUD realized in 2003 for each of the years 2004-2008. No evidence, however, has been proffered of the exact SNF pool savings, if any, that SMUD realized in 2004-2008 (Rem. TR at 10, 69, 140-51).

SMUD has requested an unspecified amount of damages "from January 1, 2004 forward" in a separate proceeding, *Sacramento Mun. Util. Dist.* v. *United States*, Case No. 09-587C (Dec. 4, 2009) at ¶ 23. Accordingly, the court has decided it is proper to account for any 2004-2008 SNF wet pool savings offset in that proceeding. *Indiana Michigan*, 422 F.3d at 1377 (holding that "[i]f the breach of an entire contract is only partial, the plaintiff can recover only such damages as he or she has sustained, leaving prospective damages to a later suit in the event of further breaches.").[6] The Government, however, legitimately is concerned that the amount of costs SMUD may seek in the next proceeding will not be sufficient to allow the Government to recoup the amount of SNF wet pool savings realized from 2004-2008 (Rem. TR at 7, 57, 61, 145-55). Therefore, the court has decided that the interests of justice require a stay of the execution of this judgment, pending the court's resolution of the damages to be asserted by SMUD in Case No. 09-587C.

## VII. CONCLUSION.

The Clerk of the United States Court of Federal Claims is directed to stay entering judgment in this case pending further Order of the court.[7]

---

[6] Likewise, since SMUD did not dispose of GTCC waste prior to December 31, 2003, SMUD is not seeking any damages in this case regarding GTCC waste. Pl. Rem. PX 3000 at ¶ 19; *see also* Rem. TR at 12, 16-20, 106. Therefore, the court has decided to account for SMUD's entitlement to costs incurred to remove and store GTCC in Case No. 09-587C. *Yankee II*, 536 F.3d at 1279 ("The proper valuation of GTCC dispose remains open for adjudication in future proceedings once the costs of this operation are fully realized and understood."). As the court understands the Government's argument, however, it is a collateral attack on the appellate court's causation determination, *i.e.*, applying the 1987 acceptance rate is not sufficient to establish causation, because there was no overall accounting for the effect of potential industry-wide GTCC waste in the 1987 acceptance rate. Rem. TR at 21-43. The Government, however, requested reconsideration of *SMUD IV*, which the appellate court denied. The mandate issued on October 24, 2008 and the subsequent efforts by the Government to recall the mandate were denied on November 13, 2008. Therefore, whatever affect the nuclear utility industry's GTCC waste would have on the 1987 acceptance rate appears to be barred under the doctrine of *res judicata*.

[7] The court is aware that this stay will impose a hardship on SMUD, however, the court discerns no other option in order to preserve the Government's ability to establish the amount of offset required to account for savings SMUD realized from having the wet pool closed from 2004-2008. Since the Government has estimated that the amount of that offset is $20,981,800, the Government certainly can stipulate that SMUD is entitled to receive a judgment of $32,178,063, that the court can direct the Clerk to enter as a final judgment. The court requested that both parties explore this option in the Post-Remand Evidentiary Proceeding, but neither

13

**IT IS SO ORDERED**.

<u>s/ Susan G. Braden</u>
**SUSAN G. BRADEN**
**Judge**

---

party made any proposals. The court intends to discuss how such an accommodation can be made at a status conference to be scheduled at the earliest convenience of the parties.